# EXHIBIT 1

LIMITED LIABILITY COMPANY OPERATING AGREEMENT
OF
JJ ARCH LLC

LIMITED LIABILITY COMPANY OPERATING AGREEMENT, made as of the 11th day of December, 2017 by and between JARED CHASSEN, an individual residing at 47 Bridge Street, 6A, Brooklyn, New York 11201 ("Chassen"), and JEFFREY SIMPSON, an individual residing at 1230 Park Avenue, 16E, New York, New York 10128 ("Simpson").

In consideration of the covenants and conditions set forth in this Agreement, the parties agree to amend and restate the Original Agreement it its entirety and agree as follows:

ARTICLE 1

CERTAIN DEFINITIONS

1.1     Specific Terms.         For purposes of this Agreement, the following terms shall have the following respective meanings:

Affiliate:  With respect to a specified Person, (i) a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person, (ii) any Person who is an officer, director, member or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, member or trustee, or with respect to which the specified Person serves in a similar capacity, and (iii) any Person who, directly or indirectly, is the beneficial owner of 50% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest.  An Affiliate does not include a Person who is a partner in a partnership or joint venture with the Company or any other Member if such Person is not otherwise an Affiliate of the Company or any Member.

AREH:  Arch Real Estate Holdings LLC, a New York limited liability company.

AREH Operating Agreement:   That certain Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC, dated of even date herewith, between the Company and 608941 NJ INC., as the same may be amended from time to time.

Articles of Organization:  That certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 1, 2017, as the same may be amended from time to time.

Bankruptcy Action:  With respect to any Member, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any

reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

Business Day:  Any day other than Saturday, Sunday or any other day on which commercial banks or savings and loan associations are required or authorized by law to close in New York, New York.

Buy Sell Closing:  As defined in Section 8.2.

Buy/Sell Demand Notice:  As defined in Section 8.1.

Buy/Sell Deposit:  As defined in Section 8.2.

Buy/Sell Exercise Notice:   as defined in Section 8.2

Buy/Sell Initiating Member:  As defined in Section 8.1.

Buy/Sell Option Period:  As defined in Section 8.2.

Buy/Sell Purchasing Member:  As defined in Section 8.2.

Buy/Sell Responding Member:  As defined in Section 8.1

Buy/Sell Sale Interest:  As defined in Section 8.2.

Buy/Sell Sale Interest Purchase Price:  As defined in Section 8.1.

Buy/Sell Selling Member:  As defined in Section 8.2

Capital Accounts:  As defined in Section 4.3.

Capital Call Amount:  As defined in Section 4.2(b).

Capital Call Notice:  As defined in Section 4.2(b).

<u>Capital Contributions</u>:  The capital contributions of the Members made pursuant to Section 4.2.

<u>Capital Loan</u>:  As defined in Section 4.2.

<u>Cash Flow</u>:  Gross cash receipts of the Company (excluding Fee Revenue), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) such reserves as may reasonably be deemed necessary by the Members "<u>Reserves</u>").

<u>Cause Event</u>:  With respect to a Member, the occurrence of a Cause Event (as defined in the AREH Operating Agreement) with respect to such Member.

<u>Code</u>:  The Internal Revenue Code of 1986, as amended from time to time, or any similar Federal internal revenue law enacted in substitution for the Code.

<u>Company</u>:  The limited liability company formed pursuant to this Agreement.

<u>Company Interest</u>:  The ownership interest of any Member in the Company.

<u>Company Law</u>:  The New York Limited Liability Company Law, as amended from time to time.

<u>Company Major Decision</u>:  As defined in Section 3.2.

<u>Contributing Member</u>:  As defined in Section 4.2(c).

<u>Control, controlled or controlling</u>:  The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

<u>Covered Person</u>:  The Member or any Affiliate thereof, or any officer, director, shareholder, partner, employee, representative, agent or spouse of a Member or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

<u>Default Loan</u>:  As defined in Section 4.2(c).

<u>Demand Notice</u>:  As defined in Section 8.1.

<u>Disability</u>:  The inability of the Member to perform his duties and responsibilities to the Company, with or without reasonable accommodation, due to any physical or mental illness or incapacity, which condition has continued for a period of (a) one hundred twenty (120) consecutive days or (b) one hundred eighty (180) days (including weekends and holidays) in any

consecutive 365-day period, which determination shall be made by an independent physician selected by the Company and approved by the Effected Member (which approval shall not be unreasonably withheld, conditioned or delayed).

Distribution Percentages:  The percentage determined in accordance with the chart set forth on Exhibit A hereto with respect.

Distributions:  Any distributions of cash or other assets of the Company to the Members.

Effected Member:  As defined in Section 7.6.

Exercise Notice:  As defined in Section 8.1.

Fee Revenue:  All amounts received by the Company the source of which relates to (i) fees paid directly to the Company or (ii) fees paid to the Investment Entity or another Subsidiary for the Company or its Affiliate, in each case for providing services to the payer thereof.

Initiating Member:  The Member who has delivered a Demand Notice in accordance with Section 8.1.

Investment Entity:  AREH, and each other Person in which the Company holds an interest or serves as manager, from time to time.

Key Personnel:  Those Persons listed on Exhibit B hereto

Members:  Chassen and Simpson and any other Persons who are admitted to the Company as Members pursuant to Article 7.

Non-Contributing Member:  As defined in Section 4.2(c).

Permitted Transfers:  A (i) Transfer by a Member of all or any part of its Company Interest to any person or entity that is an Affiliate of such Member, and (ii) Transfers pursuant to the provisions of Article 8 of this Agreement.

Person:  An individual, trust, estate, partnership, joint venture, association, company, corporation or other entity.

Profit and Loss:  "Profit" or "Loss" means, for any fiscal year of the Company, the income or loss of the Company as determined in accordance with the accounting methods followed for federal income tax purposes (including any gains or losses recognized by the Company on the sale of the Property and any items required to be separately stated under Article 703 (a) of the Code).

Promote Distribution:  As defined in the AREH Operating Agreement.

Redemption Amount:  An amount equal to all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if

all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that for purposes of determining the Redemption Amount the Effected Member's or Resigning Member's Distribution Percentage shall be the percentage set forth on Exhibit A as of the date of such death or Resignation without giving effect to the proviso set forth on Exhibit A; provided, further that in the case of a Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

Regulations: The final, temporary and proposed Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Resignation: With respect to a Member, either (i) the resignation of a Member from the Company or such Member's failure to provide substantially all of his business time for the benefit of the Company other than as a result of death of such Member or (ii) a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign.

Responding Member: As defined in Section 8.1.

Restricted Period: (i) Other than with respect to Key Parties, the twelve (12) month period following the applicable Member's Resignation or if such Member Resignation is due to a Cause Event, the twenty-four (24) month period following such Member's Resignation and (ii) with respect to Key Personnel, the twenty-four (24) month period following such Member's Resignation.

Second Option Period: As defined in Section 8.2.

Subsidiary: As defined in the AREH Operating Agreement.

Transfer: Any sale, conveyance, transfer or assignment, or the entry into any agreement to sell, convey, transfer or assign, whether by law or otherwise, of, on, in or affecting (y) all or part of a Member's Company Interest (including any legal or beneficial direct or indirect interest therein), or (z) any direct or indirect interest in a Member (including any profit interest).

Unreturned Capital Contribution: With respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 5.1(a)(i) and 5.1(b)(i).

1.2    Other Terms. Unless the context shall require otherwise:

(a)    Words importing the singular number or plural number shall include the plural number and singular number respectively;

(b)     Words importing the masculine gender shall include the feminine and neuter genders and vice versa;

(c)     Reference to "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation"; and

(d)     Reference in this Agreement to "herein", "hereof", "hereby" or "hereunder", or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the Exhibits.

(e)     Unless otherwise expressly provided, reference to a Section or Article number shall be deemed a reference to the Section or Article contained in this Agreement.

## ARTICLE 2

## GENERAL PROVISIONS

2.1     <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Company Law and agree that the rights, duties and liabilities of the Members shall be as provided in the Company Law, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Articles of Organization with the Department of State of the State of New York is hereby ratified and confirmed in all respects..

2.2     <u>Further Action</u>.  The Members shall take any and all action, as may be required, from time to time, under the laws of the State of New York, to give effect to, and continue in good standing, the Company.

2.3     <u>Name of the Company</u>.  The name of the Company shall be JJ Arch LLC or such other name as the Members may from time to time determine.  The Members shall have the right to cause the Company to operate under one or more assumed names where required to comply with the laws of any states in which the Company is doing business.  The Members shall cause to be filed on behalf of the Company such company or assumed or fictitious name certificate or certificates or other similar documents as may from time to time be required by law for the formation and continuation of the Company as a limited liability company under the laws of New York applicable to limited liability company and the laws of such other states in which the Company is doing business regarding the qualification of foreign limited liability company.

2.4     <u>Business of the Company</u>.  The business of the Company shall be to:  (i) acquire, hold, and ultimately dispose of an interest in each Investment Entity, (ii) make, enter into, perform and carry out any arrangements, contracts or agreements consistent with the foregoing, and (iii) to do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.  The Company shall not engage in any business or activity not authorized by this Agreement.

2.5     Place of Business.  The Company's principal place of business is 1230 Park Avenue, 16E, New York, New York 10128 or such other place as the Members may, from time to time, determine.  Such office may be changed from time to time in accordance with the Company Law, as may be approved the Members.

2.6     Duration of the Company.  The Company shall commence upon the filing of an Articles of Organization for the Company in accordance with the Company Law, and shall continue until dissolved in accordance with Article 9 of this Agreement.

2.7     Title to Company Property.  A Member's Interest shall for all purposes be personal property.  All property owned by the Company, whether real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in that property.

ARTICLE III

MEMBERS; MANAGEMENT

3.1     Management of the Company Prior to Fourth Anniversary.

(a)     Prior to the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.1(b)), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.  Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)     open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)     enter into any contract or endorsement in the name or for the account of the Company;

(iv)     employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)   cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(viii)  take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

(b)     Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "Company Major Decision"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request.  Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

(i)     acquire any direct or indirect interests in any Person other than AREH;

(ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)   sell any asset of the Company or any portion thereof other than any such asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

(iv)    merge, consolidate or other reorganize the Company with another Person;

(v)     borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)     enter into any lease for space;

(viii)    hire any employee, consultant or other personnel;

(ix)      engage in any business or activity not authorized by this Agreement;

(x)       enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)      enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)     enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    maintain reserves in excess of $20,000;

(xiv)     admit new or substitute Members to the Company;

(xv)      modify any material terms of the AREH Operating Agreement;

(xvi)     cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

3.2     <u>Management of the Company From and After Fourth Anniversary</u>.  From and after the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by the Members.  Each Member shall have the right to cause the Company to take any action identified in Section 3.1(a).  All other actions on the part of without the Company shall require the consent of both Members.

3.3     <u>Services of the Members</u>.  Each Member shall devote substantially all of his business time and effort to the business of the Company, and shall perform his duties with the same degree of care he exercises with respect to his own assets.  Notwithstanding the foregoing, each Member and his Affiliates may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description that is not competitive with the Company or an Investment Entity, and neither the Company nor any other Member shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures.

3.4     <u>Expenses</u>.  Each Member shall be entitled to be reimbursed for all business related expenses incurred by such Member in connection with his providing services hereunder and which are reimbursable pursuant to the Code.

3.5     <u>Guarantees</u>.  The Members acknowledge that in connection with any (i) financing or refinancing by AREH or another Investment Entity the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty,

environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, if a Guaranty is required and any Member is required to provide such Guaranty, agrees if a lender makes any written demand from time to time on a Guaranty made by a Member or its Affiliate, each Member shall pay, or reimburse the applicable guarantor, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the cause of the claim on such Guaranty is directly attributable to any action of the other Member or its Affiliate, and which action was not approved by the non-Guarantying Member. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

ARTICLE IV

CAPITAL CONTRIBUTIONS

4.1     <u>Capital</u>.  The capital of the Company shall consist of the amounts contributed to the Company pursuant to this Article IV.

4.2     <u>Capital Contributions</u>.  (a)  The Members have made Capital Contributions to the Company as reflected on the books and records of the Company.

(b)     If, at any time or from time to time, (i) Simpson determines that additional funds are required by the Company to meet its general and administrative expenses or (ii) the Company is required to make a capital contribution to an Investment Entity, Simpson shall deliver a written notice to Chassen (a "<u>Capital Call Notice</u>") setting forth the total amount of capital required (the "<u>Capital Call Amount</u>") and the purpose of such Capital Call.  Each of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to either (i) if such Capital Call Notice is in connection with a requirement of the Company to make a capital contribution pursuant to Section 3.4 of the AREH Operating Agreement, their respective percentages of Promote Distributions paid to Members hereunder or (ii) in all other cases, 50% of Capital Call Amount.

(c)     If a Member (a "<u>Non-Contributing Member</u>") shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then the Member who made its required Capital Contribution (the "<u>Contributing Member</u>") shall have the right to contribute the amount of the Non-Contributing Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a

"Default Loan") to the Non-Contributing Member in an amount equal to the unfunded capital contribution.

(d)     Each Default Loan shall be deemed to constitute a loan made by the Contributing Member to the Non-Contributing Member in accordance with the terms hereof, immediately followed by a capital contribution by the Non-Contributing Member to the Company in the amount of such Default Loan.  Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the Contributing Member and shall constitute a debt owed by the Non-Contributing Member.  Any Default Loan shall bear interest at the rate of twelve percent (12%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Non-Contributing Member from any distributions due to Non-Contributing Member hereunder.  A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty.  Any such Default Loans shall be with full recourse to the Non-Contributing Member and shall be secured by the Non-Contributing Member's Company Interest including, without limitation, the Non-Contributing Member's right to distributions hereunder.  In furtherance thereof, upon the making of such Default Loan, the Non-Contributing Member hereby pledges, assigns and grants a security interest in its Company Interest to the Contributing Member and agrees to execute such documents and statements as are reasonably requested by the Contributing Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Non-Contributing Member prior to payment in full of all amounts (including interest) owed under the Default Loan.  All distributions that would have otherwise gone to the Non-Contributing Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full.  While any Default Loan is outstanding, the Company shall be obligated to pay directly to the Contributing Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Non-Contributing Member, and (y) any proceeds of the sale of the Non-Contributing Member's Company Interest.  Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Non-Contributing Member.

4.3     Capital Accounts.  (a) The Members shall cause to be kept for each Member a capital account ("Capital Account") which shall be computed from the date hereof and which shall initially be equal to the capital contribution of each Member on the date hereof and shall be determined and maintained in accordance with Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied, and Capital Accounts shall be maintained, in a manner consistent with such Regulations.

(b)     No interest shall be paid by the Company on any Capital Contribution.  A Member shall not be entitled to demand the return of, or to withdraw, any part of his Capital Contribution or any balance in his Capital Account, or to receive any distribution, except as provided for in this Agreement.  No Member shall be liable for the return of the Capital Contributions of any other Member and no Member shall have any obligation to restore the amount of any deficit in its Capital Account to the Company.

ARTICLE 5

DISTRIBUTIONS; ALLOCATION INCOME AND LOSSES

5.1     Distributions.

(a)     Cash Flow shall be accounted for on the books of the Company in accordance with the year such amounts were originally received by the real property assets or entities in which the Company owns an indirect interest and shall be distributed, earliest years first, within five (5) Business Days of receipt thereof by the Company to the Members as follows:

(i)     First to the Members in proportion to their respective Capital Contributions until their respective Unreturned Capital Contributions have been reduced to zero;

(ii)     To the Members in accordance with their respective Distribution Percentages with respect to the underlying asset from which the funds for such distribution are derived.

(b)     Fee Revenue shall be distributed within five (5) Business Days of receipt thereof by the Company to the Members as follows:  50% to Simpson and 50% to Chassen.

5.2     Allocations of Profit and Loss.  Profit and Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 9.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 9.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Profit or Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profit or Loss.

5.3     Tax Elections.  The Members shall determine whether the Company shall make any applicable tax elections, including an election in accordance with Section 754 of the Code to adjust the basis of the assets of the Company for Federal income tax purposes in the event of a distribution of Company property as described in Section 734 of the Code or a transfer by any Member of its Company Interest as described in Section 734 of the Code.

ARTICLE 6

BOOKS AND RECORDS; ACCOUNTS

6.1     <u>Books and Records</u>.   True and correct books of account with respect to the operations of the Company shall be kept at the principal place of business of the Company.  The Members shall be responsible for keeping the books of account.  The Company shall also maintain at its principal place of business the following records:  (a) a current list of the full name and last known business address of each Member set forth in alphabetical order, (b) a copy of the Articles of Organization and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed, (c) copies of the Company's Federal, state and local income tax returns and reports, if any, for the three most recent years and (d) copies of any then effective operating agreements and of any financial statements of the Company for the three most recent years.

Any Member shall have the right, at its own expense, to examine, or have its duly authorized representative examine, the books of account of the Company and such other information reasonably related to such Member's Company Interest, and the Members shall make them available at the office at which those books are maintained.

6.2     <u>Accounting Basis and Fiscal Year</u>.  The Company's books shall be kept on such basis as the Members shall determine.  The fiscal year of the Company shall be the calendar year.

6.3     <u>Tax Returns</u>.  (a)  The Members shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any Federal, state or local tax returns required to be filed by the Company.  The Members shall use its reasonable efforts to furnish each Member within 90 days of the end of each fiscal year with such information as may be needed to enable each Member to file its Federal income tax return and any required state income tax return.  The Members shall cause the Company to pay, out of available cash flow and other assets of the Company, any taxes payable by the Company.  Except as otherwise set forth in this Agreement, all decisions regarding tax elections shall be made by the Members.

(b)     Each Member agrees to report, on his own income tax returns each year, each item of income, gain, loss, deduction and credit as reported by the Company to such Member on the Schedule K-1 (or other similar tax report) issued by the Company to such Member for such year.  Except as otherwise required by law, no Member shall take any tax reporting position that is inconsistent in any respect with any tax reporting positions taken by the Company or any entity in which the Company owns any equity interest, and, in the event of a breach by such Member of the provisions of this Section 6.3(b), shall be liable to the Company and the Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

6.4     <u>Tax Matters Member; Partnership Representative</u>.  Simpson is hereby designated the "Tax Matters Partner" pursuant to Section 6231 of the Code (and any comparable provision of applicable state and local tax laws).  All Members hereby consent to such designation and agree to take any further action as may be required to effectuate and maintain such designation and the Tax

Matter Partner is authorized to take such actions as may be required to effectuate and maintain such designation. Simpson is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Simpson shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Simpson, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 6.4 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

ARTICLE 7

ASSIGNABILITY OF INTERESTS;<br>ADDITIONAL MEMBERS

7.1     <u>General Conditions</u>.  No Member shall Transfer all or any portion of its Company Interest, or any rights to receive any Distributions under this Agreement except (A) Permitted Transfers, (B) Transfers other than Permitted Transfers with the other Members' consent, to be exercised in such other Member's sole and absolute discretion, or (C) as required by Section 7.6 hereof.  Notwithstanding the foregoing sentence, in no event shall a Member be permitted to Transfer all or any portion of its Company Interest if, in the opinion of counsel to the Company or, in the opinion of counsel to the non-transferring Members, which counsel is satisfactory to the transferring Member, in its reasonable discretion, the Transfer would (i)   cause the termination or dissolution of the Company under the Company Law; (ii) require registration under the Securities Act of 1933, as amended, or under any other securities law or result in the violation of any applicable state securities laws; (iii) cause the Company or any Member to be subject to any additional material regulatory requirements; (iv) cause the Company to be taxed as a corporation under the Code; or (v) cause a default under any agreement, that was approved by the Members, to which the Company is a party including, without limitation, the AREH Operating Agreement.

7.2     <u>Additional Member</u>.  A transferee of all or part of the Company Interest of a Member permitted under this Agreement shall be admitted to the Company as an additional Member and be listed as a Member on the books and records of the Company only if (i) the transferring Member gives such right to the transferee, (ii) except for Permitted Transfers, the Members consent to the admission of the transferee, which consent may be withheld in the Members' sole and absolute discretion, (iii) the transferee shall execute and deliver an agreement

reasonably satisfactory to and approved by the Members, agreeing to assume and to be bound by and to comply with all of the terms and conditions of this Agreement applicable to the Members, (iv) the transferee shall execute, and deliver all necessary certificates or other documents and perform such other acts as may be required under the Company Law or other applicable laws and regulations to effectuate the admission of the additional Member and to preserve the status and legal compliance of the Company as reasonably satisfactory to and approved by the Members and (v) the transferee shall pay all reasonable expenses of the Company and the Members connected with the admission including, but not limited to, reasonable legal and accounting fees and disbursements.

7.3 <u>Treatment</u>. Until compliance with the provisions of Section 7.2, the Company shall be entitled to treat the record owner of any Company Interest as the absolute owner of such Company Interest in all respects and shall incur no liability for distributions made to such owner.

7.4 <u>Other Transfers Void</u>. Any Transfer made in violation of the provisions of this Article 7 or of Article 8 shall be null and void and shall not bind the Company or any Member.

7.5 <u>Resignation of a Member</u>.

(a) Upon the Resignation of a Member, such Member's Company Interest shall be deemed automatically redeemed by the Company for the Redemption Amount, which shall be payable when and if the applicable distributions are received by the Company and such Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such Resignation occurs. In connection with any redemption pursuant to this Section 7.5, the Company shall have the right to require the redeemed Member to, and the redeemed Member shall, enter into agreements with the Company containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

(b) Each Member agrees that for the Restricted Period, such Member shall not, nor shall it permit any Person employed by, or associated or affiliated with, to (i) encourage, solicit, or inducing, or in any manner attempt to encourage, solicit, or induce, any Person employed by, as agent of, or a service provider to, the Company or an Investment Entity within the twelve (12) month period prior to the Closing to terminate (or, in the case of an agent or service provider, terminate or reduce) such Person's employment, agency or service, as the case may be, with the Company or its Subsidiary; (ii) hire any Person who was employed by, an agent of, or a service provider to, the Company or an Investment Entity, within the twelve (12) month period prior to the date of such hiring; or (iii) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce any customer, supplier, licensee or other business relation (or any direct or indirect subsidiary of any such customer, supplier, licensee or other business relation) of the Company or an Investment Entity to cease doing business with or reduce the amount of business conducted with (including by providing similar services or products to any such Person) the Company or an Investment Entity, or in any way negatively interfere with the relationship between any such customer, supplier, licensee or business relation and the Company

or an Investment Entity.  Notwithstanding the foregoing, the restrictions set forth in this Section 7.5(b) shall in no way limit the applicable Member from (i) encouraging, soliciting, or inducing to become employed any individual who was such Member's personal assistant at the Company or employing such individual or (ii) except for Persons to whom the Company or an Investment Entity is required to offer all real estate investment opportunities, seeking capital from any Person who provides equity or debt financing to the Company or an Investment Entity.  Without limiting the remedies available to the Company, the Members acknowledge that a breach of any of the covenants contained in this Section 7.5(b) may result in material irreparable injury to the Company for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of posting a bond or proving irreparable harm or injury as a result of such breach or threatened breach hereof, restraining the applicable Member from engaging in activities prohibited by this Section 7.5(b) or such other relief as may be required specifically to enforce any of the covenants in this Section 7.5(b).

7.6     Death or Disabilty of Member.

(a)     Upon the death or Disability of a Member (the "Effected Member"), such Member's Company Interest shall be automatically deemed transferred to the non-Effected Member for a purchase price equal to the Redemption Amount which shall be payable when and if the applicable distributions are received by the non-Effected Member with respect to the Company Interest acquired from the Effected Member.  From and after the date of the death or Disability of the Effected Member, the Effected Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after the date of such death but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such death occurs.

(b)     In connection with any sale pursuant to this Section 7.6, the non-Effected Member shall have the right to require the estate of the Effected Member to enter into agreements with the non-Effected Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

ARTICLE 8

BUY/SELL RIGHTS

8.1     Right to Purchase.

(a)     From and after the second anniversary of the date hereof, in the event that the Members fail to approve any action requiring the consent of both Members including, without limitation, a Company Major Decision, and are unable to reach agreement as to an appropriate alternative course of action after not less than ten (10) Business Days of good faith negotiations to resolve their differences, either Chassen, on the one hand, or Simpson on the other hand (such Member being hereinafter referred to as the "Buy/Sell Initiating Member"),

shall have the right to give written notice (the "Buy/Sell Demand Notice") to the other Member (such other Member being hereinafter referred to as the "Buy/Sell Responding Member"), of the Buy/Sell Initiating Member's intent to rely on this Article 8 and to purchase for cash all, but not less than all, of the Company Interests owned by the Buy/Sell Responding Member, whereupon the provisions set forth in this Article 8 shall apply. In the event that both Simpson and Simpson are deemed to have delivered a Buy/Sell Demand Notice, the Member who shall be deemed to have first delivered the Buy/Sell Demand Notice pursuant to Section 11.1 hereof after the ten (10) Business Day good faith negotiation period set forth herein shall be deemed the Buy/Sell Initiating Member or if both Simpson and Chassen shall be deemed to have delivered a Buy/Sell Demand Notice hereunder on the same date, the Member whose Buy/Sell Demand Notice hereunder sets forth the highest price shall be deemed the Buy/Sell Initiating Member.

(b) The Buy/Sell Demand Notice shall set forth the cash purchase price at which the Buy/Sell Initiating Member would be willing to purchase (or to cause its designee to purchase) an undivided one hundred percent (100%) interest in the Company free and clear of all liabilities and assuming that no Capital Contributions are made and that all cash flow of the Company is distributed between the date of the Buy/Sell Demand Notice and the date on which the Company Interests are sold pursuant to this Article 8, together with a calculation of such purchase price.

(c) The Buy/Sell Responding Member shall have the option, exercisable by giving written notice (the "Buy/Sell Exercise Notice") to the Buy/Sell Initiating Member within ten (10) Business Days after receipt of the Buy/Sell Demand Notice, to agree to either (i) sell to the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2 or (ii) purchase from the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2.

8.2 Procedure for Purchase of Buy/Sell Sale Interests.

(a) As used in this Section 8.2 the following terms shall have the following meanings:

(i) "Buy/Sell Deposit" shall mean an amount equal to 10% of the Buy/Sell Sale Interest Purchase Price, which deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.

(ii) "Buy/Sell Option Period" shall mean the time period during which the Buy/Sell Responding Member shall have the right to elect either to purchase the Company Interests of the Buy/Sell Initiating Member or sell its entire Company Interests to the Buy/Sell Initiating Member pursuant to Section 8.1(c) above.

(iii) "Buy/Sell Purchasing Member" shall mean either (x) the Buy/Sell Initiating Member (or its designee) if the Buy/Sell Responding Member shall have elected in its Buy/Sell Exercise Notice not to purchase the Company Interests of the Buy/Sell Initiating Member, or (y) the Buy/Sell Responding Member (or its designee) if it shall have indicated in its

Buy/Sell Exercise Notice its intent to purchase the Company Interests of the Buy/Sell Initiating Member.

(iv)    "Buy/Sell Sale Interest" shall mean the Company Interests of the Buy/Sell Selling Member.

(v)    "Buy/Sell Sale Interest Purchase Price" shall mean an amount equal to the amount which the Buy/Sell Selling Member would have been entitled to receive upon dissolution of the Company pursuant to the terms of this Agreement if the Company had sold all of its assets for cash to a third party at the price set forth in the Buy/Sell Demand Notice and had utilized such cash first to satisfy all debt obligations, paid all expenses, transfer taxes, costs and fees relating to such sale, and then liquidated the Company.

(vi)    "Buy/Sell Selling Member" shall mean the Member who is not the Buy/Sell Purchasing Member.

(b)    Within two (2) Business Days following the Buy/Sell Option Period, the Buy/Sell Purchasing Member shall deposit into escrow, with an escrow agent (the "Buy/Sell Escrow Agent") selected by the Buy/Sell Purchasing Member, but not an Affiliate of the Buy/Sell Purchasing Member, and reasonably acceptable to the Buy/Sell Selling Member, the Buy/Sell Deposit, which Buy/Sell Deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing. The Buy/Sell Deposit shall be held by the Buy/Sell Escrow Agent in accordance with the terms hereof. Upon delivery of the Buy/Sell Deposit to the Buy/Sell Escrow Agent, the Buy/Sell Purchasing Member shall have the sole right, without the need for consent from any other Member, to cause the Company to take the action, or refrain from taking the action, which was the cause of the Buy/Sell Demand Notice.

(c)    Within thirty (30) Business Days following the date on which the Buy/Sell Option Period shall have expired, the Buy/Sell Purchasing Member shall purchase from the Buy/Sell Selling Member (such purchase and sale is referred to herein as the "Buy/Sell Closing"), and the Buy/Sell Selling Member shall sell to the Buy/Sell Purchasing Member, the Buy/Sell Sale Interest at the Buy/Sell Sale Interest Purchase Price. In determining this amount it shall be assumed that: (i) no prepayment premium or make whole amount is owing to any lender, (ii) no reserves will be maintained, (iii) there will be no brokerage fees, transfer taxes or other transaction costs in connection with such liquidation, and (iv) the proceeds from such sale and liquidation would be distributed in accordance with Section 5.1 hereof. Upon the Buy/Sell Closing, the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member and applied to the Buy/Sell Sale Interest Purchase Price.

(d)    In connection with any sale pursuant to this Section 8.2, the Buy/Sell Purchasing Member shall have the right to require the Buy/Sell Selling Member to enter into agreements with the Buy/Sell Purchasing Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that the Buy/Sell Selling Member's Company Interests are free and clear of all liens, claims or encumbrances and an indemnity from the Buy/Sell Selling Member to the Buy/Sell Purchasing Member for claims arising out of events which occur prior to the Buy/Sell Closing and an indemnity from the Company to the Buy/Sell Selling Member for

claims arising on or after the Buy/Sell Closing. Each Member shall pay any transfer tax imposed on such Member pursuant to applicable law and there shall be such prorations at the Buy/Sell Closing as are customary in such transactions, including without limitation for such items as real estate taxes, rents, security deposits, service contracts and assessments.

(e)     From the date of the Buy/Sell Demand Notice until the consummation of the Buy/Sell Closing, the Company shall continue to be operated in the ordinary course, as if such Buy/Sell Closing were not going to occur, the Members shall continue to have all power and authority granted in this Agreement (including the power and obligation to make distributions), and the Members shall exercise their power and authority in good faith and without regard to the fact that such Buy/Sell Closing may occur; provided, that: (i) any and all Distributions to the Buy/Sell Selling Member derived solely from proceeds of a Capital Event shall be credited against and reduce the Buy/Sell Sale Interest Purchase Price payable to the Buy/Sell Selling Member; and (ii) except as provided in Section 8.2(b), the Company shall not, nor shall it permit any Subsidiary to, without the consent of the Members enter into any contracts or agreements, or otherwise agree, to sell or otherwise dispose of any Company assets, except that the Company and each of its Subsidiaries shall be authorized to consummate any transactions that were the subject of binding contractual obligations entered into prior to the delivery of the Buy/Sell Demand Notice.

(f)     If the Buy/Sell Purchasing Member shall default in its obligation to:

(i)     timely make the Buy/Sell Deposit as required in Section 8.2(b), then upon written notice to the Buy/Sell Purchasing Member the Buy/Sell Selling Member shall have the right to terminate the Buy/Sell Purchasing Member's right to acquire the applicable Company Interests pursuant thereto and either (x) recover an award or judgment against the Buy/Sell Purchasing Member in the amount of such required Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment or (y) have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

(ii)     consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from Buy/Sell Selling Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Selling Member, then (x) the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member as liquidated damages (the Members hereby acknowledging and agreeing that it is impossible to more precisely estimate the damages to be suffered by the Buy/Sell Selling Member upon such default and that the Buy/Sell Deposit that may be received by the Buy/Sell Selling Member is not intended as a penalty), and (y) the Buy/Sell Selling Member shall have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

The Buy/Sell Selling Member shall be deemed to have exercised its rights under clause (i)(y) or clause (ii)(y) of this Section 8.2(f) if the Buy/Sell Selling Member shall have delivered to the

Buy/Sell Purchasing Member a written notice of its intent to acquire the Buy/Sell Purchasing Member's Company Interest within ten (10) Business Days (the "Second Option Period") of the expiration of the two (2) Business Day period within which to make the Buy/Sell Deposit or the thirty (30) Business Day time period within which the Buy/Sell Purchasing Member had the right to acquire the Buy/Sell Sale Interests, as applicable. Upon the exercise by the Buy/Sell Selling Member of its rights under this Section 8.2(f), for purposes of this Section 8.2, the Buy/Sell Selling Member shall be deemed the Buy/Sell Purchasing Member, the Buy/Sell Purchasing Member shall be deemed the Buy/Sell Selling Member and the Option Period shall be deemed to have expired on the expiration of the Second Option Period.

(g)     If the Buy/Sell Selling Member shall default in its obligation to consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from the Buy/Sell Purchasing Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Purchasing Member, then the Buy/Sell Purchasing Member shall have the right upon written notice to the Buy/Sell Selling Member to either (i) seek specific performance of the Buy/Sell Selling Member's obligations, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment; it being agreed by the Buy/Sell Selling Member and the Buy/Sell Purchasing Member that the remedy at law for breach of the obligations of the Buy/Sell Selling Member set forth in Section 8.2(c) is inadequate in view of (A) the complexities and uncertainties in measuring actual damages to be sustained by the Buy/Sell Purchasing Member, and (B) the uniqueness of the Company business and the Members' relationships, or (ii) upon written notice to the Buy/Sell Selling Member, demand and receive a return of the Buy/Sell Deposit previously deposited with the Buy/Sell Escrow Agent together with reimbursement of all out-of-pocket costs and expenses incurred by the Buy/Sell Purchasing Member in connection with the exercise of the buy/sell right set forth in this Article 8 and the pursuit of the acquisition of the applicable Company Interests with respect thereto, and recover an award or judgment against the Buy/Sell Selling Member in the amount of the Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment, in which event, the Buy/Sell Selling Member's default hereunder shall be deemed waived and the Buy/Sell Demand Notice to which such default relates shall be void *ab initio* (such that any further exercise of the buy/sell right set forth in this Article 8 shall require compliance with this Article 8).

8.3     <u>Release of Buy/Sell Selling Member</u>.  The Buy/Sell Purchasing Member shall exercise commercially reasonable efforts to obtain a release of the Buy/Sell Selling Member and the Buy/Sell Selling Member's Affiliates from any personal liability with respect to all Company obligations arising or accruing from and after the Buy/Sell Closing, if any, and all other obligations related thereto including any guarantees with respect thereto.  If the Buy/Sell Purchasing Member is unable to obtain any such releases, then (i) from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, the Buy/Sell Purchasing Member and the Company, jointly and severally, shall indemnify and hold harmless the Buy/Sell Selling Member from any and all claims or liabilities arising from such unreleased obligations and/or guarantees arising or accruing from and after such closing, if any, except to the extent caused by the Buy/Sell Selling Member, and (ii) with respect to any guaranty provided by any Affiliate of the Buy/Sell Selling Member under any loan document or other agreement with respect to any indebtedness of the Company or any subsidiary that guarantees any obligation for which any

Affiliate of the Buy/Sell Purchasing Member is jointly and severally liable as a guarantor, then from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, such Affiliate of the Buy/Sell Purchasing Member shall indemnify and hold harmless such Affiliate of the Buy/Sell Selling Member from any personal liability with respect to such guaranteed obligation arising or accruing from and after such closing, if any, except to the extent such personal liability is caused by such Affiliate of the Buy/Sell Selling Member.

ARTICLE 9

DISSOLUTION AND TERMINATION

9.1    Events of Dissolution.  The Company shall be dissolved upon the happening of any of the following events:

(a)    The disposition of all or substantially all of the assets of the Company;

(b)    The unanimous vote by the Members; or

(c)    The happening of any other event causing the dissolution of the Company under the laws of New York.

Dissolution of the Company shall be effective on the day the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles of Organization of the Company has been canceled and the assets of the Company have been distributed as provided herein.

9.2    Limited Return of Capital Contributions Upon Dissolution.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution, and shall have no recourse therefor (upon dissolution or otherwise) against any Member.  Notwithstanding the dissolution of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until termination of the Company, as provided in this Agreement.  Upon dissolution of the Company, the Members or a liquidator (who may be a Member) appointed by the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this agreement and cause the cancellation of the Company's Articles of Organization.

9.3    Distributions Upon Liquidation.  (a)  Upon dissolution of the Company, the Members or the liquidator appointed pursuant to Section 9.2, shall liquidate the assets of the Company as promptly as is consistent with obtaining the fair value thereof, and apply and distribute the proceeds thereof:

(i)    First, to creditors in the order of priority provided by law;

(ii)    Second, to the establishment of any reserves for contingencies which the Members (or the liquidator) may consider necessary; and

(iii)     The balance of the proceeds shall be distributed to the Members in accordance with Section 5.1 hereof.

(b)     Notwithstanding the foregoing, in the event the Members (or liquidator) shall determine that an immediate sale of part or all of the Company assets would cause undue loss to the Members, the Members (or liquidator), in order to avoid such loss, may, after giving notice to all the Members, to the extent not then prohibited by the limited liability company law of any jurisdiction in which the Company is then formed or qualified and applicable in the circumstances, defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations.

(c)     After the proceeds of the liquidation of the assets of the Company have been distributed (which shall occur as soon as practical), the Members (or liquidator) shall cause the Articles of Organization of the Company to be canceled.

9.4     <u>Final Accounting</u>.  Upon the dissolution of the Company a proper accounting shall be made by the Company's independent public accountants from the date of the last previous accounting to the date of dissolution.

ARTICLE 10

<u>LIABILITY, EXCULPATION
AND INDEMNIFICATION</u>

10.1     <u>Liability</u>.  (a) Except as otherwise provided by the Company Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)     Except as otherwise expressly required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profit of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

10.2     <u>Indemnification</u>.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; <u>provided</u>, <u>however</u>, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

10.3    <u>Expenses</u>.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof.

ARTICLE 11

<u>MISCELLANEOUS</u>

11.1    <u>Notices</u>.  Any notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand and shall be deemed to have been given (i) when personally delivered with signed delivery receipt obtained, (ii) when transmitted by electronic mail, or (iii) three Business Days after such notice has been deposited in the United States first class mail if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed to the Members at the addresses set forth in the preamble hereto or at such other address as such Member may notify the other Members and the Company pursuant to the terms of this Section 11.1.

11.2    <u>Successors and Assigns</u>.  Subject to the restrictions on Transfer set forth in this Agreement, this Agreement, and each provision of this Agreement, shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and permitted assigns, and each successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

11.3    <u>Amendments</u>.  This Agreement may be amended only by a written document approved by and duly executed by the Members, subject to the condition that such amendment shall not increase the Capital Contribution required from any Member or adversely affect any Distribution or allocation to any Member without such Member's written consent. Notwithstanding the foregoing, the written consent of all Members shall be required to any amendment which would (a) allow the Members to take part in the control of Company's business or otherwise modify their limited liability, (b) extend the term of this Agreement, (c) in the opinion of counsel to the Company, adversely affect the status of the Company as a partnership for Federal income tax purposes, or (d) amend this Section 11.3.

11.4    <u>Partition</u>.  No Member or any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have any Company assets partitioned, and each Member, on behalf of itself, its successors, representatives, heirs and assigns, hereby waives any such right.  It is the intention of the Members that during the term of this Agreement the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the rights of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Company shall be subject to the limitations and restrictions of this Agreement.

11.5    No Waiver.  The failure of any Member to insist upon strict performance of a covenant under this Agreement or of any obligation under this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of that Member's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation under this Agreement.  No waiver or consent shall be effective unless in writing.

11.6    Entire Agreement.  This Agreement constitutes the full and complete agreement of the parties to this Agreement with respect to the subject matter of this Agreement.

11.7    Captions.  The titles or captions of Articles or Sections contained in this Agreement are inserted only as a matter of convenience and for reference, are not a part of this Agreement, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

11.8    Counterparts.  This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all Members have not signed the same counterpart.

11.9    Separability.  In case any of the provisions contained in this Agreement or any application of any of those provisions shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and other applications of those provisions shall not in any way be affected or impaired thereby.

11.10    Gender.  Words used herein, regardless of the gender specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, as the context shall require.

11.11    Applicable Law.  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and interpreted, construed and enforced in accordance with the law of the State of New York applicable to agreements made and to be performed in the State of New York.

[remainder of page left intentionally blank]

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Jared Chasen

Jeffrey Simpson

Exhibit A

Distribution Percentages

| Date of Receipt by Revenue From which Distribution is Made | Threshold Investment Amount | Simpson | Chassen |
|---|---|---|---|
| Prior to 12-31-18 | $5,000,0000 | 66.6667% | 33.3333% |
| 1-1-19 to 12-31-19 | $10,000,000 | 62.5025% | 37.4975% |
| 1-1-20 to 12-31-20 | $15,000,000 | 58.3350% | 41.6650% |
| 1-1-21 to 12-31-21 | $20,000,000 | 54.1675% | 45.8325% |
| After 12-21-21 | none | 50.0000% | 50.0000% |

; provided, however, except as set forth in the next paragraph, such distribution percentages shall not change for the applicable period unless the aggregate Company Investments equals or exceeds the applicable Threshold Investment Amount. For example, if as of December 31, 2018 the total Company Investments is less than $5,000,000 and at December 31, 2019 the total Company Investment Amount is $10,000,000 or more, the percentages for January 1, 2019 through December 31, 2019 will remain at 66.6667% and 33.3333% and the percentages for January 1, 2020 through December 31, 2020 will change to 58.3350% and 41.6650%. That is, the Threshold Investment Amount is a cumulative test with a catch up.

With respect to Cash Flow derived from Promote Distributions, if such Promote Distributions is received from an asset held by the applicable Subsidiary for at least 2 full years, the Distribution Percentages of Simpson and Chassen as to such Promote Distributions shall each be 50% regardless of what the Distribution Percentage would otherwise be in the above chart.

"Company Investment Amount" means the aggregate capital contributions made to the Company, AREH and the other Investment Entities.

818298_7

# EXHIBIT 2

## LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH REAL ESTATE HOLDINGS LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of December 11, 2017, by and between 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Investor Member"), and JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ Member", and Investor Member and JJ Member, each a "Member", and collectively, the "Members").

WHEREAS, the Members desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch Real Estate Holdings LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.   Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Acquisition Fees" shall mean all fees paid to the Company in connection with the acquisition of an asset by a Subsidiary or another Person.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)   Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)   Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)($d$)($4$), 1.704-1(b)(2)(ii)($d$)($5$) and 1.704-1(b)(2)(ii)($d$)($6$) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)($d$) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Annual Budget" means the annual budget of the Company approved in accordance with Section 7.4 as the same may be modified in accordance herewith.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided,

however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)     The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions (other than Capital Contributions made by JJ Member pursuant to Section 3.4) and Acquisition Fees), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as

such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on November 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Damages" shall have the meaning set forth in Section 7.6.4.

"Default Loan" shall have the meaning set forth in Section 3.2.3.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"Due Diligence Materials" shall have the meaning set forth in Section 7.2.2.

812194-9

"Eligible Asset" means any interest in real property either directly or indirectly through an ownership or leasehold interest including a preferred equity interest but excluding the origination or purchase of any debt financing unless such debt financing is being acquired or originated with the likely expectation that such debt financing will ultimately result in ownership of the collateral for such debt financing, and which is reasonably expected to satisfy the criteria set forth on Exhibit A hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exercise Period" shall have the meaning set forth in Section 7.9.2.

"Fiscal Year" shall be as set forth in Section 11.1.

"Guarantor Indemnitor" shall have the meaning set forth in Section 7.6.4

"Guaranty" or "Guaranties" shall have the meaning set forth in Section 7.7.1.

"Guaranty Indemnified Parties" shall have the meaning set forth in Section 7.6.4.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Initiating Member" shall have the meaning set forth in Section 7.9.1.

"Investment Expiration Date" means the earlier of (i) the fifth anniversary of the date hereof; (ii) at such time as there are five Rejected Eligible Assets; (iii) the date on which none of Michael Wiener, William Wiener or Kevin Wiener controls Investor Member unless waived in writing by Managing Member; (iv) the date on which Jeffery Simpson no longer controls Managing Member unless waived in writing by Investor Member; or (v) the date on which the Investor Member and its Affiliates have made aggregate capital contributions, without giving effect to a return of any capital contributions, to the Company and its Subsidiaries equal to $50,000,000.00.

"Investor Member" shall have the meaning set forth in Preamble.

"Investor Member Maximum Capital Contribution" means $3,000,000.00.

"JJ Member" shall have the meaning set forth in the Preamble.

"JJ Member Promote Distribution" means an amount equal that portion of a Promote Distribution received by JJ Member and its Affiliate from a Subsidiary which is ultimately distributable to JJ Member or the equity holders of JJ Member. For example purposes, if an Affiliate of JJ Member receives a Promote Distribution of $100,000 and $40,000 of it is distributable to JJ Member and $60,000 distributable to an Affiliate of JJ Member and the

equity holders of JJ Member hold a 10% interest in such Affiliate, the JJ Member Promote Distribution will be $46,000 [$40,000 + (10% x $60,000)].

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Major Decision" shall have the meaning set forth in Section 7.1.3.

"Managing Member" means JJ Member, or a replacement "managing member" appointed pursuant to Section 7.1.4.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)     items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)   any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)     if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Company Promote Interest" shall have the meaning set forth in Section 7.8.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Offer Notice" shall have the meaning set forth in Section 7.9.1.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" has the meaning set forth in the operating agreement or other governing document of the applicable Subsidiary.

"Proposed Annual Budget" has the meaning set forth in Section 6.7.

"Recourse Party" shall have the meaning set forth in Section 7.7.1.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Rejected Eligible Asset" shall have the meaning set forth in Section 7.2.2.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member; provided that, unless required under a loan, the Company shall not hold reserves less than $375,000 without Investor Member's consent, not to be unreasonably withheld, conditioned or delayed.

"Responding Member" shall have the meaning set forth in Section 7.9.1.

"ROFO Closing Date" shall have the meaning set forth in Section 7.9.4.

"ROFO Default" shall have the meaning set forth in Section 7.9.4.

"ROFO Deposit" shall have the meaning set forth in Section 7.9.2.

"ROFO Election" shall have the meaning set forth in Section 7.9.2.

"ROFO Price" shall have the meaning set forth in Section 7.9.1.

"ROFO Sale" shall have the meaning set forth in Section 7.9.2.

"Sale Asset" shall have the meaning set forth in Section 7.9.1.

"Subsidiary" shall mean any Person of which fifty percent (50%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contributions" means with respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 6.2(ii).

ARTICLE II

**ESTABLISHMENT OF THE COMPANY**

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall continue to be conducted under the name of "Arch Real Estate Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate

investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to Investor Member promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service</u>.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation. or such other agent as may be designated from time to time by Managing Member.

2.7.    <u>Admission of Members</u>.  Investor Member and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

ARTICLE III

**CAPITAL CONTRIBUTIONS**

3.1.    <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on <u>Schedule 1</u> hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    <u>Additional Capital Contributions</u>.

3.2.1.    If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with the Company's due diligence in connection

with approved Eligible Assets, Managing Member shall deliver a written notice to Investor Member (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Notwithstanding anything herein to the contrary, without the consent of Investor Member, which may be granted or withheld in its sole and absolute discretion, in no event shall the Company be permitted to make a Capital Call if the Capital Call Amount to be made by Investor Member, when added to the then Unreturned Capital Contributions of Investor Member, would cause the aggregate Unreturned Capital Contributions to exceed Investor Member Maximum Capital Contribution.

      3.2.2. Investor Member shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to the Capital Call Amount.

      3.2.3. If the Investor Member shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then JJ Member shall have the right to contribute the amount of the Investor Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a "Default Loan") to the Investor Member in an amount equal to the unfunded capital contribution.

      3.2.4. Each Default Loan shall be deemed to constitute a loan made by the JJ Member to the Investor Member in accordance with the terms hereof, immediately followed by a capital contribution by the Investor Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the JJ Member and shall constitute a debt owed by the Investor Member. Any Default Loan shall bear interest at the rate of eight percent (8%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Investor Member from any distributions due to Investor Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Investor Member and shall be secured by the Investor Member's Membership Interest including, without limitation, the Investor Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Investor Member hereby pledges, assigns and grants a security interest in its Membership Interest to the JJ Member and agrees to execute such documents and statements as are reasonably requested by the JJ Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Investor Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Investor Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the JJ Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Investor Member, and (y) any proceeds of the sale of the Investor Member's Membership Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Investor Member.

3.3. <u>No Interest</u>. Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4. <u>JJ Member Promote Distribution Capital Contributions</u>. No later than ten (10) Business Days after the receipt of Promote Distribution, if the Unreturned Capital Contribution of Investor Member is in excess of zero, JJ Member shall make a capital contribution to the Company equal to the lesser of (i) the amount of such JJ Member Promote Distribution or (ii) the product of the Investor Member's Unreturned Capital Contribution and a fraction, the numerator of which is the aggregate unreturned capital contributions made by JJ Member and its Affiliates to all Subsidiaries and the denominator of which is the aggregate unreturned capital contributions made by JJ Member, Investor Member and their respective Affiliates to all Subsidiaries.

3.5. <u>Return of Capital</u>. Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6. <u>No Personal Liability</u>. Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in <u>Section 7.6.1</u>.

ARTICLE IV

**<u>CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS</u>**

4.1. <u>Capital Accounts</u>. A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2. <u>Adjustments</u>. The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with <u>Section 5.1</u>) and (iv) any income and gain allocated to such Member pursuant to <u>Section 5.2</u>. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject

to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with <u>Section 5.1</u>), and (z) any deductions and losses allocated to such Member pursuant to <u>Section 5.2</u>.

4.3.    <u>Negative Capital Accounts</u>.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.    <u>Transfers</u>.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.    <u>Capital Account Balance</u>.    Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to <u>Sections 5.1</u> and <u>5.2</u> and all contributions and distributions made prior to the time as of which such determination is to be made.

ARTICLE V

**ALLOCATIONS AND DISTRIBUTIONS**

5.1.    <u>Allocations of Net Profit and Net Loss</u>.  After the application of <u>Section 5.2</u>, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to <u>Section 10.3.3</u> if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 10.3</u> to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this <u>Article V</u>, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    <u>Regulatory Allocations</u>.

5.2.1. Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in

812194-9

Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.  This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.  To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.  If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.  Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.  It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.  Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

812194-9

5.3.   Tax Allocations.

5.3.1.   For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.   In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.   If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.   Withholding.   The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.    Tax Matters.

5.5.1.    Tax Matters Partner; Partnership Representative.    Managing Member shall be the "Tax Matters Partner" of the Company.  The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner.  The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018.  Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.  The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2.    Tax Elections.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with Investor Member; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3.    Tax Returns. The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6.     <u>Section 754 Election</u>.  In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

ARTICLE VI

<b>DISTRIBUTIONS</b>

6.1.     <u>Distributions of Cash Flow</u>.  Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member in the following order of priority:

(i)     First, to Investor Member an amount equal to 4% per annum simple interest on its Unreturned Capital Contribution;

(ii)     Second, to Investor Member and JJ Member pro rata based on their respective Unreturned Capital Contributions until their respective Unreturned Capital Contributions are reduced to zero;

(iii)     Thereafter, 80% to JJ Member and 20% to Investor Member.

6.2.     <u>Distributions of Acquisition Fees</u>.  All Acquisition Fees, if any, shall be distributed within five (5) Business Days of the receipt thereof to the Members as follows:  20% to Investor Member; and 80% to JJ Member.

6.3.     <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

ARTICLE VII

<b>MANAGEMENT AND OPERATIONS</b>

7.1.     <u>Management</u>.

7.1.1.   The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full,

exclusive and complete discretion with respect thereto. Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3. Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)   enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)   admit one or more additional members solely to provide necessary capital in the event that Investor Member fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)  cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)    take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.  Except as otherwise provided in this Agreement, Investor Member shall not participate in the management or control of the Company or have any right to approve,

vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

   7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "<u>Major Decision</u>"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

    (i) acquire any direct or indirect interests in any real property;

    (ii) file, acquiesce to, consent to or take of any Bankruptcy Action;

    (iii) sell any Company Asset or any portion thereof other than any Company Asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property or in accordance with <u>Section 7.9</u>;

    (iv) merge, consolidate or other reorganize the Company with another Person;

    (v) borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

    (vi) possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Managing Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Asset, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

    (vii) enter into any lease for space at a Company Asset of more than 10% of the rentable area of such Company Asset;

    (viii) engage in any business or activity not authorized by this Agreement;

812194-9

(ix)     enter into any agreement requiring the expenditure of more than $50,000 per annum;

(x)     enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in <u>Section 7.3</u> and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi)     incur any expense in excess of the amount set forth in the Annual Budget; provided that emergency expenditures and other expenditures not in excess of 10% over any line item in, or 5% over the aggregate, Annual Budget amount may be incurred without the consent of Investor Member;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)   admit new or substitute Members to the Company or any Subsidiary;

(xiv)    modify any material terms of any organizational document of any Subsidiary; and

(xv)     cause any Subsidiary to take any of the foregoing.

7.1.4.   <u>Removal of JJ Member as Managing Member</u>. JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice.  Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member.  If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to <u>Section 6.1(iii)</u> or <u>6.2</u>.

7.1.5.   <u>Meetings</u>.  Managing Member shall meet with Investor Member, which meeting may be by telephone, no less frequently than monthly to provide Investor Member with a general update on the Company Asset and the Company.  Any action required or permitted to be taken at any meeting or otherwise requiring the affirmation, vote, consent or approval of the Members may be taken without a meeting if the Members affirm, vote for, consent to or approve, the same at a meeting do so in writing, and the writing or writings are filed with the minutes of proceeding of the Members, as the case may be.

7.2.    <u>Services of the Members; Company Opportunities</u>.

7.2.1.  Managing Member and Investor Member shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this <u>Section 7.2</u> or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) subject to <u>Section 7.2.2</u> or <u>Section 7.9</u>, acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.2.2.  Prior to the Investment Expiration Date or, if an Expense Contribution is required at such time as the Investor Member Maximum Expense Capital Contribution has been funded and Investor Member elects not to make such Expense Contribution, Managing Member and its Affiliates shall first offer all Eligible Assets to the Company.  Managing Member shall provide Investor Member with such information with respect to such Eligible Asset as is reasonably required for Investor Member to make an informed decision as to whether to consent to the Company acquiring such Eligible Asset including, without limitation, a description of the Eligible Asset, historic financial statements, if any, with respect to such Eligible Asset, projected cash flows from such Eligible Asset, the estimated costs associated with acquiring such Eligible Asset, including due diligence costs, and the amount, if any of the capital that will be contributed by Managing Member, together with such other information as Investor Member shall reasonably request (the "<u>Due Diligence Information</u>").  If Investor Member fails to consent to the Company acquiring any proposed Eligible Asset within fifteen (15) days of Managing Member providing the Due Diligence Information and Managing Member has elected to provide not less than 5% of the equity capital (after taking into account reasonably anticipated debt or third party equity financing) required to acquire such Eligible Asset (a "<u>Rejected Eligible Asset</u>"), Managing Member shall have the right to pursue such Eligible Asset independent of the Company provided however if the ultimate terms of the investment in such Eligible Asset are, in the aggregate, no more favorable to Managing Member than those presented to the Company.  Notwithstanding the foregoing, prior to the Investment Expiration Date, Managing Member shall not acquire any Rejected Eligible Asset which is in the same asset class and within a radius of 0.25 miles for urban properties and 2.0 miles for non-urban properties as an existing Company Asset.

7.3.    <u>Guaranteed Payment; Fees and Expenses</u>.

7.3.1.  <u>Guaranteed Payment</u>.  As compensation for its various undertaking and capital commitments hereunder, Managing Member shall be entitled to a monthly guaranteed payment from the Company equal to the amount set forth in the Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance. The right of Managing Member to receive Managing Member Guaranteed Payment shall automatically terminate upon Managing Member no longer serving as the "Managing Member" of the Company.

812194-9

7.3.2. <u>Acquisition Fee</u>.  In connection with the acquisition of each Eligible Asset, the Company shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.3. <u>Development Fee/Asset Management Fee/Other Fees</u>.  To the extent that an Eligible Asset is acquired in a Subsidiary with non-Affiliated investors, Managing Member shall use its good faith efforts to provide for the Company to be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such Company Asset to the extent the Company or an Affiliate of the Company or a Member provides such services.

7.3.4. <u>Due Diligence Expenses</u>.  The Company shall reimburse each Member for any actual out-of-pocket third party expenses incurred by such Member in connection with its determination as to whether to cause the Company to acquire an Eligible Asset.

7.4. <u>Budget</u>.  The initial Annual Budget of the Company is as set forth in Exhibit B hereto.  No later than November 1 of each calendar year, Managing Member shall prepare (or cause to be prepared) an annual budget (the "<u>Proposed Annual Budget</u>"), and deliver such Proposed Annual Budget to Investor Member.  In the event that Investor Member objects in writing to all or a portion of the Proposed Annual Budget within thirty (30) days of receipt thereof, the Members shall, diligently and in good faith, attempt to achieve a unanimous decision with respect to the Proposed Annual Budget.  In the event that Members are unable to achieve a unanimous decision with respect to the Proposed Annual Budget, the Annual Budget then in effect shall remain the Annual Budget modified as follows:  (i) any line item agreed upon by the Members in the Proposed Annual Budget shall be substituted for the same line item in the current Annual Budget; (ii) all line items that are not agreed upon shall be the lesser of the amount provided for in the current Annual Budget or the amount set forth in the Proposed Annual Budget; and (iii) any new line item in the Proposed Annual Budget shall not be deemed included in the Annual Budget.

7.5. <u>Legal Title to Company Asset</u>.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.6. <u>Guaranties</u>.

7.6.1. The Members acknowledge that in connection with any (i) financing or refinancing by the Company or any Subsidiary entered into on or after the date of this Agreement with respect to a Company Asset the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty, environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "<u>Guaranty</u>," and collectively, "<u>Guaranties</u>").  Each Member, in its sole discretion, shall or shall cause one or more of its Affiliates satisfactory to the applicable lender or landlord (each a "<u>Recourse Party</u>") to provide any such Guaranty.

7.6.2. In consideration of providing an unconditional payment Guaranty, the party providing such Guaranty shall be entitled to a one-time fee equal to 2.0% of the amount

so guaranteed, which fee shall be payable by the applicable Subsidiary at the closing of the applicable loan. In the event that more than one Person provides an unconditional guaranty, such guaranty fee shall be allocated equally among the Recourse Parties or as otherwise agreed by the Recourse Parties.

7.6.3.   Notwithstanding anything herein contained to the contrary, neither Member or any of its respective Affiliates shall be required to execute, deliver or issue any Guaranty in connection with any financing or refinancing, or office lease, by the Company or any Subsidiary except, with respect to Managing Member, in the case of a financing or refinancing, for customary "bad boy non-recourse carveout" Guaranties where Managing Member has control over the events giving rise to the payment on any guaranteed obligations.

7.6.4.   Each Member agrees if a lender makes any written demand from time to time on a Recourse Party as a result of breach of a "bad boy non-recourse carveout" Guaranty, for payment or performance under a Guaranty, each Member shall pay, or reimburse the applicable Recourse Party, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the breach of the "bad boy non-recourse carveout" Guaranty is directly attributable to any action of JJ Member or its Affiliate, on the one hand, or Investor Member or its Affiliate, on the other hand, and which action was not unanimously approved by JJ Member and Investor Member, in which event the Member who, or whose Affiliate, took such action shall be solely responsible for the amounts due on such Guaranty. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a "bad boy non-recourse carveout" Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

7.7.   Other Activities of Members.  Except as set forth in Section 7.2, neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company. Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments. The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

7.8.   Acquisition of Eligible Assets.  The Members agree that in connection with the acquisition of each Eligible Asset Managing Member shall use commercially reasonable

efforts to (i) cause the Eligible Asset to be acquired through an ownership structure as set forth on Exhibit C and (ii) will, and cause its Affiliated entities depicted on Exhibit C hereto to, form a limited liability company to serve as the direct or indirect managing member or general partner of the acquiring entity and shall, and cause its Affiliated entities depicted on Exhibit C hereto to, enter an operating agreement in substantially the form attached hereto as Exhibit D. The Managing Member shall, to the extent requested by Investor Member, seek to obtain third party equity capital for each such Eligible Asset on such terms as may be reasonably acceptable to the Members. Managing Member shall have the right to allocate a portion of the "promoted" interest to one or more of its employees or affiliates (the "Non-Company Promote Interest").

    7.9.   Sale of Company Asset.

    7.9.1.  In the event that either Managing Member or Investor Member desires to cause a Subsidiary to sell its asset and the other does not consent to such sale, the Member who desires to sell an asset ("Initiating Member") shall first give to the other Member ("Responding Member") a notice (an "Offer Notice") setting forth the applicable asset that Initiating Member desires to sell (the "Sale Asset") and the minimum gross purchase price at which Initiating Member would be willing to cause the applicable Subsidiary to sell the Sale Asset (the "ROFO Price") and the allocation of all costs (transfer taxes, title, survey etc.) and with respect thereto.

    7.9.2.  Within thirty (30) days of receipt of an Offer Notice (the "Exercise Period"), Responding Member shall have the right to elect (which election shall be irrevocable) to purchase the Sale Asset from the applicable Subsidiary for the ROFO Price, subject to prorations and adjustments, and otherwise on the same terms and conditions set forth in the Offer Notice (the "ROFO Sale"), by giving written notice of such election within the Exercise Period (the "ROFO Election") and simultaneously depositing with a mutually agreeable escrow agent a non-refundable cash deposit equal to five percent (5%) of the ROFO Price (the "ROFO Deposit") (to be applied to the ROFO Price at closing). At the closing of a ROFO Sale all items of the Sale Asset which are customarily apportioned in the sale of assets comparable to the Sale Asset shall be apportioned between Responding Member and the applicable Subsidiary as of 11:59 PM on the day preceding the closing date in accordance with the customs and practices usual in transactions involving properties comparable to the Sale Asset.

    7.9.3.  If Responding Member does not timely make a ROFO Election or affirmatively waives its right of first offer, Responding Member shall be deemed to have elected not to purchase the Sale Asset pursuant to this Section 7.9 and Initiating Member shall be free to cause the applicable Subsidiary to proceed to initiate and consummate the sale of the Sale Asset at a price not less than one hundred percent (100%) of the ROFO Price and on such other terms as are no less favorable to the applicable Subsidiary than those provided for in the Offer Notice. If the sale of the Sale Asset is not consummated within one hundred eighty (180) days after the expiration of the Exercise Period, then any attempt to consummate the sale of the Sale Asset thereafter shall again be subject to the provisions of Section 7.1.3(iii) and, if applicable, this Section 7.9.

    7.9.4.  If Responding Member has timely and properly delivered a ROFO Election, Managing Member and Investor Member shall cause the applicable Subsidiary to consummate the ROFO Sale on an "as is" and "where is" basis within sixty (60) days after the

date of the ROFO Election (the "ROFO Closing Date"). On the ROFO Closing Date, the ROFO Deposit shall be credited against the ROFO Price, and Responding Member shall pay the balance of the ROFO Price (as adjusted) to the applicable Subsidiary, as applicable. If Responding Member has timely and properly delivered a ROFO Election, but thereafter the sale contemplated thereby fails to close within a sixty (60) day period for any reason other than the default of the applicable Subsidiary (a "ROFO Default"), then Responding Member shall be in material default under this Section 7.9 and the escrow agent shall release the ROFO Deposit to the applicable Subsidiary who shall have the right to retain the ROFO Deposit as liquidated damages, it being agreed that in such instance the actual damages would be difficult, if not impossible, to ascertain, and Investor Member shall forfeit its ROFO Deposit and shall have no further rights under this Section 7.9 with respect to the Sale Asset, including the right to give a ROFO Election or to receive Offer Notices. If a ROFO Default occurred, then thereafter, Initiating Member shall have the right to cause the sale of the Sale Asset on any terms and conditions determined by Initiating Member without any further obligation under this Section 7.9.

7.9.5. At the closing of a ROFO Sale, Initiating Member shall cause the applicable Subsidiary to deliver to Responding Member a deed, assignment or other transfer document commonly used in conveying ownership of assets in the form of the Sale Asset, conveying the Sale Asset to Responding Member, which Sale Asset shall be free and clear of all legal and equitable claims and all liens and encumbrances. Initiating Member and Responding Member shall execute, or cause the Company or the applicable Subsidiary to execute, an agreement acceptable to Initiating Member and Responding Member in the exercise of their reasonable judgment in such form and substance which is customary for purchase agreements with respect to assets in the form of the Sale Asset. Prior to consummating a ROFO Sale, Responding Member shall cause all guarantees of Initiating Member (and any Affiliates, members or principals of Initiating Member) under any loan relating to the Sale Asset to which the Company, a Subsidiary or Initiating Member are an obligor to be released with respect to acts occurring after the ROFO Closing Date.

## ARTICLE VIII

### TRANSFER OF MEMBERSHIP INTERESTS;

8.1. <u>Restrictions on Transfers of Membership Interests</u>. No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member. To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest. No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.    <u>Permitted Transfers</u>.    Notwithstanding <u>Section 8.1</u>, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("<u>Permitted Transfers</u>"):

(i)      Transfers of a Member's Interest to another Member;

(ii)      Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)      Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.  If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv)      Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)      Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Investor Member, Michael Wiener, William Wiener or Kevin Wiener continues to Control Investor Member or (y) in the case of Managing Member, Jeffrey Simpson or Jared Chassen continues to be in Control of Managing Member.

812194-9

8.3.     Additional Restrictions.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)      it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)     it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)     the transferee is a Prohibited Person;

(v)      as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)     in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.     Substitute Members. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)      The Transfer complies with the provisions of this Article VIII;

(b)      The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)      The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.     Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to

812194-9

vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

ARTICLE IX

**REPRESENTATIONS; ADDITIONAL AGREEMENT**

9.1.    <u>Representations</u>. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.    it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental

authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3. there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4. this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5. (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2. <u>Indemnity</u>.

9.2.1. Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this <u>Section 9.2</u> shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this <u>Section 9.2</u>, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

9.2.2. JJ Member agrees to indemnify and hold harmless the Company, Investor Member and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against all out of pocket expenses, losses, liabilities (including liabilities for penalties), judgments, demands or costs (including, without limitation, attorneys' fees) arising from or related to JJ Member or its principals employment with Greystone Development.

9.3. <u>Agreement as to Distributions</u>. JJ Member and Investor Member agree that the calculation set forth on <u>Exhibit F</u> accurately sets forth the allocation of the various forms of distributable revenue that may be received by the Company and a Subsidiary based on the assumptions set forth therein.

812194-9

ARTICLE X

**DISSOLUTION AND LIQUIDATION**

10.1.  Dissolution.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2.  Statement of Intent to Dissolve.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of New York.

10.3.  Procedures.

10.3.1. Liquidation of Assets.  In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4.  Termination of the Company.  Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of

dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

## ARTICLE XI

## **FISCAL AND ADMINISTRATIVE MATTERS**

11.1.    <u>Fiscal Year</u>.  The fiscal year of the Company will be the calendar year.

11.2.    <u>Checks, Drafts, Etc.</u>  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.    <u>Books and Records</u>.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.    <u>Right of Inspection</u>.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.    <u>Reports</u>.

11.5.1. Within time periods set forth on <u>Exhibit E</u> hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on <u>Exhibit E</u> which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

## ARTICLE XII

## **CONFIDENTIALITY AND PRESS RELEASES**

12.1.    <u>Confidentiality</u>.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by

the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2. <u>Press Releases</u>. No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of Investor Member or its Affiliates without the prior written consent of Investor Member.

<u>ARTICLE XIII</u>

**INDEMNIFICATION**

13.1. <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to

812194-9

time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2. Exculpation/Member Indemnification. Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3. Insurance. Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

ARTICLE XIV

**MISCELLANEOUS**

14.1. Notices.

14.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth below:

If to Investor Member:

c/o 35 Oak Holdings
Viscor Inc.
35 Oak Street
Toronto, Ontario M9N 1A1
Attn: Frank van Biesen
e-mail: fvanbiesen@35oak.com

If to Managing Member:

c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
e-mail: jsimpson001@icloud.com

With a copy to:

Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention: David J. Heymann, Esq.
Email: dheymann@meltzerlippe.com

14.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

14.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.

14.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2. **Extension Not a Waiver**. No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same. Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3. **Entire Agreement; Amendments**. This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated. Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4. **Governing Law**. THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.   <u>Venue</u>.   Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.   <u>Headings</u>.   Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.   <u>Severability</u>.   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.   <u>Failure to Enforce Provision</u>.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.   <u>Interpretation</u>.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.   <u>Assignment</u>.   This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.   This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11.  <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____
Name: Michael Wiener
Title: EVP

JJ ARCH LLC

By: _____
Jeffrey Simpson
Managing Member

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____
       Name:
       Title:

JJ ARCH LLC

By: _____
       Jeffrey Simpson
       Managing Member

<u>Exhibit A</u>

Eligible Asset Criteria

Asset Class:          multi-family, office, retail, industrial and hospitality

Location:             contiguous United States

Leverage:             no more than 65%

Projected IRR:        no less than 10% for stabilized assets, 13% for value add or development

Exhibit B

Initial Budget

2018 ARCH LLC Budget (Includes projects are in process of purchasing, this has potential to grow as we acquire in 2018)

**Income**

| Property | Scope | Value | Jan | Feb | March | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SoHo Project | Development Management Services | 1,100,000 * 14 Months | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 942,857 |
| SoHo Project | Loan Origination Fee | 1% of 45M Loan (300k @ closing), 15( | 300,000 | - | - | - | - | - | - | - | - | - | - | - | 300,000 |
| SoHo Project | Construction Management Reimbursement Proj Exec | 125 / hour (100%) | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 260,000 |
| SoHo Project | Construction Management Reimbursement Proj Manager | 100 / hour (75%) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SoHo Project | Construction Management Reimbursement Proj Acct | 60 / hour (50%) | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 62,400 |
| SoHo Project | Construction Management Reimbursement Proj Office | 2,000 / month for office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| SoHo Project | Construction Management Fee | 2% of Hard Costs | 34,396 | 34,396 | 40,129 | 40,129 | 45,861 | 51,594 | 51,594 | 51,594 | 51,594 | 45,861 | 40,129 | 40,129 | 527,404 |
| SoHo Project | Asset Management Fee | 2% of NOI @ stab. or 200,000 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SoHo Project | Marketing Fee | 1 month rent / unit | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| Harlem Project | Property Management Fee | 2.5% of EGI (assumes Arch PM in July) | | | | | | | 5,447 | 5,447 | 5,447 | 5,447 | 5,447 | 5,447 | 32,683 |
| Harlem Project | Asset Management Fee | 50k / year | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 50,000 |
| | | | | | | | | | | | | | | | |
| LA Project | Asset Management Fee | 3,750 / quarter | - | - | 3,750 | - | - | 3,750 | - | - | 3,750 | - | - | 3,750 | 15,000 |
| | | | | | | | | | | | | | | | |
| TBD | Tax Return Reimbursements (from deal budgets) | | 20,000 | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | - |
| | Sum Total Income | | 466,001 | 146,001 | 155,483 | 151,733 | 157,466 | 166,949 | 168,646 | 168,646 | 172,396 | 162,913 | 157,180 | 160,930 | 2,234,343 |

Exhibit C

Eligible Asset Structure



INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023

Exhibit D

Form of GP Operating Agreement

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

### ARCH     MM LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of _____, 20__ by and between ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), [WIENER Entity], a _____ (together with its permitted successors and assigns, "Wiener"), and [JJ ENTITY], a _____ (together with its permitted successors and assigns, "JJ").

WHEREAS, Managing Member, Wiener and JJ (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch _____ MM LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

1.1. <u>Certain Defined Terms</u>. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"<u>Act</u>" shall have the meaning set forth in <u>Section 2.1</u>.

"<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A) Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"<u>Affiliate</u>" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)     The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such

distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"<u>Business Day</u>" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"<u>Capital Account</u>" shall have the meaning set forth in <u>Section 4.1</u>.

"<u>Capital Call Amount</u>" shall have the meaning set forth in <u>Section 3.2.1</u>.

"<u>Capital Call Notice</u>" shall have the meaning set forth in <u>Section 3.2.1</u>.

"<u>Capital Contribution</u>" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"<u>Capital Event</u>" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"<u>Capital Event Proceeds</u>" shall mean the gross proceeds derived from a Capital Event less the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

"<u>Cash Flow</u>" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

818000-3

"Certificate of Formation" means that certain Certificate of Formation of the Company, dated and filed with the Secretary of State of the State of Delaware on _____.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Contributing Member" shall have the meaning set forth in Section 3.2.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.3.

"Fiscal Year" shall be as set forth in Section 11.1.

"Indemnifying Member" shall have the meaning set forth in <u>Section 13.1.1</u>.

"Indemnitee" shall have the meaning set forth in <u>Section 13.1.2</u>.

"JJ" shall have the meaning set forth in the Preamble.

"Liquidating Agent" shall have the meaning set forth in <u>Section 10.3.1</u>.

"Managing Member" shall have the meaning set forth in the Preamble.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)      items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)      any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)      any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)      there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)      if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)      items of income, gain, loss, or deduction or credit allocated pursuant to <u>Section 5.2</u> shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in <u>Section 3.2.3</u>.

818000-3

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"Subsidiary" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Wiener" shall have the meaning set forth in the Preamble.

<u>ARTICLE II</u>

**<u>ESTABLISHMENT OF THE COMPANY</u>**

2.1.    <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "<u>Act</u>") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Secretary of State of the State of Delaware is hereby ratified and confirmed in all respects.

2.2.    <u>Company Name</u>.  The business of the Company shall continue to be conducted under the name of "Arch _____ MM LLC"; <u>provided</u>, <u>however</u>, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates.  In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    <u>Purposes</u>.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of Delaware and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service and Registered Office</u>.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Members.  The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by the Members; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

818000-3

2.7.    Admission of Members.    Managing Member, JJ and Wiener and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    Limitation on Liability.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

ARTICLE III

**CAPITAL CONTRIBUTIONS**

3.1.    Initial Capital Contributions.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Exhibit A hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    Additional Capital Contributions.

3.2.1.  If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call.

3.2.2.  Within five (5) Business Days of the Capital Call Notice, each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by such Member's Percentage Interest.

3.2.3.  If a Member fails to make its capital contribution required by Section 3.2.2 (the "Non-Contributing Member"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then the Member who has made its capital contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the capital contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount"). If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing

9

Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company , minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

       3.3. <u>No Interest</u>. Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

       3.4. <u>Return of Capital</u>. Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

       3.5. <u>No Personal Liability</u>. Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in <u>Section 7.6.1</u>.

<u>ARTICLE IV</u>

**<u>CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS</u>**

       4.1. <u>Capital Accounts</u>. A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account shall be as set forth in the Company's books and records.

       4.2. <u>Adjustments</u>. The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with <u>Section 5.1</u>) and (iv) any income and gain allocated to such Member pursuant to <u>Section 5.2</u>. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with <u>Section 5.1</u>), and (z) any deductions and losses allocated to such Member pursuant to <u>Section 5.2</u>. If the Contributing Member elects to make a further additional Capital

10

Call equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3. _Negative Capital Accounts_. No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4. _Transfers_. If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5. _Capital Account Balance_. Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

ARTICLE V

**ALLOCATIONS AND DISTRIBUTIONS**

5.1. _Allocations of Net Profit and Net Loss_. After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionally) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets. Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2. _Regulatory Allocations_.

5.2.1. Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as

11

defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.   This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.   To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.   If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.   Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.   It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.   Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

818000-3

5.3.    Tax Allocations.

5.3.1.    For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.    In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.    If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.    Withholding.    The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a

13

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.    Tax Matters.

5.5.1.    Tax Matters Partner; Partnership Representative.    Managing Member shall be the "Tax Matters Partner" of the Company. The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner. The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner. Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2.    Tax Elections.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent. The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members. The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3.    Tax Returns. The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

818000-3

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6. Section 754 Election. In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

## ARTICLE VI

## DISTRIBUTIONS

6.1. Distributions of Cash Flow. Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows: 20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

6.2. Distribution of Capital Event Proceeds. Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

6.3. Distributions of Promote Distributions. Promote Distributions, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows:

(i) First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1;

(ii) Second, the balance, (x) to JJ in an amount equal to the such balance multiplied by JJ's Percentage Interest and (y) the balance less the amount to be distributed pursuant to clause (x), 50% to Managing Member and 50% to Wiener.

6.4. Distributions Restricted by the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

818000-3

## ARTICLE VII

## **MANAGEMENT AND OPERATIONS**

7.1.   Management.

7.1.1.   The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)      conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)     open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)     employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)      bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)     deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to Section 3.2;

818000-3

(viii)   cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)   take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.   Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company.  Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3.   Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request.  Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)   engage in any business or activity not authorized by this Agreement;

(ii)   enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(iii)   enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(iv)   admit new or substitute Members to the Company or any Subsidiary;

(v)   modify any material terms of any organizational document of any Subsidiary; and

(vi)   cause any Subsidiary to take any of the foregoing.

17

7.2.    Services of the Members.   Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.    Fees and Expenses.

7.3.1.    Acquisition Fee.   In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.2.    Development Fee/Asset Management Fee/Other Fees.   To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.    Due Diligence Expenses.   The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.    Legal Title to Company Asset.   Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.    Other Activities of Members.   Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.   Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.   The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

818000-3

ARTICLE VIII

**TRANSFER OF MEMBERSHIP INTERESTS;**

8.1.    Restrictions on Transfers of Membership Interests.  No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.    Permitted Transfers.  Notwithstanding Section 8.1, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

(i)      Transfers of a Member's Interest to another Member;

(ii)     Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.  If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

818000-3

(iv)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of the Members, Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either Member of Managing Member continues to be in Control of Managing Member.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)  The Transfer complies with the provisions of this Article VIII;

(b)  The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)  The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.  Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.  Withdrawal, Retirement or Resignation of a Member. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this Section 8.6 shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

818000-3

ARTICLE IX

**REPRESENTATIONS**

9.1.    <u>Representations</u>.  Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.    it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.    there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.    this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.    (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.    <u>Indemnity</u>.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by

818000-3

reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

ARTICLE X

**DISSOLUTION AND LIQUIDATION**

10.1. Dissolution.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2. Statement of Intent to Dissolve.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of Delaware.

10.3. Procedures.

10.3.1. Liquidation of Assets.  In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem

818000-3

reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

       10.4.   Termination of the Company.  Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

ARTICLE XI

**FISCAL AND ADMINISTRATIVE MATTERS**

       11.1.   Fiscal Year.  The fiscal year of the Company will be the calendar year.

       11.2.   Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

       11.3.   Books and Records.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

       11.4.   Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

       11.5.   Reports.

       11.5.1. Within time periods set forth on Exhibit B hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit B which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

       11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information

818000-3

reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

ARTICLE XII

**CONFIDENTIALITY AND PRESS RELEASES**

12.1.  <u>Confidentiality</u>.   The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.  <u>Press Releases</u>.  No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

ARTICLE XIII

**INDEMNIFICATION**

13.1.  <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or

25

any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this <u>Section 13.1.2</u> with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2. <u>Exculpation/Member Indemnification</u>. Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3. <u>Insurance</u>. Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this <u>Article XIII</u>.

ARTICLE XIV

**MISCELLANEOUS**

14.1. <u>Notices</u>. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on <u>Exhibit A</u> hereto. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email. Any

26

Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2. Extension Not a Waiver. No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same. Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3. Entire Agreement; Amendments. This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated. Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4. Governing Law. THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5. Venue. Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York. Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6. Headings. Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction. In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8. Failure to Enforce Provision. The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this

818000-3

Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9. <u>Interpretation</u>. All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10. <u>Assignment</u>. This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement. The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes. Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

818000-3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
        Managing Member


    By:    _____
        Jeffrey Simpson
        Managing Member

]

[ADD SIGNATURE BLOCKS FOR JJ AND WIENER]

818000-3

INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023

Exhibit A

Members, Addresses and Capital Contributions

| Member and Address | Capital Contribution | Percentage Interest |
| --- | --- | --- |

<u>Exhibit B</u>

<u>Reports</u>

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

      a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

      b.      a statement of the Capital Account of each Member.

2.      Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

      a.      a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

      b.      a statement of the Capital Account of each Member.

Exhibit E

Reports

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.      a statement of the Capital Account of each Member.

2.      Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.      a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.      a statement of the Capital Account of each Member.

INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023

Exhibit F

Distribution Example

**Sample deal:**

| | | |
|---|---|---|
| Property acquisition equity required | | $1,000,000 |
| LP portion | 80% | $800,000 |
| GP Entity portion | 20% | $200,000 |
| | | |
| J&J2 part in GP Entity | 25% | $50,000 |
| Wiener2 part in GP Entity | 75% | $150,000 |

**Property level cash flows assumed:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| Investment | ($1,000,000) | | | | | | |
| Operating CF | | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Capital CF w/o promote | | | | | | | $1,050,000 |
| Promoted CF | | | | | | | $100,000 |
| To all equity | ($1,000,000) | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $1,200,000 |

**Split of cash flows to LP/GP:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| To LP from oper CF | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| To LP from cap CF | ($800,000) | | | | | | $840,000 |
| *LP total* | *($800,000)* | *$40,000* | *$40,000* | *$40,000* | *$40,000* | *$40,000* | *$880,000* |
| To GP from oper CF | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| To GP from cap CF | ($200,000) | | | | | | $210,000 |
| To GP from promote | | | | | | | $100,000 |
| *GP total* | *($200,000)* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$320,000* |
| *Check back to property* | *($1,000,000)* | *$50,000* | *$50,000* | *$50,000* | *$50,000* | *$50,000* | *$1,200,000* |

**Split of cash flows to GP partners:**

Promote math:

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| *Owed to J&J2 from oper* | | *$2,500* | *$2,500* | *$2,500* | *$2,500* | *$2,500* | *$2,500* |
| To J&J2 from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| To J&J2 from cap | ($50,000) | | | | | | $52,500 |
| To J&J2 from promote re catchup | | | | | | | $3,000 |
| *Owed to Wiener2 from oper* | | *$7,500* | *$7,500* | *$7,500* | *$7,500* | *$7,500* | *$7,500* |
| To Wiener2 from oper | | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 |
| To Wiener2 from cap | ($150,000) | | | | | | $157,500 |
| To Wiener2 from promote re catchup | | | | | | | $9,000 |
| To J&J2 from promote re invest | | | | | | | $25,000 |
| To Wiener2 from promote re invest | | | | | | | $37,500 |
| To Arch from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| To Arch from promote | | | | | | | $25,500 |
| | | | | | | | |
| *Check* | *($200,000)* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$320,000* |

Promote math:

| | |
|---|---|
| $100,000 | |
| ($3,000) | J&J catchup |
| ($9,000) | Wiener catchup |
| $88,000 | |
| ($25,000) | J&J superpromote |
| $63,000 | |
| ($37,500) | Wiener share |
| ($25,500) | Arch share |
| $0 | |
| $25,500 | (=$37,500 less $12,000 catchup) |

**GP partner summary:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
|---|---|---|---|---|---|---|---|---|---|
| J&J2 | ($50,000) | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $82,500 | 11.6% | 1.9x |
| Wiener2 | ($150,000) | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $210,000 | 8.8% | 1.6x |
| Arch | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | | |

**Scenario 1 at Arch - invested capital balance is all Wiener 1**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Arch opex | | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) *(Assumed)* |
| Arch income from above | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 |
| | | ($23,000) | ($23,000) | ($23,000) | ($23,000) | ($23,000) | $2,500 |
| | | | | | | | |
| Wiener1 capital account pre-alignment | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($112,500) |
| *Wiener1 capital account on pro rata basis* | | *($17,250)* | *($34,500)* | *($51,750)* | *($69,000)* | *($86,250)* | *($84,375)* *(Would be if 75% share)* |
| J&J1 capital account pre-alignment | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *J&J1 capital account on pro rata basis* | | *($5,750)* | *($11,500)* | *($17,250)* | *($23,000)* | *($28,750)* | *($28,125)* *(Would be if 25% share)* |
| | | | | | | | |
| J&J contributes to Arch, which in turn distributes to Wiener1 | | | | | | $25,000 | |
| | | | | | | | |
| Wiener1 capital account | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($87,500) *78%* |
| J&J1 capital account | | $0 | $0 | $0 | $0 | $0 | ($25,000) *22%* |

**Scenario 2 at Arch - invested capital balance is pari passu J&J1/Wiener 1**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wiener1 capital account | $0 | ($17,250) | ($34,500) | ($51,750) | ($69,000) | ($86,250) | ($84,375) |
| J&J1 capital account | $0 | ($5,750) | ($11,500) | ($17,250) | ($23,000) | ($28,750) | ($28,125) |

**Scenario 3 at Arch - invested capital balance is zero**

Assuming a reserve minimum of $375,000 is met, Arch can distribute the cash

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| To J&J1 | | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $22,000 | | |
| To Wiener1 | | $400 | $400 | $400 | $400 | $400 | $5,500 | | |
| | | | | | | | | | |
| J&J2/1 | ($50,000) | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $104,500 | 18.0% | 2.5x |
| Wiener2/1 | ($150,000) | $6,400 | $6,400 | $6,400 | $6,400 | $6,400 | $215,500 | 9.4% | 1.7x |

# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

        *Plaintiffs*,

        - against -

JARED CHASSEN and FIRST REPUBLIC BANK,

        *Defendants*

Index No. 158055/2023

**AFFIDAVIT OF JARED CHASSEN IN
OPPOSITTION TO MOTION FOR
PRELIMINARY INJUNCTION**

STATE OF NEW YORK     )
                       ) ss.:
COUNTY OF NEW YORK   )

Jared Chassen, being duly sworn, deposes and says under penalty of perjury as follows:

1.      I am the defendant in the above-captioned action. I respectfully submit this affidavit in opposition to plaintiff's order to show cause for a preliminary injunction. I am fully familiar with the facts set forth herein based upon my personal knowledge and observations.

**I.  My Relationship with Jeffrey Simpson.**

2.      I have over 15 years of experience in the real estate industry. I graduated from Nova Southeastern University with a Master of Science degree in real estate development in 2010, while working as an assistant in Acquisitions and Project Management for George A. Fuller Company, a construction firm based in Stamford, Connecticut. Between 2011 and 2012, I also worked for Pantheon Development, a full-service real estate company in the Bronx, in Project Management & Acquisitions.

1

3.      I first met Plaintiff Jeffrey Simpson ("Simpson") when we worked together at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services.  Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

4.      Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013.  At the time, Dough Benach, the head of the division hired me and placed me in the Development and Acquisitions team in 2012 to work with Benach and Simpson.  Simpson and Benach taught me essential skills for acquiring, financing debt and equity, developing and running real estate projects, and I was promoted as the Director of Acquisitions in 2014.

5.      During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict.  On a personal level, I viewed him as my mentor and developed a close relationship with him.  I reposed the utmost confidence and trust in him and even put my financial well-being in his hands.

## II.  I Introduced Simpson to 35 Oak, and We Formed a Joint Venture.

6.      In 2017, Simpson left Greystone under less than favorable circumstances.

7.      Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson.  As a result, the Greystone Development brand downsized from 30 people to currently 3 persons and Simpson was forced to leave Greystone, and I left alongside many others as the brand downsized and the jobs disappeared.

2

8.      Simpson struggled to find investors for his new business. While still employed by Greystone, he held many meetings by himself to launch his new business which yielded no success. .Through my own connections, I introduced 608941 NJ INC ("35 Oak") to Simpson while still at Greystone. We planned a new company together with him relying on my capital connections to make the company feasible.  35 Oak is an active investor in many industries, and its principal place of business is in Toronto, Canada.  After a few meetings, 35 Oak decided to invest in a joint venture with us, and on December 11, 2017, established Arch Real Estate Holdings, LLC ("Arch Real Estate"), which is governed by the Limited Liability Company Operating Agreement of Arch Real Estate Holdings, LLC (the "Arch Real Estate Operating Agreement").

9.      The real estate portfolio which Arch Real Estate ultimately grew to  more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by Arch Real Estate. Arch Real Estate also has other affiliated companies, including a property management company, brokerage company, construction company, each of which provides services relating to real properties that Arch Real Estate controls.

10.      Arch Real Estate is itself owned and controlled by two companies—JJ Arch, LLC ("JJ Arch") (collectively with Arch, the "Arch Entities") and 35 Oak.  JJ Arch holds eighty (80) percent of the membership interest in Arch Real Estate, and 35 Oak holds the remaining twenty (20) percent. Annexed hereto as **Exhibit A** is a true and correct copy of the Arch Real Estate Operating Agreement, which is also available at <u>NYSCEF No. 14</u>. *See id.* § 6.1(iii).  JJ Arch serves as Managing Member of Arch Real Estate and Simpson is, in turn, the Managing Member of JJ Arch.  *See id*. § 7.1.1. 35 Oak serves as the Investor Member of Arch but has no authority to participate in the management or control of the company, though it has consent rights to certain major decisions. *See id*. § 7.1.2.

3

11.     On the same day, Simpson and I signed a separate operating agreement for JJ Arch—the Limited Liability Company Operating Agreement of JJ Arch LLC (the "JJ Arch Operating Agreement"). A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as **Exhibit B**, and is also available at NYSCEF No. 15.

12.     The JJ Arch Operating Agreement identifies both Simpson and me as Members. *See* Ex. B § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson, who had full, exclusive, and complete discretion with respect to such matters, subject to the limitations set forth in subsection (b), which provides that any Company Major Decision, as defined in the Agreement, shall only be undertaken with my prior written consent. *See* Ex. B § 3.1(a)-(b).

13.     Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth anniversary of the Agreement, Simpson and I were to have equal rights and authority to manage the company. *See id*. § 3.2. Further, I was to be entitled to 50% of all distributions. The original intent behind the JJ Arch Operating Agreement was to let Simpson take charge of the company in the first four years and split control with me afterwards.

14.     On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without my input or drafting (the "Amendment"). A true and correct copy of the Amended JJ Arch Operating Agreement is annexed hereto as **Exhibit C** and is also available at NYSCEF No. 16. The Amendment eliminated the language in Section 3.2 of the original Agreement providing Simpson and me equal rights and authority to manage the company. Under the Amendment, Simpson maintains unilateral power and authority to make good faith decisions with respect to the business and affairs of the company for another 4 years, and I maintain the right to limit Simpson's

4

authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. I was entitled to 49.9% of all distributions, with Simpson entitled to 50.1%. And contrary to what Simpson asserts, I retained my right to consent to any Company Major Decision. *Id.*; *See* NYSCEF No. 13, Compl. at ¶ 34 (falsely claiming that amendment "meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.").

15.     I never agreed with Simpson's decision to eliminate co-management of the business after the fourth anniversary. Despite vocalizing my disagreement, he presented me with the Amendment on a take-it-or-leave-it basis, threatening me that I would be removed from the business entirely if I did not sign the Amendment after a failed real estate project at 11 Greene Street which is still embroiled in lawsuits based on another toxic partnership Simpson created. I signed the Amendment under undue pressure and threats. Simpson pressured me to not have my own counsel review the Amendment and limited my involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had drafted the amendment in his favor.

**III.Simpson Took Various Unlawful and Improper Actions**

16.     When we first started our new business, Simpson promised me, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and change his aggressive behaviors.  The operation of the Arch Entities did well initially, but it went downhill over the past two years.

17.     Simpson's aggressive business demeanor increasingly turned menacing inside the company, with partners, lenders and lawyers.  He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled

and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities'

brand in the hiring markets. I have personally witnessed him call people stupid, inept and other

demeaning names, to the point of bringing them to tears. Simpson created a toxic work

environment that forced many employees to leave, leading to understaffing and mismanagement

of the company's real estate projects. The head of Human Resources at the Arch Entities has

commented on several occasions that she has never seen a more toxic work environment, and such

a large turnover of employees, all because of the behavior of Simpson. Simpson would send

messages to key employees such as "So now everyone is going to have to come to me every time

they go to the bathroom to get my yes or no."

18.    Putting the investors' interests first, I was willing to work to mitigate the damage

caused in his wake and endure the harsh and abusive workplace that Simpson created, even to my

personal detriment. Yet he committed a series of misconducts that crossed the line of breaching

his fiduciary duties, which the company could not withstand, and I had to step up eventually.

19.    First, Simpson forced the team to make various misrepresentations about real estate

projects to induce investments. Simpson and team members including myself were forced to pitch

grossly under budgeted projects and promised unrealistic returns on investment to induce

investors, such as 35 Oak and many others to contribute additional capital without ever disclosing

risks.  Disregarding the opposition of the other Arch Entities' partners and employees, including

me, Simpson pushed numbers aggressively and used unachievable assumptions to amplify

financial outcomes. Over the years, several internal investment meetings occurred where I and

many team members aggressively pushed backed on his financial assumptions, but he would

aggressively fight us and ultimately tell us to follow his path or be sidelined or fired.  Simpson

also provided minimal reporting to investors, leaving them in the dark and keeping the staff

6

overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35

Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper

capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he

would threaten retribution if they did not continue to fund. He would tell them they were only good

for capital and guarantees, and nothing else.

20.     Second, Simpson prioritized his personal gains over the success of the Arch

Entities' projects.  For instance, the Myrtle Point development in Ridgewood, Queens, was grossly

under budgeted and experienced significant delays from lack of supervision. Simpson didn't even

visit the project for weeks at a time.  Recently, the project relied on one time-sensitive forbearance

to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and

not turn over the necessary documents to 35 Oak, the guarantor.  He was planning to hold

documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions

that would favor his personal interests.  As a result of the delay, the Myrtle Point development has

been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary

revenue and putting additional strain on the business and putting over $45 million of equity at risk

for full loss.

21.     Third, Simpson failed to properly supervise and manage projects.  Across various

projects, Simpson was not involved for months and in many instances disappeared to focus on his

other businesses.

22.     Fourth, as cash flow started to become limited at Arch, at the extreme detriment of

our managed investments and to increase income streams for the company, Simpson started a plan

forcing the team leaders to take on even heavier workloads amongst senior employees, and

shedding necessary employees such as project managers, construction managers, accountants, and

7

other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

23.     Fifth, days before I was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to me and Michelle Miller, a junior partner/employee, threatened to put all the Arch entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business.  Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

24.     Finally, Simpson misappropriated Arch Real Estate's funds and employees for an independent auto business that we own—Rêver Motors ("Rêver).  Rêver is a vintage car dealership and repair shop located in Southampton, New York.  For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities for the Arch Entities. Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay for their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. All of this was without consent.

8

25.     From the very beginning of the Rêver business, I was very clear to Simpson that if we purchased this business, it had to be a weekend side-business that would need full third-party management and should never at the expense of the Arch Entities' investments.  Repeatedly, I asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded my pleas.  He also never obtained my consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

26.     Simpson also began devoting much of his time to other business at the expense of JJ Arch such as purchasing a farm and several unaffiliated investment properties, many with large construction components that he oversaw. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

**IV.     Simpson Has Deteriorated JJ Arch's Relationship with 35 Oak**

27.     While tenuous of late, in July of 2023, Simpson's relationship with 35 Oak deteriorated to a drastic extent, leading 35 Oak to file suit against him in the United States District Court for the Southern District of New York on August 10, 2023. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed hereto as **Exhibit D**.

28.     As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's misconduct vis a vis 35 Oak included: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other

9

investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements.

**V.  Simpson's First Attempt to Remove Me as a Member of the JJ Arch After I Discover His Diversion of Corporate Funds**

29.     In July 2023, I asked JJ Arch's accountant about Simpson's diversion of money. I had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

30.     The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds. What I learned, and in protecting the company, has guided all my actions.

31.     The company had been struggling for the past year, and since Arch Real Estate is an acquisition company, the income stream does not exist without fees or closing deals. Since those deals were hard to come by in a high interest rate environment and with a dwindling and unmotivated team, the Arch Entities had become dependent on fees from property management. Arch Real Estate owns 3000+ units in southeast, and through an affiliate was also the property manager, and because the Arch Entities were not doing well, it led to those properties also not being managed well.

32.     Together with Jason Paul and Michelle Miller, junior partners/employees of JJ Arch, I told Simpson that the company should transition to third-party property management

10

because the Arch Entities were not managing the properties well, and this was hurting the investors. He kept firing people to limit staff, but with little staff, the Arch Entities weren't supporting the properties and they were failing. We again suggested that the Arch Entities hire a third-party property manager given how poorly the company was doing at property management. He responded that if the Arch Entities gave up the fees from property management, the business would not survive because these fees were now its primary source of income. In the beginning of August, I again told him we should transition to third-party management. He responded that he would not do that because he did not want to have to rely on 35 Oak's money with whom he was fighting.

33.    Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023, Simpson told me that if 35 Oak "didn't stop messing" with him, he was going to file for bankruptcy on all the properties and blow the company up. This, of course, was prohibited by the operating agreements, and indicated to me that Simpson was entirely focused on himself and his petty battle with 35 Oak.

34.    After I had challenged him on his misappropriation of company assets, and his self-interested decision-making, I heard on August 4, 2023, that Simpson was going to terminate me and free himself to misappropriate company assets at will. I then acted to protect the company funds by requesting to the bank that he should not be able to take company funds without my knowledge. On August 5, 2023, Simpson sent me an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" me that I had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately." A true and correct copy of this email is annexed hereto as **Exhibit E** and is also available at [NYSCEF No. 17](#).

11

35.     Simpson's email to remove me as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement, as amended.  Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." Ex. B at § 1.1 ("Resignation"). A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i) willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or property]." Ex. A at § 1.1 ("Cause Event").

36.     Simpson made no allegation that would constitute a Cause Event warranting my resignation. And his allegations were false. In fact, all my actions have been to protect the company and its assets. His purported notice removing me as a Member of the Arch Entities was nothing more than a blatant attempt to have sole control and management of the Arch Entities to insulate himself from his bad acts.

**VI. I Remove Simpson as a Member of the JJ Arch.**

37.     To protect the Arch Entities from further damage, on August 6, 2023, I sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." A true and correct of my notice is annexed hereto as **Exhibit F.**

38.     In the Notice, I rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported forced resignation of me as a Member of the Arch Entities,

12

noting that I had not done any conduct alleged that would constitute a Cause Event because "no such conduct occurred. *See* Ex. F at 1.

39. I then informed Simpson, as required by the JJ Arch Operating Agreement, that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement (*see* ¶ 25, *supra*), including "(a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his] own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company …" *Id.*

40. I advised Simpson that, as a result of these Cause Events, he had to resign as a Member of the Arch Entities, and no longer had the right to act on behalf of the Arch Entities. *See id.*

41. Further, Simpson's resignation is independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote "substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for Cause Event. As discussed herein, Simpson failed to devote substantially all of his time to JJ Arch, instead focusing on his other personal business ventures. *See* supra at ¶ 21. This constitutes an independent basis for his resignation.

13

## VII. 35 Oak Removes Simpson as Managing Member of Arch Real Estate

42. On August 6, 2023, 35 Oak also sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)."

43. 35 Oak advised Simpson that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement. The letter listed the same Cause Events that I identified in my Cause Event Notice to Simpson, but 35 Oak noted that the list was "by no means an exhaustive list of actual or potential Cause Events" committed by Simpson. 35 Oak also reserved its right to remove Simpson as the managing member of Arch Real Estate Holdings pursuant to the Arch Operating Agreement; and demanded that Simpson "pursue all third party consents necessary for [35 Oak] to remove [Simpson] as the 'managing member' of [Arch Real Estate Holdings]."

## VIII. Simpson Commences this Action

44. In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, me and First Republic Bank in the Supreme Court of New York County. In the complaint, Simpson asserts four causes of action against me, including breach of the amended JJ Arch Operating Agreement, breach of fiduciary duty, conversion, and tortious interference with contractual relations. Simpson also seeks declaratory judgments and preliminary and permanent injunctions that would allow him to exercise exclusive and sole control over the Arch Entities. *See* NYSCEF No. 13, Summons and Complaint.

## IX. The Court's Interim Order Restores the Status Quo Ante

45. On August 21, 2023, the Court entered an Interim Order which required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, **and such access**

14

**shall not be terminated without further order of the Court**." NYSCEF No. 36, Interim Order, at 2 (emphasis added). The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.*. That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim Order provided that "**Simpson and Chassen shall cooperate with each other in good faith** to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.* (emphasis added).

X.     **Simpson Has Acted in Contempt of the Interim Order, and Has Since Completely Shut Me out of the Company, Including by Sending a New Termination Letter**

46.     Simpson began violating the Interim Order right from the get-go. He immediately rehired Tristan Last, an employee who had resigned the day after I removed Simpson for cause and increased her salary without seeking my consent even though my consent was required. He hired a new IT company without my consent at an expense that required my consent.

47.     He then moved all employees away from my desk, leaving me on the outskirts of our office space, and clearly intending to show staff that I was no longer a co-member of the company. While I complied with the Interim Order and gave him access to Office.com, Dropbox,

Go daddy, he then used that access to read all my emails, including those with my counsel, and deleted my emails.

48.     Simpson has also stopped paying JJ Arch bills that are connected to my credit. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and I have received a call from each credit company this week that payments are not being made and they are in collections. Likewise, our company Visa card, Divvy, is under my credit, and he removed me from these accounts even though these accounts are tied to my credit. I have also received calls that payments are not being made on these accounts.

49.     He has since shut off my access to my emails, dropbox, all company systems, and bank accounts.

50.     He demanded that I consent to switch banks from First Republic, without explanation or reason, something that is especially frightening considering his repeated misappropriation of company assets and the fact that I would then be unable to view the accounts as required by the Interim Order.

51.     He began telling employees and third-party partners that I was no longer a member of JJ Arch and started defaming me to them.

52.     Then, on September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both our August letters. A true and correct copy of Simpson's September 1, 2023 letter is annexed hereto as **Exhibit G**, and also available at NYSCEF No. 53. His claims in that letter are completely false and amount to nothing more than pretext for his unilateral actions and exemplify his disregard for the Court and the judicial process. I responded to the letter in an email dated September 3, 2023 and a letter dated September 8, 2023, true and

16

correct copies of which are annexed hereto as **Exhibits H and I**, and also available at NYSCEF Nos. 54 and 55.

53.     He claims that I engaged in willful misconduct and breached my obligations because I purportedly obstructed his efforts to control the finances of the Arch companies. Even before the Interim Order, I in fact wrote First Republic: "Thanks Jeff, Christy this is also my understanding and hopefully we can unfreeze these accounts as soon as possible for business to proceed as usual." A true and correct copy of this email chain is annexed hereto as **Exhibit J**.

54.     He also claims that I instructed employees in the accounting department to refuse to take directions from him and make money transfers, but this is again a fabrication designed to justify his attempts to oust me from the company in derogation of the Court's order. For the last 5 years, with his consent, I have handled all approvals, and wire releases because he has not even logged into FRB online, our accounting system, since 2019, and have been a signatory, to my knowledge, on all accounts. My emails—which he has stolen since the Interim Order—will show that that after the order for each payment requested by an Arch employee, my immediate response was to get his approval and only then I would send payment. The only time I questioned him was when he illegally moved money from accounts to pay bills even though the accounts had been held investor money designated for specific projects.

55.     His claim that I told an employee not to follow his instructions is a complete lie. Rebecca Tokarczyk, the JJ ARCH accountant I think he is referring to, was uncomfortable working with him since he was using her for over a year for his personal assets instead of Arch matters. He was also using Arch Entities' funds for his personal businesses, and misappropriating funds. He was abusive as well to her. I did not instruct her not to follow his directions.

56.     He also says I "perpetuat[ed] a crisis situation at the Arch Companies for which you could then falsely blame me," but this is also false. After the Court entered the Interim Order, I have followed it fully, while he has ignored it, including by purportedly terminating me mere days after the Interim Order voided his prior termination letter and set forth our rights pending the preliminary injunction hearing.

57.     His claim that I have been making transactions from Arch accounts is again false. He also seeks to impute Fist Republic's conduct onto me, when I do not control First Republic. In fact, either he had them shut me out of the account, or as Mr. Kandel stated at the conference on September 11, 2023, Simpson shut me out, even though doing that requires express court permission. I have not obstructed anything, and in fact my email response to his request shows this. Annexed hereto as **Exhibit K** is a true and correct copy of my email response to his request to move banks. I also did not direct any Arch employee in the accounting department to make a payment on Arch credit cards after the Interim Order.

58.     His claim that I have not been in the office since the Interim Order is absurd. First, I was sick with Covid, and told Simpson that in a text message on August 22, 2023. A true and correct copy of the text message is annexed hereto as **Exhibit L**. A true and correct copy of a report from my doctor is annexed hereto as **Exhibit M**. I have also not gone into the office because he made it a completely hostile and abusive environment. He repeatedly told me to stay out of meetings and not talk to employees and when I confronted him, he told me "You are powerless and shouldn't even be here." When I went and had a two-hour meeting with him and Jason Paul in attendance as well to discuss settlement, he abruptly ended the meeting by standing up and calling me a "low life piece of shit and to watch out" while storming off. Before he deactivated all my accounts, I was fully working on emails, on calls with employees, working with the bank, etc.

18

59.     His claim that on August 26, 2023, I refused to execute authorization letters is again misleading and false. The Interim Order itself did not authorize any switch from First Republic, and as a fiduciary of the company I am obligated to make sure funds are being used in a legal and ethical manner, because he has been using company funds for his own personal expenses. His other claim that I held the sole Global Administrator access to Arch Companies' Office 365 and Drop Box accounts is also false, as I restored his rights. I also did not hold anything hostage with respect to a new IT provider; rather, I indicated that it was responsible to interview other IT providers before entering into any long-term contract with one.

60.     I also provided him with the location of all signed agreements despite his claim that I failed to do so. His claim that I "moved Arch Companies physical files into offices on the doors to which you had installed locks for which only you, and employees aligned with you, had keys, and locked the doors to such offices, thereby impeding me and other employees from gaining access to such files." As he knows, I asked for a new lock to be added because the old one was broken. He had it removed first thing in the morning and then right after, I got locked inside the office since the old latch didn't work. Additionally, I have no physical company files that I was hiding. The keys were sitting in the new lock, and in any event, not one time in 6 years has an employee come to look at any of my personal files, since all ARCH files are digital and on Dropbox.

61.     In sum, since the Interim Order, Simpson (1) terminated me and shut me out of my company email; (2) deleted my emails and evidence of his theft that was in my emails; (3) looked at my privileged-attorney client communications; (4) shut me out of company files; (5) shut me out of all company accounts; (5) defamed me in the industry and amongst the employees; and (6)

19

have stopped paying bills that are personally tied to my name and credit but are used for the company.

62.     I would also like to respond to the new accusations made in Simpson's counsel's letter dated September 11, 2023. NYSCEF Nos. 57-60. I have not improperly taken any monies from JJ Arch. As Simpson well knows, each of the partners is entitled to a monthly general partner draw, and I was owed months of my draw. We regularly over the past 6 years used our draw by directing payment to accounts or bills directly, instead of having the monies directed to us. Simpson himself regularly did this, including to pay for his own son's bar mitzvah, has overdrawn money from the company and had to borrow from me. I annexed hereto as **Exhibit N and O** true and correct copies of spreadsheets showing Simpson's own use of the GP draws to pay his own bills, and which also shows my use of the GP draw to pay such bills. I also annex hereto as **Exhibits P and Q** my emails to JJ Arch's accountant to pay the tuition bill from my GP draw.

63.     His claim that I am employed by 35 Oak, or anyone else, is also false. I do not work for 35 Oak. 35 Oak, the investor partner in Arch Real Estate, has been rightly concerned by Simpson's erratic behavior, as have I. I do not work for them, but for JJ Arch, whose interests I am trying to protect. Both 35 Oak and I share the same desire here: to protect the business, which we all have a fiduciary obligation to protect.

64.     Simpson's letter also corroborates my claim here that he has stolen my emails. The emails he attaches to his letter are my stolen emails. These emails include correspondence with my counsel, thus giving him access to privileged communications and my case strategy. This impairs my ability to defend and prosecute this matter.

65.     Simpson's bullying should be seen for what it is. He has shown a repeated pattern of prioritizing personal gains to the detriment of the Arch Entities' interests. He shut me out of the

20

company in violation of the Court's Interim Order. Granting sole signatory over and sole access to all bank accounts to him, and the unfettered control he seeks, will jeopardize the business, and leave no check on his misconduct. Indeed, it will almost certainly lead to the destruction of the business.

66.     It is also important for the Court to know that am I also a personal guarantor of Arch Entities' debt, including those relating to real properties located at 46 East 89th Street New York, NY; 9 Vandam Street, New York, NY; 1640 Montauk Highway, Watermill, NY; and 550 Metropolitan Ave, Brooklyn, NY Retail Unit. I issued those guaranties in reliance on my consent rights for Major Decisions, and my 49.9% membership interest in JJ Arch. I now face personal liability on Arch Entities' corporate debt if Simpson is allowed to unlawfully remove me from JJ Arch, deprive of my consent rights, take sole control of all accounts, and destroy the business.

67.     Finally, after the Court's issued the temporary restraining order on September 15, 2023, NYSCEF No. 86, and I was restored to email access, I discovered via emails that Simpson opened new bank accounts at Citizens Bank after my purported termination in violation of the Court's Interim Order. He has still not given me access to these new bank account(s) he created.

68.     If the Court does grant Simpson a preliminary injunction, it should do so only with a bond of at least $11,725,000.00, which accounts for the loss of my salary per year of $575,000.00 for 3 years, the loss of my investment in JJ Arch, worth at least $4,000,000.00, and my exposure to losses on personal guaranties in the amount of at least $6,000,000.00. Accordingly, a bond in the above amount is appropriate to reimburse me for any damages caused by the injunction, as it is rationally related to the damages I stand to suffer from an injunction.

69.     By reason of the foregoing, it is respectfully requested that the Court deny Simpson's Order to Show Cause.

Jared Chassen

Sworn to before me this
18th day of September, 2023

Notary public

Lino J. DeMasi

Notary ID #: 02DE6346731

Commissioned in Queens County

Expires : 8/22/2024

22

## **Word Count Certification**

     Allen Schwartz, Esq. hereby certifies that this affidavit contains 6,779 words exclusive of the table of contents, caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

          _____/s/_____

             Allen Schwartz, Esq.

23

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC

                              *Plaintiffs*,

             -against-

JARED CHASSEN and FIRST REPUBLIC BANK,

                            *Defendants*.

Index No. 158055/2023

Mot. Seq. No. 004

**AFFIRMATION OF MICHAEL WIENER IN SUPPORT OF 608941 NJ INC.'S
ORDER TO SHOW CAUSE REGARDING APPOINTMENT OF TEMPORARY
<u>RECEIVER OF JJ ARCH LLC</u>**

1.      I, Michael Wiener, am the Chief Executive Officer of 35 Oak Holdings Ltd. ("35 Oak" or "Oak Guarantor"), a Toronto-based family office, where I oversee a portfolio of businesses and direct investments. I respectfully submit this affirmation in support of 608941 NJ INC.,'s ("Oak") Motion to Appoint Temporary Receiver for JJ Arch LLC. The statements contained in this affirmation are based upon my personal knowledge of the matters described herein.

**Oak's History and Background with Simpson**

2.      35 Oak is a holding company and family office. While it is today focused on investments and real estate, our family business was first created by my grandfather, David Wiener, a refugee who came to Canada in the 1950s after surviving the Holocaust.

3.      My grandfather started Wiener Electric, a company that would later become Visioneering Corp. Visioneering pioneered the use of a lightweight frame housing for fluorescent lighting. Under the leadership of my grandfather, and later my father, Bill Wiener, Visioneering would become the largest independent manufacturer of lighting in Canada.

4.      My grandfather was always a believer that land was the safest possible store of value, because it is finite and satisfies a basic need. My family began using the proceeds from Visioneering's success to invest in real estate. We were always very conservative real estate investors; we would choose a parcel in an area that we believed had long-term development potential and revenue streams that could cover its operating expenses, purchase the land in cash without any leverage, and hold onto the land as long as it took for its value to be realized before selling it.

- 1 -

5.     Over the course of my grandfather and then my father running our family business, we were successful in assembling a sizeable portfolio of real estate, most of which was in the Greater Toronto Area. In order to manage this portfolio, my father and his sister, my aunt Sonia Rowan, put together a property management company called Bilnia Investments Ltd ("Bilnia"). Bilnia continues to manage our real estate portfolio, which includes retail, office and storage facilities, primarily in Ontario and Florida.

6.     My father generally had a very good eye for finding property in neighbourhoods before property values increased. For example, in the early 2000s, my father put together a bid to buy and develop the old Gooderham and Worts buildings east of downtown Toronto. At the time a derelict industrial site, today The Distillery District is a Toronto landmark and the home of independent shops, restaurants, galleries and a popular holiday market.

7.     More recently, in 2010, our family was able to attract a flagship development studio, Ubisoft, to locate as one of our tenants in Toronto's Junction neighbourhood. Bringing in this anchor tenant had an immediate positive impact on the entire neighbourhood, (https://toronto.citynews.ca/2013/08/21/how-ubisoft-is-changing-the-junctions-game-plan/).

**My Father's Accident and My Involvement in the Business**

8.     I have been actively involved in our family business for over a decade. Soon after graduating from the Ivey School of Business and obtaining a master's degree from the Community of European Management Schools in 2009, I started management training at Visioneering, shadowing every role in the company to see how it worked from the ground up.

9.     In December 2010, I started working at Paraflex, a New Jersey lighting subsidiary we had acquired, helping the management of the company turn the struggling business around.

- 2 -

10.     I unexpectedly had to start taking a much more active role across our business in January 2013, however, when my father was hit by a car while bicycling. He broke over 40 bones and spent the next month in a coma. I was twenty-six years old. For weeks it was not clear whether or not he would survive.

11.     My father's sudden and unexpected incapacity required me to much more rapidly assume a leadership role within the business, although that had long been the contemplated and planned outcome for one day.

12.     While remaining in my role at Paraflex, I also now had to help our management teams at Visioneering and Bilnia run our overall portfolio. By mid-February, my father was out of the coma, but it became clear that he had suffered severe traumatic brain injury. It would take many months before he came back to a semblance of himself and even now, a decade later, there are still many lingering effects, and he has never returned to the full day-to-day management he had before his accident.

## Our Introduction to Simpson and Chassen and the Formation of Arch Real Estate Holdings LLC ("AREH")

13.     For the next year or two after my father's accident, I was largely responsible for overseeing our businesses with the support of our management teams at Visioneering and Bilnia. Around 2015, my father began returning to a role in the business as CEO while having me take on the role of President. This was also the time when the recovery from his brain injury had started to plateau. While many of his mental faculties had returned, he still had a lot of difficulty with impulse control and had started to suffer severely from depression.

14.     Over this time, we had discussions about how he wanted to have some kind of project in his life to restore a sense of meaning he felt had been lacking ever since his accident.

- 3 -

He ultimately decided that he wanted to try putting together a land assembly in an area that he felt had development potential, just like old times.

15.     After looking at some potential options in South Florida and Ontario, my father settled on the neighbourhood of Edgewater in Miami, which he felt was likely to undergo a development boom as ridesharing apps like Uber changed urban mobility patterns. My father ended up buying several buildings in that neighbourhood, with the flagship purchase being 2501 Biscayne Blvd, a restaurant that he believed had significant development potential down the line. Like our family's previous purchases, the land was bought without financing.

16.     My father's purchase of this property was reported in The Real Deal, a real estate newspaper (https://therealdeal.com/miami/2016/02/23/cafe-owner-cashes-out-with-13m-sale-of-edgewater-eatery/), and it was through this publicized purchase that our family first attracted the attention of Greystone Development (where Jared Chassen and Jeffrey Simpson worked at the time), which happened to be developing a site across the street at 2500 Biscayne Blvd.

17.     I personally met Chassen and Simpson for the first time at a lunch my father invited me to with the then-Greystone team consisting of Simpson, Chassen and JP Rosenbaum. We continued to remain in touch with Chassen and Simpson over the next year to discuss the potential of redeveloping our Biscayne property, and in the summer of 2017, I invited Chassen, who is around my age and with whom I felt a rapport, up to our cottage north of Toronto for a weekend.

18.     While Chassen was at our cottage, he talked about how he felt constrained at Greystone, and that he felt there were potentially lucrative real estate opportunities like small multifamily properties around Los Angeles, which he didn't have the ability to pursue at Greystone.

- 4 -

19.     Around this time, I was working to restructure our business into a family office, as it is today. When my father had been running things, he was actively involved in day-to-day management at every level of the company.  Accordingly, to facilitate this shift in operations, I was working to professionalize and centralize overall management, starting to bring in employees at the family office level rather than just those who worked at Visioneering or Bilnia. I was particularly interested in getting some staff with expertise in US real estate, where I believed great opportunity lay.

20.     This led to a discussion with Chassen (but not Simpson, at this time) about whether he would be willing to leave Greystone and work with us to run our US real estate investments. I made clear that I would be looking for alignment and would provide him with the opportunity to invest alongside us on any deals we went into.

21.     Chassen later expressed not only his interest in coming on board, but Simpson's too. Landing a deal with Simpson—a development CEO—was certainly more than I had intended. At the time, this seemed like a great opportunity. I did not know then that Simpson had a history of emotional instability and abusive management at Greystone or that he was being forced out. I also did not realize that he had caused many of the projects at Greystone to fail by spearheading an aggressive strategy of undercapitalizing and overleveraging deals. In fact, in one conversation with Simpson, he told me that he was interested in pursuing deals with low loan-to-value ratios, because that would allow the project to survive and even be acquisitive in a difficult interest rate environment.

22.     Over the next months we worked out the structure for what would become AREH. Simpson was highly aggressive in the negotiations, not only hiding that he was being pushed out

- 5 -

of Greystone but saying that there was another family prepared to do a deal with him (given what I have since learned about Simpson and his history, I am highly skeptical of this being true).

23. Indeed, Simpson misrepresented his credentials and record of success at Greystone, causing me to incorrectly believe that he had the expertise and skills required to obtain the promised results from our venture. If I had known then what I know now, we would have never gone into business together.

24. Eventually, in December 2017, we executed the Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC (the "AREH LLC Agreement"), which governed the relationship between Oak and an entity simultaneously created with the execution of the AREH LLC Agreement, JJ Arch LLC ("JJ Arch"), of which Simpson and Chassen were members.

25. During the negotiation of the AREH LLC Agreement, Simpson represented that he had retained counsel for AREH, who therefore represented Oak. Proceeding on that understanding, we did not retain separate counsel.

26. With respect to the balance of power among Oak, Simpson and Chassen, I was kept totally in the dark about the 2021 amendments to the JJ Arch operating agreement that Simpson now (wrongly) claims allow him to maintain sole control over AREH indefinitely. While I was aware that at the beginning of our venture, Chassen would be a junior partner to Simpson, I was comfortable with this because I knew that they had an agreement by which they would both jointly operate AREH after four years. Simpson never advised me that this balance of power had changed, and continued to induce Oak's investment in deals and signature on guarantees well after the amendment was signed, knowing that Oak believed it was dealing with

- 6 -

two equal partners when in fact, Simpson would later claim he had the sole power to determine whether Oak could bring its guarantee liability to a close if a deal went bad.

27.    While I largely interfaced and dealt with Chassen, Simpson made it a point to maintain a relationship with my father, while keeping a distance from me.  Simpson was well aware that my father was brain-injured and used this to his advantage.  My father grew to trust Simpson immensely and felt very happy that Simpson was our partner. As he looks back on things now my dad is beside himself at the way Simpson manipulated him. Even while recently being antagonistic to my brother and I, Simpson would attempt to communicate directly to our dad and try to manipulate him to see us as bad people, as ignorant, inexperienced and the cause of AREH's failures.  *See* **Exhibit 24**.

28.    The early days of AREH were exciting and a time of growth, or so we thought. The team was small and worked collaboratively. I would be included in discussions as they related to new deals. The initial deals were for the most part successful, and this led to investors wanting to invest in AREH, causing the portfolio and employee-base to grow considerably.

29.    Simpson felt that the same effort required for smaller deals could be used on larger deals and started to target larger distressed opportunities. He was convinced that most real estate GPs were hands-off and just reliant on the market going up to make money. He felt that his hands-on, vertically integrated approach would unlock value on the failed deals of "lazy" owners. Simpson tended to bulldoze ahead with his ideas, even as his strategies often seemed ill-advised or ill-informed.  He insisted his underwriting was conservative and would often point to Michelle Miller, a member of the AREH staff, as a very conservative underwriter.  We would later find out that Simpson had considerable influence on Miller's underwriting of deals and would push her to be more aggressive in her underwriting without any disclosure to us that the

- 7 -

deals being presented to us were much riskier than we were led on to believe. Simpson also started to push higher-leverage deals notwithstanding that the AREH operating agreement limited investments to those with no more than 65% leverage. *See* NYSCEF Doc. No. 14 (AREH LLC Agreement) at Exhibit "A". He would argue that with a properly calculated basis, these newer, riskier investment deals met AREH's leverage limits.

30.     By late Spring 2023 it was apparent AREH was in serious trouble under Simpson's leadership. I cut short a business trip to Europe and flew directly to NY with my colleague, Charles Dreezer, to meet with Simpson and the AREH team. On this trip, I learned many sobering facts, all of which should have been disclosed much sooner, and which deepened my concern for the state of affairs.  Among the information brough to my attention was the dire straits of the Myrtle development.  Simpson had encouraged Oak to stop funding interest payments to pressure the lender to be more cooperative. This did not prove to be effective, and the lender had become less cooperative. Furthermore, it was disclosed to me that Oak's capital contributions in the deal were subordinate to another investor and earned no return. When I questioned how this could be possible, Simpson became angry and disrespectful towards me. While I had heard tell of his notorious volatility, this was the first (though not last) time I experienced it directly.

31.     My father then joined the trip on an emergency basis, where we all met at the Myrtle construction site, along with the other investor Doug Propp.  Simpson spent much of the tour of the site espousing the amazing job he was doing, and deflecting blame for the delays on a death at the site which had prompted a stop-work order (for which he disclaimed any responsibility), delaying the project.  At the end of the tour while in transit by car to another development site, Simpson and I got into a heated exchange surrounding another project.

- 8 -

Simpson became irate; he was screaming and spitting and cursing, and I sincerely believed he would strike me. To my utter shock, he jumped out of the vehicle while it was moving and then chased the car so he could slam the door, all in the pouring rain. He then made several attempts to retrieve his phone from the car—while it was still moving—screaming and slamming the door.

32.     As soon as the car could be pulled over safely, my father got out of the car to follow Simpson in an effort to calm him down. Chassen then turned to me and said he understood my frustrations but that we need Simpson. I was surprised, as I understood that Simpson and Chassen were partners with equal control over the business. It was then I learned from Chassen about the purported revisions to the JJ Arch LLC Agreement, according to which Simpson claims he "controls everything." Tensions with Simpson have mounted ever since, and the harder we would try to support the business and assets, the more adversarial Simpson seems to become. I started to have panic attacks as I realized my family was being held financially hostage by Simpson, as we had guarantee liabilities to lenders, which Simpson routinely attempts to hold over our heads.

33.     As detailed more fully below, Simpson's lack of fitness to manage AREH and its subsidiary properties became increasingly apparent.

### Simpson's Past Misconduct

34.     By way of background, JJ Arch is AREH's Managing Member. Oak, on the other hand, invested the vast majority of capital—$3 million in AREH directly to fund its operations, with an additional investment of over $50 million in the properties developed, managed and/or controlled by AREH or JJ Arch. Under the AREH LLC Agreement, Oak is entitled to a 4% return on, and a return of, its capital contributions to AREH, after which Oak is entitled to 20%

of the profits. Oak has made the vast majority of its investments in the Property[1] through Arch affiliated entities (the "Affiliated Entities" and together with AREH, the "AREH Entities") and is entitled to distributions from those entities in respect of such investments in accordance with the governing documents of those entities.

35.     AREH has certain Affiliated Entities, some of which hold real properties for the purpose of investment, management, development, and sale. The Affiliated Entities are managed, directly or indirectly, by AREH, but their equity is held by third-party investors, including Oak. These entities own multiple real properties. Oak is the largest equity-holder in certain of the Affiliated Entities, and in almost all cases, its interest substantially exceeds that of JJ Arch's.

36.     Simpson initiated the above-captioned matter (the "JJ Arch Proceeding") after a tumultuous stretch of weeks in August 2023 during which Simpson and Chassen each purported to have terminated the other from JJ Arch. However, the difficulties at JJ Arch long preceded the mutual terminations in August 2023, and Simpson has committed various acts of serious misconduct, which are more fully detailed in Oak's suit styled as *608941 NJ Inc. v. Jeffrey Simpson*, United States District Court of New York, Case No: 1:23-cv-07089, filed August 10, 2023 (the "Federal Proceeding"). *See* **Exhibit 1**. As alleged in the Federal Proceeding, Simpson breached his fiduciary duties to Oak by, among other things:

a.     Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor (as guarantor of certain loan obligations with respect to the Arch Portfolio) to stop work on critical, time sensitive work as a means of leverage to force Oak to take certain actions. *See, e.g.*, **Exhibit 2** (July 11, 2023 11:50 PM email from J. Simpson re:

---

[1] "Property" as used herein shall having meaning ascribed in the accompany memorandum of law: the AREH Entities, together with the AREH Entities' bank accounts (the "Accounts"), the AREH Entities' records, and the real properties owned and/or controlled by any of the AREH Entities.

Morrison Cohen, redacted due to privilege concerns but available for *in camera* review).

On information and belief, Simpson continues to interfere in the representation of AREH,

certain of its subsidiaries, Oak and Oak Guarantor in these time-sensitive matters,

advising counsel to halt work following his removal from JJ Arch and AREH.

b. Directing counsel for AREH, certain of its subsidiaries, Oak and Oak

Guarantor to not speak to Oak or Oak Guarantor, such counsel's own client. Again,

Simpson's purpose was to exert leverage over Oak and Oak Guarantor. *See, e.g.*, **Exhibit**

**3** (August 1, 2023 5:36 PM email from J. Simpson re Nostrand).

c. Making misrepresentations to Oak concerning capital. For instance,

regarding the 550 Metropolitan Avenue development in which Oak is a General Partner,

it came to Oak's attention that although the relevant member loan provisions in the

underlying agreements allow Oak to fund shortfalls and accrue an 18% interest rate,

AREH at Simpson's direction had made a commitment to other investors that such loans

would accrue at only 12%. AREH and Simpson made this commitment without Oak's

knowledge, authorization, notification, or any amendment to the underlying agreements.

*See* **Exhibit 4** at Section 3.2.2 (Amended and Restated Limited Liability Company

Operating Agreement of 550 Metropolitan Ave Holdings LLC); **Exhibit 5** (550 Member

Loan Distribution Records, reflecting interest rate of 12%). Oak challenged this

immediately, and Simpson attempted to justify his unauthorized and unwarranted conduct

by suggesting that family and friends would be unduly penalized under the contractually

agreed 18% rate. The 550 Metropolitan Avenue development is not the only instance in

which Simpson unilaterally, without Oak's knowledge, authorization, notification, or any

amendment to the underlying agreements, lowered the interest rate accruing to Oak.

- 11 -

d.      Advising Oak that certain capital calls to other investors had been made, which was not the case in fact.  As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute. *See, e.g.*, **Exhibit 2** (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted for privilege); **Exhibit 6** (July 31, 2023 8:01 PM email from T. Last re: Myrtle).

e.      Threatening to fire all AREH employees and cease operations if Oak does not accede to demands for money, despite no capital calls having been made.  *See, e.g.*, **Exhibit 7** (July 11, 2023 11:39 PM email from J. Simpson re: Meeting Recap).

f.      Engaging in conduct constituting a "Major Decision" under the AREH LLC Agreement, which requires the consent of Oak, without providing Oak any notice of such conduct nor seeking Oak's required approval.  Simpson likewise attempted to circumvent his obligations to obtain Oak's consent to make a Major Decision, which is defined as, among other things, a decision to "enter into any agreement requiring the expenditure of more than $50,000 per annum" by amending an agreement to facially appear to fall below the $50,000 threshold, when in fact, the contingent liabilities under said agreement well exceeded that amount.

g.      Making misrepresentations to induce Oak's investment in various properties in the Arch Portfolio; generally creating a hostile business atmosphere because of his ego that is damaging critical relationships with lenders, contractors, tenants, etc.; and making defamatory statements to third parties. *See, e.g.*, **Exhibit 3**.

- 12 -

37.     Through the JJ Arch Proceedings, Oak has learned of additional disturbing information as to Simpson's prior management of the AREH Entities and other misdeeds. To provide a few illustrative examples, Oak has learned:

a.      "The operation of the Arch Entities did well initially, but it went downhill over the past two years." (September 14, 2023 Affidavit of Jared Chassen (the "Sept. 14 Chassen Aff.") at ¶ 16).

b.      "Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks." *Id.* ¶ 19.

c.      "Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else." *Id.* ¶ 19

d.      "Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle

- 13 -

Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss." *Id.* ¶ 20

      e.    "Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses." *Id.* ¶ 21.

      a.    "[A]s cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures." *Id.* ¶ 22.

38.    While Chassen and Simpson alike accuse one another of misappropriating funds, Simpson has admitted to improper use of company funds, explaining that an employee of his automobile business, Rêver Motors, which is completely separate from AREH, is on the AREH payroll. (October 2, 2023 Affidavit of Jeffrey Simpson, NYSCEF Doc. No. 160, ¶ 19). Simpson's belief that this misappropriation of AREH assets is justified because the employee is working for JJ Arch rather than Simpson directly merely shows his willingness to use any excuse available to explain away his misconduct, no matter how untethered his beliefs are from reality.

**Simpson's Present and Ongoing Misconduct**

39.    Unfortunately, Simpson has continued in his campaign of obstructionist behavior and other misconduct since the initiation of the JJ Arch Proceeding and the Federal Action. This

- 14 -

Court entered the Interim Order with the hope of both parties acting in good faith to maintain the previous status quo to permit the business operations of JJ Arch to continue pending resolution of Simpson's and Chassen's respective claims. The unfortunate reality that has played out is that Simpson's inability to cooperate with others, need to have absolute control and willingness to disregard clear provisions of operating agreements or even court orders for his own personal advantage has made the goal of the Interim Order impossible to achieve.

40.     Notably, despite the clear terms of the Interim Order and the Court's urging the parties to cooperate, Simpson purported to terminate Chassen a second time on September 1, 2023. (Chassen Aff. ¶52).  Other conduct Simpson has committed in contradiction of the spirit and letter of the Interim Order includes "(1) hiring three new employees without obtaining [Chassen's] consent, and actually firing employees he perceives as allied with [Chassen]; (2) opening new bank accounts at Citizens Bank without giving [Chassen] full access to those accounts; (3) refusing to give [Chassen] signing authority on bank accounts, taking the position that the orders do not require him to do so; and (4) refusing to give [Chassen] full access to Juniper Square, JJ Arch's investor portal, instead insisting that [Chassen has] only limited access. He has also directed employees at Arch not to talk to [Chassen] and has refused to share information with [Chassen]." (October 6, 2023 Affidavit of Jared Chassen (NYSCEF Doc. No. 186, "Oct. 6 Chassen Aff.") ¶ 21).

41.     Simpson's egotism, incompetence and animus for Chassen and/or Oak has stymied plans to salvage distressed properties.[2]   For instance, regarding the flagging Myrtle

---

[2] Beyond the extortion and clear violation of his duties to Oak, Simpson's conduct is volatile to the point that third parties, besides Oak, have felt the need to act.  For example, AREH's former IT consultant hired counsel to communicate its withdrawal from providing services, citing "threats and accusations" directed towards it. (**Exhibit 9**). *See also* (NYSCEF Doc. No. 128, Transcript of September 15, 2023 Proceeding at 5:15-22 (statement of Mr. Kandel, counsel for First Republic, noting Simpson and/or his counsel called him approximately 15 times the day prior) and 37:23-38:5 (statement of Mr. Kandel, again noting the unreasonable frequency of contact from Simpson

- 15 -

development, Simpson refused to provide any meaningful information as to the financial needs to complete the project and secure the much-needed anchor tenants, which is the only reasonable path forward to prevent a complete loss on the project. (**Exhibit 8**; Oct. 6 Chassen Aff. ¶ 6). When asked to confirm the accuracy of the proposed budget to secure the anchor tenants—which Oak would contribute—Simpson set off on a tirade about the lack of funds, despite the fact that the solution under consideration was further investment from Oak: "As I previously indicated there's 200,000 to finish. . . By tomorrow, the site is getting locked down without any workers. There is no money to pay for anyone. You can't try to call the shots on this stuff when there's no money to pay for anything. It doesn't work. If you actually care about the assets and the needs that are required, that's a real dialogue." *Id.* Simpson's insistence that Oak not speak with other parties such as lenders and other investors without his involvement has also led to threats of suit, despite the utter lack of basis for such an action. *Id.* (threatening, "This is the last notice to you. You are not to reach out to anyone without my consent. If you continue, it's at your own risk and immediate legal action will be taken.").

42.    In another instance of conduct that can only be characterized as bare extortion, Simpson has decided to hold hostage the sale proceeds from the very Biscayne property my father first acquired to help him out of his depression, and that led to our family meeting Simpson in the first place. The details of Simpson's inexcusable behaviour are contained in the accompanying affirmation of Kevin Wiener ("K. Wiener Aff.").

43.    Simpson has also obstinately resisted complying with Oak's books and records demands, despite Oak's clear entitlement to such documents under the AREH LLC Agreement. AREH (under Simpson's present authority) is withholding documents unless Oak agrees, in

and his counsel)).

effect, that no information ascertained from the books and records can be used to disrupt his regime. [3]  *See* **Exhibit 10** (requiring Oak to agree not to make copies of any documents and to treat all such documents as privileged settlement communications); AREH LLC Agreement §§ 11.3, 11.4, 11.5.1, 11.5.2. [4]  His continued opposition to provide any reliable information about the financial situation at the AREH Entities prevents Oak from even considering investing further capital—which Simpson has repeatedly demanded[5]—cutting off the possibility of a necessary lifeline for the business.  (**Exhibit 13**; **Exhibit 14**; Oct. 6 Chassen Aff. ¶ 13).  When Oak has asserted its fulfilment of contractual obligations to provide capital, Simpson has resorted to such incendiary claims as calling Oak "terrorists."  Of course, without information about the intended and actual use of the funds, and any information reflecting the actual necessity, Oak refuses to throw good money after bad.

44.     Simpson's refusal to comply with the books and records demands while simultaneously demanding capital with no reasonable explanation for its use or necessity, and without following the proper channels of raising a capital call is also reflective of his pattern of extortive, threatening conduct towards Oak.[6] Brazenly, in the midst of demanding capital that

---

[3] Oak has credible concerns that the books and records will reveal serious malfeasance, explaining Simpson's conduct.  Indeed, in one of the latest rounds of urgent funding requests without any explanation of the use or necessity of the funds, Simpson advised that to meet urgent cash needs, he was proposing to "borrow" from other accounts "temporarily," including $80,000 from an "Arch account that is used for investor funds" that Simpson believed belonged to Investor Member.  When advised of Oak's needs that had to be met before it would contribute more money, whether that money came from a new wire transfer or funds in an investor account, Simpson clarified that in fact those funds had already been taken.  Oak understands that Simpson has continued to cover AREH overhead by redirecting money from the property accounts, although he has since claimed that rather than "borrowing" the funds, he is simply having those properties pay AREH money it is owed, though there is no way to confirm the veracity of these claims without access to the records.

[4] Oak is not the only partying seeking but not receiving access to financial information to which it is entitled.  *See* **Exhibit 11**; **Exhibit 12**; **Exhibit 23**.

[5] Oak is under no obligation to make any further capital contributions at this time, as its funding requirements have been fulfilled.  Any such contributions would be on a voluntary basis, subject to negotiated terms.

[6] On more than one occasion, Simpson unreasonably refused to effect certain decisions for which AREH's consent is required, absent Oak's assent to demands purely for Simpson's own benefit, often consisting of broad releases of

- 17 -

Oak can only assume is required due to Simpson's incompetence, he references the looming liability to Oak: "We must also notify the lenders about what is happening and give them a choice to make protective advances. Of course there are obligations under the loan documents to continue under all the circumstances. Since you are the completion guarantor in most cases, I need to alert you and ask you one last time." (**Exhibit 13; Exhibit 14**). Alongside such requests, Simpson has engaged in a campaign of misinformation to investors, attempting to pin the blame on Oak for the current state of affairs, without naming it as such. *See*, e.g., **Exhibit 15** (in a communication to investors, offering a seriously misleading account of the state of the project by asserting, "our investment partner has indicated they are in a position where they either unwilling or unable to contribute additional funds. This recent change has caused work to stop at the site until additional funds are infused into the project.")

45.     Simpson's urgent demands for funds (purportedly for the purpose of sustaining the AREH Entities) while Oak remains blind to the use of such funds are yet more concerning in light of the simultaneous demands that Oak pay certain legal bills.  Oak has been very clear that Simpson is a threat to the business and ardently opposes Simpson's demand that Oak contribute to its downfall by bankrolling a battle that is directly contrary to Oak's interest.

**The Existing and Imminent Harm**

46.     Certain of the effects of Simpson's mismanagement are already known.  For instance, as of the time of this filing, at least seven properties under JJ Arch's management have gone into default due to AREH's failure (under Simpson's control) to pay debt service obligations, and three have foreclosure auctions scheduled.  *See* Ex. G. to the Oct. 6 Chassen Aff. At least some of the defaults are non-remedial, occurred despite Simpson's prior notice of

---

claims and liability for unrelated matters.

imminent default, and concerned properties for which Simpson had failed to make any capital calls (which would have obviated the default if a legitimate need for capital had been established). Indeed, with respect to the 88 University default notices, the underlying conduct of amending the 88 University lease agreement (where AREH's corporate offices are located) without lender consent not only constituted a default under the loan documents, but also violated Oak's Major Decision rights.[7] *See* **Exhibit 21**; **Exhibit 22**; AREH LLC Agreement §7.1.3. The number of default notices is expected to grow based on Oak's understanding that formal notices have not been sent in all applicable cases.

47. Similarly, in a situation that is rapidly unfolding, Oak recently learned that AREH purposely failed to comply with the requirements under Section 1031 of the Internal Revenue Code (the "1031 Exchange") to obtain tax benefits, the receipt of which was essential to the commercial success of the project and was the basis on which Oak's (and other investors') investment was sought and obtained. Communications from AREH's staff to Chassen provide a startling glimpse into the circumstances:

> Oh boy, I thought for sure someone would have told you this. I am sorry to be the one to deliver the news. There will be no 1031 tax treatment for NCSC. We have known for awhile now that the 1031 exchange for NCSC basically failed. The gain deferral is so small it is immaterial. Aaron Gaynor and/or Michelle can better speak to the specifics on why that is but on a high level I understand that either or both of the following factors required for a 1031 exchange to take place was not met:
>
> 1. Requirements on timing of the reinvestment of proceeds.
>
> 2. Requirement surrounding the percent of proceeds reinvested.
>
> We've known this since back when we were on the 11th floor, but

---

[7] The lease amendment not only constitutes an agreement between AREH and an affiliate, but also an agreement requiring the expenditure of more than $50,000 in a calendar year, both of which are major decisions under the AREH operating agreement.

investors were not notified.

*See* **Exhibit 17**. Thus, while members of AREH's staff, and Simpson himself, were aware of the failure to obtain these benefits, no effort was made to inform investors, and Oak only learned of this issue after Chassen received the above-quoted correspondence and provided it to Oak. As a result, investors in the project now face unexpected and significant tax liabilities that eclipse any possible return that could have been obtained on the property. Oak has also just learned that Simpson personally had minimal exposure under the abandoned 1031 Exchange, unlike Oak and Chassen, whose tax liabilities together are in the millions of dollars. (Oct. 6 Chassen Aff. ¶24).

48. AREH induced investors'—including Oak's—investment on the basis that AREH and its principals (meaning Simpson) were rolling their proceeds into the 1031 vehicle as well, providing an alignment of interests, which was not true in fact. S*ee* Exhibit O to K. Wiener Aff. (an email from Investor Relations to Frank Van Biesen on September 24, 2021 at 8:53 PM). Indeed, Simpson likely knew before buying the properties in the 1031 vehicle that the deferral would not be successful. Nevertheless, he not only proceeded with the purchases and locked up investors' property but hid the fact from Oak, which was the biggest 1031 investor and as a member of AREH had major decision rights to purchase the properties in the first place. Oak would not have consented to the purchases if it knew that AREH did not have proper investments lined up for the 1031 to succeed.

49. Other investors, too, have come forward to express their serious dissatisfaction with the 1031 Exchange issue. *See* **Exhibit 16**. Following a call in which Simpson dodged investors questions about the failed deal, one investor, who happens to be a relative of Chassen, gave a concerning account of Simpson's conduct:

> [Simpson] appeared unprepared to answer the really critical
> questions I and the others on this call had. Instead, he got angry

- 20 -

and started throwing blame around. Regardless of who didn't do what, it is my understanding that it is Arch's responsibility to make sure that legal obligations/tax filing requirements are met. Jeff became very agitated and terminated the call in an angry manner, in effect hanging up on the callers. Arch is a business and I am an investor. Whatever is going on with the partners had no place on this call. I have significant dollars of mine invested with Arch and remain concerned about these dollars. The call today did not reduce my apprehension nor did it answer my very important questions that affect my 2022 tax filing THIS YEAR.

*Id.*

50.     While Oak has also recently learned from the various filings in the JJ Arch Proceeding that the AREH Entities face serious solvency concerns, any bankruptcy proceeding will in fact compound Oak's losses by potentially triggering hundreds of millions of dollars in liabilities under certain guaranties Oak and its parent have executed. (**Exhibit 18, Exhibit 19**). Aware of the consequences to Oak, Simpson has threatened to put the AREH Entities into bankruptcy, notwithstanding that any such action requires Oak's consent under the AREH LLC Agreement. (Chassen Aff. ¶ 23). As Chassen recounted in this proceeding: "Simpson in text messages and in verbal communications to me and Michelle Miller, a junior partner/employee, threatened to put all the Arch entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business. Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, '[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization.'" (Chassen Aff. ¶ 23).

51.     Thus far, Simpson has refused to acknowledge his awareness of Oak's consent rights or commit to observing them, requiring Oak to seek emergency relief. (**Exhibit 20**).

- 21 -

52.     Indeed, Oak has recently learned that Simpson's latest counsel (marking at least his fourth change in representation since August) specializes in bankruptcy and restructuring, and has gone so far as to file a removal to federal court to positively affirm Simpson's right to bankrupt AREH or any of the entities without Oak's consent. We can only conclude that Simpson is planning to imminently initiate bankruptcy proceedings.

53.     The fact that Simpson would even make these threats to "blow up" the business leave Oak in astonishment because Simpson himself would face significant personal losses in the event he carried out his plan, albeit on a much smaller scale than the losses incurred by Oak. Simpson's apparent willingness (and ability) to proceed on a course of mutually assured destruction gravely concerns Oak and requires that rational actor be installed in his place to prevent the natural and probable consequences of his continued conduct.

54.     Oak's concerns are not speculative or imaginary: Simpson has routinely disregarded Oak's consent rights for certain decisions—those deemed "Major Decisions" under the AREH LLC Agreement—including those pertaining to the expenditure of funds, interested party transactions and lease agreements.  All signs point towards Simpson's behavior escalating, as his increasingly desperate conduct mounts.  *See, e.g.*, **Exhibit 25** (reflecting *ex parte* communications to the court seeking court intervention regarding the Accounts).

55.     Simpson has routinely disregarded Oak's consent rights for certain decisions—those deemed "Major Decisions" under the AREH LLC Agreement—including those pertaining to the expenditure of funds, interested party transactions and lease agreements. He has not provided an AREH budget for approval since 2021, and given his steadfast refusal to provide books and records, Oak has no visibility into whether Simpson has exceeded the spending in the budget, which he requires Oak's consent to do.  AREH LLC Agreement § 7.1.3.

- 22 -

56.     Likewise, Simpson has flagrantly violated the Interim Order in the JJ Arch Proceeding by terminating Chassen for a second time without any legitimate basis and by hiring and firing AREH employees (which conduct also violates Oak's Major Decision rights).  (Oct. 6 Chassen Aff. ¶ 21).

57.     Oak stands in the untenable and unenviable position that it stands to lose all of its investment in the AREH Entities (plus incur liability under guaranty obligations) if it refuses to give in to Simpson's unjustified demands, or else, it invests more in the hopes of saving the operations, and inevitably loses that too.  If Simpson is removed from the equation, as this Motion seeks, there is hope yet to protect Oak and its interest in the Property.  The central question left to be decided in the JJ Arch Proceeding now centers on who should control JJ Arch. Based on the foregoing and as argued herein, the answer to that question is:  certainly not Jeffrey Simpson.

WHEREFORE, for the foregoing reasons and those stated in the memorandum of law accompanying this Affirmation, and the October 17, 2023 Affirmation of Kevin Wiener, Investor Member respectfully requests that the Court appoint a temporary receiver of JJ Arch to act as the Managing Member of AREH, pending the resolution of the JJ Arch Proceeding and other related cases.

I affirm this 17th day of October, 2023, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

- 23 -

_____

Michael Wiener

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

| | |
|---|---|
| JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ ARCH LLC<br><br>*Plaintiffs*,<br><br>-against-<br><br>JARED CHASSEN and FIRST REPUBLIC BANK,<br><br>*Defendants*. | Index No. 158055/2023<br><br>Mot. Seq. No. 004 |

**AFFIRMATION OF KEVIN WIENER IN SUPPORT OF 608941 NJ INC.'S ORDER TO SHOW CAUSE REGARDING APPOINTMENT OF TEMPORARY RECEIVER OF JJ ARCH LLC**

- 1 -

1.      I am a director and the corporate secretary of 35 Oak Holdings Ltd ("35 Oak"), the

parent company of 608941 NJ INC. ("Investor Member"). Recently, I have also been acting as its

in-house counsel to 35 Oak and Investor Member.

2.      While my brother, Michael, has historically been more actively involved in the

family business, I have been on its board of directors and chaired its investment committee.  On a

day-to-day basis, though, I have pursued an independent legal career.

3.      After graduating on the Dean's Honours List from the Queen's University Faculty

of Law in 2015 and completing the law licensing process, I worked as a judicial law clerk for the

Honourable Justice E. Susan Elliott of Canada's Federal Court, working primarily on

administrative law appeals.

4.      My time at the Federal Court helped me develop a passion for administrative law,

and after finishing my clerkship, I set up my own private practice in Toronto, where I practiced

mostly refugee law, primarily for clients on legal aid. Over the course of my practice, not a single

one of my clients was successfully deported when I was retained to seek a deferral or stay of

removal.

5.      In May 2020, I was appointed as an adjudicator at Canada's Immigration and

Refugee Board, which is the Canadian equivalent to being a US immigration judge. From May

2020 until September 2021, I worked in the Refugee Protection Division, where I was responsible

for questioning and making decisions on asylum claims. My job required me to review and

synthesize thousands of pages of personal and country condition evidence, sensitively question

traumatized refugee claimants, evaluate credibility, and render cogent and timely decisions on

claims, frequently orally at the end of the hearing.   From September 2021 to April 2022, I worked

in the Immigration Division, where I conducted immigration bail hearings for non-citizens

- 1 -

detained by the Canada Border Services Agency. In my time at the Immigration and Refugee Board, none of my decisions were ever found unreasonable or unfair by the Federal Court.

6.     I left the Immigration and Refugee Board in the spring of 2022 to take a position at Strosberg Sasso Sutts LLP, one of Canada's top class action plaintiff boutique litigation firms, where I had completed my articles during my law licensing process. Over both my periods of time at Strosberg, I have worked on several multi-billion dollar class actions, ranging from securities to antitrust to environmental protection. One case I worked on—a class action against Volkswagen for emissions violations in their diesel vehicles—led to the largest class action settlement in Canadian history against a non-government defendant.

7.     I recently left my job at Strosberg Sasso Sutts LLP to work full time at 35 Oak and Investor Member as the situation has deteriorated at Arch and as Jeffrey Simpson's unstable and destructive behaviour has forced us and other investors into an untenable situation, requiring both my brother and I to spend virtually all of our time trying to manage the quagmire Simpson has created.

**Beginnings of my Involvement with Arch**

8.     I began to get involved with the situation at Arch in July 2023 after my brother, Michael, informed me that many of the properties we invested in were underperforming, the development properties had serious and complex issues that needed to be resolved, and that he was dealing with a partner at Arch who was arrogant and inflexible, who felt entitled to unlimited cash infusion with no oversight, and who appeared to be demonstrating genuine mental instability. On the latter point I thought my brother must have been exaggerating based on a normal personality conflict, but I would come to learn that he was in fact understating just how uniquely appalling Simpson's conduct has been. I would also learn that all the problems my brother was aware of just

- 2 -

scratched the surface of the harm Simpson had caused through his mismanagement and compulsive dishonesty.

9.     Late at night on July 11, 2023, Simpson had precipitated a crisis by instructing Morrison Cohen, Arch's counsel working on numerous litigation and transactional matters across the portfolio, to put pens down on all work. This sudden move was particularly distressing because one of the files the firm had been working on for weeks, a forbearance agreement in the Myrtle Point development that would stop $2 million a month of default interest from accruing and create the breathing room to get the property finished, was now in jeopardy. *See* **Exhibit A** (email from D. Scharf to M. Wiener and F. van Biesen – July 12 at 6:20 AM).

10.     Simpson said that he would not allow Morrison Cohen to continue work on any file until Investor Member committed to pay all legal bills (without any specificity or limitation). Not only did this exceed any obligation Investor Member had, this was also confusing to us, as we had just made a deal with Morrison Cohen to pay half of their outstanding bills and defer the remainder for a few months in the hopes that we could get the properties to a state to start infusing cash back into the business and covering overhead. Morrison Cohen was entirely satisfied with this arrangement; it was Simpson who was suddenly making new demands on Investor Member without any necessity or basis.

11.     Simpson then went further, demanding notwithstanding the fact that Investor Member's lawyer was on vacation, that unless we made some nebulous funding commitment above and beyond what was in the operating agreements, he would "send [us] notices of non-compliance of funding on a corporate level and at the properties level" and start terminating staff at Arch and at the properties. He advised that he would be terminating staff two days later and that the remaining staff would be insufficient to cover work on the properties that we had guarantees

- 3 -

on. *See* **Exhibit B** (email from Simpson to M. Wiener and F. van Biesen – July 12 at 9:31 AM). The threat was clear: in the absence of carte blanche to cover whatever spending Simpson wanted without any oversight or adequate explanation, he would allow the properties to go into foreclosure and subject Investor Member and 35 Oak to significant default interest on our carry guarantees. I would learn that this was Simpson's typical approach: to use his power as managing member to threaten us with guarantee liability unless we immediately did what he wanted.

12.     By that Friday, Simpson was continuing to threaten and insult my brother and accusing us of not living up to our funding commitments (when in fact the relevant property-level operating agreements explicitly only required additional funding from Investor Member if the relevant JJ-controlled entity put in its share of the capital call, which it never did). He had also demanded that we agree to his proposal to immediately take over the business on his terms or he would unilaterally dissolve the business. *See* Exhibit A (email from Simpson to M. Wiener and F. van Biesen – July 13 at 11:37 PM).

13.     At this point, I began dealing with Simpson directly, hoping that a new face would help move things forward since there appeared to be a level of resentment and hostility towards my brother. I proposed that we quickly agree on an interim budget for Arch Real Estate Holdings, LLC ("AREH") and the properties for the next couple of months, and that would create the breathing room to have a larger negotiation about a separation between Simpson and the 35 Oak entities rather than agreeing to anything under such extraordinary duress. *See* Exhibit A (email from K. Wiener to Simpson – July 14 at 4:50 PM). Simpson's only response was a condescending email to "read the operating agreement," as "that will be a fruitful thought provoking process" for me. I have, of course, read the relevant operating agreements that were signed on paper, which in no way mirror Simpson's imagined agreements.

- 4 -

14.     The next week, Simpson's threats and erratic behaviour continued. After Investor Member's counsel reached out to Morrison Cohen to confirm they had no issues with the funding deal we had already reached, Simpson was now aggrieved that we had spoken directly to David Scharf (who in addition to representing AREH and the properties, also represented Investor Member and 35 Oak directly as guarantor). Rather than just committing in principle to contribute such capital as would be required to cover the legal bills, Simpson was now demanding that Morrison Cohen incur additional legal bills to "memorialize in writing" some sort of funding commitment from Investor Member to Arch. Simpson also stated that he had retained counsel for JJ Arch LLC ("JJ Arch"), and that he would be diverting needed funds from AREH to pay his own lawyer "as damages for interference of the business," despite the fact that there was no provision to use AREH funds to pay JJ Arch's lawyer. *See* **Exhibit C** (email from Simpson to K. Wiener – July 17 at 10:17 AM). Demanding or using our money to pay for his own lawyer would become a recurring theme with Simpson.

15.     After a further exchange and further threats from Simpson, I made clear that Investor Member would continue to abide by its legal obligations to meet capital calls when made, but that we would not be bullied. *See* Exhibit A (email from K. Wiener to Simpson – July 17 at 5:56 PM). I had not yet realized at that time, that across the portfolio (with a couple of exceptions), Simpson had never even attempted to capital call other investors to cover expenses, presumably because he wanted to hide from them the financial needs of those properties. Nor, in most instances, had he capital called Investor Member. He also never made any contribution on behalf of JJ Arch or offered to decrease his sizeable management distribution, despite JJ Arch's own capital call obligations.

- 5 -

16.     Simpson's response was that JJ Arch had no funding obligations (which it plainly does), told us that our "only role in the business" is to "write checks and provide guarantees" and that he would no longer make any effort to keep cash needs down, instead issuing weekly capital calls, apparently to us and only to us.  *See* Exhibit A (email from Simpson to K. Wiener – July 17 at 6:13 PM). He then sent a follow-up email threatening to shut us out of communications from our joint lawyer.  *See* Exhibit C (email from Simpson to K. Wiener – July 17 at 6:57 PM).

17.     Given the way things had deteriorated, and given Simpson had already proposed to step away from the business, we began working on a counter-proposal. At this time, we were hearing from Jared Chassen ("Chassen") that Simpson continued to be unstable and abusive at the office, that he was on the verge of driving away key staff, and that something needed to change quickly and not in a few months. We made a proposal that Simpson step away immediately, that Chassen would become managing member of JJ Arch, and that Investor Member would fund during an interim period during which either an alternative manager could be brought in to manage the assets or Investor Member would have the ability to take control of AREH.

18.     Notwithstanding Simpson's offer, just days earlier, to step away from the business, his counsel now advised ours that he was no longer considering leaving in any capacity.

19.     On July 24, 2023, we received an email from Tristan Last, an AREH employee, in response to some due diligence requests where we discovered, for the first time, that all the capital we had been putting in had not been properly called at the LP level, jeopardizing our priority with the LP investors. *See* **Exhibit D** (email from T. Last to K. Wiener – July 24 at 4:56 PM).

20.     That week, we were scheduled to have a call with David Scharf at Morrison Cohen to walk us through the bankruptcy plan for the Nostrand property, one of the properties in the AREH portfolio. The call seemed to start well, but before we could get any information from

Scharf, Simpson began monopolizing the call, not letting anyone else get in a word edgewise. Finally, Charles Dreezer, an employee of 35 Oak, interrupted to try asking a question. This set Simpson off, and he told Dreezer, in a voice on the verge of yelling, not to interrupt him. At this point, my brother told Simpson that it was inappropriate for him to talk to a member of our team that way. Simpson began screaming "I AM THE F**KING MANAGING MEMBER" at the top of his lungs, yelled that the call was over, and hung up. He then physically went around to the phones the other AREH employees were on and made them hang up too, before attempting to contact David Scharf to demand that he too get off the call. I have genuinely in my life never seen anyone blow up like that in a professional environment and I was immediately shocked and appalled at the temperament of the man we were stuck in this business relationship with.

21.     Simpson then refused to answer phone calls to try to get the call put back on the line, even when I offered to have Dreezer apologize. In follow up emails he continued to be extraordinarily combative, calling us illiquid and insolvent and blaming us for AREH's business woes because we were hesitant to continue to put tens of millions more dollars into properties that had failed due to Simpson's mismanagement and undercapitalization. *See* **Exhibit E** (email from Simpson to K. Wiener – August 1 at 11:13 PM).

**Discussions with Chassen and Simpson's Removal**

22.     While things had been continuing to deteriorate with Simpson, we maintained an open line of communication with Chassen. Unlike Simpson, who is pathologically incapable of admitting wrongdoing, Chassen felt bad for the difficult state of the properties (Chassen had put significant amounts of cash from both him and his family into various investments, unlike Simpson, the vast majority of whose equity merely came from acquisition fees) and recognized

the extraordinary strain their ongoing cash needs had placed on our family's liquidity. Chassen

had spent months trying to play a mediative role between Simpson and our family.

23.     However, by the end of July, Simpson turned even on his long-term protégé. On

August 5, 2023, Simpson purported to terminate Chassen as a member of JJ Arch and to remove

him from AREH's operations entirely. This development was extraordinarily alarming to us, as

Simpson was getting rid of the one person who had appeared to have any level of success in

tethering him to reality and who (at least on paper) had some level of control over AREH.

Moreover, as he later admitted, he did not even have cause to remove Chassen, believing based on

the operating agreement that existed only in his mind that he did not need any cause to remove

Chassen and that he could fire him as if he were an employee. *See* **Exhibit F** (email from Simpson

to K. Wiener – August 6 at 5:30 PM).

24.     It was clear to us that Simpson, not Chassen, had committed cause events under

both the AREH and JJ Arch operating agreements.  So, on August 6, 2023, counsel for Investor

Member sent Simpson a cause event notice advising that we believed cause existed for the removal

of JJ Arch as managing member of AREH. Subsequently, Chassen sent Simpson a notice that in

part for the reasons listed in Investor Member's cause event notice, Simpson had committed cause

events under the JJ Arch operating agreement and was deemed to have immediately resigned as a

member of JJ Arch.

25.     Over the next two weeks, Investor Member worked with Chassen to try to make

progress on the properties. Other than one employee, everyone else at AREH recognized the

legitimacy of Chassen's removal of Simpson and business proceeded apace. During this time,

AREH and Investor Member enjoyed a productive relationship. Instead of trying to hide

information from Investor Member the way Simpson did, Chassen ensured that AREH was

- 8 -

transparent with its other member and seemed willing to fully discuss his proposed plans of action with respect to the properties. This was a welcome change from Simpson's approach of telling us only what he felt we needed to know, demanding that he make decisions himself without consultation or input, and then threatening to dissolve the business or leave us liable on our guarantees unless we funded whatever plan Simpson decided on, regardless of whether the operating agreements required us to provide that funding or not.

26.     We also started to learn information kept from us about how many of the difficulties on various properties were attributable entirely to Simpson's erratic and bombastic behaviour. In one instance, we learned that a piece of litigation related to one of the properties had only commenced because of a nasty email Simpson had sent to all the opposing parties and that Simpson's behaviour in an attempted mediation—screaming at the other side—had been a serious impediment to resolving the dispute.   This was not the only dispute mismanaged by Simpson, leading to losses AREH would not have otherwise suffered.

27.     Meanwhile, after Simpson was removed, he continued to do everything possible to run the business into the ground. He had his counsel threaten key AREH employees with litigation if they did not cooperate with him (*see* NYSCEF Doc. No. 191 (LinkedIn message from Adam Leitman Bailey to Michelle Miller expressing "I do not want to sue you or have involved in the lawsuit")), took action to freeze all bank accounts, refused to agree to any sort of interim measure that could keep the accounts open while the parties negotiated unless Chassen was removed from every account (an outcome that I understand the court has denied him). His lawyer also advised Investor Member's counsel that he would be seeking both criminal charges and bringing civil litigation against us and our lawyers because of Simpson's removal.

- 9 -

**Simpson Restored to Management**

28.     When this Court temporarily restored Simpson to management of JJ Arch, subject to Chassen's major decision rights, Simpson reached out and seemed willing to discuss potential solutions.  While we were initially quite hopeful, Simpson's conciliatory mood did not last.

29.     Simpson kept demanding that we "take responsibility" for his removal, namely by paying him approximately $100,000 to cover the legal fees he had incurred.  This was not the only time that Simpson demanded that Investor Member pay all his legal fees.  When we drew a line in the sand that we would not fund his legal fees in ongoing and outstanding litigation against Chassen (but would consider it as part of a global settlement that led to a separation), Simpson would become enraged. Later on, instead of just funding his legals, Simpson began demanding over and over again that we send him documentation from the two-week period that Chassen was running the business so that he could use those documents in this litigation.

**Simpson Holds Biscayne Hostage**

30.     In another area where Simpson initially seemed cooperative but then reversed course, we asked for him to consent to a purchase and sale agreement for the property at 2501 Biscayne Avenue. This property was originally purchased by my father in 2016; in 2021, Simpson convinced us to sell half of the property to Infinity Collective, another real estate development firm, so that they could assist in a joint venture to redevelop the property. At Simpson's urging, rather than maintain a direct stake in the property, we instead rolled our ownership interest into a new LLC called 2501 Arch LLC, which in turn held the equity in the joint venture. Simpson maintained that this structure would allow us to leverage AREH's reputation for the redevelopment. Investor Member's subsidiary, however, maintained 100% of the equity in 2501

- 10 -

Arch LLC, and while AREH was the managing member of the LLC, it was limited in its compensation to fees previously agreed to and incorporated into the operating agreement.

31.     In our first conversation after Simpson was restored to management, we discussed whether he would be willing to consent to the sale of the property (in which Simpson held no equity stake whatsoever). There was a strong offer on the property, and particularly given the ongoing cash needs of the AREH portfolio, we badly needed to know that some liquidity was coming into the pipeline.

32.     While Simpson promised to move quickly on the consent so that the purchase and sale agreement could be signed before the buyer walked, he repeatedly delayed approval, repeatedly demanding money for his signature. During this time, he demanded that the JV capital call from us and Infinity to cover all allegedly outstanding fees rather than simply paying the fees out of the proceeds of the sale, as would be typical.

33.     After Simpson finally signed the consent (having delayed for many days, nearly jeopardizing the sale), I raised an issue I had just identified in the relevant 2501 Arch LLC operating agreement as well as that of the JV that owned the property, whereby it appeared that there may have been an overpayment of fees to AREH rather than $60,000 in additional fees being payable.  When I raised my concerns, Simpson flew off the handle, accusing us of acting in bad faith by raising this after he had signed the consent (I didn't think this should matter to the consent, since the sale of the property would obviously maximize value and cash for both investors, and any negotiations over the fees could simply be resolved by holding back the $60,000 in fees that Simpson believed he was entitled to from the sale proceeds). .

34.     That afternoon, after discussing the matter our business partner in the JV, we determined that however bad faith Simpson was acting, given the relatively small sums in dispute

- 11 -

as compared to the sale proceeds, we would simply offer to concede the fee dispute, consent to the $60,000 and waive any claims of overpayment with the understanding that Simpson would not try to interfere with the sale he had consented to or the distribution of its proceeds. Simpson refused to make this deal. While he was comfortable with the sale proceeding based on his prior consent, he now raised for the first time the idea that there needed to be a hold-back of the entire sale proceeds while any litigation is resolved relating to Investor Member's involvement in Simpson's removal from JJ Arch.

35. In discussions with other investors that have been reported back to us, Simpson has reaffirmed that he intends to hold any sale proceeds from Biscayne hostage in 2501 Arch LLC, notwithstanding that the operating agreement explicitly requires distribution of funds within 45 days of a capital event. Nor is there any basis to allow AREH, which holds 0% of the equity in 2501 Biscayne LLC, to refuse to distribute the proceeds of the sale, especially because the equity in 2501 Arch LLC is not held by Investor Member at all, but by 35 Oak US 4, Inc., a wholly separate corporation with no role in the Simpson/Chassen dispute.

36. But that is par for the course with Simpson: what matters is not what an operating agreement actually says or what the law allows, but what will give him maximum leverage in a particular situation.

37. Over the ensuing weeks, Simpson has refused every proposal we have made to pay $60,000 into the AREH coffers in exchange for giving us control of the Biscayne sale proceeds, instead making more and more demands (again, including demands for his legal fees). It is clear that just like our guarantee liability, Simpson intends to use his control of the Biscayne property for extortion, all while claiming that he is the only person in our relationship who cares about investors.

- 12 -

38.      It is hard to overstate just how corrosive Simpsons behaviour on this property has been to any remaining shred of trust we have in this partnership. While constantly exhorting everyone else to abide by the operating agreements, Simpson has demonstrated again and again that he is entirely willing to disregard those agreements if he feels sufficiently aggrieved or can gain some sort of advantage.

39.      This has put us in a bind when it comes to investing further capital into the AREH properties. The entire point of continuing to invest, rather than demanding that properties be sold or tendered (where we are the only investors willing to continue to contribute capital) is the hope that this additional money will someday lead to us recouping some or all of our initial investment. But at this point, we have no confidence that any of our money will ever be returned to us even if the properties ultimately turn around.   This is especially true where Simpson will not even provide any books, records or accounting to show us where the previously-invested money has gone, where the newly-demanded money will go, or otherwise allow any visibility at all into what is happening. And if Simpson is willing to hold hostage an entity he controls where we are 100% of the equity, how can we trust him to look after our interests where we aren't?

**Simpson's Conduct Continues to Degenerate**

40.      Notwithstanding the hostage situation with Biscayne, Simpson otherwise continued to go back and forth between cooperative and belligerent. Even when he was not being openly hostile, he would still engage in the same extortionate conduct against us, sometimes in a manner that made little sense.

41.      Earlier last the year Simpson had pursued an ultimately failed acquisition in Pittsburgh, asking us for initially $500,000 and then ultimately $1,000,000 to cover the deposit. We had made clear to Simpson that we were not in a position to cover the entire closing, and that

- 13 -

the deal absolutely needed other investors or we would not be in a position to close. Simpson assured us that he would find other investors and the deal would close with minimal investment ultimately needed by Investor Member.

42.      Simpson did not find other investors. The deal did not close.

43.      Normally when buying property, the purchase agreement would initially be executed by AREH, and then on closing assigned to the LP formed with the other investors. In this case, there was no closing, so AREH itself was involved in the ensuing litigation to try and reclaim the deposit. In addition, by the summer of 2023 there were about $250,000 in closing costs and ongoing litigation fees that needed to be paid, and for which Simpson issued a capital call to us under the AREH operating agreement.

44.      At the end of August, AREH finally entered into a settlement agreement with the sellers on Pittsburgh that would return enough funds to cover the other deal-related expenses. When we were advised that our consent would be required for the settlement, our counsel sent a basic, clean consent, as requested. But Simpson balked, demanding a consent that included a full release of any claims against him related to this deal in exchange for this consent to the settlement. This made no sense to us: the settlement was beneficial to AREH.

45.      After a frustrated back and forth, I finally worked directly with one of Simpson's many lawyers, who ultimately convinced Simpson to simply agree to the settlement on Pittsburgh.

46.      We continued to try working with Simpson's lawyer (Tom Furst) to reach some sort of partial resolution on certain of the properties that would have, among other things, ensured additional capital at the AREH level but, by September 12, Simpson had made clear that he had no interest in the partial settlement that had been productively discussed with Furst. After that date, I never heard from Furst again.

- 14 -

47.     It was at this time that things began to further deteriorate.

48.     On several occasions, Simpson had demanded that we make overhead payments to AREH, supposedly to cover payroll, although Simpson remained steadfast in his refusal to provide underlying information—saying that if we didn't, all the employees would walk. Initially we were quite willing to provide funding, notwithstanding that we had not received a budget for AREH since 2021 and had little transparency on books and records. We did have serious concerns, given Simpson's constant demands to be indemnified for his legal fees, that those fees had already been taken from AREH and would continue to be taken from AREH so that Simpson would have a war chest for his litigation against Chassen. We also had concerns about the reports we had gotten through Chassen that Simpson had been using AREH employees and resources for personal and JJ Arch work. At one point, Simpson admitted to us that AREH's staff accountant had been doing personal work for him that would, at some point, have to be reconciled and repaid to AREH. Setting aside that this was highly inappropriate in the first place, as far as we can tell, there has been no such repayment. It is unclear to us what other Arch overhead and infrastructure Simpson has used for his personal benefit, but we believe it to be significant.

49.     The other major concern we had was that our ongoing contributions to both AREH and the properties had been done without any capital calls or any sort of appropriate documentation so that we could keep track of the capital stack at the properties and our outstanding capital at AREH. While Simpson had previously represented to us that these cash infusions were being booked as equity at the AREH level to cover payroll that would eventually be reimbursed by corresponding fees to the properties (where such costs could often be paid from credit available on a loan or by multiple investors still funding), Simpson reneged, now arguing that they were equity injections directly to those properties that would never be repaid.

- 15 -

50.     We have asked on multiple occasions to get a reconciliation of the capital

contributed to AREH—or even just a breakdown of the new money being sought and how it would

be treated— but it has never been provided.   Indeed, Simpson has maintained that it was

unreasonable to ask for one given the urgency of the cash needs. In reality, he seems to wish to

retain the ability to retroactively reclassify which entities money has been funded to and how that

money is to be treated.

51.     In response to our refusal to inject capital without a breakdown of funds, Simpson

began raiding the property accounts and redirecting funds to AREH. This had begun shortly after

he was put back in charge: on August 24, 2023, Simpson advised that to meet urgent cash needs,

he was proposing to "borrow" from other accounts "temporarily," including $80,000 from an

"Arch account that is used for investor funds" that Simpson believed belonged to Investor Member.

When I followed up and advised that we had certain needs that had to be met before we could put

more money in, whether that money came from a new wire transfer or funds in an investor account,

Simpson clarified that in fact those funds had already been taken. *See* **Exhibit G** (email from

Simpson to K. Wiener – August 25 at 6:22 PM).

52.     Simpson has continued to cover overhead by redirecting money from the property

accounts, although he has since claimed that rather than "borrowing" the funds, he is simply having

those properties pay AREH money it is owed.  I have no idea whether or not that is true, given

Simpson's continued refusal to give access to books and records.

53.     Later that week, our ask became simpler: even without a breakdown or capital calls,

I wanted to know exactly what we were paying for so that I knew that the money wouldn't be used

to pay for Simpson's lawyer or an employee at his car dealership. I therefore asked Simpson to

provide the payroll report and invoices of everything that was about to be due so that we would

- 16 -

have backup for everything we would be funding. Simpson initially seemed willing, but then decided that we were not entitled to these documents and that he would not provide them.

54.     When I advised Simpson that Investor Member had reached its contractual funding cap and therefore had no funding obligations—but that we were willing to contribute upon receipt of the invoices, Simpson once more grew enraged, calling my family terrorists, implying that we would be subject to criminal penalties under federal law, and advising me not to contact him, but instead to reach out to his lawyer who I would be paying for.

55.     As we moved into September, Simpson prioritized working on the litigation above all else, at one point stopping senior AREH employees from apparently doing any work but assisting him with evidence for court.

56.     At this point, I had become very uncomfortable with Simpson's constant litigation-related threats and demands over email and advised Simpson that I was no longer willing to have direct discussions about ongoing litigation. Such discussions would need to be through counsel. I also advised that I was still willing to discuss the business of AREH and asked for an update about one of the properties. Simpson responded that he would not provide such an update, that I could not pick and choose which discussions went through counsel, and that all discussions would go through counsel that Investor Member would be liable to pay for. He also demanded that we not talk to any employees at AREH. *See* **Exhibit H** (email from Simpson to K. Wiener – September 12 at 9:20 PM).

57.     We then did not hear from Simpson again for another week, when he involved yet another new lawyer. This lawyer, like Furst, appeared interested in settlement and we had some level of hope that there would be someone talking reason to Simpson. Simpson now promised that he could get us off all the guarantees immediately and wanted to set up a settlement meeting. After

- 17 -

initially threatening to call off the meeting unless my brother and I flew down to New York on virtually no notice, he ended up walking out of the meeting shortly after it began and it ended up being a waste of everyone's time.

58.     As expected, it became clear that Simpson's promises of getting us off the guarantees were nothing more than wishful thinking or dishonesty.

59.     We then demanded an inspection of books and records, certain reports that should have been provided pursuant to the AREH LLC Agreement, and an equitable accounting so that we could see to what extent Simpson had been misusing AREH resources for his personal affairs and what the real financial state was of each property. While promising that he had nothing to hide, Simpson continued to delay and defer providing books and records, finally stating that he was willing only to have our CFO be walked through them on a screen-share provided that no copies of the records could be made, that nothing could be shared with anyone else, and that no evidence of misconduct we found could be used in court. He has even gone so far as to file a frivolous federal court removal in our state court proceeding seeking books and records merely to prevent us from having a hearing that could provide us those records.

60.     We also learned, on the last week of September, about the IRC Section 1031 failure. We could not believe that Simpson and his top employees at AREH, despite knowing that investors faced severe tax liabilities, kept the failure from investors (including us) for months. Again and again, Simpson had maintained that he could not step away from managing AREH because only he cared about the other investors while we cared only about ourselves. We also looked back at our records to see how Simpson had misled investors to induce them to invest into the 1031 vehicle in the first place, with AREH saying that there would be alignment between investors and AREH because AREH was participating in the 1031, when in fact Simpson, the sole directing mind of

- 18 -

AREH, participated minimally or not at all. *See* **Exhibit I** (email from Investor Relations to F. van Biesen – September 24, 2021 at 8:53 PM). We are still trying to determine exactly how the 1031 failure happened and whether the AREH team proceeded with asset purchases, knowing that the 1031 deferral would not take place and investor funds would be locked into illiquid assets, just to increase fees and avoid failed closings. Given Investor Member has major decision rights over the acquisition of property by any entity controlled by AREH, we would not have consented to these purchases if we were informed that they would not successfully lead to a tax deferral.

61.    At the same time, Simpson was beginning to reach out to investors about the properties that were all entering default and (in some cases) foreclosure. Receiving these investor communications, it became clear that while Simpson had always demanded property-level funding from us both on the basis that other investors could not contribute more and that we would receive economics on our member loans, in fact in most cases AREH had never informed investors about the capital needs, with these investor communications in some cases advising that investors would be receiving capital calls for millions of dollars to cover the equity we had already contributed. *See* **Exhibit J** (email from Investor Relations to F. van Biesen entitled "Bushwick Update and Capital Needs" – October 2, 2023 at 3:49 PM). Simpson played a two-faced game, telling us that he was capital-calling the other investors who could not contribute when in fact he had never asked to avoid them knowing the truth about how badly the assets were performing.

62.    Most recently, we have learned that Simpson has been holding small group investor calls, ensuring that investors cannot meaningfully talk to each other and that Investor Member (frequently the biggest investor in each deal) cannot talk to the other investors. On these calls, Simpson denies any responsibility for the state of the portfolio, blaming it solely on the interest rate environment and Investor Member's failure to cover the negative carry, having apparently

- 19 -

induced these initial investments by promising other investors, without our knowledge, that Investor Member would be on the hook for any additional capital. *See* **Exhibit K** (email from Simpson to K. Wiener – July 26 at 6:45 PM).

63.     At the same time, Simpson has made more and more unreasonable demands of us. His most recent tactic is to demand that Investor Member is not allowed to talk to any AREH employees, investors, lenders, lawyers, or apparently anyone else with any form of relationship with AREH, without Simpson's consent. *See* **Exhibit L** (email from Simpson to K. Wiener – September 30 at 10:28 PM). Simpson, who has already demonstrated himself to be a compulsive liar, appears to require that all information flow through him so he can decide who will have access to the truth and who will have access to Simpson's version of the truth.

64.     At this point, it has become impossible to see how this business can continue with Simpson in charge. We have lost all confidence that Simpson can act in our best interest or the best interest of any other investor, or that we can trust him with any amount of our money. We are bombarded constantly with unreasonable and ridiculous demands by Simpson, who grows more paranoid by the day, and who constantly reinterprets operating agreements and history to his own advantage. Simpson refuses to leave, even though he is the sole impediment to the recovery of the AREH portfolio. We cannot even get the transparency about AREH's finances to try to come to deals on a property-by-property basis, and to the extent we try to talk to a lender directly this only deepens Simpson's intransigence. It has reached the point where Simpson has threatened legal action against us for talking to lenders with whom we have a direct guarantor relationships. *See* **Exhibit M** (email from Simpson to K. Wiener – October 5, 2023 at 9:36 PM). On some of these properties, the only deals that seem workable involve us funding expenses through providing collateral to the lender rather than equity to Simpson, merely so we have some reassurance of

- 20 -

getting that money back if the property is successful. Even in these situations, Simpson has gone

out of his way to ensure such a structure cannot be consummated, apparently preferring the assets

go into foreclosure than that Investor Member contribute capital in a manner that is not controlled

by Simpson.

65.     Simpson's most recent actions have made clear that there is nothing he will not do

to try to hold the portfolio, and our guarantees, hostage. After having his counsel spend weeks

ducking the question of whether he believes he can put AREH or its subsidiaries into bankruptcy

without Investor Member's consent, as the AREH operating agreement requires, Simpson forced

investor member to bring a proceeding to seek a TRO preventing him from violating Investor

Member's major decision rights. Simpson's response has been to use his newly-retained

bankruptcy counsel, who is apparently being paid from scarce AREH funds, to remove the case to

federal court so that Simpson can affirmatively argue that he can put any entity in the AREH

portfolio into bankruptcy without the consent of Investor Member of any other investor, no matter

what the relevant operating agreements say.

66.     Not only does this further expose Simpson's hypocrisy—having said time and time

again that Investor Member needs to abide by the operating agreements, he is now seeking to

disregard their clear language—but it also shows that he has no plan to salvage the portfolio.

Instead, his only plan appears to be a kamikaze mission to put everything into bankruptcy in the

hopes of triggering full recourse liability for 35 Oak and the other investors Simpson has induced

to sign guarantees.

67.     We have been loath to take any action that would put the AREH portfolio under the

ultimate oversight of a JJ Arch receiver. In our minds, it would take a truly awful manager to

justify putting a receiver in charge of what was once a billion-dollar real estate portfolio. And yet

- 21 -

we are stuck with such a manager in Simpson, and there does not appear to be any other alternative to remove him and start to clean up the damage he has caused. In the absence of a receiver over JJ Arch, we will simply have no recourse to save AREH and all the money invested by both Investor Member and the other investors.

WHEREFORE, for the foregoing reasons and those stated in the memorandum of law accompanying this Affirmation and the October 17, 2023 Affirmation of Michael Wiener, Investor Member respectfully requests that the Court appoint a temporary receiver of JJ Arch to act as the Managing Member of AREH, pending the resolution of the JJ Arch Proceeding and other related cases.

I affirm this 17th day of October, 2023, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Kevin Wiener

- 22 -

# EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK — COMMERCIAL DIVISION

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

                              *Plaintiff,*

            - against -

JARED CHASSEN and FIRST REPUBLIC BANK,

                              *Defendants.*

Index No.: 158055/2023

**AFFIDAVIT      OF      REBECCA
TOKARCZYK**

608941 NJ INC.,

                              *Plaintiff,*

            - against -

JEFFREY SIMPSON and JJ ARCH LLC

                              *Defendants.*

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

Rebecca Tokarczyk, being duly sworn, deposes and says:

1.      I respectfully submit this Affidavit in Support of 608941 NJ INC.'S Order to

Show Cause Seeking a Temporary Restraining Order and Preliminary Injunctive Relief as an

Alternative to Appointment of a Temporary Receiver of JJ Arch LLC.

2.      I am currently employed by Arch Real Estate Holdings, LLC ("AREH") as an

accounting manager, though on Friday, October 27, 2023, I was placed on furlough, along with

all other AREH employees. Our furlough ended November 6, 2023 and we all resumed working

in the office under the control of Oak as Managing Member.

3.     I hold a Bachelor of Science in accounting from State University of New York at Oswego, where I graduated in 2016.

4.     I am not a Certified Public Accountant (CPA) or a Chartered Financial Analyst (CFA).

5.     Following my graduation from college, I held various accounting positions at professional organizations in the finance and publishing industries.

6.     My employment at AREH began in November 2022, when I was hired as a staff accountant.  I was later promoted to corporate accounting manager in June 2023.

7.     For the first several months that I was employed by AREH, I was performing work exclusively for JJ Arch and its principals (Jeff Simpson and Jared Chassen).  However, my salary and benefits have always been paid by AREH.

8.     At the time I joined AREH, there were seven or eight accountants in house, and we also used outside accounting services.  Earlier this year, three accountants—a construction accountant, a corporate accountant working on property management, and the director of finance—left AREH and were never replaced.  Then in September, another corporate accountant who focused on taxes also left.  This—along with earlier departures—led to a severe understaffing issue, and the lack of a director-level accountant particularly hampered the team due to a lack of leadership and experience.   At this point, there are only two accountants on staff who do the same amount of work we were doing when we had seven or eight in house and outside accountants.

9.     Given that I am not a CPA or a CFA and there is no one else at AREH with that background, I personally have struggled under the present circumstances.  AREH manages

hundreds of millions of dollars in real estate and is part of a highly complex organizational structure. There are dozens of bank accounts, with a great deal of activity in receivables and payables on any given day.

10.     In June 2023, when I was promoted to corporate accounting manager, I began to notice that the accounting operations fell below what I considered to be standard operating procedure, based on my education and prior work experience within other organizations. The degree of informality, lack of documentation, and general lack of discipline or rigor in processes was very concerning to me, but AREH was also not a place where differences of opinion were encouraged or even tolerated, as I will explain.

11.     At that time, Mr. Simpson directed me to figure out ways to move money around to pay AREH bills and the bills of struggling properties under various AREH subsidiary entities. Generally, we were told to go to the bank portal, see which subsidiary entities had funds in their accounts and try to find a way to move money from there into the accounts of the struggling subsidiary entities.

12.     To do this, the other accountants and I would find a certain property that had excess funds, and then would see if there were any open invoices for amounts owed to AREH. We would pay the internal invoices from the AREH subsidiary entity to one of the AREH management companies, and then move the funds up and down the corporate structure, depending on where the funds were needed.

13.     To better describe how this worked, it probably makes sense to explain the basic structure of some of the entities involved. There is AREH, which sits at the top of the organizational structure. Below AREH, there are four subsidiaries, each with accounts of their own. These are Arch Asset Management, Arch Builders, Arch Advisors and Arch Developers.

Arch Property Management is wholly owned by Arch Asset Management. Arch CS&S is wholly owned by Arch Builders. Besides these entities, there are also a number of other property-specific entities under the AREH umbrella.

14.     Generally, we would move money from the flush property-specific entities to Arch Property Management based on invoices from Arch Property Management to the project-specific entity, after which we would move that money to Arch Asset Management, and then to AREH. From there, we would distribute to Arch Builders or Arch CS&S or a property-specific entity as needed.

15.     Mr. Simpson is an extremely aggressive person whose management style can only be described as abusive. When the staff was first informed that he was removed from JJ Arch, we had a collective feeling of relief. In the immediate aftermath of his removal, we all worked from home for two weeks, but when he was reinstalled, it was like the nightmare was beginning again.

16.     In terms of my personal experience with Mr. Simpson and his style of leadership, I have never experienced the treatment I have from him from any other employer. On one occasion, he berated me for a full 45-minutes for what he claimed was "not knowing how to communicate" with him.

17.     On Friday, October 27, 2023, Mr. Simpson instructed me to "borrow" from certain entities in order to cover payroll. The entities in question had no open payables to Arch or any Arch affiliates, and there was no logical reason to expect funding from these entities. When I expressed my concerns about doing so, Jeff became irate and told me "I am the Managing Member, I can take money from wherever I want." He said he didn't "know why he was fighting for us anymore," by which I think he meant the AREH employees. After being

asked to submit these questionable, if not fraudulent, transfers and refusing, I left Jeff's office. I walked directly to my desk, picked up my jacket and my bag and walked out of the office. It was 4:30 PM. I did not speak to any other employees or tell any employees we were not going to get paid. I simply left early.

18.     I then left the office and received the furlough email sent to all AREH employees a few hours later. I found this surprising because I am aware that we have paid well over a hundred thousand dollars in legal bills in the past weeks, which I personally handled.

19.     After the furlough email, my email and dropbox access were shut off, and I no longer had my laptop. Mr. Simpson contacted me on my personal cell phone the morning after placing everyone on furlough to ask me to come in for work, but I did not respond to that text message. He then contacted me again by text on November 1, 2023, angry that I had left the previous Friday despite him giving me "an opportunity that was beyond your experience" and telling me that others left right after me. I did not tell any employee to leave nor did I organize a "walk out," as Mr. Simpson claimed. I left at 4:30 PM on Friday October 27, 2023 because Mr. Simpson was asking me to submit fraudulent transfers and I refused.

20.     I am worried that Mr. Simpson has put me in a position where I will be blamed, even though I was following his orders, and frankly, didn't feel like I was safe to go against them. I hope the damage can be undone somehow and that business can go on under stable leadership.

21.     I resigned from my position as Corporate Accounting Manager on November 9, 2023, my last day of employment will be November 22, 2023. The reasoning that has led to my decision to resign is 100% due to the actions of Mr. Simpson. My decision to resign has nothing to do with Oak being put in charge as Managing Member.

22.     Since Mr. Simpson's return to the office in mid-August, Mr. Simpson spent his time and Arch resources on his lawsuit, and his priorities were more self-interested. Although Oak has only been acting as Managing Member for just over a week, it is clear that Oak is genuinely trying to do what is best for Arch. They have been trying to understand all of the details of every deal and property, meeting with each team member, asking questions, and providing updates and feedback.

23.     Based on my experience working under the direction of Mr. Simpson for the past year, I do not believe Mr. Simpson is fit to run any company including, but not limited to, AREH and JJ Arch. In my opinion, he has failed his fiduciary duties as Managing Member.

24.     The statements contained in this affidavit are based upon my personal knowledge of the matters described herein, and upon books and records that AREH and JJ Arch keep in the regular course of business, of which I have personal knowledge and familiarity.

Rebecca Tokarczyk

Sworn to before me this

16 day of November, 2023

Notary public

MASSIEL GONZALEZ
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01GO6331700
Qualified in Queens County
Commission Expires 10/19/2027

# EXHIBIT 7

## AMENDMENT NO. 1 TO
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## JJ ARCH LLC

THIS AMENDMENT NO. 1 TO LIMITED LIABILITY COMPANY AGREEMENT of JJ ARCH LLC (this "Amendment") is made and entered into and is effective as of May 22, 2021, by and between JARED CHASSEN ("Chassen"), and JEFFREY SIMPSON ("Simpson").

### WITNESSETH:

WHEREAS, Chassen and Simpson are parties to that certain Limited Liability Company Agreement of JJ ARCH LLC, dated as of December 11, 2017 (the "Operating Agreement");

WHEREAS, Chassen and Simpson desire to amend the Operating Agreement as hereinafter provided;

NOW, THEREFORE, for good and valuable consideration, the Operating Agreement is hereby amended as follows:

1.  Capitalized Terms.  Initially capitalized terms used in this Amendment and not otherwise defined shall have the respective meanings assigned thereto in the Operating Agreement.

2.  Amendments to Operating Agreement.

a.  Section 1.1 of the Operating is hereby amended by deleting the definition of "Distribution Percentage" therefrom in its entirety and the following is inserted in lieu thereof:

"Distribution Percentages:  With respect to Simpson, 50.1% and with respect to Chassen 49.9%."

b.  Section 1.1 of the Operating is hereby amended by deleting the definition of "Redemption Amount" therefrom in its entirety and the following is inserted in lieu thereof:

"Redemption Amount:  An amount equal to the greater of (b) any life insurance maintained by the Company or the other Member, on the life of the deceased Member or (b) all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that in the case of a

Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

c.　　Section 3.1 of the Operating Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"3.1　　<u>Management of the Company</u>.　The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.2), full, exclusive and complete discretion with respect thereto.　Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.　Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)　　conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)　　open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)　　enter into any contract or endorsement in the name or for the account of the Company;

(iv)　　employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

(v)　　bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)　　deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)　　cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(viii)　　take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

2

    d.    Section 3.2 of the Operating Agreement is hereby delete in its entirety and the following is inserted in lieu thereof:

    "3.2.  <u>Limitations on Simpson's Authority</u>.  Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "<u>Company Major Decision</u>"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request.  Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

    (i)    acquire any direct or indirect interests in any Person other than AREH;

    (ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

    (iii)    sell any asset of the Company or any portion thereof other than any such asset that is no longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

    (iv)    merge, consolidate or other reorganize the Company with another Person;

    (v)    borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

    (vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

    (vii)    enter into any lease for space;

    (viii)    hire any employee, consultant or other personnel;

    (ix)    engage in any business or activity not authorized by this Agreement;

4854-0544-0262, v. 2

(x)      enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)      enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)      enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)      maintain reserves in excess of $20,000;

(xiv)      admit new or substitute Members to the Company;

(xv)      modify any material terms of the AREH Operating Agreement;

(xvi)      cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

e.      Exhibit A is hereby deleted in its entirety.

3.      <u>Right to Participate in Investments</u>.  Notwithstanding anything in the Operating Agreement to the contrary, from and after the death of either Chassen or Simpson (the "Deceased Member")  to the date on which the non-Deceased Member dies, the Company shall permit, or cause its Affiliates to permit, the spouse and issue of the Deceased Member to invest in all transactions in which the Company would otherwise have been entitled to invest if the Deceased Member had not passed away on the terms and conditions set forth in this Section 3.  The Deceased Member's spouse and issue shall be entitled to invest an amount not greater than the amount being invested by the non-Deceased Member and its Affiliates in such transaction and at such time as the non-Deceased Member and its Affiliates make their investment in such transaction; provided that if the Deceased Member's spouse or issue elect to invest in a transaction, the rights of the Deceased Member's spouse and issue shall be no more or less favorable than those of the participants in such transaction other than the non-Deceased Member.

4.      <u>Miscellaneous</u>.  (a)  Except as modified hereby, the Operating Agreement remains in full force and effect and the provisions thereof are hereby ratified and confirmed.

(b)      All references in the Operating Agreement to "this Agreement", "hereunder", "hereto" or similar references, and all references in all other documents to the Agreement shall hereinafter be deemed references to the Operating Agreement as amended hereby.

(c)      This Amendment may be executed in one or more counterparts, all of which together shall for all purposes constitute one amendment, binding on all parties hereto, notwithstanding that the parties have not signed the same counterparts.

[signature page follows]

4854-0544-0262, v. 2

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the day and year first above written.



Jeffrey Simpson



IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the day and year first above written.

_____
Jeffrey Simpson


_____
Jared Chassen

# EXHIBIT 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS
LLC, and JJ ARCH LLC,

*Plaintiffs,*

-against-

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants.*

Index No. _____

Date Filed:

**SUMMONS**

Venue is placed in New
York County because a
substantial part of the
events or omissions
giving rise to the claims
occurred there

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve
a copy of your answer, or, if the Complaint is not served with this Summons, to serve a Notice of
Appearance, on Plaintiffs' attorneys within twenty (20) days after service of this Summons,
exclusive of the day of service (or within thirty (30) days after service is complete if this Summons
is not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
Complaint.

Dated: New York, New York
August 14, 2023

Yours, etc.

ADAM LEITMAN BAILEY, P.C.

By: _____
Adam Leitman Bailey, Esq.
Brandon M. Zlotnick, Esq.
One Battery Park Plaza, 18th Floor
New York, NY 10004
Phone: (212) 825-0365
*Attorneys for Plaintiffs*

**DEFENDANTS' ADDRESSES:**
Jared Chassen
47 Bridge Street, 6A

[938485/1] 1

Brooklyn, NY 11201

First Republic Bank
c/o New York State Secretary of State

[938485/1]                              2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS
LLC, and JJ ARCH LLC,

Index No. _____

**COMPLAINT**

*Plaintiffs,*

-against-

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants.*

        Plaintiffs JEFFREY SIMPSON, individually and derivatively, as managing member of JJ

ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS

LLC, and JJ ARCH LLC, by their attorneys, ADAM LEITMAN BAILEY, P.C., complaining of

the defendants, allege as follows:

<u>**NATURE OF THE ACTION**</u>

        1.     This action is brought by Plaintiffs to undo a coup d'état executed by Defendant

Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"),

control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ

Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to

redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from

Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise control

over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at Defendant

First Republic Bank ("First Republic"), which has left Arch Entities unable to use such accounts

to pay for such necessities as payroll, subcontractors, materialmen, and insurance. Plaintiffs also

seek to require Chassen to act to restore Simpson's access to his company email account with Arch

[938459/1]                1

Entities, to the Dropbox account where Arch Entities' documents are stored, and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web site.

## PARTIES

2.      Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

3.      Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

4.      Arch is a real estate investment management, construction management, property management, and development company.

5.      Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

6.      Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

7.      Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

## BACKGROUND

### Simpson's Tenure at Greystone

8.      Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

9.      Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a

host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

10.     One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

11.     Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

12.     A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

[938459/1]                                    3

## Simpson's Formation of Arch and JJ Arch

13.　　In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

14.　　The original business address for Arch was Simpson's personal residence address at the time.

15.　　At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

16.　　At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

17.　　Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

18.　　From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

19.　　Simpson and Chassen are the only persons who have ever been members of JJ Arch.

[938459/1]　　　　　　　　　　4

## The Arch Companies' Growth Under Simpson's Leadership

20. Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

21. By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

22. Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

23. Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

24. The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

25. Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

## Chassen's Role with the Arch Companies

26. With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

27. From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

28. While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of

[938459/1]                                        5

his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

29.     The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

30.     However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

31.     In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

32.     On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

33.     However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

34.     JJ Arch's operating agreement was thus amended, with Chassen's consent, on or about May 22, 2021. The amendment removed the authority that Chassen would have had, following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage, arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained effective only until the fourth anniversary of the JJ Arch Original Operating Agreement (*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8 ¶ 3.1(b)), this meant that Chassen

[938459/1]                                     7

would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.

35.     In addition, JJ Arch's operating agreement was amended to bar Chassen from becoming an equal equity owner in JJ Arch. When JJ Arch was formed, it was agreed that my share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would commensurately increase, on an annual basis, such that, by the fourth anniversary of the operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of "Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

36.     However, JJ Arch's operating agreement was amended, with Chassen's consent and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 1 ¶ 2(a).)

37.     In addition, Arch's operating agreement provides that "the business, affairs and assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in [the operating agreement] (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto." (Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [Arch] has the authority to perform both directly and indirectly through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct, manage and

control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

38.     Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

39.     Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

40.     Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

## **Means of Removing Members of Arch and JJ Arch**

41.     Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

42. The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of [Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.")

43. Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

44. Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

**CHASSEN'S MISCONDUCT**

**Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch**

45. In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees

their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial

reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such

a pay cut, although at the time he did not inform Simpson how large of a pay cut he would be

willing to take.

47.     In or about early July 2023, Simpson asked Chassen how large of a pay reduction

Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

48.     Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact,

Chassen would not be willing to accept any pay reduction.

### The Coup Begins

49.     Chassen, apparently working in concert with NJ Inc. and with several other

employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch

from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon

information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted

the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First

Republic to remove Simpson as an authorized signatory on all accounts he maintained with First

Republic in either his corporate or individual capacity, including all bank accounts that the Arch

Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson

maintained individually with no connection to the Arch Companies.

50.     Chassen was neither authorized to make this change, nor did he provide Simpson

with any advance notice thereof.

51.     First Republic complied with Chassen's demand. First Republic informed Simpson

that it no longer permits Simpson to make transactions from any of the accounts he maintains with

First Republic in either his corporate or individual capacity, or, indeed, any other account on which

[938459/1]                                          11

Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**The Forced Resignation of Chassen from Arch**

52.     On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

53.     Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

54.     Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

55.     Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

56.     Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

57.     Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

[938459/1]                                   12

## The Coup Continues

58.     Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-issued computer. As a result, Simpson could not obtain access to the business records of the Arch Companies, or the computer payroll program that Arch Companies use to pay their employees. Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made changes to such site, without Simpson's authorization, to remove references thereon to Simpson as a managing member.

59.     Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson, by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement ("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of JJ Arch.

60.     However, by the time of the Chassen 8/6/23 Letter, Chassen had already been removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly, as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger Simpson's own resignation by delivering to him a purported notice of Cause Event.

[938459/1]                              13

61.     Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such instruction Simpson remained JJ Arch's managing member with exclusive authority over the Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ Arch's operating agreements.

62.     In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc. Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed multiple Cause Events under the Arch Operating Agreement, again none of which had actually occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member of Arch.

63.     In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

64.     Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies. He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

65.     Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as

[938459/1]                                    14

a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

66.     Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

67.     With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch

[938459/1]                                    15

Companies would also be unable to pay rent and other bills, and to make payments on construction

loans and to investors in Arch Companies.

68.     The bank accounts that are subject to First Republic's hold also include trust

accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among

others, subcontractors and materialmen on construction projects being performed for Arch

Company entities. Thus, the existing account hold prevents Arch Company entities from being

able to pay their subcontractors and materialmen. This is doubly harmful to the Arch Companies,

in that they now cannot pay those subcontractors and materialmen, which may cause them to cease

performing their present construction work, and it also may dissuade them from performing

projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over

company control may lead to another hold on Arch Companies' bank accounts and a recurrence of

delays in paying them.

69.     With both Arch Companies' employees and their subcontractors leaving active job

sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery

there adequately maintained, creating a public safety risk that will result in injury to those

remaining employees or subcontractors, and nearby members of the public.

70.     The aforesaid effects also endanger the general reputation of Arch Companies going

forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

71.     Another consequence of the coup perpetrated by Chassen is that Last, Arch's

managing director, has resigned from her position with Arch on or about August 7, 2023, in

response to said coup. Consequently, Arch has lost the benefit of Last's performance.

72.     In addition, Chassen and Computero Inc. ("Computero"), the outside company

acting as Arch's information technology consultant, have colluded to deny Simpson access to his

Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

73.     In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

74.     The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

## AS AND FOR A FIRST CAUSE OF ACTION

**(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson, Against Defendant Chassen)**

75.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

76.     The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

77.     The Amended JJ Arch Operating Agreement is supported by valuable consideration.

78.     Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

79.     Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

80.     The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

81.     The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate Arch if the benefit is lost.

82.     Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

83.     Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

84.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs

of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts, he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

85.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

86.     Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

87.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

88.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

89.     Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

[938459/1]                                    19

90.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds of Arch Companies, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

91.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

92.     Chassen materially breached the "Resignation" provision of § 1.1 of the Amended JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

93.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control the affairs of Arch Entities, to the exclusion of Simpson.

94.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority to control Arch Companies' bank accounts with First Republic, a hold has been placed on such accounts, and Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

[938459/1]                                          20

95.     By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

96.     Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:

    (a)     the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

    (b)     physical access to his office;

    (c)     the use of Simpson's email account to communicate with employees of the Arch Companies;

    (d)     the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

    (e)     the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

97.     Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

98.     By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

99.     By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

[938459/1]                                     21

100.    For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

101.    Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

102.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

103.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

104.    Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)**

105.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

106.    Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

107.    Chassen had a duty of loyalty to JJ Arch and to Simpson.

108.    This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

[938459/1]                                    22

109.    Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:

(a)    the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

(b)    physical access to his office;

(c)    the use of Simpson's email account to communicate with employees of the Arch Companies;

(d)    the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e)    the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

110.    Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

111.    Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

112.    By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own

interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

113.    Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

114.    JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

115.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

116.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

117.    Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Conversion, Brought by All Plaintiffs Against Defendant Chassen)

118.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

119.    The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

[938459/1]                          24

120.     Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

121.     The Arch Companies Funds are personal property.

122.     The Arch Companies Funds are specific, identifiable funds.

123.     Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

124.     Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

125.     Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

126.     As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

127.     In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

128.     As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

129.     Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

[938459/1]                              25

## AS AND FOR A FOURTH CAUSE OF ACTION

**(Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)**

130.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

131.    Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

132.    Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

133.    The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson**.**

134.    At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

135.    Chassen is a non-party to the First Republic Agreement.

136.    Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

137.    Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the

[938459/1]                                         26

duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

138. JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been, and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

139. Chassen's actions constitute tortious interference with the First Republic Agreement.

140. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

141. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

142. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

143. Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION

**(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)**

144. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

145. There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether

(a) the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and

(b) the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

146. Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

147. Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

148. The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

149. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

150. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

[938459/1]                                    28

151.     As managing member of JJ Arch, which in turn is the managing member of Arch,

Simpson has standing to bring this claim derivatively on behalf of Arch.

152.     Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to

resolve the aforesaid dispute.

153.     There is no adequate remedy at law.

## AS AND FOR A SIXTH CAUSE OF ACTION

**(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)**

154.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs

as if fully set forth herein.

155.     There is a justiciable controversy between Plaintiffs on the one hand, and

Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch

entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts

should be removed.

156.     Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch

entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be

released.

157.     Chassen has taken the position that Chassen is the individual at JJ Arch and Arch

entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is

incorrect.

158.     First Republic has taken the position that it cannot determine whether Simpson or

Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts,

and that the hold should remain on the Arch Accounts. However, the position taken by First

Republic is incorrect.

[938459/1]                           29

159. The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

160. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

161. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

162. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

163. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

164. There is no adequate remedy at law.

## AS AND FOR A SEVENTH CAUSE OF ACTION

**(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)**

165. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

166. Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

167. In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

[938459/1]                                    30

168.    Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

169.    The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

170.    The balance of the equities favors Plaintiffs.

171.    Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

172.    There is no adequate remedy at law.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

**(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)**

173.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

174.    Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

175.    In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

176.    The balance of the equities favors Plaintiffs.

177.    Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

178.    There is no adequate remedy at law.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)    On the First Cause of Action, awarding damages to Arch and Simpson against Chassen in an amount to be determined at trial;

(b)    On the Second Cause of Action, awarding damages to JJ Arch and Simpson against Chassen in an amount to be determined at trial;

(c)    On the Third Cause of Action, awarding damages to all Plaintiffs against Chassen in an amount to be determined at trial;

[938459/1]                          32

(d)     On the Fourth Cause of Action, awarding damages to Arch and JJ Arch against Chassen in an amount to be determined at trial;

(e)     On the Fifth Cause of Action, declaring that Simpson remains the managing member of JJ Arch, and Chassen is no longer a member of JJ Arch;

(f)     On the Sixth Cause of Action, declaring that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released;

(g)     On the Seventh Cause of Action, issuing a preliminary and permanent injunction First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch; and

(h)     On the Eighth Cause of Action, issuing a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site;

(i)     Together with interest, costs, disbursements, and attorneys' fees, and such other and further relief as to the Court may seem just.

Dated: New York, New York
       August 14, 2023

Yours, etc.

ADAM LEITMAN BAILEY, P.C.

By: _____
    Adam Leitman Bailey, Esq.

[938459/1]                      33

Brandon M. Zlotnick, Esq.
One Battery Park Plaza, 18th Floor
New York, NY 10004
Phone: (212) 825-0365
*Attorneys for Plaintiffs*

[938459/1]                                    34

# EXHIBIT 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
-----------------------------------------------------------------------x
JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,

        *Plaintiffs*                    Index No. 158055/2023

        -against-


JARED CHASSEN and FIRST REPUBLIC BANK,

        *Defendants*
-----------------------------------------------------------------------x
JARED CHASSEN, individually and derivatively
on behalf of JJ ARCH LLC, as member,
and derivatively on behalf of
ARCH REAL ESTATE HOLDINGS LLC,
as member of JJ ARCH,

        *Counterclaim Plaintiff*

        -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

        *Counterclaim Defendants*

        -and-

JJ ARCH LLC and
ARCH REAL ESTATE HOLDINGS LLC,

        *Nominal Defendants*
-----------------------------------------------------------------------x
608941 NJ INC.,

        *Plaintiff,*

        -against-

1

JEFFREY SIMPSON, JJ ARCH LLC and ARCH
REAL ESTATE HOLDINGS LLC,

        *Defendants*

        -and

ARCH REAL ESTATE HOLDINGS LLC,

        *Nominal Defendant*

-----------------------------------------------------------------x

### DEFENDANT JARED CHASSEN'S AMENDED VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT AND AMENDED COUNTER-CLAIMS

Defendant Jared Chassen ("Chassen" or "Defendant"), by and through his undersigned

counsel, for his amended verified answer to Plaintiff Jeffrey Simpson's ("Simpson" or "Plaintiff")

complaint answers and alleges to each of Plaintiff's allegations in the Complaint, quoted herein

followed by Defendant's answer in bold font, as well as for his affirmative defenses, and amended

counterclaims against Simpson and YJ Simco LLC, states as follows:

### VERIFIED ANSWER

### NATURE OF THE ACTION

1.      This action is brought by Plaintiffs to undo a coup d'état executed by Defendant
Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"),
control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ
Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to
redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from
Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise
control over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at
Defendant First Republic Bank ("First Republic"), which has left Arch Entities unable to use
such accounts to pay for such necessities as payroll, subcontractors, materialmen, and insurance.
Plaintiffs also seek to require Chassen to act to restore Simpson's access to his company email
account with Arch Entities, to the Dropbox account where Arch Entities' documents are stored,
and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web
site.

2

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations as to Plaintiff's motives in commencing the action, and otherwise denies the allegations in paragraph 1.**

2.      Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 2.**

3.      Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 3.**

4.      Arch is a real estate investment management, construction management, property management, and development company.

**Answer: Defendant admits the allegations in paragraph 4.**

5.      Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 5.**

6.      Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

**Answer: Defendant admits that he is a natural person who resides in the State of New York, but denies that he resides in the County of Kings.**

7.      Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 7.**

<u>FACTS APPLICABLE TO ALL CAUSES OF ACTION</u>
<u>BACKGROUND</u>

<u>Simpson's Tenure at Greystone</u>

8.      Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

3

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 8.**

9.      Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

**Answer: Defendant admits that Plaintiff worked at Greystone, and held the role of Chief Executive Officer of Greystone Development, but lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.**

10.      One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

**Answer: Defendant admits that he worked for Simpson at Greystone but otherwise denies the characterization of his role at Greystone as contained in paragraph 10.**

11.      Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

**Answer: Defendant admits that Tristan Last was an employee at Greystone who Simpson supervised, and had the title of Director of Investments, and otherwise lacks information sufficient to form a belief as to the truth of the allegations in paragraph 11.**

12.      A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

**Answer: Defendant admits that Michelle Miller was an employee at Greystone who Simpson supervised and who started as intern, but otherwise lacks information sufficient to form a belief as the truth of the allegations in paragraph 12.**

4

<u>Simpson's Formation of Arch and JJ Arch</u>

13.     In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

**Answer: Defendant denies the allegations in paragraph 13, except that he admits that Simpson formed JJ Arch together with Chassen.**

14.     The original business address for Arch was Simpson's personal residence address at the time.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 14.**

15.     At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 15.**

16.     At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 16.**

17.     Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

**Answer: Defendant admits that Simpson was the managing member at the time JJ Arch was formed, and held a majority of the membership interests, and for four years thereafter, but otherwise denies the allegations in paragraph 17.**

18.     From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held

5

a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

**Answer: Defendant denies the allegations in paragraph 18.**

19. Simpson and Chassen are the only persons who have ever been members of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 19.**

<u>The Arch Companies' Growth Under Simpson's Leadership</u>

20. Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

**Answer: Defendant denies the allegations in paragraph 20.**

21. By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

**Answer: Defendant denies the allegations in paragraph 21 insofar as it alleges that Arch was formed with no assets, or that Simpson formed Arch, but admits that Arch owned over $1 billion in assets in 2022.**

22. Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

**Answer: Defendant admits the allegations in paragraph 22.**

23. Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

**Answer: Defendant admits the allegations in paragraph 23.**

24. The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

**Answer: Defendant denies the allegations in paragraph 24.**

25. Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

**Answer: Defendant denies the allegations in paragraph 25.**

6

Chassen's Role with the Arch Companies

26.     With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

**Answer: Defendant denies that Simpson brought Chassen to work with him at Arch, which he formed together with Simpson, but admits that Last and Miller were brought by Simpson and Chassen to work at JJ Arch.**

27.     From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

**Answer: Defendant admits that Simpson was the majority or managing member at the formation of JJ Arch and Arch, but denies that Chassen has not had authority to exercise control over JJ Arch as JJ Arch's managing member since.**

28.     While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

**Answer: Defendant admits that Chassen was to become a co-managing member under the Operating Agreement, and otherwise denies the allegations in paragraph 28.**

29.     The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 29.**

30.     However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 30.**

31.     In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions

7

defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 31.**

32.     On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

33.     However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

**Answer: Defendant denies the allegations in paragraph 33.**

34.     JJ Arch's operating agreement was thus amended, with Chassen's consent, on or about May 22, 2021. The amendment removed the authority that Chassen would have had, following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage, arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained effective only until the fourth anniversary of the JJ Arch Original Operating Agreement (*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8 ¶ 3.1(b)), this meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.

8

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

35.     In addition, JJ Arch's operating agreement was amended to bar Chassen from becoming an equal equity owner in JJ Arch. When JJ Arch was formed, it was agreed that my share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would commensurately increase, on an annual basis, such that, by the fourth anniversary of the operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of "Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 35.**

36.     However, JJ Arch's operating agreement was amended, with Chassen's consent and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 1 ¶ 2(a).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 36.**

37.     In addition, Arch's operating agreement provides that "the business, affairs and assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in [the operating agreement] (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto." (Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [Arch] has the authority to perform both directly and indirectly through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct, manage and control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 37.**

38.     Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

9

**Answer:** **Defendant denies the allegations in paragraph 38.**

39.     Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

**Answer: Defendant admits that he is a member of JJ Arch and that he works for JJ Arch and otherwise denies the allegations in paragraph 39.**

40.     Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

**Answer: Defendant denies the allegations in paragraph 40.**

<u>Means of Removing Members of Arch and JJ Arch</u>

41.     Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 41.**

42. The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of [Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.").

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 42.**

43.     Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

10

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 43.**

44.     Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 44.**

<u>CHASSEN'S MISCONDUCT</u>

<u>Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch</u>

45.     In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

**Answer: Defendant denies the allegations in paragraph 45.**

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such a pay cut, although at the time he did not inform Simpson how large of a pay cut he would be willing to take.

**Answer: Defendant denies the allegations in paragraph 46.**

47. In or about early July 2023, Simpson asked Chassen how large of a pay reduction Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

**Answer: Defendant denies the allegations in paragraph 47.**

48. Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact, Chassen would not be willing to accept any pay reduction.

**Answer: Defendant denies the allegations in paragraph 48.**

<u>The Coup Begins</u>

11

49. Chassen, apparently working in concert with NJ Inc. and with several other employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First Republic to remove Simpson as an authorized signatory on all accounts he maintained with First Republic in either his corporate or individual capacity, including all bank accounts that the Arch Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson maintained individually with no connection to the Arch Companies.

**Answer: Defendant denies the allegations in paragraph 49.**

50. Chassen was neither authorized to make this change, nor did he provide Simpson with any advance notice thereof.

**Answer: Defendant denies the allegations in paragraph 50.**

51. First Republic complied with Chassen's demand. First Republic informed Simpson that it no longer permits Simpson to make transactions from any of the accounts he maintains with First Republic in either his corporate or individual capacity, or, indeed, any other account on which Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**Answer: Defendant denies the allegations in paragraph 51.**

<u>The Forced Resignation of Chassen from Arch</u>

52. On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 52.**

53. Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

**Answer: Defendant denies the allegations in paragraph 53.**

54. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

12

**Answer: Defendant denies the allegations in paragraph 54.**

55. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 55.**

56. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 56.**

57. Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

**Answer: Defendant denies the allegations in paragraph 57.**

<u>The Coup Continues</u>

58. Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-issued computer. As a result, Simpson could not obtain access to the business records of the Arch Companies, or the computer payroll program that Arch Companies use to pay their employees. Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made changes to such site, without Simpson's authorization, to remove references thereon to Simpson as a managing member.

**Answer: Defendant admits that he resigned Simpson from JJ Arch, and that Simpson was locked from accounts when he was removed and removed as a member on the company website but lacks information sufficient to form a belief as to the truth of the exact times Simpson could no longer access company systems and otherwise denies the allegations in paragraph 58.**

59. Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson, by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement ("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed

13

multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of JJ Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 59.**

60. However, by the time of the Chassen 8/6/23 Letter, Chassen had already been removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly, as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger Simpson's own resignation by delivering to him a purported notice of Cause Event.

**Answer: Defendant denies the allegations in paragraph 60.**

61. Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such instruction Simpson remained JJ Arch's managing member with exclusive authority over the Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ Arch's operating agreements.

**Answer: Defendant denies the allegations in paragraph 61.**

62. In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc. Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed multiple Cause Events under the Arch Operating Agreement, again none of which had actually occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member of Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 62.**

63. In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

**Answer: Defendant denies the allegations in paragraph 63.**

64. Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies. He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

14

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 64.**

65. Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 65.**

66. Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

**Answer: Defendant denies the allegations in paragraph 66.**

67. With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch Companies would also be unable to pay rent and other bills, and to make payments on construction loans and to investors in Arch Companies.

**Answer: Defendant denies the allegations in paragraph 67.**

68. The bank accounts that are subject to First Republic's hold also include trust accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among others, subcontractors and materialmen on construction projects being performed for Arch Company entities. Thus, the existing account hold prevents Arch Company entities from being able to pay

15

their subcontractors and materialmen. This is doubly harmful to the Arch Companies, in that they now cannot pay those subcontractors and materialmen, which may cause them to cease performing their present construction work, and it also may dissuade them from performing projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over company control may lead to another hold on Arch Companies' bank accounts and a recurrence of delays in paying them.

**Answer: Defendant denies the allegations in paragraph 68.**

69. With both Arch Companies' employees and their subcontractors leaving active job sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery there adequately maintained, creating a public safety risk that will result in injury to those remaining employees or subcontractors, and nearby members of the public.

**Answer: Defendant denies the allegations in paragraph 69.**

70. The aforesaid effects also endanger the general reputation of Arch Companies going forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

**Answer: Defendant denies the allegations in paragraph 70.**

71. Another consequence of the coup perpetrated by Chassen is that Last, Arch's managing director, has resigned from her position with Arch on or about August 7, 2023, in response to said coup. Consequently, Arch has lost the benefit of Last's performance.

**Answer: Defendant admits that the Last resigned but otherwise denies the allegations in paragraph 71.**

72. In addition, Chassen and Computero Inc. ("Computero"), the outside company acting as Arch's information technology consultant, have colluded to deny Simpson access to his Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

**Answer: Defendant denies the allegations in paragraph 72.**

73. In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in

16

Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

**Answer: Defendant denies the allegations in paragraph 73.**

74. The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

**Answer: Defendant denies the allegations in paragraph 74.**

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson, Against Defendant Chassen)

75. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 75 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

76. The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

**Answer: Paragraph 76 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

77. The Amended JJ Arch Operating Agreement is supported by valuable consideration.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

78. Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 78.**

79. Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

17

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 79.**

80. The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

**Answer: Defendant denies the allegations in paragraph 80.**

81. The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently to indicate the assumption by the contracting parties of a duty to compensate Arch if is lost.

**Answer: Defendant denies the allegations in paragraph 81.**

82. Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

83. Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

**Answer: Paragraph 83 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

84. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts, he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

**Answer: Defendant denies the allegations in paragraph 84.**

85. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 85.**

86. Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

**Answer: Paragraph 86 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

87. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

**Answer: Defendant denies the allegations in paragraph 87.**

88. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 88.**

89. Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

**Answer: Paragraph 89 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

90. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds of Arch Companies, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

**Answer: Defendant denies the allegations in paragraph 90.**

91. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 91.**

92. Chassen materially breached the "Resignation" provision of § 1.1 of the Amended JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

19

**Answer: Paragraph 92 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

93. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control the affairs of Arch Entities, to the exclusion of Simpson.

**Answer: Defendant denies the allegations in paragraph 93.**

94. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority to control Arch Companies' bank accounts with First Republic, a hold has been placed on such accounts, and Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 94.**

95. By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

**Answer: Paragraph 95 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

96. Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:
(a)  the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;
(b)  physical access to his office;
(c)  the use of Simpson's email account to communicate with employees of the Arch Companies;
(d)  the use of Dropbox to obtain access to the Arch Companies' corporate documents; and
(e)  the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 96.**

97. Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

**Answer: Defendant denies the allegations in paragraph 97.**

20

98. By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

**Answer: Defendant denies the allegations in paragraph 98.**

99. By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 99 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

100. For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 100.**

101. Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

**Answer: Defendant denies the allegations in paragraph 101.**

102. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 102 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

103. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 103 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

104. Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 104.**

AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)

21

105. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

106. Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

**Answer: Paragraph 106 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

107. Chassen had a duty of loyalty to JJ Arch and to Simpson.

**Answer: Paragraph 107 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

108. This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

**Answer: Paragraph 108 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

109. Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:
   (a) the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;
   (b) physical access to his office;
   (c) the use of Simpson's email account to communicate with employees of the Arch Companies;
   (d) the use of Dropbox to obtain access to the Arch Companies' corporate documents; and
   (e) the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 109.**

110. Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 110.**

22

111. Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 111.**

112. By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

**Answer: Defendant denies the allegations in paragraph 112.**

113. Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

**Answer: Defendant denies the allegations in paragraph 113.**

114. JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

**Answer: Defendant denies the allegations in paragraph 114.**

115. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 115 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

116. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 116 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

117. Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

23

**Answer: Defendant denies the allegations in paragraph 117.**

AS AND FOR A THIRD CAUSE OF ACTION
(Conversion, Brought by All Plaintiffs Against Defendant Chassen)

118. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

119. The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 119.**

120. Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 120.**

121. The Arch Companies Funds are personal property.

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

122. The Arch Companies Funds are specific, identifiable funds.

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

123. Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 123.**

124. Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

**Answer: Defendant denies the allegations in paragraph 124.**

24

125. Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

**Answer: Defendant denies the allegations in paragraph 125.**

126. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

127. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 127 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

128. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 128 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

129. Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 129.**

AS AND FOR A FOURTH CAUSE OF ACTION
(Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)

130. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 130 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

131. Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds

25

such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

**Answer: Defendant admits that Arch and JJ Arch have a banking relationship with First Republic, and have bank accounts there, but otherwise denies the allegations in paragraph 131.**

132. Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

**Answer: Defendant refers the court to the original documents and otherwise denies the allegations in paragraph 132.**

133. The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson**.**

**Answer: Defendant denies the allegations in paragraph 133.**

134. At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 134.**

135. Chassen is a non-party to the First Republic Agreement.

**Answer: Defendant denies the allegations in paragraph 134.**

136. Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 136.**

137. Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 137.**

138. JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been,

26

and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

**Answer: Defendant denies the allegations in paragraph 138.**

139. Chassen's actions constitute tortious interference with the First Republic Agreement.

**Answer: Paragraph 139 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

140. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

141. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

142. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

143. Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 143.**

AS AND FOR A FIFTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)

144. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

27

**Answer: Paragraph 144 does not require a responsive pleading, but to the extent it does, the allegations are denied.**


145. There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether
    (a) the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and
    (b) the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

**Answer: Paragraph 145 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**


146. Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 146.**

147. Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

**Answer: Defendant admits that he has taken those positions but denies that they are incorrect.**

148. The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Defendant denies the allegations in paragraph 148 because both letters were declared nullities by order of the Court.**

149. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**


150. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

151. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

152. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 152 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

153. There is no adequate remedy at law.

**Answer: Paragraph 153 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SIXTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)

154. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 154 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

155. There is a justiciable controversy between Plaintiffs on the one hand, and Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts should be removed.

**Answer: Paragraph 155 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

156. Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released.

**Answer: Defendant admits the allegations in paragraph 156.**

29

157. Chassen has taken the position that Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is incorrect.

**Answer: Defendant admits that he has taken the position but denies the position is incorrect.**

158. First Republic has taken the position that it cannot determine whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and that the hold should remain on the Arch Accounts. However, the position taken by First Republic is incorrect.

**Answer: Defendant admits that First Republic has taken the position, but denies the position is incorrect.**

159. The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Paragraph 159 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

160. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 160 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

161. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 161 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

162. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 162 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

30

163. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 163 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

164. There is no adequate remedy at law.

**Answer: Paragraph 164 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SEVENTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)

165. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 165 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

166. Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

**Answer: Paragraph 166 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

167. In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

**Answer: Paragraph 167 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

168. Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

31

**Answer: Defendant denies the allegations in paragraph 168.**

169. The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

**Answer: Defendant denies the allegations in paragraph 169.**

170. The balance of the equities favors Plaintiffs.

**Answer: Defendant denies the allegations in paragraph 170.**

171. Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

**Answer: Paragraph 171 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

172. There is no adequate remedy at law.

**Answer: Paragraph 172 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR AN EIGHTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)

173. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 173 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

174. Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 174 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

32

175. In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

**Answer: Paragraph 175 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

176. The balance of the equities favors Plaintiffs.

**Answer: Paragraph 176 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

177. Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 177 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

178. There is no adequate remedy at law.

**Answer: Paragraph 178 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs fail to state a claim as a matter of law.

### Second Affirmative Defense

Plaintiffs' claims fail based on documentary evidence.

### Third Affirmative Defense

Plaintiffs improperly intermingle their direct and derivative claims, which mandates the

dismissal of the entire complaint.

33

### Fourth Affirmative Defense

Plaintiffs' claims should be dismissed as duplicative.

### Fifth Affirmative Defense

Plaintiffs' claims fail under the doctrine of in pari delicto.

### Sixth Affirmative Defense

Plaintiffs' claims fail because of Plaintiff's unclean hands.

### Seventh Affirmative Defense

Plaintiffs' claims fail under the doctrines of waiver and estoppel.

### Eighth Affirmative Defense

Plaintiffs' derivative claims fail because under Section 10.2 of the JJ Arch Operating

Agreement, JJ Arch is obligated to indemnify Defendant for any claim "for any loss, damage, or

claim incurred" by Defendant "by reason of any act or omission performed or omitted . . . in

good faith on behalf of the Company and in a manner reasonably believed to be within the scope

of authority conferred . . . by this Agreement." Defendant's conduct has been entirely in good

faith, on behalf of the company, and in a manner reasonably believed to be within the scope of

the authority conferred by the Operating Agreement.

### Ninth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which

Simpson purported to retain sole managerial authority after December 11, 2021 is

unconscionable. Despite Chassen vocalizing his disagreement, Simpson presented him with the

Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the

business entirely if he did not sign the Amendment. Chassen signed the Amendment under undue

pressure and threats. Simpson pressured Chassen not to hire his own counsel to review the

34

Amendment and limited his involvement in calls Simpson took with the shared Arch Entities'
counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann
purported to represent both of them. Chassen was never disclosed Hyemann's actual conflicts,
and Chassen did not execute any conflict waiver. Simpson was also in a relationship of
confidence and trust with Defendant, who had been his mentor in the industry. Simpson took
advantage of that relationship of trust.

Because of their unequal bargaining power, prior relationship, Simpson's threats, and
deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked
meaningful choice in entering into the Amendment.

And the Amendment itself was substantively unconscionable as it contained only
favorable terms to Simpson and gave away Chassen's managerial rights as well as his
membership percentage under the Operating Agreement for nothing.

## Tenth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which
Simpson purported to retain sole managerial authority fails for lack of consideration. The
Amendment contained only favorable terms to Simpson for nothing of real value.

## Eleventh Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which
Simpson purported to retain sole managerial authority was the product of duress and undue
influence and breaches of fiduciary duty.

## Twelfth Affirmative Defense

35

Plaintiffs' claims fail because Simpson was in a relationship of trust and confidence at the time of the drafting and execution of the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority, and a special burden should be shifted to the party in whom the trust is reposed, Simpson, to disprove fraud or overreaching. *In re Estate of Greiff*, 92 N.Y.2d 341, 345 (1998). Given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

### Thirteenth Affirmative Defense

Plaintiffs' claims fail because Simpson breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, 35 Oak, and Arch's investors.

### Fourteenth Affirmative Defense

Plaintiffs' claims fail because Simpson was lawfully resigned from JJ Arch.

### Fifteenth Affirmative Defense

Plaintiffs' claims fail because he failed to properly serve Chassen.

### Sixteenth Affirmative Defense

Defendant reserves his right to assert additional affirmative defenses as additional information is learned during the course of this action.

WHEREFORE, the Court should award and enter judgment in Defendant's favor, dismiss the Complaint in its entirety, and award Defendant his legal fees and costs.

### AMENDED VERIFIED COUNTER-CLAIMS

Jared Chassen ("Chassen"), individually and derivatively on behalf of JJ Arch, LLC ("JJ Arch") and Arch Real Estate Holdings, LLC ("Arch Real Estate"), for his amended

36

counterclaims against Jeffrey Simpson ("Simpson") and YJ Simco LLC ("Simco"), alleges as follows:

1. This is an action for breach of fiduciary duty, breach of contract, recission, accounting, and declaratory relief and a permanent injunction brought by Chassen in his own individual capacity, and derivatively on behalf of JJ Arch and Arch Real Estate against Simpson, as well as a direct action by Chassen against Simpson and Simco for breach of contract, specific performance, and a declaratory judgment. Chassen seeks, among other things, to recover for Simpson's breaches of fiduciary duty and other corporate wrongdoing, to declare that Chassen is the sole managing member of JJ Arch, and to declare Simpson resigned as a member of JJ Arch.

## Parties

2. Plaintiff Chassen is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Chassen has over 15 years of experience in the real estate industry. Among other work, before forming JJ Arch, he worked at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services.

3. Defendant Simpson is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Before forming JJ Arch with Chassen, Simpson worked with Chassen at Greystone.

4. Defendant Simco is a New York limited liability corporation that upon information and belief has two members, Simpson and his wife Yael Simpson.

5. Nominal Defendant JJ Arch is a New York limited liability corporation. It was formed by Chassen and Simpson on or about December 11, 2017. Chassen and Simpson are the only two members of JJ Arch.

37

6.      Nominal Defendant Arch Real Estate is a New York limited liability corporation. It was formed by JJ Arch and 35 Oak on or about December 11, 2017. JJ Arch and 35 Oak are the only two members of Arch Real Estate.

### The JJ Arch Operating Agreement

7.      On December 11, 2017, Chassen and Simpson entered into the JJ Arch Operating Agreement. A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as **Exhibit A**. The JJ Arch Operating Agreement identifies both Simpson and Chassen as the two Members. *See* Ex. A § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson subject to the limitations set forth in subsection (b), which provides that any Company Major Decision, as defined in the Agreement, shall only be undertaken with Chassen's prior written consent.  *See* Ex. A § 3.1(a)-(b).

8.      Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth anniversary of the Agreement, that is, December 12, 2021, Simpson and Chassen were to both have managerial authority over JJ Arch, with consent by both required for Company Major Decisions. *See id.* § 3.2. Further, Chassen and Simpson were to be entitled to 50% of all distributions from December 12, 2021.

### The Arch Real Estate Operating Agreement

9.      On December 11, 2017, the same day that Chassen and Simpson entered into the JJ Arch Operating Agreement, JJ Arch and 35 Oak entered into the Arch Real Estate Operating Agreement. A true and correct copy of the Arch Real Estate Operating Agreement is annexed hereto as **Exhibit B**. Under the Arch Real Estate Operating Agreement, JJ Arch is the Managing

38

Member, while 35 Oak is the Investor Member. While JJ Arch was conferred with managerial rights over Arch Real Estate, 35 Oak was given consent rights to certain major decisions.

### Before Becoming Partners, Simpson Had a Prior Relationship of Confidence and Trust With Chassen

10.     Chassen first met Simpson when he worked with him at Greystone, a firm that provides real estate services. Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

11.     Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013. At the time, Dough Benach, the head of the division hired Chassen and placed him in the Development and Acquisitions team in 2012 to work with Benach and Simpson. Simpson and Benach taught him essential skills for acquiring, financing debt and equity, developing and running real estate projects, and he was promoted as the Director of Acquisitions in 2014.

12.     During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict.

13.     Chassen viewed Simpson as his mentor and developed a close relationship with him. He reposed the utmost confidence and trust in him and even put his financial well-being in his hands.

14.     In 2017, Simpson left Greystone under less than favorable circumstances.

15.     Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson. As a result, the Greystone Development brand downsized from

30 people to currently 3 persons and Simpson was forced to leave Greystone, and Chassen left

alongside many others as the brand downsized and the jobs disappeared.

**Chassen Brings Simpson 35 Oak as an Investor and they Form JJ Arch**

16.     After departing Greystone, Simpson struggled to find investors for a new business.

While still employed by Greystone, he held many meetings by himself to launch a new business

which yielded no success. Through Chassen's own connections, Chassen introduced 35 Oak to

Simpson while still at Greystone. Chassen and Simpson planned a new company together relying

on Chassen's capital connections to make the company feasible.

17.     35 Oak is an active investor in many industries, and its principal place of business

is in Toronto, Canada. After a few meetings, 35 Oak decided to invest in a joint venture with

Chassen and Simpson, and on December 11, 2017, established Arch Real Estate, which is

governed by the Arch Real Estate Operating Agreement. On the same day, Simpson and Chassen

signed the operating agreement for JJ Arch.

18.     The real estate portfolio owned and controlled by Arch Real Estate and its affiliates

and subsidiaries ("Arch" or "Arch Entities") ultimately grew to more than $1Bn in assets under

management, held in various single purpose companies that are affiliates of and/or controlled by the

Arch Entities. The Arch Entities have affiliated companies, including a property management

company, brokerage company, and a construction company, each of which provides services

relating to real properties that the Arch Entities control.

**Simpson Uses His Relationship of Trust with Chassen to Coerce Chassen to Sign an
Unconscionable Amended JJ Arch Operating Agreement**

19.     On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without

Chassen's input or drafting (the "Amendment"). A true and correct copy of the Amendment is

annexed hereto as **Exhibit C**. The Amendment eliminated the language in Section 3.2 of the

40

original Agreement providing Simpson and Chassen equal rights and authority to manage the company beginning on December 11, 2021. Under the Amendment, Chassen purported to give away his managerial rights to Simpson for another four years, though Chassen retains consent right to limit Simpson's authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. Instead of becoming entitled to 50% of the distributions, as he was to be as of December 11, 2021, under the Amendment, Chassen was to be entitled to 49.9% of all distributions, with Simpson entitled to 50.1%.

20. Because of their unequal bargaining power, Simpson's threats, his deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering the Amendment.

21. Simpson took advantage of his confidential relationship with Chassen, including as Chassen's mentor, to push a one-sided agreement. He heaped abuse on him and pressured him to sign, repeatedly telling him he was incapable and inept. Simpson also pressured Chassen to not have his own counsel review the Amendment and limited his involvement in calls Simpson took with JJ Arch and Arch Entities' counsel David Heymann, who purported to also represent both of them, and who Simpson had draft the amendment in his favor. Heymann did not disclose his actual conflicts in representing both JJ Arch, Simpson, and Chassen, and no conflict waiver was ever presented or agreed-to. Simpson presented Chassen with the Amendment on a take-it-or-leave-it basis, threatening him that he would just remove him from JJ Arch if he did not sign the Amendment. Chassen signed the Amendment under undue pressure and threats.

22. The Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson and gave away Chassen's rights under the Operating Agreement for nothing of value.

**Simpson Takes Various Unlawful and Improper Actions**

23. When they first started their new business, Simpson promised Chassen, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and reform his aggressive behavior. The operation of the Arch Entities did well initially, but it went downhill over the past two years.

24. Simpson's aggressive business demeanor increasingly turned menacing inside the company, including with partners, lenders and lawyers. He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities' brand in the hiring markets. He regularly called people stupid, inept and other demeaning names, to the point of bringing them to tears. Simpson created a toxic work environment that forced many employees to leave, leading to understaffing and mismanagement of the company's real estate projects. Simpson would send messages to key employees such as "so now everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

25. Putting the companies' and investors' interests first, Chassen was willing to work to mitigate the damage caused in Simpson'a wake and endure the harsh and abusive workplace that Simpson created, even to Chassen's personal detriment. Yet Simpson committed a series of misconducts that crossed the line of breaching his fiduciary duties, which the company could not withstand, and Chassen had to step up eventually.

26. First, Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including Chassen were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce

42

investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks.

27.     Disregarding the opposition of the other Arch Entities' partners and employees, including Chassen, Simpson pushed numbers aggressively and used unachievable assumptions to amplify financial outcomes. Over the years, several internal investment meetings occurred where Chassen and many team members aggressively pushed back on his financial assumptions, but he would aggressively fight us and ultimately tell everyone to follow his path or be sidelined or fired. Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else.

28.     Second, Simpson prioritized his personal gains over the success of the Arch Entities' projects. For instance, the Myrtle Point development in Ridgewood, Queens, was grossly under budgeted and experienced significant delays from lack of supervision. Simpson didn't even visit the project for weeks at a time.  Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests.  As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary

43

revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss.

29.     Third, Simpson failed to properly supervise and manage projects.  Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses or personal ventures.

30.     Fourth, as cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

31.     Fifth, days before Chassen was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to Chassen and Michelle Miller, a junior partner/employee, threatened to put all the Arch Entities into bankruptcy in order to leverage 35 Oak to follow his orders without resistance or he would crash the business. Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

44

32.     Simpson also misappropriated Arch Real Estate's funds and employees for an independent auto business—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities. Simpson directed Arch Entities' employees to manage the accounting, logistics, and the property of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. This was all done without Chasen's consent.

33.     From the very beginning of the Rêver business, Chassen was very clear to Simpson that if they purchased this business, it had to be a weekend side-business that would need full third-party management and should never be at the expense of Arch Real Estate's investments. Repeatedly, Chassen asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded Chassen's pleas. Simpson also never obtained Chassen's consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

34.     Simpson also began devoting much of his time to other business at the expense of JJ Arch and Arch Real Estate. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

**The Company Enters Dire Financial Circumstances Because of Simpson and Simpson Proposes that 35 Oak Take-Over JJ Arch**

45

35.     In July 2023, Chassen asked JJ Arch's accountant about Simpson's diversion of money. Chassen had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

36.     The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay JJ Arch and other expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. In fact, Simpson also used employees at Construction Services and Solutions LLC, a wholly owned Arch business, to work on his home and on other JJ Arch owned properties without 35 Oak or Chassen's consent and without reimbursing Arch, who paid these employees. She also confirmed that due to extreme lack of staff there was minimal accounting of funds.

37.     Arch's precarious situation has its origins in Simpson's refusal to act in Arch's best interests, as Simpson has little invested in Arch, while he earns money from fees. By way of background, JJ Arch earned its operating income from a flow of acquisitions of new properties and property management fees. For example, it earned income from finance fees from brokering loans on new acquisitions and new deals, property management fees for overseeing the properties that were owned by Arch, and construction fees on its development of properties acquired by Arch.

38.     Before 2022, Arch owned approximately 5500 units around the country, but in 2022 it sold approximately 2000 of the units, thus lessening its base for property management fees. The rise in interest rates also made Arch unable to acquire new properties to be able to earn income from finance and construction fees. Without this income, Arch was forced to lay-off employees, but without these employees, it could not properly manage the properties spread-out in different states, thus causing the properties to start failing from mismanagement.

46

39.     In other words, the investors were being harmed by Arch remaining as the property manager because Arch could not maintain the economies of scale required to properly run the properties once it sold many of the units in 2022. And with the real estate markets faltering, Arch also no longer had the regular income from financing fees on acquisitions by which it otherwise obtained income, or construction fees from developing newly acquired properties.

40.     And in these dire circumstances, Simpson's erratic, volatile, and abusive behavior only made the situation worse. For example, Arch's construction entity, Arch Builders, LLC, had a staff of seven people on the ground, plus people in the office, including project managers and executives. Beginning in the summer of 2022, these people were either abused and quit or were fired by Simpson. That left no one track budgets and no one to oversee or handle Arch's ongoing construction projects, leading to the projects to fail.

41.     Chassen, and others at JJ Arch, including Jason Paul and Michelle Miller, JJ Arch employees/junior partners, regularly suggested to Simpson that Arch outsource property management to independent third-party property managers who had the necessary economies of scale to oversee the properties and ensure that the investor's assets were adequately managed and protected. But JJ Arch would have less revenue by doing so, and would become a mere investment holding company, something that did not serve Simpson's personal financial interests given his minimal investment in Arch, and something his ego could not tolerate, even at the expense of the investors whose interests he was supposed to protect.

42.     With properties failing, funds running out, and investors unprotected, in July 2023, even Simpson appeared to recognize that he should walk away and give control to Arch Real Estate's investor member, 35 Oak, who had the funds to right the ship but were not willing to continue funding a black hole where their money just disappeared into Simpson's mismanagement.

47

On July 13, 2023, he sent a proposal through Michelle Miller, a JJ Arch employee/junior partner, to 35 Oak to "unwind" Arch. In the proposal, among other things, 35 Oak would take over ownership of JJ Arch after 60 days, and Simpson would execute a separation agreement. A true and correct copy of the July 13, 2023 email chain is annexed hereto as **Exhibit D**.

43.     Later that day, Simpson responded to the email to say, among other things, "[w]e sent this email this AM seeking feedback on a path forward for everyone . . . I urge you to reply and get to a conclusive agreement below by tomorrow, as we set up timeframes in the proposal for a particular reason. *If not, we will have to take more extreme measures to exercise Dissolution via the Agreement.*" *Id.* (emphasis added). Simpson recognized, expressed of course as a threat, that his remaining at the company would lead to the destruction of the company.

### 35 Oak's Response Enrages Simpson

44.     For its own reasons, 35 Oak responded via its counsel, Haynes and Boone, LLP, on July 19, 2023 that they would agree to a proposal whereby, among other things, "Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries . . . [and] [t]he JJ Operating Agreement is amended such that Jared has sole control over JJ." A true and correct copy of this email is annexed hereto as **Exhibit E**.

45.     Chassen had no knowledge of 35 Oak's deliberations, or that it was going to make this proposal to Simpson, but now understands that 35 Oak made this proposal that Chassen have sole control of JJ Arch, rather than 35 Oak itself as suggested by Simpson, because 35 Oak was concerned it might face financial liability on its Arch loan agreements if neither Simpson nor Chassen were in control of JJ Arch. The proposal that Chassen be placed in charge, however, enraged, Simpson, and he appears to have believed that, though he himself made the proposal to

48

35 Oak to walk away in their stead, that Chassen somehow was behind their counterproposal that Chassen be placed in charge of JJ Arch instead. Chassen was not.

46.     Rather, 35 Oak recognized that unlike Simpson, Chassen was and is a thoughtful, careful, diligent and stable person who acted with his fiduciary duties foremost in his mind and who could be trusted as a steward and fiduciary.

### Simpson Becomes Fixated on His Battle with 35 Oak, Which He Escalates, and Chassen Acts to Protect Arch

47.     Simpson's relationship with 35 Oak then deteriorated even more and he engaged in a campaign of extortion, abuse, and threats that led 35 Oak to file an action in federal court against him. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed hereto as **Exhibit F**.

48.     As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's breached his fiduciary duties to 35 Oak and Arch Real Estate by: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements.

49

49.     In the beginning of August, Chassen and many others again advised Simpson that Arch should transition the management of Arch's properties from self-management to third-party management. Simpson responded that he would not do that because he would lose his fee-revenue stream and would further have to rely on 35 Oak's money, the investor he was focused on bullying.

50.     Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023, Simpson told Chassen that if 35 Oak "didn't stop messing" with him, he was going to file for bankruptcy on all the properties and "blow the company up." This, of course, was prohibited by the operating agreements, and further demonstrated to Chassen that Simpson was entirely focused on himself and his petty battle with 35 Oak.

51.     After 35 Oak's counterproposal, Simpson wanted Chassen to take a pay-cut, apparently on the delusional purported belief that such a pay-cut would make him not have to rely on 35 Oak or would demonstrate his loyalty to Simpson. When Chassen suggested that he might accede to such a pay-cut if both were to do so, Simpson refused and grew further enraged.

52.     Chassen learned on August 4, 2023 that Simpson was going to terminate Chassen and free himself to destroy the company and misappropriate company assets at will. Chassen then acted to protect the company.

53.     On August 5, 2023, Simpson sent Chassen an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" Chassen that he had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately."

54.     Simpson's email to remove Chassen as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement. Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written

50

notice thereof to such Member requiring such Member to resign." Ex. A at § 1.1 ("Resignation").

A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i)

willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of

fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence

in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the

Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or

property]." Ex. A at § 1.1 ("Cause Event").

55.     Simpson made no allegation that would constitute a Cause Event warranting

Chassen's resignation. In fact, all Chassen's actions have been to protect the company and its

assets. Simpson's purported notice removing Chassen as a Member of the Arch Entities was

nothing more than a blatant attempt to wrest sole control and management of the Arch Entities to

insulate himself from his bad acts and render himself a dictator, without any checks or balances.

56.     To protect the Arch Entities from further damage, on August 6, 2023, Chassen sent

Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ

Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." In the Notice, Chassen

rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported

forced resignation of Chassen as a Member of JJ Arch, noting that that he had not done any conduct

that would constitute a Cause Event because "no such conduct occurred." A true and correct copy

of the termination letter is annexed hereto as **Exhibit G**.

57.     Chassen then informed Simpson, as required by the JJ Arch Operating Agreement,

that Simpson had committed multiple Cause Events that fall into the willful misconduct and breach

of fiduciary duty categories identified in the JJ Arch Operating Agreement, including "(a) directing

lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his]

51

own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company …" *Id.*

58. Chassen advised Simpson that, as a result of these Cause Events, he had to resign, and no longer had the right to act on behalf of the Arch Entities.

59. Further, Simpson's resignation was independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote "substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for Cause Event.

60. On August 6, 2023, 35 Oak also sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)." 35 Oak advised Simpson that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement.

**Simpson Files this Action and is Restored to His Managerial Position by an Injunction**

61. In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, Chassen and First Republic Bank.

52

62.     On August 21, 2023, the Court entered an Interim Order which restored Simpson to his managerial position but required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court." A true and correct copy of the Interim Order is annexed hereto as **Exhibit H**. The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.* That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim Order provided that "Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.*

**Simpson Further Breaches His Fiduciary Obligations and Violates the Court's
Orders, Including by Purporting to Again Terminate Chassen**

63.     Simpson began violating the Interim Order right from the get-go. He immediately rehired Tristan Last, an employee who had resigned the day after Chassen removed Simpson for cause and increased her salary without seeking my consent even though Chassen's consent was required. He hired a new IT company without Chassen's consent at an expense that required Chassen's consent.

53

64.     Simpson then moved all employees away from Chassen's desk, leaving Chassen on the outskirts of the office space, and clearly intending to show staff that Chassen was no longer a co-member of the company. While Chassen complied with the Interim Order and gave him access to Office.com, Dropbox, Go daddy, Simpson then used that access to read all of Chassen's emails, including those with Chassen's counsel, and deleted Chassen's emails.

65.     Simpson also stopped paying JJ Arch bills connected to Chassen's credit. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and Chassen received a call from each credit company this week that payments are not being made and they are in collections. Likewise, JJ Arch's company Visa card, Divvy, is under Chassen's credit, and Simpson removed Chassen from these accounts even though these accounts are tied to Chassen's credit. Chassen also received calls that payments are not being made on these accounts.

66.     Simpson then shut off Chassen's access to his emails, Dropbox, all company systems, and bank accounts.

67.     He demanded that Chassen consent to switch banks from First Republic, without explanation or reason, something that was especially frightening considering his repeated misappropriation of company assets and the fact that Chassen would then be unable to view the accounts as required by the Interim Order.

68.     He began telling employees and third-party partners that Chassen was no longer a member of JJ Arch and started defaming him to them.

69.     On September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both August letters and directed the parties to cooperate. This September 1, 2023 letter was predicated on entirely false claims and was itself a contempt of court. The letter merely represented the another act in Simpson's scorched earth retribution campaign.

54

**Simpson Continues to Breach his Fiduciary Obligations and Ignores Additional Court Orders Even After Chassen Files A Contempt Motion**

70.     On September 14, 2023, Chassen moved to hold Simpson in contempt of Court and to direct Simpson to restore him to JJ Arch and company systems. On September 15, 2023, the Court issued a temporary restraining order, restored Chassen, and barred any further unilateral terminations. A copy of the Court's order is annexed hereto as **Exhibit I**.

71.     Even then, Simpson continued to disobey the courts orders by (1) hiring three new employees without obtaining Chassen's consent, and actually firing employees he perceives as allied with Chassen; (2) opening new bank accounts at Citizens Bank without giving Chassen full access to those accounts; (3) refusing to give Chassen signing authority on bank accounts, taking the position that the orders do not require him to do so; and (4) refusing to give Chassen's full access to Juniper Square, JJ Arch's investor portal. Simpson also directed employees at Arch not to talk to Chassen and has refused to share information with Chassen.

72.     Simpson's breaches of the JJ Arch Operating Agreement and his defiance the Supreme Court's orders constitute independent breaches of fiduciary duty.

**Chassen Discovers that Simpson Failed to Disclose Huge Tax and Investment Losses to Investors**

73.     On or about September 29, 2023, Chassen discovered that Simpson had completely breached his fiduciary obligations with respect to recent IRC Section 1031 tax exchange vehicles that Simpson advocated investors join. Chassen has just been personally hit with hundreds of thousands of dollars in unexpected tax liability that he learned of in the past few days and must pay by October 15, 2023—as have dozens of other investors—because of Simpson's complete dereliction of his managerial role, as well as his failures to adequately disclose risks to investors or adverse information.

55

74.     As stated above, in 2022, Arch sold approximately 2000 units and after these units were sold, Arch reached out to investors asking if they wanted to reinvest the money from the sale into other potential properties into IRC Section 1031 tax exchange vehicles, without adequately disclosing the risks that such tax benefit might not be obtained. Chassen along with numerous others did so, though Simpson put only minimal proceeds from the sale into these new vehicles.

75.     Rather than inform investors that the IRC Section 1031 tax exchanges had failed, and that investors would face huge tax liabilities, Simpson hid the information, it only coming to Chassen's attention, and other investors' attention, as investors began to get hit with massive tax bills from the sale. Many investors have yet to learn of their tax liability, as their gains from the 2022 sale is reported as ordinary income, though their K-1s are not being sent out before their tax filing deadlines. Simpson has attempted to cover-up his failures through misleading communications to investors.

76.     And to top it off, Simpson put the funds into properties he is causing to fail by his insistence on mismanaging them, thus not only foisting on investors unexpected and hidden tax liability now, but the imminent complete loss of their investments.

### 35 Oak Terminates JJ Arch as Managing Member of Arch Real Estate Because of Simpson's Breaches of Fiduciary Duty

77.     On or about October 17, 2023, 35 Oak moved to have a temporary receiver appointed over JJ Arch, detailing numerous instances of misconduct by Simpson.

78.     On October 30, 2023, the Court entered an interim order in connection with 35 Oak's receiver motion that required Simpson and JJ Arch to comply with Oak's consent rights under the Arch Real Estate Operating Agreement. Later that day, in retaliation, Simpson furloughed all of Arch's employees.

56

79.     On October 31, 2023, 35 Oak removed JJ Arch as managing member of Arch Real

Estate. 35 Oak removed JJ Arch, because JJ Arch through the actions of Jeffrey Simpson (the

managing member of JJ Member), committed multiple Cause Events, including, without

limitation, (1) willful misconduct, (2) breach of fiduciary duty, (3) gross negligence which has

resulted in material loss to the Company, its Subsidiaries and its Members and (4) misappropriation

of Company or Subsidiary funds, in each case, in relation to the business and affairs of the

Company and various Subsidiaries, such as, without limitation, (a) making material

misrepresentations and otherwise fraudulently inducing Investor Member and other equity holders

to invest in certain transactions on the basis of obtaining material economic benefit from an

exchange under section 1031 of the Internal Revenue Code, and failing to satisfy the requirements

of such 1031 exchanges; (b) hiring and rehiring of individuals as an employees of Arch without

Investor Member consent; (c) failing to provide access to books and records of the Company and

to otherwise provide all financial reports required under the LLC Agreement; (d) modifying the

Company lease at the 88 University property; (e) making threats against employees, family

members of employees, and vendors; (f) using Arch employees for non-Arch purposes to benefit

Mr. Simpson and his separate businesses; (g) using Arch bank accounts for personal purposes, (h)

retaining counsel for the Company in violation of the LLC Agreement, and (i) furloughing the

entire staff of Arch and causing the important work of the company to come to a complete halt.

80.     35 Oak filed an emergency order to show cause on November 3, 2023 to enforce

its termination of JJ Arch, and the Court granted a temporary restraining order enjoining Simpson

and JJ Arch from acting as the managing member of Arch Real Estate. 35 Oak also filed a

complaint in this action against Simpson. A true and correct copy of the 35 Oak's Complaint is

annexed hereto as **Exhibit J**.

57

81.     Because of Simpson's misconduct, JJ Arch has already lost its managerial rights in Arch Real Estate and faces liability from investor suits.

**Simpson Pays for His Legal Bills through JJ Arch Without Posting an Undertaking to JJ Arch**

82.     Simpson has been improperly paying his counsel in this action from JJ Arch accounts in violation of the JJ Arch Operating Agreement. Section 10.2 of the JJ Arch Operating Agreement provides that Chassen and Simpson can be indemnified from certain claims against them "by reason of any act or omission performed or omitted . . . in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of [their] authority . . . except that that no Covered Person shall be entitled to be indemnified  in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions."

83.     Section 10.3 of the JJ Arch Operating Agreement further provides that legal expenses shall be advanced "prior to the final disposition or such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof."

84.     Simpson has failed to post an undertaking to JJ Arch, while using JJ Arch assets to fund his legal expenses in this action. This violates both his contractual and fiduciary obligations to JJ Arch.

85.     Further, because Simpson has engaged in gross negligence and willful misconduct, he will not be entitled to indemnification, and his payment of legal bills without posting an undertaking amount to theft of JJ Arch's funds and assets, as he attempts to strip JJ Arch of its assets during the pendency of this action.

**The JJ Arch Properties Simpson and Chassen Own Through JJ Arch**

86.     JJ Arch is a member in several corporate entities that are independent of Arch, and that are owned by Simpson and Chassen.

87.     Simpson and Chassen only entered personal investments through JJ Arch because Simpson told Chassen doing so would save time and expenses since the structure was already in place from past deals and it would be the easiest and most efficient way to proceed to quickly close on the deals.

88.     JJ Arch is the sole-member of 225 HPR LLC ("HPR LLC"), which owns a residential property known as 225 Head of Pond Road, Water Mill NY 11976 ("Head of Pond"). Simpson and Chassen (and Chassen's family members) purchased Head of Pond in 2022 through HPR LLC and renovated the home for several months. Since then, the home has become a permit holding rental property. Simpson has been uninvolved in this business, and Chassen hired the third-party manager who has successfully managed the property for approximately 2 years as an Airbnb property. Head of Pond has been cash flowing and neither took distributions.

89.     Simpson, in a further retaliatory act, decided to stop allowing Chassen to pay the rental property manager for his monthly reimbursements, including his payments to cleaning staff to clean and repair the property. After being denied reimbursements, the property manager continued to front these expenses and is now owed monies from HPR LLC.

90.     Simpson also recently told the property manager that he wants him to stop renting out the property, and that Simpson's wife will replace him, though such a hiring requires Chassen's consent, and is contrary to Simpson's fiduciary obligations. Simpson then threatened to contact the police if the property manager rents the property to any Airbnb customers leading the property manager to resign.

91.    In addition to refusing to pay for property upkeep, Simpson has also been taking money without Chassen's consent from the HPR LLC accounts to pay his own personal expenses. On November 5, 2023, Chassen discovered that Simpson has been taking money without Chassen's consent from the HPR LLC accounts and instructed employees to hide it from Chassen. These payments include a $10,000 payment on October 11, 2023, a $2,000 payment on October 19, 2023, and a $3,000 payment on October 31, 2023. Simpson has left the HPR LLC account without funds to pay its mortgage, a mortgage jointly guaranteed by Chassen's wife.

92.    By forcing the property manager to resign and looting the HPR LLC account, Simpson is ensuring that HPR LLC will default on its mortgage loan. Simpson is destroying the property to strip it value and take it for himself and as part of his vendetta against Chassen.

93.    JJ Arch is also the sole-member of JJ NY 550 LLC ("JJ 550"), which owns real property known as 550 Metropolitan Avenue, Brooklyn, New York 11211 ("550 Metropolitan"). 550 Metropolitan is a retail condo, and Chassen was solely responsible for it, dealing with its acquisition, financing, and tenant sourcing. 550 Metropolitan has been cash flow positive, but recently the tenant went out of business, and JJ Arch needs a new tenant. Chassen's ability to source a new tenant or sell the asset are being stymied by Simpson in breach of his fiduciary obligations.

94.    JJ Arch is also the sole member of 1640 Montauk LLC ("1640 Montauk"), owner of real property known as 1640 Montauk Hwy, Water Mill, NY 11976 ("Rêver Property"). Simpson and Chassen created 1640 Montauk and through it bought the Rêver Property and the underlying auto business that was at the Property, then operating under a different name.

95.    Yechiel Lehrfield organized another entity, 1640 Motors LLC ("1640 Motors"), to operate the business with a partner, but upon information and belief there was no executed

60

operating agreement for 1640 Motors, and no formal designation of membership. Upon information and belief, the member of 1640 Motors is 1640 Montauk. Upon information and belief, Simpson purported to operate Rêver through 1640 Motors. The acquisition of the Rever Property and management of Rêver was Simpson's brainchild, which Simpson sold to Chassen as a simple business where they would each invest $500,000.00 maximum, hire someone to operate it, and Chassen and Arch personnel would not need to be involved.

96.     After Simpson blew through this projection, and their initial $500,000.00 contributions, Simpson insisted that he would continue to fund Rêver Motors himself, his dream business, and that it would not affect Chassen's ownership or equity position at JJ Arch or in any way dilute or affect him with interest or penalties. Indeed, Simpson never issued any capital calls in connection with this, or any other shared, business.

97.     To gain more insight into Simpson's actions at Rêver, among other of the businesses, Chassen sent a books and records request to Simpson on November 9, 2023. Simpson immediately rejected the demand in an email on November 12, 2023. His counsel also sent a letter falsely claiming Chassen has access to all documents. Also, he opened a new bank account for 1640 Montauk at Citizens Bank, which he never told Chassen about and which Chassen has no visibility on.  Simpson has left Chassen in the dark. He has also engaged in illegality at Rêver Motors, including switching a VIN number on a car in violation of federal laws.

98.     In fact, Simpson has asserted dictatorial powers to loot all the businesses based on his own fabricated numbers, saying, "I have the full and exclusive right [to] issue capital calls and you owe $1.2 million so I can take whatever cash I need without your consent." Simpson has already unlawfully taken hundreds of thousands of dollars out of these businesses in the past two months.

**The August 1, 2023 Contract Between Chassen, Simpson and YJ Simco**

99.     On August 1, 2023, Chassen entered a contract with Simpson and Simco in which Chassen agreed to transfer any membership interest he has in 1640 Montauk and 1640 Motors to Simpson in exchange for $675,938.35 (the "Contract"). A true and correct copy of the Contract is annexed hereto as **Exhibit K.** Further, in the Contract, Simpson agreed that HPR LLC "will be managed collectively by both Simpson and Chassen, regardless of the organizational documents of 225 HPR." The organizational documents of HPR state that JJ Arch is the sole member, Simpson is the President, and Chassen the Vice President. A copy of the HPR LLC Operating Agreement is annexed hereto as **Exhibit L**.

100.     Pursuant to paragraph 2 of Contract, Simpson agreed to make an initial payment to Chassen of $500,000 "simultaneously with the closing by Simpson of that certain loan from Connect One Bank in the principal amount of $995,000 (the "Loan")," with the balance of the "Purchase Price . . . paid to Chassen from the distributions paid to Simpson by 1640 Montauk, 225 HPR and 1640 Opco, which payments shall be made to Chassen at Simpson discretion, provided that the balance of the Purchase Price shall be paid to Chassen at the sooner of (i) a capital event for the above listed Companies or (ii) the date that is twenty four (24) months following the Closing Date."

101.     The buyout calculation in Exhibit B of the Contract expressly incorporated that Simpson had repaid in or about June 2023 a prior ConnectOne Bank line of credit that was made personally to Simpson and Chassen (the "Personal Line of Credit"). The ConnectOne Bank line of credit loan documents are annexed hereto as **Exhibit M.** As evidenced from these loan documents, the total line of credit was for $1,000,000.00, but deducted $3,788.00 in various fees at closing.

62

102. Simpson's repayment of the Personal Line of Credit was expressly incorporated into the Contract and is the $497,500.00 deducted from the initial buyout amount as calculated in Exhibit B of the Contract, leading to the total buyout amount of $675,983.35.

103. The Contract also recognized and was premised upon a 50-50 distribution from the sale of property owned in part by Chassen and Simpson known as 88 Schwenks, Watermill, NY 11976 ("88 Schwenks"), a farmland in the Hamptons. 88 Schwenks was a property they purchased in June of 2022, in which they had a 50% interest, with another investor having the other 50% share. Simpson and Chassen were thus 50/50 partners in 50% of this asset.

104. Their business plan was to create a working farm or to lease the land to an operator. This investment did not work out and Simpson and Chassen decided to sell the property in the spring of 2023 at a loss, with Simpson suggesting Chassen that they should sell the asset and split proceeds 50/50 so that both would have some cashflow. 88 Schwenks was sold a few days before the Contract was executed. The Contract expressly recognized that the 88 Schwenks proceeds were split 50-50, providing in Exhibit B that the distribution of the Schwenks money had been split 50-50.

105. Simpson quickly renounced and breached the Contract, declaring it terminated and refused to proceed to close on the new loan. Indeed, on August 2, 2023 after the loan documents were fully executed and the closing fees debited from the account, ConnectOne Bank asked Chassen and Simpson to re-sign a certain form as they had sent the incorrect version, which Chassen did, but which Simpson refused to do, thereby preventing the loan from being issued.

106. Simpson has claimed that Chassen failed to exceed the 50% liquidity covenant required by the lender but this is false and the lender in fact approved Chassen, approved the loan, and was at the closing table.

63

107.    Simpson and YJ Simco have purposefully and in bad-faith frustrated performance of the Contract and Simpson unlawfully declared that he would not comply with it.

108.    As further detailed herein, failing to comply with the Contract, Simpson has also inflated his contributions to JJ Arch, unlawfully taken monies from JJ Arch, and is looting the shared properties so that Chassen will be left with nothing.

### The Fraudulent August 31, 2023 Capital Call

109.    After breaching the Contract, and one-day prior to purporting to re-terminate Chassen from JJ Arch, on August 31, 2023 Simpson purported to serve a capital call on Chassen (the "Fraudulent Capital Call"). A copy of the Fraudulent Capital Call is annexed hereto as **Exhibit N**.

110.    The Fraudulent Capital Call demanded that Chassen retroactively reimburse Simpson for $1,241,230 that he allegedly had put into JJ Arch.

111.    Simpson reached that number by claiming that Chassen owes $741,230 to "balance 50/50 for 225 HPR, 550 Met, 1640, 1640 Motors, and 146 E. 89th." Further, the Fraudulent Capital Call claims that Simpson be reimbursed for his alleged payment of the $1,000.000 million Personal Line of Credit.

112.    The Fraudulent Capital Call separately claims that Chassen improperly took a total of $34,400 on August 4, 2023 and August 9, 2023.

113.    Finally, the Fraudulent Capital Call claims that Chassen owes $70,500 from 88 Schwenks because "the 88 Schwenks closing distribution was not properly allocated per the Capital accounts in the transaction."

114.     The Fraudulent Capital Call is in breach of the JJ Arch Operating Agreement, was issued in bad faith to retaliate against Chassen and to create a pretext for Simpson to loot JJ Arch and the jointly owned assets.

115.     Each of the Operating Agreements for 1640 Montauk, HPR LLC and JJ 550 provide that JJ Arch is the sole member and JJ Arch "shall have no obligation to make any further capital contributions to" these entities. A true and correct copy of the 1640 Montauk Operating Agreement is annexed hereto as **Exhibit O**. A true and correct copy of the JJ 550 LLC Operating Agreement is annexed hereto as **Exhibit P**. Further, there is no Operating Agreement for 1640 Motors, no formally designated members, and JJ Arch has no obligation to that entity. In short, JJ Arch had no capital call obligations to any of these entities.

116.     Further, no capital calls were ever issued to JJ Arch from those entities.

117.     While Section 4.2 of the JJ Arch Operating Agreement provides that Simpson could issue a capital call to fund JJ Arch when "additional funds are required by the Company to meet its general and administrative expenses," it did not allow Simpson to issue capital calls to cover other companies' expenses where there was no obligation to fund any capital calls at those entities, and those entities never even made any capital calls to JJ Arch.

118.     Further, the purported contributions, nor the underlying expenditures, were made with notice or consent.

119.     Simpson also refers in the Fraudulent Capital Call to purported contributions he made to "146 E. 89th," a property that is owned by three limited liability corporations, 146 E. 89 Borrower 1 LLC ("Borrower 1"), 146 E. 89 Borrower 2 LLC ("Borrower 2"), and 146 E. 89 Borrower 3 LLC ("Borrower 3"). Borrower 1 has two members, JJ Arch and Jonathan Peldman. A copy of the Borrower 1 Operating Agreement is annexed hereto as **Exhibit Q.** Borrower 2 has

65

one member Kay Properties LLC, though JJ Arch is designated as the manager. A copy of the Borrower 2 Operating Agreement is annexed hereto as **Exhibit R**. Borrower 3 also has one member, 40 Neutral LLC, though JJ Arch is designated as the manager. A copy of the Borrower 3 Operating Agreement is annexed hereto as **Exhibit S**.

120.     Under Section 3.2 of the Borrower 2 and Borrower 3 Operating Agreements, JJ Arch has no capital call obligation to Borrower 2 or 3 but may issue capital calls to the member of those entities. In the event the member does not pay it, JJ Arch has the right to then issue a loan to Borrower 2 or Borrower 3. Under Section 3.2 of the Borrower 1 Operating Agreement, JJ Arch may issue capital calls to the members, and in the event a member does not pay the capital call, JJ Arch then has the right to make that payment as a loan. JJ Arch has not issued any capital calls to the members of Borrower 1, Borrower 2, or Borrower 3 and no payments have been made by JJ Arch to or on behalf of these entities that were authorized or proper under the relevant operating agreements. In fact, the property held by that entity is now in default because of Simpson's mismanagement.

121.     The Fraudulent Capital Call is also improper because the parties' rights and interests in HPR LLC, 1640 Montauk, 1640 Motors, and JJ NY were contractually agreed to in the Contract.

122.     Simpson also relied on his repayment of the Personal Line of Credit but this loan was not issued to JJ Arch, and thus its repayment was not an obligation of JJ Arch. Indeed, the Personal Line of Credit was issued personally to Simpson and Chassen. Further, the loan proceeds themselves were not used for JJ Arch, but for other business and Simpson's own personal use. Simpson cannot use his repayment of a personal loan that was not made to JJ Arch, or indeed to any companies owned by JJ Arch, as a basis to issue a retroactive JJ Arch capital call. Further, the

66

alleged repayment of Personal Line of Credit was expressly incorporated into the calculations in the Contract and cannot for the basis for the Fraudulent Capital Call.

123.     Under the JJ Arch Operating Agreement, Simpson was also required to prospectively give written notice that JJ Arch needed funds "for its general and administrative expenses," and then "[e]ach of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company . . ." Nothing in the JJ Arch Operating Agreement allowed Simpson to issue a retroactive capital call for reimbursement of payments he allegedly previously made in connection with other entities.

124.     The Fraudulent Capital Call is also in derogation of the JJ Arch Operating Agreement because nothing in the JJ Arch Operating Agreement allowed Simpson to allocate payments he allegedly made to into Rêver as JJ Arch expenses. Further, Simpson repeatedly stated that his payments into Rêver were being voluntarily made by him and would not affect Chassen and Simpson's equity positions in JJ Arch.

125.     The Fraudulent Capital Call also claims that Chassen improperly took $34,400, but these funds were GP draws that Chassen was owed by JJ Arch, and there was nothing wrongful or improper in these disbursements.

126.     Finally, the Fraudulent Capital Call claims that Chassen owes $70,500 from 88 Schwenks because "the 88 Schwenks closing distribution was not properly allocated per the Capital accounts in the transaction." The 88 Schwenks distribution was allocated 50-50 as always agreed to by Simpson, including in the Contract where that distribution was memorialized in Exhibit B therein.

**Demand Futility**

127.     Chassen did not make a pre-suit demand because such demand would be futile. Simpson is acting as the sole managing member JJ Arch and is himself accused of the wrongdoing alleged herein. He is interested in the transactions alleged herein, and has, as alleged herein, completely abdicated his fiduciary responsibilities. Simpson is incapable of making an impartial decision as to whether to bring this suit against himself. Accordingly, any demand requirement is futile and excused.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(Breach of fiduciary duty against Simpson-derivative claim on behalf of JJ Arch)**

128.     Chassen repeats each of the preceding allegations as if fully set forth herein.

129.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member.

130.     Simpson, as the managing member of JJ Arch, owes JJ Arch fiduciary duties, including the duty of loyalty and good faith.

131.     Simpson breached his fiduciary duties to JJ Arch, by among other things, (1) misappropriating JJ Arch's assets; (2) engaging in abusive behavior towards JJ Arch employees and personal and investors; (3) knowingly and utterly mismanaging JJ Arch and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to JJ Arch; (6) issuing misleading disclosures; (6) refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached JJ Arch's fiduciary obligations and expose it to liability; (7) making decisions that were harmful to JJ Arch and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6) unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent

68

prior to taking major decisions; (8) refusing to take necessary steps to prevent JJ Arch's

properties from failing and going into default; (9) unlawfully paying his legal expenses without

posting an undertaking to JJ Arch; (10) issuing a Fraudulent Capital Call to Chassen and

depleting accounts; and (11) causing JJ Arch to breach its fiduciary duties to Arch Real Estate.

132.    Simpson's breaches of fiduciary duty have damaged JJ Arch.

133.    The Court should enter a judgment against Simpson awarding JJ Arch its

damages, including consequential damages, in an amount to be determined a trial, but estimated

to exceed $1 million.

**SECOND CAUSE OF ACTION**
**(Breach of fiduciary duty against Simpson-derivative claim on behalf of Arch Real Estate)**

134.    Chassen repeats each of the preceding allegations as if fully set forth herein.

135.    Chassen has standing to bring a derivative claim on behalf of JJ Arch because he

is a member of JJ Arch, which in turn is the managing member of Arch Real Estate.

136.    Simpson, as the managing member of JJ Arch, owes Arch Real Estate fiduciary

duties, including the duty of loyalty and good faith.

137.    Simpson breached his fiduciary duties to Arch Real Estate, by among other

things, (1) misappropriating Arch Real Estate's assets; (2) engaging in abusive behavior towards

Arch Real Estate employees and personal and investors; (3) knowingly and utterly mismanaging

Arch Real Estate and its properties for his own self-interest, (4) failing to maintain internal

controls, (5) failing to devote his business time to Arch Real Estate; (6) issuing misleading

disclosures; (6) refusing to provide books and records to investors even though obligated to do

so, and otherwise knowingly taking decision that breached his fiduciary obligations and exposed

Arch Real Estate to liability; (7) making decisions that were harmful to Arch Real Estate and

investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6)

69

unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent prior to

taking major decisions; and (8) refusing to take necessary steps to prevent Arch Real Estate's

properties from failing and going into default.

138.    Simpson's breaches of fiduciary duty have damaged Arch Real Estate.

139.    The Court should enter a judgment against Simpson awarding Arch Real Estate its

damages, including consequential damages, in an amount to be determined a trial, but estimated

to exceed $1 million.

### THIRD CAUSE OF ACTION
### (Breach of fiduciary duty against Simpson-direct claim)

140.    Chassen repeats each of the preceding allegations as if fully set forth herein.

141.    Simpson, as the managing member of JJ Arch, owes Chassen fiduciary duties,

including the duty of loyalty and good faith.

142.    Simpson breached his fiduciary duties to Simpson, by among other things, (1)

entering into the Amended JJ Arch Operating Agreement by coercion, duress, and undue

influence; (2) unlawfully attempting to terminate Chassen, (3) denying Chassen access to books

and records, (4) failing to make adequate disclosures to Chassen, (5) knowingly making

decisions that were harmful to Chassen for self-interested reasons; (6) failing to obtain Chassen's

consent prior to taking major decisions; (7) improperly taking funds; (8) refusing to provide

books and records; (9) issuing a Fraudulent Capital Call; and (10) refusing to take necessary

steps to prevent Chassen's investments from failing and going into default.

143.    Simpson's breaches of fiduciary duty have damaged Chassen.

144.    The Court should enter a judgment against Simpson awarding Chassen his

damages, including consequential damages, in an amount to be determined a trial, but estimated

to exceed $1 million.

## FOURTH CAUSE OF ACTION
**(Declaratory Judgment that JJ Arch Amended Operating Agreement is void on grounds of unconscionability, lack of consideration, duress, and undue influence-direct claim)**

145.     Chassen repeats each of the preceding allegations as if fully set forth herein.

146.     There is a justiciable controversy between Simpson and Chassen whether the JJ Arch Amended Operating Agreement is a valid and binding agreement or is void as the result of unconscionability, lack of consideration, and undue influence.

147.     The Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority after December 11, 2021 is void because it is unconscionable, was not supported by consideration, and is the product of undue influence.

148.     Simpson was in a confidential relationship with Chassen, was Chassen's mentor, and held enormous power over him. Simpson took advantage of his relationship of trust with Chassen.

149.     Despite Chassen vocalizing his disagreement, Simpson presented him with the Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the business entirely if he did not sign the Amendment.

150.     Chassen signed the Amendment under undue pressure and threats. Simpson pressured Chassen not to hire his own counsel to review the Amendment and limited his involvement in calls Simpson took with the shared JJ Arch and Arch Entities' counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann purported to represent both of them. Chassen was not disclosed Heymann's actual conflicts, and he did not execute any conflict waiver.

151.     Because of their unequal bargaining power, prior relationship, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked

71

meaningful choice in entering into the Amendment, and it was procedurally unconscionable. And the Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson.

152.     The Amendment gave away Chassen's managerial rights as well as his membership percentage under the JJ Arch Operating Agreement for nothing of value and was unsupported by consideration. It is therefore void for lack of consideration.

153.     The Amendment was the product of undue influence, including abuse and deception and is therefore void as the product of undue influence.

154.     Further, given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

155.     Chassen lacks an adequate remedy at law.

156.     The Court should enter a judgment declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

### FIFTH CAUSE OF ACTION
**(Declaratory judgment against Simpson-direct claim)**

157.     Chassen repeats each of the preceding allegations as if fully set forth herein.

158.     There is a justiciable controversy between Simpson and Chassen whether Chassen properly terminated Simpson because of his misconduct, breaches of fiduciary duty, and failure to devote substantially all his business time to JJ Arch.

159.     As alleged herein, Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors, and these breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

160.     Chassen lacks an adequate remedy at law.

161.    The Court should enter a judgment declaring that Chassen lawfully terminated Simpson, that Simpson is properly terminated, and that Simpson is no longer a member of JJ Arch.

### SIXTH CAUSE OF ACTION
### (Permanent Injunction against Simpson-direct claim)

162.    Chassen repeats each of the preceding allegations as if fully set forth herein.

163.    Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors.

164.    These breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

165.    Simpson has also breached the JJ Arch Operating Agreement by issuing the Fraudulent Capital Call, and has used the Fraudulent Capital Call to loot JJ Arch of its assets.

166.    Absent injunctive relief, Simpson is liable to continue to purport to act as the managing member, or member, of JJ Arch, and will continue to loot JJ Arch of its assets in order to deprive Chassen of any recovery.

167.    Chassen faces irreparable injury if Simpson continues to act as managing member or member of JJ Arch, relies on the Fraudulent Capital Call, loots JJ Arch of its assets, or unlawfully pays his legal expenses with JJ Arch assets.

168.    Chassen lacks an adequate remedy at law.

169.    The Court should enter a judgment permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without an undertaking.

73

## SEVENTH CAUSE OF ACTION
### (Permanent Injunction against Simpson-derivative claim on behalf of JJ Arch)

170.  Chassen repeats each of the preceding allegations as if fully set forth herein.

171.  Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors.

172.  These breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

173.  Simpson has also breached the JJ Arch Operating Agreement by issuing the Fraudulent Capital Call and has used the Fraudulent Capital Call to loot JJ Arch of its assets.

174.  Absent injunctive relief, Simpson is liable to continue to purport to act as the managing member, or member, of JJ Arch, and will continue to loot JJ Arch of its assets in order to deprive Chassen of any recovery.

175.  JJ Arch faces irreparable injury if Simpson continues to act as managing member or member of JJ Arch, relies on the Fraudulent Capital Call, loots JJ Arch of its assets, or unlawfully pays his legal expenses with JJ Arch assets.

176.  JJ Arch lacks an adequate remedy at law.

177.  The Court should enter a judgment permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without an undertaking.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract against Simpson and Simco-direct claim)

178.  Chassen repeats each of the preceding allegations as if fully set forth herein.

74

179.    On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson was to buy-out Chassen of certain shared properties owned by JJ Arch and in which Simpson acknowledged their joint control of Head of Pond.

180.    Simpson promptly repudiated the Contract by declaring it terminated and refusing to proceed to finalize the loan by which he was to pay Chassen. He is now taking monies from Head of Pond without Chassen's consent, in an effort to loot the property, and is attempting to replace the property manager without Chassen's consent.

181.    Chassen was, and is, fully ready, willing, and able to perform the contract.

182.    Chassen has been damaged by Simpson and Simco's anticipatory repudiation, purported termination, and failure to perform.

183.    The Court should enter a judgment against Simpson and Simco awarding Chassen his damages, including consequential damages and pre-judgment interest, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

### NINTH CAUSE OF ACTION
### (Specific Performance against Simpson and Simco-direct claim)

184.    Chassen repeats each of the preceding allegations as if fully set forth herein.

185.    On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson was to buy-out Chassen of certain shared properties owned by JJ Arch and in which Simpson acknowledged their joint control of Head of Pond.

186.    Simpson promptly repudiated the contract by declaring it terminated and refusing to proceed to finalize the loan. He has also taken monies from Head of Pond without Chassen's consent and replaced the property manager without Chassen's consent.

187.    Chassen was, and is, fully ready, willing, and able to perform the Contract.

75

188.   Chassen has been damaged by Simpson and Simco's anticipatory repudiation, purported termination, and failure to perform.

189.   Chassen lacks an adequate remedy at law.

190.   The Court should enter a judgment against Simpson and Simco awarding Chassen specific performance of the Contract, including compelling Simpson to proceed with the loan or authorizing Chassen to do so on Simpson's behalf.

## TENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson and Simco-direct claim)

191.   Chassen repeats each of the preceding allegations as if fully set forth herein.

192.   There is a justiciable controversy between Simpson and Chassen whether Simpson has unlawfully repudiated and terminated the Contract and is obligated to comply with it.

193.   On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson was to buy-out Chassen of certain shared properties owned by JJ Arch and in which Simpson acknowledged their joint control of HPR LLC.

194.   Simpson promptly repudiated the contract by declaring it terminated and refusing to proceed to finalize the loan. He has also taken monies from Head of Pond without Chassen's consent and has effectuated the termination of the property manager without Chassen's consent.

195.   Chassen was, and is, fully ready, willing, and able to perform the Contract.

196.   Chassen lacks an adequate remedy at law.

197.   The Court should enter a judgment declaring that Simpson and Simco materially breached the Contract and unlawfully repudiated it.

76

## ELEVENTH CAUSE OF ACTION
### (Declaratory Judgement against Simpson-direct claim)

198.     Chassen repeats each of the preceding allegations as if fully set forth herein.

199.     There is a justiciable controversy between Simpson and Chassen whether Chassen is entitled to act as co-manager of HPR LLC together with Simpson.

200.      On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson acknowledged their joint managerial control of HPR LLC.

201.     Simpson has since unlawfully renounced the Contract and has acted in derogation of Chassen's managerial rights in HPR LLC.

202.     Chassen was, and is, fully ready, willing, and able to perform the Contract.

203.     Chassen lacks an adequate remedy at law.

204.     The Court should enter a judgment declaring that Chassen is entitled to co-managerial rights over HPR LLC pursuant to the Contract.

## TWELVTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-direct claim)

205.     Chassen repeats each of the preceding allegations as if fully set forth herein.

206.     There is a justiciable controversy between Simpson and Chassen whether the Fraudulent Capital Call was ultra vires, fraudulent, and unlawful, and in violation of the JJ Arch Operating Agreement.

207.     The Fraudulent Capital Call violates the JJ Arch Operating Agreement, is based on fabricated numbers, and is without legal effect. Simpson issued it in order to justify his looting of JJ Arch.

208.     Chassen lacks an adequate remedy at law.

77

209.    The Court should enter a judgment against Simpson declaring that the Fraudulent

Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

## THIRTENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-derivative claim on behalf of JJ Arch)

210.    Chassen repeats each of the preceding allegations as if fully set forth herein.

211.    There is a justiciable controversy between JJ Arch, Simpson, and Chassen

whether the Fraudulent Capital Call was ultra vires, fraudulent, and unlawful, and in violation of

the JJ Arch Operating Agreement.

212.    The Fraudulent Capital Call violates the JJ Arch Operating Agreement, is based

on fabricated numbers, and is without legal effect. Simpson issued it in order to justify his

looting of JJ Arch.

213.    JJ Arch lacks an adequate remedy at law.

214.    The Court should enter a judgment against Simpson declaring that the Fraudulent

Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

## FOURTEENTH CAUSE OF ACTION
### (Breach of Contract against Simpson-direct claim)

215.    Chassen repeats each of the preceding allegations as if fully set forth herein.

216.    As detailed herein, Simpson has breached his contractual obligations under the JJ

Arch Operating Agreement, including by failing to obtain Chassen's consent prior to Major

Decisions, issuing the Fraudulent Capital Call, looting JJ Arch of assets, and paying his legal

expenses without posting an undertaking.

217.    Chassen has fully performed his contractual obligations and remains ready willing

and able to do so.

218.    Chassen has been damaged by Simpson's breaches of contract.

219.    The Court should enter a judgment against Simpson awarding Chassen his

damages, including consequential damages, in an amount to be determined at trial, but estimated

to exceed $1 million dollars.

### FIFTEENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-direct claim)

220.    Chassen repeats each of the preceding allegations as if fully set forth herein.

221.    There is a justiciable controversy between Simpson and Chassen whether

Simpson has committed gross negligence and willful misconduct and whether he is entitled to

indemnification of his legal expenses from JJ Arch.

222.    Simpson has been using JJ Arch's funds to pay for his legal representation in this

action.

223.    Simpson is not entitled to indemnification from JJ Arch because he has committed

gross negligence and willful misconduct.

224.    The Court should enter a judgment declaring that Simpson's wrongdoing was

committed with gross negligence or was willful and that he is not entitled to indemnification

from JJ Arch of his legal expenses and authorizing that JJ Arch may collect upon any

undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal

expenses in this proceeding that are paid for by JJ Arch.

### SIXTEENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-derivative claim on behalf of JJ Arch)

225.    Chassen repeats each of the preceding allegations as if fully set forth herein.

226.    There is a justiciable controversy between JJ Arch, Simpson and Chassen whether

Simpson has committed gross negligence and willful misconduct and whether he is entitled to

indemnification of his legal expenses from JJ Arch.

227.    Simpson has been using JJ Arch's funds to pay for his legal representation in this action.

228.    Simpson is not entitled to indemnification from JJ Arch because he has committed gross negligence and willful misconduct.

229.    The Court should enter a judgment declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding.

**SEVENTEENTH CAUSE OF ACTION**
**(Accounting-direct claim)**

230.    Chassen repeats each of the preceding allegations as if fully set forth herein.

231.    As set forth above, Simpson has engaged in theft, diversion of funds, and breaches of fiduciary duty.

232.    Despite due demand, Simpson has refused to provide Chassen with an accounting of JJ Arch, Arch Real Estate, or their jointly owned assets.

233.    Chassen lacks an adequate remedy at law.

234.    Chassen is entitled to a judgement directing Simpson to account to Chassen for all financial accounts, distributions, withdrawals, and any other transactions in which Simpson engaged in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

## EIGHTEENTH CAUSE OF ACTION
### (Books and Records-direct claim)

235.    Chassen repeats each of the preceding allegations as if fully set forth herein.

236.    Pursuant to the New York LLC Law, as a member of JJ Arch, Chassen is entitled to inspect books and records.

237.    The JJ Arch Operating Agreement also provides Chassen with the right to inspect books and records.

238.    Chassen has repeatedly demanded access to JJ Arch's books and records.

239.    Simpson has wrongfully refused to provide Chassen with access to books and records.

240.    Chassen lacks an adequate remedy at law.

241.    Chassen is entitled to a judgement directing that Simpson provide all books and records to Chassen in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

## CLAIMS FOR RELIEF

**WHEREFORE**, plaintiff demands judgment as follows:

(a) On the First Cause of Action, against Simpson awarding JJ Arch its damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

(b) On the Second Cause of Action, against Simpson awarding Arch Real Estate its damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

81

(c) On the Third Cause of Action, against Simpson awarding Chassen his damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

(d) On the Fourth Cause of Action, declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

(e) On the Fifth Cause of Action, declaring that Chassen lawfully terminated Simpson, that Simpson is properly terminated, and that Simpson is no longer a member of JJ

(f) On the Sixth Cause of Action, permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without first posting an undertaking.

(g) On the Seventh Cause of Action, permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without an undertaking.

(h) On the Eighth Cause of Action, against Simpson and Simco, jointly and severally, and awarding Chassen his damages, including consequential damages and pre-judgment interest, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

(i) On the Ninth Cause of Action, against Simpson and Simco awarding Chassen specific performance of the Contract, including compelling Simpson to proceed with the loan or authorizing Chassen to do so on Simpson's behalf.

(j) On the Tenth Cause of Action, declaring that Simpson and Simco materially breached the Contract and unlawfully repudiated it.

(k) On the Eleventh Cause of Action, declaring that Chassen is entitled to co-managerial rights over HPR LLC pursuant to the Contract.

(l) On the Twelfth Cause of Action, declaring that the Fraudulent Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

(m) On the Thirteenth Cause of Action, declaring that the Fraudulent Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

(n) On the Fourteenth Cause of Action, against Simpson awarding Chassen his damages, including consequential damages, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

(o) On the Fifteenth Cause of Action, declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses, and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding.

(p) On the Sixteenth Cause of Action, declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses, and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding.

(q) On the Seventeenth Cause of Action, directing Simpson to account to Chassen for all financial accounts, distributions, withdrawals, and any other transactions in which

83

Simpson engaged in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

(r) On the Eighteenth Cause of Action, directing that Simpson provide all books and records to Chassen in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

(s) Awarding Plaintiff all costs and expenses incurred in this action, including, but not limited to, its reasonable attorneys' fees; and

(t) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 17, 2023

AIDALA, BERTUNA & KAMINS, P.C.

By: *John M Leventhal*
　　　John M. Leventhal, Esq.
546 Fifth Avenue - Sixth Floor
New York, New York 10036
(212) 486-0011 / (212) 750-9700
judgeleventhal@aidalalaw.com

*Counsel for Defendant Chassen*

Allen Schwartz, Esq. (of-counsel to Aidala, Bertuna & Kamins, P.C.)

84

## VERIFICATION

State of New York

County of New York

Jared Chassen, duly deposed, swears under penalty of perjury that I have reviewed the annexed amended answer, counterclaims and third party complaint and affirm that the contents are true to the best of my knowledge, unless stated on information and belief, and those allegations I believe to be true.

By: _____
Jared Chassen

Sworn and subscribed before me

On this 17 day of November, 2023

GANESH JUNIOR RAM
Notary Public - State of New York
No. 01RA6418262
Qualified in Queens County
My Commission Expires 06/07/2025

86

EXHIBIT 10

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:   **HON. JOEL M. COHEN**

*Justice*

PART _____ 03M

-----------------------------------------------------------------------------X

JEFFREY SIMPSON, JJ ARCH LLC

Plaintiffs,

- v -

JARED CHASSEN, FIRST REPUBLIC BANK,

Defendants.

-----------------------------------------------------------------------------X

INDEX NO. _____ 158055/2023

**ORDER REGARDING**
**INTERIM OPERATING**
**PROCEDURES (Mot. Seq. 001)**

WHEREAS, on August 14, 2023, Jeffrey Simpson ("Simpson"), individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC, and JJ Arch LLC (collectively, "Plaintiffs") filed the above-captioned action against Jared Chassen ("Chassen") and First Republic Bank ("First Republic");

WHEREAS, on August 15, 2023, Plaintiffs filed an Order to Show Cause seeking preliminary injunctive relief;

WHEREAS, on August 16, 2023, counsel for the Plaintiffs and counsel for Chassen appeared before the Honorable Joel Cohen of the Supreme Court of the State of New York, County of New York;

WHEREAS, on August 16, 2023, the Court ordered the parties to confer regarding interim operating measures for JJ Arch LLC ("JJ Arch") and its related companies (the "Arch Companies");

WHEREAS, the parties submitted competing orders for the Court's consideration;

WHEREAS, on August 18, 2023, counsel for the Plaintiffs and counsel for Chassen appeared before the Court; and

# INTERIM ORDER

WHEREAS, on August 18, 2023, the Court ordered the parties to jointly file a proposed interim order regarding operating procedures for the Arch Companies, but the parties instead again submitted competing proposals;

NOW THEREFORE, IT IS SO ORDERED by the Court that **pending the to-be-scheduled hearing on Plaintiff's motion for a preliminary injunction** (Motion Sequence No. 001):

1. The First Republic accounts that are subject to the Adverse Claim letter dated August 11, 2023 (the "Arch Accounts") shall be unfrozen. Both Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court;

2. The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect;

3. JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021 (the "JJ Arch Operating Agreement"). Specifically, the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen. Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements; and

4. Simpson and Chassen shall issue a joint communication to all employees of the Arch Companies in the form attached hereto as Exhibit A.

This constitutes an interim decision and order of the Court on Motion Sequence No. 001.

20230821095455JMCOHEN8531DA1766014D06A32E8E33DF7193A6

DATE: 8/21/2023 _____
JOEL M. COHEN, JSC

Check One: ☐ Case Disposed ☒ Non-Final Disposition

Check if Appropriate: ☐ Other (Specify _____ )

EXHIBIT A - JOINT COMMUNICATION

Dear Arch team members,

We understand that the last few weeks have been very challenging for all of us, but we sincerely hope that we have turned a corner.  Jeff and Jared are both still members of JJ Arch and will be jointly running the business at the present time.

We very much appreciate your dedication to Arch, and we look forward to continuing to work with you.

Thank you for your patience,

Jeff and Jared

# EXHIBIT 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

*Plaintiffs*,

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants*

Index No. 158055/2023

**<u>AFFIDAVIT OF JARED CHASSEN IN
SUPPORT OF MOTION FOR
CONTEMPT, TO ENFORCE
INTERIM ORDER, AND FOR
PRELIMINARY INJUNCTION</u>**

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF NEW YORK      )

Jared Chassen, being duly sworn, deposes and says under penalty of perjury as follows:

1.      I am the defendant in the above-captioned action.  I respectfully submit this affidavit in support of my motion seeking an order (1) to compel Plaintiff Jeffrey Simpson ("Simpson") to comply with the Court's August 21, 2023 Interim Order; (2) to declare null and void Simpson's post-Interim Order termination letter; (3) to hold Simpson in contempt of the Court's August 21, 2023 Interim Order, and (4) to enjoin Simpson from unilaterally acting contrary to the Court's Interim Order. I am fully familiar with the facts set forth herein based upon my personal knowledge and observations.

1

## I. My Relationship with Jeffrey Simpson.

2.      I have over 15 years of experience in the real estate industry. I graduated from Nova Southeastern University with a Master of Science degree in real estate development in 2010, while working as an assistant in Acquisitions and Project Management for George A. Fuller Company, a construction firm based in Stamford, Connecticut.  Between 2011 and 2012, I also worked for Pantheon Development, a full-service real estate company in the Bronx, in Project Management & Acquisitions.

3.      I first met Plaintiff Jeffrey Simpson ("Simpson") when we worked together at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services.  Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

4.      Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013.  At the time, Dough Benach, the head of the division hired me and placed me in the Development and Acquisitions team in 2012 to work with Benach and Simpson.  Simpson and Benach taught me essential skills for acquiring, financing debt and equity, developing and running real estate projects, and I was promoted as the Director of Acquisitions in 2014.

5.      During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict.  On a personal level, I viewed him as my mentor and developed a close relationship with him.  I reposed the utmost confidence and trust in him and even put my financial well-being in his hands.

2

## II.  I Introduced Simpson to 35 Oak, and We Formed a Joint Venture.

6.      In 2017, Simpson left Greystone under less than favorable circumstances.

7.      Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson.  As a result, the Greystone Development brand downsized from 30 people to currently 3 persons and Simpson was forced to leave Greystone, and I left alongside many others as the brand downsized and the jobs disappeared.

8.      Simpson struggled to find investors for his new business. While still employed by Greystone, he held many meetings by himself to launch his new business which yielded no success. .Through my own connections, I introduced 608941 NJ INC ("35 Oak") to Simpson while still at Greystone. We planned a new company together with him relying on my capital connections to make the company feasible.  35 Oak is an active investor in many industries, and its principal place of business is in Toronto, Canada.  After a few meetings, 35 Oak decided to invest in a joint venture with us, and on December 11, 2017, established Arch Real Estate Holdings, LLC ("Arch Real Estate"), which is governed by the Limited Liability Company Operating Agreement of Arch Real Estate Holdings, LLC (the "Arch Real Estate Operating Agreement").

9.      The real estate portfolio which Arch Real Estate ultimately grew to  more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by Arch Real Estate. Arch Real Estate also has other affiliated companies, including a property management company, brokerage company, construction company, each of which provides services relating to real properties that Arch Real Estate controls.

10.      Arch Real Estate is itself owned and controlled by two companies—JJ Arch, LLC ("JJ Arch") (collectively with Arch, the "Arch Entities") and 35 Oak.  JJ Arch holds eighty (80) percent of the membership interest in Arch Real Estate, and 35 Oak holds the remaining twenty

3

(20) percent. Annexed hereto as **Exhibit A** is a true and correct copy of the Arch Real Estate Operating Agreement, which is also available at NYSCEF No. 14. *See id.* § 6.1(iii). JJ Arch serves as Managing Member of Arch Real Estate and Simpson is, in turn, the Managing Member of JJ Arch. *See id.* § 7.1.1. 35 Oak serves as the Investor Member of Arch but has no authority to participate in the management or control of the company, though it has consent rights to certain major decisions. *See id.* § 7.1.2.

11.     On the same day, Simpson and I signed a separate operating agreement for JJ Arch—the Limited Liability Company Operating Agreement of JJ Arch LLC (the "JJ Arch Operating Agreement"). A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as **Exhibit B**, and is also available at NYSCEF No. 15.

12.     The JJ Arch Operating Agreement identifies both Simpson and me as Members. *See* Ex. B § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson, who had full, exclusive, and complete discretion with respect to such matters, subject to the limitations set forth in subsection (b), which provides that any Company Major Decision, as defined in the Agreement, shall only be undertaken with my prior written consent. *See* Ex. B § 3.1(a)-(b).

13.     Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth anniversary of the Agreement, Simpson and I were to have equal rights and authority to manage the company. *See id.* § 3.2. Further, I was to be entitled to 50% of all distributions. The original intent behind the JJ Arch Operating Agreement was to let Simpson take charge of the company in the first four years and split control with me afterwards.

4

14.     On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without my input or drafting (the "Amendment"). A true and correct copy of the Amended JJ Arch Operating Agreement is annexed hereto as **Exhibit C** and is also available at NYSCEF No. 16. The Amendment eliminated the language in Section 3.2 of the original Agreement providing Simpson and me equal rights and authority to manage the company.  Under the Amendment, Simpson maintains unilateral power and authority to make good faith decisions with respect to the business and affairs of the company for another 4 years, and I maintain the right to limit Simpson's authority with respect to any Company Major Decision.  *See* Ex. C § 3.1-3.2. I was entitled to 49.9% of all distributions, with Simpson entitled to 50.1%. And contrary to what Simpson asserts, I retained my right to consent to any Company Major Decision. *Id.*; *See* NYSCEF No. 13, Compl. at ¶ 34 (falsely claiming that amendment "meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.").

15.     I never agreed with Simpson's decision to eliminate co-management of the business after the fourth anniversary. Despite vocalizing my disagreement, he presented me with the Amendment on a take-it-or-leave-it basis, threatening me that I would be removed from the business entirely if I did not sign the Amendment after a failed real estate project at 11 Greene Street which is still embroiled in lawsuits based on another toxic partnership Simpson created. I signed the Amendment under undue pressure and threats. Simpson pressured me to not have my own counsel review the Amendment and limited my involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had drafted the amendment in his favor.

### III. Simpson Took Various Unlawful and Improper Actions

16.     When we first started our new business, Simpson promised me, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and change his aggressive behaviors.  The operation of the Arch Entities did well initially, but it went downhill over the past two years.

17.     Simpson's aggressive business demeanor increasingly turned menacing inside the company, with partners, lenders and lawyers.  He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities' brand in the hiring markets. I have personally witnessed him call people stupid, inept and other demeaning names, to the point of bringing them to tears. Simpson created a toxic work environment that forced many employees to leave, leading to understaffing and mismanagement of the company's real estate projects. The head of Human Resources at the Arch Entities has commented on several occasions that she has never seen a more toxic work environment, and such a large turnover of employees, all because of the behavior of Simpson. Simpson would send messages to key employees such as "So now everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

18.     Putting the investors' interests first, I was willing to work to mitigate the damage caused in his wake and endure the harsh and abusive workplace that Simpson created, even to my personal detriment. Yet he committed a series of misconducts that crossed the line of breaching his fiduciary duties, which the company could not withstand, and I had to step up eventually.

19.     First, Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch

6

grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks. Disregarding the opposition of the other Arch Entities' partners and employees, including me, Simpson pushed numbers aggressively and used unachievable assumptions to amplify financial outcomes. Over the years, several internal investment meetings occurred where I and many team members aggressively pushed backed on his financial assumptions, but he would aggressively fight us and ultimately tell us to follow his path or be sidelined or fired. Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else.

20. Second, Simpson prioritized his personal gains over the success of the Arch Entities' projects. For instance, the Myrtle Point development in Ridgewood, Queens, was grossly under budgeted and experienced significant delays from lack of supervision. Simpson didn't even visit the project for weeks at a time. Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary

7

revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss.

21.     Third, Simpson failed to properly supervise and manage projects.  Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses.

22.     Fourth, as cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

23.     Fifth, days before I was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to me and Michelle Miller, a junior partner/employee, threatened to put all the Arch entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business.  Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

24. Finally, Simpson misappropriated Arch Real Estate's funds and employees for an independent auto business that we own—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities for the Arch Entities. Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay for their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. All of this was without consent.

25. From the very beginning of the Rêver business, I was very clear to Simpson that if we purchased this business, it had to be a weekend side-business that would need full third-party management and should never at the expense of the Arch Entities' investments. Repeatedly, I asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded my pleas. He also never obtained my consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

26. Simpson also began devoting much of his time to other business at the expense of JJ Arch such as purchasing a farm and several unaffiliated investment properties, many with large construction components that he oversaw. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

9

### IV.     Simpson Has Deteriorated JJ Arch's Relationship with 35 Oak

27.     While tenuous of late, in July of 2023, Simpson's relationship with 35 Oak deteriorated to a drastic extent, leading 35 Oak to file suit against him in the United States District Court for the Southern District of New York on August 10, 2023. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed hereto as **Exhibit D**.

28.     As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's misconduct vis a vis 35 Oak included: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements.

### V.  Simpson's First Attempt to Remove Me as a Member of the JJ Arch After I Discover His Diversion of Corporate Funds

29.     In July 2023, I asked JJ Arch's accountant about Simpson's diversion of money. I had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

30.     The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. She confirmed that he took Arch Real Estate money to pay auto

employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds. What I learned, and in protecting the company, has guided all my actions.

31.     The company had been struggling for the past year, and since Arch Real Estate is an acquisition company, the income stream does not exist without fees or closing deals. Since those deals were hard to come by in a high interest rate environment and with a dwindling and unmotivated team, the Arch Entities had become dependent on fees from property management. Arch Real Estate owns 3000+ units in southeast, and through an affiliate was also the property manager, and because the Arch Entities were not doing well, it led to those properties also not being managed well.

32.     Together with Jason Paul and Michelle Miller, junior partners/employees of JJ Arch, I told Simpson that the company should transition to third-party property management because the Arch Entities were not managing the properties well, and this was hurting the investors. He kept firing people to limit staff, but with little staff, the Arch Entities weren't supporting the properties and they were failing. We again suggested that the Arch Entities hire a third-party property manager given how poorly the company was doing at property management. He responded that if the Arch Entities gave up the fees from property management, the business would not survive because these fees were now its primary source of income. In the beginning of August, I again told him we should transition to third-party management. He responded that he would not do that because he did not want to have to rely on 35 Oak's money with whom he was fighting.

33.     Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023, Simpson told me that if 35 Oak "didn't stop messing" with him, he was going to file for bankruptcy

on all the properties and blow the company up. This, of course, was prohibited by the operating agreements, and indicated to me that Simpson was entirely focused on himself and his petty battle with 35 Oak.

34.     After I had challenged him on his misappropriation of company assets, and his self-interested decision-making, I heard on August 4, 2023, that Simpson was going to terminate me and free himself to misappropriate company assets at will. I then acted to protect the company funds by requesting to the bank that he should not be able to take company funds without my knowledge. On August 5, 2023, Simpson sent me an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" me that I had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately." A true and correct copy of this email is annexed hereto as **Exhibit E** and is also available at NYSCEF No. 17.

35.     Simpson's email to remove me as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement, as amended.  Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." Ex. B at § 1.1 ("Resignation"). A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i) willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or property]." Ex. A at § 1.1 ("Cause Event").

12

36.     Simpson made no allegation that would constitute a Cause Event warranting my resignation. And his allegations were false. In fact, all my actions have been to protect the company and its assets. His purported notice removing me as a Member of the Arch Entities was nothing more than a blatant attempt to have sole control and management of the Arch Entities to insulate himself from his bad acts.

## VI. I Remove Simpson as a Member of the JJ Arch.

37.     To protect the Arch Entities from further damage, on August 6, 2023, I sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." A true and correct of my notice is annexed hereto as **Exhibit F.**

38.     In the Notice, I rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported forced resignation of me as a Member of the Arch Entities, noting that I had not done  any conduct alleged that would constitute a Cause Event because "no such conduct occurred. *See* Ex. F at 1.

39.     I then informed Simpson, as required by the JJ Arch Operating Agreement, that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement (*see* ¶ 25, *supra*), including "(a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his] own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and

13

affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material

loss as to the business and affairs of the Company …" *Id*.

40.     I advised Simpson that, as a result of these Cause Events, he had to resign as a

Member of the Arch Entities, and no longer had the right to act on behalf of the Arch Entities. *See*

*id*.

41.     Further, Simpson's resignation is independently mandated by the JJ Arch Operating

Agreement's provision that makes it a resignation event if the member fails to devote

"substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation

for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required

for Cause Event. As discussed herein, Simpson failed to devote substantially all of his time to JJ

Arch, instead focusing on his other personal business ventures. *See* supra at ¶ 21. This constitutes

an independent basis for his resignation.

**VII.    35 Oak Removes Simpson as Managing Member of Arch Real Estate**

42.     On August 6, 2023, 35 Oak also sent Simpson an email with the subject line

"Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause

Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)."

43.     35 Oak advised Simpson that he had committed multiple Cause Events that fall into

the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating

Agreement.  The letter listed the same Cause Events that I identified in my Cause Event Notice to

Simpson, but 35 Oak noted that the list was "by no means an exhaustive list of actual or potential

Cause Events" committed by Simpson. 35 Oak also reserved its right to remove Simpson as the

managing member of Arch Real Estate Holdings pursuant to the Arch Operating Agreement; and

14

demanded that Simpson "pursue all third party consents necessary for [35 Oak] to remove [Simpson] as the 'managing member' of [Arch Real Estate Holdings]."

## VIII. Simpson Commences this Action

44.     In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, me and First Republic Bank in the Supreme Court of New York County.  In the complaint, Simpson asserts four causes of action against me, including breach of the amended JJ Arch Operating Agreement, breach of fiduciary duty, conversion, and tortious interference with contractual relations.  Simpson also seeks declaratory judgments and preliminary and permanent injunctions that would allow him to exercise exclusive and sole control over the Arch Entities.  *See* NYSCEF No. 13, Summons and Complaint.

## IX. The Court's Interim Order Restores the Status Quo Ante

45.     On August 21, 2023, the Court entered an Interim Order which required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, **and such access shall not be terminated without further order of the Court**." NYSCEF No. 36, Interim Order, at 2 (emphasis added). The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.*. That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to the

other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim Order provided that "**Simpson and Chassen shall cooperate with each other in good faith** to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.* (emphasis added).

**X. Simpson Has Acted in Contempt of the Interim Order, and Has Since Completely Shut Me out of the Company, Including by Sending a New Termination Letter**

46.     Simpson began violating the Interim Order right from the get-go. He immediately rehired Tristan Last, an employee who had resigned the day after I removed Simpson for cause and increased her salary without seeking my consent even though my consent was required. He hired a new IT company without my consent at an expense that required my consent.

47.     He then moved all employees away from my desk, leaving me on the outskirts of our office space, and clearly intending to show staff that I was no longer a co-member of the company. While I complied with the Interim Order and gave him access to Office.com, Dropbox, Go daddy, he then used that access to read all my emails, including those with my counsel, and deleted my emails.

48.     Simpson has also stopped paying JJ Arch bills that are connected to my credit. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and I have received a call from each credit company this week that payments are not being made and they are in collections. Likewise, our company Visa card, Divvy, is under my credit, and he removed me from these accounts even though these accounts are tied to my credit. I have also received calls that payments are not being made on these accounts.

49.     He has since shut off my access to my emails, dropbox, all company systems, and bank accounts.

16

50.     He demanded that I consent to switch banks from First Republic, without explanation or reason, something that is especially frightening considering his repeated misappropriation of company assets and the fact that I would then be unable to view the accounts as required by the Interim Order.

51.     He began telling employees and third-party partners that I was no longer a member of JJ Arch and started defaming me to them.

52.     Then, on September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both our August letters. A true and correct copy of Simpson's September 1, 2023 letter is annexed hereto as **Exhibit G**, and also available at NYSCEF No. 53. His claims in that letter are completely false and amount to nothing more than pretext for his unilateral actions and exemplify his disregard for the Court and the judicial process. I responded to the letter in an email dated September 3, 2023 and a letter dated September 8, 2023, true and correct copies of which are annexed hereto as **Exhibits H and I**, and also available at NYSCEF Nos. 54 and 55.

53.     He claims that I engaged in willful misconduct and breached my obligations because I purportedly obstructed his efforts to control the finances of the Arch companies. Even before the Interim Order, I in fact wrote First Republic: "Thanks Jeff, Christy this is also my understanding and hopefully we can unfreeze these accounts as soon as possible for business to proceed as usual." A true and correct copy of this email chain is annexed hereto as **Exhibit J**.

54.     He also claims that I instructed employees in the accounting department to refuse to take directions from him and make money transfers, but this is again a fabrication designed to justify his attempts to oust me from the company in derogation of the Court's order. For the last 5 years, with his consent, I have handled all approvals, and wire releases because he has not even

17

logged into FRB online, our accounting system, since 2019. My emails—which he has stolen since the Interim Order—will show that that after the order for each payment requested by an Arch employee, my immediate response was to get his approval and only then I would send payment. The only time I questioned him was when he illegally moved money from accounts to pay bills even though the accounts had been held investor money designated for specific projects.

55.     His claim that I told an employee not to follow his instructions is a complete lie. Rebecca Tokarczyk, the JJ ARCH accountant I think he is referring to, was uncomfortable working with him since he was using her for over a year for his personal assets instead of Arch matters. He was also using Arch Entities' funds for his personal businesses, and misappropriating funds. He was abusive as well to her. I did not instruct her not to follow his directions.

56.     He also says I "perpetuat[ed] a crisis situation at the Arch Companies for which you could then falsely blame me," but this is also false. After the Court entered the Interim Order, I have followed it fully, while he has ignored it, including by purportedly terminating me mere days after the Interim Order voided his prior termination letter and set forth our rights pending the preliminary injunction hearing.

57.     His claim that I have been making transactions from Arch accounts is again false. He also seeks to impute Fist Republic's conduct onto me, when I do not control First Republic. In fact, either he had them shut me out of the account, or as Mr. Kandel stated at the conference on September 11, 2023, Simpson shut me out, even though doing that requires express court permission. I have not obstructed anything, and in fact my email response to his request shows this. Annexed hereto as **Exhibit K** is a true and correct copy of my email response to his request to move banks. I also did not direct any Arch employee in the accounting department to make a payment on Arch credit cards after the Interim Order.

18

58.     His claim that I have not been in the office since the Interim Order is absurd. First, I was sick with Covid, and told Simpson that in a text message on August 22, 2023. A true and correct copy of the text message is annexed hereto as **Exhibit L**. A true and correct copy of a report from my doctor is annexed hereto as **Exhibit M**. I have also not gone into the office because he made it a completely hostile and abusive environment. He repeatedly told me to stay out of meetings and not talk to employees and when I confronted him, he told me "You are powerless and shouldn't even be here." When I went and had a two-hour meeting with him and Jason Paul in attendance as well to discuss settlement, he abruptly ended the meeting by standing up and calling me a "low life piece of shit and to watch out" while storming off. Before he deactivated all my accounts, I was fully working on emails, on calls with employees, working with the bank, etc.

59.     His claim that on August 26, 2023, I refused to execute authorization letters is again misleading and false. The Interim Order itself did not authorize any switch from First Republic, and as a fiduciary of the company I am obligated to make sure funds are being used in a legal and ethical manner, because he has been using company funds for his own personal expenses. His other claim that I held the sole Global Administrator access to Arch Companies' Office 365 and Drop Box accounts is also false, as I restored his rights. I also did not hold anything hostage with respect to a new IT provider; rather, I indicated that it was responsible to interview other IT providers before entering into any long-term contract with one.

60.     I also provided him with the location of all signed agreements despite his claim that I failed to do so. His claim that I "moved Arch Companies physical files into offices on the doors to which you had installed locks for which only you, and employees aligned with you, had keys, and locked the doors to such offices, thereby impeding me and other employees from gaining access to such files." As he knows, I asked for a new lock to be added because the old one was

broken. He had it removed first thing in the morning and then right after, I got locked inside the office since the old latch didn't work. Additionally, I have no physical company files that I was hiding. The keys were sitting in the new lock, and in any event, not one time in 6 years has an employee come to look at any of my personal files, since all ARCH files are digital and on Dropbox.

61.     In sum, since the Interim Order, Simpson has (1) terminated me and shut me out of my company email; (2) deleted my emails and evidence of his theft that was in my emails; (3) looked at my privileged-attorney client communications; (4) shut me out of company files; (5) shut me out of all company accounts; (5) defamed me in the industry and amongst the employees; and (6) have stopped paying bills that are personally tied to my name and credit but are used for the company.

62.     I would also like to respond to the new accusations made in Simpson's counsel's letter dated September 11, 2023. NYSCEF Nos. 57-60. I have not improperly taken any monies from JJ Arch. As Simpson well knows, each of the partners is entitled to a monthly general partner draw, and I was owed months of my draw. We regularly over the past 6 years used our draw by directing payment to accounts or bills directly, instead of having the monies directed to us. Simpson himself regularly did this, including to pay for his own son's bar mitzvah, has overdrawn money from the company and had to borrow from me. I annexed hereto as **Exhibit N and O** true and correct copies of spreadsheets showing Simpson's own use of the GP draws to pay his own bills, and which also shows my use of the GP draw to pay such bills. I also annex hereto as **Exhibits P and Q** my emails to JJ Arch's accountant to pay the tuition bill from my GP draw.

63.     His claim that I am employed by 35 Oak is also false. I do not work for 35 Oak. 35 Oak, the investor partner in Arch Real Estate, has been rightly concerned by Simpson's erratic

20

behavior, as have I. I do not work for them, but for JJ Arch, whose interests I am trying to protect. Both 35 Oak and I share the same desire here: to protect the business, which we all have a fiduciary obligation to protect.

64. Simpson's letter also corroborates my claim here that he has stolen my emails. The emails he attaches to his letter are my stolen emails. These emails include correspondence with my counsel, thus giving him access to privileged communications and my case strategy. This impairs my ability to defend and prosecute this matter.

65. Simpson's bullying should be seen for what it is. He has shown a repeated pattern of prioritizing personal gains to the detriment of the Arch Entities' interests. He has now shut me out of the company in violation of the Court's Interim Order. Granting sole signatory over and sole access to all bank accounts to him, and the unfettered control he seeks, will jeopardize the business, and leave no check on his misconduct. Indeed, it will almost certainly lead to the destruction of the business.

66. It is also important for the Court to know that am I also a personal guarantor of Arch Entities' debt, including those relating to real properties located at 46 East 89th Street New York, NY; 9 Vandam Street, New York, NY; 1640 Montauk Highway, Watermill, NY; and 550 Metropolitan Ave, Brooklyn, NY Retail Unit. I issued those guaranties in reliance on my consent rights for Major Decisions, and my 49.9% membership interest in JJ Arch. I now face personal liability on Arch Entities' corporate debt if Simpson is allowed to unlawfully remove me from JJ Arch, deprive of my consent rights, and destroy the business.

67. I have refrained from issuing a mutual termination letter to Simpson out of respect for the Court and its Interim Order.

68. I respectfully request that the Court grant this motion in its entirety.

21

Jared Chassen

Sworn to before me this
_14th_ day of September, 2023

Notary public

ELIZABETH A. DREAPER
Notary Public, State of New York
No. 01DR6177050
Qualified In Westchester County
Commission Expires November 5, 2023

22

**Word Count Certification**

 Allen Schwartz, Esq. hereby certifies that this affidavit contains 6,670 words exclusive of the table of contents, caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

      _____/s/_____
       Allen Schwartz, Esq.

23