# EXHIBIT 12

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 86
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/15/2023
RECEIVED NYSCEF: 09/15/2023

At IAS Part 3 of the Supreme Court
of the State of New York, held in
and for the County of New York, at
the Courthouse located at 60 Centre
Street, New York, New York on the
15th day of September 2023.

PRESENT: Hon. Joel M. Cohen, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x

JEFFREY SIMPSON, individually and derivatively,
 as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC

,

                              Plaintiff,                    Index No.: 158055/2023

          -against-

JARED CHASSEN and FIRST REPUBLIC BANK

                              Defendants.

-------------------------------------------------------------x

## EMERGENCY ORDER TO SHOW CAUSE

**WARNING:**
**YOUR FAILURE TO APPEAR**
**IN COURT MAY RESULT IN**
**YOUR IMMEDIATE ARREST**
**AND IMPRISONMENT FOR**
**CONTEMPT OF COURT.**

**NOTICE:**
**THE PURPOSE OF THE HEARING IS TO PUNISH THE ACCUSED FOR A**
**CONTEMPT OF COURT AND SUCH PUNISHMENT MAY CONSIST OF FINE OR**
**IMPRISONMENT, OR BOTH, ACCORDING TO LAW.**

Upon the annexed affirmation of John M. Leventhal, Esq., together with its exhibits, the annexed affidavit of Jared Chassen, together with its exhibits, the summons and complaint, the memorandum of law, and all pleadings and proceedings had herein:

LET Plaintiff show cause before this Court, at IAS Part 3, Room 208, at the Courthouse located at 60 Centre Street, New York, New York on October 19, 2023 at 2:30 pm or as soon thereafter as counsel can be heard, why an order should not be entered: (1) compelling Plaintiff Jeffrey Simpson ("Simpson") to comply with the Court's August 21, 2023 Interim Order, including directing Simpson to restore Defendant Jarred Chassen's ("Chassen") company email access, access to dropbox and other company systems, and to retract the actions he took after the Court's August 21, 2023 Order to remove Chassen from JJ Arch; (2) declaring null and void Simpson's post-Interim Order termination letter; (3) holding Simpson in contempt of the Court's August 21, 2023 Interim Order; (4) enjoining Simpson from unilaterally acting to terminate Chassen from JJ Arch; and (5) granting such other and further relief the Court deems just and proper.

SUFFICIENT CAUSE THEREORE HAVING BEEN ALLEGED, it is

**ORDERED** that, pending the hearing of this motion, (1) Simpson shall reinstate Chassen; (2) neither Simpson nor Chassen shall purport to terminate or "resign" the other from membership in the company without court permission; (3) Simpson shall restore Chassen's full access to all his company email accounts and to all company information systems; (4) Simpson shall ensure that Chassen has online viewing access of all company bank accounts; (5) neither Simpson nor Chassen shall review without permission (or authorize others to review without permission) each other's private e-mails unless they are provided during discovery; and (6) Simpson and Chassen shall cooperate in good faith to ensure that each of them have

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 86
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/15/2023
RECEIVED NYSCEF: 09/15/2023

authorization from applicable banks to execute company bank transactions, which transactions remain subject to the terms and restrictions of the applicable operating agreements. The Court's Order Regarding Interim Operating Procedures (NYSCEF 36) remains in full force and effect.

LET service upon Defendants by NYSCEF of a copy of this Order and the papers on which it was based on or before September 19, 2023, be deemed good and sufficient service thereof; it is further

**ORDERED** that opposition papers, if any, be served and filed on NYSCEF on or by September 29, 2023; it is

**ORDERED** that reply papers, if any, be served and filed on NYSCEF on or by October 13, 2023.

ENTER:

Hon. Joel M. Cohen, J.S.C.

At IAS Part _____ of the Supreme
Court of the State of New York, held
in and for the County of New York,
at the Courthouse located at 60
Centre Street, New York, New York
on the _____ day of September
2023.

PRESENT: _____

        J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------x
JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC

,

                        Plaintiff,           Index No.: 158055/2023

      -against-

JARED CHASSEN and FIRST REPUBLIC BANK

                      Defendants.
----------------------------------------------------------------x

## EMERGENCY ORDER TO SHOW CAUSE

**WARNING:**
**YOUR FAILURE TO APPEAR**
**IN COURT MAY RESULT IN**
**YOUR IMMEDIATE ARREST**
**AND IMPRISONMENT FOR**
**CONTEMPT OF COURT.**

**NOTICE:**
**THE PURPOSE OF THE HEARING IS TO PUNISH THE ACCUSED FOR A**
**CONTEMPT OF COURT AND SUCH PUNISHMENT MAY CONSIST OF FINE OR**
**IMPRISOMENT, OR BOTH, ACCORDING TO LAW.**

Upon the annexed affirmation of John M. Leventhal, Esq., together with its exhibits, the annexed affidavit of Jared Chassen, together with its exhibits, the summons and complaint, the memorandum of law, and all pleadings and proceedings had herein:

LET Plaintiff show cause before this Court, at IAS Part _____, Room _____, at the Courthouse located at 60 Centre Street, New York, New York on _____ at _____ or as soon thereafter as counsel can be heard, why an order should not be entered: (1) compelling Plaintiff Jeffrey Simpson ("Simpson") to comply with the Court's August 21, 2023 Interim Order, including directing Simpson to restore Defendant Jarred Chassen's ("Chassen") company email access, access to dropbox and other company systems, and to retract the actions he took after the Court's August 21, 2023 Order to remove Chassen from the JJ Arch; (2) declaring null and void Simpson's post-Interim Order termination letter; (3) holding Simpson in contempt of the Court's August 21, 2023 Interim Order; (4) enjoining Simpson from unilaterally acting to terminate Chassen from JJ Arch; and (5) granting such other and further relief the Court deems just and proper.

SUFFICIENT CAUSE THEREORE APPEARING, it is

ORDERED that, pending the hearing of this motion, Simpson shall reinstate Chassen and not purport to terminate him again without court permission, restore Chassen's full access to all his company email accounts and to all company information systems, and shall ensure that Chassen has online viewing access of all company bank accounts;

LET service upon Defendants by NYSCEF of a copy of this Order and the papers on which it was based on or before _____ ___2023, be deemed good and sufficient service thereof.

ENTER:

Hon:_____

J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

*Plaintiffs,*

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants*

Index No. 158055/2023

**AFFIDAVIT OF JARED CHASSEN IN
SUPPORT OF MOTION FOR
CONTEMPT, TO ENFORCE
INTERIM ORDER, AND FOR
PRELIMINARY INJUNCTION**

---

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

Jared Chassen, being duly sworn, deposes and says under penalty of perjury as follows:

1.    I am the defendant in the above-captioned action.  I respectfully submit this affidavit in support of my motion seeking an order (1) to compel Plaintiff Jeffrey Simpson ("Simpson") to comply with the Court's August 21, 2023 Interim Order; (2) to declare null and void Simpson's post-Interim Order termination letter; (3) to hold Simpson in contempt of the Court's August 21, 2023 Interim Order, and (4) to enjoin Simpson from unilaterally acting contrary to the Court's Interim Order. I am fully familiar with the facts set forth herein based upon my personal knowledge and observations.

1

### I. My Relationship with Jeffrey Simpson.

2.       I have over 15 years of experience in the real estate industry. I graduated from Nova Southeastern University with a Master of Science degree in real estate development in 2010, while working as an assistant in Acquisitions and Project Management for George A. Fuller Company, a construction firm based in Stamford, Connecticut. Between 2011 and 2012, I also worked for Pantheon Development, a full-service real estate company in the Bronx, in Project Management & Acquisitions.

3.       I first met Plaintiff Jeffrey Simpson ("Simpson") when we worked together at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services. Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

4.       Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013. At the time, Dough Benach, the head of the division hired me and placed me in the Development and Acquisitions team in 2012 to work with Benach and Simpson. Simpson and Benach taught me essential skills for acquiring, financing debt and equity, developing and running real estate projects, and I was promoted as the Director of Acquisitions in 2014.

5.       During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict. On a personal level, I viewed him as my mentor and developed a close relationship with him. I reposed the utmost confidence and trust in him and even put my financial well-being in his hands.

2

## II. I Introduced Simpson to 35 Oak, and We Formed a Joint Venture.

6.      In 2017, Simpson left Greystone under less than favorable circumstances.

7.      Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson. As a result, the Greystone Development brand downsized from 30 people to currently 3 persons and Simpson was forced to leave Greystone, and I left alongside many others as the brand downsized and the jobs disappeared.

8.      Simpson struggled to find investors for his new business. While still employed by Greystone, he held many meetings by himself to launch his new business which yielded no success. .Through my own connections, I introduced 608941 NJ INC ("35 Oak") to Simpson while still at Greystone. We planned a new company together with him relying on my capital connections to make the company feasible. 35 Oak is an active investor in many industries, and its principal place of business is in Toronto, Canada. After a few meetings, 35 Oak decided to invest in a joint venture with us, and on December 11, 2017, established Arch Real Estate Holdings, LLC ("Arch Real Estate"), which is governed by the Limited Liability Company Operating Agreement of Arch Real Estate Holdings, LLC (the "Arch Real Estate Operating Agreement").

9.      The real estate portfolio which Arch Real Estate ultimately grew to  more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by Arch Real Estate. Arch Real Estate also has other affiliated companies, including a property management company, brokerage company, construction company, each of which provides services relating to real properties that Arch Real Estate controls.

10.      Arch Real Estate is itself owned and controlled by two companies—JJ Arch, LLC ("JJ Arch") (collectively with Arch, the "Arch Entities") and 35 Oak. JJ Arch holds eighty (80) percent of the membership interest in Arch Real Estate, and 35 Oak holds the remaining twenty

3

(20) percent. Annexed hereto as **Exhibit A** is a true and correct copy of the Arch Real Estate Operating Agreement, which is also available at NYSCEF No. 14. *See id.* § 6.1(iii). JJ Arch serves as Managing Member of Arch Real Estate and Simpson is, in turn, the Managing Member of JJ Arch. *See id.* § 7.1.1. 35 Oak serves as the Investor Member of Arch but has no authority to participate in the management or control of the company, though it has consent rights to certain major decisions. *See id.* § 7.1.2.

11.    On the same day, Simpson and I signed a separate operating agreement for JJ Arch—the Limited Liability Company Operating Agreement of JJ Arch LLC (the "JJ Arch Operating Agreement"). A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as **Exhibit B**, and is also available at NYSCEF No. 15.

12.    The JJ Arch Operating Agreement identifies both Simpson and me as Members. *See* Ex. B § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson, who had full, exclusive, and complete discretion with respect to such matters, subject to the limitations set forth in subsection (b), which provides that any Company Major Decision, as defined in the Agreement, shall only be undertaken with my prior written consent. *See* Ex. B § 3.1(a)-(b).

13.    Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth anniversary of the Agreement, Simpson and I were to have equal rights and authority to manage the company. *See id.* § 3.2. Further, I was to be entitled to 50% of all distributions. The original intent behind the JJ Arch Operating Agreement was to let Simpson take charge of the company in the first four years and split control with me afterwards.

4

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM

NYSCEF DOC. NO. 62
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

14.     On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without my input or drafting (the "Amendment"). A true and correct copy of the Amended JJ Arch Operating Agreement is annexed hereto as **Exhibit C** and is also available at NYSCEF No. 16. The Amendment eliminated the language in Section 3.2 of the original Agreement providing Simpson and me equal rights and authority to manage the company.  Under the Amendment, Simpson maintains unilateral power and authority to make good faith decisions with respect to the business and affairs of the company for another 4 years, and I maintain the right to limit Simpson's authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. I was entitled to 49.9% of all distributions, with Simpson entitled to 50.1%. And contrary to what Simpson asserts, I retained my right to consent to any Company Major Decision. *Id.*; *See* NYSCEF No. 13, Compl. at ¶ 34 (falsely claiming that amendment "meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.").

15.     I never agreed with Simpson's decision to eliminate co-management of the business after the fourth anniversary. Despite vocalizing my disagreement, he presented me with the Amendment on a take-it-or-leave-it basis, threatening me that I would be removed from the business entirely if I did not sign the Amendment after a failed real estate project at 11 Greene Street which is still embroiled in lawsuits based on another toxic partnership Simpson created. I signed the Amendment under undue pressure and threats. Simpson pressured me to not have my own counsel review the Amendment and limited my involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had drafted the amendment in his favor.

5

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 62
NYSCEF DOC. NO. 87
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

### III. Simpson Took Various Unlawful and Improper Actions

16.     When we first started our new business, Simpson promised me, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and change his aggressive behaviors.  The operation of the Arch Entities did well initially, but it went downhill over the past two years.

17.     Simpson's aggressive business demeanor increasingly turned menacing inside the company, with partners, lenders and lawyers.  He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities' brand in the hiring markets. I have personally witnessed him call people stupid, inept and other demeaning names, to the point of bringing them to tears. Simpson created a toxic work environment that forced many employees to leave, leading to understaffing and mismanagement of the company's real estate projects. The head of Human Resources at the Arch Entities has commented on several occasions that she has never seen a more toxic work environment, and such a large turnover of employees, all because of the behavior of Simpson. Simpson would send messages to key employees such as "So now everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

18.     Putting the investors' interests first, I was willing to work to mitigate the damage caused in his wake and endure the harsh and abusive workplace that Simpson created, even to my personal detriment. Yet he committed a series of misconducts that crossed the line of breaching his fiduciary duties, which the company could not withstand, and I had to step up eventually.

19.     First, Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch

6

grossly under budgeted projects and promised unrealistic returns on investment to induce

investors, such as 35 Oak and many others to contribute additional capital without ever disclosing

risks. Disregarding the opposition of the other Arch Entities' partners and employees, including

me, Simpson pushed numbers aggressively and used unachievable assumptions to amplify

financial outcomes. Over the years, several internal investment meetings occurred where I and

many team members aggressively pushed backed on his financial assumptions, but he would

aggressively fight us and ultimately tell us to follow his path or be sidelined or fired. Simpson

also provided minimal reporting to investors, leaving them in the dark and keeping the staff

overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35

Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper

capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he

would threaten retribution if they did not continue to fund. He would tell them they were only good

for capital and guarantees, and nothing else.

20.     Second, Simpson prioritized his personal gains over the success of the Arch

Entities' projects. For instance, the Myrtle Point development in Ridgewood, Queens, was grossly

under budgeted and experienced significant delays from lack of supervision. Simpson didn't even

visit the project for weeks at a time. Recently, the project relied on one time-sensitive forbearance

to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and

not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold

documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions

that would favor his personal interests. As a result of the delay, the Myrtle Point development has

been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary

NYSCEF DOC. NO. 62
RECEIVED NYSCEF: 09/14/2023

revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss.

21. Third, Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses.

22. Fourth, as cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

23. Fifth, days before I was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to me and Michelle Miller, a junior partner/employee, threatened to put all the Arch entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business. Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

8

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 82
RECEIVED NYSCEF: 09/14/2023
NYSCEF DOC. NO. 87
RECEIVED NYSCEF: 09/15/2023

24.     Finally, Simpson misappropriated Arch Real Estate's funds and employees for an independent auto business that we own—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities for the Arch Entities. Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay for their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. All of this was without consent.

25.     From the very beginning of the Rêver business, I was very clear to Simpson that if we purchased this business, it had to be a weekend side-business that would need full third-party management and should never at the expense of the Arch Entities' investments. Repeatedly, I asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded my pleas. He also never obtained my consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

26.     Simpson also began devoting much of his time to other business at the expense of JJ Arch such as purchasing a farm and several unaffiliated investment properties, many with large construction components that he oversaw. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

9

## IV. Simpson Has Deteriorated JJ Arch's Relationship with 35 Oak

27. While tenuous of late, in July of 2023, Simpson's relationship with 35 Oak deteriorated to a drastic extent, leading 35 Oak to file suit against him in the United States District Court for the Southern District of New York on August 10, 2023. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed hereto as **Exhibit D**.

28. As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's misconduct vis a vis 35 Oak included: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements.

## V. Simpson's First Attempt to Remove Me as a Member of the JJ Arch After I Discover His Diversion of Corporate Funds

29. In July 2023, I asked JJ Arch's accountant about Simpson's diversion of money. I had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

30. The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. She confirmed that he took Arch Real Estate money to pay auto

employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds. What I learned, and in protecting the company, has guided all my actions.

31.     The company had been struggling for the past year, and since Arch Real Estate is an acquisition company, the income stream does not exist without fees or closing deals. Since those deals were hard to come by in a high interest rate environment and with a dwindling and unmotivated team, the Arch Entities had become dependent on fees from property management. Arch Real Estate owns 3000+ units in southeast, and through an affiliate was also the property manager, and because the Arch Entities were not doing well, it led to those properties also not being managed well.

32.     Together with Jason Paul and Michelle Miller, junior partners/employees of JJ Arch, I told Simpson that the company should transition to third-party property management because the Arch Entities were not managing the properties well, and this was hurting the investors. He kept firing people to limit staff, but with little staff, the Arch Entities weren't supporting the properties and they were failing. We again suggested that the Arch Entities hire a third-party property manager given how poorly the company was doing at property management. He responded that if the Arch Entities gave up the fees from property management, the business would not survive because these fees were now its primary source of income. In the beginning of August, I again told him we should transition to third-party management. He responded that he would not do that because he did not want to have to rely on 35 Oak's money with whom he was fighting.

33.     Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023, Simpson told me that if 35 Oak "didn't stop messing" with him, he was going to file for bankruptcy

11

on all the properties and blow the company up. This, of course, was prohibited by the operating agreements, and indicated to me that Simpson was entirely focused on himself and his petty battle with 35 Oak.

34.     After I had challenged him on his misappropriation of company assets, and his self-interested decision-making, I heard on August 4, 2023, that Simpson was going to terminate me and free himself to misappropriate company assets at will. I then acted to protect the company funds by requesting to the bank that he should not be able to take company funds without my knowledge. On August 5, 2023, Simpson sent me an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" me that I had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately." A true and correct copy of this email is annexed hereto as **Exhibit E** and is also available at NYSCEF No. 17.

35.     Simpson's email to remove me as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement, as amended.  Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." Ex. B at § 1.1 ("Resignation"). A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i) willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or property]."  Ex. A at § 1.1 ("Cause Event").

12

36. Simpson made no allegation that would constitute a Cause Event warranting my resignation. And his allegations were false. In fact, all my actions have been to protect the company and its assets. His purported notice removing me as a Member of the Arch Entities was nothing more than a blatant attempt to have sole control and management of the Arch Entities to insulate himself from his bad acts.

## VI. I Remove Simpson as a Member of the JJ Arch.

37. To protect the Arch Entities from further damage, on August 6, 2023, I sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." A true and correct of my notice is annexed hereto as **Exhibit F.**

38. In the Notice, I rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported forced resignation of me as a Member of the Arch Entities, noting that I had not done any conduct alleged that would constitute a Cause Event because "no such conduct occurred. *See* Ex. F at 1.

39. I then informed Simpson, as required by the JJ Arch Operating Agreement, that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement (*see* ¶ 25, *supra*), including "(a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his] own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and

13

affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company ..." *Id.*

40.     I advised Simpson that, as a result of these Cause Events, he had to resign as a Member of the Arch Entities, and no longer had the right to act on behalf of the Arch Entities. *See id.*

41.     Further, Simpson's resignation is independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote "substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for Cause Event. As discussed herein, Simpson failed to devote substantially all of his time to JJ Arch, instead focusing on his other personal business ventures. *See* supra at ¶ 21. This constitutes an independent basis for his resignation.

**VII.    35 Oak Removes Simpson as Managing Member of Arch Real Estate**

42.     On August 6, 2023, 35 Oak also sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)."

43.     35 Oak advised Simpson that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement. The letter listed the same Cause Events that I identified in my Cause Event Notice to Simpson, but 35 Oak noted that the list was "by no means an exhaustive list of actual or potential Cause Events" committed by Simpson. 35 Oak also reserved its right to remove Simpson as the managing member of Arch Real Estate Holdings pursuant to the Arch Operating Agreement; and

14

demanded that Simpson "pursue all third party consents necessary for [35 Oak] to remove [Simpson] as the 'managing member' of [Arch Real Estate Holdings]."

## VIII. Simpson Commences this Action

44.  In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, me and First Republic Bank in the Supreme Court of New York County. In the complaint, Simpson asserts four causes of action against me, including breach of the amended JJ Arch Operating Agreement, breach of fiduciary duty, conversion, and tortious interference with contractual relations. Simpson also seeks declaratory judgments and preliminary and permanent injunctions that would allow him to exercise exclusive and sole control over the Arch Entities. *See* NYSCEF No. 13, Summons and Complaint.

## IX. The Court's Interim Order Restores the Status Quo Ante

45.  On August 21, 2023, the Court entered an Interim Order which required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, **and such access shall not be terminated without further order of the Court**." NYSCEF No. 36, Interim Order, at 2 (emphasis added). The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.*. That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to the

15

other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim Order provided that "**Simpson and Chassen shall cooperate with each other in good faith** to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.* (emphasis added).

## X.  Simpson Has Acted in Contempt of the Interim Order, and Has Since Completely Shut Me out of the Company, Including by Sending a New Termination Letter

46.   Simpson began violating the Interim Order right from the get-go. He immediately rehired Tristan Last, an employee who had resigned the day after I removed Simpson for cause and increased her salary without seeking my consent even though my consent was required. He hired a new IT company without my consent at an expense that required my consent.

47.   He then moved all employees away from my desk, leaving me on the outskirts of our office space, and clearly intending to show staff that I was no longer a co-member of the company. While I complied with the Interim Order and gave him access to Office.com, Dropbox, Go daddy, he then used that access to read all my emails, including those with my counsel, and deleted my emails.

48.   Simpson has also stopped paying JJ Arch bills that are connected to my credit. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and I have received a call from each credit company this week that payments are not being made and they are in collections. Likewise, our company Visa card, Divvy, is under my credit, and he removed me from these accounts even though these accounts are tied to my credit. I have also received calls that payments are not being made on these accounts.

49.   He has since shut off my access to my emails, dropbox, all company systems, and bank accounts.

16

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 82
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

50.     He demanded that I consent to switch banks from First Republic, without explanation or reason, something that is especially frightening considering his repeated misappropriation of company assets and the fact that I would then be unable to view the accounts as required by the Interim Order.

51.     He began telling employees and third-party partners that I was no longer a member of JJ Arch and started defaming me to them.

52.     Then, on September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both our August letters. A true and correct copy of Simpson's September 1, 2023 letter is annexed hereto as **Exhibit G**, and also available at NYSCEF No. 53. His claims in that letter are completely false and amount to nothing more than pretext for his unilateral actions and exemplify his disregard for the Court and the judicial process. I responded to the letter in an email dated September 3, 2023 and a letter dated September 8, 2023, true and correct copies of which are annexed hereto as **Exhibits H and I**, and also available at NYSCEF Nos. 54 and 55.

53.     He claims that I engaged in willful misconduct and breached my obligations because I purportedly obstructed his efforts to control the finances of the Arch companies. Even before the Interim Order, I in fact wrote First Republic: "Thanks Jeff, Christy this is also my understanding and hopefully we can unfreeze these accounts as soon as possible for business to proceed as usual." A true and correct copy of this email chain is annexed hereto as **Exhibit J**.

54.     He also claims that I instructed employees in the accounting department to refuse to take directions from him and make money transfers, but this is again a fabrication designed to justify his attempts to oust me from the company in derogation of the Court's order. For the last 5 years, with his consent, I have handled all approvals, and wire releases because he has not even

17

logged into FRB online, our accounting system, since 2019. My emails—which he has stolen since the Interim Order—will show that that after the order for each payment requested by an Arch employee, my immediate response was to get his approval and only then I would send payment. The only time I questioned him was when he illegally moved money from accounts to pay bills even though the accounts had been held investor money designated for specific projects.

55.     His claim that I told an employee not to follow his instructions is a complete lie. Rebecca Tokarczyk, the JJ ARCH accountant I think he is referring to, was uncomfortable working with him since he was using her for over a year for his personal assets instead of Arch matters. He was also using Arch Entities' funds for his personal businesses, and misappropriating funds. He was abusive as well to her. I did not instruct her not to follow his directions.

56.     He also says I "perpetuat[ed] a crisis situation at the Arch Companies for which you could then falsely blame me," but this is also false. After the Court entered the Interim Order, I have followed it fully, while he has ignored it, including by purportedly terminating me mere days after the Interim Order voided his prior termination letter and set forth our rights pending the preliminary injunction hearing.

57.     His claim that I have been making transactions from Arch accounts is again false. He also seeks to impute Fist Republic's conduct onto me, when I do not control First Republic. In fact, either he had them shut me out of the account, or as Mr. Kandel stated at the conference on September 11, 2023, Simpson shut me out, even though doing that requires express court permission. I have not obstructed anything, and in fact my email response to his request shows this. Annexed hereto as **Exhibit K** is a true and correct copy of my email response to his request to move banks. I also did not direct any Arch employee in the accounting department to make a payment on Arch credit cards after the Interim Order.

18

58.     His claim that I have not been in the office since the Interim Order is absurd. First, I was sick with Covid, and told Simpson that in a text message on August 22, 2023. A true and correct copy of the text message is annexed hereto as **Exhibit L**. A true and correct copy of a report from my doctor is annexed hereto as **Exhibit M**. I have also not gone into the office because he made it a completely hostile and abusive environment. He repeatedly told me to stay out of meetings and not talk to employees and when I confronted him, he told me "You are powerless and shouldn't even be here." When I went and had a two-hour meeting with him and Jason Paul in attendance as well to discuss settlement, he abruptly ended the meeting by standing up and calling me a "low life piece of shit and to watch out" while storming off. Before he deactivated all my accounts, I was fully working on emails, on calls with employees, working with the bank, etc.

59.     His claim that on August 26, 2023, I refused to execute authorization letters is again misleading and false. The Interim Order itself did not authorize any switch from First Republic, and as a fiduciary of the company I am obligated to make sure funds are being used in a legal and ethical manner, because he has been using company funds for his own personal expenses. His other claim that I held the sole Global Administrator access to Arch Companies' Office 365 and Drop Box accounts is also false, as I restored his rights. I also did not hold anything hostage with respect to a new IT provider; rather, I indicated that it was responsible to interview other IT providers before entering into any long-term contract with one.

60.     I also provided him with the location of all signed agreements despite his claim that I failed to do so. His claim that I "moved Arch Companies physical files into offices on the doors to which you had installed locks for which only you, and employees aligned with you, had keys, and locked the doors to such offices, thereby impeding me and other employees from gaining access to such files." As he knows, I asked for a new lock to be added because the old one was

19

broken. He had it removed first thing in the morning and then right after, I got locked inside the office since the old latch didn't work. Additionally, I have no physical company files that I was hiding. The keys were sitting in the new lock, and in any event, not one time in 6 years has an employee come to look at any of my personal files, since all ARCH files are digital and on Dropbox.

61.     In sum, since the Interim Order, Simpson has (1) terminated me and shut me out of my company email; (2) deleted my emails and evidence of his theft that was in my emails; (3) looked at my privileged-attorney client communications; (4) shut me out of company files; (5) shut me out of all company accounts; (5) defamed me in the industry and amongst the employees; and (6) have stopped paying bills that are personally tied to my name and credit but are used for the company.

62.     I would also like to respond to the new accusations made in Simpson's counsel's letter dated September 11, 2023. NYSCEF Nos. 57-60. I have not improperly taken any monies from JJ Arch. As Simpson well knows, each of the partners is entitled to a monthly general partner draw, and I was owed months of my draw. We regularly over the past 6 years used our draw by directing payment to accounts or bills directly, instead of having the monies directed to us. Simpson himself regularly did this, including to pay for his own son's bar mitzvah, has overdrawn money from the company and had to borrow from me. I annexed hereto as **Exhibit N and O** true and correct copies of spreadsheets showing Simpson's own use of the GP draws to pay his own bills, and which also shows my use of the GP draw to pay such bills. I also annex hereto as **Exhibits P and Q** my emails to JJ Arch's accountant to pay the tuition bill from my GP draw.

63.     His claim that I am employed by 35 Oak is also false. I do not work for 35 Oak. 35 Oak, the investor partner in Arch Real Estate, has been rightly concerned by Simpson's erratic

20

behavior, as have I. I do not work for them, but for JJ Arch, whose interests I am trying to protect. Both 35 Oak and I share the same desire here: to protect the business, which we all have a fiduciary obligation to protect.

64. Simpson's letter also corroborates my claim here that he has stolen my emails. The emails he attaches to his letter are my stolen emails. These emails include correspondence with my counsel, thus giving him access to privileged communications and my case strategy. This impairs my ability to defend and prosecute this matter.

65. Simpson's bullying should be seen for what it is. He has shown a repeated pattern of prioritizing personal gains to the detriment of the Arch Entities' interests. He has now shut me out of the company in violation of the Court's Interim Order. Granting sole signatory over and sole access to all bank accounts to him, and the unfettered control he seeks, will jeopardize the business, and leave no check on his misconduct. Indeed, it will almost certainly lead to the destruction of the business.

66. It is also important for the Court to know that am I also a personal guarantor of Arch Entities' debt, including those relating to real properties located at 46 East 89th Street New York, NY; 9 Vandam Street, New York, NY; 1640 Montauk Highway, Watermill, NY; and 550 Metropolitan Ave, Brooklyn, NY Retail Unit. I issued those guaranties in reliance on my consent rights for Major Decisions, and my 49.9% membership interest in JJ Arch. I now face personal liability on Arch Entities' corporate debt if Simpson is allowed to unlawfully remove me from JJ Arch, deprive of my consent rights, and destroy the business.

67. I have refrained from issuing a mutual termination letter to Simpson out of respect for the Court and its Interim Order.

68. I respectfully request that the Court grant this motion in its entirety.

21

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 67

Jared Chassen

Sworn to before me this
__14th__ day of September, 2023

Notary public

ELIZABETH A. DREAPER
Notary Public, State of New York
No. 01DR6177050
Qualified In Westchester County
Commission Expires November 5, 2023

22

FILED: NEW YORK COUNTY CLERK 09/13/2023 04:37 PM
NYSCEF DOC. NO. 62
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

## Word Count Certification

Allen Schwartz, Esq. hereby certifies that this affidavit contains 6,670 words exclusive of the table of contents, caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

_____/s/_____
Allen Schwartz, Esq.

23

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH REAL ESTATE HOLDINGS LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of December 11, 2017, by and between 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Investor Member"), and JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ Member", and Investor Member and JJ Member, each a "Member", and collectively, the "Members").

WHEREAS, the Members desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch Real Estate Holdings LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Acquisition Fees" shall mean all fees paid to the Company in connection with the acquisition of an asset by a Subsidiary or another Person.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

812194-9

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Annual Budget" means the annual budget of the Company approved in accordance with Section 7.4 as the same may be modified in accordance herewith.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided,

3

however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)     The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions (other than Capital Contributions made by JJ Member pursuant to Section 3.4) and Acquisition Fees), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as

such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on November 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Damages" shall have the meaning set forth in Section 7.6.4.

"Default Loan" shall have the meaning set forth in Section 3.2.3.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"Due Diligence Materials" shall have the meaning set forth in Section 7.2.2.

812194-9

"Eligible Asset" means any interest in real property either directly or indirectly through an ownership or leasehold interest including a preferred equity interest but excluding the origination or purchase of any debt financing unless such debt financing is being acquired or originated with the likely expectation that such debt financing will ultimately result in ownership of the collateral for such debt financing, and which is reasonably expected to satisfy the criteria set forth on Exhibit A hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exercise Period" shall have the meaning set forth in Section 7.9.2.

"Fiscal Year" shall be as set forth in Section 11.1.

"Guarantor Indemnitor" shall have the meaning set forth in Section 7.6.4

"Guaranty" or "Guaranties" shall have the meaning set forth in Section 7.7.1.

"Guaranty Indemnified Parties" shall have the meaning set forth in Section 7.6.4.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Initiating Member" shall have the meaning set forth in Section 7.9.1.

"Investment Expiration Date" means the earlier of (i) the fifth anniversary of the date hereof; (ii) at such time as there are five Rejected Eligible Assets; (iii) the date on which none of Michael Wiener, William Wiener or Kevin Wiener controls Investor Member unless waived in writing by Managing Member; (iv) the date on which Jeffery Simpson no longer controls Managing Member unless waived in writing by Investor Member; or (v) the date on which the Investor Member and its Affiliates have made aggregate capital contributions, without giving effect to a return of any capital contributions, to the Company and its Subsidiaries equal to $50,000,000.00.

"Investor Member" shall have the meaning set forth in Preamble.

"Investor Member Maximum Capital Contribution" means $3,000,000.00.

"JJ Member" shall have the meaning set forth in the Preamble.

"JJ Member Promote Distribution" means an amount equal that portion of a Promote Distribution received by JJ Member and its Affiliate from a Subsidiary which is ultimately distributable to JJ Member or the equity holders of JJ Member. For example purposes, if an Affiliate of JJ Member receives a Promote Distribution of $100,000 and $40,000 of it is distributable to JJ Member and $60,000 distributable to an Affiliate of JJ Member and the

equity holders of JJ Member hold a 10% interest in such Affiliate, the JJ Member Promote Distribution will be $46,000 [$40,000 + (10% x $60,000)].

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Major Decision" shall have the meaning set forth in Section 7.1.3.

"Managing Member" means JJ Member, or a replacement "managing member" appointed pursuant to Section 7.1.4.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)      items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)     any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)     there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)      if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)     items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Company Promote Interest" shall have the meaning set forth in Section 7.8.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Offer Notice" shall have the meaning set forth in Section 7.9.1.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" has the meaning set forth in the operating agreement or other governing document of the applicable Subsidiary.

"Proposed Annual Budget" has the meaning set forth in Section 6.7.

"Recourse Party" shall have the meaning set forth in Section 7.7.1.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Rejected Eligible Asset" shall have the meaning set forth in Section 7.2.2.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member; provided that, unless required under a loan, the Company shall not hold reserves less than $375,000 without Investor Member's consent, not to be unreasonably withheld, conditioned or delayed.

"Responding Member" shall have the meaning set forth in Section 7.9.1.

"ROFO Closing Date" shall have the meaning set forth in Section 7.9.4.

"ROFO Default" shall have the meaning set forth in Section 7.9.4.

"ROFO Deposit" shall have the meaning set forth in Section 7.9.2.

"ROFO Election" shall have the meaning set forth in Section 7.9.2.

812194-9

INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/18/2023
RECEIVED NYSCEF: 09/15/2023

"ROFO Price" shall have the meaning set forth in Section 7.9.1.

"ROFO Sale" shall have the meaning set forth in Section 7.9.2.

"Sale Asset" shall have the meaning set forth in Section 7.9.1.

"Subsidiary" shall mean any Person of which fifty percent (50%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contributions" means with respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 6.2(ii).

<div align="center">

ARTICLE II

**ESTABLISHMENT OF THE COMPANY**

</div>

2.1.  Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2.  Company Name.  The business of the Company shall continue to be conducted under the name of "Arch Real Estate Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.  Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate

<div align="center">9</div>

investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    Principal Place of Business and Address.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to Investor Member promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    Term.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    Agent for Service.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation. or such other agent as may be designated from time to time by Managing Member.

2.7.    Admission of Members.  Investor Member and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    Limitation on Liability.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1.    Initial Capital Contributions.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Schedule 1 hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    Additional Capital Contributions.

3.2.1.  If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with the Company's due diligence in connection

10

with approved Eligible Assets, Managing Member shall deliver a written notice to Investor Member (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Notwithstanding anything herein to the contrary, without the consent of Investor Member, which may be granted or withheld in its sole and absolute discretion, in no event shall the Company be permitted to make a Capital Call if the Capital Call Amount to be made by Investor Member, when added to the then Unreturned Capital Contributions of Investor Member, would cause the aggregate Unreturned Capital Contributions to exceed Investor Member Maximum Capital Contribution.

3.2.2. Investor Member shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to the Capital Call Amount.

3.2.3. If the Investor Member shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then JJ Member shall have the right to contribute the amount of the Investor Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a "Default Loan") to the Investor Member in an amount equal to the unfunded capital contribution.

3.2.4. Each Default Loan shall be deemed to constitute a loan made by the JJ Member to the Investor Member in accordance with the terms hereof, immediately followed by a capital contribution by the Investor Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the JJ Member and shall constitute a debt owed by the Investor Member. Any Default Loan shall bear interest at the rate of eight percent (8%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Investor Member from any distributions due to Investor Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Investor Member and shall be secured by the Investor Member's Membership Interest including, without limitation, the Investor Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Investor Member hereby pledges, assigns and grants a security interest in its Membership Interest to the JJ Member and agrees to execute such documents and statements as are reasonably requested by the JJ Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Investor Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Investor Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the JJ Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Investor Member, and (y) any proceeds of the sale of the Investor Member's Membership Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Investor Member.

11

3.3.    No Interest. Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    JJ Member Promote Distribution Capital Contributions. No later than ten (10) Business Days after the receipt of Promote Distribution, if the Unreturned Capital Contribution of Investor Member is in excess of zero, JJ Member shall make a capital contribution to the Company equal to the lesser of (i) the amount of such JJ Member Promote Distribution or (ii) the product of the Investor Member's Unreturned Capital Contribution and a fraction, the numerator of which is the aggregate unreturned capital contributions made by JJ Member and its Affiliates to all Subsidiaries and the denominator of which is the aggregate unreturned capital contributions made by JJ Member, Investor Member and their respective Affiliates to all Subsidiaries.

3.5.    Return of Capital. Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6.    No Personal Liability. Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in Section 7.6.1.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.    Capital Accounts.    A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    Adjustments. The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject

12

to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.

4.3.   Negative Capital Accounts.   No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.   Transfers.   If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.   Capital Account Balance.   Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.   Allocations of Net Profit and Net Loss.   After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets. Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.   Regulatory Allocations.

5.2.1.   Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in

Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2. This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3. To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4. If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5. Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6. It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3. Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

14

### 5.3. Tax Allocations.

5.3.1. For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2. In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution). If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3. If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4. Withholding. The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder. Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member. Any amount payable as indemnity hereunder by a

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

### 5.5.    Tax Matters.

5.5.1. Tax Matters Partner; Partnership Representative.    Managing Member shall be the "Tax Matters Partner" of the Company. The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner. The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner. Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2. Tax Elections.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with Investor Member; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent. The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members. The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3. Tax Returns. The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6.     Section 754 Election. In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

ARTICLE VI

**DISTRIBUTIONS**

6.1.     Distributions of Cash Flow. Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member in the following order of priority:

(i)      First, to Investor Member an amount equal to 4% per annum simple interest on its Unreturned Capital Contribution;

(ii)     Second, to Investor Member and JJ Member pro rata based on their respective Unreturned Capital Contributions until their respective Unreturned Capital Contributions are reduced to zero;

(iii)    Thereafter, 80% to JJ Member and 20% to Investor Member.

6.2.     Distributions of Acquisition Fees. All Acquisition Fees, if any, shall be distributed within five (5) Business Days of the receipt thereof to the Members as follows: 20% to Investor Member; and 80% to JJ Member.

6.3.     Distributions Restricted by the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

ARTICLE VII

**MANAGEMENT AND OPERATIONS**

7.1.     Management.

7.1.1.   The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 7.1.3), full,

17

exclusive and complete discretion with respect thereto. Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>. Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i) conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii) open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii) enter into any contract or endorsement in the name or for the account of the Company;

(iv) employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v) bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi) deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii) admit one or more additional members solely to provide necessary capital in the event that Investor Member fails to fund a required Capital Contribution pursuant to <u>Section 3.2</u>;

(viii) cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix) take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2. Except as otherwise provided in this Agreement, Investor Member shall not participate in the management or control of the Company or have any right to approve,

18

vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)     acquire any direct or indirect interests in any real property;

(ii)     file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)     sell any Company Asset or any portion thereof other than any Company Asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property or in accordance with Section 7.9;

(iv)     merge, consolidate or other reorganize the Company with another Person;

(v)     borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)     possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Managing Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Asset, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)     enter into any lease for space at a Company Asset of more than 10% of the rentable area of such Company Asset;

(viii)     engage in any business or activity not authorized by this Agreement;

19

(ix)     enter into any agreement requiring the expenditure of more than $50,000 per annum;

(x)      enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in <u>Section 7.3</u> and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi)     incur any expense in excess of the amount set forth in the Annual Budget; provided that emergency expenditures and other expenditures not in excess of 10% over any line item in, or 5% over the aggregate, Annual Budget amount may be incurred without the consent of Investor Member;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)   admit new or substitute Members to the Company or any Subsidiary;

(xiv)    modify any material terms of any organizational document of any Subsidiary; and

(xv)     cause any Subsidiary to take any of the foregoing.

7.1.4.   <u>Removal of JJ Member as Managing Member</u>. JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice. Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member. If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to <u>Section 6.1(iii)</u> or <u>6.2</u>.

7.1.5.   <u>Meetings</u>. Managing Member shall meet with Investor Member, which meeting may be by telephone, no less frequently than monthly to provide Investor Member with a general update on the Company Asset and the Company. Any action required or permitted to be taken at any meeting or otherwise requiring the affirmation, vote, consent or approval of the Members may be taken without a meeting if the Members affirm, vote for, consent to or approve, the same at a meeting do so in writing, and the writing or writings are filed with the minutes of proceeding of the Members, as the case may be.

812194-9

7.2. **Services of the Members; Company Opportunities.**

7.2.1. Managing Member and Investor Member shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) subject to Section 7.2.2 or Section 7.9, acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.2.2. Prior to the Investment Expiration Date or, if an Expense Contribution is required at such time as the Investor Member Maximum Expense Capital Contribution has been funded and Investor Member elects not to make such Expense Contribution, Managing Member and its Affiliates shall first offer all Eligible Assets to the Company. Managing Member shall provide Investor Member with such information with respect to such Eligible Asset as is reasonably required for Investor Member to make an informed decision as to whether to consent to the Company acquiring such Eligible Asset including, without limitation, a description of the Eligible Asset, historic financial statements, if any, with respect to such Eligible Asset, projected cash flows from such Eligible Asset, the estimated costs associated with acquiring such Eligible Asset, including due diligence costs, and the amount, if any of the capital that will be contributed by Managing Member, together with such other information as Investor Member shall reasonably request (the "Due Diligence Information"). If Investor Member fails to consent to the Company acquiring any proposed Eligible Asset within fifteen (15) days of Managing Member providing the Due Diligence Information and Managing Member has elected to provide not less than 5% of the equity capital (after taking into account reasonably anticipated debt or third party equity financing) required to acquire such Eligible Asset (a "Rejected Eligible Asset"), Managing Member shall have the right to pursue such Eligible Asset independent of the Company provided however if the ultimate terms of the investment in such Eligible Asset are, in the aggregate, no more favorable to Managing Member than those presented to the Company. Notwithstanding the foregoing, prior to the Investment Expiration Date, Managing Member shall not acquire any Rejected Eligible Asset which is in the same asset class and within a radius of 0.25 miles for urban properties and 2.0 miles for non-urban properties as an existing Company Asset.

7.3. **Guaranteed Payment; Fees and Expenses.**

7.3.1. Guaranteed Payment. As compensation for its various undertaking and capital commitments hereunder, Managing Member shall be entitled to a monthly guaranteed payment from the Company equal to the amount set forth in the Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance. The right of Managing Member to receive Managing Member Guaranteed Payment shall automatically terminate upon Managing Member no longer serving as the "Managing Member" of the Company.

21

7.3.2. Acquisition Fee. In connection with the acquisition of each Eligible Asset, the Company shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.3. Development Fee/Asset Management Fee/Other Fees. To the extent that an Eligible Asset is acquired in a Subsidiary with non-Affiliated investors, Managing Member shall use its good faith efforts to provide for the Company to be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such Company Asset to the extent the Company or an Affiliate of the Company or a Member provides such services.

7.3.4. Due Diligence Expenses. The Company shall reimburse each Member for any actual out-of-pocket third party expenses incurred by such Member in connection with its determination as to whether to cause the Company to acquire an Eligible Asset.

7.4. Budget. The initial Annual Budget of the Company is as set forth in Exhibit B hereto. No later than November 1 of each calendar year, Managing Member shall prepare (or cause to be prepared) an annual budget (the "Proposed Annual Budget"), and deliver such Proposed Annual Budget to Investor Member. In the event that Investor Member objects in writing to all or a portion of the Proposed Annual Budget within thirty (30) days of receipt thereof, the Members shall, diligently and in good faith, attempt to achieve a unanimous decision with respect to the Proposed Annual Budget. In the event that Members are unable to achieve a unanimous decision with respect to the Proposed Annual Budget, the Annual Budget then in effect shall remain the Annual Budget modified as follows: (i) any line item agreed upon by the Members in the Proposed Annual Budget shall be substituted for the same line item in the current Annual Budget; (ii) all line items that are not agreed upon shall be the lesser of the amount provided for in the current Annual Budget or the amount set forth in the Proposed Annual Budget; and (iii) any new line item in the Proposed Annual Budget shall not be deemed included in the Annual Budget.

7.5. Legal Title to Company Asset. Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.6. Guaranties.

7.6.1. The Members acknowledge that in connection with any (i) financing or refinancing by the Company or any Subsidiary entered into on or after the date of this Agreement with respect to a Company Asset the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty, environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, in its sole discretion, shall or shall cause one or more of its Affiliates satisfactory to the applicable lender or landlord (each a "Recourse Party") to provide any such Guaranty.

7.6.2. In consideration of providing an unconditional payment Guaranty, the party providing such Guaranty shall be entitled to a one-time fee equal to 2.0% of the amount

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 87

so guaranteed, which fee shall be payable by the applicable Subsidiary at the closing of the applicable loan. In the event that more than one Person provides an unconditional guaranty, such guaranty fee shall be allocated equally among the Recourse Parties or as otherwise agreed by the Recourse Parties.

7.6.3. Notwithstanding anything herein contained to the contrary, neither Member or any of its respective Affiliates shall be required to execute, deliver or issue any Guaranty in connection with any financing or refinancing, or office lease, by the Company or any Subsidiary except, with respect to Managing Member, in the case of a financing or refinancing, for customary "bad boy non-recourse carveout" Guaranties where Managing Member has control over the events giving rise to the payment on any guaranteed obligations.

7.6.4. Each Member agrees if a lender makes any written demand from time to time on a Recourse Party as a result of breach of a "bad boy non-recourse carveout" Guaranty, for payment or performance under a Guaranty, each Member shall pay, or reimburse the applicable Recourse Party, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the breach of the "bad boy non-recourse carveout" Guaranty is directly attributable to any action of JJ Member or its Affiliate, on the one hand, or Investor Member or its Affiliate, on the other hand, and which action was not unanimously approved by JJ Member and Investor Member, in which event the Member who, or whose Affiliate, took such action shall be solely responsible for the amounts due on such Guaranty. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a "bad boy non-recourse carveout" Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

7.7. Other Activities of Members. Except as set forth in Section 7.2, neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company. Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments. The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

7.8. Acquisition of Eligible Assets. The Members agree that in connection with the acquisition of each Eligible Asset Managing Member shall use commercially reasonable

23

efforts to (i) cause the Eligible Asset to be acquired through an ownership structure as set forth on Exhibit C and (ii) will, and cause its Affiliated entities depicted on Exhibit C hereto to, form a limited liability company to serve as the direct or indirect managing member or general partner of the acquiring entity and shall, and cause its Affiliated entities depicted on Exhibit C hereto to, enter an operating agreement in substantially the form attached hereto as Exhibit D. The Managing Member shall, to the extent requested by Investor Member, seek to obtain third party equity capital for each such Eligible Asset on such terms as may be reasonably acceptable to the Members. Managing Member shall have the right to allocate a portion of the "promoted" interest to one or more of its employees or affiliates (the "Non-Company Promote Interest").

       7.9.    Sale of Company Asset.

       7.9.1.  In the event that either Managing Member or Investor Member desires to cause a Subsidiary to sell its asset and the other Member does not consent to such sale, the Member who desires to sell an asset ("Initiating Member") shall first give to the other Member ("Responding Member") a notice (an "Offer Notice") setting forth the applicable asset that Initiating Member desires to sell (the "Sale Asset") and the minimum gross purchase price at which Initiating Member would be willing to cause the applicable Subsidiary to sell the Sale Asset (the "ROFO Price") and the allocation of all costs (transfer taxes, title, survey etc.) and with respect thereto.

       7.9.2.  Within thirty (30) days of receipt of an Offer Notice (the "Exercise Period"), Responding Member shall have the right to elect (which election shall be irrevocable) to purchase the Sale Asset from the applicable Subsidiary for the ROFO Price, subject to prorations and adjustments, and otherwise on the same terms and conditions set forth in the Offer Notice (the "ROFO Sale"), by giving written notice of such election within the Exercise Period (the "ROFO Election") and simultaneously depositing with a mutually agreeable escrow agent a non-refundable cash deposit equal to five percent (5%) of the ROFO Price (the "ROFO Deposit") (to be applied to the ROFO Price at closing). At the closing of a ROFO Sale all items of the Sale Asset which are customarily apportioned in the sale of assets comparable to the Sale Asset shall be apportioned between Responding Member and the applicable Subsidiary as of 11:59 PM on the day preceding the closing date in accordance with the customs and practices usual in transactions involving properties comparable to the Sale Asset.

       7.9.3.  If Responding Member does not timely make a ROFO Election or affirmatively waives its right of first offer, Responding Member shall be deemed to have elected not to purchase the Sale Asset pursuant to this Section 7.9 and Initiating Member shall be free to cause the applicable Subsidiary to proceed to initiate and consummate the sale of the Sale Asset at a price not less than one hundred percent (100%) of the ROFO Price and on such other terms as are no less favorable to the applicable Subsidiary than those provided for in the Offer Notice. If the sale of the Sale Asset is not consummated within one hundred eighty (180) days after the expiration of the Exercise Period, then any attempt to consummate the sale of the Sale Asset thereafter shall again be subject to the provisions of Section 7.1.3(iii) and, if applicable, this Section 7.9.

       7.9.4.  If Responding Member has timely and properly delivered a ROFO Election, Managing Member and Investor Member shall cause the applicable Subsidiary to consummate the ROFO Sale on an "as is" and "where is" basis within sixty (60) days after the

date of the ROFO Election (the "ROFO Closing Date"). On the ROFO Closing Date, the ROFO Deposit shall be credited against the ROFO Price, and Responding Member shall pay the balance of the ROFO Price (as adjusted) to the applicable Subsidiary, as applicable. If Responding Member has timely and properly delivered a ROFO Election, but thereafter the sale contemplated thereby fails to close within a sixty (60) day period for any reason other than the default of the applicable Subsidiary (a "ROFO Default"), then Responding Member shall be in material default under this Section 7.9 and the escrow agent shall release the ROFO Deposit to the applicable Subsidiary who shall have the right to retain the ROFO Deposit as liquidated damages, it being agreed that in such instance the actual damages would be difficult, if not impossible, to ascertain, and Investor Member shall forfeit its ROFO Deposit and shall have no further rights under this Section 7.9 with respect to the Sale Asset, including the right to give a ROFO Election or to receive Offer Notices. If a ROFO Default occurred, then thereafter, Initiating Member shall have the right to cause the sale of the Sale Asset on any terms and conditions determined by Initiating Member without any further obligation under this Section 7.9.

7.9.5. At the closing of a ROFO Sale, Initiating Member shall cause the applicable Subsidiary to deliver to Responding Member a deed, assignment or other transfer document commonly used in conveying ownership of assets in the form of the Sale Asset, conveying the Sale Asset to Responding Member, which Sale Asset shall be free and clear of all legal and equitable claims and all liens and encumbrances. Initiating Member and Responding Member shall execute, or cause the Company or the applicable Subsidiary to execute, an agreement acceptable to Initiating Member and Responding Member in the exercise of their reasonable judgment in such form and substance which is customary for purchase agreements with respect to assets in the form of the Sale Asset. Prior to consummating a ROFO Sale, Responding Member shall cause all guarantees of Initiating Member (and any Affiliates, members or principals of Initiating Member) under any loan relating to the Sale Asset to which the Company, a Subsidiary or Initiating Member are an obligor to be released with respect to acts occurring after the ROFO Closing Date.

## ARTICLE VIII

## **TRANSFER OF MEMBERSHIP INTERESTS;**

8.1. Restrictions on Transfers of Membership Interests. No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member. To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest. No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 84
NYSCEF DOC. NO. 87

8.2.    Permitted Transfers.    Notwithstanding Section 8.1, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

(i)    Transfers of a Member's Interest to another Member;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member. If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Investor Member, Michael Wiener, William Wiener or Kevin Wiener continues to Control Investor Member or (y) in the case of Managing Member, Jeffrey Simpson or Jared Chassen continues to be in Control of Managing Member.

8.3.  Additional Restrictions. Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)  it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)  it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)  it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)  the transferee is a Prohibited Person;

(v)  as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)  in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.  Substitute Members. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)  The Transfer complies with the provisions of this Article VIII;

(b)  The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)  The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.  Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to

27

vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6. <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

<div align="center">ARTICLE IX</div>

<div align="center">**REPRESENTATIONS; ADDITIONAL AGREEMENT**</div>

9.1. <u>Representations</u>. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1. it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2. its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental

<div align="center">28</div>

authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.  Indemnity.

9.2.1.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

9.2.2.  JJ Member agrees to indemnify and hold harmless the Company, Investor Member and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against all out of pocket expenses, losses, liabilities (including liabilities for penalties), judgments, demands or costs (including, without limitation, attorneys' fees) arising from or related to JJ Member or its principals employment with Greystone Development.

9.3.  Agreement as to Distributions.  JJ Member and Investor Member agree that the calculation set forth on Exhibit F accurately sets forth the allocation of the various forms of distributable revenue that may be received by the Company and a Subsidiary based on the assumptions set forth therein.

## ARTICLE X

## **DISSOLUTION AND LIQUIDATION**

10.1.     Dissolution.     This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2.     Statement of Intent to Dissolve.     In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of New York.

10.3.     Procedures.

10.3.1. Liquidation of Assets.     In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent.     In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets.     Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4.     Termination of the Company.     Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of

30

812194-9

dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

## ARTICLE XI

## FISCAL AND ADMINISTRATIVE MATTERS

11.1.  Fiscal Year.  The fiscal year of the Company will be the calendar year.

11.2.  Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.  Books and Records.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.  Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.  Reports.

11.5.1. Within time periods set forth on Exhibit E hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit E which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

## ARTICLE XII

## CONFIDENTIALITY AND PRESS RELEASES

12.1.  Confidentiality.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by

31

812194-9

the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2. <u>Press Releases</u>. No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of Investor Member or its Affiliates without the prior written consent of Investor Member.

<div align="center">

## ARTICLE XIII

## **INDEMNIFICATION**

</div>

13.1. <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to

<div align="center">

32

</div>

time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2.    Exculpation/Member Indemnification.  Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3.    Insurance.  Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

## ARTICLE XIV

## **MISCELLANEOUS**

14.1.    Notices.

14.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth below:

If to Investor Member:

c/o 35 Oak Holdings
Viscor Inc.
35 Oak Street
Toronto, Ontario M9N 1A1
Attn:  Frank van Biesen
e-mail:  fvanbiesen@35oak.com

If to Managing Member:

c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
e-mail:  jsimpson001@icloud.com

With a copy to:

Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention:  David J. Heymann, Esq.
Email:  dheymann@meltzerlippe.com

14.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

14.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.

14.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.  Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3.  Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.  Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

34

812194-9

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.  Venue.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York. Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.  Headings.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction. In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.  Failure to Enforce Provision.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.  Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.  Assignment.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement. The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes. Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

35

812194-9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608241 NU INC

By: _____
Name: Michael Pierce
Title: EVP

JJ ARCHI LLC

By: _____
Jeffrey Simpson
Managing Member

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____
    Name:
    Title:

JJ ARCH LLC

By: _____
    Jeffrey Simpson
    Managing Member

812184-9

NYSCEF DOC. NO. 14
RECEIVED NYSCEF: 08/14/2023

## Exhibit A

### Eligible Asset Criteria

Asset Class:          multi-family, office, retail, industrial and hospitality

Location:             contiguous United States

Leverage:             no more than 65%

Projected IRR:        no less than 10% for stabilized assets, 13% for value add or development

Exhibit B

Initial Budget

NYSCEF DOC. NO. 63

RECEIVED NYSCEF: 08/15...

2013 ARCH LLC Budget (includes projects are in process of purchasing, this has potential to grow as we acquire in 2018)

**Income**

| Property | Scope | Value | Jan | Feb | March | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SoHo Project | Development Management Services | 1,100,000 * 14 Months | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 942,857 |
| SoHo Project | Loan Origination Fee | 1% of 45M Loan [900% @ closing], 15% | 300,000 | | | | | | | | | | | | | 300,000 |
| SoHo Project | Construction Management Reimbursement Proj Svcs | 15% / hour [200%] | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 260,000 |
| SoHo Project | Construction Management Reimbursement Proj Manager | 125 / hour [73%] | | | | | | | | | | | | | |
| SoHo Project | Construction Management Reimbursement Proj Asst | 60 / hour [50%] | | | | | | | | | | | | | |
| SoHo Project | Construction Management Reimbursement Proj Asst | 60 / hour [50%] | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 62,400 |
| SoHo Project | Construction Management Reimbursement Proj Office | 2,000 / month for office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| SoHo Project | Construction Management Fee | 2% of Hard Costs | 34,386 | 34,386 | 40,129 | 40,129 | 45,861 | 51,594 | 51,594 | 51,594 | 51,594 | 45,861 | 40,129 | 40,129 | 527,404 |
| SoHo Project | Asset Management Fee | 2% of NOI @ stab. or 200,000 | | | | | | | | | | | | | |
| SoHo Project | Marketing Fee | 1 month rent / unit | | | | | | | | | | | | | |
| Harlem Project | Property Management Fee | 2.5% of 1.03 [Detached Arch PM f= July] | | | | | | | | | | | | | |
| Harlem Project | Asset Management Fee | 50% / year | 4,167 | 6,250 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 52,083 |
| | | | | | | | | | | | | | | | 50,000 |
| LA Project | Asset Management Fee | 3,750 / quarter | | | 3,750 | | | 3,750 | | | 3,750 | | | 3,750 | 15,000 |
| TBD | Tax Return Reimbursements (from last budget) | | 20,000 | | | | | | | | | | | | 20,000 |
| | | | | | | | | | | | | | | | |
| | Sum Total Income | | 466,037 | 246,001 | 155,483 | 152,783 | 157,466 | 156,949 | 168,646 | 168,646 | 172,356 | 152,713 | 157,180 | 160,000 | 2,234,343 |

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM

Exhibit C

Eligible Asset Structure



Exhibit D

Form of GP Operating Agreement

NYSCEF DOC. NO. 87  RECEIVED NYSCEF: 09/15/2023

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH _____ MM LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of _____, 20__ by and between ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), [WIENER Entity], a _____ (together with its permitted successors and assigns, "Wiener"), and [JJ ENTITY], a _____ (together with its permitted successors and assigns, "JJ").

WHEREAS, Managing Member, Wiener and JJ (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch _____ MM LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.     Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)     Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)     Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

818000-3

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)     The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such

distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"Capital Event Proceeds" shall mean the gross proceeds derived from a Capital Event less the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

4

"Certificate of Formation" means that certain Certificate of Formation of the Company, dated and filed with the Secretary of State of the State of Delaware on _____.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Contributing Member" shall have the meaning set forth in Section 3.2.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.3.

"Fiscal Year" shall be as set forth in Section 11.1.

5

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"JJ" shall have the meaning set forth in the Preamble.

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)     items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)   any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)     if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.3.

818000-3

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"Subsidiary" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Wiener" shall have the meaning set forth in the Preamble.

7

## ARTICLE II

## **ESTABLISHMENT OF THE COMPANY**

2.1.    Formation of the Company. The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company. The execution and filing of the Certificate of Formation with the Secretary of State of the State of Delaware is hereby ratified and confirmed in all respects.

2.2.    Company Name. The business of the Company shall continue to be conducted under the name of "Arch _____ MM LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes. The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes: (i) create a real estate investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    Principal Place of Business and Address. The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate. Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    Term. The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of Delaware and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    Agent for Service and Registered Office. The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Members. The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by the Members; provided, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

8

2.7.     Admission of Members.     Managing Member, JJ and Wiener and Managing Member are the only Members of the Company as of the date hereof. Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.     Limitation on Liability.     Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1.     Initial Capital Contributions.     On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Exhibit A hereto opposite its name under the heading "Initial Capital Contribution."

3.2.     Additional Capital Contributions.

3.2.1.     If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call.

3.2.2.     Within five (5) Business Days of the Capital Call Notice, each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by such Member's Percentage Interest.

3.2.3.     If a Member fails to make its capital contribution required by Section 3.2.2 (the "Non-Contributing Member"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then the Member who has made its capital contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the capital contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount"). If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing

9

Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company , minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

3.3.    No Interest. Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    Return of Capital. Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.5.    No Personal Liability. Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in Section 7.6.1.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS: DECISIONS**

4.1.    Capital Accounts.    A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    Adjustments. The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2. If the Contributing Member elects to make a further additional Capital

10

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 67
RECEIVED NYSCEF: 09/15/2023

Call equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.    Negative Capital Accounts.    No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.    Transfers.    If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.    Capital Account Balance.    Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.    Allocations of Net Profit and Net Loss.    After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets. Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    Regulatory Allocations.

5.2.1. Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as

11

defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2. This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3. To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4. If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5. Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6. It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3. Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

### 5.3. Tax Allocations.

5.3.1. For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2. In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution). If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3. If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4. Withholding. The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder. Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member. Any amount payable as indemnity hereunder by a

13

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

    5.5.    Tax Matters.

        5.5.1.  Tax Matters Partner; Partnership Representative.  Managing Member shall be the "Tax Matters Partner" of the Company. The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner. The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner. Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

        5.5.2.  Tax Elections.  All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent. The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members. The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

        5.5.3.  Tax Returns. The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

      5.6.    Section 754 Election. In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

<div align="center">

ARTICLE VI

**DISTRIBUTIONS**

</div>

      6.1.    Distributions of Cash Flow. Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows: 20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

      6.2.    Distribution of Capital Event Proceeds. Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

      6.3.    Distributions of Promote Distributions. Promote Distributions, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows:

      (i)    First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1;

      (ii)    Second, the balance, (x) to JJ in an amount equal to the such balance multiplied by JJ's Percentage Interest and (y) the balance less the amount to be distributed pursuant to clause (x), 50% to Managing Member and 50% to Wiener.

      6.4.    Distributions Restricted by the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

<div align="center">

15

</div>

818000-3

## ARTICLE VII

## **MANAGEMENT AND OPERATIONS**

7.1.    Management.

7.1.1.   The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)      conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)     open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)     employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)      bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)     deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to Section 3.2;

16

818000-3

(viii)   cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)   take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.   Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3.   Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)   engage in any business or activity not authorized by this Agreement;

(ii)   enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(iii)   enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(iv)   admit new or substitute Members to the Company or any Subsidiary;

(v)   modify any material terms of any organizational document of any Subsidiary; and

(vi)   cause any Subsidiary to take any of the foregoing.

17

7.2.    Services of the Members.  Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.    Fees and Expenses.

7.3.1.    Acquisition Fee.  In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.2.    Development Fee/Asset Management Fee/Other Fees.  To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.    Due Diligence Expenses.  The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.    Legal Title to Company Asset.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.    Other Activities of Members.  Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

18

818000-3

## ARTICLE VIII

## **TRANSFER OF MEMBERSHIP INTERESTS:**

8.1.    Restrictions on Transfers of Membership Interests.    No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.    Permitted Transfers.    Notwithstanding **Section 8.1**, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

(i)    Transfers of a Member's Interest to another Member;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.  If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

19

(iv)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of the Members, Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either Member of Managing Member continues to be in Control of Managing Member.

8.3.    <u>Additional Restrictions</u>. Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

818000-3

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/15/2023

(a)     The Transfer complies with the provisions of this Article VIII;

(b)     The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)     The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.    Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    Withdrawal, Retirement or Resignation of a Member. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this Section 8.6 shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

21

818000-3

## ARTICLE IX

## **REPRESENTATIONS**

9.1.    Representations.  Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.  it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.  its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.    Indemnity.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by

22

818000-3

reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

## ARTICLE X

## DISSOLUTION AND LIQUIDATION

10.1. Dissolution. This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2. Statement of Intent to Dissolve. In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of Delaware.

10.3. Procedures.

10.3.1. Liquidation of Assets. In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof. In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent. In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets. Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem

23

818000-3

reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4. <u>Termination of the Company</u>. Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

<div align="center">ARTICLE XI

<strong>FISCAL AND ADMINISTRATIVE MATTERS</strong></div>

11.1. <u>Fiscal Year</u>. The fiscal year of the Company will be the calendar year.

11.2. <u>Checks, Drafts, Etc.</u> All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3. <u>Books and Records</u>. Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Company's books and records will be kept at the principal place of business of Managing Member.

11.4. <u>Right of Inspection</u>. Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense. Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5. <u>Reports</u>.

11.5.1. Within time periods set forth on <u>Exhibit B</u> hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on <u>Exhibit B</u> which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary. In addition, Managing Member shall provide all information

<div align="center">24</div>

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM

NYSCEF DOC. NO. 88
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023

RECEIVED NYSCEF: 08/18/2023
RECEIVED NYSCEF: 09/15/2023

reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

<h1 style="text-align:center">ARTICLE XII</h1>

<h2 style="text-align:center">CONFIDENTIALITY AND PRESS RELEASES</h2>

12.1. <u>Confidentiality</u>. The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2. <u>Press Releases</u>. No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

<h1 style="text-align:center">ARTICLE XIII</h1>

<h2 style="text-align:center">INDEMNIFICATION</h2>

13.1. <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or

<div style="text-align:center">25</div>

any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2. Exculpation/Member Indemnification. Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3. Insurance. Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

ARTICLE XIV

MISCELLANEOUS

14.1. Notices. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A hereto. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email. Any

818000-3

Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2. Extension Not a Waiver. No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same. Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3. Entire Agreement; Amendments. This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated. Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4. Governing Law. THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5. Venue. Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York. Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6. Headings. Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction. In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8. Failure to Enforce Provision. The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this

27

Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.  Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.  Assignment.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

28

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
        Managing Member

By:    _____
        Jeffrey Simpson
        Managing Member

]

[ADD SIGNATURE BLOCKS FOR JJ AND WIENER]

818000-3

Exhibit A

Members, Addresses and Capital Contributions

| Member and Address | Capital Contribution | Percentage Interest |
|---|---|---|

RECEIVED NYSCEF: 08/15/2023

## Exhibit B

### Reports

1.  Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.  a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.  a statement of the Capital Account of each Member.

2.  Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.  a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.  a statement of the Capital Account of each Member.

Exhibit E

Reports

1.    Within one hundred twenty (120) days after the end of each Fiscal Year:

   a.    a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

   b.    a statement of the Capital Account of each Member.

2.    Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

   a.    a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

   b.    a statement of the Capital Account of each Member.

Exhibit F

Distribution Example



Sample deal:

| | | |
|---|---|---|
| Property acquisition equity required | | $1,000,000 |
| LP portion | 80% | $800,000 |
| GP Entity portion | 20% | $200,000 |
| | | |
| J&J2 part in GP Entity | 25% | $50,000 |
| Wiener2 part in GP Entity | 75% | $150,000 |

**Property level cash flows assumed:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| Investment | ($1,000,000) | | | | | | |
| Operating CF | | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Capital CF w/o promote | | | | | | | $1,050,000 |
| Promoted CF | | | | | | | $100,000 |
| To all equity | ($1,000,000) | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $1,200,000 |

**Split of cash flows to LP/GP:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| To LP from oper CF | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| To LP from cap CF | ($800,000) | | | | | | $840,000 |
| LP total | ($800,000) | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $880,000 |
| To GP from oper CF | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| To GP from cap CF | ($200,000) | | | | | | $210,000 |
| To GP from promote | | | | | | | $100,000 |
| GP total | ($200,000) | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $320,000 |
| Check back to property | ($1,000,000) | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $1,200,000 |

**Split of cash flows to GP partners:**

| | | | | | | | | | Promote math: |
|---|---|---|---|---|---|---|---|---|---|
| Owed to J&J2 from oper | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | | |
| To J&J2 from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | | |
| To J&J2 from cap | ($50,000) | | | | | | $52,500 | | $100,000 |
| To J&J2 from promote re catchup | | | | | | | $3,000 | | ($3,000) J&J catchup |
| Owed to Wiener2 from oper | | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | | ($9,000) Wiener catchup |
| To Wiener2 from oper | | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | | $88,000 |
| To Wiener2 from cap | ($150,000) | | | | | | $157,500 | | ($25,000) J&J superpromote |
| To Wiener2 from promote re catchup | | | | | | | $9,000 | | $63,000 |
| To J&J2 from promote re invest | | | | | | | $25,000 | | ($37,500) Wiener share |
| To Wiener2 from promote re invest | | | | | | | $37,500 | | ($25,500) Arch share |
| To Arch from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | | $0 |
| To Arch from promote | | | | | | | $25,500 | (=$37,500 less $12,000 catchup) | |
| | | | | | | | | | |
| Check | ($200,000) | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $320,000 | | |

**GP partner summary:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| J&J2 | ($50,000) | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $82,500 | 11.6% | 1.9x |
| Wiener2 | ($150,000) | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $210,000 | 8.8% | 1.6x |
| Arch | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | | |

**Scenario 1 at Arch - invested capital balance is all Wiener 1**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Arch opex | | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | *(Assumed)* |
| Arch income from above | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | |
| | | ($23,000) | ($23,000) | ($23,000) | ($23,000) | ($23,000) | $2,500 | |
| | | | | | | | | |
| Wiener1 capital account pre-alignment | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($112,500) | |
| *Wiener1 capital account on pro rata basis* | | *($17,250)* | *($34,500)* | *($51,750)* | *($69,000)* | *($86,250)* | *($84,375)* | *(Would be if 75% share)* |
| J&J1 capital account pre-alignment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| *J&J1 capital account on pro rata basis* | | *($5,750)* | *($11,500)* | *($17,250)* | *($23,000)* | *($28,750)* | *($28,125)* | *(Would be if 25% share)* |
| | | | | | | | | |
| J&J contributes to Arch, which in turn distributes to Wiener1 | | | | | | | $25,000 | |
| | | | | | | | | |
| Wiener1 capital account | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($87,500) | 78% |
| J&J1 capital account | | $0 | $0 | $0 | $0 | $0 | ($25,000) | 22% |

**Scenario 2 at Arch - invested capital balance is pari passu J&J1/Wiener 1**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wiener1 capital account | $0 | ($17,250) | ($34,500) | ($51,750) | ($69,000) | ($86,250) | ($84,375) |
| J&J1 capital account | $0 | ($5,750) | ($11,500) | ($17,250) | ($23,000) | ($28,750) | ($28,125) |

**Scenario 3 at Arch - invested capital balance is zero**

Assuming a reserve minimum of $375,000 is met, Arch can distribute the cash

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| To J&J1 | | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $22,000 | | |
| To Wiener1 | | $400 | $400 | $400 | $400 | $400 | $5,500 | | |
| | | | | | | | | | |
| J&J2/1 | ($50,000) | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $104,500 | 18.0% | 2.5x |
| Wiener2/1 | ($150,000) | $6,400 | $6,400 | $6,400 | $6,400 | $6,400 | $215,500 | 9.4% | 1.7x |

LIMITED LIABILITY COMPANY OPERATING AGREEMENT
OF
JJ ARCH LLC


LIMITED LIABILITY COMPANY OPERATING AGREEMENT, made as of the 11th day of December, 2017 by and between JARED CHASSEN, an individual residing at 47 Bridge Street, 6A, Brooklyn, New York 11201 ("Chassen"), and JEFFREY SIMPSON, an individual residing at 1230 Park Avenue, 16E, New York, New York 10128 ("Simpson").

In consideration of the covenants and conditions set forth in this Agreement, the parties agree to amend and restate the Original Agreement it its entirety and agree as follows:

ARTICLE 1

CERTAIN DEFINITIONS

1.1     Specific Terms.        For purposes of this Agreement, the following terms shall have the following respective meanings:

Affiliate:  With respect to a specified Person, (i) a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person, (ii) any Person who is an officer, director, member or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, member or trustee, or with respect to which the specified Person serves in a similar capacity, and (iii) any Person who, directly or indirectly, is the beneficial owner of 50% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest.  An Affiliate does not include a Person who is a partner in a partnership or joint venture with the Company or any other Member if such Person is not otherwise an Affiliate of the Company or any Member.

AREH:  Arch Real Estate Holdings LLC, a New York limited liability company.

AREH Operating Agreement:  That certain Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC, dated of even date herewith, between the Company and 608941 NJ INC., as the same may be amended from time to time.

Articles of Organization:  That certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 1, 2017, as the same may be amended from time to time.

Bankruptcy Action:  With respect to any Member, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any

818298_7

reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

<u>Business Day</u>:   Any day other than Saturday, Sunday or any other day on which commercial banks or savings and loan associations are required or authorized by law to close in New York, New York.

<u>Buy Sell Closing</u>:  As defined in Section 8.2.

<u>Buy/Sell Demand Notice</u>:  As defined in Section 8.1.

<u>Buy/Sell Deposit</u>:  As defined in Section 8.2.

<u>Buy/Sell Exercise Notice</u>:  as defined in Section 8.2

<u>Buy/Sell Initiating Member</u>:  As defined in Section 8.1.

<u>Buy/Sell Option Period</u>:  As defined in Section 8.2.

<u>Buy/Sell Purchasing Member</u>:  As defined in Section 8.2.

<u>Buy/Sell Responding Member</u>:  As defined in Section 8.1

<u>Buy/Sell Sale Interest</u>:  As defined in Section 8.2.

<u>Buy/Sell Sale Interest Purchase Price</u>:  As defined in Section 8.1.

<u>Buy/Sell Selling Member</u>:  As defined in Section 8.2

<u>Capital Accounts</u>:  As defined in Section 4.3.

<u>Capital Call Amount</u>:  As defined in Section 4.2(b).

<u>Capital Call Notice</u>:  As defined in Section 4.2(b).

Capital Contributions:  The capital contributions of the Members made pursuant to Section 4.2.

Capital Loan:  As defined in Section 4.2.

Cash Flow:  Gross cash receipts of the Company (excluding Fee Revenue), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) such reserves as may reasonably be deemed necessary by the Members "Reserves").

Cause Event:  With respect to a Member, the occurrence of a Cause Event (as defined in the AREH Operating Agreement) with respect to such Member.

Code:  The Internal Revenue Code of 1986, as amended from time to time, or any similar Federal internal revenue law enacted in substitution for the Code.

Company:  The limited liability company formed pursuant to this Agreement.

Company Interest:  The ownership interest of any Member in the Company.

Company Law:  The New York Limited Liability Company Law, as amended from time to time.

Company Major Decision:  As defined in Section 3.2.

Contributing Member:  As defined in Section 4.2(c).

Control, controlled or controlling:  The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Covered Person:   The Member or any Affiliate thereof, or any officer, director, shareholder, partner, employee, representative, agent or spouse of a Member or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

Default Loan:  As defined in Section 4.2(c).

Demand Notice:  As defined in Section 8.1.

Disability:  The inability of the Member to perform his duties and responsibilities to the Company, with or without reasonable accommodation, due to any physical or mental illness or incapacity, which condition has continued for a period of (a) one hundred twenty (120) consecutive days or (b) one hundred eighty (180) days (including weekends and holidays) in any

consecutive 365-day period, which determination shall be made by an independent physician selected by the Company and approved by the Effected Member (which approval shall not be unreasonably withheld, conditioned or delayed).

Distribution Percentages:  The percentage determined in accordance with the chart set forth on Exhibit A hereto with respect.

Distributions:  Any distributions of cash or other assets of the Company to the Members.

Effected Member:  As defined in Section 7.6.

Exercise Notice:  As defined in Section 8.1.

Fee Revenue:  All amounts received by the Company the source of which relates to (i) fees paid directly to the Company or (ii) fees paid to the Investment Entity or another Subsidiary for the Company or its Affiliate, in each case for providing services to the payer thereof.

Initiating Member:  The Member who has delivered a Demand Notice in accordance with Section 8.1.

Investment Entity:  AREH, and each other Person in which the Company holds an interest or serves as manager, from time to time.

Key Personnel:  Those Persons listed on Exhibit B hereto

Members:  Chassen and Simpson and any other Persons who are admitted to the Company as Members pursuant to Article 7.

Non-Contributing Member:  As defined in Section 4.2(c).

Permitted Transfers:  A (i) Transfer by a Member of all or any part of its Company Interest to any person or entity that is an Affiliate of such Member, and (ii) Transfers pursuant to the provisions of Article 8 of this Agreement.

Person:  An individual, trust, estate, partnership, joint venture, association, company, corporation or other entity.

Profit and Loss:  "Profit" or "Loss" means, for any fiscal year of the Company, the income or loss of the Company as determined in accordance with the accounting methods followed for federal income tax purposes (including any gains or losses recognized by the Company on the sale of the Property and any items required to be separately stated under Article 703 (a) of the Code).

Promote Distribution:  As defined in the AREH Operating Agreement.

Redemption Amount:  An amount equal to all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if

all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that for purposes of determining the Redemption Amount the Effected Member's or Resigning Member's Distribution Percentage shall be the percentage set forth on Exhibit A as of the date of such death or Resignation without giving effect to the proviso set forth on Exhibit A; provided, further that in the case of a Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

Regulations: The final, temporary and proposed Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Resignation: With respect to a Member, either (i) the resignation of a Member from the Company or such Member's failure to provide substantially all of his business time for the benefit of the Company other than as a result of death of such Member or (ii) a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign.

Responding Member: As defined in Section 8.1.

Restricted Period: (i) Other than with respect to Key Parties, the twelve (12) month period following the applicable Member's Resignation or if such Member Resignation is due to a Cause Event, the twenty-four (24) month period following such Member's Resignation and (ii) with respect to Key Personnel, the twenty-four (24) month period following such Member's Resignation.

Second Option Period: As defined in Section 8.2.

Subsidiary: As defined in the AREH Operating Agreement.

Transfer: Any sale, conveyance, transfer or assignment, or the entry into any agreement to sell, convey, transfer or assign, whether by law or otherwise, of, on, in or affecting (y) all or part of a Member's Company Interest (including any legal or beneficial direct or indirect interest therein), or (z) any direct or indirect interest in a Member (including any profit interest).

Unreturned Capital Contribution: With respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 5.1(a)(i) and 5.1(b)(i).

1.2     Other Terms. Unless the context shall require otherwise:

(a)     Words importing the singular number or plural number shall include the plural number and singular number respectively;

(b)     Words importing the masculine gender shall include the feminine and neuter genders and vice versa;

(c)     Reference to "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation"; and

(d)     Reference in this Agreement to "herein", "hereof", "hereby" or "hereunder", or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the Exhibits.

(e)     Unless otherwise expressly provided, reference to a Section or Article number shall be deemed a reference to the Section or Article contained in this Agreement.

## ARTICLE 2

### GENERAL PROVISIONS

2.1     Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Company Law and agree that the rights, duties and liabilities of the Members shall be as provided in the Company Law, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Articles of Organization with the Department of State of the State of New York is hereby ratified and confirmed in all respects..

2.2     Further Action.  The Members shall take any and all action, as may be required, from time to time, under the laws of the State of New York, to give effect to, and continue in good standing, the Company.

2.3     Name of the Company.  The name of the Company shall be JJ Arch LLC or such other name as the Members may from time to time determine.  The Members shall have the right to cause the Company to operate under one or more assumed names where required to comply with the laws of any states in which the Company is doing business.  The Members shall cause to be filed on behalf of the Company such company or assumed or fictitious name certificate or certificates or other similar documents as may from time to time be required by law for the formation and continuation of the Company as a limited liability company under the laws of New York applicable to limited liability company and the laws of such other states in which the Company is doing business regarding the qualification of foreign limited liability company.

2.4     Business of the Company.  The business of the Company shall be to:  (i) acquire, hold, and ultimately dispose of an interest in each Investment Entity, (ii) make, enter into, perform and carry out any arrangements, contracts or agreements consistent with the foregoing, and (iii) to do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.  The Company shall not engage in any business or activity not authorized by this Agreement.

2.5     Place of Business.  The Company's principal place of business is 1230 Park Avenue, 16E, New York, New York 10128 or such other place as the Members may, from time to time, determine.  Such office may be changed from time to time in accordance with the Company Law, as may be approved the Members.

2.6     Duration of the Company.  The Company shall commence upon the filing of an Articles of Organization for the Company in accordance with the Company Law, and shall continue until dissolved in accordance with Article 9 of this Agreement.

2.7     Title to Company Property.  A Member's Interest shall for all purposes be personal property.  All property owned by the Company, whether real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in that property.

ARTICLE III

MEMBERS; MANAGEMENT

3.1     Management of the Company Prior to Fourth Anniversary.

(a)     Prior to the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.1(b)), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.  Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)     open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)     enter into any contract or endorsement in the name or for the account of the Company;

(iv)     employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)     deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)     cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(viii)     take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

(b)     Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "Company Major Decision"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request. Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

(i)     acquire any direct or indirect interests in any Person other than AREH;

(ii)     file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)     sell any asset of the Company or any portion thereof other than any such asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

(iv)     merge, consolidate or other reorganize the Company with another Person;

(v)     borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)     possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

818298_7

8

(vii)     enter into any lease for space;

(viii)    hire any employee, consultant or other personnel;

(ix)      engage in any business or activity not authorized by this Agreement;

(x)       enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)      enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)     enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    maintain reserves in excess of $20,000;

(xiv)    admit new or substitute Members to the Company;

(xv)     modify any material terms of the AREH Operating Agreement;

(xvi)    cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

3.2     Management of the Company From and After Fourth Anniversary. From and after the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by the Members. Each Member shall have the right to cause the Company to take any action identified in Section 3.1(a). All other actions on the part of without the Company shall require the consent of both Members.

3.3     Services of the Members. Each Member shall devote substantially all of his business time and effort to the business of the Company, and shall perform his duties with the same degree of care he exercises with respect to his own assets. Notwithstanding the foregoing, each Member and his Affiliates may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description that is not competitive with the Company or an Investment Entity, and neither the Company nor any other Member shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures.

3.4     Expenses. Each Member shall be entitled to be reimbursed for all business related expenses incurred by such Member in connection with his providing services hereunder and which are reimbursable pursuant to the Code.

3.5     Guarantees. The Members acknowledge that in connection with any (i) financing or refinancing by AREH or another Investment Entity the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty,

environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, if a Guaranty is required and any Member is required to provide such Guaranty, agrees if a lender makes any written demand from time to time on a Guaranty made by a Member or its Affiliate, each Member shall pay, or reimburse the applicable guarantor, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the cause of the claim on such Guaranty is directly attributable to any action of the other Member or its Affiliate, and which action was not approved by the non-Guarantying Member. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

4.1    Capital.  The capital of the Company shall consist of the amounts contributed to the Company pursuant to this Article IV.

4.2    Capital Contributions.  (a) The Members have made Capital Contributions to the Company as reflected on the books and records of the Company.

(b)    If, at any time or from time to time, (i) Simpson determines that additional funds are required by the Company to meet its general and administrative expenses or (ii) the Company is required to make a capital contribution to an Investment Entity, Simpson shall deliver a written notice to Chassen (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call.  Each of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to either (i) if such Capital Call Notice is in connection with a requirement of the Company to make a capital contribution pursuant to Section 3.4 of the AREH Operating Agreement, their respective percentages of Promote Distributions paid to Members hereunder or (ii) in all other cases, 50% of Capital Call Amount.

(c)    If a Member (a "Non-Contributing Member") shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then the Member who made its required Capital Contribution (the "Contributing Member") shall have the right to contribute the amount of the Non-Contributing Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a

"Default Loan") to the Non-Contributing Member in an amount equal to the unfunded capital contribution.

(d) Each Default Loan shall be deemed to constitute a loan made by the Contributing Member to the Non-Contributing Member in accordance with the terms hereof, immediately followed by a capital contribution by the Non-Contributing Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the Contributing Member and shall constitute a debt owed by the Non-Contributing Member. Any Default Loan shall bear interest at the rate of twelve percent (12%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Non-Contributing Member from any distributions due to Non-Contributing Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Non-Contributing Member and shall be secured by the Non-Contributing Member's Company Interest including, without limitation, the Non-Contributing Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Non-Contributing Member hereby pledges, assigns and grants a security interest in its Company Interest to the Contributing Member and agrees to execute such documents and statements as are reasonably requested by the Contributing Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Non-Contributing Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Non-Contributing Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the Contributing Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Non-Contributing Member, and (y) any proceeds of the sale of the Non-Contributing Member's Company Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Non-Contributing Member.

4.3 Capital Accounts. (a) The Members shall cause to be kept for each Member a capital account ("Capital Account") which shall be computed from the date hereof and which shall initially be equal to the capital contribution of each Member on the date hereof and shall be determined and maintained in accordance with Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied, and Capital Accounts shall be maintained, in a manner consistent with such Regulations.

(b) No interest shall be paid by the Company on any Capital Contribution. A Member shall not be entitled to demand the return of, or to withdraw, any part of his Capital Contribution or any balance in his Capital Account, or to receive any distribution, except as provided for in this Agreement. No Member shall be liable for the return of the Capital Contributions of any other Member and no Member shall have any obligation to restore the amount of any deficit in its Capital Account to the Company.

## ARTICLE 5

## DISTRIBUTIONS; ALLOCATION INCOME AND LOSSES

5.1     Distributions.

(a)     Cash Flow shall be accounted for on the books of the Company in accordance with the year such amounts were originally received by the real property assets or entities in which the Company owns an indirect interest and shall be distributed, earliest years first, within five (5) Business Days of receipt thereof by the Company to the Members as follows:

(i)     First to the Members in proportion to their respective Capital Contributions until their respective Unreturned Capital Contributions have been reduced to zero;

(ii)     To the Members in accordance with their respective Distribution Percentages with respect to the underlying asset from which the funds for such distribution are derived.

(b)     Fee Revenue shall be distributed within five (5) Business Days of receipt thereof by the Company to the Members as follows:  50% to Simpson and 50% to Chassen.

5.2     Allocations of Profit and Loss.  Profit and Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 9.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 9.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Profit or Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profit or Loss.

5.3     Tax Elections.  The Members shall determine whether the Company shall make any applicable tax elections, including an election in accordance with Section 754 of the Code to adjust the basis of the assets of the Company for Federal income tax purposes in the event of a distribution of Company property as described in Section 734 of the Code or a transfer by any Member of its Company Interest as described in Section 734 of the Code.

818298_7

12

## ARTICLE 6

## BOOKS AND RECORDS; ACCOUNTS

6.1     Books and Records.   True and correct books of account with respect to the operations of the Company shall be kept at the principal place of business of the Company. The Members shall be responsible for keeping the books of account. The Company shall also maintain at its principal place of business the following records:  (a) a current list of the full name and last known business address of each Member set forth in alphabetical order, (b) a copy of the Articles of Organization and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed, (c) copies of the Company's Federal, state and local income tax returns and reports, if any, for the three most recent years and (d) copies of any then effective operating agreements and of any financial statements of the Company for the three most recent years.

Any Member shall have the right, at its own expense, to examine, or have its duly authorized representative examine, the books of account of the Company and such other information reasonably related to such Member's Company Interest, and the Members shall make them available at the office at which those books are maintained.

6.2     Accounting Basis and Fiscal Year.   The Company's books shall be kept on such basis as the Members shall determine. The fiscal year of the Company shall be the calendar year.

6.3     Tax Returns.  (a)  The Members shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any Federal, state or local tax returns required to be filed by the Company. The Members shall use its reasonable efforts to furnish each Member within 90 days of the end of each fiscal year with such information as may be needed to enable each Member to file its Federal income tax return and any required state income tax return.  The Members shall cause the Company to pay, out of available cash flow and other assets of the Company, any taxes payable by the Company. Except as otherwise set forth in this Agreement, all decisions regarding tax elections shall be made by the Members.

(b)     Each Member agrees to report, on his own income tax returns each year, each item of income, gain, loss, deduction and credit as reported by the Company to such Member on the Schedule K-1 (or other similar tax report) issued by the Company to such Member for such year. Except as otherwise required by law, no Member shall take any tax reporting position that is inconsistent in any respect with any tax reporting positions taken by the Company or any entity in which the Company owns any equity interest, and, in the event of a breach by such Member of the provisions of this Section 6.3(b), shall be liable to the Company and the Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

6.4     Tax Matters Member; Partnership Representative.  Simpson is hereby designated the "Tax Matters Partner" pursuant to Section 6231 of the Code (and any comparable provision of applicable state and local tax laws). All Members hereby consent to such designation and agree to take any further action as may be required to effectuate and maintain such designation and the Tax

Matter Partner is authorized to take such actions as may be required to effectuate and maintain such designation. Simpson is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Simpson shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Simpson, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 6.4 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

## ARTICLE 7

### ASSIGNABILITY OF INTERESTS; ADDITIONAL MEMBERS

7.1     General Conditions. No Member shall Transfer all or any portion of its Company Interest, or any rights to receive any Distributions under this Agreement except (A) Permitted Transfers, (B) Transfers other than Permitted Transfers with the other Members' consent, to be exercised in such other Member's sole and absolute discretion, or (C) as required by Section 7.6 hereof. Notwithstanding the foregoing sentence, in no event shall a Member be permitted to Transfer all or any portion of its Company Interest if, in the opinion of counsel to the Company or, in the opinion of counsel to the non-transferring Members, which counsel is satisfactory to the transferring Member, in its reasonable discretion, the Transfer would (i)   cause the termination or dissolution of the Company under the Company Law; (ii) require registration under the Securities Act of 1933, as amended, or under any other securities law or result in the violation of any applicable state securities laws; (iii) cause the Company or any Member to be subject to any additional material regulatory requirements; (iv) cause the Company to be taxed as a corporation under the Code; or (v) cause a default under any agreement, that was approved by the Members, to which the Company is a party including, without limitation, the AREH Operating Agreement.

7.2     Additional Member. A transferee of all or part of the Company Interest of a Member permitted under this Agreement shall be admitted to the Company as an additional Member and be listed as a Member on the books and records of the Company only if (i) the transferring Member gives such right to the transferee, (ii) except for Permitted Transfers, the Members consent to the admission of the transferee, which consent may be withheld in the Members' sole and absolute discretion, (iii) the transferee shall execute and deliver an agreement

reasonably satisfactory to and approved by the Members, agreeing to assume and to be bound by and to comply with all of the terms and conditions of this Agreement applicable to the Members, (iv) the transferee shall execute, and deliver all necessary certificates or other documents and perform such other acts as may be required under the Company Law or other applicable laws and regulations to effectuate the admission of the additional Member and to preserve the status and legal compliance of the Company as reasonably satisfactory to and approved by the Members and (v) the transferee shall pay all reasonable expenses of the Company and the Members connected with the admission including, but not limited to, reasonable legal and accounting fees and disbursements.

7.3     Treatment. Until compliance with the provisions of Section 7.2, the Company shall be entitled to treat the record owner of any Company Interest as the absolute owner of such Company Interest in all respects and shall incur no liability for distributions made to such owner.

7.4     Other Transfers Void. Any Transfer made in violation of the provisions of this Article 7 or of Article 8 shall be null and void and shall not bind the Company or any Member.

7.5     Resignation of a Member.

(a)     Upon the Resignation of a Member, such Member's Company Interest shall be deemed automatically redeemed by the Company for the Redemption Amount, which shall be payable when and if the applicable distributions are received by the Company and such Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such Resignation occurs. In connection with any redemption pursuant to this Section 7.5, the Company shall have the right to require the redeemed Member to, and the redeemed Member shall, enter into agreements with the Company containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

(b)     Each Member agrees that for the Restricted Period, such Member shall not, nor shall it permit any Person employed by, or associated or affiliated with, to (i) encourage, solicit, or inducing, or in any manner attempt to encourage, solicit, or induce, any Person employed by, as agent of, or a service provider to, the Company or an Investment Entity within the twelve (12) month period prior to the Closing to terminate (or, in the case of an agent or service provider, terminate or reduce) such Person's employment, agency or service, as the case may be, with the Company or its Subsidiary; (ii) hire any Person who was employed by, an agent of, or a service provider to, the Company or an Investment Entity, within the twelve (12) month period prior to the date of such hiring; or (iii) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce any customer, supplier, licensee or other business relation (or any direct or indirect subsidiary of any such customer, supplier, licensee or other business relation) of the Company or an Investment Entity to cease doing business with or reduce the amount of business conducted with (including by providing similar services or products to any such Person) the Company or an Investment Entity, or in any way negatively interfere with the relationship between any such customer, supplier, licensee or business relation and the Company

or an Investment Entity. Notwithstanding the foregoing, the restrictions set forth in this Section 7.5(b) shall in no way limit the applicable Member from (i) encouraging, soliciting, or inducing to become employed any individual who was such Member's personal assistant at the Company or employing such individual or (ii) except for Persons to whom the Company or an Investment Entity is required to offer all real estate investment opportunities, seeking capital from any Person who provides equity or debt financing to the Company or an Investment Entity. Without limiting the remedies available to the Company, the Members acknowledge that a breach of any of the covenants contained in this Section 7.5(b) may result in material irreparable injury to the Company for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of posting a bond or proving irreparable harm or injury as a result of such breach or threatened breach hereof, restraining the applicable Member from engaging in activities prohibited by this Section 7.5(b) or such other relief as may be required specifically to enforce any of the covenants in this Section 7.5(b).

7.6     Death or Disabilty of Member.

(a)     Upon the death or Disability of a Member (the "Effected Member"), such Member's Company Interest shall be automatically deemed transferred to the non-Effected Member for a purchase price equal to the Redemption Amount which shall be payable when and if the applicable distributions are received by the non-Effected Member with respect to the Company Interest acquired from the Effected Member. From and after the date of the death or Disability of the Effected Member, the Effected Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after the date of such death but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such death occurs.

(b)     In connection with any sale pursuant to this Section 7.6, the non-Effected Member shall have the right to require the estate of the Effected Member to enter into agreements with the non-Effected Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

## ARTICLE 8

## BUY/SELL RIGHTS

8.1     Right to Purchase.

(a)     From and after the second anniversary of the date hereof, in the event that the Members fail to approve any action requiring the consent of both Members including, without limitation, a Company Major Decision, and are unable to reach agreement as to an appropriate alternative course of action after not less than ten (10) Business Days of good faith negotiations to resolve their differences, either Chassen, on the one hand, or Simpson on the other hand (such Member being hereinafter referred to as the "Buy/Sell Initiating Member"),

shall have the right to give written notice (the "Buy/Sell Demand Notice") to the other Member (such other Member being hereinafter referred to as the "Buy/Sell Responding Member"), of the Buy/Sell Initiating Member's intent to rely on this Article 8 and to purchase for cash all, but not less than all, of the Company Interests owned by the Buy/Sell Responding Member, whereupon the provisions set forth in this Article 8 shall apply. In the event that both Simpson and Simpson are deemed to have delivered a Buy/Sell Demand Notice, the Member who shall be deemed to have first delivered the Buy/Sell Demand Notice pursuant to Section 11.1 hereof after the ten (10) Business Day good faith negotiation period set forth herein shall be deemed the Buy/Sell Initiating Member or if both Simpson and Chassen shall be deemed to have delivered a Buy/Sell Demand Notice hereunder on the same date, the Member whose Buy/Sell Demand Notice hereunder sets forth the highest price shall be deemed the Buy/Sell Initiating Member.

(b)     The Buy/Sell Demand Notice shall set forth the cash purchase price at which the Buy/Sell Initiating Member would be willing to purchase (or to cause its designee to purchase) an undivided one hundred percent (100%) interest in the Company free and clear of all liabilities and assuming that no Capital Contributions are made and that all cash flow of the Company is distributed between the date of the Buy/Sell Demand Notice and the date on which the Company Interests are sold pursuant to this Article 8, together with a calculation of such purchase price.

(c)     The Buy/Sell Responding Member shall have the option, exercisable by giving written notice (the "Buy/Sell Exercise Notice") to the Buy/Sell Initiating Member within ten (10) Business Days after receipt of the Buy/Sell Demand Notice, to agree to either (i) sell to the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2 or (ii) purchase from the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2.

8.2     Procedure for Purchase of Buy/Sell Sale Interests.

(a)     As used in this Section 8.2 the following terms shall have the following meanings:

(i)     "Buy/Sell Deposit" shall mean an amount equal to 10% of the Buy/Sell Sale Interest Purchase Price, which deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.

(ii)     "Buy/Sell Option Period" shall mean the time period during which the Buy/Sell Responding Member shall have the right to elect either to purchase the Company Interests of the Buy/Sell Initiating Member or sell its entire Company Interests to the Buy/Sell Initiating Member pursuant to Section 8.1(c) above.

(iii)     "Buy/Sell Purchasing Member" shall mean either (x) the Buy/Sell Initiating Member (or its designee) if the Buy/Sell Responding Member shall have elected in its Buy/Sell Exercise Notice not to purchase the Company Interests of the Buy/Sell Initiating Member, or (y) the Buy/Sell Responding Member (or its designee) if it shall have indicated in its

Buy/Sell Exercise Notice its intent to purchase the Company Interests of the Buy/Sell Initiating Member.

(iv)     "Buy/Sell Sale Interest" shall mean the Company Interests of the Buy/Sell Selling Member.

(v)     "Buy/Sell Sale Interest Purchase Price" shall mean an amount equal to the amount which the Buy/Sell Selling Member would have been entitled to receive upon dissolution of the Company pursuant to the terms of this Agreement if the Company had sold all of its assets for cash to a third party at the price set forth in the Buy/Sell Demand Notice and had utilized such cash first to satisfy all debt obligations, paid all expenses, transfer taxes, costs and fees relating to such sale, and then liquidated the Company.

(vi)     "Buy/Sell Selling Member" shall mean the Member who is not the Buy/Sell Purchasing Member.

(b)     Within two (2) Business Days following the Buy/Sell Option Period, the Buy/Sell Purchasing Member shall deposit into escrow, with an escrow agent (the "Buy/Sell Escrow Agent") selected by the Buy/Sell Purchasing Member, but not an Affiliate of the Buy/Sell Purchasing Member, and reasonably acceptable to the Buy/Sell Selling Member, the Buy/Sell Deposit, which Buy/Sell Deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing. The Buy/Sell Deposit shall be held by the Buy/Sell Escrow Agent in accordance with the terms hereof. Upon delivery of the Buy/Sell Deposit to the Buy/Sell Escrow Agent, the Buy/Sell Purchasing Member shall have the sole right, without the need for consent from any other Member, to cause the Company to take the action, or refrain from taking the action, which was the cause of the Buy/Sell Demand Notice.

(c)     Within thirty (30) Business Days following the date on which the Buy/Sell Option Period shall have expired, the Buy/Sell Purchasing Member shall purchase from the Buy/Sell Selling Member (such purchase and sale is referred to herein as the "Buy/Sell Closing"), and the Buy/Sell Selling Member shall sell to the Buy/Sell Purchasing Member, the Buy/Sell Sale Interest at the Buy/Sell Sale Interest Purchase Price. In determining this amount it shall be assumed that: (i) no prepayment premium or make whole amount is owing to any lender, (ii) no reserves will be maintained, (iii) there will be no brokerage fees, transfer taxes or other transaction costs in connection with such liquidation, and (iv) the proceeds from such sale and liquidation would be distributed in accordance with Section 5.1 hereof. Upon the Buy/Sell Closing, the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member and applied to the Buy/Sell Sale Interest Purchase Price.

(d)     In connection with any sale pursuant to this Section 8.2, the Buy/Sell Purchasing Member shall have the right to require the Buy/Sell Selling Member to enter into agreements with the Buy/Sell Purchasing Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that the Buy/Sell Selling Member's Company Interests are free and clear of all liens, claims or encumbrances and an indemnity from the Buy/Sell Selling Member to the Buy/Sell Purchasing Member for claims arising out of events which occur prior to the Buy/Sell Closing and an indemnity from the Company to the Buy/Sell Selling Member for

claims arising on or after the Buy/Sell Closing. Each Member shall pay any transfer tax imposed on such Member pursuant to applicable law and there shall be such prorations at the Buy/Sell Closing as are customary in such transactions, including without limitation for such items as real estate taxes, rents, security deposits, service contracts and assessments.

(e)     From the date of the Buy/Sell Demand Notice until the consummation of the Buy/Sell Closing, the Company shall continue to be operated in the ordinary course, as if such Buy/Sell Closing were not going to occur, the Members shall continue to have all power and authority granted in this Agreement (including the power and obligation to make distributions), and the Members shall exercise their power and authority in good faith and without regard to the fact that such Buy/Sell Closing may occur; provided, that: (i) any and all Distributions to the Buy/Sell Selling Member derived solely from proceeds of a Capital Event shall be credited against and reduce the Buy/Sell Sale Interest Purchase Price payable to the Buy/Sell Selling Member; and (ii) except as provided in Section 8.2(b), the Company shall not, nor shall it permit any Subsidiary to, without the consent of the Members enter into any contracts or agreements, or otherwise agree, to sell or otherwise dispose of any Company assets, except that the Company and each of its Subsidiaries shall be authorized to consummate any transactions that were the subject of binding contractual obligations entered into prior to the delivery of the Buy/Sell Demand Notice.

(f)     If the Buy/Sell Purchasing Member shall default in its obligation to:

(i)     timely make the Buy/Sell Deposit as required in Section 8.2(b), then upon written notice to the Buy/Sell Purchasing Member the Buy/Sell Selling Member shall have the right to terminate the Buy/Sell Purchasing Member's right to acquire the applicable Company Interests pursuant thereto and either (x) recover an award or judgment against the Buy/Sell Purchasing Member in the amount of such required Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment or (y) have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

(ii)     consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from Buy/Sell Selling Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Selling Member, then (x) the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member as liquidated damages (the Members hereby acknowledging and agreeing that it is impossible to more precisely estimate the damages to be suffered by the Buy/Sell Selling Member upon such default and that the Buy/Sell Deposit that may be received by the Buy/Sell Selling Member is not intended as a penalty), and (y) the Buy/Sell Selling Member shall have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

The Buy/Sell Selling Member shall be deemed to have exercised its rights under clause (i)(y) or clause (ii)(y) of this Section 8.2(f) if the Buy/Sell Selling Member shall have delivered to the

Buy/Sell Purchasing Member a written notice of its intent to acquire the Buy/Sell Purchasing Member's Company Interest within ten (10) Business Days (the "Second Option Period") of the expiration of the two (2) Business Day period within which to make the Buy/Sell Deposit or the thirty (30) Business Day time period within which the Buy/Sell Purchasing Member had the right to acquire the Buy/Sell Sale Interests, as applicable. Upon the exercise by the Buy/Sell Selling Member of its rights under this Section 8.2(f), for purposes of this Section 8.2, the Buy/Sell Selling Member shall be deemed the Buy/Sell Purchasing Member, the Buy/Sell Purchasing Member shall be deemed the Buy/Sell Selling Member and the Option Period shall be deemed to have expired on the expiration of the Second Option Period.

(g)     If the Buy/Sell Selling Member shall default in its obligation to consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from the Buy/Sell Purchasing Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Purchasing Member, then the Buy/Sell Purchasing Member shall have the right upon written notice to the Buy/Sell Selling Member to either (i) seek specific performance of the Buy/Sell Selling Member's obligations, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment; it being agreed by the Buy/Sell Selling Member and the Buy/Sell Purchasing Member that the remedy at law for breach of the obligations of the Buy/Sell Selling Member set forth in Section 8.2(c) is inadequate in view of (A) the complexities and uncertainties in measuring actual damages to be sustained by the Buy/Sell Purchasing Member, and (B) the uniqueness of the Company business and the Members' relationships, or (ii) upon written notice to the Buy/Sell Selling Member, demand and receive a return of the Buy/Sell Deposit previously deposited with the Buy/Sell Escrow Agent together with reimbursement of all out-of-pocket costs and expenses incurred by the Buy/Sell Purchasing Member in connection with the exercise of the buy/sell right set forth in this Article 8 and the pursuit of the acquisition of the applicable Company Interests with respect thereto, and recover an award or judgment against the Buy/Sell Selling Member in the amount of the Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment, in which event, the Buy/Sell Selling Member's default hereunder shall be deemed waived and the Buy/Sell Demand Notice to which such default relates shall be void *ab initio* (such that any further exercise of the buy/sell right set forth in this Article 8 shall require compliance with this Article 8).

8.3     Release of Buy/Sell Selling Member.  The Buy/Sell Purchasing Member shall exercise commercially reasonable efforts to obtain a release of the Buy/Sell Selling Member and the Buy/Sell Selling Member's Affiliates from any personal liability with respect to all Company obligations arising or accruing from and after the Buy/Sell Closing, if any, and all other obligations related thereto including any guarantees with respect thereto.  If the Buy/Sell Purchasing Member is unable to obtain any such releases, then (i) from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, the Buy/Sell Purchasing Member and the Company, jointly and severally, shall indemnify and hold harmless the Buy/Sell Selling Member from any and all claims or liabilities arising from such unreleased obligations and/or guarantees arising or accruing from and after such closing, if any, except to the extent caused by the Buy/Sell Selling Member, and (ii) with respect to any guaranty provided by any Affiliate of the Buy/Sell Selling Member under any loan document or other agreement with respect to any indebtedness of the Company or any subsidiary that guarantees any obligation for which any

Affiliate of the Buy/Sell Purchasing Member is jointly and severally liable as a guarantor, then from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, such Affiliate of the Buy/Sell Purchasing Member shall indemnify and hold harmless such Affiliate of the Buy/Sell Selling Member from any personal liability with respect to such guaranteed obligation arising or accruing from and after such closing, if any, except to the extent such personal liability is caused by such Affiliate of the Buy/Sell Selling Member.

## ARTICLE 9

## DISSOLUTION AND TERMINATION

9.1     Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

(a)     The disposition of all or substantially all of the assets of the Company;

(b)     The unanimous vote by the Members; or

(c)     The happening of any other event causing the dissolution of the Company under the laws of New York.

Dissolution of the Company shall be effective on the day the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles of Organization of the Company has been canceled and the assets of the Company have been distributed as provided herein.

9.2     Limited Return of Capital Contributions Upon Dissolution. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution, and shall have no recourse therefor (upon dissolution or otherwise) against any Member. Notwithstanding the dissolution of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until termination of the Company, as provided in this Agreement. Upon dissolution of the Company, the Members or a liquidator (who may be a Member) appointed by the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this agreement and cause the cancellation of the Company's Articles of Organization.

9.3     Distributions Upon Liquidation.    (a)    Upon dissolution of the Company, the Members or the liquidator appointed pursuant to Section 9.2, shall liquidate the assets of the Company as promptly as is consistent with obtaining the fair value thereof, and apply and distribute the proceeds thereof:

(i)     First, to creditors in the order of priority provided by law;

(ii)    Second, to the establishment of any reserves for contingencies which the Members (or the liquidator) may consider necessary; and

(iii)    The balance of the proceeds shall be distributed to the Members in accordance with Section 5.1 hereof.

(b)    Notwithstanding the foregoing, in the event the Members (or liquidator) shall determine that an immediate sale of part or all of the Company assets would cause undue loss to the Members, the Members (or liquidator), in order to avoid such loss, may, after giving notice to all the Members, to the extent not then prohibited by the limited liability company law of any jurisdiction in which the Company is then formed or qualified and applicable in the circumstances, defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations.

(c)    After the proceeds of the liquidation of the assets of the Company have been distributed (which shall occur as soon as practical), the Members (or liquidator) shall cause the Articles of Organization of the Company to be canceled.

9.4    Final Accounting.  Upon the dissolution of the Company a proper accounting shall be made by the Company's independent public accountants from the date of the last previous accounting to the date of dissolution.

ARTICLE 10

LIABILITY, EXCULPATION
AND INDEMNIFICATION

10.1    Liability.  (a) Except as otherwise provided by the Company Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)    Except as otherwise expressly required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profit of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

10.2    Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

818298_7                                    22

10.3    Expenses. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof.

## ARTICLE 11

## MISCELLANEOUS

11.1    Notices. Any notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand and shall be deemed to have been given (i) when personally delivered with signed delivery receipt obtained, (ii) when transmitted by electronic mail, or (iii) three Business Days after such notice has been deposited in the United States first class mail if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed to the Members at the addresses set forth in the preamble hereto or at such other address as such Member may notify the other Members and the Company pursuant to the terms of this Section 11.1.

11.2    Successors and Assigns. Subject to the restrictions on Transfer set forth in this Agreement, this Agreement, and each provision of this Agreement, shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and permitted assigns, and each successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

11.3    Amendments. This Agreement may be amended only by a written document approved by and duly executed by the Members, subject to the condition that such amendment shall not increase the Capital Contribution required from any Member or adversely affect any Distribution or allocation to any Member without such Member's written consent. Notwithstanding the foregoing, the written consent of all Members shall be required to any amendment which would (a) allow the Members to take part in the control of Company's business or otherwise modify their limited liability, (b) extend the term of this Agreement, (c) in the opinion of counsel to the Company, adversely affect the status of the Company as a partnership for Federal income tax purposes, or (d) amend this Section 11.3.

11.4    Partition. No Member or any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have any Company assets partitioned, and each Member, on behalf of itself, its successors, representatives, heirs and assigns, hereby waives any such right. It is the intention of the Members that during the term of this Agreement the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the rights of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Company shall be subject to the limitations and restrictions of this Agreement.

818298_7

23

11.5     No Waiver. The failure of any Member to insist upon strict performance of a covenant under this Agreement or of any obligation under this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of that Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation under this Agreement. No waiver or consent shall be effective unless in writing.

11.6     Entire Agreement. This Agreement constitutes the full and complete agreement of the parties to this Agreement with respect to the subject matter of this Agreement.

11.7     Captions. The titles or captions of Articles or Sections contained in this Agreement are inserted only as a matter of convenience and for reference, are not a part of this Agreement, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

11.8     Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all Members have not signed the same counterpart.

11.9     Separability. In case any of the provisions contained in this Agreement or any application of any of those provisions shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and other applications of those provisions shall not in any way be affected or impaired thereby.

11.10     Gender. Words used herein, regardless of the gender specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, as the context shall require.

11.11     Applicable Law. This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and interpreted, construed and enforced in accordance with the law of the State of New York applicable to agreements made and to be performed in the State of New York.

[remainder of page left intentionally blank]

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

_____
Jared Chassen

_____
Jeffrey Simpson

25

Exhibit A

Distribution Percentages

| Date of Receipt by Revenue From which Distribution is Made | Threshold Investment Amount | Simpson | Chassen |
|---|---|---|---|
| Prior to 12-31-18 | $5,000,0000 | 66.6667% | 33.3333% |
| 1-1-19 to 12-31-19 | $10,000,000 | 62.5025% | 37.4975% |
| 1-1-20 to 12-31-20 | $15,000,000 | 58.3350% | 41.6650% |
| 1-1-21 to 12-31-21 | $20,000,000 | 54.1675% | 45.8325% |
| After 12-21-21 | none | 50.0000% | 50.0000% |

; provided, however, except as set forth in the next paragraph, such distribution percentages shall not change for the applicable period unless the aggregate Company Investments equals or exceeds the applicable Threshold Investment Amount. For example, if as of December 31, 2018 the total Company Investments is less than $5,000,000 and at December 31, 2019 the total Company Investment Amount is $10,000,000 or more, the percentages for January 1, 2019 through December 31, 2019 will remain at 66.6667% and 33.3333% and the percentages for January 1, 2020 through December 31, 2020 will change to 58.3350% and 41.6650%. That is, the Threshold Investment Amount is a cumulative test with a catch up.

With respect to Cash Flow derived from Promote Distributions, if such Promote Distributions is received from an asset held by the applicable Subsidiary for at least 2 full years, the Distribution Percentages of Simpson and Chassen as to such Promote Distributions shall each be 50% regardless of what the Distribution Percentage would otherwise be in the above chart.

"Company Investment Amount" means the aggregate capital contributions made to the Company, AREH and the other Investment Entities.

818298_7

INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023
RECEIVED NYSCEF: 09/15/2023

**AMENDMENT NO. 1 TO**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**JJ ARCH LLC**

THIS AMENDMENT NO. 1 TO LIMITED LIABILITY COMPANY AGREEMENT of JJ ARCH LLC (this "Amendment") is made and entered into and is effective as of May 22, 2021, by and between JARED CHASSEN ("Chassen"), and JEFFREY SIMPSON ("Simpson").

WITNESSETH:

WHEREAS, Chassen and Simpson are parties to that certain Limited Liability Company Agreement of JJ ARCH LLC, dated as of December 11, 2017 (the "Operating Agreement");

WHEREAS, Chassen and Simpson desire to amend the Operating Agreement as hereinafter provided;

NOW, THEREFORE, for good and valuable consideration, the Operating Agreement is hereby amended as follows:

1.      Capitalized Terms.  Initially capitalized terms used in this Amendment and not otherwise defined shall have the respective meanings assigned thereto in the Operating Agreement.

2.      Amendments to Operating Agreement.

        a.      Section 1.1 of the Operating is hereby amended by deleting the definition of "Distribution Percentage" therefrom in its entirety and the following is inserted in lieu thereof:

                "Distribution Percentages:  With respect to Simpson, 50.1% and with respect to Chassen 49.9%."

        b.      Section 1.1 of the Operating is hereby amended by deleting the definition of "Redemption Amount" therefrom in its entirety and the following is inserted in lieu thereof:

                "Redemption Amount:  An amount equal to the greater of (b) any life insurance maintained by the Company or the other Member, on the life of the deceased Member or (b) all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that in the case of a

Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

c.     Section 3.1 of the Operating Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"3.1     <u>Management of the Company</u>.  The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.2), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.  Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)     open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)     enter into any contract or endorsement in the name or for the account of the Company;

(iv)     employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)     deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)     cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(viii)     take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

2

4854-0544-0262, v. 2

d.      Section 3.2 of the Operating Agreement is hereby delete in its entirety and the following is inserted in lieu thereof:

"3.2.   <u>Limitations on Simpson's Authority</u>.  Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "<u>Company Major Decision</u>"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request.  Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

(i)    acquire any direct or indirect interests in any Person other than AREH;

(ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)   sell any asset of the Company or any portion thereof other than any such asset that is no longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

(iv)   merge, consolidate or other reorganize the Company with another Person;

(v)    borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)   possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)   enter into any lease for space;

(viii)  hire any employee, consultant or other personnel;

(ix)   engage in any business or activity not authorized by this Agreement;

3

(x)    enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)    enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    maintain reserves in excess of $20,000;

(xiv)    admit new or substitute Members to the Company;

(xv)    modify any material terms of the AREH Operating Agreement;

(xvi)    cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

e.    Exhibit A is hereby deleted in its entirety.

3.    <u>Right to Participate in Investments</u>. Notwithstanding anything in the Operating Agreement to the contrary, from and after the death of either Chassen or Simpson (the "Deceased Member") to the date on which the non-Deceased Member dies, the Company shall permit, or cause its Affiliates to permit, the spouse and issue of the Deceased Member to invest in all transactions in which the Company would otherwise have been entitled to invest if the Deceased Member had not passed away on the terms and conditions set forth in this Section 3. The Deceased Member's spouse and issue shall be entitled to invest an amount not greater than the amount being invested by the non-Deceased Member and its Affiliates in such transaction and at such time as the non-Deceased Member and its Affiliates make their investment in such transaction; provided that if the Deceased Member's spouse or issue elect to invest in a transaction, the rights of the Deceased Member's spouse and issue shall be no more or less favorable than those of the participants in such transaction other than the non-Deceased Member.

4.    <u>Miscellaneous</u>. (a) Except as modified hereby, the Operating Agreement remains in full force and effect and the provisions thereof are hereby ratified and confirmed.

(b)    All references in the Operating Agreement to "this Agreement", "hereunder", "hereto" or similar references, and all references in all other documents to the Agreement shall hereinafter be deemed references to the Operating Agreement as amended hereby.

(c)    This Amendment may be executed in one or more counterparts, all of which together shall for all purposes constitute one amendment, binding on all parties hereto, notwithstanding that the parties have not signed the same counterparts.

[signature page follows]

4

4854-0544-0262, v. 2

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the day and year first above written.



Jeffrey Simpson

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the day and year first above written.

_____
Jeffrey Simpson


_____
Jared Chassen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

608941 NJ INC.,

*Plaintiff,*

- against -

JEFFREY SIMPSON,

*Defendant.*

Civil Action No.

## COMPLAINT

Plaintiff 608941 NJ INC. files its Complaint against Defendant Jeffrey Simpson and in support thereof states and alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff 608941 NJ INC. ("Oak") and another company called JJ Arch LLC ("JJ Arch") are parties to a December 11, 2017 Limited Liability Company Operating Agreement (the "AREH LLC Agreement") that governs the operations of Arch Real Estate Holdings LLC ("AREH"). Together, Oak and JJ Arch are the two members of AREH.

2.      Defendant Jeffrey Simpson ("Simpson") was until recently the managing member of JJ Arch, as described further below. JJ Arch, in turn, was and still is the Managing Member of AREH.

3.      AREH ultimately controls a number of entities that own, or have mortgage liens on, a portfolio of properties throughout the United States (the "Arch Portfolio").

4.      Oak, through various subsidiary entities, has invested over $50 million of equity in the Arch Portfolio, and an affiliate of Oak (the "Oak Guarantor") executed various loan guaranties in connection with loans secured by the Arch Portfolio. Oak Guarantor has millions of dollars of

**COMPLAINT**                                                                                           **Page 1**

Case 1:23-cv-07089-AT  Document 1  Filed 08/10/23  Page 2 of 14

potential liability under those guaranties.

5.      Oak brings this action against Simpson in his individual capacity as the former managing member of JJ Arch for breach of fiduciary duties he owes directly to Oak, defamation, and tortious interference with prospective economic advantage.

## THE PARTIES

6.      Oak is a corporation duly organized and existing under, and by virtue of, the laws of the State of New Jersey, with its principal place of business in Toronto, Canada.

7.      Simpson is a resident of the State of New York, domiciled at 1055 Park Avenue Unit 4, New York, New York 10028.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because, as alleged above, (i) Oak and Simpson are citizens of different States and (ii) the amount in controversy, exclusive of interest and costs, exceeds $75,000.  Specifically, Oak is a New Jersey corporation with its principal place of business in Toronto, Canada.  Simpson is an individual whose primary residence is within the State of New York.  Further, Simpson's actions as alleged below have damaged Oak in an amount that greatly exceeds $75,000, exclusive of interest and costs.

9.      To the extent the Court determines that Oak is a citizen of a foreign state (i.e., Canada) because its principal place of business is in Toronto, Canada, this Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a State (Simpson) and a citizen of a foreign state (Oak).

10.      Venue is proper in this Court because Simpson resides within this judicial district. 28 U.S.C. § 1391(b)(1).  Venue is further proper in this Court because a substantial part of the

**COMPLAINT**                                                                                    **Page 2**

events or omissions giving rise to Oak's claims occurred within the territory of the United States District Court for the Southern District of New York.  28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### A.    Background of the Parties' Relationship

11.    Nonparty JJ Arch is a New York limited liability company that was, upon information and belief, created to serve as Managing Member of AREH and as a direct or indirect investor and manager of various investments.

12.    Simpson was until recently the managing member of JJ Arch and, through JJ Arch, the managing member of AREH.  As described further below, Simpson was recently removed from JJ Arch.

13.    Oak and JJ Arch together are the two members of AREH, a New York limited liability company.  JJ Arch is the Managing Member of AREH.  The Arch Portfolio, which AREH ultimately manages, comprises more than 10 real estate properties, held in various single purpose companies that are affiliates of and/or controlled by AREH.

14.    The AREH LLC Agreement, dated December 11, 2017, sets forth Oak's and JJ Arch's respective rights and obligations in respect of AREH.  A true and correct copy of the AREH LLC Agreement is attached hereto as **Exhibit 1**.

15.    A separate December 11, 2017 Limited Liability Company Operating Agreement (the "JJ Arch LLC Agreement") sets forth the respective rights and obligations of Simpson and JJ Arch's other member, Jared Chassen, with respect to JJ Arch.  A copy of the JJ Arch LLC Agreement, which Simpson previously provided to Oak, is attached hereto as **Exhibit 2**.

16.    Pursuant to Article 1, Section 1.1 of the AREH LLC Agreement, JJ Arch is the Managing Member of AREH.

**COMPLAINT**    **Page 3**

Case 1:23-cv-07089-AT   Document 1   Filed 08/10/23   Page 4 of 14

17.     Pursuant to Section 1.1 of the AREH LLC Agreement, Plaintiff Oak is the Investor Member of AREH.

**B.      Simpson's Misconduct**

18.     As the individual controlling JJ Arch, the Managing Member of AREH, Simpson owed fiduciary duties directly to Oak, its non-Managing Member.

19.     Simpson has repeatedly breached those fiduciary duties.  Such breaches include:

a.      Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor (as guarantor of certain loan obligations with respect to the Arch Portfolio) to stop work on critical, time sensitive work as a means of leverage to force Oak to take certain actions.  *See, e.g.*, **Exhibit 3** (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted due to privilege concerns but available for *in camera* review). On information and belief, Simpson continues to interfere in the representation of AREH, certain of its subsidiaries, Oak and Oak Guarantor in these time-sensitive matters, advising counsel to halt work following his removal from JJ Arch and AREH.

b.      Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor to not speak to Oak or Oak Guarantor, such counsel's own client.  Again, Simpson's purpose was to exert leverage over Oak and Oak Guarantor. *See, e.g.*, **Exhibit 4** (August 1, 2023 5:36 PM email from J. Simpson re Nostrand).

c.      Making misrepresentations to Oak concerning capital. For instance, regarding the 550 Metropolitan Avenue development in which Oak is a General Partner, it came to Oak's attention that although the relevant member loan provisions in the underlying agreements allow Oak to fund shortfalls and accrue an 18% interest rate, AREH at Simpson's direction had made a commitment to other investors that such loans would

**COMPLAINT**                                                                                           **Page 4**

accrue at only 12%. AREH and Simpson made this commitment without Oak's knowledge, authorization, notification, or any amendment to the underlying agreements. *See* **Exhibit 5** at Section 3.2.2 (Amended and Restated Limited Liability Company Operating Agreement of 550 Metropolitan Ave Holdings LLC); **Exhibit 6** (550 Member Loan Distribution Records, reflecting interest rate of 12%). Oak challenged this immediately, and Simpson attempted to justify his unauthorized and unwarranted conduct by suggesting that family and friends would be unduly penalized under the contractually agreed 18% rate. The 550 Metropolitan Avenue development is not the only instance in which Simpson unilaterally, without Oak's knowledge, authorization, notification, or any amendment to the underlying agreements, lowered the interest rate accruing to Oak.

      d.     Advising Oak that certain capital calls to other investors had been made, which was not the case in fact. As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute. In fact, Oak had no such right to priority payments or interest, as no capital calls had occurred. *See, e.g.*, **Exhibit 3** (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted for privilege); **Exhibit 7** (July 31, 2023 8:01 PM email from T. Last re: Myrtle).

      e.     Threatening to fire all AREH employees and cease operations if Oak does not accede to demands for money, despite no capital calls having been made. *See, e.g.*, **Exhibit 10** (July 11, 2023 11:39 PM email from J. Simpson re: Meeting Recap).

f.     Refusing to execute noncontroversial Consents absent unrelated language that would serve only his interests, prejudicing the business. For instance, Simpson refused to execute a simple Consent required by a lender in connection with the handover of a property by "deed-in-lieu of foreclosure" on the evening before the foreclosure auction unless Oak agreed to sweeping indemnity for himself and a further agreement to broaden his authority beyond that contemplated in the AREH LLC Agreement. A consensual handover by "deed in lieu of foreclosure" – as opposed to completion of the foreclosure – would have resulted in a release by the lender of various liabilities that would not be released upon foreclosure. Simpson's refusal to sign the Consent lacked any legitimate business purpose, and Simpson was aware his refusal would leave Oak Guarantor potentially liable for substantial additional costs due to its status as guarantor. The foreclosure auction was postponed to try to resolve this, but Simpson continues to refuse to sign the Consent. *See* **Exhibit 12** (July 26, 2023 10:34 PM email from J. Simpson re AREH Brown Consent; **Exhibit 8** (August 10, 2023 12:14 AM email from J. Simpson re: Trawler/Arch/Penn Treaty Mezz Loan). This is just one of many instances of Simpson engaging in extortive and threatening conduct to the detriment of Oak and AREH for his own personal gain.

g.     Engaging in conduct constituting a "Major Decision" under the AREH LLC Agreement, which requires the consent of Oak, without providing Oak any notice of such conduct nor seeking Oak's required approval. Simpson likewise attempted to circumvent his obligations to obtain Oak's consent to make a Major Decision, which is defined as, among other things, a decision to "enter into any agreement requiring the expenditure of more than $50,000 per annum" by amending an agreement to facially appear to fall below

the $50,000 threshold, when in fact, the contingent liabilities under said agreement well exceeded that amount.

      h.     Making misrepresentations to induce Oak's investment in various properties in the Arch Portfolio; generally creating a hostile business atmosphere because of his ego that is damaging critical relationships with lenders, contractors, tenants, etc.; and making defamatory statements to third parties. *See, e.g.*, **Exhibit 4**.

      20.     These breaches have damaged Oak and significantly prejudiced it both operationally and in pending litigation with third parties.

**C.**    **Simpson is Notified of Cause Events and JJ Arch terminates Simpson as a Result**

      21.     Pursuant to Section 7.1.4 of the AREH LLC Agreement, JJ Arch can be removed as Managing Member for a Cause Event. Specifically, Section 7.1.4 of the AREH LLC Agreement, entitled "Removal of JJ Member as Managing Member," provides:

> JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice. Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member. If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to Section 6.1(iii) or 6.2.

      22.     Section 1.1 of the AREH LLC Agreement defines a Cause Event as follows:

> "Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of

**COMPLAINT**                    **Page 7**

Case 1:23-cv-07089-AT   Document 1   Filed 08/10/23   Page 8 of 14

fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

23.     Accordingly, on August 6, 2023, Oak gave written notice to JJ Arch and Simpson of a Cause Event (the "AREH Cause Event Notice"), attached hereto as **Exhibit 9**, but did not seek the immediate removal of JJ Arch as Managing Member of AREH because, among other reasons, such removal would require the prior consent of various third parties.  The AREH Cause Event Notice states, among other things:

> JJ Member, through the actions of Jeffrey Simpson (the managing member of JJ Member), has committed multiple Cause Events, including, without limitation, willful misconduct and breach of fiduciary duty in relation to the business and affairs of the Company and various Subsidiaries, such as, without limitation, (a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for Jeffrey Simpson's own personal leverage, (b) continually threatening to sabotage the business of the Company and various Subsidiaries if Investor Member does not accede to various demands, and (c) making various misrepresentations to Investor Member to induce Investor Member to invest in deals and contribute additional capital to Subsidiaries.

24.     The JJ Arch LLC Agreement provides that a Member is required to resign immediately if "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." *See* JJ Arch LLC Agreement at Section 1.1 (definition of "Resignation") and Section 7.5.

25.     A "Cause Event" with respect to a Member under the JJ Arch LLC Agreement is

Case 1:23-cv-07089-AT   Document 1   Filed 08/10/23   Page 9 of 14

defined as a Cause Event under the AREH LLC Agreement with respect to that Member and therefore is identically defined. *See* JJ Arch LLC Agreement at Section 1.1 (definition of "Cause Event").

26.     Mr. Chassen gave written notice also on August 6, 2023 to Simpson of a Cause Event under the JJ Arch LLC Agreement (the "JJ Arch Cause Event Notice" and together with the AREH Cause Event Notices, the "Cause Event Notices") and demanded his immediate resignation as managing member of JJ Arch.

27.     Simpson's resignation, per the terms of the JJ Arch LLC Agreement, was immediate upon receipt of the JJ Arch Cause Notice, as the underlying JJ Arch LLC Agreement provides that Resignation occurs if "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign."

28.     By virtue of his removal from JJ Arch, AREH's Managing Member, Simpson no longer has any authority to act on behalf of AREH.

**D.     Simpson Continues to Purport to Act on Behalf of AREH without any Authority**

29.     Nevertheless, following the Cause Event Notices, Simpson refuses to acknowledge his forced resignation from JJ Arch, writing, "I will run the business that I am authorized to run, and you will all stand down" and further threatening criminal complaint. *See* **Exhibit 11** (August 6, 2023 4:30pm email from J. Simpson).

30.     Following the Cause Event Notices, Simpson has refused to resign as managing member of JJ Arch and continues to intentionally breach his duties and harm Oak by, among other things:

          a.     failing to execute a Consent required by a lender;

**COMPLAINT**                                                                                                      **Page 9**

b.      again directing counsel to stop work on critical work without concessions from Oak; and

c.      falsely advising the bank that holds all the bank accounts for AREH and the Arch Portfolio that he remains in charge, resulting in freezing of accounts that will effectively halt the AREH business, prevent the ability to pay various employees and vendors, and prevent the ability to pay any other expenses with respect to the Arch Portfolio, causing considerable harm to plaintiff Oak's interests in the Arch Portfolio.

## CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTIES

31.     Oak repeats and realleges the allegations contained in paragraphs 1 through 30 of this Complaint as if fully set forth herein.

32.     Simpson was the managing member of JJ Arch, which in turn, is the Managing Member of AREH.

33.     Oak and JJ Arch are co-members of AREH.

34.     As a result of this relationship and Simpson's former status as the controlling person of the Managing Member of AREH, Simpson owed fiduciary duties to Oak.

35.     Simpson knowingly breached his fiduciary duties to Oak.

36.     A non-exhaustive recitation of Simpson's misconduct includes:

a.      unilaterally and without authorization reducing the contractually obligated interest rate accruing to Oak for loans made to other co-investors; and

b.      interfering in the legal representation of Oak in pending litigations by directing counsel for AREH, certain of its subsidiaries, and Oak, to stop work on critical, time sensitive work or else not communicate with Oak, among other serious acts of

Case 1:23-cv-07089-AT   Document 1   Filed 08/10/23   Page 11 of 14

misconduct.

37.     Simpson's misconduct caused Oak to suffer damages in excess of $75,000, exclusive of interest and costs, including the loss of accrued interest to which it was contractually entitled, increasing Oak's legal bills in the pending litigation and creating substantial risks to the value of Oak's investments in the Arch Portfolio, among other damages.

## COUNT II – DEFAMATION

38.     Oak repeats and realleges the allegations contained in paragraphs 1 through 30 of this Complaint as if fully set forth herein.

39.     Simpson has made knowingly false statements of fact about Oak's business.

40.     Simpson has made numerous statements that are defamatory per se, including statements that employees of Oak have and that prejudice Oak in its profession.

41.     For instance, in an email communication in which numerous business associates of Oak were included, including Oak's counsel and employees of AREH, Simpson falsely stated, among other things, "Again, you were entered into a funding relationship without having the cash to support it so lets [sic.] understand the facts, you are illiquid and insolvent.  Markets change, and your father entered this relationship with us as capital preservation / long-term, not fly by the seat of our pants because interest rates went up and you are out of money."

42.     On information and belief, Simpson has also made false statements of fact regarding Oak's competency and capabilities in the business of real estate investment, with the purpose of damaging Oak's reputation in the industry both among potential business partners, lenders, and other business associates.

43.     Simpson knew these statements were false at the time they were made, or else demonstrated reckless disregard for the truth or falsity.

44.     Statements as to Oak's solvency and creditworthiness or ability to make payments

**COMPLAINT**                                                                        **Page 11**

when due prejudice Oak in its profession, including its ability to secure financing and co-investors in projects.

45.     Moreover, statements regarding the insolvency of Oak Guarantor, to which Simpson's statements also reasonably apply, would constitute a default under various lending agreements related to the Arch Portfolio.

46.     Likewise, statements as to Oak's competency prejudice Oak's ability to enter into future business relationships.

47.     Accordingly, Oak is substantially damaged by Simpson's defamatory statements in excess of $75,000, exclusive of interest and costs.

### COUNT III – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

48.     Oak repeats and realleges the allegations contained in paragraphs 1 through 30 of this Complaint as if fully set forth herein.

49.     Through its investments in properties managed by AREH, Oak has investments valued in the range of $50 million.

50.     AREH is responsible for the day-to-day management responsibilities of these properties.

51.     As a result of his wrongful and unauthorized conduct, both before and after his removal from JJ Arch, Simpson has engaged in conduct that has caused losses to the value of Oak's investments in the properties.

52.     For example, as a result of Simpson's unilateral and unauthorized conduct in lowering the interest rate accruing to Oak from co-investors, Oak accrued less than the contractual interest rate to which it was entitled.

53.     Indeed, the tortious conduct that Simpson has already undertaken and as alleged

**COMPLAINT**                                                                 **Page 12**

herein has the ability to impair Oak's business interests to such a degree as to wipe out the entire

equity value of all the properties the Arch Portfolio, costing Oak not only its initial investments in

these properties, but the return on those investments it would have otherwise realized.

## PRAYER FOR RELIEF

**WHEREFORE**, Oak demands that judgment be entered in their favor against Simpson as follows:

(i)      awarding Oak damages in an amount to be determined at trial, including punitive

damages, but believed to be no less than $50 million, plus interest;

(ii)     awarding Oak the costs, fees and expenses incurred in this action, including,

without limitation, reasonable attorneys' fees to the extent permitted by law; and

(iii)    awarding Oak such other and further relied as the Court may deem just and proper.

**COMPLAINT**                                                                                    **Page 13**

Dated: New York, New York
August 10, 2023

Respectfully submitted,

By: */s/ Leslie C. Thorne*
    Leslie C. Thorne
    leslie.thorne@haynesboone.com
    Aishlinn Bottini
    Aishlinn.bottini@haynesboone.com

    HAYNES AND BOONE, LLP
    30 Rockefeller Plaza, 26th Floor
    New York, NY 10112
    Telephone: (212) 659-7300
    Facsimile: (212) 918-8989

    **ATTORNEYS FOR 608941 NJ INC.**

Case 1:23-cv-07089-AT Document 1-1 Filed 08/10/23 Page 1 of 76

# EXHIBIT 1

# LIMITED LIABILITY COMPANY

# OPERATING AGREEMENT OF

# ARCH REAL ESTATE HOLDINGS LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of December 11, 2017, by and between 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Investor Member"), and JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ Member", and Investor Member and JJ Member, each a "Member", and collectively, the "Members").

WHEREAS, the Members desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch Real Estate Holdings LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1. <u>Certain Defined Terms</u>. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Acquisition Fees" shall mean all fees paid to the Company in connection with the acquisition of an asset by a Subsidiary or another Person.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A) Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Annual Budget" means the annual budget of the Company approved in accordance with Section 7.4 as the same may be modified in accordance herewith.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided,

3

however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)     The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions (other than Capital Contributions made by JJ Member pursuant to Section 3.4) and Acquisition Fees), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as

Case 1:23-cv-07089-AT Document 1-1 Filed 08/10/23 Page 5 of 76

such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on November 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Damages" shall have the meaning set forth in Section 7.6.4.

"Default Loan" shall have the meaning set forth in Section 3.2.3.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"Due Diligence Materials" shall have the meaning set forth in Section 7.2.2.

"Eligible Asset" means any interest in real property either directly or indirectly through an ownership or leasehold interest including a preferred equity interest but excluding the origination or purchase of any debt financing unless such debt financing is being acquired or originated with the likely expectation that such debt financing will ultimately result in ownership of the collateral for such debt financing, and which is reasonably expected to satisfy the criteria set forth on Exhibit A hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exercise Period" shall have the meaning set forth in Section 7.9.2.

"Fiscal Year" shall be as set forth in Section 11.1.

"Guarantor Indemnitor" shall have the meaning set forth in Section 7.6.4

"Guaranty" or "Guaranties" shall have the meaning set forth in Section 7.7.1.

"Guaranty Indemnified Parties" shall have the meaning set forth in Section 7.6.4.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Initiating Member" shall have the meaning set forth in Section 7.9.1.

"Investment Expiration Date" means the earlier of (i) the fifth anniversary of the date hereof; (ii) at such time as there are five Rejected Eligible Assets; (iii) the date on which none of Michael Wiener, William Wiener or Kevin Wiener controls Investor Member unless waived in writing by Managing Member; (iv) the date on which Jeffery Simpson no longer controls Managing Member unless waived in writing by Investor Member; or (v) the date on which the Investor Member and its Affiliates have made aggregate capital contributions, without giving effect to a return of any capital contributions, to the Company and its Subsidiaries equal to $50,000,000.00.

"Investor Member" shall have the meaning set forth in Preamble.

"Investor Member Maximum Capital Contribution" means $3,000,000.00.

"JJ Member" shall have the meaning set forth in the Preamble.

"JJ Member Promote Distribution" means an amount equal that portion of a Promote Distribution received by JJ Member and its Affiliate from a Subsidiary which is ultimately distributable to JJ Member or the equity holders of JJ Member. For example purposes, if an Affiliate of JJ Member receives a Promote Distribution of $100,000 and $40,000 of it is distributable to JJ Member and $60,000 distributable to an Affiliate of JJ Member and the

Case 1:23-cv-07089-AT   Document 1-1   Filed 08/10/23   Page 7 of 76

equity holders of JJ Member hold a 10% interest in such Affiliate, the JJ Member Promote Distribution will be $46,000 [$40,000 + (10% x $60,000)].

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Major Decision" shall have the meaning set forth in Section 7.1.3.

"Managing Member" means JJ Member, or a replacement "managing member" appointed pursuant to Section 7.1.4.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)      items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)     any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)     there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)      if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)     items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Company Promote Interest" shall have the meaning set forth in Section 7.8.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Offer Notice" shall have the meaning set forth in Section 7.9.1.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" has the meaning set forth in the operating agreement or other governing document of the applicable Subsidiary.

"Proposed Annual Budget" has the meaning set forth in Section 6.7.

"Recourse Party" shall have the meaning set forth in Section 7.7.1.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Rejected Eligible Asset" shall have the meaning set forth in Section 7.2.2.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member; provided that, unless required under a loan, the Company shall not hold reserves less than $375,000 without Investor Member's consent, not to be unreasonably withheld, conditioned or delayed.

"Responding Member" shall have the meaning set forth in Section 7.9.1.

"ROFO Closing Date" shall have the meaning set forth in Section 7.9.4.

"ROFO Default" shall have the meaning set forth in Section 7.9.4.

"ROFO Deposit" shall have the meaning set forth in Section 7.9.2.

"ROFO Election" shall have the meaning set forth in Section 7.9.2.

"ROFO Price" shall have the meaning set forth in Section 7.9.1.

"ROFO Sale" shall have the meaning set forth in Section 7.9.2.

"Sale Asset" shall have the meaning set forth in Section 7.9.1.

"Subsidiary" shall mean any Person of which fifty percent (50%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contributions" means with respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 6.2(ii).

<div align="center">

ARTICLE II

**ESTABLISHMENT OF THE COMPANY**

</div>

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall continue to be conducted under the name of "Arch Real Estate Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate

<div align="center">9</div>

investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to Investor Member promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service</u>.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation. or such other agent as may be designated from time to time by Managing Member.

2.7.    <u>Admission of Members</u>.  Investor Member and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

<div align="center">

### ARTICLE III

### CAPITAL CONTRIBUTIONS

</div>

3.1.    <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on <u>Schedule 1</u> hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    <u>Additional Capital Contributions</u>.

3.2.1.  If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with the Company's due diligence in connection

<div align="center">10</div>

with approved Eligible Assets, Managing Member shall deliver a written notice to Investor Member (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Notwithstanding anything herein to the contrary, without the consent of Investor Member, which may be granted or withheld in its sole and absolute discretion, in no event shall the Company be permitted to make a Capital Call if the Capital Call Amount to be made by Investor Member, when added to the then Unreturned Capital Contributions of Investor Member, would cause the aggregate Unreturned Capital Contributions to exceed Investor Member Maximum Capital Contribution.

3.2.2. Investor Member shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to the Capital Call Amount.

3.2.3. If the Investor Member shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then JJ Member shall have the right to contribute the amount of the Investor Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a "Default Loan") to the Investor Member in an amount equal to the unfunded capital contribution.

3.2.4. Each Default Loan shall be deemed to constitute a loan made by the JJ Member to the Investor Member in accordance with the terms hereof, immediately followed by a capital contribution by the Investor Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the JJ Member and shall constitute a debt owed by the Investor Member. Any Default Loan shall bear interest at the rate of eight percent (8%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Investor Member from any distributions due to Investor Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Investor Member and shall be secured by the Investor Member's Membership Interest including, without limitation, the Investor Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Investor Member hereby pledges, assigns and grants a security interest in its Membership Interest to the JJ Member and agrees to execute such documents and statements as are reasonably requested by the JJ Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Investor Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Investor Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the JJ Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Investor Member, and (y) any proceeds of the sale of the Investor Member's Membership Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Investor Member.

812194-9

3.3. <u>No Interest</u>. Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4. <u>JJ Member Promote Distribution Capital Contributions</u>. No later than ten (10) Business Days after the receipt of Promote Distribution, if the Unreturned Capital Contribution of Investor Member is in excess of zero, JJ Member shall make a capital contribution to the Company equal to the lesser of (i) the amount of such JJ Member Promote Distribution or (ii) the product of the Investor Member's Unreturned Capital Contribution and a fraction, the numerator of which is the aggregate unreturned capital contributions made by JJ Member and its Affiliates to all Subsidiaries and the denominator of which is the aggregate unreturned capital contributions made by JJ Member, Investor Member and their respective Affiliates to all Subsidiaries.

3.5. <u>Return of Capital</u>. Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6. <u>No Personal Liability</u>. Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in <u>Section 7.6.1</u>.

## ARTICLE IV

## CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS

4.1. <u>Capital Accounts</u>. A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2. <u>Adjustments</u>. The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with <u>Section 5.1</u>) and (iv) any income and gain allocated to such Member pursuant to <u>Section 5.2</u>. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject

to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.

4.3.    Negative Capital Accounts.    No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.    Transfers.    If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.    Capital Account Balance.    Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.    Allocations of Net Profit and Net Loss.    After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.    Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    Regulatory Allocations.

5.2.1.    Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in

Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.  This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.  To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.  If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.  Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.  It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3. Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

14

5.3.  <u>Tax Allocations</u>.

5.3.1.  For federal income tax purposes, except as otherwise provided in this <u>Section 5.3</u>, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to <u>Sections 5.1</u> and <u>5.2</u>.

5.3.2.  In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.  If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.  <u>Withholding</u>.  The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.    Tax Matters.

5.5.1.    Tax Matters Partner; Partnership Representative.    Managing Member shall be the "Tax Matters Partner" of the Company.  The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner.  The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018.  Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.  The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2.    Tax Elections.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with Investor Member; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members.  The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3.    Tax Returns.  The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6.     Section 754 Election. In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

## ARTICLE VI

## **DISTRIBUTIONS**

6.1.     Distributions of Cash Flow. Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member in the following order of priority:

(i)     First, to Investor Member an amount equal to 4% per annum simple interest on its Unreturned Capital Contribution;

(ii)     Second, to Investor Member and JJ Member pro rata based on their respective Unreturned Capital Contributions until their respective Unreturned Capital Contributions are reduced to zero;

(iii)     Thereafter, 80% to JJ Member and 20% to Investor Member.

6.2.     Distributions of Acquisition Fees. All Acquisition Fees, if any, shall be distributed within five (5) Business Days of the receipt thereof to the Members as follows: 20% to Investor Member; and 80% to JJ Member.

6.3.     Distributions Restricted by the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

## ARTICLE VII

## **MANAGEMENT AND OPERATIONS**

7.1.     Management.

7.1.1.     The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 7.1.3), full,

812194-9

exclusive and complete discretion with respect thereto. Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3. Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)   enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)   admit one or more additional members solely to provide necessary capital in the event that Investor Member fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)  cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)    take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.  Except as otherwise provided in this Agreement, Investor Member shall not participate in the management or control of the Company or have any right to approve,

18

vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

   7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "<u>Major Decision</u>"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

    (i)  acquire any direct or indirect interests in any real property;

    (ii)  file, acquiesce to, consent to or take of any Bankruptcy Action;

    (iii)  sell any Company Asset or any portion thereof other than any Company Asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property or in accordance with <u>Section 7.9</u>;

    (iv)  merge, consolidate or other reorganize the Company with another Person;

    (v)  borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

    (vi)  possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Managing Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Asset, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

    (vii)  enter into any lease for space at a Company Asset of more than 10% of the rentable area of such Company Asset;

    (viii)  engage in any business or activity not authorized by this Agreement;

(ix)    enter into any agreement requiring the expenditure of more than $50,000 per annum;

(x)    enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in <u>Section 7.3</u> and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi)    incur any expense in excess of the amount set forth in the Annual Budget; provided that emergency expenditures and other expenditures not in excess of 10% over any line item in, or 5% over the aggregate, Annual Budget amount may be incurred without the consent of Investor Member;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    admit new or substitute Members to the Company or any Subsidiary;

(xiv)    modify any material terms of any organizational document of any Subsidiary; and

(xv)    cause any Subsidiary to take any of the foregoing.

7.1.4.    <u>Removal of JJ Member as Managing Member</u>. JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice.  Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member.  If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to <u>Section 6.1(iii)</u> or <u>6.2</u>.

7.1.5.    <u>Meetings</u>.  Managing Member shall meet with Investor Member, which meeting may be by telephone, no less frequently than monthly to provide Investor Member with a general update on the Company Asset and the Company.  Any action required or permitted to be taken at any meeting or otherwise requiring the affirmation, vote, consent or approval of the Members may be taken without a meeting if the Members affirm, vote for, consent to or approve, the same at a meeting do so in writing, and the writing or writings are filed with the minutes of proceeding of the Members, as the case may be.

7.2.    Services of the Members; Company Opportunities.

7.2.1.   Managing Member and Investor Member shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) subject to Section 7.2.2 or Section 7.9, acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.2.2.   Prior to the Investment Expiration Date or, if an Expense Contribution is required at such time as the Investor Member Maximum Expense Capital Contribution has been funded and Investor Member elects not to make such Expense Contribution, Managing Member and its Affiliates shall first offer all Eligible Assets to the Company.  Managing Member shall provide Investor Member with such information with respect to such Eligible Asset as is reasonably required for Investor Member to make an informed decision as to whether to consent to the Company acquiring such Eligible Asset including, without limitation, a description of the Eligible Asset, historic financial statements, if any, with respect to such Eligible Asset, projected cash flows from such Eligible Asset, the estimated costs associated with acquiring such Eligible Asset, including due diligence costs, and the amount, if any of the capital that will be contributed by Managing Member, together with such other information as Investor Member shall reasonably request (the "Due Diligence Information").  If Investor Member fails to consent to the Company acquiring any proposed Eligible Asset within fifteen (15) days of Managing Member providing the Due Diligence Information and Managing Member has elected to provide not less than 5% of the equity capital (after taking into account reasonably anticipated debt or third party equity financing) required to acquire such Eligible Asset (a "Rejected Eligible Asset"), Managing Member shall have the right to pursue such Eligible Asset independent of the Company provided however if the ultimate terms of the investment in such Eligible Asset are, in the aggregate, no more favorable to Managing Member than those presented to the Company.  Notwithstanding the foregoing, prior to the Investment Expiration Date, Managing Member shall not acquire any Rejected Eligible Asset which is in the same asset class and within a radius of 0.25 miles for urban properties and 2.0 miles for non-urban properties as an existing Company Asset.

7.3.    Guaranteed Payment; Fees and Expenses.

7.3.1.   Guaranteed Payment.  As compensation for its various undertaking and capital commitments hereunder, Managing Member shall be entitled to a monthly guaranteed payment from the Company equal to the amount set forth in the Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance. The right of Managing Member to receive Managing Member Guaranteed Payment shall automatically terminate upon Managing Member no longer serving as the "Managing Member" of the Company.

7.3.2. <u>Acquisition Fee</u>.  In connection with the acquisition of each Eligible Asset, the Company shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.3. <u>Development Fee/Asset Management Fee/Other Fees</u>.  To the extent that an Eligible Asset is acquired in a Subsidiary with non-Affiliated investors, Managing Member shall use its good faith efforts to provide for the Company to be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such Company Asset to the extent the Company or an Affiliate of the Company or a Member provides such services.

7.3.4. <u>Due Diligence Expenses</u>.  The Company shall reimburse each Member for any actual out-of-pocket third party expenses incurred by such Member in connection with its determination as to whether to cause the Company to acquire an Eligible Asset.

7.4. <u>Budget</u>.  The initial Annual Budget of the Company is as set forth in Exhibit B hereto.  No later than November 1 of each calendar year, Managing Member shall prepare (or cause to be prepared) an annual budget (the "<u>Proposed Annual Budget</u>"), and deliver such Proposed Annual Budget to Investor Member.  In the event that Investor Member objects in writing to all or a portion of the Proposed Annual Budget within thirty (30) days of receipt thereof, the Members shall, diligently and in good faith, attempt to achieve a unanimous decision with respect to the Proposed Annual Budget.  In the event that Members are unable to achieve a unanimous decision with respect to the Proposed Annual Budget, the Annual Budget then in effect shall remain the Annual Budget modified as follows:  (i) any line item agreed upon by the Members in the Proposed Annual Budget shall be substituted for the same line item in the current Annual Budget; (ii) all line items that are not agreed upon shall be the lesser of the amount provided for in the current Annual Budget or the amount set forth in the Proposed Annual Budget; and (iii) any new line item in the Proposed Annual Budget shall not be deemed included in the Annual Budget.

7.5. <u>Legal Title to Company Asset</u>.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.6. <u>Guaranties</u>.

7.6.1.  The Members acknowledge that in connection with any (i) financing or refinancing by the Company or any Subsidiary entered into on or after the date of this Agreement with respect to a Company Asset the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty, environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "<u>Guaranty</u>," and collectively, "<u>Guaranties</u>").  Each Member, in its sole discretion, shall or shall cause one or more of its Affiliates satisfactory to the applicable lender or landlord (each a "<u>Recourse Party</u>") to provide any such Guaranty.

7.6.2.  In consideration of providing an unconditional payment Guaranty, the party providing such Guaranty shall be entitled to a one-time fee equal to 2.0% of the amount

22

so guaranteed, which fee shall be payable by the applicable Subsidiary at the closing of the applicable loan.  In the event that more than one Person provides an unconditional guaranty, such guaranty fee shall be allocated equally among the Recourse Parties or as otherwise agreed by the Recourse Parties.

7.6.3.  Notwithstanding anything herein contained to the contrary, neither Member or any of its respective Affiliates shall be required to execute, deliver or issue any Guaranty in connection with any financing or refinancing, or office lease, by the Company or any Subsidiary except, with respect to Managing Member, in the case of a financing or refinancing, for customary "bad boy non-recourse carveout" Guaranties where Managing Member has control over the events giving rise to the payment on any guaranteed obligations.

7.6.4.  Each Member agrees if a lender makes any written demand from time to time on a Recourse Party as a result of breach of a "bad boy non-recourse carveout" Guaranty, for payment or performance under a Guaranty, each Member shall pay, or reimburse the applicable Recourse Party, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the breach of the "bad boy non-recourse carveout" Guaranty is directly attributable to any action of JJ Member or its Affiliate, on the one hand, or Investor Member or its Affiliate, on the other hand, and which action was not unanimously approved by JJ Member and Investor Member, in which event the Member who, or whose Affiliate, took such action shall be solely responsible for the amounts due on such Guaranty.  Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a "bad boy non-recourse carveout" Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

7.7.    Other Activities of Members.  Except as set forth in Section 7.2, neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company. Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

7.8.    Acquisition of Eligible Assets.  The Members agree that in connection with the acquisition of each Eligible Asset Managing Member shall use commercially reasonable

efforts to (i) cause the Eligible Asset to be acquired through an ownership structure as set forth on Exhibit C and (ii) will, and cause its Affiliated entities depicted on Exhibit C hereto to, form a limited liability company to serve as the direct or indirect managing member or general partner of the acquiring entity and shall, and cause its Affiliated entities depicted on Exhibit C hereto to, enter an operating agreement in substantially the form attached hereto as Exhibit D. The Managing Member shall, to the extent requested by Investor Member, seek to obtain third party equity capital for each such Eligible Asset on such terms as may be reasonably acceptable to the Members. Managing Member shall have the right to allocate a portion of the "promoted" interest to one or more of its employees or affiliates (the "Non-Company Promote Interest").

    7.9.    Sale of Company Asset.

    7.9.1.   In the event that either Managing Member or Investor Member desires to cause a Subsidiary to sell its asset and the other does not consent to such sale, the Member who desires to sell an asset ("Initiating Member") shall first give to the other Member ("Responding Member") a notice (an "Offer Notice") setting forth the applicable asset that Initiating Member desires to sell (the "Sale Asset") and the minimum gross purchase price at which Initiating Member would be willing to cause the applicable Subsidiary to sell the Sale Asset (the "ROFO Price") and the allocation of all costs (transfer taxes, title, survey etc.) and with respect thereto.

    7.9.2.   Within thirty (30) days of receipt of an Offer Notice (the "Exercise Period"), Responding Member shall have the right to elect (which election shall be irrevocable) to purchase the Sale Asset from the applicable Subsidiary for the ROFO Price, subject to prorations and adjustments, and otherwise on the same terms and conditions set forth in the Offer Notice (the "ROFO Sale"), by giving written notice of such election within the Exercise Period (the "ROFO Election") and simultaneously depositing with a mutually agreeable escrow agent a non-refundable cash deposit equal to five percent (5%) of the ROFO Price (the "ROFO Deposit") (to be applied to the ROFO Price at closing). At the closing of a ROFO Sale all items of the Sale Asset which are customarily apportioned in the sale of assets comparable to the Sale Asset shall be apportioned between Responding Member and the applicable Subsidiary as of 11:59 PM on the day preceding the closing date in accordance with the customs and practices usual in transactions involving properties comparable to the Sale Asset.

    7.9.3.   If Responding Member does not timely make a ROFO Election or affirmatively waives its right of first offer, Responding Member shall be deemed to have elected not to purchase the Sale Asset pursuant to this Section 7.9 and Initiating Member shall be free to cause the applicable Subsidiary to proceed to initiate and consummate the sale of the Sale Asset at a price not less than one hundred percent (100%) of the ROFO Price and on such other terms as are no less favorable to the applicable Subsidiary than those provided for in the Offer Notice. If the sale of the Sale Asset is not consummated within one hundred eighty (180) days after the expiration of the Exercise Period, then any attempt to consummate the sale of the Sale Asset thereafter shall again be subject to the provisions of Section 7.1.3(iii) and, if applicable, this Section 7.9.

    7.9.4.   If Responding Member has timely and properly delivered a ROFO Election, Managing Member and Investor Member shall cause the applicable Subsidiary to consummate the ROFO Sale on an "as is" and "where is" basis within sixty (60) days after the

date of the ROFO Election (the "ROFO Closing Date"). On the ROFO Closing Date, the ROFO Deposit shall be credited against the ROFO Price, and Responding Member shall pay the balance of the ROFO Price (as adjusted) to the applicable Subsidiary, as applicable. If Responding Member has timely and properly delivered a ROFO Election, but thereafter the sale contemplated thereby fails to close within a sixty (60) day period for any reason other than the default of the applicable Subsidiary (a "ROFO Default"), then Responding Member shall be in material default under this Section 7.9 and the escrow agent shall release the ROFO Deposit to the applicable Subsidiary who shall have the right to retain the ROFO Deposit as liquidated damages, it being agreed that in such instance the actual damages would be difficult, if not impossible, to ascertain, and Investor Member shall forfeit its ROFO Deposit and shall have no further rights under this Section 7.9 with respect to the Sale Asset, including the right to give a ROFO Election or to receive Offer Notices. If a ROFO Default occurred, then thereafter, Initiating Member shall have the right to cause the sale of the Sale Asset on any terms and conditions determined by Initiating Member without any further obligation under this Section 7.9.

7.9.5. At the closing of a ROFO Sale, Initiating Member shall cause the applicable Subsidiary to deliver to Responding Member a deed, assignment or other transfer document commonly used in conveying ownership of assets in the form of the Sale Asset, conveying the Sale Asset to Responding Member, which Sale Asset shall be free and clear of all legal and equitable claims and all liens and encumbrances. Initiating Member and Responding Member shall execute, or cause the Company or the applicable Subsidiary to execute, an agreement acceptable to Initiating Member and Responding Member in the exercise of their reasonable judgment in such form and substance which is customary for purchase agreements with respect to assets in the form of the Sale Asset. Prior to consummating a ROFO Sale, Responding Member shall cause all guarantees of Initiating Member (and any Affiliates, members or principals of Initiating Member) under any loan relating to the Sale Asset to which the Company, a Subsidiary or Initiating Member are an obligor to be released with respect to acts occurring after the ROFO Closing Date.

## ARTICLE VIII

## TRANSFER OF MEMBERSHIP INTERESTS;

8.1. Restrictions on Transfers of Membership Interests. No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member. To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest. No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

  8.2. <u>Permitted Transfers</u>. Notwithstanding <u>Section 8.1</u>, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("<u>Permitted Transfers</u>"):

  (i) Transfers of a Member's Interest to another Member;

  (ii) Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

  (iii) Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.  If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

  (iv) Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

  (v) Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Investor Member, Michael Wiener, William Wiener or Kevin Wiener continues to Control Investor Member or (y) in the case of Managing Member, Jeffrey Simpson or Jared Chassen continues to be in Control of Managing Member.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this <u>Article VIII</u>;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 8.4</u>, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to

27

vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

<div align="center">

ARTICLE IX

**REPRESENTATIONS; ADDITIONAL AGREEMENT**

</div>

9.1.    <u>Representations</u>. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.    it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental

authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.    Indemnity.

9.2.1.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

9.2.2.  JJ Member agrees to indemnify and hold harmless the Company, Investor Member and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against all out of pocket expenses, losses, liabilities (including liabilities for penalties), judgments, demands or costs (including, without limitation, attorneys' fees) arising from or related to JJ Member or its principals employment with Greystone Development.

9.3.    Agreement as to Distributions.  JJ Member and Investor Member agree that the calculation set forth on Exhibit F accurately sets forth the allocation of the various forms of distributable revenue that may be received by the Company and a Subsidiary based on the assumptions set forth therein.

## ARTICLE X

### DISSOLUTION AND LIQUIDATION

10.1.　Dissolution.　This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

　　10.1.1. Upon the unanimous election to dissolve by the Members; or

　　10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

　　Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2.　Statement of Intent to Dissolve.　In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of New York.

10.3.　Procedures.

　　10.3.1. Liquidation of Assets.　In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.　In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

　　10.3.2. Authority of Liquidating Agent.　In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

　　10.3.3. Distribution of Assets.　Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4.　Termination of the Company.　Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of

dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

<div align="center">

ARTICLE XI

**FISCAL AND ADMINISTRATIVE MATTERS**

</div>

11.1.  <u>Fiscal Year</u>.  The fiscal year of the Company will be the calendar year.

11.2.  <u>Checks, Drafts, Etc.</u>  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.  <u>Books and Records</u>.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.  <u>Right of Inspection</u>.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.  <u>Reports</u>.

11.5.1. Within time periods set forth on <u>Exhibit E</u> hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on <u>Exhibit E</u> which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

<div align="center">

ARTICLE XII

**CONFIDENTIALITY AND PRESS RELEASES**

</div>

12.1.  <u>Confidentiality</u>.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by

<div align="center">

31

</div>

the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2. <u>Press Releases</u>. No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of Investor Member or its Affiliates without the prior written consent of Investor Member.

<div align="center">

## ARTICLE XIII

## **INDEMNIFICATION**

</div>

13.1. <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to

time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2. Exculpation/Member Indemnification. Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3. Insurance. Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

## ARTICLE XIV

## MISCELLANEOUS

14.1. Notices.

14.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth below:

If to Investor Member:

c/o 35 Oak Holdings
Viscor Inc.
35 Oak Street
Toronto, Ontario M9N 1A1
Attn: Frank van Biesen
e-mail: fvanbiesen@35oak.com

If to Managing Member:

c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
e-mail:  jsimpson001@icloud.com

With a copy to:

Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention:  David J. Heymann, Esq.
Email:  dheymann@meltzerlippe.com

14.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

14.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.

14.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.    Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3.    Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.    Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

812194-9

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.  <u>Venue</u>.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.  <u>Headings</u>.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.  <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.  <u>Failure to Enforce Provision</u>.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.  <u>Interpretation</u>.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.  <u>Assignment</u>.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

35

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____

Name: Michael Wiener

Title: EVP

JJ ARCH LLC

By: _____

Jeffrey Simpson
Managing Member

 

 

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____
     Name:
     Title:

JJ ARCH LLC

By: _____
     Jeffrey Simpson
     Managing Member

812184-9

Exhibit A

Eligible Asset Criteria

Asset Class:        multi-family, office, retail, industrial and hospitality

Location:          contiguous United States

Leverage:          no more than 65%

Projected IRR:     no less than 10% for stabilized assets, 13% for value add or development

Exhibit B

Initial Budget

2018 ARCH LLC Budget (includes projects are in process of purchasing, this has potential to grow as we acquire in 2018)

**Income**

| Property | Scope | Value | Jan | Feb | March | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SoHo Project | Development Management Services | 1,100,000 * 14 Months | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 942,857 |
| SoHo Project | Loan Origination Fee | 1% of 45M Loan (300k @ closing), 15/ | 300,000 | - | - | - | - | - | - | - | - | - | - | - | 300,000 |
| SoHo Project | Construction Management Reimbursement Proj Exec | 125 / hour (100%) | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 260,000 |
| SoHo Project | Construction Management Reimbursement Proj Manager | 100 / hour (75%) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SoHo Project | Construction Management Reimbursement Proj Acct | 60 / hour (50%) | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 62,400 |
| SoHo Project | Construction Management Reimbursement Proj Office | 2,000 / month for office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| SoHo Project | Construction Management Fee | 2% of Hard Costs | 34,396 | 34,396 | 40,129 | 40,129 | 45,861 | 51,594 | 51,594 | 51,594 | 51,594 | 45,861 | 40,129 | 40,129 | 527,404 |
| SoHo Project | Asset Management Fee | 2% of NOI @ stab. or 200,000 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SoHo Project | Marketing Fee | 1 month rent / unit | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | - |
| Harlem Project | Property Management Fee | 2.5% of EGI (assumes Arch PM in July) | | | | | | | 5,447 | 5,447 | 5,447 | 5,447 | 5,447 | 5,447 | 32,683 |
| Harlem Project | Asset Management Fee | 50k / year | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 50,000 |
| | | | | | | | | | | | | | | | - |
| LA Project | Asset Management Fee | 3,750 / quarter | - | - | 3,750 | - | - | 3,750 | - | - | 3,750 | - | - | 3,750 | 15,000 |
| | | | | | | | | | | | | | | | - |
| TBD | Tax Return Reimbursements (from deal budgets) | | 20,000 | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | - |
| | Sum Total Income | | 466,001 | 146,001 | 155,483 | 151,733 | 157,466 | 166,949 | 168,646 | 168,646 | 172,396 | 162,913 | 157,180 | 160,930 | 2,234,343 |

Exhibit C

Eligible Asset Structure



Exhibit D

Form of GP Operating Agreement

## LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH _____ MM LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of _____, 20__ by and between ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), [WIENER Entity], a _____ (together with its permitted successors and assigns, "Wiener"), and [JJ ENTITY], a _____ (together with its permitted successors and assigns, "JJ").

WHEREAS, Managing Member, Wiener and JJ (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch _____ MM LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)    The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such

distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)    The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"Capital Event Proceeds" shall mean the gross proceeds derived from a Capital Event less the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

4

"Certificate of Formation" means that certain Certificate of Formation of the Company, dated and filed with the Secretary of State of the State of Delaware on _____.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Contributing Member" shall have the meaning set forth in Section 3.2.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.3.

"Fiscal Year" shall be as set forth in Section 11.1.

5

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"JJ" shall have the meaning set forth in the Preamble.

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)    items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)    if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.3.

6

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"Subsidiary" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Wiener" shall have the meaning set forth in the Preamble.

# ARTICLE II

## ESTABLISHMENT OF THE COMPANY

2.1.    <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "<u>Act</u>") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Secretary of State of the State of Delaware is hereby ratified and confirmed in all respects.

2.2.    <u>Company Name</u>.  The business of the Company shall continue to be conducted under the name of "Arch _____ MM LLC"; <u>provided</u>, <u>however</u>, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates.  In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    <u>Purposes</u>.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of Delaware and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service and Registered Office</u>.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Members.  The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by the Members; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

2.7.    <u>Admission of Members</u>.   Managing Member, JJ and Wiener and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

<div align="center">ARTICLE III</div>

<div align="center">**CAPITAL CONTRIBUTIONS**</div>

3.1.    <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on <u>Exhibit A</u> hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    <u>Additional Capital Contributions</u>.

3.2.1.   If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "<u>Capital Call Notice</u>") setting forth the total amount of capital required (the "<u>Capital Call Amount</u>") and the purpose of such Capital Call.

3.2.2.   Within five (5) Business Days of the Capital Call Notice, each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by such Member's Percentage Interest.

3.2.3.   If a Member fails to make its capital contribution required by <u>Section 3.2.2</u> (the "<u>Non-Contributing Member</u>"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then the Member who has made its capital contribution pursuant to the Capital Call Notice (the "<u>Contributing Member</u>") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the capital contribution the Non-Contributing Member failed to make (the "<u>Failed Contribution Amount</u>"). If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing

<div align="center">9</div>

818000-3

Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company , minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

3.3.    <u>No Interest</u>.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    <u>Return of Capital</u>.  Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.5.    <u>No Personal Liability</u>.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets.  No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in <u>Section 7.6.1</u>.

<u>ARTICLE IV</u>

<u>CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS</u>

4.1.    <u>Capital Accounts</u>.    A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    <u>Adjustments</u>.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with <u>Section 5.1</u>) and (iv) any income and gain allocated to such Member pursuant to <u>Section 5.2</u>. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with <u>Section 5.1</u>), and (z) any deductions and losses allocated to such Member pursuant to <u>Section 5.2</u>.  If the Contributing Member elects to make a further additional Capital

818000-3

Call equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.  Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.  Transfers.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.  Capital Account Balance.  Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.  Allocations of Net Profit and Net Loss.  After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.  Regulatory Allocations.

5.2.1.  Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as

defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.  This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.  To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.  If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.  Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.  It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3. Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

12

5.3.    <u>Tax Allocations</u>.

5.3.1.    For federal income tax purposes, except as otherwise provided in this <u>Section 5.3</u>, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to <u>Sections 5.1</u> and <u>5.2</u>.

5.3.2.    In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution). If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.    If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.    <u>Withholding</u>.    The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member. Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder. Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member. Any amount payable as indemnity hereunder by a

13

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

    5.5.    Tax Matters.

    5.5.1.  Tax Matters Partner; Partnership Representative.  Managing Member shall be the "Tax Matters Partner" of the Company. The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner. The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner. Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

    5.5.2.  Tax Elections.  All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent. The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members. The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

    5.5.3.  Tax Returns.  The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6.    Section 754 Election.  In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

## ARTICLE VI

## **DISTRIBUTIONS**

6.1.    Distributions of Cash Flow.  Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows:  20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

6.2.    Distribution of Capital Event Proceeds.  Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

6.3.    Distributions of Promote Distributions.  Promote Distributions, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows:

(i)    First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1;

(ii)    Second, the balance, (x) to JJ in an amount equal to the such balance multiplied by JJ's Percentage Interest and (y) the balance less the amount to be distributed pursuant to clause (x), 50% to Managing Member and 50% to Wiener.

6.4.    Distributions Restricted by the Act.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

15

# ARTICLE VII

## MANAGEMENT AND OPERATIONS

7.1.    <u>Management</u>.

7.1.1.    The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to <u>Section 3.2</u>;

16

(viii)   cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)   take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.   Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company.  Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3.   Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request.  Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)   engage in any business or activity not authorized by this Agreement;

(ii)   enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(iii)   enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(iv)   admit new or substitute Members to the Company or any Subsidiary;

(v)   modify any material terms of any organizational document of any Subsidiary; and

(vi)   cause any Subsidiary to take any of the foregoing.

7.2.    <u>Services of the Members</u>.    Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this <u>Section 7.2</u> or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.    <u>Fees and Expenses</u>.

7.3.1.    <u>Acquisition Fee</u>.    In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.2.    <u>Development Fee/Asset Management Fee/Other Fees</u>.    To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.    <u>Due Diligence Expenses</u>.    The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.    <u>Legal Title to Company Asset</u>.    Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.    <u>Other Activities of Members</u>.    Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.    Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.    The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

18

## ARTICLE VIII

## TRANSFER OF MEMBERSHIP INTERESTS;

8.1.  <u>Restrictions on Transfers of Membership Interests</u>.  No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this <u>Article VIII</u> and until all requirements and conditions stated in this <u>Article VIII</u>, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this <u>Article VIII</u> shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.  <u>Permitted Transfers</u>.  Notwithstanding <u>Section 8.1</u>, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("<u>Permitted Transfers</u>"):

(i)  Transfers of a Member's Interest to another Member;

(ii)  Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)  Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.  If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

818000-3

(iv)     Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)     Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of the Members, Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either Member of Managing Member continues to be in Control of Managing Member.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)     it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)     it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)     it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)     the transferee is a Prohibited Person;

(v)     as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)     in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)      The Transfer complies with the provisions of this <u>Article VIII</u>;

(b)      The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)      The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 8.4</u>, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

## ARTICLE IX

## REPRESENTATIONS

9.1.  Representations. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.  it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.  its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.  Indemnity. Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by

818000-3

22

reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

## ARTICLE X

## DISSOLUTION AND LIQUIDATION

10.1.  Dissolution.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2.  Statement of Intent to Dissolve.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of Delaware.

10.3.  Procedures.

10.3.1. Liquidation of Assets.  In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem

reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

      10.4.  Termination of the Company.  Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

## ARTICLE XI

## FISCAL AND ADMINISTRATIVE MATTERS

      11.1.  Fiscal Year.  The fiscal year of the Company will be the calendar year.

      11.2.  Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

      11.3.  Books and Records.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

      11.4.  Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

      11.5.  Reports.

      11.5.1. Within time periods set forth on Exhibit B hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit B which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

      11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information

reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

## ARTICLE XII

## CONFIDENTIALITY AND PRESS RELEASES

12.1.  <u>Confidentiality</u>.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.  <u>Press Releases</u>.  No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

## ARTICLE XIII

## INDEMNIFICATION

13.1.  <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or

any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this <u>Section 13.1.2</u> with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2.   <u>Exculpation/Member Indemnification</u>.   Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3.   <u>Insurance</u>.   Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this <u>Article XIII</u>.

<div align="center">

### ARTICLE XIV

### <u>MISCELLANEOUS</u>

</div>

14.1.   <u>Notices</u>.   All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on <u>Exhibit A</u> hereto. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email. Any

Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.  **Extension Not a Waiver**.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3.  **Entire Agreement; Amendments**.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.  **Governing Law**.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.  **Venue**.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.  **Headings**.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.  **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.  **Failure to Enforce Provision**.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this

Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.  Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.  Assignment.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
        Managing Member


By:    _____
        Jeffrey Simpson
        Managing Member

]

[ADD SIGNATURE BLOCKS FOR JJ AND WIENER]

818000-3

Exhibit A

Members, Addresses and Capital Contributions

| Member and Address | Capital Contribution | Percentage Interest |
| --- | --- | --- |

**Exhibit B**

**Reports**

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.      a statement of the Capital Account of each Member.

2.      Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.      a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.      a statement of the Capital Account of each Member.

Exhibit E

Reports

1.  Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.  a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.  a statement of the Capital Account of each Member.

2.  Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.  a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.  a statement of the Capital Account of each Member.

Exhibit F

Distribution Example



**Sample deal:**

| | | |
|---|---|---|
| Property acquisition equity required | | $1,000,000 |
| LP portion | 80% | $800,000 |
| GP Entity portion | 20% | $200,000 |
| | | |
| J&J2 part in GP Entity | 25% | $50,000 |
| Wiener2 part in GP Entity | 75% | $150,000 |

**Property level cash flows assumed:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| Investment | ($1,000,000) | | | | | | |
| Operating CF | | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Capital CF w/o promote | | | | | | | $1,050,000 |
| Promoted CF | | | | | | | $100,000 |
| To all equity | ($1,000,000) | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $1,200,000 |

**Split of cash flows to LP/GP:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| To LP from oper CF | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| To LP from cap CF | ($800,000) | | | | | | $840,000 |
| *LP total* | *($800,000)* | *$40,000* | *$40,000* | *$40,000* | *$40,000* | *$40,000* | *$880,000* |
| To GP from oper CF | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| To GP from cap CF | ($200,000) | | | | | | $210,000 |
| To GP from promote | | | | | | | $100,000 |
| *GP total* | *($200,000)* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$320,000* |
| *Check back to property* | *($1,000,000)* | *$50,000* | *$50,000* | *$50,000* | *$50,000* | *$50,000* | *$1,200,000* |

**Split of cash flows to GP partners:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Promote math: | |
|---|---|---|---|---|---|---|---|---|---|
| *Owed to J&J2 from oper* | | *$2,500* | *$2,500* | *$2,500* | *$2,500* | *$2,500* | *$2,500* | | |
| To J&J2 from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | | |
| To J&J2 from cap | ($50,000) | | | | | | $52,500 | $100,000 | |
| To J&J2 from promote re catchup | | | | | | | $3,000 | ($3,000) | J&J catchup |
| *Owed to Wiener2 from oper* | | *$7,500* | *$7,500* | *$7,500* | *$7,500* | *$7,500* | *$7,500* | ($9,000) | Wiener catchup |
| To Wiener2 from oper | | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $88,000 | |
| To Wiener2 from cap | ($150,000) | | | | | | $157,500 | ($25,000) | J&J superpromote |
| To Wiener2 from promote re catchup | | | | | | | $9,000 | $63,000 | |
| To J&J2 from promote re invest | | | | | | | $25,000 | ($37,500) | Wiener share |
| To Wiener2 from promote re invest | | | | | | | $37,500 | ($25,500) | Arch share |
| To Arch from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $0 | |
| To Arch from promote | | | | | | | $25,500 | (=$37,500 less $12,000 catchup) | |
| | | | | | | | | | |
| *Check* | *($200,000)* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$320,000* | | |

**GP partner summary:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
|---|---|---|---|---|---|---|---|---|---|
| J&J2 | ($50,000) | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $82,500 | 11.6% | 1.9x |
| Wiener2 | ($150,000) | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $210,000 | 8.8% | 1.6x |
| Arch | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | | |

**Scenario 1 at Arch - invested capital balance is all Wiener 1**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Arch opex | | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | *(Assumed)* |
| Arch income from above | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | |
| | | ($23,000) | ($23,000) | ($23,000) | ($23,000) | ($23,000) | $2,500 | |
| | | | | | | | | |
| Wiener1 capital account pre-alignment | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($112,500) | |
| *Wiener1 capital account on pro rata basis* | | *($17,250)* | *($34,500)* | *($51,750)* | *($69,000)* | *($86,250)* | *($84,375)* | *(Would be if 75% share)* |
| J&J1 capital account pre-alignment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| *J&J1 capital account on pro rata basis* | | *($5,750)* | *($11,500)* | *($17,250)* | *($23,000)* | *($28,750)* | *($28,125)* | *(Would be if 25% share)* |
| | | | | | | | | |
| J&J contributes to Arch, which in turn distributes to Wiener1 | | | | | | | $25,000 | |
| | | | | | | | | |
| Wiener1 capital account | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($87,500) | 78% |
| J&J1 capital account | | $0 | $0 | $0 | $0 | $0 | ($25,000) | 22% |

**Scenario 2 at Arch - invested capital balance is pari passu J&J1/Wiener 1**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wiener1 capital account | $0 | ($17,250) | ($34,500) | ($51,750) | ($69,000) | ($86,250) | ($84,375) | |
| J&J1 capital account | $0 | ($5,750) | ($11,500) | ($17,250) | ($23,000) | ($28,750) | ($28,125) | |

**Scenario 3 at Arch - invested capital balance is zero**

Assuming a reserve minimum of $375,000 is met, Arch can distribute the cash

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| To J&J1 | | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $22,000 | | |
| To Wiener1 | | $400 | $400 | $400 | $400 | $400 | $5,500 | | |
| | | | | | | | | | |
| J&J2/1 | ($50,000) | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $104,500 | 18.0% | 2.5x |
| Wiener2/1 | ($150,000) | $6,400 | $6,400 | $6,400 | $6,400 | $6,400 | $215,500 | 9.4% | 1.7x |

# EXHIBIT 2

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF
## JJ ARCH LLC

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**, made as of the 11th day of December, 2017 by and between JARED CHASSEN, an individual residing at 47 Bridge Street, 6A, Brooklyn, New York 11201 ("Chassen"), and JEFFREY SIMPSON, an individual residing at 1230 Park Avenue, 16E, New York, New York 10128 ("Simpson").

In consideration of the covenants and conditions set forth in this Agreement, the parties agree to amend and restate the Original Agreement it its entirety and agree as follows:

## ARTICLE 1

## CERTAIN DEFINITIONS

1.1     Specific Terms.        For purposes of this Agreement, the following terms shall have the following respective meanings:

Affiliate:  With respect to a specified Person, (i) a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person, (ii) any Person who is an officer, director, member or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, member or trustee, or with respect to which the specified Person serves in a similar capacity, and (iii) any Person who, directly or indirectly, is the beneficial owner of 50% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest.  An Affiliate does not include a Person who is a partner in a partnership or joint venture with the Company or any other Member if such Person is not otherwise an Affiliate of the Company or any Member.

AREH:  Arch Real Estate Holdings LLC, a New York limited liability company.

AREH Operating Agreement:   That certain Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC, dated of even date herewith, between the Company and 608941 NJ INC., as the same may be amended from time to time.

Articles of Organization:  That certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 1, 2017, as the same may be amended from time to time.

Bankruptcy Action:  With respect to any Member, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any

818298_7

reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

Business Day:  Any day other than Saturday, Sunday or any other day on which commercial banks or savings and loan associations are required or authorized by law to close in New York, New York.

Buy Sell Closing:  As defined in Section 8.2.

Buy/Sell Demand Notice:  As defined in Section 8.1.

Buy/Sell Deposit:  As defined in Section 8.2.

Buy/Sell Exercise Notice:   as defined in Section 8.2

Buy/Sell Initiating Member:  As defined in Section 8.1.

Buy/Sell Option Period:  As defined in Section 8.2.

Buy/Sell Purchasing Member:  As defined in Section 8.2.

Buy/Sell Responding Member:  As defined in Section 8.1

Buy/Sell Sale Interest:  As defined in Section 8.2.

Buy/Sell Sale Interest Purchase Price:  As defined in Section 8.1.

Buy/Sell Selling Member:  As defined in Section 8.2

Capital Accounts:  As defined in Section 4.3.

Capital Call Amount:  As defined in Section 4.2(b).

Capital Call Notice:  As defined in Section 4.2(b).

Capital Contributions:  The capital contributions of the Members made pursuant to Section 4.2.

Capital Loan:  As defined in Section 4.2.

Cash Flow:  Gross cash receipts of the Company (excluding Fee Revenue), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) such reserves as may reasonably be deemed necessary by the Members "Reserves").

Cause Event:  With respect to a Member, the occurrence of a Cause Event (as defined in the AREH Operating Agreement) with respect to such Member.

Code:  The Internal Revenue Code of 1986, as amended from time to time, or any similar Federal internal revenue law enacted in substitution for the Code.

Company:  The limited liability company formed pursuant to this Agreement.

Company Interest:  The ownership interest of any Member in the Company.

Company Law:  The New York Limited Liability Company Law, as amended from time to time.

Company Major Decision:  As defined in Section 3.2.

Contributing Member:  As defined in Section 4.2(c).

Control, controlled or controlling:  The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Covered Person:  The Member or any Affiliate thereof, or any officer, director, shareholder, partner, employee, representative, agent or spouse of a Member or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

Default Loan:  As defined in Section 4.2(c).

Demand Notice:  As defined in Section 8.1.

Disability:  The inability of the Member to perform his duties and responsibilities to the Company, with or without reasonable accommodation, due to any physical or mental illness or incapacity, which condition has continued for a period of (a) one hundred twenty (120) consecutive days or (b) one hundred eighty (180) days (including weekends and holidays) in any

818298_7                                          3

consecutive 365-day period, which determination shall be made by an independent physician selected by the Company and approved by the Effected Member (which approval shall not be unreasonably withheld, conditioned or delayed).

Distribution Percentages:  The percentage determined in accordance with the chart set forth on Exhibit A hereto with respect.

Distributions:  Any distributions of cash or other assets of the Company to the Members.

Effected Member:  As defined in Section 7.6.

Exercise Notice:  As defined in Section 8.1.

Fee Revenue:  All amounts received by the Company the source of which relates to (i) fees paid directly to the Company or (ii) fees paid to the Investment Entity or another Subsidiary for the Company or its Affiliate, in each case for providing services to the payer thereof.

Initiating Member:  The Member who has delivered a Demand Notice in accordance with Section 8.1.

Investment Entity:  AREH, and each other Person in which the Company holds an interest or serves as manager, from time to time.

Key Personnel:  Those Persons listed on Exhibit B hereto

Members:  Chassen and Simpson and any other Persons who are admitted to the Company as Members pursuant to Article 7.

Non-Contributing Member:  As defined in Section 4.2(c).

Permitted Transfers:  A (i) Transfer by a Member of all or any part of its Company Interest to any person or entity that is an Affiliate of such Member, and (ii) Transfers pursuant to the provisions of Article 8 of this Agreement.

Person:  An individual, trust, estate, partnership, joint venture, association, company, corporation or other entity.

Profit and Loss:  "Profit" or "Loss" means, for any fiscal year of the Company, the income or loss of the Company as determined in accordance with the accounting methods followed for federal income tax purposes (including any gains or losses recognized by the Company on the sale of the Property and any items required to be separately stated under Article 703 (a) of the Code).

Promote Distribution:  As defined in the AREH Operating Agreement.

Redemption Amount:  An amount equal to all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if

all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that for purposes of determining the Redemption Amount the Effected Member's or Resigning Member's Distribution Percentage shall be the percentage set forth on Exhibit A as of the date of such death or Resignation without giving effect to the proviso set forth on Exhibit A; provided, further that in the case of a Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

Regulations:  The final, temporary and proposed Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Resignation:  With respect to a Member, either (i) the resignation of a Member from the Company or such Member's failure to provide substantially all of his business time for the benefit of the Company other than as a result of death of such Member or (ii) a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign.

Responding Member:  As defined in Section 8.1.

Restricted Period:  (i) Other than with respect to Key Parties, the twelve (12) month period following the applicable Member's Resignation or if such Member Resignation is due to a Cause Event, the twenty-four (24) month period following such Member's Resignation and (ii) with respect to Key Personnel, the twenty-four (24) month period following such Member's Resignation.

Second Option Period:  As defined in Section 8.2.

Subsidiary:  As defined in the AREH Operating Agreement.

Transfer:  Any sale, conveyance, transfer or assignment, or the entry into any agreement to sell, convey, transfer or assign, whether by law or otherwise, of, on, in or affecting (y) all or part of a Member's Company Interest (including any legal or beneficial direct or indirect interest therein), or (z) any direct or indirect interest in a Member (including any profit interest).

Unreturned Capital Contribution:  With respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 5.1(a)(i) and 5.1(b)(i).

1.2    Other Terms.  Unless the context shall require otherwise:

(a)    Words importing the singular number or plural number shall include the plural number and singular number respectively;

(b)     Words importing the masculine gender shall include the feminine and neuter genders and vice versa;

(c)     Reference to "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation"; and

(d)     Reference in this Agreement to "herein", "hereof", "hereby" or "hereunder", or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the Exhibits.

(e)     Unless otherwise expressly provided, reference to a Section or Article number shall be deemed a reference to the Section or Article contained in this Agreement.

<div align="center">ARTICLE 2</div>

<div align="center">GENERAL PROVISIONS</div>

2.1     Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Company Law and agree that the rights, duties and liabilities of the Members shall be as provided in the Company Law, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Articles of Organization with the Department of State of the State of New York is hereby ratified and confirmed in all respects..

2.2     Further Action.  The Members shall take any and all action, as may be required, from time to time, under the laws of the State of New York, to give effect to, and continue in good standing, the Company.

2.3     Name of the Company.  The name of the Company shall be JJ Arch LLC or such other name as the Members may from time to time determine.  The Members shall have the right to cause the Company to operate under one or more assumed names where required to comply with the laws of any states in which the Company is doing business.  The Members shall cause to be filed on behalf of the Company such company or assumed or fictitious name certificate or certificates or other similar documents as may from time to time be required by law for the formation and continuation of the Company as a limited liability company under the laws of New York applicable to limited liability company and the laws of such other states in which the Company is doing business regarding the qualification of foreign limited liability company.

2.4     Business of the Company.  The business of the Company shall be to:  (i) acquire, hold, and ultimately dispose of an interest in each Investment Entity, (ii) make, enter into, perform and carry out any arrangements, contracts or agreements consistent with the foregoing, and (iii) to do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.  The Company shall not engage in any business or activity not authorized by this Agreement.

Case 1:23-cv-07089-AT    Document 1-2    Filed 08/10/23    Page 8 of 27

2.5    Place of Business.  The Company's principal place of business is 1230 Park Avenue, 16E, New York, New York 10128 or such other place as the Members may, from time to time, determine.  Such office may be changed from time to time in accordance with the Company Law, as may be approved the Members.

2.6    Duration of the Company.  The Company shall commence upon the filing of an Articles of Organization for the Company in accordance with the Company Law, and shall continue until dissolved in accordance with Article 9 of this Agreement.

2.7    Title to Company Property.  A Member's Interest shall for all purposes be personal property.  All property owned by the Company, whether real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in that property.

ARTICLE III

MEMBERS; MANAGEMENT

3.1    Management of the Company Prior to Fourth Anniversary.

(a)    Prior to the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.1(b)), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.  Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)   cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(viii)  take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

(b)     Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "Company Major Decision"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request.  Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

(i)     acquire any direct or indirect interests in any Person other than AREH;

(ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)   sell any asset of the Company or any portion thereof other than any such asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

(iv)    merge, consolidate or other reorganize the Company with another Person;

(v)     borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)     enter into any lease for space;

(viii)    hire any employee, consultant or other personnel;

(ix)      engage in any business or activity not authorized by this Agreement;

(x)       enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)      enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)     enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    maintain reserves in excess of $20,000;

(xiv)     admit new or substitute Members to the Company;

(xv)      modify any material terms of the AREH Operating Agreement;

(xvi)     cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

3.2     <u>Management of the Company From and After Fourth Anniversary</u>.  From and after the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by the Members.  Each Member shall have the right to cause the Company to take any action identified in Section 3.1(a).  All other actions on the part of without the Company shall require the consent of both Members.

3.3     <u>Services of the Members</u>.  Each Member shall devote substantially all of his business time and effort to the business of the Company, and shall perform his duties with the same degree of care he exercises with respect to his own assets.  Notwithstanding the foregoing, each Member and his Affiliates may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description that is not competitive with the Company or an Investment Entity, and neither the Company nor any other Member shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures.

3.4     <u>Expenses</u>.  Each Member shall be entitled to be reimbursed for all business related expenses incurred by such Member in connection with his providing services hereunder and which are reimbursable pursuant to the Code.

3.5     <u>Guarantees</u>.  The Members acknowledge that in connection with any (i) financing or refinancing by AREH or another Investment Entity the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty,

environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, if a Guaranty is required and any Member is required to provide such Guaranty, agrees if a lender makes any written demand from time to time on a Guaranty made by a Member or its Affiliate, each Member shall pay, or reimburse the applicable guarantor, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the cause of the claim on such Guaranty is directly attributable to any action of the other Member or its Affiliate, and which action was not approved by the non-Guarantying Member. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

<div align="center">ARTICLE IV</div>

<div align="center">CAPITAL CONTRIBUTIONS</div>

4.1     Capital.  The capital of the Company shall consist of the amounts contributed to the Company pursuant to this Article IV.

4.2     Capital Contributions.  (a)  The Members have made Capital Contributions to the Company as reflected on the books and records of the Company.

(b)     If, at any time or from time to time, (i) Simpson determines that additional funds are required by the Company to meet its general and administrative expenses or (ii) the Company is required to make a capital contribution to an Investment Entity, Simpson shall deliver a written notice to Chassen (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Each of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to either (i) if such Capital Call Notice is in connection with a requirement of the Company to make a capital contribution pursuant to Section 3.4 of the AREH Operating Agreement, their respective percentages of Promote Distributions paid to Members hereunder or (ii) in all other cases, 50% of Capital Call Amount.

(c)     If a Member (a "Non-Contributing Member") shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then the Member who made its required Capital Contribution (the "Contributing Member") shall have the right to contribute the amount of the Non-Contributing Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a

"Default Loan") to the Non-Contributing Member in an amount equal to the unfunded capital contribution.

(d)    Each Default Loan shall be deemed to constitute a loan made by the Contributing Member to the Non-Contributing Member in accordance with the terms hereof, immediately followed by a capital contribution by the Non-Contributing Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the Contributing Member and shall constitute a debt owed by the Non-Contributing Member. Any Default Loan shall bear interest at the rate of twelve percent (12%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Non-Contributing Member from any distributions due to Non-Contributing Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Non-Contributing Member and shall be secured by the Non-Contributing Member's Company Interest including, without limitation, the Non-Contributing Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Non-Contributing Member hereby pledges, assigns and grants a security interest in its Company Interest to the Contributing Member and agrees to execute such documents and statements as are reasonably requested by the Contributing Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Non-Contributing Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Non-Contributing Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the Contributing Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Non-Contributing Member, and (y) any proceeds of the sale of the Non-Contributing Member's Company Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Non-Contributing Member.

4.3    Capital Accounts. (a) The Members shall cause to be kept for each Member a capital account ("Capital Account") which shall be computed from the date hereof and which shall initially be equal to the capital contribution of each Member on the date hereof and shall be determined and maintained in accordance with Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied, and Capital Accounts shall be maintained, in a manner consistent with such Regulations.

(b)    No interest shall be paid by the Company on any Capital Contribution. A Member shall not be entitled to demand the return of, or to withdraw, any part of his Capital Contribution or any balance in his Capital Account, or to receive any distribution, except as provided for in this Agreement. No Member shall be liable for the return of the Capital Contributions of any other Member and no Member shall have any obligation to restore the amount of any deficit in its Capital Account to the Company.

## ARTICLE 5

## DISTRIBUTIONS; ALLOCATION INCOME AND LOSSES

5.1    Distributions.

(a)    Cash Flow shall be accounted for on the books of the Company in accordance with the year such amounts were originally received by the real property assets or entities in which the Company owns an indirect interest and shall be distributed, earliest years first, within five (5) Business Days of receipt thereof by the Company to the Members as follows:

(i)    First to the Members in proportion to their respective Capital Contributions until their respective Unreturned Capital Contributions have been reduced to zero;

(ii)    To the Members in accordance with their respective Distribution Percentages with respect to the underlying asset from which the funds for such distribution are derived.

(b)    Fee Revenue shall be distributed within five (5) Business Days of receipt thereof by the Company to the Members as follows: 50% to Simpson and 50% to Chassen.

5.2    Allocations of Profit and Loss.    Profit and Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 9.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 9.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets. Subject to the other provisions of this Article V, an allocation to a Member of a share of Profit or Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profit or Loss.

5.3    Tax Elections.    The Members shall determine whether the Company shall make any applicable tax elections, including an election in accordance with Section 754 of the Code to adjust the basis of the assets of the Company for Federal income tax purposes in the event of a distribution of Company property as described in Section 734 of the Code or a transfer by any Member of its Company Interest as described in Section 734 of the Code.

## ARTICLE 6

## BOOKS AND RECORDS; ACCOUNTS

6.1 <u>Books and Records</u>. True and correct books of account with respect to the operations of the Company shall be kept at the principal place of business of the Company. The Members shall be responsible for keeping the books of account. The Company shall also maintain at its principal place of business the following records: (a) a current list of the full name and last known business address of each Member set forth in alphabetical order, (b) a copy of the Articles of Organization and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed, (c) copies of the Company's Federal, state and local income tax returns and reports, if any, for the three most recent years and (d) copies of any then effective operating agreements and of any financial statements of the Company for the three most recent years.

Any Member shall have the right, at its own expense, to examine, or have its duly authorized representative examine, the books of account of the Company and such other information reasonably related to such Member's Company Interest, and the Members shall make them available at the office at which those books are maintained.

6.2 <u>Accounting Basis and Fiscal Year</u>. The Company's books shall be kept on such basis as the Members shall determine. The fiscal year of the Company shall be the calendar year.

6.3 <u>Tax Returns</u>. (a) The Members shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any Federal, state or local tax returns required to be filed by the Company. The Members shall use its reasonable efforts to furnish each Member within 90 days of the end of each fiscal year with such information as may be needed to enable each Member to file its Federal income tax return and any required state income tax return. The Members shall cause the Company to pay, out of available cash flow and other assets of the Company, any taxes payable by the Company. Except as otherwise set forth in this Agreement, all decisions regarding tax elections shall be made by the Members.

(b) Each Member agrees to report, on his own income tax returns each year, each item of income, gain, loss, deduction and credit as reported by the Company to such Member on the Schedule K-1 (or other similar tax report) issued by the Company to such Member for such year. Except as otherwise required by law, no Member shall take any tax reporting position that is inconsistent in any respect with any tax reporting positions taken by the Company or any entity in which the Company owns any equity interest, and, in the event of a breach by such Member of the provisions of this Section 6.3(b), shall be liable to the Company and the Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

6.4 <u>Tax Matters Member; Partnership Representative</u>. Simpson is hereby designated the "Tax Matters Partner" pursuant to Section 6231 of the Code (and any comparable provision of applicable state and local tax laws). All Members hereby consent to such designation and agree to take any further action as may be required to effectuate and maintain such designation and the Tax

Matter Partner is authorized to take such actions as may be required to effectuate and maintain such designation. Simpson is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Simpson shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Simpson, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 6.4 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

ARTICLE 7

ASSIGNABILITY OF INTERESTS;
ADDITIONAL MEMBERS

7.1     General Conditions. No Member shall Transfer all or any portion of its Company Interest, or any rights to receive any Distributions under this Agreement except (A) Permitted Transfers, (B) Transfers other than Permitted Transfers with the other Members' consent, to be exercised in such other Member's sole and absolute discretion, or (C) as required by Section 7.6 hereof. Notwithstanding the foregoing sentence, in no event shall a Member be permitted to Transfer all or any portion of its Company Interest if, in the opinion of counsel to the Company or, in the opinion of counsel to the non-transferring Members, which counsel is satisfactory to the transferring Member, in its reasonable discretion, the Transfer would (i) cause the termination or dissolution of the Company under the Company Law; (ii) require registration under the Securities Act of 1933, as amended, or under any other securities law or result in the violation of any applicable state securities laws; (iii) cause the Company or any Member to be subject to any additional material regulatory requirements; (iv) cause the Company to be taxed as a corporation under the Code; or (v) cause a default under any agreement, that was approved by the Members, to which the Company is a party including, without limitation, the AREH Operating Agreement.

7.2     Additional Member. A transferee of all or part of the Company Interest of a Member permitted under this Agreement shall be admitted to the Company as an additional Member and be listed as a Member on the books and records of the Company only if (i) the transferring Member gives such right to the transferee, (ii) except for Permitted Transfers, the Members consent to the admission of the transferee, which consent may be withheld in the Members' sole and absolute discretion, (iii) the transferee shall execute and deliver an agreement

818298_7                                          14

reasonably satisfactory to and approved by the Members, agreeing to assume and to be bound by and to comply with all of the terms and conditions of this Agreement applicable to the Members, (iv) the transferee shall execute, and deliver all necessary certificates or other documents and perform such other acts as may be required under the Company Law or other applicable laws and regulations to effectuate the admission of the additional Member and to preserve the status and legal compliance of the Company as reasonably satisfactory to and approved by the Members and (v) the transferee shall pay all reasonable expenses of the Company and the Members connected with the admission including, but not limited to, reasonable legal and accounting fees and disbursements.

7.3     Treatment.  Until compliance with the provisions of Section 7.2, the Company shall be entitled to treat the record owner of any Company Interest as the absolute owner of such Company Interest in all respects and shall incur no liability for distributions made to such owner.

7.4     Other Transfers Void.  Any Transfer made in violation of the provisions of this Article 7 or of Article 8 shall be null and void and shall not bind the Company or any Member.

7.5     Resignation of a Member.

(a)     Upon the Resignation of a Member, such Member's Company Interest shall be deemed automatically redeemed by the Company for the Redemption Amount, which shall be payable when and if the applicable distributions are received by the Company and such Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such Resignation occurs.  In connection with any redemption pursuant to this Section 7.5, the Company shall have the right to require the redeemed Member to, and the redeemed Member shall, enter into agreements with the Company containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

(b)     Each Member agrees that for the Restricted Period, such Member shall not, nor shall it permit any Person employed by, or associated or affiliated with, to (i) encourage, solicit, or inducing, or in any manner attempt to encourage, solicit, or induce, any Person employed by, as agent of, or a service provider to, the Company or an Investment Entity within the twelve (12) month period prior to the Closing to terminate (or, in the case of an agent or service provider, terminate or reduce) such Person's employment, agency or service, as the case may be, with the Company or its Subsidiary; (ii) hire any Person who was employed by, an agent of, or a service provider to, the Company or an Investment Entity, within the twelve (12) month period prior to the date of such hiring; or (iii) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce any customer, supplier, licensee or other business relation (or any direct or indirect subsidiary of any such customer, supplier, licensee or other business relation) of the Company or an Investment Entity to cease doing business with or reduce the amount of business conducted with (including by providing similar services or products to any such Person) the Company or an Investment Entity, or in any way negatively interfere with the relationship between any such customer, supplier, licensee or business relation and the Company

or an Investment Entity. Notwithstanding the foregoing, the restrictions set forth in this Section 7.5(b) shall in no way limit the applicable Member from (i) encouraging, soliciting, or inducing to become employed any individual who was such Member's personal assistant at the Company or employing such individual or (ii) except for Persons to whom the Company or an Investment Entity is required to offer all real estate investment opportunities, seeking capital from any Person who provides equity or debt financing to the Company or an Investment Entity. Without limiting the remedies available to the Company, the Members acknowledge that a breach of any of the covenants contained in this Section 7.5(b) may result in material irreparable injury to the Company for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of posting a bond or proving irreparable harm or injury as a result of such breach or threatened breach hereof, restraining the applicable Member from engaging in activities prohibited by this Section 7.5(b) or such other relief as may be required specifically to enforce any of the covenants in this Section 7.5(b).

7.6     Death or Disabilty of Member.

(a)     Upon the death or Disability of a Member (the "Effected Member"), such Member's Company Interest shall be automatically deemed transferred to the non-Effected Member for a purchase price equal to the Redemption Amount which shall be payable when and if the applicable distributions are received by the non-Effected Member with respect to the Company Interest acquired from the Effected Member. From and after the date of the death or Disability of the Effected Member, the Effected Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after the date of such death but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such death occurs.

(b)     In connection with any sale pursuant to this Section 7.6, the non-Effected Member shall have the right to require the estate of the Effected Member to enter into agreements with the non-Effected Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

ARTICLE 8

BUY/SELL RIGHTS

8.1     Right to Purchase.

(a)     From and after the second anniversary of the date hereof, in the event that the Members fail to approve any action requiring the consent of both Members including, without limitation, a Company Major Decision, and are unable to reach agreement as to an appropriate alternative course of action after not less than ten (10) Business Days of good faith negotiations to resolve their differences, either Chassen, on the one hand, or Simpson on the other hand (such Member being hereinafter referred to as the "Buy/Sell Initiating Member"),

818298_7                                    16

shall have the right to give written notice (the "Buy/Sell Demand Notice") to the other Member (such other Member being hereinafter referred to as the "Buy/Sell Responding Member"), of the Buy/Sell Initiating Member's intent to rely on this Article 8 and to purchase for cash all, but not less than all, of the Company Interests owned by the Buy/Sell Responding Member, whereupon the provisions set forth in this Article 8 shall apply. In the event that both Simpson and Simpson are deemed to have delivered a Buy/Sell Demand Notice, the Member who shall be deemed to have first delivered the Buy/Sell Demand Notice pursuant to Section 11.1 hereof after the ten (10) Business Day good faith negotiation period set forth herein shall be deemed the Buy/Sell Initiating Member or if both Simpson and Chassen shall be deemed to have delivered a Buy/Sell Demand Notice hereunder on the same date, the Member whose Buy/Sell Demand Notice hereunder sets forth the highest price shall be deemed the Buy/Sell Initiating Member.

(b)     The Buy/Sell Demand Notice shall set forth the cash purchase price at which the Buy/Sell Initiating Member would be willing to purchase (or to cause its designee to purchase) an undivided one hundred percent (100%) interest in the Company free and clear of all liabilities and assuming that no Capital Contributions are made and that all cash flow of the Company is distributed between the date of the Buy/Sell Demand Notice and the date on which the Company Interests are sold pursuant to this Article 8, together with a calculation of such purchase price.

(c)     The Buy/Sell Responding Member shall have the option, exercisable by giving written notice (the "Buy/Sell Exercise Notice") to the Buy/Sell Initiating Member within ten (10) Business Days after receipt of the Buy/Sell Demand Notice, to agree to either (i) sell to the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2 or (ii) purchase from the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2.

8.2     Procedure for Purchase of Buy/Sell Sale Interests.

(a)     As used in this Section 8.2 the following terms shall have the following meanings:

(i)     "Buy/Sell Deposit" shall mean an amount equal to 10% of the Buy/Sell Sale Interest Purchase Price, which deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.

(ii)     "Buy/Sell Option Period" shall mean the time period during which the Buy/Sell Responding Member shall have the right to elect either to purchase the Company Interests of the Buy/Sell Initiating Member or sell its entire Company Interests to the Buy/Sell Initiating Member pursuant to Section 8.1(c) above.

(iii)     "Buy/Sell Purchasing Member" shall mean either (x) the Buy/Sell Initiating Member (or its designee) if the Buy/Sell Responding Member shall have elected in its Buy/Sell Exercise Notice not to purchase the Company Interests of the Buy/Sell Initiating Member, or (y) the Buy/Sell Responding Member (or its designee) if it shall have indicated in its

Buy/Sell Exercise Notice its intent to purchase the Company Interests of the Buy/Sell Initiating Member.

(iv)     "Buy/Sell Sale Interest" shall mean the Company Interests of the Buy/Sell Selling Member.

(v)      "Buy/Sell Sale Interest Purchase Price" shall mean an amount equal to the amount which the Buy/Sell Selling Member would have been entitled to receive upon dissolution of the Company pursuant to the terms of this Agreement if the Company had sold all of its assets for cash to a third party at the price set forth in the Buy/Sell Demand Notice and had utilized such cash first to satisfy all debt obligations, paid all expenses, transfer taxes, costs and fees relating to such sale, and then liquidated the Company.

(vi)     "Buy/Sell Selling Member" shall mean the Member who is not the Buy/Sell Purchasing Member.

(b)     Within two (2) Business Days following the Buy/Sell Option Period, the Buy/Sell Purchasing Member shall deposit into escrow, with an escrow agent (the "Buy/Sell Escrow Agent") selected by the Buy/Sell Purchasing Member, but not an Affiliate of the Buy/Sell Purchasing Member, and reasonably acceptable to the Buy/Sell Selling Member, the Buy/Sell Deposit, which Buy/Sell Deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing. The Buy/Sell Deposit shall be held by the Buy/Sell Escrow Agent in accordance with the terms hereof. Upon delivery of the Buy/Sell Deposit to the Buy/Sell Escrow Agent, the Buy/Sell Purchasing Member shall have the sole right, without the need for consent from any other Member, to cause the Company to take the action, or refrain from taking the action, which was the cause of the Buy/Sell Demand Notice.

(c)     Within thirty (30) Business Days following the date on which the Buy/Sell Option Period shall have expired, the Buy/Sell Purchasing Member shall purchase from the Buy/Sell Selling Member (such purchase and sale is referred to herein as the "Buy/Sell Closing"), and the Buy/Sell Selling Member shall sell to the Buy/Sell Purchasing Member, the Buy/Sell Sale Interest at the Buy/Sell Sale Interest Purchase Price. In determining this amount it shall be assumed that: (i) no prepayment premium or make whole amount is owing to any lender, (ii) no reserves will be maintained, (iii) there will be no brokerage fees, transfer taxes or other transaction costs in connection with such liquidation, and (iv) the proceeds from such sale and liquidation would be distributed in accordance with Section 5.1 hereof. Upon the Buy/Sell Closing, the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member and applied to the Buy/Sell Sale Interest Purchase Price.

(d)     In connection with any sale pursuant to this Section 8.2, the Buy/Sell Purchasing Member shall have the right to require the Buy/Sell Selling Member to enter into agreements with the Buy/Sell Purchasing Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that the Buy/Sell Selling Member's Company Interests are free and clear of all liens, claims or encumbrances and an indemnity from the Buy/Sell Selling Member to the Buy/Sell Purchasing Member for claims arising out of events which occur prior to the Buy/Sell Closing and an indemnity from the Company to the Buy/Sell Selling Member for

claims arising on or after the Buy/Sell Closing. Each Member shall pay any transfer tax imposed on such Member pursuant to applicable law and there shall be such prorations at the Buy/Sell Closing as are customary in such transactions, including without limitation for such items as real estate taxes, rents, security deposits, service contracts and assessments.

        (e)    From the date of the Buy/Sell Demand Notice until the consummation of the Buy/Sell Closing, the Company shall continue to be operated in the ordinary course, as if such Buy/Sell Closing were not going to occur, the Members shall continue to have all power and authority granted in this Agreement (including the power and obligation to make distributions), and the Members shall exercise their power and authority in good faith and without regard to the fact that such Buy/Sell Closing may occur; provided, that: (i) any and all Distributions to the Buy/Sell Selling Member derived solely from proceeds of a Capital Event shall be credited against and reduce the Buy/Sell Sale Interest Purchase Price payable to the Buy/Sell Selling Member; and (ii) except as provided in Section 8.2(b), the Company shall not, nor shall it permit any Subsidiary to, without the consent of the Members enter into any contracts or agreements, or otherwise agree, to sell or otherwise dispose of any Company assets, except that the Company and each of its Subsidiaries shall be authorized to consummate any transactions that were the subject of binding contractual obligations entered into prior to the delivery of the Buy/Sell Demand Notice.

        (f)    If the Buy/Sell Purchasing Member shall default in its obligation to:

        (i)    timely make the Buy/Sell Deposit as required in Section 8.2(b), then upon written notice to the Buy/Sell Purchasing Member the Buy/Sell Selling Member shall have the right to terminate the Buy/Sell Purchasing Member's right to acquire the applicable Company Interests pursuant thereto and either (x) recover an award or judgment against the Buy/Sell Purchasing Member in the amount of such required Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment or (y) have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

        (ii)    consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from Buy/Sell Selling Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Selling Member, then (x) the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member as liquidated damages (the Members hereby acknowledging and agreeing that it is impossible to more precisely estimate the damages to be suffered by the Buy/Sell Selling Member upon such default and that the Buy/Sell Deposit that may be received by the Buy/Sell Selling Member is not intended as a penalty), and (y) the Buy/Sell Selling Member shall have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

The Buy/Sell Selling Member shall be deemed to have exercised its rights under clause (i)(y) or clause (ii)(y) of this Section 8.2(f) if the Buy/Sell Selling Member shall have delivered to the

Buy/Sell Purchasing Member a written notice of its intent to acquire the Buy/Sell Purchasing Member's Company Interest within ten (10) Business Days (the "Second Option Period") of the expiration of the two (2) Business Day period within which to make the Buy/Sell Deposit or the thirty (30) Business Day time period within which the Buy/Sell Purchasing Member had the right to acquire the Buy/Sell Sale Interests, as applicable.  Upon the exercise by the Buy/Sell Selling Member of its rights under this Section 8.2(f), for purposes of this Section 8.2, the Buy/Sell Selling Member shall be deemed the Buy/Sell Purchasing Member, the Buy/Sell Purchasing Member shall be deemed the Buy/Sell Selling Member and the Option Period shall be deemed to have expired on the expiration of the Second Option Period.

(g)     If the Buy/Sell Selling Member shall default in its obligation to consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from the Buy/Sell Purchasing Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Purchasing Member, then the Buy/Sell Purchasing Member shall have the right upon written notice to the Buy/Sell Selling Member to either (i) seek specific performance of the Buy/Sell Selling Member's obligations, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment; it being agreed by the Buy/Sell Selling Member and the Buy/Sell Purchasing Member that the remedy at law for breach of the obligations of the Buy/Sell Selling Member set forth in Section 8.2(c) is inadequate in view of (A) the complexities and uncertainties in measuring actual damages to be sustained by the Buy/Sell Purchasing Member, and (B) the uniqueness of the Company business and the Members' relationships, or (ii) upon written notice to the Buy/Sell Selling Member, demand and receive a return of the Buy/Sell Deposit previously deposited with the Buy/Sell Escrow Agent together with reimbursement of all out-of-pocket costs and expenses incurred by the Buy/Sell Purchasing Member in connection with the exercise of the buy/sell right set forth in this Article 8 and the pursuit of the acquisition of the applicable Company Interests with respect thereto, and recover an award or judgment against the Buy/Sell Selling Member in the amount of the Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment, in which event, the Buy/Sell Selling Member's default hereunder shall be deemed waived and the Buy/Sell Demand Notice to which such default relates shall be void *ab initio* (such that any further exercise of the buy/sell right set forth in this Article 8 shall require compliance with this Article 8).

8.3     Release of Buy/Sell Selling Member.  The Buy/Sell Purchasing Member shall exercise commercially reasonable efforts to obtain a release of the Buy/Sell Selling Member and the Buy/Sell Selling Member's Affiliates from any personal liability with respect to all Company obligations arising or accruing from and after the Buy/Sell Closing, if any, and all other obligations related thereto including any guarantees with respect thereto.  If the Buy/Sell Purchasing Member is unable to obtain any such releases, then (i) from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, the Buy/Sell Purchasing Member and the Company, jointly and severally, shall indemnify and hold harmless the Buy/Sell Selling Member from any and all claims or liabilities arising from such unreleased obligations and/or guarantees arising or accruing from and after such closing, if any, except to the extent caused by the Buy/Sell Selling Member, and (ii) with respect to any guaranty provided by any Affiliate of the Buy/Sell Selling Member under any loan document or other agreement with respect to any indebtedness of the Company or any subsidiary that guarantees any obligation for which any

Affiliate of the Buy/Sell Purchasing Member is jointly and severally liable as a guarantor, then from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, such Affiliate of the Buy/Sell Purchasing Member shall indemnify and hold harmless such Affiliate of the Buy/Sell Selling Member from any personal liability with respect to such guaranteed obligation arising or accruing from and after such closing, if any, except to the extent such personal liability is caused by such Affiliate of the Buy/Sell Selling Member.

## ARTICLE 9

### DISSOLUTION AND TERMINATION

9.1     Events of Dissolution.  The Company shall be dissolved upon the happening of any of the following events:

(a)     The disposition of all or substantially all of the assets of the Company;

(b)     The unanimous vote by the Members; or

(c)     The happening of any other event causing the dissolution of the Company under the laws of New York.

Dissolution of the Company shall be effective on the day the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles of Organization of the Company has been canceled and the assets of the Company have been distributed as provided herein.

9.2     Limited Return of Capital Contributions Upon Dissolution.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution, and shall have no recourse therefor (upon dissolution or otherwise) against any Member.  Notwithstanding the dissolution of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until termination of the Company, as provided in this Agreement.  Upon dissolution of the Company, the Members or a liquidator (who may be a Member) appointed by the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this agreement and cause the cancellation of the Company's Articles of Organization.

9.3     Distributions Upon Liquidation.   (a)   Upon dissolution of the Company, the Members or the liquidator appointed pursuant to Section 9.2, shall liquidate the assets of the Company as promptly as is consistent with obtaining the fair value thereof, and apply and distribute the proceeds thereof:

(i)     First, to creditors in the order of priority provided by law;

(ii)     Second, to the establishment of any reserves for contingencies which the Members (or the liquidator) may consider necessary; and

(iii)     The balance of the proceeds shall be distributed to the Members in accordance with Section 5.1 hereof.

(b)     Notwithstanding the foregoing, in the event the Members (or liquidator) shall determine that an immediate sale of part or all of the Company assets would cause undue loss to the Members, the Members (or liquidator), in order to avoid such loss, may, after giving notice to all the Members, to the extent not then prohibited by the limited liability company law of any jurisdiction in which the Company is then formed or qualified and applicable in the circumstances, defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations.

(c)     After the proceeds of the liquidation of the assets of the Company have been distributed (which shall occur as soon as practical), the Members (or liquidator) shall cause the Articles of Organization of the Company to be canceled.

9.4     <u>Final Accounting</u>.  Upon the dissolution of the Company a proper accounting shall be made by the Company's independent public accountants from the date of the last previous accounting to the date of dissolution.

<p style="text-align:center">ARTICLE 10</p>

<p style="text-align:center"><u>LIABILITY, EXCULPATION<br>AND INDEMNIFICATION</u></p>

10.1     <u>Liability</u>.  (a) Except as otherwise provided by the Company Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)     Except as otherwise expressly required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profit of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

10.2     <u>Indemnification</u>.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; <u>provided</u>, <u>however</u>, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

     10.3   Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof.

## ARTICLE 11

## MISCELLANEOUS

     11.1   Notices.  Any notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand and shall be deemed to have been given (i) when personally delivered with signed delivery receipt obtained, (ii) when transmitted by electronic mail, or (iii) three Business Days after such notice has been deposited in the United States first class mail if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed to the Members at the addresses set forth in the preamble hereto or at such other address as such Member may notify the other Members and the Company pursuant to the terms of this Section 11.1.

     11.2   Successors and Assigns.  Subject to the restrictions on Transfer set forth in this Agreement, this Agreement, and each provision of this Agreement, shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and permitted assigns, and each successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

     11.3   Amendments.  This Agreement may be amended only by a written document approved by and duly executed by the Members, subject to the condition that such amendment shall not increase the Capital Contribution required from any Member or adversely affect any Distribution or allocation to any Member without such Member's written consent. Notwithstanding the foregoing, the written consent of all Members shall be required to any amendment which would (a) allow the Members to take part in the control of Company's business or otherwise modify their limited liability, (b) extend the term of this Agreement, (c) in the opinion of counsel to the Company, adversely affect the status of the Company as a partnership for Federal income tax purposes, or (d) amend this Section 11.3.

     11.4   Partition.  No Member or any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have any Company assets partitioned, and each Member, on behalf of itself, its successors, representatives, heirs and assigns, hereby waives any such right. It is the intention of the Members that during the term of this Agreement the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the rights of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Company shall be subject to the limitations and restrictions of this Agreement.

818298_7

23

11.5    No Waiver.  The failure of any Member to insist upon strict performance of a covenant under this Agreement or of any obligation under this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of that Member's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation under this Agreement.  No waiver or consent shall be effective unless in writing.

11.6    Entire Agreement.  This Agreement constitutes the full and complete agreement of the parties to this Agreement with respect to the subject matter of this Agreement.

11.7    Captions.  The titles or captions of Articles or Sections contained in this Agreement are inserted only as a matter of convenience and for reference, are not a part of this Agreement, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

11.8    Counterparts.  This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all Members have not signed the same counterpart.

11.9    Separability.  In case any of the provisions contained in this Agreement or any application of any of those provisions shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and other applications of those provisions shall not in any way be affected or impaired thereby.

11.10    Gender.  Words used herein, regardless of the gender specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, as the context shall require.

11.11    Applicable Law.  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and interpreted, construed and enforced in accordance with the law of the State of New York applicable to agreements made and to be performed in the State of New York.

[remainder of page left intentionally blank]

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Jared Chasen

Jeffrey Simpson

25

Exhibit A

Distribution Percentages

| Date of Receipt by Revenue From which Distribution is Made | Threshold Investment Amount | Simpson | Chassen |
|---|---|---|---|
| Prior to 12-31-18 | $5,000,0000 | 66.6667% | 33.3333% |
| 1-1-19 to 12-31-19 | $10,000,000 | 62.5025% | 37.4975% |
| 1-1-20 to 12-31-20 | $15,000,000 | 58.3350% | 41.6650% |
| 1-1-21 to 12-31-21 | $20,000,000 | 54.1675% | 45.8325% |
| After 12-21-21 | none | 50.0000% | 50.0000% |

; provided, however, except as set forth in the next paragraph, such distribution percentages shall not change for the applicable period unless the aggregate Company Investments equals or exceeds the applicable Threshold Investment Amount. For example, if as of December 31, 2018 the total Company Investments is less than $5,000,000 and at December 31, 2019 the total Company Investment Amount is $10,000,000 or more, the percentages for January 1, 2019 through December 31, 2019 will remain at 66.6667% and 33.3333% and the percentages for January 1, 2020 through December 31, 2020 will change to 58.3350% and 41.6650%. That is, the Threshold Investment Amount is a cumulative test with a catch up.

With respect to Cash Flow derived from Promote Distributions, if such Promote Distributions is received from an asset held by the applicable Subsidiary for at least 2 full years, the Distribution Percentages of Simpson and Chassen as to such Promote Distributions shall each be 50% regardless of what the Distribution Percentage would otherwise be in the above chart.

"Company Investment Amount" means the aggregate capital contributions made to the Company, AREH and the other Investment Entities.

818298_7

# EXHIBIT 3

| From: | Bottini_Aishlinn |
| To: | Bottini_Aishlinn |
| Subject: | FW: Morrison Cohen |
| Date: | Monday, August 7, 2023 10:57:07 AM |

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Monday, July 17, 2023 6:13 PM
**To:** Kevin Wiener <kwiener@35oak.com>
**Cc:** Michelle Miller <mmiller@archcre.com>; Michael Wiener <MWiener@35OAK.com>; Tristan Last <tlast@archcre.com>; Jared Chassen <jchassen@archcre.com>; fvanbiesen <fvanbiesen@35oak.com>; Charles Dreezer <cdreezer@35oak.com>; Len Breslow <LBreslow@breslowwalker.com>; Lavender, Brad <Brad.Lavender@haynesboone.com>
**Subject:** RE: Morrison Cohen

> **EXTERNAL:** Sent from outside Haynes and Boone, LLP

We owed $600k+ to Morrison Cohen. 60% is paid as of last week. We will capital call for all of the rest via property level notices immediately. Michelle is already working on them.

Since you are aware of the risks and obligations and acknowledge them, we will ask Morrison Cohen to proceed accordingly but to be clear, we asked them to work on the forbearance agreement last week and I have not stopped an important issue from being resolved imminently. David can attest to such, ask him.

All open capital obligations, on every matter, on every deal – corporate and property is being prepared and you will have shortly.

You can't play the same game that your brother has. Frank is aware of all the capital needed and has been for the entire time. We have used every effort to keep the cash needs down at all times but that will not happen anymore, you will have capital calls weekly for all. You can then choose not to pay them, like debt service and legal bills!

And to your Q about JJ vs Oak. You are the funding partner! That is your only role in this business – to write checks and provide guarantees. Other than that, you guys are on very limited major decisions. Again, please read the agreement so you know your role and what your obligations and responsibilities are. I know ours, it is certainly nice to hear from you when things are hard but when we make $ for the family, everyone hides behind the curtain and it is just, "deal with Frank". Happy you guys woke up and realized what it is that we do every day.

**From:** Kevin Wiener <kwiener@35oak.com>
**Sent:** Monday, July 17, 2023 5:57 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Michelle Miller <mmiller@archcre.com>; Michael Wiener <MWiener@35OAK.com>; Tristan Last <tlast@archcre.com>; Jared Chassen <jchassen@archcre.com>; fvanbiesen <fvanbiesen@35oak.com>; Charles Dreezer <cdreezer@35oak.com>; Len Breslow <LBreslow@breslowwalker.com>; Brad Lavender <brad.lavender@haynesboone.com>
**Subject:** RE: Morrison Cohen

Jeff every single one of those properties has the ability to make a capital call if it lacks sufficient funds to cover legal bills. We will honour our legal obligations to respond to capital calls as we have continuously done. We fully intend to cover those legal expenses, but I'm not going to have this email be construed as some sort of separate legal guarantee outside of our funding structure to cover every property's legal expenses. As far as I can tell, we're the only investor in any of these properties who *is* responding to capital calls (including JJ).

If what you are looking for is a statement of our intention with respect to capital calls on a property level with respect to these legal expenses, you now have it and I look forward to you getting Morrison Cohen back to work.

If you're asking for some kind of legal guarantee (that apparently would only apply to us and not to any of the other investors in the various properties), our position is that it's inappropriate to require such a guarantee before incurring expenses that you have a fiduciary obligation to incur to protect the investments in the various properties, and where there is a clear mechanism to have those expenses paid for. As far as I'm aware you have not even attempted to make any capital calls to fund these legals so I'm not sure why you'd need a third-party guarantee from 35 Oak when the capital call process has not been used, let alone failed.

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Monday, July 17, 2023 5:32 PM
**To:** Kevin Wiener <kwiener@35oak.com>
**Cc:** Michelle Miller <mmiller@archcre.com>; Michael Wiener <MWiener@35OAK.com>; Tristan Last <tlast@archcre.com>; Jared Chassen <jchassen@archcre.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>; Len Breslow <LBreslow@breslowwalker.com>; Brad Lavender <brad.lavender@haynesboone.com>
**Subject:** Re: Morrison Cohen

==EXTERNAL==
[EXTERNAL EMAIL]

Morrison Cohen legal bills for defense litigation at the properties level .  I've been crystal clear.

If Michael didn't suggest that he didn't want to pay, we wouldn't be having this conversation.


JEFFREY SIMPSON
Managing Partner | Arch Companies
D 646.854.6810 | C 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone


> On Jul 17, 2023, at 5:00 PM, Kevin Wiener <kwiener@35oak.com> wrote:

> Jeff are you asking us to make a commitment that waives all our rights, oversight, capital limits and approvals in the operating agreements and the property-level agreements or are you asking us to commit to meeting our obligations that we have under those agreements? Those are very different questions and you keep demanding a yes or no answer without specifying what it is exactly that you're asking.

> **From:** Jeffrey Simpson <jsimpson@archcre.com>
> **Sent:** Monday, July 17, 2023 4:14 PM
> **To:** Kevin Wiener <kwiener@35oak.com>
> **Cc:** Michelle Miller <mmiller@archcre.com>; Michael Wiener <MWiener@35OAK.com>; Tristan Last <tlast@archcre.com>; Jared Chassen <jchassen@archcre.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>; Len Breslow <LBreslow@breslowwalker.com>; Brad Lavender <brad.lavender@haynesboone.com>
> **Subject:** Re: Morrison Cohen

> ==EXTERNAL==
> [EXTERNAL EMAIL]

> Again, it's a yes or no question.  Are you going to fulfill the capital obligations to pay the Morrison Cohen bill's?

> JEFFREY SIMPSON
> Managing Partner | Arch Companies
> D 646.854.6810 | C 646.753.2872
> jsimpson@archcre.com | archcorealestate.com
> 88 University Place, 11th Floor, New York, NY 10003

> Sent from my iPhone


>> On Jul 17, 2023, at 4:06 PM, Kevin Wiener <kwiener@35oak.com> wrote:

Are you asking for a response from us or a response from Jeff? Our position remains that we are fully committed to our operating agreements and will meet all capital calls under our operating agreements. I'm hoping Jeff will agree not to instruct deferral on these time-sensitive legal matters while we negotiate broader agreements leading to a separation. Doing so will materially prejudice our financial position and we would fully reserve our rights to exercise all legal remedies under our operating agreements and that are otherwise available to us in law.

Jeff, given you have made very clear that you do not want us communicating directly with David's team, can you confirm that you are instructing David to participate on this call?

Kevin

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Monday, July 17, 2023 3:53 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Kevin Wiener <kwiener@35oak.com>; Michael Wiener <MWiener@35OAK.com>; Tristan Last <tlast@archcre.com>; Jared Chassen <jchassen@archcre.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>; Len Breslow <LBreslow@breslowwalker.com>; Brad Lavender <brad.lavender@haynesboone.com>
**Subject:** Re: Morrison Cohen

<mark>EXTERNAL</mark>
[EXTERNAL EMAIL]

I haven't seen a response on the below. The lender on brown has requested a 4pm call with someone from David's team. I do not know how to proceed with additional legal expenses without confirmation especially given the timing urgency and the auction scheduled for Wednesday.

Thank you

MICHELLE MILLER
Partner | Arch Companies
D 646.854.8551 | C 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003


*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*

> On Jul 17, 2023, at 9:56 AM, Jeffrey Simpson <jsimpson@archcre.com> wrote:
>
>  Len and Brad should speak.
>
> In the interim, please read the operating agreement and understand what role the managing member has, and the investor member has, that will be a fruitful thought provoking process for you.
>
> JEFFREY SIMPSON
> Managing Partner | Arch Companies
> D 646.854.6810 | C 646.753.2872
> jsimpson@archcre.com | archcorealestate.com
> 88 University Place, 11th Floor, New York, NY 10003
>
> Sent from my iPhone
>
>> On Jul 14, 2023, at 4:16 PM, Kevin Wiener <kwiener@35oak.com> wrote:

Case 1:23-cv-07089-AT    Document 1-3    Filed 08/10/23    Page 5 of 16

Hi Jeff,

We haven't worked together much. I can see the working relationship
between you and Mike is under a lot of strain and I'm hoping I can help
turn down the temperature a bit. We have our own team and stakeholders
and employees just like you do. I hope we can all keep in mind that this is
bigger than two people. It's about us both taking care of our teams and
treating each other with mutual respect; we've had a great working history
and so much to lose by fighting. We both owe it to our teams and our
investors to try to resolve this amicably whatever personal feelings may
have developed.

With respect to your proposal, I can say that we agree in principle with an
amicable and orderly transition to us managing the business working with
Jason and Jared while you move to something more ad hoc like a
consultant role. So I think we can have the same end goal here – the
discussion is just on the specifics that are going to work best on both sides
and that are an essential part of any deal.

You've made a lot of allegations about our company and about Mike's
behaviour. Obviously we disagree with those allegations. We have our own
areas where we have grievances. Having an argument about who was
wrong isn't going to help us get this resolved and it's just going to lead to
more hurt feeling. We also clearly disagree that you have the right to
unilaterally dissolve the business. Any such unilateral steps – whether it's
you trying to dissolve the business without our consent or us declaring a
cause event and trying to unilaterally become managing partner – is just
going to lead to a lot of mutual litigation while our properties lose money
and our stakeholders wonder why we're fighting instead of protecting their
investments and their jobs.

I'd like to be in a position to give you a point by point response to your
proposal today, but the reality is that we're not in a position to do that. Our
lawyers can't even give us proper advice on the potential risks and liabilities
of the structure without getting certain more information; any deal is going
to require some level of due diligence before it becomes firm; and just from
a principled basis we don't negotiate major deals like this with a gun to our
head.

From what I can tell the short term issues are this:
1. You have concerns that you're incurring expenses with suppliers that
   won't get paid and that there's uncertainty about payroll
2. You believe that we're being too actively involved with management
   decisions and not respecting your role as the managing partner
3. We have a budget that was approved last year and doesn't reflect
   the current needs of Arch or the properties and the expenses that
   need to be incurred to salvage these projects, and the process for
   approval of special expenses is cumbersome
4. We have concerns that important decisions—including decisions to
   protect the various investments and stakeholders—that need to be
   made and work that needs to be done on very short term timelines
   is being put on hold while we resolve this disagreement in a way that
   seriously prejudices our financial position
5. We have concerns that you're asking us to put more money into a
   business that you keep threatening to dissolve if we don't agree to
   an evolving list of commitments (sometimes very significant and

long-term commitments like a divorce structure) on very short timeframes.

Your proposal includes an Initial Period that provides short term certainty while we transition management of the business. The reality is that any kind of divorce proposal we agree to is going to require a period of time where you continue to manage the business and we have mutual trust that, at least over that short term, the business and properties will be adequately financed and management decisions will be made in a way that protects the investments and not to maximize leverage for one side of the partnership.

What I would propose (with the usual caveat that this email isn't intended to create any binding legal obligations right now, all rights are reserved, etc.) is let's use that concept of that Initial Period to create that period of stability while we negotiate our separation agreement. Let's figure out a time period, be it one or two or three months – you can propose a budget that includes adequate financing for all the work that needs to be done to protect these investments in a time-sensitive manner. We'll come to an agreement on that budget that reflects the current realities and needs and you'll have our iron-clad commitment to the funding of that budget. And you'll agree that during that time you'll push forward that time-sensitive work that needs to be done as expeditiously as possible and you won't contingent getting that work done or incurring necessary expenses on us making additional commitments or finalizing the separation agreement – we both fund and work in good faith. We can also work during this period on the potential of bringing in a third party as you proposed during the Initial Period.

During that negotiating period where we're all working together towards a common goal, we'll work as quickly as we reasonably can to attempt to hammer out a separation agreement with you that is fair to the work you and your partners have done and that is fair to your employees. But figuring out what that agreement is going to look like and getting on the same page is something that's going to take a couple weeks not a couple days. What we can do in a couple days is create the breathing room and stability for us both to negotiate the separation properly.

If there's any other short-term commitments you'd like us to make during this negotiating period we're happy to consider them. And of course my discussion of short-term commitments shouldn't in any way be seen as us walking away from the permanent commitments that we've already made in our operating agreement and the agreements governing each property. We fully intend to honour those agreements as we always have, but you've made clear you want something more than that. So let's figure out what we need to ensure some short-term certainty on both sides right now and then use that space to negotiate a fair separation agreement.

Best regards,

Kevin Wiener

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Thursday, July 13, 2023 11:38 PM
**To:** Michael Wiener <MWiener@35OAK.com>
**Cc:** Michelle Miller <mmiller@archcre.com>; Tristan Last

<tlast@archcre.com>; Jared Chassen <jchassen@archcre.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>; Kevin Wiener <kwiener@35oak.com>
**Subject:** Re: Morrison Cohen

EXTERNAL
[EXTERNAL EMAIL]

It's great to float on water Michael and think that the actions that you partake in have no ramifications. Do you really think that Tristan lied? Because that's about the last thing that happened on this earth.

You still have not formally committed to paying the cost of the lawyer that you're asking to work for us. It's nice that you would like to participate in every email, I'm not sure if that's even something that you are entitled to per our Agreement. The last I checked, you are still the Investor Member that has funding obligations (in default of per multiple loan documents), not management controls.

Every circumstance that you chose to insert yourself in has resulted in inappropriate behavior pursuant to our Agreement.

Since you don't seem to understand, I will list examples here for you:

1. Failed capital contributions in property level documentation that results in loan defaults and potential investor claims against you and us.
2. Disclosing information to a party that is not a member, and it's simply a conflict of interest without our consent - Infinity.  This has been noted in multiple conversations and communications, but you still choose to breach the Agreement.
3. Demanding that a Dissolution broker should work on non-market terms after extreme negotiations.  Again, not consistent with the direction of the Managing Member, who has the authority to decide.
4. Bringing on additional consultants to dig in to our business without disclosing or requesting consent of the Managing Member.
We learned today that Zack's mother (Wendy) has been engaged by you after we told you we had a bad experience with her.
5. Demanding that the Managing Member pursue a modification to a 3rd party investor agreement for the sole purpose of the Investor Member economic interests.
6. Your illustration to us that you were unaware of key documents, and guarantees until two months ago when your COO had reviewed the documents and arranged for your signature.  How do you think you can come to our office and tell us "I didn't understand" and Monday morning quarterback?
7. Do you think coming to our office, making those statements, and then putting your bare feet on a desk is indicative or illustrative of leadership or sustainability?

I could continue, but let's be clear you trying to manipulate any member of my team is ineffective.  This poor and inappropriate business conduct will only cause further problems to you and us.  Our agreement does not consist of a copilot arrangement.  If that is your wish, it is time for you to step up and try and take on that direction because it is not provided for and you are not qualified to do so and no one on your team is.  Your term of "collaboration" is actually manipulation and a poor shot at it because we are all smarter than what it is you're trying to achieve.

You want to focus on the ball and move on, respond point by point to the well thought out and curated exit plan.  It deals with all the issues that are outstanding.  I've seen enough poor behavior, bad business judgment, manipulation attempts, that we cannot put our name side-

by-side. It's simply not your role as you're not the manager, managing member, or an entity that has the rights to control the operations of the business. If you feel that you will be effective, you will formally get those rights through a plan that we have prepared, after all parties are signed off.


JEFFREY SIMPSON

Managing Partner | Arch Companies
D 646.854.6810 | C 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone


> On Jul 12, 2023, at 4:42 PM, Michael Wiener <MWiener@35oak.com> wrote:
>
>
> I did not say that. I don't appreciate the allegations.
>
> If you are done attacking me and my character for the day can we have a discussion or at minimum an update on the Madison proposal and where things stand? Are there any other updates we should be looped in on?
>
> ---
>
> **From:** jsimpson@archcre.com
> **Sent:** July 12, 2023 4:24 PM
> **To:** MWiener@35OAK.com; mmiller@archcre.com; tlast@archcre.com
> **Cc:** jchassen@archcre.com; fvanbiesen@35OAK.com
> **Subject:** FW: Morrison Cohen
>
> <mark>EXTERNAL</mark>
> [EXTERNAL EMAIL]
>
> Michael, you asked Tristan last week at 11:30 pm if you can cut these bills or make them go away. I highly doubt Tristan is lying, so please don't tell people that you have not said you won't pay. Words like that don't go unnoticed.
>
> **From:** Y. David Scharf <dscharf@morrisoncohen.com>
> **Sent:** Wednesday, July 12, 2023 9:48 AM
> **To:** Michael Wiener <MWiener@35OAK.com>; Jeffrey Simpson <jsimpson@archcre.com>
> **Cc:** fvanbiesen <fvanbiesen@35oak.com>; Tristan Last <tlast@archcre.com>; Michelle Miller <mmiller@archcre.com>; Brad Lavender <brad.lavender@haynesboone.com>; Jared Chassen <jchassen@archcre.com>; Charles Dreezer <cdreezer@35oak.com>; Kevin Wiener <kwiener@35oak.com>; Bill Wiener <BWiener@35oak.com>
> **Subject:** RE: Morrison Cohen
>
> Hi. Michael I am sorry for the health and family matters. I feel like a child of people divorcing and being asked if I am ok. I have a job to do and there are some important deadlines today and tomorrow as well as 50% of the old invoices outstanding. I understood last week that that there was a commitment to be paid for past and ongoing work and there

was a suggestion that that is no longer the case. The commitment of our clients to pay for our services is essential and if that commitment has changed I need to be told so we can comply with our obligations to the court and clients.

**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 |C: 917.754.0484 |F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

**From:** Michael Wiener <MWiener@35OAK.com>
**Sent:** Wednesday, July 12, 2023 8:49 AM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Y. David Scharf <dscharf@morrisoncohen.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Tristan Last <tlast@archcre.com>; Michelle Miller <mmiller@archcre.com>; Brad Lavender <brad.lavender@haynesboone.com>; Jared Chassen <jchassen@archcre.com>; Charles Dreezer <cdreezer@35oak.com>; Kevin Wiener <kwiener@35oak.com>; Bill Wiener <BWiener@35oak.com>
**Subject:** Re: Morrison Cohen

I believe it's relevant. Brad is away, and I have not been able to speak to him. This is important obviously.

What I am suggesting is that we keep things moving forward while we in tandem try to address your concerns. I believe this is a reasonable approach. We can further solidify a wind down plan which hopefully deals with your concerns around Arch payroll etc. Let's pick a date, and figure out what it takes to get there.

Especially given we worked out a deal with David last week to keep things moving forward on the legal front, I feel that we can probably address concerns he might have in a more productive and collaborative manner.

I urge that we work as a team here.



On a separate note I am dealing with some personal health issues and with a family emergency. I would really appreciate if you can take this into consideration as well.

Thanks,


Get Outlook for Android

---

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Wednesday, July 12, 2023 7:30:36 AM
**To:** Michael Wiener <MWiener@35OAK.com>
**Cc:** Y. David Scharf <dscharf@morrisoncohen.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Tristan Last <tlast@archcre.com>; Michelle Miller <mmiller@archcre.com>; Jared Chassen <jchassen@archcre.com>; Brad Lavender <brad.lavender@haynesboone.com>
**Subject:** Re: Morrison Cohen

<mark>EXTERNAL</mark>
[EXTERNAL EMAIL]

None of the below is relevant in this context. The simple answer as a relates to David is " yes, we will cover legal expenses for your firm".

Again, do you confirm? It's a simple "yes" or "no". Without a yes, I will not ask David to continue on behalf of Arch as managing member. The business doesn't have the cash to cover the legal expense, so it comes from the investment/ funding partner.


JEFFREY SIMPSON
Managing Partner | Arch Companies
D 646.854.6810 | C 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

> On Jul 12, 2023, at 7:25 AM, Michael Wiener <MWiener@35oak.com> wrote:
>
> I don't know how to respond to the below emails. It's my understanding these are all important matters that need for us to continue to make progress on.
>
> Brad is away this week and next.
>
> I know these are stressful times but we need to be working collaboratively here. Oak has always stepped up financially and has made capital calls when called upon. When we were asked to contribute towards legals last week we did so. I was under the impression David was appreciative and understands that we are going through a tough time.

Jeff - if you have issues with me personally or with Oak as a partner let's work together to address them, but asking counsel to put pens down seems counterproductive, especially after the discussion with David last week where we discussed the importance of keeping things moving forward.

You mentioned you feel Arch should be wound down, and you asked that Oak assist to ensure the staff are supported and that we have a soft landing. This was even discussed as recently as yesterday.

I want to get through these challenging times as much as everyone. Can we at minimum keep things moving forward at least until Brad is back in a couple weeks and we can have this discussion then?



We are making progress, let's at minimum continue to make progress while we sort through our challenges.

**From:** dscharf@morrisoncohen.com
**Sent:** July 12, 2023 6:20 AM
**To:** jsimpson@archcre.com
**Cc:** fvanbiesen@35OAK.com;
MWiener@35OAK.com; tlast@archcre.com;
mmiller@archcre.com; jchassen@archcre.com
**Subject:** Re: Morrison Cohen

**EXTERNAL**
[EXTERNAL EMAIL]

I have let David Ross and Gayle know.

**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 | C: 917.754.0484 | F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

On Jul 12, 2023, at 6:13 AM,
Jeffrey Simpson

<[jsimpson@archcre.com](mailto:jsimpson@archcre.com)> wrote:



Until we hear back a firm
commitment from Oak, on the
below,

Thanks and sorry

JEFFREY SIMPSON
Managing Partner | Arch
Companies
D [646.854.6810](tel:646.854.6810) |
C [646.753.2872](tel:646.753.2872)
[jsimpson@archcre.com](mailto:jsimpson@archcre.com) | [archcor
ealestate.com](http://archcorealestate.com)
88 University Place, 11th Floor,
New York, NY 10003

Sent from my iPhone

> On Jul 12, 2023, at
> 6:02 AM, Y. David
> Scharf
> <[dscharf@morrisonc
> ohen.com](mailto:dscharf@morrisoncohen.com)> wrote:





**Y. David Scharf**

*Chair and Co-Managing Partner*

T: 212.735.8604 | C: 917.7
54.0484 | F: 917.522.3104
dscharf@morrisoncohen.
com

vCard | Bio | LinkedIn

**Morrison Cohen LLP**

909 Third Avenue

27th Floor

New York, NY 10022

www.morrisoncohen.com

On Jul 11, 2023, at 11:50 PM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

| CAUTION: External sender. Verify before continuing. |
| --- |

David

Please put all Arch work product on hold for the moment.

We need Oak to confirm (in writing) that they are

going to fund the invoices that is associated with the work product before we can ask you to continue.

JEFFREY SIMPSON Managing Partner | Arch Companies D [646.854.6810](tel:646.854.6810) | C [646.753.2872](tel:646.753.2872) [jsimpson@archcre.com](mailto:jsimpson@archcre.com) | [archcorealestate.com](http://archcorealestate.com) 88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received

this transmittal in
error; any review,
dissemination,
distribution or
copying of this
transmittal is strictly
prohibited. If you
have received this
transmittal and/or
attachment(s) in
error, please notify
us immediately by
reply or by telephone
(call us collect at
212-735-8600) and
immediately delete
this message and all
of its attachments.
Thank you. We take
steps to remove
metadata in
attachments sent by
email, and any
remaining metadata
should be presumed
inadvertent and
should not be viewed
or used without our
express permission.
If you receive an
attachment
containing metadata,
please notify the
sender immediately
and a replacement
will be provided.

This email has been
scanned for email
related threats and
delivered safely by
Mimecast.
For more information
please visit
http://www.mimecast.c
om

This transmittal and/or attachment (s) may be
a confidential attorney-client communication
or may otherwise be privileged or
confidential. If you are not the intended
recipient, you are hereby notified that you
have received this transmittal in error; any
review, dissemination, distribution or copying
of this transmittal is strictly prohibited. If you
have received this transmittal and/or
attachment(s) in error, please notify us
immediately by reply or by telephone (call us
collect at 212-735-8600) and immediately
delete this message and all of its attachments.
Thank you. We take steps to remove metadata
in attachments sent by email, and any
remaining metadata should be presumed
inadvertent and should not be viewed or used
without our express permission. If you

receive an attachment containing metadata,
please notify the sender immediately and a
replacement will be provided.

This email has been scanned for email related
threats and delivered safely by Mimecast.
For more information please visit
http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential
attorney-client communication or may otherwise be privileged
or confidential. If you are not the intended recipient, you are
hereby notified that you have received this transmittal in
error; any review, dissemination, distribution or copying of
this transmittal is strictly prohibited. If you have received this
transmittal and/or attachment(s) in error, please notify us
immediately by reply or by telephone (call us collect at 212-
735-8600) and immediately delete this message and all of its
attachments. Thank you. We take steps to remove metadata
in attachments sent by email, and any remaining metadata
should be presumed inadvertent and should not be viewed or
used without our express permission. If you receive an
attachment containing metadata, please notify the sender
immediately and a replacement will be provided.

This email has been scanned for email related threats and
delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

# EXHIBIT 4

**Bottini, Aishlinn**

| | |
|---|---|
| **To:** | Bottini, Aishlinn |
| **Subject:** | RE: Nostrand |

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Tuesday, August 1, 2023 11:14 PM
**To:** Kevin Wiener <kwiener@35oak.com>
**Cc:** Michael Wiener <MWiener@35oak.com>; Jared Chassen <jchassen@archcre.com>; fvanbiesen <fvanbiesen@35oak.com>; Charles Dreezer <cdreezer@35oak.com>; Tristan Last <tlast@archcre.com>; Lavender, Brad <Brad.Lavender@haynesboone.com>; Len Breslow <LBreslow@breslowwalker.com>; Michelle Miller <mmiller@archcre.com>; Thorne, Leslie <Leslie.Thorne@haynesboone.com>; Silberstein, Andrew <Andrew.Silberstein@haynesboone.com>
**Subject:** Re: Nostrand

**EXTERNAL:** Sent from outside Haynes and Boone, LLP

You cannot hold us personally responsible for shit, so stop with the nonsense and the threats.  Dare to threaten me personal again and it'll be the last conversation I ever have with you.

You're only hope to getting through this stuff is me so stop fighting me and listen to what I'm telling you.

You have been involved in work that I've done for 20 years for about two weeks, so know your place and stand down.

And you have no right to tell me what is negotiable and non negotiable as you still are the investor member and nothing else.

Keep copying lawyers and think that will help you, It's just more bills for you to pay.

Again, you were entered into a funding relationship without having the cash to support it so lets understand the facts, you are illiquid and insolvent.   Markets change, and your father entered this relationship with us as capital preservation / long-term, not fly by the seat of our pants because interest rates went up and you are out of money.

No need to write back because I'm not responding to you further.

PS - just because you called me three times doesn't mean I have to respond to you in the hours that you asked for it because you're another spoiled child like your brother.  And for the record, Jared did call you.  Call me when you when you grow up and then there is a conversation.

JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Aug 1, 2023, at 10:13 PM, Kevin Wiener <kwiener@35oak.com> wrote:

Jeff you started screaming and swearing at us, said the meeting was over, hung up the phone, and instructed counsel (to whom we are a joint client) that he was not to talk to us.

That is the opposite of being "ready and willing to have a call."

I then attempted to speak to you to try to get you back on the call and you ignored my calls and texts. Whether or not Charles was wrong for interrupting you (and he did attempt to apologize but by then you had left the call), that was not an appropriate way to react. You cannot ask us for millions of dollars in financing and then scream and swear at us every time you believe you have been slighted. There is an appropriate way to deal with interpersonal issues.

I could not make the 6pm time because I already had a scheduled call. I cannot make 7:30 tomorrow because I am flying back from an out of country trip and my plane lands at 7:30 and then I need to go through customs and actually get somewhere I can take a call.

We were willing to do 10pm even though it's late for all of us because we're sensitive to the need to make a decision quickly, but unfortunately that ship appears to have sailed.

But let me be clear: you do not decide when we have enough information to give our go-ahead for a major decision strategy that we will have to fund. We decide when we have enough information to spend our money.

You also do not decide whether we get to talk to the lawyers who jointly represent us as guarantors and whose bills we are paying for. The end result of you giving our lawyers the wholly unreasonable instruction that they are not allowed to talk to us without your permission, and then not granting that permission, will be that those lawyers have a conflict of interest and will have to withdraw at a minimum from Nostrand and possibly from all Arch files. You may want to have a discussion with Len about what that would mean for our ability to declare a cause event and for your personal liability.

I do not know why you seem insistent on making every decision a game of chicken. I would much rather us work together collaboratively as I have repeatedly said. If we put aside personality conflicts I'm sure we can chart a way forward that meets everyone's needs. But that means if you have a concern or a disagreement that you be willing to discuss it openly and in good faith to try to reach an agreement rather than making blanket refusals or threats.

We would like to have the call with David as soom as possible. Since there's no availability tomorrow then the call will need to happen on Thursday. But unfortunately having this conversation with David is a non-negotiable prerequisite for us providing additional funding to this property, and we will hold JJ and you personally liable for any losses we thereby suffer.

I have removed David from this email conversation so that we can work this out before looping him back in. We will await confirmation of your instructions to David to reschedule the call. I've asked my team to send their questions to me to reduce the potential of any further issues. If an issue does develop with a member of our team I am always happy to talk with you one on one to try to resolve it; it is unfortunate we were unable to do that today.

2

Kevin

Sent from my Galaxy


-------- Original message --------
From: Jeffrey Simpson <jsimpson@archcre.com>
Date: 2023-08-01 5:36 p.m. (GMT-08:00)
To: Michael Wiener <MWiener@35OAK.com>
Cc: Kevin Wiener <kwiener@35oak.com>, "Y. David Scharf" <dscharf@morrisoncohen.com>,
Jared Chassen <jchassen@archcre.com>, Conferenece Line 1078 <1078@archcre.com>, Frank
van Biesen <fvanbiesen@35OAK.com>, Charles Dreezer <cdreezer@35oak.com>, Tristan Last
<tlast@archcre.com>, "Pollack, Gayle" <gpollack@morrisoncohen.com>
Subject: Re: Nostrand

EXTERNAL

[EXTERNAL EMAIL]

No, and no.

10 PM is an unreasonable time when we were ready willing and able to have a call at 2 PM when
your guy was a dick like usual.  Then 6 PM is offered or tomorrow morning .  Talk about sense
of urgency, David told me has gone through all these parts and pieces with Brad, so this is just a
waste of time.  So no, appeasing your needs when you've been informed, at 10 PM, is not
something I'm willing to do for my own sanity. Have a good night.


JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone


> On Aug 1, 2023, at 8:31 PM, Michael Wiener <MWiener@35oak.com> wrote:

> Given the time sensitivity, maybe someone from the Arch team can join so we
> can go ahead with the call?

> Alternatively would you object to us having a call directly with David in our
> capacity as guarantor so that we can ask him questions directly?

> Thanks,

**From:** jsimpson@archcre.com
**Sent:** August 1, 2023 8:23 PM
**To:** MWiener@35OAK.com
**Cc:** kwiener@35oak.com; dscharf@morrisoncohen.com; jchassen@archcre.com; 1078@archcre.com; fvanbiesen@35OAK.com; cdreezer@35oak.com; tlast@archcre.com; gpollack@morrisoncohen.com
**Subject:** Re: Nostrand

**EXTERNAL**

[EXTERNAL EMAIL]

No thanks

JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

> On Aug 1, 2023, at 8:22 PM, Michael Wiener
> <MWiener@35oak.com> wrote:
>
> We on for 10pm?
>
> **From:** MWiener@35OAK.com
> **Sent:** August 1, 2023 7:13 PM
> **To:** kwiener@35oak.com; dscharf@morrisoncohen.com; jchassen@archcre.com
> **Cc:** 1078@archcre.com; fvanbiesen@35OAK.com; cdreezer@35oak.com; tlast@archcre.com; gpollack@morrisoncohen.com; jsimpson@archcre.com
> **Subject:** Re: Nostrand
>
> Works for me
>
> **From:** kwiener@35oak.com
> **Sent:** August 1, 2023 7:08 PM
> **To:** dscharf@morrisoncohen.com; MWiener@35OAK.com; jchassen@archcre.com
> **Cc:** 1078@archcre.com; fvanbiesen@35OAK.com; cdreezer@35oak.com; tlast@archcre.com; gpollack@morrisoncohen.com; jsimpson@archcre.com
> **Subject:** RE: Nostrand
>
> I can do that
>
> Sent from my Galaxy

4

Case 1:23-cv-07089-AT   Document 1-4   Filed 08/10/23   Page 6 of 10

-------- Original message --------
From: "Y. David Scharf" <dscharf@morrisoncohen.com>
Date: 2023-08-01 4:04 p.m. (GMT-08:00)
To: Michael Wiener <MWiener@35OAK.com>, Kevin Wiener
<kwiener@35oak.com>, Jared Chassen <jchassen@archcre.com>
Cc: Conferenece Line 1078 <1078@archcre.com>, Frank van Biesen
<fvanbiesen@35OAK.com>, Charles Dreezer <cdreezer@35oak.com>,
Tristan Last <tlast@archcre.com>, "Pollack, Gayle"
<gpollack@morrisoncohen.com>, Jeffrey Simpson
<jsimpson@archcre.com>
Subject: RE: Nostrand

EXTERNAL
[EXTERNAL EMAIL]


10 pm?


**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 | C: 917.754.0484 | F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com


**From:** Michael Wiener <MWiener@35OAK.com>
**Sent:** Tuesday, August 1, 2023 7:01 PM
**To:** Y. David Scharf <dscharf@morrisoncohen.com>; Kevin Wiener
<kwiener@35oak.com>; Jared Chassen <jchassen@archcre.com>
**Cc:** Conferenece Line 1078 <1078@archcre.com>; Frank van Biesen
<fvanbiesen@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>;
Tristan Last <tlast@archcre.com>; Pollack, Gayle
<gpollack@morrisoncohen.com>; Jeffrey Simpson
<jsimpson@archcre.com>
**Subject:** Re: Nostrand

CAUTION: External sender. Verify before continuing.


Do you have any availability tonight by chance?

5

**From:** dscharf@morrisoncohen.com
**Sent:** August 1, 2023 6:58 PM
**To:** kwiener@35oak.com; jchassen@archcre.com
**Cc:** 1078@archcre.com; fvanbiesen@35OAK.com; MWiener@35OAK.com; cdreezer@35oak.com; tlast@a gpollack@morrisoncohen.com; jsimpson@archcre.com
**Subject:** RE: Nostrand

<mark>EXTERNAL</mark>
[EXTERNAL EMAIL]

I have witness prep all day. Can 730 am work?

**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 |C: 917.754.0484 |F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

---

**From:** Kevin Wiener <kwiener@35oak.com>
**Sent:** Tuesday, August 1, 2023 3:34 PM
**To:** Y. David Scharf <dscharf@morrisoncohen.com>; Jared Chassen <jchassen@archcre.com>
**Cc:** Conferenece Line 1078 <1078@archcre.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Michael Wiener <MWiener@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>; Tristan Last <tlast@archcre.com>; Pollack, Gayle <gpollack@morrisoncohen.com>; Jeffrey Simpson <jsimpson@archcre.com>
**Subject:** RE: Nostrand

Unfortunately I can't do 6. What does tomorrow look like for everyone?

Sent from my Galaxy

-------- Original message --------
From: "Y. David Scharf" <dscharf@morrisoncohen.com>
Date: 2023-08-01 12:13 p.m. (GMT-08:00)
To: Jared Chassen <jchassen@archcre.com>

6

Cc: Conferenece Line 1078 <1078@archcre.com>, Frank van
Biesen <fvanbiesen@35OAK.com>, Michael Wiener
<MWiener@35OAK.com>, Charles Dreezer
<cdreezer@35oak.com>, Kevin Wiener <kwiener@35oak.com>,
Tristan Last <tlast@archcre.com>, "Pollack, Gayle"
<gpollack@morrisoncohen.com>, Jeffrey Simpson
<jsimpson@archcre.com>
Subject: Re: Nostrand

<mark>EXTERNAL</mark>
[EXTERNAL EMAIL]

6 pm.

**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 |C: 917.754.0484 |F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

On Aug 1, 2023, at 3:05 PM, Jared Chassen
<jchassen@archcre.com> wrote:

CAUTION: External sender. Verify before continuing.

I have spoken with both parties and we would like
to reconvene for a call.

David, when do you have availability?

**Nostrand**
Scheduled: Aug 1, 2023 at 2:00 PM to 2:30 PM,
EDT
Location: 646.854.1078
Invitees: Conferenece Line 1078, fvanbiesen,
Michael Wiener, Charles Dreezer, Kevin Wiener,
Tristan Last, Pollack, Gayle, Y. David Scharf,
Jeffrey Simpson

JARED CHASSEN

Partner | Arch Companies
D 646.854.1947 | C 646.634.9955
jchassen@archcre.com | archcorealestate.com
15 West 27th Street, 6th Floor, New York, NY
10001

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its

8

attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---

# EXHIBIT 5

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH 550 METROPOLITAN AVE LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of October 2, 2019, by and between ARCH MM 550 METROPOLITAN AVE LLC, a Delaware limited liability company (together with its permitted successors and assigns, "Managing Member") and each of the other Persons party hereto (the "Non-Managing Members").

WHEREAS, the Managing Member and the Non-Managing Members (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

899777_1

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"BBA" shall have the meaning set forth in Section 5.5.1.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial book value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The book values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the partnership representative; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above need not be made if the partnership representative reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member.

2

899777_1

(C)    The book value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)    The book values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's book value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, the two days of Rosh Hashanah, Yom Kippur, the first two days of Sukkot, Shemini Atzeret, Simchat Torah, the first two days and last two days of Passover, the two days of Shavuot or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement as may be amended from time to time by the Managing Member to reflect increases and decreases thereto as set forth in this Agreement, including without limitation Section 3.2 and Section 4.2.

"Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property other than obsolete property, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"Capital Event Proceeds" shall mean the gross proceeds derived from a Capital Event less the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted reserves.

"Certificate of Formation" means that certain Certificate of Incorporation of Arch 550 Metropolitan Ave LLC, dated and filed with the Secretary of State of the State of Delaware on _____ __, 2019.

"Code" means the Internal Revenue Code of 1986, as amended.

3

"Company" means the limited liability company formed under the Act and governed by the terms of this Agreement and the Certificate of Formation.

"Contributing Member" shall have the meaning set forth in Section 3.2.2.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the partnership representative in accordance with Section 1.704-1(b)(2)(iv)(g)(3) of the Regulations.

"Dissolution Event" shall have the meaning set forth in Section 9.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excess Contributions" means Capital Contributions made pursuant to Section 3.2.2(ii) by the Managing Member unless the Non-Managing Members elect to fund their pro rata share thereof.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.2.

"First Preferred Return" means, respect to the applicable Member, the aggregate amount accrued and calculated in the same manner interest would be calculated if such Member's Unreturned Capital Contribution constituted a loan bearing interest at the rate of 12.0% per annum, cumulative and compounded annually.

"Fiscal Year" shall be as set forth in Section 10.1.

4

"Indemnifying Member" shall have the meaning set forth in Section 12.1.1.

"Indemnitee" shall have the meaning set forth in Section 12.1.2.

"Liquidating Agent" shall have the meaning set forth in Section 9.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Member Loan" shall have the meaning set forth in Section 3.2.2.

"Net Cash Flow" for any period, (a) the gross revenues of the Company and its Subsidiaries from all sources for such period (but excluding Capital Event Proceeds and Capital Contributions), *less* (b)(i) any amounts required to pay the costs and expenses of the Company and its Subsidiaries incurred for such period including, without limitation, the fees payable pursuant to Section 6.2, (ii) any debt service payments (including amortization) on any indebtedness of the Company and its Subsidiaries, (iii) any capital expenditures of the Company and its Subsidiaries and (iv) any increases in the Company's reserves, as reasonably determined by Managing Member, including reserves established for future capital expenditures, working capital or for future debt service payments (including amortization) on any Company indebtedness, *plus* (c) any released or reduced Company reserves, as reasonably determined by Managing Member.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)     items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)   any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

5

(v)    if the Book Value of any Company asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.2.

"Non-Managing Member" shall have the meaning set forth in the Preamble.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage determined by dividing such Member's aggregate Capital Contributions by the aggregate Capital Contributions of all Members.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Property" means that certain parcel of real property and the improvements situated thereon located at 550 Metropolitan Avenue, Brooklyn, New York.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Second Preferred Return" means, respect to the applicable Member, the aggregate amount accrued and calculated in the same manner interest would be calculated if such Member's Unreturned Capital Contribution constituted a loan bearing interest at the rate of 17.0% per annum, cumulative and compounded annually.

"Subsidiary" means any corporation, limited liability company or other single purpose entity, all or any of the ownership interests in which are owned directly or indirectly by the Company.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Third Preferred Return" means, respect to the applicable Member, the aggregate amount accrued and calculated in the same manner interest would be calculated if such Member's Unreturned Capital Contribution constituted a loan bearing interest at the rate of 22.0% per annum, cumulative and compounded annually.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contribution" means, with respect to the applicable Member, the amount, if any, by which the aggregate amount of the Capital Contributions made by such Member exceeds the cumulative amount of distributions to such Member pursuant to Section 5.7.2(ii).

## ARTICLE II

## ESTABLISHMENT OF THE COMPANY

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall be conducted under the name of "Arch 550 Metropolitan Ave LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates.  In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:

2.3.1.  to, directly or indirectly, acquire, own, hold, manage, maintain, finance, refinance, and otherwise deal with the Property in such manner as Managing Member shall determine, in its sole and absolute discretion (subject to Section 6.1.3); and

2.3.2.  to do any and all things which may be necessary, incidental, or convenient to carry on the business of the Company as described herein and which are permitted under the Act, all on the terms and conditions set forth herein.

7

899777_1

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at 524 Broadway, Suite 405, New York, New York 10012, or at such other place as Managing Member may designate.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation o and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Registered Office</u>.  The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by Managing Member; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

2.7.    <u>Admission of Members</u>.  Non-Managing Members and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

<div align="center">ARTICLE III</div>

<div align="center">CAPITAL CONTRIBUTIONS</div>

3.1.    <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall contribute to the Company cash the amount set forth opposite such Member's name on <u>Exhibit A</u> under the column "<u>Initial Capital Contribution</u>".

3.2.    <u>Additional Capital Contributions</u>.

3.2.1.    At any time and from time to time following the date hereof, if the Managing Member reasonably determines that the Company or any Subsidiary requires additional funds for any purpose, to the extent such funds are not obtained through borrowings, the Managing Member shall call for additional Capital Contributions by providing written notice thereof (a "<u>Capital Call Notice</u>") to the Members which notice shall set forth the amount of capital required by the Company and the use of the funds so requested.  Within ten (10) Business Days of the Capital Call Notice, then each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by such Member's Percentage Interest.

3.2.2.    If a Member fails to make its capital contribution required by <u>Section 3.2.2</u> (the "<u>Non-Contributing Member</u>"), as and when due, for any reason, and such failure

<div align="center">8</div>

899777_1

continues for two (2) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then the Member who has made its capital contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional capital contribution equal to the capital contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount"). If the Contributing Member elects to make a further additional capital contribution equal to the Failed Contribution Amount, then, subject to Section 3.2.3, the Failed Contribution Amount shall be treated as a loan from the Contributing Member to the Non-Contributing Member (a "Member Loan") followed immediately by a contribution of the Non-Contributing Member to the Company. Each Member Loan shall: (i) have an initial principal amount equal to the Failed Contribution Amount made by the applicable Contributing Member to the applicable Non-Contributing Member; (ii) bear interest at a rate of 18% per annum compounded monthly (the "Member Loan Rate"); (iii) be non-recourse to the applicable Non-Contributing Member; (iii) unless otherwise agreed to by the applicable Non-Contributing Member, be payable solely out of any distributions that would otherwise thereafter be distributable to the applicable Non-Contributing Member in accordance with Section 5.7; (iv) be secured by the Non-Contributing Member's Member Interest (and the Non-Contributing Member to which a Member Loan is made does hereby grant to each Contributing Member or other Person making such Member Loan a first priority security interest in and to all of such Non-Contributing Member's Member Interest); and (v) be repayable at any time in whole or in part without premium or penalty. Each Non-Contributing Member shall, upon request, execute such security agreements and financing statements as may from time to time be requested by the Contributing Member(s) or other Person making a Member Loan to such Non-Contributing Member to better assure the security interest in such Non-Contributing Member(s)' Member Interest granted hereby and, effective upon the making of any Member Loan, hereby irrevocably constitutes and appoints the Contributing Member(s) or other Person making such Member Loan as its true and lawful attorney-in-fact, coupled with an interest, to make, execute on behalf of the Non-Contributing Member, consent to, swear to, acknowledge, deliver, record and file such documents and instruments as may be necessary in the sole discretion of the Contributing Member(s) or other Person to confirm and render fully effective all remedies thereof in connection with such Member Loan.

3.2.3.  The Contributing Member may, by delivering a notice to the Non-Contributing Member at any time following the date that shall be one hundred eighty (180) days after the making of such Member Loan and prior to the full repayment of such Member Loan (and all accrued and unpaid interest thereon), elect to terminate such Member Loan and have the Non-Contributing Member's Percentage Interest diluted as set forth in this Section 3.2.3, with the outstanding principal amount of the Member Loan, together with the accrued and unpaid interest thereon, treated as a Capital Contribution to the Company ("Default Contribution") and the Capital Accounts of the Non-Contributing Member and the Contributing Member adjusted accordingly. If a Member Loan is converted into a Default Contribution, then as of the date of such conversion, (A) the Contributing Member will be deemed to have made a Default Contribution in the amount of 150% of the outstanding principal balance under such Member Loan, (B) the Non-Contributing Member shall be treated as receiving a distribution in the amount of 150% of the outstanding principal balance under the Member Loan which distribution shall be deemed as having repaid the Member Loan in full and (C) the Member Loan shall be deemed refunded and shall be null and void.

899777_1

3.3.    <u>Right to Lend</u>.  Notwithstanding anything in this Agreement to the contrary, if the Managing Member determines that the Company or any Subsidiary requires additional funds for any purpose and such funds are needed prior to the date on which an additional Capital Contribution is to be made, the Managing Member may lend such funds to the Company or such Subsidiary, which loan shall bear interest at 8% per annum provided that the Managing Member promptly delivers a Capital Call Notice following the making of such loan.

3.4.    <u>No Interest</u>.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.5.    <u>Return of Capital</u>.  No Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6.    <u>No Personal Liability</u>.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in <u>Section 6.6.1</u>.

<div align="center">ARTICLE IV</div>

<div align="center">CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS</div>

4.1.    <u>Capital Accounts</u>.    A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    <u>Adjustments</u>.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with <u>Section 5.1</u>) and (iv) any income and gain allocated to such Member pursuant to <u>Section 5.2</u>.  The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with <u>Section 5.1</u>), and (z) any deductions and losses allocated to such Member pursuant to <u>Section 5.2</u>.  If the Contributing Member elects to make a further additional capital contribution equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an

<div align="center">10</div>

additional amount equal to one-half of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 5.7.2(ii) in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.   Negative Capital Accounts.   No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.   Transfers.   If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.   Capital Account Balance.   Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

<div align="center">

ARTICLE V

ALLOCATIONS AND DISTRIBUTIONS

</div>

5.1.   Allocations of Net Profit and Net Loss.   After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3 hereof if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.   Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.   Regulatory Allocations.

5.2.1.   Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in

<div align="center">11</div>

Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.  This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code.  Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.  To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.  If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.  Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.  It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.  Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

12

### 5.3. <u>Tax Allocations</u>.

5.3.1.  For federal income tax purposes, except as otherwise provided in this <u>Section 5.3</u>, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to <u>Sections 5.1</u> and <u>5.2</u>.

5.3.2.  In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company asset shall take account of any variation between the adjusted basis of such Company asset for federal income tax purposes and the Book Value of such Company asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.  If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers an Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Managing Member.

5.4.  <u>Withholding</u>.  The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a Member will be paid promptly

13

to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

### 5.5. Tax Matters.

5.5.1. Partnership Representative. Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Bipartisan Budget Act of 2015 (the "BBA"), as well as for purposes of any state, local, or non-U.S. tax law. Managing Member shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the BBA. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2. Tax Elections. All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Managing Member, in its good faith discretion; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Managing Member, nor any Member, nor the Company, shall take any action inconsistent with such intent. The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Managing Member reasonably believes, will produce the most favorable tax results for the Members. The Company and the Managing Member shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3. Tax Returns. The Managing Member shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications, elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.

5.6. Section 754 Election. In the event a distribution of Company assets occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

5.7. Distributions.

899777_1

5.7.1.   The Company shall distribute Net Cash Flow to the Members, as and when determined by Managing Member but no earlier than forty-five (45) days after the end of each calendar quarter, in the following amounts and order or priority:

(i)      first, to each Member, pari passu, in accordance with their respective Percentage Interests until each Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (i) and clause (i) of <u>Section 5.7.2</u> equal to the greater of (1) such Members' First Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 25%;

(ii)     second, (x) to the Managing Member its Percentage Interests plus 10% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (ii) and clause (iii) of <u>Section 5.7.2</u> equal to the greater of (1) such Member's Second Preferred Return or (2) its aggregate Capital Contributions multiplied by 65%;

(iii)    third, (x) to the Managing Member its Percentage Interests plus 20% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (iii) and clause (iv) of <u>Section 5.7.2</u> equal to the greater of (1) such Members' Third Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 100%; and

(iv)     thereafter, (x) to the Managing Member its Percentage Interests plus 30% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests.

For the avoidance of doubt, Non-Contributing Members shall have 100% of potential distributions used to repay Member Loan prior to receiving any distributions in accordance with this Section 5.7.1.

5.7.2.   Capital Event Proceeds shall be distributed to the Members within forty-five (45) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests

(i)      first, to each Member, pari passu, in accordance with their respective Percentage Interests until each Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (i) and clause (i) of <u>Section 5.7.1</u> equal to the greater of (1) such Members' First Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 25%;

(ii)     second, to the Members on a pro rata basis in accordance with their respective Percentage Interests pari passu, until each Member (other than Non-

15

899777_1

Contributing Members) have received aggregate distributions pursuant to this clause (ii) equal to such Member's Unreturned Capital Contributions;

(iii)    third, (x) to the Managing Member its Percentage Interests plus 10% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (iii) and clause (ii) of Section 5.7.1 equal to the greater of (1) such Member's Second Preferred Return or (2) its aggregate Capital Contributions multiplied by 65%;

(iv)    fourth, (x) to the Managing Member its Percentage Interests plus 20% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (iv) and clause (iii) of Section 5.7.1 equal to the greater of (1) such Members' Third Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 100%; and

(v)    thereafter, (x) to the Managing Member its Percentage Interests plus 30% and (y) the balance to the Members pari passu, in accordance with their respective Percentage Interests.

For the avoidance of doubt, Non-Contributing Members shall have 100% of potential distributions used to repay Member Loan prior to receiving any distributions in accordance with this Section 5.7.1.

5.8.    Distributions Restricted by the Act.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

ARTICLE VI

MANAGEMENT AND OPERATIONS

6.1.    Management.

6.1.1.    The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 6.1.3 below), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform, including, without limitation, the power to:

16

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    acquire, lease, finance, pledge and dispose of all or any portion of the Property;

(iv)    enter into any contract or endorsement in the name or for the account of the Company;

(v)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(vi)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vii)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(viii)    maintain such reserves as the Managing Member deems advisable; and

(ix)    cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company.

6.1.2.    Except as otherwise provided in this Agreement, Non-Managing Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

6.1.3.    Notwithstanding anything to the contrary contained in this Agreement, the following decisions or actions by the Company or any Subsidiary (each a "Major Decision") shall be undertaken only with the prior written consent of Non-Managing Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if

17

made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Non-Managing Member if such Non-Managing Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

        (i)     acquisition of any direct or indirect interests in any real property (other than the Property);

        (ii)     filing, acquiescing to, consenting to or taking of any Bankruptcy Action;

        (iii)     merging, consolidating or other reorganization of the Company or any Subsidiary with another Person;

        (iv)     entering into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company and/or any Subsidiary on the other hand; except as provided in Section 6.2 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

        (v)     entering into any amendment or modification to this Agreement except to the extent such amendment or modification does not materially adversely effect the rights of the Non-Managing Members; and

        (vi)     causing any Subsidiary to take any of the foregoing.

    6.2.    Managing Member Fees and Expenses.

       6.2.1.  In connection with the operation of the Property, Managing Member shall cause the Company or its Subsidiary to pay the following fees to Managing Member, its Affiliate, or an affiliate of the managing Member of the Subsidiary (without duplication therefor):

        (i)     a structuring fee of $100,000 payable upon the execution of this Agreement;

        (ii)     a development fee of $500,000 payable in equal monthly draws over the time period which the Project is expected to be completed;

        (iii)     until the issuance of a temporary certificate of occupancy for the Project, a construction management fee in an amount of five percent (5%) of the gross cost of such construction project;

        (iv)     a financing fee equal to one-half of one percent (0.5%) of the principal amount of the initial financing obtained by the Company and/or its Subsidiaries in connection it the Project;

        (v)     a financing fee equal one percent (1.0%) of the principal amount of all financings secured, directly or indirectly, by the Property other than for the

initial financing obtained by the Company and/or its Subsidiaries in connection it the Project; and

(vi)   an asset management fee of either (x) if the residential component of the Property is being marketed as condominium units, $5,000 per month commencing sixty (60) days prior to anticipated issuance of a temporary certificate of occupancy for the Project or (y) if the residential component of the Property is being marketed as rental units, two percent (2%) of gross income from the residential component of the Property;

(vii)   a marketing fee not to exceed six percent (6%) of the gross sales price of such condominium unit;

(i)   if the residential component of the Property is being marketed as rental units, a property management fee, when added to any third-party property management fee paid for such residential units, not to exceed five percent (5%) of gross income from the residential component of the Property.

6.2.2.   The Company shall reimburse the Managing Member and its direct and indirect members whose sole purpose is to hold or manage another entity whose sole purposes is to invest, directly or indirectly, in the Company, for all third party costs and expenses incurred in connection with maintaining its legal existence, filing requisite tax returns and other reasonable costs incurred by the Managing Member in connection with the Company.

6.3.   <u>Legal Title to Company Property</u>.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary of the Company.

6.4.   <u>Other Activities of Members</u>.  Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

6.5.   <u>Personal Liability</u>.  Notwithstanding anything herein to the contrary, no Member shall take any action that would result in any other Member having any personal liability for the obligations of the Company without the effected Member's written consent.

899777_1

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS;

7.1.    <u>Restrictions on Transfers of Membership Interests</u>.  No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this <u>Article VII</u> and until all requirements and conditions stated in this <u>Article VII</u>, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this <u>Article VII</u> shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

7.2.    <u>Permitted Transfers</u>.  Notwithstanding <u>Section 7.1</u>, but subject to the applicable provisions or terms of any loan to any Subsidiary or the Company, and <u>Section 7.5</u>, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, so long as such Member has provided the Managing Member with at least twenty (20) Business Days advance written notice, as follows ("<u>Permitted Transfers</u>"):

(i)    Transfers of a Member's Interest to another Member;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual by will or by laws of intestate succession, to such individual's executors, administrators, testamentary trustees, legatees or beneficiaries;

(iii)    Transfers which do not effect a change in Control of such Member; or

(iv)    Transfers consented to by the Managing Member.

7.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

20

(iii)     it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)     the transferee is a Prohibited Person;

(v)     as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)     in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

7.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)     The Transfer complies with the provisions of this Article VII;

(b)     The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)     The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

7.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 7.4</u>, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member

899777_1

upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

     7.6.   <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 7.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

<div align="center">

## ARTICLE VIII

## REPRESENTATIONS

</div>

     8.1.   <u>Representations</u>. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

     8.1.1.  other than an individual, it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

     8.1.2.  its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

     8.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

<div align="center">22</div>

8.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof;

8.1.5.  such Member is an accredited investor as such term is defined in Section 501 or Regulation D promulgated under the Securities Act of 1933, as amended; and

8.1.6.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

8.2.    Indemnity.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 8.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 8.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

## ARTICLE IX

## DISSOLUTION AND LIQUIDATION

9.1.    Dissolution.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

9.1.1.  Upon the unanimous election to dissolve by the Members; or

9.1.2.  Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article IX unless the Members otherwise unanimously agree.

9.2.    Statement of Intent to Dissolve.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the Secretary of State of Delaware.

9.3.    <u>Procedures</u>.

9.3.1.    <u>Liquidation of Assets</u>.    In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "<u>Liquidating Agent</u>") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.    In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

9.3.2.    <u>Authority of Liquidating Agent</u>.    In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

9.3.3.    <u>Distribution of Assets</u>.    Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of <u>Section 5.7.2</u>.

9.4.    <u>Termination of the Company</u>.    Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

<div align="center">ARTICLE X</div>

<div align="center">FISCAL AND ADMINISTRATIVE MATTERS</div>

10.1.    <u>Fiscal Year</u>.    The fiscal year of the Company will be the calendar year.

10.2.    <u>Checks, Drafts, Etc.</u>    All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

10.3.    <u>Books and Records</u>.    Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.    The Company's books and records will be kept at the principal place of business of Managing Member.

<div align="center">24</div>

899777_1

10.4.   Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

10.5.   Reports.

10.5.1. Within time periods set forth on Exhibit B attached hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit B, which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.  As soon as reasonably possible after the end of each Fiscal Year, the Managing Member will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

## ARTICLE XI

## CONFIDENTIALITY AND PRESS RELEASES

11.1.   Confidentiality.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

11.2.   Press Releases.  No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law.

## ARTICLE XII

## INDEMNIFICATION

12.1.   Indemnification.

12.1.1. Subject to the terms of Section 6.5, no Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("Indemnifying Member") shall have any liability to the Company or to any other Member for any loss suffered

25

by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 12.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

12.1.2. Subject to the terms of <u>Section 6.5</u>, the Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted gross negligence, fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this <u>Section 12.1.2</u> with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

12.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

12.2. <u>Exculpation/Member Indemnification</u>. Subject to <u>Section 6.5</u>, except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

## ARTICLE XIII

## MISCELLANEOUS

13.1.    Notices.

13.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A.

13.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

13.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 13.1 to the other Member.

13.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

13.2.    Attorneys' Fees.  In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation

13.3.    Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

13.4.    Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

13.5.    Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

27

LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

13.6.   Venue.   Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

13.7.   Headings.   Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

13.8.   Severability.   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

13.9.   Failure to Enforce Provision.   The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.10.   Interpretation.   All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

13.11.   Assignment.   This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.   This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

13.12.   Counterparts.   This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Arch MM 550 Metropolitan Ave LLC

By:     Jeffrey Simpson
Its:     Authorized Signatory

Address:

Initial Capital Contribution:  $465,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    608941 N.J. Inc.

Its:    CFO , SECRETARY

Address:

Initial Capital Contribution: $535,119

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:      Michael Queller

Its:      An Individual

Address:

Initial Capital Contribution:  $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By: _____
    Yuval Greenblatt

Its:    An Individual

Address:

Initial Capital Contribution:    $92,668

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Morgan Jones
Its:    An Individual

Address:

Initial Capital Contribution: $100,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Deborah Chassen

Its:    An Individual

Address:

Initial Capital Contribution: $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:     **Raquel** Jove

Its:    An Individual

Address:

Initial Capital Contribution: $20,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:     Parch LIC LLC, Adam Peldman
Its:    Member

Address:

Initial Capital Contribution:  $100,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Roger Leifer & Max Leifer Partnership

By:    _____
Roger Leifer
Its: Partner

Address:

Initial Capital Contribution: $75,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Mal

By:      Mal Jones
Its:      An Individual

Address:

Initial Capital Contribution:  $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:     David Jacobs
Its:    An Individual

AND

By:     Mary Beth Jacobs
Its:    An Individual

Address:

Initial Capital Contribution:  $25,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:     Pinkas Landau
Its:     An Individual

AND

By:     Judy Landau
Its:     An Individual

Address:

Initial Capital Contribution:  $20,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:      Hilary Gibson
Its:      An Individual

Address:

Initial Capital Contribution:  $100,000

Social Security Number/Tax ID:

Case 1:23-cv-07089-AT   Document 1-5   Filed 08/10/23   Page 43 of 47

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

      IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Glenn Harris
Its:    An Individual

Address:

Initial Capital Contribution: $154,447

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Gregg Stuart
Its:    An Individual

Address:

Initial Capital Contribution: $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:     Thomas Haughton
Its:     An Individual

Address:

Initial Capital Contribution: $100,000

Social Security Number/Tax ID:

## Exhibit A

| Member Name | Initial Capital Contribution |
|---|---|
| Arch MM 550 Metropolitan Ave LLC | $465,000 |
| 608941 NJ Inc. | $535,119 |
| Pinkas Landau & Judy Landau | $20,000 |
| Deborah Chassen | $50,000 |
| Michael Queller | $50,000 |
| Morgan Jones | $100,000 |
| Mal Jones | $50,000 |
| David Jacobs & Mary Beth Jacobs | $25,000 |
| Raquel Love | $20,000 |
| Roger Leifer & Max Leifer Partnership | $75,000 |
| Parch LIC LLC | $100,000 |
| Hilary Gibson | $100,000 |
| Gregg Stuart | $50,000 |
| Glenn Harris | $154,447 |
| Yuval Greenblatt | $92,668 |
| Thomas Haughton | $100,000 |

899777_1

<u>Exhibit B</u>

<u>Reports</u>

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

     a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

     b.      a statement of the Capital Account of each Member.

2.      Within sixty (60) days after the end of each calendar quarter, a financial report of the Company which shall include:

     a.      a statement showing distributions to the Members;

     b.      general information regarding Property operations.

899777_1

# EXHIBIT 6

| Interest | 12% |
|---|---|
| Compounding Periods per Year | 1.00 |
| As of | 4/27/2022 |
| Paydown | 1,894,126 |

**608941 MEMBER LOAN**

| | Member loan | | Years | Interest (Compounded Annually) | Interest and Principal | Interest Payment | Paydown Balance | Principal Payment | Paydown Balance | Remaining Member Loan Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| # | Amount | Date | | | | | 1,894,126 | | 1,645,846.97 | |
| 1 | 100,000.00 | 8/12/2020 | 1.7068 | 21,341 | 121,341 | 21,341 | 1,872,785 | 100,000 | 1,545,846 | - |
| 2 | 100,000.00 | 9/17/2020 | 1.6082 | 19,992 | 119,992 | 19,992 | 1,852,793 | 100,000 | 1,445,846 | - |
| 3 | 100,000.00 | 11/16/2020 | 1.4438 | 17,778 | 117,778 | 17,778 | 1,835,015 | 100,000 | 1,345,846 | - |
| 4 | 50,000.00 | 12/24/2020 | 1.3397 | 8,198 | 58,198 | 8,198 | 1,826,817 | 50,000 | 1,295,846 | - |
| 5 | 50,000.00 | 1/26/2021 | 1.2493 | 7,605 | 57,605 | 7,605 | 1,819,212 | 50,000 | 1,245,846 | - |
| 6 | 50,000.00 | 3/5/2021 | 1.1462 | 6,929 | 56,929 | 6,929 | 1,812,283 | 50,000 | 1,195,846 | - |
| 7 | 50,000.00 | 4/6/2021 | 1.0575 | 6,366 | 56,366 | 6,366 | 1,805,917 | 50,000 | 1,145,846 | - |
| 8 | 150,000.00 | 5/6/2021 | 0.9753 | 17,556 | 167,556 | 17,556 | 1,788,361 | 150,000 | 995,846 | - |
| 9 | 100,000.00 | 5/13/2021 | 0.9589 | 11,507 | 111,507 | 11,507 | 1,776,854 | 100,000 | 895,846 | - |
| 10 | 175,683.11 | 6/15/2021 | 0.8658 | 18,252 | 193,935 | 18,252 | 1,758,602 | 175,683 | 720,163 | - |
| 11 | 117,059.08 | 7/14/2021 | 0.7863 | 11,045 | 128,104 | 11,045 | 1,747,557 | 117,059 | 603,104 | - |
| 11 | 10,775.06 | 7/14/2021 | 0.7863 | 1,017 | 11,792 | 1,017 | 1,746,540 | 10,775 | 592,329 | - |
| 12 | 9,461.28 | 8/3/2021 | 0.7315 | 831 | 10,292 | 831 | 1,745,709 | 9,461 | 582,867 | - |
| 13 | 52,076.28 | 8/24/2021 | 0.6740 | 4,212 | 56,288 | 4,212 | 1,741,498 | 52,076 | 530,791 | - |
| 14 | 208,909.89 | 9/1/2021 | 0.6521 | 16,346 | 225,256 | 16,346 | 1,725,151 | 208,910 | 321,881 | - |
| 15 | 35,000.00 | 9/10/2021 | 0.6274 | 2,635 | 37,635 | 2,635 | 1,722,516 | 35,000 | 286,881 | - |
| 16 | 1,100,000.00 | 10/8/2021 | 0.5562 | 73,414 | 1,173,414 | 73,414 | 1,649,102 | 286,881 | - | 813,119 |
| 17 | 45,000.00 | 10/8/2021 | 0.5507 | 2,974 | 47,974 | 2,974 | 1,646,129 | - | - | 45,000 |
| 18 | 10,000.00 | 1/31/2022 | 0.2356 | 283 | 10,283 | 283 | 1,645,846 | - | - | 10,000 |
| **Total** | **2,613,984.76** | | | **248,280** | **2,762,245** | **248,280** | | **1,645,846** | | **868,119** |

| Total Int and principal to date | 2,762,244.75 | |
|---|---|---|
| Paydown of Interest | (248,280.05) | |
| Paydown of Principal | (1,645,845.97) | |
| Remaining | 868,118.73 | |
| | | |
| AOI to 608941 | 1,500,000.00 | 1,748,280.05 |
| Remainder to WW trust | 394,126.03 | |
| total distributed | 1,894,126.03 | TRUE | 145,845.97 |

| | | | | | | | 884,101.62 |
|---|---|---|---|---|---|---|---|
| Final payment re member | 868,118.73 | 6/22/2022 | 0.1534 | 15,982.90 | 884,102 | 15,983 | 868,118.72 |

# EXHIBIT 7

From: Bottini, Ashlinn
To: Bottini, Ashlinn
Subject: FW: Myrtle
Date: Monday, August 7, 2023 11:04:41 AM
Attachments: image001.png

---

**From:** Tristan Last <tlast@archcre.com>
**Sent:** Tuesday, August 1, 2023 4:29 PM
**To:** Kevin Wiener <kwiener@35oak.com>; Frank van Biesen <fvanbiesen@35OAK.com>; Michael Wiener <MWiener@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>; Michelle Miller <mmiller@archcre.com>
**Subject:** RE: Myrtle

**EXTERNAL**
[EXTERNAL EMAIL]

All –

Please see attached for the formal capital calls and the executed letter agreement (inclusive of our accepted comments). Please note that Madison required that we true up their third party consultant and servicing fees ($25,075) in addition to the previously circulated $2.09mm of immediate uses for the property. Please send your wire for $1,115,075.00 as soon as possible so that we can get funding released from Madison.

Best,

**TRISTAN LAST**
Managing Director
--
O 646.854.7102 / C 347.931.2594
tlast@archcre.com · archcorerealestate.com
88 University Place, 11ᵗʰ Floor, New York, NY 10003
*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



---

**From:** Tristan Last
**Sent:** Monday, July 31, 2023 8:01 PM
**To:** Kevin Wiener <kwiener@35oak.com>; fvanbiesen <fvanbiesen@35oak.com>; Michael Wiener <MWiener@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>; Michelle Miller <mmiller@archcre.com>
**Subject:**

Up to this point, the relationship between us and Doug has been largely governed by friendliness and trust so a formal capital call was not issued. The increase in the budget was disclosed on the monthly reports (see attached examples) along with the written disclosure that funds were being contributed to the deal above and beyond the original budget and would need to continue to do so in the future. I also went over the ACR with him in our office earlier this summer.

A summary of the budget discussion in the reports is below:

| Report Date | Distribution Date | Budget Amount | Delta from Prior Report | Language on Budget |
|---|---|---|---|---|
| September 2022 | 11/28/2022 | 150,371,880.46 | 0.00 | The budget is currently under re-evaluation after the stop work order that took place earlier this year. Updated figures will be reflected once the analysis is complete which is expected shortly after year-end. |
| March 2023 | 3/21/2023 | 153,216,046.28 | 2,844,165.82 | Management is currently reevaluating the project budget based on current market conditions.<br>• Given rising interest rates, the development's debt service requirements have increased, and the loan's reserves toward it have been fully drawn.<br>• Soft costs have increased, specifically for insurance premiums and tax consultancy fees. Soft cost savings opportunities in the budget are currently being explored and are anticipated to offset a majority of potential overages, however the loan's reserves toward soft costs have been fully drawn.<br>• Currently there have been no formal change orders or hard costs. Management is working to continue to keep costs in line with current budget.<br>As a result of the above, additional equity has been and will continue to be required to get the project to TCO. Updated cost projections are anticipated to be completed by end of March 2023. |
| April 2023 | | 154,563,709.14 | 1,347,662.86 | Management is currently reevaluating the project budget based on current market conditions.<br>• Management continues seeking additional soft cost savings opportunities and has largely seen the budget tracking with estimated revised projections.<br>• Given rising interest rates, the development's debt service requirements have increased, and the loan's reserves toward it have been fully drawn.<br>• Soft costs have increased, specifically for insurance premiums and tax consultancy fees. Soft cost savings opportunities in the budget are being explored and are anticipated to offset a majority of potential overages, however the loan's reserves toward soft costs have been fully drawn.<br>The team continues to work on estimating cost projections through project completion |

**TRISTAN LAST**
Managing Director
--
O 646.854.7102 / C 347.931.2594
tlast@archcre.com · archcorerealestate.com
88 University Place, 11ᵗʰ Floor, New York, NY 10003
*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



---

**From:** Kevin Wiener <kwiener@35oak.com>
**Sent:** Monday, July 31, 2023 4:49 PM
**To:** Tristan Last <tlast@archcre.com>; fvanbiesen <fvanbiesen@35oak.com>; Michael Wiener <MWiener@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>; Michelle Miller <mmiller@archcre.com>
**Subject:** RE: Myrtle

Hi Tristan,

As previously discussed, can you please provide the documentation from the previous capital infusions to show that Doug was called and defaulted so that there's no possible claim from him that the money isn't a member loan? Alternatively we would want some kind of acknowledgment from Doug that those funds are member loans that come ahead of his distributions.

For this infusion we would similarly want copies of the LP capitals calls going out with our GP capital calls so the GP can make the short term-loan to the LPs and then convert it to a member loan when there is a default at the LP level.

Obviously we have no desire to push back the cash from Madison but we did request this several days ago.

Kevin

Sent from my Galaxy

-------- Original message --------
From: Tristan Last <tlast@archcre.com>
Date: 2023-07-31 1:40 p.m. (GMT-08:00)
To: Frank van Biesen <fvanbiesen@35OAK.com>, Michael Wiener <MWiener@35OAK.com>, Kevin Wiener <kwiener@35oak.com>, Charles Dreezer <cdreezer@35oak.com>
Cc: Jeffrey Simpson <jsimpson@archcre.com>, Jared Chassen <jchassen@archcre.com>, Michelle Miller <mmiller@archcre.com>
Subject: RE: Myrtle

**EXTERNAL**
[EXTERNAL EMAIL]

All –

We just heard from Madison that they will be in a position to fund $1mm tomorrow contingent on us funding our portion as well. Will you please prepare a wire for $1.09mm? I'll send a formal capital call later tonight but wanted to get you this note while the banks are still open.

The uses for this cash are attached again for reference.

Best,

**TRISTAN LAST**
Managing Director
--
O 646.854.7102 / C 347.931.2594
tlast@archcre.com · archcorerealestate.com
88 University Place, 11ᵗʰ Floor, New York, NY 10003
*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Tristan Last
**Sent:** Tuesday, July 25, 2023 6:47 PM

Case 1:23-cv-07089-AT   Document 1-7   Filed 08/10/23   Page 3 of 3

**To:** fvanbiesen <fvanbiesen@35oak.com>; Michael Wiener <MWiener@35OAK.com>; Kevin Wiener <karener@35oak.com>; Charles Dreezer <cdreezer@35oak.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>; Michelle Miller <mmiller@archcre.com>
**Subject:** FW: Myrtle

FYI - attached is what we sent to Madison today. The budget is the same one we previously circulated to them in June but simplified in the manner Madison requested. The excel shows how the next ~$2mm will be allocated.

Best,

**TRISTAN LAST**
Managing Director

D 646.864.7102 / C 347.931.2594
tlast@archcre.com . archoneralestate.com
88 University Place, 11th Floor, New York, NY 10003
*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Tristan Last
**Sent:** Tuesday, July 25, 2023 3:50 PM
**To:** Josh Zegen <josh@madisonrealtycapital.com>; Siobhan O'Sullivan <sosullivan@madisonrealtycapital.com>; Jerry Feuerstein <jfeuerstein@kandflip.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>; Y. David Scharf <dscharf@morrisoncohen.com>; Ilan Lerman, Esq. (ilan@j2legal.com) <ilan@j2legal.com>
**Subject:** Myrtle

All,

Please see attached and below for the following items:

1. Updated anticipated cost to complete (excluding TI/LC)
2. TI / LC Schedule
3. Latest Communications with Target and Burlington
4. Anticipated uses for the ~$2mm funding

Please let me know if you have any questions.

Best,

**TRISTAN LAST**
Managing Director

D 646.864.7102 / C 347.931.2594
tlast@archcre.com . archoneralestate.com
88 University Place, 11th Floor, New York, NY 10003
*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



# EXHIBIT 8

**Bottini, Aishlinn**

| | |
|---|---|
| **Subject:** | FW: Trawler/Arch/Penn Treaty Mezz Loan |
| **Attachments:** | image001.png; image001.png; image001.png; image002.gif; image003.png; image001.png; image002.gif; adjournment to 8_15 (2).DOCX |

Begin forwarded message:

> **From:** Michelle Miller <mmiller@archcre.com>
> **Date:** August 10, 2023 at 7:20:37 AM EDT
> **To:** Jared Chassen <jchassen@archcre.com>
> **Subject: Fwd: Trawler/Arch/Penn Treaty Mezz Loan**
>
>
> MICHELLE MILLER
> Partner | Arch Companies
> D  646.854.8551 | C  908.342.2355
> mmiller@archcre.com | archcorealestate.com
> 88 University Place, 2nd Floor, New York, NY 10003
>
>
> *PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*
>
> Begin forwarded message:
>
> > **From:** Jeffrey Simpson <jsimpson001@icloud.com>
> > **Date:** August 10, 2023 at 12:14:52 AM EDT
> > **To:** "Y. Scharf" <dscharf@morrisoncohen.com>, Michelle Miller <mmiller@archcre.com>
> > **Cc:** Adam Bailey <alb@alblawfirm.com>
> > **Subject: Fwd: Trawler/Arch/Penn Treaty Mezz Loan**
> >
> >
> > As mentioned previously, i can only sign this with a full indemnification, hold harmless, release from Oak and expanded to cover claims and legal if investors sue.
> >
> >
> > Jeffrey Simpson
> >
> > Sent from my iPhone
> >
> > Begin forwarded message:
> >
> > > **From:** Robert Hempstead <RHEMPSTEAD@sillscummis.com>

**Date:** August 9, 2023 at 4:30:51 PM EDT
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>, Michelle
Miller <mmiller@archcre.com>, Brian Ashin
<BAshin@kslaw.com>
**Cc:** SHauck@kelleydrye.com, Rich Spinelli
<rspinelli@trawlercap.com>, Joseph Laderer
<jladerer@trawlercap.com>, IbrahimD@gtlaw.com,
Jeffrey Simpson <jsimpson@archcre.com>,
pkurzweil@archcre.com, Josh Biel
<jbiel@archcre.com>, Oren Evenhar
<oe@evenhar.net>, "Y. David Scharf"
<dscharf@morrisoncohen.com>,
jmargolis@morrisoncohen.com, "Schwalb, Stephen"
<Stephen.Schwalb@nmrk.com>, Matthew Mannion
<mdmannion@jpandr.com>, "Rodriguez, Sandra M."
<SRodriguez@kelleydrye.com>, "Hauck, Stephen G."
<SHauck@kelleydrye.com>,
rspinelli@thirdpointres.com,
JLaderer@thirdpointres.com
**Subject: RE: Trawler/Arch/Penn Treaty Mezz Loan**

Please see the attached letter adjourning the sale to
August 15th.

Bob Hempstead
973-643-5689 (o)
201-306-0575 (c)

---

**From:** Robert Hempstead
**Sent:** Thursday, August 3, 2023 2:33 PM
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>; Michelle
Miller <mmiller@archcre.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>;
jmargolis@morrisoncohen.com; Schwalb, Stephen
<Stephen.Schwalb@nmrk.com>; Matthew Mannion
<mdmannion@jpandr.com>; Rodriguez, Sandra M.
<SRodriguez@KelleyDrye.com>; Hauck, Stephen G.
<SHauck@KelleyDrye.com>;
rspinelli@thirdpointres.com;
JLaderer@thirdpointres.com
**Subject:** RE: Trawler/Arch/Penn Treaty Mezz Loan

Please see the attached letter adjourning the sale to
August 10th.

2

Bob Hempstead
973-643-5689 (o)
201-306-0575 (c)

**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Thursday, July 27, 2023 10:31 AM
**To:** Robert Hempstead
<RHEMPSTEAD@sillscummis.com>; Michelle Miller
<mmiller@archcre.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>;
jmargolis@morrisoncohen.com; Schwalb, Stephen
<Stephen.Schwalb@nmrk.com>; Matthew Mannion
<mdmannion@jpandr.com>; Rodriguez, Sandra M.
<SRodriguez@KelleyDrye.com>; Hauck, Stephen G.
<SHauck@KelleyDrye.com>;
rspinelli@thirdpointres.com;
JLaderer@thirdpointres.com
**Subject:** RE: Trawler/Arch/Penn Treaty Mezz Loan

All - Please see the attached letter.

Jeff

**From:** Robert Hempstead
<RHEMPSTEAD@sillscummis.com>
**Sent:** Wednesday, July 19, 2023 9:56 AM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey
Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>;
jmargolis@morrisoncohen.com; Schwalb, Stephen
<Stephen.Schwalb@nmrk.com>; Matthew Mannion
<mdmannion@jpandr.com>; Rodriguez, Sandra M.
<SRodriguez@KelleyDrye.com>; Hauck, Stephen G.
<SHauck@KelleyDrye.com>;
rspinelli@thirdpointres.com;

3

JLaderer@thirdpointres.com
**Subject:** RE: Trawler/Arch/Penn Treaty Mezz Loan

Please see the attached letter.

Thank you.

Bob Hempstead
973-643-5689 (o)
201-306-0575 (c)

**From:** Robert Hempstead
**Sent:** Tuesday, June 27, 2023 10:52 AM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey
Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>;
jmargolis@morrisoncohen.com; Schwalb, Stephen
<Stephen.Schwalb@nmrk.com>; Matthew Mannion
<mdmannion@jpandr.com>; Rodriguez, Sandra M.
<SRodriguez@KelleyDrye.com>
**Subject:** Trawler/Arch/Penn Treaty Mezz Loan

Please see the attached letter.

Thank you.

Bob Hempstead
973-643-5689 (o)
201-306-0575 (c)

**From:** Robert Hempstead
**Sent:** Monday, June 19, 2023 12:30 PM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey
Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>;
jmargolis@morrisoncohen.com; Schwalb, Stephen
<Stephen.Schwalb@nmrk.com>; Matthew Mannion
<mdmannion@jpandr.com>; Rodriguez, Sandra M.

4

<SRodriguez@KelleyDrye.com>
**Subject:** Trawler/Arch/Penn Treaty Mezz Loan

Please see the attached letter.

Thank you.

Bob Hempstead
973-643-5689 (o)
201-306-0575 (c)

**From:** Robert Hempstead
**Sent:** Monday, April 17, 2023 10:07 AM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey
Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>
**Subject:** RE: Trawler/Arch/Penn Treaty Mezz Loan

Please see the attached letter.

Bob Hempstead
973-643-5689 (o)
201-306-0575 (c)

**From:** Robert Hempstead
**Sent:** Thursday, April 6, 2023 3:32 PM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey
Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>; Y. David Scharf
<dscharf@morrisoncohen.com>
**Subject:** Trawler/Arch/Penn Treaty Mezz Loan

Please see the attached letter.

**From:** Robert Hempstead
**Sent:** Friday, March 24, 2023 4:44 PM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey

5

Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

Please see the attached letter.

---

**From:** Robert Hempstead
**Sent:** Wednesday, March 15, 2023 9:50 PM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey
Gaskill <jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; IbrahimD@gtlaw.com;
jsimpson@archcre.com; pkurzweil@archcre.com; Josh
Biel <jbiel@archcre.com>; Oren Evenhar
<oe@evenhar.net>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

Please see the attached letter.

---

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Thursday, January 5, 2023 9:33 PM
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>; Robert
Hempstead <RHEMPSTEAD@sillscummis.com>; Brian
Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

## *** External Email ***

Please see attached. Thank you

**MICHELLE MILLER**
Partner
—

6

**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*


**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Thursday, January 5, 2023 4:14 PM
**To:** Michelle Miller <mmiller@archcre.com>; Robert
Hempstead <RHEMPSTEAD@sillscummis.com>; Brian
Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

Michelle — I believe we are still pending signature pages
to the mezz amendment. Can you please advise as to
status?

Thanks,
Jeff

**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Tuesday, December 13, 2022 11:26 AM
**To:** Michelle Miller <mmiller@archcre.com>; Robert
Hempstead <RHEMPSTEAD@sillscummis.com>; Brian
Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

Hi Michelle — Just checking in on the below.

Thanks,
Jeff

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Monday, December 5, 2022 5:16 PM
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>; Robert
Hempstead <RHEMPSTEAD@sillscummis.com>; Brian
Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

7

**\*\*\* External Email \*\*\***

Hi Jeff – I have some of the signatures. Just waiting on the last ones. Sorry for the delay. Thanks

**MICHELLE MILLER**
**Partner**
—
**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*

---

**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Monday, December 5, 2022 9:43 AM
**To:** Michelle Miller <mmiller@archcre.com>; Robert Hempstead <RHEMPSTEAD@sillscummis.com>; Brian Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli <rspinelli@trawlercap.com>; Joseph Laderer <jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan Agreement

Hi Michelle – Just following up on the below. Can you please send us the borrower's signatures?

Thanks,
Jeff

---

**From:** Jeffrey Gaskill
**Sent:** Thursday, November 17, 2022 10:23 AM
**To:** Michelle Miller <mmiller@archcre.com>; Robert Hempstead <RHEMPSTEAD@sillscummis.com>; Brian Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli <rspinelli@trawlercap.com>; Joseph Laderer <jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan Agreement

Hi Michelle – We just wanted to check in on the signatures to the mezz amendment.

Thanks,
Jeff

8

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Wednesday, November 9, 2022 2:24 PM
**To:** Robert Hempstead
<RHEMPSTEAD@sillscummis.com>; Jeffrey Gaskill
<jgaskill@sillscummis.com>; Brian Ashin
<BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

## *** External Email ***

Hi Bob,

The senior amendment has been executed. I'm just
working on collecting signatures for the mezz. Will try to
get you a timing update.

Thanks!

**MICHELLE MILLER**
Partner
—
**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*

**From:** Robert Hempstead
<RHEMPSTEAD@sillscummis.com>
**Sent:** Wednesday, November 9, 2022 10:16 AM
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>; Brian
Ashin <BAshin@KSLAW.com>; Michelle Miller
<mmiller@archcre.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

Just checking in. Has this been executed? And has the
senior loan amendment been executed?

Please advise.

Thanks

Bob

**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Monday, November 7, 2022 10:30 AM
**To:** Brian Ashin <BAshin@KSLAW.com>; Michelle Miller
<mmiller@archcre.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; Robert Hempstead
<RHEMPSTEAD@sillscummis.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan
Agreement

Thanks Brian – Attached is a PDF of the signature pages.
Can you please have three sets executed and returned
to my attention at the address below?

Jeff

**Jeffrey Gaskill**
Of Counsel

website | vCard | newsroom | email

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5511 | f (973) 643-6500 map

**From:** Brian Ashin <BAshin@KSLAW.com>
**Sent:** Monday, November 7, 2022 10:11 AM
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>; Michelle Miller <mmiller@archcre.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli <rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; Robert Hempstead <RHEMPSTEAD@sillscummis.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan Agreement

## *** External Email ***

Jeff,

Thank you for providing the draft Amendment to the Mezz Loan Agreement. We believe
this document is in final form. Can you please provide us with signature pages? We are
going to chase down signatories to get this signed up in short order.

Regards,
Brian

10

**Brian E. Ashin**
*Partner*

T: +1 202 626 2380 | M: +1 202 255 9933 | E: bashin@kslaw.com

kslaw.com

---

**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Friday, November 4, 2022 2:21 PM
**To:** Michelle Miller <mmiller@archcre.com>; Brian Ashin <BAshin@KSLAW.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli <rspinelli@trawlercap.com>; Joseph Laderer <jladerer@trawlercap.com>; Robert Hempstead <RHEMPSTEAD@sillscummis.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan Agreement

CAUTION: **MAIL FROM OUTSIDE THE FIRM**

Hi Michelle – Oren and John are guarantors on the mezz loan to the extent any guaranteed obligations are caused by events occurring prior to October 15, 2020.

Jeff

---

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Friday, November 4, 2022 1:57 PM
**To:** Jeffrey Gaskill <jgaskill@sillscummis.com>; bashin@kslaw.com
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli <rspinelli@trawlercap.com>; Joseph Laderer <jladerer@trawlercap.com>; Robert Hempstead <RHEMPSTEAD@sillscummis.com>
**Subject:** RE: Penn Treaty - Amendment to Mezz Loan Agreement

# *** External Email ***

---

Thanks Jeff! Why have Oren Evan-Har and John Damascus been added signatories?

**MICHELLE MILLER**
**Partner**
—

**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

11

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*

**From:** Jeffrey Gaskill <jgaskill@sillscummis.com>
**Sent:** Friday, November 4, 2022 11:28 AM
**To:** bashin@kslaw.com; Michelle Miller
<mmiller@archcre.com>
**Cc:** SHauck@KelleyDrye.com; Rich Spinelli
<rspinelli@trawlercap.com>; Joseph Laderer
<jladerer@trawlercap.com>; Robert Hempstead
<RHEMPSTEAD@sillscummis.com>
**Subject:** Penn Treaty - Amendment to Mezz Loan
Agreement

All,

Please see attached for a draft of the Amendment to
the Mezz Loan Agreement, along with a redline against
the mortgage loan amendment.

Please note that this is subject to mezz lender's review
and approval.

Please let me know if you have any questions.

Thanks,
Jeff

**Jeffrey Gaskill**
Of Counsel

**website | vCard | newsroom | email**

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5511 | f (973) 643-6500 **map**

NOTICE: The contents of this email and any attachments to it contain confidential and/or legally privileged information from the law firm of Sills Cummis & Gross P.C. This information is only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the contained information is strictly prohibited and that the documents should be returned to this firm immediately. In this regard, if you have received this email in error, please notify us by email immediately.

**Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Sills Cummis & Gross P.C. for any loss or damage arising in any way from its use.

This email message has been scanned for viruses by Mimecast.

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise

12

Case 1:23-cv-07089-AT Document 1-8 Filed 08/10/23 Page 14 of 14

legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy
or disseminate this message or any part of it. If you have received this message in error, please notify the sender
immediately by e-mail and delete all copies of the message. Click here to view our Privacy Notice.

13

# EXHIBIT 9

608941 NJ INC.
c/o 35 Oak Holdings
35 Oak Street
Toronto, Ontario M9N 1A1

August 6, 2023

By Electronic Mail

JJ Arch LLC
c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
E-mail: jsimpson001@icloud.com
       jsimpson@archcre.com

Re:    Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC (as
       amended, modified and restated from time to time, the "**LLC Agreement**")

Ladies and Gentlemen:

Reference is made to the LLC Agreement. Capitalized terms used but not defined herein have the
meanings given to them in the LLC Agreement.

PLEASE TAKE NOTICE THAT JJ Member, through the actions of Jeffrey Simpson (the
managing member of JJ Member), has committed multiple Cause Events, including, without
limitation, willful misconduct and breach of fiduciary duty in relation to the business and affairs
of the Company and various Subsidiaries, such as, without limitation, (a) directing lawyers for
one or more Subsidiaries to stop work on extremely time sensitive matters for Jeffrey Simpson's
own personal leverage, (b) continually threatening to sabotage the business of the Company and
various Subsidiaries if Investor Member does not accede to various demands, and (c) making
various misrepresentations to Investor Member to induce Investor Member to invest in deals and
contribute additional capital to Subsidiaries. The foregoing is by no means an exhaustive list of
actual or potential Cause Events, and we reserve all rights and remedies on account thereof.

We hereby reserve all of our rights and remedies under the LLC Agreement, at law, or in equity
on account of such Cause Events, including, without limitation, (1) the right to remove JJ
Member as the "managing member" of the Company pursuant to Section 7.1.4 of the LLC
Agreement, and (2) the right to pursue against JJ Member and/or Jeffrey Simpson all of our
damages on account of such Cause Events.

4885-2033-2405 v.4

In addition, we demand that JJ Member pursue all third party consents (including, without limitation, those of lenders and investors) necessary for Investor Member to remove JJ Member as the "managing member" of the Company pursuant to Section 7.1.4 of the LLC Agreement.

In any event, Investor Member reserves all rights and remedies under the LLC Agreement, at law, or in equity.

Very truly yours,

608941 NJ INC.

By: _____

Name: Michael Wiener

Title: ASO

cc:    Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention: David J. Heymann, Esq.
Email: dheymann@meltzerlippe.com

Jared Chassen, JJ Arch LLC
Email: jchassen@archcre.com

Len Breslow, Esq., Breslow & Walker, LLP
Email: lbreslow@breslowwalker.com

4885-2033-2405 v.4

# EXHIBIT 10

| From: | Bottini, Aishlinn |
| --- | --- |
| To: | Bottini, Aishlinn |
| Subject: | FW: Meeting Recap |
| Date: | Monday, August 7, 2023 2:06:44 PM |
| Attachments: | image001.png |

**From:** jsimpson@archcre.com
**Sent:** July 13, 2023 11:39 PM
**To:** mmiller@archcre.com
**Cc:** fvanbiesen@35OAK.com; cdreezer@35oak.com; MWiener@35OAK.com; BWiener@35oak.com; tlast@archcre.com; jchassen@archcre.com
**Subject:** Re: Meeting Recap

**EXTERNAL**
[EXTERNAL EMAIL]

Oak team,

Many of the issues discussed in this recap have not been addressed or taken seriously.  Oak's lack of clarity or commitment to living up to obligations, even at a corporate level have caused deterioration, or inability to hire, and will cause liability surrounding payroll exposure that I will no longer take without firm commitment.   If we don't hear commitments regarding payroll on absolute terms, pursuant to the executed Agreement, we will be left with no choice, other than terminating all folks that are not covered by the cash fees that are currently being generated.  That group of people remaining will not be sufficient to fulfill obligations under the requirements of our third party equity partnership and loan documents.  I will not take on the personal obligation and liability of payroll when we have a partner that has explicit right to do so in their agreements, regardless if they feel good about it or not.

Since I have asked for commitment several  times in writing and verbally and have not received it, I will work with our HR team starting tomorrow morning to see about the termination plan that will be effective by Friday.

PS - In the US, it is a federal crime for not paying payroll, it breaks all corporate vails and goes to the individual person.


JEFFREY SIMPSON
Managing Partner | Arch Companies
D 646.854.6810 | C 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Jun 21, 2023, at 1:44 PM, Michelle Miller <mmiller@archcre.com> wrote:

Thank you for taking the time to meet last week. We know it had its rough patches and miscommunications, but sometimes that is required in long-term relationships and as they say, those things that don't kill us make us stronger!

We want to take a few minutes to recap high-level what we believe next steps are across the portfolio.

Brown - there is plenty of separate communications that deals with this matter. We are on the same page and there will be a capstone email I will send to close the loop.

New York Development

Myrtle - everyone was in agreement that we need to move quickly.   After Monday's calls, we know that your counsel is trying to catch up to speed quickly and we sent a revised Madison proposal for your review.  Charles followed up with several information requests yesterday and we have turned that information back as quickly as possible. Charles, Frank, and Tristan are scheduling a time to connect this afternoon on any remaining questions. David Scharf is in the process of coordinating a meeting with Madison.

A lot of discussion was given around pref and the waterfall.  We understand its importance and that this is work in progress.

There are several ancillary items that we are bringing you up to speed on which includes the ground lessor and Target.  Background materials for these two topics were provided to Brad. I don't think we had time to give you color on Meir's additional collateral properties, but we should do that at some point.

Bushwick – A more in-depth analysis was reviewed, and we believe that you were checking your treasury as to how to move forward quickly. We are going to send a separate email with immediate next steps

Nostrand - we forwarded you the court's order that the master tenant turn over information and keys to the receiver. We are still waiting on next steps with the referee.

There was a lot of discussion about a recap, and we don't know if the proposal with ACRE is approved to proceed or not, simultaneous to other processes.  We do see signing up Acre as a good step for getting additional support for Myrtle and Nostrand as we work through next steps with our lender (Madison for both) on those deals>

Multifamily- we shared with you how to shift the business model back from direct management to third-party and why that will work better.
We all discussed cash needs, and the circumstances with our other partners there.  These are not as much of a fire drill, but need attention as we all know.

Columbia – we will continue down the current path of working to stabilize tenancy and renovations. We will continue to capital call Drake for their portion of amounts due

Birmingham - we will continue down the current path of working to stabilize tenancy and renovations. We will call for capital monthly

Tuscaloosa – income is currently covering expenses so no need to discuss further at the moment. We will keep the team updated on performance and getting traction back on leasing and increasing occupancy

Forestdale – income is currently covering expenses so no need to discuss further at the moment. We will keep the team updated on delinquency and occupancy

Melrose – we currently have enough operating and CapEx funds for the next few months so we will revisit

Office

88 University - We're hopeful that Adam Neumann is taking the 11th floor and that additional lease will be helpful to both the property's cash flows and the lender's flexibility to let Arch out of its lease on the 11th floor.  Adam Neumann's family office is aware that Arch would need to be bought out of funds it invested in the floor which would also be a significant help to corporate cash flows.  Other leasing initiatives continue in the background of these discussions

Cambridge – As discussed, there is not much we can do until this property hits special servicing later this year.

Corporate

We discussed the corporate structure and the arrangement that we have amongst parties, inclusive of payroll and five-year exclusivity.   We have reviewed the documents that governs the relationship with Frank more recently, but if you'd like to review it again, please let us now.

There was discussion of a change that JJ had to start reimbursing for payroll, but we all agreed that was not a solution. Rather, Arch will present a budget more periodically so that 35 Oak can always be in the mix on where the payroll and budget is going forward.  If applicable, we will also share how much of each employee's time is allocated to the existing properties versus others that may not be related to Oak in the future. Our belief is that the current document does not require any changes to reflect the above. In addition, we need to finalize the path to covering the JJ minimum payments.

There was discussion of the Pittsburgh situation which we are aware is an open item and will need to be resolved in the future.

Please let us know if you have anything that you think should be added or clarified on the list above.


**MICHELLE MILLER**
Partner
—
**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003
*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



# EXHIBIT 11

| | |
|---|---|
| **From:** | Bottini, Aishlinn |
| **To:** | Bottini, Aishlinn |
| **Subject:** | FW: Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice |
| **Date:** | Sunday, August 6, 2023 8:16:25 PM |
| **Attachments:** | image001.png |
| | Notice JJ Arch.pdf |

**From:** Jeffrey Simpson <jsimpson001@icloud.com>
**Sent:** Sunday, August 6, 2023 4:30 PM
**To:** Jared Chassen <jchassen@archcre.com>
**Cc:** Lavender, Brad <Brad.Lavender@haynesboone.com>; DHeymann@meltzerlippe.com; Len Breslow <LBreslow@breslowwalker.com>; Kevin Wiener <kwiener@35oak.com>; Michael Wiener <MWiener@35oak.com>; Thorne, Leslie <Leslie.Thorne@haynesboone.com>; Silberstein, Andrew <Andrew.Silberstein@haynesboone.com>
**Subject:** Re: Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice

> **EXTERNAL:** Sent from outside Haynes and Boone, LLP

How convenient that a second non-manager sends a letter out minutes after the first, good attempt to try and deflect your non compliance and collusive efforts.

I will run the business that I am authorized to run, and you will all stand down. If you feel differently, you can go to court and pursue injunctive relief.   That's how it works in New York State, you all know that.  If you need the authorities to tell you that, no problem. We will have all the documents ready to go at the open of business tomorrow to show the police if you try to continue your coup.

Further attempts to sabotage this will be part of the claim that you will undertake and further deteriorate the business that we built.

My email will need to be restored immediately.  Just so you know, Jared does not even have the authority to engage in the IT agreement so I guess we will be in court in the morning to deal with this if it's not resolved, immediately.   You guys are really playing with fire.

PS - I don't need a cause to remove Jared, I have the authority give him zero at any time, read the documents.  He has no substantial control - never did,  never will, and isn't competent to.


JEFFREY SIMPSON
Managing Partner | Arch Companies
D 646.854.6810 | C 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003


Sent from my iPhone

Jeffrey Simpson

Sent from my iPhone

On Aug 6, 2023, at 4:59 PM, Jared Chassen <jchassen@archcre.com> wrote:

Re:    Limited Liability Company Operating Agreement of JJ Arch LLC (as amended, modified and restated from time to time, the "**LLC Agreement**")

Ladies and Gentlemen:

Please see the attached Cause Event notice, which I am sending under the LLC Agreement on behalf of JJ Arch LLC

Thank you,

**JARED CHASSEN**
Partner
—
**D** 646.854.1947 | **C** 646.634.9955
jchassen@archcre.com | archcorealestate.com
88 University Place, 2ⁿᵈ Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



# EXHIBIT 12

## Bottini, Aishlinn

| | |
|---|---|
| **To:** | Bottini, Aishlinn |
| **Subject:** | FW: AREH Brown Consent |
| **Attachments:** | image001.png; Arch Real Estate Holdings LLC - unlilateral consent 4891-0532-2098 v.2-1.pdf |


-------- Original message --------
From: Jeffrey Simpson <jsimpson@archcre.com>
Date: 2023-07-26 10:34 p.m. (GMT-05:00)
To: Kevin Wiener <kwiener@35oak.com>
Cc: Charles Dreezer <cdreezer@35oak.com>, Michelle Miller <mmiller@archcre.com>, Michael Wiener
<MWiener@35OAK.com>, Frank van Biesen <fvanbiesen@35OAK.com>, Jared Chassen <jchassen@archcre.com>,
Tristan Last <tlast@archcre.com>
Subject: Re: AREH Brown Consent


**EXTERNAL**

**[EXTERNAL EMAIL]**

All rejected.

Since you won't accept any responsibility for your actions, a very remarkable attribute that I can't believe your father is
watching, we will go to every investor and get them to consent, and if they want to pursue remedies, we will find out
right now.

This is not a new topic it was brought up two months ago, so I'm happy that the "silver spoon" mentality that exists
amongst you and your brother makes you think that you can strong arm me to take a liability for your failures , the
answer is it will not happen.

The closing is not ready for tomorrow, everyone in the transaction knows that.

I caution you again to this behavior, you continue to cause issues and lack of trust for everyone involved in a portfolio
that's $500 million with a $50 million investment.

All rights reserved.


**JEFFREY SIMPSON**
**Managing Partner | Arch Companies**
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone


On Jul 26, 2023, at 8:50 PM, Kevin Wiener <kwiener@35oak.com> wrote:

1

Hi Jeff,

Please find attached an executed Major Decision consent. In our view there is nothing else preventing you as managing member from completing the transaction. If there is anything required by the lender then please advise ASAP.

If Arch nonetheless fails to cause the subsidiary to consummate the transaction we will hold you and JJ liable for any losses we experience and reserve all our rights, including the declaration of a cause event.

I'm not going to comment on your allegations about how we got to this point except to say that we disagree with them and that the path we are on right now is one that we mutually agreed on after it became clear that it would cost more to carry the property than we would ever realistically get out of a sale down the line.

I look forward to your confirmation that the deal will go ahead as previously discussed and now that you have our Major Decision approval.

Kevin

Sent from my Galaxy

-------- Original message --------
From: Jeffrey Simpson <jsimpson@archcre.com>
Date: 2023-07-26 6:45 p.m. (GMT-05:00)
To: Kevin Wiener <kwiener@35oak.com>
Cc: Charles Dreezer <cdreezer@35oak.com>, Michelle Miller <mmiller@archcre.com>, Michael Wiener <MWiener@35OAK.com>, Frank van Biesen <fvanbiesen@35OAK.com>, Jared Chassen <jchassen@archcre.com>, Tristan Last <tlast@archcre.com>
Subject: Re: AREH Brown Consent

EXTERNAL

[EXTERNAL EMAIL]

You are the guarantor (limited ) on the loan!  I guess this doesn't mean anything to you.

The investors were all told that our Investor Member could cover capital calls, that is why there is a dilution mechanism.  If this isn't relevant to you, speak with your father and Frank.

JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Jul 26, 2023, at 6:38 PM, Kevin Wiener <kwiener@35oak.com> wrote:

Hi Jeff I've reviewed the relevant OAs several times and I can't find which provision we allegedly failed our funding obligations on. Can you please specify?

Sent from my Galaxy

-------- Original message --------
From: Jeffrey Simpson <jsimpson@archcre.com>
Date: 2023-07-26 6:17 p.m. (GMT-05:00)
To: Kevin Wiener <kwiener@35oak.com>, Charles Dreezer <cdreezer@35oak.com>, Michelle Miller <mmiller@archcre.com>, Michael Wiener <MWiener@35OAK.com>, Frank van Biesen <fvanbiesen@35OAK.com>
Cc: Jared Chassen <jchassen@archcre.com>, Tristan Last <tlast@archcre.com>
Subject: RE: AREH Brown Consent

**EXTERNAL**
[EXTERNAL EMAIL]

Below

**From:** Kevin Wiener <kwiener@35oak.com>
**Sent:** Wednesday, July 26, 2023 6:04 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>; Charles Dreezer <cdreezer@35oak.com>; Michelle Miller <mmiller@archcre.com>; Michael Wiener <MWiener@35OAK.com>; fvanbiesen <fvanbiesen@35oak.com>
**Cc:** Jared Chassen <jchassen@archcre.com>; Tristan Last <tlast@archcre.com>
**Subject:** RE: AREH Brown Consent

Hi Jeff,

I'm not sure what you find objectionable about the changes, they seemed reasonable from our end. If there are particular issues you have, please let us know; I'm sure we can get to something mutually agreeable.

WE DON'T AGREE

My understanding is you don't need our ratification under the OA for any acts other than the Major Decision, so if you'd prefer we can just send a document indicating that we consent to the major decision and recognize that you have existing rights as managing member under the OA to put the major decision into effect.

SURE, BUT THAT ISN'T SUFFICIENT. WE RAISED THIS WITH MICHAEL AND FRANK WEEKS AGO, HAPPY THAT YOU ARE NOW JUMPING IN AS IF NOTHING HAS HAPPENED PRIOR TO YOUR INVOLVEMENT.

But it does not look like any of the provisions you are disputing are something required by the lender. From our perspective, it's wholly inappropriate to hold this deal hostage

3

to force us to agree to unreasonable blanket ratifications to better your internal position.

IT IS REQUIRED BY US.  YOU GUYS REFUSED TO FUND WITH GAURANTEES.  WE ASKED FOR AN INDEMNITY AND PULLED BACK AS THAT WAS OBJECTIONABLE TO YOU.  THIS IS THE BEST I AM GOING TO DO.

If you are unwilling to at least negotiate mutually agreeable language in good faith such that 35 Oak suffers damages, I hope you understand that we will hold JJ, and you personally, liable for those damages and moreover reserve the right to treat such conduct as a cause event under our Operating Agreement.

NO, I DON'T AGREE AND YOU HAVE NO RIGHT TO DO SO.  YOU DIDN'T DO YOUR PART AS THE INVESTOR MEMBER, YOU WILL TAKE ON THE OBLIGATIONS OF THOSE RISKS.  YOU COULD HAVE FUNDED THROUGH THIS BUT YOU CAUSED THE DEFAULT BECAUSE OF YOUR SHORT TERM BUSINESS TRAJECTORY AND LACK OF LIQUIDITY.

As I've said before, we don't want to fight, but we do not negotiate with a gun to our head.

THE NEGOTIATION HAS BEEN THERE ON THIS FOR WEEKS, YOU WERENT INVOLVED.  I CAN JUST GO BACK TO ASKING FOR THE INDEMNITEE.  YOU GOT WHAT I AM GOING TO GIVE.  IF YOU DON'T LIKE IT HAVE YOUR ATTORNEY CALL MINE.

Kevin

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Wednesday, July 26, 2023 5:08 PM
**To:** Charles Dreezer <cdreezer@35oak.com>; Michelle Miller <mmiller@archcre.com>; Kevin Wiener <kwiener@35oak.com>; Michael Wiener <MWiener@35OAK.com>; Frank van Biesen <fvanbiesen@35OAK.com>
**Cc:** Jared Chassen <jchassen@archcre.com>; Tristan Last <tlast@archcre.com>
**Subject:** RE: AREH Brown Consent

EXTERNAL
[EXTERNAL EMAIL]

All changes are hereby rejected.

**From:** Charles Dreezer <cdreezer@35oak.com>
**Sent:** Wednesday, July 26, 2023 4:47 PM
**To:** Michelle Miller <mmiller@archcre.com>; Kevin Wiener <kwiener@35oak.com>; Michael Wiener <MWiener@35OAK.com>; fvanbiesen <fvanbiesen@35oak.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>; Tristan Last <tlast@archcre.com>
**Subject:** RE: AREH Brown Consent

Hi Michelle,

We've tightened up the language a bit to make it clearer what we are approving. Please let us know whether you're ok with the changes and we'll circulate an executed version.

4

Thanks,
Charlie

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Wednesday, July 26, 2023 1:56 PM
**To:** Kevin Wiener <kwiener@35oak.com>; Michael Wiener <MWiener@35OAK.com>;
Charles Dreezer <cdreezer@35oak.com>; Frank van Biesen <fvanbiesen@35OAK.com>
**Cc:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>;
Tristan Last <tlast@archcre.com>
**Subject:** AREH Brown Consent

EXTERNAL
[EXTERNAL EMAIL]

Hi All,

Please find the attached AREH consent for Brown that is needs to be executed in
conjunction with the assignment. Let me know if you have any questions.

Thanks

**MICHELLE MILLER**
Partner

—

**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*

**From:** Jeffrey Simpson
**Sent:** Saturday, August 5, 2023 12:31 PM
**To:** Jared Chassen <jchassen@archcre.com>; Jaredchassen@gmail.com
**Cc:** David Heymann <DHeymann@meltzerlippe.com>; Len Breslow <LBreslow@breslowwalker.com>
**Subject:** Jared Chassen - Resignation of JJ Arch LLC

Jared,

Please be advised that pursuant to the Cause and Resignation section of the Arch Real Estate Holding LLC, JJ Arch LLC, and associated amendments, you have been hereby forced to resign as a Member. Your duties as it relates to the business are diminished to 0% as you are no longer a Member pursuant to section 7.5 (a) of the JJ Arch LLC Agreement. This e mail shall be construed as notice pursuant to the Agreement.

You are hereby guided that you are not affiliated with the business (and affiliates) effective immediately. All communications or inquiries that you receive shall be directed to me or my designee. It is my understanding that you have reached out to Computero (our IT people) and told them to not do anything with your e mail should I call. This is unacceptable and you do not have the authority to make those decisions. Also, they shared with me that you are the administrator of the accounts, you will need to turn that over to me immediately. Any moves of this type will be construed as further events for Cause and will require full legal intervention.

Thanks.

Jeff

All rights reserved.

**JEFFREY SIMPSON**
Managing Partner

1

RECEIVED NYSCEF: 09/15/2023

**D** 646.854.6810 | **C** 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11ᵗʰ Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



August 6, 2023

By Electronic Mail

Mr. Jeffrey Simpson

Re:     Limited Liability Company Agreement of JJ Arch LLC, dated as of December 11, 2017
        (as amended, the "**LLC Agreement**")

Dear Jeff:

Reference is made to the LLC Agreement. Capitalized terms used but not defined herein have the
meanings given to them in the LLC Agreement.

I am in receipt of your email from yesterday. I reject in total (1) all the assertions in your email
and (2) your purported forced resignation of me as a Member. You allege no conduct on my part
that would constitute a Cause Event, and no such conduct occurred. As such, I remain a Member
with all of my rights and remedies under the LLC Agreement, at law and in equity.

In fact, you are the one who has committed multiple Cause Events, including, without limitation,
willful misconduct and breach of fiduciary duty in relation to the business and affairs of the
Company, AREH and other Subsidiaries (as defined in the limited liability company agreement of
AREH), such as, without limitation, (a) directing lawyers for one or more Subsidiaries to stop
work on extremely time sensitive matters for your own personal leverage, (b) making various
misrepresentations to 608941 NJ INC. ("35 Oak") and other investors to induce them to invest in
deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for
your personal use, (d) breaching your fiduciary duty under the LLC Agreement by *inter alia* failing
to obtain my consent required for certain decisions as required under the LLC Agreement, (e)
engaging in willful misconduct as to the business and affairs of the Company, including but not
limited engaging in conduct resulting issuance by 35 Oak, the Investor Member, of the attached
notice removing the Company as Managing Member of AREH ("Investor Removal Notice"), (f)
engaging in gross negligence, which will result in material loss as to the business and affairs of the
Company, as a result of the Investor Member's issuance of the Investor Removal Notice  and (g)
the other Cause Events listed in the Investor Removal Notice. The foregoing items are not intended
to be an exclusive itemization of your misconduct providing grounds for removal but are sufficient
alone to require your Resignation.

As a result of your commission of multiple Cause Events, (1) a Resignation occurred on your part,
(2) your Company Interest has been deemed automatically redeemed by the Company for the
Redemption Amount in accordance with Section 7.5 of the LLC Agreement, and (3) you are no
longer a Member of the Company and have no right to act on behalf of the Company, any
Investment Entity, or any other Subsidiary in any capacity or in any respect.

As such, I hereby direct you to immediately refrain from taking (or purporting to take), whether directly or through any other person or entity, any action on behalf of the Company, any Investment Entity, or any other Subsidiary in any capacity or in any respect, including, without limitation, having any contact with any employee, contractor or counterparty of the Company, any Investment Entity, or any other Subsidiary. If you take, or purport to take, any such action (whether directly or through any other person or entity), then I reserve the right to exercise, and intend to exercise, all rights and remedies on account thereof, including the right to pursue damages or seek injunctive relief. For the avoidance of doubt, although this correspondence is being sent in a good faith effort to avoid litigation, any attempt by you to exercise any unauthorized rights in the membership interest by continuing your frivolous, bad faith, and legally untenable positions will constitute a further material breach of the LLC Agreement and will result in the immediate initiation of legal proceedings. Lastly, in addition to contractual damages, I will seek prejudgment interest and reimbursement of my legal fees and expenses in accordance with New York law.

For all of the forgoing reasons, please consider this correspondence as formal notice that you have Resigned as a Member by operation of the express provisions of the LLC Agreement and demand that you immediately retract, in writing, your notices to 35 Oak, employees and other third parties. Failure to do so will result in taking all legal actions necessary to enforce my rights.

This notice is not intended to set forth the full scope of my rights, remedies and claims against you (particularly in light of your bad faith actions towards me over the past forty-eight (48) hours). Accordingly, this notice should not be seen as a limitation of any additional rights I may have under related documents, and/or New York law. I reserve all rights to assert additional rights, remedies and claims against you.

In any event, foregoing is without prejudice to or waiver of any of my rights and/or remedies under the LLC Agreement, all of which are expressly reserved.

Very truly yours,

*Jared Chassen*

Jared Chassen

**JJ ARCH LLC**
88 University Place, Floor 2
New York, NY 10003

September 1, 2023

Jared Chassen
20 Connor Court
Irvington, New York

Re:     JJ ARCH LLC – Notice of Cause Events and of Forced Resignation

Dear Jared Chassen:

Please be advised that pursuant to the subdivision (ii) of the definition of "Resignation," in the Limited Liability Company Operating Agreement of JJ Arch LLC, as amended ("JJ Arch Operating Agreement"), § 1.1, you are hereby given notice of your having engaged in multiple Cause Events, as defined by the definition of "Cause Event" in JJ Arch Operating Agreement, § 1.1, and, as incorporated therein by reference, the definition of "Cause Event" in the Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC, as amended ("Arch Operating Agreement"), § 1.1. This letter shall be construed as notice of Cause Events pursuant to the JJ Arch Operating Agreement. Accordingly, pursuant to the definition of "Resignation" in the JJ Arch Operating Agreement, § 1.1, subdivision (ii), you are required to resign immediately from your position as a member of JJ Arch LLC ("JJ Arch"). In addition, pursuant to JJ Arch Operating Agreement, ¶ 7.5(a), you are not entitled to any rights as a member of JJ Arch for any period from and after the date of the Resignation effectuated by this notice. The effects of this Resignation include, but are not limited to, the diminishment of your duties, as relates to the business of JJ Arch, Arch Real Estate Holdings LLC ("Arch"), and any subsidiaries or affiliates of JJ Arch and/or Arch (collectively, the "Arch Companies"), to zero percent (0%).

As will be discussed in greater detail below, the Cause Events in which you have engaged include, but are not limited to, events that constitute "willful misconduct in relation to the business or affairs of [JJ Arch] or a subsidiary" within subdivision (i) of the definition of "Cause Event" in the Arch Operating Agreement; and "breach of fiduciary duty in relation to the business or affairs of [JJ Arch] or a Subsidiary" within subdivision (ii) of the definition of "Cause Event" in the Arch Operating Agreement; and "misappropriation of [JJ Arch] or Subsidiary funds or property" within subdivision (v) of the definition of "Cause Event" in the Arch Operating Agreement.

<u>**Cause Events**</u>

You have engaged in willful misconduct, and breached your fiduciary duties to JJ Arch and the Arch Companies and to me as a fellow member of JJ Arch, by obstructing my efforts to control the finances of the Arch Companies, even after the entry of the Court's Order Regarding Interim Operating Procedures on August 21, 2023 in *Simpson et al. v. Chassen et ano.*, Supreme Court, New York County, Index No. 158055/2023 (the "Interim Order"). To begin with, after entry of the Interim Order, you instructed an Arch Companies employee in the accounting department to

[942844/2]                                    1

refuse to take directions from me to prepare and send checks and make money transfers, from Arch Companies funds, in order to pay financial obligations owed by the Arch Companies. Eventually, after approximately a week and a half, that employee resumed following my instructions to make such payments. However, your instruction to that employee frustrated my efforts to control payments from Arch Companies, pursuant to my rights under both the JJ Arch Operating Agreement and the Interim Order, to the detriment of the Arch Companies. In addition, it served your own self-interest at the expense of the interest of the Arch Companies, by perpetuating a crisis situation at the Arch Companies for which you could then falsely blame me.[1] It thus constituted both willful misconduct, and a breach of fiduciary duty, on your part, and constituted a Cause Event. In addition, on other occasions subsequent to the Interim Order, you have directed other employees and consultants of the Arch Companies to disobey directives from me, as managing member. These, too, were willful misconduct, breaches of fiduciary duty, and Cause Events on your part.

Also, subsequent to the Interim Order, you have continued to authorize, either personally or through Arch Companies employees, the making of transactions from the Arch Accounts, without my authorization, notwithstanding that the Interim Order recognizes my sole right, under the JJ Arch Operating Agreement, to "draw checks or other orders for the payment of monies" (Amendment No. 1 to Limited Liability Company Agreement of JJ Arch LLC, ¶ 2(c), insertion of new ¶ 3.1(ii) into JJ Arch Operating Agreement) and to "withdraw . . . pay . . . and distribute [JJ Arch's] funds in a manner consistent with the provisions of this Agreement" (id., insertion of new ¶ 3.1(vi) into JJ Arch Operating Agreement.) It is understood that First Republic Bank is not following the instructions of the Interim Order to the effect that I have sole control over the Arch Accounts, but you are continuing to exercise, without authority, your claimed control over the Arch Accounts to your benefit in a continuing effort to usurp power. Furthermore, after the Interim Order, you directed an Arch Companies employee in the accounting department to make a payment on an Arch Companies credit card without my consent. These, too, amount to willful misconduct, breaches of fiduciary duty, and misappropriation of JJ Arch's funds, all of which are Cause Events on your part. Moreover, you are hereby guided to **CEASE AND DESIST** from all direct ACH, check and wire payments from the Arch Accounts without my express advance authorization.

In addition, you have engaged in willful misconduct, and breached your fiduciary duties to JJ Arch and the Arch Companies and to me as a fellow member of JJ Arch, by obstructing my efforts to move the Arch Companies' bank accounts (the "Arch Accounts") from First Republic Bank ("First Republic") to JPMorgan Chase Bank ("JPMorgan"). Because First Republic, in response to your prior, improper and unauthorized direction to it that only you had authority to transact in the Arch Accounts, has continued not to recognize my ability to make payments and transfers from said accounts, I have been unable to make such payments and transfers directly. In order to reclaim my ability to make such payments and transfers, I sought to move the Arch Accounts to JPMorgan. I prepared two proposed letters, one addressed to "Chase Bank" and the other to "J.P. Morgan," indicating a desire by JJ Arch to migrate, to those institutions, all of the bank accounts at First Republic from which you had improperly removed my authority to make transactions. On August

---

[1] Given that you also have been in the Arch Companies' office on only two days in the last nearly two weeks running from the date of the Interim Order, any instruction from you that you personally authorize payments made on behalf of the Arch Companies necessarily slows down the making of such payments, since you have generally not been physically present to authorize them.

[942844/2]                                 2

26, 2023, an Arch employee emailed you both of those letters and asked you to review and execute them. However, you did not respond until two days later, and then refused, claiming that you felt Arch Companies needed instead to interview several regional banks before transferring the accounts to JPMorgan. This is despite the fact that the JJ Arch Operating Agreement provides me alone, as managing member, with the exclusive authority to "open, maintain and close bank accounts and draw checks or other orders for the payment of monies". (Amendment No. 1 to Limited Liability Company Agreement of JJ Arch LLC, ¶ 2(c), insertion of new ¶ 3.1(ii) into JJ Arch Operating Agreement.) This was during a period, which continues to this day, in which Arch Companies have encountered financial disaster because they have been unable to move money around due to the restrictions on transfer authority that you instructed First Republic to impose. This has resulted in, among other things, Arch Companies having missed several cutoff dates for the payment of payroll. Allowing this crisis to continue, ostensibly in the hopes of obtaining superior service from regional banks in the long run, is both willful misconduct and a breach of your fiduciary duty to JJ Arch and the Arch Companies, and a Cause Event on your part.

You have been notified on many occasions since the Interim Order not to tamper with, or hinder, Arch Companies' use of its information technology and intellectual property. However during the course of last week, subsequent to the Interim Order, you have held the sole Global Administrator access to Arch Companies' Office365 and DropBox accounts, and have refused to release such access either to me or to my IT consultant. You were aware that holding this hostage would cause potential risks to the business by not allowing any of the staff to have support from an IT provider. You have claimed that you could not approve any administrative rights without "understand[ing]" my current IT consultant's annual contracts and without having interviewed other IT companies over a period that you claim "will take a few weeks." However, Arch Companies' prolonged inability to retain a new IT consultant, to replace the one that was removed for cause prior to the Interim Order, represents an ongoing crisis for the Arch Companies. Indeed, certain parts of Arch Companies' IT network still remain disconnected in the wake of your coup attempt. In addition, the choice of an IT consultant is not yours to make in the first instance. Even assuming for the sake of argument that, as you have claimed through counsel, Section 3.2 of the JJ Arch Operating Agreement provides you with the right to consent to the hiring of the IT consultant, which I do not concede, that would still not empower you to interview and select an IT consultant on your own initiative, let alone spend weeks on it at a time when Arch Companies have no current IT consultant. This conduct on your part also constitutes willful misconduct and a breach of fiduciary on your part, and a Cause Event on your part.

Moreover, since the Interim Order, I have consistently asked for you to share documentation and relevant signed documents during your time where you purported to be managing member of JJ Arch, but we have yet to receive any such documents, making it impossible to reconstruct what events transpired between your attempted coup and the Interim Order, or what new obligations you purported to entered into on behalf of the Arch Companies during that period. Moreover, on the day of the Interim Order, you moved Arch Companies physical files into offices on the doors to which you had installed locks for which only you, and employees aligned with you, had keys, and locked the doors to such offices, thereby impeding me and other employees from gaining access to such files. These incidents of concealment of information regarding Arch Companies' operations also represent willful misconduct and a breach of fiduciary duty, and are yet another Cause Event on your part.

[942844/2]                                    3

You are hereby guided that you are not affiliated with the Arch Companies, effective immediately. All communications or inquiries that you receive shall be directed to me or my designee. Please be advised that pursuant to JJ Arch Operating Agreement, ¶ 7.5(a), you are still obligated to sign documents. I will be in touch with you regarding what is required. Please also be advised that I have been in touch with lenders and investors to advise them of potential claims and minimize potential damages therefrom. I will be in touch with you later to advise you further on this point.

Thanks.
Jeff

All rights reserved. Nothing stated herein is a waiver of the capital call letter sent by the undersigned to you dated August 31, 2023.

Nothing contained herein shall be construed as a settlement or offer regarding the present litigation in *Simpson et al. v. Chassen et ano.*, Supreme Court, New York County, Index No. 158055/2023.

Please contact jsimpson@archcre.com with any questions.

Yours truly,

JJ ARCH LLC

By: _____
Name: Jeffrey Simpson
Title: Managing Member

To: jchassen@archcre.com

CC: jaredchassen@gmail.com

[942844/2]                                        4

## John Leventhal

| | |
|---|---|
| **From:** | jaredchassen@gmail.com |
| **Sent:** | Friday, September 8, 2023 11:50 AM |
| **To:** | John Leventhal |
| **Subject:** | Fwd: JJ Arch Removal Letter |
| **Attachments:** | Jared Chassen - letter of removal 090123 FINAL.pdf |

Jared Chassen

Begin forwarded message:

> **From:** Jaredchassen@gmail.com
> **Date:** September 3, 2023 at 10:31:51 AM EDT
> **To:** Jeffrey Simpson <jsimpson001@icloud.com>, Jeffrey Simpson <jsimpson@archcre.com>
> **Cc:** John Leventhal <Judgeleventhal@aidalalaw.com>, "Imran H. Ansari" <iansari@aidalalaw.com>
> **Subject:** Re: JJ Arch Removal Letter

> Jeffrey,

> We are both to abide by Justice Cohen's Order. I am abiding by the Order. It is clear from your recent actions in removing my access to my company email account and reading and tinkering with my emails that you are disregarding and violating the Court's order.

> It is obvious that you had your attorneys write the letter for you which you emailed me right before the Labor Day holiday weekend and before the Sabbath.

> As your attorneys are writing your letters, have them call my attorneys to discuss any issues that you want them to discuss.

> I reject your accusations and your attempt to throw me out of the company, contrary to what Justice Cohen has ordered.

> My attorneys will likely deal with your letter and all of your improper actions when they file the opposition to your papers.

> You continue to operate outside the confines of your rights. You will be hearing from us, guide yourself accordingly. Please stop with your continued illegal activity in all levels of the business.

> > **From:** Jeffrey Simpson <jsimpson@archcre.com>
> > **Date:** September 1, 2023 at 4:59:37 PM EDT
> > **To:** Jared Chassen <jchassen@archcre.com>, Jared Chassen <jaredchassen@gmail.com>
> > **Subject:** JJ Arch Removal Letter

1

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/08/2023
RECEIVED NYSCEF: 09/15/2023

Jared,

Please see attached.

Thanks,
Jeff


JEFFREY SIMPSON
Managing Partner | Arch Companies
D 646.854.6810 | C 646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

2

JJ ARCH LLC
88 University Place, Floor 2
New York, NY 10003

September 8, 2023

Jeffrey Simpson
1055 Park Ave, Unit 4
New York, NY

Re: JJ ARCH LLC – Response to Invalid Notice

Dear Jeff Simpson:

      I write to remind you that your September 1, 2023 letter purporting to terminate my membership in JJ Arch is a legal nullity and without effect. Any major decisions you take without my consent are illegal, and I will seek full recourse against you for your ongoing misconduct and illegality. Indeed, your letter and conduct also shows your complete disregard for the Court and its orders. The Court's August 21, 2023 Interim Order, NYSCEF No. 36, expressly nullified your prior termination letter, and directed that the parties proceed under the terms of the Amended Operating Agreement, which, as you know, makes me a 49.9% member, with consent rights on enumerated major decisions. NYSCEF No. 4. It also barred you from terminating my right to view any company accounts. In other words, the Court restored the status quo ante, and you have no right to terminate me in defiance of the Interim Order. Your actions post Interim Order amount to nothing more than naked bullying.

      You have been violating the Interim Order right from the get-go. You immediately rehired Tristan Last, an employee who had resigned the day after I removed you for cause and increased her salary without seeking my consent even though my consent was required. You hired a new IT company without my consent at an expense that required my consent. You then moved my desk to the outskirts of our office space, clearly intending to show staff that I was no longer a co-member of the company. While I complied with the Interim Order and gave you access to Office.com, Dropbox, Go daddy, you then used that access to read all my emails, including those with my counsel, and deleted my emails. You have since shut off my access to my emails, all company systems, and bank accounts. You demanded that I consent to switch banks from First Republic, without explanation or reason, something that is especially frightening considering your repeated misappropriation of company assets and the fact that I would then be unable to view the accounts as required by the Interim Order. Your theft of company assets includes using company assets to pay for expenses of your own personal business ventures, to pay employee salaries outside the company, and make your

1

personal mortgage payments. You began telling employees and third-party partners that I was no longer a member of JJ Arch and started defaming me to them.

Then, on September 1, 2023 you sent another formal forced resignation letter even though the Court has just nullified both our August letters. Your claims in that letter are completely false and amount to nothing more than pretext for your unilateral actions and disregard for the Court and the judicial process.

You claim that I engaged in willful misconduct and breached my obligations because I purportedly obstructed your efforts to control the finances of the Arch companies. Even before the Interim Order, I in fact wrote First Republic: "Thanks Jeff, Christy this is also my understanding and hopefully we can unfreeze these accounts as soon as possible for business to proceed as usual." A copy of this email chain is annexed hereto as Exhibit A. You also claim that I instructed employees in the accounting department to refuse to take directions from you and make money transfers, but this is again a fabrication designed to justify your attempts to oust me from the company in derogation of the Court's order. For the last 5 years, with your consent, I have handled all approvals, and wire releases because you have not even logged into FRB online, our accounting system, since 2019. During the 2 weeks you were out, I worked tirelessly to try and reconcile monies owed on every project and to all financial obligations since the company was in shambles from your mismanagement. My emails—which you have stolen over the past week—will show that that after the order for each payment requested by an Arch employee, my immediate response was to get your approval and only then I would send payment. The only time I questioned you was when you illegally moved money from accounts to pay bills even though the accounts had been held with investor money designated for specific projects, but with no reconciliation by your direction it is too convoluted for anyone to see.

You claim that I told an employee not to follow your instructions, but this is a complete lie. Rebecca Tokarczyk, the ARCH accountant I think you are referring to, was uncomfortable working with you since you were using her for over a year for your personal assets instead of Arch matters. You were also using Arch funds for your personal businesses, and misappropriating funds. You were abusive as well to her. I did not instruct her not to follow your directions.

You also say I "perpetuat[ed] a crisis situation at the Arch Companies for which you could then falsely blame me," but this is also false. After the Court entered the Interim Order, I have followed it fully, while you have ignored it, including by purportedly terminating me mere days after the Interim Order voided your prior termination letter and set forth our rights pending the preliminary injunction hearing.

Your claim that I have been making transactions from Arch accounts is again false. You also seek to impute First Republic's conduct onto me, when I do not control First Republic, and as you know, you have had them shut me out of the account even though doing that requires express court permission. I have not obstructed anything, and in fact my email response to your request shows this. Annexed hereto as Exhibit B is my email response to

2

your request to move banks. I also did not direct any Arch employee in the accounting department to make a payment on Arch credit cards for my personal wellbeing, any payments were made in the regular course of business for expenses, after the Interim Order.

Your claim that I have not been in the office since the Interim Order is absurd. I have not gone into the office because you made it a completely hostile and abusive environment. You repeatedly told me to stay out of meetings and not talk to employees and when I confronted you, you told me "You are powerless and shouldn't even be here." I went in for another attempt a week ago and had a two-hour meeting with you with Jason Paul in attendance as well to discuss settlement, but you abruptly ended the meeting by standing up and calling me a "low life piece of shit and to watch out" while storming off. Before you deactivated all my accounts, I was fully working on emails, on calls with employees, working with the bank, etc.

Your claim that on August 26, 2023, I refused to execute letters is again misleading and false. The Interim Order itself did not authorize any switch from First Republic, and as a fiduciary of the company I am obligated to make sure funds are being used in a legal and ethical manner, because you have been using company funds for your own personal expenses. Your other claim that I held the sole Global Administrator access to Arch Companies' Office 365 and Drop Box accounts is also false, as I restored your rights. I also did not hold anything hostage with respect to a new IT provider; rather, I indicated that it was responsible to interview other IT providers before entering into any long-term contract with one.

I also provided you with all signed agreements and this is another lie. See Ex. D, annexed hereto. You also claim that I "moved Arch Companies physical files into offices on the doors to which you had installed locks for which only you, and employees aligned with you, had keys, and locked the doors to such offices, thereby impeding me and other employees from gaining access to such files." As you know, I asked for a new lock to be added because the old one was broken. You had it removed first thing in the morning and then right after, I got locked inside the office since the old latch didn't work. Additionally, I have no physical company files that I was hiding. The keys were sitting in the new lock, and in any event, not one time in 6 years has an employee come to look at any of my personal files, since all ARCH files are digital and on Dropbox.

Since the Interim Order, you have (1) shut me out of my company email; (2) deleted my emails and evidence of your theft that was in my emails; (3) looked at my privileged-attorney client communications; (4) shut me out of company files; (5) shut me out of all company accounts; (5) defamed me in the industry and amongst the employees; and (6) have stopped paying bills that are personally tied to my name and credit but are used for the company. For example, as you know, we have 3 Arch trucks that are used for Arch builder entities, and I have received a call from each credit company this week that payments are not being made and they are in collections. Likewise, as you know, our company Visa card, Divvy, is under my credit, and you removed me from these accounts even though these

3

accounts are tied to my credit. I have received calls that payments are not being made on these accounts. This amounts to further theft by you.

I will address your pre-and-post interim order misconduct in further detail in my testimony. But suffice it to say, I intend to pursue all my legal remedies against you. And I intend to raise your unlawful post-Interim Order conduct with the Court as expeditiously as possible.

Yours truly,

JJ ARCH LLC

By:

Name: Jared Chassen
Title: Member

To: jsimpson@archcre.com

CC: jsimpson001@icloud.com

4

# EXHIBIT A

## Annexed To EXHIBIT C

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 84
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/15/2023

https://mail.google.com/mail/u/0/?ik=bffcd358cc&view=pt&search=al

 Gmail

J Chassen <jaredchassen@gmail.com>

---

**Fwd: Adverse Claim**
1 message

jaredchassen@gmail.com <jaredchassen@gmail.com>
To: Jared Chassen <jaredchassen@gmail.com>

Thu, Sep 7, 2023 at 11:27 AM

Jared Chassen

Begin forwarded message:

> **From:** "Santoro, Christy" <csantoro@firstrepublic.com>
> **Date:** August 22, 2023 at 4:51:52 PM EDT
> **To:** Jeffrey Simpson <jsimpson@archcre.com>
> **Cc:** Jared Chassen <jchassen@archcre.com>, "Genovese, Mark" <mgenovese@firstrepublic.com>
> **Subject: RE: Adverse Claim**

Hi Jeff,

Thank you for reaching out. I have connected with our legal team and, in follow up to my email correspondence from yesterday, the Bank will follow the court order language, paragraph 1, as excerpted below. No further changes will be made to the Arch Accounts unless and until the Bank receives further binding instruction.

Given that the Bank has been added as a named party to the lawsuit, all further communications must flow in writing and through counsel. I can only help with day-to-day business matters that cannot be handled through Corporate Online and would ask that all such requests be sent in writing.

Paragraph 1 from the court order:

"The First Republic accounts that are subject to the Adverse Claim letter dated August 11, 2023 (the "Arch Accounts") shall be unfrozen. Both Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court."

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650    F. (212) 259-3688    E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Tuesday, August 22, 2023 4:33 PM
**To:** Santoro, Christy <csantoro@firstrepublic.com>
**Cc:** Jared Chassen <jchassen@archcre.com>; Genovese, Mark <mgenovese@firstrepublic.com>
**Subject:** Re: Adverse Claim

More hours gone by without communication. What is the issue and who is in charge there?


JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003


Sent from my iPhone


On Aug 22, 2023, at 11:05 AM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

Following up again. At this time, the bank is not following the court order.

JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003


Sent from my iPhone


On Aug 22, 2023, at 10:23 AM, Santoro, Christy <csantoro@firstrepublic.com> wrote:


Hi Jeff,


Per our conversation yesterday, our Legal team communicated the below based on the instructions in the Court Order we received. I am speaking with Legal shortly and will get back to you.


Best,

Christy


**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com


CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650    F. (212) 259-3688    E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819


**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Tuesday, August 22, 2023 10:17 AM

**To:** Santoro, Christy <csantoro@firstrepublic.com>; Jared Chassen <jchassen@archcre.com>
**Cc:** Genovese, Mark <mgenovese@firstrepublic.com>
**Subject:** RE: Adverse Claim

---

Christy, I didn't hear back form you last night. I called Mark G as well and we spoke. He didn't communicate back with me either. Who is the person that made the errors below and how do we reach them? There is no more time on this matter.

**From:** Santoro, Christy <csantoro@firstrepublic.com>
**Sent:** Monday, August 21, 2023 9:04 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>, Jared Chassen <jchassen@archcre.com>
**Subject:** RE: Adverse Claim
**Importance:** High

Good evening,

First Republic, now a part of JPMorgan Chase, is in receipt of the attached Order Regarding Interim Operating Procedures (Index No. 158055/2023). The Bank is hereby complying with the attached order and taking the following action, effective 8/22/2023.

1. As set forth in Paragraph 1 of the order, Unfreezing the Arch Accounts (as defined in the order) set forth on the PDF attached hereto entitled "Arch Accounts."
2. As set forth in Paragraph 2 of the order, adding Corporate Online access to view the Arch Accounts to Jeffrey Simpson. It is important to note, however, that this is online view access only and does not confer Authorized Signatory status.

Further to that Adverse Claim Letter sent by the Bank on August 11, 2023 (a copy is included here for reference), the Bank is taking these actions in conformance with the order and reserves all other rights pursuant to the governing account documents, at law, or at equity.

Thank you both.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650     F. (212) 259-3688     E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Monday, August 21, 2023 2:54 PM
**To:** Santoro, Christy <csantoro@firstrepublic.com>
**Cc:** Jared Chassen <jchassen@archcre.com>
**Subject:** Re: Adverse Claim

If you need something from us, please don't hesitate to reach out. The court order also names First Republic , so it should be a non issue.

JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

> On Aug 21, 2023, at 2:43 PM, Santoro, Christy <csantoro@firstrepublic.com> wrote:

> Hi Jeff,

> Thanks for your email. I have a catch up call with the head of our Legal team at 4:15pm, I will keep you posted with any updates.

> Best,

> Christy

> **Christy Santoro**
> Preferred Banker

> Preferred Banking East
> First Republic Bank *now part of* JPMorgan Chase

> 1230 Ave of the Americas | New York, NY 10020
> Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

> CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

> T. (212) 259-3650    F. (212) 259-3688    E. clientserviceny@firstrepublic.com

> Corporate Online: 1-800-221-9777 opt.3
> Consumer Online: 1-855-886-4819

> **From:** Jeffrey Simpson <jsimpson@archcre.com>
> **Sent:** Monday, August 21, 2023 2:31 PM
> **To:** Santoro, Christy <csantoro@firstrepublic.com>; Jared Chassen <jchassen@archcre.com>
> **Subject:** RE: Adverse Claim

> Hi Christy,

> Any update?

> **From:** Santoro, Christy <csantoro@firstrepublic.com>
> **Sent:** Monday, August 21, 2023 10:29 AM
> **To:** Jared Chassen <jchassen@archcre.com>; Jeffrey Simpson <jsimpson@archcre.com>
> **Subject:** RE: Adverse Claim

Good morning,

Thank you both for your emails. I am forwarding your emails to our Legal team now and will revert back shortly.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650        F. (212) 259-3688        E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jared Chassen <jchassen@archcre.com>
**Sent:** Sunday, August 20, 2023 7:10 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Santoro, Christy <csantoro@firstrepublic.com>
**Subject:** Re: Adverse Claim

Thanks Jeff, Christy this is also my understanding and hopefully we can unfreeze these accounts as soon as possible for business to proceed as usual.

JARED CHASSEN
Partner | Arch Companies
D 646.854.1947 | C 646.634.9955
jchassen@archcre.com | archcorealestate.com
15 West 27th Street, 6th Floor, New York, NY 10001

On Aug 20, 2023, at 7:08 PM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

Good evening Christy,

Jared is copied here and we will be sending you a court order in the morning, I hope to unfreeze the accounts. We are waiting on the judge to sign the paperwork.

Unless Jared has an objection, we are going back to what everything was and we can regroup with you after things are at status quo on who needs to be on which account.

If Jared approves this note, will that be sufficient or do you need to wait for the court order at this point? I know it's been hard on everybody by the people affected the most employees and vendors and we need to get things flowing ASAP

Thank you

JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

> On Aug 11, 2023, at 5:33 PM, Santoro, Christy <csantoro@firstrepublic.com> wrote:
>
> Good afternoon,
>
> Please see the attached letters regarding the Arch accounts. Please let us know if you have any questions.
>
> Best,
>
> Christy
>
> **Christy Santoro**
> Preferred Banker
>
> Preferred Banking Esst
> First Republic Bank *now part of* JPMorgan Chase
>
> 1230 Ave of the Americas | New York, NY 10020
> Office: (212) 621-1264 | Email: csantoro@firstrepublic.com
>
> CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:
>
> T. (212) 259-3650    F. (212) 259-3686    E. clientserviceny@firstrepublic.com
>
> Corporate Online: 1-800-221-6777 opt.3
> Consumer Online: 1-865-886-4819



The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance

https://mail.google.com/mail/u/0/?ik=bff0d358cc&view=pt&search=al

upon, this information by persons or entities other than the intended recipient is
prohibited. If you received this in error, please contact the sender and delete the
material from any computer. This message cannot be guaranteed to be secure or
error-free.

First Republic Bank and its related entities do not take responsibility for, or accept
time-sensitive instructions sent by email including orders, funds transfer
instructions or stop payments on checks. All instructions of this nature must be
handled by direct communication, not email.

We reserve the right to monitor and review the content of all email
communications sent or received. Emails sent to or from this address may be
stored in accordance with regulatory requirements.

<ADVERSE CLAIM LETTER - JSIMPSON.pdf>

<ARCH ACCOUNTS.pdf>

158055_2023_JEFFREY_SIMPSON_et_al_v_JARED_CHASSEN_et_al_ORDER___INTERIM__MO_38.pdf
252K

# EXHIBIT B

## Annexed To EXHIBIT C



**J Chassen <jaredchassen@gmail.com>**

---

## Fwd: Bank Accounts
2 messages

---

**jaredchassen@gmail.com** <jaredchassen@gmail.com>    Mon, Aug 28, 2023 at 6:50 AM
To: Jeffery Dayon <jdayon@mdlawllp.com>, Saul A Mishaan <smishaan@mdlawllp.com>
Cc: David Berg <db@infinitycollective.com>


Jared Chassen

Begin forwarded message:

> **From:** Jeffrey Simpson <jsimpson@archcre.com>
> **Date:** August 28, 2023 at 6:17:49 AM EDT
> **To:** Jared Chassen <jchassen@archcre.com>
> **Cc:** Michelle Miller <mmiller@archcre.com>
> **Subject: Re: Bank Accounts**
>
> Incorrect. The court order suggests that I have the powers as managing member, which includes opening and closing bank accounts.   The additional language put in the order has caused confusion and makes it seem like you have more power than you do with the intended purpose to give you viewing access only.   We are moving the bank accounts for good reason as you are aware the bank is defunct and does not have the staff that it used to.   I agree that regional Banks may be a solution for certain accounts in the future but we don't have time for that as the business can't operate in the current form.  If you will not cooperate immediately we will be in court to enforce the order.   All damages will be on you.
>
> JEFFREY SIMPSON
> Managing Partner | Arch Companies
> D  646.854.6810 | C  646.753.2872
> jsimpson@archcre.com | archcorealestate.com
> 88 University Place, 11th Floor, New York, NY 10003
>
> Sent from my iPhone
>
>> On Aug 28, 2023, at 5:40 AM, Jared Chassen <jchassen@archcre.com> wrote:
>>
>> I was not available this weekend and am responding first thing Monday morning.
>>
>> We have had success with local regional banks throughout our company's history and so I'm hesitant to move to a large bulk bracket bank for fear of inferior service amongst other items.  If our intention is to move on from Republic that is fine but we should prudently interview other regional banks such as IDB, Webster, NYCB etc before making this important transition. Once we have sufficiently interviewed several banks, I'm happy to be part of the transition Once we have sufficiently interviewed several banks, I'm happy to be part of the transition.
>>
>> Additionally, this will require a court order as moving on from First Republic was not contemplated.

JARED CHASSEN
Partner | Arch Companies
D 646.854.1947 | C 646.634.9955
jchassen@archcre.com | archcorealestate.com
15 West 27th Street, 6th Floor, New York, NY 10001

> On Aug 27, 2023, at 9:58 PM, Jeffrey Simpson <jsimpson@archcre.com>
> wrote:

> Jared - No reply.

> Third inquiry over the weekend.

> If your intention is not to comply and help us move the accounts to a bank
> that will service us urgently, please be forthright, but as you know, the only
> person who can authorize bank accounts is me.

> JEFFREY SIMPSON
> Managing Partner | Arch Companies
> D 646.854.6810 | C 646.753.2872
> jsimpson@archcre.com | archcorealestate.com
> 88 University Place, 11th Floor, New York, NY 10003

> Sent from my iPhone

>> On Aug 27, 2023, at 3:48 PM, Jeffrey Simpson
>> <jsimpson@archcre.com> wrote:

>> Following up, I have a meeting with the banker at 8 AM
>> tomorrow. First Republic will not be able to service us any
>> further given what has happened and their in ability to be
>> accommodating of our corporate needs .

>> JEFFREY SIMPSON
>> Managing Partner | Arch Companies
>> D 646.854.6810 | C 646.753.2872
>> jsimpson@archcre.com | archcorealestate.com
>> 88 University Place, 11th Floor, New York, NY 10003

>> Sent from my iPhone

>>> On Aug 26, 2023, at 8:29 AM, Michelle Miller
>>> <mmiller@archcre.com> wrote:

>>> Hi Jared,

>>> With all the systems issues and lack of staff at

FRB, Jeff has a contact to move the accounts over to JPM or Chase Bank. Would you be able to take a look at and execute the attached letters (we're not sure which bank this would land with so have two) to help begin the process?


Thanks


**MICHELLE MILLER**

Partner

—

**D** 646.854.8551 | **C** 908.342.2355

mmiller@archcre.com | archcorealestate.com

88 University Place, 2nd Floor, New York, NY 10003


*PLEASE NOTE THAT OUR ADDRESS HAS
CHANGED*

---

**3 attachments**


**image001.png**
8K


**JP Morgan Letter.pdf**
497K


**Chase Bank Letter.pdf**
497K

---

**jaredchassen@gmail.com** <jaredchassen@gmail.com>
To: Jared Chassen <jaredchassen@gmail.com>

Thu, Sep 7, 2023 at 12:02 PM

[Quoted text hidden]

3 attachments



**image001.png**
8K



**JP Morgan Letter.pdf**
497K

**Chase Bank Letter.pdf**
497K

 Gmail

J Chassen <jaredchassen@gmail.com>

**Fwd: Adverse Claim**
1 message

jaredchassen@gmail.com <jaredchassen@gmail.com>                    Thu, Sep 7, 2023 at 11:27 AM
To: Jared Chassen <jaredchassen@gmail.com>

Jared Chassen

Begin forwarded message:

> **From:** "Santoro, Christy" <csantoro@firstrepublic.com>
> **Date:** August 22, 2023 at 4:51:52 PM EDT
> **To:** Jeffrey Simpson <jsimpson@archcre.com>
> **Cc:** Jared Chassen <jchassen@archcre.com>, "Genovese, Mark" <mgenovese@firstrepublic.com>
> **Subject: RE: Adverse Claim**

Hi Jeff,

Thank you for reaching out. I have connected with our legal team and, in follow up to my email correspondence from yesterday, the Bank will follow the court order language, paragraph 1, as excerpted below. No further changes will be made to the Arch Accounts unless and until the Bank receives further binding instruction.

Given that the Bank has been added as a named party to the lawsuit, all further communications must flow in writing and through counsel. I can only help with day-to-day business matters that cannot be handled through Corporate Online and would ask that all such requests be sent in writing.

Paragraph 1 from the court order:

"The First Republic accounts that are subject to the Adverse Claim letter dated August 11, 2023 (the "Arch Accounts") shall be unfrozen. Both Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court."

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650    F. (212) 259-3688    E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Tuesday, August 22, 2023 4:33 PM
**To:** Santoro, Christy <csantoro@firstrepublic.com>
**Cc:** Jared Chassen <jchassen@archcre.com>; Genovese, Mark <mgenovese@firstrepublic.com>
**Subject:** Re: Adverse Claim

More hours gone by without communication. What is the issue and who is in charge there?

JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Aug 22, 2023, at 11:05 AM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

Following up again. At this time, the bank is not following the court order.

JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Aug 22, 2023, at 10:23 AM, Santoro, Christy <csantoro@firstrepublic.com> wrote:

Hi Jeff,

Per our conversation yesterday, our Legal team communicated the below based on the instructions in the Court Order
we received. I am speaking with Legal shortly and will get back to you.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650    F. (212) 259-3688    E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Tuesday, August 22, 2023 10:17 AM

**To:** Santoro, Christy <csantoro@firstrepublic.com>, Jared Chassen <jchassen@archcre.com>
**Cc:** Genovese, Mark <mgenovese@firstrepublic.com>
**Subject:** RE: Adverse Claim

Christy, I didn't hear back form you last night. I called Mark G as well and we spoke. He didn't communicate back with me either. Who is the person that made the errors below and how do we reach them? There is no more time on this matter.

**From:** Santoro, Christy <csantoro@firstrepublic.com>
**Sent:** Monday, August 21, 2023 9:04 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>
**Subject:** RE: Adverse Claim
**Importance:** High

Good evening,

First Republic, now a part of JPMorgan Chase, is in receipt of the attached Order Regarding Interim Operating Procedures (Index No. 158055/2023). The Bank is hereby complying with the attached order and taking the following action, effective 8/22/2023.

1. As set forth in Paragraph 1 of the order, Unfreezing the Arch Accounts (as defined in the order) set forth on the PDF attached hereto entitled "Arch Accounts."
2. As set forth in Paragraph 2 of the order, adding Corporate Online access to view the Arch Accounts to Jeffrey Simpson. It is important to note, however, that this is online view access only and does not confer Authorized Signatory status.

Further to that Adverse Claim Letter sent by the Bank on August 11, 2023 (a copy is included here for reference), the Bank is taking these actions in conformance with the order and reserves all other rights pursuant to the governing account documents, at law, or at equity.

Thank you both.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650      F. (212) 259-3688      E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Monday, August 21, 2023 2:54 PM
**To:** Santoro, Christy <csantoro@firstrepublic.com>
**Cc:** Jared Chassen <jchassen@archcre.com>
**Subject:** Re: Adverse Claim

If you need something from us, please don't hesitate to reach out.   The court order also names First Republic , so it should be a non issue.

JEFFREY SIMPSON

Managing Partner | Arch Companies

D  646.854.6810 | C  646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

> On Aug 21, 2023, at 2:43 PM, Santoro, Christy <csantoro@firstrepublic.com> wrote:

Hi Jeff,

Thanks for your email.  I have a catch up call with the head of our Legal team at 4:15pm, I will keep you posted with any updates.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP:  For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650      F. (212) 259-3688      E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Monday, August 21, 2023 2:31 PM
**To:** Santoro, Christy <csantoro@firstrepublic.com>; Jared Chassen <jchassen@archcre.com>
**Subject:** RE: Adverse Claim

Hi Christy,

Any update?

**From:** Santoro, Christy <csantoro@firstrepublic.com>
**Sent:** Monday, August 21, 2023 10:29 AM
**To:** Jared Chassen <jchassen@archcre.com>; Jeffrey Simpson <jsimpson@archcre.com>
**Subject:** RE: Adverse Claim

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/15/2023

Good morning.

Thank you both for your emails. I am forwarding your emails to our Legal team now and will revert back shortly.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: (212) 621-1254 | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650      F. (212) 259-3688      E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819

**From:** Jared Chassen <jchassen@archcre.com>
**Sent:** Sunday, August 20, 2023 7:10 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Santoro, Christy <csantoro@firstrepublic.com>
**Subject:** Re: Adverse Claim

Thanks Jeff, Christy this is also my understanding and hopefully we can unfreeze these accounts as soon as possible for business to proceed as usual.

JARED CHASSEN
Partner | Arch Companies
D 646.854.1947 | C 646.634.9955
jchassen@archcre.com | archcorealestate.com
15 West 27th Street, 6th Floor, New York, NY 10001

On Aug 20, 2023, at 7:08 PM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

Good evening Christy,

Jared is copied here and we will be sending you a court order in the morning, I hope to unfreeze the accounts. We are waiting on the judge to sign the paperwork.

Unless Jared has an objection, we are going back to what everything was and we can regroup with you after things are at status quo on who needs to be on which account.

If Jared approves this note, will that be sufficient or do you need to wait for the court order at this point? I know it's been hard on everybody by the people affected the most employees and vendors and we need to get things flowing ASAP

Thank you

JEFFREY SIMPSON

Managing Partner | Arch Companies

D 646.854.6810 | C 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my IPhone

On Aug 11, 2023, at 5:33 PM, Santoro, Christy <csantoro@firstrepublic.com> wrote:

Good afternoon,

Please see the attached letters regarding the Arch accounts. Please let us know if you have any questions.

Best,

Christy

**Christy Santoro**
Preferred Banker

Preferred Banking East
First Republic Bank *now part of* JPMorgan Chase

1230 Ave of the Americas | New York, NY 10020
Office: **(212) 621-1254** | Email: csantoro@firstrepublic.com

CLIENT SERVICE GROUP: For statements, checks, balance inquiries, and all transfers:

T. (212) 259-3650    F. (212) 259-3688    E. clientserviceny@firstrepublic.com

Corporate Online: 1-800-221-9777 opt.3
Consumer Online: 1-855-886-4819



The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance

upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. This message cannot be guaranteed to be secure or error-free.

First Republic Bank and its related entities do not take responsibility for, or accept time-sensitive instructions sent by email including orders, funds transfer instructions or stop payments on checks. All instructions of this nature must be handled by direct communication, not email.

We reserve the right to monitor and review the content of all email communications sent or received. Emails sent to or from this address may be stored in accordance with regulatory requirements.

<ADVERSE CLAIM LETTER - JSIMPSON.pdf>

<ARCH ACCOUNTS.pdf>

158055_2023_JEFFREY_SIMPSON_et_al_v_JARED_CHASSEN_et_al_ORDER__INTERIM__MO_38.pdf
252K



**J Chassen <jaredchassen@gmail.com>**

---

## Fwd: Bank Accounts

2 messages

---

**jaredchassen@gmail.com** <jaredchassen@gmail.com>
To: Jeffery Dayon <jdayon@mdlawllp.com>, Saul A Mishaan <smishaan@mdlawllp.com>
Cc: David Berg <db@infinitycollective.com>

Mon, Aug 28, 2023 at 6:50 AM

Jared Chassen

Begin forwarded message:

> **From:** Jeffrey Simpson <jsimpson@archcre.com>
> **Date:** August 28, 2023 at 6:17:49 AM EDT
> **To:** Jared Chassen <jchassen@archcre.com>
> **Cc:** Michelle Miller <mmiller@archcre.com>
> **Subject: Re: Bank Accounts**

> Incorrect. The court order suggests that I have the powers as managing member, which includes opening and closing bank accounts.   The additional language put in the order has caused confusion and makes it seem like you have more power than you do with the intended purpose to give you viewing access only.   We are moving the bank accounts for good reason as you are aware the bank is defunct and does not have the staff that it used to.   I agree that regional Banks may be a solution for certain accounts in the future but we don't have time for that as the business can't operate in the current form.  If you will not cooperate immediately we will be in court to enforce the order.   All damages will be on you.

> JEFFREY SIMPSON
> Managing Partner | Arch Companies
> D 646.854.6810 | C 646.753.2872
> jsimpson@archcre.com | archcorealestate.com
> 88 University Place, 11th Floor, New York, NY 10003

> Sent from my iPhone

>> On Aug 28, 2023, at 5:40 AM, Jared Chassen <jchassen@archcre.com> wrote:

>> I was not available this weekend and am responding first thing Monday morning.

>> We have had success with local regional banks throughout our company's history and so I'm hesitant to move to a large bulk bracket bank for fear of inferior service amongst other items.  If our intention is to move on from Republic that is fine but we should prudently interview other regional banks such as IDB, Webster, NYCB etc before making this important transition. Once we have sufficiently interviewed several banks, I'm happy to be part of the transition Once we have sufficiently interviewed several banks, I'm happy to be part of the transition.

>> Additionally, this will require a court order as moving on from First Republic was not contemplated.

JARED CHASSEN
Partner | Arch Companies
D 646.854.1947 | C 646.634.9955
jchassen@archcre.com | archcorealestate.com
15 West 27th Street, 6th Floor, New York, NY 10001

> On Aug 27, 2023, at 9:58 PM, Jeffrey Simpson <jsimpson@archcre.com>
> wrote:

> Jared - No reply.

> Third inquiry over the weekend.

> If your intention is not to comply and help us move the accounts to a bank
> that will service us urgently, please be forthright, but as you know, the only
> person who can authorize bank accounts is me.

> JEFFREY SIMPSON
> Managing Partner | Arch Companies
> D 646.854.6810 | C 646.753.2872
> jsimpson@archcre.com | archcorealestate.com
> 88 University Place, 11th Floor, New York, NY 10003

> Sent from my iPhone

>> On Aug 27, 2023, at 3:48 PM, Jeffrey Simpson
>> <jsimpson@archcre.com> wrote:

>> Following up, I have a meeting with the banker at 8 AM
>> tomorrow. First Republic will not be able to service us any
>> further given what has happened and their in ability to be
>> accommodating of our corporate needs .

>> JEFFREY SIMPSON
>> Managing Partner | Arch Companies
>> D 646.854.6810 | C 646.753.2872
>> jsimpson@archcre.com | archcorealestate.com
>> 88 University Place, 11th Floor, New York, NY 10003

>> Sent from my iPhone

>>> On Aug 26, 2023, at 8:29 AM, Michelle Miller
>>> <mmiller@archcre.com> wrote:

>>> Hi Jared,

>>> With all the systems issues and lack of staff at

FRB, Jeff has a contact to move the accounts
over to JPM or Chase Bank. Would you be able
to take a look at and execute the attached
letters (we're not sure which bank this would
land with so have two) to help begin the
process?


Thanks


**MICHELLE MILLER**

Partner

—

**D** 646.854.8551 | **C** 908.342.2355

mmiller@archcre.com | archcorealestate.com

88 University Place, 2nd Floor, New York, NY 10003


*PLEASE NOTE THAT OUR ADDRESS HAS
CHANGED*


**3 attachments**

 **image001.png**
8K

 **JP Morgan Letter.pdf**
497K

 **Chase Bank Letter.pdf**
497K

---

**jaredchassen@gmail.com** <jaredchassen@gmail.com>    Thu, Sep 7, 2023 at 12:02 PM
To: Jared Chassen <jaredchassen@gmail.com>

[Quoted text hidden]

**3 attachments**



**image001.png**
8K

**JP Morgan Letter.pdf**
497K

**Chase Bank Letter.pdf**
497K





869 White Plains Rd., Suite B
Eastchester, NY 10709
P: 914-395-3691 F: 914-395-3693

Date: 8/22/23

Patient Name: Jared Chasse     Date of Birth: ███████

Street Address: 167 Paine Ave     City/State/Zip: N Roc NY 11804

Date of Exam: 8/22/23

Reason for appointment: n/a

Please excuse the above patient is excused from:

☑ Work

☐ School     All

☐ Physical Education

☐ Sports

As of today's date, and cleared to return on:

Note / Restrictions: 5 day guarantee at least
110 day suggested

Any questions or concerns, please call the office at: 914-395-3691.

Sincerely,

Mack Lee Sullivan, MD

Mack Lee Sullivan, M.D.
NYS Lic #203477

401 of 503

CHASSEN, Jared Daniel **DOB:** ▮▮▮▮ (36 yo M) **Acc No.** ▮▮▮ **DOS:** 08/22/2023

Chassen, Jared Daniel

Progress Notes: MACKEL SULLIVAN, ADAMS

### Reason for Appointment
1. Lobar Pneumonia - Established

### History of Present Illness
Shortness of Breath:
    36 year old male presents with c/o Trouble Breathing.
Constitutional:
    36M presenting with a "productive cough." progressively worsening over the past 2-3 days
    Patient c/o productive cough with sputum production. Patient describes shortness of breath, difficulty breathing, fever, and intermittent chills.

### Examination
General Examination:
    General/Constitutional:  Overall: No acute distress.
    Eyes:  Pupils: Extraocular movements intact (EOMI).
    Ears/Nose/Throat: Throat: No erythema, no exudates, no sores. No uvular edema or peritonsillar abscess. Uvula midline, oral mucosa moist
    Ears: TMs and canals normal, no bulging of B/L TM
    Sinus: No opacification of the maxillary sinuses
    Nose: no discharge present
    External ear: Hearing intact B/L..
    Respiratory:  **Lungs: Decreased breath sounds of the left lower lobe with scattered rales, no wheezing, no rhonchi,**
    Effort: Normal respiratory effort.
    Cardiovascular:  Heart sounds: Regular rate and rhythm. Normal S1, S2 heart sounds. No murmurs/rubs/gallops
    Extremities: No upper extremity cyanosis.
    Gastrointestinal:  Abdomen: nontender, nondistended.
    Skin Overall:  Skin: no rashes/lesions.
    Psychiatric:  Judgment/insight: Awake, Alert and oriented with appropriate behavior.
    Neurologic:  Overall: Cranial nerves 2-12 and cognitive function intact. Sensation: no paresthesias..

### Assessments
1. Contact with and (suspected) exposure to COVID-19 - Z20.822 (Primary)
2. Shortness of breath - R06.02

---

### Review of Systems
General/Constitutional:
    Patient denies change in appetite, chills, fatigue, fever, lightheadedness, weight gain, weight loss.
Ophthalmologic:
    Patient denies blurred vision, change in vision, double vision, dry eye, eye pain, itching and redness.
ENT:
    Patient denies decreased hearing, ear pain, ringing in the ears, difficulty swallowing, dry mouth, hoarseness, sore throat, sinus pain, swollen glands.
Respiratory:
    Patient denies hemoptysis. Patient complaining of **Productive cough with sputum production,** .
Cardiovascular:
    Patient denies chest pain at rest or with exertion, dizziness, irregular heartbeat, palpitations.

Gastrointestinal:
    Patient denies abdominal pain, blood in stool, change in bowel habits, constipation, nausea.
Genitourinary:
    Patient denies blood in the urine, difficulty urinating, frequent urination.
Musculoskeletal:
    Patient denies arthritis, joint stiffness, muscle aches, painful joints.
Skin:
    Patient denies dry skin,

1/3

CHASSEN, Jared Daniel DOB: ████████ (36 yo M) Acc No. ████ DOS: 08/22/2023

discoloration, skin lesion(s), rash.

**Neurologic:**
Patient denies balance difficulty, difficulty speaking, dizziness, headache, loss of strength, memory loss, tingling/numbness.

**Psychiatric:**
Patient denies anxiety, depressed mood, loss of appetite.

3. Dyspnea, unspecified - R06.00
4. Encounter for screening for other viral diseases - Z11.59
5. Encounter for screening for other bacterial diseases - Z11.2
6. Lobar pneumonia, unspecified organism - J18.1
7. Cough - R05

Treatment

### 1. Shortness of breath
Notes: CXR performed (2 views - PA & LAT) shows negative for evolving process; PFT to evaluate current pulmonary function; lung age measured (SEE REPORT).

### 2. Lobar pneumonia, unspecified organism
IMAGING: X ray : CHEST PA LATERAL
Clinical Notes: Patient presenting with a productive cough throughout the day
- Rales and decreased breath sounds on exam, no wheezing
- Take medication as orded
- Chest XR in office due to symptoms and findings on exam- significant for retrocardiac infiltrate.
- Reviewed pathophysiology of lobar pneumonia and importance of medication adherence.
- Counseled on medication compliance, side effects
- If symptoms worsen or change, return to office.

### 3. Others
Notes: Recommended quarantine proportional to onset and severity of symptoms is at least 5 days and the full 10 would be in his best interest. Clinical Notes: A total of 30 minutes were spent face-to-face with the patient during this encounter and 20 minutes of that time was spent on counseling and coordination of care., Explained indications for, selection of, proper administration of, relevant risk/benefits/side effects of, and potential contraindications of prescribed medications., Discussed administration of proper fluids for adequate hydration during recovery, and signs and symptoms of dehydration and indications to return or go to ER; discussed pathophysiology of fever and proper management going forward; thresholds above which to treat and thresholds above which to bring to ER., Patient given time to ask any questions. Patient demonstrated clear understanding and agreement with diagnosis, management, treatment, and plan; given information on medication, treatment and plan. Teach-back method used, pt verbalized all instructions given.

Procedures

COVID-19 PCR Swab testing in office today due to patient's symptoms; tolerated well
COVID-19 hand-out provided to patient (indications for ED, symptoms, quarantine information)
RAPID Testing performed:
- Covid-19, Influenza A, Influenza B
- Streptococcal Pharyngitis
Results within 15 minutes:
Covid-19 - POSITIVE
Influenza A - NEGATIVE

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO.: 75
NYSCEF DOC. NO.: 87
RECEIVED NYSCEF: 09/15/2023
RECEIVED NYSCEF: 09/15/2023

CHASSEN, Jared Daniel **DOB:**  (36 yo M) **Acc No.** DOS: 08/22/2023

Influenza B - NEGATIVE
Streptococcal Pharyngitis - NEGATIVE.

### Preventive Medicine
Nutrition:
    Goals: Aggressively hydrate with nutrient dense liquids.

### Procedure Codes
99000 SPECIMEN HANDLING
71046 CHEST A/P & LATERAL (2 VIEWS), Modifiers: 59
94618 PFT, Modifiers: 59
87426 CORONAVIRUS AG IA, Modifiers: QW
87804 INFLUENZA ASSAY W/OPTIC, Modifiers: QW
87804 INFLUENZA ASSAY W/OPTIC, Modifiers: QW , 59
87880 Rapid Strep, Modifiers: QW

### Follow Up
prn, pending course of Medication/Treatment, pending course of
conservative therapy discussed

Electronically signed by MACK S. SULLIVAN M.D.
on 12, 2023 at 02:15 PM EDT

Sign off status: Pending

Mack Lee Sullivan, M.D.
NYS Lic #203477

Elliot & Roswell PA
66 WHITE PLAINS RD.
SUITE P
EASTCHESTER, NY 10709-3617

View All Activity

Shared JJ

Jeff expenses

Jared expenses

Successfully retrieved account information.

Enter your inquiry criteria in the form fields below, then choose 'View Results'.

**Criteria**

| Account Number | 80006445359-JJ ARCH LLC | Lookup |
| Inquiry Type | All Activity |

From Posting Date: 07/12/2023   To Posting Date: 09/12/2023

**Account Details**

Account Number: 80006445359-JJ ARCH LLC

Balances as of 10:27:08 AM PDT on 09/12/2023

| Current Balance: | $12,068.49 | Available Balance: | $12,068.49 |
| Total Float: | $0.00 | One Day Float: | $0.00 |
| Two Day Float: | $0.00 | Three Day Float: | $0.00 |
| Average Available Balance: | $156,472.33 | Average Available 12 Month: | $104,638.00 |
| Amount of Last Deposit: | $25,000.00 | Date of Last Deposit: | 08/01/2023 |
| Date Last Active: | 09/11/2023 | Statement Date: | 08/31/2023 |
| Interest Deposit: | $0.00 | Interest Rate: | 0.000% |
| Last Year Interest Paid: | $0.00 | YTD Interest Paid: | $0.00 |
| Accrued Interest: | $0.00 | Beginning Statement Bal: | $14,235.10 |

Results 1-20   |<   <   >   >|

Pending transactions are in the process of being processed or posted to your account. The amount may not be reflected in your available balance and the final dollar amount posted may differ from the pending transaction amount.

| Date | Status | Description | Serial Number | Withdrawal Amount | Deposit Amount | Balance | Image |
|------|--------|-------------|---------------|-------------------|----------------|---------|-------|
| 09/11/2023 | | ACH DEBIT GEICO PREM COLL JEFFREY S SIMPSON 3530075853 | | $166.61 | | $12,068.49 | |
| 09/01/2023 | | INTERNET TRANSFER TO DDA# 80018321124 ON 09/01 AT 01:38 PM TRANSFER TO COVER DEBT SERVICE | | $2,000.00 | | $12,235.10 | |
| 08/29/2023 | | ACH DEBIT INTUIT * QBOOKS ONL JJ ARCH LLC 9185622 0000756346 | | $217.75 | | $14,235.10 | |
| 08/29/2023 | | ACH DEBIT VERIZON PAYMENTREC JARED CHASSEN 9558454250001 9783397101 | | $138.32 | | $14,452.85 | |
| 08/24/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JJ ARCH LLC 17 S 1314542717 9000313004 | | $1,465.09 | | $14,591.17 | |
| 08/23/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JARED CHASSEN 17 S 1312148117 9000313004 | | $481.60 | | $16,056.26 | |
| 08/10/2023 | | ACH DEBIT GEICO PREM COLL JEFFREY S SIMPSON 3530075853 | | $171.53 | | $16,537.86 | |
| 08/09/2023 | | DOMESTIC ONLINE WIRE CHAMCHA REAL ESTAT E INC N089G5151LZW7YKB | | $25,000.00 | | $16,709.39 | |
| 08/04/2023 | | DOMESTIC ONLINE WIRE ELMWOOD DAY SCHOOL INC. N084G5807DCWN97R | | $9,400.00 | | $41,709.39 | |
| 08/01/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 08/01 AT 01:58 PM FUNDING FOR 1640 M OTORS | | $25,000.00 | | $51,109.39 | |
| 08/01/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 08/01 AT 01:49 PM 88 SCHWENKS SALE P ROCEEDS | | $127,854.64 | | $76,109.39 | |
| 08/01/2023 | | INTERNET TRANSFER TO DDA# 80003451846 ON 08/01 AT 01:49 PM 88 SCHWENKS SALE P ROCEEDS | | $127,854.64 | | $203,964.03 | |
| 08/01/2023 | | INTERNET TRANSFER FROM SAV 50017311486 ON 08/01 AT 01:58 PM FUNDING FOR 1640 M OTORS | | | $25,000.00 | $331,818.67 | |
| 08/01/2023 | | INTERNET TRANSFER FROM DDA# 80013320904 ON 08/01 AT 11:45 AM 88 SCHWENKS SALE P ROCEEDS | | | $255,709.27 | $306,818.67 | |
| 07/31/2023 | | ACH DEBIT VERIZON PAYMENTREC JARED CHASSEN 9558454250001 9783397101 | | $138.32 | | $51,109.40 | |
| 07/26/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JJ ARCH LLC 17 S 1314542717 9000313004 | | $1,465.09 | | $51,247.72 | |
| 07/21/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JARED CHASSEN 17 S 1312148117 9000313004 | | $479.22 | | $52,712.81 | |
| 07/18/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 07/18 AT 10:53 AM ADVANCE FOR FUNDIN G NEEDS | | $10,000.00 | | $53,192.03 | |

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM

NYSCEF DOC. NO. 77

NYSCEF DOC. NO. 87

INDEX NO. 158055/2023

RECEIVED NYSCEF: 09/14/2023

RECEIVED NYSCEF: 09/15/2023

| Date | Status | Description | Serial Number | Withdrawal Amount | Deposit Amount | Balance | Image |
|------|--------|-------------|---------------|-------------------|----------------|---------|-------|
| 07/17/2023 | | ACH DEBIT JPMORGAN CHASE EXT TRNSFR JJ ARCH LLC 17616716026 9200502231 | | $1,176.40 | | $63,192.03 | |
| 07/14/2023 | | DOMESTIC ONLINE WIRE BRESLOW AND WALKER LLP N07EG1023I2N7XEF | | $10,000.00 | | $64,368.43 | |

Shared JJ

Jeff expenses

Jared expenses

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 77
NYSCEF DOC. NO. 87
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

View All Activity

Successfully retrieved account information.

Enter your inquiry criteria in the form fields below, then choose 'View Results'.

**Criteria**

| | | |
|---|---|---|
| Account Number * | 80006445359-JJ ARCH LLC | Lookup |
| Inquiry Type * | All Activity | |
| From Posting Date * | 05/12/2023 | To Posting Date | 07/12/2023 |

*Handwritten notes on right:* Shared JJ / Jeff expenses / Jared expenses

**Account Details**

Account Number: 80006445359-JJ ARCH LLC

Balances as of 10:26:01 AM PDT on 09/12/2023

| | | | |
|---|---|---|---|
| Current Balance: | $12,068.49 | Available Balance: | $12,068.49 |
| Total Float: | $0.00 | One Day Float: | $0.00 |
| Two Day Float: | $0.00 | Three Day Float: | $0.00 |
| Average Available Balance: | $156,472.33 | Average Available 12 Month: | $104,638.00 |
| Amount of Last Deposit: | $25,000.00 | Date of Last Deposit: | 08/01/2023 |
| Date Last Active: | 09/11/2023 | Statement Date: | 08/31/2023 |
| Interest Deposit: | $0.00 | Interest Rate: | 0.000% |
| Last Year Interest Paid: | $0.00 | YTD Interest Paid: | $0.00 |
| Accrued Interest: | $0.00 | Beginning Statement Bal: | $14,235.10 |

Results 1-48  |< < > >|

Pending transactions are in the process of being processed or posted to your account. The amount may not be reflected in your available balance and the final dollar amount posted may differ from the pending transaction amount.

| Date | Status | Description | Serial Number | Withdrawal Amount | Deposit Amount | Balance | Image |
|---|---|---|---|---|---|---|---|
| 07/10/2023 | | ACH DEBIT GEICO PREM COLL JEFFREY S SIMPSON 3530075853 | | $158.93 | | $74,368.43 | |
| 07/06/2023 | | INTERNET TRANSFER TO DDA# 80003451846 ON 07/06 AT 10:52 AM MAY GP | | $47,567.34 | | $74,527.36 | |
| 07/06/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 07/06 AT 10:52 AM MAY GP | | $15,602.77 | | $122,094.70 | |
| 07/06/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 07/06 AT 10:52 AM MAY RENT | | $2,500.00 | | $137,697.47 | |
| 07/06/2023 | | INTERNET TRANSFER TO DDA# 80006566071 ON 07/06 AT 10:52 AM MAY RENT | | $1,500.00 | | $140,197.47 | |
| 07/06/2023 | | INTERNET TRANSFER FROM DDA# 80006445342 ON 07/06 AT 10:47 AM MAY GP INVOICE | | | $99,008.09 | $141,697.47 | |
| 07/03/2023 | | INTERNET TRANSFER TO DDA# 80018321124 ON 07/03 AT 04:48 PM CONTRIBUTION TO CO VER DEBT SERVICE | | $3,000.00 | | $42,689.38 | |
| 06/29/2023 | | INTERNET TRANSFER TO DDA# 80003451846 ON 06/29 AT 08:12 AM APRIL GP | | $46,040.75 | | $45,689.38 | |
| 06/29/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 06/29 AT 08:12 AM APRIL GP | | $31,765.78 | | $91,730.13 | |
| 06/29/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 06/29 AT 08:12 AM APRIL RENT | | $2,500.00 | | $123,495.91 | |
| 06/29/2023 | | INTERNET TRANSFER TO DDA# 80006566071 ON 06/29 AT 08:12 AM APRIL RENT | | $1,500.00 | | $125,995.91 | |
| 06/28/2023 | | ACH DEBIT AMEX EPAYMENT ACH PMT JARED CHASSEN A3166 0005000040 | | $26,789.25 | | $127,495.91 | |
| 06/28/2023 | | ACH DEBIT AMEX EPAYMENT ACH PMT JARED CHASSEN A0686 0005000040 | | $10,000.00 | | $154,285.16 | |
| 06/28/2023 | | ACH DEBIT VERIZON PAYMENTREC JARED CHASSEN 9558454250001 9783397101 | | $138.32 | | $164,285.16 | |
| 06/28/2023 | | INTERNET TRANSFER FROM DDA# 80006445342 ON 06/28 AT 05:04 PM APRIL GP INVOICE | | | $99,008.09 | $164,423.48 | |
| 06/26/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JJ ARCH LLC 17 S 1314542717 9000313004 | | $1,465.09 | | $65,415.39 | |
| 06/21/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JARED CHASSEN 17 S 1312148117 9000313004 | | $394.13 | | $66,880.48 | |

| Date | Status | Description | Serial Number | Withdrawal Amount | Deposit Amount | Balance | Image |
|---|---|---|---|---|---|---|---|
| 06/16/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 06/16 AT 01:19 PM CONTRIBUTION | | $25,000.00 | | $67,274.61 | Motor. |
| 06/16/2023 | | INTERNET TRANSFER FROM DDA# 80009773021 ON 06/16 AT 01:19 PM CONTRIBUTION | | | $50,000.00 | $92,274.61 | YJ Simc |
| 06/15/2023 | | ACH DEBIT JPMORGAN CHASE EXT TRNSFR JJ ARCH LLC 17341413377 9200502231 | | $1,176.40 | | $42,274.61 | |
| 06/13/2023 | | DOMESTIC ONLINE WIRE RAM CATERERS OF OL D WESTBURY N06DB2357AHHAMGR | | $25,000.00 | | $43,451.01 | |
| 06/12/2023 | | ACH DEBIT GEICO PREM COLL JEFFREY S SIMPSON 3530075853 | | $158.95 | | $68,451.01 | |
| 06/07/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 06/07 AT 01:57 PM ADVANCE TO JS TO B E REIMBURSED TO JC | | $23,000.00 | | $68,609.96 | |
| 06/07/2023 | | INTERNET TRANSFER FROM DDA# 80003451846 ON 06/07 AT 01:57 PM JC CONTRIBUTION TO JJ FOR JS EXP TO BE REIMBURSED | | | $50,000.00 | $91,609.96 | |
| 06/06/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 06/06 AT 12:14 PM GP ADVANCE | | $20,000.00 | | $41,609.96 | |
| 06/05/2023 | | ACH DEBIT AMEX EPAYMENT ACH PMT JARED CHASSEN A2946 0005000040 | | $10,000.00 | | $61,609.96 | |
| 06/05/2023 | | DOMESTIC ONLINE WIRE CONNECTONE BANK N065E5644PW5H7JU | | $1,007,972.22 | | $71,609.96 | |
| 06/05/2023 | | INTERNET TRANSFER FROM DDA# 80009773021 ON 06/05 AT 11:30 AM TRANSFER FOR LOC P AYOFF | | | $1,000,000.00 | $1,079,582.18 | |
| 06/02/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 06/02 AT 10:45 AM DIST FOR MOTORS EX P | | $20,000.00 | | $79,582.18 | |
| 06/02/2023 | | DOMESTIC ONLINE WIRE REVOLUTION EVENTS N062D0012NZ5O4HM | | $11,482.00 | | $99,582.18 | |
| 06/02/2023 | | INTERNET TRANSFER FROM DDA# 80010922190 ON 06/02 AT 10:44 AM DIST FOR MOTORS EX P | | | $20,000.00 | $111,064.18 | |
| 06/01/2023 | | DOMESTIC ONLINE WIRE MORE THAN MUSIC & ENTERTAINMENT INC N061H2555RQ5GR40 | | $9,201.75 | | $91,064.18 | |
| 05/31/2023 | | ACH DEBIT VERIZON PAYMENTREC JARED CHASSEN 9558454250001 9783397101 | | $138.32 | | $100,265.93 | |
| 05/31/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 05/31 AT 11:37 AM FUNDING FOR EXPENS ES | | $2,000.00 | | $100,404.25 | |
| 05/31/2023 | | DOMESTIC ONLINE WIRE REVOLUTION EVENTS N05VF18442A48G9K | | $11,682.00 | | $102,404.25 | |
| 05/30/2023 | | ACH DEBIT AMEX EPAYMENT ACH PMT JARED CHASSEN A0230 0005000040 | | $7,457.27 | | $114,086.25 | |
| 05/26/2023 | | INTERNET TRANSFER TO DDA# 80003451846 ON 05/26 AT 08:16 AM MARCH GP | | $11,042.62 | | $121,543.52 | |
| 05/26/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 05/26 AT 08:16 AM MARCH GP | | $18,719.96 | | $132,586.14 | |
| 05/26/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 05/26 AT 08:16 AM MARCH RENT | | $2,500.00 | | $151,306.10 | |
| 05/26/2023 | | INTERNET TRANSFER TO DDA# 80006566071 ON 05/26 AT 08:16 AM MARCH RENT | | $1,500.00 | | $153,806.10 | |
| 05/25/2023 | | INTERNET TRANSFER FROM DDA# 80006445342 ON 05/25 AT 08:15 AM MARCH GP INVOICE | | | $99,008.09 | $155,306.10 | |
| 05/24/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JJ ARCH LLC 17 S 1314542717 9000313004 | | $1,441.14 | | $56,298.01 | |
| 05/23/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JARED CHASSEN 17 S 1312148117 9000313004 | | $580.01 | | $57,739.15 | |
| 05/23/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 05/23 AT 11:42 AM ADVANCE FOR 1640 M TK EXPENSES | | $5,000.00 | | $58,319.16 | |
| 05/19/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 05/19 AT 05:45 PM TRANSFER TO COVER PAYROLL | | $4,000.00 | | $63,319.16 | |
| 05/17/2023 | | INTERNET TRANSFER FROM DDA# 80010372177 ON 05/17 AT 07:25 AM INVOICE #53 | | | $7,846.15 | $67,319.16 | |
| 05/16/2023 | | ACH DEBIT JPMORGAN CHASE EXT TRNSFR JJ ARCH LLC 17082283312 9200502231 | | $1,176.40 | | $59,473.01 | |
| 05/15/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 05/15 AT 03:28 PM FUNDING FOR MOTORS | | $2,500.00 | | $60,649.41 | |



Shared JJ
Jeff expenses
Jared expenses

# Jared Chassen

**From:** Rebecca Tokarczyk
**Sent:** Wednesday, August 9, 2023 5:36 PM
**To:** Jared Chassen; Charisse Chassen
**Subject:** RE: Need transfer from JJ

This has been processed, thanks.

**REBECCA TOKARCZYK**
Corporate Accounting Manager
—
D 646.421.6268 | C 845.709.4384
rtokarczyk@archcre.com | archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Jared Chassen <jchassen@archcre.com>
**Sent:** Wednesday, August 9, 2023 3:22 PM
**To:** Charisse Chassen <cmchassen@gmail.com>; Rebecca Tokarczyk <rtokarczyk@archcre.com>
**Subject:** RE: Need transfer from JJ

Hey, if I still have owed draw left, this is approved. Please send today if you can, need to make a tax payment.

**JARED CHASSEN**
Managing Partner
—
D 646.854.1947 | C 646.634.9955
jchassen@archcre.com | archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Charisse Chassen <cmchassen@gmail.com>
**Sent:** Wednesday, August 9, 2023 11:29 AM
**To:** Rebecca Tokarczyk <rtokarczyk@archcre.com>
**Cc:** Jared Chassen <jchassen@archcre.com>
**Subject:** Need transfer from JJ

Hi Rebecca, when you have a chance can you please transfer $25k from JJ to my business account at Chase.
Thank you!

CHAMCHA Real Estate Inc

Account number

Routing number 021

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 87
RECEIVED NYSCEF: 09/15/2023

**J Chassen <jaredchassen@gmail.com>**

---

## Invoice from Elmwood Day School

**J Chassen** <jaredchassen@gmail.com>                              Mon, Jul 31, 2023 at 1:25 PM
To: Rebecca Tokarczyk <rtokarczyk@archcre.com>, Charisse Chassen <cmchassen@gmail.com>

RT, can you please pay from my JJ. Thank you.

---------- Forwarded message ---------
From: **Elmwood Day School** <quickbooks@notification.intuit.com>
Date: Mon, Jul 31, 2023 at 1:22 PM
Subject: Invoice from Elmwood Day School
To: <jaredchassen@gmail.com>, <cmchassen@gmail.com>

Hi Chassen, Jordan:2023-2024! You can pay now your invoice to Elmwood Day School in the amount of $9,400.00

---

## Elmwood Day School

INVOICE 9723 DETAILS

**DUE 08/01/2023**

# $9,400.00

**Print or save**

Powered by QuickBooks

Dear Families,

This is a reminder that the next tuition payment of 50% is due on August 1, 2023. Thank you for your deposit and 1st payment; it has been credited towards the tuition balance.

Payments may be made by check payable to Elmwood Day School, wire transfer, or Chase QuickPay via Zelle using the

Directors@elmwooddayschool.com e-mail address.

Thank you.

**Bill to**                          The Chassen Family
                                     Jordan Chassen
                                     55 Manor Pond Lane
                                     Irvington, NY 10533

**Terms**                            Net 15

School Year Tuition for 2023-2024: Threes - (8:45-2:00)

1 X $18,800.00                                          $18,800.00

Please make checks payable to ELMWOOD DAY SCHOOL, INC. or pay via
Chase QuickPay with Zelle using our email address:
Directors@Elmwooddayschool.com. Thank You!

1 X $0.00                                               $0.00

                                     Payment         $9,400.00

                                     Balance due     $9,400.00

Thank you for submitting your deposit, which has been credited as a
payment towards the balance due.

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 79
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

Federal EIN: 13-2867399

Please make checks payable to ELMWOOD DAY SCHOOL, Inc. or pay via Chase QuickPay with Zelle using our email address: Directors@Elmwooddayschool.com. Thank you!

**Print or save**

Elmwood Day School

900 Dobbs Ferry Rd White Plains, NY 10607

(914)592-8577    directors@elmwooddayschool.com    http://elmwooddayschool.com

If you receive an email that seems fraudulent, please check with the business owner before paying.



© Intuit, Inc. All rights reserved.    Privacy | Security | Terms of Service

--
Jared Chassen

📕 **Invoice_9723_from_Elmwood_Day_School.pdf**
12K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,

                          Plaintiff,           Index No.: 158055/2023

     -against-

JARED CHASSEN and FIRST REPUBLIC BANK

                        Defendants.

-----------------------------------------------------------------x

### AFFIRMATION OF JOHN M. LEVENTHAL, ESQ. IN SUPPORT OF EMERGENCY MOTION

John M. Leventhal, Esq., an attorney duly admitted to practice law before the Courts of

this State affirms under penalty of perjury pursuant to CPLR 2106 as follows:

    1.     I am counsel for Defendant Jared Chassen ("Chassen"). I submit this affirmation

in support of Chasen's motion seeking an order: (1) compelling Plaintiff to comply with the

Court's August 21, 2023 Interim Order; (2) declaring null and void Simpson's post-Interim

Order termination letter; (3) holding Simpson in contempt of the Court's August 21, 2023

Interim Order, and (4) enjoining Simpson from unilaterally acting contrary to the Court's Interim

Order.

    2.     On August 21, 2023, the Court entered an Interim Order which required that

"[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, **and such**

**access shall not be terminated without further order of the Court**." NYSCEF No. 36, Interim

Order, at 2 (emphasis added). The Interim Order further provided that the "JJ Arch shall be

managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement

of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22,

2021." *Id.*. That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be

managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating

Agreement, which provides among other things that any Company Major Decision, as defined in

the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of

Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson

and Chassen to the other purportedly resigning or terminating the other as a member or

managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the

Interim order provided that "**Simpson and Chassen shall cooperate with each other in good**

**faith** to facilitate the effective exercise of their respective roles and responsibilities under the JJ

Arch Operating Agreement and related agreements. . ." *Id.* (emphasis added). A copy of the

Interim Order is annexed hereto as **Exhibit A**.

3. On September 1, 2023, Simpson sent Chassen another termination letter.

NYSCEF No. 53.

4. On September 3, 2023, Chassen rejected the letter, NYSCEF No. 54, and again

reiterated his objection by letter on September 8, 2023. NYSCEF No. 55.

5. On September 5, 2023, I wrote a letter to Simpson's counsel notifying him that

Simpson's conduct was in violation of the Court's Interim Order, and warning him his client's

deletion of emails constitutes spoilation of evidence. A copy of my letter is annexed hereto as

**Exhibit B**.

6. On September 8, 2023, I requested a pre-motion conference in the hopes that such

a conference could resolve this issue without need to file a motion for contempt. NYSCEF No.

52. The conference was held on September 11, 2023. A copy of the transcript is annexed hereto as **Exhibit C**. Further corroborating Chassen's claims herein regarding Simpson's complete disregard for the Interim Order, First Republic's counsel said at the September 11, 2023 conference, "[t]hen it appears, the bank is still conducting an internal investigation, that on September 6th that Mr. Simpson or somebody acting on his behalf toggled the settings so that Mr. Chassen can no longer access the accounts online. The bank is now aware of that." Ex. C, Sept. 11, 2023 Tr. at 25:7-16.

7.      Our efforts to resolve this dispute have since failed, Chassen remains shut out from his email and company systems, and Mr. Simpson has refused to restore the status quo as reflected in the Interim Order. Chassen has no choice but to file this emergency motion.

8.      On September 14, 2023, we gave notice to Simspon's counsel Adam Leitman Bailey, Esq. via email that Chassen would be presenting this emergency application to the Ex Parte Part of the New York County Supreme Court located at 60 Centre Street, New York, New York on September 14, 2023 at approximately 3:00 p.m. via NYSCEF. A copy of the email notice is annexed hereto as **Exhibit D**. This motion is being filed on an expedited basis on short notice because this is an emergency, and the Court has already held a pre-motion conference, and said there: "I will take a motion as promptly as the defendant can file it and we'll see what happens, Mr. Bailey." Ex. C at 39:7-9.

9.      No prior request for this relief has been made to this or any other court.

10.     Each of the documents cited by citation to NYSCEF herein, or in the annexed memorandum of law or Chassen Affidavit submitted herewith are expressly incorporated herein by reference and are expressly part of the record herein. *See* CPLR 2214(c) ("[I]n an e-filed action, a party that files papers in connection with a motion need not include copies of papers

that were filed previously electronically with the court, but may make reference to them, giving

the docket numbers on the e-filing system.").

11. For the reasons detailed in Chassen's moving papers, the Court should grant this

motion in its entirety.

Dated: New York, New York　　　　　By: _John M. Leventhal_
　　　September 14, 2023　　　　　　　　　John M. Leventhal, Esq.

## Word Count Certification

John M. Leventhal Esq. hereby certifies that this affirmation contains 851 words exclusive of the table of contents, caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

_____/s/_____

John M. Leventhal, Esq.

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**PRESENT:**    **HON. JOEL M. COHEN**          **PART** _____ 03M _____

*Justice*

-----------------------------------------------------------------X

JEFFREY SIMPSON, JJ ARCH LLC

           Plaintiffs,

- v -

JARED CHASSEN, FIRST REPUBLIC BANK,

           Defendants.

-----------------------------------------------------------------X

**INDEX NO.** _____ 158055/2023 _____

### ORDER REGARDING
### INTERIM OPERATING
### PROCEDURES (Mot. Seq. 001)

WHEREAS, on August 14, 2023, Jeffrey Simpson ("Simpson"), individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC, and JJ Arch LLC (collectively, "Plaintiffs") filed the above-captioned action against Jared Chassen ("Chassen") and First Republic Bank ("First Republic");

WHEREAS, on August 15, 2023, Plaintiffs filed an Order to Show Cause seeking preliminary injunctive relief;

WHEREAS, on August 16, 2023, counsel for the Plaintiffs and counsel for Chassen appeared before the Honorable Joel Cohen of the Supreme Court of the State of New York, County of New York;

WHEREAS, on August 16, 2023, the Court ordered the parties to confer regarding interim operating measures for JJ Arch LLC ("JJ Arch") and its related companies (the "Arch Companies");

WHEREAS, the parties submitted competing orders for the Court's consideration;

WHEREAS, on August 18, 2023, counsel for the Plaintiffs and counsel for Chassen appeared before the Court; and

# INTERIM ORDER

WHEREAS, on August 18, 2023, the Court ordered the parties to jointly file a proposed interim order regarding operating procedures for the Arch Companies, but the parties instead again submitted competing proposals;

NOW THEREFORE, IT IS SO ORDERED by the Court that **pending the to-be-scheduled hearing on Plaintiff's motion for a preliminary injunction** (Motion Sequence No. 001):

1.    The First Republic accounts that are subject to the Adverse Claim letter dated August 11, 2023 (the "Arch Accounts") shall be unfrozen. Both Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court;

2.    The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect;

3.    JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021 (the "JJ Arch Operating Agreement"). Specifically, the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen. Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements; and

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 85
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/24/2023
RECEIVED NYSCEF: 09/15/2023

4. Simpson and Chassen shall issue a joint communication to all employees of the Arch Companies in the form attached hereto as Exhibit A.

This constitutes an interim decision and order of the Court on Motion Sequence No. 001.

2023082105455455JMCOHEN8538A170661400A6A32E8E33DF7193A6

**DATE: 8/21/2023**                    JOEL M. COHEN, JSC

**Check One:**    ☐ **Case Disposed**    ☒ **Non-Final Disposition**

**Check if Appropriate:**    ☐ **Other (Specify** _____ **)**

EXHIBIT A - JOINT COMMUNICATION

Dear Arch team members,

We understand that the last few weeks have been very challenging for all of us, but we sincerely hope that we have turned a corner. Jeff and Jared are both still members of JJ Arch and will be jointly running the business at the present time.

We very much appreciate your dedication to Arch, and we look forward to continuing to work with you.

Thank you for your patience,

Jeff and Jared

LAW OFFICES OF

*Aidala, Bertuna & Kamins, P.C.*

ARTHUR L. AIDALA*
MARIANNE E. BERTUNA*
HON. BARRY KAMINS (RET.)
HON. JOHN M. LEVENTHAL (RET.)
JOHN S. ESPOSITO
MICHAEL T. JACOARINO
IMRAN H. ANSARI
DIANA FABI SAMSON**
ANDREA M. ARRIGO*
MICHAEL F. DIBENEDETTO*
LINO J DE MASI
DAVID M. SCHWARTZ+

*ALSO ADMITTED IN NEW JERSEY
**ALSO ADMITTED IN CONNECTICUT
+ALSO ADMITTED IN D.C.

640 FIFTH AVENUE
NEW YORK, NY 10036
TELEPHONE: (212) 486-0011
FACSIMILE: (917) 261-4892
WWW.AIDALALAW.COM

8118 - 13TH AVENUE
BROOKLYN, NEW YORK 11228
TEL: (718) 238-9898
FAX: (718) 921-3292

OF COUNSEL
JOSEPH A. BARATTA
ANTOINETTE LANTERI
WILLIAM R. SANTO
PETER S. THOMAS
LAWRENCE SPASOJEVICH
SIGURD SORENSON

SENIOR COUNSEL
LOUIS R. AIDALA
JOSEPH P. BARATTA

September 5, 2023

Adam Leitman Bailey, Esq.
One Battery Plaza, 18th Floor
New York, New York 10004
Via email: alb@alblawfirm.com

Re:     158055/2023 Jeffrery Simpson et al v. Jared Chassen et al

Dear Mr. Bailey:

Our law firm represents Mr. Chassen in the above-referenced case.

Your client has violated Justice Cohen's Court Order by his September 1, 2023, letter to my client purporting to terminate his ownership to JJ Arch LLC and his September 4, 2023, email to JJ Arch's employees claiming and informing them that Mr. Chassen is no longer a member.

It has also come to our attention that your client is notifying JJ Arch's partners, investors and others that Jared is no longer part of JJ Arch LLC. This too is in violation of Justice Cohen's Order. It is clear that Jeffrey is following your legal advice and that you are directing him to send these letters and emails. We are demanding that your client notify employees, partners, investors that Jared remains a member of JJ Arch and that he also restores Jared's access to his emails via the Arch and JJ Arch email accounts which your client improperly and illegally removed.

Your client's failure to do so will constitute a violation of Justice Cohen's Order and sanctions will be sought.

You are to make sure that your client refrains from deleting any emails or other documents and evidence relating to the above-referenced case. If documents have been destroyed or emails deleted, we will take appropriate action as provided by the CPLR.

Very Truly Yours,

John M. Leventhal

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY : CIVIL TERM : PART 3
------------------------------------------------------------X
JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ
ARCH LLC,

                    Plaintiffs,

          -against-              Index No. 158055/2023

JARED CHASSEN and FIRST REPUBLIC BANK,

                    Defendants.
------------------------------------------------------------X

                MICROSOFT TEAMS PROCEEDING

September 11, 2023


B E F O R E:  HON. JOEL M. COHEN
                    Supreme Court Justice


A P P E A R A N C E S:


ADAM LEITMAN BAILEY P.C.
Attorneys for the Plaintiffs
One Battery Park Plaza - Floor 18
New York, New York  10004-1646
BY:  ADAM LEITMAN BAILEY, ESQ.


AIDALA, BERTUNA & KAMINS, P.C.
Attorneys for the Defendant - Jared Chassen
546 Fifth Avenue - 6th Floor
New York, New York  10036
BY:  JONATHAN LEVENTHAL, ESQ.


SEDDIO & ASSOCIATES
Of Counsel Attorneys for the Defendant - Jared Chassen
9306 Flatlands Avenue
Brooklyn, New York  11236-3706
BY:  JASON ALLEN SCHWARTZ, ESQ.

NYSCEF DOC. NO. 87

2

1

2      A P P E A R A N C E S:   (Continued)

3

4      SHERMAN ATLAS SYLVESTER & STAMELMAN LLP
       Attorneys for the Defendant - First Republic Bank
       1185 Avenue of the Americas - Third Floor
5      New York, New York  10036
       BY:   JAY KANDEL, ESQ.
6      AND:  NATHANIA REYES, ESQ.

7

8

9

10
                         Lori Ann Sacco
11                       Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CONFERENCE

THE COURT: Good afternoon folks. I just ask everybody to stay on mute until you're ready to speak, because we're getting a lot of feedback. I would appreciate that. Thank you. All right. Good afternoon. This is not going to be an argument. I will let you speak in a few minutes. I'm going to mostly just give you a few comments and then directions, but just at the outset let's see who is here beginning with appearances from the plaintiff who has to then unmute himself first.

MR. BAILEY: Good afternoon, your Honor. Adam Leitman Bailey appearing for Jeffrey Simpson.

THE COURT: And anyone else for the plaintiff?

(No response.)

THE COURT: All right. For the defendant.

MR. LEVENTHAL: Good afternoon, your Honor. John Leventhal for the defendant, Mr. Chassen, and Allen Schwartz will be making most of the arguments. I just want to add a couple of things, your Honor. But Allen Schwartz is here as well of counsel.

THE COURT: Right. Just a few things.

MR. KANDEL: Your Honor, if I could appear.

THE COURT: Sure.

MR. KANDEL: I'm appearing on behalf of First

1        CONFERENCE

2    Republic Bank, but the official name, this is Tyler

3    Kandel from Sherman, Atlas, Sylvester and Stamelman

4    LLP, on behalf of JPMorgan Chase Bank, N.A.,

5    purchaser of certain assets and assumed liability

6    from First Republic Bank from the FDIC as receiver.

7        THE COURT: Hopefully this will be your last

8    experience here. Go ahead, Ms. Reyes.

9        MS. REYES: Nathania Reyes from Sherman,

10    Atlas. I am representing JPMorgan Chase Bank,

11    purchaser of certain assets and assumed liabilities

12    of First Republic Bank from the Federal Deposit

13    Insurance Corporation as receiver. Thank you.

14        THE COURT: Anyone else? Okay. I've

15    received the letter that was sent into me from

16    Mr. Leventhal. A couple of things. First of all, my

17    part rules, I do not take Rule 24 letters other

18    than -- I don't require pre-motion conferences other

19    than for discovery. You know, in certain

20    circumstances I think I may put this in the rules,

21    I'm not sure, if the parties think that a short pre-

22    motion conference can be helpful, I will do it. I

23    don't refuse to do it, but I don't require pre-motion

24    conferences.

25        My overriding reaction is that I'm not sure

26    if people were listening terribly carefully during

1                         CONFERENCE

2         the court conferences we had on this case before I

3         left on vacation, because it's hard for me to square

4         the conduct that has gone on between then and now

5         with what I thought I had conveyed.

6              Now I'm putting aside for the moment whether

7         anyone literally violated the terms of any orders or

8         whether you are just sort of tone deaf to what I was

9         trying to accomplish with an order that was designed

10        to steady the ship, to put the company back in sort

11        of normal working order, recognizing that the

12        principals have a heated disputes with one another,

13        but the goal was to get the business at least

14        operating on the basis of the existing agreement,

15        which is relatively straightforward it seems to me

16        anyway.  And so a couple of things I -- I don't much

17        like.  I don't like when people engage in self help

18        in the middle of a litigation to instead of, if they

19        perceive the other side is violating an order that

20        was issued by the Court, coming to court and having

21        it be resolved in a civilized, organized way, but

22        instead to go back to the battlefield of unilateral

23        termination.  It just could not be further away from

24        the path I was trying to put you all on with the

25        order that I issued before the end of August.

26              So, you know, I -- I -- you know, I think

CONFERENCE

it's important, it's important as you all know, to

get to know the Judge a little bit, and I just -- I

just felt the need to at least give that preamble,

that I do count on counsel to help keep this thing on

the rails.  I'm just astonished.  Again, I've only

heard one side I suppose.  I've got Judge Leventhal's

letter, and I don't have any response yet.  But

certainly based on looking at the correspondence back

and forth, everyone seems to think this is a free for

all in the business.  I'm not talking about the

lawyers now, although I'm quite sure the lawyers

wrote these letters, but this is a mess, okay.

We're in a lawsuit.  We're trying to resolve

these contractual issues in a civilized way.  And,

you know, I have people being banished to, you know,

a corner of the office.  People throwing each other

out.  People throwing resignations at each other

again.  You have to know, now I'm talking to the

clients as well, that in evaluating these claims, I'm

going to be watching really carefully how you all act

while under the glare of the Court in complying with

agreements.  It's an exceptionally bad time to be

overreaching and acting in a manner that in my view

is inconsistent with the spirit of the, I thought,

the conversations before we last broke, to get the

CONFERENCE

business at least back on a solid footing, you know,
ensure the bank was, you know, comfortable that it
knew who was in charge, at the same time, you know,
so that the business could at least be solvent.

So, I'm really kind of flabbergasted by this.
I don't get surprised by too many things. I did not
expect this. Then on top of all of it, I suppose I
was kind of confused a bit by why it took a week to
let me know that one party had terminated the other
party.

So, that's a sort of a disorganized set of
initial reactions to these letters -- this letter,
which I got on Friday. And, you know, I'll let you
all speak briefly. I'm not here, I genuinely am not
here to argue this motion, because this motion hasn't
been made yet. If Mr. Chassen's counsel or if you
want to make a motion, make it.

MR. LEVENTHAL: Your Honor --

THE COURT: Go ahead.

MR. LEVENTHAL: -- I don't want to speak on
the merits, but I just want to say, I want to address
one thing that you said. You said you were shocked
or surprised that you didn't hear about this before.
Well, number one, you're on vacation. Like we didn't
want to bother you. Really the main reason I had

1               CONFERENCE

2        written Mr. Bailey and asked him to put everything

3        back, because I believe his client was in violation.

4        I heard deafness.  No response.  I had asked him

5        to -- that there is a violation of the order, et

6        cetera.  I requested that on -- on one or two

7        occasions.  You had asked us or your law clerk had

8        asked us to meet and try to resolve these things.  I

9        sent an e-mail to do that.  Deafness.  Silence.

10            So, I didn't want to bother the Court on

11       vacation, and I tried to resolve it with the other

12       attorney.  The other attorney did not respond.

13            MR. SCHWARTZ:  Your Honor, if I may also just

14       to add to what Judge Leventhal just said.  You know,

15       your Honor issued the interim order August 21st.  So,

16       in a matter, in a very short amount of time, as your

17       Honor mentioned, Mr. Chassen was banished to a corner

18       office.  Verbal abuse was directed at him.  He's been

19       terminated.  Employees, vendors and partners have

20       been told he's not part of the business.  Mr. Simpson

21       has accessed all of his e-mails, privileged e-mails,

22       deleted his e-mails and completely shut off access to

23       all of his company e-mails.  He shut off

24       Mr. Chassen's access to all company systems.  And

25       according to what Mr. Chassen has heard from third

26       parties, he has been calling him names such as stupid

1                          CONFERENCE

2       and dumb and other derogatory terms to employees and

3       third parties.  All of this has happened in literally

4       -- in breakneck speed.

5              Your Honor issued an interim order that set

6       forth Mr. Chassen's consent rights.  Set forth

7       Mr. Chassen's right to view the company accounts.

8       Nullifying both parties termination letters and

9       clearly thereby said that using these termination

10      letters as a weapon in the midst of this litigation

11      was not something the Court wanted to see or was

12      going to count on seeing.  And then on top of it the

13      Court specifically said the parties should reasonably

14      cooperate.

15             Your Honor, there is no excuse or

16      justification for any of this.  No matter what

17      Mr. Simpson may say Mr. Chassen did or didn't do,

18      there was no excuse for Mr. Simpson to take the law

19      in his own hands with the litigation pending, with a

20      court order in place and take unilateral action such

21      as the ones we just described.  There can be no

22      jurisdiction for it.  So, the reason we asked for a

23      pre-motion conference, your Honor, is because we

24      hoped and we still hope that there shouldn't be a

25      need for motion practice in this type of

26      circumstance.  The court order was quite clear.  So

1                    CONFERENCE

2        all the actions that have been taken since the

3        Court's order we are hopeful can be resolved without

4        the necessity of contempt motion practice or other

5        motion practice on an interim basis while there

6        already is interim motion practice pending.  If that

7        has to happen today after the conference today and

8        what your Honor just said isn't clear enough for

9        Mr. Simpson, then of course we're going to proceed

10       with motion practice and file that motion.  But we

11       sought the conference today because we were hopeful,

12       given how clear your Honor's order was and what your

13       Honor intended, that -- that there may, hopefully

14       there might not be a need for that after this

15       conference today.  Obviously we'll see.

16                    THE COURT:  What I suspect I'm going to hear

17       from Mr. Bailey is that the order directed everyone

18       to follow the agreement.  And I -- I did not, I guess

19       I did not think it necessary, but the agreement

20       includes the termination provisions.  So, I suppose

21       strictly speaking directing everyone to follow the

22       agreement didn't direct folks not to jump back into

23       the same behaviors that lead them to this court in

24       the first place, which is why I hesitated when I

25       described whether this is a violation of the order or

26       not.  I'm sure there are going to be arguments in

1                      CONFERENCE

2          both directions with what each party was doing.

3              The goal of this kind of an order is not to

4          have the Court be consulted every few days to see how

5          things are going, but instead to have the parties,

6          with the advice of counsel, operate the business for

7          their mutual advantage rather than using it as a club

8          to beat each other over the head with.  Mr. Bailey

9          over to you.

10             MR. BAILEY:  Thank you very much, your Honor.

11         We have filed a response, a letter (gesturing),

12         shortly before the oral argument started, dated

13         September 11th, 2023.  It's e-filed and there is

14         exhibits as well.

15             THE COURT:  Well, that's, I'm afraid, too

16         late, because we're already here.

17             MR. BAILEY:  Okay.  Second housekeeping

18         matter is while I was on vacation, on 8/30/2023 I

19         received an e-mail from Imran Ansari, who is a member

20         of Mr. Leventhal's firm, and he introduced himself,

21         and I wrote back, "Nice to me you too Imran.  I have

22         been a big fan of Mr. Aidala for over 20 years.  Can

23         you send me a change of attorney form.  This case is

24         an emergency brought by an emergency order to show

25         cause, which has already been heard and decided.

26         Your client decided to try to recoup the business.

CONFERENCE

My client still does not have access to his bank
accounts. He's a managing partner of the business,
which I believe all we have left for the preliminary
junction phase is access. I do not see opposing
that. Either way we cannot provide any adjournments
until access has been given and the continued
attempts at a recoup to stop. You can have an
adjournment at your answer. Please send me a
stipulation. I am back from vacation on Tuesday."

So, I don't -- I answered the second or third
attorney's e-mails, 'cause I was dealing with one
attorney. That's my excuse for not responding to
you, Mr. Leventhal.

Okay. Now going to the merits of this.
Number one, we have not violated any court order.
Jared Chassen still has access to all bank accounts.
You are correct, in accordance with the operating
agreements and the JJ Arch as amended operating
agreement, we were forced to fire Jared Chassen. Let
me give you the reasons stated in our letter.
Incredibly, first of all, Mr. Chassen signed an
agreement where he was going to work for a third
party minority investor. Be paid by them. Take
direction from them. And they also agreed to
indemnify them for any and all lawsuits and legal

CONFERENCE

1
2   fees.  And this -- We understand it is a large
3   agreement that covers all kinds of affairs.  And this
4   all continued until after the order.
5           THE COURT:  Is this the same investor that we
6   talked about during the earlier hearing?
7           MR. BAILEY:  Correct.  It continued
8   afterwards.  In fact, there is e-mails whereby,
9   they're exhibits to this letter, there is e-mails
10  whereby Mr. Chassen would get an e-mail from Jeffrey
11  Simpson about a subject and then Mr. Chassen would
12  send it to the Wiener brothers and say can I do this
13  or should I do this.  So, Mr. Chassen stopped working
14  for Arch and started taking orders from the Wiener
15  brothers, the minority investor.  So, he was
16  basically a trader to his own employer.

17          Second of all, he disobeyed the order.  He
18  refused, for almost two weeks, in giving up access to
19  Microsoft, 'cause he knew we would be able to see
20  e-mails then of everything he was doing.  Only until
21  I said I'm going to court tomorrow while I was on
22  vacation.  We're going to have to go to court
23  tomorrow to get an order to show cause with another
24  judge to get access to the commuters, he finally gave
25  over the pass codes.  Then with the bank accounts we
26  still didn't get access from Mr. Chassen.  We had to

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 87
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

14

CONFERENCE

find a back workaround way to get access to the bank
accounts. Meaning the preliminary hearing is now
moot. So, he disobeyed everything in the order.

The third part is he stole money from the
company. He refuses to reimburse that money. It's
approximately $75,000. We highlighted those monies
in the exhibits to this letter.

Next. Mr. Chassen refused to come to work
after a letter went out requiring all employees
required to come to work. Instead he came to work
one day. Out of two weeks' worth of work, he came to
work one day. Instead, one day outside of work, he
blew kisses to the employees. All other employees
came back to work. He instead decided he wasn't
working for the company anymore. He wasn't
participating in anything. He was no longer going to
be part of any affairs. He was instead doing
everything he can to hurt the company, ambush the
company and help other companies harm Arch. So, this
wasn't really a choice in what we do.

THE COURT: You just said other companies.
Are we still talking about the investor member? Is
that the third party you're talking about?

MR. BAILEY: There is 35 Oak and there is
another company called Infinity. Those are the two.

15

CONFERENCE

1

2          THE COURT:  Are they both associated with the

3      investor member?

4          MR. BAILEY:  They are both investors.

5          THE COURT:  You keep referring to these third

6      parties as if they have no legitimate interest in

7      your company.  They do.  I made that point a number

8      of times.

9          MR. BAILEY:  They both are minority members

10     of the company.

11         THE COURT:  I told you, as I mentioned in one

12     of our conferences, if Mr. Chassen was out, you know,

13     doing a deal with brand X, whoever brand X is, your

14     company's competitor, I would understand the nature

15     of -- of Mr. Simpson's frustrations.  And I do

16     understand that sometimes relationships between an

17     investor member and a management member can sometimes

18     be less than cordial.  But, you know, it still sort

19     of confuses me as to why the reaction to this

20     wouldn't have been, if you do think that there was a

21     violation of the order, you're in the middle of a

22     lawsuit that you brought, why not pursue it the legal

23     route and then have the allegations tested.  I mean,

24     frankly I don't think any of this should have

25     necessarily been brought to the Court, and this is

26     the kind of thing that I would hope between

1                           CONFERENCE

2        experienced counsel could be resolved.  Because, you

3        know, frankly you may say that these things sound

4        outrageous.  I'm kind of listening to them through

5        the prism of what I suspect was actually going on.

6        And, you know, if I have to make findings about this

7        and you have to be derailed from your motion and from

8        your client's business to fight about who did what to

9        whose e-mails, I guess that's my job and I have to do

10       it, but nothing that you've said strikes me as well,

11       the only thing literally we could do was terminate

12       him again as opposed to seeking relief from the

13       Court.

14             MR. BAILEY:  No.  See there are noncompete

15       agreements for both of these companies, where he's

16       not allowed to work for these companies in our

17       agreements.  He's violated company agreements by

18       working for them.

19             THE COURT:  The agreements list the investor

20       member as a company that he cannot work for?

21             MR. BAILEY:  Correct.  Both of them.

22             THE COURT:  Okay.

23             MR. BAILEY:  So, he's violated that.  My

24       understanding in 28 years of practicing law, in this

25       type of law, real estate and corporate law, I don't

26       go to judges.  My companies don't go to judges when

CONFERENCE

1

2      they need babysitting or they need help with making

3      decisions.  There is a provision here that allows you

4      to fire employees when they are working against you

5      and when they are doing horrible things.  When their

6      goal is to ruin you.  When they're seeking people

7      they are not allowed to work with to try to destroy

8      you.  When they are trying to sell your employees

9      after the order, after you've already given an order

10     to leave the company or do bad things or self

11     destruct, basically light fires is the best metaphor

12     I can do.  What are you suppose to do?  You exercise

13     the provision that fires the person from the

14     agreement.

15            Now in order to not violate the order, we

16     looked at it very carefully and we made sure, you

17     could look today, anyone could look today, the banks

18     here, they can tell you, that he still has full

19     access to the bank accounts.  Everything in the order

20     that you decided is still in effect except we have --

21     we exercised our provision that he's fired, because

22     he was doing so much damage that it was really

23     risking the safety, life and safety of employees on

24     job sites.  It was risking the morale of employees.

25     He was stealing money.  Taking money for himself.

26     Taking money to pay for his wife's kids' schooling.

CONFERENCE

He was really just doing everything he can to help
himself and not the company. And this is
something --

THE COURT: The part of the background --
Look, it's hard to disagree in principle with the
idea that you don't run to court every time to have
your hand held. I agree with that in principle. But
the background here is that you had mutual
terminations, unilateral terminations that took
place. Then you went through a court process where
those were both vacated. And then according to you,
you know, giving credence to what you just said, if
it is true, Mr. Chassen then did something that, you
know, I guess you argue is as bad or worse as what he
had done before. It does strike me as odd that you
would go back to the same toolbox of unilateral
termination and telling the employees, after having
told them that everything was fine and we're working
together and all is well. Look, I obviously cannot
make a judgment as to who did what at this point.
It's just it does baffle me a bit that the judgment
was made. You know, that the only thing that could
be done was to run up the same hill, in the same way.
You know, all I'm saying is that I thought I made it
very clear. And look if both sides have done things

CONFERENCE

1
2     that were inconsistent with just getting themselves
3     back to the grindstone and running this business,
4     then I will be an equal opportunity critic. But, you
5     know, as I look at it now, one thing that is clear is
6     that things have gone off the rails. It's hard for
7     me to see that unilateral action was the only thing
8     available.

9         Now maybe you're right. You're each throwing
10     pretty heavy allegations. An allegation that
11     Mr. Simpson was deleting Mr. Chassen's e-mails, if
12     that were true, would be, among other things,
13     spoliation of evidence. I'm assuming you're going to
14     deny that or maybe you are.

15         MR. BAILEY: Nothing -- Everything has been
16     preserved because we knew, we assumed that, and I
17     told my client that nothing, no spoliation. We're
18     going to act perfectly, and we're going to do
19     everything right, so in case we ever have to come
20     back here, we want to look good.

21         MR. LEVENTHAL: Your Honor, may I interject
22     for just a moment? I'm not going to belabor the
23     point.

24         THE COURT: Sure.

25         MR. LEVENTHAL: I had e-mailed Mr. Bailey
26     about preserving and erasing and giving our client

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 83
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

20

1                    CONFERENCE

2         access.   What we have here is an order to show cause

3         for a TRO and a preliminary injunction, and we have

4         to defend ourselves.   If we don't have access to the

5         e-mails, and they look at our client's e-mails with

6         attorneys, which is privileged, there is all kinds of

7         violations here.   Besides spoliation, there is all

8         kinds of sanctions.

9              I have to take issue with what Mr. Bailey

10        said.   Because Mr. Ansari asked for an adjournment

11        and it wasn't given, and we had to write to the

12        Court, and your law clerk was very Solomonic by

13        giving us some time when we first came into the case.

14        I asked him to reconsider.   He choses to ignore me

15        because I'm a second attorney, a named party in the

16        case.   I find that's a little incredulous.

17             Secondly, I write him again and I say restore

18        him to -- to his e-mails.   Restore him to the bank

19        accounts.   Restore him to have access.   And he

20        chooses to ignore me, because Mr. Ansari had

21        contacted him originally for an adjournment of our

22        response to the order to show cause.   I contacted him

23        again and said, as your court attorney had written or

24        your Honor may have written, try to resolve any

25        differences in advance to this conference.   I

26        e-mailed.   I said I'm available until quarter to 5:00

1                           CONFERENCE

2        on Friday.  Silence again.  I find it incredible just

3        because Mr. Ansari was the initial contactor, that he

4        could choose to ignore me, and I hope the Court would

5        find that incredible as well.  But Mr. Schwartz, if

6        need be, since he's prepared for this case, will

7        address all of these allegations.  But I would like

8        some direction from the Court.  If the Court restores

9        us to the status quo as the interim order, a contempt

10       order may or may not be needed.  If you tell me that

11       there is wiggle room here for Mr. Bailey because the

12       Court said go back to the agreement, and in the

13       agreement you can terminate, and a contempt order

14       is -- would be out of line, because it wasn't a

15       clear, direct order of the Court, then we don't want

16       to engage in just to waste the Court's time, to waste

17       our client's money.  We don't want to do that.  We

18       would like some direction from you, your Honor.

19                   THE COURT:  Well, look, honestly, I'm not

20       taking anything off the table, because I don't know

21       enough yet.  I'm, you know, I'm not going to preclude

22       you from doing that.  I mean, you know, if you ask

23       me, it was my law clerk who said to meet and confer

24       and try to resolve this before today, but, you know,

25       with my approval.  This is clearly something that

26       should go back to the status quo.  Look, if

1                    CONFERENCE

2         Mr. Bailey is right, this is what's hard for me,

3         right.  If, in fact, there is a world in which money

4         is being siphoned out of the company in realtime,

5         which is all I'm hearing, and I guess I didn't recall

6         hearing that there was an outright prohibition about

7         any interactions with the member, investor member,

8         but that would be useful to know, but it is certainly

9         more consistent with my view of where we were heading

10        for the clients, and I've used this phrase before, to

11        put the swords away.  Get the business on track.  You

12        know, it can't be terribly helpful frankly for

13        Mr. Kandel's client to be, you know, listening to the

14        two people who are supposedly in charge of this

15        company still fighting every day and firing each

16        other and them not knowing who they should take

17        direction from.  But, you know, what I would like to

18        sentence you to is to, before you file anything on

19        either side, just try to, you know, take a deep

20        breath and listen to what I've been saying, which is

21        I have not heard a one sided, you know, this is

22        clearly a situation where one of these two guys has

23        to be jettison from this company or else the company

24        will be in ruins.  The view I reached last week was

25        that the company could still proceed under the

26        agreement.  There had never been, you know,

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 83                                  RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

23

1              CONFERENCE

2     unilateral terminations before.  So the last thing I

3     thought would happen would be an immediate return to

4     that, you know, last resort scenario.

5              So, you know, I'm very skeptical about the

6     unilateral termination that happened under the shadow

7     of the last order I signed.  I'm not in a position to

8     just vacate it, because I don't have a record yet as

9     to what happened that I can make a legitimate

10    finding, but I am certainly inclined in that

11    direction.  Look, is it possible that Mr. Chassen did

12    certain things that would have me basically rethink

13    the order and say well this guy shouldn't be on the

14    premises.  I can't discount that could happen or in

15    the other direction as well.  But that is not what

16    I'm looking for.  I'm looking for counsel and their

17    clients to show frankly the Court, who is going to be

18    trying to make an equitable decision here, that left

19    to their own devices, they have the best interests of

20    the company in mind and are trying to lower the

21    temperature rather than raise it.  But I must say

22    that the actions of September 1st are -- remain a bit

23    shocking to me.  Obviously Mr. Bailey has just levied

24    a couple of allegations that I would like to hear

25    from Mr. Schwartz about, because they are pretty

26    stark.  But ultimately I'm going to send you back to

CONFERENCE

1

2          try to talk it over and see if you could avoid.  I

3          don't think you want to come back here in front of me

4          on an evidentiary hearing on this record.  I

5          genuinely don't.  First of all, you have more

6          important things to do.  Mr. Chassen and Mr.  Simpson

7          have a business to run.  You guys still have a

8          preliminary injunction hearing to get ready for.

9          This seems to be counterproductive.

10              Mr. Schwartz, let me turn it over to you.

11              MR. SCHWARTZ:  Thank you, your Honor.  First

12         of all, the issue with the bank accounts.  The bank

13         accounts, Mr. Chassen was removed from observing the

14         bank activity.  It was restored, we learned it was

15         restored today through our communication.

16              MR. KANDEL:  Can I interject for one second.

17         I know I spoke with Mr. Leventhal before this hearing

18         today, and I got updated information after I spoke

19         with him.  So, I just don't want Mr. Schwartz to give

20         incorrect information that I later learned was

21         incorrect.

22              THE COURT:  The bank has been name checked so

23         you can answer.  Go ahead.

24              MR. KANDEL:  Thank you, your Honor.  So the

25         bank, after the entry of the interim order, took

26         steps to comply with the interim order as it related

CONFERENCE

to the two directions set forth therein.  One was to
unfreeze all of the accounts.  And then secondly to
provide both individuals with full access view to
view them online, each of the accounts online.  The
bank did that.

Then it appears, the bank is still conducting
an internal investigation, that on September 6th that
Mr. Simpson or somebody acting on his behalf toggled
the settings so that Mr. Chassen can no longer access
the accounts online.  The bank is now aware of that.
Although I thought earlier today that full access had
been restored, they are working, as the e-mail I just
got during this hearing, they are working as we speak
to restore full access to all of the accounts online.
So, I just wanted to state that for the record.

I do have something else I wanted the Court
to address, but I don't want to interject in the
middle of Mr. Schwartz's argument.  I will wait.

THE COURT:  Okay.  I will be back to you.
Thank you though.

MR. KANDEL:  Thank you.

MR. BAILEY:  Can I interject?

THE COURT:  No.  No.

MR. SCHWARTZ:  Your Honor, the order was
very, very clear that access to the banking accounts

1               CONFERENCE

2       could not be removed without prior Court permission.

3       That was very clear.  That -- that, your Honor, did

4       put and did insert that language, that it could not

5       be modified or changed without prior Court

6       permission.  To the extent Mr. Chassen was removed

7       from those bank accounts, that is a clear, we would

8       argue that is a clear contempt of Court, regardless

9       of whether or not the order didn't specifically

10      prohibit self help actions or unilateral actions in

11      other regards.

12              Your Honor, the reality is, your Honor,

13      Mr. Simpson came to court.  He came to this court.

14      He made a motion for a temporary restraining order

15      and a preliminary injunction.  The Court put

16      Mr. Simpson back in charge of the company, but with

17      one significant restriction primarily, one major

18      restriction, that the operating agreement and

19      Mr. Chassen's consent rights would remain in place.

20      The Court did not put Mr. Simpson in full charge of

21      this company and knock Mr. Chassen out of the company

22      by entering that interim order.  That was clearly not

23      the intent of the order.  What Simpson has done with

24      that order is he has taken it and he has run with it,

25      where now Mr. Chassen has no rights to the company.

26      He has been -- All the employees have been told he's

CONFERENCE

not a part of the company.  All the investors have
been told the same.

 So, your Honor, the reality here is, is that
whatever -- There are no accusations.  Even the
accusations that your Honor heard from Mr. Bailey,
none of them are -- justify Mr. Chassen not being
able to exercise his consent rights on major
decisions.  If they want to say that he has used,
improperly used money, which is false.  And, I mean,
we have also -- that is also one of the accusations
we have against Mr. Simpson.  That he has been using
money for his own private businesses, which the Court
will presumably get to at a later point in time, if
this is where things go.

 The fact of the matter is though is that all
that is at stake here is consent rights.  That is
what your Honor put back in place.  Your Honor said
that Mr. Chassen shall have his rights of consent on
major decisions.  That Mr. Simpson is not going to --
isn't going -- he can waive the operating agreement.
It was designed to or was structured, which gave
Mr. Simpson the -- he was the managing member.
Mr. Chassen is the member, 49.9 percent member with
-- with consent rights.  None of the things that they
claim Mr. Chassen may or may not have done, which we

1                          CONFERENCE

2        deny, would justify the loss of consent rights to

3        major decisions, to supervision of an act or who the

4        Court reinserted back into his position through that

5        very same interim order.  So --

6                THE COURT:  What about taking employment at

7        the investor member or the investor member's

8        affiliate?

9                MR. SCHWARTZ:  We deny that.  We deny that he

10       has taken employment at the investment member.  He is

11       working for -- he is working for JJ Arch.  JJ Arch

12       has -- We deny that he's done that.  That is not a

13       corroborated established fact.

14               MR. BAILEY:  Is your client with you?

15               MR. SCHWARTZ:  What?

16               MR. BAILEY:  Is your client with you?

17               MR. SCHWARTZ:  My client is not with me.

18               THE COURT:  He's on the Teams call.

19               MR. SCHWARTZ:  He's on the call.

20               MR. BAILEY:  Why don't you ask him if he

21       signed the agreement.

22               THE COURT:  Why don't we let me handle the

23       questions, okay.  Keep going, Mr. Schwartz.

24               MR. BAILEY:  Yes, your Honor.

25               MR. SCHWARTZ:  So, your Honor, that's, you

26       know, that's one point.  In terms of him being

CONFERENCE

banished, not coming to the office, your Honor. As
we said in our letter, Mr. Chassen said in his
letter, he was banished to a corner of the office
space. He was subject to verbal abuse, which we
quote. Mr. Chassen quoted some of that abuse in his
letter to Mr. Simpson responding to the termination.
Things like you don't even belong here, you're
powerless or calling him other derogatory terms
during attempts at a settlement. This is not an
environment where -- Mr. Simpson was making it very
clear to Mr. Chassen that he was not a part of the
company. That he was -- That this is what he
intended to do and was going to be doing.

So, the idea that Mr. Chassen should be
coming into the office in that environment to subject
himself to that kind of abuse, and then use that not
coming to the office as an excuse for now terminating
him in this context is -- is, quite frankly, absurd
I would suggest.

THE COURT: All right. But your position,
your statement is that the allegations are not true.

MR. SCHWARTZ: Yeah. Broadly speaking.

MR. LEVENTHAL: May I add one thing, your
Honor?

THE COURT: Hang on a second. You said

1                       CONFERENCE

2       broadly speaking.

3               MR. SCHWARTZ:  I said broadly speaking our

4       position is that the allegations are not true.  More

5       particularly, your Honor, the allegations, even if

6       they were to be true or were not to be true, do not

7       justify the unilateral actions of Mr. Simpson.  So I

8       want to --

9               THE COURT:  Well, we may, depending on the

10      circumstances, differ on that, you know, because one

11      of the allegations involves, you know, theft of

12      corporate assets, which again you may have a context

13      that I don't have.  But in my view that is not

14      something that I would just sort of brush off as not

15      a big deal.  Just so we're clear, I do not take that

16      lightly.  Now look --

17              MR. LEVENTHAL:  Your Honor, this is the first

18      we heard of that.  He said he sent a letter.  I

19      looked at it now briefly.  This came in at, our

20      hearing is at 2:30, it came in on NYSCEF at 2:28 or

21      2:27.  This is the first we ever heard.  He never

22      responded to any of our letters before, Mr. Bailey.

23              But I want to bring one thing to your

24      attention.  I did have a conversation with Mr. Kandel

25      early on, and he said that Mr. Bailey approached him

26      and said that he should be -- This is before he took

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM

NYSCEF DOC. NO. 83

CONFERENCE

1

2     any actions like he did -- that only Jeffrey should

3     be the sole signatory on the account. Now, I don't

4     want to talk for Mr. Kandel, but Mr. Kandel said to

5     him, Do you have a court order? He said, No, but the

6     Judge said it on the record. And then Mr. Kandel

7     asked him, Do you have the minutes? And then

8     Mr. Bailey said again, Oh, I'm not sure it's in the

9     minutes. I think maybe it was off the record.

10         Now, I wasn't there, your Honor. I don't

11     think you said that on the record, off the record. I

12     don't think there was any order. There was a, before

13     he was even terminated, there was a movant of foot to

14     cut him out. It was a goal to violate your order by

15     putting him -- And Mr. Kandel will, I think will

16     verify this. I was on the phone with him and

17     Mr. Ansari when we talked about this. This is before

18     any termination action. So this -- this I hope would

19     color, gives a background of the portrait before the

20     painting is even on -- the paints are even on the --

21     on the canvas. This is what was started.

22         MR. BAILEY: Before degrading me, you may

23     want to read the operating agreement. And to be

24     exact, paragraph two, when a managing member opens,

25     maintains and closes bank accounts and draws checks

26     and other payments of money, that's a managing

1                          CONFERENCE

2       member's jobs.

3                MR. LEVANTHAL:  The interim report --

4                MR. BAILEY:  Hold on.

5                THE COURT:  Guys.  Hang on a second.

6                MR. BAILEY:  In the order it says that

7       Jeffrey Simpson is a managing member, therefore it's

8       his job to maintain the bank accounts.  Thank you.

9                MR. KANDEL:  Your Honor, if I may.

10               MR. BAILEY:  It is ugly and --

11               MR. KANDEL:  Your Honor, if I may just

12      interject since my name was referenced.  By the way,

13      my name is Mr. Kandel.  Just for my father, make my

14      father proud to correct the pronunciation of my last

15      name.  First of all, I just got an update by e-mail

16      that full access has been restored to Mr. Chassen's,

17      you know, online view of the accounts.

18               Since I got involved in the case, a couple of

19      days after the entry of the interim order, while I

20      was on vacation, I started to have conversations with

21      Mr. Leitman Bailey's first partner and then with Mr.

22      Leitman Bailey himself.  And I made it explicitly

23      clear that the bank had complied with the two

24      obligations set forth in the interim order.  And that

25      if Mr. Simpson believed that the Court also intended

26      that the bank take any other action in furtherance of

CONFERENCE

the interim order, that was not set forth in the
interim order, that they should seek the Court's
clarification, and at a minimum seek a conference
with the Court, while your Honor was on vacation in
the event that the Court's law clerk would be willing
to convene a conference. That fell on deaf ears.
What I got instead was threats to hold First Republic
Bank in contempt. Threats to seek damages and
liability against First Republic Bank for failure to
designate Mr. Simpson as the sole -- the person with
sole and exclusive signatory authority on each of the
accounts. I questioned each of the attorneys at
Mr. Leitman Bailey's office, including Mr. Leitman
Bailey himself. I said where is that set forth
anywhere. There is an explicit direction to First
Republic, albeit Chase, that there is a direction to
take that action. The Court was explicit in the
first paragraph of the order. There is two
directions to First Republic. If there was going to
be a third direction, I assume that direction would
have been set forth in that same paragraph. I don't
read another direction in that paragraph.

So, Mr. Simpson's counsel wanted First
Republic, effectively a stakeholder, not just
effectively, a stakeholder, with no interest in the

CONFERENCE

1

2       outcome of this case or which one of the two

3       individuals controls the accounts, to take a logical

4       leap in Mr. Simpson's favor to then say all right,

5       we're going to exclude Mr. Chassen from -- from any

6       authority to make transactions in the account. And

7       we're going to get the proper documentation, some of

8       which would require Mr. Chassen to provide, for

9       Mr. Simpson to then be designated as the person with

10      sole exclusive signature authority on each of the

11      accounts, without there being a direction in the

12      order.

13              I repeatedly asked counsel, who was the

14      plaintiff in the case, rather than him foisting the

15      obligation on us, the stakeholder, to seek the

16      Court's clarification if that's what they believed

17      the Court had intended. I wasn't at the hearing. My

18      client was advised, I believe by counsel, that they

19      didn't need to be at the hearing. But I was retained

20      two days after. I don't know what your Honor said on

21      or off the record during the hearing, because I've

22      not gotten a copy of the transcript, which I was

23      assured I would get from Mr. Leitman Bailey. I still

24      haven't gotten it. That is what I wanted to raise,

25      what I referenced before, that I think needs to have

26      some sort of -- I'm requesting that the Court give

| | CONFERENCE |
|---|---|
| 1 | |
| 2 | some sort of elucidation as far as what First |
| 3 | Republic Bank's obligations are in that regard. |
| 4 | THE COURT: Right. Look, my recollection is |
| 5 | we did have one or two hearings on the record. And |
| 6 | then when we had, over a lunch hour I think it was, |
| 7 | we had an off the record conference just to sort of |
| 8 | work through the various drafts of the or proposals |
| 9 | for the order. I think there might have been one off |
| 10 | the record conference. The end of the day, as you |
| 11 | correctly noted, the order is what the order is. |
| 12 | Whatever I said. I don't remember saying anything |
| 13 | about this issue frankly. But the order is what it |
| 14 | is. |
| 15 | The question of whether it requires |
| 16 | additional, you know, detail is to say that the |
| 17 | parties should go back to the operating agreement, |
| 18 | which Mr. Bailey is correct, says that the managing |
| 19 | member, you know, sort of runs the banking |
| 20 | relationship, that does not mean that the other |
| 21 | member, who is an important part of the organization, |
| 22 | just like in any company, that doesn't mean that |
| 23 | there is an agreement that the other member has no |
| 24 | access. I certainly didn't order that. |
| 25 | Now, in a regular company where people are |
| 26 | working together to help the business rather than |

FILED: NEW YORK COUNTY CLERK 09/15/2023 04:37 PM
NYSCEF DOC. NO. 83
NYSCEF DOC. NO. 87

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/14/2023
RECEIVED NYSCEF: 09/15/2023

36

1                    CONFERENCE

2       undermine it, you wouldn't need to have clarification

3       about that, because the two members wouldn't be

4       operating at cross purposes.  So, I can't recall

5       whether Mr. Simpson and his counsel asked for an

6       explicit authority such as that to say, and they may

7       have in their proposed order, and I chose --

8               MR. KANDEL:  They did.

9               THE COURT:  -- and I chose to keep it the way

10      it was, which was, you know, the order, the agreement

11      doesn't prohibit Mr. Chassen from having access.  It

12      just says that Mr. Simpson is in charge.

13              Now, to balance that, you know, if one of the

14      two of them is in charge, that does leave open the

15      possibility that the person in charge says, you know

16      what, I'm going to take or I want full control of the

17      banking relationship.  You know, again, if you're

18      outside the court process, somebody has to be in

19      charge.  And if there is, again hypothetically, one

20      of the other member is alleged to have withdrawn

21      funds for personal purposes, which again I'm not

22      finding, but I'm just saying that there is a world in

23      which if you went through the proper channels, that

24      is me, it's an order that I could consider saying

25      that well, you know, to effect the proper operation

26      of the agreement, only Mr. Simpson can deal with the

CONFERENCE

bank. I did not order that. I am not ordering it
now. But it is open.

Just to be clear, I'm not on anybody's side
here. You're correct, Mr. Kandel, you read the order
correctly. It does say Mr. Simpson is in charge as
the managing member. Mr. Chassen has important
rights as part of it. I certainly did not intend for
him to be sort of persona non grata at the company
and be, you know, sent into Siberia or something. I
assume a properly running company would be able to
operate.

I mean, I have to say as I listen to this,
you know, the notion of a receiver is not that far
from my mind, because I don't know what I can trust
these folks to do at this point. I thought I could
rely -- I thought -- You know, Mr. Simpson was there
listening to me. I thought that he probably got --
was able to take some measure of what I was trying to
accomplish. I am disappointed frankly with how this
has panned out.

MR. BAILEY: Your Honor --

THE COURT: I have to learn what happened and
all of that. But between, you know, the experience
of counsel I'm staring at on this screen and the
experience of the individuals running this company,

1                                 CONFERENCE

2   you should be able to figure this out. Look, I

3   certainly go into it thinking that Mr. Chassen is not

4   somebody who is going to be overtly stealing money

5   from this company and running off with it. Maybe I'm

6   wrong. Maybe that's the way this company works,

7   because I've had my share of small companies where

8   both sides, in ways that may or may not be proper,

9   use company expenses to pay for personal items. I'm

10   not naive that that doesn't happen. But we need to

11   get back on the rails here or I'm telling you, this

12   is not going to go well for either side because, you

13   know, the bank has responsibilities. They need clear

14   guidance. Having this kind of instability at the top

15   and going to court hearings is not helpful for a

16   healthy banking relationship. I think I can fairly

17   speak for Mr. Kandel on that front.

18        You still have time to fix this. You know,

19   you're all very hard nosed litigators, but you also

20   have to be counselors and try to walk your clients

21   back from the edge. I don't know whether they are

22   walking to the edge or you're sending them to the

23   edge. I can't really quite figure that out at this

24   point. But this is not going to be good for anyone.

25   You can both make whatever motions you want. I don't

26   need a Rule 24 conference. I'm happy to try to help,

1                         CONFERENCE

2       but what I need to hear is that both parties are

3       committed to working together at least until the

4       court process is over.  I mean, right now you have to

5       deal with this resignation thing.  If it's not

6       withdrawn voluntarily and you go back to where I

7       hoped you would be, I will take a motion as promptly

8       as the defendant can file it and we'll see what

9       happens, Mr. Bailey.  You know, maybe you'll convince

10      me that this stuff was outrageous and you had no

11      other choice or even if you did have a choice, the

12      behavior was so bad that this guy shouldn't be let

13      within a hundred feet of this company, okay.  That is

14      not where I thought we were headed.  It's certainly

15      not where I hope we're headed.  My preference would

16      be to take this off the Court's radar and get it back

17      on to counselors and business people operating a

18      business that doesn't look as chaotic as frankly as

19      it looks to me right now.

20              MR. BAILEY:  That's what we did.  That's why

21      we used the operating agreement instead of you.  By

22      the way, the problem with the bank was my client

23      is -- was not a signatory on anything, and we needed

24      the bank to recognize Simpson, because Jared would

25      not cooperate and recognize Jeff and sign any

26      documents with him, and the bank wouldn't recognize

CONFERENCE

1  Jeff.  That's what went wrong there.

2       THE COURT:  Your client wasn't a signatory

3  because it sounds like it's correct, Mr. Chassen for

4  years was the one who was operating the business as a

5  liaison with the bank without incident.

6       MR. BAILEY:  He put himself on the bank

7  accounts.  He sent a letter right before the coup

8  saying I am now the signatory at the banks.

9       THE COURT:  Before that your client, from

10  what I've read, hadn't signed onto the system to be

11  able to even make payments for years.

12       MR. BAILEY:  Correct.  Correct.

13       THE COURT:  And he had been fine leaving this

14  to Mr. Chassen to operate.

15       MR. BAILEY:  Correct.

16       THE COURT:  So this notion that it is sort of

17  shocking that he was doing so doesn't really land

18  well with me.  And your client simultaneously saying,

19  Well now I'm taking this over.  Telling the bank, I

20  think incorrectly from my order, that you should

21  eliminate Mr. Chassen from having any role, which is

22  not what I put in the order, was a huge overreach.

23  And if you genuinely think that what you did here was

24  consistent with what I was just encouraging you to

25  do, you're not listening.

CONFERENCE

1

2          MR. BAILEY:  No.  No.  Let me explain the

3     whole thing.  Jeff is on half the bank accounts.

4     Jared himself alone was on a couple -- There is like

5     535 bank accounts -- was on a number of bank

6     accounts.  In order to run the business, Jared and

7     Jeff needed to both sign their names.  Right before

8     the coup, Jeff sent out an e-mail saying take Jeff's

9     name off of everything.  I'm now in charge.  Christy

10    wrote back okay.  The bank was requiring both their

11    names to be on it.  They weren't recognizing Jeff.

12    We needed Jared.  Despite your order, Jared wouldn't

13    comply and the rest was chaos.

14          Mr. Kandel was doing the best he can.  He

15    couldn't -- he couldn't -- He said, I'm following the

16    order.  You can't follow the order alone, despite our

17    proposal of the order, you can't follow the order

18    alone.  You need to read the operating agreements to

19    see that Jeff, the managing member, maintains the

20    bank accounts, but no one is reading the operating

21    documents.  I don't blame Mr. Kandel for doing

22    that -- for not doing that.  But so no one is

23    recognizing Jeff as the person in charge of the bank

24    accounts.  So Jeff couldn't manage the money, and

25    then it caused chaos at the business.  That's where

26    we were with that many days at the bank until we

42

1                        CONFERENCE

2       found a work record.

3               THE COURT:  Now, look, if you want to go back

4       to a point where -- where the bank is told that both

5       parties signatures is required, that's not a good way

6       to run a business necessarily.

7               MR. BAILEY:  I'm telling you why we were at

8       where we were at.  Why we were freaking out.  I was

9       on vacation also.  I was freaking out because they

10      can't get money to make payroll, because they don't

11      recognize Jeff on the accounts, because he was taken

12      off all of the accounts.  And the --

13              MR. LEVENTHAL:  I would like to respond, your

14      Honor.  I see his mouth moving.

15              MR. BAILEY:  Can you stop speaking for other

16      people, please.

17              THE COURT:  Hang on.  One thing I do insist

18      on is counsel treating each other with respect.

19              MR. BAILEY:  I always will.  You're running

20      the courtroom, not Mr. Leventhal, right.

21              THE COURT:  I would say not you.

22              MR. BAILEY:  I agree.

23              THE COURT:  At the moment it's -- Let's keep

24      it professional.  Go ahead, Mr. Leventhal.

25              MR. LEVENTHAL:  I -- I -- I just noticed that

26      Mr. Kandel was trying to say something, and I wanted

1                        CONFERENCE

2          to bring it to your attention, your Honor.

3                    THE COURT:  I could see.

4                    MR. LEVENTHAL:  But I do want to say -- I do

5          want to say that I don't want to repeat what I said

6          earlier.  That wasn't my impression after speaking to

7          the bank's attorney a while ago.  I just want to say,

8          your Honor, I think I get the gist where you're

9          going.  I think you've been very clear.  I'm going to

10         be in Albany all day tomorrow.  I will make myself

11         available at the end of this hearing at 4:30 to speak

12         to Mr. Leitman Bailey in hopes of bringing reason to

13         this case so we don't have to make the contempt

14         motion.  I'll make myself available, like I did last

15         Friday, to speak to him and I was ignored.  I'm just

16         saying I will make myself available.  Mr. Bailey --

17                    THE COURT:  I will turn it over to

18         Mr. Kandel.

19                    MR. KANDEL:  Yeah.

20                    THE COURT:  If Mr. Simpson wasn't given

21         credentials to work with the bank immediately upon

22         the order that I entered, that's not correct either.

23         So, I would like to make sure that we -- we isolate

24         that as well.  This is not a one way street.  At the

25         moment, the status quo at the moment of my order, I

26         believe Mr. Simpson did not have control of things,

CONFERENCE

and I certainly didn't mean for that -- for him not

to have access to the bank account is not what I

intended.

Mr. Kandel, why don't I let you talk and then

I'll try to wrap this up.

MR. KANDEL: Yeah. So, with respect to Adam

Leitman Bailey, who I've known for 30 years, we

studied for the bar together as third year law

students, I have respect for him. But to be fair, we

were threatened with to hold us in contempt. We were

threatened with liability. There was no -- there was

no reasoned discussion. It was do what we want to

add Mr. Simpson as the person with sole authorization

on all the accounts or be held in contempt. And so I

repeatedly advised him that that's not the way the

order is to be read in my opinion. And that it

seemed to me, not being at the hearing, that

section three of the order requires the parties, the

individuals to work together, cooperatively. In

fact, there was an order to send a letter to that

effect to the company.

THE COURT: That's the only sentence of the

order that I wrote.

MR. KANDEL: Okay. Well, you know, so it's

our opinion that if that's what the parties want,

1                          CONFERENCE

2          then send us an agreement to that effect, which I

3          also said to counsel, when they said they were in

4          agreement, I had to then confirm with Mr. Chassen's

5          counsel whether or not they were in agreement that he

6          should be the person in sole exclusive authority.

7          They said no.  Mr. Simpson actually wrote me an

8          e-mail directly and accused me of being the only one

9          of ten lawyers, I believe, who reads the order the

10         way I read it.  I'm happy take hear and heartened to

11         hear that your Honor reads it the same way I do.  But

12         if there is an agreement and they are working

13         cooperatively as to how the bank accounts should be

14         operated and who has authority, the bank will take

15         direction from that agreement.

16                    THE COURT:  Right.

17                    MR. KANDEL:  We don't want to be in the

18         middle.

19                    THE COURT:  The company can operate, working

20         through its operating agreement, could change the

21         authorizations for banking transactions.  The company

22         has worked for a number of years with shared

23         authority to do that.  I did not change that.  The

24         company, as far as I'm aware, did not change that,

25         nor do I think that the order gave any lean one way

26         or the other.  I certainly did not mandate it.  So I

1                       CONFERENCE

2          think you -- you handled it correctly.

3                   MR. KANDEL:  Thank you, your Honor.

4                   THE COURT:  If there is going to be a change

5          in status quo, where the party with a 49 something

6          percent interest is -- is going to not be permitted

7          to be involved in certain things, which again, just

8          so it's clear, I don't foreclose that, because, you

9          know, there is a way to read the agreement where

10         Simpson is in charge and Chassen has veto rights,

11         consent rights.  And sometimes that could mean that

12         if, you know, push comes to shove, Mr. Simpson's

13         views will take precedence subject to the

14         contractually agreed upon consent rights.  I did not

15         order that.  And, you know, so I think you need to --

16         (pause).

17                  Look, you have a business to run here, the

18         principals.  You have a bank that is being extremely

19         patient with you all at the moment.  And you need to

20         work out a non chaotic program here to ensure that

21         the bank stays comfortable enough with -- What I

22         assume one of the things they want to avoid is

23         executing a transaction and then being blamed someday

24         by doing it without authorization.  So, whatever it

25         is you all come up with in this conversation between

26         Mr. Bailey and Mr. Leventhal and Mr. Schwartz or

CONFERENCE

whoever, I am going to direct you to have very clear
guidance for the bank as to how this is going to
work.  And I get it that, you know, lines have been
drawn and people are mad at each other, okay.  Your
job as counsel, in my opinion, is to be the
moderating forces, not the accelerating forces in
that kind of situation.  And if you can't work it out
and I see a risk to the assets of this entity, and
somebody asks for a receiver, which is not what
anybody wants I imagine, I will take it seriously.
So work this out.  I am imploring you to do that.
And look, I've said what I'm going to say.  I want
you to try to work it out.  You're free to file
motions.  You don't need to wait and have a
conference.  But I sure hope that you conclude that
you're going to get a better result through
cooperation than through a busy court who is trying
to balance you between a bunch of other hearings and
doing the best I can to reach the right result.  But,
you know, I'm going to get frustrated by all of this,
if I'm constantly being called in to handle what
sound like somewhat immature squabbles to be honest
with you.

             MR. LEVENTHAL:  With that in mind, your
Honor, I'm willing to meet with Mr. Bailey at 4:30

CONFERENCE

1
2  with Mr. Schwartz to try to iron this out so we don't
3  have to make a contempt motion.  I would like to
4  restore the status quo voluntarily.  I hope we can do
5  that, and I'm willing to do that.
6           THE COURT:  All right.  I appreciate it, and
7  I will -- Mr. Bailey, I'm going to assume, since it's
8  in your client's interest to do it, that you will
9  take him up on that and talk.  I can't direct you to
10  reach an agreement.
11           MR. BAILEY:  Yeah.
12           THE COURT:  But if you're not willing to
13  talk, I will take that into consideration.
14           MR. BAILEY:  It depends what we're talking
15  about.  It doesn't make any sense after someone tried
16  stabbing you and ruining your company to let them
17  back in.  The discussion should be about
18  Mr. Chassen's exit.  That's the only discussion that
19  should be going on, his exit and what it entails and
20  how to cut out the damage that he has caused this
21  company.  That's the only conversation.
22           THE COURT:  All right.  That's the second
23  time I've told you that you have maybe not read the
24  room entirely correctly.  So I'll let you -- you
25  guys --
26           MR. BAILEY:  I got it.

CONFERENCE

1

2     THE COURT: -- you guys do what you want.

3     MR. LEVENTHAL: I'm not going to have a

4 conversation with him, your Honor. I don't want to

5 go on a fool's errand.

6     THE COURT: I don't know what to do with that

7 last point, Mr. Bailey. That sounds like someone who

8 has tied their hands to the steering wheel.

9     MR. BAILEY: Your Honor, he's working for

10 other companies that there is a noncompete with.

11 He's stealing money from the company. He refuses to

12 come to work. What would you do if you had that?

13     MR. LEVENTHAL: He keeps saying that.

14     THE COURT: The only thing I could say is I

15 guess at the end if you don't want to talk, I will

16 see you in court.

17     MR. BAILEY: I'm always will to talk. I'll

18 talk to anyone.

19     THE COURT: Okay. Well, it doesn't sound

20 like it. I will await your guidance as to what

21 you're going to do next. I can't promise you when

22 I'm going to fit you in but, you know, I would

23 strongly urge people, when they are advised by the

24 Court to meet and confer, not to throw down an

25 ultimatum in advance, because that's not very

26 productive. With that, we're off the record. Thank

1                          CONFERENCE

2          you very much.

3                    MR. BAILEY:  Thank you, your Honor.

4                    MR. LEVENTHAL:  Thank you, your Honor.

5

6                          ooOoo

7

8

9

10

11

12

13

14

15     Certified to be a true and accurate transcript of the

16     above-captioned stenographic minutes.

17

18     _Lori Ann Sacco_____

19     Lori Ann Sacco

20     Official Court Reporter

21

22

23

24

25

26

**$**

$75,000 [1] - 14:7

**1**

10004-1646 [1] - 1:18
10036 [2] - 1:21, 2:5
11 [1] - 1:11
11236-3706 [1] - 1:25
1185 [1] - 2:4
11th [1] - 11:13
158055/2023 [1] - 1:7
18 [1] - 1:17
1st [1] - 23:22

**2**

20 [1] - 11:22
2023 [2] - 1:11, 11:13
21st [1] - 8:15
24 [2] - 4:17, 38:26
28 [1] - 16:24
2:27 [1] - 30:21
2:28 [1] - 30:20
2:30 [1] - 30:20

**3**

3 [1] - 1:2
30 [1] - 44:8
35 [1] - 14:25

**4**

49 [1] - 46:5
49.9 [1] - 27:24
4:30 [2] - 43:11, 47:26

**5**

535 [1] - 41:5
546 [1] - 1:21
5:00 [1] - 20:26

**6**

6th [2] - 1:21, 25:8

**8**

8/30/2023 [1] - 11:18

**9**

9306 [1] - 1:24

**A**

able [6] - 13:19, 27:8,
37:11, 37:19, 38:2,
40:12

above-captioned [1] -
50:16
absurd [1] - 29:19
abuse [4] - 8:18, 29:5,
29:6, 29:17
accelerating [1] - 47:7
access [23] - 8:22,
8:24, 12:2, 12:5,
12:7, 12:17, 13:18,
13:24, 13:26, 14:2,
17:19, 20:2, 20:4,
20:19, 25:4, 25:10,
25:12, 25:15, 25:26,
32:16, 35:24, 36:11,
44:3
accessed [1] - 8:21
accomplish [2] - 5:9,
37:20
accordance [1] -
12:18
according [2] - 8:25,
18:12
account [3] - 31:3,
34:6, 44:3
accounts [31] - 9:7,
12:3, 12:17, 13:25,
14:3, 17:19, 20:19,
24:12, 24:13, 25:3,
25:5, 25:11, 25:15,
25:26, 26:7, 31:25,
32:8, 32:17, 33:13,
34:3, 34:11, 40:8,
41:3, 41:5, 41:6,
41:20, 41:24, 42:11,
42:12, 44:15, 45:13
accurate [1] - 50:15
accusations [3] -
27:5, 27:6, 27:11
accused [1] - 45:8
act [3] - 6:21, 19:18,
28:3
acting [2] - 6:24, 25:9
action [5] - 9:20, 19:7,
31:18, 32:26, 33:18
actions [6] - 10:2,
23:22, 26:10, 30:7,
31:2
activity [1] - 24:14
Adam [2] - 3:13, 44:7
ADAM [2] - 1:16, 1:18
add [4] - 3:21, 8:14,
29:24, 44:14
additional [1] - 35:16
address [3] - 7:22,
21:7, 25:18
adjournment [3] -
12:9, 20:10, 20:21
adjournments [1] -
12:6
advance [2] - 20:25,

49:25
advantage [1] - 11:7
advice [1] - 11:6
advised [3] - 34:18,
44:16, 49:23
affairs [2] - 13:3,
14:18
affiliate [1] - 28:8
afraid [1] - 11:15
afternoon [4] - 3:2,
3:6, 3:12, 3:18
afterwards [1] - 13:8
ago [1] - 43:7
agree [2] - 18:8, 42:22
agreed [2] - 12:25,
46:14
agreement [28] - 5:14,
10:18, 10:19, 10:22,
12:20, 12:23, 13:3,
17:14, 21:12, 21:13,
22:26, 26:18, 27:21,
28:21, 31:23, 35:17,
35:23, 36:10, 36:26,
39:21, 45:2, 45:4,
45:5, 45:12, 45:15,
45:20, 46:9, 48:10
agreements [7] - 6:23,
12:19, 16:15, 16:17,
16:19, 41:18
ahead [4] - 4:8, 7:20,
24:23, 42:24
AIDALA [1] - 1:20
Aidala [1] - 11:22
Albany [1] - 43:10
albeit [1] - 33:17
allegation [1] - 19:10
allegations [8] -
15:23, 19:10, 21:7,
23:24, 29:22, 30:4,
30:5, 30:11
alleged [1] - 36:20
Allen [2] - 3:20, 3:22
ALLEN [1] - 1:25
allowed [2] - 16:16,
17:7
allows [1] - 17:3
almost [1] - 13:18
alone [3] - 41:4, 41:16,
41:18
ambush [1] - 14:19
amended [1] - 12:19
Americas [1] - 2:4
amount [1] - 8:16
Ann [2] - 2:10, 50:19
Ansari [5] - 11:19,
20:10, 20:20, 21:3,
31:17
answer [2] - 12:9,
24:23
answered [1] - 12:11

anyway [1] - 5:16
appear [1] - 3:24
appearances [1] -
3:10
appearing [2] - 3:13,
3:26
appreciate [2] - 3:5,
48:6
approached [1] -
30:25
approval [1] - 21:25
ARCH [3] - 1:4, 1:4,
1:5
Arch [5] - 12:19,
13:14, 14:20, 28:11
argue [3] - 7:16,
18:15, 26:8
argument [3] - 3:6,
11:12, 25:19
arguments [2] - 3:20,
10:26
aside [1] - 5:6
assets [4] - 4:5, 4:11,
30:12, 47:9
associated [1] - 15:2
ASSOCIATES [1] -
1:23
assume [4] - 33:21,
37:11, 46:22, 48:7
assumed [3] - 4:5,
4:11, 19:16
assuming [1] - 19:13
assured [1] - 34:23
astonished [1] - 6:6
ATLAS [1] - 2:3
Atlas [2] - 4:3, 4:10
attempts [2] - 12:8,
29:10
attention [2] - 30:24,
43:2
attorney [7] - 8:12,
11:23, 12:13, 20:15,
20:23, 43:7
attorney's [1] - 12:12
attorneys [2] - 20:6,
33:13
Attorneys [4] - 1:17,
1:20, 1:24, 2:4
August [2] - 5:25, 8:15
authority [7] - 33:12,
34:6, 34:10, 36:6,
45:6, 45:14, 45:23
authorization [2] -
44:14, 46:24
authorizations [1] -
45:21
available [5] - 19:8,
20:26, 43:11, 43:14,
43:16
Avenue [3] - 1:21,

1:24, 2:4
avold [2] - 24:2, 46:22
await [1] - 49:20
aware [2] - 25:11,
45:24

**B**

babysitting [1] - 17:2
background [3] -
18:5, 18:9, 31:19
bad [4] - 6:23, 17:10,
18:15, 39:12
baffle [1] - 18:22
BAILEY [38] - 1:16,
1:18, 3:12, 11:10,
11:17, 13:7, 14:25,
15:4, 15:9, 16:14,
16:21, 16:23, 19:15,
25:23, 28:14, 28:16,
28:20, 28:24, 31:22,
32:4, 32:6, 32:10,
37:22, 39:20, 40:7,
40:13, 40:16, 41:2,
42:7, 42:15, 42:19,
42:22, 48:11, 48:14,
48:26, 49:9, 49:17,
50:3
Bailey [25] - 3:13, 8:2,
10:17, 11:8, 19:25,
20:9, 21:11, 22:2,
23:23, 27:6, 30:22,
30:25, 31:8, 32:22,
33:15, 34:23, 35:18,
39:9, 43:12, 43:15,
44:8, 46:26, 47:26,
48:7, 49:7
Bailey's [2] - 32:21,
33:14
balance [2] - 36:13,
47:19
banished [4] - 6:16,
8:17, 29:2, 29:4
bank [48] - 7:3, 12:2,
12:17, 13:25, 14:2,
17:19, 20:18, 24:12,
24:14, 24:22, 24:25,
25:6, 25:7, 25:11,
26:7, 31:25, 32:8,
32:23, 32:26, 37:2,
38:13, 39:22, 39:24,
39:26, 40:6, 40:7,
40:20, 41:3, 41:5,
41:10, 41:20, 41:23,
41:26, 42:4, 43:21,
44:3, 45:13, 45:14,
46:18, 46:21, 47:3
Bank [6] - 2:4, 4:2,
4:4, 4:6, 4:10, 4:12,
33:9, 33:10

BANK [1] - 1:8
Bank's [1] - 35:3
bank's [1] - 43:7
banking [5] - 25:26, 35:19, 36:17, 38:16, 45:21
banks [2] - 17:17, 40:9
bar [1] - 44:9
based [1] - 6:9
basis [2] - 5:14, 10:5
Battery [1] - 1:17
battlefield [1] - 5:22
beat [1] - 11:8
beginning [1] - 3:10
behalf [3] - 3:26, 4:4, 25:9
behavior [1] - 39:12
behaviors [1] - 10:23
belabor [1] - 19:22
belong [1] - 29:8
BERTUNA [1] - 1:20
best [4] - 17:11, 23:19, 41:14, 47:20
better [1] - 47:17
between [8] - 5:4, 15:16, 15:26, 37:24, 46:25, 47:19
big [2] - 11:22, 30:15
bit [4] - 6:3, 7:9, 18:22, 23:22
blame [1] - 41:21
blamed [1] - 46:23
blew [1] - 14:14
bother [2] - 7:26, 8:10
brand [2] - 15:13
breakneck [1] - 9:4
breath [1] - 22:20
briefly [2] - 7:15, 30:19
bring [2] - 30:23, 43:2
bringing [1] - 43:12
broadly [3] - 29:23, 30:2, 30:3
broke [1] - 6:26
Brooklyn [1] - 1:25
brothers [2] - 13:12, 13:15
brought [1] - 11:24, 15:22, 15:25
brush [1] - 30:14
bunch [1] - 47:19
business [20] - 5:13, 6:11, 7:2, 7:5, 8:20, 11:6, 11:26, 12:3, 16:8, 19:3, 22:11, 24:7, 35:26, 39:17, 39:18, 40:5, 41:6, 41:25, 42:6, 46:17
businesses [1] -

27:13
busy [1] - 47:18
BY [4] - 1:18, 1:22, 1:25, 2:5

C

cannot [3] - 12:6, 16:20, 18:20
canvas [1] - 31:21
captioned [1] - 50:16
carefully [3] - 4:26, 6:21, 17:16
case [10] - 5:2, 11:23, 19:19, 20:13, 20:16, 21:6, 32:18, 34:2, 34:14, 43:13
caused [2] - 41:25, 48:20
certain [5] - 4:5, 4:11, 4:19, 23:12, 46:7
certainly [9] - 6:9, 22:8, 23:10, 35:24, 37:8, 38:3, 39:14, 44:2, 45:26
Certified [1] - 50:15
cetera [1] - 8:6
change [5] - 31:23, 45:20, 45:23, 45:24, 46:4
changed [1] - 26:5
channels [1] - 36:23
chaos [2] - 41:13, 41:25
chaotic [2] - 39:18, 46:20
charge [12] - 7:4, 22:14, 26:16, 26:20, 36:12, 36:14, 36:15, 36:19, 37:6, 41:9, 41:23, 46:10
Chase [3] - 4:4, 4:10, 33:17
Chassen [40] - 1:20, 1:24, 3:19, 8:17, 8:25, 9:17, 12:17, 12:20, 12:22, 13:10, 13:11, 13:13, 13:26, 14:9, 15:12, 18:14, 23:11, 24:6, 24:13, 25:10, 26:6, 26:21, 26:25, 27:7, 27:19, 27:24, 27:26, 29:3, 29:6, 29:12, 29:16, 34:5, 34:8, 36:11, 37:7, 38:3, 40:4, 40:15, 40:22, 46:10
CHASSEN [1] - 1:8
Chassen's [9] - 7:17, 8:24, 9:6, 9:7, 19:11,

26:19, 32:16, 45:4, 48:18
checked [1] - 24:22
checks [1] - 31:25
choice [3] - 14:21, 39:11
choose [1] - 21:4
chooses [1] - 20:20
chose [2] - 36:7, 36:9
choses [1] - 20:14
Christy [1] - 41:9
circumstance [1] - 9:26
circumstances [2] - 4:20, 30:10
CIVIL [1] - 1:2
civilized [2] - 5:21, 6:15
claim [1] - 27:26
claims [1] - 6:20
clarification [3] - 33:4, 34:16, 36:2
clear [18] - 9:26, 10:8, 10:12, 18:26, 19:5, 21:15, 25:26, 26:3, 26:7, 26:8, 29:12, 30:15, 32:23, 37:4, 38:13, 43:9, 46:8, 47:2
clearly [4] - 9:9, 21:25, 22:22, 26:22
clerk [4] - 8:7, 20:12, 21:23, 33:6
client [14] - 8:3, 11:26, 12:2, 19:17, 19:26, 22:13, 28:14, 28:16, 28:17, 34:18, 39:22, 40:3, 40:10, 40:19
client's [4] - 16:8, 20:5, 21:17, 48:8
clients [4] - 6:20, 22:10, 23:17, 38:20
closes [1] - 31:25
club [1] - 11:7
codes [1] - 13:25
COHEN [1] - 1:13
color [1] - 31:19
comfortable [2] - 7:3, 46:21
coming [4] - 5:20, 29:2, 29:16, 29:18
comments [1] - 3:8
committed [1] - 39:3
communication [1] - 24:15
commuters [1] - 13:24
companies [7] - 14:20, 14:22, 16:15, 16:16, 16:26, 38:7, 49:10

company [43] - 5:10, 8:23, 8:24, 9:7, 14:6, 14:16, 14:19, 14:20, 14:26, 15:7, 15:10, 16:17, 16:20, 17:10, 18:3, 22:4, 22:15, 22:23, 22:25, 23:20, 26:16, 26:21, 26:25, 27:2, 29:13, 35:22, 35:25, 37:9, 37:11, 37:26, 38:5, 38:6, 38:9, 39:13, 44:22, 45:19, 45:21, 45:24, 48:16, 48:21, 49:11
company's [1] - 15:14
competitor [1] - 15:14
completely [1] - 8:22
complied [1] - 32:23
comply [2] - 24:26, 41:13
complying [1] - 6:22
conclude [1] - 47:16
conduct [1] - 5:4
conducting [1] - 25:7
confer [2] - 21:23, 49:24
conference [12] - 4:22, 9:23, 10:7, 10:11, 10:15, 20:25, 33:4, 33:7, 35:7, 35:10, 38:26, 47:16
conferences [4] - 4:18, 4:24, 5:2, 15:12
confirm [1] - 45:4
confused [1] - 7:9
confuses [1] - 15:19
consent [9] - 9:6, 26:19, 27:8, 27:17, 27:19, 27:25, 28:2, 46:11, 46:14
consider [1] - 36:24
consideration [1] - 48:13
consistent [2] - 22:9, 40:25
constantly [1] - 47:22
consulted [1] - 11:4
contacted [2] - 20:21, 20:22
contactor [1] - 21:3
contempt [9] - 10:4, 21:9, 21:13, 26:8, 33:9, 43:13, 44:11, 44:15, 48:3
context [2] - 29:19, 30:12
Continued [1] - 2:2
continued [3] - 12:7, 13:4, 13:7

contractual [1] - 6:15
contractually [1] - 46:14
control [2] - 36:16, 43:26
controls [1] - 34:3
convene [1] - 33:7
conversation [4] - 30:24, 46:25, 48:21, 49:4
conversations [2] - 6:26, 32:20
conveyed [1] - 5:5
convince [1] - 39:9
cooperate [2] - 9:14, 39:25
cooperation [1] - 47:18
cooperatively [2] - 44:20, 45:13
copy [1] - 34:22
cordial [1] - 15:18
corner [3] - 6:17, 8:17, 29:4
corporate [2] - 16:25, 30:12
Corporation [1] - 4:13
correct [11] - 12:18, 13:7, 16:21, 32:14, 35:18, 37:5, 40:4, 40:13, 40:16, 43:22
correctly [4] - 35:11, 37:6, 48:2, 48:24
correspondence [1] - 6:9
corroborated [1] - 28:13
Counsel [1] - 1:24
counsel [16] - 3:22, 6:5, 7:17, 11:6, 16:2, 23:16, 33:24, 34:13, 34:18, 36:5, 37:25, 42:18, 45:3, 45:5, 47:6
counselors [2] - 38:20, 39:17
count [2] - 6:5, 9:12
counterproductive [1] - 24:9
COUNTY [1] - 1:2
coup [2] - 40:8, 41:8
couple [6] - 3:21, 4:16, 5:16, 23:24, 32:18, 41:4
course [1] - 10:9
court [19] - 5:2, 5:20, 9:20, 9:26, 10:23, 12:16, 13:21, 13:22, 18:7, 18:11, 20:23, 26:13, 31:5, 36:18,

38:15, 39:4, 47:18, 49:16

**COURT** [56] - 1:2, 3:2, 3:14, 3:17, 3:23, 3:25, 4:7, 4:14, 7:20, 10:16, 11:15, 13:5, 14:22, 15:2, 15:5, 15:11, 16:19, 16:22, 18:5, 19:24, 21:19, 24:22, 25:20, 25:24, 28:6, 28:18, 28:22, 29:21, 29:26, 30:9, 32:5, 35:4, 36:9, 37:23, 40:3, 40:10, 40:14, 40:17, 42:3, 42:17, 42:21, 42:23, 43:3, 43:17, 43:20, 44:23, 45:16, 45:19, 46:4, 48:6, 48:12, 48:22, 49:2, 49:6, 49:14, 49:19

**Court** [32] - 1:13, 2:11, 5:20, 6:22, 8:10, 9:11, 9:13, 11:4, 15:25, 16:13, 20:12, 21:4, 21:8, 21:12, 21:15, 23:17, 25:17, 26:2, 26:5, 26:8, 26:15, 26:20, 27:13, 28:4, 32:25, 33:5, 33:18, 34:17, 34:26, 49:24, 50:20

**Court's** [6] - 10:3, 21:16, 33:3, 33:6, 34:16, 39:16

**courtroom** [1] - 42:20

**covers** [1] - 13:3

**credence** [1] - 18:13

**credentials** [1] - 43:21

**critic** [1] - 19:4

**cross** [1] - 36:4

**cut** [2] - 31:14, 48:20

### D

**damage** [2] - 17:22, 48:20

**damages** [1] - 33:9

**dated** [1] - 11:12

**days** [4] - 11:4, 32:19, 34:20, 41:26

**deaf** [2] - 5:8, 33:7

**deafness** [2] - 8:4, 8:9

**deal** [4] - 15:13, 30:15, 36:26, 39:5

**dealing** [1] - 12:12

**decided** [4] - 11:25, 11:26, 14:15, 17:20

**decision** [1] - 23:18

**decisions** [4] - 17:3,

27:9, 27:20, 28:3

**deep** [1] - 22:19

**defend** [1] - 20:4

**defendant** [3] - 3:17, 3:19, 39:8

**Defendant** [3] - 1:20, 1:24, 2:4

**Defendants** [1] - 1:9

**degrading** [1] - 31:22

**deleted** [1] - 8:22

**deleting** [1] - 19:11

**deny** [5] - 19:14, 28:2, 28:9, 28:12

**Deposit** [1] - 4:12

**derailed** [1] - 16:7

**derivatively** [2] - 1:3, 1:4

**derogatory** [2] - 9:2, 29:9

**described** [2] - 9:21, 10:25

**design** [1] - 33:11

**designate** [1] - 33:11

**designated** [1] - 34:9

**designed** [2] - 5:9, 27:22

**despite** [2] - 41:12, 41:16

**destroy** [1] - 17:7

**destruct** [1] - 17:11

**detail** [1] - 35:16

**devices** [1] - 23:19

**differ** [1] - 30:10

**differences** [1] - 20:25

**direct** [4] - 10:22, 21:15, 47:2, 48:9

**directed** [2] - 8:18, 10:17

**directing** [1] - 10:21

**direction** [13] - 12:25, 21:8, 21:18, 22:17, 23:11, 23:15, 33:16, 33:17, 33:21, 33:23, 34:11, 45:15

**directions** [4] - 3:9, 11:2, 25:2, 33:20

**directly** [1] - 45:8

**disagree** [1] - 18:6

**disappointed** [1] - 37:20

**discount** [1] - 23:14

**discovery** [1] - 4:19

**discussion** [3] - 44:13, 48:17, 48:18

**disobeyed** [2] - 13:17, 14:4

**disorganized** [1] - 7:12

**disputes** [1] - 5:12

**documentation** [1] - 34:7

**documents** [2] - 39:26, 41:21

**done** [8] - 18:16, 18:24, 18:26, 26:23, 27:26, 28:12

**down** [1] - 49:24

**drafts** [1] - 35:8

**drawn** [1] - 47:5

**draws** [1] - 31:25

**dumb** [1] - 9:2

**during** [6] - 4:26, 13:6, 25:14, 29:10, 34:21

### E

**e-filed** [1] - 11:13

**e-mail** [7] - 8:9, 11:19, 13:10, 25:13, 32:15, 41:8, 45:8

**e-mailed** [2] - 19:25, 20:26

**e-mails** [13] - 8:21, 8:22, 8:23, 12:12, 13:8, 13:9, 13:20, 16:9, 19:11, 20:5, 20:18

**early** [1] - 30:25

**ears** [1] - 33:7

**edge** [3] - 38:21, 38:22, 38:23

**effect** [4] - 17:20, 36:25, 44:22, 45:2

**effectively** [2] - 33:25, 33:26

**either** [4] - 12:6, 22:19, 38:12, 43:22

**eliminate** [1] - 40:22

**elucidation** [1] - 35:2

**emergency** [2] - 11:24

**employees** [11] - 8:19, 9:2, 14:10, 14:14, 17:4, 17:8, 17:23, 17:24, 18:18, 26:26

**employer** [1] - 13:16

**employment** [2] - 28:6, 28:10

**encouraging** [1] - 40:25

**end** [4] - 5:25, 35:10, 43:11, 49:15

**engage** [2] - 5:17, 21:16

**ensure** [2] - 7:3, 46:20

**entails** [1] - 48:19

**entered** [1] - 43:22

**entering** [1] - 26:22

**entirely** [1] - 48:24

**entity** [1] - 47:9

**entry** [2] - 24:25, 32:19

**environment** [2] - 29:11, 29:16

**equal** [1] - 19:4

**equitable** [1] - 23:18

**erasing** [1] - 19:26

**errand** [1] - 49:5

**ESQ** [6] - 1:18, 1:22, 1:25, 2:5, 2:6

**established** [1] - 28:13

**estate** [1] - 16:25

**ESTATE** [1] - 1:4

**et** [1] - 8:5

**evaluating** [1] - 6:20

**event** [1] - 33:6

**evidence** [1] - 19:13

**evidentiary** [1] - 24:4

**exact** [1] - 31:24

**except** [1] - 17:20

**exceptionally** [1] - 6:23

**exclude** [1] - 34:5

**exclusive** [3] - 33:12, 34:10, 45:6

**excuse** [4] - 9:15, 9:18, 12:13, 29:18

**executing** [1] - 46:23

**exercise** [2] - 17:12, 27:8

**exercised** [1] - 17:21

**exhibits** [3] - 11:14, 13:9, 14:8

**existing** [1] - 5:14

**exit** [2] - 48:18, 48:19

**expect** [1] - 7:8

**expenses** [1] - 38:9

**experience** [3] - 4:8, 37:24, 37:26

**experienced** [1] - 16:2

**explain** [1] - 41:2

**explicit** [3] - 33:16, 33:18, 36:6

**explicitly** [1] - 32:22

**extent** [1] - 26:6

**extremely** [1] - 46:18

### F

**fact** [5] - 13:8, 22:3, 27:16, 28:13, 44:21

**failure** [1] - 33:10

**fair** [1] - 44:10

**fairly** [1] - 38:16

**false** [1] - 27:10

**fan** [1] - 11:22

**far** [3] - 35:2, 37:14, 45:24

**father** [2] - 32:13, 32:14

**favor** [1] - 34:4

**FDIC** [1] - 4:6

**Federal** [1] - 4:12

**feedback** [1] - 3:4

**fees** [1] - 13:2

**feet** [1] - 39:13

**fell** [1] - 33:7

**felt** [1] - 6:4

**few** [4] - 3:7, 3:8, 3:23, 11:4

**Fifth** [1] - 1:21

**fight** [1] - 16:8

**fighting** [1] - 22:15

**figure** [2] - 38:2, 38:23

**file** [4] - 10:10, 22:18, 39:8, 47:14

**filed** [2] - 11:11, 11:13

**finally** [1] - 13:24

**findings** [1] - 16:6

**fine** [2] - 18:19, 40:14

**fired** [1] - 17:21

**fires** [2] - 17:11, 17:13

**firing** [1] - 22:15

**firm** [1] - 11:20

**FIRST** [1] - 1:8

**First** [11] - 2:4, 3:26, 4:6, 4:12, 32:15, 33:8, 33:10, 33:16, 33:20, 33:24, 35:2

**first** [11] - 3:11, 4:16, 10:24, 12:22, 20:13, 24:5, 24:11, 30:17, 30:21, 32:21, 33:19

**fit** [1] - 49:22

**fix** [1] - 38:18

**flabbergasted** [1] - 7:6

**Flatlands** [1] - 1:24

**Floor** [3] - 1:17, 1:21, 2:4

**foisting** [1] - 34:14

**folks** [3] - 3:2, 10:22, 37:16

**follow** [4] - 10:18, 10:21, 41:16, 41:17

**following** [1] - 41:15

**fool's** [1] - 49:5

**foot** [1] - 31:13

**footing** [1] - 7:2

**forced** [1] - 12:20

**forces** [2] - 47:7

**foreclose** [1] - 46:8

**form** [1] - 11:23

**forth** [8] - 6:10, 9:6, 25:2, 32:24, 33:2, 33:15, 33:22

**frankly** [8] - 15:24, 16:3, 22:12, 23:17, 29:19, 35:13, 37:20,

39:18
**freaking** [2] - 42:8, 42:9
**free** [2] - 6:10, 47:14
**Friday** [3] - 7:14, 21:2, 43:15
**front** [2] - 24:3, 38:17
**frustrated** [1] - 47:21
**frustrations** [1] - 15:15
**full** [7] - 17:18, 25:4, 25:12, 25:15, 26:20, 32:16, 36:16
**funds** [1] - 36:21
**furtherance** [1] - 32:26

**G**

**genuinely** [3] - 7:15, 24:5, 40:24
**gesturing** [1] - 11:11
**gist** [1] - 43:8
**given** [5] - 10:12, 12:7, 17:9, 20:11, 43:20
**glare** [1] - 6:22
**goal** [4] - 5:13, 11:3, 17:6, 31:14
**grata** [1] - 37:9
**grindstone** [1] - 19:3
**guess** [5] - 10:18, 16:9, 18:15, 22:5, 49:15
**guidance** [3] - 38:14, 47:3, 49:20
**guy** [2] - 23:13, 39:12
**guys** [5] - 22:22, 24:7, 32:5, 48:25, 49:2

**H**

**half** [1] - 41:3
**hand** [1] - 18:8
**handle** [2] - 28:22, 47:22
**handled** [1] - 46:2
**hands** [2] - 9:19, 49:8
**hang** [3] - 29:26, 32:5, 42:17
**happy** [2] - 38:26, 45:10
**hard** [5] - 5:3, 18:6, 19:6, 22:2, 38:19
**harm** [1] - 14:20
**head** [1] - 11:8
**headed** [2] - 39:14, 39:15
**heading** [1] - 22:9
**healthy** [1] - 38:16
**hear** [6] - 7:24, 10:16,

23:24, 39:2, 45:10, 45:11
**heard** [5] - 6:7, 8:4, 8:25, 11:25, 22:21, 27:6, 30:18, 30:21
**hearing** [14] - 13:6, 14:3, 22:5, 22:6, 24:4, 24:8, 24:17, 25:14, 30:20, 34:17, 34:19, 34:21, 43:11, 44:18
**hearings** [3] - 35:5, 38:15, 47:19
**heartened** [1] - 45:10
**heated** [1] - 5:12
**heavy** [1] - 19:10
**held** [2] - 18:8, 44:15
**help** [6] - 5:17, 6:5, 14:20, 17:2, 18:2, 26:10, 35:26, 38:26
**helpful** [3] - 4:22, 22:12, 38:15
**hesitated** [1] - 10:24
**highlighted** [1] - 14:7
**hill** [1] - 18:24
**himself** [9] - 3:11, 11:20, 17:26, 18:3, 29:17, 32:22, 33:15, 40:7, 41:4
**Hold** [1] - 32:4
**hold** [2] - 33:8, 44:11
**HOLDINGS** [1] - 1:4
**HON** [1] - 1:13
**honest** [1] - 47:23
**honestly** [1] - 21:19
**Honor** [49] - 3:12, 3:18, 3:21, 3:24, 7:19, 8:13, 8:15, 8:17, 9:5, 9:15, 9:23, 10:8, 10:13, 11:10, 19:21, 20:24, 21:18, 24:11, 24:24, 25:25, 26:3, 26:12, 27:4, 27:6, 27:18, 28:24, 28:25, 29:2, 29:25, 30:5, 30:17, 31:10, 32:9, 32:11, 33:5, 34:20, 37:22, 42:14, 43:2, 43:8, 45:11, 46:3, 47:26, 49:4, 49:9, 50:3, 50:4
**Honor's** [1] - 10:12
**hope** [7] - 9:24, 15:26, 21:4, 31:18, 39:15, 47:16, 48:4
**hoped** [2] - 9:24, 39:7
**hopeful** [2] - 10:3, 10:11
**hopefully** [2] - 4:7, 10:13

**hopes** [1] - 43:12
**horrible** [1] - 17:5
**hour** [1] - 35:6
**housekeeping** [1] - 11:17
**huge** [1] - 40:23
**hundred** [1] - 39:13
**hurt** [1] - 14:19
**hypothetically** [1] - 36:19

**I**

**idea** [2] - 18:7, 29:15
**ignore** [3] - 20:14, 20:20, 21:4
**ignored** [1] - 43:15
**imagine** [1] - 47:11
**immature** [1] - 47:23
**immediate** [1] - 23:3
**immediately** [1] - 43:21
**imploring** [1] - 47:12
**important** [5] - 6:2, 24:6, 35:21, 37:7
**impression** [1] - 43:6
**improperly** [1] - 27:10
**imran** [2] - 11:19, 11:21
**incident** [1] - 40:6
**inclined** [1] - 23:10
**includes** [1] - 10:20
**including** [1] - 33:14
**inconsistent** [2] - 6:25, 19:2
**incorrect** [2] - 24:20, 24:21
**incorrectly** [1] - 40:21
**incredible** [2] - 21:2, 21:5
**incredibly** [1] - 12:22
**incredulous** [1] - 20:16
**indemnify** [1] - 12:26
**Index** [1] - 1:7
**individually** [1] - 1:3
**Individuals** [4] - 25:4, 34:3, 37:26, 44:20
**Infinity** [1] - 14:26
**Information** [2] - 24:18, 24:20
**initial** [2] - 7:13, 21:3
**Injunction** [2] - 20:3, 24:8, 26:15
**insert** [1] - 26:4
**insist** [1] - 42:17
**instability** [1] - 38:14
**instead** [9] - 5:18, 5:22, 11:5, 14:11, 14:13, 14:15, 14:18,

33:8, 39:21
**insurance** [1] - 4:13
**intend** [1] - 37:8
**Intended** [5] - 10:13, 29:14, 32:25, 34:17, 44:4
**intent** [1] - 26:23
**Interactions** [1] - 22:7
**Interest** [4] - 15:6, 33:26, 46:6, 48:8
**interests** [1] - 23:19
**interim** [14] - 8:15, 9:5, 10:5, 10:6, 21:9, 24:25, 24:26, 26:22, 28:5, 32:3, 32:19, 32:24, 33:2, 33:3
**interject** [5] - 19:21, 24:16, 25:18, 25:23, 32:12
**Internal** [1] - 25:8
**Introduced** [1] - 11:20
**Investigation** [1] - 25:8
**Investment** [1] - 26:10
**Investor** [10] - 12:24, 13:5, 13:15, 14:23, 15:3, 15:17, 16:19, 22:7, 28:7
**investors** [2] - 15:4, 27:2
**Involved** [2] - 32:18, 46:7
**involves** [1] - 30:11
**Iron** [1] - 48:2
**isolate** [1] - 43:23
**issue** [3] - 20:9, 24:12, 35:13
**issued** [4] - 5:20, 5:25, 8:15, 9:5
**issues** [1] - 6:15
**items** [1] - 38:9

**J**

**JARED** [1] - 1:8
**Jared** [9] - 1:20, 1:24, 12:17, 12:20, 39:24, 41:4, 41:6, 41:12
**JASON** [1] - 1:25
**JAY** [1] - 2:5
**Jeff** [10] - 39:25, 40:2, 41:3, 41:7, 41:8, 41:11, 41:19, 41:23, 41:24, 42:11
**Jeff's** [1] - 41:8
**Jeffrey** [4] - 3:13, 13:10, 31:2, 32:7
**JEFFREY** [1] - 1:3
**jettison** [1] - 22:23
**JJ** [5] - 1:4, 1:4, 12:19,

28:11
**job** [4] - 16:9, 17:24, 32:8, 47:6
**jobs** [1] - 32:2
**JOEL** [1] - 1:13
**John** [1] - 3:19
**JONATHAN** [1] - 1:22
**JPMorgan** [2] - 4:4, 4:10
**judge** [1] - 13:24
**Judge** [4] - 6:3, 6:7, 8:14, 31:6
**judges** [2] - 16:26
**judgment** [2] - 18:21, 18:22
**jump** [1] - 10:22
**junction** [1] - 12:5
**jurisdiction** [1] - 9:22
**Justice** [1] - 1:13
**justification** [1] - 9:16
**justify** [3] - 27:7, 28:2, 30:7

**K**

**KAMINS** [1] - 1:20
**Kandel** [14] - 4:3, 30:24, 31:4, 31:6, 31:15, 32:13, 37:5, 38:17, 41:14, 41:21, 42:26, 43:18, 44:5
**KANDEL** [14] - 2:5, 3:24, 3:26, 24:16, 24:24, 25:22, 32:9, 32:11, 36:8, 43:19, 44:7, 44:25, 45:17, 46:3
**Kandel's** [1] - 22:13
**keep** [6] - 6:5, 15:5, 28:23, 36:9, 42:23
**keeps** [1] - 49:13
**kids'** [1] - 17:26
**kind** [6] - 7:6, 7:9, 11:3, 15:26, 16:4, 29:17, 38:14, 47:8
**kinds** [3] - 13:3, 20:6, 20:8
**kisses** [1] - 14:14
**knock** [1] - 26:21
**knowing** [1] - 22:16
**known** [1] - 44:8

**L**

**land** [1] - 40:18
**language** [1] - 26:4
**large** [1] - 13:2
**last** [4] - 4:7, 6:26, 22:24, 23:2, 23:4, 23:7, 32:14, 43:14,

49:7
late [1] - 11:16
law [9] - 8:7, 9:18, 16:24, 16:25, 20:12, 21:23, 33:6, 44:9
lawsuit [2] - 6:14, 15:22
lawsuits [1] - 12:26
lawyers [3] - 6:12, 45:9
lead [1] - 10:23
lean [1] - 45:25
leap [1] - 34:4
learn [1] - 37:23
learned [2] - 24:14, 24:20
least [5] - 5:13, 6:4, 7:2, 7:5, 39:3
leave [2] - 17:10, 36:14
leaving [1] - 40:14
left [3] - 5:3, 12:4, 23:18
legal [2] - 12:26, 15:22
legitimate [2] - 15:6, 23:9
LEITMAN [2] - 1:16, 1:18
Leitman [8] - 3:13, 32:21, 32:22, 33:14, 34:23, 43:12, 44:8
less [1] - 15:18
letter [14] - 4:15, 6:8, 7:13, 11:11, 12:21, 13:9, 14:8, 14:10, 29:3, 29:4, 29:7, 30:18, 40:8, 44:21
letters [6] - 4:17, 6:13, 7:13, 9:8, 9:10, 30:22
LEVANTHAL [1] - 32:3
LEVENTHAL [16] - 1:22, 3:18, 7:19, 7:21, 19:21, 19:25, 29:24, 30:17, 42:13, 42:25, 43:4, 47:25, 49:3, 49:13, 50:4
Leventhal [8] - 3:19, 4:16, 8:14, 12:14, 24:17, 42:20, 42:24, 46:26
Leventhal's [2] - 6:7, 11:20
levied [1] - 23:23
liabilities [1] - 4:11
liability [3] - 4:5, 33:10, 44:12
liaison [1] - 40:6
life [1] - 17:23

light [1] - 17:11
lightly [1] - 30:16
line [1] - 21:14
lines [1] - 47:4
list [1] - 16:19
listen [2] - 22:20, 37:13
listening [5] - 4:26, 16:4, 22:13, 37:18, 40:26
literally [3] - 5:7, 9:3, 16:11
litigation [3] - 5:18, 9:10, 9:19
litigators [1] - 38:19
LLC [3] - 1:4, 1:4, 1:5
LLP [2] - 2:3, 4:4
logical [1] - 34:3
look [16] - 17:17, 18:20, 18:26, 19:5, 19:20, 20:5, 21:19, 21:26, 23:11, 30:16, 35:4, 38:2, 39:18, 42:3, 47:13
Look [2] - 18:6, 46:17
looked [2] - 17:16, 30:19
looking [3] - 6:9, 23:16
looks [1] - 39:19
Lori [2] - 2:10, 50:19
loss [1] - 28:2
lower [1] - 23:20
lunch [1] - 35:6

**M**

mad [1] - 47:5
mail [7] - 8:9, 11:19, 13:10, 25:13, 32:15, 41:8, 45:8
malled [2] - 19:25, 20:26
mails [13] - 8:21, 8:22, 8:23, 12:12, 13:8, 13:9, 13:20, 16:9, 19:11, 20:5, 20:18
main [1] - 7:26
maintain [1] - 32:8
maintains [2] - 31:25, 41:19
major [4] - 26:17, 27:8, 27:20, 28:3
manage [1] - 41:24
management [1] - 15:17
managing [10] - 1:4, 1:4, 12:3, 27:23, 31:24, 31:26, 32:7, 35:18, 37:7, 41:19

mandate [1] - 45:26
manner [1] - 6:24
matter [4] - 8:16, 9:16, 11:18, 27:16
mean [9] - 15:23, 21:22, 27:10, 35:20, 35:22, 37:13, 39:4, 44:2, 46:11
meaning [1] - 14:3
measure [1] - 37:19
meet [4] - 8:8, 21:23, 47:26, 49:24
member [23] - 1:4, 1:4, 11:19, 14:23, 15:3, 15:17, 16:20, 22:7, 27:23, 27:24, 28:7, 28:10, 31:24, 32:7, 35:19, 35:21, 35:23, 36:20, 37:7, 41:19
member's [2] - 28:7, 32:2
members [2] - 15:9, 36:3
mentioned [2] - 8:17, 15:11
merits [2] - 7:22, 12:15
mess [1] - 6:13
metaphor [1] - 17:11
Microsoft [1] - 13:19
MICROSOFT [1] - 1:10
middle [4] - 5:18, 15:21, 25:19, 45:18
midst [1] - 9:10
might [2] - 10:14, 35:9
mind [3] - 23:20, 37:15, 47:25
minimum [1] - 33:4
minority [3] - 12:24, 13:15, 15:9
minutes [4] - 3:7, 31:7, 31:9, 50:16
moderating [1] - 47:7
modified [1] - 26:5
moment [6] - 5:6, 19:22, 42:23, 43:25, 46:19
money [14] - 14:5, 14:6, 17:25, 17:26, 21:17, 22:3, 27:10, 27:13, 31:26, 38:4, 41:24, 42:10, 49:11
monies [1] - 14:7
moot [1] - 14:4
morale [1] - 17:24
most [1] - 3:20
mostly [1] - 3:8
motion [16] - 4:18, 4:22, 4:23, 7:16,

7:18, 9:23, 9:25, 10:4, 10:5, 10:6, 10:10, 16:7, 26:14, 39:7, 43:14, 48:3
motions [2] - 38:25, 47:15
mouth [1] - 42:14
movant [1] - 31:13
moving [1] - 42:14
MR [74] - 3:12, 3:18, 3:24, 3:26, 7:19, 7:21, 8:13, 11:10, 11:17, 13:7, 14:25, 15:4, 15:9, 16:14, 16:21, 16:23, 19:15, 19:21, 19:25, 24:11, 24:16, 24:24, 25:22, 25:23, 25:25, 28:9, 28:14, 28:15, 28:16, 28:17, 28:19, 28:20, 28:24, 28:25, 29:23, 29:24, 30:3, 30:17, 31:22, 32:3, 32:4, 32:6, 32:9, 32:10, 32:11, 36:8, 37:22, 39:20, 40:7, 40:13, 40:16, 41:2, 42:7, 42:13, 42:15, 42:19, 42:22, 42:25, 43:4, 43:19, 44:7, 44:25, 45:17, 46:3, 47:25, 48:11, 48:14, 48:26, 49:3, 49:9, 49:13, 49:17, 50:3, 50:4
MS [1] - 4:9
must [1] - 23:21
mute [1] - 3:3
mutual [1] - 11:7, 18:9

**N**

N.A [1] - 4:4
naive [1] - 38:10
name [6] - 4:2, 24:22, 32:12, 32:13, 32:15, 41:9
named [1] - 20:15
names [3] - 8:26, 41:7, 41:11
NATHANIA [1] - 2:6
nathania [1] - 4:9
nature [1] - 15:14
necessarily [2] - 15:25, 42:6
necessary [1] - 10:19
necessity [1] - 10:4
need [16] - 6:4, 9:25, 10:14, 17:2, 21:6, 34:19, 36:2, 38:10, 38:13, 38:26, 39:2,

41:18, 46:15, 46:19, 47:15
needed [4] - 21:10, 39:23, 41:7, 41:12
needs [1] - 34:25
never [2] - 22:26, 30:21
NEW [2] - 1:2, 1:2
New [7] - 1:18, 1:21, 1:25, 2:5
next [2] - 14:9, 49:21
Nice [1] - 11:21
non [2] - 37:9, 46:20
noncompete [2] - 16:14, 49:10
none [2] - 27:7, 27:25
normal [1] - 5:11
nosed [1] - 38:19
noted [1] - 35:11
nothing [3] - 16:10, 19:15, 19:17
noticed [1] - 42:25
notion [2] - 37:14, 40:17
Nullifying [1] - 9:8
number [5] - 7:25, 12:16, 15:7, 41:5, 45:22
NYSCEF [1] - 30:20

**O**

Oak [1] - 14:25
obligation [1] - 34:15
obligations [2] - 32:24, 35:3
observing [1] - 24:13
obviously [3] - 10:15, 18:20, 23:23
occasions [1] - 8:7
odd [1] - 18:16
office [7] - 6:17, 8:18, 29:2, 29:4, 29:16, 29:18, 33:14
Official [2] - 2:11, 50:20
official [1] - 4:2
one [37] - 5:12, 6:7, 7:10, 7:23, 7:25, 8:6, 12:12, 12:16, 14:12, 14:13, 15:11, 19:5, 22:21, 22:22, 24:16, 25:2, 26:17, 27:11, 28:26, 29:24, 30:10, 30:23, 34:2, 35:5, 35:9, 36:13, 36:19, 40:5, 41:20, 41:22, 42:17, 43:24, 45:8, 45:25, 46:22
One [1] - 1:17

ones [1] - 9:21
online [5] - 25:5, 25:11, 25:15, 32:17
ooOoo [1] - 50:6
open [2] - 36:14, 37:3
opens [1] - 31:24
operate [4] - 11:6, 37:12, 40:15, 45:19
operated [1] - 45:14
operating [14] - 5:14, 12:18, 12:19, 26:18, 27:21, 31:23, 35:17, 36:4, 39:17, 39:21, 40:5, 41:18, 41:20, 45:20
operation [1] - 36:25
opinion [3] - 44:17, 44:26, 47:6
opportunity [1] - 19:4
opposed [1] - 16:12
opposing [1] - 11:12
oral [1] - 11:12
order [80] - 5:9, 5:11, 5:19, 5:25, 8:5, 8:15, 9:5, 9:20, 9:26, 10:3, 10:12, 10:17, 10:25, 11:3, 11:24, 12:16, 13:4, 13:17, 13:23, 14:4, 15:21, 17:9, 17:15, 17:19, 20:2, 20:22, 21:9, 21:10, 21:13, 21:15, 23:7, 23:13, 24:25, 24:26, 25:25, 26:9, 26:14, 26:22, 26:23, 26:24, 28:5, 31:5, 31:12, 31:14, 32:6, 32:19, 32:24, 33:2, 33:3, 33:19, 34:12, 35:9, 35:11, 35:13, 35:24, 36:7, 36:10, 36:24, 37:2, 37:5, 40:21, 40:23, 41:6, 41:12, 41:16, 41:17, 43:22, 43:25, 44:17, 44:19, 44:21, 44:24, 45:9, 45:25, 46:15
ordering [1] - 37:2
orders [2] - 5:7, 13:14
organization [1] - 35:21
organized [1] - 5:21
originally [1] - 20:21
ourselves [1] - 20:4
outcome [1] - 34:2
outrageous [2] - 16:4, 39:10
outright [1] - 22:6
outset [1] - 3:9
outside [2] - 14:13,

36:18
overreach [1] - 40:23
overreaching [1] - 6:24
overriding [1] - 4:25
overtly [1] - 38:4
own [4] - 9:19, 13:16, 23:19, 27:13

**P**

P.C [2] - 1:16, 1:20
paid [1] - 12:24
painting [1] - 31:20
paints [1] - 31:20
panned [1] - 37:21
paragraph [4] - 31:24, 33:19, 33:22, 33:23
Park [1] - 1:17
part [9] - 4:17, 8:20, 14:5, 14:18, 18:5, 27:2, 29:12, 35:21, 37:8
PART [1] - 1:2
participating [1] - 14:17
particularly [1] - 30:5
parties [12] - 4:21, 8:26, 9:3, 9:8, 9:13, 11:5, 15:6, 35:17, 39:2, 42:5, 44:19, 44:26
partner [2] - 12:3, 32:21
partners [1] - 8:19
party [7] - 7:10, 7:11, 11:2, 12:24, 14:24, 20:15, 46:5
pass [1] - 13:25
path [1] - 5:24
patient [1] - 46:19
pause [1] - 46:16
pay [2] - 17:26, 38:9
payments [2] - 31:26, 40:12
payroll [1] - 42:10
pending [2] - 9:19, 10:6
people [12] - 4:26, 5:17, 6:16, 6:17, 8:18, 17:6, 22:14, 35:25, 39:17, 42:16, 47:5, 49:23
perceive [1] - 5:19
percent [2] - 27:24, 46:6
perfectly [1] - 19:18
permission [2] - 26:2, 26:6
permitted [1] - 46:6

person [7] - 17:13, 33:11, 34:9, 36:15, 41:23, 44:14, 45:6
persona [1] - 37:9
personal [2] - 36:21, 38:9
phase [1] - 12:5
phone [1] - 31:16
phrase [1] - 22:10
place [5] - 9:20, 10:24, 18:11, 26:19, 27:18
plaintiff [3] - 3:10, 3:15, 34:14
Plaintiffs [2] - 1:6, 1:17
Plaza [1] - 1:17
point [9] - 15:7, 18:21, 19:23, 27:14, 28:26, 37:16, 38:24, 42:4, 49:7
portrait [1] - 31:19
position [4] - 23:7, 28:4, 29:21, 30:4
possibility [1] - 36:15
possible [1] - 23:11
powerless [1] - 29:9
practice [5] - 9:25, 10:4, 10:5, 10:6, 10:10
practicing [1] - 16:24
pre [4] - 4:18, 4:21, 4:23, 9:23
pre-motion [3] - 4:18, 4:23, 9:23
preamble [1] - 6:4
precedence [1] - 46:13
preclude [1] - 21:21
preference [1] - 39:15
preliminary [5] - 12:4, 14:3, 20:3, 24:8, 26:15
premises [1] - 23:14
prepared [1] - 21:6
preserved [1] - 19:16
preserving [1] - 19:26
presumably [1] - 27:14
pretty [2] - 19:10, 23:25
primarily [1] - 26:17
principals [2] - 5:12, 46:18
principle [2] - 18:6, 18:8
prism [1] - 16:5
private [1] - 27:13
privileged [2] - 8:21, 20:6
problem [1] - 39:22

proceed [2] - 10:9, 22:25
PROCEEDING [1] - 1:10
process [3] - 18:11, 36:18, 39:4
productive [1] - 49:26
professional [1] - 42:24
program [1] - 46:20
prohibit [2] - 26:10, 36:11
prohibition [1] - 22:6
promise [1] - 49:21
promptly [1] - 39:7
pronunciation [1] - 32:14
proper [4] - 34:7, 36:23, 36:25, 38:8
properly [1] - 37:11
proposal [1] - 41:17
proposals [1] - 35:8
proposed [1] - 36:7
proud [1] - 32:14
provide [3] - 12:6, 25:4, 34:8
provision [3] - 17:3, 17:13, 17:21
provisions [1] - 10:20
purchaser [2] - 4:5, 4:11
purposes [2] - 36:4, 36:21
pursue [1] - 15:22
push [1] - 46:12
put [11] - 4:20, 5:10, 5:24, 8:2, 22:11, 26:4, 26:15, 26:20, 27:18, 40:7, 40:23
putting [2] - 5:6, 31:15

**Q**

quarter [1] - 20:26
questioned [1] - 33:13
questions [1] - 28:23
quite [4] - 6:12, 9:26, 29:19, 38:23
quo [5] - 21:9, 21:26, 43:25, 46:5, 48:4
quote [1] - 29:6
quoted [1] - 29:6

**R**

radar [1] - 39:16
rails [3] - 6:6, 19:6, 38:11
raise [2] - 23:21, 34:24
rather [4] - 11:7,

23:21, 34:14, 35:26
reach [2] - 47:20, 48:10
reached [1] - 22:24
reaction [2] - 4:25, 15:19
reactions [1] - 7:13
read [9] - 31:23, 33:23, 37:5, 40:11, 41:18, 44:17, 45:10, 46:9, 48:23
reading [1] - 41:20
reads [2] - 45:9, 45:11
ready [2] - 3:3, 24:8
real [1] - 16:25
REAL [1] - 1:4
reality [2] - 26:12, 27:4
really [8] - 6:21, 7:6, 7:26, 14:21, 17:22, 18:2, 38:23, 40:18
realtime [1] - 22:4
reason [3] - 7:26, 9:22, 43:12
reasonably [1] - 9:13
reasoned [1] - 44:13
reasons [1] - 12:21
received [2] - 4:15, 11:19
receiver [4] - 4:6, 4:13, 37:14, 47:10
recognize [4] - 39:24, 39:25, 39:26, 42:11
recognizing [3] - 5:11, 41:11, 41:23
recollection [1] - 35:4
reconsider [1] - 20:14
record [13] - 23:8, 24:4, 25:16, 31:6, 31:9, 31:11, 34:21, 35:5, 35:7, 35:10, 42:2, 49:26
recoup [2] - 11:26, 12:8
referenced [2] - 32:12, 34:25
referring [1] - 15:5
refuse [1] - 4:23
refused [2] - 13:18, 14:9
refuses [2] - 14:6, 49:11
regard [1] - 35:3
regardless [1] - 26:8
regards [1] - 26:11
regular [1] - 35:25
reimburse [1] - 14:6
reinserted [1] - 28:4
related [1] - 24:26
relationship [3] - 35:20, 36:17, 38:16

relationships [1] - 15:16
relatively [1] - 5:15
relief [1] - 16:12
rely [1] - 37:17
remain [2] - 23:22, 26:19
remember [1] - 35:12
removed [3] - 24:13, 26:2, 26:6
repeat [1] - 43:5
repeatedly [2] - 34:13, 44:16
report [1] - 32:3
Reporter [2] - 2:11, 50:20
representing [1] - 4:10
REPUBLIC [1] - 1:8
Republic [10] - 2:4, 4:2, 4:6, 4:12, 33:8, 33:10, 33:17, 33:20, 33:25, 35:3
requested [1] - 8:6
requesting [1] - 34:26
require [3] - 4:18, 4:23, 34:8
required [2] - 14:11, 42:5
requires [2] - 35:15, 44:19
requiring [2] - 14:10, 41:10
resignation [1] - 39:5
resignations [1] - 6:18
resolve [5] - 6:14, 8:8, 8:11, 20:24, 21:24
resolved [3] - 5:21, 10:3, 16:2
resort [1] - 23:4
respect [3] - 42:18, 44:7, 44:10
respond [2] - 8:12, 42:13
responded [1] - 30:22
responding [2] - 12:13, 29:7
response [6] - 3:16, 6:8, 8:4, 11:11, 20:22
responsibilities [1] - 38:13
rest [1] - 41:13
restore [5] - 20:17, 20:18, 20:19, 25:15, 48:4
restored [4] - 24:14, 24:15, 26:13, 32:16
restores [1] - 21:8
restraining [1] - 26:14

restriction [1] - 26:17, 26:18
result [2] - 47:17, 47:20
retained [1] - 34:19
rethink [1] - 23:12
return [1] - 23:3
REYES [2] - 2:6, 4:9
Reyes [2] - 4:8, 4:9
rights [12] - 9:6, 26:19, 26:25, 27:8, 27:17, 27:19, 27:25, 28:2, 37:8, 46:10, 46:11, 46:14
risk [1] - 47:9
risking [2] - 17:23, 17:24
role [1] - 40:22
room [2] - 21:11, 48:24
route [1] - 15:23
ruin [1] - 17:6
ruining [1] - 48:16
ruins [1] - 22:24
Rule [2] - 4:17, 38:26
rules [2] - 4:17, 4:20
run [7] - 18:7, 18:24, 24:7, 26:24, 41:6, 42:6, 46:17
running [5] - 19:3, 37:11, 37:26, 38:5, 42:19
runs [1] - 35:19

**S**

Sacco [2] - 2:10, 50:19
safety [1] - 17:23
sanctions [1] - 20:8
scenario [1] - 23:4
schooling [1] - 17:26
SCHWARTZ [11] - 1:25, 8:13, 24:11, 26:25, 28:9, 28:15, 28:17, 28:19, 28:25, 29:23, 30:3
Schwartz [5] - 3:20, 3:22, 21:5, 23:26, 24:10, 24:19, 28:23, 46:26, 48:2
Schwartz's [1] - 25:19
screen [1] - 37:25
second [8] - 11:17, 12:11, 13:17, 20:15, 24:16, 29:26, 32:5, 48:22
secondly [2] - 20:17, 25:3
section [1] - 44:19

SEDDIO [1] - 1:23
see [15] - 3:9, 9:11, 10:15, 11:4, 12:5, 13:19, 16:14, 19:7, 24:2, 39:8, 41:19, 42:14, 43:3, 47:9, 49:16
seeing [1] - 9:12
seek [4] - 33:3, 33:4, 33:9, 34:15
seeking [2] - 16:12, 17:6
self [3] - 5:17, 17:10, 26:10
sell [1] - 17:8
send [6] - 11:23, 12:9, 13:12, 23:26, 44:21, 45:2
sending [1] - 38:22
sense [1] - 48:15
sent [6] - 4:15, 8:9, 30:18, 37:10, 40:8, 41:8
sentence [2] - 22:18, 44:23
September [4] - 1:11, 11:13, 23:22, 25:8
seriously [1] - 47:11
set [6] - 7:12, 9:5, 9:6, 25:2, 32:24, 33:2, 33:15, 33:22
settings [1] - 25:10
settlement [1] - 29:10
shadow [1] - 23:6
shall [1] - 27:19
share [1] - 38:7
shared [1] - 45:22
SHERMAN [1] - 2:3
Sherman [2] - 4:3, 4:9
ship [1] - 5:10
shocked [1] - 7:23
shocking [2] - 23:23, 40:18
short [2] - 4:21, 8:16
shortly [1] - 11:12
shove [1] - 46:12
show [5] - 11:24, 13:23, 20:2, 20:22, 23:17
shut [2] - 8:22, 8:23
Siberia [1] - 37:10
side [5] - 5:19, 6:7, 22:19, 37:4, 38:12
sided [1] - 22:21
sides [2] - 18:26, 38:8
sign [2] - 39:25, 41:7
signatory [5] - 31:3, 33:12, 39:23, 40:3, 40:9
signature [1] - 34:10

signatures [1] - 42:5
signed [4] - 12:22, 23:7, 28:21, 40:11
significant [1] - 26:17
silence [2] - 8:9, 21:2
SIMPSON [1] - 1:3
Simpson [34] - 3:13, 8:20, 9:17, 9:18, 10:9, 13:11, 19:11, 24:6, 25:9, 26:13, 26:16, 26:20, 26:23, 27:12, 27:20, 27:23, 29:7, 29:11, 30:7, 32:7, 32:25, 33:11, 34:9, 36:5, 36:12, 36:26, 37:6, 37:17, 39:24, 43:20, 43:26, 44:14, 45:7, 46:10
Simpson's [4] - 15:15, 33:24, 34:4, 46:12
simultaneously [1] - 40:19
siphoned [1] - 22:4
sites [1] - 17:24
situation [2] - 22:22, 47:8
skeptical [1] - 23:5
small [1] - 38:7
sole [6] - 31:3, 33:11, 33:12, 34:10, 44:14, 45:6
solid [1] - 7:2
Solomonic [1] - 20:12
solvent [1] - 7:5
someday [1] - 46:23
someone [2] - 48:15, 49:7
sometimes [3] - 15:16, 15:17, 46:11
somewhat [1] - 47:23
sort [11] - 5:8, 5:10, 7:12, 15:18, 30:14, 34:26, 35:2, 35:7, 35:19, 37:9, 40:17
sought [1] - 10:11
sound [3] - 16:3, 47:23, 49:19
sounds [2] - 40:4, 49:7
space [1] - 29:5
speaking [6] - 10:21, 29:23, 30:2, 30:3, 42:15, 43:6
specifically [2] - 9:13, 26:9
speed [1] - 9:4
spirit [1] - 6:25
spoliation [5] - 19:13, 19:17, 20:7
squabbles [1] - 47:23

square [1] - 5:3
stabbing [1] - 48:16
stake [1] - 27:17
stakeholder [3] - 33:25, 33:26, 34:15
STAMELMAN [1] - 2:3
Stamelman [1] - 4:3
staring [1] - 37:25
stark [1] - 23:26
started [4] - 11:12, 13:14, 31:21, 32:20
STATE [1] - 1:2
state [1] - 25:16
statement [1] - 29:22
status [5] - 21:9, 21:26, 43:25, 46:5, 48:4
stay [1] - 3:3
stays [1] - 46:21
steady [1] - 5:10
stealing [3] - 17:25, 38:4, 49:11
steering [1] - 49:8
stenographic [1] - 50:16
steps [1] - 24:26
still [14] - 9:24, 12:2, 12:17, 13:26, 14:23, 15:18, 17:18, 17:20, 22:15, 22:25, 24:7, 26:7, 34:23, 38:18
stipulation [1] - 12:10
stole [1] - 14:5
stop [2] - 12:8, 42:15
stopped [1] - 13:13
straightforward [1] - 5:15
street [1] - 43:24
strictly [1] - 10:21
strike [1] - 18:16
strikes [1] - 16:10
strongly [1] - 49:23
structured [1] - 27:22
students [1] - 44:10
studied [1] - 44:9
stuff [1] - 39:10
stupid [1] - 8:26
subject [4] - 13:11, 29:5, 29:16, 46:13
suggest [1] - 29:20
suing [1] - 1:4
supervision [1] - 28:3
suppose [4] - 6:7, 7:8, 10:20, 17:12
supposedly [1] - 22:14
SUPREME [1] - 1:2
Supreme [1] - 1:13
surprised [2] - 7:7,

7:24
suspect [2] - 10:16, 16:5
swords [1] - 22:11
SYLVESTER [1] - 2:3
Sylvester [1] - 4:3
system [1] - 40:11
systems [1] - 8:24

## T

table [1] - 21:20
TEAMS [1] - 1:10
Teams [1] - 28:18
temperature [1] - 23:21
temporary [1] - 26:14
ten [1] - 45:9
TERM [1] - 1:2
terminate [2] - 16:11, 21:13
terminated [3] - 7:10, 8:19, 31:13
terminating [1] - 29:18
termination [8] - 5:23, 9:8, 9:9, 10:20, 18:18, 23:6, 29:7, 31:18
terminations [3] - 18:10, 23:2
terms [4] - 5:7, 9:2, 28:26, 29:9
terribly [2] - 4:26, 22:12
tested [1] - 15:23
THE [55] - 3:2, 3:14, 3:17, 3:23, 3:25, 4:7, 4:14, 7:20, 10:16, 11:15, 13:5, 14:22, 15:2, 15:5, 15:11, 16:19, 16:22, 18:5, 19:24, 21:19, 24:22, 25:20, 25:24, 28:6, 28:18, 28:22, 29:21, 29:26, 30:9, 32:5, 35:4, 36:9, 37:23, 40:3, 40:10, 40:14, 40:17, 42:3, 42:17, 42:21, 42:23, 43:3, 43:17, 43:20, 44:23, 45:16, 45:19, 46:4, 48:6, 48:12, 48:22, 49:2, 49:6, 49:14, 49:19
theft [1] - 30:11
themselves [1] - 19:2
thereby [1] - 9:9
therefore [1] - 32:7
therein [1] - 25:2

thinking [1] - 38:3
third [9] - 8:25, 9:3, 12:11, 12:23, 14:5, 14:24, 15:5, 33:21, 44:9
Third [1] - 2:4
threatened [2] - 44:11, 44:12
threats [2] - 33:8, 33:9
three [1] - 44:19
throw [1] - 49:24
throwing [3] - 6:17, 6:18, 19:9
tied [1] - 49:8
today [10] - 10:7, 10:11, 10:15, 17:17, 21:24, 24:16, 24:18, 25:12
together [5] - 18:20, 35:26, 39:3, 44:9, 44:20
toggled [1] - 25:9
tomorrow [3] - 13:21, 13:23, 43:10
tone [1] - 5:8
took [4] - 7:9, 18:10, 24:25, 30:26
toolbox [1] - 18:17
top [3] - 7:8, 9:12, 38:14
track [1] - 22:11
trader [1] - 13:16
transaction [1] - 46:23
transactions [2] - 34:6, 45:21
transcript [2] - 34:22, 50:15
treating [1] - 42:18
tried [2] - 8:11, 48:15
TRO [1] - 20:3
true [7] - 18:14, 19:12, 29:22, 30:4, 30:6, 50:15
trust [1] - 37:15
try [12] - 8:8, 11:26, 17:7, 20:24, 21:24, 22:19, 24:2, 38:20, 38:26, 44:6, 47:14, 48:2
trying [8] - 5:9, 5:24, 6:14, 17:8, 23:18, 23:20, 37:19, 42:26, 47:18
Tuesday [1] - 12:10
turn [2] - 24:10, 43:17
two [15] - 8:6, 13:18, 14:12, 14:26, 22:14, 22:22, 25:2, 31:24, 32:23, 33:19, 34:2, 34:20, 35:5, 36:3,

36:14
Tyler [1] - 4:2
type [2] - 9:25, 16:25

## U

ugly [1] - 32:10
ultimately [1] - 23:26
ultimatum [1] - 49:25
under [3] - 6:22, 22:25, 23:6
undermine [1] - 36:2
unfreeze [1] - 25:3
unilateral [9] - 5:22, 9:20, 18:10, 18:17, 19:7, 23:2, 23:6, 26:10, 30:7
unmute [1] - 3:11
up [5] - 13:18, 18:24, 44:6, 46:25, 48:9
update [1] - 32:15
updated [1] - 24:18
urge [1] - 49:23
useful [1] - 22:8

## V

vacate [1] - 23:8
vacated [1] - 18:12
vacation [9] - 5:3, 7:25, 8:11, 11:18, 12:10, 13:22, 32:20, 33:5, 42:9
various [1] - 35:8
vendors [1] - 8:19
verbal [2] - 8:18, 29:5
verify [1] - 31:16
veto [1] - 46:10
view [8] - 6:24, 9:7, 22:9, 22:24, 25:4, 25:5, 30:13, 32:17
views [1] - 46:13
violate [2] - 17:15, 31:14
violated [4] - 5:7, 12:16, 16:17, 16:23
violating [1] - 5:19
violation [4] - 8:3, 8:5, 10:25, 15:21
violations [1] - 20:7
voluntarily [2] - 39:6, 48:4

## W

wait [2] - 25:19, 47:15
waive [1] - 27:21
walk [1] - 38:20
walking [1] - 38:22
wants [1] - 47:11

waste [2] - 21:16
watching [1] - 6:21
ways [1] - 38:8
weapon [1] - 9:10
week [2] - 7:9, 22:24
weeks [1] - 13:18
weeks' [1] - 14:12
wheel [1] - 49:8
whereby [2] - 13:8, 13:10
whole [1] - 41:3
Wiener [2] - 13:12, 13:14
wife's [1] - 17:26
wiggle [1] - 21:11
willing [4] - 33:6, 47:26, 48:5, 48:12
withdrawn [2] - 36:20, 39:6
workaround [1] - 14:2
works [1] - 38:6
world [2] - 22:3, 36:22
worse [1] - 18:15
worth [1] - 14:12
wrap [1] - 44:6
write [2] - 20:11, 20:17
written [3] - 8:2, 20:23, 20:24
wrote [5] - 6:13, 11:21, 41:10, 44:24, 45:7

## Y

year [1] - 44:9
years [8] - 11:22, 16:24, 40:5, 40:12, 44:8, 45:22
YORK [2] - 1:2, 1:2
York [7] - 1:18, 1:21, 1:25, 2:5



Allen Schwartz <allen@allenschwartzlaw.com>

## 158055/2023 JEFFREY SIMPSON et al v. JARED CHASSEN et al Notice of Application for Injunctive Releif

**Allen Schwartz** <allen@allenschwartzlaw.com>                    Thu, Sep 14, 2023 at 12:17 PM
To: Adam Leitman Bailey <alb@alblawfirm.com>
Cc: John Leventhal <judgeleventhal@aidalalaw.com>, Allen Schwartz <allenschwartzlaw@gmail.com>,
"tkandel@shermanatlas.com" <tkandel@shermanatlas.com>, Brandon Zlotnick <Bzlotnick@alblawfirm.com>, John
Desiderio <JDesiderio@alblawfirm.com>, "Imran H. Ansari, Esq." <iansari@aidalalaw.com>

Counsel:

Please take notice that Defendant Jarred Chassen ("Chassen") will be presenting an emergency
application seeking temporary restraints to the New York County Supreme Court seeking for an order: (1)
compelling Plaintiff Jeffrey Simpson ("Simpson") to comply with the Court's August 21, 2023 Interim
Order, including directing Simpson to restore Chassen's company email access, access to dropbox and
other company systems, and to retract the actions he took after the Court's August 21, 2023 Order to
remove Chassen from the JJ Arch; (2) declaring null and void Simpson's post-Interim Order termination
letter; (3) holding Simpson in contempt of the Court's August 21, 2023 Interim Order; (4) enjoining
Simpson from unilaterally acting to terminate Chassen from JJ Arch; and (5) granting such other and
further relief the Court deems just and proper.

The emergency application will be presented to the Ex Parte Part of the New York County Supreme Court
located at 60 Centre Street, New York, New York 10007 on September 14, 2023 at approximately 3:00
pm via NYSCEF filing. Proceedings will be virtual. Please be guided accordingly.

Thank you,

Allen

Allen Schwartz, Esq.
Schwartz Law PLLC
150 Broadway, Suite 701
New York, NY 10038
Tel: 347-460-5379
Cell: 773-808-8972
Email: Allen@allenschwartzlaw.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 3
-----------------------------------------------------------------x
JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,

                       Plaintiff,              Index No.: 158055/2023
                                           Justice Joel M. Cohen

     -against-

JARED CHASSEN and FIRST REPUBLIC BANK

                       Defendants.
-----------------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION**

                                  AIDALA, BERTUNA & KAMINS, P.C.

                                    John M. Leventhal, Esq.
                                    546 Fifth Avenue - Sixth Floor
                                    New York, New York 10036
                                    (212) 486-0011 / (212) 750-9700
                                    **judgeleventhal@aidalalaw.com**

                                    Counsel for Defendant Chassen

Allen Schwartz, Esq. (of-counsel to Aidala,
Bertuna & Kamins, P.C.)

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/15/2023

# Table of Contents

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 2

    A.   The Partnership ................................................................................................. 2

    B.   Simpson Took Unlawful and Improper Actions ............................................... 4

    C.   Simpson Has Deteriorated JJ Arch's Relationship with 35 Oak ....................... 5

    D.   Simpson's First Attempt to Remove Chassen as a Member of the JJ Arch. ..... 6

    E.   Chassen Removes Simpson ............................................................................... 8

    F.   Simpson Files this Action ................................................................................. 9

    G.   The Court's Interim Order Restores the Status Quo Ante ................................. 9

    H.   Simpson Has Acted in Contempt of the Interim Order, and Has Since Completely Shut Chassen out of the Company ....................................................................................... 10

ARGUMENT ................................................................................................................ 12

    I.   THE COURT SHOULD HOLD SIMPSON IN CIVIL CONTEMPT OF THE COURT'S AUGUST 21, 2023 INTERIM ORDER BECAUSE SIMPSON SHUT OFF CHASSEN'S ONLINE BANK VIEWING ACCESS WITHOUT COURT PERMISSION ......................... 12

    II.   THE COURT SHOULD ENFORCE THE AUGUST 21, 2023 INTERIM ORDER AND NULLIFY SIMPSON'S POST-INTERIM ORDER TERMINATION ................................... 13

    III.  THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION BARRING FURTHER TERMINATIONS WITHOUT COURT ORDER ............................................................................................................... 14

CONCLUSION ............................................................................................................. 16

WORD COUNT CERTIFICATION ............................................................................... 17

# TABLE OF AUTHORITIES

**CASES**

*Chana v Machon Chana Women's Inst., Inc.,* 162 A.D.3d 635 (2d Dep't 2018). ...........................
.................................................................................................................................... 14, 15

*Congregation Erech Shai Bais Yosef, Inc. v Werzberger,* 189 A.D.3d 1165 (2d Dep't 2020)
.................................................................................................................................... 14, 15

*Costello v. Molloy,* 73 Misc 3d 1206[A], n 10 (Westchester Co. 2021)
.......................................................................................................................................... 15

*Madigan v Berkeley Capital, LLC,* 205 A.D.3d 900, 905 (2d Dep't 2022)
.......................................................................................................................................... 12

*Matter of Madelone,* 18 Misc. 3d 1131[A] (Albany Co. 2008)
.......................................................................................................................................... 15

*Reuschenberg v Town of Huntington,* 16 A.D.3d 568 (2d Dep't 2005)
.......................................................................................................................................... 15

*Spivak v Bertrand,* 2016 NY Slip Op 30216[U], *16 (N.Y. Co. 2016)
.......................................................................................................................................... 15

*Vanderminden v Vanderminden,* 226 A.D.2d 1037 (3rd Dep't 1996)
.......................................................................................................................................... 15

*Wisdom Import Sales Co., L.L.C. v Labatt Brewing Co.,* 339 F.3d 101, 115 (2d Cir. 2003)
.......................................................................................................................................... 15

*Yemini v Goldberg,* 60 A.D.3d 935 (2d Dep't 2009)
.......................................................................................................................................... 15

**STATUTES**

CPLR 6301 ..................................................................................................................... 14

iii

Defendant Jared Chassen ("Chassen" or "Defendant"), through his undersigned counsel, respectfully submits this Memorandum of Law in support of his motion seeking an order: (1) to compel Plaintiff Jeffrey Simpson ("Simpson") to comply with the Court's August 21, 2023 Interim Order; (2) to declare null and void Simpson's post-Interim Order termination letter; (3) to hold Simpson in contempt of the Court's August 21, 2023 Interim Order; (4) to enjoin Simpson from unilaterally acting contrary to the Court's Interim Order; and (5) for such other and further relief the Court deems just and proper.

## PRELIMINARY STATEMENT

On August 21, 2023 the Court issued an order nullifying Simpson and Jared Chassen's mutual August 2023 termination letters, and expressly directed the parties to cooperate. Unfortunately, Simpson did not get the message. Rather than cooperate with Chassen as the Court ordered, on September 1, 2023 he sent Chassen another termination letter. He did this after heaping verbal and other forms of abuse on him, shutting him out of his email, shutting off access, including viewing access, to all accounts and company systems, announcing that he had been fired, and badmouthing him to employees and third parties. Even after a lengthy pre-motion conference on September 11, 2023, where the Court clearly expressed its extreme disappointment with Simpson's unilateral actions, Simpson has refused to yield even an inch. Chassen has, in contrast, refrained from sending his own termination letter out of respect for the Court and the judicial process—as Chassen clearly has his own right to terminate Simpson under the Operating Agreement. Indeed, as detailed in Chassen's affidavit submitted herewith, there is ample cause and basis for Simpson's forced resignation.

1

Simpson's latest tirade amounts to nothing more a bully acting as if he is above the judicial process. Chassen's efforts to resolve this without motion practice have failed and he has no choice but to bring this emergency motion seeking a court order holding Simpson in contempt, restoring the status quo as directed in the Court's August 21, 2023 order, and enjoining Simpson from engaging in further purported terminations and similar actions without court permission.

## FACTUAL BACKGROUND

### A. The Partnership

Plaintiff Jeffrey Simpson and Defendant Jared Chassen are partners in JJ Arch, LLC ("JJ Arch"), and previously worked together at Greystone Development. Chassen Aff. at ¶¶ 3-11. After they left Greystone in 2017, they formed JJ Arch. *Id.* Struggling to find investors, Chassen introduced 608941 NJ INC ("35 Oak") to Simpson. *Id.* at ¶ 8. 35 Oak is an active investor in the real estate industry, and its principal place of business is in Toronto, Canada. *Id.* After a few meetings, 35 Oak decided to invest in a joint venture, and on December 11, 2017, established Arch Real Estate Holdings, LLC ("Arch Real Estate"), which is governed by the Limited Liability Company Operating Agreement of Arch Real Estate Holdings, LLC (the "Arch Real Estate Operating Agreement"). *Id.* The real estate portfolio which Arch Real Estate ultimately grew to more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by Arch Real Estate. *Id.* at ¶ 9.

Arch Real Estate is owned and controlled by two companies—JJ Arch, LLC ("JJ Arch") (collectively with Arch, the "Arch Entities") and 35 Oak. *Id.* at ¶ 10. JJ Arch holds eighty (80) percent of the membership interest, and 35 Oak holds the remaining twenty (20) percent. Annexed to the Chassen Aff. as **Exhibit A** is a true and correct copy of the Arch Real Estate Operating

2

Agreement, which is also available at NYSCEF No. 14. *See id.* § 6.1(iii). JJ Arch serves as

Managing Member of Arch and Simpson is, in turn, the Managing Member of JJ Arch. *See id.* §

7.1.1. 35 Oak serves as the Investor Member of Arch but has no authority to participate in the

management or control of the company, though it has consent rights to certain major decisions.

*See id.* § 7.1.2.

On the same day, Simpson and Chassen signed a separate operating agreement for JJ

Arch—the Limited Liability Company Operating Agreement of JJ Arch LLC (the "JJ Arch

Operating Agreement"). A true and correct copy of the JJ Arch Operating Agreement is annexed

to the Chassen Aff. as **Exhibit B** and is also available at NYSCEF No. 15.

The JJ Arch Operating Agreement identifies both Simpson and Chassen as Members. *See*

Ex. B § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth

anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson,

who had full, exclusive, and complete discretion with respect to such matters, subject to the

limitations set forth in subsection (b), which provides that any Company Major Decision, as

defined in the Agreement, shall only be undertaken with Chassen's prior written consent. *See* Ex.

B § 3.1(a)-(b). Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth

anniversary of the Agreement, Simpson and Chassen were to have equal rights and authority to

manage the company. *See id.* § 3.2. Further, Chassen was to be entitled to 50% of all distributions.

The original intent behind the JJ Arch Operating Agreement was to let Simpson take charge of the

company in the first four years and split control afterwards. Chassen Aff. at ¶ 13.

On May 22, 2021, the JJ Arch Operating Agreement was amended. A true and correct copy

of the Amended JJ Arch Operating Agreement is annexed to the Chassen Aff. as **Exhibit C** and is

also available at NYSCEF No. 16. The Amendment eliminated the language in Section 3.2 of the

original Agreement providing Simpson and Chassen had equal rights and authority to manage the company. Under the Amendment, Simpson maintains unilateral power and authority to make good faith decisions with respect to the business and affairs of the company for another 4 years, and Chassen maintains the right to limit Simpson's authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. Chassen was entitled to 49.9% of all distributions, with Simpson entitled to 50.1%. And contrary to what Simpson asserts, Chassen retained his right to consent to any Company Major Decision. *Id.*; *See* NYSCEF No. 13, Compl. at 34 (falsely claiming that amendment "meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.").

## B. Simpson Took Unlawful and Improper Actions

Simpson has engaged in numerous forms of misconduct. Chassen Aff. at ¶¶ 16-65. Simpson forced the JJ Arch team to make various misrepresentations about real estate projects to induce investments. *Id.* at ¶ 19. Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. *Id.* Simpson prioritized his personal gains over the success of the Arch Entities' projects. *Id.* at ¶ 20. Simpson failed to properly supervise and manage projects. *Id.* at ¶ 19. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses. *Id.* at ¶ 21.

Simpson in email messages and in verbal communications to Chassen and Michelle Miller, a junior partner/employee, threatened to put all the Arch entities into bankruptcy in order to leverage them and 35 Oak to follow his orders without resistance or he would crash the business. *Id.* at ¶ 23. Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he

would do so if they disobeyed him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization." *Id.*

Simpson misappropriated Arch Real Estate's funds and employees for an independent auto business that he owns with Chassen—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. *Id.* at ¶ 24. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities for the Arch Entities. *Id.* Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business. *Id.* Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay for their wages. *Id.* In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. *Id.* All of this was done without Chassen's consent. *Id.*

Simpson also began devoting much of his time to other business at the expense of JJ Arch such as purchasing a farm and several unaffiliated investment properties, many with large construction components that he oversaw. *Id.* at ¶ 26. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch. *Id.*

### C. Simpson Has Deteriorated JJ Arch's Relationship with 35 Oak

While tenuous of late, in July of 2023, Simpson's relationship with 35 Oak deteriorated to a drastic extent, leading 35 Oak to file suit against him in the United States District Court for the Southern District of New York on August 10, 2023. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed to the Chassen Aff. as **Exhibit D**.

5

As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's misconduct vis a vis 35 Oak included: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements. Chassen Aff., Ex. D.

### D. Simpson's First Attempt to Remove Chassen as a Member of the JJ Arch.

In July 2023, Chassen asked JJ Arch's accountant about Simpson's diversion of money. Chassen Aff. at ¶ 29. Chassen had just seen a Paylocity report, a payroll document, that showed payments from JJ Arch to a worker at auto shop. *Id.* The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. *Id.* at ¶ 30. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. *Id.* She also confirmed that there was minimal accounting of funds, and that he had asked her to take monies from other accounts that were designated for specific purposes and use it to pay for other things such as payroll. *Id.*

After Chassen had challenged Simpson on his misappropriation of company assets, and his self-interested decision-making, Chassen heard on August 4, 2023 that Simpson was going to terminate him and free himself to misappropriate company assets at will. *Id.* at ¶ 34. Chassen

6

then acted to protect the company funds by requesting to the bank that Simpson should not be able to take company funds without Chassen's knowledge. *Id*. On August 5, 2023, Simpson sent Chassen an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." *Id*. at ¶ 34. In this email, he "advised" Chassen that he had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately." A true and correct copy of this email is annexed to the Chassen Aff. as **Exhibit E** and is also available at NYSCEF No. 17.

Simpson's email to remove Chassen as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement, as amended. Chassen Aff. at ¶ 35. Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." Ex. B at § 1.1 ("Resignation"). A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i) willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or property]." Ex. A at § 1.1 ("Cause Event").

Simpson made no allegation that would constitute a Cause Event warranting Chassen's resignation. Chassen Aff. at ¶ 36. And his allegations were false. *Id*. In fact, all of Chassen's actions have been to protect the company and its assets. *Id*. Simpson's purported notice removing Chassen as a Member of the Arch Entities was nothing more than a blatant attempt to have sole control and management of the Arch Entities to insulate himself from his bad acts. *Id*.

7

### E. Chassen Removes Simpson

To protect the Arch Entities from further damage, on August 6, 2023, Chassen sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." A true and correct of this notice is annexed to the Chassen Aff. as **Exhibit F.**

In the Notice, Chassen rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported forced resignation as a Member of the Arch Entities, noting that Simpson had not alleged any conduct that would constitute a Cause Event because "no such conduct occurred." *See* Ex. F at 1. Chassen then informed Simpson, as required by the JJ Arch Operating Agreement, that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement (*see* ¶ 25, *supra*), including "(a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his] own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company …" *Id.* Chasen advised Simpson that, as a result of these Cause Events, Simpson had to resign as a Member of the Arch Entities, and no longer had the right to act on behalf of the Arch Entities. *See id.*

Further, Simpson's resignation is independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote

"substantially all business time for JJ Arch." Chassen Aff., Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for a Cause Event. As discussed herein, Simpson failed to devote substantially all of his time to JJ Arch, instead focusing on his other personal business ventures. *See* supra at ¶ 21. This constitutes an independent basis for his resignation.

### F.  Simpson Files this Action

In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, Chassen and First Republic Bank in the Supreme Court of New York County. NYSCEF No. 13, Summons and Complaint. In the complaint, Simpson asserts four causes of action against Chassen, including breach of the amended JJ Arch Operating Agreement, breach of fiduciary duty, conversion, and tortious interference with contractual relations. *Id.* Simpson also seeks declaratory judgments and preliminary and permanent injunctions that would allow him to exercise exclusive and sole control over the Arch Entities. *Id.*

### G.  The Court's Interim Order Restores the Status Quo Ante

On August 21, 2023, the Court entered an Interim Order which required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, **and such access shall not be terminated without further order of the Court**." NYSCEF No. 36, Interim Order, at 2 (emphasis added). The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.*. That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement,

which provides among other things that any Company Major Decision, as defined in the JJ Arch

Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.*

The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to

the other purportedly resigning or terminating the other as a member or managing member of JJ

Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim order provided

that "**Simpson and Chassen shall cooperate with each other in good faith** to facilitate the

effective exercise of their respective roles and responsibilities under the JJ Arch Operating

Agreement and related agreements. . ." *Id.* (emphasis added).

### H. Simpson Has Acted in Contempt of the Interim Order, and Has Since Completely Shut Chassen out of the Company

Simpson began violating the Interim Order right from the get-go. He immediately rehired

Tristan Last, an employee who had resigned the day after Chassen removed Simpson for cause

and increased her salary without seeking Chassen's consent even though Chassen's consent was

required. Chassen Aff. at ¶ 46. He hired a new IT company without Chassen's consent at an

expense that required Chassen's consent. *Id.* He then moved all employees away from Chassen's

desk which left Chassen on the outskirts of the office space, clearly intending to show staff that

Chassen was no longer a co-member of the company. *Id.* at ¶ 47. While Chassen complied with

the Interim Order and gave Simpson access to Office.com, Dropbox, Go daddy, Simpson then used

that access to read all of Chassen's emails, including those with his counsel, and deleted Chassern'

emails. *Id.*

Simpson has also stopped paying JJ Arch bills that are connected to Chassen's credit. *Id.*

at ¶ 48. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and Chassen

has received a call from each credit company this week that payments are not being made and they

are in collections. *Id.* Likewise, JJ Arch's company Visa card, Divvy, is under Chassen's credit,

and he removed Chassen from these accounts even though these accounts are tied to his credit. *Id.*

Chassen has also received calls that payments are not being made on these accounts. Simpson shut

off Chassen's access to his emails, all company systems, and bank accounts. *Id.*

Simpson demanded that Chassen consent to switch banks from First Republic, without

explanation or reason, something that is especially frightening considering his repeated

misappropriation of company assets and the fact that Chassen would then be unable to view the

accounts as required by the Interim Order. *Id.* at ¶ 50. He began telling employees and third-party

partners that Chassen was no longer a member of JJ Arch and started defaming Chassen to them.

*Id.* at ¶ 50.

Then, on September 1, 2023, Simpson sent another formal forced resignation letter even

though the Court had just nullified both August termination letters. A true and correct copy of

Simpson's September 1, 2023 letter is annexed to the Chassen Aff. as **Exhibit G**. He has since

shut Chassen from all his emails, from company accounts, and all company systems, such a

dropbox. Chassen Aff. at ¶¶ 49, 67. His claims in that letter are completely false and amount to

nothing more than pretext for his unilateral actions and exemplify his disregard for the Court and

the judicial process. *Id.* at ¶¶ 53-67. Chassen responded to the letter in an email dated September

3, 2023 and a letter dated September 8, 2023, true and correct copies of which are annexed to the

Chassen Aff. as **Exhibits H and I** and are also available at NYSCEF Nos. 54 and 55.

As Chassen explains in his affidavit submitted herewith, nothing in the intervening period

between August 21, 2023 and September 1, 2023, justifies Simpson's actions. Chassen Aff. at ¶¶

53-67. Simpson's bullying should be seen for what it is. He has shown a repeated pattern of

prioritizing personal gains to the detriment of the Arch Entities' interests. *Id.* at ¶ 65. He has now

shut Chassen out of the company in violation of the Court's Interim Order. Granting sole signatory

over and sole access to all bank accounts to him, and the unfettered control he seeks, will jeopardize the business, and leave no check on his misconduct. *Id.* at ¶ 65. Indeed, it will almost certainly lead to the destruction of the business. *Id.* Chasen, in contrast, has refrained from issuing a mutual termination letter out of respect for the Court and its Interim Order. *Id.* at ¶ 67.

Finally, it is also important for the Court to know that Chassen is also a personal guarantor of Arch Entities' debt, including those relating to real properties located at 46 East 89th Street New York, NY; 9 Vandam Street, New York, NY; 1640 Montauk Highway, Watermill, NY; and 550 Metropolitan Ave, Brooklyn, NY Retail Unit. Chassen issued those guaranties in reliance on his consent rights for Major Decisions, and his 49.9% membership interest in JJ Arch. *Id.* at ¶ 66. He now faces personal liability on Arch Entities' corporate debt if Simpson is allowed to unlawfully remove Chassen from JJ Arch, deprive of him of consent rights, and destroy the business. *Id.*

## ARGUMENT

I. **THE COURT SHOULD HOLD SIMPSON IN CIVIL CONTEMPT OF THE COURT'S AUGUST 21, 2023 INTERIM ORDER BECAUSE SIMPSON SHUT OFF CHASSEN'S ONLINE BANK VIEWING ACCESS WITHOUT COURT PERMISSION**

"To prevail on a motion to punish for civil contempt, the movant must establish by clear and convincing evidence: (1) that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect, (2) that the party against whom contempt is sought disobeyed the order, (3) that the party who disobeyed the order had knowledge of its terms, and (4) that the movant was prejudiced by the offending conduct." *Madigan v Berkeley Capital, LLC*, 205 A.D.3d 900, 905 (2d Dep't 2022) (citations and quotations omitted).

Here, this standard is easily met. First, the August 21, 2021 Interim Order was clear that Chassen was not to be deprived of his right to view the online bank accounts without prior court authorization and that the parties were to cooperate. *See* NYSCEF No. 36, Interim Order at 2.

12

Simpson disobeyed the August 21, 2021 Order by terminating Chassen and shutting down his access to the online bank accounts rather than cooperate with him. Chassen Aff. at ¶¶ 46-52. As First Republic's counsel said at the September 11, 2023 conference, "[t]hen it appears, the bank is still conducting an internal investigation, that on September 6th that Mr. Simpson or somebody acting on his behalf toggled the settings so that Mr. Chassen can no longer access the accounts online. The bank is now aware of that." Leventhal Affirm., Ex. B, Sept. 11, 2023 Tr. 25:7-16. Third, Simpson had knowledge of the August 21, 2023 Interim Order because he was the party who filed the submission which led to the Interim Order. And fourth, Chassen has clearly been prejudiced because he lost rights protected by the Interim Order.

Accordingly, the Court should enter an order finding Simpson in civil contempt, direct Simpson to comply with the Order, and award monetary and other sanctions sufficient to make Chassen whole and ensure that Simpson complies with the Interim Order.

## II.      THE COURT SHOULD ENFORCE THE AUGUST 21, 2023 INTERIM ORDER AND NULLIFY SIMPSON'S POST-INTERIM ORDER TERMINATION

The Court should also nullify Simpson's September 1, 2023 termination letter, just as it did his August termination letter. Simpson issued his September 1, 2023 termination letter mere days after the Court's August 21, 2023 Interim Order and nothing in the intervening days after the August 21, 2023 Order warranted or justified him issuing another termination letter just days after the Court nullified his prior termination letter. Nothing justified his unilaterally shutting Chassen out of JJ Arch just after the Court expressly directed the parties to cooperate.

To the extent Simpson argues that he has the right to issue a termination letter, so did (and does) Chassen. Chassen has not done so out of respect for the Court and the judicial process. There are no intervening facts in the few days between August 21, 2023 and September 1, 2023 that

13

warranted Simpson doing the exact opposite than cooperating with Chassen—terminating him.

The Court's August 21, 2023 Order expressly ordered the parties to cooperate and by its plain

intent precluded the parties from reissuing the termination letters the Court had just nullified.

### III.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION BARRING FURTHER TERMINATIONS WITHOUT COURT ORDER

The Court should enter a temporary restraining order and preliminary injunction

enjoining Simpson from terminating Chassen without court permission. CPLR 6301 provides

that "[a] preliminary injunction may be granted in any action where it appears that the defendant

threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of

the plaintiff's rights respecting the subject of the action, and tending to render the judgment

ineffectual . . ." *Id.* That provision further provides that "[a] temporary restraining order may be

granted pending a hearing for a preliminary injunction where it appears that immediate and

irreparable injury, loss or damage will result unless the defendant is restrained before the hearing

can be had." *Id.*

"To be entitled to a preliminary injunction, a movant must establish (1) a probability of

success on the merits, (2) a danger of irreparable injury in the absence of an injunction, and (3) a

balance of the equities in the movant's favor." *Congregation Erech Shai Bais Yosef, Inc. v*

*Werzberger*, 189 A.D.3d 1165, 1166-1167 (2d Dep't 2020) (citations and quotations omitted).

"The purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation

of property that could render a judgment ineffectual." *Id.* (citations omitted). "The decision as to

whether to grant or deny a preliminary injunction rests in the sound discretion of the court

hearing the motion." *Chana v Machon Chana Women's Inst., Inc.*, 162 A.D.3d 635, 637 (2d

Dep't 2018).

Chassen easily meets all the criteria for a temporary restraining order and preliminary injunction. First, Chassen is likely to succeed on the merits as this Court just nullified Simpson's prior August termination letter, has expressly ruled that the parties must cooperate, and nothing occurred in the few days after August 21, 2023 that justified Simpson sending yet another termination letter with the Interim Order directing the parties to cooperate. Second, Chassen faces irreparable injury because absent injunctive relief, he stands to lose his membership right and consent rights, which is harm that cannot be remedied by money damages. "[A] bargained-for minority right to participate in corporate management has value in and of itself and a denial of that right, without more, can give rise to irreparable harm." *Wisdom Import Sales Co., L.L.C. v Labatt Brewing Co.*, 339 F.3d 101, 115 (2d Cir. 2003); *Yemini v Goldberg*, 60 A.D.3d 935 (2d Dep't 2009) (irreparable injury where control and management rights are at stake); *Vanderminden v Vanderminden*, 226 A.D.2d 1037 (3rd Dep't 1996) (same); *Costello v. Molloy*, 73 Misc 3d 1206[A], n 10 (Westchester Co. 2021) ("[T]he loss of a minority voice in terms of voting rights and other membership rights may constitute irreparable injury.") (citing *Spivak v Bertrand*, 2016 NY Slip Op 30216[U], *16 (N.Y. Co. 2016) and *Matter of Madelone*, 18 Misc. 3d 1131[A] (Albany Co. 2008)).

The equities also favor Chasen because while he stands to lose his rights without injunctive relief, injunctive relief here merely restores the status quo ante as of the date of the Court's August 2021 Interim Order, and does not harm Simpson, who still retains his right to manage JJ Arch. Thus, while Chassen will lose his rights without an injunction, Simpson cannot show that he "will suffer any hardship during the pendency of a preliminary injunction." *Reuschenberg v Town of Huntington*, 16 A.D.3d 568, 570 (2d Dep't 2005). Further, "a balance of the equities favors the granting of preliminary injunctive relief to maintain the status quo. .

." *[Congregation Erech Shai Bais Yosef, Inc. v Werzberger](#)*, 189 A.D.3d 1165, 1167 (2d Dep't

2020); *[Chana, 162 A.D.3d at 637-638](#)* (same).

## CONCLUSION

For the forgoing reasons, the Court should grant this motion in its entirety together with

such other and further relief the Court deems just and proper.

Dated: New York, New York
     September 14, 2023

AIDALA, BERTUNA & KAMINS, P.C.

By:  *John M. Leventhal*
     John M. Leventhal, Esq.
546 Fifth Avenue - Sixth Floor
New York, New York 10036
(212) 486-0011 / (212) 750-9700
**[judgeleventhal@aidalalaw.com](mailto:judgeleventhal@aidalalaw.com)**

Counsel for Defendant Chassen

Allen Schwartz, Esq. (of-counsel to Aidala,
Bertuna & Kamins, P.C.)

16

## WORD COUNT CERTIFICATION

I, John M. Leventhal, Esq., that the foregoing Memorandum of Law contains 5037 words, as counted by Microsoft Word's word-processing system, excluding the caption, date, and signature, and that it complies with the applicable word limits.

/s/ John M. Leventhal
John M. Leventhal