# EXHIBIT 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 03M

-----------------------------------------------------------------------------X

JEFFREY SIMPSON, JJ ARCH LLC,

                             Plaintiff,

           - v -

JARED CHASSEN, FIRST REPUBLIC BANK,

                       Defendants.

| INDEX NO. | 158055/2023 |
| --- | --- |
| MOTION DATE | 09/14/2023 |
| MOTION SEQ. NO. | 003 |

**DECISION + ORDER ON MOTION**

-----------------------------------------------------------------------------X

680941 NJ INC,

                             Plaintiff,

           - V -

JEFFREY SIMPSON, JJ ARCH LLC, and ARCH REAL
ESTATE HOLDINGS LLC,

                       Defendants.

-----------------------------------------------------------------------------X

HON. JOEL M. COHEN:

The following e-filed documents, listed by NYSCEF document number (Motion 003) 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 128, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 222, 223

were read on this motion for           CONTEMPT; PRELIMINARY INJUNCTION     .

      Upon the foregoing documents, and for the reasons stated on the record after oral

argument on November 20, 2023, it is hereby

      **ORDERED** that Defendant Chassen's motion for contempt is **denied**; it is further

**158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL**
**Motion No.  003**

Page 1 of 3

**ORDERED** that defendant Chassen's motion for a preliminary injunction is **granted** in the following respects:

(1) Simpson's September 1, 2023 purported termination letter to Chassen is void and shall not take effect;

(2) During the pendency of this litigation and subject to further order of the Court:

    a. Simpson and Chassen are enjoined from unilaterally seeking to terminate or force the resignation of the other member without permission of the Court;

    b. Simpson shall not deny Chassen online viewing access of any Arch Accounts;

    c. Neither Simpson nor Chassen shall review without permission, and neither Simpson nor Chassen shall authorize others to review without permission, each other's private e-mails unless they are produced during discovery;

    d. Simpson and Chassen shall cooperate in good faith to ensure that each of them have authorization from applicable banks to execute JJ Arch bank transactions, which transactions remain subject to the terms and restrictions of the applicable operating agreements; and

(3) Except as limited by the Court's preliminary injunction orders granting Oak the status of Acting Managing Member in Arch Real Estate Holdings LLC (NYSCEF Doc. Nos. 412 (interim); 418 (amended)), the Court's prior Order Regarding Interim Operating Procedures (NYSCEF Doc. No. 36) ("First Interim Order") remains in full force and effect. In the event of a conflict between the First Interim Order and this Order, this Order shall control; and it is further

**ORDERED** that counsel upload a copy of the oral argument transcript to NYSCEF upon receipt.

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL
Motion No.  003

Page 2 of 3

2 of 3

This constitutes the decision and order of the Court.



2023112221310AMC0HEJ0DB6RAX047B674EF289F25B0393EB5D9C

_____          _____
__11/22/2023__                      JOEL M. COHEN, J.S.C.
**DATE**

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL          Page 3 of 3
Motion No.  003

3 of 3

# EXHIBIT 14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

---

JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ ARCH LLC

*Plaintiff,*

-against-

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants.*

Index No. 158055/2023

Mot. Seq. No. 004

**ORDER TO SHOW CAUSE REGARDING APPOINTMENT OF TEMPORARY RECEIVER OF JJ ARCH LLC**

---

**UPON**, the Affirmation of Michael Wiener, sworn to on October 17, 2023 (the "Michael Wiener Affirmation"), the Affirmation of Kevin Wiener, sworn to on October 17, 2023 (the "Kevin Wiener Affirmation" and together with the Michael Wiener Affidavit, the "Wiener Affirmations"), the Affirmation of Leslie C. Thorne, dated October 16, 2023 (the "Thorne Affirmation"), the exhibits annexed to the Wiener Affirmations and Thorne Affirmation, the Memorandum of Law Submitted in Support of Appointment of JJ Arch LLC Temporary Receiver dated October 16, 2023 (the "Memo of Law"), submitted by 608941 NJ Inc. ("Oak" or "Investor Member") by and through its counsel, Haynes and Boone, LLP, and upon all prior proceedings had herein,

**ORDERED,** that Jeffrey Simpson and Jared Chassen and all other interested persons, show cause at a term of Supreme Court, _____, why the following relief should not be issued:

1. An order pursuant to CPLR §6401 and the court's plenary power appointing a temporary receiver (the "Receiver") for JJ Arch, LLC ("JJ Arch") to manage JJ Arch's affairs, prevent corporate waste, and free the members from the current wasteful mismanagement, on the grounds that JJ Arch's assets cannot be properly safeguarded, preserved and protected, and there is danger that the property will be materially injured or destroyed, without a Receiver appointed during the pendency of the proceeding and the resolution of the claims between the members in the instant action.

2. An order granting such other relief as the Court deems just and reasonable.

**ORDERED,** that the parties should appear on _____ at ___ a.m./p.m. to address the following request for appointment of a Receiver; and it is further

**ORDERED,** that by _____, JJ Arch, Jeffrey Simpson, and Jared Chassen shall furnish to the Court a schedule of JJ Arch's assets and liabilities and the assets and liabilities of JJ Arch's affiliated entities over which it exercises control (together with JJ Arch, the "JJ Arch Entities"); and it is further

**ORDERED,** that _____, of the City of _____, New York, be and he or she hereby is appointed Receiver of JJ Arch, who, by virtue of his or her appointment as Receiver and pursuant to the Limited Liability Company Operating Agreement of JJ ARCH LLC shall have managerial authority over (1) the bank accounts over which JJ Arch exercises control (the "Accounts"), (2) the JJ Arch Entities' records, and (3) the real properties owned and/or controlled by JJ Arch, with all of the powers provided by the terms of the Limited Liability Company Agreement of Arch Real Estate Holdings LLC to JJ Arch as its Managing

Member and according to the practice of this Court, upon his or her executing and acknowledging in the usual form, and filing with the Clerk of this Court, a bond to the People of the State of New York in the penal sum of $ _____, with a duly authorized surety company as surety, or with at least two sufficient individual sureties who shall severally justify, conditioned for the faithful discharge of his or her duties and for all moneys or property of every kind received by him or her as such receiver, which bond is to be approved as to its sufficiency, form, and manner of execution and sufficiency of surety by a Justice of this Court; and it is further

**ORDERED**, that upon the filing of said bond so approved, the Receiver shall proceed forthwith to collect and receive all the Accounts, including bank accounts and credit cards in the name of the JJ Arch Entities, and shall protect and preserve the Accounts; and it is further

**ORDERED**, that upon the filing of said bond so approved, the Receiver shall proceed forthwith to collect and receive all real property owned or controlled by JJ Arch; and it is further

**ORDERED**, that the Receiver shall have the power and authority to do all things appropriate and necessary to carry out his or obligations and authority as set forth in this Order, including without limitation commencing any legal action that may be necessary to collect, receive, protect or preserve the Accounts, the JJ Arch Entities' records or the real properties owned and/or controlled by JJ Arch, provided, however, that the Receiver shall not seek to collect any alleged debts or money damages that are the subject of the claims asserted in the action pending in No. 158055/2023, without further order of this Court; and it is further

**ORDERED**, that the appointee named herein shall comply with Section 35a of the Judiciary Law, Sections 6401-6404 of the C.P.L.R., Section 1325 of the R.P.A.P.L. and Rule 36 of the Chief Judge; and it is further

**ORDERED**, that personal service of this Order and annexed affidavits upon the defendants

or their counsel on or before _____, _____ at o'clock in the a.m./p.m. shall be deemed

good and sufficient service thereof.

      **NOTWITHSTANDING ANY OTHER PROVISION OF THIS ORDER TO THE CONTRARY, THE RECEIVER SHALL NOT APPOINT AN ATTORNEY, AGENT, APPRAISER, AUCTIONEER, OR ACCOUNTANT WITHOUT PRIOR ORDER OF THIS COURT.**

      E N T E R :


_____

             J.S.C.

# EXHIBIT 15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

Plaintiffs,

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

Defendants.

Index No. 158055/2023

Motion Sequence No. 004

**INTERIM ORDER REGARDING
MEASURES DURING THE
PENDENCY OF THE ORDER TO
SHOW CAUSE REGARDING THE
APPOINTMENT OF RECEIVER FOR
JJ ARCH**

WHEREAS, on August 14, 2023, Jeffrey Simpson ("Simpson"), individually and

purportedly derivatively on behalf of JJ Arch LLC ("JJ Arch") and Arch Real Estate Holdings

LLC ("AREH") filed the above-captioned action against Jared Chassen ("Chassen") and First

Republic Bank ("First Republic") (NYSCEF No. 1); and

WHEREAS, on August 15, 2023, Simpson filed an Order to Show Cause seeking

preliminary injunctive relief (NYSCEF Nos. 9-22) (Motion Sequence No. 1); and

WHEREAS, on August 21, 2023, the Court entered an Order Regarding Interim

Operating Procedures ("Interim Order") (NYSCEF No. 36); and

WHEREAS, on September 14, 2023, Chassen moved, inter alia, to hold Simpson in

contempt of the Interim Order and sought injunctive and remedial relief (NYSCEF Nos. 61-85)

(Motion Sequence No. 3); and

1

INDEX NO. 158055/2023

RECEIVED NYSCEF: 10/27/2023

WHEREAS, on September 15, 2023, the Court entered a temporary restraining order (NYSCEF No. 86); and

WHEREAS, on September 29, 2023, the Court granted Simpson's motion for a preliminary injunction "in part to the extent set forth in the Court's Interim Order (NYSCEF No. 36) and the Order to Show Cause entered in Mot. Seq. 003 (NYSCEF No. 86), which shall remain in effect until further Order of the Court . . ."; (NYSCEF No. 159); and

WHEREAS, on October 17, 2023, 608941 NJ Inc. ("Oak" or "Investor Member") filed an Order to Show Cause Regarding Appointment of Receiver for JJ Arch LLC (the "OSC," NYSCEF Nos. 225-269)[1]; and

WHEREAS, on October 19, 2023, counsel for Oak, counsel for Simpson, counsel for JJ Arch, counsel for AREH, and counsel for Chassen appeared before the Honorable Joel M. Cohen of the Supreme Court of the State of New York, County of New York to argue the OSC; and

WHEREAS, on October 19, 2023, the Court ordered further briefing on whether the Court should grant the relief requested in the OSC; and

WHEREAS, on October 19, 2023, the Court authorized Oak to submit a proposed order setting forth proposed interim measures pending resolution Oak's motion to appoint a receiver, and the Court has considered that proposed order as well as comments from counsel for AREH and Simpson;

**NOW THEREFORE IT IS SO ORDERED** that pending the hearing on this motion (Motion Seq. No. 4):

---

[1] For purposes of this Interim Order, Oak is considered to be joined as a party (CPLR 6401[a]). Any reference to "parties" subject to this Order shall be construed to include Oak.

2

1.      JJ Arch, AREH, Simpson, Chassen, and Oak shall comply with their existing

obligations under the Limited Liability Company Operating Agreement of Arch Real Estate

Holdings LLC (the "AREH LLC Agreement").  This includes, without limitation, complying

with the requirements of Section 7.13 of the AREH LLC Agreement, which provides in part that

any "Major Decision"[2] (including but not limited to filing, acquiescing to, consenting to, or

taking any Bankruptcy Action) shall be undertaken only with the prior written consent of all

AREH Members (and, for avoidance of doubt, any action or decision that would constitute a

Major Decision if made or taken by the Company shall be a Major Decision if made or taken by

any Subsidiary), which consent shall be deemed granted by an AREH Member if such Member

fails to object to such action within fifteen (15) days of AREH Managing Member's written

request therefor.[3]  Moreover, nothing herein shall abridge or diminish Oak's rights under Section

7.1.4 of the AREH LLC Agreement to remove JJ Arch as Managing Member

---

[2] Unless otherwise indicated, capitalized terms have the meanings set forth in the AREH LLC
Agreement.

[3] Contrary to the position taken by Simpson and AREH in connection with this motion, the Court
finds that the Major Decision consent rights contained in the AREH LLC Agreement with
respect to Bankruptcy Actions are enforceable (*In re Pasta Bar By Scotto II, LLC*, No. 15-12766
(MG), 2015 WL 7307246, at *1 (Bankr SDNY Nov. 19, 2015) (enforcing "Major Decision"
right of LLC member regarding authority to commence a bankruptcy action and dismissing the
unauthorized Chapter 11 petition).  The cases on which AREH's counsel relies for the
proposition that Oak's consent right is unenforceable as a matter of federal law are inapposite.
Each involves a situation in which a *creditor*, directly or indirectly, sought to restrict a debtor
from seeking bankruptcy protection (*see In re Lexington Hosp. Grp., LLC*, 577 BR 676, 684
[Bankr ED Ky 2017]).  Here, by contrast, Oak is acting solely as a Member of AREH
(contributing to AREH's decision as a *debtor* as to whether to take a Bankruptcy Action) and not
as a *creditor* (or on behalf of AREH's creditors) to limit AREH's rights as a debtor.  The Court
will, of course, give due consideration to any decision rendered on this issue in the related
pending lawsuit by Oak that was removed to the United States District Court for the Southern
District of New York (*608941 NJ Inc. v Simpson*, US Dist Ct, SD NY, 23 CV 8966, Carter, J,
2023).

3

2.      Within seven (7) days of the entry of this Order, or sooner if reasonably practical, the books and records of AREH and the books and records of all subsidiary entities to whom Investor Member or its affiliate has contributed capital or that are directly or indirectly managed or controlled by AREH (the "Applicable Entities"), from January 1, 2020 to the present, will be made available to Oak, and any accounting professional Oak may retain. No limitations on use or copying of the documents shall apply, except those found in the AREH LLC Agreement (as applicable to the respective rights of Oak), or those limitations, expressed or implied, by applicable law or by relevant and enforceable confidentiality agreements, if any; *provided* that AREH or JJ Arch shall be provided with a copy of any documents or information that Oak or AREH copy or remove from AREH's offices. This obligation is continuing and requires the good faith efforts of AREH, the Managing Member of AREH as that term is defined in Section 1.1 and the Preamble to the AREH LLC Agreement ("AREH Managing Member"), and Simpson. The books and records Oak is entitled to receive include, but are not limited to:

a.  An alphabetical list of the name and mailing address of each current member and manager of each Applicable Entity, including each member's contribution (capital contributions or otherwise) to such Applicable Entity and share of the profits and losses.

b.  Each Applicable Entity's articles of organization or similar organizational document, all its amendments and restatements, and any powers of attorney used to execute those documents.

c.  Each Applicable Entity's operating agreement and its amendments and restatements.

4

    d.  Each Applicable Entity's federal, state, and local income tax or information returns and reports for the three most recent fiscal years.

    e.  Any financial statements maintained by any Applicable Entity for the three most recent fiscal years.

    f.  Complete and accurate books and records supporting the documentation of any expenditures from each Applicable Entity's bank accounts.

    g.  Reasonably detailed capital stack statements on every Applicable Entity (including, without limitation, the order of priority in which the proceeds of a hypothetical liquidation of each Applicable Entity would be distributed);

    h.  Complete and accurate information regarding the state of the business and financial condition of each Applicable Entity's – including, but not limited to:

        i.  Bank records;

        ii.  QuickBooks, or other accounting system files;

        iii.  Check registers; and

        iv.  Evidence of payment and support of expenses.

3.     On November 1, 2023, and by the first of each month thereafter while this Order remains in effect, Oak will be provided a statement specifying the amount spent under each line item of the most recently approved AREH budget.

4.     In operating AREH and each Applicable Entity, JJ Arch will make its best effort, in reasonable good faith, to provide full transparency with respect to any request for information from Oak regarding:

     a.  The status of negotiations with lenders in respect of loans pursuant to which Oak or 35 Oak Holdings Ltd. ("Oak Guarantor") has executed a guaranty, or any affiliate of Oak or Oak Guarantor, has executed a guaranty.

     b.  Any discussions or negotiations (past, present or future) to bring in any new lenders or investors with respect to any Applicable Entity for which Oak, Oak Guarantor, or any affiliate of Oak or Oak Guarantor has executed a guaranty.

5.     Oak, or any agent or representative it may appoint, is entitled to access, at any reasonable time, and subject to applicable laws about personnel presence on construction sites and any contractual limits on access to space from lease agreements, any AREH or any Applicable Entities' building or build sites, provided that Oak will provide AREH and JJ Arch with reasonable advance notice, and consider AREH's advice in good faith concerning access, to avoid unreasonable disruption of AREH's business activities.

6.     Simpson and/or the AREH Managing Member will ensure that Oak receives a reasonable and prompt summary of all communications with lenders, banks, or other investors regarding AREH or the Applicable Entities.

     a.  In the event that Simpson receives an incoming communication from lenders, banks, or other investors regarding AREH or the Applicable Entities, Simpson will send a summary of the discussion by email to Oak.

     b.  JJ Arch and Simpson shall not impede Oak from communicating with any lenders or negotiating settlements with such lenders where Oak or an affiliate of Oak has a guaranty agreement, provided that Oak's

6

communications are consistent with the AREH LLC Agreement and applicable law.

    c.  To the extent any aforementioned discussions pertain solely to Simpson's personal guaranty obligations, Simpson is entitled to communicate with lenders, banks and counsel directly without a requirement to include Oak.

7.    Simpson (and Chassen, as necessary) will cooperate with any banking entities that have accounts that hold AREH's funds, any Applicable Entities' funds, or in any way facilitate AREH's business (the "Accounts") to ensure that Oak has viewing access with respect to the Accounts.

8.    The Interim Order (NYSCEF Doc. No. 36), the TRO (NYSCEF Doc. No. 86), and the Preliminary Injunction (NYSCEF Doc. No. 159), which incorporates by reference the Interim Order and TRO until further order of the Court, remain in full force and effect. Except where he is explicitly mentioned, this Order does not address the rights of Chassen in JJ Arch, which is addressed in the orders incorporated by this paragraph, but this Order's scope and substance shall not be construed to diminish any rights of Chassen in JJ Arch. To the extent anything in this Order conflicts with those earlier orders, the terms of this Order shall prevail.

9.    Opposition or cross-motions, if any, with respect to Motion Sequence No. 004 shall be filed **on or before 5:00 p.m. on November 15, 2023**, with reply papers, if any, filed **on or before 5:00 p.m. on November 22, 2023**.

**10.**    The hearing on Motion Sequence No. 4 shall be **on December 1, 2023, at 10:00 a.m.**

7

This constitutes an interim decision and order of the Court on Motion Sequence No. 4.

Hon. Joel M. Cohen, JSC

DATED: 10/27/23

8

# EXHIBIT 16

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

        *Plaintiff,*

    - against -

JARED CHASSEN and FIRST REPUBLIC BANK,

        *Defendants.*

Index No.: 158055/2023

**AFFIDAVIT OF DANA KING**

608941 NJ INC.,

        *Plaintiff,*

    - against -

JEFFREY SIMPSON and JJ ARCH LLC,

        *Defendants,*

    and

ARCH REAL ESTATE HOLDINGS LLC,

        *Nominal Defendant.*

STATE OF __North Carolina__   )
                ) ss:
COUNTY OF __Guilford__     )

    Dana King, being duly sworn, deposes and says:

    1.    I respectfully submit this Affidavit in Support of 608941 NJ INC.'s Order to

Show Cause Seeking a Temporary Restraining Order and Preliminary Injunctive Relief as an

Alternative to Appointment of a Temporary Receiver of JJ Arch LLC.

2.    My name is Dana King. I am the Senior Regional Manager for Ore Living, an arm of Arch Property Management and Arch Real Estate Holdings LLC ("AREH"). I oversee all 10 properties in the Southeast. The following lists just a few of the interactions and property conditions that I have dealt with this year:

3.    On Monday, July 31st, 2023, Jeff Simpson called me with Karolina Bartko and Jason Paul on the line. Jeff was very upset that a manager (Nekoshia Moody, who we call "Shae") did not join a call that he had rescheduled with her from the previous week, of which I had no prior knowledge and was not an invited participant. I informed him that Shae had called in sick. Jeff became extremely upset and demanded that I fire her immediately for calling in sick and not making that call. He did not want her back on the property and wanted to know what type of manager I would allow to call in sick and not continue to run her property. I explained that I did not agree with him, and he stated, "Are you defending her?" He continued to talk about calling in for "sniffles" and saying things like, "These are not the type of managers we would want to have at our sites." I tried to explain that Shae was by herself for the last month (with my assistance as available) and that we cannot ask why people are sick. He was very harsh and intimidating. He finally said that he did not have any more questions for me and hung up. This incident created a very uneasy feeling and felt threatened regarding my own employment.

4.    Due to various medical reasons, as exacerbated by the work environment (workload requiring 12+-hour days, continued calls from vendors screaming about their payments, managers frustrated about cut vendors, inability to get parts, etc.), I went on leave on August 18, 2023. While I was out on leave, my insurance premiums were not paid resulting once again in delaying treatment. I was required to pay out of pocket for my visit.

5.    During the time I was on leave, the properties did not receive guidance and

continued to operate without much oversight. I was called regularly for many needed items while out on medical leave to work without pay.

6.      I returned from leave on September 18, 2023 to find a complete mess. I was then instructed not to travel any longer and work from home. I was then called at the end of September and told that I would be getting a pay cut in half due to the ongoing battles in court with AREH. I refused and told Jason Paul that he would need to terminate me before giving me the pay cut. I requested it all in writing and never received it.

7.      I found out later while reviewing court documents in Jeff's case against Jared Chassen, that Jeff had called for an exit plan for me shortly after the call took place and prior to me taking leave.

8.      During my tenure I have experienced the following:

a.   Vendors not being paid. Continued threats of liens on the properties. Work cannot be completed if vendors are not paid.

b.   Being told to find new vendors, knowing they will not be paid.

c.   Rents being withheld by residents due to maintenance work not completed. These conditions have been reported almost daily to upper management with very little solution. The majority of suppliers have cut off the sites for nonpayment. Units cannot get completed to ensure move-ins.

d.   Utilities being turned off. Center Pointe Landing and Village Square have phone and internet turned off due to non-payment making operating the property nearly impossible.

e.   Substandard overall condition at the properties. The Columbia sites regularly get failed inspections from Columbia Housing Authority resulting in abatements and inability to collect rent. Mallard Pointe went three weeks without trash pickup due to non-payment. This was a health hazard that caused the city to come out and threaten violations before the bill would be paid.

f.   Weekly check selections have been sent by me to pay our open payables based on "urgency." When crucial vendors are selected, I am told we are not going to pay them so we can pay other items such as Arch Asset Management and Arch Property Management.

g. *Daily calls* from vendors and utility companies regarding payment. I am unable to get them an answer.

9.      Furthermore, while my hands are tied for any resources, I have been told that I needed to take responsibility for my part in the decline of the sites. This problem has been ongoing and continues to get worse.

10.     On October 27th, Jeff Simpson sent out an email furloughing all employees in the corporate office effective immediately. The sites do not have anyone to report to or get guidance from. There is no one there to pay their vendors. Utilities will begin to be cut off. Site teams will walk out of the properties without any guidance. The teams were not told about this situation and have been calling me regularly panicked about what is happening and who do they talk to regarding needed items. Jeff is giving no oversight to the teams as he had discussed in his email. Not even an email has been sent to the sites from our Corporate Staff.

11.     The properties will begin to have power and water shut off leaving thousands of residents and their families without these basic necessities.

12.     If this path continues even one more week, the properties may not be able to be turned around. It will take months and additional manpower to repair what is happening. Residents are not going to pay rent, attorneys are not being paid to file evictions, maintenance will become non-existent, residents will call the news and report what is happening, and the sites will be destroyed. There will not be a team to run the sites if not paid on Friday. Finding staff to want to take over with these conditions will be impossible. I receive calls and texts daily from the team begging for some assistance and want to know what is happening.

13.     The site teams have not had their payroll processed as of yet, which is due November 3, 2023. Nonpayment will result in teams walking out, leaving the residents to fend for themselves.

14.     As of November 2nd, 2023, the corporate teams, including myself, have not been paid for work performed. This was due to us on October 31st, and we are not getting anything from Jeff Simpson as to when we can receive payment.

15.     The statements contained in this affidavit are based upon my personal knowledge of the matters described herein, and upon books and records that AREH and JJ Arch keep in the regular course of business, of which I have personal knowledge and familiarity.

_____
Dana King

Sworn to before me this

3rd day of NOV , 2023

_____
Notary public

TANYA ROHRS
MY COMMISSION EXPIRES
NOTARY
PUBLIC
NOV. 27, 2023
GUILFORD COUNTY, NC

# EXHIBIT 17

608941 NJ INC.
c/o 35 Oak Holdings
35 Oak Street
Toronto, Ontario M9N 1A1


October 31, 2023

<u>By Electronic Mail</u>

JJ Arch LLC
c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
E-mail: jsimpson001@icloud.com
         jsimpson@archcre.com

Re:     Limited Liability Company Agreement of Arch Real Estate Holdings LLC (as amended,
        modified and restated from time to time, the "**<u>LLC Agreement</u>**")

Ladies and Gentlemen:

Reference is made to the LLC Agreement. Capitalized terms used but not defined herein have the
meanings given to them in the LLC Agreement.  Reference is further made to that certain notice
to JJ Member from Investor Member, dated August 6, 2023, setting forth certain Cause Events
that have occurred under the LLC Agreement (the "<u>Initial Notice</u>").

This notice ("<u>Notice</u>") supplements the Initial Notice and identifies certain additional Cause
Events of which Investor Member has become aware since the Initial Notice, as described below.
Numerous Cause Events set forth in the Initial Notice and in this Notice are not subject to any
cure right under the LLC Agreement. As such, **THIS NOTICE CONSTITUTES A NOTICE
OF REMOVAL UNDER SECTION 7.1.4 OF THE LLC AGREEMENT.**

JJ Member, through the actions of Jeffrey Simpson (the managing member of JJ Member), has
committed multiple Cause Events, including, without limitation, (1) willful misconduct, (2)
breach of fiduciary duty, (3) gross negligence which has resulted in material loss to the
Company, its Subsidiaries and its Members and (4) misappropriation of Company or Subsidiary
funds, in each case, in relation to the business and affairs of the Company and various
Subsidiaries, such as, without limitation, (a) making material misrepresentations and otherwise
fraudulently inducing Investor Member and other equity holders to invest in certain transactions
on the basis of obtaining material economic benefit from an exchange under section 1031 of the
Internal Revenue Code, and failing to satisfy the requirements of such 1031 exchanges; (b)
hiring and rehiring of individuals as an employees of Arch without Investor Member consent; (c)
failing to provide access to books and records of the Company and to otherwise provide all
financial reports required under the LLC Agreement; (d) modifying the Company lease at the 88
University property; (e) making threats against employees, family members of employees, and

vendors; (f) using Arch employees for non-Arch purposes to benefit Mr. Simpson and his separate businesses; (g) using Arch bank accounts for personal purposes, (h) retaining counsel for the Company in violation of the LLC Agreement, (i) furloughing the entire staff of Arch and causing the important work of the company to come to a complete halt; and (j) such other Cause Events as are described in Investor Member's Order to Show Cause Regarding Appointment of Temporary Receiver of JJ Arch LLC (the "Receiver Motion," Index. No 158055/2023 (N.Y. Sup. Ct. 2023), NYSCEF No. 225) and the affirmations accompanying the Receiver Motion (NYSCEF Doc. Nos. 227 and 241). The foregoing is by no means an exhaustive list of actual or potential Cause Events, and we reserve all rights and remedies on account thereof.

Pursuant to Section 7.1.4 of the LLC Agreement, Investor Member hereby removes JJ Member as "managing member", effective as of 12:01am on November 17, 2023.

We hereby reserve all of our rights and remedies under the LLC Agreement, at law, or in equity on account of such Cause Events and the removal of JJ Member as "managing member", including, without limitation, the right to pursue against JJ Member and/or Jeffrey Simpson all of our damages on account of such Cause Events.

In addition, we reiterate our demand that JJ Member pursue all third party consents (including, without limitation, those of lenders and investors) necessary for Investor Member to remove JJ Member as the "managing member" of the Company pursuant to Section 7.1.4 of the LLC Agreement. The removal of JJ Member as "managing member" pursuant to this Notice shall be effective in accordance with the terms hereof regardless of whether such third party consents are obtained.

In any event, Investor Member reserves all rights and remedies under the LLC Agreement, at law, or in equity.

Very truly yours,

608941 NJ INC.

By: _____
Name: Michael Wiener
Title: ASO

cc: Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention: David J. Heymann, Esq.
Email: dheymann@meltzerlippe.com

Jared Chassen, JJ Arch LLC
Email: jchassen@archcre.com

Scott Griffin, Esq., Griffin Legal
Email: sgriffin@grifflegal.com

Sam Israel, Esq., Sam P. Israel, P.C.
Email: samisrael@spi-pc.com

Jeffrey Dayon, Esq., Mishaan Dayon LLP
Email: jdayon@mdlawllp.com

# EXHIBIT 18

At Commercial Part 3 of the Supreme
Court of the State of New York, held
in and for the County of New York, at
the courthouse located at 60 Centre
Street, New York, New York, on the
3rd day of November, 2023.

PRESENT:     Hon. Joel M. Cohen
                Justice of the Supreme Court

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

---

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively
as managing member of ARCH REAL ESTATE
HOLDINGS LLC, and JJ ARCH LLC,

<em>Plaintiff</em>,

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

<em>Defendants</em>.

Index No.: 158055/2023

Motion Seq. No. 005

**ORDER TO SHOW CAUSE
SEEKING A TEMPORARY
RESTRAINING ORDER
AND PRELIMINARY
INJUNCTIVE RELIEF AS
AN ALTERNATIVE TO
APPOINTMENT OF A
TEMPORARY RECEIVER
OF JJ ARCH LLC**

---

608941 NJ INC,

<em>Plaintiff</em>,

- against –

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
ESTATE HOLDINGS LLC,

<em>Defendants</em>,

and

ARCH REAL ESTATE HOLDINGS LLC,

<em>Nominal Defendant</em>.

---

**Page 1**

Upon the Emergency Affirmation of Leslie C. Thorne, the Affirmations of Michael Wiener and Frank van Biesen, and the Affidavit of Dana King, each dated November 3, 2023, the concurrently filed Complaint, the exhibits thereto, the accompanying memorandum of law, and upon all prior proceedings had herein:

**ORDERED** that Defendants JEFFREY SIMPSON and JJ ARCH LLC show cause before the Honorable Joel M. Cohen at Commercial Part 3, Room 208, of the Supreme Court of the State of New York, County of New York, at the Courthouse located at 60 Centre Street, New York, New York, on _November 16_, 2023 at _2:30 PM_ or as soon thereafter as counsel may be heard, why an Order should not be made and entered herein, pursuant to CPLR 6301, for a preliminary injunction and temporary restraining order:

    a)  Commanding JEFFREY SIMPSON and JJ ARCH LLC to:

        1.  Refrain from acting as managing member of Arch Real Estate Holdings LLC ("AREH"); AND

    b)  Ordering one of the alternatives of:

        1.  Allowing Oak to act as AREH's managing member during the pendency of this suit; OR

        2.  Appointing a temporary receiver for JJ Arch LLC (per Doc. No. 295); AND

    c)  Granting such other and further relief as this Court deems just and equitable; and it is further

**ORDERED**, that opposition papers, if any, are required to be served upon the undersigned, on or before the _10th_ day of _November_, 2023; and it is further

**ORDERED**, that reply papers, if any, are required to be served upon the undersigned, on or before the _14th_ day of _November_, 2023; and it is further

Page 2

**ORDERED** that the Court will ~~determine this motion and that~~ hear oral argument ~~will be~~ ~~heard~~ on the return date and time stated above; and it is further

**ORDERED** that pending the hearing ~~and determination~~ of this Order to Show Cause, Defendants be, and they hereby are, restrained and enjoined from acting as the managing member of AREH; and it is further

**ORDERED** that pending the hearing ~~and determination~~ of this Order to Show Cause, Oak will serve as acting managing member of AREH, *owing all applicable duties to AREH and its Members* and it is further

**ORDERED** that personal service of this Order and annexed affidavits upon the parties or their counsel via electronic mail (Sam Israel, admin@spi-pc.com; Scott Griffin, sgriffin@griffilegal.com; Allen Schwartz, allen@allenschwartzlaw.com; Tyler Kandel, tkandel@shermanatlas.com; Hon. John M. Leventhal (Ret.), judgeleventhal@aidalalaw.com), on or before the _6th_ day of _November_ , 2023, shall be deemed good and sufficient service thereof.

ENTERED:

Hon. Joel M. Cohen J.S.C.

Dated: _11/3/23_

# EXHIBIT 19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

|  |  |
|---|---|
| JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ ARCH LLC, | Index No.: 158055/2023 <br><br> Motion Seq. No. 005 |

*Plaintiff,*

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants.*

608941 NJ INC,

*Plaintiff,*

- against –

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
ESTATE HOLDINGS LLC,

*Defendants,*

and

ARCH REAL ESTATE HOLDINGS LLC,

*Nominal Defendant.*

**AFFIDAVIT OF MICHAEL WIENER IN FURTHER SUPPORT OF 608941 NJ INC.'S
ORDER TO SHOW CAUSE SEEKING A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTIVE RELIEF AS AN ALTERNATIVE
TO APPOINTMENT OF A TEMPORARY RECEIVER OF JJ ARCH LLC**

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

Michael Wiener, being duly sworn, deposes and says:

1.      I, Michael Wiener, am the Chief Executive Officer of 35 Oak Holdings Ltd., a

Toronto-based family office, where I oversee a portfolio of businesses and direct investments. I

respectfully submit this affidavit in further support of 608941 NJ INC.'s ("Oak") Order to Show

Cause Seeking a Temporary Restraining Order and Preliminary Injunctive Relief as an

Alternative to Appointment of a Temporary Receiver of JJ Arch LLC (the "PI OSC"). The

statements contained in this affidavit are based upon my personal knowledge of the matters

described herein.

2.      As this Court is aware, since Friday, November 3, 2023, Oak has been acting as

the managing member of Arch Real Estate Holdings LLC ("AREH"), pursuant to the temporary

restraining order ("TRO") entered by this Court.

3.      As described in the November 13, 2023 Affirmation of Kevin Wiener (NYSCEF

Doc. No. 356), filed in support of AREH's submission regarding the PI OSC, Oak has

immediately jumped into action as acting managing member, beginning with meeting AREH's

payroll obligation to end the furlough and bring the office staff back to work.

4.      Making payroll required Oak to contribute $70,000 of its own capital to AREH—

much less than the $413,038.00 initially sought in the purported October 25, 2023 "capital call"

(NYSCEF Doc. No. 301) or the reduced sum of $299,000 that was repeatedly represented to be

necessary to make payroll. *See* NYSCEF Doc. No. 302.

- 1 -

5.      All told, as of November 15, 2023, since the TRO, Oak has contributed $167,743 to meet the immediate needs of the business, inclusive of the payroll contributions. Accordingly, and as feared, the sum Simpson (through AREH) requested from Oak overstated the immediate needs of the business—setting aside, of course, that Oak was under no obligation to make any contribution because it had already exceeded the $3 million Investor Member Maximum Capital Contribution, which sets a limit on Oak's funding obligations to AREH. *See* NYSCEF Doc. No. 2 at § 3.2.1.

6.      Besides contributing its own funds into the business (and under the real risk that such contributions may convert to losses), the Oak team has dedicated a significant amount of its time towards the businesses since the TRO. To assist in all of the efforts described below, Oak has enlisted its own personnel, spanning its finance, legal and asset management functions. To briefly recap some of the matters in which I or members of the Oak team have been working on, we have:

a.  Diffused the situation with two anchor tenants at an AREH property, who were planning legal action based on a failure to use the property's funds for basic services like waste removal, security, cleaning and landscaping. Oak ensured that the funds were released and essential services are resuming. Before Oak stepped in, the tenants had believed that the property had been totally abandoned.

b.  Conducted productive discussions with almost every lender in the portfolio, including the execution of additional pre-negotiation agreements. One lender advised me on a call with him that the call was the most productive conversation he had ever had with anyone at AREH. Where there are insufficient funds at the property level to cover essential expenses, Oak is engaged in lender discussions to

- 2 -

secure protective advances where necessary. This will allow those expenses to be paid for while it is determined whether seeking additional capital from existing investors would be a prudent use of their funds.

c. Engaged in forbearance agreement negotiations for in-default properties. One such agreement related to the largest project in the AREH portfolio is close to completion and has been preliminarily approved by all major investors. Whether this particular deal can be consummated, however, depends on Simpson's cooperation.

d. Engaged strategic advisors to assist in developing plans and strategies to try to maximize the value of each asset in the portfolio.

e. Communicated directly with key personnel to develop plans to attain greater productivity and efficiency and improve morale.

f. Started processes to begin putting in place best-in-class third-party property managers at multi-family properties. A major decision consent for one of these properties was sent to JJ Arch a week ago and Oak is still awaiting a decision.

g. Engaged and met with other investors, some of whom have likewise offered to roll up their sleeves, much like Oak, to help however possible.

h. Met with all commercial real estate brokers that are currently representing AREH properties on leasing, and have been actively negotiating multiple leases across various properties.

i. Identified key payables that were previously neglected or deliberately ignored (some important vendors had outstanding invoices dating back to 2022, long before there was a hint of any turmoil at AREH).

- 3 -

    j.  Conducted a review of active litigation files independent of this proceeding to identify ways to maximize the benefit to the company.

7.    On the accounting front alone, Oak has been heavily engaged in a variety of remedial efforts. All of the following activities are underway or complete:

    a.  Conducted inventory of all entities that require attention for accounting and reporting.

    b.  Identified and recorded which entities use which of three different accounting systems in use. Plans are underway to consolidate under two systems.

    c.  Paid down past due invoices to regain access to QuickBooks Desktop (hosted on a third-party remote desktop). The books on QuickBooks Desktop had been neglected for a significant period of time.

    d.  Searched for third-party accounting providers to address understaffing, which will become more acute when a member of the accounting team leaves next week for new employment, which she began searching for due to Simpson's harassment and bullying (which harassment and bullying he has continued, as further detailed below, after being removed from management).

    e.  Compared AREH-provided capital tables against Oak's records to identify issues (of which there are many), as described in the concurrently filed Affirmation of Frank van Biesen.

    f.  Reconciled accounts that have been neglected for over a year.

    g.  Finalized tax returns (in conjunction with CPAs).

8.    While Oak has occupied itself with critical business matters, Simpson has continued on his path of destructive behavior, and his focus at present appears to be threatening

- 4 -

and intimidating AREH's employees who he perceives as having betrayed him for speaking up about the dire situation at AREH. In addition to the events described in the November 13, 2023 Affirmation of Kevin Wiener, Simpson has attempted to further disrupt AREH's operations by writing accusatory and threatening emails to its staff, despite the TRO.

9.      **Exhibit 1**, attached hereto, is a November 14, 2023 email thread between Simpson and Dana King, who submitted an affidavit in support of the PI OSC (NYSCEF Doc. No. 298), that copied my brother and me. In the email, Simpson accuses Ms. King of breaching a purported employment agreement by submitting the affidavit, writing:

> I am sure you are aware, per your offer letter attached here, you have obligations to the business and your superiors that are serious in nature, confidentiality, non-disparagement to say a few. Obviously, if you had issues and concerns, you had every right to report them to Jason, Karolina, or me but you have not whatsoever. This situation is tough on all in general but please know that you had an obligation and you breached it by submitting this Affidavit.

Following innuendo and accusations that Oak must have caused Ms. King to submit the affidavit, Simpson then threatens legal action against her, asserting:

> While I was the managing member (and maybe I will be again one day shortly) you had employee duties that you didn't consider. It is not acceptable and my rights are reserved to consider next steps surrounding this action that you took in your own hands to attempt to damage and sabotage Arch, me, and the investors / lenders of these properties.

Notably, this email was sent after the Court entered the TRO prohibiting Mr. Simpson from acting as managing member. My brother, another principal of Oak, Kevin Wiener, intervened to demand Simpson refrain from further threatening behavior, which only elicited further vitriolic and senseless accusations from Simpson. Ms. King was extraordinarily distraught in the wake of this email and had to be reassured by AREH management.

- 5 -

10.     **Exhibit 2**, attached hereto, is a similar post-TRO email thread, also dated November 13, between Simpson and Rebecca Tokarczyk, who has executed an affidavit concurrently filed herewith.  Simpson initially feigns a friendly tone, wishing Ms. Tokarczyk well in her new position following her resignation from AREH, but this is entirely belied by the threatening and accusatory content of balance of the message, which includes the following:

> It has been brough [*sic.*] to my attention that you decided to "tip off" the Arch staff to leave the office on Friday, October 27th, 2023 at approximately 4:30 PM, saying that they would not be paid. You were aware of the financial pressure and situation that we were going through and that confidential information was used improperly to go against Arch, me, and the business at large. I told you that day that the staff would be paid for their time and I did exactly as I said it would (it was a bit late because you refused to help per my request).

> Employees are trusted with confidential information and are not authorized to share that information with others because of their view, instincts, or own desires. . . .

> We had this circumstance occur similarly during the first week of August, where Jared asked you to make distributions to him without my consent, after I warned you in advance.  This was not long after (in June) where you, me, and Jared put a policy in place to make sure that wires were approved by me in all circumstances. . .

> As in your attached Employment Agreement, it notes that all matters of this type have survival.  I reserve all rights in this matter and wish you great success in your new role.  These matters must be on the record prior to your departure, I am sure that you understand.

Like Ms. King, Ms. Tokarcyzk felt extraordinarily threatened by Simpson's conduct.

11.     **Exhibits 3** and **4**, attached hereto, are two email exchanges that begin on November 8, 2023, between Jason Paul and Simpson, again after entry of the TRO.  Like the messages to the other AREH employees, the communications to Mr. Paul contain numerous

- 6 -

accusations and reflect a complete preoccupation with what he perceives to be Mr. Paul's allegiances:

> The only forgiving that is required is by you. There was me and Tristan in the office all by ourselves, and you disappeared to Vegas, really? Oh, and that was the day after you got aggressive with me and told me about my crying, similar behavior to what you did in the end of July

> Dana has told me in writing and on the phone that you were nowhere to be found when payroll was due. We begged you for two days to give us real page information to pay bills. How coincidental that you were nowhere to be found in another attempt to try and take over the business. And what is your answer about lying to her about you getting paid or not? Shall we do a phone call with you me and her?

> And yes, do not send me aggressive emails Jason, it is not going to be tolerated. I know you are in the hurrah hurrah moments again, but let me tell you we will not be forgetting about the things that you've done to damage this business. Shall we be reminded about your fussing with IT or writing letters about me that are false, or collaborating with people improperly? Or shall we talk about locking me out of the office? Those were all good things for the business, weren't they Jason?

12.     All of these communications were written to AREH's employees while the TRO was in effect and represent bare attempts to exert managerial control over AREH's staff—by the threat of legal action, and in retaliation for perceived wrongs, no less—in clear violation of the TRO. Oak has also been advised by other staff who wished to provide evidence in this proceeding that they are afraid to do so because of numerous harassing calls and text messages from Simpson during the TRO and fears that he could follow through on his threats. Simpson has therefore used his time outside the business to engage in a campaign of witness tampering, which has been at least partially successful. The few communications that Oak has access to speak for themselves in demonstrating why Simpson cannot be reinstated in any position of power at AREH.

- 7 -

13.     Simpson's harassing behavior directed at employees is extremely disruptive to AREH's business, and Oak's ability to attempt to operate it.  Mr. Paul and Ms. King are in charge of managing over 2,000 apartment units, and to be on the receiving end of Simpson's communications is obviously a serious detriment to their abilities to focus on the task at hand. Likewise, Ms. Tokarczyk will soon be departing the company for other employment, like virtually all of the accounting staff before her, due to Mr. Simpson's abusive conduct.

14.     I have witnessed firsthand that Simpson's very presence—or the mere possibility of it—is a threat to AREH's business.  Nearly half a day of productivity was lost when he attempted to force his way into AREH's offices, and the staff was visibly shaken and on edge.

15.     While Simpson's campaign of employee harassment has netted him some degree of success in limiting the evidence that is before this Court, it has also ensured that this business cannot exist if he is reinstalled as its manager.  Based on discussions with staff, it is my belief that if Simpson is returned to management of AREH, almost all current office employees would immediately quit, even if Simpson was able and willing to pay them.

16.     The chaos caused by Simpson's conduct has not gone unnoticed by AREH's other investors, many of whom have signed onto **Exhibit 5**, attached hereto, which is a letter signed by nine constituencies of investors in AREH and the properties it manages. These investors have approximately $15 million invested across AREH properties, and have no affiliation with any of the parties in this dispute. The letter expresses their view that, under the current circumstances, "we believe that the best interests of investors are served by allowing Oak to take over the running of the business in lieu of Mr. Simpson."

17.     Along these same lines, I have been told by various counterparties that it is essentially out of the question that we will secure any capital or operating partners so long as

- 8 -

Simpson maintains even major decision rights—let alone the full managerial authority he previously exercised. Similarly, in discussions with lenders it has become clear that forbearance agreements will be impossible to finalize unless the respective assets are entirely carved out of AREH such that Simpson has absolutely zero ability to take any action to interfere with lender remedies. In the absence of such agreements, the lenders will foreclose, and all equity will be lost.

18.     I note that in the email exchange attached as Exhibit "A" to the November 13 Affirmation of Kevin Wiener (NYSCEF Doc. No. 357), Simpson states that he is unwilling to provide major decision consent to any restructuring agreement with a lender unless Oak releases him from any claims related to the property. This has been a recurring demand with Simpson: he is only willing to act in his own self-interest (such as by demanding releases), to the obvious detriment of investors.

19.     Meanwhile, Oak has also continued to find itself on the receiving end of Simpson's various tirades, creating completely unnecessary diversions and wasting our time. **Exhibit 6**, attached hereto, is a recent communication from Simpson regarding Simpson's entirely false perception that Oak is "now housing the books and records of AREH in Toronto, inclusive of our IT systems." No amount of explanation was able to dissuade Simpson of this view, and repeated questions about why Simpson believed such a thing went unanswered. I remain completely unclear as to the source of the confusion or what Oak had done that prompted the concern, however misplaced. Nevertheless, and as was explained to Simpson multiple times, the records are hosted on cloud software, where everything remains "housed."

20.     As noted in the November 13, 2023 Affirmation of Kevin Wiener, Oak began working to investigate and stabilize AREH's financial condition immediately after entry of the

TRO. While Oak is still investigating the state of the businesses, initial findings minimally reflect gross incompetence and negligence. For example, given many invoices or demands for payment were never properly accounted for in the accounting system, Oak has frequently been met with urgent and critical payment needs with no advance notice to obtain capital (presumably because Simpson's only method of dealing with such payables was to make urgent and extortionate demands of Oak to pay for them even when Oak had no legal obligation to). Oak is putting in place a "code red" payables calendar to ensure that funding can be obtained from appropriate sources (whether lender advances or investor capital) in advance of the most critical payables hitting their due dates.

21.     On November 14, 2023, approximately nineteen different AREH and affiliated bank accounts were automatically debited by the NY Department of Taxation and Finance for a little under $100,000. Needless to say, Oak presently has no idea as to the reason for the debits. It is possible, however, that the answer may lie in the unopened pieces of mail that buried an entire table in Simpson's office, which we are currently in the process of opening and reviewing. The letters date back to August 2023 and so far consist of past due bills, demand letters, notices of default, IRS correspondence, and the like. Given the apparent lack of any system to organize such correspondence (or indeed, any prior effort to read it), it will take time to address and resolve.

22.     In addition, since receiving greater access to information about the business, while we long suspected that Simpson's conduct has all along been motivated by his own financial benefit (and covering up the evidence of such), new information confirms as much.

23.     For instance, this Tuesday, November 14, I learned that lenders sold two foreclosed properties that Simpson had long refused to sell in a matter of days for $1 million

- 10 -

above the loan principal. Back in May, AREH had received written offers to buy the properties for $2 million above the loan principal (a copy of a report containing these offers is attached hereto as **Exhibit 7**). This fact had been hidden from me by AREH, and I had been advised that the offers were below the loan basis. Despite the fact that there was insufficient capital to complete the projects, Simpson refused to sell the properties then or even to attempt to market the properties during the foreclosure process, maintaining that the only way to get any money out was to complete the project. Ultimately, Simpson's refusal to sell the properties even on the eve of foreclosure denied the investors a partial recovery and instead the investment is now gone. It is clear that Simpson's primary motivation was not preserving investor capital, but ensuring more fees to AREH, which would ultimately fund Simpson's management draw.

24.     While Oak is still examining the records to understand the state of play, the records show that Simpson took much more out of the businesses than he ever invested in the portfolio. True to form, in the midst of all the chaos (and apparently despite Simpson's earlier claims of insolvency), Simpson has been demanding hundreds of thousands of dollars in fees from AREH (to be paid by Oak, of course) and threatening to initiate legal action if the fees are not paid. My present understanding is that Simpson has collected over $3 million in management fees, cashed out or received promotes totaling millions more (such as the funds from the sale that Oak and others, but not Simpson, reinvested in the 1031 Exchange), which I estimate bring Simpson's overall take to approximately $6 to $8 million. Rather than reinvesting these funds back into AREH properties, Simpson has used the funds to buy other properties owned by JJ Arch or himself personally, while using AREH resources to staff and manage those properties without compensation. These estimates are exclusive of other benefits accrued, such as through misappropriation of AREH's assets, which have yet to be fully quantified, though a

- 11 -

review of AREH's accounting systems indicate that there are $65,900.20 in unpaid bills from Simpson and JJ Arch (only a small portion of Simpson's misuse of AREH resources were formally billed and entered into the accounting system). The breakdown is as follows:

| Debtor | Amount Owed to AREH |
| --- | --- |
| 1055 Park Avenue (Simpson-owned condo) | $6,446.15 |
| 146 E 89th St (JJ-owned property) | $28,729.11 |
| 1640 Montauk LLC (Rever Motors property owner) | $4,465.25 |
| 1640 Motors LLC (Rever Motors operating business) | $26,259.69 |

25. Meanwhile, although Simpson has attempted to craft a narrative that his own personal financial wellbeing is tied up in AREH's success, that is simply not borne out by the records. Based on an estimate provided to me by Yechiel Lehrfield, AREH's former Financial Controller and Director of Accounting, Simpson has invested well under $500,000 of his own money into AREH properties while cashing out millions, even before accounting for management fees. It is likely that when all is said and done, Simpson will have made more money off AREH than any other person associated with this enterprise, and will be one of the only people to have not taken a financial loss. While his current behaviour may seem baffling from the perspective of preserving investor capital, it is readily explained by the fact that at this point, releases from Oak are likely worth far more to Simpson than whatever negligible equity he still holds in the business.

WHEREFORE, for the foregoing reasons and those stated in the reply memorandum of law accompanying this Affidavit and the other concurrently filed Affirmations and Affidavits, Oak respectfully requests that the Court grant the relief sought in the Complaint, and in the PI OSC.

_____
Michael Wiener

Sworn to before me this

17 day of November, 2023

_____
Notary public

REBECCA CATHERINE TOKARCZYK
NOTARY PUBLIC-STATE OF NEW YORK
No. 01TO6425486
Qualified in Rockland County
My Commission Expires 11-22-2025

- 13 -

**Word Count Certification**

Pursuant to 22 CRR-NY 202.8b, Leslie Thorne, Esq., hereby certifies that this affidavit contains fewer than 7,000 words exclusive of the table of contents, caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

- 14 -

EXHIBIT 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively
as managing member of ARCH REAL ESTATE
HOLDINGS LLC, and JJ ARCH LLC,

                    Plaintiffs,

       -against-

JARED CHASSEN and FIRST REPUBLIC BANK,

                    Defendants,

       -and-

ARCH REAL ESTATE HOLDINGS LLC,

                    Nominal Defendant.

Index No. 158055/2023

**AFFIRMATION OF
KEVIN WIENER**

608941 NJ INC.,

                    Plaintiffs,
       -against-

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
ESTATE HOLDINGS LLC,

                    Defendants,

       -and-

ARCH REAL ESTATE HOLDINGS LLC,

                    Nominal Defendant.

      1.      I am currently the Executive Vice President of 608941 NJ Inc. ("**Oak**"), the Investor

Member in Arch Real Estate Holdings LLC ("**AREH**"), as well as its Canadian in-house counsel.

Since Oak has been appointed as acting Managing Member of AREH, my brother and I have both

been exercising Oak's management rights under the Order to Show Cause and AREH's operating agreement.

2.      I write this affirmation on behalf of AREH. While AREH, as a nominal defendant, has a limited stake in the dispute between its two members, it does have certain legitimate interests that will be impacted by the choice of whether JJ Arch LLC ("**JJ**") or Oak will serve as its Managing Member while the membership dispute is litigated. It will also be impacted should JJ return as Managing Member but while under receivership. I also write to advise the Court of certain developments since the issuance of the Order to Show Cause.

3.      The weekend after Oak was made Acting Managing Member of AREH, Oak made plans to bring five of its senior staff to New York to gather information, meet with AREH employees, and start to come up with a plan for AREH and the properties in its portfolio. Oak also immediately lifted the employee furlough put in place the previous week.

4.      On arriving in New York and beginning to have full access to AREH's accounting software, it quickly became apparent that both AREH and its subsidiaries were in a difficult financial state. On November 6, the first business day Oak was in charge, accounts were already going into overdraft, and payroll payments to employees were about to bounce. Oak immediately began injecting additional capital into AREH to stabilize the short-term cash needs while management gets a clearer picture of liabilities and spending needs at the corporate and property levels. In the week since Oak has assumed management of AREH, it has injected approximately $132,000 of additional capital into AREH and the properties. Given this would equate to approximately $6.8 million in annual capital support, management is focused on further investigating AREH's financial condition and coming up with a plan to ensure long-term financial

92088058.1

stability for the company. In the meantime, Oak has been covering the most urgent cash needs of

the business where there is no other feasible source of capital to try to stanch the bleeding.

5. Oak has spent much of the week getting up to speed on the various properties and

working with AREH employees to come up with potential plans for each. I have received status

updates from lawyers working on all the outstanding litigation and transactional files. We have

begun deep dives on the financial state of each property with the team to determine how much

additional capital is required to stabilize the asset. Given the current strained relationship between

AREH's partners, we have been exploring options, in cooperation with Jeffrey Simpson and Jared

Chassen, to shift some of the assets outside of AREH control so that there is the stability to bring

additional capital into those deals. We have also been in touch with all the lenders on the properties

as we start to come up with potential structures to bring the loans out of default (regrettably, AREH

has received a default notice for one additional loan; while AREH does not agree that the loan is

in default, the lender's claim of a default could have been avoided but for JJ's unwillingness to

cooperate in securing advance lender consents to a potential AREH change in control

notwithstanding Oak providing a default notice to JJ in August).

6. New management is working to change human resources practices and policies

that, in the current view of AREH, reduced employee morale and were a significant contributor to

high staff turnover. It was immediately communicated to staff that AREH would be a working

environment where all individuals would be treated with dignity and respect and that there was no

room for abusive conduct in the workplace. We have been informed by current and former AREH

staff that this was previously a significant issue at AREH, with new employees sometimes lasting

only weeks before being subject to verbal abuse by management and then quitting. Some of the

formal policies that we have reversed also created an oppressive workplace environment. For

3

example, we were advised that there was a policy banning two or more employees from meeting

in an office or boardroom, or taking a phone call there, unless management had specifically been

informed of the meeting and its subject and approved. In our view, we prefer showing AREH

employees that they have our trust to collaborate in teams or take phone calls without us

micromanaging their conduct. We are also ending a policy that required sick employees to come

into the office unless they could provide a positive COVID-19 test. Particularly given Oak's key

personnel will frequently be working in Canada, we are exploring options to increase the

availability of work from home.

7.      We have also started the process of working with AREH's accounting team to start

to get the books back in order. This is proving a somewhat herculean task; I am informed by Frank

van Biesen that the accounting records for at least one of AREH's subsidiaries have not been

reconciled since mid-2022, over a year before this litigation began. We anticipate that outsourced

accounting support will likely be necessary for at least a couple months.

8.      Management has also taken seriously its obligation to provide information to, and

consult with, the members of JJ. Because of the current litigation environment, this has necessarily

been more structured in the case of Jeffrey Simpson than Jared Chassen. We invited Chassen to

join us day-to-day in the office, though we made very clear to the AREH employees that he is not

part of the management structure and they should not report to him or take direction from him. We

have had to use him to help get bank wires out until Oak personnel can be added as account

signatories. We have also found his strategic advice valuable and he has helped us get up to speed

on the properties.

9.      With respect to Simpson, we have been providing him with updates on

developments on the properties and have in some cases involved him directly in conversations

4

with our other investment partners. For example, we are currently in the process of securing JJ's consent to put in place best-in-class third-party property management for three properties in the AREH portfolio. I have also reached out to Simpson to get his advice and position on how to navigate a complex ground lease in the Myrtle Point project that is currently in litigation. My strategy has been to try to determine in advance what issues may be sticking points for the JJ partners so that Oak can cause AREH to participate in settlement discussions knowing in advance that major decision approval is likely.

10.    Unfortunately, while Simpson has been cooperative in some areas, at other times he has acted in a manner severely detrimental to AREH and its employees. On the morning of November 9, when most of the Oak team was scheduled to return to Canada, Simpson advised that he wished to have a meeting with Oak and other investors to discuss the 88 University Place property. When I told him that we weren't in a position to have that meeting yet, as I hadn't yet had the opportunity to review the lender's latest proposal with counsel, he stated that he was would come in at 11:30 AM, occupy one of the boardrooms and meet with whoever he wanted.

11.    I was forced to make clear to Simpson that, while I was happy to set up a time and place with Simpson to hold an in-person meeting, the boardrooms were in use and that he did not have our permission to come to the AREH office that morning. Simpson then became irate, stating that not only would he come to the office, but that he would occupy the management office (that my brother and I had been using), that we didn't have his permission to use that office, and that nothing in the Order to Show Cause prevented him from coming to the office.

12.    On arrival at the office that morning, we had to confirm that Mr. Simpson's electronic access to the offices had been revoked and advised the front desk staff and property manager that Mr. Simpson was not allowed up to the AREH office without our consent and that

we should be called if he arrived. When he did arrive later that morning, he emailed me to say that

he had called the police (presumably after being denied entry). A copy of this email exchange is

attached hereto as Exhibit "A". Simpson then spent the next 30 minutes to an hour outside the

AREH offices before leaving and when the police did arrive I had to explain to them the litigation

history of this matter, that Oak had been appointed acting Managing Member, and that Simpson

did not have AREH's permission to be in the offices. Later that afternoon, Simpson sent me a

threatening email accusing me of lying to the police and lying in my written testimony before this

Court, and said that I should not be so quick to leave back to Canada (I do not know what he meant

by that last bit, but it certainly sounded threatening). A copy of this email is attached hereto as

Exhibit "B". A copy of the incident report from the building's concierge is attached hereto as

Exhibit "C".

13.     The entire event was highly disruptive to the workday of management and AREH's

employees, who were very stressed by the prospect of Simpson entering into the office and

occupying it. Because Simpson had entered the office despite his access having been deactivated

back when his partnership was terminated by Chassen, and given that Simpson had already entered

the AREH offices without Oak's knowledge or consent the evening of November 3, we had

concerns that Simpson would go to one of the other exit doors of the building and go up the stairs

when someone else exited. We therefore had to make a safety plan with staff that in the event

Simpson got up to the office and began occupying it, that all staff should leave the office and work

from home, at which point we expected we would need to come back to the Court to seek a further

order.

14.     Simpson has also initiated a financial dispute with AREH, on behalf of JJ. On

November 6, the very first business day of new management of AREH, Simpson sent an email

92088058.1

demanding immediate payment of the "guaranteed payment" under the AREH operating agreement that Simpson claimed had been accrued over several months. He then sent a follow-up email two days later threatening to involve lawyers. Simpson claimed that AREH owed JJ $344,036 in management fees. To provide context, AREH currently has numerous vendors claiming to be owed significant sums of money at the corporate level. Even Scott Griffin, the counsel Simpson purportedly retained to act for AREH to fight against Oak's books and records request and demand that JJ not unilaterally put the company into bankruptcy, claims to be owed an additional $70,000 by AREH.

15.     Given AREH's outstanding liabilities, I informed Simpson that it would be improper for AREH to pay a claim to a related party in preference to its arms-length creditors. I also advised that AREH had not yet determined the total amount of money that may be owed to AREH by JJ, which would need to be set off against any payments to JJ (assuming any such payments are, in fact, owed). Simpson responded that he expected a reconciliation and payment in short order, or he would pursue litigation. Notwithstanding Simpson's previous litigation position that the Managing Member of AREH needed to have the unilateral right to make a bankruptcy petition because Oak had a conflict with AREH's creditors, it now appears that JJ has genuinely put itself in a conflict with AREH's creditors by claiming to be a creditor itself, and one that is demanding preferential payment over the other creditors regardless of whether "the business is profitable or not." A copy of this email exchange is attached hereto as Exhibit "D".

16.     If anything, it appears more likely at this point that AREH is owed money by JJ and its subsidiaries. As Simpson has previously admitted, JJ used AREH to staff its car dealership. What has now come to our attention is that AREH has not actually been paid for that staffing. According to AREH's accounting records, there are 44 transactions between CS&S (an AREH

7

subsidiary) and 1640 Motors LLC (or its property owner 1640 Montauk), a subsidiary of JJ known as Rever Motors since August 2022. While $42,427.72 was invoiced to Rever, only $11,702.80 has been paid. There is therefore an outstanding balance of $30,724.94 with an average weighted days outstanding on the balance of 125 days.

17.     More significantly, in discussions with current and former AREH accounting staff, AREH management has learned that JJ misappropriated significant resources for its own non-AREH activities. One accountant at AREH, Rebecca Tokarczyk, currently the head of accounting at AREH, was initially hired solely to work on JJ's accounting and transaction-processing needs and continued to work on JJ matters full time from around November 2022 to June 2023. Two other accountants spent between 10-25% of their time on JJ matters and the head of human resources spent about 10% of her time dealing with JJ, rather than AREH, employment issues. None of this work was ever reimbursed by JJ, nor were entries even put on the books to document it. Preliminarily, we estimate that more than $200,000 in AREH salary payments were misappropriated by JJ for its own use.

**WHEREFORE**, for the foregoing reasons and those stated in the memorandum of law accompanying this Affirmation, AREH respectfully requests that the Court account for the interests of AREH and its subsidiaries, investors, and employees in making its decision, and grant such relief as this Court deems just and equitable.

I affirm this 13th day of November, 2023, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Kevin Wiener

9

92088058.1

## CERTIFICATION OF WORD COUNT COMPLIANCE

I certify under Rule 202.70.17 Commercial Division of the Supreme Court that the foregoing **AFFIRMATION** was prepared on a computer using Microsoft Word.

Type:  A proportionally spaced typeface was follows:

Name of typeface:     Times New Roman

Point Size:     12

Line spacing:  Double

Word Count*:*  The total number of words in this **AFFIRMATION**, exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is **2,452**.

Dated: New York, New York
     November 13, 2023

POLSINELLI PC

By: _____
     Aaron E. Zerykier, Esq.
     600 Third Avenue, 42nd Floor
     New York, NY 10016
     azerykier@polsinelli.com
     (646) 289-6512

     *Counsel for Arch Real Estate Holdings LLC*

10

92088058.1

# EXHIBIT 21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 3M

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

*Plaintiffs*,

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants*

Index No. 158055/2023

Justice Joel M. Cohen

Mot. Seq. 1

**SUPPLEMENTAL AFFIDAVIT OF
JARED CHASSEN REGARDING
UNDERTAKING**

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK      )

Jared Chassen, being duly sworn, deposes and says under penalty of perjury as follows:

1.     I am the defendant in the above-captioned action. I respectfully submit this supplemental affidavit regarding the appropriate undertaking required of Jeffrey Simpson ("Simpson") in connection with the Court's Preliminary Injunction. NYSCEF No. 159. I am fully familiar with the facts set forth herein based upon my personal knowledge unless stated upon information and belief.

2.     In determining the size and nature of the undertaking, I believe it is important to provide some background so that the Court may understand the financial harm that I (not to mention company investors) stand to suffer from Simpson being restored to his position as manager of JJ Arch, and the undertaking that should be required.

1

3.      Prior to the Court's Interim Order, on August 6, 2023, I had terminated Simpson, and taken de facto control of JJ Arch. I did so pursuant to the JJ Arch LLC ("JJ Arch") Operating Agreement which allowed me to resign Simpson for his misconduct and to protect JJ Arch and Arch Real Estate Holdings LLC ("Arch Real Estate," and together with JJ Arch and subsidiaries, "Arch") from Simpson, who was threatening to "blow up" Arch, and had engaged in numerous acts of corporate malfeasance where he favored his own interests over those whom he had a fiduciary to act in their best interests. NYSCEF No. 96.

4.      Before I terminated Simpson, Arch was failing and rather than take corrective actions, Simpson took actions that were entirely self-interested. His actions are leading Arch to its destruction. Since he has been restored to his position, Arch is on the verge of imminent corporate failure because of Simpson, with properties failing and loans in default. In fact, on a call with some individual investors on October 6, 2023, Simpson admitted that "he has no plan." Numerous employees have quit, and Arch does not have the funds to operate its business without imminent investor help. That investor help is not forthcoming with an erratic and volatile actor like Simpson at the helm, someone who is abusive and disregards investors' interests and keeps them in the dark.

5.      As I explained previously, JJ Arch is the managing member of Arch Real Estate, whose investor member is 608941NJ Inc. ("35 Oak"). 35 Oak has invested tens of millions of dollars into Arch. And each individual real property deal was also funded by numerous other investors, many individual investors with no real estate experience.

6.      Simpson continues to frustrate any attempts to work collaboratively with 35 Oak to save critical project developments, as he remains hellbent on his scorched earth campaign against them. An email exchange just yesterday, on October 5, 2023, between 35 Oak, Simpson and I exemplifies Simpson's continued efforts to frustrate any efforts to save the company, as he instead

2

focuses on battling 35 Oak. A true and correct copy of this email exchange is annexed hereto as **Exhibit A**. In the exchange, after 35 Oak requests information to save projects and tells Simpson that he is keeping them in the dark and not providing access to any books and records, Simpson threatens to sue 35 Oak if they talk to lenders of failing properties to try to work out any kind of deal even though 35 Oak is a personal guarantor of these loans and faces massive financial exposure, saying to them "I am not responding to you and you are not speaking to anybody . . . This is the last notice to you. You are not to reach out to anyone without my consent. If you continue, it's at your own risk and immediate legal action will be taken." *Id.*

7.      Several things changed over the past two years and laid the foundations for the current dire circumstances.

8.      By way of background, JJ Arch earned its operating income from a flow of acquisitions of new properties, property management and asset management fees and construction and developer fees. For example, it earned income from finance fees from brokering loans on its own new acquisitions, property management fees for overseeing the properties that were owned by Arch, and construction fees on its development of properties acquired by Arch.

9.      Before 2022, Arch owned approximately 5500 units around the country, but in 2022 it sold approximately 2000 of the units, thus lessening its base for property management fees. The rise in interest rates also made Arch unable to acquire new properties to be able to earn income from finance and construction fees. Without this income, Arch was forced to lay-off employees, but without these employees, it could not properly manage the properties spread-out in different states, thus causing the properties to start failing from mismanagement.

10.      In other words, the investors were being harmed by Arch remaining as the property manager because Arch could not maintain the economies of scale required to properly run the

3

properties once it sold many of the units in 2022. And with the real estate markets faltering, Arch

also no longer had the regular income from financing fees on acquisitions by which it otherwise

obtained income, or construction fees from developing newly acquired properties.

11.     And into these dire circumstances, Simpson's erratic, volatile, and abusive behavior

only made the situation worse. For example, Arch's construction entity, Arch Builders, LLC and

its subsidiaries, had a staff of over 70 people, in which nine were highly skilled professionals that

worked in the office and managed the entire development operation, their roles a vital part of

running a budgeted and safe construction processes, including project managers and executives.

These people were either abused and quit or were fired by Simpson. He would often visit sites and

scream at and belittle subcontractors and his own team members. That left no one to track budgets

and no one to oversee or handle Arch's ongoing construction projects, leading the projects to fail.

Simpson was also an absentee manager, focused on other business ventures.

12.     I, and others at JJ Arch, including Jason Paul and Michelle Miller, regularly pleaded

with Simpson that we outsource property management to independent third-party property

managers who had the necessary economies of scale to oversee the properties and ensure that the

investor's assets were adequately managed and protected. But JJ Arch would have less revenue by

doing so, and would become a mere investment holding company, something that Simpson's ego

could not tolerate, even at the expense of the investors whose interests he was supposed to protect.

13.     With properties failing, funds running out, and investors unprotected, in July 2023,

even Simpson recognized that he needed to walk away and give control to Arch Real Estate's

investor member, 35 Oak, who had the funds to right the ship but were not willing to continue

funding a blackhole where their money just disappeared into Simpson's mismanagement. On July

13, 2023, Simpson sent a proposal through Michelle Miller, a JJ Arch employee/junior partner, to

4

35 Oak to "unwind" Arch. In the proposal, among other things, 35 Oak would take over ownership of JJ Arch after 60 days, and Simpson would execute a separation agreement. A true and correct copy of the July 13, 2023 email chain is annexed hereto as **Exhibit B**.

14.     Later that day, Simpson responded to the email to say, among other things, "[w]e sent this email this AM seeking feedback on a path forward for everyone . . . I urge you to reply and get to a conclusive agreement below by tomorrow, as we set up timeframes in the proposal for a particular reason. *If not, we will have to take more extreme measures to exercise Dissolution via the Agreement.*" *Id.* (emphasis added). Simpson recognized, expressed of course as a threat, that his remaining at the company would lead to the destruction of the company.

15.     For its own reasons, 35 Oak responded via its counsel, Haynes and Boone, LLP, on July 19, 2023 that they would agree to a proposal whereby, among other things, "Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries . . . [and] [t]he JJ Operating Agreement is amended such that Jared has sole control over JJ." A true and correct copy of this email is annexed hereto as **Exhibit C**.

16.     I had no knowledge of 35 Oak's deliberations, or that it was going to make this proposal to Simpson, but now understand that 35 Oak made this proposal that I have sole control, rather than 35 Oak itself as suggested by Simpson, because 35 Oak was concerned it might face financial liability on some of its loan agreements if neither Simpson nor myself were in control of JJ Arch. Their proposal that I be placed in charge, however, enraged Simpson, and he appears to have believed, incorrectly, that, though he himself made the proposal to 35 Oak to walk away in their stead, that I somehow was involved in their counterproposal that I be placed in charge of JJ Arch instead of 35 Oak as he suggested.

5

17.     About 2 weeks later, he would attempt to forcibly resign me on entirely frivolous grounds. He wanted to free himself on any check on his powers at JJ Arch, which would enable him to further blow up the company as he escalated his battles with 35 Oak. Simpson's relationship with 35 Oak has further deteriorated and he engaged in a campaign of extortion, abuse, and threats that led 35 Oak to file an action in federal court against him, and which is available in this action at NYSCEF No. 100.

18.     Simpson attempted to terminate my membership without any lawful basis and purely based upon his selfish and destructive motives. After 35 Oak's counterproposal, Simpson wanted me to take a pay-cut on the delusional belief that such a pay-cut would make him not have to rely on 35 Oak and would demonstrate my loyalty to him in his escalating battle against 35 Oak. When I suggested that I might accede to such a pay-cut if both of us were to do so, he refused and grew further enraged.

19.     Simpson's behavior has been volatile, abusive, and with complete disregard for his fiduciary obligations. To protect him from blowing up the company, as he threatened, I rightfully acted to terminate him for the reasons I have detailed in my prior submissions and herein. Simpson has completely ignored the interests of the investors or the properties but is focused on his own self-aggrandizement and harming 35 Oak, and now me, while destroying the entire business.

20.     As Jason Paul, as Arch employee wrote me in an email on August 8, 2023, Simpson sent "abusive text messages to investors" and sent him text messages where he indicated that he saw it as a problem that Arch employees "were putting the investors first." A true and correct copy of an email from Jason Paul to me dated August 9, 2023 is annexed hereto as **Exhibit D**. I note that while Mr. Paul put in an affidavit apparently extolling Simpson, NYSCEF No. 131, it is the opposite of what he told me or said in his detailed emails to me, wherein he stated that Simpson

6

"is exceptionally volatile and abusive." *See* Ex. C. His testimony appears to be coerced. And while Michelle Miller put in a near identical affidavit, NYSCEF No. 130, not only does her affidavit contradict what she has communicated to me, but her testimony also appears coerced and she has been subjected to threats by Adam Leitman Bailey, Esq., Simpson's counsel, who on August 9, 2023 threatened her via LinkedIn message that "I do not want to sue you or have you involved in the lawsuit. I really need you to call me. This is not a threat but I need to speak to you . . ." A true and correct copy of the message is annexed hereto as **Exhibit E**.

21. While I was in control, all employees were paid and all business matters were attended to. Simpson regained control via his emergency application for injunctive relief, and since he has not even been able abide by any of the Court's orders. In addition to his contempt as documented in my pending motion, NYSCEF Nos. 61-86, which included almost immediately terminating me after the Court directed him to cooperate and nullified both our prior termination letters and directed the parties to cooperate, Simpson continues to disobey the Court's orders by (1) hiring three new employees without obtaining my consent, and actually firing employees he perceives as allied with me; (2) opening new bank accounts at Citizens Bank without giving me full access to those accounts; (3) refusing to give me signing authority on bank accounts, taking the position that the orders do not require him to do so; and (4) refusing to give me full access to Juniper Square, JJ Arch's investor portal, instead insisting that I have only limited access. He has also directed employees at Arch not to talk to me and has refused to share information with me. Simpson's demonstrated willingness to defy the Supreme Court's orders does not support his control of Arch and demonstrates the risks I and investors face from his remaining in control.

22. Simpson's malfeasance is having immediate consequences on me and other investors. Not only is company on the verge of failing, but because of Simpson's complete

dereliction of his managerial role, as well as his failures to adequately disclose risks to investors or adverse information, I have also just been personally hit with approximately a million dollars in unexpected tax liability that I learned of in the past few days and must pay by October 16, 2023—as have dozens of investors, including my own family members.

23.     As I stated above, in 2022, Arch sold approximately 2000 units and after these units were sold, Arch reached out to investors asking if they wanted to reinvest the money from the sale into other potential properties into IRC Section 1031 tax exchange vehicles, without adequately disclosing the risks that such tax benefit might not be obtained. I along with numerous others did so, though Simpson put minimal proceeds from the sale into these new vehicles. Rather than inform investors that the IRC Section 1031 tax exchanges had failed, and that investors would face huge tax liabilities, Simpson hid the information that he and other team members knew in 2022, it only coming to my attention on October 2, 2023 from an employee who came forward to me, as we began to get hit with massive tax bills from the sale. Many investors have yet to learn of their tax liability, as their gains from the 2022 sale were supposed to be rolled in the failed IRC Section 1031 vehicles, but their K-1s are not being sent to them before their tax filing deadlines. Simpson has also attempted to cover-up his failures through misleading communications to investors.

24.     And to top it off, Simpson put the funds into properties he is causing to fail by his insistence on mismanaging them, thus not only foisting on investors unexpected and hidden tax liability now, but the complete loss of their investments. I am one of those investors, and now face immediate and massive tax liability, and the loss of millions of dollars I invested, though Simpson does not, as he invested minimal proceeds from the sale into these attempted IRC Section 1031 exchange properties.

8

25.     Simpson's bond should total at least $10,000,000.00. This sum is based on my personal guaranty exposure and the likely loss of my equity investments in Arch if Simpson remains at the helm because of the injunction. My equity investment in various Arch properties presently totals $3,730,000.00. A copy of my Juniper Square printout showing my current Arch property equity interests is annexed hereto as **Exhibit F**. In addition, I have equity investments in properties I own just with Simpson that are owned and managed through JJ Arch, and which Simpson now controls and stands to run into the ground. These equity investments total $1,428,458.51, and include real properties known as 225 Head of Pond Road, 550 Metropolitan Ave, 1640 Montauk Highway, as well as the business, Rever Motors. Thus, my total equity exposure is $5,158,458.51. In addition, for further context, my father has approximately $1.3 million in equity in Arch properties, my mother has over $2 million in equity in Arch properties, and my sister has over $1 million in equity in Arch properties.

26.     I also have guaranty exposure that includes guaranties on the following loans: (1) a carveout guaranty on a $7 million loan on real property known as 9 Vandam Street, New York, New York 10013, (2) a full recourse guaranty on a $3.8 million loan on real property known as 146 East 89th Street, New York, New York 10128, (3) a full recourse guaranty on $1.5 million loan on real property known as 1640 Montauk Hwy, Watermill, New York, and (4) a full recourse guaranty on $380,000 loan on real property known as 550 Metropolitan Avenue, Brooklyn, New York 11211.

27.     Of course, my quantum of damages pales in comparison to 35 Oak and the investors collectively, who face massive losses if Simpson retains control of Arch. Since Simpson was restored, he has already defaulted on numerous Arch loans. We have received a number of default

9

notices for Arch loans which have gone into default since, which are just the tip of iceberg. True and correct copies of these default notices are attached hereto as **Exhibit G**.

28.     I recognize and appreciate that while the Preliminary Injunction granted by the Court restored Simpson to managerial power, something that harms me, JJ Arch and all the investors, it importantly also sought to insert calm and order into a state of apparent chaos by bringing the parties back to the Operating Agreements, at least until further order of the Court. I recognize and welcome that it created order by barring unilateral actions outside the judicial process. I am well-aware that I am a steward of Arch and numerous innocent investors, including but not limited to 35 Oak and my own family, who I introduced to Simpson, and whose financial futures are in jeopardy from Simpson's mismanagement and revenge campaign.

29.     To ensure that all issues continue to be dealt with in an orderly manner, I respectfully ask that the preliminary injunction not be automatically vacated by reason of Simpson's failure to post the bond amount selected by the Court, but rather that a failure to pay the bond make the injunction voidable on that basis by my motion. And of course, even if the bond is posted, the injunction should remain without prejudice to my ability to move at any time to vacate or modify the injunction. I ask this to ensure that further status changes occur only through orderly motion practice, so that the parties, and the numerous affected non-parties, are not thrust into any kind of free-for-all.

10

## CONCLUSION

30.    For the foregoing reasons and the reasons stated in the accompanying memorandum

of law, the Court should impose the requested undertaking on the terms requested herein or such

other undertaking and on such terms that the Court deems just and proper.

_____
Jared Chassen

Sworn to before me this
6th day of October, 2023

_____
Notary public

STACY FRENCH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01FR6187456
Qualified in WESTCHESTER County
Commission Expires May 19, 2024

11

**Word Count Certification**

Allen Schwartz, Esq. hereby certifies that this affidavit contains 3226 words exclusive of the caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

_____/s/_____
Allen Schwartz, Esq.

12

# EXHIBIT 22

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 03M

-------------------------------------------------------------------------------X

JEFFREY SIMPSON, JJ ARCH LLC,

                                       Plaintiffs,

                 - v -

JARED CHASSEN, FIRST REPUBLIC BANK,

                                     Defendants.

| | |
|---|---|
| **INDEX NO.** | 158055/2023 |
| **MOTION DATE** | 11/03/2023 |
| **MOTION SEQ. NO.** | 005 |

**AMENDED DECISION +
ORDER ON MOTION**

-------------------------------------------------------------------------------X

608941 NJ INC

                                       Plaintiff,

                 - v -

JEFFREY SIMPSON, JJ ARCH LLC, AND ARCH REAL
ESTATE HOLDINGS LLC,

                                     Defendants.

-------------------------------------------------------------------------------X

HON. JOEL M. COHEN:

The following e-filed documents, listed by NYSCEF document number (Motion 005) 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 321, 322, 323, 324, 325, 329, 330, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 356, 357, 358, 359, 360, 361, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 412, 413, 414, 415, 416

were read on this motion for            PRELIMINARY INJUNCTION/RESTRAINING ORDER    .

      The Court's November 20, 2023 Interim Decision and Order (NYSCEF 412) granting

Plaintiff 608941 NJ Inc.'s ("Oak") motion for a preliminary injunction is hereby amended to

provide the following details with respect to the terms and scope of the injunction.  It is now

further:

      **ORDERED** that, during the pendency of this action and subject to further order of the

Court, Jeffrey Simpson and JJ Arch LLC are enjoined from:

1. Acting as (or holding themselves out to third parties to be) managing members of Arch Real Estate Holdings LLC ("AREH"), and Oak shall continue to act in their stead as AREH's sole managing member in accordance with Section 7.1 of the Limited Liability Operating Agreement of AREH (the "Operating Agreement"), owing all applicable duties to AREH and its members;

2. Denying prompt consent to any Major Decision proposed by Oak as Managing Member under Section 7.1.3 of the Operating Agreement unless *both* JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such consent (or alternatively, either JJ Arch member may convey consent);

3. Making any filings with the New York City Department of Buildings or any other similar regulatory authorities in any jurisdictions on behalf of AREH or any of its subsidiary entities; and

4. Otherwise interfering with Oak's ability to exercise its responsibilities as Managing Member of AREH.

**ORDERED** that, during the pendency of this action and subject to further order of the Court, Jeffery Simpson is enjoined from entering the offices of AREH except with and upon the terms stated in an advance written consent provided by Oak[1]; it is further

---

[1] Oak proposed adding a provision enjoining Mr. Simpson from contacting employees of AREH or its subsidiaries except through counsel or with the advance written permission of Oak. The Court has not included that proposed language, which seems an excessively broad restriction on what could be legitimate and inoffensive conduct and speech. That said, the Court notes that contacting individuals who are represented by counsel (as current and former employees of AREH may be) during the course of a litigation can raise significant issues. In addition, it should go without saying any actions that could constitute threats to actual or potential witnesses could raise even graver concerns, as Mr. Simpson's counsel acknowledged during the argument of this motion. For now, the Court will rely on counsel to advise Mr. Simpson on these issues

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL        Page 2 of 8
Motion No.  005

2 of 8

**ORDERED** that, during the pendency of this action and subject to further order of the

Court, Oak representatives Michael Wiener, Kevin Wiener, and Frank van Biesen shall each be

permitted to have online viewing access to the Arch Accounts listed on Exhibit A, attached

hereto, and shall each be given authorized signer access to make transactions in the Arch

Accounts; and Jeffrey Simpson and Jared Chassen, shall cease to have authorized signer access

but shall retain viewing access to the Arch Accounts; and all parties must promptly provide any

information or documentation requested by First Republic Bank (or its successor in interest) to

implement this Order; and it is further

**ORDERED** that, pursuant to CPLR 6312(b), Oak shall be required, within 15 days of the

filing of notice of entry of this Order, to cause a duly licensed surety to file an undertaking for

costs and damages that may be suffered by Jeffrey Simpson and/or JJ Arch should the

preliminary injunction herein ordered be found to have been improvidently granted, in the fixed

sum of $250,000.00, failing which the preliminary injunction herein ordered shall dissolve.[2]

---

rather than attempting to incorporate these restrictions – which are imposed by law and carry
their own independent consequences – in this Order.  However, the Court reserves judgment on a
future motion for injunctive relief if subsequent events give rise to such a motion.

[2] The Court considered the competing proposals for an undertaking and believes $250,000.00 is a
reasonable amount in the circumstances.  To be clear, however, the undertaking is solely to
protect against injury flowing from the preliminary injunction itself (if later found to have been
improvidently granted).  To the extent harm is claimed to result instead from Managing Member
conduct that constitutes an independent breach of contract, fiduciary duty, or other viable claim,
the harmed parties are not limited to making claims against the undertaking ordered herein.

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL
Motion No.  005

Page 3 of 8

This constitutes the Decision and Order of the Court.

20231122122544JMCOHEN0DB9A4B8D64674BE1AA9028F1F7FD7A45

| 11/22/2023 | JOEL M. COHEN, J.S.C. |
|------------|----------------------|
| **DATE** | |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|------------|------------------|--------------------------|--|
| | ☒ GRANTED | ☐ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

**158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL**
**Motion No.  005**

**Page 4 of 8**

4 of 8

## EXHIBIT A

CHECKING XXXXXXX5334 5952 BENNER MANAGER LLC
CHECKING XXXXXXX5342 ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX5367 5952 BENNER INVESTOR LLC
CHECKING XXXXXXX1395 ARCH 11 GREENE ST MM LLC
CHECKING XXXXXXX1577 ARCH BUILDERS LLC A DISREGARDED ENTITY OF
ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX1809 ARCH 11 GREENE ST BUILDERS LLC A DISREGARDED
ENTITY OF ARCH REAL ESTATE
HOLDINGS LLC
CHECKING XXXXXXX8449 5401 CALIFORNIA ASSOCIATES LLC
CHECKING XXXXXXX1160 TDRT 11 GREENE STREET LLC
CHECKING XXXXXXX2013 ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX1825 ARCH 45 SAVINGS INVESTORS LLC
CHECKING XXXXXXX1874 ARCH 45 SAVINGS LLC
CHECKING XXXXXXX1924 ARCH 45 SAVINGS MM LLC
CHECKING XXXXXXX1932 45 SAVINGS STREET JV LLC
CHECKING XXXXXXX1973 45 SAVINGS STREET MM LLC
CHECKING XXXXXXX5952 CAMBRIDGE ACQUISITIONS LLC
CHECKING XXXXXXX6075 CAMBRIDGE MEZZ LLC
CHECKING XXXXXXX4165 CAMBRIDGE ACQUISITIONS LLC
CHECKING XXXXXXX4181 CAMBRIDGE ACQUISITIONS LLC
MONEY MARKET CHECKING XXXXXXX3763 CAMBRIDGE ACQUISITIONS LLC
CHECKING XXXXXXX4013 ARCH CAMBRIDGE INVESTORS LLC
CHECKING XXXXXXX4154 ARCH ADVISORS LLC
CHECKING XXXXXXX5160 ARCH ASSET MANAGEMENT LLC
CHECKING XXXXXXX7952 ARCH ADVISORS LLC
CHECKING XXXXXXX6568 MIDTOWN OAKS JV LLC
CHECKING XXXXXXX6626 MIDTOWN OAKS MM JV LLC
CHECKING XXXXXXX9491 CAMELOT CLASS B JV LLC
CHECKING XXXXXXX9509 CAMELOT JV LLC
CHECKING XXXXXXX9525 CAMELOT MM JV LLC
CHECKING XXXXXXX0673 ARCH PROPERTY MANAGEMENT LLC
CHECKING XXXXXXX0764 MMSS LLC
CHECKING XXXXXXX7456 NCSC JV LLC
CHECKING XXXXXXX7464 NCSC MM JV LLC
MONEY MARKET CHECKING XXXXXXX9197 FRANCISCAN PROPERTY OWNER LLC
MONEY MARKET CHECKING XXXXXXX9346 ABNER PROPERTY OWNER LLC
MONEY MARKET CHECKING XXXXXXX8508 OAK GROVE PROPERTY OWNER LLC
CHECKING XXXXXXX5724 LAKESTAR CAMBRIDGE LLC
CHECKING XXXXXXX5799 ARCH SLOPE CAMBRIDGE LLC
CHECKING XXXXXXX5823 ARCH SLOPE CAMBRIDGE MM LLC
CHECKING XXXXXXX5872 ARCH CAMBRIDGE MM LLC
CHECKING XXXXXXX5948 102-02 PARTNERS CAMBRIDGE LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL                    Page 5 of 8
Motion No.  005

5 of 8

CHECKING XXXXXXX6003 4690 ORACLE INVESTORS LLC
CHECKING XXXXXXX0122 ARCH BUILDERS LLC A DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX6194 ARCH PROPERTY MANAGEMENT LLC
CHECKING XXXXXXX2411 ONE BROWN JV LLC
CHECKING XXXXXXX2429 ONE BROWN MM JV LLC
CHECKING XXXXXXX6016 1 BROWN STREET ASSOCIATES LP AND 1 BROWN STREET OWNER LLC (DACA)
CHECKING XXXXXXX6024 1 BROWN STREET ASSOCIATES LP
CHECKING XXXXXXX6032 1 BROWN STREET ASSOCIATES LP
CHECKING XXXXXXX4607 RIDGEWOOD TOWER LLC
CHECKING XXXXXXX4110 MYRTLE POINT CM LLC
CHECKING XXXXXXX4243 MYRTLE POINT JV LLC
CHECKING XXXXXXX4458 MYRTLE POINT MM JV LLC
CHECKING XXXXXXX5413 DRAKE ARCH BIRMINGHAM 1 LLC
CHECKING XXXXXXX5470 PEBBLE CREEK BORROWER LLC
CHECKING XXXXXXX5553 PEBBLE CREEK MM JV LLC
CHECKING XXXXXXX0862 PEBBLE CREEK BORROWER LLC
CHECKING XXXXXXX0896 PEBBLE CREEK BORROWER LLC
CHECKING XXXXXXX4826 2501 VENTURES OP CO I LLC
CHECKING XXXXXXX1846 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0744 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0785 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0793 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0801 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0843 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0884 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0918 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0942 HAMR BORROWER 3 LLC (DEPOSIT ACCOUNT CONTROL AGREEMENT)
CHECKING XXXXXXX2326 ARCH DEVELOPERS LLC
CHECKING XXXXXXX3294 2501 ARCH LLC
CHECKING XXXXXXX3351 2501 JV LLC
CHECKING XXXXXXX1005 3820 1ST OWNER LLC
CHECKING XXXXXXX1044 3820 1ST OWNER LLC
CHECKING XXXXXXX1336 3504 12TH OWNER LLC
CHECKING XXXXXXX5987 3504 12TH OWNER LLC (DEPOSIT ACCOUNT CONTROL AGREEMENT)
CHECKING XXXXXXX5995 3504 12TH OWNER LLC
CHECKING XXXXXXX1203 235 JAMES OWNER LLC
CHECKING XXXXXXX1810 235 JAMES OWNER LLC
CHECKING XXXXXXX1054 DRAKE ARCH TUSCALOOSA 1 LLC
CHECKING XXXXXXX0019 ARCH TUSCALOOSA MM LLC
CHECKING XXXXXXX7278 2501 BISCAYNE PROPERTY OWNER LLC
CHECKING XXXXXXX2373 ARCH PROPERTY HOLDINGS 2 LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL                Page 6 of 8
Motion No.  005

6 of 8

CHECKING XXXXXXX2418 DRAKE ARCH COLUMBIA 1 LLC
CHECKING XXXXXXX2475 COLUMBIA MM JV LLC
CHECKING XXXXXXX8438 9 VANDAM JV LLC
CHECKING XXXXXXX8776 9 VANDAM OWNER LLC
CHECKING XXXXXXX6402 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0347 3504 12TH OWNER LLC
CHECKING XXXXXXX8537 9 VANDAM MM JV LLC
CHECKING XXXXXXX2060 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2102 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2128 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2151 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2169 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2177 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2185 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2201 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2219 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2235 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX2045 1700 ARCH LLC
CHECKING XXXXXXX9537 CENTER POINT BORROWER 1 LLC
CHECKING XXXXXXX1409 CENTER POINT BORROWER 1 LLC (OPERATING - CAPEX)
CHECKING XXXXXXX1417 CENTER POINT BORROWER 1 LLC (OPERATING - RENT)
CHECKING XXXXXXX1540 CENTER POINT BORROWER 1 LLC (SECURITY DEPOSIT)
CHECKING XXXXXXX9636 CENTER POINT BORROWER 2 LLC
CHECKING XXXXXXX0154 CENTER POINT BORROWER 2 LLC (SECURITY DEPOSIT ACCOUNT)
CHECKING XXXXXXX0188 CENTER POINT BORROWER 2 LLC (OPERATING - RENT)
CHECKING XXXXXXX0220 CENTER POINT BORROWER 3 LLC
CHECKING XXXXXXX6215 CENTER POINT BORROWER 3 LLC (OPERATING ACCOUNT - RENT)
CHECKING XXXXXXX6223 CENTER POINT BORROWER 3 LLC (SECURITY DEPOSIT ACCOUNT)
CHECKING XXXXXXX5922 CAMELOT 3 LLC
CHECKING XXXXXXX5930 CAMELOT HOLDINGS JV 2 LLC
CHECKING XXXXXXX5948 CAMELOT JV 2 LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL          Page 7 of 8
Motion No.  005

7 of 8

CHECKING XXXXXXX5963 CAMELOT MM JV 2 LLC
CHECKING XXXXXXX5971 CAMELOT MM JV 3 LLC
CHECKING XXXXXXX5989 NCSC JV 2 LLC
CHECKING XXXXXXX5997 NCSC MM JV 2 LLC
CHECKING XXXXXXX6003 MIDTOWN OAKS MM JV 2 LLC
CHECKING XXXXXXX6011 MIDTOWN OAKS JV 2 LLC
CHECKING XXXXXXX4703 9 VANDAM BORROWER 2 LLC
CHECKING XXXXXXX6583 88 ARCH LLC
CHECKING XXXXXXX2053 9 VANDAM LP JV LLC
CHECKING XXXXXXX2460 1580 NOSTRAND LLC
CHECKING XXXXXXX1303 ARCH NOSTRAND MM LLC
CHECKING XXXXXXX8400 88 TOWER LLC
CHECKING XXXXXXX0767 88 TOWER LLC
CHECKING XXXXXXX0495 CONSTRUCTION SERVICES AND SOLUTIONS LLC
CHECKING XXXXXXX5316 88 TOWER LLC (DACA ACCOUNT)
CHECKING XXXXXXX0751 TOWER OWNER TWO LLC
CHECKING XXXXXXX7223 ORE LIVING II LLC
CHECKING XXXXXXX6075 ARCH NOSTRAND LLC
CHECKING XXXXXXX6688 3200 N HAVERHILL BORROWER LLC
CHECKING XXXXXXX3516 3200 N HAVERHILL BORROWER LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL          Page 8 of 8
Motion No.  005

8 of 8