# EXHIBIT 31

1

NEW YORK STATE SUPREME COURT.
NEW YORK COUNTY : CIVIL TERM : PART 3
------------------------------------------------------------X
JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ
ARCH LLC,

               Plaintiffs,

     -against-          Index No. 158055/2023

JARED CHASSEN and FIRST REPUBLIC BANK,

               Defendants.
------------------------------------------------------------X

September 29, 2023


B E F O R E:  HON. JOEL M. COHEN
             Supreme Court Justice


A P P E A R A N C E S:


ADAM LEITMAN BAILEY P.C.
Attorneys for the Plaintiffs
One Battery Park Plaza - Floor 18
New York, New York  10004-1646
BY:  ADAM LEITMAN BAILEY, ESQ.


AIDALA, BERTUNA & KAMINS, P.C.
Attorneys for the Defendant - Jared Chassen
546 Fifth Avenue - 6th Floor
New York, New York  10036
BY:  JONATHAN LEVENTHAL, ESQ.


SCHWARTZ LAW PLLC
Of Counsel Attorneys for the Defendant - Jared Chassen
150 Broadway - Suite 701
New York, New York  10038
BY:  ALLEN SCHWARTZ, ESQ.

A P P E A R A N C E S:   (Continued)


SHERMAN ATLAS SYLVESTER & STAMELMAN LLP
Attorneys for the Defendant - First Republic Bank
1185 Avenue of the Americas - Third Floor
New York, New York  10036
BY:   JAY KANDEL, ESQ. (Virtually)


                    Lori Ann Sacco
                    Official Court Reporter

1                          MOTION

2              THE COURT:  All right.  Good morning

3      everyone.  Let's get started.  I would like to begin

4      with appearances, starting with the plaintiff.

5              MR. BAILEY:  Adam Leitman Bailey appearing

6      for the plaintiff.

7              THE COURT:  Good morning.  And for the

8      defendants in the courtroom.

9              MR. LEVENTHAL:  John M. Leventhal, Aidala,

10     Bertuna and Kimins, 546 Fifth Avenue, New York, New

11     York 10036.

12             MR. SCHWARTZ:  Allen Schwartz, your Honor, of

13     counsel to Aidala, Bertuna and Kimins.

14             THE COURT:  And on Teams.

15             MR. KANDEL:  Good morning, your Honor.  This

16     is Tyler Kandel with Sherman, Atlas, Sylvester and

17     Stamelman on behalf of JPMorgan Chase Bank as

18     purchaser of certain assets and assumed liabilities

19     of First Republic Bank on the FCIC as receiver.

20             THE COURT:  All right.  Still waiting for

21     your exit ramp in this case, Mr. Kandel, yes.

22             MR. KANDEL:  As am I, yes.

23             THE COURT:  So, we're here today on the

24     preliminary injunction motion filed way back when by

25     the plaintiff.  So, why don't we just get right to

26     it.  I would shoot for roughly a half hour a side

2      total, because I would like to try to be done this

3      morning.  So, Mr. Bailey, the floor is yours.  If you

4      can use the lectern, I would appreciate it.

5              MR. BAILEY:  Thank you, your Honor.  And I

6      appreciate your time.

7              THE COURT:  Is it okay to do it over there?

8              MR. BAILEY:  No.  No.  I'm great.  Good

9      morning again.  Okay.  I'm going to do this a little

10     bit differently than I normally do it.  Normally I

11     would state the issues and then the rollout

12     application and conclusions.  And I'll do it a

13     different way, and I think it's going to work

14     hopefully.

15             The real estate world is in chaos.  Every

16     real estate business that actually takes out loans is

17     having a tough time surviving that I'm aware of.  And

18     we have about 10,000 active clients.  It is really,

19     really difficult to survive.

20             Jeff Simpson, the managing partner of Arch

21     and JJ Arch is fighting for his life.  And since you

22     put him back into business, via the interim order,

23     things have been good at the company.

24             THE COURT:  Have been or have not been?

25             MR. BAILEY:  Have been.  Have been.  The

26     morale has been good.  As far as the company, that's

MOTION

the internal with employees and the morale of the

company.  On the outset of the company Jeff's on --

Jeff is -- Jeff is on tons of guarantees, on tons of

loans.  He is having a rough time.  Attached to our

papers you can see a spreadsheet of deals that he is

on.  It's extremely difficult working with the

lenders.  Working with the deals he's on.  Making

sure the deals happen.  Having to give up some

buildings.  Having to make tough decisions with

employees.  Having to cut costs.  And that is where

right now there is one employee Jared Chassen, who is

doing everything he can, even currently today, to try

to cause harm to the company.  To work for another

company.  I'm going to get into detail coming up on

how he's doing it.  How he's still violating your

first order, your second order and what he's doing to

hurt the company now.

Let's start with -- let's start with from

where we started to where we are today we know a lot

more of how it happened and why it happened through

reading documents.  The draw, when things were really

good for the company, for Jared Chassen was around

$48,000 a month he would get, and he was very happy

about that.  Then Jeffrey Simpson met with

Mr. Chassen and also wrote him, which is an exhibit,

MOTION

1

2    an e-mail saying we're not going to be able to

3    survive if we keep taking distributions.  It wasn't a

4    draw.  It was distributions they would call it.

5    We're not going to survive if we take distributions

6    of 48,000 a month anymore.  We're going to go out of

7    business.  That is exact time, the exact week that

8    Jared Chassen contacted 35 Oak and said we need to

9    get rid of Jeff Simpson.  He contacted them.  I've

10   seen the first page of the agreement, so I couldn't

11   attach it as the exhibit, because I don't have the

12   full one, 'cause I don't believe that's proper.  But

13   we know that 35 Oak, who wants to run the Arch

14   business, jumped at the chance to have an employee on

15   their side.  And we know that Jared Chassen was paid.

16   We don't know how much.  We know that they paid, and

17   this is in writing, 20,000 to Fried, Frank to hire

18   attorneys and around 50,000 to another law firm to

19   retain them.  And they had an agreement whereby they

20   protect any employee at the firm that would sign it

21   and indemnify them.  We don't know -- we don't have

22   the full agreement, so we don't know exactly what's

23   in it.  I know through discovery, we'll receive this,

24   but we still don't have an answer in this case, but

25   through discovery we'll receive, as far as I know, we

26   don't have an answer, through discovery we'll receive

MOTION

this agreement. But Jared under I believe it's three
point -- there is a provision in the agreements that
requires, without getting into every detail, you
know, there is a provision in the agreements that
require Jared Chassen to give his full -- his full
time and his full loyalty and his full -- work full
time for JJ Arch. That is his requirement. He's not
allowed to work for any other company and he can't --
and specifically he cannot work for 35 Oak and he
violated that.

       So, right now it's really hard to have an
employee who, when he comes to meetings -- Because
Jeff Simpson worked really hard. He was ordered by
me to not only welcome him back, but send out e-mails
announcing that he's back, and we're going to
cooperate and we're going to get along. And Jeff
started giving him assignments. Jared refused to do
them. I said Jeff, you have to keep going and keep
giving him work to do. Jared refused to do them. I
said you got to keep trying. You got to keep doing
it. It's not going to work out unless you invite him
back and get him back in. And what kept happening
was that he kept on doing, Jared Chassen kept on
doing everything he can to try to hurt the company
and he refused to work for the company.

MOTION

1

2         Now, this is why, I guess, from the Cardozo,

3    Justice Cardozo on, you know, our judges have always

4    said that we have to let businesses, from the Menorah

5    case on, we have to let businesses act on their own.

6    We can't interfere with their -- we can't interfere

7    with their affairs.  And when I was a young law

8    student as Syracuse Law School, where our president

9    went -- We have very few things to brag about, so I

10   have to mention that -- I didn't understand that.

11   Why can't judges, you know, they are so smart.  Why

12   can't they interfere with the affairs and give

13   advice.  It doesn't work because it's hard for a

14   judge to know, 28 years later, it's hard for a judge

15   to jump in and be able to be in the guts of the

16   business, in the courage of the business, these hard

17   decisions to be made, to jump in and tell us what to

18   do.  Yes, it's a great idea that everybody Kumbala,

19   get along again, but not when someone -- not when

20   money is involved, money causes, money is following

21   it.  And I don't blame Jared Chassen.  You're getting

22   $48,000 a month.  Based on the money he stole, I'm

23   sorry, money he paid himself during the coup that he

24   refuses to reimburse for private schools, for the

25   expenses that he has.  I don't blame him for wanting

26   to have 48,000 a month to pay himself.  That doesn't

MOTION

exist anymore.  Jeff Simpson doesn't get that.  He
doesn't take any money out.  He can't.  There is
hardly any money in the business right now.  He can't
take that himself.  By the way, any money that Jeff
takes he was giving to Jared.  There is no money
anymore.

So, I understand where Jared is coming from.
He wants money.  He needs money.  Greed is not a bad
thing, I guess.  I'm in a business where I've never
been interested -- I have to run a business.  I have
to make money.  But I never entered a business where
money was my goal.  So, I have trouble understanding
it, but I remember, you know, Ivan Boesky saying
greed, for lack of a better word, is good.  Fine.  I
don't get it, but I understand people's goals are
being interested in money.  Fine.

THE COURT:  I think that was a movie, but go
ahead.

MR. BAILEY:  Well, it was the Wall Street's
movie was taken by an Ivan Boesky's speech that he
gave at Burke.

THE COURT:  Got it.

MR. BAILEY:  Okay.  So, what does Chassen do?
He freezes all credit cards for everybody in the
business except guess who?  His own.

MOTION

Let me explain a couple of things that my
adversaries pointed out, and then we'll continue.
Citizens Bank was opened up, because up until
yesterday, as Mr. Kandel will, I'm sure, affirm, I
hope, you never know, they finally, after disobeying
the court order for about 40 days, the first interim
court order for 40 days, finally Mr. Chassen signed
the cards needed to put -- give Mr. Simpson the
authority once again to be on the bank accounts. He
orally took away that authority during the coup,
where he wrote to First Republic and said take
Mr. Simpson off all accounts. That was done. Then
finally yesterday was the day where we received the
notification from Mr. Kandel that both of you have
signed. The debate last week, which we had with
Mr. Blaustein, who did the best he can to make sure
we would get payroll and your law clerk worked really
hard at it, and I give them full kudos for this, he
worked really hard, because both orders read that
Mr. Chassen gets -- only receives viewing access
only, which thank God for that, because Mr. Chassen
was -- any chance he could get, he was just taking
whatever money he could. So, if he had more than
viewing access, we really would be out of business.
Thank God you put that in the order. Thank you.

MOTION

1
2   When we opened the Citizen's Bank account, because we
3   didn't have access to the First Republic Bank
4   accounts, we gave Mr. Chassen viewing access.
5          Finally, we got the cards where they are
6   signed, where I believe Mr. Chassen gets viewing
7   access and we can do business again.  However, ten
8   minutes ago in court Mr. Simpson showed me his
9   computer that he does not have administrative access.
10  And I wrote to Mr. Kandel asking him, can he help
11  with this -- this problem or situation.  And I
12  haven't had time to check my e-mail obviously since
13  then.
14          Okay.  Next.  My adversaries complain about
15  Tristan Last, who is actually here (indicating).
16  She's waiving.  She is one -- This is a personal
17  observation and doesn't really mean anything
18  obviously because it's personal, but knowing,
19  spending so much time with this company now, she is
20  the most important person at the company besides Jeff
21  Simpson and then -- and before his money hungry bing
22  Jared Chassen.  So, she would be number three.  She
23  quit the company or resigned temporarily when the
24  coup happened.  She said I can't participate in these
25  actions.  So she said in protest I'm resigning.  She
26  put that in writing, and she explained that in

MOTION

1   writing.  And she has an affidavit that -- You're

2   always the most prepared judge out of anyone I've

3   ever seen, so I'm sure you read it already.  And

4   that's a compliment to you.  So, she never quit

5   permanently.  It's not a new hire, where the

6   adversary is claiming that only Jared Chassen can --

7   can hire employees.  But so it's someone who came

8   back after a coup was over.  You know, extrinsic

9   circumstances.  Also if you look at the corporate

10  documents, which I've done thoroughly, because the

11  last two times I wasn't so great with the corporate

12  documents, so I made myself do a better job this

13  time, Mr. Simpson also has a right to hire under 7.1,

14  under management.  And he, under also 3.1, number

15  four, he can employ persons.  So, yes, under

16  meaningful decisions Mr. Chassen has a right to hire,

17  but it's not an exclusive right.  Mr. Simpson also

18  has a right to hire on the book.  And then we have an

19  employee --

20          THE COURT:  Mr. Chassen's rights are just

21  rights to consent to certain major decisions.

22          MR. BAILEY:  I was about to go there.  So

23  it's really Mr. Chassen's job, it's not Mr. Simpson.

24  I think that Mr. Chassen's right overrides

25  Mr. Simpson.  You know, I'm the type of attorney

MOTION

1
2  that's not going to try to BS anyone.  So, it's
3  really Mr. Chassen's job.  However, you know,
4  Mr. Chassen is not coming to work.  When he does come
5  to work -- You know, he had COVID, so he couldn't
6  come to work those days.  Remember the story of The
7  Boy That Cried Wolf?  I have a seven and eight year
8  old, so these stories are fresher in my mind than
9  yours.  But he was calling in sick all the time and
10  he doesn't show up to work hardly ever.  So, if no
11  one is doing the job that he's suppose to be doing,
12  then what is the company suppose to do.  We have to
13  revert back to the other rights in the agreement, the
14  other person that has the right to hire.  He's not
15  there to do his job.  He's refusing to do his job.
16       What is he doing?  Let me give you a couple
17  of things that he's doing.  Besides refusing to work,
18  he refuses to take assignments.  His purpose, this is
19  in our papers, his purpose is to interfere with --
20  with company affairs.  Bank accounts, we went over
21  that.  The bank forms are now filled out finally.  We
22  went over him removing -- Okay.  He refused -- he has
23  refused to reimburse the company for monies taken for
24  personal expenses without authorization.  Every,
25  going back in time, every time money has been taken
26  out of the company, Jeff Simpson has authorized it.

MOTION

1

2       That's the company policy.  So, during the coup I get

3       Jeff Simpson couldn't do that because he was kicked

4       out of the company.  But when Jeff came back and said

5       can you show -- can you -- you know, can you

6       reimburse the monies you took out because I would

7       never have authorized these personal expenses, he

8       refused to pay it back.

9               Next one.  Chassen contacted 35 Oak.  We went

10      over the agreement with them.  We still -- He is

11      still violating your first order.  E-mail access,

12      Jeff Simpson still does not have access to the

13      Dropbox where the company documents are kept.  This

14      is still going on today.  He still doesn't have

15      access to all the documents he needs.  So he's trying

16      to run a business.  He needs documents for a certain

17      building and he can't get them.  Do you know where

18      the documents are?  They were downloaded, this is

19      from our computer person, they were downloaded to

20      Jared Simpson's personal computer.  Where is it?  In

21      the Hamptons.  They haven't been delivered to Jeff

22      Simpson.

23              THE COURT:  Where is that in the record?  Is

24      there an affidavit from the IT person?

25              MR. BAILEY:  No.  It's in -- it's in your

26      affidavit.

MOTION

1

2      MR. SIMPSON:  There is an exhibit that shows

3      the entries.

4      MR. BAILEY:  There is an exhibit that shows

5      the entries and it shows -- it shows his Dropbox in

6      the Hamptons and the account.

7      THE COURT:  No.  I meant, you know, by this

8      point in time, your statement that he doesn't have

9      access to corporate documents --

10      MR. BAILEY:  That's in his affidavit as well.

11      Also the website, which is also in his affidavit.  We

12      don't have access to the domain name of the website.

13      The website is in disarray.  It hurts the reputation

14      of the company by not having a website that actually

15      works well, that's missing pages.  Simpson cannot

16      update or fix the website as Chassen will not release

17      access to the main name of the company.  This is part

18      of your first order.  We still don't have it.  It's

19      still ongoing.  It's just disbelief.

20      THE COURT:  Again the evidence supporting

21      this is all in Mr. Simpson's affidavit?

22      MR. BAILEY:  Yes.  But do we have an exhibit

23      supporting it, I hope so.

24      THE COURT:  All right.  Keep going.

25      MR. BAILEY:  Okay.  3.3 of JJ Arch's

26      operating agreement requires that Chassen,

MOTION

Mr. Chassen devote substantially all his business

time to the company.  Instead, as I said, he's not

showing up to work.  He disconnected QuickBooks link

to the current staff.  He's caused a tax lien.

          THE COURT:  Say that one again.

          MR. BAILEY:  QuickBooks is no longer linked

to the current staff.  That's how they pay the

employees.  That's his job.  His job duties includes

QuickBooks.  A tax lien has been put on Arch.  That's

Jared's former job or the job he's suppose to be

doing, not happening.  He told the accounting

employee to refuse following Simpson orders in the

affidavit.

          THE COURT:  Is the tax lien in the record?

          MR. BAILEY:  In the affidavit.

          THE COURT:  The actual lien itself.  It's a

document.

          MR. BAILEY:  No, we don't have it.

          You have it, but is it in the affidavit?

          MR. SIMPSON:  I'm not sure.

          MR. BAILEY:  No, it's not in the affidavit.

          THE COURT:  All right.  Keep going.

          MR. BAILEY:  I'm happy to get anything that's

missing.

          Without Simpson's authority he sent checks

```
1                        MOTION

2       and money transfers to pay for financial obligations

3       that this company didn't have the money or were not

4       priority payments to make without Jeff Simpson's

5       authority.  The way the business runs, no money goes

6       out without Jeff Simpson's authority.  We have in the

7       record an e-mail from long ago where that policy was

8       set up.  Then we have an e-mail to Jared saying why

9       did you do this.  On 9/13/2023 he moved items from

10      Arch companies into his personal bank accounts as

11      Exhibit 19 in the Hamptons.  The Hamptons -- the

12      Hamptons move is Exhibit 19.  I should have been

13      clearer about that earlier.  I apologize.

14              Chassen disrupts company affairs by not

15      coming to meetings or coming to meetings late.  He

16      rarely comes to work.  And he focuses -- and his

17      focus is on 35 Oak and to take over and to have them

18      take over the company.  I have no further remarks.

19              THE COURT:  Okay.  Thank you.  Counsel.

20              MR. SCHWARTZ:  Good morning, your Honor.

21              THE COURT:  Good morning.

22              MR. SCHWARTZ:  Before I address some of the

23      points that were made by Mr. Bailey, I do want to

24      address first the reply that was served, I think it

25      was two nights ago, and our desire to be able to

26      respond to that reply, which contains several
```

MOTION

```
 1                          affidavits.  I think it's about five affidavits, many
 2     of which, while there is no word count certification
 3     attached to those affidavits, they appear to be, some
 4     of them appear to be 20 plus pages on reply.  They
 5     contain numerous screenshots, which appear to be some
 6     of those screenshots that were stolen or -- or
 7     accessed when Mr. Chassen was improperly removed from
 8     the company.  And we would like the opportunity to --
 9     to be able to address that in some detail.
10
11            We did send the Court a letter yesterday.  It
12     was a brief letter.  But in that letter we did note
13     that as an example of some of the outright falsehoods
14     in these affidavits, one example being that
15     Mr. Simpson testified that he does not have access to
16     GoDaddy, to the website, and we attached e-mails from
17     the IT person, who Mr. Simpson says is JJ Arch's IT
18     person in his affidavit, which was directed both to
19     Mr. Simpson and to Mr. Chassen, where he acknowledges
20     that Mr. Chassen had made a request to transfer the
21     access to Mr. Simpson for that GoDaddy website that
22     had been sitting in his junk e-mail.  Now this might
23     have been just a simple oversight, but this, as we
24     showed in the e-mail, it does not appear to be.  So
25     this e-mail was sent weeks before.  This is just one
26     example, your Honor.
```

MOTION

1

2    THE COURT:  Here's my comment on the reply.

3    There are some parts of the evidentiary submission in

4    the reply that are responding to arguments or

5    statements made in the opposition, and that's okay

6    for a reply.  But there are large parts of the reply

7    affidavits that are just additional arguments in

8    support of the motion, which you can't just bring in

9    on reply for the first time.

10    I recognize that the process is always a

11    little chaotic in a preliminary injunction fight and

12    sometimes the initial papers by the movant doesn't

13    reflect a full investigation yet.  And a way to deal

14    with that is for the plaintiff to seek to supplement

15    their papers before the opposition.  But the way it

16    worked here, and I'm not really casting aspersions,

17    it does put the defendant in an impossible position

18    that a day and a half before the hearing there is

19    waves of affidavits that, you know, are generally

20    relevant, but given the lack of an ability to test

21    them, I mean I'm not going to take the step of

22    striking it.  I'm also not going to give it a whole

23    lot of weight at this point because, you know,

24    frankly 90 percent of what I received are just the

25    two principals swearing at each other across various

26    affidavits.  And the few third party affidavits I've

MOTION

1

2     gotten just came in in relatively recently, and I

3     have to figure out what to do with those. Look, I

4     agree with you that I'm not just going to assume the

5     truth of various affidavits that came pouring in

6     without the ability to test them, depose them. You

7     know, the movant has the burden and, you know, just

8     putting in affidavits a day and a half before the

9     hearing. I recognize that you haven't had a chance

10     to test it. I have some issues with the affidavits

11     on their face anyway, but I didn't want to postpone

12     this hearing to give you time to do it. We'll just

13     see what the evidence that they have submitted that I

14     consider, but I'm -- I take your point. I'm not

15     going to strike it at this point, but large portions

16     of it should have either been in the original papers

17     or there should have been another procedure in place

18     for you to have an opportunity to respond. So, I

19     agree.

20     MR. SCHWARTZ: Thank you, your Honor. And

21     just to -- just to add to that, with respect to the

22     three affidavits that were submitted by employees, we

23     -- we also, in a letter that we sent yesterday, we

24     sent an e-mail by that same employee where that

25     employee said precisely the opposite. He described

26     Mr. Simpson as extraordinarily abusive. And then he

MOTION

submitted an affidavit here scolding Mr. Simpson.

So, we certainly want to have a chance to address

that.  And with the other, we would submit this with

Ms. Miller.  Again, she submitted an affidavit

extolling Mr. Simpson, but we have communication on

Linkedin directed from Mr. Bailey to Mr. -- to

Ms. Miller basically implicitly or implicitly,

however you want to read it, threatening her

potential inclusion in this lawsuit if she weren't to

reverse or pick a side.  So, with that being said, we

have what to tell the Court about all of this.  So I

just wanted to alert the Court that there is a lot to

be -- to be said about what was submitted in the --

in the reply.

All right.  So with that being said, your

Honor, you know, we're here today about this motion

for a preliminary injunction.  You know, we don't

generally object, your Honor, to the maintenance of

the status quo anti as your Honor provided in the

interim order.  But what is being asked on top of

what your Honor provided in that interim order, to

restore the status quo and pending the resolution of

this litigation and these issues about -- about what

happened and who -- and what should happen, they're

asking, your Honor, to basically give Mr. Simpson

MOTION

1

2    sole control over -- over the bank accounts.  I mean,

3    that is facially what -- what their motion is

4    seeking.

5          THE COURT:  Look, what I did in the interim

6    order is attempt to reinstitute the agreement.  Now

7    the agreement does give Mr. Simpson managerial

8    authority subject really only to certain consent

9    rights for certain major decisions.  And I'll say

10    this as a basic principle, although I think it has to

11    be -- I've had to think through it in light of what

12    I've seen recently.  If nothing else had happened,

13    right, if none of these disputes had happened, none

14    of the back and forth had happened, none of the

15    violations of court orders had happened, and if

16    Mr. Simpson just woke up one day and said you know

17    what, I've allowed you to have signing authority on

18    these bank accounts for a long time.  I've now

19    decided that I really should be the only one who has

20    signing authority on these banks.  You still have

21    your consent rights, but we're going to wipe the

22    slate clean and start over again.  This is the way as

23    manager I'm going to organize this.  I don't think a

24    Court would look at that and strike that down and say

25    that's outside the scope of his responsibility.  He

26    is in charge.

1                          MOTION

2              Now, the business has run for years with

3      Mr. Chassen having frankly more access and authority

4      over the day-to-day banking relationship.  That's

5      also true.  But nothing would have stopped

6      Mr. Simpson from revising that, at least that's the

7      way I read the agreements.  Your client has a

8      circumscribed set of consent rights and other than

9      that, Mr. Simpson is in charge.  The problem I have

10     is that as I've watched this case unfurl itself, I

11     have grave concerns frankly about either of the two

12     principals being totally in charge of anything at

13     this point, because I think credibility on both sides

14     has been somewhat lacking.  But just basic

15     principles, your client does not have a contractual

16     right to be anything other than having his consent

17     rights as a member in my opinion.

18              MR. SCHWARTZ:  Your Honor, I think that the

19     operating agreement does, it does as your Honor say,

20     provides, as your Honor has characterized them,

21     fairly robust consent rights, but Mr. Chassen is a

22     check and a balance on Mr. Simpson.  That is what the

23     operating agreement -- agreement does, does envision

24     that is his role.

25              THE COURT:  In terms of operationally running

26     the bank accounts, the contract does not say that.

1                          MOTION

2           MR. SCHWARTZ:  That's correct, your Honor.

3      But as your Honor, you know, pointed out, I think in

4      a prior hearing, you know, hearing, I think it might

5      have been on the TRO hearing or one of the other

6      hearings, your Honor pointed out that, you know, this

7      is about the status quo.  And so the issue here is --

8      is, you know, Mr. Simpson is seeking to alter a

9      status quo here.  So the question then becomes

10     several fold.  Number one, does he have a probability

11     of success on the merits.  Number two, does he suffer

12     irretrievable injury if Mr. Chassen also has

13     signatory control over these agreements -- over the

14     bank accounts.  Excuse me.  And number three, is

15     Mr. Simpson coming here with clean hands.  Do the

16     equities favor Mr. Simpson.  He's seeking equitable

17     relief from the Court, to have the Court change the

18     status quo and give him powers, that while they may

19     be powers that he may or may not have had in the

20     operating agreement, he's asking the Court now to

21     enforce them and modify and alter the status quo as

22     the business has been operating in the context that

23     we have just seen, the Court has just seen unfold,

24     which includes, your Honor, continuing noncompliance

25     with the Court's TRO of September 15, 2023, which we

26     address also in our letter yesterday.  Some of that,

MOTION

1

2      firing employees without obtaining Mr. -- hiring new

3      employees without obtaining Mr. Chassen's consent in

4      addition to Ms. Last, new employees, firing employees

5      that he perceives is aligned with Chassen as far as

6      we can tell.  Not allowing him access.

7           THE COURT:  The place does seem to be a bit

8      of a mess at the moment.

9           MR. SCHWARTZ:  And, your Honor, we actually,

10     just as an aside, you know, we just learned today

11     that apparently there were -- there was -- investors

12     had submitted documents for -- for I think it's --

13     What's the --

14          MR. LEVENTHAL:  1031.

15          MR. SCHWARTZ:  -- 1031, it just slipped my

16     head, but 1031 tax transfers for tax benefits.  We

17     learned that those 1031 exchanges did not go through

18     for numerous investors of the company, and the

19     investors were never told by Mr. Simpson.  So, there

20     is apparently a lot of angry investors in these

21     companies as we sit here now.

22          THE COURT:  You mean tax-free exchanges?

23          MR. SCHWARTZ:  Yes, 1031 tax exchanges.  So a

24     lot of investors, including Mr. Chassen, are being

25     issued with K-1s that are going to be posing a lot of

26     tax liability on them.  This is definitely a

```
 1                        MOTION
 2      situation where Mr. Simpson wasn't -- This is just
 3      another example where he wasn't forthright with
 4      investors.  This was over six months.
 5            THE COURT:  Can I ask you another question
 6      that's been at least in my mind I saw in the papers.
 7      So, I take it there is another lawsuit by the
 8      investor member.  Is it across the street in the
 9      Southern District?
10            MR. SCHWARTZ:  Yes.  Yes.
11            THE COURT:  Am I right that there is another
12      judge somewhere, well not too far away, also being
13      asked to reach decisions on managerial rights at the
14      same time I am?
15            MR. SCHWARTZ:  So, the way I would say it is,
16      is that the 35, that's what we call them, though they
17      have a different technical name, 35 Oak is the
18      minority member of Arch Real Estate Holdings LLC.
19      So, Arch Real Estate Holdings -- So, there is -- JJ
20      Arch is the 80 percent member, the managing member of
21      Arch Real Estate Holdings LLC.  The case here is
22      about --
23            THE COURT:  I have just a very simple
24      question.  Is that Court also reaching the question
25      of whether, for example, JJ Arch continues as the
26      managing member of the real estate company?
```

```
1                            MOTION

2              MR. SCHWARTZ:  So, it's unclear at this time

3         whether the relief 35 Oak is seeking is simply

4         monetary damages or if they are seeking the outright

5         removal of JJ Arch from the face of the complaint and

6         the pleadings, which is the only thing that's --

7         that's really relevant in terms of determining what

8         they are seeking at this time.  It doesn't appear

9         they are actually seeking the removal at this time,

10        but they are seeking declaratory, other forms of

11        relief.

12             THE COURT:  I'll let Mr. Bailey respond

13        later.  I did see that they have, you know, these

14        termination rights are similar

15             MR. SCHWARTZ:  Okay.

16             THE COURT:  Anyway, go ahead.  I just wanted

17        to see whether my orders are already in conflict with

18        anything.

19             MR. SCHWARTZ:  No, they are not in conflict

20        with anything.  The case -- the case has not gotten

21        to a place where that has been, as far as we know,

22        any motion practice.  I'm not sure if the complaint

23        has been served yet though.  We believe it is in the

24        process or it will be served.  I don't know the exact

25        status of the case other than to say there hasn't

26        been any motion practice.
```

MOTION

1

2       THE COURT:  All right.  Continue.  I hope at

3   some point you're going to address these two points

4   that they have made of specific things that were in

5   my interim order that they say have not been complied

6   with, the Dropbox and his e-mail.  At least I heard

7   that -- that he has no access to the Dropbox files.

8   No access to the website.  I guess you've described

9   what that is.  I thought at some point in their

10  papers they say he still doesn't have access to his

11  e-mail, is that right?

12      MR. BAILEY:  We have access to e-mail.

13      THE COURT:  He does have access to e-mails.

14      MR. SCHWARTZ:  I think the website they are

15  referring to, the GoDaddy, which as I said is an

16  outright false testimony because --

17      THE COURT:  That was the one where the IT guy

18  said he did see it was in his junk mail, something

19  like that.

20      MR. SCHWARTZ:  Yes.  We'll respond to the

21  Dropbox if we have the opportunity to submit

22  opposition or sur-reply to these accusations.  We

23  will -- we will address it similarly.  Mr. Chassen

24  was shut out of all company systems.  He was fired,

25  terminated.  He was shut out of bank accounts.  He

26  was shut out of his own e-mails.  He was shut out of

MOTION

1

2       Dropbox.  Until September 15th he had no access to

3       anything.  So, the idea that he is somehow still

4       shutting out Mr. Simpson who has control of this

5       company is -- is facially hard to believe, but we

6       will also establish that in affidavit testimony, if

7       your Honor gives us that opportunity to do so, that

8       that's the case.  Similarly to the GoDaddy issue in

9       the website, where we established, showed or the

10      e-mails show that Mr. Chassen did what he had to do

11      to give him that access.  He has that access.  And

12      this testimony is simply false.  It's frankly

13      incredible that it's even being submitted to the

14      Court.

15              THE COURT:  Okay.  Let me let you continue.

16      I'm sorry for the questions.

17              MR. SCHWARTZ:  Okay.  So, your Honor, in

18      terms of the probability of success on the merits,

19      your Honor, you know, there is a lot of -- there is a

20      lot of dispute.  As your Honor pointed out, you have

21      testimony from both principals.  The facts are

22      certainly sharply disputed here at best.  And we --

23      we, as Mr. Chassen points out in his affidavit,

24      Mr. Simpson was -- he had ample reason, basis to have

25      done what he did in August of 2023 in terms of

26      terminating Mr. Mr. Simpson at that time.

1                           MOTION

2        Mr. Simpson was threatening to blow up the company.

3        Mr. Simpson was extremely volatile.  Mr. Simpson's

4        actions were, in terms of his -- his relationship and

5        actions towards other minority members, investor

6        members, was -- was very abusive.  And so, your

7        Honor, in terms of the probability of success on the

8        merits prong of it, there is certainly -- we would

9        say they haven't established any probability of

10       success or an adequate probability of success based

11       on the facts that have been presented to the Court.

12       I will also note, your Honor, that the complaint will

13       likely be dismiss, albeit probably without prejudice

14       at some point because of the intermingling of the

15       direct derivative claims, which subjects the entire

16       complaint to dismissal under -- under Court of

17       Appeals precedent.  We also point out in the

18       memorandum of law, your Honor, which I know your

19       Honor has read, that some of the claims are

20       duplicative of the brief of fiduciary duty claims.

21       So, those claims will be dismissed.

22              So in terms of the probability of success on

23       the merits, we don't believe they establish that, but

24       at best here the facts are sharply disputed.  And in

25       a situation where the facts are so sharply disputed,

26       there is case law that says that injunctive relief

1                        MOTION

2          may be inappropriate in such circumstances or

3          certainly injunctive relief altering a status quo

4          to --

5              THE COURT:  Just so I'm clear.  Is your

6          position that we should go back and wipe out the

7          interim order and all the other orders and just go

8          back to the state of affairs before the lawsuit

9          began, which was Mr. Simpson's out?

10             MR. SCHWARTZ:  Your Honor, we're not -- As I

11         said, I think we would -- we are not -- As I said

12         earlier, we're not opposed to the interim order

13         maintained in the status quo anti.  We recognize that

14         resolution that the Court put in place to restore the

15         operating agreement, restore the parties to their

16         rights under the operating agreement, both parties

17         was -- was -- was reasonable in this context.  We

18         don't have a pending -- You know, we're not --

19             THE COURT:  So, a lot of what the plaintiffs

20         sought in the initial preliminary injunction is

21         incorporated in those orders.  So, to that extent you

22         don't oppose the grant of the motion to keep those

23         orders in place?

24             MR. SCHWARTZ:  Yes.  That's correct, your

25         Honor.  We're not -- we're not asking the Court to

26         basically deny the motion and thereby remove Simpson

1                           MOTION

2       now.  Rather we're asking that -- We're conceding

3       that the Court should -- We're conceding the interim

4       orders, correct.

5              THE COURT:  By their terms the interim orders

6       expire at the end of this hearing unless I --

7              MR. SCHWARTZ:  Yes.  We, you know, we -- we

8       understand that.

9              THE COURT:  Okay.

10             MR. SCHWARTZ:  And frankly it's not -- it

11      wouldn't be clear what would happen if the interim

12      orders expire.  I mean we would just have a new free

13      for all potentially without the interim orders, and

14      we would have further motion practice immediately

15      thereafter, Simpson motion practice most likely for

16      the exact same purposes if the interim orders were --

17      were to expire.  So, with that in mind, that is the

18      reason why we are taking the position that we are

19      taking is because without the Court's interim orders,

20      the status would be highly unclear in terms of --

21      because things have changed on the ground since the

22      Court entered the interim orders.  At the time the

23      interim orders were entered, Mr. Simpson was not a

24      member -- was not -- had been removed from the

25      company.  And so now Mr. Simpson is in full control

26      of the company.  So, if the interim orders were to be

1               MOTION

2        removed now, in effect we would be in a situation

3        where we would be back in front of the Court seeking

4        relief.  And they would be back in court seeking

5        relief.

6               THE COURT:  Now, I'm going to ask you about

7        something that's in these new affidavits which sort

8        of surprised me a little, and recognizing that you

9        are really not required to answer this if you feel

10        like you need more information.  But for the first

11        time I think I saw in this last affidavit, and it was

12        somewhat echoed in Mr. Simpson's, that there was,

13        right before all the conflagrations began in August,

14        that in July, at least as Ms. Last put it, there were

15        discussions going on about actually turning over the

16        company to Mr. Chassen.  Ms. Last refers to it that

17        way.  I guess Mr. Simpson refers to it as a proposed

18        buyout, which seemed inconsistent with all the stuff

19        I was hearing about Mr. Chassen being incompetent.

20        But maybe as a buyout I understand it.  Do you have

21        enough information now to help me understand where

22        that all fits in?  'Cause it really happened right

23        before everything blew up.

24               MR. SCHWARTZ:  So, I don't have -- You know,

25        I don't want to give your Honor the impression that I

26        could give your Honor any kind of fulsome answer to

1                          MOTION

2       that question just other than to say those

3       conversations were going on.  I believe those

4       discussions were with the participation of 35 Oak.

5       And I believe that those discussions did blow up.  I

6       am also aware that, you know, there are other

7       business dealings between Mr. Simpson and Mr. Chassen

8       regarding their other assets separate and apart from

9       Arch Real Estate Holdings.  And there was actually a

10      settlement that was reached, a contract that was

11      reached to basically split their -- to go their

12      separate ways and to divide up those -- those assets,

13      those liabilities.  This will all be presented in

14      affidavit testimony in a submission.

15              THE COURT:  Look, the affidavits candidly are

16      not awfully helpful at this point.  I heard enough

17      from the two principals.  What I really need is

18      actual evidence that can be tied to contemporaneous

19      documents or maybe disinterested witnesses, if there

20      are any.  But what this -- look, what this whole

21      thing is screaming out for is for some sort of

22      commercial resolution, because I don't think there is

23      a court in this world that can waive some magic wand

24      and make this company run smoothly at this point

25      because you have two principals who are oppositional.

26      You have an investor member who is either protecting

MOTION

1

2     their interests, if you look at it from one

3     perspective or acting opportunistically if you look

4     at it from another perspective.  But you have three

5     power centers sort of swirling around each other.

6     And you have a business that strikes me as

7     potentially in danger of drifting.  And, you know,

8     somebody needs to be able to take control without a

9     court overseeing it all.  Now whether that's one of

10    the individuals sitting in front of me here, whether

11    it's a receiver, which is the more extreme version of

12    court intervention, but I do have some real concerns

13    as to how this business is going to run in a

14    rationale way under the current circumstances.  You

15    know what series of orders can I issue.  Courts are

16    not, as Mr. Bailey I think rightly put it, we are not

17    comfortable with this role of trying to micromanage

18    companies, which is why the purpose of my order was

19    to just say look, you have an agreement.  Follow it.

20    That didn't go very well, because immediately there

21    was chaos.  So, I'll continue to do the best I can,

22    but if you all can't see that there is a need for

23    commercial resolution to this, I don't mean you all

24    the lawyers, but the principals can't see there has

25    to be some resolution to this, otherwise you're going

26    to lead to these people dragging themselves under the

```
 1                        MOTION
 2    water.
 3            MR. SCHWARTZ:  My colleague, Judge Leventhal,
 4    he asked if he could address you quickly.
 5            THE COURT:  That's fine.  You guys have a few
 6    more minutes, and then I'll have Mr. Bailey speak.
 7            MR. BAILEY:  Could I -- could I help with
 8    information?
 9            THE COURT:  Let me let Mr. Leventhal say
10    something first.
11            MR. LEVENTHAL:  I want to make two
12    observations.  What happened, there was a profit
13    event in 2022, the summer, 200 million.  There was a
14    $60 million profit, and they did 1031 transfers
15    within a short time.
16            THE COURT:  They bought other properties with
17    the property?
18            MR. LEVENTHAL:  Well, they tried to.  Today
19    everyone was served with a K-1, not everyone, but a
20    lot of the people were served with K-1s.  And they
21    were just told today that the -- the 1031s were not
22    approved.  And they knew this five months ago.
23            So, you mentioned receiver.  That's why I'm
24    getting up.  We can't ask for a receiver, because it
25    would cause foreclosures.  I don't think they can ask
26    for a receiver.  I think it would cause some harm.
```

MOTION

2   You have a lot more experience than I do -- I think
3   some of these -- in this area -- you may have some of
4   these investors who are very disgruntled who thought
5   they never got the profit.  They don't have the
6   money, and they have a big tax bill.  I think they
7   may come forward regarding that.

8          One other observation I want to make.  Even
9   though you said how we would return.  There is an
10  outstanding order from the contempt which basically
11  is that our client is a signatory.  So, I just want
12  to point out to you that if Mr. Simpson is solely in
13  charge, he's going to do what he did before.  He's
14  going to ignore the order with Mr. Bailey's approval,
15  saying no, no, no, only viewing rights.  And -- and
16  characterizing the transcript as dicta.  Your
17  pronouncements on the record calling it dicta and
18  somehow construing that order as saying oh, no, you
19  only have viewing rights.  If you permit him to be
20  only in charge, he's going to squash everyone.  He's
21  going to remove people who talk to Jared, as he did
22  dismissing three people upon his coming.  There might
23  have to be a receiver.  We can't ask for one and
24  we're not going to because of the catastrophic
25  effect.  I think that may have to be the remedy in
26  the future.  I'm pointing out to you that Mr. Simpson

1                           MOTION

2    and his lawyer is allowing this to thumb their nose

3    at the Court.  And I think you should take that into

4    consideration.

5              THE COURT:  Thank you.  All right,

6    Mr. Bailey.

7              MR. BAILEY:  Thank you, your Honor.

8              MR. KANDEL:  Your Honor, may I just speak?

9              THE COURT:  Yeah.  Just briefly, Mr. Kandel.

10   Sure.

11             MR. KANDEL:  Yeah, because I know Mr. Bailey

12   is going to speak, and he may want to respond to what

13   I'm going to say.

14             Yesterday I received from both counsel

15   executed signature documents called multi vesting

16   account forms that I then forwarded to my client.

17   Those forms as completed, and I'll wait for my client

18   to confirm this, but would provide both individuals

19   with the authority to make transactions in each of

20   the accounts.  And I just want to make sure that the

21   counsels sitting in the courtroom are aware that's

22   what these documents provide as completed.

23             THE COURT:  Which is consistent with what the

24   order required.

25             MR. KANDEL:  Correct.  But I thought I heard

26   from Mr. Bailey that he said yesterday that there was

MOTION

1

2  documentation that provides for Mr. Simpson only to

3  have the authority to make transactions and that

4  Mr. Chassen would only have viewing access. I just

5  want to make sure everybody is aware the documents I

6  forwarded, at least my understanding is, that as

7  completed would provide both individuals with the

8  authority to make transactions. I am waiting to hear

9  from my client as to the processing of those forms.

10  You know, I know Mr. Simpson, who has peppered me

11  with e-mails, wants things to occur more quickly than

12  is commercially practicable, and they are going --

13  you know, the bank will process the documents in a

14  commercially reasonable amount of time. Thank you,

15  your Honor. That's all I have.

16      THE COURT: All I will say before Mr. Bailey

17  goes, under the current orders what people have done,

18  at least what you just described, is exactly what I

19  ordered. All of those orders were pending this

20  hearing today. So, today I think plaintiff can

21  certainly make the argument that going forward he

22  should have sole authority and that that would then

23  supersede the interim orders that I've entered. But,

24  you know, what you've just described is what --

25  frankly I'm surprised it took this long for the

26  parties to get the signature cards to you, since that

MOTION

1

2   order was, I don't know how long ago it was, but it

3   wasn't yesterday.

4          Anyway Mr. Bailey, go ahead.

5          MR. BAILEY:  Thank you, your Honor.

6          THE COURT:  You only have about, because I

7   want to give you an answer --

8          MR. BAILEY:  I'm going to be really quick.

9          THE COURT:  Well, talk slow and still be

10  quick.

11         MR. BAILEY:  I will speak slowly.  Number one

12  and most importantly, if you appoint a receiver, that

13  will cause a default in all loan agreements.  The

14  mention of a receiver in your last transcript caused

15  much harm and a lot of phone calls in distress to

16  Jeffrey Simpson to not be defaulted upon.  And my

17  letting -- letting Jeffrey know to keep telling him

18  it's not the order, it's dicta and dicta doesn't

19  matter, only the order does, was a great help.  But a

20  receiver would be very, very bad.

21         THE COURT:  I understand your point.

22         MR. BAILEY:  Thank you.

23         THE COURT:  The reference to receiver was not

24  an order.  The reference to bank account access was.

25  Go ahead.

26         MR. BAILEY:  Okay.  Obviously giving bank

MOTION

1

2   account access to someone who is trying to ruin the

3   company and help out a third company is a -- would be

4   very, very bad.  Viewing access only -- viewing

5   access only is -- is not only preferable but I think

6   essential.

7           THE COURT:  Well, I do want to make one thing

8   clear.  I worded it very specifically.  I said that

9   the parties should, for reasons that I thought were

10  extraordinary, because I frankly lost trust in the

11  parties to -- to follow normal business practice as

12  opposed to a reign of retribution, that they should

13  both have authority, but that it was subject to, you

14  know, the actual transactions are still subject to

15  the overarching provisions of the operating

16  agreement.  And among those, you know, this whole

17  idea of the parties taking informal distributions and

18  sending checks to private schools, look, some

19  companies do that, but it's not in the operating

20  agreement.  There should be -- You know, again,

21  Mr. Simpson is the managing member.  And I don't have

22  any problem at all with the idea that yeah, they both

23  have signing authority, but Mr. Chassen does not have

24  authority to give himself informal distributions by

25  sending monies to private schools.  I'm not

26  suggesting that what happened in the past is

MOTION

1
2     improper, because I don't know enough about whether
3     things were authorized and consented to in various
4     ways.  Maybe.  Maybe not.  But I do want to make it
5     clear that the fact that Mr. Chassen was given
6     signing authority does not mean that I'm waiving away
7     all the provisions of the agreement governing
8     distributions and the like, which are subject to
9     Mr. Simpson's managerial control.
10          MR. BAILEY:  Right.  But that being said, the
11    first thing Mr. Simpson will do will be telling
12    Mr. Chassen he only has viewing authority.  That will
13    be one --
14          THE COURT:  Now we're starting to -- to -- I
15    recognize you may think that the Court has gone out
16    over its skis a little bit here.  You're the party
17    that brought the Court into this by filing this case.
18    Once you bring the Court into a situation where there
19    are fiduciary duties in all sorts of different
20    directions, you know, I think the Court properly can
21    exercise discretion in deciding, especially in a
22    preliminary injunction, how to maintain the status
23    quo in a way that avoids harming the parties and the
24    company.  And so there may be situations where to --
25    to effect that role, which again you guys brought me
26    in to deal with it initially, I will do some of that.

MOTION

1

2      But my -- my guiding principles are largely the

3      contract.  But I will tell you that your client has

4      acted in ways that trouble me in terms of complying

5      with court orders and doing what I thought was

6      necessary to balance things out a bit.  But I'm not

7      taking away the managerial control, but I think some

8      guardrails are necessary, 'cause frankly I am

9      concerned about what I've seen here.

10          MR. BAILEY:  Understood.  At the same time I

11     think we have shown at least eight examples that by

12     giving Mr. Chassen access to bank accounts, he's

13     going to take money that he's not allowed to take.

14          THE COURT:  Well, I'm, without necessarily

15     dealing with each individual situation, I am amenable

16     to making it even more clearer that having signing

17     authority does not mean that it's a license to do

18     whatever you want.  It means that in fulfilling the

19     corporate, you know, operating the corporate

20     business, each of them should have some role in it.

21     But I am not signing off on some change in the

22     corporate documents that would permit Mr. Chassen to

23     grant himself a distribution.  I just want to make

24     that clear.  That hasn't really been stated.  And I'm

25     not characterizing what he did before in the same

26     colorful way you have periodically, because as I

MOTION

1

2     said, I've had a lot of experience with companies of

3     this type, where it is perfectly agreed and accepted

4     that the partners will sometimes do things

5     informally.  I don't know enough yet about this one,

6     although it does have elements of that that I have

7     seen so far.  But I'm saying going forward, informal

8     is not going to work anymore because the parties

9     don't trust each other.  So distributions are going

10    to have to be by the book.

11         MR. BAILEY:  Understood.  You asked about the

12    lawsuit that's attached as an exhibit involving 35

13    Oak against Mr. Simpson.

14         THE COURT:  Just to be clear for Mr. Kandel's

15    purposes.  That is not for the bank to regulate.  The

16    bank is an order taker here.  If these two guys have

17    signing authority and one of them does something that

18    might ultimately be viewed as conversion or

19    inappropriate, it's not the bank's liability, all

20    right.  That's on the two principals.

21         MR. BAILEY:  Your Honor --

22         MR. KANDEL:  Thank you, your Honor.  I

23    appreciate that.  I was going to ask for

24    clarification on that myself, because I could foresee

25    a world where the bank or me specifically will be

26    receiving daily e-mails with threats and

1                              MOTION

2        admonishments not to execute transactions based upon

3        the other individual's authority.

4                THE COURT:  That's between the parties and

5        the Court.

6                MR. BAILEY:  I would go a step further.  Your

7        Honor, I would like to discontinue our case against

8        the bank as soon as, if you're ruling that both

9        parties -- as soon as my client has administrative

10       authority, I would like to discontinue our case

11       against the bank.  They are only a stakeholder in

12       this case.  We didn't bring -- we didn't bring a case

13       against the bank to go against them.  We brought a

14       case as a stakeholder, because they are holding the

15       money.

16               THE COURT:  I understand.

17               MR. BAILEY:  They were never an adversary to

18       our client.

19               THE COURT:  Your proviso about your client

20       having -- I don't know what you mean by that.  If at

21       the end of this hearing I reconfirm that your client

22       is the managing member, but that I -- I don't think

23       that means, given the current circumstances, he's

24       solely in charge of the mechanics of paying bills and

25       the like.  Go ahead.

26               MR. BAILEY:  My client's intention is -- is

MOTION

1
2       to move all monies from First Republic to another
3       bank for a fresh, clean start.  Just so you know.
4       'Cause it hasn't been easy working with that bank.
5       And I'm sure Mr. Kandel will celebrate us moving the
6       monies out of that bank.  So we would ask for the
7       authority to do that.
8               THE COURT:  I don't know if that comes within
9       the consent rights or not.  Maybe not.
10              MR. BAILEY:  It doesn't mention it in any
11      part of the agreements.  And the managing manager,
12      under 3.1 the managing member has the right to open
13      and maintain bank accounts of all Arch, JJ Arch --
14              THE COURT:  That wouldn't surprise me.
15              MR. BAILEY:  Next.  The 35 Oak versus Simpson
16      has not been served yet.  It may be served.  There is
17      another attorney that Jeff Simpson uses named Avi
18      Weitzman.  And I thought he was going to come in this
19      case, in case I had an adversarial relationship with
20      Mr. Kandel, which hasn't happened thankfully.  But
21      he -- we know as of today the lawsuit has not been
22      served, and one of the reasons would he -- it
23      probably hasn't been served is because the coup, when
24      Jeff was out, 35 Oak's attorney, Brett Lavender,
25      contacted me because they needed Jeff's signatures to
26      do business and sell properties.  And they couldn't

MOTION

1
2     do it because Jeff was on loans and guarantees. So,
3     they called me to get Jeff's signature, and I said do
4     you really think Jeff is going to sign anything when
5     you kicked him out of the company. That's how that
6     went. That explains that.
7          The only people laid off because of the
8     trying times at -- at -- By the way, I could get the
9     section if you want, but Jeff has the power to fire,
10    very junior staff members, and that's Jeff's
11    prerogative to fire not Mr. Chassen's. And I believe
12    that covers all of the questions that were
13    outstanding by you. Thank you very much.
14          THE COURT: Okay. All right. Here's where I
15    am on this. First, the standard, a party seeking the
16    drastic remedy of a preliminary injunction has the
17    burden of demonstrating by clear and convincing
18    evidence a likelihood of ultimate success on the
19    merits, the prospect of irreparable injury if the
20    provisional relief is withheld, and the balancing of
21    the equities in the movant's favor. The purpose of a
22    preliminary injunction generally is to maintain the
23    status quo and prevent the dissipation of property
24    that could render a judgment ineffectual. Here, I
25    mean, frankly most of the substantive elements of the
26    motion for preliminary injunction were granted

MOTION

1
2    effectively or many of the elements were granted in
3    the interim operating order as modified by some
4    subsequent orders, 'cause at the time, when this
5    motion was brought, Mr. Simpson was really out of the
6    company and without access to documents and e-mails
7    and all sorts of things. And the defendant doesn't
8    really seek to modify any of that. So there is
9    actually relatively narrow disputes at the moment,
10    although the parties are continuing to expand the
11    orbit of disputes each day.
12    Where we are now is, I may be over-
13    simplifying it a little bit, is Mr. Simpson wants a
14    much clearer statement that he is entirely in charge.
15    Effectively has tried in several different ways
16    either minimize or jettison Mr. Chassen from the
17    company in several different ways, some formal, some
18    informal.
19    You know, in my view the evidentiary record
20    now does not justify any changes to the existing
21    orders that I have entered. No expansions of it.
22    The guardrails that I put up I think are relatively
23    narrow, but the principle around my interim order is
24    really as far as I'm willing to go at this point.
25    There are stark factual disputes about almost
26    everything plaintiff has said in his reply papers and

|     |                                                              |
| --- | ------------------------------------------------------------ |
|  1  | MOTION                                                       |
|  2  | in his opening papers.  The lion's share of the, you         |
|  3  | know, "evidence" that was submitted is -- is just            |
|  4  | affidavit testimony, which is not subject to cross           |
|  5  | examination.  A lot of it, you know, is -- Some of           |
|  6  | the affidavits seem to, I mean candidly, be written          |
|  7  | by multiple people.  They seem to go in one                  |
|  8  | direction, and then a different voice takes over and         |
|  9  | something else is said.  I don't know exactly what's         |
| 10  | going on here, but I find it difficult to just accept        |
| 11  | at face value the various statements that were made.         |
| 12  | I don't suggest that purgery is going on here, but a         |
| 13  | lot of what's in the affidavits are conclusions and          |
| 14  | opinions.  There are some facts in there.  A lot of          |
| 15  | it is unsupported by any concrete evidence.  And this        |
| 16  | is a dispute that, you know, I don't suspect will be         |
| 17  | resolved quickly, but I am not persuaded that               |
| 18  | plaintiff has established such a likelihood of              |
| 19  | success on the merits on everything that would             |
| 20  | justify the full scope of the injunctive relief they       |
| 21  | seek.  Again my view is that the interim orders that        |
| 22  | were entered give plaintiff most of what they were         |
| 23  | seeking anyway.  I don't think that, to the extent         |
| 24  | that they are asking for more than that, it is             |
| 25  | appropriate.                                                |
| 26  | Now, to the extent that things that were                   |

MOTION

1

2    ordered, such as providing access to company

3    documents and the like and the website, which seems

4    like an issue that should be resolvable based on what

5    I've seen, the evidentiary recovered is still a mess

6    candidly on all of that.  I don't need to change the

7    order, because the order already gives Mr. Simpson

8    that relief.  So, if there are disputes about whether

9    the orders are being complied with, you know our

10   address.  So, that's the way we'll deal with that.

11       I will say this.  Even if the plaintiff was

12   able to demonstrate more of a likelihood of success

13   on all of their claims as well as irreparable injury,

14   the balance of equities does not favor the plaintiffs

15   here.  The actions I've observed over the past

16   several weeks don't give me confidence to alter the

17   status quo from the interim orders.  Instead, from my

18   perspective, the plaintiff has demonstrated the

19   inclination to take every opportunity possible to

20   either get around court orders or further inflame the

21   situation at every turn.  You know, even the

22   supported affidavits sort of in polite ways make note

23   of Mr. Simpson's, you know, sort of aggressive and

24   blunt attitude.  I don't have a particular problem

25   with that.  I have a pretty thick skin myself.  But

26   when it gets to the point of, in my view, acting

MOTION

1

2      inconsistently with both the letter and spirit of

3      court orders that are trying to lower the temperature

4      around a potentially very disruptive corporate

5      dispute, then it does become my business.  And I will

6      just give you the observation that a calmer, more

7      analytical approach to explaining to the Court your

8      managerial responsibilities and conduct which

9      demonstrates an intention to exercise those

10     managerial responsibilities for the benefit of the

11     entity and its customers as opposed to what can only

12     really be described as vendettas, maybe some of the

13     vendettas have some justification, but like all

14     vendettas they tend to lead to overreaction.  And so,

15     in my view plaintiff does not come today with clean

16     hands to seek additional injunctive relief.  That may

17     change.  You know, I imagine I'm going to learn more

18     about this company than I ever wanted to, but I am

19     here, believe it or not, to try to help.

20          I think the orders that I've done to date are

21     sufficient.  They don't give everybody what they

22     want.  The only clarification that I will make, and

23     again I don't think it needs to change the words of

24     the order, but I do want to make it clear, this is

25     not dicta, when I said that each of these folks

26     should have at least the ability to make banking

MOTION

1

2    transactions, that is subject to the provisions of

3    the operating agreement.  And the operating agreement

4    does put Mr. Simpson in charge of the business.  So,

5    Mr. Chassen does not have independent authority to

6    spend corporate funds on anything without

7    Mr. Simpson's approval.  That certainly goes to

8    paying distributions and the like.

9         Now, if an investor member has separate

10   rights that can, you know, basically push Mr. Simpson

11   or JJ Arch out as managing member of the real estate

12   company, that's a separate lawsuit.  But Mr. Chassen

13   has no claims in this lawsuit at this point to remove

14   Mr. Simpson.  So unless and until there is some claim

15   to remove Mr. Simpson in a legally justifiable way,

16   Mr. Chassen's ability to help manage this company is

17   governed by the operating agreement, meaning he can

18   help to affect corporate transactions.  And I think

19   having him be removed from the banking

20   authorizations, which he has had for years, really

21   doesn't make any sense.  But I'm not, by making that

22   ruling changing the nature of Mr. Simpson's initial

23   control over transactions and decisions subject only

24   to Mr. Chassen's consent rights, and although not

25   part of this case, subject to the investor members'

26   rights that it may have under the agreement as well.

1                           MOTION

2    I'm not, by anything I'm saying here, denigrating

3    what their rights may be.

4           So, all I'll add is that, you know, I will

5    continue to judge people by how they act under these

6    orders.  The orders are intended to permit the

7    company to go back to normal operating procedure.

8    You know, if the past is prologue, the next I hear

9    from people will be another series of firings.  I

10   really urge you to try to figure out a way to run

11   this business and put some of this vendetta mindset

12   to the side.  You know, I'm in this now.  I don't

13   particularly want to be.  This is not a court's role

14   to be overseeing a company.  I'm trying as best I can

15   to let the contracts do their job.  But if I continue

16   to hear of, you know, maybe they are viewed as tough

17   management styles, they come across to the Court as

18   completely irrational in most situations.  And we'll

19   see what happens next.  But at this point we need to

20   get on with this litigation, all right.

21           MR. LEVENTHAL:  Clarification, your Honor, if

22   I may.

23           THE COURT:  Yes.

24           MR. LEVENTHAL:  A corporate bill, if

25   Mr. Chassen writes the check, he needs the permission

26   of Mr. Simpson to write that check?  'Cause if that

MOTION

is so, I envision Mr. Simpson saying no, and he'll
write the check to further eviscerate his authority
in the eyes of the employees.  That's what I
envision.

THE COURT:  Well, look, unless and until this
partnership is broken up, Mr. Chassen is a 49 percent
member without managerial control.  I get that point,
and I know the initial order also included a scripted
statement drafted by the parties to the employees
saying that the parties are partners and they are
going to continue to work together.  And my order
mandated that the parties cooperate with one another
in effecting this.  You know, I'm not going to
legislate manners.  But I think the way the contract
works, you know, substantive decisions are up to
Mr. Simpson.  Unless something happens where
something that trips a corporate right to remove
Mr. Simpson, that's the way it is.

Now, what Mr. Simpson chooses to do with that
discretion and whether the exercise of that
discretion can rise to the level where the Court
would take action, I don't know.  But Mr. Chassen,
his contractual rights are to be a 49 percent member
with substantial consent rights to important
decisions.  I should have mentioned.  I have seen, at

1                           MOTION

2          least based on what I'm looking at, decisions have

3          been made that seem to me to be inconsistent

4          potentially with the consent rights.  That does go

5          into my reasoning as to why not to give some broader

6          statement of authority for Mr. Simpson.  But, yeah, I

7          think the short answer to your question is under this

8          agreement, subject to the consent rights and to the

9          investor members' rights, whatever they may be,

10         Mr. Simpson calls the shots.

11                 MR. SCHWARTZ:  Your Honor, if I just can make

12         two quick --

13                 THE COURT:  We are very, very short on time.

14                 MR. SCHWARTZ:  First of all, this is

15         obviously without, you know, prejudice to us making

16         our own motion based on our own counterclaims for

17         differing relief, that's correct?

18                 THE COURT:  Agreed.

19                 MR. SCHWARTZ:  And then second, your Honor,

20         in terms of a bond.  I mean, it is a requirement that

21         the party obtaining an injunction post a bond.  Now

22         that bond has to be rationally or reasonably related

23         to the potential damages that the nonmovant may

24         suffer.  We -- we submitted --

25                 THE COURT:  I'm going to cut you off by

26         saying I'll take submissions from each side as to the

MOTION

1

2  amount of the bond.  You know, again since I haven't

3  really done anything more than what I've done before,

4  I'm not sure that anyone saw the need for a bond

5  before a substantial one.  If you want to put in a

6  submission, a letter explaining what you think is the

7  appropriate bond is, and than the plaintiff can

8  respond, I will review those carefully obviously.

9       MR. BAILEY:  May I advised my adversary

10  before he does so to read about no bonds in the

11  operating agreement before he puts ink on paper.

12       THE COURT:  I, of course, care about what the

13  contract says, but I also care about what the CPLR

14  says.  And generally speaking I'm required to

15  consider a bond --

16       MR. BAILEY:  Understood.

17       THE COURT:  -- for a preliminary injunction.

18       MR. SCHWARTZ:  And just to say one more

19  thing, your Honor.  The way we understand what your

20  Honor is saying is that Mr. Chassen will have

21  signatory rights over the bank accounts, including

22  new bank accounts.  But that your Honor is saying

23  that he will need to obtain Mr. Simpson's approval to

24  make -- to use those bank accounts.  So, we look at

25  that as -- that is an expansion from the language of

26  the interim order.

MOTION

1

THE COURT:  No, it's not.  Well, the interim

order as followed up by the subsequent order in

response to the contempt motion, which that is the

first time that I gave reference to signatory

authority, said it's subject to the terms of the

agreement.  The agreement does not give Mr. Chassen

managerial authority.  So, I didn't change anything.

And what has changed is that in the past Mr. Simpson

had seemingly delegated authority to Mr. Chassen in a

wide variety of things.  My point to you today has

been the contract does not give Mr. -- does not give

Mr. Chassen permanent managerial rights because in

the past he was granted some.  You know, and at the

moment I think trying to set up a situation where

both parties have managerial rights I think leads to

a deadlock.  So, but again make whatever arguments

you want as to a bond, and I don't feel bound by

whatever the agreement says about -- about a bond.

That's -- that's a responsibility on me as a court.

You know, I may take into account, if the parties had

agreed that there would be no bond, I could at least

consider that.  All right.  Thank you all.  Good luck

getting back to your respective homes.

MR. BAILEY:  Thank you, your Honor.

MR. SCHWARTZ:  Thank you, your Honor.

1          MOTION

2          THE COURT:  And please order the transcript.

3     If past is prologue again, people will disagree about

4     almost everything I do or say.

5          MR. SCHWARTZ:  We're here back I think on the

6     19th for the contempt hearing.

7          MR. BAILEY:  Can we agree to let the bank out

8     of the case?

9          THE COURT:  You're the plaintiff.

10         MR. KANDEL:  Accepted.

11         MR. BAILEY:  I can do that.

12         MR. SCHWARTZ:  You can do a notice of

13    voluntary discontinuance of them.

14         THE COURT:  Yes.  While you're at it, I would

15    do a voluntary discontinuance of the duplicative

16    matter on my docket.

17         MR. BAILEY:  I have two dockets.  We have to

18    do a voluntary discontinuance on both of them?

19         THE COURT:  No, only on one.

20         MR. BAILEY:  Only on one.

21         THE COURT:  I'm sorry.  Two things.  You can

22    dismiss the bank on -- The 158055 matter is the

23    active one that you've been doing all of your court

24    papers in.  Keep that one.  For some reason you filed

25    another matter with the same complaint on the same

26    day.  You just need to get rid of that.  You can do

```
 1                         MOTION
 2          it by a discontinuance, a stipulation of
 3          discontinues.  Why don't you do it by a stipulation
 4          of discontinuance, okay.  Thanks everyone.
 5               MR. KANDEL:  Thank you, your Honor.
 6               MR. BAILEY:  Thank you, your Honor.
 7               MR. LEVENTHAL:  Thank you, your Honor.
 8
 9                         ooOoo
10
11
12
13
14
15
16
17
18
19
20
21    Certified to be a true and accurate transcript of the
22    above-captioned stenographic minutes.
23
24    _Lori Ann Sacco_____
25    Lori Ann Sacco
26    Official Court Reporter
```

## $

**$48,000** [2] - 5:24, 8:22
**$60** [1] - 36:14

## 1

**10,000** [1] - 4:18
**10004-1646** [1] - 1:17
**10036** [3] - 1:20, 2:5, 3:11
**10038** [1] - 1:24
**1031** [6] - 25:14, 25:15, 25:16, 25:17, 25:23, 36:14
**1031s** [1] - 36:21
**1185** [1] - 2:4
**15** [1] - 24:25
**150** [1] - 1:23
**158055** [1] - 58:22
**158055/2023** [1] - 1:7
**15th** [1] - 29:2
**18** [1] - 1:16
**19** [2] - 17:11, 17:12
**19th** [1] - 58:6

## 2

**20** [1] - 18:5
**20,000** [1] - 6:17
**200** [1] - 36:13
**2022** [1] - 36:13
**2023** [3] - 1:10, 24:25, 29:25
**28** [1] - 8:14
**29** [1] - 1:10

## 3

**3** [1] - 1:2
**3.1** [2] - 12:15, 46:12
**3.3** [1] - 15:25
**35** [12] - 6:8, 6:13, 7:10, 14:9, 17:17, 26:16, 26:17, 27:3, 34:4, 44:12, 46:15, 46:24

## 4

**40** [2] - 10:7, 10:8
**48,000** [2] - 6:6, 8:26
**49** [2] - 54:7, 54:24

## 5

**50,000** [1] - 6:18
**546** [2] - 1:20, 3:10

## 6

**6th** [1] - 1:20

## 7

**7.1** [1] - 12:14
**701** [1] - 1:23

## 8

**80** [1] - 26:20

## 9

**9/13/2023** [1] - 17:9
**90** [1] - 19:24

## A

**ability** [1] - 19:20, 20:6, 51:26, 52:16
**able** [6] - 6:2, 8:15, 17:25, 18:10, 35:8, 50:12
**above-captioned** [1] - 59:22
**abusive** [2] - 20:26, 30:6
**accept** [1] - 49:10
**accepted** [2] - 44:3, 58:10
**access** [32] - 10:21, 10:25, 11:3, 11:4, 11:7, 11:9, 14:11, 14:12, 14:15, 15:9, 15:12, 15:17, 18:15, 18:21, 23:3, 25:6, 28:7, 28:8, 28:10, 28:12, 28:13, 29:2, 29:11, 39:4, 40:24, 41:2, 41:4, 41:5, 43:12, 48:6, 50:2
**accessed** [1] - 18:8
**account** [6] - 11:2, 15:6, 38:16, 40:24, 41:2, 57:21
**accounting** [1] - 16:12
**accounts** [16] - 10:10, 10:13, 11:4, 13:20, 17:10, 22:2, 22:18, 23:26, 24:14, 28:25, 38:20, 43:12, 46:13, 56:21, 56:22, 56:24
**accurate** [1] - 59:21
**accusations** [1] - 28:22
**acknowledges** [1] - 18:19
**act** [2] - 8:5, 53:5
**acted** [1] - 43:4

**acting** [2] - 35:3, 50:26
**action** [1] - 54:23
**actions** [4] - 11:25, 30:4, 30:5, 50:15
**active** [2] - 4:18, 58:23
**actual** [3] - 16:17, 34:18, 41:14
**ADAM** [2] - 1:15, 1:17
**Adam** [1] - 3:5
**add** [2] - 20:21, 53:4
**addition** [1] - 25:4
**additional** [2] - 19:7, 51:16
**address** [9] - 17:22, 17:24, 18:10, 21:3, 24:26, 28:3, 28:23, 36:4, 50:10
**adequate** [1] - 30:10
**administrative** [2] - 11:9, 45:9
**admonishments** [1] - 45:2
**adversarial** [1] - 46:19
**adversaries** [2] - 10:3, 11:14
**adversary** [3] - 12:7, 45:17, 56:9
**advice** [1] - 8:13
**advised** [1] - 56:9
**affairs** [5] - 8:7, 8:12, 13:20, 17:14, 31:8
**affect** [1] - 52:18
**affidavit** [18] - 12:2, 14:24, 14:26, 15:10, 15:11, 15:21, 16:14, 16:16, 16:20, 16:22, 18:18, 21:2, 21:5, 29:6, 29:23, 33:11, 34:14, 49:4
**affidavits** [17] - 18:2, 18:4, 18:14, 19:7, 19:19, 19:26, 20:5, 20:8, 20:10, 20:22, 33:7, 34:15, 49:6, 49:13, 50:22
**affirm** [1] - 10:5
**aggressive** [1] - 50:23
**ago** [5] - 11:8, 17:7, 17:25, 36:22, 40:2
**agree** [3] - 20:4, 20:19, 58:7
**agreed** [3] - 44:3, 55:18, 57:22
**agreement** [28] - 6:10, 6:19, 6:22, 7:2, 13:13, 14:10, 15:26, 22:6, 22:7, 23:19, 23:23, 24:20, 31:15, 31:16, 35:19, 41:16,

41:20, 42:7, 52:3, 52:17, 52:26, 55:8, 56:11, 57:7, 57:19
**agreements** [6] - 7:3, 7:5, 23:7, 24:13, 40:13, 46:11
**ahead** [5] - 9:19, 27:16, 40:4, 40:25, 45:25
**Aidala** [2] - 3:9, 3:13
**AIDALA** [1] - 1:19
**albeit** [1] - 30:13
**alert** [1] - 21:13
**aligned** [1] - 25:5
**ALLEN** [1] - 1:24
**Allen** [1] - 3:12
**allowed** [3] - 7:9, 22:17, 43:13
**allowing** [2] - 25:6, 38:2
**almost** [2] - 48:25, 58:4
**alter** [3] - 24:8, 24:21, 50:16
**altering** [1] - 31:3
**amenable** [1] - 43:15
**Americas** [1] - 2:4
**amount** [2] - 39:14, 56:2
**ample** [1] - 29:24
**analytical** [1] - 51:7
**angry** [1] - 25:20
**Ann** [2] - 2:13, 59:25
**announcing** [1] - 7:16
**answer** [6] - 6:24, 6:26, 33:9, 33:26, 40:7, 55:7
**anti** [2] - 21:20, 31:13
**anyway** [4] - 20:11, 27:16, 40:4, 49:23
**apart** [1] - 34:8
**apologize** [1] - 17:13
**Appeals** [1] - 30:17
**appear** [5] - 18:4, 18:5, 18:6, 18:24, 27:8
**appearances** [1] - 3:4
**appearing** [1] - 3:5
**application** [1] - 4:12
**appoint** [1] - 40:12
**appreciate** [3] - 4:4, 4:6, 44:23
**approach** [1] - 51:7
**appropriate** [2] - 49:25, 56:7
**approval** [2] - 37:14, 52:7, 56:23
**approved** [1] - 36:22
**Arch** [16] - 4:20, 4:21, 6:13, 7:8, 16:10,

17:10, 26:18, 26:19, 26:20, 26:21, 26:25, 27:5, 34:9, 46:13, 52:11
**ARCH** [3] - 1:4, 1:4, 1:5
**Arch's** [2] - 15:25, 18:17
**area** [1] - 37:3
**argument** [1] - 39:21
**arguments** [3] - 19:4, 19:7, 57:17
**aside** [1] - 25:10
**aspersions** [1] - 19:16
**assets** [3] - 3:18, 34:8, 34:12
**assignments** [2] - 7:18, 13:18
**assume** [1] - 20:4
**assumed** [1] - 3:18
**ATLAS** [1] - 2:3
**Atlas** [1] - 3:16
**attach** [1] - 6:11
**attached** [4] - 5:5, 18:4, 18:16, 44:12
**attempt** [1] - 22:6
**attitude** [1] - 50:24
**attorney** [3] - 12:26, 46:17, 46:24
**Attorneys** [4] - 1:16, 1:19, 1:23, 2:4
**attorneys** [1] - 6:18
**August** [2] - 29:25, 33:13
**authority** [29] - 10:10, 10:11, 16:26, 17:5, 17:6, 22:8, 22:17, 22:20, 23:3, 38:19, 39:3, 39:8, 39:22, 41:13, 41:23, 41:24, 42:6, 42:12, 43:17, 44:17, 45:3, 45:10, 46:7, 52:5, 54:3, 55:6, 57:6, 57:8, 57:10
**authorization** [1] - 13:24
**authorizations** [1] - 52:20
**authorized** [3] - 13:26, 14:7, 42:3
**Avenue** [3] - 1:20, 2:4, 3:10
**Avi** [1] - 46:17
**avoids** [1] - 42:23
**aware** [4] - 4:17, 34:6, 38:21, 39:5
**awfully** [1] - 34:16

**B**

**bad** [3] - 9:9, 40:20, 41:4
**Bailey** [12] - 3:5, 4:3, 17:23, 21:7, 27:12, 35:16, 36:6, 38:6, 38:11, 38:26, 39:16, 40:4
**BAILEY** [44] - 1:15, 1:17, 3:5, 4:5, 4:8, 4:25, 9:20, 9:24, 12:23, 14:25, 15:4, 15:10, 15:22, 15:25, 16:7, 16:16, 16:19, 16:22, 16:24, 28:12, 36:7, 38:7, 40:5, 40:8, 40:11, 40:22, 40:26, 42:10, 43:10, 44:11, 44:21, 45:6, 45:17, 45:26, 46:10, 46:15, 56:9, 56:16, 57:25, 58:7, 58:11, 58:17, 58:20, 59:6
**Bailey's** [1] - 37:14
**balance** [3] - 23:22, 43:6, 50:14
**balancing** [1] - 47:20
**BANK** [1] - 1:8
**bank** [28] - 10:10, 13:20, 13:21, 17:10, 22:2, 22:18, 23:26, 24:14, 28:25, 39:13, 40:24, 40:26, 43:12, 44:15, 44:16, 44:25, 45:8, 45:11, 45:13, 46:3, 46:4, 46:6, 46:13, 56:21, 56:22, 56:24, 58:7, 58:22
**Bank** [6] - 2:4, 3:17, 3:19, 10:4, 11:2, 11:3
**bank's** [1] - 44:19
**banking** [3] - 23:4, 51:26, 52:19
**banks** [1] - 22:20
**based** [6] - 8:22, 30:10, 45:2, 50:4, 55:2, 55:16
**basic** [2] - 22:10, 23:14
**basis** [1] - 29:24
**Battery** [1] - 1:16
**become** [1] - 51:5
**becomes** [1] - 24:9
**began** [2] - 31:9, 33:13
**begin** [1] - 3:3
**behalf** [1] - 3:17
**benefit** [1] - 51:10

**benefits** [1] - 25:16
**BERTUNA** [1] - 1:19
**Bertuna** [2] - 3:10, 3:13
**best** [5] - 10:17, 29:22, 30:24, 35:21, 53:14
**better** [2] - 9:15, 12:13
**between** [2] - 34:7, 45:4
**big** [1] - 37:6
**bill** [2] - 37:6, 53:24
**bills** [1] - 45:24
**bing** [1] - 11:21
**bit** [5] - 4:10, 25:7, 42:16, 43:6, 48:13
**blame** [2] - 8:21, 8:25
**Blaustein** [1] - 10:17
**blew** [1] - 33:23
**blow** [2] - 30:2, 34:5
**blunt** [1] - 50:24
**Boesky** [1] - 9:14
**Boesky's** [1] - 9:21
**bond** [10] - 55:20, 55:21, 55:22, 56:2, 56:4, 56:7, 56:15, 57:18, 57:19, 57:22
**bonds** [1] - 56:10
**book** [2] - 12:19, 44:10
**bought** [1] - 36:16
**bound** [1] - 57:18
**Boy** [1] - 13:7
**brag** [1] - 8:9
**Brett** [1] - 46:24
**brief** [2] - 18:12, 30:20
**briefly** [1] - 38:9
**bring** [4] - 19:8, 42:18, 45:12
**broader** [1] - 55:5
**Broadway** [1] - 1:23
**broken** [1] - 54:7
**brought** [4] - 42:17, 42:25, 45:13, 48:5
**BS** [1] - 13:2
**building** [1] - 14:17
**buildings** [1] - 5:10
**burden** [2] - 20:7, 47:17
**Burke** [1] - 9:22
**business** [27] - 4:16, 4:22, 6:7, 6:14, 8:16, 9:4, 9:10, 9:11, 9:12, 9:26, 10:25, 11:7, 14:16, 16:2, 17:5, 23:2, 24:22, 34:7, 35:6, 35:13, 41:11, 43:20, 46:26, 51:5, 52:4, 53:11
**businesses** [2] - 8:4, 8:5

**buyout** [2] - 33:18, 33:20
**BY** [4] - 1:17, 1:21, 1:24, 2:5

**C**

**calmer** [1] - 51:6
**candidly** [3] - 34:15, 49:6, 50:6
**cannot** [2] - 7:10, 15:15
**captioned** [1] - 59:22
**Cardozo** [2] - 8:2, 8:3
**cards** [4] - 9:25, 10:9, 11:5, 39:26
**care** [2] - 56:12, 56:13
**carefully** [1] - 56:8
**case** [20] - 3:21, 6:24, 8:5, 23:10, 26:21, 27:20, 27:25, 29:8, 30:26, 42:17, 45:7, 45:10, 45:12, 45:14, 46:19, 52:25, 58:8
**casting** [1] - 19:16
**catastrophic** [1] - 37:24
**caused** [2] - 16:5, 40:14
**causes** [1] - 8:20
**celebrate** [1] - 46:5
**centers** [1] - 35:5
**certain** [5] - 3:18, 12:22, 14:16, 22:8, 22:9
**certainly** [6] - 21:3, 29:22, 30:8, 31:3, 39:21, 52:7
**certification** [1] - 18:3
**Certified** [1] - 59:21
**chance** [4] - 6:14, 10:23, 20:9, 21:3
**change** [6] - 24:17, 43:21, 50:6, 51:17, 51:23, 57:8
**changed** [2] - 32:21, 57:9
**changes** [1] - 48:20
**changing** [1] - 52:22
**chaos** [2] - 4:15, 35:21
**chaotic** [1] - 19:11
**characterized** [1] - 23:20
**characterizing** [2] - 37:16, 43:25
**charge** [8] - 22:26, 23:9, 23:12, 37:13, 37:20, 45:24, 48:14, 52:4
**Chase** [1] - 3:17

**CHASSEN** [1] - 1:8
**Chassen** [55] - 1:19, 1:23, 5:12, 5:23, 5:26, 6:8, 6:15, 7:6, 7:24, 8:21, 9:24, 10:8, 10:21, 10:22, 11:4, 11:6, 11:22, 12:7, 12:17, 13:4, 14:9, 15:16, 15:26, 16:2, 17:14, 18:8, 18:19, 18:20, 23:3, 23:21, 24:12, 25:5, 25:24, 28:23, 29:10, 29:23, 33:16, 33:19, 34:7, 39:4, 41:23, 42:5, 42:12, 43:12, 43:22, 48:16, 52:5, 52:12, 53:25, 54:7, 54:23, 56:20, 57:7, 57:10, 57:13
**Chassen's** [8] - 12:21, 12:24, 12:25, 13:3, 25:3, 47:11, 52:16, 52:24
**check** [5] - 11:12, 23:22, 53:25, 53:26, 54:3
**checks** [2] - 16:26, 41:18
**chooses** [1] - 54:20
**circumscribed** [1] - 23:8
**circumstances** [4] - 12:10, 31:2, 35:14, 45:23
**Citizen's** [1] - 11:2
**citizens** [1] - 10:4
**CIVIL** [1] - 1:2
**claim** [1] - 52:14
**claiming** [1] - 12:7
**claims** [6] - 30:15, 30:19, 30:20, 30:21, 50:13, 52:13
**clarification** [3] - 44:24, 51:22, 53:21
**clean** [4] - 22:22, 24:15, 46:3, 51:15
**clear** [8] - 31:5, 32:11, 41:8, 42:5, 43:24, 44:14, 47:17, 51:24
**clearer** [3] - 17:13, 43:16, 48:14
**clerk** [1] - 10:18
**client** [11] - 23:7, 23:15, 37:11, 38:16, 38:17, 39:9, 43:3, 45:9, 45:18, 45:19, 45:21
**client's** [1] - 45:26
**clients** [1] - 4:18

**COHEN** [1] - 1:12
**colleague** [1] - 36:3
**colorful** [1] - 43:26
**comfortable** [1] - 35:17
**coming** [7] - 5:15, 9:8, 13:4, 17:15, 24:15, 37:22
**comment** [1] - 19:2
**commercial** [2] - 34:22, 35:23
**commercially** [2] - 39:12, 39:14
**communication** [1] - 21:6
**companies** [5] - 17:10, 25:21, 35:18, 41:19, 44:2
**company** [49] - 4:23, 4:26, 5:3, 5:14, 5:15, 5:18, 5:23, 7:9, 7:25, 7:26, 11:19, 11:20, 11:23, 13:12, 13:20, 13:23, 13:26, 14:2, 14:4, 14:13, 15:14, 15:17, 16:3, 17:3, 17:14, 17:18, 18:9, 25:18, 26:26, 28:24, 29:5, 30:2, 32:25, 32:26, 33:16, 34:24, 41:3, 42:24, 47:5, 48:6, 48:17, 50:2, 51:18, 52:12, 52:16, 53:7, 53:14
**complain** [1] - 11:14
**complaint** [5] - 27:5, 27:22, 30:12, 30:16, 58:25
**completed** [3] - 38:17, 38:22, 39:7
**completely** [1] - 53:18
**complied** [2] - 28:5, 50:9
**compliment** [1] - 12:5
**complying** [1] - 43:4
**computer** [3] - 11:9, 14:19, 14:20
**conceding** [2] - 32:2, 32:3
**concerned** [1] - 43:9
**concerns** [2] - 23:11, 35:12
**conclusions** [2] - 4:12, 49:13
**concrete** [1] - 49:15
**conduct** [1] - 51:8
**confidence** [1] - 50:16
**confirm** [1] - 38:18
**conflagrations** [1] - 33:13

**conflict** [2] - 27:17, 27:19
**consent** [12] - 12:22, 22:8, 22:21, 23:8, 23:16, 23:21, 25:3, 46:9, 52:24, 54:25, 55:4, 55:8
**consented** [1] - 42:3
**consider** [3] - 20:14, 56:15, 57:23
**consideration** [1] - 38:4
**consistent** [1] - 38:23
**construing** [1] - 37:18
**contacted** [4] - 6:8, 6:9, 14:9, 46:25
**contain** [1] - 18:6
**contains** [1] - 17:26
**contemporaneous** [1] - 34:18
**contempt** [3] - 37:10, 57:4, 58:6
**context** [2] - 24:22, 31:17
**continue** [7] - 10:3, 28:2, 29:15, 35:21, 53:5, 53:15, 54:12
**Continued** [1] - 2:2
**continues** [1] - 26:25
**continuing** [2] - 24:24, 48:10
**contract** [6] - 23:26, 34:10, 43:3, 54:15, 56:13, 57:12
**contracts** [1] - 53:15
**contractual** [2] - 23:15, 54:24
**control** [9] - 22:2, 24:13, 29:4, 32:25, 35:8, 42:9, 43:7, 52:23, 54:8
**conversations** [1] - 34:3
**conversion** [1] - 44:18
**convincing** [1] - 47:17
**cooperate** [2] - 7:17, 54:13
**corporate** [11] - 12:10, 12:12, 15:9, 43:19, 43:22, 51:4, 52:6, 52:18, 53:24, 54:18
**correct** [5] - 24:2, 31:24, 32:4, 38:25, 55:17
**costs** [1] - 5:11
**Counsel** [1] - 1:23
**counsel** [3] - 3:13, 17:19, 38:14
**counsels** [1] - 38:21
**count** [1] - 18:3

**counterclaims** [1] - 55:16
**COUNTY** [1] - 1:2
**coup** [6] - 8:23, 10:11, 11:24, 12:9, 14:2, 46:23
**couple** [2] - 10:2, 13:16
**courage** [1] - 8:16
**course** [1] - 56:12
**court** [13] - 10:7, 10:8, 11:8, 22:15, 33:4, 34:23, 35:9, 35:12, 43:5, 50:20, 51:3, 57:20, 58:23
**COURT** [75] - 1:2, 3:2, 3:7, 3:14, 3:20, 3:23, 4:7, 4:24, 9:18, 9:23, 12:21, 14:23, 15:7, 15:20, 15:24, 16:6, 16:15, 16:17, 16:23, 17:19, 17:21, 19:2, 22:5, 23:25, 25:7, 25:22, 26:5, 26:11, 26:23, 27:12, 27:16, 28:2, 28:13, 28:17, 29:15, 31:5, 31:19, 32:5, 32:9, 33:6, 34:15, 36:5, 36:9, 36:16, 38:5, 38:9, 38:23, 39:16, 40:6, 40:9, 40:21, 40:23, 41:7, 42:14, 43:14, 44:14, 45:4, 45:16, 45:19, 46:8, 46:14, 47:14, 53:23, 54:6, 55:13, 55:18, 55:25, 56:12, 56:17, 57:2, 58:2, 58:9, 58:14, 58:19, 58:21
**Court** [29] - 1:12, 2:13, 18:11, 21:12, 21:13, 22:24, 24:17, 24:20, 24:23, 26:24, 29:14, 30:11, 30:16, 31:14, 31:25, 32:3, 32:22, 33:3, 38:3, 42:15, 42:17, 42:18, 42:20, 45:5, 51:7, 53:17, 54:22, 59:26
**court's** [1] - 53:13
**Court's** [2] - 24:25, 32:19
**courtroom** [2] - 3:8, 38:21
**courts** [1] - 35:15
**covers** [1] - 47:12
**COVID** [1] - 13:5
**CPLR** [1] - 56:13
**credibility** [1] - 23:13

**credit** [1] - 9:25
**Cried** [1] - 13:7
**cross** [1] - 49:4
**current** [5] - 16:5, 16:8, 35:14, 39:17, 45:23
**customers** [1] - 51:11
**cut** [2] - 5:11, 55:25

**D**

**daily** [1] - 44:26
**damages** [2] - 27:4, 55:23
**danger** [1] - 35:7
**date** [1] - 51:20
**day-to-day** [1] - 23:4
**days** [3] - 10:7, 10:8, 13:6
**deadlock** [1] - 57:17
**deal** [3] - 19:13, 42:26, 50:10
**dealing** [1] - 43:15
**dealings** [1] - 34:7
**deals** [3] - 5:6, 5:8, 5:9
**debate** [1] - 10:16
**decided** [1] - 22:19
**deciding** [1] - 42:21
**decisions** [10] - 5:10, 8:17, 12:17, 12:22, 22:9, 26:13, 52:23, 54:16, 54:26, 55:2
**declaratory** [1] - 27:10
**default** [1] - 40:13
**defaulted** [1] - 40:16
**defendant** [2] - 19:17, 48:7
**Defendant** [3] - 1:19, 1:23, 2:4
**defendants** [1] - 3:8
**Defendants** [1] - 1:9
**definitely** [1] - 25:26
**delegated** [1] - 57:10
**delivered** [1] - 14:21
**demonstrate** [1] - 50:12
**demonstrated** [1] - 50:18
**demonstrates** [1] - 51:9
**demonstrating** [1] - 47:17
**denigrating** [1] - 53:2
**deny** [1] - 31:26
**depose** [1] - 20:6
**derivative** [1] - 30:15
**derivatively** [2] - 1:3, 1:4
**described** [5] - 20:25, 28:8, 39:18, 39:24,

51:12
**desire** [1] - 17:25
**detail** [3] - 5:15, 7:4, 18:10
**determining** [1] - 27:7
**devote** [1] - 16:2
**dicta** [5] - 37:16, 37:17, 40:18, 51:25
**different** [6] - 4:13, 26:17, 42:19, 48:15, 48:17, 49:8
**differently** [1] - 4:10
**differing** [1] - 55:17
**difficult** [3] - 4:19, 5:7, 49:10
**direct** [1] - 30:15
**directed** [2] - 18:18, 21:7
**direction** [1] - 49:8
**directions** [1] - 42:20
**disagree** [1] - 58:3
**disarray** [1] - 15:13
**disbelief** [1] - 15:19
**disconnected** [1] - 16:4
**discontinuance** [5] - 58:13, 58:15, 58:18, 59:2, 59:4
**discontinue** [2] - 45:7, 45:10
**discontinues** [1] - 59:3
**discovery** [3] - 6:23, 6:25, 6:26
**discretion** [3] - 42:21, 54:21, 54:22
**discussions** [3] - 33:15, 34:4, 34:5
**disgruntled** [1] - 37:4
**disinterested** [1] - 34:19
**dismiss** [2] - 30:13, 58:22
**dismissal** [1] - 30:16
**dismissed** [1] - 30:21
**dismissing** [1] - 37:22
**disobeying** [1] - 10:6
**dispute** [3] - 29:20, 49:16, 51:5
**disputed** [3] - 29:22, 30:24, 30:25
**disputes** [5] - 22:13, 48:9, 48:11, 48:25, 50:8
**disruptive** [1] - 51:4
**disrupts** [1] - 17:14
**dissipation** [1] - 47:23
**distress** [1] - 40:15
**distribution** [1] - 43:23

51:12
**distributions** [8] - 6:3, 6:4, 6:5, 41:17, 41:24, 42:8, 44:9, 52:8
**District** [1] - 26:9
**divide** [1] - 34:12
**docket** [1] - 58:16
**dockets** [1] - 58:17
**document** [1] - 16:18
**documentation** [1] - 39:2
**documents** [17] - 5:22, 12:11, 12:13, 14:13, 14:15, 14:16, 14:18, 15:9, 25:12, 34:19, 38:15, 38:22, 39:5, 39:13, 43:22, 48:6, 50:3
**domain** [1] - 15:12
**done** [8] - 4:2, 10:13, 12:11, 29:25, 39:17, 51:20, 56:3
**down** [1] - 22:24
**downloaded** [2] - 14:18, 14:19
**drafted** [1] - 54:10
**dragging** [1] - 35:26
**drastic** [1] - 47:16
**draw** [1] - 5:22, 6:4
**drifting** [1] - 35:7
**Dropbox** [6] - 14:13, 15:5, 28:6, 28:7, 28:21, 29:2
**duplicative** [2] - 30:20, 58:15
**during** [3] - 8:23, 10:11, 14:2
**duties** [2] - 16:9, 42:19
**duty** [1] - 30:20

**E**

**e-mail** [12] - 6:2, 11:12, 14:11, 17:7, 17:8, 18:22, 18:24, 18:25, 20:24, 28:6, 28:11, 28:12
**e-mails** [8] - 7:15, 18:16, 28:13, 28:26, 29:10, 39:11, 44:26, 48:6
**easy** [1] - 46:4
**echoed** [1] - 33:12
**effect** [3] - 33:2, 37:25, 42:25
**effecting** [1] - 54:14
**effectively** [2] - 48:2, 48:15
**eight** [2] - 13:7, 43:11

**either** [5] - 20:16, 23:11, 34:26, 48:16, 50:20
**elements** [3] - 44:6, 47:25, 48:2
**employ** [1] - 12:16
**employee** [8] - 5:12, 6:14, 6:20, 7:13, 12:20, 16:13, 20:24, 20:25
**employees** [11] - 5:2, 5:11, 12:8, 16:9, 20:22, 25:2, 25:3, 25:4, 54:4, 54:10
**end** [2] - 32:6, 45:21
**enforce** [1] - 24:21
**entered** [6] - 9:12, 32:22, 32:23, 39:23, 48:21, 49:22
**entire** [1] - 30:15
**entirely** [1] - 48:14
**entity** [1] - 51:11
**entries** [2] - 15:3, 15:5
**envision** [3] - 23:23, 54:2, 54:5
**equitable** [1] - 24:16
**equities** [3] - 24:16, 47:21, 50:14
**especially** [1] - 42:21
**ESQ** [4] - 1:17, 1:21, 1:24, 2:5
**essential** [1] - 41:6
**establish** [2] - 29:6, 30:23
**established** [3] - 29:9, 30:9, 49:18
**ESTATE** [1] - 1:4
**estate** [4] - 4:15, 4:16, 26:26, 52:11
**Estate** [4] - 26:18, 26:19, 26:21, 34:9
**event** [1] - 36:13
**evidence** [6] - 15:20, 20:13, 34:18, 47:18, 49:3, 49:15
**evidentiary** [3] - 19:3, 48:19, 50:5
**eviscerate** [1] - 54:3
**exact** [4] - 6:7, 27:24, 32:16
**exactly** [3] - 6:22, 39:18, 49:9
**examination** [1] - 49:5
**example** [5] - 18:13, 18:14, 18:26, 26:3, 26:25
**examples** [1] - 43:11
**except** [1] - 9:26
**exchanges** [3] - 25:17, 25:22, 25:23

**exclusive** [1] - 12:18
**excuse** [1] - 24:14
**execute** [1] - 45:2
**executed** [1] - 38:15
**exercise** [3] - 42:21, 51:9, 54:21
**Exhibit** [2] - 17:11, 17:12
**exhibit** [6] - 5:26, 6:11, 15:2, 15:4, 15:22, 44:12
**exist** [1] - 9:2
**existing** [1] - 48:20
**exit** [1] - 3:21
**expand** [1] - 48:10
**expansion** [1] - 56:25
**expansions** [1] - 48:21
**expenses** [3] - 8:25, 13:24, 14:7
**experience** [2] - 37:2, 44:2
**expire** [3] - 32:6, 32:12, 32:17
**explain** [1] - 10:2
**explained** [1] - 11:26
**explaining** [2] - 51:7, 56:6
**explains** [1] - 47:6
**extent** [3] - 31:21, 49:23, 49:26
**extolling** [1] - 21:6
**extraordinarily** [1] - 20:26
**extraordinary** [1] - 41:10
**extreme** [1] - 35:11
**extremely** [2] - 5:7, 30:3
**extrinsic** [1] - 12:9
**eyes** [1] - 54:4

**F**

**face** [3] - 20:11, 27:5, 49:11
**facially** [2] - 22:3, 29:5
**fact** [1] - 42:5
**facts** [5] - 29:21, 30:11, 30:24, 30:25, 49:14
**factual** [1] - 48:25
**fairly** [1] - 23:21
**false** [2] - 28:16, 29:12
**falsehoods** [1] - 18:13
**far** [7] - 4:26, 6:25, 25:5, 26:12, 27:21, 44:7, 48:24
**favor** [3] - 24:16, 47:21, 50:14

**FCIC** [1] - 3:19
**few** [3] - 8:9, 19:26, 36:5
**fiduciary** [1] - 30:20, 42:19
**Fifth** [2] - 1:20, 3:10
**fight** [1] - 19:11
**fighting** [1] - 4:21
**figure** [2] - 20:3, 53:10
**filed** [2] - 3:24, 58:24
**files** [1] - 28:7
**filing** [1] - 42:17
**filled** [1] - 13:21
**finally** [5] - 10:6, 10:8, 10:14, 11:5, 13:21
**financial** [1] - 17:2
**fine** [3] - 9:15, 9:17, 36:5
**fire** [2] - 47:9, 47:11
**fired** [1] - 28:24
**firing** [2] - 25:2, 25:4
**firings** [1] - 53:9
**firm** [2] - 6:18, 6:20
**first** [13] - 5:17, 6:10, 10:7, 14:11, 15:18, 17:24, 19:9, 33:10, 36:10, 42:11, 47:15, 55:14, 57:5
**First** [5] - 2:4, 3:19, 10:12, 11:3, 46:2
**FIRST** [1] - 1:8
**fits** [1] - 33:22
**five** [2] - 18:2, 36:22
**fix** [1] - 15:16
**Floor** [3] - 1:16, 1:20, 2:24
**floor** [1] - 4:3
**focus** [1] - 17:17
**focuses** [1] - 17:16
**fold** [1] - 24:10
**folks** [1] - 51:25
**follow** [2] - 35:19, 41:11
**followed** [1] - 57:3
**following** [2] - 8:20, 16:13
**foreclosures** [1] - 36:25
**foresee** [1] - 44:24
**formal** [1] - 48:17
**former** [1] - 16:11
**forms** [5] - 13:21, 27:10, 38:16, 38:17, 39:9
**forth** [1] - 22:14
**forthright** [1] - 26:3
**forward** [3] - 37:7, 39:21, 44:7
**forwarded** [2] - 38:16,

39:6
**four** [1] - 12:16
**Frank** [1] - 6:17
**frankly** [9] - 19:24, 23:3, 23:11, 29:12, 32:10, 39:25, 41:10, 43:8, 47:25
**free** [2] - 25:22, 32:12
**freezes** [1] - 9:25
**fresh** [1] - 46:3
**fresher** [1] - 13:8
**Fried** [1] - 6:17
**front** [2] - 33:3, 35:10
**fulfilling** [1] - 43:18
**full** [11] - 6:12, 6:22, 7:6, 7:7, 10:19, 19:13, 32:25, 49:20
**fulsome** [1] - 33:26
**funds** [1] - 52:6
**future** [1] - 37:26

**G**

**generally** [4] - 19:19, 21:19, 47:22, 56:14
**given** [3] - 19:20, 42:5, 45:23
**goal** [1] - 9:13
**goals** [1] - 9:16
**God** [2] - 10:22, 10:26
**GoDaddy** [4] - 18:16, 18:21, 28:15, 29:8
**governed** [1] - 52:17
**governing** [1] - 42:7
**grant** [2] - 31:22, 43:23
**granted** [3] - 47:26, 48:2, 57:14
**grave** [1] - 23:11
**great** [4] - 4:8, 8:18, 12:12, 40:19
**Greed** [1] - 9:9
**greed** [1] - 9:15
**ground** [1] - 32:21
**guarantees** [2] - 5:4, 47:2
**guardrails** [2] - 43:8, 48:22
**guess** [5] - 8:2, 9:10, 9:26, 28:8, 33:17
**guiding** [1] - 43:2
**guts** [1] - 8:15
**guy** [1] - 28:17
**guys** [3] - 36:5, 42:25, 44:16

**H**

**half** [3] - 3:26, 19:18, 20:8

**Hamptons** [5] - 14:21, 15:6, 17:11, 17:12
**hands** [2] - 24:15, 51:16
**happy** [5] - 5:24, 16:24
**hard** [8] - 7:12, 7:14, 8:13, 8:14, 8:16, 10:19, 10:20, 29:5
**hardly** [2] - 9:4, 13:10
**harm** [3] - 5:14, 36:26, 40:15
**harming** [1] - 42:23
**head** [1] - 25:16
**hear** [3] - 39:8, 53:8, 53:16
**heard** [3] - 28:6, 34:16, 38:25
**hearing** [11] - 19:18, 20:9, 20:12, 24:4, 24:5, 32:6, 33:19, 39:20, 45:21, 58:6
**hearings** [1] - 24:6
**help** [8] - 11:10, 33:21, 36:7, 40:19, 41:3, 51:19, 52:16, 52:18
**helpful** [1] - 34:16
**highly** [1] - 32:20
**himself** [5] - 8:23, 8:26, 9:5, 41:24, 43:23
**hire** [7] - 6:17, 12:6, 12:8, 12:14, 12:17, 12:19, 13:14
**hiring** [1] - 25:2
**holding** [1] - 45:14
**Holdings** [4] - 26:18, 26:19, 26:21, 34:9
**HOLDINGS** [1] - 1:4
**homes** [1] - 57:24
**HON** [1] - 1:12
**Honor** [49] - 3:12, 3:15, 4:5, 17:20, 18:26, 20:20, 21:17, 21:19, 21:20, 21:22, 21:26, 23:18, 23:19, 23:20, 24:2, 24:3, 24:6, 24:24, 25:9, 29:7, 29:17, 29:19, 29:20, 30:7, 30:12, 30:18, 30:19, 31:10, 31:25, 33:25, 33:26, 38:7, 38:8, 39:15, 40:5, 44:21, 44:22, 45:7, 53:21, 55:11, 55:19, 56:19, 56:20, 56:22, 57:25, 57:26, 59:5, 59:6, 59:7
**hope** [3] - 10:6, 15:23, 28:2
**hopefully** [1] - 4:14

**hour** [1] - 3:26
**hungry** [1] - 11:21
**hurt** [2] - 5:18, 7:25
**hurts** [1] - 15:13

# I

**idea** [4] - 8:18, 29:3, 41:17, 41:22
**ignore** [1] - 37:14
**imagine** [1] - 51:17
**immediately** [2] - 32:14, 35:20
**implicitly** [2] - 21:8
**important** [2] - 11:20, 54:25
**importantly** [1] - 40:12
**impossible** [1] - 19:17
**impression** [1] - 33:25
**improper** [1] - 42:2
**improperly** [1] - 18:8
**inappropriate** [2] - 31:2, 44:19
**inclination** [1] - 50:19
**included** [1] - 54:9
**includes** [2] - 16:9, 24:24
**including** [2] - 25:24, 56:21
**inclusion** [1] - 21:10
**incompetent** [1] - 33:19
**inconsistent** [2] - 33:18, 55:3
**inconsistently** [1] - 51:2
**incorporated** [1] - 31:21
**incredible** [1] - 29:13
**indemnify** [1] - 6:21
**independent** [1] - 52:5
**Index** [1] - 1:7
**indicating)** [1] - 11:15
**individual** [1] - 43:15
**individual's** [1] - 45:3
**individually** [1] - 1:3
**individuals** [3] - 35:10, 38:18, 39:7
**ineffectual** [1] - 47:24
**inflame** [1] - 50:20
**informal** [4] - 41:17, 41:24, 44:7, 48:18
**informally** [1] - 44:5
**information** [3] - 33:10, 33:21, 36:8
**initial** [4] - 19:12, 31:20, 52:22, 54:9
**injunction** [10] - 3:24, 19:11, 21:18, 31:20, 42:22, 47:16, 47:22,

47:26, 55:21, 56:17
**injunctive** [4] - 30:26, 31:3, 49:20, 51:16
**injury** [3] - 24:12, 47:19, 50:13
**ink** [1] - 56:11
**instead** [2] - 16:3, 50:17
**intended** [1] - 53:6
**intention** [2] - 45:26, 51:9
**interested** [2] - 9:11, 9:17
**interests** [1] - 35:2
**interfere** [4] - 8:6, 8:12, 13:19
**interim** [24] - 4:22, 10:7, 21:21, 21:22, 22:5, 28:5, 31:7, 31:12, 32:3, 32:5, 32:11, 32:13, 32:16, 32:19, 32:22, 32:23, 32:26, 39:23, 48:3, 48:23, 49:21, 50:17, 56:26, 57:2
**intermingling** [1] - 30:14
**internal** [1] - 5:2
**intervention** [1] - 35:12
**investigation** [1] - 19:13
**investor** [6] - 26:8, 30:5, 34:26, 52:9, 52:25, 55:9
**investors** [7] - 25:11, 25:18, 25:19, 25:20, 25:24, 26:4, 37:4
**invite** [1] - 7:22
**involved** [1] - 8:20
**involving** [1] - 44:12
**irrational** [1] - 53:18
**irreparable** [2] - 47:19, 50:13
**irretrievable** [1] - 24:12
**issue** [4] - 24:7, 29:8, 35:15, 50:4
**issued** [1] - 25:25
**issues** [3] - 4:11, 20:10, 21:24
**IT** [4] - 14:24, 18:17, 28:17
**items** [1] - 17:9
**itself** [2] - 16:17, 23:10
**Ivan** [2] - 9:14, 9:21

# J

**JARED** [1] - 1:8

**Jared** [19] - 1:19, 1:23, 5:12, 5:23, 6:8, 6:15, 7:2, 7:6, 7:18, 7:20, 7:24, 8:21, 9:6, 9:8, 11:22, 12:7, 14:20, 17:8, 37:21
**Jared's** [1] - 16:11
**JAY** [1] - 2:5
**Jeff** [22] - 4:20, 5:4, 6:9, 7:14, 7:17, 7:19, 9:2, 9:5, 11:20, 13:26, 14:3, 14:4, 14:12, 14:21, 17:4, 17:6, 46:17, 46:24, 47:2, 47:4, 47:9
**Jeff's** [4] - 5:3, 46:25, 47:3, 47:10
**JEFFREY** [1] - 1:3
**Jeffrey** [5] - 5:25, 40:16, 40:17
**jettison** [1] - 48:16
**JJ** [11] - 1:4, 1:4, 4:21, 7:8, 15:25, 18:17, 26:19, 26:25, 27:5, 46:13, 52:11
**job** [11] - 12:13, 12:24, 13:3, 13:11, 13:15, 16:9, 16:11, 53:15
**JOEL** [1] - 1:12
**John** [1] - 3:9
**JONATHAN** [1] - 1:21
**JPMorgan** [1] - 3:17
**Judge** [1] - 36:3
**judge** [5] - 8:14, 12:3, 26:12, 53:5
**judges** [2] - 8:3, 8:11
**judgment** [1] - 47:24
**July** [1] - 33:14
**jump** [2] - 8:15, 8:17
**jumped** [1] - 6:14
**junior** [1] - 47:10
**junk** [2] - 18:22, 28:18
**Justice** [2] - 1:12, 8:3
**justifiable** [1] - 52:15
**justification** [1] - 51:13
**justify** [2] - 48:20, 49:20

# K

**K-1** [1] - 36:19
**K-1s** [2] - 25:25, 36:20
**KAMINS** [1] - 1:19
**KANDEL** [9] - 2:5, 3:15, 3:22, 38:8, 38:11, 38:25, 44:22, 58:10, 59:5
**Kandel** [8] - 3:16, 3:21, 10:5, 10:15,

11:10, 38:9, 46:5, 46:20
**Kandel's** [1] - 44:14
**keep** [10] - 6:3, 7:19, 7:21, 15:24, 16:23, 31:22, 40:17, 58:24
**kept** [4] - 7:23, 7:24, 14:13
**kicked** [2] - 14:3, 47:5
**Kimins** [2] - 3:10, 3:13
**kind** [1] - 33:26
**knowing** [1] - 11:18
**kudos** [1] - 10:19
**Kumbala** [1] - 8:18

# L

**lack** [2] - 9:15, 19:20
**lacking** [1] - 23:14
**laid** [1] - 47:7
**language** [1] - 56:25
**large** [2] - 19:6, 20:15
**largely** [1] - 43:2
**last** [7] - 10:16, 12:12, 25:4, 33:11, 33:14, 33:16, 40:14
**Last** [1] - 11:15
**late** [1] - 17:15
**Lavender** [1] - 46:24
**LAW** [1] - 1:22
**law** [5] - 6:18, 8:7, 10:18, 30:18, 30:26
**Law** [1] - 8:8
**lawsuit** [7] - 21:10, 26:7, 31:8, 44:12, 46:21, 52:12, 52:13
**lawyer** [1] - 38:2
**lawyers** [1] - 35:24
**lead** [2] - 35:26, 51:14
**leads** [1] - 57:16
**learn** [1] - 51:17
**learned** [2] - 25:10, 25:17
**least** [10] - 23:6, 26:6, 28:6, 33:14, 39:6, 39:18, 43:11, 51:26, 55:2, 57:22
**lectern** [1] - 4:4
**legally** [1] - 52:15
**legislate** [1] - 54:15
**LEITMAN** [2] - 1:15, 1:17
**Leitman** [1] - 3:5
**lenders** [1] - 5:8
**letter** [7] - 18:11, 18:12, 20:23, 24:26, 51:2, 56:6
**letting** [2] - 40:17
**level** [1] - 54:22
**LEVENTHAL** [8] -

1:21, 3:9, 25:14, 36:11, 36:18, 53:21, 53:24, 59:7
**Leventhal** [2] - 3:9, 36:3, 36:9
**liabilities** [2] - 3:18, 34:13
**liability** [2] - 25:26, 44:19
**license** [1] - 43:17
**lien** [4] - 16:5, 16:10, 16:15, 16:17
**life** [1] - 4:21
**light** [1] - 22:11
**likelihood** [3] - 47:18, 49:18, 50:12
**likely** [2] - 30:13, 32:15
**link** [1] - 16:4
**linked** [1] - 16:7
**Linkedin** [1] - 21:7
**lion's** [1] - 49:2
**litigation** [2] - 21:24, 53:20
**LLC** [5] - 1:4, 1:4, 1:5, 26:18, 26:21
**LLP** [1] - 2:3
**loan** [1] - 40:13
**loans** [3] - 4:16, 5:5, 47:2
**look** [12] - 12:10, 20:3, 22:5, 22:24, 34:15, 34:20, 35:2, 35:3, 35:19, 41:18, 54:6, 56:24
**looking** [1] - 55:2
**Lori** [2] - 2:13, 59:25
**lost** [1] - 41:10
**lower** [1] - 51:3
**loyalty** [1] - 7:7
**luck** [1] - 57:23

# M

**magic** [1] - 34:23
**mail** [13] - 6:2, 11:12, 14:11, 17:7, 17:8, 18:22, 18:24, 18:25, 20:24, 28:6, 28:11, 28:12, 28:18
**mails** [8] - 7:15, 18:16, 28:13, 28:26, 29:10, 39:11, 44:26, 48:6
**main** [1] - 15:17
**maintain** [3] - 42:22, 46:13, 47:22
**maintained** [1] - 31:13
**maintenance** [1] - 21:19
**major** [2] - 12:22, 22:9

**manage** [1] - 52:16
**management** [2] - 12:15, 53:17
**manager** [2] - 22:23, 46:11
**managerial** [10] - 22:7, 26:13, 42:9, 43:7, 51:8, 51:10, 54:8, 57:8, 57:13, 57:16
**managing** [10] - 1:4, 1:4, 4:20, 26:20, 26:26, 41:21, 45:22, 46:11, 46:12, 52:11
**mandated** [1] - 54:13
**manners** [1] - 54:15
**matter** [4] - 40:19, 58:16, 58:22, 58:25
**mean** [12] - 11:17, 19:21, 22:2, 25:22, 32:12, 35:23, 42:6, 43:17, 45:20, 47:25, 49:6, 55:20
**meaning** [1] - 52:17
**meaningful** [1] - 12:17
**means** [2] - 43:18, 45:23
**meant** [1] - 15:7
**mechanics** [1] - 45:24
**meetings** [3] - 7:13, 17:15
**member** [17] - 1:4, 1:4, 23:17, 26:8, 26:18, 26:20, 26:26, 32:24, 34:26, 41:21, 45:22, 46:12, 52:9, 52:11, 54:8, 54:24
**members** [3] - 30:5, 30:6, 47:10
**members'** [2] - 52:25, 55:9
**memorandum** [1] - 30:18
**Menorah** [1] - 8:4
**mention** [3] - 8:10, 40:14, 46:10
**mentioned** [2] - 36:23, 54:26
**merits** [6] - 24:11, 29:18, 30:8, 30:23, 47:19, 49:19
**mess** [2] - 25:8, 50:5
**met** [1] - 5:25
**micromanage** [1] - 35:17
**might** [4] - 18:22, 24:4, 37:22, 44:18
**Miller** [2] - 21:5, 21:8
**million** [2] - 36:13, 36:14
**mind** [3] - 13:8, 26:6,

32:17
**mindset** [1] - 53:11
**minimize** [1] - 48:16
**minority** [2] - 26:18, 30:5
**minutes** [3] - 11:8, 36:6, 59:22
**missing** [2] - 15:15, 16:25
**modified** [1] - 48:3
**modify** [2] - 24:21, 48:8
**moment** [2] - 25:8, 48:9, 57:15
**monetary** [1] - 27:4
**money** [23] - 8:20, 8:22, 8:23, 9:3, 9:4, 9:5, 9:6, 9:9, 9:12, 9:13, 9:17, 10:24, 11:21, 13:25, 17:2, 17:3, 17:5, 37:6, 43:13, 45:15
**monies** [3] - 13:23, 14:6, 41:25, 46:2, 46:6
**month** [4] - 5:24, 6:6, 8:22, 8:26
**months** [2] - 26:4, 36:22
**morale** [2] - 4:26, 5:2
**morning** [7] - 3:2, 3:7, 3:15, 4:3, 4:9, 17:20, 17:21
**most** [7] - 11:20, 12:3, 32:15, 40:12, 47:25, 49:22, 53:18
**motion** [14] - 3:24, 19:18, 21:17, 22:3, 27:22, 27:26, 31:22, 31:26, 32:14, 32:15, 47:26, 48:5, 55:16, 57:4
**movant** [2] - 19:12, 20:7
**movant's** [1] - 47:21
**move** [2] - 17:12, 46:2
**moved** [1] - 17:9
**movie** [2] - 9:18, 9:21
**moving** [1] - 46:5
**MR** [89] - 3:5, 3:9, 3:12, 3:15, 3:22, 4:5, 4:8, 4:25, 9:20, 9:24, 12:23, 14:25, 15:2, 15:4, 15:10, 15:22, 15:25, 16:7, 16:16, 16:19, 16:21, 16:22, 16:24, 17:20, 17:22, 20:20, 23:18, 24:2, 25:9, 25:14, 25:15, 25:23, 26:10, 26:15,

27:2, 27:15, 27:19, 28:12, 28:14, 28:20, 29:17, 31:10, 31:24, 32:7, 32:10, 33:24, 36:3, 36:7, 36:11, 36:18, 38:7, 38:8, 38:11, 38:25, 40:5, 40:8, 40:11, 40:22, 40:26, 42:10, 43:10, 44:11, 44:21, 44:22, 45:6, 45:17, 45:26, 46:10, 46:15, 53:21, 53:24, 55:11, 55:14, 55:19, 56:9, 56:16, 56:18, 57:25, 57:26, 58:5, 58:7, 58:10, 58:11, 58:12, 58:17, 58:20, 59:5, 59:6, 59:7
**multi** [1] - 38:15
**multiple** [1] - 49:7

**N**

**name** [3] - 15:12, 15:17, 26:17
**named** [1] - 46:17
**narrow** [2] - 48:9, 48:23
**nature** [1] - 52:22
**necessarily** [1] - 43:14
**necessary** [2] - 43:6, 43:8
**need** [9] - 6:8, 33:10, 34:17, 35:22, 50:6, 53:19, 56:4, 56:23, 58:26
**needed** [2] - 10:9, 46:25
**needs** [6] - 9:9, 14:15, 14:16, 35:8, 51:23, 53:25
**never** [8] - 9:10, 9:12, 10:6, 12:5, 14:7, 25:19, 37:5, 45:17
**new** [6] - 12:6, 25:2, 25:4, 32:12, 33:7, 56:22
**NEW** [1] - 1:2, 1:2
**New** [10] - 1:17, 1:20, 1:24, 2:5, 3:10
**next** [5] - 11:14, 14:9, 46:15, 53:8, 53:19
**nights** [1] - 17:25
**noncompliance** [1] - 24:24
**none** [3] - 22:13, 22:14
**nonmovant** [1] - 55:23
**normal** [2] - 41:11,

53:7
**normally** [1] - 4:10
**nose** [1] - 38:2
**note** [3] - 18:12, 30:12, 50:22
**nothing** [2] - 22:12, 23:5
**notice** [1] - 58:12
**notification** [1] - 10:15
**number** [6] - 11:22, 12:15, 24:10, 24:11, 24:14, 40:11
**numerous** [2] - 18:6, 25:18

**O**

**Oak** [10] - 6:8, 6:13, 7:10, 14:9, 17:17, 26:17, 27:3, 34:4, 44:13, 46:15
**Oak's** [1] - 46:24
**object** [1] - 21:19
**obligations** [1] - 17:2
**observation** [3] - 11:17, 37:8, 51:6
**observations** [1] - 36:12
**observed** [1] - 50:15
**obtain** [1] - 56:23
**obtaining** [3] - 25:2, 25:3, 55:21
**obviously** [5] - 11:12, 11:18, 40:26, 55:15, 56:8
**occur** [1] - 39:11
**Official** [2] - 2:13, 59:26
**old** [1] - 13:8
**once** [2] - 10:10, 42:18
**One** [1] - 1:16
**one** [31] - 5:12, 6:12, 11:16, 13:11, 14:9, 16:6, 18:14, 18:25, 22:16, 22:19, 24:5, 24:10, 28:17, 35:2, 35:9, 37:8, 37:23, 40:11, 41:7, 42:13, 44:5, 44:17, 46:22, 49:7, 54:13, 56:5, 56:18, 58:19, 58:20, 58:23, 58:24
**ongoing** [1] - 15:19
**ooOoo** [1] - 59:9
**open** [1] - 46:12
**opened** [2] - 10:4, 11:2
**opening** [1] - 49:2
**operating** [16] - 15:26, 23:19, 23:23, 24:20,

24:22, 31:15, 31:16, 41:15, 41:19, 43:19, 48:3, 52:3, 52:17, 53:7, 56:11
**operationally** [1] - 23:25
**opinion** [1] - 23:17
**opinions** [1] - 49:14
**opportunistically** [1] - 35:3
**opportunity** [5] - 18:9, 20:18, 28:21, 29:7, 50:19
**oppose** [1] - 31:22
**opposed** [3] - 31:12, 41:12, 51:11
**opposite** [1] - 20:25
**opposition** [3] - 19:5, 19:15, 28:22
**oppositional** [1] - 34:25
**orally** [1] - 10:11
**orbit** [1] - 48:11
**order** [35] - 4:22, 5:17, 10:7, 10:8, 10:26, 14:11, 15:18, 21:21, 21:22, 22:6, 28:5, 31:7, 31:12, 35:18, 37:10, 37:14, 37:18, 38:24, 40:2, 40:18, 40:19, 40:24, 44:16, 48:3, 48:23, 50:7, 51:24, 54:9, 54:12, 56:26, 57:3, 58:2
**ordered** [3] - 7:14, 39:19, 50:2
**orders** [31] - 10:20, 16:13, 22:15, 27:17, 31:7, 31:21, 31:23, 32:4, 32:5, 32:12, 32:13, 32:16, 32:19, 32:22, 32:23, 32:26, 35:15, 39:17, 39:19, 39:23, 43:5, 48:4, 48:21, 49:21, 50:9, 50:17, 50:20, 51:3, 51:20, 53:6
**organize** [1] - 22:23
**original** [1] - 20:16
**otherwise** [1] - 35:25
**outright** [3] - 18:13, 27:4, 28:16
**outset** [1] - 5:3
**outside** [1] - 22:25
**outstanding** [2] - 37:10, 47:13
**overarching** [1] - 41:15
**overreaction** [1] - 51:14

overrides [1] - 12:25
overseeing [2] - 35:9, 53:14
oversight [1] - 18:23
own [5] - 8:5, 9:26, 28:26, 55:16

**P**

P.C [2] - 1:15, 1:19
page [1] - 6:10
pages [2] - 15:15, 18:5
paid [3] - 6:15, 6:16, 8:23
paper [1] - 56:11
papers [10] - 5:6, 13:19, 19:12, 19:15, 20:16, 26:6, 28:10, 48:26, 49:2, 58:24
Park [1] - 1:16
part [3] - 15:17, 46:11, 52:25
PART [1] - 1:2
participate [1] - 11:24
participation [1] - 34:4
particular [1] - 50:24
particularly [1] - 53:13
parties [16] - 31:15, 31:16, 39:26, 41:9, 41:11, 41:17, 42:23, 44:8, 45:4, 45:9, 48:10, 54:10, 54:11, 54:13, 57:16, 57:21
partner [1] - 4:20
partners [2] - 44:4, 54:11
partnership [1] - 54:7
parts [2] - 19:3, 19:6
party [4] - 19:26, 42:16, 47:15, 55:21
past [6] - 41:26, 50:15, 53:8, 57:9, 57:14, 58:3
pay [4] - 8:26, 14:8, 16:8, 17:2
paying [1] - 45:24, 52:8
payments [1] - 17:4
payroll [1] - 10:18
pending [3] - 21:23, 31:18, 39:19
people [10] - 35:26, 36:20, 37:21, 37:22, 39:17, 47:7, 49:7, 53:5, 53:9, 58:3
people's [1] - 9:16
peppered [1] - 39:10
perceives [1] - 25:5
percent [1] - 19:24,

26:20, 54:7, 54:24
perfectly [1] - 44:3
periodically [1] - 43:26
permanent [1] - 57:13
permanently [1] - 12:6
permission [1] - 53:25
permit [3] - 37:19, 43:22, 53:6
person [6] - 11:20, 13:14, 14:19, 14:24, 18:17, 18:18
personal [6] - 11:16, 11:18, 13:24, 14:7, 14:20, 17:10
persons [1] - 12:16
perspective [3] - 35:3, 35:4, 50:18
persuaded [1] - 49:17
phone [1] - 40:15
pick [1] - 21:11
place [5] - 20:17, 25:7, 27:21, 31:14, 31:23
plaintiff [13] - 3:4, 3:6, 3:25, 19:14, 39:20, 48:26, 49:18, 49:22, 50:11, 50:18, 51:15, 56:7, 58:9
plaintiffs [2] - 31:19, 50:14
Plaintiffs [1] - 1:6, 1:16
Plaza [1] - 1:16
pleadings [1] - 27:6
PLLC [1] - 1:22
plus [1] - 18:5
point [20] - 7:3, 15:8, 19:23, 20:14, 20:15, 23:13, 28:3, 28:9, 30:14, 30:17, 34:16, 34:24, 37:12, 40:21, 48:24, 50:26, 52:13, 53:19, 54:8, 57:11
pointed [1] - 10:3, 24:3, 24:6, 29:20
pointing [1] - 37:26
points [3] - 17:23, 28:3, 29:23
policy [1] - 14:2, 17:7
polite [1] - 50:22
portions [1] - 20:15
posing [1] - 25:25
position [3] - 19:17, 31:6, 32:18
possible [1] - 50:19
post [1] - 55:21
postpone [1] - 20:11
potential [2] - 21:10, 55:23
potentially [4] - 32:13,

35:7, 51:4, 55:4
pouring [1] - 20:5
power [2] - 35:5, 47:9
powers [2] - 24:18, 24:19
practicable [1] - 39:12
practice [5] - 27:22, 27:26, 32:14, 32:15, 41:11
precedent [1] - 30:17
precisely [1] - 20:25
preferable [1] - 41:5
prejudice [2] - 30:13, 55:15
preliminary [9] - 3:24, 19:11, 21:18, 31:20, 42:22, 47:16, 47:22, 47:26, 56:17
prepared [1] - 12:3
prerogative [1] - 47:11
presented [2] - 30:11, 34:13
president [1] - 8:8
pretty [1] - 50:25
prevent [1] - 47:23
principals [7] - 19:25, 23:12, 29:21, 34:17, 34:25, 35:24, 44:20
principle [2] - 22:10, 48:23
principles [2] - 23:15, 43:2
priority [1] - 17:4
private [3] - 8:24, 41:18, 41:25
probability [6] - 24:10, 29:18, 30:7, 30:9, 30:10, 30:22
problem [4] - 11:11, 23:9, 41:22, 50:24
procedure [2] - 20:17, 53:7
process [3] - 19:10, 27:24, 39:13
processing [1] - 39:9
profit [3] - 36:12, 36:14, 37:5
prologue [2] - 53:8, 58:3
prong [1] - 30:8
pronouncements [1] - 37:17
proper [1] - 6:12
properly [1] - 42:20
properties [2] - 36:16, 46:26
property [2] - 36:17, 47:23
proposed [1] - 33:17
prospect [1] - 47:19

protect [1] - 6:20
protecting [1] - 34:26
protest [1] - 11:25
provide [3] - 38:18, 38:22, 39:7
provided [2] - 21:20, 21:22
provides [2] - 23:20, 39:2
providing [1] - 50:2
provision [2] - 7:3, 7:5
provisional [1] - 47:20
provisions [3] - 41:15, 42:7, 52:2
proviso [1] - 45:19
purchaser [1] - 3:18
purgery [1] - 49:12
purpose [4] - 13:18, 13:19, 35:18, 47:21
purposes [2] - 32:16, 44:15
push [1] - 52:10
put [13] - 4:22, 10:9, 10:26, 11:26, 16:10, 19:17, 31:14, 33:14, 35:16, 48:22, 52:4, 53:11, 56:5
puts [1] - 56:11
putting [1] - 20:8

**Q**

questions [2] - 29:16, 47:12
quick [3] - 40:8, 40:10, 55:12
QuickBooks [3] - 16:4, 16:7, 16:10
quickly [3] - 36:4, 39:11, 49:17
quit [2] - 11:23, 12:5
quo [11] - 21:20, 21:23, 24:7, 24:9, 24:18, 24:21, 31:3, 31:13, 42:23, 47:23, 50:17

**R**

ramp [1] - 3:21
rarely [1] - 17:16
rather [1] - 32:2
rationale [1] - 35:14
rationally [1] - 55:22
reach [1] - 26:13
reached [2] - 34:10, 34:11
reaching [1] - 26:24
read [6] - 10:20, 12:4, 21:9, 23:7, 30:19,

56:10
reading [1] - 5:22
REAL [1] - 1:4
real [5] - 4:15, 4:16, 26:26, 35:12, 52:11
Real [4] - 26:18, 26:19, 26:21, 34:9
really [28] - 4:18, 4:19, 5:22, 7:12, 7:14, 10:18, 10:20, 10:25, 11:17, 12:24, 13:3, 19:16, 22:8, 22:19, 27:7, 33:9, 33:22, 34:17, 40:8, 43:24, 47:4, 48:5, 48:8, 48:24, 51:12, 52:20, 53:10, 56:3
reason [3] - 29:24, 32:18, 58:24
reasonable [2] - 31:17, 39:14
reasonably [1] - 55:22
reasoning [1] - 55:5
reasons [2] - 41:9, 46:22
receive [3] - 6:23, 6:25, 6:26
received [3] - 10:14, 19:24, 38:14
receiver [10] - 3:19, 35:11, 36:23, 36:24, 36:26, 37:23, 40:12, 40:14, 40:20, 40:23
receives [1] - 10:21
receiving [1] - 44:26
recently [2] - 20:2, 22:12
recognize [2] - 19:10, 20:9, 31:13, 42:15
recognizing [1] - 33:8
reconfirm [1] - 45:21
record [5] - 14:23, 16:15, 17:7, 37:17, 48:19
recovered [1] - 50:5
reference [3] - 40:23, 40:24, 57:5
referring [1] - 28:15
refers [2] - 33:16, 33:17
reflect [1] - 19:13
refuse [1] - 16:13
refused [6] - 7:18, 7:20, 7:26, 13:22, 13:23, 14:8
refuses [2] - 8:24, 13:18
refusing [1] - 13:15, 13:17
regarding [2] - 34:8,

37:7
**regulate** [1] - 44:15
**reign** [1] - 41:12
**reimburse** [3] - 8:24, 13:23, 14:6
**reinstitute** [1] - 22:6
**related** [1] - 55:22
**relationship** [3] - 23:4, 30:4, 46:19
**relatively** [3] - 20:2, 48:9, 48:22
**release** [1] - 15:16
**relevant** [2] - 19:20, 27:7
**relief** [12] - 24:17, 27:3, 27:11, 30:26, 31:3, 33:4, 33:5, 47:20, 49:20, 50:8, 51:16, 55:17
**remarks** [1] - 17:18
**remedy** [2] - 37:25, 47:16
**remember** [2] - 9:14, 13:6
**removal** [2] - 27:5, 27:9
**remove** [5] - 31:26, 37:21, 52:13, 52:15, 54:18
**removed** [4] - 18:8, 32:24, 33:2, 52:19
**removing** [1] - 13:22
**render** [1] - 47:24
**reply** [11] - 17:24, 17:26, 18:5, 19:2, 19:4, 19:6, 19:9, 21:15, 28:22, 48:26
**Reporter** [2] - 2:13, 59:26
**REPUBLIC** [1] - 1:8
**Republic** [5] - 2:4, 3:19, 10:12, 11:3, 46:2
**reputation** [1] - 15:13
**request** [1] - 18:20
**require** [1] - 7:6
**required** [3] - 33:9, 38:24, 56:14
**requirement** [2] - 7:8, 55:20
**requires** [2] - 7:4, 15:26
**resigned** [1] - 11:23
**resigning** [1] - 11:25
**resolution** [5] - 21:23, 31:14, 34:22, 35:23, 35:25
**resolvable** [1] - 50:4
**resolved** [1] - 49:17
**respect** [1] - 20:21

respective [1] - 57:24
**respond** [6] - 17:26, 20:18, 27:12, 28:20, 38:12, 56:8
**responding** [1] - 19:4
**response** [1] - 57:4
**responsibilities** [2] - 51:8, 51:10
**responsibility** [2] - 22:25, 57:20
**restore** [2] - 31:23, 31:14, 31:15
**retain** [1] - 6:19
**retribution** [1] - 41:12
**return** [1] - 37:9
**reverse** [1] - 21:11
**revert** [1] - 13:13
**review** [1] - 56:8
**revising** [1] - 23:6
**rid** [2] - 6:9, 58:26
**rightly** [1] - 35:16
**rights** [26] - 12:21, 12:22, 13:13, 22:9, 22:21, 23:8, 23:17, 23:21, 26:13, 27:14, 31:16, 37:15, 37:19, 46:9, 52:10, 52:24, 52:26, 53:3, 54:24, 54:25, 55:4, 55:8, 55:9, 56:21, 57:13, 57:16
**rise** [1] - 54:22
**robust** [1] - 23:21
**role** [5] - 23:24, 35:17, 42:25, 43:20, 53:13
**rollout** [1] - 4:11
**rough** [1] - 5:5
**roughly** [1] - 3:26
**ruin** [1] - 41:2
**ruling** [2] - 45:8, 52:22
**run** [7] - 6:13, 9:11, 14:16, 23:2, 34:24, 35:13, 53:10
**running** [1] - 23:25
**runs** [1] - 17:5

**S**

**Sacco** [2] - 2:13, 59:25
**saw** [3] - 26:6, 33:11, 56:4
**School** [1] - 8:8
**schools** [3] - 8:24, 41:18, 41:25
**SCHWARTZ** [32] - 1:22, 1:24, 3:12, 17:20, 17:22, 20:20, 23:18, 24:2, 25:9, 25:15, 25:23, 26:10,

26:15, 27:2, 27:15, 27:19, 28:14, 28:20, 29:17, 31:10, 31:24, 32:7, 32:10, 33:24, 36:3, 55:11, 55:14, 55:19, 56:18, 57:26, 58:5, 58:12
**Schwartz** [1] - 3:12
**scolding** [1] - 21:2
**scope** [2] - 22:25, 49:20
**screaming** [1] - 34:21
**screenshots** [2] - 18:6, 18:7
**scripted** [1] - 54:9
**second** [2] - 5:17, 55:19
**section** [1] - 47:9
**see** [8] - 5:6, 20:13, 27:13, 27:17, 28:18, 35:22, 35:24, 53:19
**seek** [4] - 19:14, 48:8, 49:21, 51:16
**seeking** [12] - 22:4, 24:8, 24:16, 27:3, 27:4, 27:8, 27:9, 27:10, 33:3, 33:4, 47:15, 49:23
**seem** [4] - 25:7, 49:6, 49:7, 55:3
**seemingly** [1] - 57:10
**sell** [1] - 46:26
**send** [2] - 7:15, 18:11
**sending** [2] - 41:18, 41:25
**sense** [1] - 52:21
**sent** [4] - 16:26, 18:25, 20:23, 20:24
**separate** [4] - 34:8, 34:12, 52:9, 52:12
**September** [3] - 1:10, 24:25, 29:2
**series** [2] - 35:15, 53:9
**served** [9] - 17:24, 27:23, 27:24, 36:19, 36:20, 46:16, 46:22, 46:23
**set** [3] - 17:8, 23:8, 57:15
**settlement** [1] - 34:10
**seven** [1] - 13:7
**several** [5] - 17:26, 24:10, 48:15, 48:17, 50:16
**share** [1] - 49:2
**sharply** [3] - 29:22, 30:24, 30:25
**SHERMAN** [1] - 2:3
**Sherman** [1] - 3:16
**shoot** [1] - 3:26

**short** [3] - 36:15, 55:7, 55:13
**shots** [1] - 55:10
**show** [3] - 13:10, 14:5, 29:10
**showed** [3] - 11:8, 18:24, 29:9
**showing** [1] - 16:4
**shown** [1] - 43:11
**shows** [4] - 15:2, 15:4, 15:5
**shut** [4] - 28:24, 28:25, 28:26
**shutting** [1] - 29:4
**sick** [1] - 13:9
**side** [5] - 3:26, 6:15, 21:11, 53:12, 55:26
**sides** [1] - 23:13
**sign** [2] - 6:20, 47:4
**signatory** [4] - 24:13, 37:11, 56:21, 57:5
**signature** [3] - 38:15, 39:26, 47:3
**signatures** [1] - 46:25
**signed** [3] - 10:8, 10:16, 11:6
**signing** [7] - 22:17, 22:20, 41:23, 42:6, 43:16, 43:21, 44:17
**similar** [1] - 27:14
**similarly** [2] - 28:23, 29:8
**simple** [2] - 18:23, 26:23
**simplifying** [1] - 48:13
**simply** [2] - 27:3, 29:12
**SIMPSON** [3] - 1:3, 15:2, 16:21
**Simpson** [73] - 4:20, 5:25, 6:9, 7:14, 9:2, 10:9, 10:13, 11:8, 11:21, 12:14, 12:18, 12:24, 12:26, 13:26, 14:3, 14:12, 14:22, 15:15, 16:13, 18:15, 18:17, 18:19, 18:21, 20:26, 21:2, 21:6, 21:26, 22:7, 22:16, 23:6, 23:9, 23:22, 24:8, 24:15, 24:16, 25:19, 26:2, 29:4, 29:24, 29:26, 30:2, 30:3, 31:26, 32:15, 32:23, 32:25, 33:17, 34:7, 37:12, 37:26, 39:2, 39:10, 40:16, 41:21, 42:11, 44:13, 46:15, 46:17, 48:5, 48:13, 50:7, 52:4,

52:10, 52:14, 52:15, 53:26, 54:2, 54:17, 54:19, 54:20, 55:6, 55:10, 57:9
**Simpson's** [13] - 14:20, 15:21, 16:26, 17:4, 17:6, 30:3, 31:9, 33:12, 42:9, 50:23, 52:7, 52:22, 56:23
**sit** [1] - 25:21
**sitting** [3] - 18:22, 35:10, 38:21
**situation** [8] - 11:11, 26:2, 30:25, 33:2, 42:18, 43:15, 50:21, 57:15
**situations** [2] - 42:24, 53:18
**six** [1] - 26:4
**skin** [1] - 50:25
**skis** [1] - 42:16
**slate** [1] - 22:22
**slipped** [1] - 25:15
**slow** [1] - 40:9
**slowly** [1] - 40:11
**smart** [1] - 8:11
**smoothly** [1] - 34:24
**sole** [1] - 22:2, 39:22
**solely** [2] - 37:12, 45:24
**someone** [3] - 8:19, 12:8, 41:2
**sometimes** [2] - 19:12, 44:4
**somewhat** [2] - 23:14, 33:12
**somewhere** [1] - 26:12
**soon** [2] - 45:8, 45:9
**sorry** [3] - 8:23, 29:16, 58:21
**sort** [5] - 33:7, 34:21, 35:5, 50:22, 50:23
**sorts** [2] - 42:19, 48:7
**sought** [1] - 31:20
**Southern** [1] - 26:9
**speaking** [1] - 56:14
**specific** [1] - 28:4
**specifically** [3] - 7:10, 41:8, 44:25
**speech** [1] - 9:21
**spend** [1] - 52:6
**spending** [1] - 11:19
**spirit** [1] - 51:2
**split** [1] - 34:11
**spreadsheet** [1] - 5:6
**squash** [1] - 37:20
**staff** [3] - 16:5, 16:8, 47:10

**stakeholder** [2] - 45:11, 45:14
**STAMELMAN** [1] - 2:3
**Stamelman** [1] - 3:17
**standard** [1] - 47:15
**stark** [1] - 48:25
**start** [4] - 5:19, 22:22, 46:3
**started** [3] - 3:3, 5:20, 7:18
**starting** [2] - 3:4, 42:14
**state** [2] - 4:11, 31:8
**STATE** [1] - 1:2
**statement** [4] - 15:8, 48:14, 54:10, 55:6
**statements** [2] - 19:5, 49:11
**status** [13] - 21:20, 21:23, 24:7, 24:9, 24:18, 24:21, 27:25, 31:3, 31:13, 32:20, 42:22, 47:23, 50:17
**stenographic** [1] - 59:22
**step** [2] - 19:21, 45:6
**still** [16] - 3:20, 5:16, 6:24, 14:10, 14:11, 14:12, 14:14, 15:18, 15:19, 22:20, 28:10, 29:3, 40:9, 41:14, 50:5
**stipulation** [2] - 59:2, 59:3
**stole** [1] - 8:22
**stolen** [1] - 18:7
**stopped** [1] - 23:5
**stories** [1] - 13:8
**story** [1] - 13:6
**street** [1] - 26:8
**Street's** [1] - 9:20
**strike** [2] - 20:15, 22:24
**strikes** [1] - 35:6
**striking** [1] - 19:22
**student** [1] - 8:8
**stuff** [1] - 33:18
**styles** [1] - 53:17
**subject** [10] - 22:8, 41:13, 41:14, 42:8, 49:4, 52:2, 52:23, 52:25, 55:8, 57:6
**subjects** [1] - 30:15
**submission** [3] - 19:3, 34:14, 56:6
**submissions** [1] - 55:26
**submit** [2] - 21:4, 28:21
**submitted** [9] - 20:13,

20:22, 21:2, 21:5, 21:14, 25:12, 29:13, 49:3, 55:24
**subsequent** [2] - 48:4, 57:3
**substantial** [2] - 54:25, 56:5
**substantially** [1] - 16:2
**substantive** [2] - 47:25, 54:16
**success** [9] - 24:11, 29:18, 30:7, 30:10, 30:22, 47:18, 49:19, 50:12
**suffer** [2] - 24:11, 55:24
**sufficient** [1] - 51:21
**suggest** [1] - 49:12
**suggesting** [1] - 41:26
**suing** [1] - 1:4
**Suite** [1] - 1:23
**summer** [1] - 36:13
**supersede** [1] - 39:23
**supplement** [1] - 19:14
**support** [1] - 19:8
**supported** [1] - 50:22
**supporting** [2] - 15:20, 15:23
**suppose** [3] - 13:11, 13:12, 16:11
**SUPREME** [1] - 1:2
**Supreme** [1] - 1:12
**sur** [1] - 28:22
**sur-reply** [1] - 28:22
**surprise** [1] - 46:14
**surprised** [2] - 33:8, 39:25
**survive** [3] - 4:19, 6:3, 6:5
**surviving** [1] - 4:17
**suspect** [1] - 49:16
**swearing** [1] - 19:25
**swirling** [1] - 35:5
**Sylvester** [1] - 3:16
**SYLVESTER** [1] - 2:3
**Syracuse** [1] - 8:8
**systems** [1] - 28:24

**T**

**taker** [1] - 44:16
**tax** [9] - 16:5, 16:10, 16:15, 25:16, 25:22, 25:23, 25:26, 37:6
**tax-free** [1] - 25:22
**Teams** [1] - 3:14
**technical** [1] - 26:17
**temperature** [1] - 51:3

**temporarily** [1] - 11:23
**ten** [1] - 11:7
**tend** [1] - 51:14
**TERM** [1] - 1:2
**terminated** [1] - 28:25
**terminating** [1] - 29:26
**termination** [1] - 27:14
**terms** [12] - 23:25, 27:7, 29:18, 29:25, 30:4, 30:7, 30:22, 32:5, 32:20, 43:4, 55:20, 57:6
**test** [3] - 19:20, 20:6, 20:10
**testified** [1] - 18:15
**testimony** [6] - 28:16, 29:6, 29:12, 29:21, 34:14, 49:4
**thankfully** [1] - 46:20
**THE** [74] - 3:2, 3:7, 3:14, 3:20, 3:23, 4:7, 4:24, 9:18, 9:23, 12:21, 14:23, 15:7, 15:20, 15:24, 16:6, 16:15, 16:17, 16:23, 17:19, 17:21, 19:2, 22:5, 23:25, 25:7, 25:22, 26:5, 26:11, 26:23, 27:12, 27:16, 28:2, 28:13, 28:17, 29:15, 31:5, 31:19, 32:5, 32:9, 33:6, 34:15, 36:5, 36:9, 36:16, 38:5, 38:9, 38:23, 39:16, 40:6, 40:9, 40:21, 40:23, 41:7, 42:14, 43:14, 44:14, 45:4, 45:16, 45:19, 46:8, 46:14, 47:14, 53:23, 54:6, 55:13, 55:18, 55:25, 56:12, 56:17, 57:2, 58:2, 58:9, 58:14, 58:19, 58:21
**themselves** [1] - 35:26
**thereafter** [1] - 32:15
**thereby** [1] - 31:26
**thick** [1] - 50:25
**Third** [1] - 2:4
**third** [2] - 19:26, 41:3
**thoroughly** [1] - 12:11
**threatening** [2] - 21:9, 30:2
**threats** [1] - 44:26
**three** [6] - 7:2, 11:22, 20:22, 24:14, 35:4, 37:22
**thumb** [1] - 38:2

**tied** [1] - 34:18
**today** [13] - 3:23, 5:13, 5:20, 14:14, 21:17, 25:10, 36:18, 36:21, 39:20, 46:21, 51:15, 57:11
**together** [1] - 54:12
**tons** [2] - 5:4
**took** [3] - 10:11, 14:6, 39:25
**top** [1] - 21:21
**total** [1] - 4:2
**totally** [1] - 23:12
**tough** [3] - 4:17, 5:10, 53:16
**towards** [1] - 30:5
**transactions** [8] - 38:19, 39:3, 39:8, 41:14, 45:2, 52:2, 52:18, 52:23
**transcript** [4] - 37:16, 40:14, 58:2, 59:21
**transfer** [1] - 18:20
**transfers** [3] - 17:2, 25:16, 36:14
**tried** [2] - 36:18, 48:15
**trips** [1] - 54:18
**Tristan** [1] - 11:15
**TRO** [2] - 24:5, 24:25
**trouble** [2] - 9:13, 43:4
**true** [2] - 23:5, 59:21
**trust** [2] - 41:10, 44:9
**truth** [1] - 20:5
**try** [6] - 4:2, 5:13, 7:25, 13:2, 51:19, 53:10
**trying** [8] - 7:21, 14:15, 35:17, 41:2, 47:8, 51:3, 53:14, 57:15
**turn** [1] - 50:21
**turning** [1] - 33:15
**two** [14] - 12:12, 17:25, 19:25, 23:11, 24:11, 28:3, 34:17, 34:25, 36:11, 44:16, 44:20, 55:12, 58:17, 58:21
**Tyler** [1] - 3:16
**type** [2] - 12:26, 44:3

**U**

**ultimate** [1] - 47:18
**ultimately** [1] - 44:18
**unclear** [2] - 27:2, 32:20
**under** [15] - 7:2, 12:14, 12:15, 12:16, 30:16, 31:16, 35:14, 35:26, 39:17, 46:12, 52:26,

53:5, 55:7
**understood** [3] - 43:10, 44:11, 56:16
**unfold** [1] - 24:23
**unfurl** [1] - 23:10
**unless** [4] - 7:22, 32:6, 52:14, 54:6
**Unless** [1] - 54:17
**unsupported** [1] - 49:15
**up** [18] - 5:9, 5:15, 10:4, 13:10, 16:4, 17:8, 22:16, 30:2, 33:23, 34:5, 34:12, 36:24, 48:22, 54:7, 54:16, 57:3, 57:15
**update** [1] - 15:16
**urge** [1] - 53:10
**uses** [1] - 46:17

**V**

**value** [1] - 49:11
**variety** [1] - 57:11
**various** [4] - 19:25, 20:5, 42:3, 49:11
**vendetta** [1] - 53:11
**vendettas** [3] - 51:12, 51:13, 51:14
**version** [1] - 35:11
**versus** [1] - 46:15
**vesting** [1] - 38:15
**via** [1] - 4:22
**view** [4] - 48:19, 49:21, 50:26, 51:15
**viewed** [2] - 44:18, 53:16
**viewing** [10] - 10:21, 10:25, 11:4, 11:6, 37:15, 37:19, 39:4, 41:4, 42:12
**violated** [1] - 7:11
**violating** [2] - 5:16, 14:11
**violations** [1] - 22:15
**Virtually** [1] - 2:5
**voice** [1] - 49:8
**volatile** [1] - 30:3
**voluntary** [3] - 58:13, 58:15, 58:18

**W**

**wait** [1] - 38:17
**waiting** [2] - 3:20, 39:8
**waive** [1] - 34:23
**waiving** [2] - 11:16, 42:6
**Wall** [1] - 9:20
**wand** [1] - 34:23

**wants** [4] – 6:13, 9:9, 39:11, 48:13

**watched** [1] – 23:10

**water** [1] – 36:2

**waves** [1] – 19:19

**ways** [6] – 34:12, 42:4, 43:4, 48:15, 48:17, 50:22

**website** [11] – 15:11, 15:12, 15:13, 15:14, 15:16, 18:16, 18:21, 28:8, 28:14, 29:9, 50:3

**week** [2] – 6:7, 10:16

**weeks** [2] – 18:25, 50:16

**weight** [1] – 19:23

**Weitzman** [1] – 46:18

**welcome** [1] – 7:15

**whereby** [1] – 6:19

**whole** [3] – 19:22, 34:20, 41:16

**wide** [1] – 57:11

**willing** [1] – 48:24

**wipe** [2] – 22:21, 31:6

**withheld** [1] – 47:20

**witnesses** [1] – 34:19

**woke** [1] – 22:16

**Wolf** [1] – 13:7

**word** [2] – 9:15, 18:3

**worded** [1] – 41:8

**words** [1] – 51:23

**works** [2] – 15:15, 54:16

**world** [3] – 4:15, 34:23, 44:25

**write** [2] – 53:26, 54:3

**writes** [1] – 53:25

**writing** [3] – 6:17, 11:26, 12:2

**written** [1] – 49:6

**wrote** [3] – 5:26, 10:12, 11:10

## Y

**year** [1] – 13:7

**years** [3] – 8:14, 23:2, 52:20

**yesterday** [8] – 10:5, 10:14, 18:11, 20:23, 24:26, 38:14, 38:26, 40:3

**YORK** [2] – 1:2, 1:2

**York** [10] – 1:17, 1:20, 1:24, 2:5, 3:10, 3:11

**young** [1] – 8:7

# EXHIBIT 32

At Part 3 of the Supreme Court of
the State of New York, held in and
for the County of New York, at the
Courthouse located at 60 Centre
Street, New York, New York on the
2nd day of February 2024

PRESENT: Hon. Joel M. Cohen
          J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

--------------------------------------------------------------------x

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,

               *Plaintiffs*

          -against-

JARED CHASSEN and FIRST REPUBLIC BANK,

              *Defendants*

--------------------------------------------------------------------x

JARED CHASSEN, individually and derivatively
on behalf of JJ ARCH LLC, as member,
and derivatively on behalf of
ARCH REAL ESTATE HOLDINGS LLC,
as member of JJ ARCH,

            *Counterclaim Plaintiff*

          -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

            *Counterclaim Defendants*

Index No. 158055/2023

Mot. Seq. 007

Justice Joel M. Cohen

**ORDER TO SHOW CAUSE**

-and-

JJ ARCH LLC and
ARCH REAL ESTATE HOLDINGS LLC,

*Nominal Defendants*

------------------------------------------------------------------------x

608941 NJ, INC.

*Plaintiff*

-against-

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
ESTATE HOLDINGS LLC,

*Defendants*,
-and-

ARCH REAL ESTATE HOLDINGS LLC,

*Nominal Defendant*

------------------------------------------------------------------------x

## **ORDER TO SHOW CAUSE**

Upon the annexed affirmation of Allen Schwartz, Esq., together with its exhibits, the

annexed affirmation of Jared Chassen, together with its exhibits, the amended counterclaims, the

memorandum of law, and all documents cited therein, the opposition filed on February 1, 2024,

and all pleadings and proceedings had herein, and for the reasons stated on the record at the

February 2, 2024 hearing:

LET Jeffrey Simpson ("Simpson") and JJ Arch LLC and its counsel show cause before

this Court, at Part 3, Room 208, at the Courthouse located at 60 Centre Street, New York, New

York **on June 6,**  ƒ **2024, at 9:30 a.m.** or as soon thereafter as counsel can be heard, why an

order should not be entered:

(1) pursuant to CPLR 6401 and the court's plenary power appointing a temporary receiver (the "Receiver") to: (a) manage and take control of JJ Arch LLC's ("JJ Arch") membership and managerial interests in 225 HPR LLC, 1640 Montauk LLC, 1640 Motors LLC, JJ NY 550 LLC aka 550 Metropolitan Ave LLC, 146 E. 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, 146 E. 89 Borrower 3 LLC, and any subsidiaries of the aforementioned entities (together "the JJ Arch Controlled Entities"), and any properties or assets held or owned by the JJ Arch Controlled Entities, (b) manage and take control of JJ Arch's and the JJ Arch Controlled Entities' funds, records, and bank accounts; (c) make or proceed with any and all insurance claims on behalf of JJ Arch and the JJ Arch Controlled Entities, and manage any such claims; (d) select, retain, and manage the legal representation for JJ Arch in this action and for 146 E. 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, 146 E. 89 Borrower 3 LLC in the foreclosure proceeding captioned *146 89 Funding LLC v. 146 E. 89 Borrower 1 LLC, et. al.*, Index No. 850101/2024 (N.Y. Co.) (the "Foreclosure Action") in consultation with Chassen and Simpson (collectively, the "Property"), on the grounds that JJ Arch's assets cannot be properly safeguarded, preserved and protected, and there is danger that the Property will be materially injured or destroyed, without a Receiver during the pendency of the proceeding and the resolution of the claims between the two members of JJ Arch;

(2) issuing a temporary restraining order and preliminary injunction barring and enjoining Simpson without Chassen's consent (a) from transferring, encumbering, selling, or otherwise disposing of any JJ Arch or JJ Arch Controlled Entities

assets, (b) from transferring, encumbering, selling, or otherwise disposing of assets that are or were to be conveyed to Chassen under the August 1, 2023 contract between Simpson and YJ Simco LLC and Chassen (the "August 1 Contract"), (c) from taking any distributions from JJ Arch or the JJ Arch Controlled Entities assets, (d) from interfering with Chassen's right to co-manage HPR LLC as provided in the August 1 Contract; and (e) from paying for Simpson's counsel in this action from JJ Arch funds without posting an undertaking to JJ Arch as required by Section 10.3 of the JJ Arch LLC Operating Agreement;

(3) issuing a temporary restraining order and preliminary injunction requiring that Simpson provide Chassen with full viewing access of the bank accounts of JJ Arch and the JJ Arch Controlled Entities and that Simpson provide Chassen with the JJ Arch and JJ Arch Controlled Entities' books and records as requested by Chassen in his books and records demand;

(4) disqualifying Steven Altman, Esq., Altman & Company P.C., and DLA Piper US LLP, and any other counsel, from representing JJ Arch or Simpson as conflicted by their representation of both Simpson and JJ Arch in this proceeding and in the event a receiver is not appointed to retain counsel for JJ Arch, requiring that Chassen consent to any retention for JJ Arch pursuant to Section 3.1(b) of the JJ Arch LLC Operating Agreement and conflict waiver rules;

(5) pursuant to CPLR 2201 staying this action for at least 30 days to enable JJ Arch to obtain independent counsel; and

(6) granting such other and further relief as the Court deems just and proper.

**SUFFICIENT CAUSE THEREFORE APPEARING**, it is

**ORDERED** that, pending the hearing of this motion, Simpson, and all acting in concert with him, are enjoined and restrained from: (1) selling, transferring, or encumbering JJ Arch assets, or assets owned or controlled by the JJ Arch Controlled Entities, without Chassen's written consent under Section 3.2 of the JJ Arch Operating Agreement (as amended), which consent shall not be unreasonably withheld; (2) making distributions to themselves from JJ Arch's or the JJ Arch Controlled Entities' accounts in a way that contravenes Article 5 of the JJ Arch Operating Agreement (as amended); and (3) using JJ Arch's or JJ Arch Controlled Entities' funds, or other money drawn directly from JJ Arch or JJ Arch Controlled Entities' accounts to make payments to counsel representing Simpson in a personal capacity; and it is further

**ORDERED** that, pending the hearing of this motion, Simpson shall: (1) ensure and continue to ensure that Chassen is provided with online viewing access for all bank accounts of JJ Arch and the JJ Arch Controlled Entities, and (2) provide and continue to provide Chassen with the JJ Arch and JJ Arch Controlled Entities' books and records under the process detailed in Article 6 of the JJ Arch Operating Agreement (as amended); and it is further

**ORDERED** that except as provided herein, nothing abrogates or supersedes the Court's November 22, 2023 Decision and Order, NYSCEF No. 419, which otherwise remains in full force and effect; and it is further

**ORDERED** that nothing herein abrogates or supersedes paragraph 2 of the Court's November 22, 2023 Amended Decision and Order, NYSCEF No. 418, which remains in full force and effect; it is further

**ORDERED** that opposition briefs supplementing those already filed in connection with the motion-in-chief and principal briefs on cross-motions, if any, be served, noticed, filed, and uploaded to NYSCEF as appropriate **on or before March 22, 2024**; it is further

**ORDERED** that reply briefs in further support of the motion-in-chief and opposition to cross-motions, if any, be served, noticed, filed, and uploaded to NYSCEF as appropriate **on or before April 19, 2024**; it is further

**ORDERED** that the parties shall confer and submit a joint proposed witness list (in connection with both MS 007 **and** MS 008) **on or before April 30, 2024**, which list shall identify the witnesses and which party intends to call them and may include one brief sentence explaining why that witness is necessary; it is further

**ORDERED** that reply briefs in further support of cross-motions, if any, be served, noticed, filed, and uploaded to NYSCEF as appropriate **on or before May 17, 2024**; it is further

**ORDERED** that the parties shall confer and submit one joint filing (in connection with both MS 007 **and** MS 008), including all pre-marked exhibits, and indicating whether they are Joint Exhibits ("JX"), plaintiff Simpson's proposed exhibits ("PX"), defendant Chassen's proposed exhibits ("DX"), or intervenor Oak's proposed exhibits ("IX"), **on or before May 23, 2024**; it is further

**ORDERED** that the parties upload a copy of the transcript of the February 2, 2024 hearing to NYSCEF upon receipt; it is further

**ORDERED** that service of this Order and annexed affidavits upon the parties and their counsel via NYSCEF **and via email to counsel for all parties** on or before February 9, 2024, be deemed good and sufficient service thereof.

[Signature page follows.]

ENTER:

Hon. Joel M. Cohen, J.S.C.

Date: 2/7/24

# EXHIBIT 33

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
------------------------------------------------------------------------x
JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,

        *Plaintiffs*                       Index No. 158055/2023

        -against-                     Justice Joel M. Cohen

JARED CHASSEN and FIRST REPUBLIC BANK,

        *Defendants*
------------------------------------------------------------------------x
JARED CHASSEN, individually and derivatively
on behalf of JJ ARCH LLC, as member,
and derivatively on behalf of
ARCH REAL ESTATE HOLDINGS LLC,
as member of JJ ARCH LLC,

        *Counterclaim Plaintiff*

        -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

        *Counterclaim Defendants*

        -and-

JJ ARCH LLC and
ARCH REAL ESTATE HOLDINGS LLC,

        *Nominal Defendants*
------------------------------------------------------------------------x
608941 NJ, INC.

        *Plaintiff*

        -against-

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
ESTATE HOLDINGS LLC,

1

*Defendants*,

-and-

ARCH REAL ESTATE HOLDINGS LLC,

*Nominal Defendant*

------------------------------------------------------------------------x

### AFFIRMATION OF JARED CHASSEN IN SUPPORT OF EMERGENCY MOTION

STATE OF NEW YORK      )
                                 ) ss.:
COUNTY OF NEW YORK     )

Jared Chassen, being duly deposed, affirms under penalty of perjury pursuant to CPLR 2106 as follows:

1.       I am the defendant and counter-claim plaintiff in the above-captioned action and a member of JJ Arch LLC (JJ Arch"). I submit this affirmation in support of my emergency motion seeking an order:

(1) pursuant to CPLR 6401 and the court's plenary power appointing a temporary receiver (the "Receiver") to: (a) manage and take control of JJ Arch LLC's ("JJ Arch") membership and managerial interests in 225 HPR LLC, 1640 Montauk LLC, 1640 Motors LLC, JJ NY 550 LLC aka 550 Metropolitan Ave LLC, 146 E. 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, 146 E. 89 Borrower 3 LLC, and any subsidiaries of the aforementioned entities (together "the JJ Arch Controlled Entities"), and any properties or assets held or owned by the JJ Arch Controlled Entities, (b) manage and take control of JJ Arch's and the JJ Arch Controlled Entities' funds, records, and bank accounts; (c) make or proceed with any and all insurance claims on behalf of JJ Arch; (d) select, retain, and manage the legal

2

representation for JJ Arch in this action and for 146 E. 89 Borrower 1 LLC, 146 E.

89 Borrower 2 LLC, 146 E. 89 Borrower 3 LLC in the foreclosure proceeding

captioned *146 89 Funding LLC v. 146 E. 89 Borrower 1 LLC, et. al.*, Index No.

850101/2024 (N.Y. Co.) (the "Foreclosure Action") in consultation with Chassen

and Simpson (collectively, the "Property"), on the grounds that JJ Arch's assets

cannot be properly safeguarded, preserved and protected, and there is danger that

the Property will be materially injured or destroyed, without a Receiver during the

pendency of the proceeding and the resolution of the claims between the two

members of JJ Arch;

(2) issuing a temporary restraining order and preliminary injunction barring and

enjoining Simpson without Chassen's consent (a) from transferring, encumbering,

selling, or otherwise disposing of any JJ Arch or JJ Arch Controlled Entities

assets or (b) from transferring, encumbering, selling, or otherwise disposing or

assets that were to be conveyed to Chassen under the August 1, 2023 contract

between Simpson and YJ Simco LLC and Chassen (the "August 1 Contract); (c)

from taking any distributions from JJ Arch or the JJ Arch Controlled Entities

assets, (d) interfering with Chassen's right to co-manage HPR LLC as provided in

the Contract; and (e) from paying for Simpson's counsel in this action from JJ

Arch funds without posting an undertaking to JJ Arch as required by Section 10.3

of the JJ Arch LLC Operating Agreement;

(3) issuing a preliminary injunction, requiring that Simpson, JJ Arch, and the JJ Arch

Controlled Entities provide Chassen with full viewing access of the bank accounts

of JJ Arch and the JJ Arch Controlled Entities and that they provide Chassen with

3

the JJ Arch Controlled Entities' books and records as requested by Chassen in his

books and records demand;

(4) disqualifying Steven Altman, Esq., Altman & Company P.C., and DLA Piper US

LLP, and any other counsel, from representing JJ Arch or Simpson as conflicted

by their representation of both Simpson and JJ Arch in this proceeding and in the

event a receiver is not appointed to retain counsel for JJ Arch, requiring that

Chassen consent to any retention for JJ Arch pursuant to Section 3.2 of the

Operating Agreement;

(5) pursuant to CPLR 2201 staying this action for at least 30 days to enable JJ Arch to

obtain independent counsel; and

(6) granting such other and further relief as the Court deems just and proper.

## **INTRODUCTION**

2.      The appointment of a temporary receiver over the Property is a matter of great

urgency. Without a receiver, JJ Arch and its assets will be materially injured and destroyed while

this action is pending. Simpson has already said he take can whatever he wants, and he will

continue to loot, injure and destroy the Property while this action is pending to ensure that I am

left with nothing. He has already looted accounts for his own personal use and is presently

attempting to sell unique and irreplaceable assets on his own personal account that he expressly

agreed belong to me pursuant to our signed August 1, 2023 contract.

3.      He has brought JJ Arch's properties into disrepair and default. Indeed, on January

11, 2024, the lender on the mortgage for one of these properties, owned together with innocent

third-party investors, filed the Foreclosure Action, naming me as a defendant guarantor for any

4

deficiency. A copy of the Complaint is annexed hereto as **Exhibit 1**. Simpson has even refused to insure that property.

4.      Simpson's behavior is increasingly unhinged. He has even broken into an Airbnb property while a paying tenant was there, taking the position that he can do as he pleases, there violating Airbnb privacy rules.

5.      Simpson's malfeasance is well-documented.[1] He has grievously damaged Arch Real Estate Holdings, LLC ("AREH") and JJ Arch, AREH's former managing member. And though the Court did not ultimately hold him in contempt for removing my bank account access in September 2023 in violation of an express directive of this Court (the First Republic user logs showed that he did exactly that (NYSCEF No. 211)), this Court recognized that Simpson "has demonstrated the inclination to take every opportunity possible to either get around court orders or further inflame the situation at every turn." NYSCEF No. 224, Sept. 29, 2023, Hr. Tr. at 50:18-21. Simpson "has acted in ways that trouble [the Court] in terms of complying with court orders . . ." *Id.* at 43:3-5. Indeed, because of Simpson's malfeasance, this Court removed JJ Arch as managing member of AREH on November 20, 2023 for the remainder of this litigation, replacing it with AREH's investor member, 608941 NJ Inc. ("Oak"). NYSCEF No. 412. The

---

[1] *See* NYSCEF No. 62, Sept. 14, 2023 Chassen Aff.; NYSCEF No. 96, Sept. 18, 2023 Chassen Aff.; NYSCEF No. 186, Oct. 6, 2023 Chassen Aff.; NYSCEF No. 198, Oct. 13, 2023 Chassen Aff; NYSCEF No. 227, NYSCEF No. 270, Oct. 19, 2023 Chassen Aff.; NYSCEF No. 341, Nov. 13, 2023 Chassen Aff. I incorporate these affidavits by reference, which address many of Simpson's regurgitated claims, including his contradictory claim that I am at the same time behind Oak's actions, (NYSCEF No. 363 at ¶ 2), and its puppet. *Id.* at ¶ 5. In fact, it was Simpson who first proposed to Oak that it take over JJ Arch in July 2023, but he grew enraged when Oak, on its own accord, suggested that I be put in charge of JJ Arch instead of Oak so that it did not face potential guarantor liability. *See* NYSCEF No. 186, Oct. 6, 2023 Chassen Aff. at ¶¶ 6-18; *See also* NYSCEF No. 200, Simpson's July 13, 2023 email proposal and NYSCEF No. 201, responsive exchange.

same malfeasance underpinning the preliminary injunction obtained by Oak also supports this motion for a receiver.

6.      Without a temporary receiver there is a clear and present danger that the properties I own with Simpson through JJ Arch will be materially injured or destroyed by Simpson during the pendency of this litigation, as he seeks to extract all value for himself so that I and other investors are left with nothing.

7.      These properties constitute my life's savings, and without them I will have effectively lost everything, while facing full recourse liability on the assets' personal guaranties, all before this litigation is concluded, including the adjudication of my amended counterclaims seeking relief as to these very same properties. NYSCEF No. 392. And Simpson understands what these assets mean to me and has been, and is using, his control of these assets to hurt me. And besides the harm to me, there are third party investors in some of these properties that Simpson is treating as collateral damage. In addition to the liability he faces from my suit against him, Simpson also faces massive liability to 608941 NJ Inc. ("Oak") and investors and has every incentive to extract and spend the value of these assets now, leaving me with nothing.

I.      **A TEMPORARY RECEIVER AND INTERIM INJUNCTION IS NECCESARY TO PREVENT THE DESTRUCTION AND DISSIPATION OF PROPERTY AT ISSUE DURING THE PENDENCY OF THIS PROCEEDING**

A.  **Simpson's Stated Position is that "_I Can Take Whatever Cash I Need Without Your Consent_"**

8.      Simpson's evident belief that he can do as he pleases is not supposition. Simpson recently wrote me that he has unchecked power to loot our jointly owned assets based on his bogus claim that I owe him $1.2 million (addressed _infra_ at ¶¶ 52-64, and the subject of some of my counterclaims), saying, "I have the full and exclusive right [to] issue capital calls and you

6

owe $1.2 million so I can take whatever cash I need without your consent." A true and correct copy of this email is annexed hereto as **Exhibit 2**.

9.     Simpson has already unlawfully taken hundreds of thousands of dollars out of these businesses in the past few months. A true and correct printout of some of these transfers are annexed hereto as **Exhibit 3**.

**B. Simpson Is Destroying the JJ Arch Asset We Own with Other Partners**

10.     Simpson and I, through JJ Arch, have interests in a property located at 146 E. 89th Street, New York, New York that is owned by three limited liability corporations, 146 E. 89 Borrower 1 LLC ("Borrower 1"), 146 E. 89 Borrower 2 LLC ("Borrower 2"), and 146 E. 89 Borrower 3 LLC ("Borrower 3"). Borrower 1 has two members, JJ Arch and Jonathan Peldman. A copy of the Borrower 1 Operating Agreement is annexed hereto as **Exhibit 4**. Borrower 2 has one member Kay Properties LLC, though JJ Arch is designated as the manager. A copy of the Borrower 2 Operating Agreement is annexed hereto as **Exhibit 5**. Borrower 3 also has one member, 40 Neutral LLC, though JJ Arch is designated as the manager. A copy of the Borrower 3 Operating Agreement is annexed hereto as **Exhibit 6**.

11.     Simpson mismanaged the development and budgeting of the 89th Street Property, doing construction and renovations without permits. This led to a partial stop work order, delaying the project and causing JJ Arch to grossly overshoot its capitalization. A true and correct copy of the stop-work-order is annexed hereto as **Exhibit 7**. Simpson also used AREH and Construction Services and Solutions LLC employees for the construction, leading AREH and Construction Services and Solutions LLC to put their own liens on the 89th Street Property. A true and correct copy of the liens is annexed hereto as **Exhibit 8**.

7

12. Though obligated to issue annual reports under Section 10.5 of the Borrower 1, 2, and 3 Operating Agreements, Simpson never did. And Simpson never issued any capital calls, though the entities are in desperate need of funds. Instead, Simpson hid all the problems from the outside investors until only very recently.

13. Simpson's mismanagement has had dire consequences. On January 11, 2024, the lender commenced the Foreclosure Action, naming me as a defendant-guarantor for any deficiency. *See* Ex. 1, Foreclosure Complaint.

14. And the property itself remains uninsured. A true and correct copy of email correspondence showing that Simpson is on notice that the property is uninsured is annexed hereto as **Exhibit 9**.

### C. Simpson is Destroying Our Shared-Assets

#### 1. 1640 Montauk LLC and 1640 Motors LLC

15. JJ Arch is also the sole member of 1640 Montauk LLC ("1640 Montauk"), owner of real property known as 1640 Montauk Hwy, Water Mill, NY 11976 ("Rêver Property"). A true and correct copy of the 1640 Montauk Operating Agreement is annexed hereto as **Exhibit 10**. Simpson and I created 1640 Montauk and through it bought the Rêver Property and the underlying auto business that was at the Property, then operating under a different name. In addition to my equity interest, I am also a full recourse personal guarantor of the 1640 Montauk mortgage debt.

16. Yechiel Lehrfield, an ex-employee, organized another entity, 1640 Motors LLC ("1640 Motors"), to operate the business with a partner, but upon information and belief there was no executed operating agreement for 1640 Motors, and no formal designation of membership because the partnership did not pan out. A true and correct copy of the 1640 Motors

8

incorporation documents are annexed hereto as **Exhibit 11**. Upon information and belief, the

member of 1640 Motors is 1640 Montauk, whose member is JJ Arch, which controls both

entities.

17.     To gain more insight into Simpson's actions at Rêver Motors, among other of the

businesses, I sent a books and records request to Simpson on November 9, 2023. A copy of my

demand is annexed hereto as **Exhibit 12**. Simpson immediately rejected the demand in an email

on November 12, 2023. *See* Ex. 2. His counsel also sent a letter falsely claiming that I have

access to all documents. A true and correct copy of the letter is annexed hereto as **Exhibit 13**.

18.     Simpson, in fact, opened a new bank account for 1640 Montauk at Citizens Bank,

which he never told me about and which I have no visibility on. Not only did this violate the

Court's Interim Order, (NYSCEF No. 36), but it is designed to allow him to escape any financial

oversight. Additionally, my Rêver Motors email Jared@rmhamptons.com was shut down.

Effectively I have no visibility into this business. Simpson also removed me from the Square

credit card processing system so I am not able to see any income.

19.     I recently discovered though that Simpson has not filed 2023 NY state tax returns

for Rêver Motors, which owes $9,863.75 in NY state taxes, and owes federal taxes of at least

$87,816.25 that because of Simpson's ongoing looting of all corporate assets it will be unable to

pay. To the best of my knowledge, Simpson has also not filed federal returns and paid federal

taxes for 2022. True and correct copies of tax bills are annexed hereto as **Exhibits 14** and **15**. In

addition, Simpson has not paid contractors, and has not paid debt servicing to the entities' lender,

ConnectOne Bank. Annexed hereto as **Exhibit 16** is a true and correct copy of email

correspondence with ConnectOne Bank. I also recently learned that the insurance policy for

9

Rêver Motors was cancelled for non-payment. Annexed hereto as **Exhibit 30** is a true and correct copy of the Notice of Cancellation.

20.     And as detailed further below, Simpson is attempting to sell on his own personal Facebook page vehicles at the business that he expressly agreed were to be mine pursuant to our August 1, 2023 contract (discussed below in ¶¶ 22, 37-48), specifically a 1983 Porsche for $45,000.00. A true and correct copy of the listing is annexed hereto as **Exhibit 17**. The 1983 Porsche, which I am entitled to under that contract, is unique and irreplaceable and Simpson is actively attempting to steal it for himself and is selling it below market so that he can quickly get cash for himself.

**2. 225 HPR LLC**

21.     JJ Arch is the sole-member of 225 HPR LLC ("HPR LLC"), which owns a residential property known as 225 Head of Pond Road, Water Mill NY 11976 ("Head of Pond"). A true and correct copy of the HPR LLC Operating Agreement is annexed hereto as **Exhibit 18**. Simpson and I purchased Head of Pond in 2022 through HPR LLC and renovated the home for several months. Since then, the home has become a permit holding rental property. I hired a third-party manager who successfully managed the property for approximately 2 years as an Airbnb property. Head of Pond has been cash flowing, and Simpson has been uninvolved in this business. My wife is a guarantor on the Head of Pond mortgage loan.

22.     Pursuant to our August 1, 2023 contract, I am to co-manage Head of Pond with Simpson. That contract provides that as of August 1, 2023, HPR LLC "will be managed collectively by both Simpson and Chassen, regardless of the organizational documents of" HPR LLC. A true and correct copy of the August 1, 2023 Contract is available at NYSCEF No. 403, and is separately annexed hereto as **Exhibit 19**.

23.     Simpson directed the property manager to stop renting out the property, telling him that Simpson's wife will replace him, though such a hiring requires my consent and is entirely self-interested. Simpson then threatened to contact the police if the property manager rented the property to any Airbnb customers leading the property manager to verbally resign on November 21, 2023.

24.     Simpson refused to pay for property upkeep, or pay the property manager, and took money without my consent from the HPR LLC accounts to pay his own personal expenses. Indeed, I discovered that Simpson has been taking money without my consent from the HPR LLC accounts and instructed employees to hide it from me. These payments include a $10,000 payment on October 11, 2023, a $2,000 payment on October 19, 2023, and a $3,000 payment on October 31, 2023. A true and correct copy of Simpson's withdrawals are annexed hereto as **Exhibit 20**. Instead of making payments for the property's upkeep, he has pocketed whatever is in the account for himself.

25.     Just recently, on or about December 20, 2023, after I told Simpson many times the home is rented to Airbnb customers, Simpson broke into the home while a tenant was staying there. He did not announce himself and scared the tenant by his break-in, jeopardizing future property rentals and violating Airbnb policy.

26.     By forcing the property manager to resign and looting the HPR LLC account, Simpson is ensuring that HPR LLC will default on its mortgage loan and electricity and other bills.

27.     While Simpson depleted what was left in the accounts, I have taken every effort to preserve HPR LLC as a going concern and prevent it from falling into default. Out of my own personal funds, to prevent the property from going into default and disrepair, I paid the following

11

HPR LLC's bills: (1) the past due bill to the property manager in the amount of $7,342.00 for cleaning and property maintenance; (2) $1,495 to accounting professionals to prepare HPR LLC's tax returns, as they were refusing to continue work on taxes without payment. A true and correct copy of these disbursements is annexed hereto as **Exhibits 21**.

28.     I discovered on December 11, 2023 that beginning on or about August 8, 2023, Airbnb was unable to deposit rental income money into HPR LLC's account due to First Republic freezing the account as a result of this dispute. After 15 days of being unable to deposit these monies, Airbnb sent the money to the primary default account listed on the Airbnb account, which was an account linked to another property that I manage, since I have always been the one managing this property. A true and correct copy of an email from Airbnb confirming this is annexed hereto as **Exhibit 22**. I discovered this only after checking the HPR LLC account and discovering that there were no funds from Airbnb in the account. To remedy this, I reentered the HPR LLC account information, and it took another 5 days for Airbnb to redo the payment method. Since December 26, 2023, all Airbnb rental payments are now going to the HPR LLC account at First Republic.

29.     The amount that was deposited by Airbnb automatically into this other account during that period was $44,685.00. I deposited $4,000 of these funds into the HPR LLC account at First Republic, which covered the auto-pay for the mortgage, electric bills and other which was about to go into default otherwise. The remaining $40,685,000 is presently in a segregated account until the Court hears this motion and directs their disposition. If deposited in HPR LLC's account before this emergency motion for a receiver is heard, Simpson will immediately take the funds for his own personal use, as he has done previously. The account statement of the account holding these segregated funds is annexed hereto as **Exhibit 23**.

12

### 3. JJ NY 550 LLC

30.    JJ Arch is also the sole-member of JJ NY 550 LLC ("JJ 550"), which owns real property known as 550 Metropolitan Avenue, Brooklyn, New York 11211 ("550 Metropolitan"). A true and correct copy of the JJ 550 Operating Agreement is annexed hereto as **Exhibit 24**.

31.    In addition to my equity interest, I am also a full recourse personal guarantor of the 550 Metropolitan mortgage debt.

32.    550 Metropolitan is a retail condo, and I was solely responsible for it, dealing with its acquisition, financing, and tenant sourcing. 550 Metropolitan has been cash flow positive, but the tenant went out of business and stopped paying rent in July 2023, with the tenant vacating the property in October 2023.

33.    On or about September 19, 2023, I provided Simpson and his personal assistant, Raimy Klestadt, with all information about property and the vacancy at the property. I provided Simpson all broker agreements, contract information and other relevant information. I even provided Simpson with a broker to list the property for sale or leasing in November 2023, but he has refused to engage a broker.

34.    The monthly mortgage payment on the property is $3,269.54, in addition to taxes and other monthly obligations.

35.    JJ 550's reserves have been nearly depleted, and the mortgage is in on the verge of default. Simpson has taken no steps to lease, sell or even enter the property to manage it or keep it safe. I recently learned the heat is not even on at the property, subjecting the property to a possible leak that could flood the condominium building.

36.    Simpson has also denied me viewing access to the Connect One bank account for JJ 550 despite the Court's orders.

13

**D. I Entered an August 1, 2023 Contract with Simpson and YJ Simco LLC, Owned by Simpson and his Wife, to Resolve Our Disputes Over the Jointly Owned Assets, but Simpson Unlawfully Repudiated It**

37.     On August 1, 2023, I entered the Contract with Simpson and an entity owned by him and his wife, YJ Simco LLC, in which I agreed to transfer any membership interest I have in 1640 Montauk and 1640 Motors to Simpson in exchange for $675,938.35. Ex. 19, Contract. The Contract also resolved our interests in HPR LLC and 550 NY (together with 1640 Montauk and 1640 Motors, the "Jointly Owned Assets").[2]

38.     Also, as part of the Contract, Simpson agreed that I would receive certain vehicles that were purchased and rehabilitated by Rever Motors, including the 1983 Porsche, the 1983 Mercedez Benz 230 GE, and the 2003 Land Rover Discovery, and each of which I invested in.

39.     Further, in the Contract, Simpson agreed that HPR LLC "will be managed collectively by both Simpson and Chassen, regardless of the organizational documents of 225 HPR." *Id.* at § 1. The organizational documents of HPR state that JJ Arch is the sole member, Simpson is the President, and Chassen the Vice President. *See* Ex. 18 at §§ 5.2.

40.     Pursuant to paragraph 2 of Contract, Simpson agreed to make an initial payment to me of $500,000 "simultaneously with the closing by Simpson of that certain loan from Connect One Bank in the principal amount of $995,000 (the "Loan")," with the balance of the "Purchase Price . . . paid to Chassen from the distributions paid to Simpson by 1640 Montauk, 225 HPR and 1640 Opco, which payments shall be made to Chassen at Simpson discretion, provided that the balance of the Purchase Price shall be paid to Chassen at the sooner of (i) a

---

[2] 550 NY is incorrectly denominated in the Contract as 550 Metropolitan Ave LLC, an entity that does not exist in the New York Department of State database. A true and correct copy of the NYDOS search is annexed hereto as **Exhibit 25.**

14

capital event for the above listed Companies or (ii) the date that is twenty four (24) months following the Closing Date." Ex. 19 at § 2.

41.     The buyout calculation in Exhibit B of the Contract expressly incorporated that Simpson had repaid in or about June 2023 a prior ConnectOne Bank line of credit that was made personally to Simpson and Chassen (the "Personal Line of Credit"). The ConnectOne Bank Personal Line of Credit documents are annexed hereto as **Exhibit 26**. As evidenced from these loan documents, the total line of credit was for $1,000,000.00, but deducted $3,788.00 in various fees at closing.

42.     Simpson's repayment of the Personal Line of Credit was expressly incorporated into the Contract and is the $497,500.00 deducted from the initial buyout amount as calculated in Exhibit B of the Contract, leading to the total buyout amount of $675,983.35.

43.     The Contract also recognized and was premised upon a 50-50 distribution from the sale of property owned in part by Simpson and known as 88 Schwenks, Watermill, NY 11976 ("88 Schwenks"), a farmland in the Hamptons. 88 Schwenks was a property we purchased in June of 2022, in which we had a 50% interest, with another investor having the other 50% share.

44.     This investment did not work out and we decided to sell the property in the spring of 2023 at a loss, with Simpson suggesting to me that we sell the asset and split the proceeds 50/50 to give us some cash flow. 88 Schwenks was sold a few days before the Contract was executed. The Contract expressly recognized that the 88 Schwenks proceeds were split 50-50, providing in Exhibit B that the distribution of the Schwenks money had been split 50-50.

45.     Simpson quickly renounced and breached the Contract, declaring it terminated and refused to proceed to close on the new loan. Indeed, on August 2, 2023 after the loan

15

documents were fully executed and the closing fees debited from the account, ConnectOne Bank asked Simpson and I to re-sign a certain form as they had sent the incorrect version, which I did, but which Simpson refused to do, thereby preventing the loan from being issued.

46.     Simpson has claimed that I failed to exceed the 50% liquidity covenant required by the lender but this is false, as the documents I provided the lender met the requirements, and the lender in fact approved me, approved the loan, and was at the closing table. True and correct copies of documents showing that the loan was approved are annexed hereto as **Exhibit 27**.

47.     Simpson's breach of the Contract is expressly the subject of my counterclaims. *See* NYSCEF No. 392 at ¶¶ 178-197.

48.     In addition to failing to perform the Contract, and unlawfully repudiating it, Simpson is attempting to sell on his own personal Facebook page the 1983 Porsche that he agreed was to be mine for $45,000.00, dropping the price $55,000.00 in his scramble to sell my assets and pocket the cash for himself. *See* Ex. 17. The 1983 Porsche, which I am entitled to under the Contract, is unique and irreplaceable and Simpson is now attempting to sell it and pocket the proceeds for himself while I am seeking to recover it in this proceeding.

**E.  Simpson Has Paid His Counsel Without Posting an Undertaking to JJ Arch**

49.     Simpson has improperly paid his counsel in this action from JJ Arch accounts in violation of the JJ Arch Operating Agreement. A true and correct spreadsheet of some of these payments is annexed hereto as **Exhibit 28**. Section 10.2 of the JJ Arch Operating Agreement provides that Simpson and I can be indemnified from certain claims against us except for such claims "by reason of gross negligence or willful misconduct . . ." *See* NYSCEF No. 64 at § 10.2.

50.     Section 10.3 of the JJ Arch Operating Agreement further provides that legal expenses will be advanced "prior to the final disposition or such claim, demand, suit or

16

proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered

Person to repay such amount if it shall be determined that the Covered Person is not entitled to

be indemnified as authorized in Section 10.2 hereof." *Id.* at § 10.3. The Operating Agreement

does not authorize any advancement of legal expenses without such an undertaking.

51.     Simpson has failed to post an undertaking to JJ Arch, while using JJ Arch assets

to fund his legal expenses in this action and is thereby stripping JJ Arch of its assets while this

action is ongoing and before his right (and indeed my right) to indemnification has been

adjudicated.

### F.  The Unlawful August 31, 2023 Capital Call

52.     Simpson has used a bogus capital call he issued on August 31, 2023 to justify

stealing corporate assets. After breaching the Contract, and one-day prior to purporting to re-

terminate me from JJ Arch, on August 31, 2023 Simpson purported to serve a capital call on me

(the "Fraudulent Capital Call"). A copy of the Fraudulent Capital Call is annexed hereto as

**Exhibit 29**.

53.     The Fraudulent Capital Call demanded that I retroactively reimburse Simpson for

$1,241,230 that he allegedly had put into JJ Arch. Simpson reached that number by claiming that

I owe $741,230 to "balance 50/50 for 225 HPR, 550 Met, 1640, 1640 Motors, and 146 E. 89th."

Further, the Fraudulent Capital Call claims that Simpson should be reimbursed for his alleged

payment of the $1,000.000 Personal Line of Credit.

54.     The Fraudulent Capital Call separately claims that I improperly took a total of

$34,400 on August 4, 2023 and August 9, 2023. These, of course, were the GP draws that it had

been company practice for to take over the past 5 years through the accounting department. *See*

NYSCEF No. 96, Sept. 14, 2023 Chassen Aff. at ¶ 62; NYSCEF No. 198, Oct. 13, 2023 Chassen

Aff. at ¶¶ 20-22.

55.     Finally, the Fraudulent Capital Call claims that I owe $70,500 from 88 Schwenks

because "the 88 Schwenks closing distribution was not properly allocated per the Capital

accounts in the transaction." The 88 Schwenks proceeds were distributed 50-50 as Simpson

acknowledged in Exhibit B of the Contract. *See* Ex. 19, Contract at Ex. B.

56.     The Fraudulent Capital Call was issued to create a pretext for Simpson to loot JJ

Arch and the Jointly Owned assets.

57.     Each of the Operating Agreements for 1640 Montauk, HPR LLC and JJ 550

provide that JJ Arch is the sole member and JJ Arch "shall have no obligation to make any

further capital contributions to" these entities. *See* Exs. 10, 18, and 24 at § 2.2. Further, there is

no Operating Agreement for 1640 Motors, no formally designated members, and JJ Arch has no

contractual obligation to provide capital to that entity. And importantly, no capital calls were

ever issued to JJ Arch from those entities.

58.     While Section 4.2 of the JJ Arch Operating Agreement provides that Simpson could

issue a capital call to fund JJ Arch when "additional funds are required by the Company to meet

its general and administrative expenses," (NYSCEF No. 64 at § 4.2), it did not allow Simpson to

issue capital calls to cover other companies' expenses where there was no obligation to fund any

capital calls at those entities, and those entities never even made any capital calls to JJ Arch.

59.     Simpson also refers in the Fraudulent Capital Call to purported contributions he

made to "146 E. 89th," a property owned by Borrower 1, Borrower 2, and Borrower 3. Under

Section 3.2 of the Borrower 2 and Borrower 3 Operating Agreements, JJ Arch has no capital call

obligation to Borrower 2 or 3 but may issue capital calls to the member of those entities. Ex. 5 and

6 at § 3.2. In the event the member does not pay it, JJ Arch has the right to then issue a loan to Borrower 2 or Borrower 3. *Id.* Under Section 3.2 of the Borrower 1 Operating Agreement, JJ Arch may also issue capital calls to the members, and in the event a member does not pay the capital call, JJ Arch then has the right to make that payment as a loan. Ex. 4 at § 3.2. JJ Arch has not issued any capital calls to the members of Borrower 1, Borrower 2, or Borrower 3 and no payments have been made by JJ Arch to or on behalf of these entities that were authorized or proper under the relevant operating agreements. In fact, rather than issue any capital call, Simpson allowed the property to go into default and foreclosure. *See* Ex. 1.

60.     The Fraudulent Capital Call is also improper because our rights and interests in HPR LLC, 1640 Montauk, 1640 Motors, and JJ NY were contractually agreed to in the Contract.

61.     Further, neither the purported contributions, nor the underlying expenditures, were made with notice or consent. And under the JJ Arch Operating Agreement, Simpson was also required to prospectively give written notice that JJ Arch needed funds "for its general and administrative expenses," and then "[e]ach of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company . . ." NYSCEF No. 64 at § 10.2. Nothing in the JJ Arch Operating Agreement allowed Simpson to issue a retroactive JJ Arch capital call for reimbursement of payments he allegedly previously made in connection with other entities to whom JJ Arch had no capital call obligation, and from whom no capital call was ever made.

62.     Simpson further relied on his alleged repayment of the Personal Line of Credit but this loan was not issued to JJ Arch, and thus its repayment was not a capital obligation of JJ Arch. Indeed, the Personal Line of Credit was issued personally to Simpson and me. The loan proceeds themselves were not used for JJ Arch, but for other business and Simpson's own personal use.

63.     In other words, Simpson issued the Fraudulent Capital Call on August 31, 2023, the day before he purported to re-terminate me, to justify his prospective looting of our Jointly Owned Assets, after repudiating and breaching the Contract.

64.     Simpson is now openly claiming that he can take whatever money he wants and is actively stripping and destroying our shared assets even though the division of our joint assets, and our rights in them, is a disputed litigation issue.

**G. JJ Arch's Conflicted-Counsel**

65.     Simpson has used his own counsel to also represent JJ Arch despite the obvious conflict of interest given the dispute between JJ Arch's two members. The conflict, as this Court observed, is quite obvious. NYSCEF No. 417, Nov. 20, 2023 Hr. Tr. at 80:6-9 ("I can't remember what mythical characters were sentenced to fight in the heavens for all time without ceasing to end their battles, but I think these are two folks who could possibly do that.").

66.     In addition to Steven Altman and Altman & Company P.C. representing both Simpson and JJ Arch, Simpson has recently retained DLA Piper US LLP ("DLA Piper") to represent both him and JJ Arch. *See* NYSCEF No. 477, Letter from Altman to Court; *see also* NYSCEF No. 476, Consent to Change Attorney.

67.      Simpson has also not sought my consent before hiring or entering agreements to pay JJ Arch's counsel, and I have objected to his retention of conflicted JJ Arch counsel.

**CONCLUSION**

68.     To ensure that the Property is not destroyed and dissipated, the Court should appoint a temporary receiver as requested in this motion. The Court should also disqualify Altman, DLA Piper or any other attorney in this matter from representing Simpson and JJ Arch and should stay this proceeding to enable JJ Arch to have adequate time to retain its own independent counsel.

20

Finally, the Court should grant the injunctive relief requested herein, restraining Simpson from taking distributions or transferring assets without my consent, taking corporate monies for personal use, transferring assets that are mine pursuant to the Contract, interfering with my co-managerial rights in HPR LLC, or using JJ Arch funds to pay is attorneys without posting an undertaking, and compelling him to provide bank account access and the books and records I requested, together with such other and further relief the Court deems just and proper.

69.     I affirm this 28th day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Jared Chassen

21

## **Word Count Certification**

Allen Schwartz, Esq. hereby certifies that this affidavit contains 6109 words exclusive of the caption, and signature block and complies with applicable word limits. I relied on Microsoft Word to ascertain the word count.

_____/s/_____
Allen Schwartz, Esq.

22