UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JJ ARCH LLC,<br><br>　　　　　　　Debtor.[1] | Chapter 11<br>(Subchapter V)<br><br>Case No. 24-10381 (JPM) |

**DECLARATION OF KEVIN WIENER IN SUPPORT OF
ARCH REAL ESTATE HOLDINGS LLC'S NOTICE OF JOINDER TO
JARED CHASSEN'S MOTION TO DISMISS AND MOTION TO SHORTEN NOTICE**

Kevin Wiener, declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Executive Vice President of 608941 NJ Inc. ("Oak"), the Investor Member in Arch Real Estate Holdings LLC ("AREH"). Since November 2023, Oak has been acting as the managing member of AREH, pursuant to an order of the Commercial Division of the New York Supreme Court, with JJ Arch LLC ("JJ Arch") holding Oak's former major decision consent rights.

2. I submit this declaration in support of the accompanying joinder (the "Joinder") to the Motion of Jared Chassen seeking the entry of an order (I) dismissing the Debtor's chapter 11 subchapter V case pursuant to 11 U.S.C. § 1112(b); and (II) scheduling a hearing on shortened notice pursuant to S.D.N.Y Local Bankruptcy Rule 9077-1(b).

3. Specifically, I wish to draw this Court's attention to the significant prejudice that AREH and the portfolio companies that it controls will face if this Court is unable to swiftly determine whether this was an authorized bankruptcy filing, which prejudice appears to be

---

[1] The last four digits of the Debtor's federal tax identification number is 4251.

12416523-1

the primary motivation behind Jeffrey Simpson ("Simpson") seeking to delay adjudication on Jared Chassen ("Chassen")'s motion to dismiss.

4. Oak was originally made acting managing member of AREH after it sent a notice removing JJ Arch as AREH's managing member and pursuant to a temporary restraining order on November 3, 2023. While the TRO swapped Oak and JJ Arch's roles in the governance of AREH, it did not make any changes to the manner in which JJ Arch would be able to consent to certain "major decisions" specified in the AREH LLC Agreement – both Simpson and Chassen would need to consent.

5. At the subsequent preliminary injunction hearing, the Commercial Division was highly concerned by evidence that Simpson intended to use his power to withhold consent to major decisions to extract personal concessions from Oak, which is the largest investor (with over $50 million invested) across AREH's portfolio companies. Oak or its parent company, 35 Oak Holdings Limited, is also guarantor on several hundred million dollars of loans in the AREH portfolio. By contrast, JJ Arch has no money invested in any of the AREH portfolio companies and no ownership interest therein.

6. At the hearing, Judge Cohen expressed concern about how major decisions could be affected and how Oak would be able to "right the ship" of Simpson's mismanagement, having found that there was a "substantial case in terms of likelihood of success on the merits of one or more cause events", which would also constitute cause events and grounds for removal under JJ Arch's own operating agreement. *See* Ex. 1, Transcript of November 20, 2023 Hearing, 57:5-6; Bankr. Doc No. 4-2, Ex. 1 to Schwartz Declaration.

7. The Commercial Division ultimately decided to clarify the consent structure for JJ Arch consistent with the two members' competing claims for control and in light of AREH's

12416523-1

notice of removal: while both members of JJ Arch, acting together, could deny consent for an AREH major decision, either member of JJ Arch would be able to consent on behalf of JJ Arch to a major decision.

8. Since being deprived of the ability to use major decision rights to extort personal concessions from Oak, Simpson has engaged in an unrelenting crusade to attack the Commercial Division's order and interfere with AREH's ability to execute major decisions. Despite not appealing the original preliminary injunction, Simpson brought a thinly disguised motion to re-argue it and to terminate Chassen as a member of JJ Arch. Bankr. Doc No. 4-5, Ex. 25 to Schwartz Declaration. When that motion was heard by Judge Cohen, he denied the motion to re-argue out of hand, remarking that it would "effectively give Mr. Simpson the sole consent rights under my prior order," and set the request to forcibly resign Chassen for hearing in June 2024. *See* Ex. 2, Transcript of February 2, 2024 Hearing, 46:5-6. Simpson subsequently complained to the Chief Administrative Judge and appealed that order to the Appellate Division, where his emergency motion to restore consent rights (and for other relief) was denied (with a further request now pending before the full panel). Bankr. Doc. No. 4-6, Ex. 30 to Schwartz Declaration.

9. While there is nothing inherently wrong with filing appeals, Simpson has consistently used the very existence of his frivolous filings to obstruct and interfere with counterparties (including lenders and insurers), falsely stating that the ongoing proceedings nullify the PI and that AREH cannot effect major decisions without Simpson's consent.

10. For example, on the verge of AREH finalizing a portfolio company's restructuring agreement on more than $50 million in debt with one lender, Simpson threatened legal

12416523-1

action against the lender and their counsel if the deal was finalized in accordance with the consent structure in the PI.

11. When it was later confirmed to Simpson that this deal, along with a previous $100 million loan restructuring for another portfolio company, had been consummated with Chassen's consent, Simpson again threatened the lender and its legal counsel, and made threats against the company's own legal counsel along with other lawyers who had acted for AREH and its portfolio companies.

12. This came to a head on March 6, 2024, when Simpson again threatened me and demanded that no major decisions be made without his consent because of his outstanding appeal. When I made clear in no uncertain terms that ongoing appellate proceedings did not invalidate the existing court orders, I received a serious of unhinged threatening emails from Simpson which, among other things, appeared to imply that I would be deported from or otherwise rendered inadmissible to, the United States *See* Ex. 3, March 6, 2024 email from Simpson to Kevin Wiener.

13. Two days later, JJ Arch filed this bankruptcy petition, which it now defends based on an entirely different theory of Chassen's removal than the one asserted in the petition itself.

14. It seems self-evident that Simpson's goal with this bankruptcy filing is to accomplish what his motion to reargue the PI and his subsequent appeal could not: to paralyze AREH's ability to make major decisions unless Simpson is given personal concessions by clouding AREH's authority to act and deterring lenders from entering into deals that do not include Simpson's consent. A swift determination of Chassen's motion to dismiss is necessary to lift this cloud and allow these deals, many of which are at critical phases of negotiations, to proceed.

12416523-1

15. A brief summary of some of the time-sensitive deals jeopardized by Simpson's conduct is below.

   **435 Central Ave**

16. 435 Central Ave is a 14-unit multifamily development in the Bushwick neighborhood of New York with a $4-million loan. At the time AREH came into the development, it had already been stalled and was in foreclosure. AREH negotiated a restructuring of the loan to reduce the principal down to the current $4 million in exchange for a confession of foreclosure. Despite putting more than $10 million in new capital into the project, AREH under Simpson's management was unable to complete the project, and at the time Oak was made acting managing member, the lender was proceeding towards a snap judicial foreclosure.

17. Over Simpson's objections, AREH used Chassen's consent to negotiate an extension of the loan, with Oak putting in more than $200,000 in additional capital to secure the extension and cover interest so that property could be sold in the hopes of realizing some investor returns.

18. Unfortunately, due to the manner in which the construction was done, the more than $10 million in additional investor capital put into the project in the last year has barely moved the needle in terms of its value. While AREH was able to have the portfolio company enter into a Purchase and Sale Agreement, the ultimate closing proceeds are unlikely to lead to any equity recovery of even ongoing interest payments. As a result, it is no longer economically viable to continue to make interest payments, and a quick sale is the only way to avoid foreclosure.

19. Notwithstanding the likely loss of all investor equity, AREH intends to proceed with the sale, as the portfolio company has several hundred thousand dollars in outstanding accounts payable to subcontractors, some of whom have liened the property. While the sale of the property may not lead to equity recovery, it is the only way to ensure that all these vendors who worked hard on this project are ultimately paid for their work.

20. By contrast, if we cannot finalize the current PSA, which requires closing by the end of March, default interest accrual will quickly kill the viability of any other sale options, and the lender will likely schedule a snap foreclosure auction to be held within a few months. In such a case, the judicial foreclosure would wipe the liens from the property and the unpaid vendor would be left with unsecured claims against a company that has lost its only asset.

21. While AREH already obtained JJ Arch's consent (through Chassen) to enter into this sale agreement prior to the bankruptcy filing, there have been issues getting title insurance and the original title insurer indicated that they would not insure given the cloud of the pending bankruptcy petition. We have serious concerns that this ongoing bankruptcy proceeding—along with Simpson's position that Chassen has been removed and that no decision can be made without Simpson's own consent—may make it impossible to obtain title insurance. In such a case, the sale transaction will fall apart, it will likely prove impossible to effect another sale (if we can find another willing buyer), and the property will be lost to judicial foreclosure, with the subcontractors remaining unpaid. Only by obtaining a decision on the motion to dismiss before the end of March can AREH be sure that this sale can close.

**88 University Place**

22. 88 University Place, in Manhattan, is an 11-story commercial office building that went into default in fall 2023. The property has $70 million in combined mortgage and mezzanine debt. While the lender was originally planning to conduct a UCC foreclosure on the mezzanine loan in January, they were persuaded to hold off in doing so while we negotiated a deal with them.

23. We have arrived at a deal in principle, in which the two guarantors for the property (who are also its largest investors) would put in a significant sum of money, in order to secure a hope note for all the investors. While we are precluded from putting the details of the proposed deal into a public court record, we believe that the deal represents the best possible structure reasonably available to the investors, and has a real chance at there being an eventual recovery of some of the investment capital.

24. While we believe JJ Arch's bankruptcy does not, in any way, impact our authority under the PI to sign a major decision with only Chassen's consent, the lender has expressed concern as to whether proceeding while the bankruptcy petition is outstanding could present problems, and is therefore reluctant to proceed. By contrast, because a UCC foreclosure would not rely on any of JJ Arch's consent rights under the AREH operating agreement, the bank believes it is free to pursue that route (as none of the relevant entities are in bankruptcy or subject to a stay) and intends to do so absent dismissal of the bankruptcy petition in short order.

25. The lender has expressed on several occasions their desire to have finality on this property, and that should a UCC foreclosure be commenced, all bets are off in terms of whether this deal could be salvaged. Any prolonged paralysis of AREH's ability to make major

decisions increases the risk of the deal falling apart, the investment being completely wiped without any hope note, and both guarantors facing significant guarantee claims.

**9 Vandam St**

26. 9 Vandam St is a townhouse renovation and restoration project in Manhattan. Like the 435 Central development, the construction went well over budget and then stalled when capital ran out. AREH spent several months trying to work out a restructure of the loan with the lender, but was ultimately stymied in its ability to do so because of the position taken by a junior lender on an upper-tier promissory note that Simpson had signed in spring 2023 without Oak's consent, in contravention of the AREH operating agreement.

27. AREH also attempted to sell this property on an as-is basis. It received one bid that would have allowed the property to clear both the loan and the mechanic liens, but the buyer backed out before a PSA was signed. Given the continued accrual of default interest, a sale is not viable and AREH is instead negotiating a hand-back of the property to the lender, in which the lender has indicated a willingness to retain existing subcontractors and see them paid for their AP and mechanics liens. By contrast, in the event a deal cannot be consummated, the lender has indicated an intention to proceed with a UCC foreclosure on their equity pledge and then a subsequent judicial foreclosure during the completion of the construction, which would wipe out any mechanics liens and deprive the subcontractors of payment for any work and materials they provided. Such a deal would also allow the guarantors, which include Chassen and Simpson, to obtain releases from their guarantees.

28. Attached hereto as Exhibit 1 is a true and correct copy of the transcript of the November 20, 2023 hearing in the Commercial Division Proceedings.

29. Attached hereto as Exhibit 2 is a true and correct copy of the transcript of the February 2, 2024 hearing in the Commercial Division Proceedings.

30. Attached hereto as Exhibit 3 is a true and correct copy of an email from Simpson to Kevin Wiener dated March 6, 2024.

Dated: March 18, 2024

By: /s/ *Kevin Wiener*

Kevin Wiener

12416523-1