UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                        :

In re:                             :    Chapter 11

                             :    (Subchapter V)

JJ ARCH LLC,                :

                             :    Case No. 24-10381(JPM)

              Debtor.[1]    :

                             :
---------------------------------------------------------------X

**FIRST DAY AFFIDAVIT OF JEFFREY SIMPSON**
**PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY**
**RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK         )
                           ) ss.:
COUNTY OF NEW YORK       )

Jeffrey Simpson, being duly sworn, deposes and says:

1.      I am the managing member of JJ Arch LLC, a New York limited liability company organized under the laws of the state of New York and the debtor and debtor in possession ("JJ Arch" or the "Debtor"). I have served in such capacity since the Debtor's inception in 2017 and, as a result, am intimately familiar with JJ Arch's day-to-day operations and business affairs. I was similarly familiar with the operations and business affairs of each of its direct vertically integrated non-debtor affiliates that together with JJ Arch, constitute the Debtor's corporate enterprise (collectively, the "Arch Companies").[2]

---

[1] The last four digits of the Debtor's federal tax identification number are 4251.

[2] As discussed in greater detail below, my familiarity with the Arch Companies' day-to-day operations have been limited due to JJ Arch's removal as the managing member of Arch Real Estate Holdings LLC – the Arch Companies' parent operating company. The Arch Companies are headquartered in New York City, with satellite offices in Alabama, Florida, North Carolina and South Carolina.

2.      I hold a degree in Engineering from the University of Delaware, and Master of Science (Real Estate Development) and Advanced Finance degrees from the Schack Institute of Real Estate at New York University.

3.      I have more than twenty years of experience in the real estate sector focusing on commercial and residential development, design, entitlements, construction management, asset management, property management, transaction negotiations and capital raises. Since their inception, I have grown the Arch Companies' real estate portfolio to more than $1 billion in assets under management, with over 5.7 million square feet of property across the United States.

4.      Prior to founding the Arch Companies, I worked for 11 years at Greystone & Co. Inc. ("Greystone"), a New York City-based real estate finance and investment company, ultimately serving as the head of Greystone's Development group.[3]  Before my tenure at Greystone, I held real estate management roles with Equity Office Properties Trust (a REIT), and Jones Lang LaSalle Incorporated, a global real estate and investment management firm. I also previously worked as a project engineer and project manager for several national construction firms.

5.      I submit this affidavit (the "Affidavit") pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") in support of the Debtor's petition (the "Petition") for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on March 7, 2024 (the

---

[3] I started the Development group at Greystone, including hiring operations personnel and retaining outside professionals to execute the group business strategy.

"Petition Date"). I have reviewed the Debtor's Petition and related filings, and it is my belief that they are true and accurate to the best of my knowledge.

6. Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, information that I obtained from the Debtor's available non audited and internally prepared relevant books and records and/or provided to me by professionals retained by the Debtor (including, Griffin LLP), or my opinion based upon experience, knowledge, and information concerning the financial and business operations of the Debtor, the Arch Companies' and/or the Arch Companies' industry as a whole. I am authorized to submit this Affidavit on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein. Unless otherwise indicated, the financial information contained in this Affidavit is unaudited.

7. The Affidavit is divided into three parts. Part I provides (a) an overview of the Arch Companies – with a particular focus on AREH (as defined below), the companies' primary operating entity; (b) a discussion of the organizational structure of the Debtor and the Arch Companies; (c) a discussion of certain of the Debtor's key agreements; and (d) a discussion of the Debtor's capital structure. Part II addresses the events leading to the filing of the chapter 11 case, including the decline in the Arch Companies' business; and correspondingly, the Debtor's business, the cause for such decline, and efforts made by the Debtor's management to restructure its financial and operational affairs. Part III sets forth information required by Local Rule 1007-2 to the extent not otherwise provided herein.

**I.**

**The Debtors' Business**

A.    Company Overview

8.    Founded in 2017, the Arch Companies, through JJ Arch and its non-debtor affiliates, collectively constitute a vertically integrated real estate owner, operator and developer – with a general focus on real estate investment, development, construction and asset management across primary and secondary markets in the United States.[4] The Arch Companies have invested in single and multi-family, mixed-use, hotel and office properties in those markets, effectuating investment strategies directed toward repositioning, rehabilitations and "ground-up" development projects (collectively, the "Portfolio Projects"). In conjunction with this strategic direction, the Arch Companies have sourced, invested, and operated in excess of $1 billion of real estate across the United States, which currently includes 5.7 million of square footage and 15 active investments in seven states.[5] By square footage, the Portfolio Projects consist of: commercial office space (17%), multi-family units (71%), retail space (5%) and hospitality space (7%).

9.    Leveraged finance transactions involving the Portfolio Projects and utilizing third-party investors are key components of the Arch Companies' business.  In fact, these transactions make up the core of the business, with the Arch Companies' adopting a private equity-based investment management model which provides leveraged returns to investors and linking company profits to the success of assets under management. Thus, the more successful a Portfolio Project investment, the greater the returns are for investors and, correspondingly, the Arch

---

[4]  The Debtor is a real estate holding company with no operations. As discussed in greater detail herein, the Debtor's revenue is generated primarily through its 80% ownership interest in AREH and related indirect holdings in various real property assets.

[5]  The Arch Companies' assets under management are located in Alabama, Arizona, California, Florida, New York, North Carolina, and South Carolina.

Companies' profits. This model creates and alignment of interest for both investors and the Arch Companies.

**B.**    <u>The Debtor and Arch Companies' Organizational Structure[6]</u>

10.     JJ Arch is a real estate holding company with no employees.  The Debtor's business is limited solely to its indirect ownership interests in various real property assets and indirect managerial control in each of the Portfolio Projects.  These interests include assets held by the Debtor (a) with third-party investors through non-debtor subsidiaries, where the Debtor is the majority owner – the Portfolio Projects, and (b) through non-Debtor affiliates where the Debtor is the ultimate parent company – the Non-Portfolio Project Assets (defined below)

*The Debtor's Portfolio Project Holdings*

11.     JJ Arch holds an 80% membership interest in Arch Real Estate Holdings LLC ("AREH"), which is the Debtor's most valuable asset.[7]  AREH is a vertically integrated real estate operating company that does not own physical assets.[8] Instead, it is responsible for the Arch Companies' overall business direction, including investment decisions, executing corporate strategy and fostering and maintaining relationships with the Arch Companies' prospective and existing capital partners and investors. The Arch Companies' executive and decision-making teams are housed and compensated under the AREH umbrella.  These teams coordinate all acquisitions, dispositions, and capital transactions relating to the Portfolio Projects. AREH also

---

[6]  Charts illustrating the Debtor and the Arch Companies' organizational structure are attached hereto as Exhibit A.

[7]  608941 NJ, Inc. ("608941") holds the remaining 20% membership interest in AREH. Upon information and belief, 35 Oak Holdings, Ltd. ("35 Oak," together with 608941, "Oak") a company organized under the laws of Canada, is the sole owner of 608941.

[8]  In certain circumstances, AREH temporarily holds title to Portfolio Project real property until a stand-alone entity is organized to hold such property.

serves as the Arch Companies' primary administrative services provider with all accounting, human resources and investor relations functions situated at the AREH level.

12.     Significantly, AREH serves as the transaction's top tier manager member for the complex organizational structures that constitute each Portfolio Project transaction, and as such controls all decisions relating to the underlying real property asset. Under the companies' transaction structure, AREH receives profits or tier stepped "promotes" pursuant to a waterfall structure when all "limited partner" investor party returns have reached certain agreed upon percentages or "preferred returns." AREH also holds management and profits interests in lower tiers of each Project Portfolio transaction as a "general partner." In such capacity, AREH is also entitled to a percentage of investment returns based on the waterfall structure. The promotes interests from Portfolio Project transactions are paid only after all investors receive a minimum "hurdle return." The steps in the waterfall vary deal by deal, but generally all investor members receive *pari passu* distributions up to an 8% annualized return hurdle rate. Upon reaching this hurdle rate, distribution splits are increased for investors based on Portfolio Project yield. A portion of those yields are awarded to the transaction's management operator - AREH. AREH then shares a portion of those yields with the Debtor and Oak.

**[\*\*\*Remainder of Page Intentionally Left Blank\*\*\*]**

13.    The below reflects the general organizational structure for the Arch Companies' Portfolio Projects:



**This investment vehicle consists of Messrs. Simpson and Chassen, and certain AREH personnel, family and friends.

14.    Additionally, AREH is the ultimate parent company for certain of the Arch Companies' non-debtor affiliates that provide low-cost vertical asset management, property management, advisory, direct construction trades, and construction management services (collectively, the Affiliate Services") for the Portfolio Projects – namely through Arch Asset Management LLC ("Arch Asset Management"), Arch Advisors LLC ("Arch Advisors") and Arch Builders LLC ("Arch Builders," together with Arch Asset Management and Arch Advisors, the "Arch Service Providers"). Any profits earned by the Arch Service Providers are sent to AREH.

(a)    *Arch Asset Management LLC*:   Arch Asset Management serves as the asset manager and real estate property manager for each of the Portfolio Projects. In addition, Arch Asset Management is responsible for ensuring that the Arch Companies' properties are managed

and operated in an efficient and cost-effective manner, effectuating business plan integration and execution at the real property level of each Portfolio Project. These services are rendered through Arch Asset Management's 100% directly owned subsidiary, Arch Property Management LLC ("Arch Property").[9]

(b)     _Arch Advisors LLC_:  Arch Advisors provides capital raising services for the Portfolio Projects and brokerage services for certain related property sales and leasing.

(c)     _Arch Builders LLC_:  Arch Builders provides dedicated construction management services and in-house construction expertise in connection with the Arch Companies "ground-up" developments and rehabilitation investments.  Arch Builders is responsible for managing the Arch Companies' large- and small-scale construction to ensure that projects are completed properly, on schedule and in accordance with applicable business plans and budgets. Arch Builders is also the direct 100% equity owner of Construction Services & Solutions LLC ("CSS").  CSS is a staffing company providing skilled and unskilled construction trade services for the Portfolio Projects. The utilization of CSS results in substantial cost-efficiencies for these projects.

_The Debtor's Non-Portfolio Project Asset Holdings_

15.     As part of its holdings, the Debtor also owns 100% of the membership interests in the following entities: JJ NY Schwenks LLC ("JJ Schwenks"); JJ NY 550 LLC ("JJ 550"); 225 HPR LLC ("225 HPR"); 146 E. 89 Borrower I LLC ("146 E. 89 Borrower"), and 1640

---

[9]  Arch Property is also the 100% owner of Ore Living II LLC, a staffing company providing management and oversight of all day-to-day activities on the Arch Companies' property level real estate projects, including maintenance, accounting, and financial reporting.

Montauk LLC ("1640 Montauk," together with JJ Schwenks, JJ 550, 225 HPR, and 146 E. 89 Borrower, collectively, the "Non-Portfolio Project Assets").[10]

(a)    *JJ Schwenks*: JJ Schwenks owns 50% of the membership interests in 88 Schwenks LLC, which in turn is the sole owner of real property located at 88 Schwenks Road in Water Mill, New York, 11976. The Schwenks real property was sold in 2023 for approximately $1.6 million (the "Schwenks Proceeds"), with $1 million of the Schwenks Proceeds distributed to the property's mortgagee and the balance escrowed to satisfy tax and dissolution expenses.

(b)    *JJ 550*: JJ 550 is the sole owner of real property located at 550 Metropolitan Avenue in Brooklyn, New York, 11211.  The property is a 400 square foot, street level, retail condominium.

(c)    *225 HPR and 1640 Montauk*: 225 HP and 1640 Montauk each are the sole owners of separate parcels of real property, respectively, located at 225 Head of Pond Road (the "HPR Property") and 1640 Montauk Highway (the "Montauk Property") in Water Mill, New York, 11976. The HPR Property is a single-family residential property, currently used as a rental property, while the Montauk Property includes an automotive shop with a residential apartment.

(d)    *146 E. 89 Borrower I*:  146 E. 89 Borrower is the indirect majority owner of real property located 146 E. 89th Street in New York, New York, 10128.[11] The property consists of a 5000 square foot vacant townhouse.

---

[10] The Debtor also is the sole owner of 1640 Motors LLC d/b/a Rever Motors ("Rever Motors"). Rever Motors holds a real property lease for property owned by 1640 Montauk.  I oversee the management of Rever Motors, but there is a dedicated staff that runs the day-to-day operations.

[11] JJ Arch's ownership interest in the E.89th Street Property is through a tenancy in common with two other owners, where JJ Arch is the non-member manager of the property-owner limited liability company for all owners.

16.     The real property associated with the Non-Portfolio Projects holdings have an aggregate estimated value of approximately $10 million and generate approximately $1.1 million of revenue annually for the Debtor.

**C.     The Debtor's Key Agreements**

17.     Due to JJ Arch's holding company status, its key agreements are limited to the following operating company agreements in which it is a member party: (i) Limited Liability Company Operating Agreement of JJ Arch LLC dated December 11, 2017 (as amended on May 22, 2021) (the "JJ Arch Operating Agreement");   (ii) Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC dated December 11, 2017 (the "AREH Operating Agreement");[12] (iii) Limited Liability Company Operating Agreement of Arch Property Holdings I LLC dated July 9, 2020; (iv) Limited Liability Company Operating Agreement of JJ Schwenks LLC dated February 8, 2022; (v) Limited Liability Company Operating Agreement of JJ NY 550 LLC dated January 27, 2022; (vi) Limited Liability Company Operating Agreement of 225 HPR LLC dated January 27, 2022; (vii) Limited Liability Company Operating Agreement of 1640 Montauk LLC dated March 23, 2022; and (viii)  Limited Liability Company Operating Agreement of 146 E. 89 Street Borrower I LLC dated June 27, 2022.[13]

**D.     The Debtor's Capital Structure**

18.     The Debtor has no secured debt, and approximately $143,000 in professional services and trade debt.

---

[12] Copies of the JJ Arch Operating Agreement and AREH Operating Agreement are attached hereto as Schedules B and C, respectively.

[13] The Debtor was unable to locate a limited liability company operating agreement for 1640 Motors LLC.

19.     As noted above, the Debtor has no employees, and all revenue for the Debtor is derived from its indirect ownership interests in the Portfolio Projects and Non-Portfolio Project Assets.

## II.
## Circumstances Leading to These Chapter 11 Cases

20.     The decline in the Arch Companies' business may be attributable to the confluence of two events – financial turmoil in the global real estate investment and lending markets due to inflation and interest rate growth, and substantial disagreements regarding financial obligations between the Debtor and its primary investor Oak, which disagreements have resulted in pervasive litigation in New York state court.[14]

21.     Indeed, since 2022, with a general cooling of investor interest in real estate markets, high interest rates and tightening lending markets, the Arch Companies have been unable to obtain the liquidity necessary to operate the business – namely, completing its various Portfolio Projects and/or servicing the bank and trade debt associated with those projects.  The Company's liquidity issues have been further exacerbated by disputes with Oak regarding its refusal to fund; and more significantly, its litigation efforts to remove me from JJ Arch, the managing member of AREH – all to limit Oak's more than $50 million in potential guaranty obligations for the Portfolio Projects.

---

[14] Simultaneously, I have been involved in litigation in New York State court with Jared Chassen ("Chassen"), the former minority member of the Debtor regarding, *inter alia*, the management of the Debtor.  Mr. Chassen voluntarily decided to cease providing substantially all of his business time for the benefit of the Debtor no later than January 2024 and, as a result, was deemed to have resigned from the Debtor under the under the terms of the JJ Arch Operating Agreement.  As a result of such resignation, Mr. Chassen's interest in the Debtor was "deemed automatically redeemed by the [Debtor]," Mr. Chassen was "no longer . . . deemed a 'Member' of the [Debtor]" and Mr. Chassen was no longer "entitled to any rights as a Member of the [Debtor] for any period from and after such Resignation[.]" JJ Arch Operating Agreement at §§ 1.1, 7.5(a).  Notably, although certain of the New York state court orders did enjoin the Debtor's members from unilaterally seeking to terminate or force the resignation of the other without permission of the court, such orders did not prohibit Mr. Chassen from voluntarily resigning from the Debtor in the manner in which he chose to do so.

*The Debtor's Prepetition Relationship with Oak*

22.    In late 2017, I commenced discussions with the principals of 35 Oak regarding their interest in serving as investment partner in what would eventually become the Arch Companies.[15] These discussions resulted in 35 Oak agreeing to, among other things, (i) provide $50 million of funding for real estate investments over a five year period, in return for the exclusive right (the "Exclusivity Right") to invest at the top tier of contemplated real estate portfolio projects as a "general partner;"[16] (ii) cover funding shortfalls for the portfolio projects; (iii) serve as a guarantor for those projects; and (iii) fund the overhead costs for AREH's operations up to $3 million (subject to reimbursement), all as set forth in the AREH Operating Agreement and related investor and portfolio project agreements.

*Oak's Refusal to Fund and Prepetition Restructuring Efforts*

23.    In December 2017, AREH was formed to effectuate the business direction and strategies of what was to become the Arch Companies,' with the Debtor and Oak's 608941 affiliate operating AREH without issue regarding investment strategy or funding relating thereto.

24.    In November 2022, I provided Oak with projections reflecting the need for additional capital due to unexpected interest rate increases – specifically noting that the Portfolio Projects would require capital calls from investors to service the projects' debt obligations. Accordingly, I contacted investors, including Oak, to explore their desire or willingness to fund their respective capital call obligations as required for the Portfolio Projects.  Many of the investors indicated that they would not be able to fund their capital call obligations considering the existing

---

[15] Upon information and belief, 35 Oak is owned and/or controlled by William Weiner, Michael Weiner and Kevin Weiner (collectively, the "Weiners").

[16] Pursuant to the AREH Operating Agreement, Oak's Exclusivity Right expired on December 11, 2022. AREH Operating Agreement at § 1.1.

market conditions.  Oak also refused to honor its capital call funding obligations in full or backstop the shortfall in capital calls of the Arch Companies' other investors as required under the AREH Operating Agreement and various Portfolio Project investor and loan agreements.[17]  Additionally, I engaged a broker to source rescue capital for the Portfolio Projects, including capital that may be raised through a going concern sale.

25.     With limited access to capital, I discussed with the Arch Companies' executive team the potential of an in-court restructuring of the Arch Companies as one of the means of addressing the Portfolio Projects' critical debt service issues.  Oak, however, was vehemently opposed to an in-court restructuring. I also provided Oak with a detailed restructuring plan for each Portfolio Project. Surprisingly, Oak did not respond to this plan.  Instead, their solution was to either shirk their funding obligations by walking away from the Arch Companies or have me remove myself from any involvement with the companies.

26.     Recognizing that Oak was unwilling to engage in constructive dialogue to remedy the Arch Companies' financial distress, I pursued a series of financial and operational measures aimed at preserving capital, including terminating new transaction pursuits, and pausing certain in-process acquisitions. I also developed measures with the Arch Companies' key personnel to reduce overhead, while continuing to provide high quality services for the Portfolio Projects and our investors. In addition to the above measures, I began contacting lenders to the Portfolio Projects to negotiate forbearance and restructuring terms, and was gaining positive momentum with a number of the lenders regarding deal terms.  I also contacted new potential

---

[17] Certain Oak representatives informed the Debtor's members that Oak did not have the requisite funds to satisfy their funding obligations to the Arch Companies, had to borrow money to help support the Arch Companies' platform, and was marking down their investment positions in their various investments, including investments in the Arch Companies.

investors regarding their interest in providing capital to the Portfolio Projects. All of the above efforts were halted as result of litigation commenced by Oak to further its aims of controlling the Arch Companies.

*The Oak Litigation*

27.     After countless unsuccessful attempts to find a path forward, in July 2023, Oak proposed that I resign as managing member of the Debtor and be replaced by Jared Chassen, a then minority member of JJ Arch – the purpose of which to provide Oak with complete control of the Arch Companies.  I refused Oak's request, resulting in Oak and Mr. Chassen's coordinated efforts to improperly effectuate my ouster from the Debtor and take control of AREH through costly, non-stop litigation, and a complete refusal by Oak to provide the funds necessary for the Arch Companies' going concern existence.[18]

28.     Indeed, on August 5, 2023, I terminated Mr. Chassen for "cause" pursuant to the terms of the JJ Arch Operating Agreement.  Mr. Chassen, working with Oak, then purported to terminate me, impermissibly blocking me from having access to the Arch Companies' bank accounts and IT information (including access to my company e-mail), with Oak sending JJ Arch and me a notice of removal of JJ Arch as the managing member of AREH on August 6, 2023.

29.     On August 10, 2023, however, prior to my commencement of the Chassen Litigation, Oak, through its 608941 affiliate, commenced an action against me in the United States District Court for the Southern District of New York (the "District Court") alleging, *inter alia*, breach of fiduciary duties, defamation and tortious interference with prospective economic

---

[18] I understand that Oak's guaranty obligations in connection with the Portfolio Projects would be triggered by an AREH bankruptcy filing.

advantage. In the complaint, 608941 highlighted Oak's ***millions of dollars*** of guaranty obligations. I have not been served with a summons or the complaint in this action.

30.     On August 15, 2023, I commenced litigation in the Supreme Court of the State of New York, New York County, styled as *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member Arch Real Estate Holdings LLC, and JJ Arch LLC v. Chassen,* Index No. 158055/2203 (the "Chassen Litigation") before the Hon. Joel Cohen.

31.     October 10, 2023, 608941, commenced another action seeking injunctive relief (via T.R.O.) against me, JJ Arch and AREH, styled as *608941 NJ Inc. v. Jeffrey Simpson, JJ Arch LLC, and Arch Real Estate Holdings LLC*, Index No. 654963/2023 (the "Removed Case"). In the Removed Case litigation, 608941, sought among other things, to enjoin AREH from filing a bankruptcy case without 608941's consent – a consent unlikely to occur given Oak's considerable guaranty obligations.  AREH removed the litigation to District Court on October 12, 2023. In response, on October 13, 2023, 608941 filed its motion to remand the Removed Case and sought identical injunctive relief in the District Court to that in the Removed Case, in an action styled as *608941 NJ Inc. v. Jeffrey Simpson, JJ Arch LLC, and Arch Real Estate Holdings LLC*, Case No. 1:23-cv-08966, before the Hon. Andrew L. Carter (the "District Court Litigation").

32.     Although Judge Carter initially granted 608941's T.R.O. request, he seemed skeptical that 608941 could enjoin AREH's from seeking bankruptcy protection and that a bankruptcy court should determine whether AREH had authority to commence a prospective case, notwithstanding blocking provisions in the AREH Operating Agreement.

33.     On October 17, 2023, during the pendency of the District Court Litigation, Oak, through its affiliate 608941, commenced additional litigation, this time seeking the

appointment of a Receiver for JJ Arch as an additional means of securing control of AREH by removing me as managing member of JJ Arch. [Chassen Litigation Dkt. Nos. 225 and 226]. By interim order dated, October 27, 2023, Judge Cohen directed the parties to comply with their obligations under the AREH Operating Agreement [Chassen Litigation Dkt. No. 292]. Unsatisfied with this relief, 608941 commenced an additional action less than a week later in the Chassen Litigation to restrain me from furloughing employees for which Oak refused to provide salaries, as it had agreed to do pursuant to the AREH Operating Agreement [Chassen Litigation Dkt. Nos. 296 and 297]. Again, with the aim of divesting control from me of AREH and ensuring that Oak's guarantor obligations would not triggered by a bankruptcy filing.

34.    Rather than appoint a receiver, Judge Cohen removed JJ Arch as the managing member of AREH and replaced it with 608941, pursuant to a preliminary injunction with final disposition of this action tentatively set for June 7, 2024. Significantly, the AREH Operating Agreement provides that the managing member may be replaced only after the finding of a "cause" event following notice and the opportunity to cure.  There has not been an adjudication of a cause event, as required under the AREH Operating Agreement, to effectuate JJ Arch's removal as AREH's managing member.

35.    As a result of 608941's temporary appointment as managing member of AREH, Oak is now in control of the day-to-day management of AREH and its subsidiaries despite its apparent conflict of interest regarding a comprehensive restructuring of AREH and its Portfolio Project subsidiary entities. Upon information and belief, since 608941's appointment as the managing member of AREH, Oak has done little if anything to comprehensively address the debt service issues faced at the Portfolio Projects.  Instead, it has facilitated self-interested sell-offs of valuable Portfolio Project assets or agreed to voluntary bank foreclosures of certain of these assets

where Oak is released as a guarantor. While these solutions may be amenable to Oak and certain secured creditors, they fail to address the claims of the Arch Companies' other stakeholders, including the claims of trade creditors that have rendered goods and services to the Portfolio Projects.

36.      Further, although 608941 is now required to obtain consent from JJ Arch's managing member under Section 7.1.3 of the Operating Agreement, Judge Cohen modified the Operating Agreement to allow either Mr. Simpson or me to provide the necessary consents for Oak to consummate the above-referenced transactions. [Chassen Litigation Dkt. No. 418]. This modification is problematic, as Mr. Chassen is seriously conflicted. Indeed, upon information and belief, Mr. Chassen (a) is being paid by, or has been paid by, AREH through Oak for rendering services on behalf of AREH, and (b) has a joint defense agreement with Oak in connection with issues involving the Debtor, AREH, Oak and me.

37.      Oak has requested that I provide consent on at least two transactions either after the transaction given rise to the consent requirement had been agreed to following Mr. Chassen's approval, or with insufficient time for me to properly consider the transaction, in which case Oak obtained Mr. Chassen's consent, resulting in the unchecked dissipation of the Portfolio Projects. Such dissipation adversely impacts the value of AREH's interest in those projects, and the corresponding value of the Debtor's interest in AREH.

38.      Although I sought an appeal to reverse Judge Cohen's decisions before the Appellate Division of the New York State Supreme Court (First Judicial Department), Oak has indicated that it would continue the asset dispositions during the pendency of the appeal. Thus, commencement of the Debtor's chapter 11 case to, *inter alia*, determine its interest in AREH is

necessary to preserve value for the Debtor and the Arch Companies through a comprehensive restructuring.[19]

### III.
### Information Required by Local Rule 1007-2

39.    Pursuant to Bankruptcy Rule 1007(d) and Local Rule 1007-2, this affidavit provides the following information:[20]

40.    Set forth in the attached Exhibit D is a list of any committees organized prior to the order for relief in this Chapter 11 Case. No committees were organized prior to the order for relief in this case.

41.    Set forth in the attached Exhibit E is a list of the names and addresses and, where available, telephone numbers of the creditors holding the twenty largest unsecured claims against the Debtor, excluding insiders and affiliates, and (where available) the name of the person familiar with the Debtor's account.  This list also includes the amount of each claim, and, if appropriate, an indication whether such claim is contingent, unliquidated, disputed, or partially secured, subject to the Debtor's rights to dispute the validity of any claims.

42.    Set forth in the attached Exhibit F is a list of the names and addresses of the creditors holding the five largest secured claims against the Debtor.  The Debtor does not have any secured lenders.

43.    Set forth in the attached Exhibit G is a summary of the assets and liabilities of the Debtor, as of April 30, 2023.

---

[19] Upon information and belief, on March 8, 2024, Oak authorized the chapter 11 filing of a Portfolio Project affiliate, *In re Hello Nostrand LLC* (Case No 24-22192 (SHL)), in the United States Bankruptcy Court for the Southern District of New York.  This filing was authorized by Oak a after notice that JJ Arch had commenced its bankruptcy case.

[20] Local Rule 1007-2(3) requires disclosure of certain information regarding any committee organized prior to the order for relief in a chapter 11 case.  As no such committee was formed in this case, Local Rule 1007-2(3) is not applicable hereto.

44.     Set forth in the attached Exhibit H is a list of the number and classes of debt securities of the Debtor that are publicly held.  The Debtor does not have publicly held equity securities.

45.     Set forth in the attached Exhibit I is a list of the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor (other than bank accounts which may be subject to claims or setoff), or agent for any such entity. The Debtor does not have any property that falls within the aforementioned categories.

46.     Set forth in the attached Exhibit J is a list of the premises owned, leased, or held under other arrangement from which the Debtor operate its business. The Debtor is a holding company with no operations, and this does not own, lease or hold premises to operate its business.

47.     Set forth in the attached Exhibit K is a list of the locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States. The Debtor's books and records are held electronically via Dropbox, Quickbooks and the Arch Companies' Servers.

48.     Set forth in the attached Exhibit L is a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property, where a judgment against the Debtor or a seizure of its property may be imminent.

49.     Set forth in the attached Exhibit M is a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor's, and a brief summary of their relevant responsibilities and experience.

50.     Set forth in the attached Exhibit N is a list of information relating to (i) payroll to non-insider Debtor employees, and (ii) estimated amounts to be paid to officers, equity

holders, directors, and financial and business consultants retained by the Debtor for the thirty-day period following the filing of its chapter 11 petition.  The Debtor is a holding company with no employees.  No amounts will be paid to any officers, equity holders, directors or financial and business consultants retained by the Debtor for the thirty-day period following the Petition Date.

51.    Set forth in the attached Exhibit O list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remaining unpaid (other than professional fees), for the thirty-day period following the Petition Date.

52.    Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of, or the validity of any claim, or (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing.  The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

**[\*\*\*Remainder of Page Intentionally Left Blank\*\*\*]**

53.    The foregoing is true and correct to the best of my knowledge and belief.

Dated:    New York, New York
          March 19, 2024


                                        _/s/___Jeffrey Simpson_____
                                        Jeffrey Simpson


SWORN TO before me this
18th day of March, 2024

_/s/_Scott A. Griffin_____
Notary Public, State of New York
Qualified in Kings County
Registration No. 02GR63538362
Commission Expires on May 8, 2025

# Exhibit A

# Organizational Charts

# Arch Real Estate Holdings



# 1580 Nostrand Ave





Melrose
Apartments

# Melrose Apartments









JJ Pebble Creek LLC
*Member*
*NY  LLC*
*EIN: 86-1240989*

Arch Real
Estate Holdings LLC
*NY LLC*
*Non-Member Manager*
EIN: 82-3604000

608941
NJ Inc.
Member
NJ Corporation
PIN: 30-0413784

Arch Property
Holdings 1 LLC
*Member*

50%    0%    50%    0%

# Forestdale Portfolio Birmingham, Alabama

Pebble Creek MM JV
LLC



# Forestdale Portfolio
# Birmingham, Alabama



Center Point
Portfolio

# Center Point Portfolio





Columbia





Vandam



Vandam

# Bushwick



# 435 Central



# 1351 Dekalb





# Myrtle Point

# 88 University



# 88 University
# 88 Arch LLC Upper Tier



# 88 University Camelot





88 University NCSC

# Cambridge



# Arch Cambridge Investors LLC





Arch Cambridge
MM LLC

Exhibit B

JJ Arch LLC Operating Agreement

LIMITED LIABILITY COMPANY OPERATING AGREEMENT
OF
JJ ARCH LLC


LIMITED LIABILITY COMPANY OPERATING AGREEMENT, made as of the 11th day of December, 2017 by and between JARED CHASSEN, an individual residing at 47 Bridge Street, 6A, Brooklyn, New York 11201 ("Chassen"), and JEFFREY SIMPSON, an individual residing at 1230 Park Avenue, 16E, New York, New York 10128 ("Simpson").

In consideration of the covenants and conditions set forth in this Agreement, the parties agree to amend and restate the Original Agreement it its entirety and agree as follows:

ARTICLE 1

CERTAIN DEFINITIONS

1.1     Specific Terms.        For purposes of this Agreement, the following terms shall have the following respective meanings:

Affiliate:  With respect to a specified Person, (i) a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person, (ii) any Person who is an officer, director, member or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, member or trustee, or with respect to which the specified Person serves in a similar capacity, and (iii) any Person who, directly or indirectly, is the beneficial owner of 50% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest.  An Affiliate does not include a Person who is a partner in a partnership or joint venture with the Company or any other Member if such Person is not otherwise an Affiliate of the Company or any Member.

AREH:  Arch Real Estate Holdings LLC, a New York limited liability company.

AREH Operating Agreement:  That certain Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC, dated of even date herewith, between the Company and 608941 NJ INC., as the same may be amended from time to time.

Articles of Organization:  That certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 1, 2017, as the same may be amended from time to time.

Bankruptcy Action:  With respect to any Member, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any

reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

Business Day:   Any day other than Saturday, Sunday or any other day on which commercial banks or savings and loan associations are required or authorized by law to close in New York, New York.

Buy Sell Closing:  As defined in Section 8.2.

Buy/Sell Demand Notice:  As defined in Section 8.1.

Buy/Sell Deposit:  As defined in Section 8.2.

Buy/Sell Exercise Notice:   as defined in Section 8.2

Buy/Sell Initiating Member:  As defined in Section 8.1.

Buy/Sell Option Period:  As defined in Section 8.2.

Buy/Sell Purchasing Member:  As defined in Section 8.2.

Buy/Sell Responding Member:  As defined in Section 8.1

Buy/Sell Sale Interest:  As defined in Section 8.2.

Buy/Sell Sale Interest Purchase Price:  As defined in Section 8.1.

Buy/Sell Selling Member:  As defined in Section 8.2

Capital Accounts:  As defined in Section 4.3.

Capital Call Amount:  As defined in Section 4.2(b).

Capital Call Notice:  As defined in Section 4.2(b).

Capital Contributions:  The capital contributions of the Members made pursuant to Section 4.2.

Capital Loan:  As defined in Section 4.2.

Cash Flow:  Gross cash receipts of the Company (excluding Fee Revenue), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) such reserves as may reasonably be deemed necessary by the Members "Reserves").

Cause Event:  With respect to a Member, the occurrence of a Cause Event (as defined in the AREH Operating Agreement) with respect to such Member.

Code:  The Internal Revenue Code of 1986, as amended from time to time, or any similar Federal internal revenue law enacted in substitution for the Code.

Company:  The limited liability company formed pursuant to this Agreement.

Company Interest:  The ownership interest of any Member in the Company.

Company Law:  The New York Limited Liability Company Law, as amended from time to time.

Company Major Decision:  As defined in Section 3.2.

Contributing Member:  As defined in Section 4.2(c).

Control, controlled or controlling:  The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Covered Person:  The Member or any Affiliate thereof, or any officer, director, shareholder, partner, employee, representative, agent or spouse of a Member or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

Default Loan:  As defined in Section 4.2(c).

Demand Notice:  As defined in Section 8.1.

Disability:  The inability of the Member to perform his duties and responsibilities to the Company, with or without reasonable accommodation, due to any physical or mental illness or incapacity, which condition has continued for a period of (a) one hundred twenty (120) consecutive days or (b) one hundred eighty (180) days (including weekends and holidays) in any

consecutive 365-day period, which determination shall be made by an independent physician selected by the Company and approved by the Effected Member (which approval shall not be unreasonably withheld, conditioned or delayed).

Distribution Percentages:  The percentage determined in accordance with the chart set forth on Exhibit A hereto with respect.

Distributions:  Any distributions of cash or other assets of the Company to the Members.

Effected Member:  As defined in Section 7.6.

Exercise Notice:  As defined in Section 8.1.

Fee Revenue:  All amounts received by the Company the source of which relates to (i) fees paid directly to the Company or (ii) fees paid to the Investment Entity or another Subsidiary for the Company or its Affiliate, in each case for providing services to the payer thereof.

Initiating Member:  The Member who has delivered a Demand Notice in accordance with Section 8.1.

Investment Entity:  AREH, and each other Person in which the Company holds an interest or serves as manager, from time to time.

Key Personnel:  Those Persons listed on Exhibit B hereto

Members:  Chassen and Simpson and any other Persons who are admitted to the Company as Members pursuant to Article 7.

Non-Contributing Member:  As defined in Section 4.2(c).

Permitted Transfers:  A (i) Transfer by a Member of all or any part of its Company Interest to any person or entity that is an Affiliate of such Member, and (ii) Transfers pursuant to the provisions of Article 8 of this Agreement.

Person:  An individual, trust, estate, partnership, joint venture, association, company, corporation or other entity.

Profit and Loss:  "Profit" or "Loss" means, for any fiscal year of the Company, the income or loss of the Company as determined in accordance with the accounting methods followed for federal income tax purposes (including any gains or losses recognized by the Company on the sale of the Property and any items required to be separately stated under Article 703 (a) of the Code).

Promote Distribution:  As defined in the AREH Operating Agreement.

Redemption Amount:  An amount equal to all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if

all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that for purposes of determining the Redemption Amount the Effected Member's or Resigning Member's Distribution Percentage shall be the percentage set forth on Exhibit A as of the date of such death or Resignation without giving effect to the proviso set forth on Exhibit A; provided, further that in the case of a Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

Regulations:   The final, temporary and proposed Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Resignation:   With respect to a Member, either (i) the resignation of a Member from the Company or such Member's failure to provide substantially all of his business time for the benefit of the Company other than as a result of death of such Member or (ii) a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign.

Responding Member:   As defined in Section 8.1.

Restricted Period:   (i) Other than with respect to Key Parties, the twelve (12) month period following the applicable Member's Resignation or if such Member Resignation is due to a Cause Event, the twenty-four (24) month period following such Member's Resignation and (ii) with respect to Key Personnel, the twenty-four (24) month period following such Member's Resignation.

Second Option Period:   As defined in Section 8.2.

Subsidiary:   As defined in the AREH Operating Agreement.

Transfer:   Any sale, conveyance, transfer or assignment, or the entry into any agreement to sell, convey, transfer or assign, whether by law or otherwise, of, on, in or affecting (y) all or part of a Member's Company Interest (including any legal or beneficial direct or indirect interest therein), or (z) any direct or indirect interest in a Member (including any profit interest).

Unreturned Capital Contribution:   With respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 5.1(a)(i) and 5.1(b)(i).

1.2   Other Terms.  Unless the context shall require otherwise:

(a)   Words importing the singular number or plural number shall include the plural number and singular number respectively;

(b)    Words importing the masculine gender shall include the feminine and neuter genders and vice versa;

(c)    Reference to "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation"; and

(d)    Reference in this Agreement to "herein", "hereof", "hereby" or "hereunder", or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the Exhibits.

(e)    Unless otherwise expressly provided, reference to a Section or Article number shall be deemed a reference to the Section or Article contained in this Agreement.

ARTICLE 2

GENERAL PROVISIONS

2.1    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Company Law and agree that the rights, duties and liabilities of the Members shall be as provided in the Company Law, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Articles of Organization with the Department of State of the State of New York is hereby ratified and confirmed in all respects..

2.2    Further Action.  The Members shall take any and all action, as may be required, from time to time, under the laws of the State of New York, to give effect to, and continue in good standing, the Company.

2.3    Name of the Company.  The name of the Company shall be JJ Arch LLC or such other name as the Members may from time to time determine.  The Members shall have the right to cause the Company to operate under one or more assumed names where required to comply with the laws of any states in which the Company is doing business.  The Members shall cause to be filed on behalf of the Company such company or assumed or fictitious name certificate or certificates or other similar documents as may from time to time be required by law for the formation and continuation of the Company as a limited liability company under the laws of New York applicable to limited liability company and the laws of such other states in which the Company is doing business regarding the qualification of foreign limited liability company.

2.4    Business of the Company.  The business of the Company shall be to:  (i) acquire, hold, and ultimately dispose of an interest in each Investment Entity, (ii) make, enter into, perform and carry out any arrangements, contracts or agreements consistent with the foregoing, and (iii) to do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.  The Company shall not engage in any business or activity not authorized by this Agreement.

2.5    Place of Business.  The Company's principal place of business is 1230 Park Avenue, 16E, New York, New York 10128 or such other place as the Members may, from time to time, determine.  Such office may be changed from time to time in accordance with the Company Law, as may be approved the Members.

2.6    Duration of the Company.  The Company shall commence upon the filing of an Articles of Organization for the Company in accordance with the Company Law, and shall continue until dissolved in accordance with Article 9 of this Agreement.

2.7    Title to Company Property.  A Member's Interest shall for all purposes be personal property.  All property owned by the Company, whether real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in that property.

ARTICLE III

MEMBERS; MANAGEMENT

3.1    Management of the Company Prior to Fourth Anniversary.

(a)    Prior to the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.1(b)), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.  Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

     (v)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

     (vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

     (vii)    cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

     (viii)    take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

     (b)    Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "Company Major Decision"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request. Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

     (i)    acquire any direct or indirect interests in any Person other than AREH;

     (ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

     (iii)    sell any asset of the Company or any portion thereof other than any such asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

     (iv)    merge, consolidate or other reorganize the Company with another Person;

     (v)    borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

     (vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)    enter into any lease for space;

(viii)   hire any employee, consultant or other personnel;

(ix)     engage in any business or activity not authorized by this Agreement;

(x)      enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)     enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)   maintain reserves in excess of $20,000;

(xiv)    admit new or substitute Members to the Company;

(xv)     modify any material terms of the AREH Operating Agreement;

(xvi)    cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

3.2    <u>Management of the Company From and After Fourth Anniversary</u>. From and after the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by the Members. Each Member shall have the right to cause the Company to take any action identified in Section 3.1(a). All other actions on the part of without the Company shall require the consent of both Members.

3.3    <u>Services of the Members</u>. Each Member shall devote substantially all of his business time and effort to the business of the Company, and shall perform his duties with the same degree of care he exercises with respect to his own assets. Notwithstanding the foregoing, each Member and his Affiliates may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description that is not competitive with the Company or an Investment Entity, and neither the Company nor any other Member shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures.

3.4    <u>Expenses</u>. Each Member shall be entitled to be reimbursed for all business related expenses incurred by such Member in connection with his providing services hereunder and which are reimbursable pursuant to the Code.

3.5    <u>Guarantees</u>. The Members acknowledge that in connection with any (i) financing or refinancing by AREH or another Investment Entity the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty,

environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, if a Guaranty is required and any Member is required to provide such Guaranty, agrees if a lender makes any written demand from time to time on a Guaranty made by a Member or its Affiliate, each Member shall pay, or reimburse the applicable guarantor, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the cause of the claim on such Guaranty is directly attributable to any action of the other Member or its Affiliate, and which action was not approved by the non-Guarantying Member. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

ARTICLE IV

CAPITAL CONTRIBUTIONS

4.1   Capital.  The capital of the Company shall consist of the amounts contributed to the Company pursuant to this Article IV.

4.2   Capital Contributions.  (a)  The Members have made Capital Contributions to the Company as reflected on the books and records of the Company.

(b)   If, at any time or from time to time, (i) Simpson determines that additional funds are required by the Company to meet its general and administrative expenses or (ii) the Company is required to make a capital contribution to an Investment Entity, Simpson shall deliver a written notice to Chassen (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Each of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to either (i) if such Capital Call Notice is in connection with a requirement of the Company to make a capital contribution pursuant to Section 3.4 of the AREH Operating Agreement, their respective percentages of Promote Distributions paid to Members hereunder or (ii) in all other cases, 50% of Capital Call Amount.

(c)   If a Member (a "Non-Contributing Member") shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then the Member who made its required Capital Contribution (the "Contributing Member") shall have the right to contribute the amount of the Non-Contributing Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a

"Default Loan") to the Non-Contributing Member in an amount equal to the unfunded capital contribution.

(d)     Each Default Loan shall be deemed to constitute a loan made by the Contributing Member to the Non-Contributing Member in accordance with the terms hereof, immediately followed by a capital contribution by the Non-Contributing Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the Contributing Member and shall constitute a debt owed by the Non-Contributing Member. Any Default Loan shall bear interest at the rate of twelve percent (12%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Non-Contributing Member from any distributions due to Non-Contributing Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Non-Contributing Member and shall be secured by the Non-Contributing Member's Company Interest including, without limitation, the Non-Contributing Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Non-Contributing Member hereby pledges, assigns and grants a security interest in its Company Interest to the Contributing Member and agrees to execute such documents and statements as are reasonably requested by the Contributing Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Non-Contributing Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Non-Contributing Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the Contributing Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Non-Contributing Member, and (y) any proceeds of the sale of the Non-Contributing Member's Company Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Non-Contributing Member.

4.3     Capital Accounts.  (a) The Members shall cause to be kept for each Member a capital account ("Capital Account") which shall be computed from the date hereof and which shall initially be equal to the capital contribution of each Member on the date hereof and shall be determined and maintained in accordance with Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied, and Capital Accounts shall be maintained, in a manner consistent with such Regulations.

(b)     No interest shall be paid by the Company on any Capital Contribution. A Member shall not be entitled to demand the return of, or to withdraw, any part of his Capital Contribution or any balance in his Capital Account, or to receive any distribution, except as provided for in this Agreement. No Member shall be liable for the return of the Capital Contributions of any other Member and no Member shall have any obligation to restore the amount of any deficit in its Capital Account to the Company.

ARTICLE 5

DISTRIBUTIONS; ALLOCATION INCOME AND LOSSES

5.1     Distributions.

(a)     Cash Flow shall be accounted for on the books of the Company in accordance with the year such amounts were originally received by the real property assets or entities in which the Company owns an indirect interest and shall be distributed, earliest years first, within five (5) Business Days of receipt thereof by the Company to the Members as follows:

(i)     First to the Members in proportion to their respective Capital Contributions until their respective Unreturned Capital Contributions have been reduced to zero;

(ii)     To the Members in accordance with their respective Distribution Percentages with respect to the underlying asset from which the funds for such distribution are derived.

(b)     Fee Revenue shall be distributed within five (5) Business Days of receipt thereof by the Company to the Members as follows:  50% to Simpson and 50% to Chassen.

5.2     Allocations of Profit and Loss.  Profit and Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 9.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 9.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Profit or Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profit or Loss.

5.3     Tax Elections.  The Members shall determine whether the Company shall make any applicable tax elections, including an election in accordance with Section 754 of the Code to adjust the basis of the assets of the Company for Federal income tax purposes in the event of a distribution of Company property as described in Section 734 of the Code or a transfer by any Member of its Company Interest as described in Section 734 of the Code.

ARTICLE 6

BOOKS AND RECORDS; ACCOUNTS

6.1    Books and Records.   True and correct books of account with respect to the operations of the Company shall be kept at the principal place of business of the Company.   The Members shall be responsible for keeping the books of account.   The Company shall also maintain at its principal place of business the following records:   (a) a current list of the full name and last known business address of each Member set forth in alphabetical order, (b) a copy of the Articles of Organization and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed, (c) copies of the Company's Federal, state and local income tax returns and reports, if any, for the three most recent years and (d) copies of any then effective operating agreements and of any financial statements of the Company for the three most recent years.

Any Member shall have the right, at its own expense, to examine, or have its duly authorized representative examine, the books of account of the Company and such other information reasonably related to such Member's Company Interest, and the Members shall make them available at the office at which those books are maintained.

6.2    Accounting Basis and Fiscal Year.   The Company's books shall be kept on such basis as the Members shall determine.   The fiscal year of the Company shall be the calendar year.

6.3    Tax Returns.   (a)   The Members shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any Federal, state or local tax returns required to be filed by the Company.   The Members shall use its reasonable efforts to furnish each Member within 90 days of the end of each fiscal year with such information as may be needed to enable each Member to file its Federal income tax return and any required state income tax return.   The Members shall cause the Company to pay, out of available cash flow and other assets of the Company, any taxes payable by the Company.   Except as otherwise set forth in this Agreement, all decisions regarding tax elections shall be made by the Members.

(b)    Each Member agrees to report, on his own income tax returns each year, each item of income, gain, loss, deduction and credit as reported by the Company to such Member on the Schedule K-1 (or other similar tax report) issued by the Company to such Member for such year.   Except as otherwise required by law, no Member shall take any tax reporting position that is inconsistent in any respect with any tax reporting positions taken by the Company or any entity in which the Company owns any equity interest, and, in the event of a breach by such Member of the provisions of this Section 6.3(b), shall be liable to the Company and the Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

6.4    Tax Matters Member; Partnership Representative.   Simpson is hereby designated the "Tax Matters Partner" pursuant to Section 6231 of the Code (and any comparable provision of applicable state and local tax laws).   All Members hereby consent to such designation and agree to take any further action as may be required to effectuate and maintain such designation and the Tax

Matter Partner is authorized to take such actions as may be required to effectuate and maintain such designation. Simpson is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Simpson shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Simpson, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 6.4 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

ARTICLE 7

ASSIGNABILITY OF INTERESTS;
ADDITIONAL MEMBERS

7.1    General Conditions. No Member shall Transfer all or any portion of its Company Interest, or any rights to receive any Distributions under this Agreement except (A) Permitted Transfers, (B) Transfers other than Permitted Transfers with the other Members' consent, to be exercised in such other Member's sole and absolute discretion, or (C) as required by Section 7.6 hereof. Notwithstanding the foregoing sentence, in no event shall a Member be permitted to Transfer all or any portion of its Company Interest if, in the opinion of counsel to the Company or, in the opinion of counsel to the non-transferring Members, which counsel is satisfactory to the transferring Member, in its reasonable discretion, the Transfer would (i) cause the termination or dissolution of the Company under the Company Law; (ii) require registration under the Securities Act of 1933, as amended, or under any other securities law or result in the violation of any applicable state securities laws; (iii) cause the Company or any Member to be subject to any additional material regulatory requirements; (iv) cause the Company to be taxed as a corporation under the Code; or (v) cause a default under any agreement, that was approved by the Members, to which the Company is a party including, without limitation, the AREH Operating Agreement.

7.2    Additional Member. A transferee of all or part of the Company Interest of a Member permitted under this Agreement shall be admitted to the Company as an additional Member and be listed as a Member on the books and records of the Company only if (i) the transferring Member gives such right to the transferee, (ii) except for Permitted Transfers, the Members consent to the admission of the transferee, which consent may be withheld in the Members' sole and absolute discretion, (iii) the transferee shall execute and deliver an agreement

reasonably satisfactory to and approved by the Members, agreeing to assume and to be bound by and to comply with all of the terms and conditions of this Agreement applicable to the Members, (iv) the transferee shall execute, and deliver all necessary certificates or other documents and perform such other acts as may be required under the Company Law or other applicable laws and regulations to effectuate the admission of the additional Member and to preserve the status and legal compliance of the Company as reasonably satisfactory to and approved by the Members and (v) the transferee shall pay all reasonable expenses of the Company and the Members connected with the admission including, but not limited to, reasonable legal and accounting fees and disbursements.

7.3    Treatment.  Until compliance with the provisions of Section 7.2, the Company shall be entitled to treat the record owner of any Company Interest as the absolute owner of such Company Interest in all respects and shall incur no liability for distributions made to such owner.

7.4    Other Transfers Void.  Any Transfer made in violation of the provisions of this Article 7 or of Article 8 shall be null and void and shall not bind the Company or any Member.

7.5    Resignation of a Member.

(a)    Upon the Resignation of a Member, such Member's Company Interest shall be deemed automatically redeemed by the Company for the Redemption Amount, which shall be payable when and if the applicable distributions are received by the Company and such Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such Resignation occurs.  In connection with any redemption pursuant to this Section 7.5, the Company shall have the right to require the redeemed Member to, and the redeemed Member shall, enter into agreements with the Company containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

(b)    Each Member agrees that for the Restricted Period, such Member shall not, nor shall it permit any Person employed by, or associated or affiliated with, to (i) encourage, solicit, or inducing, or in any manner attempt to encourage, solicit, or induce, any Person employed by, as agent of, or a service provider to, the Company or an Investment Entity within the twelve (12) month period prior to the Closing to terminate (or, in the case of an agent or service provider, terminate or reduce) such Person's employment, agency or service, as the case may be, with the Company or its Subsidiary; (ii) hire any Person who was employed by, an agent of, or a service provider to, the Company or an Investment Entity, within the twelve (12) month period prior to the date of such hiring; or (iii) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce any customer, supplier, licensee or other business relation (or any direct or indirect subsidiary of any such customer, supplier, licensee or other business relation) of the Company or an Investment Entity to cease doing business with or reduce the amount of business conducted with (including by providing similar services or products to any such Person) the Company or an Investment Entity, or in any way negatively interfere with the relationship between any such customer, supplier, licensee or business relation and the Company

or an Investment Entity. Notwithstanding the foregoing, the restrictions set forth in this Section 7.5(b) shall in no way limit the applicable Member from (i) encouraging, soliciting, or inducing to become employed any individual who was such Member's personal assistant at the Company or employing such individual or (ii) except for Persons to whom the Company or an Investment Entity is required to offer all real estate investment opportunities, seeking capital from any Person who provides equity or debt financing to the Company or an Investment Entity. Without limiting the remedies available to the Company, the Members acknowledge that a breach of any of the covenants contained in this Section 7.5(b) may result in material irreparable injury to the Company for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of posting a bond or proving irreparable harm or injury as a result of such breach or threatened breach hereof, restraining the applicable Member from engaging in activities prohibited by this Section 7.5(b) or such other relief as may be required specifically to enforce any of the covenants in this Section 7.5(b).

       7.6    <u>Death or Disabilty of Member</u>.

       (a)    Upon the death or Disability of a Member (the "<u>Effected Member</u>"), such Member's Company Interest shall be automatically deemed transferred to the non-Effected Member for a purchase price equal to the Redemption Amount which shall be payable when and if the applicable distributions are received by the non-Effected Member with respect to the Company Interest acquired from the Effected Member. From and after the date of the death or Disability of the Effected Member, the Effected Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after the date of such death but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such death occurs.

       (b)    In connection with any sale pursuant to this Section 7.6, the non-Effected Member shall have the right to require the estate of the Effected Member to enter into agreements with the non-Effected Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

ARTICLE 8

<u>BUY/SELL RIGHTS</u>

       8.1    <u>Right to Purchase</u>.

       (a)    From and after the second anniversary of the date hereof, in the event that the Members fail to approve any action requiring the consent of both Members including, without limitation, a Company Major Decision, and are unable to reach agreement as to an appropriate alternative course of action after not less than ten (10) Business Days of good faith negotiations to resolve their differences, either Chassen, on the one hand, or Simpson on the other hand (such Member being hereinafter referred to as the "<u>Buy/Sell Initiating Member</u>"),

shall have the right to give written notice (the "Buy/Sell Demand Notice") to the other Member (such other Member being hereinafter referred to as the "Buy/Sell Responding Member"), of the Buy/Sell Initiating Member's intent to rely on this Article 8 and to purchase for cash all, but not less than all, of the Company Interests owned by the Buy/Sell Responding Member, whereupon the provisions set forth in this Article 8 shall apply. In the event that both Simpson and Simpson are deemed to have delivered a Buy/Sell Demand Notice, the Member who shall be deemed to have first delivered the Buy/Sell Demand Notice pursuant to Section 11.1 hereof after the ten (10) Business Day good faith negotiation period set forth herein shall be deemed the Buy/Sell Initiating Member or if both Simpson and Chassen shall be deemed to have delivered a Buy/Sell Demand Notice hereunder on the same date, the Member whose Buy/Sell Demand Notice hereunder sets forth the highest price shall be deemed the Buy/Sell Initiating Member.

(b)    The Buy/Sell Demand Notice shall set forth the cash purchase price at which the Buy/Sell Initiating Member would be willing to purchase (or to cause its designee to purchase) an undivided one hundred percent (100%) interest in the Company free and clear of all liabilities and assuming that no Capital Contributions are made and that all cash flow of the Company is distributed between the date of the Buy/Sell Demand Notice and the date on which the Company Interests are sold pursuant to this Article 8, together with a calculation of such purchase price.

(c)    The Buy/Sell Responding Member shall have the option, exercisable by giving written notice (the "Buy/Sell Exercise Notice") to the Buy/Sell Initiating Member within ten (10) Business Days after receipt of the Buy/Sell Demand Notice, to agree to either (i) sell to the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2 or (ii) purchase from the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2.

8.2    Procedure for Purchase of Buy/Sell Sale Interests.

(a)    As used in this Section 8.2 the following terms shall have the following meanings:

(i)    "Buy/Sell Deposit" shall mean an amount equal to 10% of the Buy/Sell Sale Interest Purchase Price, which deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.

(ii)    "Buy/Sell Option Period" shall mean the time period during which the Buy/Sell Responding Member shall have the right to elect either to purchase the Company Interests of the Buy/Sell Initiating Member or sell its entire Company Interests to the Buy/Sell Initiating Member pursuant to Section 8.1(c) above.

(iii)    "Buy/Sell Purchasing Member" shall mean either (x) the Buy/Sell Initiating Member (or its designee) if the Buy/Sell Responding Member shall have elected in its Buy/Sell Exercise Notice not to purchase the Company Interests of the Buy/Sell Initiating Member, or (y) the Buy/Sell Responding Member (or its designee) if it shall have indicated in its

Buy/Sell Exercise Notice its intent to purchase the Company Interests of the Buy/Sell Initiating Member.

(iv)    "Buy/Sell Sale Interest" shall mean the Company Interests of the Buy/Sell Selling Member.

(v)    "Buy/Sell Sale Interest Purchase Price" shall mean an amount equal to the amount which the Buy/Sell Selling Member would have been entitled to receive upon dissolution of the Company pursuant to the terms of this Agreement if the Company had sold all of its assets for cash to a third party at the price set forth in the Buy/Sell Demand Notice and had utilized such cash first to satisfy all debt obligations, paid all expenses, transfer taxes, costs and fees relating to such sale,  and then liquidated the Company.

(vi)    "Buy/Sell Selling Member" shall mean the Member who is not the Buy/Sell Purchasing Member.

(b)    Within two (2) Business Days following the Buy/Sell Option Period, the Buy/Sell Purchasing Member shall deposit into escrow, with an escrow agent (the "Buy/Sell Escrow Agent") selected by the Buy/Sell Purchasing Member, but not an Affiliate of the Buy/Sell Purchasing Member, and reasonably acceptable to the Buy/Sell Selling Member, the Buy/Sell Deposit, which Buy/Sell Deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.  The Buy/Sell Deposit shall be held by the Buy/Sell Escrow Agent in accordance with the terms hereof.  Upon delivery of the Buy/Sell Deposit to the Buy/Sell Escrow Agent, the Buy/Sell Purchasing Member shall have the sole right, without the need for consent from any other Member, to cause the Company to take the action, or refrain from taking the action, which was the cause of the Buy/Sell Demand Notice.

(c)    Within thirty (30) Business Days following the date on which the Buy/Sell Option Period shall have expired, the Buy/Sell Purchasing Member shall purchase from the Buy/Sell Selling Member (such purchase and sale is referred to herein as the "Buy/Sell Closing"), and the Buy/Sell Selling Member shall sell to the Buy/Sell Purchasing Member, the Buy/Sell Sale Interest at the Buy/Sell Sale Interest Purchase Price.  In determining this amount it shall be assumed that: (i) no prepayment premium or make whole amount is owing to any lender, (ii) no reserves will be maintained, (iii) there will be no brokerage fees, transfer taxes or other transaction costs in connection with such liquidation, and (iv) the proceeds from such sale and liquidation would be distributed in accordance with Section 5.1 hereof.  Upon the Buy/Sell Closing, the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member and applied to the Buy/Sell Sale Interest Purchase Price.

(d)    In connection with any sale pursuant to this Section 8.2, the Buy/Sell Purchasing Member shall have the right to require the Buy/Sell Selling Member to enter into agreements with the Buy/Sell Purchasing Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that the Buy/Sell Selling Member's Company Interests are free and clear of all liens, claims or encumbrances and an indemnity from the Buy/Sell Selling Member to the Buy/Sell Purchasing Member for claims arising out of events which occur prior to the Buy/Sell Closing and an indemnity from the Company to the Buy/Sell Selling Member for

claims arising on or after the Buy/Sell Closing. Each Member shall pay any transfer tax imposed on such Member pursuant to applicable law and there shall be such prorations at the Buy/Sell Closing as are customary in such transactions, including without limitation for such items as real estate taxes, rents, security deposits, service contracts and assessments.

(e)    From the date of the Buy/Sell Demand Notice until the consummation of the Buy/Sell Closing, the Company shall continue to be operated in the ordinary course, as if such Buy/Sell Closing were not going to occur, the Members shall continue to have all power and authority granted in this Agreement (including the power and obligation to make distributions), and the Members shall exercise their power and authority in good faith and without regard to the fact that such Buy/Sell Closing may occur; provided, that: (i) any and all Distributions to the Buy/Sell Selling Member derived solely from proceeds of a Capital Event shall be credited against and reduce the Buy/Sell Sale Interest Purchase Price payable to the Buy/Sell Selling Member; and (ii) except as provided in Section 8.2(b), the Company shall not, nor shall it permit any Subsidiary to, without the consent of the Members enter into any contracts or agreements, or otherwise agree, to sell or otherwise dispose of any Company assets, except that the Company and each of its Subsidiaries shall be authorized to consummate any transactions that were the subject of binding contractual obligations entered into prior to the delivery of the Buy/Sell Demand Notice.

(f)    If the Buy/Sell Purchasing Member shall default in its obligation to:

(i)    timely make the Buy/Sell Deposit as required in Section 8.2(b), then upon written notice to the Buy/Sell Purchasing Member the Buy/Sell Selling Member shall have the right to terminate the Buy/Sell Purchasing Member's right to acquire the applicable Company Interests pursuant thereto and either (x) recover an award or judgment against the Buy/Sell Purchasing Member in the amount of such required Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment or (y) have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

(ii)    consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from Buy/Sell Selling Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Selling Member, then (x) the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member as liquidated damages (the Members hereby acknowledging and agreeing that it is impossible to more precisely estimate the damages to be suffered by the Buy/Sell Selling Member upon such default and that the Buy/Sell Deposit that may be received by the Buy/Sell Selling Member is not intended as a penalty), and (y) the Buy/Sell Selling Member shall have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

The Buy/Sell Selling Member shall be deemed to have exercised its rights under clause (i)(y) or clause (ii)(y) of this Section 8.2(f) if the Buy/Sell Selling Member shall have delivered to the

Buy/Sell Purchasing Member a written notice of its intent to acquire the Buy/Sell Purchasing Member's Company Interest within ten (10) Business Days (the "Second Option Period") of the expiration of the two (2) Business Day period within which to make the Buy/Sell Deposit or the thirty (30) Business Day time period within which the Buy/Sell Purchasing Member had the right to acquire the Buy/Sell Sale Interests, as applicable.  Upon the exercise by the Buy/Sell Selling Member of its rights under this Section 8.2(f), for purposes of this Section 8.2, the Buy/Sell Selling Member shall be deemed the Buy/Sell Purchasing Member, the Buy/Sell Purchasing Member shall be deemed the Buy/Sell Selling Member and the Option Period shall be deemed to have expired on the expiration of the Second Option Period.

(g)    If the Buy/Sell Selling Member shall default in its obligation to consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from the Buy/Sell Purchasing Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Purchasing Member, then the Buy/Sell Purchasing Member shall have the right upon written notice to the Buy/Sell Selling Member to either (i) seek specific performance of the Buy/Sell Selling Member's obligations, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment; it being agreed by the Buy/Sell Selling Member and the Buy/Sell Purchasing Member that the remedy at law for breach of the obligations of the Buy/Sell Selling Member set forth in Section 8.2(c) is inadequate in view of (A) the complexities and uncertainties in measuring actual damages to be sustained by the Buy/Sell Purchasing Member, and (B) the uniqueness of the Company business and the Members' relationships, or (ii) upon written notice to the Buy/Sell Selling Member, demand and receive a return of the Buy/Sell Deposit previously deposited with the Buy/Sell Escrow Agent together with reimbursement of all out-of-pocket costs and expenses incurred by the Buy/Sell Purchasing Member in connection with the exercise of the buy/sell right set forth in this Article 8 and the pursuit of the acquisition of the applicable Company Interests with respect thereto, and recover an award or judgment against the Buy/Sell Selling Member in the amount of the Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment, in which event, the Buy/Sell Selling Member's default hereunder shall be deemed waived and the Buy/Sell Demand Notice to which such default relates shall be void *ab initio* (such that any further exercise of the buy/sell right set forth in this Article 8 shall require compliance with this Article 8).

8.3    Release of Buy/Sell Selling Member.  The Buy/Sell Purchasing Member shall exercise commercially reasonable efforts to obtain a release of the Buy/Sell Selling Member and the Buy/Sell Selling Member's Affiliates from any personal liability with respect to all Company obligations arising or accruing from and after the Buy/Sell Closing, if any, and all other obligations related thereto including any guarantees with respect thereto.  If the Buy/Sell Purchasing Member is unable to obtain any such releases, then (i) from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, the Buy/Sell Purchasing Member and the Company, jointly and severally, shall indemnify and hold harmless the Buy/Sell Selling Member from any and all claims or liabilities arising from such unreleased obligations and/or guarantees arising or accruing from and after such closing, if any, except to the extent caused by the Buy/Sell Selling Member, and (ii) with respect to any guaranty provided by any Affiliate of the Buy/Sell Selling Member under any loan document or other agreement with respect to any indebtedness of the Company or any subsidiary that guarantees any obligation for which any

Affiliate of the Buy/Sell Purchasing Member is jointly and severally liable as a guarantor, then from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, such Affiliate of the Buy/Sell Purchasing Member shall indemnify and hold harmless such Affiliate of the Buy/Sell Selling Member from any personal liability with respect to such guaranteed obligation arising or accruing from and after such closing, if any, except to the extent such personal liability is caused by such Affiliate of the Buy/Sell Selling Member.

ARTICLE 9

DISSOLUTION AND TERMINATION

9.1    Events of Dissolution.  The Company shall be dissolved upon the happening of any of the following events:

(a)    The disposition of all or substantially all of the assets of the Company;

(b)    The unanimous vote by the Members; or

(c)    The happening of any other event causing the dissolution of the Company under the laws of New York.

Dissolution of the Company shall be effective on the day the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles of Organization of the Company has been canceled and the assets of the Company have been distributed as provided herein.

9.2    Limited Return of Capital Contributions Upon Dissolution.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution, and shall have no recourse therefor (upon dissolution or otherwise) against any Member.  Notwithstanding the dissolution of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until termination of the Company, as provided in this Agreement.  Upon dissolution of the Company, the Members or a liquidator (who may be a Member) appointed by the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this agreement and cause the cancellation of the Company's Articles of Organization.

9.3    Distributions Upon Liquidation.  (a)  Upon dissolution of the Company, the Members or the liquidator appointed pursuant to Section 9.2, shall liquidate the assets of the Company as promptly as is consistent with obtaining the fair value thereof, and apply and distribute the proceeds thereof:

(i)    First, to creditors in the order of priority provided by law;

(ii)    Second, to the establishment of any reserves for contingencies which the Members (or the liquidator) may consider necessary; and

818298_7                                      21

(iii)    The balance of the proceeds shall be distributed to the Members in accordance with Section 5.1 hereof.

(b)    Notwithstanding the foregoing, in the event the Members (or liquidator) shall determine that an immediate sale of part or all of the Company assets would cause undue loss to the Members, the Members (or liquidator), in order to avoid such loss, may, after giving notice to all the Members, to the extent not then prohibited by the limited liability company law of any jurisdiction in which the Company is then formed or qualified and applicable in the circumstances, defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations.

(c)    After the proceeds of the liquidation of the assets of the Company have been distributed (which shall occur as soon as practical), the Members (or liquidator) shall cause the Articles of Organization of the Company to be canceled.

9.4    <u>Final Accounting</u>.  Upon the dissolution of the Company a proper accounting shall be made by the Company's independent public accountants from the date of the last previous accounting to the date of dissolution.

ARTICLE 10

<u>LIABILITY, EXCULPATION
AND INDEMNIFICATION</u>

10.1    <u>Liability</u>.  (a) Except as otherwise provided by the Company Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)    Except as otherwise expressly required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profit of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

10.2    <u>Indemnification</u>.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; <u>provided</u>, <u>however</u>, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

10.3    Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof.

ARTICLE 11

MISCELLANEOUS

11.1    Notices.  Any notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand and shall be deemed to have been given (i) when personally delivered with signed delivery receipt obtained, (ii) when transmitted by electronic mail, or (iii) three Business Days after such notice has been deposited in the United States first class mail if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed to the Members at the addresses set forth in the preamble hereto or at such other address as such Member may notify the other Members and the Company pursuant to the terms of this Section 11.1.

11.2    Successors and Assigns.  Subject to the restrictions on Transfer set forth in this Agreement, this Agreement, and each provision of this Agreement, shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and permitted assigns, and each successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

11.3    Amendments.  This Agreement may be amended only by a written document approved by and duly executed by the Members, subject to the condition that such amendment shall not increase the Capital Contribution required from any Member or adversely affect any Distribution or allocation to any Member without such Member's written consent. Notwithstanding the foregoing, the written consent of all Members shall be required to any amendment which would (a) allow the Members to take part in the control of Company's business or otherwise modify their limited liability, (b) extend the term of this Agreement, (c) in the opinion of counsel to the Company, adversely affect the status of the Company as a partnership for Federal income tax purposes, or (d) amend this Section 11.3.

11.4    Partition.  No Member or any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have any Company assets partitioned, and each Member, on behalf of itself, its successors, representatives, heirs and assigns, hereby waives any such right.  It is the intention of the Members that during the term of this Agreement the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the rights of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Company shall be subject to the limitations and restrictions of this Agreement.

11.5    <u>No Waiver</u>.  The failure of any Member to insist upon strict performance of a covenant under this Agreement or of any obligation under this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of that Member's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation under this Agreement.  No waiver or consent shall be effective unless in writing.

11.6    <u>Entire Agreement</u>.  This Agreement constitutes the full and complete agreement of the parties to this Agreement with respect to the subject matter of this Agreement.

11.7    <u>Captions</u>.  The titles or captions of Articles or Sections contained in this Agreement are inserted only as a matter of convenience and for reference, are not a part of this Agreement, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

11.8    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all Members have not signed the same counterpart.

11.9    <u>Separability</u>.  In case any of the provisions contained in this Agreement or any application of any of those provisions shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and other applications of those provisions shall not in any way be affected or impaired thereby.

11.10    <u>Gender</u>.  Words used herein, regardless of the gender specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, as the context shall require.

11.11    <u>Applicable Law</u>.  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and interpreted, construed and enforced in accordance with the law of the State of New York applicable to agreements made and to be performed in the State of New York.

[remainder of page left intentionally blank]

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Jared Chassen

Jeffrey Simpson

Exhibit C

Arch Real Estate Holding LLC Operating Agreement

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH REAL ESTATE HOLDINGS LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of December 11, 2017, by and between 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Investor Member"), and JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ Member", and Investor Member and JJ Member, each a "Member", and collectively, the "Members").

WHEREAS, the Members desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch Real Estate Holdings LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Acquisition Fees" shall mean all fees paid to the Company in connection with the acquisition of an asset by a Subsidiary or another Person.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"<u>Affiliate</u>" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Annual Budget</u>" means the annual budget of the Company approved in accordance with <u>Section 7.4</u> as the same may be modified in accordance herewith.

"<u>Bankruptcy Action</u>" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"<u>Book Value</u>" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided,

812194-9

however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)    The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)    The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions (other than Capital Contributions made by JJ Member pursuant to Section 3.4) and Acquisition Fees), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as

4

such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on November 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Damages" shall have the meaning set forth in Section 7.6.4.

"Default Loan" shall have the meaning set forth in Section 3.2.3.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"Due Diligence Materials" shall have the meaning set forth in Section 7.2.2.

"Eligible Asset" means any interest in real property either directly or indirectly through an ownership or leasehold interest including a preferred equity interest but excluding the origination or purchase of any debt financing unless such debt financing is being acquired or originated with the likely expectation that such debt financing will ultimately result in ownership of the collateral for such debt financing, and which is reasonably expected to satisfy the criteria set forth on Exhibit A hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exercise Period" shall have the meaning set forth in Section 7.9.2.

"Fiscal Year" shall be as set forth in Section 11.1.

"Guarantor Indemnitor" shall have the meaning set forth in Section 7.6.4

"Guaranty" or "Guaranties" shall have the meaning set forth in Section 7.7.1.

"Guaranty Indemnified Parties" shall have the meaning set forth in Section 7.6.4.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Initiating Member" shall have the meaning set forth in Section 7.9.1.

"Investment Expiration Date" means the earlier of (i) the fifth anniversary of the date hereof; (ii) at such time as there are five Rejected Eligible Assets; (iii) the date on which none of Michael Wiener, William Wiener or Kevin Wiener controls Investor Member unless waived in writing by Managing Member; (iv) the date on which Jeffery Simpson no longer controls Managing Member unless waived in writing by Investor Member; or (v) the date on which the Investor Member and its Affiliates have made aggregate capital contributions, without giving effect to a return of any capital contributions, to the Company and its Subsidiaries equal to $50,000,000.00.

"Investor Member" shall have the meaning set forth in Preamble.

"Investor Member Maximum Capital Contribution" means $3,000,000.00.

"JJ Member" shall have the meaning set forth in the Preamble.

"JJ Member Promote Distribution" means an amount equal that portion of a Promote Distribution received by JJ Member and its Affiliate from a Subsidiary which is ultimately distributable to JJ Member or the equity holders of JJ Member. For example purposes, if an Affiliate of JJ Member receives a Promote Distribution of $100,000 and $40,000 of it is distributable to JJ Member and $60,000 distributable to an Affiliate of JJ Member and the

6

equity holders of JJ Member hold a 10% interest in such Affiliate, the JJ Member Promote Distribution will be $46,000 [$40,000 + (10% x $60,000)].

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Major Decision" shall have the meaning set forth in Section 7.1.3.

"Managing Member" means JJ Member, or a replacement "managing member" appointed pursuant to Section 7.1.4.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)    items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)    if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Company Promote Interest" shall have the meaning set forth in Section 7.8.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Offer Notice" shall have the meaning set forth in Section 7.9.1.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" has the meaning set forth in the operating agreement or other governing document of the applicable Subsidiary.

"Proposed Annual Budget" has the meaning set forth in Section 6.7.

"Recourse Party" shall have the meaning set forth in Section 7.7.1.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Rejected Eligible Asset" shall have the meaning set forth in Section 7.2.2.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member; provided that, unless required under a loan, the Company shall not hold reserves less than $375,000 without Investor Member's consent, not to be unreasonably withheld, conditioned or delayed.

"Responding Member" shall have the meaning set forth in Section 7.9.1.

"ROFO Closing Date" shall have the meaning set forth in Section 7.9.4.

"ROFO Default" shall have the meaning set forth in Section 7.9.4.

"ROFO Deposit" shall have the meaning set forth in Section 7.9.2.

"ROFO Election" shall have the meaning set forth in Section 7.9.2.

"ROFO Price" shall have the meaning set forth in Section 7.9.1.

"ROFO Sale" shall have the meaning set forth in Section 7.9.2.

"Sale Asset" shall have the meaning set forth in Section 7.9.1.

"Subsidiary" shall mean any Person of which fifty percent (50%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contributions" means with respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 6.2(ii).

ARTICLE II

**ESTABLISHMENT OF THE COMPANY**

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall continue to be conducted under the name of "Arch Real Estate Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate

9

investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    Principal Place of Business and Address.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to Investor Member promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    Term.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    Agent for Service.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation. or such other agent as may be designated from time to time by Managing Member.

2.7.    Admission of Members.  Investor Member and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    Limitation on Liability.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

<u>ARTICLE III</u>

**CAPITAL CONTRIBUTIONS**

3.1.    Initial Capital Contributions.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Schedule 1 hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    Additional Capital Contributions.

3.2.1.  If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with the Company's due diligence in connection

10

with approved Eligible Assets, Managing Member shall deliver a written notice to Investor Member (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Notwithstanding anything herein to the contrary, without the consent of Investor Member, which may be granted or withheld in its sole and absolute discretion, in no event shall the Company be permitted to make a Capital Call if the Capital Call Amount to be made by Investor Member, when added to the then Unreturned Capital Contributions of Investor Member, would cause the aggregate Unreturned Capital Contributions to exceed Investor Member Maximum Capital Contribution.

3.2.2.    Investor Member shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to the Capital Call Amount.

3.2.3.    If the Investor Member shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then JJ Member shall have the right to contribute the amount of the Investor Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a "Default Loan") to the Investor Member in an amount equal to the unfunded capital contribution.

3.2.4.    Each Default Loan shall be deemed to constitute a loan made by the JJ Member to the Investor Member in accordance with the terms hereof, immediately followed by a capital contribution by the Investor Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the JJ Member and shall constitute a debt owed by the Investor Member. Any Default Loan shall bear interest at the rate of eight percent (8%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Investor Member from any distributions due to Investor Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Investor Member and shall be secured by the Investor Member's Membership Interest including, without limitation, the Investor Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Investor Member hereby pledges, assigns and grants a security interest in its Membership Interest to the JJ Member and agrees to execute such documents and statements as are reasonably requested by the JJ Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Investor Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Investor Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the JJ Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Investor Member, and (y) any proceeds of the sale of the Investor Member's Membership Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Investor Member.

812194-9

3.3.    <u>No Interest</u>.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    <u>JJ Member Promote Distribution Capital Contributions</u>.  No later than ten (10) Business Days after the receipt of Promote Distribution, if the Unreturned Capital Contribution of Investor Member is in excess of zero, JJ Member shall make a capital contribution to the Company equal to the lesser of (i) the amount of such JJ Member Promote Distribution or (ii) the product of the Investor Member's Unreturned Capital Contribution and a fraction, the numerator of which is the aggregate unreturned capital contributions made by JJ Member and its Affiliates to all Subsidiaries and the denominator of which is the aggregate unreturned capital contributions made by JJ Member, Investor Member and their respective Affiliates to all Subsidiaries.

3.5.    <u>Return of Capital</u>.  Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6.    <u>No Personal Liability</u>.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in <u>Section 7.6.1</u>.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.    <u>Capital Accounts</u>.  A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    <u>Adjustments</u>.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with <u>Section 5.1</u>) and (iv) any income and gain allocated to such Member pursuant to <u>Section 5.2</u>. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject

12

to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with <u>Section 5.1</u>), and (z) any deductions and losses allocated to such Member pursuant to <u>Section 5.2</u>.

        4.3.   <u>Negative Capital Accounts</u>.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

        4.4.   <u>Transfers</u>.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

        4.5.   <u>Capital Account Balance</u>.  Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to <u>Sections 5.1</u> and <u>5.2</u> and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE V

## **ALLOCATIONS AND DISTRIBUTIONS**

        5.1.   <u>Allocations of Net Profit and Net Loss</u>.  After the application of <u>Section 5.2</u>, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to <u>Section 10.3.3</u> if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 10.3</u> to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this <u>Article V</u>, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

        5.2.   <u>Regulatory Allocations</u>.

        5.2.1.  Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in

13

Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.   This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.   To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.   If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.   Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.   It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.   Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

14

5.3.    Tax Allocations.

5.3.1.    For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.    In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.    If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.    Withholding.    The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a

15

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

    5.5.   <u>Tax Matters</u>.

    5.5.1.  <u>Tax Matters Partner; Partnership Representative</u>.  Managing Member shall be the "<u>Tax Matters Partner</u>" of the Company.  The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner.  The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018.  Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.  The provisions contained in this <u>Section 5.5.1</u> shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

    5.5.2.  <u>Tax Elections</u>.  All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with Investor Member; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members.  The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

    5.5.3.  <u>Tax Returns</u>.  The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

812194-9

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.  The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

    5.6. <u>Section 754 Election</u>.  In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

ARTICLE VI

**DISTRIBUTIONS**

    6.1. <u>Distributions of Cash Flow</u>.  Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member in the following order of priority:

      (i) First, to Investor Member an amount equal to 4% per annum simple interest on its Unreturned Capital Contribution;

      (ii) Second, to Investor Member and JJ Member pro rata based on their respective Unreturned Capital Contributions until their respective Unreturned Capital Contributions are reduced to zero;

      (iii) Thereafter, 80% to JJ Member and 20% to Investor Member.

    6.2. <u>Distributions of Acquisition Fees</u>.  All Acquisition Fees, if any, shall be distributed within five (5) Business Days of the receipt thereof to the Members as follows:  20% to Investor Member; and 80% to JJ Member.

    6.3. <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

ARTICLE VII

**MANAGEMENT AND OPERATIONS**

    7.1. <u>Management</u>.

    7.1.1. The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full,

17

exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)  conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)  open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)  enter into any contract or endorsement in the name or for the account of the Company;

(iv)  employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)  bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)  deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)  admit one or more additional members solely to provide necessary capital in the event that Investor Member fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)  cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)  take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.  Except as otherwise provided in this Agreement, Investor Member shall not participate in the management or control of the Company or have any right to approve,

18

vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)     acquire any direct or indirect interests in any real property;

(ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)   sell any Company Asset or any portion thereof other than any Company Asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property or in accordance with Section 7.9;

(iv)    merge, consolidate or other reorganize the Company with another Person;

(v)     borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Managing Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Asset, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)   enter into any lease for space at a Company Asset of more than 10% of the rentable area of such Company Asset;

(viii)  engage in any business or activity not authorized by this Agreement;

(ix)    enter into any agreement requiring the expenditure of more than $50,000 per annum;

(x)    enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi)    incur any expense in excess of the amount set forth in the Annual Budget; provided that emergency expenditures and other expenditures not in excess of 10% over any line item in, or 5% over the aggregate, Annual Budget amount may be incurred without the consent of Investor Member;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    admit new or substitute Members to the Company or any Subsidiary;

(xiv)    modify any material terms of any organizational document of any Subsidiary; and

(xv)    cause any Subsidiary to take any of the foregoing.

7.1.4.    Removal of JJ Member as Managing Member. JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice.  Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member.  If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to Section 6.1(iii) or 6.2.

7.1.5.    Meetings.  Managing Member shall meet with Investor Member, which meeting may be by telephone, no less frequently than monthly to provide Investor Member with a general update on the Company Asset and the Company.  Any action required or permitted to be taken at any meeting or otherwise requiring the affirmation, vote, consent or approval of the Members may be taken without a meeting if the Members affirm, vote for, consent to or approve, the same at a meeting do so in writing, and the writing or writings are filed with the minutes of proceeding of the Members, as the case may be.

20

7.2.    Services of the Members; Company Opportunities.

7.2.1.    Managing Member and Investor Member shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) subject to Section 7.2.2 or Section 7.9, acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.2.2.    Prior to the Investment Expiration Date or, if an Expense Contribution is required at such time as the Investor Member Maximum Expense Capital Contribution has been funded and Investor Member elects not to make such Expense Contribution, Managing Member and its Affiliates shall first offer all Eligible Assets to the Company.   Managing Member shall provide Investor Member with such information with respect to such Eligible Asset as is reasonably required for Investor Member to make an informed decision as to whether to consent to the Company acquiring such Eligible Asset including, without limitation, a description of the Eligible Asset, historic financial statements, if any, with respect to such Eligible Asset, projected cash flows from such Eligible Asset, the estimated costs associated with acquiring such Eligible Asset, including due diligence costs, and the amount, if any of the capital that will be contributed by Managing Member, together with such other information as Investor Member shall reasonably request (the "Due Diligence Information").   If Investor Member fails to consent to the Company acquiring any proposed Eligible Asset within fifteen (15) days of Managing Member providing the Due Diligence Information and Managing Member has elected to provide not less than 5% of the equity capital (after taking into account reasonably anticipated debt or third party equity financing) required to acquire such Eligible Asset (a "Rejected Eligible Asset"), Managing Member shall have the right to pursue such Eligible Asset independent of the Company provided however if the ultimate terms of the investment in such Eligible Asset are, in the aggregate, no more favorable to Managing  Member than those presented to the Company.   Notwithstanding the foregoing, prior to the Investment Expiration Date, Managing Member shall not acquire any Rejected Eligible Asset which is in the same asset class and within a radius of 0.25 miles for urban properties and 2.0 miles for non-urban properties as an existing Company Asset.

7.3.    Guaranteed Payment; Fees and Expenses.

7.3.1.    Guaranteed Payment.  As compensation for its various undertaking and capital commitments hereunder, Managing Member shall be entitled to a monthly guaranteed payment from the Company equal to the amount set forth in the Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance. The right of Managing Member to receive Managing Member Guaranteed Payment shall automatically terminate upon Managing Member no longer serving as the "Managing Member" of the Company.

21

7.3.2.  <u>Acquisition Fee</u>.  In connection with the acquisition of each Eligible Asset, the Company shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.3.  <u>Development Fee/Asset Management Fee/Other Fees</u>.  To the extent that an Eligible Asset is acquired in a Subsidiary with non-Affiliated investors, Managing Member shall use its good faith efforts to provide for the Company to be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such Company Asset to the extent the Company or an Affiliate of the Company or a Member provides such services.

7.3.4.  <u>Due Diligence Expenses</u>.  The Company shall reimburse each Member for any actual out-of-pocket third party expenses incurred by such Member in connection with its determination as to whether to cause the Company to acquire an Eligible Asset.

7.4.  <u>Budget</u>.  The initial Annual Budget of the Company is as set forth in Exhibit B hereto.  No later than November 1 of each calendar year, Managing Member shall prepare (or cause to be prepared) an annual budget (the "<u>Proposed Annual Budget</u>"), and deliver such Proposed Annual Budget to Investor Member.  In the event that Investor Member objects in writing to all or a portion of the Proposed Annual Budget within thirty (30) days of receipt thereof, the Members shall, diligently and in good faith, attempt to achieve a unanimous decision with respect to the Proposed Annual Budget.  In the event that Members are unable to achieve a unanimous decision with respect to the Proposed Annual Budget, the Annual Budget then in effect shall remain the Annual Budget modified as follows:  (i) any line item agreed upon by the Members in the Proposed Annual Budget shall be substituted for the same line item in the current Annual Budget; (ii) all line items that are not agreed upon shall be the lesser of the amount provided for in the current Annual Budget or the amount set forth in the Proposed Annual Budget; and (iii) any new line item in the Proposed Annual Budget shall not be deemed included in the Annual Budget.

7.5.  <u>Legal Title to Company Asset</u>.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.6.  <u>Guaranties</u>.

7.6.1.  The Members acknowledge that in connection with any (i) financing or refinancing by the Company or any Subsidiary entered into on or after the date of this Agreement with respect to a Company Asset the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty, environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "<u>Guaranty</u>," and collectively, "<u>Guaranties</u>").  Each Member, in its sole discretion, shall or shall cause one or more of its Affiliates satisfactory to the applicable lender or landlord (each a "<u>Recourse Party</u>") to provide any such Guaranty.

7.6.2.  In consideration of providing an unconditional payment Guaranty, the party providing such Guaranty shall be entitled to a one-time fee equal to 2.0% of the amount

so guaranteed, which fee shall be payable by the applicable Subsidiary at the closing of the applicable loan.  In the event that more than one Person provides an unconditional guaranty, such guaranty fee shall be allocated equally among the Recourse Parties or as otherwise agreed by the Recourse Parties.

7.6.3.  Notwithstanding anything herein contained to the contrary, neither Member or any of its respective Affiliates shall be required to execute, deliver or issue any Guaranty in connection with any financing or refinancing, or office lease, by the Company or any Subsidiary except, with respect to Managing Member, in the case of a financing or refinancing, for customary "bad boy non-recourse carveout" Guaranties where Managing Member has control over the events giving rise to the payment on any guaranteed obligations.

7.6.4.  Each Member agrees if a lender makes any written demand from time to time on a Recourse Party as a result of breach of a "bad boy non-recourse carveout" Guaranty, for payment or performance under a Guaranty, each Member shall pay, or reimburse the applicable Recourse Party, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the breach of the "bad boy non-recourse carveout" Guaranty is directly attributable to any action of JJ Member or its Affiliate, on the one hand, or Investor Member or its Affiliate, on the other hand, and which action was not unanimously approved by JJ Member and Investor Member, in which event the Member who, or whose Affiliate, took such action shall be solely responsible for the amounts due on such Guaranty.  Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a "bad boy non-recourse carveout" Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

7.7.    Other Activities of Members.  Except as set forth in Section 7.2, neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company. Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

7.8.    Acquisition of Eligible Assets.  The Members agree that in connection with the acquisition of each Eligible Asset Managing Member shall use commercially reasonable

efforts to (i) cause the Eligible Asset to be acquired through an ownership structure as set forth on Exhibit C and (ii) will, and cause its Affiliated entities depicted on Exhibit C hereto to, form a limited liability company to serve as the direct or indirect managing member or general partner of the acquiring entity and shall, and cause its Affiliated entities depicted on Exhibit C hereto to, enter an operating agreement in substantially the form attached hereto as Exhibit D.   The Managing Member shall, to the extent requested by Investor Member, seek to obtain third party equity capital for each such Eligible Asset on such terms as may be reasonably acceptable to the Members.   Managing Member shall have the right to allocate a portion of the "promoted" interest to one or more of its employees or affiliates (the "Non-Company Promote Interest").

7.9.    Sale of Company Asset.

7.9.1.    In the event that either Managing Member or Investor Member desires to cause a Subsidiary to sell its asset and the other Member does not consent to such sale, the Member who desires to sell an asset ("Initiating Member") shall first give to the other Member ("Responding Member") a notice (an "Offer Notice") setting forth the applicable asset that Initiating Member desires to sell (the "Sale Asset") and the minimum gross purchase price at which Initiating Member would be willing to cause the applicable Subsidiary to sell the Sale Asset (the "ROFO Price") and the allocation of all costs (transfer taxes, title, survey etc.) and with respect thereto.

7.9.2.    Within thirty (30) days of receipt of an Offer Notice (the "Exercise Period"), Responding Member shall have the right to elect (which election shall be irrevocable) to purchase the Sale Asset from the applicable Subsidiary for the ROFO Price, subject to prorations and adjustments, and otherwise on the same terms and conditions set forth in the Offer Notice (the "ROFO Sale"), by giving written notice of such election within the Exercise Period (the "ROFO Election") and simultaneously depositing with a mutually agreeable escrow agent a non-refundable cash deposit equal to five percent (5%) of the ROFO Price (the "ROFO Deposit") (to be applied to the ROFO Price at closing).  At the closing of a ROFO Sale all items of the Sale Asset which are customarily apportioned in the sale of assets comparable to the Sale Asset shall be apportioned between Responding Member and the applicable Subsidiary as of 11:59 PM on the day preceding the closing date in accordance with the customs and practices usual in transactions involving properties comparable to the Sale Asset.

7.9.3.    If Responding Member does not timely make a ROFO Election or affirmatively waives its right of first offer, Responding Member shall be deemed to have elected not to purchase the Sale Asset pursuant to this Section 7.9 and Initiating Member shall be free to cause the applicable Subsidiary to proceed to initiate and consummate the sale of the Sale Asset at a price not less than one hundred percent (100%) of the ROFO Price and on such other terms as are no less favorable to the applicable Subsidiary than those provided for in the Offer Notice. If the sale of the Sale Asset is not consummated within one hundred eighty (180) days after the expiration of the Exercise Period, then any attempt to consummate the sale of the Sale Asset thereafter shall again be subject to the provisions of Section 7.1.3(iii) and, if applicable, this Section 7.9.

7.9.4.    If Responding Member has timely and properly delivered a ROFO Election, Managing Member and Investor Member shall cause the applicable Subsidiary to consummate the ROFO Sale on an "as is" and "where is" basis within sixty (60) days after the

date of the ROFO Election (the "<u>ROFO Closing Date</u>").  On the ROFO Closing Date, the ROFO Deposit shall be credited against the ROFO Price, and Responding Member shall pay the balance of the ROFO Price (as adjusted) to the applicable Subsidiary, as applicable.  If Responding Member has timely and properly delivered a ROFO Election, but thereafter the sale contemplated thereby fails to close within a sixty (60) day period for any reason other than the default of the applicable Subsidiary (a "<u>ROFO Default</u>"), then Responding Member shall be in material default under this <u>Section 7.9</u> and the escrow agent shall release the ROFO Deposit to the applicable Subsidiary who shall have the right to retain the ROFO Deposit as liquidated damages, it being agreed that in such instance the actual damages would be difficult, if not impossible, to ascertain, and Investor Member shall forfeit its ROFO Deposit and shall have no further rights under this <u>Section 7.9</u> with respect to the Sale Asset, including the right to give a ROFO Election or to receive Offer Notices.  If a ROFO Default occurred, then thereafter, Initiating Member shall have the right to cause the sale of the Sale Asset on any terms and conditions determined by Initiating Member without any further obligation under this <u>Section 7.9</u>.

7.9.5.   At the closing of a ROFO Sale, Initiating Member shall cause the applicable Subsidiary to deliver to Responding Member a deed, assignment or other transfer document commonly used in conveying ownership of assets in the form of the Sale Asset, conveying the Sale Asset to Responding Member, which Sale Asset shall be free and clear of all legal and equitable claims and all liens and encumbrances.  Initiating Member and Responding Member shall execute, or cause the Company or the applicable Subsidiary to execute, an agreement acceptable to Initiating Member and Responding Member in the exercise of their reasonable judgment in such form and substance which is customary for purchase agreements with respect to assets in the form of the Sale Asset.  Prior to consummating a ROFO Sale, Responding Member shall cause all guarantees of Initiating Member (and any Affiliates, members or principals of Initiating Member) under any loan relating to the Sale Asset to which the Company, a Subsidiary or Initiating Member are an obligor to be released with respect to acts occurring after the ROFO Closing Date.

<u>ARTICLE VIII</u>

**<u>TRANSFER OF MEMBERSHIP INTERESTS;</u>**

8.1.   <u>Restrictions on Transfers of Membership Interests</u>.   No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this <u>Article VIII</u> and until all requirements and conditions stated in this <u>Article VIII</u>, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this <u>Article VIII</u> shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.   <u>Permitted Transfers</u>.   Notwithstanding <u>Section 8.1</u>, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("<u>Permitted Transfers</u>"):

(i)   Transfers of a Member's Interest to another Member;

(ii)   Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)   Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.  If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv)   Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)   Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Investor Member, Michael Wiener, William Wiener or Kevin Wiener continues to Control Investor Member or (y) in the case of Managing Member, Jeffrey Simpson or Jared Chassen continues to be in Control of Managing Member.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and voi*d ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this <u>Article VIII</u>;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 8.4</u>, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to

812194-9

vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

ARTICLE IX

<strong>REPRESENTATIONS; ADDITIONAL AGREEMENT</strong>

9.1.    <u>Representations</u>.  Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.   it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.   its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental

28

authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.   there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.   this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.   (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.   <u>Indemnity</u>.

9.2.1.   Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this <u>Section 9.2</u> shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this <u>Section 9.2</u>, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

9.2.2.   JJ Member agrees to indemnify and hold harmless the Company, Investor Member and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against all out of pocket expenses, losses, liabilities (including liabilities for penalties), judgments, demands or costs (including, without limitation, attorneys' fees) arising from or related to JJ Member or its principals employment with Greystone Development.

9.3.   <u>Agreement as to Distributions</u>.   JJ Member and Investor Member agree that the calculation set forth on <u>Exhibit F</u> accurately sets forth the allocation of the various forms of distributable revenue that may be received by the Company and a Subsidiary based on the assumptions set forth therein.

812194-9

ARTICLE X

**DISSOLUTION AND LIQUIDATION**

10.1.    <u>Dissolution</u>.   This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "<u>Dissolution Event</u>"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this <u>Article X</u> unless the Members otherwise unanimously agree.

10.2.    <u>Statement of Intent to Dissolve</u>.   In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of New York.

10.3.    <u>Procedures</u>.

10.3.1. <u>Liquidation of Assets</u>.   In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "<u>Liquidating Agent</u>") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.   In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. <u>Authority of Liquidating Agent</u>.   In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. <u>Distribution of Assets</u>.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of <u>Section 6.2</u>.

10.4.    <u>Termination of the Company</u>.  Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of

dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

ARTICLE XI

<b>FISCAL AND ADMINISTRATIVE MATTERS</b>

11.1.   <u>Fiscal Year</u>.  The fiscal year of the Company will be the calendar year.

11.2.   <u>Checks, Drafts, Etc.</u>  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.   <u>Books and Records</u>.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.   <u>Right of Inspection</u>.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.   <u>Reports</u>.

11.5.1. Within time periods set forth on <u>Exhibit E</u> hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on <u>Exhibit E</u> which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

ARTICLE XII

<b>CONFIDENTIALITY AND PRESS RELEASES</b>

12.1.   <u>Confidentiality</u>.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by

31

the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.    <u>Press Releases</u>.  No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of Investor Member or its Affiliates without the prior written consent of Investor Member.

<u>ARTICLE XIII</u>

**INDEMNIFICATION**

13.1.    <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to

812194-9

time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this <u>Section 13.1.2</u> with respect thereto.  Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2.    <u>Exculpation/Member Indemnification</u>.  Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3.    <u>Insurance</u>.  Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this <u>Article XIII</u>.

<u>ARTICLE XIV</u>

<u>**MISCELLANEOUS**</u>

14.1.    <u>Notices</u>.

14.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth below:

If to Investor Member:

c/o 35 Oak Holdings
Viscor Inc.
35 Oak Street
Toronto, Ontario M9N 1A1
Attn:  Frank van Biesen
e-mail:  fvanbiesen@35oak.com

33

If to Managing Member:

c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
e-mail:  jsimpson001@icloud.com

With a copy to:

Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention:  David J. Heymann, Esq.
Email:  dheymann@meltzerlippe.com

14.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

14.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.

14.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.   Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3.   Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.   Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5. <u>Venue</u>.    Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6. <u>Headings</u>.    Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7. <u>Severability</u>.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8. <u>Failure to Enforce Provision</u>.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9. <u>Interpretation</u>.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10. <u>Assignment</u>.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11. <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____
Name: Michael Wiener
Title: EVP

JJ ARCH LLC

By: _____
Jeffrey Simpson
Managing Member

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: _____
　　　Name:
　　　Title:

JJ ARCH LLC

By: _____
　　　Jeffrey Simpson
　　　Managing Member

<u>Exhibit A</u>

Eligible Asset Criteria

Asset Class:         multi-family, office, retail, industrial and hospitality

Location:            contiguous United States

Leverage:            no more than 65%

Projected IRR:       no less than 10% for stabilized assets, 13% for value add or development

Exhibit B

Initial Budget

2018 ARCH LLC Budget (includes projects are in process of purchasing, this has potential to grow as we acquire in 2018)

**Income**

| Property | Scope | Value | Jan | Feb | March | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Soho Project | Development Management Services | 1,100,000 * 14 Months | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 78,571 | 942,857 |
| Soho Project | Loan Origination Fee | 1% of 45M Loan (300k @ closing), 15 | 300,000 | | | | | | | | | | | | 300,000 |
| Soho Project | Construction Management Reimbursement Proj Exec | 125 / hour (100%) | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 | 260,000 |
| Soho Project | Construction Management Reimbursement Proj Manager | 100 / hour (75%) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Soho Project | Construction Management Reimbursement Proj Acct | 60 / hour (50%) | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 | 62,400 |
| Soho Project | Construction Management Reimbursement Proj Office | 2,000 / month for office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Soho Project | Construction Management Fee | 2% of Hard Costs | 34,396 | 34,396 | 40,129 | 40,129 | 45,861 | 51,594 | 51,594 | 51,594 | 51,594 | 45,861 | 40,129 | 40,129 | 527,404 |
| Soho Project | Asset Management Fee | 2% of NOI @ stab, or 100,000 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Soho Project | Marketing fee | 1 month rent / unit | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Harlem Project | Property Management Fee | 2.5% of EGI (assumes Arch PM in Jun) | | | | | | | 5,447 | 5,447 | 5,447 | 5,447 | 5,447 | 5,447 | 32,683 |
| Harlem Project | Asset Management Fee | 50k / year | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 50,000 |
| LA Project | Asset Management Fee | 3,750 / quarter | | | 3,750 | | | 3,750 | | | 3,750 | | | 3,750 | 15,000 |
| TBD | Tax Return Reimbursements (from deal budgets) | | 20,000 | | | | | | | | | | | | 20,000 |
| | Sum Total Income | | 466,001 | 146,001 | 155,483 | 151,733 | 157,466 | 166,949 | 168,646 | 168,646 | 172,396 | 162,913 | 157,180 | 160,930 | 2,234,343 |

Exhibit C

Eligible Asset Structure



Exhibit D

Form of GP Operating Agreement

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH _____ MM LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of _____, 20__ by and between ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), [WIENER Entity], a _____ (together with its permitted successors and assigns, "Wiener"), and [JJ ENTITY], a _____ (together with its permitted successors and assigns, "JJ").

WHEREAS, Managing Member, Wiener and JJ (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch _____ MM LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Bankruptcy Action</u>" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"<u>Book Value</u>" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)    The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such

818000-3

distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)    The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"Capital Event Proceeds" shall mean the gross proceeds derived from a Capital Event less the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"<u>Certificate of Formation</u>" means that certain Certificate of Formation of the Company, dated and filed with the Secretary of State of the State of Delaware on _____.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Company</u>" shall have the meaning set forth in recitals.

"<u>Company Asset</u>" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"<u>Contributing Member</u>" shall have the meaning set forth in <u>Section 3.2.3</u>.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"<u>Cram-Down Contribution</u>" shall have the meaning set forth in <u>Section 4.2</u>.

"<u>Depreciation</u>" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"<u>Dissolution Event</u>" shall have the meaning set forth in <u>Section 10.1</u>.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>Failed Contribution Amount</u>" shall have the meaning set forth in <u>Section 3.2.3</u>.

"<u>Fiscal Year</u>" shall be as set forth in <u>Section 11.1</u>.

5

"<u>Indemnifying Member</u>" shall have the meaning set forth in <u>Section 13.1.1</u>.

"<u>Indemnitee</u>" shall have the meaning set forth in <u>Section 13.1.2</u>.

"<u>JJ</u>" shall have the meaning set forth in the Preamble.

"<u>Liquidating Agent</u>" shall have the meaning set forth in <u>Section 10.3.1</u>.

"<u>Managing Member</u>" shall have the meaning set forth in the Preamble.

"<u>Member</u>" shall have the meaning set forth in the Recitals.

"<u>Membership Interest</u>" or "<u>Interest</u>" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"<u>Net Profits</u>" and "<u>Net Losses</u>" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)     items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)     any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)     any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)     there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)     if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)     items of income, gain, loss, or deduction or credit allocated pursuant to <u>Section 5.2</u> shall not be taken into account.

"<u>Non-Contributing Member</u>" shall have the meaning set forth in <u>Section 3.2.3</u>.

818000-3

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"Subsidiary" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Wiener" shall have the meaning set forth in the Preamble.

## ARTICLE II

## **ESTABLISHMENT OF THE COMPANY**

2.1.    <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "<u>Act</u>") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Secretary of State of the State of Delaware is hereby ratified and confirmed in all respects.

2.2.    <u>Company Name</u>.  The business of the Company shall continue to be conducted under the name of "Arch _____ MM LLC"; <u>provided</u>, <u>however</u>, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates.  In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    <u>Purposes</u>.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of Delaware and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service and Registered Office</u>.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Members.  The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by the Members; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

818000-3

2.7.   <u>Admission of Members</u>.   Managing Member, JJ and Wiener and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.   <u>Limitation on Liability</u>.   Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

ARTICLE III

**CAPITAL CONTRIBUTIONS**

3.1.   <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on <u>Exhibit A</u> hereto opposite its name under the heading "Initial Capital Contribution."

3.2.   <u>Additional Capital Contributions</u>.

3.2.1.   If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "<u>Capital Call Notice</u>") setting forth the total amount of capital required (the "<u>Capital Call Amount</u>") and the purpose of such Capital Call.

3.2.2.   Within five (5) Business Days of the Capital Call Notice, each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by such Member's Percentage Interest.

3.2.3.   If a Member fails to make its capital contribution required by <u>Section 3.2.2</u> (the "<u>Non-Contributing Member</u>"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then the Member who has made its capital contribution pursuant to the Capital Call Notice (the "<u>Contributing Member</u>") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the capital contribution the Non-Contributing Member failed to make (the "<u>Failed Contribution Amount</u>"). If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing

9

Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company , minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

3.3.    No Interest.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    Return of Capital.  Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.5.    No Personal Liability.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in Section 7.6.1.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.    Capital Accounts.  A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    Adjustments.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2. If the Contributing Member elects to make a further additional Capital

10

Call equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.    Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.    Transfers.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.    Capital Account Balance.   Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

ARTICLE V

**ALLOCATIONS AND DISTRIBUTIONS**

5.1.    Allocations of Net Profit and Net Loss.  After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    Regulatory Allocations.

5.2.1.  Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as

11

defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.    This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.    To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.    If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.    Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.    It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.  Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

12

5.3.    Tax Allocations.

5.3.1.    For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.    In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.    If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.    Withholding.    The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a

13

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

    5.5.   Tax Matters.

        5.5.1.  Tax Matters Partner; Partnership Representative.  Managing Member shall be the "Tax Matters Partner" of the Company.  The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner.  The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018.  Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.  The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

        5.5.2.  Tax Elections.  All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

        5.5.3.  Tax Returns.  The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.  The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

      5.6.   <u>Section 754 Election</u>.  In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

<u>ARTICLE VI</u>

<strong>DISTRIBUTIONS</strong>

      6.1.   <u>Distributions of Cash Flow</u>.  Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows:  20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

      6.2.   <u>Distribution of Capital Event Proceeds</u>.  Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

      6.3.   <u>Distributions of Promote Distributions</u>.  Promote Distributions, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member as follows:

      (i)   First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1;

      (ii)   Second, the balance, (x) to JJ in an amount equal to the such balance multiplied by JJ's Percentage Interest and (y) the balance less the amount to be distributed pursuant to clause (x), 50% to Managing Member and 50% to Wiener.

      6.4.   <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

15

<u>ARTICLE VII</u>

**<u>MANAGEMENT AND OPERATIONS</u>**

7.1.    <u>Management</u>.

7.1.1.    The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to <u>Section 3.2</u>;

818000-3

(viii)   cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)   take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.   Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company.  Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3.   Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request.  Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)   engage in any business or activity not authorized by this Agreement;

(ii)   enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(iii)   enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(iv)   admit new or substitute Members to the Company or any Subsidiary;

(v)   modify any material terms of any organizational document of any Subsidiary; and

(vi)   cause any Subsidiary to take any of the foregoing.

17

7.2.    <u>Services of the Members</u>.    Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this <u>Section 7.2</u> or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.    <u>Fees and Expenses</u>.

7.3.1.    <u>Acquisition Fee</u>.    In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.2.    <u>Development Fee/Asset Management Fee/Other Fees</u>.    To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.    <u>Due Diligence Expenses</u>.    The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.    <u>Legal Title to Company Asset</u>.    Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.    <u>Other Activities of Members</u>.    Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.    Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.    The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

18

ARTICLE VIII

**TRANSFER OF MEMBERSHIP INTERESTS;**

8.1.   <u>Restrictions on Transfers of Membership Interests</u>.   No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this <u>Article VIII</u> and until all requirements and conditions stated in this <u>Article VIII</u>, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.   To the fullest extent permitted under applicable law, any Transfer in violation of this <u>Article VIII</u> shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.   No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.   <u>Permitted Transfers</u>.   Notwithstanding <u>Section 8.1</u>, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("<u>Permitted Transfers</u>"):

(i)   Transfers of a Member's Interest to another Member;

(ii)   Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)   Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member.   If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

19

818000-3

(iv)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of the Members, Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either Member of Managing Member continues to be in Control of Managing Member.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and voi*d ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

       (a)      The Transfer complies with the provisions of this <u>Article VIII</u>;

       (b)      The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

       (c)      The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

    8.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 8.4</u>, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

    8.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

818000-3

## ARTICLE IX

## **REPRESENTATIONS**

9.1.    <u>Representations</u>.  Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.  it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.  its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.    <u>Indemnity</u>.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by

reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

ARTICLE X

**DISSOLUTION AND LIQUIDATION**

10.1.   Dissolution.   This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2.   Statement of Intent to Dissolve.   In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of Delaware.

10.3.   Procedures.

10.3.1. Liquidation of Assets.   In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent.   In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem

818000-3

reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4.    Termination of the Company.  Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

ARTICLE XI

**FISCAL AND ADMINISTRATIVE MATTERS**

11.1.    Fiscal Year.  The fiscal year of the Company will be the calendar year.

11.2.    Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.    Books and Records.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.    Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.    Reports.

11.5.1. Within time periods set forth on Exhibit B hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit B which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information

24

reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

ARTICLE XII

**CONFIDENTIALITY AND PRESS RELEASES**

12.1.    <u>Confidentiality</u>.    The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.    <u>Press Releases</u>.    No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

ARTICLE XIII

**INDEMNIFICATION**

13.1.    <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or

25

any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2. Exculpation/Member Indemnification. Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3. Insurance. Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

ARTICLE XIV

**MISCELLANEOUS**

14.1. Notices. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A hereto. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email. Any

Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.  Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.    Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3.    Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.    Governing Law.   THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.    Venue.   Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.    Headings.    Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.    Failure to Enforce Provision.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this

Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.    <u>Interpretation</u>.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.  <u>Assignment</u>.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11.  <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

818000-3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
       Managing Member


       By:    _____
              Jeffrey Simpson
              Managing Member

]

[ADD SIGNATURE BLOCKS FOR JJ AND WIENER]

<u>Exhibit A</u>

Members, Addresses and Capital Contributions

| <u>Member and Address</u> | <u>Capital Contribution</u> | <u>Percentage Interest</u> |
|---|---|---|

<u>Exhibit B</u>

<u>Reports</u>

1.    Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.    a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.    a statement of the Capital Account of each Member.

2.    Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.    a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.    a statement of the Capital Account of each Member.

<u>Exhibit E</u>

<u>Reports</u>

1.    Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.    a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.    a statement of the Capital Account of each Member.

2.    Within forty five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.    a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.    a statement of the Capital Account of each Member.

<u>Exhibit F</u>

<u>Distribution Example</u>



**Sample deal:**

| | | |
|---|---|---|
| Property acquisition equity required | | $1,000,000 |
| LP portion | 80% | $800,000 |
| GP Entity portion | 20% | $200,000 |
| | | |
| J&J2 part in GP Entity | 25% | $50,000 |
| Wiener2 part in GP Entity | 75% | $150,000 |

**Property level cash flows assumed:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| Investment | ($1,000,000) | | | | | | |
| Operating CF | | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Capital CF w/o promote | | | | | | | $1,050,000 |
| Promoted CF | | | | | | | $100,000 |
| To all equity | ($1,000,000) | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $1,200,000 |

**Split of cash flows to LP/GP:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| To LP from oper CF | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| To LP from cap CF | ($800,000) | | | | | | $840,000 |
| *LP total* | *($800,000)* | *$40,000* | *$40,000* | *$40,000* | *$40,000* | *$40,000* | *$880,000* |
| To GP from oper CF | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| To GP from cap CF | ($200,000) | | | | | | $210,000 |
| To GP from promote | | | | | | | $100,000 |
| *GP total* | *($200,000)* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$320,000* |
| *Check back to property* | *($1,000,000)* | *$50,000* | *$50,000* | *$50,000* | *$50,000* | *$50,000* | *$1,200,000* |

**Split of cash flows to GP partners:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | Promote math: |
|---|---|---|---|---|---|---|---|---|---|
| *Owed to J&J2 from oper* | | *$2,500* | *$2,500* | *$2,500* | *$2,500* | *$2,500* | *$2,500* | | |
| To J&J2 from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | | $100,000 |
| To J&J2 from cap | ($50,000) | | | | | | $52,500 | | ($3,000) J&J catchup |
| To J&J2 from promote re catchup | | | | | | | $3,000 | | ($9,000) Wiener catchup |
| *Owed to Wiener2 from oper* | | *$7,500* | *$7,500* | *$7,500* | *$7,500* | *$7,500* | *$7,500* | | $88,000 |
| To Wiener2 from oper | | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | | ($25,000) J&J superpromote |
| To Wiener2 from cap | ($150,000) | | | | | | $157,500 | | $63,000 |
| To Wiener2 from promote re catchup | | | | | | | $9,000 | | ($37,500) Wiener share |
| To J&J2 from promote re invest | | | | | | | $25,000 | | ($25,500) Arch share |
| To Wiener2 from promote re invest | | | | | | | $37,500 | | $0 |
| To Arch from oper | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | | |
| To Arch from promote | | | | | | | $25,500 | | (=$37,500 less $12,000 catchup) |
| *Check* | *($200,000)* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$10,000* | *$320,000* | | |

**GP partner summary:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
|---|---|---|---|---|---|---|---|---|---|
| J&J2 | ($50,000) | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $82,500 | 11.6% | 1.9x |
| Wiener2 | ($150,000) | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $210,000 | 8.8% | 1.6x |
| Arch | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | | |

**Scenario 1 at Arch - invested capital balance is all Wiener 1**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Arch opex | | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | *(Assumed)* |
| Arch income from above | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $27,500 | |
| | | ($23,000) | ($23,000) | ($23,000) | ($23,000) | ($23,000) | $2,500 | |
| | | | | | | | | |
| Wiener1 capital account pre-alignment | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($112,500) | |
| *Wiener1 capital account on pro rata basis* | | *($17,250)* | *($34,500)* | *($51,750)* | *($69,000)* | *($86,250)* | *($84,375)* | *(Would be if 75% share)* |
| J&J1 capital account pre-alignment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| *J&J1 capital account on pro rata basis* | | *($5,750)* | *($11,500)* | *($17,250)* | *($23,000)* | *($28,750)* | *($28,125)* | *(Would be if 25% share)* |
| | | | | | | | | |
| J&J contributes to Arch, which in turn distributes to Wiener1 | | | | | | | $25,000 | |
| | | | | | | | | |
| Wiener1 capital account | $0 | ($23,000) | ($46,000) | ($69,000) | ($92,000) | ($115,000) | ($87,500) | 78% |
| J&J1 capital account | | $0 | $0 | $0 | $0 | $0 | ($25,000) | 22% |

**Scenario 2 at Arch - invested capital balance is pari passu J&J1/Wiener 1**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wiener1 capital account | $0 | ($17,250) | ($34,500) | ($51,750) | ($69,000) | ($86,250) | ($84,375) |
| J&J1 capital account | | ($5,750) | ($11,500) | ($17,250) | ($23,000) | ($28,750) | ($28,125) |

**Scenario 3 at Arch - invested capital balance is zero**

Assuming a reserve minimum of $375,000 is met, Arch can distribute the cash

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| To J&J1 | | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $22,000 | | |
| To Wiener1 | | $400 | $400 | $400 | $400 | $400 | $5,500 | | |
| | | | | | | | | | |
| J&J2/1 | ($50,000) | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $104,500 | 18.0% | 2.5x |
| Wiener2/1 | ($150,000) | $6,400 | $6,400 | $6,400 | $6,400 | $6,400 | $215,500 | 9.4% | 1.7x |

# Exhibit D

## Committees Organized Prepetition

As required under Local Bankruptcy Rule 1007-2(a)(3), no committees have been organized prior to the order for relief in this chapter 11 case.

# Exhibit E

**List of Creditors Holding Twenty (20) of the Largest Unsecured Claims**

As required under Local Bankruptcy Rule 1007-2(a)(4), the following lists information relevant to the twenty (20) largest unsecured claims.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  Moreover, nothing herein shall affect any rights of the Debtor to challenge the amount or characterization of any claim at a later date.

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **JJ Arch LLC** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | _____ |

☐ Check if this is an
amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| Adam Leitman Bailey, P.C. One Battery Park Plaza 18th Floor New York, NY 10004 Bailey, P.C. | Adam Leitman Bailey alb@alblawfirm.com 212-825-0365 | Professional Services | | | | $128,353.00 |
| A.Y. Strauss 535 Fifth Avenue 4th floor New York, NY 10017 | Aaron Strauss 646-374-0255 ays@aystrauss.com | Professional Services | | | | $6,074.05 |
| Geico 1 Geico Blvd. Fredricksburg, VA 22412 | 800-424-3426 | Trade Debt | | | | $166.63 |
| Intuit Inc. (Quickbooks) 2700 Coast Avenue Mountain View, CA 94043 | 800-446-8848 | Trade Debt | | | | $217.75 |
| State Farm Insurance Companies Insurance Support Center - East P.O Box 588002 North Metro, GA 30029 | 800-440-0998 | Trade Debt | | | | $1,295.93 |
| Verizon 1095 Avenue of the Americas New York, NY | 833-837-4966 | Trade Debt | | | | $143.32 |

# Exhibit F

**Holders of the Five (5) Largest Secured Claims**

Local Bankruptcy Rule 1007-2(a)(5) is inapplicable in this chapter 11 case, as the Debtor does not have any secured claims.

# Exhibit G

**Summary of Assets and Liabilities**

As required under Local Bankruptcy Rule 1007-2(a)(6), the following is a summary of the assets and liabilities of the Debtor JJ Arch LLC.

**JJ Arch LLC**
## Balance Sheet
**As of April 30, 2023**

Accrual Basis

|  | Apr 30, 23 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 10020 · CNOB | 30,825.00 |
| 10000 · First Republic Bank | 265,058.36 |
| **Total Checking/Savings** | 295,883.36 |
| **Accounts Receivable** | |
| 11000 · Accounts Receivable | 125,950.00 |
| **Total Accounts Receivable** | 125,950.00 |
| **Other Current Assets** | |
| 10010 · Petty Cash | 5,700.00 |
| **Due from (to) Related Parties** | |
| JC | -14,763.30 |
| JS | -600.00 |
| AREH | -2,483.65 |
| 608491 NJ INC | -52,773.71 |
| Due from (to) Related Parties - Other | -5,000.00 |
| **Total Due from (to) Related Parties** | -75,620.66 |
| **Total Other Current Assets** | -69,920.66 |
| **Total Current Assets** | 351,912.70 |
| **Fixed Assets** | |
| **19000 · Corporate Vehicle** | |
| 19001 · Section 179 - Accu. Depr | -58,850.00 |
| 19000 · Corporate Vehicle - Other | 93,290.06 |
| **Total 19000 · Corporate Vehicle** | 34,440.06 |
| **15001 · Investment in Subsidiaries** | |
| 15007 · 1640 Motors LLC | 1,456,149.37 |
| 15006 · 1640 Montauk LLC | 1,764,849.56 |
| **15005 · 225 HPR LLC** | |
| 15009 · Contribution | 708,781.28 |
| 15008 · Distribution | -55,000.00 |
| **Total 15005 · 225 HPR LLC** | 653,781.28 |
| 15004 · JJ NY Schwenks LLC | 290,251.01 |
| 15003 · JJ NY 550 LLC | 114,101.00 |
| **15002 · Arch Real Estate Holdings** | |
| K-1 Income/Loss | -102,222.00 |
| Contribution | 342,930.86 |
| **Total 15002 · Arch Real Estate Holdin...** | 240,708.86 |
| **Total 15001 · Investment in Subsidiaries** | 4,519,841.08 |
| **Total Fixed Assets** | 4,554,281.14 |
| **TOTAL ASSETS** | **4,906,193.84** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 20000 · Accounts Payable | 2,115.99 |
| **Total Accounts Payable** | 2,115.99 |
| **Credit Cards** | |
| Credit Card at American Express | -349,703.20 |
| **Total Credit Cards** | -349,703.20 |

**Page 1**

**JJ Arch LLC**
# Balance Sheet
As of April 30, 2023

Accrual Basis

|  | Apr 30, 23 |
|---|---|
| **Other Current Liabilities** | |
| **Accrued Expenses Payable** | -3,395.00 |
| **Total Other Current Liabilities** | -3,395.00 |
| **Total Current Liabilities** | -350,982.21 |
| **Long Term Liabilities** | |
| **24900 · Note Payable** | 1,000,000.00 |
| **Total Long Term Liabilities** | 1,000,000.00 |
| **Total Liabilities** | 649,017.79 |
| **Equity** | |
| **30210 · Jared Chassen Equity** | |
| **30201 · Jared Distribution** | -460,930.25 |
| **30313 · Home Reno** | -158,740.28 |
| **30800 · Estimated Taxes** | |
| **30802 · Federal** | -89,831.25 |
| **30801 · State** | -131,010.00 |
| **Total 30800 · Estimated Taxes** | -220,841.25 |
| **30300 · Jared Draws - Cash Flow** | |
| **30312 · Insurance** | -19,122.43 |
| **30311 · Prop Taxes** | -22,629.30 |
| **30310 · Medical** | -18,780.86 |
| **30309 · Networking** | -243.29 |
| **30308 · Business Services** | -42,028.08 |
| **30307 · Communications** | -18,350.89 |
| **30306 · Supplies** | -110,935.86 |
| **30305 · M&E** | -72,743.02 |
| **30304 · Travel** | -146,200.58 |
| **30303 · Partner Business Expense** | -33,238.73 |
| **30302 · Draws** | -709,097.61 |
| **30301 · Lease Payments** | -166,082.53 |
| **Total 30300 · Jared Draws - Cash Flow** | -1,359,453.18 |
| **30200 · Jared Draw - Fee Revenue** | -152,500.00 |
| **30400 · Jared Contribution** | 1,787,710.50 |
| **30210 · Jared Chassen Equity - Other** | 10,000.00 |
| **Total 30210 · Jared Chassen Equity** | -554,754.46 |
| **30100 · Jeff Simpson Equity** | |
| **30601 · Jeff Distribution** | -441,819.75 |
| **30900 · Estimated Taxes** | |
| **30902 · State** | -110,213.00 |
| **30901 · Federal** | -151,892.00 |
| **Total 30900 · Estimated Taxes** | -262,105.00 |
| **30500 · Jeffrey Draws - Cash Flows** | |
| **30509 · Insurance** | -44,070.62 |
| **30508 · Supplies** | -27,651.46 |
| **30507 · Misc Office Exp** | -3,785.18 |
| **30506 · M&E** | -31,294.37 |
| **30504 · Travel** | -82,274.00 |
| **30502 · Draws** | -1,908,382.26 |
| **30503 · Partner Business Expense** | -30,843.16 |
| **30501 · Lease Payments** | -207,277.56 |
| **Total 30500 · Jeffrey Draws - Cash Fl...** | -2,335,578.61 |

**JJ Arch LLC**
# Balance Sheet
**As of April 30, 2023**

**Accrual Basis**

|  | Apr 30, 23 |
|---|---|
| **30600 · Jeff Contribution** | 3,059,290.06 |
| **30700 · Jeff Draw - Fee Revenue** | -152,500.00 |
| **Total 30100 · Jeff Simpson Equity** | -132,713.30 |
| **32000 · Retained Earnings** | 4,761,148.46 |
| **Net Income** | 183,495.35 |
| **Total Equity** | 4,257,176.05 |
| **TOTAL LIABILITIES & EQUITY** | **4,906,193.84** |

# Exhibit H

**Publicly Held Securities**

Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in this chapter 11 case, as the Debtor does not have any publicly held securities.

# Exhibit I

## Property Not in Debtor's Possession

Local Bankruptcy Rule 1007-2(a)(8) is inapplicable in this chapter 11 case, as none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or any agent for such entity.

# Exhibit J

**Debtor's Premises**

Local Bankruptcy Rule 1007-2(a)(9) is inapplicable in this chapter 11 case, as the Debtor is a holding company with no operations.  The does not have any premises owned, leased or held under other arrangement from which the Debtor operates its business.

# Exhibit K

**Location of Debtor's Substantial Assets and Books and Records,
and Nature and Location of Debtor's Assets Outside of the United States.**

As required under Local Bankruptcy Rule 1007-2(a)(10), the following lists the location of the Debtor's substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

Location of Debtor's substantial assets:

| Description of Asset | Location of Asset |
|---|---|
| Bank Account | Republic Bank<br>111 Pine Street<br>San Francisco, CA 94111 |
| Bank Account | ConnectOne Bank<br>48 South Service Road, Suite 207<br>Melville, New York 11747 |

JJ Arch's books and records are located electronically with Quickbooks and the Arch Companies' servers.

# Exhibit L

## Summary of Litigation Actions or Proceedings

As required under Local Bankruptcy Rule 1007-2(a)(11), the Debtors have the following pending litigation or threatened litigation.

| Action | Case No./Index No. | Date | Description |
|---|---|---|---|
| *608941 NJ Inc. v. Jeffrey Simpson* | Case No. 23-cv-07089<br>Hon. Analisa Torres | August 10, 2023 | Breach of fiduciary duties, defamation, tortious interference with prospective business advantage |
| *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member Arch Real Estate Holdings LLC, and JJ Arch LLC v. Chassen and First Republic, et al.* | 158055/2023<br>Hon. Joel Cohen | August 15, 2023 | Injunctive relief regarding, *inter alia*, rights of parties in conjunction with limited liability companies and receiver appointment requests. |
| *608941 NJ Inc. v. Jefferson et al.* | 654963/2023<br>Hon. Joel Cohen | October 10, 2023 | Injunctive relief regarding, *inter alia*, authority to commence bankruptcy filing and access to books and records. |
| *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member Arch Real Estate Holdings LLC, and JJ Arch LLC v. Chassen and First Republic, et al.* | 2024-01021 | February 20, 2024 | Appeal to vacate and or modify preliminary injunction issued by trial court |

# Exhibit M

## Senior Management of the Debtor

As required under Local Bankruptcy Rule 1007-2(a)(12), the following lists the names of the individuals that comprise the Debtor's existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Member | Position | Tenure | Responsibilities & Experience |
|---|---|---|---|
| Jeffrey Simpson | Managing Member | December 11, 2017 to present | Mr. Simpson is the founder of the Arch Companies and the managing member of JJ Arch LLC.<br><br>Prior to founding the Arch Companies, Mr. Simpson worked for 11 years at Greystone & Co. Inc. ("Greystone"), a New York City-based real estate finance and investment company, ultimately serving as the head of Greystone's Development group.  Before his tenure at Greystone, Mr. Simpson held real estate management roles with Equity Office Properties Trust (REIT), and Jones Lang LaSalle Incorporated, a global real estate and investment management firm. Mr. Simpson also previously worked as a project engineer and project manager for several national construction firms.<br><br>Mr. Simpson has more than 20 years of experience in the real estate sector, and holds a degree in Engineering from the University of Delaware, and Master of Science (Real Estate Development) and Advanced Finance degrees from the Schack Institute of Real Estate at New York University. |

# Exhibit N

**Estimated Payroll for the Thirty (30) Day Period After Filing**

Local Bankruptcy Rule 1007-2(b)(1) – (2)(A), is inapplicable in this chapter 11 case, as the Debtor is a holding company with no employees. No amounts will be paid to any officers, equity holders, directors or financial and business consultants retained by the Debtor for the thirty-day period following the Petition Date.

# Exhibit O

**Estimated Receipts and Disbursements for the Thirty (30) Day Period After Filing**

Pursuant to Local Bankruptcy Rules 1007-2(b)(3) the following provides a schedule of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the thirty (30) day period following the filing of the Debtor's chapter 11 petition.

| Type | Amount |
|---|---|
| Estimated Cash Receipts | $0 |
| Estimated Cash Disbursements | $2,500.00 (approx.) |
| Net Cash Gain | $0 |
| Accrued-Unpaid Obligations | $1,657.00 |
| Accrued-Unpaid Receivables | $344,046.00 |