# EXHIBIT 8

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

### 146 E 89 BORROWER 2 LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of June 23, 2022, by and between KAY PROPERTIES LLC (the "Member"), a New York limited liability company, and JJ ARCH LLC a New York limited liability company (together with its permitted successors and assigns, "Manager").

WHEREAS, the Manager and the Member desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the

appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, the two days of Rosh Hashanah, Yom Kippur, the first two days of Sukkot, Shemini Atzeret, Simchat Torah, the first two days and last two days of Passover, the two days of Shavuot or any other day on which the banking institutions in New York are authorized to close.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement as may be amended from time to time by the Manager to reflect increases and decreases thereto as set forth in this Agreement, including without limitation Section 3.2 and Section 4.2.

"Certificate of Formation" means that certain Articles of Organization of 146 E 89 BORROWER 2 LLC, dated and filed with the Department of State of the State of New York on June 9, 2022.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means the limited liability company formed under the Act and governed by the terms of this Agreement and the Certificate of Formation.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Dissolution Event" shall have the meaning set forth in Section 9.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.2.

"Family Member" means, with respect to each Member that is an individual, such Member's spouse, parent, lineal descendant (which shall include by way of marriage, adoption and biological), siblings and lineal descendants of a sibling (which shall include by way of marriage, adoption and biological).

"Fiscal Year" shall be as set forth in Section 10.1.

"Indemnifying Member" shall have the meaning set forth in Section 12.1.1.

"Indemnitee" shall have the meaning set forth in Section 12.1.2.

4840-0916-7077, v. 1

"Liquidating Agent" shall have the meaning set forth in Section 9.3.1.

"Manager" shall have the meaning set forth in the Preamble.

"Manager Loan" shall have the meaning set forth in Section 3.2.2.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole."

"Net Cash Flow" for any period, (a) the gross revenues of the Company and its Subsidiaries from all sources for such period (but excluding Capital Contributions), *less* (b)(i) any amounts required to pay the costs and expenses of the Company and its Subsidiaries incurred for such period including, without limitation, the fees payable pursuant to Section 6.2, (ii) any debt service payments (including amortization) on any indebtedness of the Company and its Subsidiaries, (iii) any capital expenditures of the Company and its Subsidiaries and (iv) any increases in the Company's reserves, as reasonably determined by Managing Member, including reserves established for future capital expenditures, working capital or for future debt service payments (including amortization) on any Company indebtedness, *plus* (c) any released or reduced Company reserves, as reasonably determined by Managing Member.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.2.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage determined by dividing such Member's aggregate Capital Contributions by the aggregate Capital Contributions of all Members. As of the date hereof, the Member, who is the sole member of the Company, holds 100% of the Percentage Interests.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Property" means each of, and "Properties" means all of, those certain parcels of real property and the improvements situated thereon located at 146 E 89th Street, New York, NY.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Subsidiary" means any corporation, limited liability company or other single purpose entity, all or any of the ownership interests in which are owned directly or indirectly by the Company.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member or (B) any direct or indirect beneficial owner of the Member.

## ARTICLE II

## ESTABLISHMENT OF THE COMPANY

2.1.    Formation of the Company.  The Member hereby forms the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Member shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Member shall be the sole member of the Company.  The execution and filing of the Certificate of Formation is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall be conducted under the name of "146 E 89 Borrower 2 LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Manager, as long as such name does not include or incorporate all or any part of the name of the Member or its respective Affiliates.  In this regard, Manager shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Member hereby agrees that the Company is to be organized for the benefit of the Member, for the following purposes:

2.3.1.  to, directly or indirectly, acquire, own, hold, manage, maintain, finance, refinance, and otherwise deal with the Properties in such manner as Manager shall determine, in its sole and absolute discretion (subject to Section 6.1.3); and

4

2.3.2. to do any and all things which may be necessary, incidental, or convenient to carry on the business of the Company as described herein and which are permitted under the Act, all on the terms and conditions set forth herein.

2.4. <u>Principal Place of Business and Address</u>. The principal place of business of the Company shall be located at 88 University Pl, New York, New York 10003, or at such other place as Manager may designate. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Manager.

2.5. <u>Term</u>. The existence of the Company commenced as of the date of the filing of the Certificate of Formation and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6. <u>Intentionally Omitted.</u>

2.7. <u>Admission of Member</u>. The Member is the only Member of the Company as of the date hereof. Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8. <u>Limitation on Liability</u>. Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1. <u>Initial Capital Contributions</u>. On the date hereof, the Member shall contribute to the Company cash the amount set forth opposite the Member's name on <u>Exhibit A</u> under the column "<u>Initial Capital Contribution</u>".

3.2. <u>Additional Capital Contributions</u>.

3.2.1. At any time and from time to time following the date hereof, if the Manager reasonably determines that the Company or any Subsidiary requires additional funds for any purpose, to the extent such funds are not obtained through borrowings, the Manager shall call for additional Capital Contributions by providing written notice thereof (a "<u>Capital Call Notice</u>") to the Member which notice shall set forth the amount of capital required by the Company and the use of the funds so requested. Within ten (10) Business Days of the Capital Call Notice, then the Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice.

3.2.2. If the Member fails to make its capital contribution required by <u>Section 3.2.1</u> (the "<u>Non-Contributing Member</u>"), as and when due, for any reason, and such failure continues for two (2) Business Days following the receipt by the Non-Contributing Member of

written notice of such default, then the Manager shall have the right to make a loan to the Company (the "Manager Loan") in an amount equal to the capital contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount"). Each Manager Loan shall: (i) have an initial principal amount equal to the Failed Contribution Amount made by the Manager to the applicable Non-Contributing Member; (ii) bear interest at a rate of 18% per annum compounded monthly; and (iii) be repayable at any time in whole or in part without premium or penalty. Manager Loans shall be payable prior to any distributions payable to the Member.

3.3.    Right to Lend. Notwithstanding anything in this Agreement to the contrary, if the Manager determines that the Company or any Subsidiary requires additional funds for any purpose and such funds are needed prior to the date on which an additional Capital Contribution is to be made, the Manager may lend such funds to the Company or such Subsidiary, which loan shall bear interest at 8% per annum.

3.4.    No Interest. Except as agreed between the Member and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by the Member, or (b) on any advance to the Company from the Member.

3.5.    Return of Capital. The Member shall not have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, the Member has no right to demand or to receive property other than cash in return for its contributions to the capital of the Company.

3.6.    No Personal Liability. Except as otherwise expressly provided in this Agreement the Member shall not be personally liable for the return of any Capital Contributions of, or loans made by, the Member or any portion thereof and the return of Capital Contributions and repayment of such loans by the Member shall be made solely from the Company's assets. The Member shall not be personally liable for the payment or performance of the debts and other obligations of the Company. Notwithstanding anything to the contrary contained in this Agreement, the Member shall have no obligation under this Agreement and shall not be in default under this Agreement (a) for failing to make any Capital Contribution in addition to the Initial Capital Contribution and (b) for failing to execute any form of guaranty (non-recourse or otherwise), pledge agreement or indemnity or provide any other form of security in connection with any third party financing. Additionally, (i) the Member shall not have any personal liability beyond its total Capital Contribution (i.e., the Member shall suffer a loss in excess of its total Capital Contribution without its prior written consent).

## ARTICLE IV

## INTENTIONALLY OMITTED

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.    Allocations. All allocations shall be made to the Member.

5.2.    Intentionally Omitted.

5.3.    Intentionally Omitted.

5.4.    Withholding. The Company at all times shall be entitled to make payments with respect to the Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to the Member and to withhold (or deduct) the same from distributions to the Member. Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member for all purposes under this Agreement. If the Company makes any payment to a Taxing Authority in respect of the Member that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of the Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum, and shall be deducted from the distributions to the Member; any amounts so deducted shall constitute a repayment of the Member's obligation hereunder. The Member's reimbursement obligation under this Section 5.4 shall continue after the Member transfers its interest in the Company or after a withdrawal by the Member. The Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. The Member agrees to indemnify and hold harmless the Company from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to the Member. Any amount payable as indemnity hereunder by the Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to the Member for all such amounts.

5.5.    Tax Matters.

5.5.1.    Tax Classification. The Company shall be a "disregarded entity" of the Member for federal tax purposes, and neither the Company nor the Manager shall take any action inconsistent with this status. Among other things, without limitation, the Company shall not file a federal tax return for an entity classified as a partnership or a corporation. The remaining provisions of this Section 5.5 shall refer only to state and local tax, and, to the extent relevant, federal tax other than income tax.

5.5.2.    Tax Elections. Subject to Section 5.5.1: All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Manager, in its good faith discretion. The Company shall claim all deductions and make such elections for tax purposes, which the Manager reasonably believes, will produce the most favorable tax results for the Member. The Company and the Manager shall provide each Member with a copy of any material Notice it gives to or receives from a Taxing Authority promptly after sent or its receipt thereof.

5.5.3.    Tax Returns. The Manager shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications, elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.

7

5.6.    Intentionally Omitted.

5.7.    Distributions.

The Company shall distribute Net Cash Flow to the Member, as and when determined by Manager but no earlier than forty-five (45) days after the end of each calendar quarter in proportion to their respective Percentage Interests.

5.8.    Distributions Restricted by the Act.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to the Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

ARTICLE VI

MANAGEMENT AND OPERATIONS

6.1.    Management.

6.1.1.  The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Manager, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 6.1.3 below), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Manager shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3.  Except as otherwise provided in this Agreement, Manager shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)   acquire, lease, finance, pledge and dispose of each Property;

(iv)    establish one or more Subsidiaries to hold a Property;

(v)     enter into any contract or endorsement in the name or for the account of the Company;

(vi)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Manager or its Affiliate, all on such terms and for such consideration as Manager deems advisable; provided, however, that any

8

such contracts, agreements or other undertakings and transactions with Manager or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(vii)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(viii)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(ix)    maintain such reserves as the Manager reasonably deems advisable; and

(x)    cause the Company to carry such indemnification insurance as Manager deems necessary to protect it and any other individual or entity entitled to indemnification by the Company.

6.1.2.    Except as otherwise provided in this Agreement, the Member shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Manager, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

6.1.3.    Notwithstanding anything to the contrary contained in this Agreement, the following decisions or actions by the Company or any Subsidiary (each a "Major Decision") shall be undertaken only with the prior written consent of Member (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by the Member if the Member fails to object to such action within fifteen (15) days of Manager's written request therefor:

(i)    acquisition of any direct or indirect interests in any real property (other than the Properties);

(ii)    filing, acquiescing to, consenting to or taking of any Bankruptcy Action;

(iii)    merging, consolidating or other reorganization of the Company or any Subsidiary with another Person;

(iv)    entering into any agreement with Manager and/or any Affiliate thereof, on the one hand, and the Company and/or any Subsidiary on the other hand; except as provided in Section 6.2 and for transactions where the compensation paid to Manager or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

9

(v)    entering into any amendment or modification to this Agreement;

(vi)    causing any Subsidiary to take any of the foregoing.

6.2.    Manager Fees and Expenses.

6.2.1.    In connection with the operation of the Properties, Manager shall cause the Company or its Subsidiary to pay its proportionate share of each of the following fees, based upon the actual percentage of the Company's Tenant in Common interest in the Properties to Manager or its Affiliate (without duplication therefor):

(i)    its proportionate share of an acquisition fee equal to 1.0% of the purchase price of the Property;

(ii)    its proportionate share of an annual asset management fee equal to up to 2% of the gross revenues of each Property shall be payable to an Affiliate of the Manager;

(iii)    its proportionate share of a property management fee of 3.00% of the gross revenues of each Property less any third party property management fees paid by the Company or its Subsidiary shall be payable to an Affiliate of the Manager;

(iv)    its proportionate share of a construction management fee of up to 5.0% on all general conditions, hard and soft costs incurred by the construction management entity with respect to any construction project at the Property which shall be reduced by any fees payable by the Company or its Subsidiary to any co-construction manager; and

(v)    its proportionate share of a financing fee equal to 0.75% of the principal amount of all amounts borrowed by the Company or a Subsidiary which shall be payable to Arch an Affiliate of the Manager.

6.2.2.    The Company shall reimburse the Manager and its direct and indirect members whose sole purpose is to hold or manage another entity whose sole purposes is to invest, directly or indirectly, in the Company, for all third party costs and expenses incurred in connection with maintaining its legal existence, filing requisite tax returns and other reasonable costs incurred by the Manager in connection with the Company.

6.3.    Legal Title to Company Property.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary of the Company.

6.4.    Other Activities of the Member.  Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent the Member or any of the Affiliates of the Member, or any Person owning any direct or indirect interest in the Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Member nor its Affiliates shall have

4840-0916-7077, v. 1

any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Member and its Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Member or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS;

7.1.    Restrictions on Transfers of Membership Interests.  The Member shall not Transfer all or any portion of its Membership Interest, and the Member shall not cause its direct or indirect beneficial owners to make such a Transfer (nor shall the Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VII and until all requirements and conditions stated in this Article VII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the Manager.  To the fullest extent permitted under applicable law, any Transfer in violation of this Article VII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

7.2.    Permitted Transfers.  Notwithstanding Section 7.1, but subject to the applicable provisions or terms of any loan to any Subsidiary or the Company, and Section 7.5, the Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company, so long as the Member has provided the Manager with at least twenty (20) Business Days advance written notice, as follows ("Permitted Transfers"):

(i)    Intentionally omitted;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual by will or by laws of intestate succession, to such individual's executors, administrators, testamentary trustees, legatees or beneficiaries;

(iii)    Transfers by the Member to a Family Member or a trust or other entity, the sole beneficiaries or equity owners of which are a Family Member and over which a Family Member has sole and exclusive voting, investment and management powers with respect to the Interest;

(iv)    Transfers which do not effect a change in Control of the Member; or

(v)    Transfers consented to by the Manager.

4840-0916-7077, v. 1

7.3.  Additional Restrictions. Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in the Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i)  it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)  it would result in the Company or the Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)  it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)  the transferee is a Prohibited Person;

(v)  as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA;

(vi)  in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

7.4.  Substitute Members. No assignee of all or part of the Member's Interest shall become a substitute Member in place of the Member unless and until:(a)  The Transfer complies with the provisions of this Article VII;

(b)  The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)  The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

7.5.  Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 7.4, a permitted assignee of all or a part of the Member's Interest shall not be entitled to exercise any of the rights or powers of the Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to

vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of the Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of the Member's Interest unless and until the assignee(s) becomes a substitute Member.

7.6.    Withdrawal, Retirement or Resignation of the Member. The Member shall not have the right or power, and the Member shall not attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of the Member in violation of this Section 7.6 shall be null and void and of no effect. If the Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from the Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to the Member under the Act, the Certificate of Formation or this Agreement.

## ARTICLE VIII

## REPRESENTATIONS

8.1.    Representations.  The Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to the Member as of the date hereof:

8.1.1.  other than an individual, it is a corporation, trust, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and, in the case of a corporation, limited partnership or limited liability company, is in good standing under the laws of the state of its organization or formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

8.1.2.  its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational

4840-0916-7077, v. 1

documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

8.1.3.   there is no action, suit or proceeding pending against the Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

8.1.4.   this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against the Member in accordance with the terms hereof and thereof;

8.1.5.   the Member is an accredited investor as such term is defined in Section 501 or Regulation D promulgated under the Securities Act of 1933, as amended; and

8.1.6.   (i) neither the Member nor any Person owning an interest in the Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, the Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

8.2.   Indemnity.   The Member agrees to indemnify and hold harmless the Company and the Manager from all claims, loss, damages or liabilities which it may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of the Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 8.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement.

## ARTICLE IX

## DISSOLUTION AND LIQUIDATION

9.1.   Dissolution.   This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

9.1.1.   Upon the election to dissolve by the Member; or

9.1.2.   Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article IX unless the Member otherwise determines.

9.2. <u>Statement of Intent to Dissolve</u>. In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the Department of State of the State of New York.

9.3. <u>Procedures</u>.

9.3.1. <u>Liquidation of Assets</u>. In the event of the dissolution of the Company, Manager or the Person required by law to wind up the Company's affairs (the Member or other person being referred to herein as the "<u>Liquidating Agent</u>") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof. In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to the Member by the Liquidating Agent.

9.3.2. <u>Authority of Liquidating Agent</u>. In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that the Member (if authorized) or Manager would have pursuant to the Act or any other applicable law.

9.3.3. <u>Distribution of Assets</u>. Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Member in accordance with the provisions of <u>Section 5.7.2</u>.

9.4. <u>Termination of the Company</u>. Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

## ARTICLE X

## FISCAL AND ADMINISTRATIVE MATTERS

10.1. <u>Fiscal Year</u>. The fiscal year of the Company will be the calendar year.

10.2. <u>Checks, Drafts, Etc.</u> All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Manager from time to time shall authorize and designate in writing.

10.3. <u>Books and Records</u>. Manager, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period

of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Company's books and records will be kept at the principal place of business of Manager.

           10.4.   <u>Right of Inspection</u>. The Member will have the right to examine, during normal business hours of Manager, for any purpose and upon reasonable prior notice to Manager, the minutes and the books and records of account of the Company, and to make copies thereof at the Member's expense. Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

           10.5.   <u>Reports</u>. Within time periods set forth on <u>Exhibit B</u> attached hereto, the Company shall cause to be prepared and sent to the Member such reports as listed on <u>Exhibit B</u>, which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied. As soon as reasonably possible after the end of each Fiscal Year, the Manager will cause to be delivered to the Member such information with respect to the Company as may be necessary for the preparation of the Member's federal, state, and local income tax returns for such Fiscal Year.

## ARTICLE XI

### CONFIDENTIALITY AND PRESS RELEASES

           11.1.   <u>Confidentiality</u>. The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with a Property, and (f) disclosures otherwise approved by the parties.

           11.2.   <u>Press Releases</u>. The Member shall not issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or any Property without the approval of Manager, except to the extent required by law.

## ARTICLE XII

### INDEMNIFICATION

           12.1.   <u>Indemnification</u>.

           12.1.1. Subject to the terms of <u>Section 6.5</u>, neither the Member nor the Manager (or any predecessor, successor or Affiliate of the Member or Manager or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company for any loss suffered by the Company unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 12.1.1</u> shall not limit, restrict or

otherwise affect the rights or obligations of the Member or the Manager (or any predecessor, successor or Affiliate of the Member or Manager or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

12.1.2. Subject to the terms of <u>Section 6.5</u>, the Company shall indemnify, defend and hold harmless the Member, the Manager and their respective Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by the Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in the Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted gross negligence, fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this <u>Section 12.1.2</u> with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

12.1.3. Except as expressly provided herein, no direct or indirect shareholder or member in or of the Member or the Manager (and no officer, director, member, employee or agent of the Member, Manager, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

12.2.    <u>Exculpation/Member Indemnification</u>.  Subject to <u>Section 6.5</u>, except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, neither the Member nor the Manager shall be liable to the Company for (i) any act or omission performed or omitted in good faith, (ii) the Member's or Manager's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

## ARTICLE XIII

## MISCELLANEOUS

13.1.  Notices.

13.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A.

13.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

13.1.3. The Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 13.1 to the Manager.

13.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

13.2.  Attorneys' Fees.  In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation

13.3.  Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

13.4.  Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by the Member, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

13.5.  Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

4840-0916-7077, v. 1

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

13.6.    Venue. Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York. The Member consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

13.7.    Headings.    Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

13.8.    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction. In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

13.9.    Failure to Enforce Provision. The failure of the Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.10.    Interpretation. All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

13.11.    Assignment. This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of the Member's Membership Interest as permitted by this Agreement. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

13.12.    Counterparts.    This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement. The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes. Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

[remainder of page left intentionally blank]

4840-0916-7077, v. 1

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
146 E 89 BORROWER 2 LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

MEMBER:

KAY PROPERTIES LLC,
a New York limited liability company

By: JONATHAN Peldman
Its:    MEMBER

Address:

Initial Capital Contribution:  $

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
146 E 89 BORROWER 2 LLC

MANAGER:

JJ ARCH LLC,
a New York limited liability company

By: Jeffrey Simpson
Its:  Manager

Address:

## Exhibit A
### Member

| Member | Initial Capital Contribution |
|---|---|
| Kay Properties LLC | $956,877.86 |

Exhibit B

Reports

1.    Within one hundred twenty (120) days after the end of each Fiscal Year:

   a.    a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Member all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing the Member's taxable income, gains, losses, deductions and credits with respect to the Company; and