**GRIFFIN LLP**

420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile: (646) 998-8284
Scott A. Griffin
Frank L. Eaton

-and-

**WIGGIN AND DANA LLP**

437 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 490-1700
Facsimile: (212) 551-2888
Nathan Denning
Andrew C. Ritter (*pro hac vice pending*)
Kate E. Cassidy

*Proposed Co-Counsel for the Debtor*
*and Debtor in Possession*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                        :

In re:                           :    Chapter 11
                                  :    (Subchapter V)

JJ ARCH LLC,                :
                                  :    Case No. 24-10381 (JPM)
                                  :

               Debtor.[1]    :
                                  :
------------------------------------------------------------X

**REPLY TO ARCH REAL ESTATE HOLDINGS LLC'S OBJECTION
TO DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER PURSUANT TO
SECTIONS 327(a) AND 329 OF THE BANKRUPTCY CODE, BANKRUPTCY
RULES 2014 AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016-1
AUTHORIZING THE DEBTOR TO EMPLOY AND RETAIN GRIFFIN LLP, AS
GENERAL BANKRUPTCY COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

---

[1] The last four digits of the Debtor's federal tax identification number are 4251.

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................ **2**

**TABLE OF AUTHORITIES** ....................................................... **3**

**PRELIMINARY STATEMENT** ................................................... **6**

**SUPPLEMENTAL BACKGROUND** ............................................ **8**

Griffin's Prepetition Prior Representation of AREH ................................ 8

Oak's Prepetition Litigation Against AREH, the Debtor and Simpson ..................... 9

The D&O Policy ................................................................ 12

**ARGUMENT** ........................................................................ **12**

The Objection Is Devoid of Merit and Should be Overruled ......................... 12

A.    Griffin Does Not Hold or Represent an Interest Adverse to the Estate ........................ 15

B.    Griffin Is a Disinterested Under Section 101(14) of the Bankruptcy Code ................ 17

i.    Griffin's Prior Representation of AREH Is Not Disqualifying ................................ 18

ii.    Griffin Did Not Represent Simpson ........................................................ 23

iii.    Funding of the Debtor's Attorney's Fees From the D&O Policy Does Not Render Griffin Materially Adverse to AREH ................................ 24

C.    Griffin Does Not Have an Actual Conflict of Interest ................................. 25

**RESERVATION OF RIGHTS AND REQUEST FOR EVIDENTIARY HEARING** ......... **26**

**CONCLUSION** ...................................................................... **27**

## TABLE OF AUTHORITIES

Page

CASES

*Arista Records LLC v. Lime Group LLC*,
No. 06 CIV. 5936 (KMW) (S.D.N.Y. Feb. 22, 2011) ....................................................... 13, 21

*AroChem, Bank Brussels Lambert v. Coan (In re AroChem Corp.)*,
176 F.3d 610 (2d Cir. 1999)................................................................................................ passim

*Bass Pub. Ltd. Co. v. Promus Cos. Inc.*,
868 F. Supp. 615 (S.D.N.Y. 1994) ........................................................................................... 23

*Bd. of Educ. of the City of New York v. Nyquist*,
590 F.2d 1241 (2d Cir. 1979)............................................................................................... 13, 20

*Evans v. Artek Systems Corp.*,
715 F.2d 788 (2d Cir. 1983)....................................................................................................... 13

*GSI Commerce Solutions Inc. v. BabyCenter, L.L.C.*,
618 F.3d 2014 (2d Cir. 2010)...................................................................................................... 20

*Hempstead Video, Inc. v Vill. of Valley Stream*,
409 F.3d 127, (2d Cir. 2005)...................................................................................................... 21

*In re Enron Corp.*, No. 01 B 16034/Adv No. 04-2933 (AJG),
2005 WL 3873898  (Bankr. S.D.N.Y. Aug. 15, 2005) ......................................................... 13, 21

*In re Ampal-American Israel Corp.*,
*aff'd* 554 B.R. 569 (S.D.N.Y 2015), *aff'd*, 691 Fed. Appx. 12 (2d Cir. 2017)................. passim

*In re Ampal-American Israel Corp.*,
534 B.R. 569 (Bankr. S.D.N.Y. 2015).............................................................................. passim

*In re Ampal-American Israel Corp.*, 554 B.R. 604 (S.D.N.Y. 2016),
*aff'd* 554 B.R. 569 (S.D.N.Y 2015), *aff'd* 691 Fed. Appx. 12 (2d Cir. 2017)................. passim

*In re Ampal-American Israel Corp.*,
691 Fed. Appx. 12 (2d Cir. 2017)...................................................................................... passim

*In re Best Craft Gen. Contractor and Design Cabinet, Inc. v. Wong*,
239 B.R. 462 (Bankr. E.D.N.Y. 1999).................................................................................... 14

*In re Black and White Stripes, LLC*,
623 B.R. 34 (Bankr. S.D.N.Y. 2020)...............................................................................16(n.11)

*In re Champ Car World Series, LLC*,
411 B.R. 619 (Bankr. S.D. Ind. 2008) ................................................. 14

*In re Diva Jewelry Design, Inc.*,
367 B.R. 463 (Bankr. S.D.N.Y. 2007) ............................... 14, 15, 18, 24, 25

*In re Empire State Conglomerates*,
546 B.R. 306 (Bankr. S.D.N.Y. 2016) ............................................ 16, 18

*In re Enron Corp.*, No. 01-16034 (AJG),
2002 WL 32034346, (Bankr. S.D.N.Y. May 23, 2002) ............................ 18

*In re Granite Partners, L.P.*,
219 B.R. 22 (Bankr. S.D.N.Y. 1998) ............................................. 18, 26

*In re Innomed Labs, LLC,* No. CIV. 4778 (WCC),
2008 WL 276490 (Bankr. S.D.N.Y Jan. 29, 2008) ................................ 15

*In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*,
189 B.R. 874 (Bankr. E.D.N.Y. 1995) ............................................ 15

*In re Leslie Fay Companies*,
175 B.R. 525 (S.D.N.Y. 1994) ................................................... 19

*In re Leslie Fay Companies, Inc.*,
222 B.R. 718 (Bankr. S.D.N.Y 1998*)* ............................................ 15

*In re Persaud*,
467 B.R. 26 (Bankr. E.D.N.Y. 2012) .............................. 13, 15, 21, 26 (n.18)

*In re Persaud*,
467 B.R. 26 (Bankr. E.D.N.Y. 2012) .............................. 13, 15, 21, 26 (n.18)

*In re Persaud*,
496 B.R. 667 (E.D.N.Y. 2013) .................................................. 18, 20

*In re Project Orange Assoc., LLC*,
431 B.R. 363 (Bankr. S.D.N.Y. 2010) ............................................ 16

*In re Schwindt*, No. 12-31418 (MER),
2013 WL 321297 (Bankr. D. Colo. Jan. 28, 2013) ............................... 14

*In re WorldCom, Inc.*,
311 B.R. 151 (Bankr. S.D.N.Y. 2004) ...................................... 14, 15, 18

*John Wiley & Sons, Inc. v. Book Dog Books LLC*,
126 F.Supp. 3d 413 (S.D.N.Y. 2015) ............................................ 13

*Network Apps, LLC, v. AT&T Mobility LLC,*
    598 F.Supp.3d 118 (S.D.N.Y. 2022) ...................................................................... 21

*Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.,*
    258 F.R.D. 95 (S.D.N.Y. 2009) .....................................................................22(n.15)

*Pegaso Development Inc. v. Moriah Education Management LP,*
    19 CIV. 7787 (AT), 2022 WL 1306571 (S.D.N.Y. May 2, 2002)..................................22(n.15)

*Yorke v. Santa Fe Indus., Inc. (In re Santa Fe Trail Transp. Co.),*
    121 B.R. 794 (Bankr. N.D. Ill. 1990) ...................................................................... 23

STATUTES

11 U.S.C. §101(14) ............................................................................................ passim

11 U.S.C. § 327............................................................................................... passim

RULES

New York Rule of Professional Conduct 1.9(a) ........................................................ 20

LEGISLATIVE HISTORY

H.R. Rep. No. 95-595 at 328 (1978),
    *reprinted* in 1978 U.S.C.CA.N. (95 Stat.) 6284 ...................................................... 14

JJ Arch LLC, the debtor and debtor in possession in the above-captioned case (the "Debtor" or "JJ Arch"), files this reply (the "Reply") to *Arch Real Estate Holdings LLC's ("AREH") Objection to the Debtor's Application (the "Retention Application") for Entry of an Order Pursuant to Sections 327(a) and 329 of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Debtor to Employ and Retain Griffin LLP ("Griffin" or the "Firm"), as General Bankruptcy Counsel, Nunc Pro Tunc to the Petition Date* (the "Oak Objection"), and in support thereof respectfully represents:[2]

### **PRELIMINARY STATEMENT**[3]

The Oak Objection to disqualify the Debtor's proposed general bankruptcy counsel is yet another part of its coordinated strategy to frustrate the Debtor's reorganization efforts and disrupt any judicial oversight or review of its various self-interested transactions that are detrimentally impacting the estate. At its core, the Oak Objection is a litigation tactic evidenced by: (i) arguments that are either not supported by existing facts, or completely counter to the clear authority of this Circuit; (ii) the improper omission of controlling Circuit authority regarding the standard for disqualification; and (iii) threats by Oak against the D&O Policy insurer in an attempt to deny the Debtor of a legitimate funding source for legal fees to prosecute the Chapter 11 Case (including claims against Oak).

The irony of Oak's disqualification tactic is that it is purportedly raised on behalf of AREH – an entity that, less than seven months ago, was the target of lawsuits commenced by Oak

---

[2] Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"). "Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037. "Local Rule" or "L.R." references are to the Local Bankruptcy Rules for the Southern District of New York. Capitalized terms not otherwise defined herein, retain those definitions ascribed to them in the Application. The factual and legal positions set forth in the Retention Application are incorporated herein by reference.

[3] Capitalized terms used in this Preliminary Statement, but not otherwise defined, shall have the meanings ascribed to them in the body of this Reply.

(lawsuits which also included the Debtor and Jeffrey Simpson) in both state and federal court to prevent AREH's restructuring. Now, as its ***acting*** managing member, Oak is attempting to manufacture a conflict between AREH and those same parties in its effort to disqualify the Firm.

Even if the Court were not to ignore the absurdity of an alleged conflict manufactured by Oak (which it should), nothing in the blunderbuss of allegations raised in the Oak Objection supports disqualification under section 327(a) of the Bankruptcy Code or section 327(c), as applicable, or controlling Second Circuit authority.

Indeed, Oak's arguments premised on alleged ***prior*** representations or ***prior*** interests held by Griffin, even if true, are not proper grounds for disqualification. The standard under section 327(a) of the Bankruptcy Code adopted by this Circuit is whether a present actual conflict exists. As discussed below, Griffin holds no present actual conflict. Similarly, Oak's contentions regarding the future competition over the D&O Policy proceeds also fails to raise a cognizable basis for disqualification, as it also does not reflect a present adverse interest or a present actual conflict. Additionally, Oak's reliance on the New York Rules of Professional Conduct to support its disqualification arguments also fails, as the rules are not controlling on this Court's adjudication of the Retention Application upon the Debtor's satisfaction of the requirements under section 327(a). Simply put, Oak has not and cannot meet its heavy burden of demonstrating that a conflict exists warranting Griffin's disqualification under the Bankruptcy Code or controlling Second Circuit case law. Accordingly, Oak's litigation tactic should not be condoned by this Court and the Oak Objection should be overruled.

## SUPPLEMENTAL BACKGROUND[4]

### Griffin's Prepetition Prior Representation of AREH

1.      On or about October 6, 2023, AREH retained Griffin in conjunction with the potential preparation, commencement and prosecution of a Chapter 11 case for the Arch Companies as part of a comprehensive restructuring for the business. *See* Griffin Decl. at ¶ 3 n.4 (Exhibit 1 the "AREH Engagement Letter").  The terms of the AREH Engagement Letter were limited to the "filing, commencement, administration, and completion of a case under chapter 11 of the Bankruptcy Code."

2.      On October 11, 2023, Griffin filed a Substitution of Attorney (the "Initial Substitution Notice") replacing Adam Leitman Bailey, P.C., as attorneys of record for Mr. Simpson, individually and derivatively, as managing member of JJ Arch suing derivatively as the managing member of AREH and JJ Arch in litigation (the "State Court Action") pending in the Supreme Court of the State of New York, New York County, before the Hon. Joel Cohen, styled as *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC, and JJ Arch LLC v. Chassen, et al.,* Index No. 158055/2023. *See* Griffin Decl. at ¶ 20 n.7 (Exhibit 4)

3.      On October 12, 2023, prior to rendering **any** services on behalf of JJ Arch or Mr. Simpson, Griffin withdrew the Notice of Substitution on behalf of Mr. Simpson and JJ Arch (the "Subsequent Substitution Notice") through a subsequent Substitution of Attorney, with Sam P.

---

[4]In further support of the Retention Application, the Debtor submits the *Supplemental Declaration of Scott A. Griffin in Support of the Debtor's Application for Entry of an Order Pursuant to Sections 327(a) and 329 of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Debtor to Employ and Retain Griffin LLP, as General Bankruptcy Counsel, Nunc Pro Tunc to the Petition Date* (the "Supplemental Griffin Declaration").  The Supplemental Griffin Declaration shall be referred to herein as the "Suppl. Griffin Decl."

"Griffin Decl." shall refer to the Griffin Declaration attached as Exhibit A to the Retention Application.

Israel P.C. ("Israel") serving as counsel for Mr. Simpson and JJ Arch. *See* Griffin Decl. at ¶ 2 n.8 (Exhibit 5).

4.      On November 8, 2023, Griffin withdrew as counsel for AREH as a result of Oak becoming its acting managing member, and the previous adverse positions that AREH had taken against Oak with the Firm as counsel. *See* Griffin Decl. at ¶ 24 (Exhibit 8). Oak accepted Griffin's termination of the engagement on the same date. *See* Suppl. Griffin Decl. at ¶ 4 (Exhibit 1). The Firm has not represented AREH in any capacity after it withdrew as counsel on November 8, 2023. *See* Suppl. Griffin Decl. at ¶ 4.

5.      Accordingly, the Firm's representation of AREH commenced on October 6, 2023, and terminated on November 8, 2023 (the "AREH Engagement Period"). *See* Suppl. Griffin Decl. at ¶ 5.

6.      During the AREH Engagement Period, Griffin made three appearances on behalf of AREH – twice in the State Court Action and the Initial State Court Litigation (as defined below), and once in the Federal Court Action (as defined below) in connection with the Removed Case (as defined below) and related relief. *See* Suppl. Griffin Decl. at ¶ 6.

7.      On November 27, 2023, Griffin presented Oak, as the acting managing member of AREH, with its final invoices for outstanding fees from the AREH Engagement Period. Kevin Weiner, a director and corporate secretary at Oak, informed Griffin – without explanation - that the Firm's invoices would not be paid. *See* Griffin Decl. at ¶ 26 (Exhibit 9).

**<u>Oak's Prepetition Litigation Against AREH, the Debtor and Simpson</u>**

8.      On October 10, 2023, ***Oak*** filed an action in the Supreme Court of the State of New York, New York County styled as 608941 *NJ Inc. v. Jeffrey Simpson, JJ Arch LLC, and Arch Real*

*Estate Holdings LLC,* Index No. 654963/2023 before the Hon. Joel Cohen (the "Removed Case").[5] In conjunction with the Removed Case, Oak filed an order to show cause with a request for a temporary restraining order, which sought, in large part, to deprive AREH of the federal right to seek bankruptcy protection. *See* Suppl. Griffin Decl. at ¶ 7.

9.    On October 11, 2023, **Oak** served Simpson, the Debtor and AREH with an amended order to show cause in conjunction with the Removed Case. *See* Suppl. Griffin Decl. at ¶ 8.

10.   On October 12, 2023, Griffin, on behalf of AREH, filed a Notice of Removal (the "Removal Action") in the United States District Court for the Southern District of New York (the "Federal Court Action") in response to, *inter ali*a, the injunctive relief requested by Oak in the Removed Case seeking to prevent AREH from commencing a bankruptcy case. *See* Suppl. Griffin Decl. at 9. The Federal Court Action was ultimately assigned to the Hon. Andrew L. Carter. *See* Suppl. Griffin Decl. at ¶ 10.

11.   On October 13, 2023, **Oak** filed a motion to remand or alternatively for a preliminary injunction and temporary restraining order (the "Oak TRO"). *See* Suppl. Griffin Decl. at ¶ 10. On the same date, Judge Carter granted the Oak TRO restraining any bankruptcy filing by AREH *pendente lite. See* Suppl. Griffin Decl. at ¶ 11.

12.   On October 17, 2023, **Oak** filed an order to show cause seeking the appointment of a temporary receiver for JJ Arch in the Supreme Court of the State of New York, New York County, before the Hon. Joel Cohen, in the litigation styled as *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC, and JJ Arch LLC v. Chassen, et al.,* Index No. 158055/2023 (the "Initial State Court Litigation"). *See* Suppl. Griffin Decl. at ¶ 12.  Judge Cohen did not grant Oak's

---

[5] *See* Reply at ¶ 10 (discussing the Notice of Removal).

request to appoint a receiver for JJ Arch, but instead entered an interim order outlining measures regarding the parties' conduct of the business operations of AREH and certain of its subsidiaries. *See* Suppl. Griffin Decl. at ¶ 12.

13.     On October 19, 2023, Israel filed a notice of consent to the Removal Action, on behalf of Simpson and JJ Arch. *See* Suppl. Griffin Decl. at ¶ 13.

14.     On October 28, 2023, Oak dismissed its Federal Court Action after Judge Carter appeared skeptical that Oak could enjoin AREH from seeking bankruptcy protection and that a bankruptcy court should determine whether AREH had the authority to commence a prospective case, notwithstanding blocking provisions set forth in the AREH Operating Agreement. *See* Suppl. Griffin Decl. at ¶ 14.

15.     On November 3, 2023, Oak again sought the appointment of a receiver for JJ Arch in the Initial State Court Litigation. *See* Suppl. Griffin Decl. at ¶ 15. Rather than appoint a receiver, Judge Cohen granted Oak temporary/interim emergency relief allowing it to serve as the ***acting*** managing member of AREH pending a final order. *See* Suppl. Griffin Decl. at ¶ 15.  Judge Cohen has not entered a final order on the matter.

16.     On the same date it was appointed as AREH's managing member, ***Oak caused AREH*** to commence an action against the Debtor and Simpson in the Initial State Litigation. *See* Suppl. Griffin Decl. at ¶ 16.[6]

17.     Oak is now using its position as the acting managing member of AREH, with the assistance of Jared Chassen (the Debtor's former minority member), to effectuate a series of self-interested transactions to reduce Oak's exposure of guaranty obligations related to AREH's

---

[6] Remarkably, Oak caused AREH to file the complaint initiating the action prior to the entry of Judge Cohen's order appointing it as the acting managing member of AREH.

expansive underlying real estate portfolio. These transactions have been conducted to the detriment of the Debtor's interest in AREH and its real estate portfolio.[7]

**The D&O Policy**

18.     AREH is the "Named Insured" of a claims-made directors' and officers' insurance policy (the "D&O Policy") with the Great American Insurance Group ("Great American"), with a policy period that commenced on April 18, 2023 and ended on April 18, 2024 (the "Policy Term"). *See* Suppl. Griffin Decl. at ¶ 17.[8] The D&O Policy contains a sixty (60) day automatic discovery period (the "Discovery Period"), beginning immediately upon expiration of the Policy Term. The Discovery Period ends on June 17, 2024. *See* Suppl. Griffin Decl. at ¶ 17.

19.     Simpson, an "Insured Person," under the D&O Policy made a claim (the "Simpson D&O Claim") against the policy on or about November 7, 2023. Great American agreed to cover costs relating to Simpson's Claim, including, *inter alia*, costs associated with the Chapter 11 Case. *See* Suppl. Griffin Decl. at ¶ 18.

20.     Upon information and belief, AREH has not made a claim against the D&O Policy to Great American.

**ARGUMENT**

**The Objection Is Devoid of Merit and Should be Overruled[9]**

21.     Oak's request to disqualify Griffin is a clear-cut litigation tactic aimed at gaining an advantage over the Debtor to derail its restructuring efforts, and a textbook example of why courts in this Circuit thoroughly scrutinize and view with disfavor an adversary's efforts to

---

[7] In the less than six months that Oak has served as AREH's acting managing member, it has restructured or attempted to restructure more than $300 million of debt associated with AREH's underlying real estate portfolio.

[8] A copy of the D&O Policy is attached as Exhibit 2 to the Supplemental Griffin Declaration.

[9] Griffin disputes all contentions raised in the Oak Objection that the Chapter 11 Case was improperly filed and hereby reserves all rights with respect to the same. As such allegations are not relevant in determining whether the Firm may be properly retained under section 327(a) of the Bankruptcy Code, they will not be addressed in this Reply.

disqualify its opponent's counsel. *See Evans v. Artek Systems Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983) (quoting  *Bd. of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (finding that because disqualification motions "are often made for tactical reasons," they are 'viewed with disfavor'"); *accord John Wiley & Sons, Inc. v. Book Dog Books LLC,* 126 F.Supp. 3d 413, 419 (S.D.N.Y. 2015) (citation omitted); *In re Ampal-American Israel Corp.,* 534 B.R. 569, 585 (Bankr. S.D.N.Y. 2015) (refusing to disqualify counsel on conflict grounds and recognizing that requested disqualification was being raised for strategic purposes), *aff'd* 554 B.R. 569 (S.D.N.Y 2015), *aff'd*, 691 Fed. Appx. 12 (2d Cir. 2017); *Arista Records LLC v. Lime Group LLC*, No. 06 CIV. 5936 (KMW), 2011 WL 672254, at *4 (S.D.N.Y. Feb. 22, 2011); *see also*, *In re Persaud*, 467 B.R. 26, 37 (Bankr. E.D.N.Y. 2012) (finding that "[c]ourts scrutinize motions to disqualify an adversary's counsel with special care because of the obvious potential for abuse") (citations omitted); *In re Enron Corp.*, No. 01 B 16034/Adv No. 04-2933 (AJG), 2005 WL 3873898, at *4 (Bankr. S.D.N.Y. Aug. 15, 2005) (noting "in the Second Circuit motions to disqualify counsel have long been disfavored" and the "moving party who seeks to disqualify his former counsel must meet a high standard of proof") (citations omitted).  Here, the Court need only engage in a cursory review of the facts, including Oak's own conflicts, and the controlling authority of this Circuit to quickly ascertain the improper motive behind, and use of, Oak's disqualification objection.

22.     It is well-settled that the starting point for the Court's examination of attorney conflict issues is section 327(a) of the Bankruptcy Code. The section provides, in relevant part, that:

> the trustee, with the court's approval, may employ one or more attorneys . . . or other professionals, that do not hold or represent an interest adverse to the estate, and that are disinterested persons to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). Thus, under section 327(a), a debtor may retain general bankruptcy counsel for the estate if the attorney satisfies a two-prong test: (i) it does not hold or represent an interest adverse to the debtor's estate; and (ii) it is a disinterested person. *See In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 469 (Bankr. S.D.N.Y. 2007) (finding that a bankruptcy judge must examine whether the professional is disinterested and holds or represents and interest adverse to the estate); *see also*, *In re WorldCom, Inc.*, 311 B.R. 151, 163 (Bankr. S.D.N.Y. 2004) (creating a three-part test by separating the "hold or represent an adverse interest to the estate" elements in addition to the "disinterestedness" element); *In re Champ Car World Series, LLC*, 411 B.R. 619 (Bankr. S.D. Ind. 2008) (noting as a threshold to retention under section 327(a) satisfaction of the two-prong test).

23.    Section 327(c) of the Bankruptcy Code offers an exception to section 327(a)'s retention requirements, providing that "a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is an objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." *See* 11 U.S.C. § 327(c); *see also*, *In re Best Craft Gen. Contractor and Design Cabinet, Inc. v. Wong*, 239 B.R. 462, 466 (Bankr. E.D.N.Y. 1999) (finding section 327(c) as an exception to section 327(a) "[delineating] a less stringent standard than otherwise required by § 327(a)); *see also*, H.R. Rep. No. 95-595 at 328 (1978), *reprinted* in 1978 U.S.C.C.A.N. (95 Stat.) 6284 (noting that "Subsection (c) is an additional exception to [§ 327(a)]; *In re Schwindt*, No. 12-31418 (MER), 2013 WL 321297, at *7 (Bankr. D. Colo. Jan. 28, 2013) (finding a bankruptcy court's "inquiry ends where the threshold requirements of § 327(a) are satisfied, unless § 327(c) (or any other exception to the general rule) is implicated"). Accordingly, section 327(c) of the Bankruptcy Code is relevant in a court's retention and/or

conflict analysis only where counsel fails to satisfy the two-prong test of section 327(a). Such analysis is inapplicable here because, as discussed below, Griffin does not **presently** hold or **presently** represent an interest adverse to the estate and is a disinterested person under section 101(14) of the Bankruptcy Code.

A. <u>Griffin Does Not Hold or Represent an Interest Adverse to the Estate</u>

24. A court's determination of whether an adverse interest exists should be conducted on a case-by-case basis, with an examination of the specific facts of the case. *AroChem, Bank Brussels Lambert v. Coan (In re AroChem Corp.),* 176 F.3d 610, 623 (2d Cir. 1999); *In re WorldCom, Inc.*, 311 B.R. 151, 164 (Bankr. S.D.N.Y. 2004) (citing *AroChem* finding that "[t]he decision on whether an adverse interest exists is determined by the court on a case-by-case basis"); *accord In re Innomed Labs, LLC,* No. CIV. 4778 (WCC), 2008 WL 276490, at *2 (Bankr. S.D.N.Y Jan. 29, 2008); *Diva Jewelry*, 367 B.R. at 471; *In re Persaud*, 467 B.R. 26, 36 (Bankr. E.D.N.Y. 2012). Only after a thorough examination of the specific facts surrounding a debtor's choice of counsel should disqualification occur under section 327(a).

25. While a debtor bears the burden of proof under section 327(a) of the Bankruptcy Code, the party seeking disqualification under section 327(c) bears the burden of proof in establishing a conflict of interest. *See In re Leslie Fay Companies, Inc.,* 222 B.R. 718, 721 (Bankr. S.D.N.Y 1998*); In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc., 189 B.R. 874, 880* (Bankr. E.D.N.Y. 1995) (holding that "in a case involving an objection under 11 U.S.C. § 327(c), the burden would be on the objecting creditor [or United States Trustee] to prove conflict of interest.")*.

26. Under clear Second Circuit precedent, the litmus test for disqualification under section 327(a) of the Bankruptcy Code is whether counsel presently holds or represents an interest to the estate. *See In re Ampal-American Israel Corp.*, 691 Fed. Appx. 12, 15 (2d Cir. 2017)

*(Summary Order)(citing AroChem,* 176 F.3d at 623) ("As we held in *AroChem,* 'counsel will be

disqualified under section 327(a) *only if it presently* holds or represents an interest to the estate,

*notwithstanding any interests it may have held or represented in the past.*'") (emphasis added)

(alterations and internal quotation marks omitted); *accord In re Empire State Conglomerates*, 546

B.R. 306, 314 (Bankr. S.D.N.Y. 2016); *see also, In re Project Orange Assoc., LLC*, 431 B.R. 363,

370 (Bankr. S.D.N.Y. 2010) ("The test is not retrospective; courts only examine present interests

when determining whether a party has an adverse interest.") [10]

27.     A professional holds or represents an interest adverse to the estate where such

professional either (i) possesses or asserts any economic interest that would tend to lessen the value

of the bankruptcy estate or that would create either an actual or potential dispute in which the estate

is a rival claimant; or (ii) possesses a predisposition under circumstances that render a bias against

the estate. *Ampal*, 554 B.R. at 618. Neither of the above factors are relevant here, and Oak does

not allege either of those factors as their basis to disqualify the Firm.[11]

---

[10] Although *AroChem* analyzed the propriety of disqualification for proposed special counsel under section 327(e) of
the Bankruptcy Code, the present tense requirement for disqualification of requiring that counsel currently hold or
represent and interest adverse to the estate applies to section 327(a) counsel. *See In re Ampal-American Israel Corp.*,
554 B.R. 604, 620 (S.D.N.Y. 2016), *aff'd* 554 B.R. 569 (S.D.N.Y 2015), *aff'd* 691 Fed. Appx. 12 (2d Cir. 2017) (citing
*AroChem*, 176 F.3d at 623 (2d Cir. 1999) citing 11 U.S.C. § 327(a)) ("[T]he Second Circuit did not cabin its statement
that 'section 327(a) is phrased in the present tense, permitting representation by professionals that do not *hold* or
*represent* an interest adverse to the estate,' and limiting the class of acceptable counsel to those 'that *are* disinterested
persons.") (emphases in original).

[11] Oak relies heavily on *In re Black and White Stripes, LLC*, 623 B.R. 34 (Bankr. S.D.N.Y. 2020), a case that adopts
the "present" representation standard under section 327(a) of the Bankruptcy Court articulated in *AroChem*. In *Black
and White*, the proposed counsel previously represented the debtor and certain of its members in a state court case.
The proposed counsel's initial retention application failed to discuss the firm's short but extensive and litigious
representation of both the debtor and its members in the state court case. In denying the retention, the court focused
on the broad scope of the proposed bankruptcy counsel's state court retainer agreement. Specifically, the court noted
that while the retention agreement was a "general retainer," it specifically included "review of the entire [state court]
litigation file." *Id.* at p. 51. In the court's view, this language created a potential conflict that precluded the retention
based on the existence of potential avoidance actions against the members. In contrast, the AREH Engagement Letter
was limited to the "filing, commencement, administration, and completion of a case under chapter 11 of the
Bankruptcy Code." Notably, in *Black and White*, the Debtor had not retained conflicts counsel, notwithstanding the
existence of potential conflicts. In contrast, to the extent the Debtor determines to pursue any litigation against any
related non-debtor party, the Debtor has retained Wiggin and Dana LLP as proposed conflicts counsel.

28.     Tellingly, absent from the litany of bald allegations raised in the Oak Objection is an allegation that the Firm *currently* "holds or represents" an interest adverse to the Debtor's estate; instead it contends that Griffin is not a disinterested person under section 101(14)(C) of the Bankruptcy Code. Yet, Oak fails to offer a single credible argument or fact establishing that the Firm presently holds "an interest materially adverse" to the Debtor's estate as required under prevailing authority. These failures are fatal to Oak's disqualification tactics.

B.     Griffin Is a Disinterested Under Section 101(14) of the Bankruptcy Code

29.     Oak lacks any colorable basis to claim that Griffin is not a disinterested person, and its attempts to do so border on frivolity. Section 101(14) defines a "disinterested person" as a person that:

(A)     is not a creditor, an equity security holder or an insider;

(B)     is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and;

(C)     does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. §101(14). Here, Oak does not allege that the Firm or any of its attorneys or paraprofessionals are creditors, equity security holders or insiders of the Debtor under section 101(14)(A) of the Bankruptcy Code.  Nor does Oak allege that the Firm or any of its attorneys or paraprofessionals is, or was, a director, officer or employee of the Debtor within 2 years of the Petition Date under section 101(14)(B). Rather, Oak wrongly contends that Griffin is not disinterested under subsection (C) because of (i) a *prior* representation of AREH; (ii) an alleged *prior* representation of Simpson; and (iii) a purported future competition with AREH's insured parties to director and officer insurance proceeds under a now expired policy. None of these contentions, however, render the Firm not disinterested or give rise to a cognizable conflict on

17

section 327 grounds when analyzed under the clear law of the Second Circuit and the facts (that

were known to Oak or should have been known at the time it filed the Oak Objection).

     *i.*  <u>*Griffin's Prior Representation of AREH Is Not Disqualifying*</u>

  30. Notwithstanding Oak's attempt to manufacture a conflict, Griffin's former

representation of AREH is simply not enough to do so. It is settled law in this Circuit that the

"materially adverse standard incorporated into the definition of disinterestedness under section

101(14)[(C)] and the 'interest adverse to the estate' language in section 327(a) overlap and are

duplicative, forming a single test to judge conflicts." *WorldCom*, 311 B.R. at 164; *In re Enron*

*Corp.*, No. 01-16034 (AJG), 2002 WL 32034346, at *8 (Bankr. S.D.N.Y. May 23, 2002); *In re*

*Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998); *see also*, *Diva Jewelry*, 367 B.R.

at 470 (finding that the addition of "a requirement that any adverse interest be 'materially' adverse,

section 101(14) imposes a requirement that is more forgiving of adverse interests than section

327(a) itself is"). Key to the test, as applicable here, is whether Griffin **currently** maintains an

interest materially adverse to the Debtor's estate. *See Empire*, 546 B.R. at 315 (finding where no

facts were alleged to show or imply an ongoing relationship between counsel and its former client,

a creditor of the debtor, where counsel now seeks to represent the debtor's trustee, counsel did not

have a personal interest materially adverse to the estate or anyone else under section 101(14)(C)

of the Bankruptcy Code); *In re Persaud*, 496 B.R. 667, 677 (E.D.N.Y. 2013)) ("The Second Circuit

has held that the 'disinterestedness' requirement implicates only the personal interests' of the

professional in question, requiring the professional actually to 'have' such an interest.") (internal

quotations and citations omitted).

  31. First, it is undisputed that Griffin's representation of AREH terminated on

November 8, 2023 – approximately one month after the Firm was hired - and that the Firm has not

represented AREH after such date. *See* Griffin Decl. at ¶ 24; *see also,* Suppl. Griffin Decl. at ¶ 4.

Accordingly, because Griffin no longer represents AREH in any matters, the Firm has no

"meaningful incentive to act contrary to the best interests of the estate" in favor of AREH, *In re*

*Leslie Fay Companies*, 175 B.R. 525, 532 (S.D.N.Y. 1994), and significantly no such incentive is

alleged by Oak. In fact, the Firm's representation of JJ Arch is part of a global restructuring that

inures to the benefit of AREH.

32.     Second, notwithstanding Oak's attempts to expand Griffin's prepetition

involvement in litigation between AREH, the Debtor and Simpson, on the one hand, and Oak on

the other, the Firm's role was limited to assisting AREH and certain of its affiliates in facilitating

an in-court restructuring of their financial and operational affairs, and all court appearances were

in furtherance of those efforts.[12]   Notably, during the AREH Engagement Period, the Firm made

only three appearances on behalf of AREH – appearing twice in the State Court Action and the

Initial State Court Litigation, and once in the Federal Court Action to address the obstacles raised

by Oak's efforts to prevent the company's chapter 11 filing.[13] The limited scope and duration of

the Firm's engagement on behalf of AREH leans heavily against finding an existing conflict for

Griffin. *See In re Ampal-American Israel Corp.,* 534 B.R. 569, 581 (Bankr. S.D.N.Y. 2015), *aff'd*

554 B.R. 569 (S.D.N.Y 2015), *aff'd*, 691 Fed. Appx. 12 (2d Cir. 2017) (finding "[t]he more limited

---

[12] Contrary to Oak's repeated misrepresentations, Griffin did not appear at any hearing or conference on behalf of JJ Arch or Simpson in the State Court Action, Initial State Court Litigation or the Federal Court Action.

[13] It is difficult to ignore the clearly improper nature of the Oak Objection, given that in October 2023 Oak commenced actions against AREH, JJ Arch and Simpson in both the State Court Action and Federal Court Action, and now less than seven months later under the guise of the ***acting*** managing member of AREH seeks to use AREH as a vehicle to disqualify Griffin as general bankruptcy counsel. Oak's position is even more remarkable considering the Debtor's retention of Wiggin and Dana LLP as proposed conflicts and litigation counsel to address AREH related litigation issues.

the prior representation, even in the same bankruptcy case, the less likely the actual conflict") (citations omitted). [14]

33.     Third, and equally unavailing are Oak's arguments that the Firm has a conflict because the New York Rules of Professional Conduct purportedly precludes the Firm's continued representation of the Debtor as a result of it having previously represented AREH and having obtained confidential information during such representation.  To start, this Circuit has routinely ruled that although state disciplinary rules may provide guidance on conflict issues, such rules are not dispositive. *See GSI Commerce Solutions Inc. v. BabyCenter, L.L.C.*, 618 F.3d 2014, 209 (2d Cir. 2010) (quoting *Bd. of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (finding that while "state disciplinary codes provide valuable guidance, a violation of those rules may not warrant disqualification"); *see also, Ampal,* 534 B.R. at 582 (comparing section 327(c) to New York Rule of Professional Conduct 1.9(a) which prohibits subsequent representation of a client with an interest adverse to a former client without consent); *In re Persaud*, 496 B.R. 667, 677 (E.D.N.Y. 2013) ("The Bankruptcy Court stated that 'New York's professional conduct rules provide a framework to assess questions of conflict of interest for bankruptcy courts . . . [however] I'm not persuaded this is correct, especially since it is generally accepted that the standards for ethical conduct under the Bankruptcy Code are stricter than the local disciplinary rules.").

34.     Additionally, Oak's conflict argument based on Griffin's receipt of "confidential information" also fails to provide an adequate disqualification ground under controlling Second

---

[14] It is unclear from the Oak Objection whether Oak is alleging that Griffin is conflicted because of the November 2023 action by AREH (directed by Oak) against the Debtor and Simpson.  If so, a conflict argument based on these grounds would clearly lack merit, as the Firm was not involved in this action and the action was clearly initiated at the direction of Oak.

Circuit case law. In applying New York law, courts require former clients seeking to disqualify an opponent's counsel to establish:

(1)  the moving party is a former client of the adverse party's counsel

(2)  there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit;

**and**

(3)  the attorney whose disqualification is sought had access to or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*See Network Apps, LLC, v. AT&T Mobility LLC,* 598 F.Supp.3d 118 (S.D.N.Y. 2022) (quoting *Hempstead Video, Inc. v Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005); *accord In re Persaud*, 467 B.R. 26, 37-38 (Bankr. E.D.N.Y. 2012); *Arista Records*, 2011 WL 672254, at *4; *Enron*, 2005 WL 3873898 at *4.  The "substantially related" element is applied strictly, and the party seeking disqualification must establish that there is a "patently clear" relationship between the two actions, or the actions are "identical." *Persaud*, 467 B.R. at 38; *See Enron*, 2005 WL 3873898, at *4-5 ("noting that "[d]isqualification has been granted by the Second Circuit only when the issues involved have been identical or essentially the same") (internal citations and quotations omitted). Importantly, there must be clear factual overlap, and Oak has the burden of proffering evidence establishing the same. *Enron*, 2005 WL 3873898 *11 (finding that there must be a clear factual overlap of actions for disqualification and the party seeking to disqualify failed to meet its high burden for disqualification under the substantial relationship test).

35.     Here, there is no "factual overlap," and unsurprisingly, Oak does not reference the "substantial relationship" test because it knows there simply is no way under the facts that it can meet the high burden for satisfying the test.  Further, Oak fails to offer any evidence demonstrating, or even allege, that AREH and JJ Arch were involved in any litigation against each other during

the AREH Engagement Period, because the entities were not and any attempt to allege the same is frivolous. The nature of the litigation in which it now alleges a conflict, on behalf of AREH, has always been between Oak, on the one hand, and Simpson, AREH and the Debtor on the other.  In fact, a close examination of the State Court Action, Initial State Court Litigation and Federal Court Action reveals that the real essence and core of the litigation concerns disputes between Oak and Simpson.  Moreover, there was never a prepetition dispute between the Debtor and AREH with respect to the general restructuring of either entity, and the current litigation between AREH (as directed by Oak) and the Debtor is limited to breach of fiduciary duty claims, with the nature of those claims based on purported acts by Simpson.

36.    Thus, there is no real dispute that Oak has not met its burden of establishing a substantial relationship between Griffin's representation of the Debtor as general bankruptcy counsel and the dispute that it has attempted to manufacture between the Debtor and AREH.[15] Notably, although there is no conflict (actual or potential), the Debtor has requested permission to obtain separate conflicts/litigation counsel to address any litigation between the Debtor and AREH to avoid even the mere appearance of a conflict.[16] *See Ampal,* 534 B.R. at 587 (recognizing the appropriateness of conflicts counsel where there is not an actual conflict). Of course Oak opposes

---

[15] Oak's contention that the AREH Engagement Letter constitutes confidential information is not supported by the law in this district finding that general engagement agreements are not confidential. *See Pegaso Development Inc. v. Moriah Education Management LP*, 19 CIV. 7787 (AT), 2022 WL 1306571 *3 (S.D.N.Y. May 2, 2002) (concluding "engagement letters [are] generally not considered privileged because they do not qualify as confidential communications made for the purpose of securing legal advice.") (citations and internal quotations omitted); *accord Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 101 (S.D.N.Y. 2009). The AREH Engagement Letter does not contain any specifics, motives or strategy regarding the chapter 11 case contemplated for AREH. Moreover, AREH's contemplated bankruptcy became public knowledge from the various filings in the Federal Court Action discussing the propriety of such prospective filing and arguments on the record regarding the same.

[16] On April 19, 2024, the Debtor filed its *Application for Entry of an Order Pursuant to Sections 327(a), 328 and 329 of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Debtor to Employ and Retain Wiggin and Dana LLP, as Conflicts and Litigation Counsel, Nunc Pro Tunc to the Date of Engagement* [Dkt. No. 92].

conflicts counsel, disingenuously contending that such counsel would not remedy the purported conflicts it is raising. Oak's position is not a surprise, as it recognizes conflicts counsel thwarts its improper disqualification/litigation tactics.

37.     Additionally, to the extent that Oak contends that Griffin represented AREH, the Debtor and Simpson, simultaneously (which is false) [Oak Objection at 11], AREH is estopped from now alleging that the Firm may not use confidential information that it obtained during such representation. *Bass Pub. Ltd. Co. v. Promus Cos. Inc.*, 868 F. Supp. 615, 620 (S.D.N.Y. 1994) ("Where there is a joint attorney-client privilege, there is no expectation that confidential information will be held from joint clients as there is no privilege between them."). Accordingly, Oak cannot have it both ways – it cannot one moment argue that Griffin should be disqualified because it represented AREH, the Debtor and Simpson simultaneously (which it never did), and then the next moment assert the Firm should be disqualified because it received privilege/confidential information during its representation of AREH. Moreover, the Firm's mere possession of confidential information obtained during the AREH Engagement Period would not serve to disqualify it if that same information is available through discovery. *Yorke v. Santa Fe Indus., Inc. (In re Santa Fe Trail Transp. Co.)*, 121 B.R. 794 (Bankr. N.D. Ill. 1990) (finding that former parent could not claim privilege to prevent discovery by former subsidiary where in-house counsel represented both the subsidiary and parent in sale of former subsidiary's stock). Oak has proffered no evidence to demonstrate that any information received by Griffin, to the extent confidential, would not be subject to production in discovery.

## ii.     *Griffin Did Not Represent Simpson*

38.     Despite Oak's contentions, Griffin did not represent Simpson in his individual capacity – the Firm's engagement was by Simpson as the managing member of AREH for AREH. The Initial Substitution Notice reflecting the Firm as counsel of record for AREH, the Debtor or

Simpson was limited in its duration, and the Firm was clear with Simpson that it did not represent him in his individual capacity or the Debtor. *See* Suppl. Griffin Decl. at ¶ 3. Even if the Court were to find that the Initial Substitution Notice created an attorney-client relationship between Griffin and Simpson, that relationship terminated on the date of the Subsequent Substitution Notice, and as of the Subsequent Substitution Notice, Griffin would have no longer purportedly represented an interest adverse to the Debtor's estate or any creditor thereof. *In re AroChem* 176 F.3d at 629 (finding section 327(a)) "is phrased in the present tense, permitting representation by professionals that do not *hold* or *represent* an interest adverse to the estate").

*iii.*    *Funding of the Debtor's Attorney's Fees From the D&O Policy Does Not Render Griffin Materially Adverse to AREH*

39.    As noted above, the D&O Policy is a claims-made policy. Simpson made a claim under the D&O Policy prior the expiration of the Policy Term. In conjunction with the Simpson D&O Claim, Great American determined that the costs associated with the Chapter 11 Case constitute appropriate defense costs, notwithstanding that the Debtor would act only in the best interests of the estate, even under circumstances where such interests may be adverse to Simpson or Great American.  Upon information AREH did not make a claim against the D&O Policy during the Policy Term and has not made a claim against the policy during the Discovery Period.

40.    Because AREH does not allege that it or any other insured party under the D&O Policy has presently made a claim against the policy, it is has failed to demonstrate that the Firm currently holds an interest adverse to any of the constituencies covered under section 101(14)(C). *See Ampal*, 554 B.R. at 583 (noting only a potential conflict over D&O insurance proceeds, where no actual conflict had been brought to the Court's attention). Further payment of Griffin's fees from the D&O Policy does not create an adverse interest as it has a right to payment for services rendered. *See Diva Jewelry,* 367 B.R. at 473 ("[A] professional's getting paid for services to the

24

extent provided under the law, is not an adverse interest. Every professional has an economic

interest in getting paid for his, her or its work.  If securing work for an estate, or getting paid for

it, were ever held to constitute an adverse interest, no professional could ever be retained.")

### C.    Griffin Does Not Have an Actual Conflict of Interest

41.    As discussed above, section 327(c) of the Bankruptcy Code is only relevant if

proposed counsel is unable to satisfy the two-part test set forth in 327(a). Griffin has satisfied

section 327(a); and thus, an "actual conflict" analysis under section 327(c) is unnecessary. Even if

this Court were to engage in such analysis, the Debtor's retention of the Firm is proper as there is

no actual conflict. Section 327(c) "prevents disqualification based solely on the professional's

prior representation of or employment by a creditor," but is appropriate following an objection by

the U.S. Trustee or a creditor and there is an actual conflict of interest. *See AroChem*, 176 F.3d at

621; *see also Diva Jewelry,* 367 B.R. at 472 ("the past representation of the creditor would not be

dispositive by itself, and instead would require consideration of the existence or nonexistence of

an *actual conflict*.") (emphasis in original).

42.    In determining whether an actual conflict exists, courts should review "each case .

. . on its own circumstances, [with a decision] based on a common-sense divination of adversity

or communality." *See AroChem*, 176 F.3d at 626-27; *see also Diva Jewelry,* 367 B.R. at 471

("Court turning to the case law in [the] area, factual examination, and common sense" in deciding

whether an actual conflict exists). The conflict that Oak is attempting to manufacture as AREH's

acting managing member (when it was adverse to AREH, the Debtor and Simpson less than a year

ago) dictates that the Court apply a common sense approach in finding that no actual conflict exists.

43.    Further, it is black-letter law in this Circuit that an actual conflict involves the

representation of 'two ***presently*** competing adverse interests. *Diva Jewelry,* 367 B.R. at 472

(finding that an actual conflict of interest is one where there is "an active competition between two

25

interests, in which one interest can only be served at the expense of the other"); *accord Ampal*,

554 B.R. at 619; *see also*, *In re Granite Partners, L.P.*, 219 B.R 22, 33 (Bankr. S.D.N.Y. 1998)

(noting that a potential conflict, as opposed to an actual conflict, "occurs where the competition

***may*** become active if certain contingencies arise") (emphasis added).  Potential conflicts are not

grounds for disqualification under section 327(c) of the Bankruptcy Code – the statutory language

requires an **actual** conflict.

44.    Here, AREH argues that Griffin has an actual conflict because of its prior

representation of AREH and allegedly Simpson, and the prospective payment of the Firm's fees

from the D&O Policy proceeds. None of these grounds, however, equate to "presently competing

adverse interests" between Griffin and the Debtor's estate or AREH for the reasons discussed

above.[17] Additionally, the existence of conflicts counsel to address any litigation between the

Debtor and AREH more than remedies any actual conflict as the Debtor's restructuring is not the

core of any dispute that AREH purportedly has against the Debtor. *See Ampal.,* 534 B.R. at 578

(recognizing the appropriateness of conflicts counsel for a potential conflict, although noting

conflicts counsel was not required where counsel did not presently hold or represent an interest

adverse to the estate).

## <u>RESERVATION OF RIGHTS AND REQUEST FOR EVIDENTIARY HEARING</u>[18]

45.    The Debtor submits this Reply without prejudice to, and with a full reservation of

its rights, claims, defenses, and remedies, including the right to amend, modify, or supplement, the

---

[17] Even assuming arguendo, that AREH or others may have an interest in the D&O Policy proceeds, such interest does not rise give rise to an actual conflict for Griffin. At best, it would create a potential conflict because the Firm has not received payment from the D&O Policy proceeds and could potentially have its fees in this Chapter 11 Case funded from an alternative source, including debtor-in-possession financing.

[18] Allegations regarding attorney conflicts are matters of serious concern and the parties subject to such allegations should be afforded an opportunity to fully defend against the same. *See* Persaud, 467 B.R. at 30 (Court conducting a nine-day evidentiary hearing on a contested retention application).

Reply raise additional contentions, serve and take discovery in advance of the hearing on the Retention Application, and to introduce evidence at any hearing related to the Retention Application and this Reply, and without waiving or limiting any other rights of the Debtor may have to support the Retention Application.

## CONCLUSION

The Debtor respectfully requests the Court overrule the Oak Objection, enter the Order approving the Retention Application and grant such other and further relief as it may deem just and proper.

Dated:    New York, New York
          April 30, 2024

**GRIFFIN LLP**

By /s/ *Scott A. Griffin*
Scott A. Griffin
Frank L. Eaton
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone:  (646) 998-5580
Facsimile:  (646) 998-8284

-and-

**WIGGIN AND DANA LLP**
Nathan Denning
Andrew C. Ritter (*pro hac vice pending*)
Kate E. Cassidy
437 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 490-1700
Facsimile:  (212) 551-2888

*Proposed Co-Counsel for the Debtor
and Debtor in Possession*

# EXHIBIT A
## (Suppl. Griffin Decl.)

**GRIFFIN LLP**

420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile: (646) 998-8284
Scott A. Griffin
Frank L. Eaton

-and-

**WIGGIN AND DANA LLP**

437 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 490-1700
Facsimile: (212) 551-2888
Nathan Denning
Andrew C. Ritter (*pro hac vice pending*)
Kate E. Cassidy

*Proposed Co-Counsel for the Debtor*
*and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                                              :
In re:                                                        :    Chapter 11
                                                              :    (Subchapter V)
JJ ARCH LLC,                                                  :
                                                              :    Case No. 24-10381 (JPM)
                                                              :
                            Debtor.[1]                        :
                                                              :
-------------------------------------------------------------X

### SUPPLEMENTAL DECLARATION OF SCOTT A. GRIFFIN IN SUPPORT OF THE DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 327(a) AND 329 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014 AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016-1 AUTHORIZING THE DEBTOR TO EMPLOY AND RETAIN GRIFFIN LLP, AS GENERAL BANKRUPTCY COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

---

[1]       The last four digits of the Debtor's federal tax identification number are 4251.

Under 28 U.S.C. § 1746, I, Scott A. Griffin, declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a partner with the law firm Griffin LLP (the "Firm"), which maintains its offices for the practice of law at 420 Lexington Avenue, Suite 400, New York, New York 10170.  I am admitted in, practicing in, and a member in good standing of the bar of the State of New York and the bar of the United States District Court for the Southern District of New York.  I submit this declaration and statement in further support of the Debtor's Application for Entry of an Order Pursuant to Sections 327(a) and 329 of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Debtor to Employ and Retain Griffin LLP, as General Bankruptcy Counsel, *Nunc Pro Tunc* to the Petition Date (the "Application"),[2] filed at Dkt. No. 73 by the Debtor, and in support of the Reply to Arch Real Estate Holdings LLC's ("AREH") Objection to the Application at Dkt. 91 filed simultaneously herewith (the "Reply").

2.      Except as otherwise set forth herein, all statements in this Declaration are based on my personal knowledge of the matters set forth herein.  If I were called upon to testify, I could and would testify competently to the facts set forth in the Application and the Reply.

### Griffin's Prepetition Prior Representation of AREH

3.      On or about October 6, 2023, AREH retained Griffin in conjunction with the potential preparation, commencement and prosecution of a Chapter 11 case for the Arch Companies as part of a comprehensive restructuring for the business. At the time of the AREH engagement and thereafter, Griffin advised Jeffrey Simpson, the Debtor's managing member and (through the Debtor, AREH's then managing member), that it did not represent him personally.

---

[2] Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Application.

4.      On November 8, 2023, Griffin withdrew as counsel for AREH. Oak accepted Griffin's termination of the engagement on the same date. A copy of Oak's acceptance of Griffin's termination of its engagement on behalf of AREH is attached hereto as Exhibit 1. The Firm has not represented AREH in any capacity after it withdrew as counsel on November 8, 2023.

5.      The Firm's representation of AREH commenced on October 6, 2023, and terminated on November 8, 2023 (the "AREH Engagement Period").

6.      During the AREH Engagement Period, Griffin made three appearances on behalf of AREH – twice in the State Court Action and Initial State Court Litigation (as defined below), and once in the Federal Court Action (as defined below) in connection with the Removed Case (as defined below) and related relief.

**Oak's Prepetition Litigation Against AREH, the Debtor and Simpson**

7.      On October 10, 2023, Oak filed an action in the Supreme Court of the State of New York, New York County styled as 608941 *NJ Inc. v. Jeffrey Simpson, JJ Arch LLC, and Arch Real Estate Holdings LLC,* Index No. 654963/2023 before the Hon. Joel Cohen (the "Removed Case"). In conjunction with the Removed Case, Oak filed an order to show cause with a request for a temporary restraining order, which sought, in large part, to deprive AREH of the federal right to seek bankruptcy protection. *See* Removed Case, at NYSCEF Dkt. No. 2.

8.      On October 11, 2023, Oak served Simpson, JJ Arch and AREH with an amended order to show cause in conjunction with the Removed Case.

9.      On October 12, 2023, Griffin, on behalf of AREH, filed a Notice of Removal (the "Removal Action") in the United States District Court for the Southern District of New York (the "Federal Court Action") in response to, *inter ali*a, the injunctive relief requested

by Oak in the Removed Case seeking to prevent AREH from commencing a bankruptcy case. *See* Removed Case at NYSCEF Dkt. No. 31; *see also*, Federal Court Action at Dkt. No. 1.

10.    On October 13, 2023, Oak filed a motion to remand or alternatively for a preliminary injunction and temporary restraining order (the "Oak TRO") styled as 608941 *NJ Inc. v. Jeffrey Simpson, JJ Arch LLC, and Arch Real Estate Holdings LLC*. *See* Federal Court Action at Dkt. No. 3. The Federal Court Action was ultimately assigned to the Hon. Andrew L. Carter.

11.    On October 13, 2023, Judge Carter granted the Oak TRO restraining any bankruptcy filing by AREH *pendente lite. See* Federal Court Action at Dkt. No. 13.

12.    On October 17, 2023, Oak filed an order to show cause seeking the appointment of a temporary receiver for the Debtor in the Supreme Court of the State of New York, New York County, before the Hon. Joel Cohen, in the litigation styled as *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC, and JJ Arch LLC v. Chassen, et al.,* Index No. 158055/2023 (the "Initial State Court Litigation") at NYSCEF Dkt. No. 225. Judge Cohen did not grant Oak's request to appoint a receiver for JJ Arch, but instead entered an interim order outlining measures regarding the parties' conduct of the business operations of AREH and certain of its subsidiaries. *See* Initial State Court Litigation at NYSCEF Dkt. No. 292.

13.    On October 19, 2023, Sam Israel, P.C. (counsel to Simpson and JJ Arch) filed a notice of consent to the Removal Action, on behalf of Simpson and JJ Arch. *See* Federal Court Action at Dkt. No. 17.

14.    On October 28, 2023, Oak dismissed its Federal Court Action after Judge Carter appeared skeptical that Oak could enjoin AREH from seeking bankruptcy protection and

that a bankruptcy court should determine whether AREH had the authority to commence a prospective case, notwithstanding blocking provisions set forth in the AREH Operating Agreement. *See* Federal Court Action at Dkt. No. 29.

15.    On November 3, 2023, Oak again sought the appointment of a receiver for the Debtor in the State Court Action. *See* Initial State Court Litigation at NYSCEF Dkt. No. 296. Rather than appoint a receiver, Judge Cohen granted Oak temporary/interim emergency relief allowing it to serve as the ***acting*** managing member of AREH pending a final order. *See* Initial State Court Litigation at NYSCEF Dkt. No. 321.  Judge Cohen has not entered a final order on the matter.

16.    On the same date it was appointed as AREH's managing member, Oak caused AREH to commence an action against the Debtor and Simpson in the Initial State Court Litigation. *See* Initial State Court Litigation at NYSCEF Dkt. No. 319.

### The D&O Policy

17.    AREH is the "Named Insured" of a claims-made directors and officers' insurance policy (the "D&O Policy") with the Great American Insurance Group ("Great American"), with a policy period that commenced on April 18, 2023 and ended on April 18, 2024 (the "Policy Term"). The D&O Policy contains a sixty (60) day automatic discovery period (the "Discovery Period"), beginning immediately upon expiration of the Policy Term. The Discovery Period ends on June 17, 2024. A copy of the D&O Policy is attached hereto as Exhibit 2.

18.    Simpson, an "Insured Person," under the D&O Policy made a claim (the "Simpson D&O Claim") against the policy on or about November 7, 2023. Great American

agreed to cover costs relating to Simpson's Claim, including, *inter alia*, costs associated with the

Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Dated:      New York, New York
          April 30, 2024

                                 /s/ *Scott A. Griffin*
                                 Scott A. Griffin, Esq.
                                 Partner
                                 Griffin LLP

# EXHIBIT 1
## (Wiener Email)

From: Kevin Wiener <kwiener@35oak.com>
Subject: RE: AREH Legal Representation
Date: November 8, 2023 at 5:49:38 PM EST
To: Scott Griffin <sgriffin@grifflegal.com>
Cc: Michael Wiener <MWiener@35OAK.com>

Hi Scott,

Fully understand your decision.

New counsel is being retained; no need to move to remove yourself from the
record. The change of counsel should be ready tomorrow.

Can you advise whether there's any money left in the retainer that hasn't been
applied to bills? As you're aware the cash situation at AREH is very tight so we'd
appreciate having that refunded as soon as possible.

Thanks,

Kevin


Sent from my Galaxy


-------- Original message --------
From: Scott Griffin <sgriffin@grifflegal.com>
Date: 2023-11-08 5:16 p.m. (GMT-05:00)
To: Kevin Wiener <kwiener@35oak.com>
Cc: Michael Wiener <MWiener@35OAK.com>
Subject: Re: AREH Legal Representation

**EXTERNAL**

[EXTERNAL EMAIL]

Kevin:

Given Judge Cohen's November 3rd Order (including his recent clarification) and
Griffin LLP's representation of Arch Real Estate Holdings LLC ("AREH") in
litigation that has been directly adversarial to 60891 NJ Inc. ("Oak") (AREH's
current "acting managing member"), and the potential for AREH to be adverse to
Oak in the future (in the event of (i) a successful appeal of Judge Cohen's
various interim orders in the litigation under Index No. 158055/2023 (Motion Seq.
No. 0004 and Sequence No. 005) or (ii) a ruling by Judge Cohen adverse to Oak

in that litigation ), I do not believe under the New York Rules of Professional Conduct Griffin LLP can continue its representation of AREH.  I refer you to Rules 1.16(b)(1), 1.6(a) and 1.7(a)(1) of the New York Rules of Professional Conduct.

I am happy to discuss a transition of the engagement (including files of a non-confidential nature) to the counsel of your selection.

Please let me know how you would like to proceed - substitution of counsel or Griffin LLP filing a motion to withdraw.

Best,

Scott


GRIFFIN

Scott A. Griffin I Partner
**Griffin LLP**
420 Lexington Avenue, Suite 400
New York, NY 10170
Office: +1.646.998.5575
Mobile: +1.917.975.4863
Fax:  +1.646.998.5574
sgriffin@grifflegal.com I www.grifflegal.com

On Nov 6, 2023, at 11:23 AM, Kevin Wiener <kwiener@35oak.com> wrote:
Hi Scott,

I haven't heard from you regarding the below.

Given AREH has a court deadline this week I need to know whether you intend to remain as counsel or not and, if so, we need to discuss the response.

If you will be withdrawing I also need to know asap so we can retain new counsel immediately.

Thanks,

Kevin


Sent from my Galaxy

-------- Original message --------
From: Kevin Wiener <kwiener@35oak.com>
Date: 2023-11-03 7:09 p.m. (GMT-05:00)
To: dscharf@morrisoncohen.com, sgriffin@grifflegal.com,
gpollack@morrisoncohen.com, rmastro@kslaw.com, bashin@kslaw.com,
jkrukas@qmlegal.com, rmandel@bbgllp.com, lhaber@agmblaw.com
Cc: Michael Wiener <MWiener@35oak.com>
Subject: AREH Legal Representation

Hello,

I'm reaching out because your firms are currently acting for Arch
Real Estate Holdings LLC ("AREH") or one of its subsidiaries.

We haven't had the chance to meet. I'm Kevin Wiener. Along with
my brother, Mike, we are the principals of 35 Oak Holdings Ltd,
and its wholly-owned subsidiary, 608941 NJ Inc ("Oak").

Pursuant to the attached New York Supreme Court order, Oak
has been appointed as acting managing member of Arch Real
Estate Holdings LLC ("AREH"), and through AREH acts as
manager of all of its subsidiaries. Mike and I will be exercising
management rights over AREH on behalf of Oak.

While I've had the chance to speak with some of you, others I
haven't yet had the pleasure.

For the period of time that AREH is under its new management
structure, I will be spearheading all legal strategy and instructions
on all ongoing legal files. If you are dealing with anyone else at
AREH, please copy me on all correspondence. For greater clarity,
the principals of JJ Arch (Jeffrey Simpson and Jared Chassen) are
no longer acting in a management capacity at AREH and are not
presently authorized to give new legal instructions on behalf of
AREH or a subsidiary. Please reach out to me before sending
them any communications on behalf of AREH or a subsidiary.

I would like to set up a time with someone from each of your firms

next week (ideally Monday if possible) to go over all ongoing legal matters where your firm is retained and the status of those matters. I would appreciate if you could send me a reply advising who at your firm I should primarily deal with to schedule this call (no need to reply all; I don't want to clutter everyone's inboxes with emails from other firms).

Please also let me know if there is any time-sensitive legal work that is being done this week. If at all possible, I would ask none of the firms to incur legal expenses over the weekend until I have a chance to have our call and understand what work is being done. If there is anything particularly time sensitive that needs to be worked on over the weekend, please let me know ASAP.

If any of you ever need to reach out to me directly, my cell number is (416) 618-3615 and I'm very responsive to email.

Thanks, have a great weekend, and I look forward to working with you.

Best regards,

Kevin

<2023-11-03 (321) Simpson v. Chassen - Executed OSC for TRO.pdf>

# EXHIBIT 2

## (D&O Policy)



**GREATAMERICAN**®
**INSURANCE GROUP**

301 E. Fourth Street, Cincinnati, OH 45202

Asset Management Liability Solution
## DECLARATIONS

### THIS IS A CLAIMS MADE POLICY, READ IT CAREFULLY

Insurance is afforded by the company indicated below:  (Each a capital stock corporation)

☒ Great American Insurance Company          ☐ Great American Insurance Company of New York

☐ Other

Note:  The Insurance Company selected above shall herein be referred to as the **Insurer**.

Policy Number: PEPE246619          Policy Form Number:  D18100-F

---

Note:  This is a   claims made policy, please read it carefully.  Amounts incurred as **Costs of Defense** shall  reduce the Limit of Liability available to pay judgments or settlements and shall also be applied against the retention.  This Policy does not provide for any duty by the **Insurer** to defend those insured under the Policy.

---

Item 1.  **Named Insured**:          ARCH REAL ESTATE HOLDINGS, LLC

Mailing Address:          88 UNIVERSITY PLACE, 2ND FLOOR
NEW YORK, NY 10003

Attention:

Item 2.  **Policy Period**:     From:          4/18/2023          To:          4/18/2024
*(Month, Day, Year)*               *(Month, Day, Year)*
(Both dates at 12:01 a.m. Standard Time at the address of the **Corporation** as stated in Item 1)

Item 3.  Limit of Liability (Inclusive of **Costs of Defense**):

$3,000,000          Aggregate Limit of Liability for the **Policy Period**

Item 4.  Retentions:

| | | |
|---|---|---|
| Insuring Agreement A: | Each **Claim**: | $0 |
| Insuring Agreements B: | Each **Claim** other than an **Employment Practices Claim**: | $150,000 |
| | Each **Employment Practices Claim**: | $150,000 |
| Insuring Agreement C: | Each **Claim**: | $0 |

Item 5.  Premium: (Prepaid)          $41,820

Item 6.  Endorsements Attached
D18408NY     D18712 (6)     D18712 (22)     D18712 (50)     D18712NY (15     D18716          DTCOV
IL7324

Item 7.  Prior and Pending Date  12/31/2018

Item 8.  **Discovery Period**
(A)     Additional Premium          $41,820
(B)     Additional Period          365 Days

Item 9.  Notices:  **Notice of Claim or Wrongful Act(s)** shall be addressed to:     All other notice shall be addressed to:
Great American Insurance Companies,     Great American Insurance Companies,
Attn: Claims Department          Executive Liability Division,
1450 American Lane, 8th Floor          P.O. Box 66943
Schaumburg, IL 60173          Chicago, IL 60666

These Declarations, along with the completed and signed Proposal Form and the *Private Equity Liability Insurance Policy*, shall constitute the contract between the **Insured** and the **Insurer**.

**Countersignature
Not Required**

_____          _____
(Authorized Representative)          (Countersignature Date)

---

NOTE:  THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

---

**New York Declarations Page**
**Attachment**

Notice:        Except to such extent as may be provided herein, the coverage provided by this policy is limited to
               liability for only those claims that are first made against the insureds during the Policy Period and
               reported in writing to the Insurer pursuant to the terms herein.  Please read the policy carefully and
               discuss the coverage thereunder with your agent or broker.

Notice:        The Limit of Liability available to pay judgments or settlements may be reduced by amounts incurred
               by the Insured for legal defenses pursuant to Section V.C.



Asset Management
Liability Solution

# AMENDMENT TO DECLARATIONS PAGE

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

It is understood and agreed that Item <u>4.</u> of the Declarations is hereby amended to read as follows::

Item 4.  Retentions:

      Insuring Agreement A:

            Each **Insured Person, Claim**:      $   5,000

            But in no event exceeding:      $   50,000
            for all Insured Persons, each Claim

      Insuring Agreement B:

            Each **Claim** other than an
            **Employment Practices Claim**:      $  150,000

            Each **Employment Practices Claim**:      $  150,000

      Insuring Agreement C:

            Each **Claim**:      $   0

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration      Policy Number:  PEPE246619

Countersigned by:  _____      Endorsement Effective Date:  4/18/2023
        *Authorized Representative*



Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# PRE-CLAIM EXPENSES ENDORSEMENT

It is understood and agreed that the Policy is amended as follows:

1.      Section III.B. is amended by the addition of the following:

If, pursuant to Section VIII.B. of the Policy, notice is provided by an **Insured** and accepted in writing by the **Insurer** ("Noticed Matter"), then, with respect to any covered **Claim** arising out of such Noticed Matter, **Costs of Defense** shall also mean reasonable and customary legal fees, costs and expenses incurred from the date such Noticed Matter is accepted by the **Insurer** until the date such Noticed Matter develops into a covered **Claim** ("Pre-Claim Expenses").  However, this coverage is available only to **Insureds** who:

(i)      are in material compliance with all terms and conditions of the Policy;

(ii)     agree to provide the **Insurer** with the same rights to associate with the **Insureds** as afforded for any **Claim** as set forth in Section VII.B. of the Policy; and

(iii)    obtain the **Insurer's** prior written consent to incur such Pre-Claim Expenses.

2.      For purposes of coverage extended by this endorsement, Section IV.H. is deleted and replaced with the following:

**H.**      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of _12/31/2018_ , or any fact, circumstance or situation underlying or alleged in such proceeding;

3.      For purposes of coverage extended by this endorsement, Section VII.A. is deleted and replaced with the following:

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration          Policy Number:  PEPE246619

Countersigned by: _____          Endorsement Effective Date:   4/18/2023
                    *Authorized Representative*



Asset Management
Liability Solution

## PRE-CLAIM EXPENSES ENDORSEMENT

**A.**     No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed.  The **Insurer** shall not be liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented.  Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

**GREAT**AMERICAN®

**INSURANCE GROUP**

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# COST OF CORRECTIONS WITH SEPARATE RETENTION

It is understood and agreed that the following changes are made to the Policy:

| AMENDMENT TO INSURING AGREEMENT |
|---|

1.      Section I. is amended by the addition of the following:

Subject to the terms and conditions this Policy, the **Insurer** shall reimburse the **Insured** for amounts paid by the **Insured** in connection with a **Claim** for **Costs of Correction** but only if:

(1)      the **Insurer** is notified in writing within fifteen (15) business days of the discovery of the **Trade Error** and such notification is received as soon as practicable from the date during the **Policy Period** that the **Trade Error** occurred but in no event later than thirty (30) days after the expiration date of this Policy;

(2)      such **Trade Error** arose in the ordinary course of the **Insured's** operations and occurred during the **Policy Period**;

(3)      if not corrected, the **Trade Error** would reasonably be the basis for a **Claim** against the **Insureds** for quantifiable **Loss** which would be payable and not otherwise excluded under this Policy;

(4)      the **Insured** reasonably establishes that a **Trade Error** has in fact taken place and that payments constituting **Costs of Correction** were paid and in what amount they were paid.

| AMENDMENT TO DEFINITIONS |
|---|

1.      Solely with respect to coverage afforded under this endorsement, Section III. A. is amended by the addition of the following:

**Claim** means a request by the **Insured** for approval to incur any **Costs of Correction**.

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration                          Policy Number:   PEPE246619

Countersigned by: _____                          Endorsement Effective Date:   4/18/2023
                               *Authorized Representative*

D18712 (22)   (03/18)                                                      Endorsement:        3     Page 1 of 4
2-14176



Asset Management
Liability Solution

# COST OF CORRECTIONS WITH SEPARATE RETENTION

2.      Solely with respect to coverage afforded under this endorsement, Section III. is amended by the addition of the following:

"**Alteration**" means any act done upon an instrument, document or security by which its meaning, legal effect, rights or obligations attendant to it, or interests in it are changed.

"**Costs of Correction**" means any payments made to an **Investment Fund** or **Separately Managed Account** for the benefit of an investor(s) in such **Investment Fund** or **Separately Managed Account** provided such payments were made to avoid or reduce financial loss to such investor(s) resulting from any **Trade Error**.

"**Forgery**" means the signing of another person's name, by either mechanical, electronic or handwritten means, with the intent to deceive.

"**Theft**" means:

(1)     The wrongful taking of money or other property; or

(2)     Dishonest or fraudulent acts committed by or on behalf of an **Insured** acting alone or in collusion with others with the intent (a) to cause a financial loss to an **Insured** or **Insured's** customer, or (b) to obtain a financial benefit for any person or entity.

"**Trade Error**" means any trades performed by an **Insured**: (1) that were incorrectly executed: (a) in the wrong security; (b) on the wrong side of the market; (c) for a quantity different than specified in the instructions; or (d) duplicating a prior execution of the same original order; or (2) where the **Insured** failed to execute a written order that was executable when rendered.

"**Separately Managed Account**" means any **Organization** that is an investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization** for the purpose of making investments pursuant to a written investment mandate or agreement and where the capital of such **Organization** was contributed solely by an unaffiliated investor.

| AMENDMENT TO EXCLUSIONS |
|---|

Solely with respect to coverage afforded under this endorsement, Section IV. is amended by the addition of the following:

based upon, arising from, or in any way related to diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value, unless such diminution in value or damages are established to have been caused by a **Trade Error**;



Asset Management
Liability Solution

# COST OF CORRECTIONS WITH SEPARATE RETENTION

for any contractual obligation to a customer or client of the **Insured** guaranteeing any rate of return or the fulfillment of any minimum performance standards;

for any act committed within the scope of any **Insured's** discretionary authority for which the **Insured** would not be held legally liable;

for which no coverage would have been afforded under the Policy had the **Trade Error** resulted in a **Claim**;

for any **Trade Error** of which the **Insured** had knowledge or information prior to the inception date of this Policy or the first policy in an uninterrupted series of policies issued by the **Insurer**, or any insurance company controlling, controlled by, or under common control with the **Insurer**, of which this policy is a direct or indirect renewal or replacement;

based upon, arising from, or in any way related to wire or electronic transfer of funds not directly related to an order or trade;

based upon, arising from, or in any way related to unauthorized access, use or operation of the **Insured's** computer or other electronic systems;

based upon, arising from, or in any way related to loss of physical possession of money, securities or other property in the care, custody or control of the **Insured**; or

based upon, arising from, or in any way related to **Theft**, **Forgery** or **Alteration**.

| AMENDMENT TO DECLARATIONS |
| --- |

1.    Solely for the purposes of any **Claim** for **Costs of Correction** to which this endorsement may in whole or in part apply, Item 3. of the Declarations is amended to read as follows:

$ ___3,000,000___ in the aggregate each **Policy Period**, including **Costs of Defense**

The extension of coverage afforded by this endorsement shall in no way serve to increase the **Insurer's** maximum aggregate Limit of Liability as shown under Item 3. of the Declarations. Such Limit of Liability is part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations.



Asset Management
Liability Solution

## COST OF CORRECTIONS WITH SEPARATE RETENTION

2.    Solely for the purposes of any **Claim** to which this endorsement may in whole or in part apply Item 4. of the Declarations is amended to read as follows:

Each **Claim** for **Costs of Correction**:    $ _____ 500,000 _____

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## EXCESS ADDITIONAL LIMIT OF LIABILITY
## FOR CHIEF COMPLIANCE OFFICER

Solely with respect to **Claims** by any **Regulatory Authority** against a **Chief Compliance Officer** for a **Regulatory Violation**, it is understood and agreed that the Policy is amended as follows:

1.      Section III.is amended by the addition of the following:

   "**Chief Compliance Officer**" means any **Insured Person** appointed pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940, Rule 38a-1 of the Investment Company Act of 1940 and/or Section 4s(k) of the Commodities Exchange Act as the chief compliance officer of the **Insured Entity**, or the functional equivalent to the foregoing in any foreign jurisdiction.

   "**Regulatory Authority**" means:

   (1)      any federal, state, local or foreign law enforcement authority or other governmental Investigation authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general); or

   (2)      the enforcement unit of any securities or commodities exchange or other **Self-Regulatory Organization**.

   "**Regulatory Violation**" means an actual or alleged violation of:

   (1)      the Investment Advisor Act of 1940;

   (2)      the Investment Company Act of 1940; or

   (3)      the Securities Act of 1933 or the Securities Exchange Act of 1934;

   regarding the adoption and implementation of written policies and procedures to prevent violation of law pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940, Rule 38a-1 of the Investment Company Act of 1940 and/or Section 4s(k) of the Commodities Exchange Act, or any similar law, including, without limitation, any equivalent law in any foreign jurisdiction.

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration                    Policy Number:  PEPE246619

Countersigned by: _____                    Endorsement Effective Date:  4/18/2023
                *Authorized Representative*



Asset Management
Liability Solution

## EXCESS ADDITIONAL LIMIT OF LIABILITY
## FOR CHIEF COMPLIANCE OFFICER

2.　　Section III.Y. is amended by the addition of the following:

With respect to a **Chief Compliance Officer**, a **Wrongful Act** shall also include a **Regulatory Violation**.

3.　　Section V.C. is amended by the addition of the following:

provided, however:

(1)　　An Additional Limit of Liability in an amount not to exceed $ __150,000__ is available solely for **Loss** resulting from any **Claim** made against **Chief Compliance Officer** and which is otherwise covered under Insuring Agreement I.A. This Additional Limit of Liability is in addition to and not part of the Limit of Liability set forth in Item 3. of the Declarations.

(2)　　This Additional Limit of Liability shall be excess of any insurance available that is specifically excess of this Policy. Such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment under this Additional Limit of Liability.

(3)　　Any **Loss** covered under Insuring Agreement I.A. shall first be paid under the Limit of Liability set forth in Item 3. of the Declarations, and only when such Limit of Liability is completely exhausted by payment of **Loss** under any Insuring Agreements shall **Loss** be paid under this Additional Limit of Liability.

4.　　Section VI. is amended by the addition of the following:

Any **Claims** subject to this additional Limit of Liability shall not be shall not be subject to any Retention.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# RT ELITE REAL ESTATE ENDORSEMENT

It is understood and agreed that the following changes are made to the Policy:

**Amendment to Insuring Agreements**

Section I. is deleted and replaced with the following:

**Section I.  Insuring Agreements**

A.    Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

B.    The **Insurer** will pay on behalf of the **Insured Organization**:

(1)    **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

(2)    **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim**;

provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

C.    Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**;

D.    The **Insurer** shall pay on behalf of the **Insured Organization** all **Investigative Costs** resulting from any **Shareholder Derivative Demand** first made during the **Policy Period** or the **Discovery Period** for any actual or alleged **Wrongful Act** of an **Insured Person**.

**Amendment to Declarations**

Item 3. of the Declarations is amended by the addition of the following:

$ 3,000,000    Aggregate   Sub-Limit of Liability for **Investigative Costs** for any **Shareholder Derivative Demand** for the **Policy Period.**  This sub-limit is part of and not in addition to the Limit of Liability stated in Item 3.(a).

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration                 Policy Number:  PEPE246619

Countersigned by: _____         Endorsement Effective Date:   4/18/2023
*Authorized Representative*



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

| Amendment to Discovery Period |
|---|

Section II.B. is deleted and replaced with the following:

**B.**      As a condition precedent to the right to purchase the **Discovery Period**, the total premium for this Policy must have been paid, and a written request together with payment of the appropriate premium for the **Discovery Period** must be provided to the **Insurer** no later than sixty (60) days after the **Termination of Coverage**.

| Amendment to Definitions |
|---|

1.      Section III. is amended by adding the following:

"**Business Practices Wrongful Act**" shall mean any actual or alleged act of discrimination, sexual harassment or the violation of any individual's civil rights related to such discrimination or sexual harassment.

"**Controlling Person**" shall have the same meaning as set forth in Section 15 of the Securities Act of 1933 or Section 20 (a) of the Securities Exchange Act of 1934, as amended, or under the common law or under any other applicable statute, rule, regulation or law or any foreign equivalent thereof.

"**Extradition**" shall mean any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States of America or any of its territories or possessions.

"**Insured Capacity**" shall mean the position or capacity of an **Insured Person** that causes him or her to meet the definition of **Insured Person** under the Policy, but does not include any position or capacity held by such **Insured Person** in any entity other than the **Insured Organization** or **Portfolio Company**, even if directed or requested by the **Insured Organization**.

"**Investigative Costs**" shall mean reasonable and necessary costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the **Directors, Officers,** or employees of the **Insured Organization**) incurred by the **Insured Organization** (including its Board of Directors or similar management body or any committee thereof) in connection with the investigation or evaluation of any **Shareholder Derivative Demand**.

"**Investigation**" shall mean any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local, foreign or offshore government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after receipt or service of a formal order of investigation or matter under inquiry, subpoena, grand-jury subpoena, receipt of a Wells Notice, receipt of a target letter (within the meaning of Title 9-11.151 of the United States Attorney's Manual), civil investigative demand, search warrant or similar document; provided, however, that the foregoing shall not include a routine examination, inspection, or industry sweep of a type periodically conducted by any administrative or regulatory authority that appears to be unrelated to any **Wrongful Act** of an **Insured**.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

"**Inquiry**" means:

(1)      a request or demand for an **Insured Person** either to appear at a meeting, deposition or interview or to produce documents relating to the business of the **Insured Organization** or such **Insured Person's** capacity with the **Insured Organization**, where such request or demand is:

         (a)      by any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including but not limited to the U.S. Securities and Exchange Commission, U.S. Department of Justice or any attorney general);

         (b)      by the enforcement organization of any securities or commodities exchange or other self-regulatory entity;

         (c)      by or on behalf of the **Insured Organization**, the **Insured Organization's** Board of Directors (or similar management body) or a committee thereof: (i) arising out of a request or demand set forth in subparagraphs (a) or (b) above; or (ii) which is part of the **Insured Organization's** investigation and evaluation of a **Shareholder Derivative Demand**; or

(2)      the arrest or confinement of an **Insured Person**, whether residential or custodial, by a law enforcement authority, relating to the business of the **Insured Organization** or the **Insured Person's** capacity with the **Insured Organization**.

**Inquiry** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in the normal review or compliance process of the **Insured Organization** by a law enforcement authority, governmental investigative authority or enforcement organization of a securities or commodities exchange or other self-regulatory entity.

Coverage, subject to all other terms and conditions of the Policy, will be extended for an **Inquiry** whether or not a **Wrongful Act** is alleged.

"**Pollutants**" shall mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, asbestos, chemicals or waste of any kind, including any materials to be recycled, reconditioned or reclaimed.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

"**Securities Claim**" shall mean any **Claim** (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an **Insured** alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1)    brought by any person or entity alleging, arising out of , based upon or attributable to, in part or in whole, the: (a) purchase or sale of, or (b) offer or solicitation of an offer to purchase or sell, any securities of an **Insured Organization** or **Portfolio Company**; or

(2)    brought by a security holder of an **Insured Organization** or **Portfolio Company**, arising solely with respect to such security holder's interest in such securities of the **Insured Organization** or **Portfolio Company**, whether directly, by class action, or derivatively on behalf of the **Insured Organization** or **Portfolio Company**.

"**Shareholder Derivative Demand**" shall mean a written demand by one or more shareholders of the **Insured Organization**, upon the Board of Directors (or similar management body or any committee thereof) of the **Insured Organization** to initiate a civil proceeding in a court of law against any individual **Insured Person**.

"**SOX 304/Dodd-Frank 954 Costs**" shall mean the reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond) consented to by the **Insurer** and incurred by any **Insured Person** solely to facilitate the return of amounts required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; provided, however, **SOX 304/Dodd-Frank 954 Costs** shall not include any payment, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

"**Third Party Claim**" shall mean any **Claim** brought by a customer, client, supplier, distributor, or independent contractor of the **Insured Organization**, or any other individual or group of individuals for any **Business Practices Wrongful Act**.

"**Whistleblower Conduct**" shall mean any of the activity set forth in 18 U.S.C. 1514A (a), engaged in by a whistleblower with any federal regulatory or law enforcement agency, member of the Congress or any committee of the Congress, or persons with supervisory authority over the employee, or an enforcement action by the whistleblower set forth in 18 U.S.C. 1514A (b) or any similar 'whistleblower' protection provision of any applicable federal, state, local or foreign securities law.

2.    Section III.A. is deleted and replaced with the following:

**A.**    "**Claim**" means:

(1)    A written demand, other than a **Shareholder Derivative Demand**, for monetary, non-monetary or injunctive relief against an **Insured** commenced by such **Insured's** receipt of such demand;



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2)    an administrative, regulatory, arbitration, or other alternative dispute resolution proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, mediation or other alternative dispute resolution proceeding, notice of charges, formal investigative order or similar document, including the foreign equivalent thereof;

(3)    a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading, or information or similar document including the foreign equivalent thereof;

(4)    a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

(5)    any **Investigation**;

(6)    an **Employment Practices Claim**;

(7)    a **Third Party Claim**;

(8)    any **Securities Claim**; or

(9)    an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

(10)    an **Inquiry**, if reported to the **Insurer** pursuant to Section VIII. of the Policy.

3.    Section III.B. is deleted and replaced with the following:

**B.**    "**Costs of Defense**" means reasonable legal fees, costs and expenses (including but not limited to attorneys, experts, consultants, mediator and arbitrator fees, costs and expenses, document production fees and expenses) incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

Solely with respect to any **Extradition**, **Costs of Defense** shall also mean reasonable fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

(a)    opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

(b)    appealing any order or other grant of **Extradition** of that **Insured Person**.



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

If, pursuant to Section VIII.B. of the Policy, notice is provided by an **Insured** and accepted in writing by the **Insurer** ("Noticed Matter"), then, with respect to any covered **Claim** arising out of such Noticed Matter, **Costs of Defense** shall also mean reasonable and customary legal fees, costs and expenses incurred from the date such Noticed Matter is accepted by the **Insurer** until the date such Noticed Matter develops into a covered **Claim** ("Pre-Claim Expenses"). However, this coverage is available only to **Insureds** who:

(1)      are in material compliance with all terms and conditions of the Policy;

(2)      agree to provide the **Insurer** with the same rights to associate with the **Insureds** as afforded for any **Claim** as set forth in Section VII.B. of the Policy; and

(3)      obtain the **Insurer's** prior written consent to incur such Pre-Claim Expenses, such consent to not be unreasonably withheld.

4.      Section III.D. is deleted and replaced with the following:

      **D.**      "**Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

5.      Section III.E. is amended by the addition of the following:

(13)      wrongful demotion;

(14)      negligent reassignment;

(15)      violation of any federal, state or local civil rights laws;

(16)      negligent hiring;

(17)      negligent supervision;

(18)      negligent training;

(19)      negligent retention; or

(20)      acts described in (1) through (19) above, arising from the use of the **Insured Organization's** internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to such use of the **Insured Organization's** internet, e-mail, telecommunication or similar systems.

(21)      with respect to any of the foregoing items (1) through (19) of this definition: infliction of emotional distress and failure to provide or enforce adequate or consistent corporate policies.

6.      Section III.F. is deleted and replaced with the following:

      **F.**      "**Executive Officer**" means the functional equivalent of a chief financial officer or in-house general counsel, regardless of the actual title or position.

**GREATAMERICAN**®
**INSURANCE GROUP**

Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

7.    Section III.J. is deleted and replaced with the following:

**J.    "Insured Person(s)"** means:

(1)    any natural person who was, is or shall become a director, officer, general partner, manager, managing member, member of the board of managers, management committee member, equivalent executive or employee (including any part-time, seasonal, temporary or leased employees) of an **Insured Organization**;

(2)    any natural person who was, is or shall serve in equivalent positions to those noted in subsection (1) above in a foreign-domiciled **Insured Organization**;

(3)    any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or other committee of an **Investment Fund**; or

(4)    any natural person other than a director, officer, general partner, manager, equivalent executive or employee; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)**.

8.    Section III.M. is deleted and replaced with the following:

**M.    "Investment Fund"** means:

(1)    any **Organization** that is a pooled investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization**; and

(2)    any **Organization** which is created or established prior to or during the **Policy Period** for the purpose of monitoring, liquidating, dissolving or winding down an **Organization** identified in subsection (1) above or for the purpose of holding investments in connection with monitoring, liquidating, dissolving or winding down such an **Organization** identified in subsection (1) above.

9.    Section III.N. is deleted and replaced with the following:

**N.    "Loss"** means compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, **SOX 304/Dodd-Frank 954 Costs**, **Investigative Costs**, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense.**

**Loss** shall also include any reasonable fees and expenses of any attorney representing any party who has brought a **Claim** against any **Insured** where such fees and expenses are awarded pursuant to a covered judgment against an **Insured** or a covered settlement (consented to by the **Insurer**, which consent shall not be unreasonably withheld, delayed or denied) to which an **Insured** is a party.

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

**Loss**, other than **Costs of Defense**, shall not include:

((1)     taxes, criminal or civil fines or penalties imposed by law;

(2)     amounts which may be deemed uninsurable under the law pursuant to which this Policy is construed;

(3)     non-monetary relief;

(4)     employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay;

(5)     any portion of damages, settlements or judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities but solely with respect to coverage provided under Insuring Agreement I. B. (2) and solely to the extent such portion of damages, settlements or judgments, or settlements constitute an increase in consideration paid to the underlying claimant

(6)     costs incurred in connection with cleaning up, removing, eliminating, abating, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**;

For clarification, this subsection (1), shall not in itself exclude from the definition of **Loss** any damages, settlements or judgments incurred by an **Insured** that are calculated based upon, or that flow directly from, any taxes, fines or penalties imposed upon a client where such taxes, fines or penalties result from a **Wrongful Act** of an **Insured**.

Notwithstanding sub-paragraph (2) above, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the **Insurer** shall not assert the portion of any amounts incurred by any **Insureds** attributable to such violations constitutes uninsurable loss and shall treat that portion of all settlements, judgments and **Costs of Defense** as constituting **Loss** under the Policy.

Further, notwithstanding subparagraphs (1) and (2) above and solely with respect to coverage provided by Insuring Agreement I.A., "**Loss**" shall also mean civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B).

10.     Section III.Q. is deleted and replaced with the following:

Q.     "**Operating Entity**" means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insureds** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1)     ownership of greater than 50% voting securities in such **Organization**;

**GREATAMERICAN.** ®
**INSURANCE GROUP**

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2)     right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3)     rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall include any entity (including, but not limited to, any holding company, special purpose vehicle or other acquisition vehicle) formed to hold a direct or indirect interest in a **Portfolio Company**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

11.    Section III.R. is deleted and replaced with the following:

**R.**    "**Organization**" means any corporation, trust (including any grantor trust), limited liability company, limited liability partnership, limited partnership, general partnership or joint venture. **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust (including any grantor trust), limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

12.    Section III.S. is deleted and replaced with the following:

**S.**    "**Outside Position**" means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board, shareholder representative or other equivalent executive or management position in any:

(1)     **Portfolio Company**;

(2)     **Non-Profit Entity**; or

(3)     other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

**Outside Position** shall also include service by an **Insured Person** in any other capacity with a **Portfolio Company** other than the capacities listed above, provided such service entitles the **Insured Person** to the same rights of indemnification and advancement afforded individuals in the capacities listed above.

13.    Section III.U. is deleted and replaced with the following:

**U.**    "**Portfolio Company**" means any entity, including without limitation any pooled investment vehicle sponsored, established and managed by an unaffiliated entity, in which an **Investment Fund** directly or indirectly maintains, maintained or may maintain a debt, equity or other investment interest and any direct or indirect majority-owned subsidiaries of such entity(ies).



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

14.    Section III.V. is deleted and replaced with the following:

**V.**    **"Professional Services"** means:

(1)    any financial, economic, investment advice, investment management, advisory, asset allocation services, portfolio management, or any other management services (including the hiring and supervision of third party vendors), administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2)    the formation, creation, distribution or sale of securities in, or the management, administration or investment decision or potential investment decision (including but not limited to any decisions based upon an **Insured's** due diligence of, investment in, or disposition of any **Portfolio Company**) of any **Investment Fund**;

(3)    any advisory, management, administrative or other services performed by an **Insured** for or on behalf of any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, purchase or sale of assets, merger or acquisitions, stock issuance, contemplated financing or capitalization, internal controls, legal or regulatory compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters;

(4)    identification of property and arranging of financing for, the purchase or sale of, or investment in, real properties or any potential properties on behalf of an **Insured Organization**;

(5)    legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**; or

(6)    the publication of written material, whether in tangible or electronic format, in connection with any of the activities identified in (1) through (5) above;

**Professional Services** also means the direction of, control of, management of or influence over a **Portfolio Company**, directly or indirectly, by an **Insured** in his, her or its capacity as a **Controlling Person** of such **Portfolio Company**, including, without limitation, the exercising of actual or alleged control over funding or management of, being a fiduciary of, or controlling, any pension, employee benefit or welfare plan established by a **Portfolio Company** and regulated by ERISA or any regulation promulgated thereunder or any similar, federal, state or local law or regulation.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

**Professional Services** shall also mean:

(1)     an agreement or refusal to grant or extend any loan, lease or extension of credit or the granting or extension of any loan, lease or extension of credit (including but not limited to the administration of any loan, lease or extension of credit);

(2)     declaring an event of default, accelerating any loan, lease or extension of credit or foreclosing on any collateral or asset or pursuing any of these remedies (including but not limited to any debt collection activities, taking possession of or assignment of, or the subordination of any collateral or asset), with respect to any loan, lease or extension of credit;

(3)     the termination, cancellation, acceleration, withdrawal or failure to advance funds in connection with any loan, lease or extension of credit or the releasing of or failure to release any information in connection with any loan, lease or extension of credit;

(4)     the imposition of financial, business or management controls or requirements upon any customer of an **Insured** to whom any loan, lease or extension of credit has been granted;

(5)     servicing, monitoring and administration of any loan, lease or extension of credit including (including but not limited to, the selection and oversight of a third party that performs such services pursuant to a written contract or agreement, record keeping, billing or disbursement of principal or interest, receipt or payment of insurance premiums or taxes, credit reporting or amount of property value, restructuring, monitoring and maintaining the attachment and perfection of security interests and other functions relating to collateral, and the termination, transfer, repossession, or foreclosure of the subject loans and related collateral); or

(6)     due diligence services performed in any of the foregoing.

15.    Section III.Z. is deleted and replaced with the following:

**Z.**    "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act**, any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1)     by the **Insured Persons** in their capacity as such or solely because of their status as such;

(2)     with respect to Insuring Agreement (B)(2), by the **Insured Organization**;

**GREAT AMERICAN®**
**INSURANCE GROUP**

Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

(3)     with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**;

(4)     by an **Insured** solely by reason of their status as a **Controlling Person** or as a selling shareholder; or

(5)     With respect to (1) and (2) above, **Wrongful Act** shall also include any **Business Practices Wrongful Act**.

| Amendments to Exclusions |
|---|

1.     Section IV.A. is deleted and replaced with the following:

**A.**     for any actual or alleged:

(1)     bodily injury, sickness, disease, or death of any person;

(2)     damage to or destruction of any tangible property, including the loss of use thereof; or

(3)     mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any:

(a)     **Employment Practices Claim**; or

(b)     **Third Party Claim**;

provided, however, that this exclusion shall not apply to any **Securities Claim** or to any **Claim** arising from the performance of or failure to perform **Professional Services**;

2.     Section IV.C. is deleted and replaced with the following:

**C.**     by or on behalf of an **Insured Organization** provided, however, this exclusion shall not apply to any **Claim** against any **Insured Person** if such **Claim**:

(1)     is brought solely and entirely in a jurisdiction other than the United States of America, its territories and possessions;

(2)     is in the event of **Financial Insolvency**;

(3)     is brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

(4)     is against any **Insured Person** who is no longer acting in an **Insured Capacity**; or



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(5)      is brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**;

For the purposes of Section IV.C.(3), where one or more security holders allege, certify or affirm there is likely support for their **Claim** by referring to any of the following actions taken by an **Insured Person**, such allegations, certification or affirmation shall not, in itself, demonstrate such security holder is not "acting totally independent of, and without solicitation, assistance, active participation or intervention of any **Insured**":

(a)      providing information to, causing information to be provided to, or otherwise assisting in an investigation conducted by a federal regulatory agency, a federal law enforcement agency, or any member or committee of the United States Congress regarding the possible violation by an **Insured** of the laws, rules, and regulations listed in 18 U.S.C. 1514A(a)(2);

(b)      filing, causing to be filed, testifying, participating in, or otherwise assisting in a proceeding relating to the possible violation by an Insured of law, rules, or regulations listed in 18 U.S.C. 1514A(a)(2);

(c)      filing a complaint with the United States Secretary of Labor, as authorized by 18 U.S.C. 1514A(b)(1)(A); or

(d)      a bringing an action at law or equity to the extent that such action seeks relief pursuant to 18 U.S.C. 1514A(b)(1)(B).

3.      Section IV.D. is deleted and replaced with the following:

**D.**      brought about or contributed to by:

(1)      any **Insureds** gaining any personal profit, financial advantage or remuneration to which they were not legally entitled; or

(2)      the deliberately fraudulent or deliberately criminal acts of any **Insureds**;

provided, however: (a) this exclusion shall only apply if it is established by any final, non-appealable adjudication in the underlying proceeding that such conduct in fact occurred, provided, further, that this exclusion shall not apply to any **Costs of Defense** occurring prior to such final non-appealable adjudication; (b) this exclusion shall not apply to coverage provided under Insuring Agreement I.B.(1); and (c) with respect to subsection (2) above, for acts or omissions which are considered a criminal violation in a **Foreign Jurisdiction** that are not considered a criminal violation in the United States of America, the imposition of a criminal fine or criminal sanction in such **Foreign Jurisdiction** will not trigger this exclusion.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

4.      Section IV.E. is deleted in its entirety.

5.      Section IV.G. is deleted and replaced with the following:

**G.**      for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization**; provided, however, solely with respect to an **Employment Practices Claim**, this Exclusion **G.** shall not apply to any **Claim** based upon, arising out of, relating to, or directly or indirectly resulting from any actual or alleged retaliation including but not limited to any **Claim** for an actual or alleged violation of Section 510 of the Employee Retirement Income Security Act (ERISA).

6.      Section IV.H. is deleted and replaced with the following:

**H.**      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding against any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

7.      Section IV.J. is deleted and replaced with the following:

**J.**      solely with respect to the **Insured Organization**, for any actual or alleged breach of a written contract or agreement; provided, however, this exclusion shall not apply to:

(1)      liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2)      any actual or alleged breach of any contract describing or calling for **Professional Services**;

(3)      any indemnification obligation between an **Insured Organization** and an **Insured Person**;

(4)      any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture, limited partnership agreement, operating agreement, or similar organizational or constituting document; or

(5)      **Costs of Defense**;

8.      Section IV.L. is deleted in its entirety.

9.      Section IV.M. is deleted and replaced with the following:

**M.**      for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or Fair Labor Standards Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

10.      The last paragraph of Section IV. is deleted and replaced with the following:

Note:      It is agreed that the acts of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the above stated exclusions.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

| Amendments to Retention |
| --- |

Section VI. is amended by the addition of the following:

**D.**    With respect to a **Claim** against an **Insured Person** for a **Wrongful Act** while serving in an **Outside Position**, no Retention shall apply to such **Claim**.

**E.**    Coverage for **Investigative Costs** shall not be subject to any Retention;

| Amendments to Costs of Defense and Settlements |
| --- |

Section VII. A. of the Policy is deleted and replaced with the following:

**A.**    No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed. The **Insurer** shall not be liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

| Amendment to Notice of Claim |
| --- |

Section VIII. A. of the Policy is deleted and replaced with the following:

**A.**

(1)    The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim**, other than an **Inquiry,** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable; or

(2)    If, during the **Policy Period**, the **Insureds** first become aware of an **Inquiry**, and if the **Insureds** give written notice to the **Insurer** as soon as practicable from the date the Chief Financial Officer or General Counsel first becomes aware of the **Inquiry**, but in no event later than ninety (90) days after the end of the **Policy Period** of:

(i) the entity conducting the **Inquiry**;

(ii) the circumstances by which the **Insureds** first became aware of the **Inquiry**; and

(iii) the particulars as to dates and persons involved;

then the **Inquiry** shall be treated as a **Claim** under this Policy and the reasonable and necessary costs, charges, fees and expenses incurred by an **Insured Person** solely in connection with his or her preparation for and response to the **Inquiry** shall be covered, subject to all terms, conditions and limitations of this Policy. Any other **Claim** which arises out of such **Inquiry** shall be deemed to have been first made at the time such written notice of the **Inquiry** was received by the **Insurer**. However, if the **Insureds** elect not to report an **Inquiry**, then any subsequent **Claim** which arises out of the **Inquiry** shall be subject to the reporting requirements set forth in subparagraph A. (1) above, and coverage for such subsequent **Claim** will not be denied because of the **Insureds'** failure to report the **Inquiry** pursuant to this section of the Policy.

**GREATAMERICAN®**
**INSURANCE GROUP**

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

| Addition to General Conditions |
|---|

Section IX. is amended by the addition of the following:

**Supplemental Coverage for UK Corporate Manslaughter Act Investigation Costs**

The **Insurer** shall, subject to prior written consent, pay on behalf of or reimburse an **Insured Person** for reasonable costs and expenses that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against the **Insured Organization** for any actual or alleged violations of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction, provided, however, such costs and expenses shall not include any salary, wages, overhead or benefit expenses associated with such **Insured Person**. Any payment pursuant to this supplemental coverage shall be considered **Loss** for purposes of the exhaustion of the Limit of Liability and shall be subject to the Retention applicable to " each **Claim** other than an **Employment Practices Claim**" as stated for Insuring Agreement B in Item 4. of the Declarations. In the event the **Insured Person** is not indemnified by the **Insured Organization** for any reason, the **Insurer** shall advance payment hereunder without requiring payment of the Retention.

**Other Insurance Provisions**

This Policy shall apply only as excess over, and shall not contribute with, any other valid and collectible policy or policies (except with respect to: (1) any excess beyond the amount or amounts of coverage under such other policy or policies; and (2) any personal umbrella liability policy, independent directors' liability or other personal liability policy providing coverage to **Insured Persons** and only to the extent coverage is otherwise provided to such **Insured Persons** under this Policy whether such other policy or policies are stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is specifically written as excess insurance over the Limit of Liability provided by this Policy.

Notwithstanding the foregoing, such insurance as is provided by this Policy shall apply as primary to any contractual right of indemnification that an **Insured Organization** has from any **Portfolio Company**, **Non-Profit Entity**, or any other entity in which an **Insured Person** serves in an **Outside Position** (collectively, "**Outside Entity**").

In the event of a **Claim** covered under Insuring Agreement I.C. that is made against an **Insured Person** for a **Wrongful Act**, coverage provided under this Policy shall be specifically excess of: (a) any indemnification provided by an **Outside Entity**; and (b) any valid and collectible insurance coverage afforded to an **Outside Entity** or its executives applicable to such **Claim**. Notwithstanding the foregoing sentence, and without prejudice to the Insurer's excess position, if:

(a)     for any reason (including but not limited to **Financial Insolvency**) an **Outside Entity** fails or refuses to advance, pay or indemnify **Loss** from a **Claim** made against an **Insured Person**; or

(b)     **Loss** from such **Claim** is not actually paid to, or on behalf of, the **Insured Person** by insurance afforded to an **Outside Entity** or its executives;

then this Policy will respond as if it were primary with no Retention being applicable, but subject to all its other terms, conditions and limitations including the **Insurer's** subrogation rights under Section IX.J.

Advancement, payment or indemnification of an **Insured Person** by an **Outside Entity** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Outside Entity** within sixty (60) days of such request; and advancement, payment or indemnification by an **Outside Entity** is deemed "refused" if such **Outside Entity** gives a written notice of the refusal to the **Insured Person**.



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

### Amendments to General Conditions

1. Section IX.D.(1) is deleted and replaced with the following:

    (1) This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**. In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, Standard & Poor's or Moody's, the **Insurer** shall retain the customary short rate premium. However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-] by A.M. Best or [BBB] by Standard & Poor's Ratings Services, the **Insurer** shall refund any unearned premium on a pro rata basis. Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

2. Section IX.G. is deleted and replaced with the following:

    **G. Merger or Acquisition**

    If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed fifty percent (50%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request. Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

3. Section IX.H.(3) is deleted and replaced with the following:

    (3) Sale of **Portfolio Company**

    If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** to such **Portfolio Company** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

    An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

4. Sections IX.I.(2) and IX.I.(3) are deleted and replaced with the following:

    (2) Worldwide Provision

    The coverage provided under this Policy shall apply worldwide.

    (3) Estates and Legal Representatives

    The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives assigns, or any trust (including but not limited to any grantor trust, irrevocable trust, revocable trust, bypass trust, GST trust, marital trust) or any entity (including but not limited to any corporation, partnership, limited liability company) used for estate planning purposes or any other estate planning or wealth management devices, maintained by or for the benefit of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of such **Insured Persons**.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

| Amendment to Subrogation |
|---|

Section IX.J. is deleted and replaced with the following:

**J.      Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all the **Insureds'** rights of recovery.  The **Insured Organization** and **Insured Persons** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.  In no event, however, shall the **Insurer** exercise its rights to subrogation against an **Insured Person** under this Policy unless, such **Insured Person**:

(1)      has been convicted of a deliberate criminal act; or

(2)      has been determined by a final adjudication adverse to the **Insured Person** to have committed a deliberate fraudulent act, or to have obtained any personal profit, financial advantage or remuneration to which such **Insured Person** was not legally entitled.

In the event the **Insurer** shall for any reason pay indemnifiable **Loss** on behalf of an **Insured Person**, the **Insurer** shall have the contractual right hereunder to recover from the **Insured Organization** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Insured Organization** and shall be subrogated to rights of the **Insured Persons** hereunder.

| Amendment to Representations and Severability |
|---|

Section IX.Q. is deleted and replaced with the following:

**Q.      Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy. It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations. In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy:

(1)      There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. For purposes of this paragraph (2), knowledge of any Insured shall not be imputed to any other **Insured Person**;

(3)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**; for purposes of this paragraph (3), knowledge of any **Insured** other than an **Executive Officer** of the **Named Insured** shall not be imputed to any **Insured Organization**;

(4)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

(5)     The **Policy** shall not be rescinded by the **Insurer**.

| Amendment to Insured Capacity |
|---|

It is understood and agreed that the **Insurer** shall not be liable to make any payment for that portion of **Loss** for any **Claim** made against an **Insured Organization** for the rendering or failure to render services in its capacity as a(n):

(1)     Property Manager;
(2)     General Contractor;
(3)     Real Estate Developer;
(4)     Architect or Engineer;
(5)     Insurance Broker or Agent;
(6)     Real Estate Broker or Agent;
(7)     Securities Broker or Dealer (provided, however, subpart (7) of this exclusion shall not apply to transactions sponsored by the **Insured Organization**);

Notwithstanding the foregoing, this exclusion shall not apply to any **Employment Practices Claim** or any **Claim** brought by a security holder of an **Investment Fund** relating to the diminution of value of real property owned by an **Investment Fund** as a result of an **Insured Organization's** negligent rendering or failing to render professional services in any of the above scheduled capacities.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

**GREAT AMERICAN**® 
**INSURANCE GROUP**

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## MOCK REGULATORY COMPLIANCE EXAMINATION
## RENEWAL PREMIUM CREDIT

If, during the **Policy Period**, the **Insured** undergoes a mock regulatory compliance examination conducted by a qualified consulting firm, then the **Insurer** will offer a premium credit toward the renewal of this Policy. The premium credit may be up to: (1) fifty percent (50%) of the cost of such examination; or (2) ten percent (10%) of the annualized premium for such renewal; whichever is less. However, in no event shall the premium credit exceed $25,000. The **Insured** will be not be eligible for another premium credit attributable to any future mock regulatory compliance examination until the **Policy Period** following the expiration of the second renewal of this Policy.

Notwithstanding the foregoing, the premium credit is subject to the following conditions:

(1)     any such examination shall not be conducted without the prior written consent of the **Insurer** (such consent not to be unreasonably withheld); and

(2)     receipt and review of a copy of the consultant's statement for such work and letter of findings and recommendations or similar documents.

This endorsement should not be construed to guarantee an offer to renew coverage with the **Insurer**.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration                 Policy Number:   PEPE246619

Countersigned by:  _____                 Endorsement Effective Date:   4/18/2023
                                         *Authorized Representative*

D 18716        (10/16)                                         Endorsement:   6                 Page 1 of 1
2-14176

**GREAT**AMERICAN®
INSURANCE GROUP

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## TERRORISM COVERAGE ENDORSEMENT
## CAP ON LOSS FROM CERTIFIED ACTS

Subject to all terms and conditions of this Policy, including any follow-form provisions, this Policy is amended by the addition of the following:

**CERTIFIED ACTS OF TERRORISM COVERAGE**

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of Homeland Security and the Attorney General of the United States, to be an act pursuant to the federal Terrorism Risk Insurance Act.  The criteria contained in the Terrorism Risk Insurance Act for a "Certified Act of Terrorism" include the following:

1.    the act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.    the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

If the aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year in the aggregate and the Insurer has met its deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rate allocation in accordance with procedures established by the Secretary of the Treasury.

It is understood and agreed that the Premium section of the Declarations is amended by the addition of the following:

Terrorism Premium:  $  0.00

The Policyholder Disclosure Offer of Terrorism Coverage is attached to and is to be considered as incorporated in and constituting a part of this Policy.

*This coverage shall not apply to any commercial crime or errors & omissions coverages that may be included in this policy.*

This endorsement does not extend any additional coverage or otherwise change the terms and conditions of any coverage under this Policy.

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration             Policy Number:   PEPE246619

Countersigned by: _____        Endorsement Effective Date:   4/18/2023
                          *Authorized Representative*



NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# ECONOMIC AND TRADE SANCTIONS CLAUSE

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration

Policy Number:  PEPE246619

Countersigned by: _____
                        *Authorized Representative*

Endorsement Effective Date:   4/18/2023

IL 73 24  (Ed. 08/12)
2-14176

Endorsement:   8

Page 1 of 1



# POLICYHOLDER DISCLOSURE
# OFFER OF TERRORISM COVERAGE

The Terrorism Risk Insurance Act establishes a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals as part of an effort to coerce the government or population of the United States.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% beginning on January 1, 2020, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

In accordance with the Terrorism Risk Insurance Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism. The policy's other provisions will still apply to such an act.

*This coverage shall not apply to any commercial crime coverage that may be included in this policy.*

**Terrorism coverage** for acts of terrorism that are certified under the federal program as an act of terrorism is included for no additional premium.  Nonetheless, if you would like to reject such Terrorism coverage, please provide Great American written confirmation of such, and an exclusion will be attached to your policy.

*This coverage shall not apply to any commercial crime or errors & omissions coverages that may be included in this policy.*



**THIS IS A CLAIMS MADE POLICY. UPON TERMINATION OF COVERAGE FOR ANY REASON, A SIXTY (60) DAY AUTOMATIC DISCOVERY PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM AN ADDITIONAL THREE YEAR DISCOVERY PERIOD CAN BE PURCHASED. EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD, THE AUTOMATIC DISCOVERY PERIOD, ANY APPLICABLE DISCOVERY PERIOD OR ANY RENEWAL. HOWEVER, MORE THAN ONE CLAIM INVOLVING THE SAME WRONGFUL ACT OR RELATED WRONGFUL ACTS OF ONE OR MORE INSUREDS SHALL BE CONSIDERED A SINGLE CLAIM, AND ONLY ONE RETENTION SHALL BE APPLICABLE TO SUCH SINGLE CLAIM. ALL SUCH CLAIMS, CONSTITUTING A SINGLE CLAIM SHALL BE DEEMED TO HAVE BEEN MADE ON THE EARLIER OF THE FOLLOWING DATES (1) THE EARLIEST DATE ON WHICH ANY SUCH CLAIM WAS FIRST MADE; OR (2) THE EARLIEST DATE ON WHICH ANY SUCH WRONGFUL ACT OR RELATED WRONGFUL ACT WAS REPORTED UNDER THIS POLICY OR ANY OTHER POLICY PROVIDING SIMILAR COVERAGE.**

**THERE IS NO COVERGE FOR INCIDENTS THAT TOOK PLACE PRIOR TO THE RETROACTIVE DATE. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE AUTOMATIC DISCOVERY PERIOD, OR IF PURCHASED, THE ADDITIONAL DISCOVERY PERIOD, WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT PROVIDED BY ANOTHER INSURER. DURING THE FIRST SEVERAL YEARS OF A CLAIMS MADE RELATIONSHIP, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES, UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.**

Asset Management Liability Solution

**Asset Management Liability Solution**

Great American Insurance Company - Executive Liability Division
Headquarters:  301 E. Fourth Street, Cincinnati, Ohio 45202

# Table of Contents

| | | |
|---|---|---|
| I. | Insuring Agreement.................................................................... | Page 1 |
| II. | Discovery Period......................................................................... | Page 2 |
| III. | Definitions.................................................................................. | Page 3 |
| IV. | Exclusions.................................................................................. | Page 7 |
| V. | Limit of Liability.......................................................................... | Page 10 |
| VI. | Retention…………………………….......................................... | Page 10 |
| VII. | Costs of Defense and Settlements............................................. | Page 10 |
| VIII. | Notice of Claim……………………………………………………... | Page 12 |
| IX. | General Conditions..................................................................... | Page 13 |
| | (A) Payment of Judgment…………................................. | Page 13 |
| | (B) Bankruptcy/Insolvency …..................................... | Page 13 |
| | (C) Claim Information…............................................... | Page 13 |
| | (D) Cancellation…….................................................. | Page 13 |
| | (E) Nonrenewal……….............................................. | Page 14 |
| | (F) Action Against the Insurer.................................... | Page 15 |
| | (G) Merger or Acquisition.......................................... | Page 15 |
| | (H) Run-Off Coverage............................................... | Page 15 |
| | (I) Coverage Extensions........................................... | Page 16 |
| | (J) Subrogation……................................................. | Page 17 |
| | (K) Assignment……………….................................... | Page 17 |
| | (L) Conformity of Statute……………………………….... | Page 17 |
| | (M) Entire Agreement……………………………………... | Page 17 |
| | (N) Named Insured Represents Insured……………………... | Page 17 |
| | (O) Representative of the Insured……………………………... | Page 17 |
| | (P) Order of Payments……………………………………... | Page 17 |
| | (Q) Representations and Severability………………………….. | Page 18 |

# GREAT AMERICAN INSURANCE COMPANIES®

### Headquarters: 301 E. Fourth Street, Cincinnati, Ohio 45202

## THIS IS A CLAIMS MADE POLICY.  READ IT CAREFULLY

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (a stock insurance company, hereinafter called the **Insurer**), including the statements made in the **Proposal Form** and subject to all terms, conditions and limitations of this Policy, the **Insured** and the **Insurer** agree:

## Section I.  Insuring Agreements

**A.**    Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**B.**    The **Insurer** will pay on behalf of the **Insured Organization**:

  (1)    **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

  (2)    **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim** first made against the **Insured Organization**;

  provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**C.**    Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**; provided, however, that such coverage shall be specifically excess of any indemnity and/or valid and collectible insurance available from or provided by the entity in which the **Insured Person** serves in such **Outside Position**.

## Section II. Discovery Period

**A.**    If either the **Named Insured** or the **Insurer** cancels or does not renew this Policy, or if the **Insurer** offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, or any change in coverage less favorable to the **Insured**, the **Named Insured** shall be entitled to acquire an additional reporting period for **Claims** first made against an **Insured** as set forth below, but only with respect to **Wrongful Acts** committed prior to the end of the **Policy Period**. This additional reporting period shall be referred to as the **Discovery Period.**

**B.**    If either the **Named Insured** or the **Insurer** cancels or does not renew this Policy, or if the **Insurer** offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, or any change in coverage less favorable to the **Insured**, even if such change is requested by the **Insured**, it is understood and agreed that the **Discovery Period** shall be the period of sixty (60) days from the end of the **Policy Period**, and there shall be no additional charge.  This sixty (60) day period shall be referred to as the **Automatic Discovery Period.**    If prior to the end of the **Automatic Discovery Period** the **Named Insured** pays the **Insurer** an additional amount equal to one hundred fifty percent (150%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional thirty-six (36) months from the end of the **Automatic Discovery Period**.

**C.**    The **Insurer** will provide written notice to the **Named Insured** of the **Automatic Discovery Period** and the availability of, the premium for, and the importance of purchasing, the **Discovery Period** within thirty (30) days after the **Termination of Coverage**.  This provision shall not apply where the claims-made relationship has continued for less than one (1) year and the **Insurer** is canceling the Policy for non-payment of premium.

**D.**    The right to purchase the **Discovery Period** will terminate unless written notice is given to the **Insurer** within sixty (60) days from the **Termination of Coverage**, or within thirty (30) days after the mailing or delivery of the notice provided by the **Insurer** under Section C, above, whichever is greater, together with full payment of the premium for the **Discovery Period**. If such notice and premium payment are not so given to the **Insurer**, the **Named Insured** will not be able to exercise the right to purchase the **Discovery Period**.  The premium charged for the **Discovery Period** shall be based upon the rates in effect on the date this Policy was issued or last renewed.

In the event the **Named Insured** is in liquidation or bankruptcy, or permanently ceases operation, and if the **Named Insured** or its designated trustee, although entitled to, does not purchase the **Discovery Period**, any **Insured Persons** who request the **Discovery Period** within one hundred twenty (120) days of the **Termination of Coverage** may purchase the **Discovery Period**, as provided in Section B, above.

**E.**    **Insured Persons** employed or otherwise affiliated with the **Named Insured** and covered by this Policy during such affiliation shall continue to be covered under this Policy and any **Discovery Period** after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

**F.**    Upon **Termination of Coverage**, any return premium due the **Named Insured** shall be applied to the premium for the **Discovery Period** if the **Insured** elects to purchase such coverage. Where the premium is due to the **Insurer**, any payment received by the **Insurer** from the **Named Insured** as payment for the **Discovery Period** shall be first applied to any premium due for the Policy.

**G.**    In the event similar insurance to that provided by this Policy is in force during the **Discovery Period**, the coverage afforded during the **Discovery Period** shall be excess over any such valid and collectible insurance.

H.      Where a claims-made relationship has continued for at least three (3) years, the Policy's annual aggregate Limit of Liability for the Discovery Period, shall be equal to one hundred percent (100%) of the Policy's annual aggregate Limit of Liability.

Where a claims-made relationship has continued for less than three (3) years, the Policy's annual Limit of Liability for the Discovery Period, shall be at least equal to the greater of:
(1)     the amount of coverage remaining in the Policy's annual aggregate Limit of Liability; or
(2)     fifty percent (50%) of the Policy's annual aggregate Limit of Liability.

## Section III.    Definitions

A.      "**Claim**" means:

(1)     a written demand for monetary or non-monetary relief against an **Insured** commenced by such **Insured's** receipt of such demand;

(2)     an administrative, regulatory, or arbitration proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, notice of charges, formal investigative order or similar document;

(3)     a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading or similar document;

(4)     a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

(5)     any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local or foreign government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after service of a subpoena, receipt of a Wells Notice, receipt of a target letter or receipt of a formal order of investigation; or

(6)     an **Employment Practices Claim**.

B.      "**Costs of Defense**" means reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

C.      "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

D.      "**Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

E.    **"Employment Practices Wrongful Act**" means:

(1)    wrongful dismissal, discharge or termination of employment, whether actual or constructive;

(2)    employment related misrepresentation;

(3)    sexual or workplace harassment of any kind;

(4)        discrimination;

(5)    wrongful failure to employ or promote;

(6)    wrongful discipline;

(7)    wrongful deprivation of career opportunity, including defamatory statements made in connection with an employee reference;

(8)    failure to grant tenure;

(9)    negligent evaluation;

(10)    failure to provide adequate workplace or employment policies and procedures;

(11)    wrongful retaliation; or

(12)    employment related libel, slander, defamation, or invasion of privacy.

Coverage is provide only if the actual or alleged **Employment Practices Wrongful Act** is based on disparate impact or actual or alleged vicarious liability.

F.    **"Executive Officer"** means the functional equivalent of a chief executive officer, chief financial officer, or in-house general counsel, regardless of the actual title or position.

G.    "**Financial Insolvency**" means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Insured Organization**, or the **Insured Organization** becoming a debtor in possession.

H.    **"General Partner(s)"** means any natural person or organization identified as such in the limited partnership agreement of an **Operating Entity** formed as a limited partnership.

I.    "**Insured Organization**" means the **Named Insured** and any **Operating Entity**. **Insured Organization** shall not include any **Portfolio Company**.

J.    "**Insured Person(s)**" means:

(1)    any natural person who was, is or shall become a director, officer, general partner, manager, equivalent executive or employee of an **Insured Organization**;

(2)    any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or committee of an **Investment Fund**; or

(3)    any natural person other than a director, officer, general partner, manager, equivalent executive or employee while serving in an **Outside Position**; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)** while serving in such **Outside Position**.

K.    **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**.

**L.**    "**Interrelated Wrongful Acts**" means **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision.

**M.**    "**Investment Fund**" means an **Organization** which is created or established prior to or during the **Policy Period** by an **Insured Organization** consisting of a sum of money whose principal is invested pursuant to the objectives set forth in such **Organization's** private placement, prospectus, or similar document.

**N.**    "**Loss**" means compensatory damages, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense**.  Loss shall also mean punitive or exemplary damages and the multiple portion of any multiplied damage if allowed by law.

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

"**Loss**" shall not include:

(1)    taxes, fines or penalties, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2)    non-monetary relief;

(3)    employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay; or

(4)    any portion of damages, judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities.

**O.**    "**Named Insured**" means the entity named in Item 1 of the Declarations.

**P.**    "**Non-Profit Entity**" means any non-profit and/or eleemosynary organizations.

**Q.**    "**Operating Entity**" means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insured's** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1)    ownership of greater than 50% voting securities in such **Organization**;

(2)    right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3)    rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

**R.**    "**Organization**" means any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.  **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

S.    **"Outside Position"** means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position in any:

(1)    **Portfolio Company**;

(2)    **Non-Profit Entity**; or

(3)    other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

T.    "**Policy Period**" means the period set forth in Item 2 of the Declarations or any shorter period that may occur as a result of a cancellation or termination of this Policy.

U.    "**Portfolio Company**" means any entity in which any **Investment Fund** has or had or proposes to have a financial interest pursuant to the investment objectives set forth in any private placement memorandum, prospectus or similar document issued by an **Insured Organization**. **Portfolio Company** shall also mean any entity in which an **Insured Organization** other than an **Investment Fund** has or had or proposes to have a financial interest provided that such financial interest was acquired in connection with an investment in such entity by an **Investment Fund**.

V.    **"Professional Services"** means:

(1)    any advisory, management, administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2)    the formation, creation, distribution or sale of securities in, or the management, administration or investment decision of any **Investment Fund**;

(3)    any advisory or other consultative services performed by an **Insured** for any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, sale of assets, stock issuance, contemplated financing or capitalization, internal controls, legal compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters; or

(4)    legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**.

W.    "**Proposal Form**" means the application for this Policy, any attachments to such application, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy.

**X.**   "**Self-Regulatory Organization**" means any association of investment advisors or securities dealers registered under state or federal securities laws or any national securities exchange registered with the Securities Exchange Commission under the Securities and Exchange Act of 1934, as amended, or any similar Canadian or other national or international exchange or commission.

**Y.**   "**Termination of Coverage**" means, whether made by the **Insurer** or the **Insured** at any time: (1) cancellation or nonrenewal of the Policy; or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change less favorable to the **Insured.**

**Z.**   "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act** or any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1)   by the **Insured Persons**, in their capacity as such;

(2)   with respect to Insuring Agreement (B)(2), by the **Insured Organization**; or

(3)   with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**.

## Section IV.   Exclusions

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

**A.**   for any actual or alleged:

(1)   bodily injury, sickness, disease, or death of any person;

(2)   damage to or destruction of any tangible property, including the loss of use thereof; or

(3)   mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any **Employment Practices Claim**;

**B.**   based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts**, or any fact, circumstance or situation which has been the subject of any notice or **Claim** given under any other policy of which this Policy is a renewal or replacement;

**C.**   brought or maintained by or on behalf of any **Insured**, provided, however, this exclusion shall not apply to:

(1)   any **Claim** brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

(2)   any **Employment Practices Claim**;

(3)   any **Claim** brought by any **Insured Person** where such **Claim** is in the form of a cross-claim or third party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

(4)    any **Claim** brought by the bankruptcy trustee or examiner of an **Insured Organization** or any assignee of such bankruptcy trustee or examiner, or any receiver, conservator, rehabilitator, or liquidator or comparable authority of an **Insured Organization**;

(5)    any **Claim** brought by any **Insured Person** who is no longer employed, contractually or otherwise, by an **Insured Organization**; provided, however, that when such **Claim** is made and maintained, such natural person is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

(6)    any **Claim** made in a jurisdiction outside of the United States of America, Canada or Australia by an **Insured Person** of an **Insured Organization** created in such jurisdiction;

(7)    any **Claim** brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**; or

(8)    any **Claim** brought by an **Insured Person** serving as a member of an **Investment Fund's** advisory board, advisory committee or any similar board or committee; provided, however, that such **Insured Person** is serving in such capacity at the request and direction of a security holder of an **Investment Fund**.

**D.**    brought about or contributed to by:

(1)    any **Insureds** gaining any profit, advantage or remuneration to which they were not legally entitled; or

(2)    the deliberately fraudulent or criminal acts of any **Insureds**;

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred; and this exclusion shall not apply to coverage provided under Insuring Agreement I.B(1);

**E.**    for: (1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or (2) any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste;

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**F.**    for, based upon, arising from, or in any way related to any **Wrongful Act** of any **Insured  Person** serving as a director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position of any entity other than the **Insured Organization** even if such service is at the direction or request of the **Insured Organization**, provided, however, this exclusion does not        apply to any **Claim** for any **Wrongful Act** of an **Insured Person** while serving in an **Outside Position**;

**G.**    for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization** or a **Portfolio Company**;

**H.**    based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

**I.**    for any **Wrongful Act** of any **Operating Entity** or the **Insured Persons** of such **Operating Entity** occurring:

(1)    prior to the date such entity became an **Operating Entity**;

(2)    subsequent to the date such entity became an **Operating Entity** or was merged with an **Insured Organization** which, together with a **Wrongful Act** occurring prior to the date such entity became an **Operating Entity** or was merged with an **Insured Organization**, would constitute **Interrelated Wrongful Acts**; or

(3)    subsequent to the date an **Insured** ceased to possess, directly or indirectly, the power to control, manage or direct such **Operating Entity**;

**J.**    solely with respect to the **Insured Organization**, for, based upon, arising from, or in any way related to any actual or alleged breach of contract or agreement, whether written or oral; provided, however, this exclusion shall not apply to:

(1)    liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2)    any actual or alleged breach of any contract describing or calling for **Professional Services**;

(3)    any indemnification obligation between an **Insured Organization** and an **Insured Person**; or

(4)    any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture or similar organizational or constituting document;

**K.**    for, based upon, arising from, or in any way related to any public offering of securities of an **Insured Organization** or the purchase or sale of such securities subsequent to such public offering; provided, however, that this exclusion shall not apply to the offering of securities of an **Insured Organization** that is exempt from registration under the Securities Act of 1933;

**L.**    which is insured in whole or in part by another valid and collectible policy or policies (except with respect to any excess beyond the amount or amounts of coverage under such other policy or policies), whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise;

**M.**    for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

NOTE:  For the purpose of determining the applicability of the aforementioned Exclusion D., it is understood and agreed that:

(1)    the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**; and

(2)    only the **Wrongful Acts** of any past, present or future **Executive Officer** shall be imputed to the **Insured Organization**.

## Section V.    Limit of Liability

**A.**    The **Insurer** shall be liable to pay one hundred percent (100%) of **Loss** in excess of the applicable Retention amount stated in Item 4 of the Declarations and subject to applicable retention amount stated in Section VII.F. of the policy, up to the Limit of Liability stated in Item 3 of the Declarations.

**B.**    **Costs of Defense** shall be part of, and not in addition to, the Limit of Liability stated in Item 3 of the Declarations, and such **Costs of Defense** shall serve to reduce the Limit of Liability.

**C.**    The **Insurer's** liability for all **Loss** shall be the amount shown in Item 3 of the Declarations which shall be the maximum aggregate Limit of Liability of the **Insurer** for the **Policy Period**, regardless of the time of payment or the number of **Claims**.

## Section VI.    Retention

**A.**    One Retention shall apply to each and every **Claim**.  The **Insured Organization** shall be responsible for, and shall hold the **Insurer** harmless from, any amount within the Retention.  With respect to Insuring Agreement B.(1), if the **Insured Organization** is permitted or required by the **Insured Organization** agreement, by-laws, certificate of incorporation, or similar document to indemnify the **Insured Persons** for **Loss**, or to advance **Costs of Defense** on their behalf, and does not in fact do so other than for reasons of **Financial Insolvency**, then the **Insurer** shall pay all such **Loss** on behalf of such **Insured Persons** subject to the Retention applicable to Insuring Agreement B.(1) and all terms and conditions of this Policy. For purposes of this paragraph, any partnership agreement, operating agreement, shareholder and/or board of director's resolutions of an **Insured Organization** shall be deemed to provide indemnification and advancement for such **Loss** to the fullest extent permitted or required by the law.

**B.**    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more **Insureds** shall be considered a single **Claim**, and only one Retention shall be applicable to such single **Claim**.  All such **Claims** constituting a single **Claim** shall be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such **Claim** was first made; or (2) the earliest date on which any such **Wrongful Act** or **Interrelated Wrongful Acts** was reported under this Policy or any other policy providing similar coverage.

**C.**    In the event **Loss** arising from a single **Claim** is subject to more than one Retention, the largest Retention amount set forth in Item 4 of the Declarations shall be the maximum Retention applicable to such **Claim**.

## Section VII.    Costs of Defense and Settlements

**A.**    No **Costs of Defense** shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld. The **Insurer** shall not be liable for any **Costs of Defense**, settlement, assumed obligation or admission to which it has not consented.  Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

**B.**    The **Insurer** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Policy. The **Insurer** may make any investigation it deems appropriate. However, it shall be the duty of the **Insureds**, not the **Insurer**, to defend any **Claim** provided that the **Insureds** shall only retain counsel as is mutually agreed upon with the **Insurer**.

**C.**     The **Insurer** shall advance on behalf of the **Insureds**, excess of any applicable Retention, covered **Costs of Defense** which the **Insureds** have incurred in connection with covered **Claims** made against them prior to disposition of such **Claims** and within ninety (90) days of receipt and review of the invoices containing such **Insured's Costs of Defense**, provided that to the extent it is finally established that any such **Costs of Defense** are not covered under this Policy, the **Insureds**, severally according to their relative interests, agree to repay the **Insurer** such non-covered **Costs of Defense**.  Any amounts advanced by the **Insurer** shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid.

**D.**     The **Insureds** shall as a condition precedent to their rights under this Policy, give to the **Insurer** all information and cooperation as the **Insurer** may reasonably require and shall do nothing that may hinder the **Insurer's** position or its potential or actual rights of recovery.

**E.**     **(1)**   If the **Insurer** concludes that, based on **Claims** which have been reported to the **Insurer** and to which this Policy may apply, the Policy's Limit of Liability is likely to be exhausted by the payment of **Loss**, the **Insurer** will notify the **Named Insured**, in writing, to  that effect.

**(2)**   When the Limit of Liability set forth in Item 3. of the Declarations has actually been exhausted by the payment of **Loss**:

**(a)**   The **Insurer** will notify the **Named Insured**, in writing, as soon as practicable, that:

**(i)**   The Limit of Liability has actually been exhausted; and

**(ii)**  The **Insurer's** duty to pay on behalf of the **Insured(s)** all **Loss** which the **Insured(s)** shall be legally obligated to pay as a result of **Claims** has ceased.

**(b)**   The **Insurer** will initiate and cooperate in the transfer of control to any appropriate **Insured** all **Claims** subject to that Limit of Liability and which were reported to the **Insurer** prior to the exhaustion of the Limit of Liability.  The **Insured** must cooperate in the transfer of control of these **Claims**.

The **Insurer** agrees to take such steps as it deems appropriate to avoid a default in, or to continue the defense of, such **Claims** until the transfer is completed, provided the appropriate **Insured** is cooperating in completing such transfer.

The **Insurer** will take no action whatsoever with respect to any **Claim** that would have been subject to the Limit of Liability had it not been exhausted, if the **Claim** is reported to the **Insurer** after the Limit of Liability is exhausted.

**(c)**   The **Named Insured** and any other **Insured** involved in a **Claim** subject to the Limit of Liability, must arrange for the defense of any **Claim** within such time period as agreed to between the **Insurer** and the **Insured**.  Absent such agreement, arrangements for the defense of such **Claim** must be made as soon as practicable.

**(3)**   The **Insured** will reimburse the **Insurer** for expenses the **Insurer** incurs in taking those steps deemed appropriate by the **Insurer** in accordance with Section E. (2)(b) above.

The duty of the **Insured** to reimburse the **Insurer** will begin on:

**(a)**   The date the applicable Limit of Liability is exhausted, if the **Insurer** sent notice in accordance with Section E**.** (1) above; or

**(b)**   The date the **Insurer** sent notice in accordance with Section E.(2)(a) above, if the **Insurer** did not send notice in accordance with Section E. (1) above

**(4)** The exhaustion of the Limit of Liability by the payment of **Loss**, and the resulting end of the **Insurer's** duty to pay on behalf of the **Insureds,** will not be affected by the **Insurer's** failure to comply with any of the provisions of this Policy.

**F**.     It is agreed that to the extent that this policy of insurance could result in indemnifying the **Insured Persons** in instances where they may not otherwise be indemnified by the **Insured Organization** under the provisions of the Business Corporation Law of the State of New York: (a) an individual retention amount as set forth in Item 4. of the Declarations will apply to each such **Insured Person,** and (b) the first $1,000,000 of the Limit of Liability afforded by this Policy shall only apply to 99.5% of **Loss** if the Insured Organization has assets greater than $20,000,000; 99.6% of Loss if the **Insured Organization** has assets greater than $10,000,000 but less than $20,000,000; 99.7% of Loss if the **Insured Organization** has assets greater than $5,000,000 but less than $10,000,000; and 99.8% of Loss if the **Insured Organization** has assets less than $5,000,000.  The remaining percentage shall be uninsured and borne by such **Insured Persons**.

## Section VIII.   Notice of Claim

**A.**     The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable.  Provided, however, that failure by the **Insureds** to give notice will not invalidate any coverage that would otherwise have been available if the **Insureds** show that (1) it was not reasonably possible to do so and (2) notice was given as soon as reasonably possible.

**B.**     If during the **Policy Period** or **Discovery Period** any **Insureds** become aware of a specific **Wrongful Act** that may reasonably be expected to give rise to a **Claim** against any **Insureds**, and, if such **Wrongful Act** is reported to the **Insurer** during the **Policy Period** or **Discovery Period** in writing with particulars as to the reasons for anticipating such a **Claim**, the nature and dates of the alleged **Wrongful Act**, the alleged injuries or damages sustained, the names of potential claimants, any **Insureds** involved in the alleged **Wrongful Act** and the manner in which the **Insureds** first became aware of the specific **Wrongful Act**, then any **Claim** subsequently arising from such specific **Wrongful Act** duly reported in accordance with this paragraph shall be deemed under this Policy to be a **Claim** made during the **Policy Period** or **Discovery Period**.

**C.**     All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or by email, properly addressed to the appropriate party.  Notice to the **Insured(s)** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations.  Notice to the **Insurer** of any **Claim** or **Wrongful Act(s)** shall be given to the **Insurer** at the following address:

GREAT AMERICAN INSURANCE COMPANIES
EXECUTIVE LIABILITY DIVISION
CLAIMS DEPARTMENT
P.O. Box 66943
Chicago, IL 60666

or

By Email:  ELDClaims@gaig.com
Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

**D.**    Written notice given by or on behalf of the **Insureds** or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the **Insurer** in this State shall be deemed notice to the **Insurer**.

## Section IX.    General Conditions

**A.    Payment of Judgment**

If the **Insurer** does not pay any judgment covered by the terms of this Policy within thirty (30) days after the serving of notice of entry of judgment upon the **Insureds** or their attorney and upon the **Insurer,** then, except during a stay or limited stay of execution against the **Insured** on such judgment, an action may be maintained against the **Insurer** under the Policy for the amount of such judgment not exceeding this applicable Limit of Liability under the Policy.  Nothing in this paragraph is intended, however, nor shall it be construed, to obligate the **Insurer** to make any payment it would not otherwise be obligated to make under the terms, conditions, limitations and endorsements of this Policy, or to pay any **Loss** in excess of the then available Limit of Liability under this Policy.

**B**.    **Bankruptcy/Insolvency**

The insolvency or bankruptcy of the **Insureds**, or the insolvency of their estates, shall not release the **Insurer** from the payment of damages for injury sustained or **Loss** or **Costs of Defense** occasioned during the life of and within the coverage of this Policy.

**C.    Claim Information**

Upon written request by the **Named Insured** or such **Insured's** authorized agent or broker, the **Insurer** shall mail or deliver the following information for the time the Policy was in effect within twenty (20) days of such request:

**(1)** information on closed **Claims**, including the date and description of the **Claim,** and any payments;

**(2)** information on open **Claims**, including date and description of the **Claim**, and amounts of any payments; and

**(3)** information on notice of any **Wrongful Acts**, including date and description of such notice.

**D.    Cancellation**

**(1)** This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**.  In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, the **Insurer** shall retain the customary short rate premium.  However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-], the **Insurer** shall refund any unearned premium on a pro rata basis.  Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

**(2)** During the first sixty (60) days this Policy is initially in effect, except for the reasons for cancellation set forth in paragraph (2) of this section, no cancellation shall become effective until twenty (20) days after written notice is mailed or delivered to the **Named Insured** at the mailing address shown in the Policy and to its authorized agent or broker.

**(3)** After this Policy has been in effect for sixty (60) days or on or after the effective date if such Policy is a renewal, no notice of cancellation shall become effective until sixty (60) days, or fifteen (15) days for non payment of premium, after written notice is mailed or delivered to the **Named Insured** and to its authorized agent or broker, and such cancellation is based on one or more of the following reasons:

  **(a)** non payment of premium; Notice of Non-payment shall include amounts Past Due.

  **(b)** conviction of a crime arising out of acts increasing the hazard insured against;

  **(c)** discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a **Claim** thereunder;

  **(d)** after issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period.**

  **(e)** a determination by the New York Superintendent of Insurance that continuation of the present premium volume of the insurer would jeopardize that insurers solvency or be hazardous to the interests of policyholders of the **Insurer**, its creditors or the public; or

  **(f)** a determination by the New York Superintendent that continuation of this Policy would violate, or would place the **Insurer** in violation of, any provision of the New York Insurance Code.

After this Policy has been in effect for sixty (60) days or on or after the effective date if the Policy is a renewal, no premium increase for the term of the Policy shall be made to become effective unless due to and commensurate with insured value added, subsequent to issuance or the last renewal date, pursuant to the Policy or at the **Insured**'s request or, in lieu of cancellation, where such increase is based upon Section (3) (d) of Section D. Cancellation.

**E.    Nonrenewal**

  **(1)** If the **Insurer** elects not to renew this Policy, or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of ten percent (10%), then the **Insurer** shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Named Insured** at the mailing address shown on the Policy and to the **Named Insured's** authorized agent at least sixty (60) days but not more than one hundred and twenty (120) days in advance of the Policy's expiration date.  The notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

  If the **Insurer** does not provide notice of nonrenewal or conditional renewal as provided in the paragraph above, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered, unless the **Named Insured**, during this sixty (60) day period, has replaced the coverage or elects to cancel.  The Limit of Liability of the expiring Policy will be increased in proportion to the Policy extension provided for in this provision.

**(2)** If the **Insurer** provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another **Policy Period**, at the lower of the current rates or the prior period's rates, unless the **Named Insured**, during the additional **Policy Period**, has replaced the coverage or elects to cancel.

**(3)** The **Insurer** will not send the **Named Insured** notice of nonrenewal or conditional renewal if the **Named Insured**, the **Insured Persons**, their authorized agent or another insurer of the **Insureds** mails or delivers notice that the Policy has been replaced or is no longer desired.

**(4)** If the **Insureds** elect to accept the terms, conditions and rates of the conditional renewal notice, a new aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the New York Superintendent of Insurance.

**F.      Action Against the Insurer**

**(1)**      No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the **Insured's** obligation to pay shall have been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.

**(2)**      No person or organization shall have any right under this Policy to join the **Insurer** as a party to any **Claim** against the **Insureds** nor shall the **Insurer** be impleaded by any **Insured** or their legal representative in any such **Claim**.

**G.      Merger or Acquisition**

If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed twenty-five percent (25%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request.  Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

**H.      Run-Off Coverage**

**(1)** Acquisition of **Named Insured**

If, during the **Policy Period**, a transaction occurs wherein another entity gains control of the **Named Insured** through the ownership of more than fifty percent (50%) of the voting stock of the **Named Insured**, or the **Named Insured** merges into another entity or consolidates with another entity such that the **Named Insured** is not the surviving entity, then:

**(a)** the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary;

**(b)** this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction; and

**(c)** the entire premium for this Policy shall be deemed earned as of the date of such transaction;

provided, however, this condition shall not apply if the transaction is a reorganization or restructuring of security ownership of the **Named Insured** among **Insured Persons**.

**(2)** Withdrawal, Resignation, Replacement or Substitution of **General Partner**

If, during the **Policy Period,** the **General Partner** of an **Investment Fund** withdraws, resigns, is replaced or is substituted with another entity that is not an **Operating Entity,** then:

**(a)** the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary; and

**(b)** with respect to coverage for such **Investment Fund**, this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction.

**(3)** Sale of **Portfolio Company**

If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

**I.**    **Coverage Extensions**

**(1)** Spousal/Domestic Partner Provision

In the event a **Claim** made against an **Insured Person**, which is otherwise within the coverage afforded by this Policy, also includes a **Claim** against such **Insured Person's** lawful spouse or **Domestic Partner** solely by reason of (a) such spousal or **Domestic Partner** status, or (b) such spouse or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, then any and all **Loss** for which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Insured Person** of the spouse or **Domestic Partner** becomes legally obligated to pay as a result of the **Claim** made against such **Insured Person**.

All terms and conditions of this Policy, including the Retention, applicable to **Loss** sustained by such **Insured Person** in the **Claim** shall also apply to loss sustained by such spouse or **Domestic Partner**. The extension of coverage afforded by this Section IX.E. shall only apply to the extent the **Claim** arises out of any actual or alleged **Wrongful Act** of an **Insured Person**.

**(2)** Worldwide Provision

The coverage provided under this Policy shall apply worldwide.  The term **Insured Persons** is deemed to include individuals who serve in equivalent positions in foreign **Operating Entities**.

**(3)** Estates and Legal Representatives

The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives or assigns of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of any **Insured Persons**.

**J.**     **Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the **Insureds**' rights of recovery and the **Insured Organization** and **Insured Persons** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.

**K.**     **Assignment**

Assignment of interest under this Policy shall not bind the **Insurer** until its consent is endorsed hereon.

**L.**     **Conformity to Statute**

To the extent that any of the terms, conditions or limitations of this Policy, including any endorsement, may be inconsistent with applicable New York law or regulations, the provisions of New York law will prevail.

**M.**     **Entire Agreement**

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the Declarations, **Proposal Forms** submitted to the **Insurer** and any information provided therewith) and any written endorsements attached hereto constitute the entire agreement between the parties.  The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

**N.**     **Named Insured Represents Insured**

By acceptance of this Policy, the **Named Insured** shall be designated to act on behalf of the **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

**O.**     **Representative of the Insurer**

Great American Insurance Companies, Executive Liability Division, P.O. Box 66943, Chicago, Illinois 60666 shall act on behalf of the **Insurer** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, provided, however, notice of **Claims** shall be given pursuant to Section VIII. of the Policy.

**P.**     **Order of Payments**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Policy, then the **Insurer** shall in all events:

**(1)**  first, pay **Loss** for which coverage is provided under Insuring Agreement A of this Policy; then

**(2)**  only after payment of **Loss** has been made pursuant to Insuring Agreement A of this Policy, with respect to whatever remaining amount of the Limit of Liability is available after such payment, the **Insurer** shall pay such other **Loss** for which coverage is provided under any other applicable Insuring Agreements in Section I of this Policy.

The **Financial Insolvency** of any **Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this Policy.

**Q.     Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy.  It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations. In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate:

**(1)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;

**(2)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form,** whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  For purposes of this paragraph (2), knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**;

**(3)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**;

**(4)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

**(5)** Solely with respect to Insuring Agreement A, under no circumstances shall the **Insurer** be entitled to rescind such coverage.

In witness whereof the **Insurer** has caused this Policy to be signed by its President and Secretary and countersigned, if required, on the Declarations page by a duly authorized agent of the **Insurer**.

## GREAT AMERICAN INSURANCE COMPANIES®

*President*                                            *Secretary*