# **Exhibit A**

```
                    UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK (NEW YORK)

                                        .
IN RE:                                  .   Case No. 24-10381-jpm
                                        .   Chapter 11
JJ Arch LLC,                            .
                                        .
                 Debtor.                .
. . . . . . . . . . . . . . . . .
```

              TRANSCRIPT OF 341 MEETING OF CREDITORS

                         New York, NY

                        June 20, 2024

APPEARANCES:

| | |
|---|---|
| U.S. Trustee: | Office of the United States Trustee<br>By:  BRIAN S. MASUMOTO, ESQ.<br>Alexander Hamilton Custom House<br>One Bowling Green, Room 534<br>New York, NY 10004-1408<br>212-510-0500 |
| For the Debtor: | Davidoff Hutcher & Citron LLP<br>By:  JONATHAN S. PASTERNAK, ESQ.<br>605 Third Avenue<br>New York, NY 10158<br>646-428-3124 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46048<br>(855) 873-2223<br>www.accesstranscripts.com |


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES (Continued):


For Arch Real Estate      Olshan Frome Wolosky LLP
Holdings LLC:             By:  JONATHAN T. KOEVARY, ESQ.
                          1325 Avenue of the Americas
                          New York, NY 10019
                          212-451-2265

For Jared Chassen:        Klestadt Winters Jureller Southard &
                          Stevens, LLP
                          By:  SEAN C. SOUTHARD, ESQ.
                          200 West 41st Street
                          New York, NY 10036
                          212-972-3000

                          Schwartz Law PLLC
                          By:  ALLEN SCHWARTZ, ESQ.
                          150 Broadway, Ste 900
                          New York, NY 10038
                          347-460-5379

For 608941 NJ Inc.:       Haynes and Boone LLP
                          By:  LESLIE C. THORNE, ESQ.
                               AISHLINN BOTTINI, ESQ.
                          30 Rockefeller Plaza
                          Ste 26th Floor
                          New York, NY 10112
                          212-835-4848

For 40 Neutral LLC and    Westerman Ball, et al.
Kay Properties LLC:       By:  WILLIAM HEUER, ESQ.
                          1201 RXR Plaza
                          Uniondale, NY 11556
                          516-622-9200

For ConnectOne Bank:      Cole Schotz PC
                          By:  JACOB S. FRUMKIN, ESQ.
                          1325 Avenue of the Americas
                          19th Floor
                          New York, NY 10019-6079
                          646-563-8944

Also Present:             KEVIN WIENER
```

 1        (Proceedings commence)

 2            MR. MASUMOTO:  All right.  Good afternoon.  My name

 3  is Brian Masumoto.  I'm a trial attorney with the Office of the

 4  United States Trustee.  Today's date is Thursday, June 20th,

 5  2024.  It's approximately 2 p.m. -- 12 p.m. this afternoon.

 6            This is the adjourned initial 341 in the matter of JJ

 7  Arch LLC.  Case Number is 24-10381.  Case has been assigned to

 8  Judge John P. Mastando.

 9            This is the first 341 meeting.  The original meeting,

10  I believe, was scheduled for April 8th, 2024.  And that was

11  adjourned because it fell approximately at the time a hearing

12  on the motion to dismiss the case was scheduled.

13  Unfortunately, that motion to dismiss was -- has been

14  adjourned.

15            In the interim, the Court has issued opinions on the

16  motions to remand or abstain, as well as the motion to lift

17  stay.  So it was determined by our office that it was probably

18  appropriate at this time to go forward just to get a status.

19  As all of the parties on this call is aware, there was a

20  hearing at 9 a.m. this morning on various matters.

21            So again, preliminarily, this case has been extremely

22  complicated in several respects.  There's been currently new

23  counsel that has entered the case.  And unfortunately, it's not

24  quite clear as to where this case is going.  But it seemed

25  incumbent upon our office to at least start the initial 341.

1  Whether or not the 341 will be continued, is to be determined.

2         Having said that, and given the profile of this case,

3  and part of the concern about adjourning the initial was that

4  this was a very contentious case.  And in fact, at the time,

5  the decision was made regarding the initial 341, there were

6  indications that extensive discovery would be necessary.

7         Unfortunately, at least my understanding based upon

8  the judge's two opinions, the issue of discovery relating to

9  governance and the possible motion to dismiss is still

10  technically out there.  So I do want to warn people that this

11  341 is not intended to serve as a substitute for discovery.

12         Given the interrelationship between governance and

13  the bankruptcy filing and so forth, I'll provide -- I'll allow

14  some latitude.  But again, I'm not going to allow this 341 to

15  be used as a discovery opportunity for the parties.

16         Basically, the 341 that I'm concerned about for this

17  meeting is what is the debtor's intentions going forward, and

18  its prospect for reorganization.  So I would ask, when I do

19  open up the meeting to questions from parties in interests,

20  creditors, and so forth, that they be limited to that sort of

21  general concern about the case.

22         And again, although I will provide -- I will allow

23  some latitude, again, don't be surprised if I cut you off if I

24  believe that in fact, we're sort of moving into sort of

25  discovery type issues that are not appropriate for a 341.

 1            All right.  So why don't we proceed?  My

 2   understanding, again, is that the principal of the debtor is

 3   Jeffrey Simpson.  Mr. Simpson, are you on the line?

 4            MR. SIMPSON:  Yes, I am.

 5            MR. MASUMOTO:  All right.

 6         JEFFREY SIMPSON, DEBTOR'S REPRESENTATIVE, SWORN

 7            MR. MASUMOTO:  All right.  Okay.  For the record,

 8   please state other appearances for the record beginning with

 9   the debtor's counsel, and then with the creditors and other

10   parties in interest.  All right.  Debtor's counsel?

11            MR. PASTERNAK:  Jonathan Pasternak, Davidoff Hutcher

12   & Citron, 605 Third Avenue, New York, New York 10158 for the

13   debtor.

14            MR. MASUMOTO:  Thank you.  Other parties?

15            MR. KOEVARY:  Jonathan Koevary --

16            MR. SOUTHARD:  This is Sean --

17            MR. KOEVARY:  -- Olshan Frome Wolosky for Arch Real

18   Estate Holdings.

19            MR. SOUTHARD:  Sean Southard, Klestadt Winters

20   Jureller Southard & Stevens on behalf of Jared Chassen.

21            MR. HEUER:  Bill Heuer --

22            MS. THORNE:  Leslie Thorne and Aishlinn Bottini,

23   Haynes Boone, on behalf of 608941 NJ Inc.

24            MR. HEUER:  This is Bill Heuer, Westerman Ball for 40

25   Neutral and Kay Properties.

```
 1              MR. MASUMOTO:  All right.  Any other appearances?

 2              MR. FRUMKIN:  Jacob Frumkin --

 3              MR. SCHWARTZ:  Yeah, this is Allen Schwartz --

 4         (Simultaneous speaking)

 5              MR. MASUMOTO:  I'm sorry, there were two people

 6    talking.

 7              MR. SCHWARTZ:  Try again.  This is Allen Schwartz.

 8    Yeah.  Allen Schwartz, Schwartz Law PLLC, 150 Broadway, New

 9    York, New York 10038 on behalf of Jared Chassen, and I believe

10    Mr. Chassen is also has -- is on this call.

11              MR. MASUMOTO:  All right.  Thank you.  Anyone else?

12              MR. FRUMKIN:  Jacob Frumkin from Cole Schotz P.C. on

13    behalf of ConnectOne Bank.

14              MR. MASUMOTO:  Okay.  Anyone else?

15              MR. WIENER:  Kevin Wiener, executive vice president

16    of 608941 NJ Inc. and acting managing member of Arch Real

17    Estate Holdings, LLC.

18              MR. MASUMOTO:  All right.  Any other appearances?

19    No.  All right.  Why don't we proceed?

20              Mr. Simpson, did you sign the petitions, schedules,

21    and statement of financial affairs?

22              MR. SIMPSON:  Yes.

23              MR. MASUMOTO:  All right.  With respect to the

24    petition, are there any corrections, additions, or amendments

25    that you'd like to state for the record at this time?
```

1           MR. SIMPSON:  I mean, I think, consistent with the

2    email exchanges that most of the parties here were on, and I'll

3    state for record, there's a lot of information I do not have.

4    I don't have the -- you know, the way that JJ Arch works is

5    it's an opportune organization.  So it is the majority owner of

6    Arch Real Estate Holdings.  Arch Real Estate Holdings has a

7    variety of companies that are directly owned, indirectly

8    involved in.  The way taxes have to work is go off the flow

9    from the top.

10          So I am -- do not have information for those entities

11   down below for the liabilities, assets prospective to properly

12   illustrate what those things are or are not, which obviously

13   the (indiscernible) situation, if I make it -- if I was or when

14   I was in control of Arch Real Estate Holdings, it would be

15   something I would be able to get from the staff that we used to

16   have.  But those staffs are gone.  And I did not receive that

17   information from the acting managing member.

18          I'll bite what was said by Adam Friedman or

19   Friedberg, who I called him out and said, if you have it -- if

20   you think I have it, please send it now.  And he hasn't.  So I

21   think we all know --

22          MR. MASUMOTO:  All right.

23          MR. SIMPSON:  -- I don't have that information.  So

24   that's --

25          MR. MASUMOTO:  Mr. Simpson?

1              MR. SIMPSON:  -- where we are.

2              MR. MASUMOTO:  One moment, Mr. Simpson.  Do you have

3   copies of the document, the petition, the schedules, and

4   statement of financial affairs in front of you?

5              MR. SIMPSON:  No, I don't have those in front of me.

6              MR. MASUMOTO:  Okay.

7              MR. SIMPSON:  I know of caveats that I've made.

8   Like, the caveats that I've made hold true.  Those have not

9   changed, those caveats.

10             MR. MASUMOTO:  So would it be possible for you to

11  acquire copies for you to review at this time?

12             MR. SIMPSON:  Sure.

13             THE COURT:  Okay.  So as we proceed, I would

14  appreciate it if you had those documents before you.  If you

15  look at the original petition, it's a page -- 15 pages.  Again,

16  this is separate.  I'm talking about the petition, separate

17  apart from the schedules and statement of financial affairs.

18             With respect to the petition, the 15-page petition, I

19  want -- I was asking whether or not you're aware of any changes

20  or corrections.  Now, having said that, I understand that the

21  debtor filed an amendment to the petition, changing its

22  selection of Subchapter V treatment to one of regular under

23  Chapter 11.  But aside from that change to the original

24  petition, are you aware of any revisions, changes, or

25  amendments that you'd like to state for the record at this

1  time?

2          MR. SIMPSON:  No.  The -- that's the only change that

3  I'm aware of, and I can't tell you I know how that would change

4  the (indiscernible) question on how it changed, just given the

5  change from the election to 5 to 11.  But other than that,

6  that's the only thing I'm aware of.

7          MR. MASUMOTO:  Okay.  Again, now, with respect to the

8  schedules and statement of financial affairs, there have been

9  global notes -- there are global notes attached to those,

10 essentially stating what you stated earlier, which is

11 essentially that you don't have the sufficient information to

12 be able to essentially attest to those documents.  That's your

13 current position, correct?

14         MR. SIMPSON:  Yes.

15         MR. MASUMOTO:  I did see an email exchange --

16         MR. KOEVARY:  I'm sorry, that --

17         MR. MASUMOTO:  I'm sorry, go ahead.

18         MR. KOEVARY:  Trustee Masumoto, may I interrupt for a

19 second?  This is John Koevary for counsel for AREH.

20         MR. MASUMOTO:  Go ahead.

21         MR. KOEVARY:  You know, Mr. Simpson is making excuses

22 that are entirely unfounded.  And I think the email

23 correspondence speaks for itself.  And the fact that he's

24 sitting here today pointing fingers at AREH who has, you know,

25 given him, you know, everything they can and said, if there's

1  anything else, has offered to, you know, make anything

2  available upon request and no such specific request has been

3  made.  So you know, he can take whatever position he wants, but

4  that's just completely disputed.

5          MR. MASUMOTO:  Okay.

6          MR. SIMPSON:  And complete disputed and arguably --

7  arguably -- arguably AREH's my company and you work for me.  I

8  never approved your --

9          MR. MASUMOTO:  One moment, excuse me.

10         MR. SIMPSON:  -- further --

11         MR. MASUMOTO:  Excuse me.

12         MR. SIMPSON:  And further -- and --

13         MR. MASUMOTO:  Hang on.  Mr. Simpson, I take it that

14  that was your interjection.  At this time, we need one person

15  to speak at a time.  And whenever someone speaks, they need to

16  identify themselves.

17          At this point, look, just as I stated earlier, I know

18  there are disputes, discovery disputes that are probably

19  outstanding and so forth.  I don't want this to devolve into,

20  you know, finger pointing and, you know, back and forth

21  accusations or whatever.  I will give everyone an opportunity

22  to make a statement, but essentially one statement.

23          Mr. Simpson, your position has been stated initially.

24  And at this point, I've allowed Mr. Koevary to make a

25  statement.  Let's leave it at that for now.  And then let's

 1 | continue.

 2 |         So with respect to the statement of financial affairs

 3 | and the schedules, the global notes as far -- which indicate

 4 | that the schedules and statement of financial affairs cannot be

 5 | finalized or not finalized at this point, that is the current

 6 | position of the debtor.  Is that correct, Mr. Simpson?

 7 |         MR. SIMPSON:  Yes.

 8 |         MR. MASUMOTO:  Okay.  All right.  So going for -- the

 9 | next question is one, Mr. Simpson, you can answer if you're

10 | able.  I certainly would understand if you prefer to defer to

11 | your counsel.  But what I wanted to know, and what I thought

12 | was important for this 341 meeting, was sort of the status of

13 | the case with vis-a-vis the debtor's intentions, post the two

14 | opinions rendered by the bankruptcy court.  The bankruptcy

15 | court rendered a decision remanding and or abstaining with

16 | respect to the state court action, and also as a companion

17 | opinion indicating that it would lift the stay.

18 |         So Mr. Simpson and/or your counsel, can you advise me

19 | as to the debtor's intention?  Does it regard the opinions --

20 |         MR. PASTERNAK:  Yes.

21 |         MR. MASUMOTO:  -- as a want to be appealed?  Or is it

22 | interlocutory?  What exactly -- can you give me some idea as to

23 | what the debtor intends to do vis-a-vis the two opinions?

24 |         MR. PASTERNAK:  Yeah.  Well, since the -- this is

25 | Mr. Pasternak for the debtor.  The decisions are not final

1  orders.  They are referred to as proposed findings of fact and

2  conclusions of law to the district court.  The debtor will be

3  filing objections to those proposed findings and conclusions of

4  law.  That's the appropriate procedure.  It's not a direct

5  appeal.

6          MR. MASUMOTO:  Okay.  And so do you have any schedule

7  or timeframe with respect to the district court's ruling?

8          MR. PASTERNAK:  Yes, these pleadings are due on

9  Monday.

10          MR. MASUMOTO:  Okay.  And have you been in contact

11  with chambers as to when hearings might be held and so forth?

12          MR. PASTERNAK:  Not until the papers are filed.

13          MR. MASUMOTO:  Okay.  And with respect to the

14  debtor's intention, I mean, as to both, since they're

15  contingent upon the district court, your position is that until

16  the district court rules, your time to appeal does not begin.

17  Is that correct?

18          MR. PASTERNAK:  Well, technically, once a final order

19  is entered by the district court, it's actually not appealable.

20          MR. MASUMOTO:  Okay.  So --

21          MR. PASTERNAK:  So this is a quasi-appeal that gets

22  determined up front.  That's how it works under federal rules.

23          MR. MASUMOTO:  Okay.  All right.  So do you have any

24  idea -- I know you said you -- until the pleadings are filed

25  and so forth.  Do you have any sort of expectation as to when

1  the district court will rule?

2        MR. PASTERNAK:  We hope as quickly as -- we'll ask

3  for expedited ruling if possible.  Thank you.

4        MR. MASUMOTO:  All right.  So until the district

5  court rules, what is the debtor's intention with respect to its

6  bankruptcy case?  I guess technically, it seems to me that

7  based upon this morning's hearing, the issue as to whether or

8  not you're entitled to convert to a regular 11 is still

9  outstanding and may be heard and ruled upon by the bankruptcy

10 court.  Was that your understanding?

11       MR. PASTERNAK:  That's not the debtor's belief.  I

12 don't think the Court opined one way or the other.  They simply

13 adjourned the motion to expand the Sub V trustee's powers.  And

14 what we're doing with the case is we're reaching out to each of

15 the constituents, including that movant, see if we can resolve

16 things.  Otherwise things will devolve into litigation on

17 multiple fronts.

18       MR. MASUMOTO:  But I -- my understanding is that the

19 party who moved to for the expansion of the Subchapter V

20 trustee's powers stated on the record that it intended to

21 object to the change in selection from Subchapter V to a

22 regular Chapter 11.  Is that -- isn't that what happened?

23       UNIDENTIFIED:  So -- so we --

24       MR. PASTERNAK:  I -- as -- I think that's what --

25    (Simultaneous speaking)

1            MR. PASTERNAK:  Go ahead, Mr. Simpson.

2       (Simultaneous speaking)

3            MR. HEUER:  My apologies.  I don't mean to interrupt,

4  but it makes sense for me --

5            MR. PASTERNAK:  Not at all.

6            MR. HEUER:  So present intention is that I intend to

7  file an objection to that.  Whether I will or will not, I -- I

8  cannot say with absolute certainty.  I'm reviewing it.  My hope

9  and expectation is that matters can be resolved.  And

10  Mr. Pasternak did reach out right after the hearing.  So I -- I

11  remain hopeful that may not be something that is necessary for

12  us to go through.  Thank you.

13            THE COURT:  All right.  Thank you.  All right.

14  Now --

15            MR. PASTERNAK:  Thank you, Mr. Heuer.

16            MR. MASUMOTO:  So with respect to the debtor's

17  bankruptcy case, assume -- let's assume it proceeds in -- as a

18  regular Chapter 11 case.  Does the debtor intend to file a plan

19  and disclosure statement prior to the decision by the district

20  court?

21            MR. PASTERNAK:  The debtor intends to file a plan

22  within its exclusive periods subject to those periods being

23  extended.

24            MR. MASUMOTO:  Okay.  With respect to the -- I

25  believe the debtors filed a motion for a bar date which -- to

 1  which an objection was filed.  Has the debtor reached any sort

 2  of resolution with respect to the bar date?

 3          MR. PASTERNAK:  That objection was filed late

 4  yesterday and we haven't addressed it yet.  No.

 5          MR. MASUMOTO:  Okay.  All right.  All right.  If I

 6  may, although I get it seems that the schedules and so forth

 7  are somewhat up in the air, I guess, as filed, I want to see if

 8  I can get some handle on the filings, on what was filed.

 9          Looking at the schedules -- and this is for

10  Mr. Simpson, if you can -- if counsel has been able to get up

11  to speed on it.  If you look at the schedules and look at page

12  -- I guess beginning on Page 10 of -- I'm sorry.  I'm trying to

13  look at the schedules of all the various properties on which

14  the debtors indicate that it has different kinds of interest.

15  And I guess it starts with the real property interest on Page

16  10 of 19, Page -- Part 9.

17          MR. PASTERNAK:  Brian?

18          MR. MASUMOTO:  Yes.

19          MR. PASTERNAK:  Mr. Masumoto, can you just hold your

20  question for a minute?

21          MR. MASUMOTO:  Sure.

22          MR. PASTERNAK:  So I can get the document up in front

23  of my client, please.  Thank you.  Be a minute.

24          MR. SIMPSON:  Jon, I'm good.  Thank you.

25          MR. PASTERNAK:  I'm sending it right -- I -- you have

1   the petition.  I was just going to send you the schedules.

2            MR. MASUMOTO:  All right.

3            MR. SIMPSON:  Oh, sorry.  I'm looking at schedules.

4   Okay.

5            MR. PASTERNAK:  Yeah, there's two different

6   documents.  There's the voluntary petition.  And here comes --

7            MR. SIMPSON:  Right.

8            MR. PASTERNAK:  -- the schedules.

9            MR. SIMPSON:  All right.

10           MR. PASTERNAK:  Thanks for everyone's patience.

11           MR. MASUMOTO:  All right.  So Part 9 was --

12           MR. PASTERNAK:  All right.  Just --

13           MR. MASUMOTO:  I'm sorry.  So Mr. Simpson --

14           MR. PASTERNAK:  You can pull it up now.

15           MR. MASUMOTO:  Mr. Simpson, do you have a copy of the

16   schedules?  This would be filed -- which was filed as document

17   -- ECF Document 31.

18           MR. SIMPSON:  Bear with me one second.  There's two

19   documents I'm opening to make sure I have the right one in

20   front of me.  Okay.

21           MR. PASTERNAK:  Yeah, the one called schedules is

22   Document 31, Jeff.

23           MR. SIMPSON:  There you go.  Okay.  Yes.  Okay.  Now

24   I do have it in front of me.  Thank you.

25           MR. MASUMOTO:  Okay.  So Document 31.  If you look at

1   Part 9, which is sort of the section that's sort of listed as

2   real property.  Do you see that?  Do you see Page 10 of 19?

3          MR. SIMPSON:  I do.

4          MR. MASUMOTO:  Okay.  Part 9, I guess, beginning with

5   Paragraph 54 and then 55 are the individual lists -- listing of

6   properties.  Are those properties in which JJ Arch has a

7   ownership interest?  Is that the representation here?

8          MR. SIMPSON:  So here's the -- there -- there's sort

9   of two buckets, right?  And I think we've disclosed this in

10  multiple documents.  There's -- let's call them above the line

11  and below the line for the purpose of this conversation, or

12  let's say it -- with Oak and without Oak, right?  So -- or let

13  me clarify with AREH or without AREH.

14          Okay.  So the properties listed, like, in 55.1, you

15  know, pretty much every -- right up to 55.1, 55.2, to 55.3,

16  those three properties are properties where there -- there's no

17  AREH involvement.  The -- you know, that -- those are JJ Arch

18  properties.  JJ Arch is not the owner directly.  The properties

19  like 55.1, 55.2, those two are a little simpler.  They have

20  single member LLCs.  And those single member LLCs have the

21  membership shares are owned by JJ Arch LLC.

22          So like, the first one, 225 HPR LLC, which is, you

23  know, the membership shares, and then 55.3 is one where -- this

24  is -- your client is a participant, which is a little bit of a

25  unique one.  There's a -- there's three different 1031

1   entities, which JJ Arch has, you know, has involvement as

2   management, etc.  So those three fit in that bucket.

3           And then everything there afterwards, I'm just

4   confirming as I look through them here, are ones where, you

5   know, as we call it in the Arch Real Estate Holdings

6   Agreements, if you look at Exhibit C and Exhibit D, there's a

7   form structure in the agreements of Arch, where Arch is an

8   operating company.  And Arch has a file in which it buys

9   property.

10          And Exhibit D in the agreement shows the form

11  documents used.  Every property has what we'll call, you know,

12  MM, whatever the LLC's name is.  So if it was, like, Tuscaloosa

13  MM LLC, Arch Tuscaloosa MM LLC, there's always another party,

14  that would be a JJ party that's affiliated with it.  So JJ Arch

15  itself is not the party.

16          But you see Exhibit C, which not here, but Exhibit C

17  in the Arch Real Estate Holdings Agreements, it will show that

18  it will always be JJ Arch LLC, or a designated party by JJ Arch

19  LLC, which was done by me as the sole authoritator since 2021

20  of all these entities.  And then those entities individually,

21  one by one, they're JJ entities, and there's a whole bunch of

22  them.  Each one of these entities that could be from Columbia,

23  South Carolina to Brooklyn, they're very duplicative in nature.

24  Document by document, each one of those have a group of

25  investors, which was myself and my in-house team.  And it's a

1   JJ investor member entity that has --

2          MR. MASUMOTO:  I'm sorry.  Mr. --

3          MR. SIMPSON:  -- me personally as the authoritator.

4          MR. MASUMOTO:  I'm sorry, Mr. Simpson.  I understand

5   this is extremely complicated and so forth.  And quite frankly,

6   I'm not sure --

7          MR. SIMPSON:  Yes.

8          MR. MASUMOTO:  -- I entire -- I followed entirely

9   your narrative.  But so --

10          MR. SIMPSON:  Okay.

11          MR. MASUMOTO:  -- how about if we do this?  Okay.

12   55.1 refers to a residential realty property.  The address

13   appears to be 225 Head of Pond Road in Water Mill --

14          MR. SIMPSON:  Yes.

15          MR. MASUMOTO:  -- New York.  Is that entity --

16          MR. SIMPSON:  Yes.

17          MR. MASUMOTO:  -- anywhere on your 1007-2 affidavit?

18   I mean, that document included various organizational charts

19   and so forth.  Is that property listed anywhere in the 1007-2

20   affidavit?

21          MR. SIMPSON:  I would have to check the affidavit.  I

22   don't know off the top of my head.

23          MR. MASUMOTO:  Okay.  Of the three, you seem to

24   distinguish between 55.1 through 55.3.  Those properties you

25   indicated seem to be separate from the others.  Are any of

1  those -- any of the other two 55.2 and/or 55.3 on the -- when I

2  say affidavit, I'm talking about the first day affidavit.  Are

3  any of those properties listed on any --

4          MR. SIMPSON:  Yes.

5          MR. MASUMOTO:  -- of the exhibits attached or

6  organizational charts?  Mr. Simpson, do you know?

7          MR. SIMPSON:  I have to check.

8          MR. MASUMOTO:  Okay, you don't --

9          MR. SIMPSON:  I have to check.  I have to check.  I

10  don't -- I have to look.

11          MR. MASUMOTO:  Okay.

12          MR. SIMPSON:  I have to look at how we categorized it

13  for our information.

14          MR. MASUMOTO:  All right.  Well --

15          MR. SIMPSON:  So I can check while we're -- while we

16  continue.

17          MR. MASUMOTO:  Correct me if I'm mistaken.  55.3, the

18  property located is 146 East 89th Street.  Is that the

19  property?  Is that the property that --

20          MR. SIMPSON:  Yes, I'm supposed -- if I can, I'm

21  sorry, I opened up this 1007.

22          MR. MASUMOTO:  Right.

23          MR. SIMPSON:  Just let me show the same page as you.

24  Are you referring to Exhibit A in the 1007?

25          MR. MASUMOTO:  Right.  You have -- Exhibit A is a

1  listing of various organizational --

2          MR. SIMPSON:  Yes.  So I'm there now.  So you're

3  asking me if 55.1 through 55.3 are included in there?  Is that

4  your question?

5          MR. MASUMOTO:  Yeah.  Are they listed on any of those

6  charts?

7          MR. SIMPSON:  I am checking right now.  I don't

8  believe we structured in this way.  I believe we separated

9  those --

10          MR. MASUMOTO:  Okay.

11          MR. SIMPSON:  -- because again, they're what I would

12  call -- what I call, you know, as I said earlier, above the

13  line and below the line, meaning those are -- those have a much

14  more narrow group of people involved.  It's literally just a JJ

15  Arch affiliated property without the AREH components.  Where

16  everything below that line is -- it has AREH components.  So

17  when I when I look at the Exhibit A, it looks to me like those

18  are not included in Exhibit A.  It may be somewhere else in

19  this 165-page document I have to flip through.  But they're not

20  in Exhibit A from what I could tell.

21          MR. MASUMOTO:  Okay.  So let me ask a slightly

22  different question then.  And again, you forgive me because

23  this complexity is probably beyond my usual comprehension.

24  What I'm trying to determine is that all of these things are

25  listed as indirect LLC interest.  And looking at the

1  organizational charts, it seems that some of the interest is

2  associated by virtue of management.  I mean, like a ARE -- JJ

3  -- the debtor has an interest in AREH.  AREH is frequently the

4  managing member of a number of these entities.

5        In some cases, AREH is a managing member with no

6  underlying membership interest.  So it would seem to me that if

7  the debtor's interest is through AREH where AREH is a managing

8  member with no membership interest, the debtor doesn't have a

9  direct interest in the underlying property itself.  It may have

10 an interest in the entity because of its management fees, but

11 not a not a property interest in the in the ultimate bottom

12 line real estate.  Is that a fair summary or characterization

13 or is that inaccurate?

14        MR. SIMPSON:  Now, in -- inaccurate.  So if you could

15 go to the 1007, I'm going to give you a really easy example,

16 because most of them are pretty hard to read.  But there's a

17 few that are simple --

18        MR. MASUMOTO:  Okay.

19        MR. SIMPSON:  -- but we use the same structure.  We

20 have used the best things because there won't be no future.

21 But let's just look at -- if you look at Page 25, 26 or -- in

22 the PDF, or I would say, like, we use -- if you flip to Exhibit

23 A, which is the Melrose Apartments, if you can go there.

24        MR. MASUMOTO:  Okay.

25        MR. SIMPSON:  That would be helpful, if you could

1    look at that one.

2          MR. MASUMOTO:  I'm sorry.  It looks like my PDF is

3    somewhat corrupted.  I'll have to call it back up.  All right.

4    What page?  This --

5          MR. SIMPSON:  Okay.

6          MR. MASUMOTO:  165?  What page on the --

7          MR. SIMPSON:  So Page 25 --

8          MR. MASUMOTO:  Okay.

9          MR. SIMPSON:  -- in my PDF on the 1007 declaration --

10         MR. MASUMOTO:  Right.

11         MR. SIMPSON:  -- Page 25.

12         MR. MASUMOTO:  All right.  Okay.  Is that the Melrose

13   Apartments with the underlying F?

14         MR. SIMPSON:  Yes.

15         MR. MASUMOTO:  The bottom-line entity is 3200?

16         MR. SIMPSON:  Yes.

17         MR. MASUMOTO:  Okay.  Go ahead.

18         MR. SIMPSON:  So structurally, the way that Arch was

19   built is in its original corporate governance, it had a checks

20   and balances system, and Exhibit C of the Arch Real Estate

21   Holdings Agreement, which is an operating company, it's not a

22   real estate owned company, it only operates property, right?

23   It has an ownership structure.  And this illustrates that with

24   one exception.  And I'm -- just to share with you so you -- to

25   answer your question.

1          So under the construct of where it says in -- not the

2    middle, but the second one from the left, it says Arch Real

3    Estate Holdings LLC, right?  So that says non-member manager.

4    It says zero percent.  So the way you categorize the situation,

5    it would fall into that bucket, where JJ Arch and 35 Oak, or in

6    this case, 608941 NJ, right, are the parties that are part of a

7    non-member manager, which was often the case, how we structured

8    just about everything, not everything, but more closely to

9    everything.  Okay?

10         On the right side of that is the 608941 NJ member,

11   where they invested money as part of this GP.  It doesn't mean

12   that any -- all monies were here, but this is sort of the --

13   the governance and the guiding force of the managing member of

14   the entity, 3200 Haverhill GP LLC.

15         And then you'll see two other entities on the left

16   and the right side, okay, flanking left and the right side.  So

17   all the way on the left, it says JJ Haverhill LLC member.  So

18   JJ Haverhill LLC consists of monies invested by personal

19   members of JJ Arch, like Jared Chassen and Jeffrey Simpson.

20   And it also afforded the ability for others that were key

21   employees, employees that had very specific agreements with the

22   allocation ability to do it, and their direct family members to

23   invest under these entities.

24         So JJ Haverhill LLC, I don't have the breakdown in

25   front of me, has funds that are inserted by me and others in

1   every one of these real estate deals.  And JJ Haverhill LLC is

2   what I was describing as, if you look at the corporate

3   governance of Arch Real Estate Holdings, and you would see that

4   the way it's set up is that every one of the what I call

5   Exhibit D property owners, which 3200 N Haverhill GP LLC is an

6   illustration of Exhibit D in the Arch Real Estate Holdings

7   operative structure, okay, which is duplicative over and over

8   again.

9          And if you looked at the corporate governance, you'll

10  see it has an allocation for JJ Arch, or a JJ Arch designee to

11  invest these monies as part of this GP.  So this entity JJ

12  Haverhill LLC, which is listed on the schedules that we just

13  were on, is part of that.  So that's where we listed it as an

14  indirect rather than direct.

15         MR. MASUMOTO:  So what would you claim that the

16  debtors percentage interest in the underlying property is?

17         MR. SIMPSON:  That's very difficult to figure out on

18  the phone call.  Do you see the -- if you look at these org

19  charts, the complexity, it would be very difficult for me to

20  tell you.  I mean, it's not all -- it's -- they are minority

21  interests.  That's without question.

22         However, they're not minority interests that relates

23  to control, right, the way it was set up.  And if you would

24  look at any one of these documents, as you will see that in

25  order for, let's say, the managing member to do big things, or

1   do things with themselves, they have to get consent from the

2   other side.

3           So that's the checks and balances that was built into

4   the system because both sides put in equity, cash equity,

5   besides third party investors, because there's certain deals

6   that have third party investors of cash that are large, and

7   some have it as small.

8           But in every situation, it's consistently built the

9   same way, where you have this checks and balances, where

10  there's -- if you look at the original Arch agreement

11  (indiscernible) three, you know, three players at the party,

12  the fourth member, which you'll see consistently is the one on

13  the right side, which is Arch Property Holdings I, LLC, member,

14  which also, by the way, has JJ Arch as its managing member.

15          And that's, you know, that was a little bit more

16  difficult to describe, because it's for what we call promote

17  shares for profits, interests, right.  And that's the profits

18  and interest vehicle that was amended later in life from when

19  we originally started the company.

20          But if you're looking at investment dollars in

21  patrols, if you'd review any one of the agreements, like 3200

22  North Haverhill GP LLC, it will enumerate the members, and it

23  will say that the people that are able to make decisions with

24  the rest of the money would be JJ Haverhill LLC, and Arch Real

25  Estate Holdings LLC, as its non-member manager, in this case,

1  now being run by 608941.  And then it would also be 608941 as

2  its other 50 percent interest of the GP.

3          MR. MASUMOTO:  Okay.  So let me ask, that Page 25, in

4  that set up, is it your explanation that they -- that structure

5  is sort of represented in the Paragraph 55.1 through 55.3?  Is

6  that the setup that for those three different --

7          MR. SIMPSON:  No, no, no, no.  No, that's not -- if

8  you're -- no, no, no, no.  This is everything after that.

9          MR. MASUMOTO:  Okay.

10         MR. SIMPSON:  So, no.

11         MR. MASUMOTO:  So everything --

12         MR. SIMPSON:  5.1 through 5.3 are very, very simple.

13 And those typically consist of, you know, it was an investment

14 by Chassen and Simpson, and usually nobody else, or maybe a

15 family member of his.  And that's it.  This is everything we're

16 including the whole kicker bootlegged team on this call, right,

17 all the AREH -- you know, allegedly AREH people that are

18 affiliated with Oaks, right, all those people are interested in

19 -- in everything below the 55.3, I would say 55.4 downward.

20 And that's the schedule that was used for what I call the AREH

21 properties.  And if you look at the original AREH agreement,

22 which I doubt you have in front of you, it follows suit toward

23 a corporate structure in which we created.

24         MR. MASUMOTO:  Okay.  All right.  I guess I'll have

25 to suffice for now.  If I may direct your attention to to ECF

1    Document Number 32, which is the statement of financial

2    affairs.  Do you have a copy before you?

3              MR. PASTERNAK:  It's at the end of the document, I'd

4    say, called schedules.

5              MR. SIMPSON:  Yeah, yeah, I'm just looking for it.

6    Right -- sorry, guys.  Just give me -- can you please repeat

7    the form name again, which form we're talking about?

8              MR. MASUMOTO:  Yeah.  It's the statement of financial

9    affairs.  It would be -- it was filed as ECF Document Number

10   32.

11             MR. SIMPSON:  Hold on a second.  I'm just trying to

12   make sure I get to the right place.

13             Jonathan, are you able to help me with -- it -- it's

14   part of the larger --

15             MR. PASTERNAK:  (Indiscernible).

16             MR. SIMPSON:  -- file, right?  Yeah, well, there's

17   several of them, but the one --

18             MR. PASTERNAK:  No, no, no, no.

19             MR. SIMPSON:  -- that --

20             MR. PASTERNAK:  The last one I sent you, the very

21   last --

22             MR. SIMPSON:  Right.

23             MR. PASTERNAK:  -- email I sent you, and it should

24   say rate --

25             MR. SIMPSON:  Yep.

```
 1              MR. PASTERNAK:  -- schedules.  I'll pull it up with

 2   you.  Now, if you --

 3              MR. MASUMOTO:   Okay.  Let me --

 4              MR. PASTERNAK:  Sure, I'll try and get you to the

 5   page.  Give us a moment here.  Go to page --

 6              MR. MASUMOTO:  I believe it's Page 13 of 32.

 7              MR. PASTERNAK:  (Indiscernible) only the schedules.

 8   Yeah, these -- I only sent him the schedules.  I have to --

 9              MR. MASUMOTO:  Okay.  Well, Mr. Simpson, maybe if I

10   can sort of describe -- my question is, hopefully it's not that

11   complicated.

12              MR. SIMPSON:  Go ahead.

13              MR. MASUMOTO:  In your statement of financial

14   affairs, there's a section Part 13, which asks for details

15   about the debtor's business or connections to any businesses.

16   It begins with Paragraph 25, and you have 25.1 through several

17   pages, I think it goes to, I think, 25.80 or something like

18   that.

19              But in these lists, the nature of the business is

20   described as sort of, there are two descriptions.  The first

21   section, I think the first, approximately nine, are listed as

22   investment entities.  The first being Arch 11 Green Street MM

23   LLC.  Second was Arch 701 South Juniper MM LLC.  These are

24   listed as investment entities.  And then just again, further

25   down beginning at 25.10, the description of the businesses are
```

1  listed as Arch Real Estate Holdings LLC, as real estate, and

2  then Arch Builders LLC, real estate.  So there's a distinction

3  among the listings between an investment entity and a real

4  estate entity.  And I was wondering if you could sort of

5  describe the differences between these --

6          MR. SIMPSON:  Yes.

7          MR. MASUMOTO:  -- these entities.

8          MR. SIMPSON:  Yes, I can.  If I could point you to --

9  I think this is going to be the easiest way.  If I could point

10  you to the 1007 --

11          MR. MASUMOTO:  Right.

12          MR. SIMPSON:  -- and if you would go to Page 75,

13  okay, there's a real clear line in the sand that will help

14  illustrate this.

15          MR. MASUMOTO:  All right.  I'm looking at --

16          MR. SIMPSON:  So in that -- in the nomenclature that

17  we -- okay.  Yes, the nomenclature we use is we call

18  OpCo/PropCo, right, similar to a hotel or nursing home.  So

19  operating company versus property company.  So if you look at

20  1007 and Page 75, which is Arch Real Estate Holdings,

21  everything that's involved in Arch Real Estate Holdings --

22          MR. MASUMOTO:  I'm sorry, Mr. --

23          MR. SIMPSON:  -- would be --

24          MR. MASUMOTO:  I'm sorry.  Mr. Simpson, I'm looking

25  at Page 75 of 165.  Is that what you're asking me to look at in

1   the 1007?

2          MR. SIMPSON:  Yes, it is.  Correct.

3          MR. MASUMOTO:  Okay.  Okay.

4          MR. SIMPSON:  Correct.  Absolutely.  Yes.  So where

5   it says here, Limited Liability Operating Agreement of Arch

6   Real Estate Holdings.

7          MR. MASUMOTO:  Right.

8          MR. SIMPSON:  Right.  So this is the operating

9   company.  Arch Real Estate Holdings has ownership of Arch

10  Builders, of all of the affiliated operating companies, which

11  your distinction or our distinction the way we described it,

12  right, is -- is not an investment entity because they're not

13  investment entities, right?  They didn't invest in anything.

14  They were operating companies, right?

15         MR. MASUMOTO:  Right.

16         MR. SIMPSON:  And that's the whole -- the dispute

17  over control lives in this bucket.  And if you go to, let me

18  just keep rolling through, this is the whole Arch agreement.

19  And now if we get to page, bear with me one moment.  Okay.  So

20  after the signature pages, if you go to Page 114 of 165.

21         MR. MASUMOTO:  All right.

22         MR. SIMPSON:  And you see on 114 of 165, where it

23  says Eligible Asset Structure.

24         MR. MASUMOTO:  All right.

25         MR. SIMPSON:  Do you see that?

1             MR. MASUMOTO:  Yes.

2             MR. SIMPSON:  Okay.  So if you look at the left side

3    of that org chart, this is the org chart attached to the Arch

4    Real Estate Holdings Agreement.  If you look at the org chart

5    on the left, it says JJ Arch 608941 as Arch Real Estate

6    Holdings, the GP.  So that is the operating entity, where it's

7    highly disputed controls, right?  This is -- this probably

8    familiar to you, because this looks a lot like what we looked

9    at for the Melrose property, not that long ago, a few minutes

10   ago, right?

11            MR. MASUMOTO:  Right.

12            MR. SIMPSON:  Same construct here.  So essentially,

13   this is the corporate governance.  So you'll see here what it

14   says, in the middle, JJ Arch LLC, or entity controlled by JJ

15   Arch LLC.  And on the right is Wiener 2, which the other

16   nomenclature is going to be 608941, because they never used

17   anything other than 608941.

18            So now if you continue to Exhibit D, okay, it is all

19   the corporate governance.  This is duplicative.  This is the

20   only operating company for the overall business that exists.

21   Under Exhibit D, it says form of GP Operating Agreement, right?

22            MR. MASUMOTO:  Right.

23            MR. SIMPSON:  If you just continue to the first page,

24   and I won't bore you more details.  If you read in the first

25   page in the preamble, it describes, this is an agreement, this

1   is Arch Blank MM LLC.  So when you ask me about Juniper, or you

2   ask who owned these entities, right?  It's familiar, right?

3   This is Arch Blank MM LLC.  This is the form investment entity

4   structure that we use on every deal.  Every -- I wouldn't say

5   every, most, majority.

6            And if you would look at the way the words are in the

7   preamble, it says there between Arch Real Estate Holdings, it

8   says Wiener Entity, and then it says the JJ entity, right?  And

9   together it is -- its business successors are assigned JJ.

10           So this describes the investment entity, which is the

11  Arch Blank MM LLC.  So all those entities that you asked me

12  about, they're all duplicative, more or less, with this form

13  document, which is part of our corporate governance, which is

14  further articulated, I don't waste everyone's time, in Arch

15  Real Estate Holdings above, it describes how investment

16  entities or eligible assets are dealt with.  And those are all

17  considered to be affiliates of one another across the board.

18           MR. MASUMOTO:  Okay.  All right.  Thank you for that

19  explanation.  Now, currently, the debtor -- is the debtor

20  receiving any income from any source at this point?  From any

21  of the entities --

22           MR. SIMPSON:  JJ Arch --

23           MR. MASUMOTO:  -- that are listed?

24           MR. SIMPSON:  So anything AREH related, it has

25  received zero on anything that I'm aware of whatsoever.  On the

 1  JJ Arch LLC side, there have been very limited payments that

 2  have been scheduled and put into the reports where money has

 3  been received, but it's extremely limited money of any kind.

 4  And that's all been reported, you know, maybe there's been four

 5  payments of tiny amounts that are sort of legacy money that

 6  came from something from, you know, months ago, or something of

 7  that nature.

 8          MR. MASUMOTO:  All right.  I believe that the debtor

 9  filed its operating report for the month of March, I guess the

10  partial month of March.  Is that correct?

11          MR. SIMPSON:  Yes.  And I believe April -- Jonathan,

12  I don't know if you've sent it yet, but April was just -- with

13  the change of counsel, and we thought April was done, it was

14  basically done, it just -- I guess it never got sent.  So April

15  was completed.  And I think Jonathan either did send it or was

16  about to send it.  And we can share that with you, but it's

17  not --

18          MR. PASTERNAK:  Yeah, we filed that.

19          MR. MASUMOTO:  Okay.

20          MR. SIMPSON:  It's not very notable.  It's not very

21  much money to speak of.

22          MR. MASUMOTO:  So again, I'm trying to determine, in

23  the April report that -- I'm sorry, the March report that was

24  filed, it listed cash receipts of $3,557.83.  Do you recall

25  that?

1          MR. SIMPSON:  I do.

2          MR. MASUMOTO:  Okay.  What was the source of that

3   cash receipt?

4          MR. SIMPSON:  There was a vehicle that was being used

5   by me as a -- as allowed to be used on the JJ Arch.  And the

6   vehicle was disposed of.  And it was titled under JJ Arch.  So

7   we disclosed that.

8          MR. MASUMOTO:  So the full amount of the 3,500 and et

9   cetera is solely from the sale of the vehicle.  Is that

10  correct?

11         MR. SIMPSON:  Yeah, the vehicle, but it -- it was

12  like a $40,000 sale, but the net proceeds after the debt was

13  like that amount of money $3,000-whatever.

14         MR. MASUMOTO:  Okay.  So --

15         MR. SIMPSON:  Yep.

16         MR. MASUMOTO:  -- were there --

17         MR. SIMPSON:  (Indiscernible.)

18         MR. MASUMOTO:  -- did you receive -- was it --

19         MR. SIMPSON:  It was going under JJ Arch explicitly.

20         MR. MASUMOTO:  Okay.  Did you report any income from

21  any other source, from any of the other indirect entities that

22  you've listed on the schedules and statement of financial

23  affairs?  Were there any amounts listed?

24         MR. SIMPSON:  We don't -- there aren't any other

25  that --

1           MR. MASUMOTO:  Okay.

2           MR. SIMPSON:  -- that I'm aware of.  There aren't any

3    others.

4           MR. MASUMOTO:  So --

5           MR. SIMPSON:  There was -- there's a -- there's one

6    that's going to be either in April or May, where there was a --

7    there was funds that were available from a sale of a property

8    that was JJ Arch affiliated, not AREH, but Chassen and there's

9    another 50 percent member that's not, you know, on this call,

10   that was sold like a year ago.  And given the back and forth

11   with JP Morgan and First Republic, there was money that was

12   stuck for many months.  And I believe -- I wasn't even aware if

13   they've released the funds to the 50 percent partner who fell

14   off many, many times.  But First Republic, AKA JP Morgan, and

15   then the funds were released as well, on my side.  But there

16   have been more than suitable bills that I've had to pay for the

17   various JJ entities to offset those monies, and I think it's

18   like $10,000.  And if it's not on a schedule, it probably is on

19   the April schedule, or I don't know if it happened in April or

20   May.  But that's the only thing that I'm aware of where JJ Arch

21   received any funds.

22          MR. MASUMOTO:  So with respect to the April report,

23   which is about to be filed, what is the amount of income that

24   you've reported on that monthly operating report?

25          MR. SIMPSON:  Jon, we can probably open it up.  I

1  don't have it.  (Indiscernible) hold up.  Maybe this is right

2  here.  One second, hold on.

3          MR. MASUMOTO:  Okay.  Well, while your counsel is

4  looking up the amount, can you tell me the source of any of

5  that income?  Do you know which entity it came from or is

6  attributable to?

7          MR. SIMPSON:  Well, yes.  Yes, as I -- as I

8  mentioned, so there was an entity called ADH Swinks (phonetic).

9  And it was a property that was owned 50 percent by JJ Arch in

10 membership shares, and then 50 percent by a third party.  And

11 that was pulled probably a year ago.

12          And then there was residual funds that were kept on

13 account to cover costs that would -- could happen, you know, as

14 you know, unwinding costs, taxes, et cetera.  And the partner

15 had asked to dispose of the funds and leave, you know, a couple

16 dollars to pay for taxes.  And we made that request well,

17 before the filing of this -- of the bankruptcy petition.  It

18 took a couple months for the bank to release the funds after

19 the partner followed up many times.

20          MR. MASUMOTO:  Okay.  So --

21          MR. SIMPSON:  But it should be pursuant to our

22 agreement.

23          MR. MASUMOTO:  So counsel, do you have any idea what

24 the total receipt was for April?

25          MR. PASTERNAK:  Jeff, you should have the report in

 1 │ front of you.  You just didn't see it --

 2 │          MR. SIMPSON:  Yep, I'm -- yep, looking right now.

 3 │ I'm looking right now.  Hold on.  One second, I have it here

 4 │ now.  Yeah, it's as I expected it.  It talks about ADH Swinks

 5 │ LLC.  It says $10,750.

 6 │          MR. MASUMOTO:  So the income in April that you'll be

 7 │ reporting is approximately 10,000.  Is that correct?

 8 │          MR. SIMPSON:  Yes.

 9 │          MR. MASUMOTO:  Okay.

10 │          MR. SIMPSON:  Mm-hmm.

11 │          MR. MASUMOTO:  As to -- what about your May report?

12 │ When do you anticipate being able to complete your May report?

13 │          MR. SIMPSON:  I don't think it's going to take long.

14 │ I mean, Jonathan is just ramping up.  He -- as he said, he

15 │ started to go and he's, you know, putting out fires to help get

16 │ engaged, but he's helping me and we're cleaning up this April

17 │ one, which I thought was released, but it wasn't released to

18 │ prior counsel.  So that's going out today.  And there's so few

19 │ updates because there's no income really coming in --

20 │          MR. MASUMOTO:  So --

21 │          MR. SIMPSON:  -- that it won't take long to do May

22 │ (indiscernible).

23 │          MR. MASUMOTO:  With respect to the May report, do --

24 │ what is your anticipated income?

25 │          MR. SIMPSON:  I don't know of any.

1           MR. MASUMOTO:  I'm sorry.  You don't know of any

2    income that's likely to be reported in the May --

3           MR. SIMPSON:  As in zero.

4           MR. MASUMOTO:  Okay.

5           MR. SIMPSON:  As in zero.

6           MR. MASUMOTO:  All right.

7           MR. SIMPSON:  As in zero.  I mean, there is --

8    there's really no -- there's no sources of revenue at this

9    point for anywhere in JJ Arch.  The two amounts that came in

10   those two months are residual funds that came from, you know,

11   historical months ago.  Like, there's no transactions that are

12   occurring that are bringing positive cash flow into JJ Arch in

13   its current time.

14          MR. MASUMOTO:  All right.  And your testimony today

15   is that going forward, at this point, you don't anticipate any

16   other source of income coming in to JJ Arch from non-AREH

17   sources.  Is that your testimony?

18          MR. SIMPSON:  I --- it's -- given the way this has

19   been set up and the way that all the parties on this phone call

20   have made it, it's impossible to bring any money in.

21          MR. MASUMOTO:  Okay.

22          MR. SIMPSON:  The answer is no.  There's no money

23   coming in because everyone's short on limitations on

24   everything.

25          MR. MASUMOTO:  Okay.

```
 1              MR. SIMPSON:  So no, I don't have any money coming

 2   in.

 3              MR. MASUMOTO:  Okay.  And with respect to AREH, you

 4   don't anticipate any funds being upstream from AREH going

 5   forward at this time.  Is that correct?

 6              MR. SIMPSON:  You can -- you could ask the folks at

 7   Oak or AREH if they're ever going to pay the bills they're

 8   supposed to, but highly unlikely, is my guess.

 9              MR. MASUMOTO:  Okay.

10              MR. SIMPSON:  (Indiscernible.)

11              MR. MASUMOTO:  Again, this is you know, it's whatever

12   your understanding is.  So from -- my question is, okay, if

13   you're proposing a plan, a plan of reorganization, what would

14   be the source of your funding of the plan?

15              MR. SIMPSON:  Jonathan, do you want to try to talk to

16   this?

17              MR. PASTERNAK:  I'm sorry, Brian, can you repeat the

18   question?

19              MR. MASUMOTO:  Yes.  In any plan that you submit or

20   file with the Court for reorganization, what's the source of

21   the plan funding?  How do you -- how does the debtor --

22              MR. PASTERNAK:  That has --

23              MR. MASUMOTO:  -- intend to fund a plan of

24   reorganization?

25              MR. PASTERNAK:  Brian, I'm too new into this case,
```

1   and that is to be determined.  So I don't have an answer for

2   you today.

3           MR. MASUMOTO:  Okay.  All right.  At this time, I'd

4   like to open it up to questions from the creditors and other

5   parties in interest.  Once again, I would ask that the parties

6   limit their questions to sort of the general questions

7   regarding reorganization and to try to avoid questions that are

8   -- that might be characterized as discovery-type questions, you

9   know, that for disputes that remain outstanding in the

10  bankruptcy case.

11          All right.  So please identify yourself for the

12  record before you ask your question.  Are there any questions?

13          MR. SOUTHARD:  Yes, Brian.  This is Sean Southard on

14  behalf of Jared Chassen.

15          MR. MASUMOTO:  Okay.  Go ahead.

16          MR. SOUTHARD:  I do have some questions.

17          So Mr. Simpson, we spent some time in the prior

18  discussions this afternoon talking about the two different

19  buckets of interest by JJ Arch, those that are related to AREH

20  and those that are not.  What I'd like to do is focus on those

21  that are not related to AREH, which I believe your first day

22  affidavit defined as the non-portfolio project assets.  Do you

23  understand to what I'm referring to?

24          MR. SIMPSON:  I do.

25          MR. SOUTHARD:  Great.  So before the bankruptcy was

1   filed, is it your understanding that the debtor was in

2   operational control over each of the subsidiary or affiliate

3   entities that own those non-portfolio project assets or the

4   non-AREH assets?

5             MR. SIMPSON:  With certainty, is to be clear by the

6   state court, that I was the only managing member that existed,

7   who was in control of those assets contrary to your client's

8   allegations and taking of money.  It's been brought up in court

9   countless times.  And each time --

10            MR. SOUTHARD:  Yeah.  Let me cut you off for a

11  second.

12            MR. SIMPSON:  The answer is I was --

13            MR. SOUTHARD:  Just clarify.

14            MR. SIMPSON:  -- in control and I am in control.

15  Other than --

16            MR. SOUTHARD:  Yeah.  Let me --

17            MR. SIMPSON:  -- I'm in control.  Yes.  That's the

18  answer.

19            MR. SOUTHARD:  Let me --

20            MR. SIMPSON:  Yes.  I'm in control.

21            MR. SOUTHARD:  I actually wasn't pointing --

22            MR. SIMPSON:  (Indiscernible.)

23            MR. SOUTHARD:  I actually wasn't pointing the

24  question to you personally, but I appreciate your advising us

25  of that.  I was referring to the debtor as JJ Arch.

```
 1              MR. SIMPSON:  Well, there's only two members of JJ

 2   Arch.  There's only two members of JJ Arch.  Right?  Who else

 3   -- who else is there?

 4              MR. SOUTHARD:  Okay.

 5              MR. SIMPSON:  Who are the members?

 6              MR. SOUTHARD:  All of them.

 7              MR. SIMPSON:  Is Oak a member?  Is Oak a member?  Who

 8   else is a member of JJ Arch?

 9              MR. SOUTHARD:  Mr. Simpson --

10              MR. SIMPSON:  (Indiscernible.)

11              MR. SOUTHARD:  -- perhaps you don't under -- perhaps

12   you don't understand the protocol here --

13              MR. SIMPSON:  Okay.  Jonathan --

14              MR. SOUTHARD:  -- but I'm not here to answer your

15   questions.

16              MR. SIMPSON:  Jonathan, maybe you can help me.

17   Jonathan, why don't you ask Mr. Southard here what his question

18   is?  Because he wasn't being --

19              MR PASTERNAK:  Jeff, Jeff --

20              MR. SIMPSON:  He's --

21              MR. PASTERNAK:  Jeff, please stop.

22              MR. SIMPSON:  PG.

23              MR. PASTERNAK:  Jeff, please.

24              MR. SIMPSON:  I'd like to know what his question is.

25              MR. SOUTHARD:  I'd be happy to --
```

```
 1                MR. MASUMOTO:  All right.  Stop walking over people.

 2                MR. SOUTHARD:  -- question.

 3                MR. MASUMOTO:  Everybody ,one at a time.  I think he

 4     answered the question already.  Yes.  But if you want to ask it

 5     again, Sean, go ahead.

 6                MR. SOUTHARD:  Thank you.

 7                MR. MASUMOTO:  (Indiscernible.)

 8                MR. SOUTHARD:  I'll just move through it as best I

 9     can.  And we'll, you know, deal with it as we need to

10     hereafter.  But there's one other entity that I wanted to focus

11     you on, and that is 1640 Motors LLC, which does business as R-

12     E-V-E-R Motors or Rever Motors.  Is that an entity owned by JJ

13     Arch?

14                MR. SIMPSON:  It is an entity that is within the JJ

15     Arch construct.  Correct.  There's an operating company that is

16     within the -- it -- it's -- so -- for lack of clarity, as far

17     as organizational documents, because I didn't lose access,

18     contrary to what -- what the folks from Olshan, who would know

19     nothing about anything, have said that I have access to

20     everything.  I've accessed to nothing.  I've lost all access to

21     email, all access to everything I've ever had with the company

22     I built.  So I don't have all access to all files.

23                But if there is lack of clarity, and even when

24     Mr. Chassen posted stuff on the docket, he already

25     (indiscernible) clarity on the 1640 Motors LLC has always
```

1   operated under JJ Arch.  It definitely has affiliation to JJ

2   Arch.  As far as having sort of a direct operating agreement

3   for that, I have -- I do not have such a document.  I know the

4   intentions of it.  But that's as far as I can go with it.  I

5   don't have a document to support it.

6           MR. SOUTHARD:  Okay.

7           MR. SIMPSON:  And if we can --

8           MR. SOUTHARD:  What sort of business --

9           MR. SIMPSON:  -- (indiscernible).

10          MR. SOUTHARD:  What sort of business does that entity

11  conduct?

12          MR. SIMPSON:  It buys and sells cars and repairs

13  cars.  And that's what it does.  Yeah.  It's coupled with a

14  property called 1640 Montauk Highway, which is, again, an

15  OpCo/PropCo structure.  1640 Montauk LLC is the owner of the

16  property.  1640 Motors LLC is the operating company, which is

17  essentially a tenant that's, you know, it's a related party

18  tenant, which the lender is aware of, and it was disclosed to

19  lenders and as we're speaking here, was disclosed at the very

20  beginning on how that works.

21          MR. SOUTHARD:  And before the bankruptcy, did JJ Arch

22  have control over Rever Motors and its receipts and

23  disbursements?

24          MR. SIMPSON:  Yes.

25          MR. SOUTHARD:  And since the bankruptcy, does JJ Arch

 1  continue to have control over the receipts and disbursements of

 2  Rever Motors?

 3          MR. SIMPSON:  Yes, it -- it's still catching up.

 4  It's still catching up because there are a lot of missing

 5  records that were part of my organization that I got pushed

 6  from, which -- so the answer is I don't have everything and

 7  we're still trying to reconcile.  But I don't have an accurate

 8  report today of the latest and greatest.  It is in process.

 9  And it is - it is being evolved and cleaned up and brought up

10  to date.  But I don't have the latest and greatest accounting

11  of it.

12          At this point, I have people working on it, but I

13  don't have it in its final form where I can say to you, hey,

14  here's -- here is the latest and greatest as of March 2024.  I

15  don't have that yet.  We are still filling a lot of gaps and I

16  have resources that are helping me to come to conclusion on

17  those numbers.

18          MR. SOUTHARD:  But you, you, Jeffrey Simpson, are

19  personally making decisions concerning Rever Motors at this

20  point on behalf of the debtor?

21          MR. SIMPSON:  Well, let's see.  Well, let's see.  JJ

22  Arch, which is responsible for all these entities, and JJ Arch,

23  who only has one person who has been in full control since 2021

24  pursuant to the amendment, if we were to go over it, read that

25  today now if you want to, yes, it ultimately has -- a human has

1  to be the one on behalf of the entity, JJ Arch, and then on

2  behalf of the sub, or the sub or the entity that's owned at the

3  real estate level, but then has membership interest up above.

4          MR. SOUTHARD:  Thank you.

5          MR. SIMPSON:  (Indiscernible.)

6          MR. SOUTHARD:  And does Rever Motors have its own

7  bank account?

8          MR. SIMPSON:  Absolutely.

9          MR. SOUTHARD:  And where is that bank account held?

10 Which banking institution?

11         MR. SIMPSON:  Citizens Bank.  Citizens Bank.  It was

12 originally with -- with First Republic.  And then it was with

13 Citizens Bank thereafter.

14         MR. SOUTHARD:  And at the time of the bankruptcy

15 filing, did that bank account have any cash or funds on

16 deposit?

17         MR. SIMPSON:  It has money in and out every day, like

18 any operating business.  So it rarely has anything surplus.  It

19 covers payroll at best, and it's struggling to meet its -- met

20 its obligations, because it needs to outside capital, because

21 it's a new business.  So it doesn't have a plethora of cash

22 that is available.

23         MR. SOUTHARD:  Thank you.  And you referred to the

24 record keeping as as being challenging.  That's my paraphrase.

25 Can you describe how those records are being kept presently?

1   Are they electronic?  Are they --

2              MR. SIMPSON:  QuickBooks.

3              MR. SOUTHARD:  -- written?

4              MR. SIMPSON:  QuickBooks.

5              MR. SOUTHARD:  QuickBooks?  Thank you.

6              MR. SIMPSON:  It's QuickBooks.  It's QuickBooks, but

7    it requires -- given that it has a lot of entries, it's an

8    operating business.  It requires a lot of bookkeeping work that

9    has been sporadic in how it's been dealt with and having sort

10   of the litigation out over a lot of this has been very

11   difficult to have staffed and have resources to help organize

12   all these things that support it.  Everyone who knows me on

13   this call, I'm not an accountant.  I'm doing the best I can

14   with people that have accounting background to try to bring it

15   up to date.  But it's not as if there's free cash flow that's

16   flowing from that property to an individual's pocket.  That's

17   not how it works.  That's not what happens.

18             MR. SOUTHARD:  Okay.  And focusing -- refocusing on

19   the other non-portfolio project assets, the property-owning

20   entity, so when I say that, your Paragraph 15 of your affidavit

21   identified them as JJ NY 550 LLC, 225 HPR LLC, 1640 Montauk,

22   which you just referenced, and 146 East 89 Borrower 1 LLC.  Do

23   each of those have separate bank accounts as well that you're

24   in control of for the debtor?

25             MR. SIMPSON:  Each of those have separate bank

1   accounts.  Everything is separate.  There's very little

2   activity on any of them.  They're all vacant at this point.

3   Yeah, they're all vacant.  So there is really no activity other

4   than bills to pay when there's funds available to pay and

5   there's really no funds available to pay.  So that is -- so

6   those bank statements say very little, because it's practically

7   no activity.

8          MR. SOUTHARD:  Understood.  So with regard to Rever

9   Motors, you mentioned there were daily inflows and outflows,

10  but with regard to these property-owning entities, there's not

11  that same level of activity and they're essentially dormant.

12  Is that my understanding?

13         MR. SIMPSON:  I mean, they're not fully dormant, but

14  there's very few transactions.  I mean, it's -- it may be an

15  insurance payment or, you know, a tax payment, but it's very,

16  very small.  I mean, it's -- just -- there's only three of

17  them.  We can talk about.  But 550 is a retail store that went

18  out of business late last year.  So there hasn't been any

19  income coming in during that period of time.  Right?  So that's

20  a small $400,000, $500,000, $600,000 store that it is.  It

21  doesn't have any income, right.  So and even when it did have

22  income, its expenses were limited.  It's a retail condo, right?

23         As far as 225 Head of Pond, the only income that has

24  been there has been through what I call unauthorized Airbnb

25  leasing, which has been conducted by Mr. Chassen after I've

1  asked him not to.  It finally stopped more recently.  But other

2  than that, the only income it was generating was through this

3  Airbnb regime that I felt was not within my hands.  And I

4  complained about it and told the Court about it.  And it

5  finally stopped after we've asked many times.

6          And then finally -- and finally, on 89th Street,

7  that's a vacant building, right?  It's not leased.  It's -- it

8  has work that's been done inside and there's nothing to do

9  other than to either fix it and sell it.  It's not going to get

10 leased as it -- as is.  It can't be.  It's not safe to lease as

11 is.  And there's mortgage payments that are supposed to be made

12 that, you know, there's no cash available.  So it's all pretty

13 much in the same position, very few income, very few expense.

14 I mean, income pretty much none.

15         The 6040 business just has -- it has, you know, it --

16 larger hopes, because it has income, but it also has quite a

17 bit of expense that it has to deal with.  So --

18         MR. SOUTHARD:  Understood.  So in terms of --

19         MR. SIMPSON:  -- think of.

20         MR. SOUTHARD:  Thank you.  225 Head of Pond, is that

21 entity currently receiving any rental income?

22         MR. SIMPSON:  Nope.

23         MR. SOUTHARD:  Does it have any --

24         MR. SIMPSON:  Nope.

25         MR. SOUTHARD:  -- rental income --

```
 1              MR. SIMPSON:  (Indiscernible.)

 2              MR. SOUTHARD:  -- summer as yet?

 3              MR. SIMPSON:  No.  Your client has a camera on it and

 4   make allegations and tried to hold it hostage.  So no, I've not

 5   even been in his house or near that house in probably eight

 6   weeks after he made allegations that were improper.  So unless

 7   there's police intervention, I can't even go to this house,

 8   which I'm happy to do.  But no, I cannot even go to this house

 9   without having your client improperly, without control, saying

10   that he has some responsibility to control this house that he

11   doesn't have control over.  So no, that's the answer to your

12   question.  It's vacant unless he's occupying it.

13              MR. SOUTHARD:  Thank you for your answer.  For the

14   avoidance of doubt, and for the record, my client, Mr. Chassen,

15   disagrees with your characterizations, but we'll set that

16   aside --

17              MR. SIMPSON:  It's okay.

18              MR. SOUTHARD:  -- to --

19              MR. SIMPSON:  That's all -- it's okay to disagree.

20   The facts are the facts.  I could go and take a picture of the

21   camera for you if you'd like.

22              MR. SOUTHARD:  I agree.

23              MR. SIMPSON:  (Indiscernible.)

24              MR. SOUTHARD:  The facts are indeed the facts.

25              MR. SIMPSON:  The facts tell the truth.
```

```
 1                  MR. SOUTHARD:  And that's --

 2                  MR. SIMPSON:  Facts tell the truth.

 3                  MR. SOUTHARD:  -- really what we're trying to get to.

 4  That's what we're really --

 5                  MR. SIMPSON:  Yeah.

 6                  MR. SOUTHARD:  -- trying to get to

 7                  MR. SIMPSON:  Yeah.  I'll tell you the truth on

 8  everything.  Continue.  What else?

 9                  MR. SOUTHARD:  Excellent.  Thank you.  So since --

10  referring to the -- both the property-owning entities that

11  we've just been talking about and Rever Motors, since the

12  filing of the bankruptcy, have you caused any funds or any

13  value from any of those entities or their bank accounts to be

14  transferred to you or for your benefit?

15                  MR. SIMPSON:  There have been funds that have

16  reimbursed me for loans that I have made to several of the

17  properties in small amounts.  For example, I use the credit

18  card because my credit card that we had for 1640 Motors got

19  shut down.  Credit has been destroyed given what's happened

20  with this bankruptcy.  So if a credit card was utilized by

21  another entity that's controlled by me and only me for buying

22  goods and materials, because we don't have any credit, and that

23  got paid back, yes, that's about the extent of it.

24                  There has been reimbursement in that level as small

25  amounts of money, but that is it.  And that's not net cash flow
```

1   or anything else.  It's a loan that is, from this counsel's

2   perspective, what I've been told, is absolutely allowed to be

3   sort of repaid when it is done through the ordinary course of

4   business.  But that's the extent of it.

5            MR. SOUTHARD:  The counsel -- thank you.  The counsel

6   to which you refer is counsel to the debtor or some other

7   counsel representing you personally?

8            MR. SIMPSON:  It's been debtor's counsel, who's

9   represented the debtor.

10           MR. SOUTHARD:  Okay.

11           MR. SIMPSON:  And again, we could talk about all

12  this.  It -- I see your gamesmanship here, at the end of the

13  day, JJ Arch had two people, two humans, right, that are the

14  only two people.  And the money, if it doesn't come from those

15  entities, it has to come from people, right?  That's where it

16  has to come from.  If it doesn't come from them personally, it

17  comes from them corporately some other way.  There's no other

18  source of capital, right?

19           MR. SOUTHARD:  For the record, and on behalf of my

20  client, and I don't know whether others feel the same, but we

21  would request reporting in detail be included concerning any

22  amounts that have been taken by you personally in repayment of

23  the loans that you referenced.  Just for the record.

24  Mr. Simpson, what is --

25           MR. PASTERNAK:  -- object --

 1            MR. SOUTHARD:  On behalf of counsel --

 2            MR. PASTERNAK:  I object to that.

 3            MR. SOUTHARD:  On behalf of counsel --

 4            MR. PASTERNAK:  The debtor objects to that.  We'll

 5  talk about it offline, Sean.  But those debtors --

 6            MR. SOUTHARD:  That's fine.  I'm just making a

 7  record, John.  I'm making a record.

 8            MR. PASTERNAK:  That's fine.

 9            MR. SIMPSON:  And by the way --

10            MR. SOUTHARD:  What is --

11            MR. SIMPSON:  --  by the way, just to be clear --

12  just to be clear --

13            MR. SOUTHARD:  Yes, Jeff?

14            MR. SIMPSON:  -- JJ Arch, there's a member loan of

15  Mr. Chassen.  There's a very, very large amount of money that

16  has no -- no plans to be paid back.  So we should also talk

17  about that when you have what (indiscernible).

18            MR. PASTERNAK:  All right, Jeff.  Thank you, Jeff.

19            MR. SOUTHARD:  What is YJ SIMCO LLC, Mr. Simpson?

20            MR. SIMPSON:  It is an entity that's controlled by me

21  and my wife.  It has nothing to do with this.

22            MR. SOUTHARD:  I believe it isn't referenced in the

23  schedules and statement of financial affairs as having

24  involvement with certain of the pre-bankruptcy payments that

25  were made to creditors.  Do you recall that?

```
 1              MR. SIMPSON:  As I said, five minutes ago, that when

 2   there's no other money from any other place, it would come from

 3   another corporate entity of mine or me personally.  Did I not

 4   say that?

 5              MR. SOUTHARD:  You may well have.  I was referring to

 6   your statement --

 7              MR. SIMPSON:  I did.

 8              MR. SOUTHARD:  -- just a moment ago that it did not

 9   relate in any way to this bankruptcy/

10              MR. SIMPSON:  It has no involvement.  It's not

11   related.  It's not related.  But when monies have to be paid,

12   and there is no other way to make money be paid, unless humans

13   (indiscernible) and write the check or someone else is there to

14   write the check, it's got to come from some other entity.

15   Therefore, when that other entity funds those monies, and they

16   get booked as a loan, because the entity has no money, right?

17   There's some other way to do that.  Correct?

18              MR. SOUTHARD:  I can't say for sure.

19   (Indiscernible.)

20              MR. SIMPSON:  Well, no.  Well, your client says

21   (indiscernible) try to include --

22              MR. SOUTHARD:  This is your testimony that --

23              MR. SIMPSON:  No, no, no, no, your client

24   (indiscernible) to include my family's LLC into litigation,

25   which is not appropriate.  And that's why I have to make the
```

1    statement I'm making.  But continue.  Go ahead.

2                MR. SOUTHARD:  Thank you.

3                MR. SIMPSON:  (Indiscernible) but you're doing fine.

4    Go ahead.  Keep going.

5                MR. SOUTHARD:  I'm referring specifically to the

6    statement of financial affairs and Page 8 of it, which is

7    Docket Number 32, where it identifies payments that were made

8    during the 90 days before the bankruptcy.  And the first one --

9                MR. SIMPSON:  Right.

10                MR. SOUTHARD:  -- like, Number 3.1 refers to a

11    $38,000 payment to YJ SIMCO.  And then there's a reference --

12                MR. SIMPSON:  Yes.  Yeah, that's a great one.

13                MR. SOUTHARD:  -- indicating --

14                MR. SIMPSON:  Your client --

15                MR. SOUTHARD:  -- reimbursement --

16                MR. SIMPSON:  -- your client stole the money.

17                MR. SOUTHARD:  -- for various loans --

18                MR. SIMPSON:  Your client stole the money --

19                MR. SOUTHARD:  -- that YJ SIMCO --

20                MR. SIMPSON:  -- and sent it -- sent the money to me.

21    Look where it comes from.  Look at the source of the revenue.

22    It's from your client who stole it.  He stole it in a -- in an

23    undisclosed bank account for revenue --

24                MR. SOUTHARD:  Okay.

25                MR. SIMPSON:  -- from JJ Arch.

1              MR. SOUTHARD:  Okay.

2              MR. SIMPSON:  It's a self-serving question.  You want

3    to be careful.  I can't keep going without one.  Your client

4    stole --

5              MR. SOUTHARD:  No --

6              MR. SIMPSON:  -- $38,000 from JJ Arch.  He stole it

7    in a bank account undisclosed, and then repaid it when he had

8    no choice.  But continue.  Keep going.  I'm showing it.  Keep

9    going.

10             MR. SOUTHARD:  That's wonderful.  Thank you.

11   Moving --

12             MR. SIMPSON:  By the way, what's the source of --

13   what's the source of the 38,000?

14             MR. SOUTHARD:  You --

15             MR. SIMPSON:  Ethically (indiscernible), right?

16             MR. SOUTHARD:  Mr. Simpson, you are here under oath

17   testifying.  I am not here --

18             MR. SIMPSON:  I am here under oath.  And I am being

19   discovered for people that don't provide discovery, and avoid

20   discovery at all costs.  And Mr. Masumoto said that discovery

21   wasn't going to be happening here.  So this discovery is going

22   to be two ways.  But continue.  Unless the trustee feels

23   differently, or if Jonathan Pasternak, you feel differently.

24   It is not appropriate to disclose --

25             MR. SOUTHARD:  I'm happy to move --

1          MR. SIMPSON:  -- it separately.

2          MR. SOUTHARD:  I'm happy to move on.  I'm happy to

3   move on.

4          MR. SIMPSON:  Well, you should.  Well, you should.

5          MR. SOUTHARD:  Mr. Simpson, isn't it true that

6   several of the property-owning affiliates, entities that we've

7   just been talking about, the non-AREH entities, are in default

8   on their mortgage loans since the bankruptcy?

9          MR. SIMPSON:  Absolutely.  As I just said, if there's

10  no revenue, how do they pay their bills?

11         MR. SOUTHARD:  And was that the result of any error

12  or mistake in your view, or just a matter of market forces?

13         MR. SIMPSON:  No, it's -- it -- these properties are

14  great.  It's your client's fault.  If you really want to know

15  on the testimony, it's your client's fault.  I would lease out

16  or I would sell the Head of Pond's house, which I've oftentimes

17  have asked over 20 different occasions.  And he dares to

18  threaten me to go to court when he has no right or authority to

19  do so.  We should have just done it anyway.  Okay.  And there's

20  been countless emails about it.  I would have sold the property

21  to (indiscernible), and it would be cleared of the debt.  But

22  he feels that he has a tax issue.  He doesn't want me to sell

23  it.  So that answers your self-serving question as it

24  relates --

25         MR. SOUTHARD:  So --

1            MR. SIMPSON:  -- hold it.  I want to -- no, no, no,

2    no, I'm talking now.  550 Metropolitan, same story, right?

3    I've offered to put it on market.  I've asked him to cooperate,

4    doesn't cooperate.  He owns another apartment in the building

5    under another LLC.  He has access, which I don't have, which

6    I've asked for countless times, including your managing

7    partner, who -- your managing partner.  They said his daughter

8    used to work for us, and she asked him for that information,

9    and he wouldn't give it to her.  So no, he has not provided

10   access to 550 Metropolitan so I could sell it, or I could lease

11   it to provide any revenue to pay for the costs that are needed

12   to make these mortgages true.  But they're valuable properties.

13   So look at your client when you ask these questions.  Keep

14   going.

15           MR. SOUTHARD:  Thank you, Mr. Simpson.  With regard

16   to Great American Insurance, we understand from your sworn

17   statements in the case that both the Griffin firm and Wiggin

18   and Dana were to be retained by the debtor, but their legal

19   fees and expenses were to be paid by Great American under the

20   insurance policy.  Is that correct?

21           MR. SIMPSON:  There was a application that was

22   pending under consideration that would have had a circumstance

23   like you described.  It did not actually happen.  Right.  They

24   were proposed counsel, right?  They have not debated the

25   purported on the call.  I think you were on this morning, and

1    that's sort of where it stands today.

2           There was discussion that Great American would cover

3    costs as it relates to this, because they agree what's happened

4    here is a mockery and a mess, other than your client tax and

5    policy, too.  So yes.  So the answer is they have not debated.

6    And Mr. Griffin gave a very clear answer this morning that we

7    don't need to repeat on what exactly was paid.  I agree with

8    what he said.  I do believe (indiscernible) could do it.  But

9    there's been no payments made to Wiggin and Dana whatsoever.

10   Zero.

11          MR. SOUTHARD:  Thank you.  And do you know when the

12   last payment was --

13          MR. PASTERNAK:  Mr. Southard?  Mr. Southard?  It's

14   been --

15          MR. SOUTHARD:  Yes?

16          MR. PASTERNAK:  -- 15 to 20 minutes.  Are you

17   wrapping it up, sir?  We've got --

18          MR. SOUTHARD:  I'm just just about there,

19   Mr. Pasternak.  Just about there.

20          MR. PASTERNAK:  Thank you.  Go ahead.

21          MR. SOUTHARD:  That's about all I have for the

22   moment.  I'm reserving all rights for any continued 341 meeting

23   beyond today.  But that's all I have for the moment.  Thank you

24   for your time, Mr. Simpson.

25          MR. MASUMOTO:  All right.  This is --

 1          MR. SIMPSON:  I look forward to continuing this

 2  conversation with you, Mr. Southard.  Thank you.

 3          MR. SOUTHARD:  Thank you.

 4          MR. MASUMOTO:  That's -- okay.  This is Brian

 5  Masumoto for the Office of the United States Trustee.

 6          Mr. Simpson, I did want to follow up I guess a

 7  question that Mr. Southard had.  In the Griffin retention

 8  application that was filed with the Court in Paragraph 34 of --

 9  on Page 12, it indicated that you provided a payment to the

10  Simpson firm of $76,598.  Is that correct?

11          MR. SIMPSON:  I don't have that specific application

12  in front of me.  But it sound -- it does sound -- it -- I

13  definitely made a payment to him in that order of magnitude.

14          MR. MASUMOTO:  Okay.

15          MR. SIMPSON:  And it was paid for by -- not by JJ

16  Arch.  It was paid for by I believe an entity of mine.

17          MR. MASUMOTO:  I'm sorry.  The statement also goes on

18  to say upon information and belief, Great American agreed to

19  reimburse Mr. Simpson for the receivable amount, the $76,000.

20  Did you in fact receive a reimbursement for the amount that you

21  paid the Simpson firm?

22          MR. SIMPSON:  Yes.

23          MR. MASUMOTO:  Yes?  I'm sorry.  The answer is yes,

24  you did receive reimbursement?

25          MR. SIMPSON:  I did.

```
 1              MR. MASUMOTO:  Okay.  All right.  Thank you.  All

 2     right.  Are there any other questions from any other party in

 3     interest or interested party -- creditor?

 4              MR. KOEVARY:  Yeah, yeah.  This is a Jonathan Koevary

 5     for AREH, if I may.

 6              MR. MASUMOTO:  Okay.  Go ahead.

 7              MR. KOEVARY:  Okay.  This is -- I just want to clear

 8     up something that's confusing to me.  Mr. Nagi, you had

 9     retained him as counsel, correct?

10              MR. SIMPSON:  First, individually, he was retained

11     individually.  He was not, his firm Offit Kurman was, Offit

12     Kurman was.

13              MR. KOEVARY:  Okay.  Got it.  Is he still your

14     individual counsel, Offit Kurman?

15              MR. SIMPSON:  He is not.  He is not.  Offit is not my

16     individual counsel at this point.

17              MR. KOEVARY:  Okay.  Do you have individual counsel

18     right now on this or no, or it's just Mr. Pasternak for the

19     debtor?

20              MR. SIMPSON:  At this moment in time, Mr. Pasternak

21     is representing JJ Arch.  And I am in the process of selecting

22     new personal counsel.  And that's where we're at.

23              MR. KOEVARY:  Got it.  Okay.  All right.

24     Historically, has the debtor maintained bank accounts for the

25     AREH umbrella entities?
```

 1              MR. SIMPSON:  (Indiscernible.)

 2              MR. PASTERNAK:  (Indiscernible.)  Could you be more

 3   specific?  Thank you.

 4              MR. KOEVARY:  Sure.  AREH entities have bank accounts

 5   at First Republic.  Do you know what I'm referring to?

 6              MR. SIMPSON:  So I will share with you what I think

 7   you're trying to tell me, or you're trying to ask me.  So first

 8   of all, First Republic was a relationship that was pretty

 9   robust of one that I had for my prior life in my prior firm,

10   where I was key principal  Okay.  And we had probably 200 bank

11   accounts with First Republic in our days at AREH, right, 80

12   percent owned, and probably 100 percent owned or likely 100

13   percent owned after the five-year anniversary, which has

14   passed.  So that's why I say he probably works for me.

15              But let's put that aside for a moment.  First

16   Republic was the exclusive bank that represented us.  It's not

17   easy to get a bank to do hundreds of bank accounts, with lots

18   of different layers.  If anyone here sees the org charts, lots

19   and lots of separate bank accounts, so everything can be done

20   properly.

21              We had an accounting team that was facilitated by

22   individuals within the organization of Arch Real Estate

23   Holdings.  And they would process the payments for years this

24   way without any issue.

25              And then in May, First Republic goes bust, and things

1  get ugly, right?  Besides all the money issues that Arch has,

2  thank you to your client, and lack of payments that were

3  happening starting as early as March of 2023.  So what do you

4  want to know as relates to the banking relationship of First

5  Republic?

6         MR. KOEVARY:  So sometime around March or June of

7  2023, did the debtor cause accounts to open elsewhere other

8  than First Republic related to AREH?

9         MR. SIMPSON:  So no.  What happened, there's two

10  other bank institutions that we were working with.  One of them

11  was ConnectOne Bank, which is here on the phone, which we

12  believe there was going to be a greater relationship and

13  diversity of banking is very important in any corporate

14  structure, if anyone knows the corporate structures, right.

15  And the fact that First Republic was going under was definitely

16  something that was, like, a consideration.  And arguably, when

17  everyone had a freak out moment about First Republic, we moved

18  a lot of bank accounts that we can.  And Chassen did more of it

19  than I did with our former controller to avoid the FDIC limits.

20         Okay.  We had interviewed Wells Fargo and others, and

21  our company was falling apart.  So switching bank accounts was

22  not really all that easy.

23         The team from First Republic, who all left, other

24  than Christy Santoro, Mr. Chassen's friend who did what she did

25  to me, that whole team left and went over to Citizens Bank.

1  And it was my goal and intention to open up all the bank

2  accounts there, especially since the lawyer who represented

3  First Republic did not understand Judge Cohen's orders,

4  extensively did not understand them.  She could not understand

5  how clear it was that I had the only authority to move money

6  and no one else did.

7          And for the reason Judge Cohen's very kind to this

8  man who eventually got fired, Tyler Kandel (phonetic), who

9  could not understand court rulings.  So we had no choice other

10 than to open up the bank accounts, which Chassen was aware of,

11 others were aware of, at Citizens Bank.  We got very little of

12 them done before things got even worse with this overall

13 company issue.

14         So there may be one or two other random bank accounts

15 I'm not thinking of right now, but from a bank account

16 perspective, those are the -- really the main organizational

17 banks.  And as it relates to ConnectOne Bank, right, there's

18 been full disclosure way before this bankruptcy to, you know,

19 we can call it AREH, but it's really Oak, your client Oak, they

20 got everything that's there, they've seen it all.  And as it

21 relates to Citizens, I don't know if there's much of anything,

22 and they were given access to that immediately as well.  So I'm

23 not really sure what you're asking me here.  I feel like you're

24 fishing for something.

25         MR. KOEVARY:  Okay.  I think I -- if you'll just

1   focus on answering the question, I'd appreciate it.

2            MR. SIMPSON:  I answered the question.

3            MR. KOEVARY:  Thank you.  And does it sound correct

4   that about June 2023, that roughly about $670,000 was

5   transferred in connection with Cambridge Acquisitions from the

6   First Republic Bank account to ConnectOne?

7            MR. SIMPSON:  I don't know -- in front of me, I don't

8   have that.  I don't have the exact amounts or any of that.  I

9   know we did establish a relationship with ConnectOne Bank.  And

10  we thought we were going to do more business with them.  So we

11  did put some deposits there with them.

12           MR. KOEVARY:  Did you you say those deposits --

13           MR. SIMPSON:  I don't have the date.  I know the date

14  -- I don't know the date of it, but we did open a bank account

15  there with those monies that were on escrow that were used for

16  nothing else other than Cambridge.

17           MR. KOEVARY:  (Indiscernible) 670,000 is in the

18  ballpark?

19           MR. SIMPSON:  Yeah, yeah.  Yeah.  But where are you

20  going with this?

21           MR. KOEVARY:  I'm asking the question.  Thank you.

22           MR. SIMPSON:  Yeah, keep asking them.  Because

23  there's nothing here.  Your clients just already beat the crap

24  out of me over this court order --

25           MR. PASTERNAK:  Jeff --

```
 1              MR. SIMPSON:  Go ahead.  What else do you got?

 2              MR. PASTERNAK:  Let's (indiscernible) questions and

 3  get this meeting over with.  It's already an hour and a half.

 4              MR. SIMPSON:  Go ahead.  Go ahead.  What's your

 5  question?  What's his question?

 6              MR. PASTERNAK:  Go ahead.

 7              MR. SIMPSON:  What's your question of the 670?

 8  What's your question?

 9              MR. KOEVARY:  That was my question.  I'm just asking

10  a question.  So I think your answer was that it sounds about

11  roughly right.

12              MR. SIMPSON:  $670,000, approximately, I don't know

13  the exact month, the exact amount, but approximately that

14  amount of money was moved to ConnectOne Bank, as I just said

15  prior to your last question, that was a bank institution that

16  we were looking to do more business with.  And we thought we

17  could create a more robust relationship with because we

18  couldn't continue simply with First Republic given what

19  happened.

20              MR. KOEVARY:  Okay.  Does it sound right to you that

21  in December '23, you return about $400,000, $402,000 from the

22  ConnectOne account to the Cambridge Acquisitions First Republic

23  account?

24              MR. SIMPSON:  It sounds to me as a part of the effort

25  of your client to force my hand, we pushed all the money --
```

1              MR. KOEVARY:  It's a yes or no question.

2              MR. SIMPSON:  -- into that account because we were

3    still -- no, it's not a yes or no question.

4              MR. KOEVARY:  I asked a yes or no question.

5              MR. SIMPSON:  It's not a yes or no question.  No.

6    The answer is not a yes or no question.  $700,000 was used for

7    Cambridge and only Cambridge.  If that's what you're asking,

8    that's the answer.  So there's no other answer.

9              MR. KOEVARY:  Okay.

10             MR. SIMPSON:  I can take the money to my pocket.  The

11   money was used for Cambridge and only Cambridge.  There's 100

12   emails about this --

13             MR. KOEVARY:  Okay.

14             MR. SIMPSON:  -- and you've seen it.  So let's do

15   discovery, and we'll deal with it in discovery.  Next question.

16             MR. KOEVARY:  Okay.  I asked my next question.  Does

17   it sound right to you that about 400,000 came back from

18   ConnectOne to Cambridge Acquisition?

19             MR. SIMPSON:  All 700,000 was used for Cambridge.

20   All of it.  Every penny of it.

21             MR. KOEVARY:  How much?

22             MR. SIMPSON:  All -- whatever the number was, 700-,

23   600-.  There's not a dollar left to me personally, not $1 if

24   that's what you're trying to get at.  All the money went to

25   Cambridge, every dollar, whatever was left in the account that

```
 1  day, when your client was aggressive for no good reason, when I

 2  have 20 emails offering to pay the bill for that account,

 3  because they were not authorized, nor this is -- they've ever

 4  been authorized.

 5           If you want to read the operating agreement, we can

 6  look at the operating agreement right now, right, they should

 7  have never had any -- if they can do anything, including right

 8  now, other than -- other improper court orders.  Okay.  So all

 9  the money was used for Cambridge, every dollar, every penny was

10  used for Cambridge, whatever was left in the account the day

11  that we agreed via court order to move the money from Account A

12  to Account B, it was all done properly.  So I'm not sure what

13  you're asking here.

14           MR. KOEVARY:  So that -- all right.  So I'll ask it

15  differently.  I think you agree that 600- -- roughly

16  $670,000 --

17           MR. SIMPSON:  Right.

18           MR. KOEVARY:  -- went to Cambridge in June, right?

19  On account of Cambridge was transferred in June to ConnectOne.

20  And, right, I think you agree with me on that, correct?

21           MR. SIMPSON:  We moved money from one bank into

22  another, for the purpose of saying (indiscernible) yes.

23           MR. KOEVARY:  Okay.  And do you -- would you agree

24  that you move $400,000 back in December?  Back to the First

25  Republic?
```

```
 1              MR. SIMPSON:  Whatever the court order was, whatever

 2    the court order was, because these guys couldn't access the

 3    money and they were jerk offs about it, yes.  Whatever the

 4    amount was, yes.

 5              MR. KOEVARY:  Okay.

 6              MR. SIMPSON:  I'm still not getting your point here.

 7    What do you want to know?

 8              MR. KOEVARY:  Okay.  So --

 9              MR. SIMPSON:  -- need to know?

10              MR. KOEVARY:  So it sounds to me that only $400,000

11    came back and there's a difference of about $268,000.  Can you

12    explain that --

13              MR. SIMPSON:  And where do you think that money is?

14              MR. KOEVARY:  -- control over it?  I don't know.  I'd

15    have to --

16              MR. SIMPSON:  We paid bills at Cambridge.  Of course,

17    you know, your client has access.  Paid bills at Cambridge.

18    Cambridge bills, all Cambridge bills, all done to the bank.

19    Get the bank statements.

20              MR. MASUMOTO:  Excuse me.  This is Brian.

21              MR. SIMPSON:  (Indiscernible) personally --

22              MR. MASUMOTO:  Mr. Simpson?

23              MR. SIMPSON:  -- I didn't take one dollar.

24              MR. MASUMOTO:  Mr. Simpson, one moment.  This is

25    Brian Masumoto from the U.S. Trustee's office.  I think your
```

 1  counsel has asked you and I'm asking you now, if you keep

 2  anticipating questions, or answers to questions, this will be

 3  very much extended.  I believe a lot of the questions are

 4  intended to be yes or no questions.  And whether or not you

 5  believe it should be amplified, I would recommend that you give

 6  the succinct yes or no answers.

 7          If there are any follow up necessary, your counsel

 8  can do it for you.  So let's not prolong this.  As I indicated,

 9  I'm trying to give latitude to the parties.

10          MR. SIMPSON:  My counsel doesn't know.

11          MR. MASUMOTO:  Again --

12          MR. SIMPSON:  I'm sorry, my counsel doesn't know.  My

13  counsel's new because of all the crap these people have done to

14  me and my company.  Okay?

15          MR. MASUMOTO:  Okay.

16          MR. SIMPSON:  So that's the problem here.

17          MR. MASUMOTO:  I understand--

18          MR. SIMPSON:  They attack everybody.  They threaten

19  everybody.  And this was not supposed to be discovery.  As you

20  told the judge, as you said to start, this isn't a discovery

21  discussion right now.  It's a discovery discussion that's one-

22  sided, or the other side who had stolen, has lied, cheated,

23  hasn't said a word here.  And I am under attack.

24          So I'm sorry, Mr. Pasternak, if you want to continue

25  this, we can continue it.  I don't think we should continue

1   this conversation at all.

2           MR. PASTERNAK:  I'm sorry.  You know, I --

3           MR. SIMPSON:  (Indiscernible) in appropriate

4   whatsoever.

5       (Simultaneous speaking)

6           MR. KOEVARY:  Here's the deal.  You filed bankruptcy.

7   You already have one judge that's accused you of forum

8   shopping.  And this is the situation that you find yourself now

9   in.

10          MR. MASUMOTO:  Wait one moment.

11          MR. KOEVARY:  (Indiscernible.)

12          MR. SIMPSON:  Who's speaking?  Who's speaking?

13          MR. KOEVARY:  (Indiscernible.)

14          MR. SIMPSON:  Who is speaking?

15          MR. MASUMOTO:  Stop.

16          MR. SIMPSON:  Who's speaking?  Who's speaking?

17          MR. KOEVARY:  This is Jonathan Koevary.

18          MR. SIMPSON:  Who's speaking?

19          MR. KOEVARY:  Jonathan Koevary --

20          MR. SIMPSON:  Jonathan Koevary -- Jonathan Koevary --

21          MR. MASUMOTO:  Look --

22          MR. SIMPSON:  -- you work for me.  Remember that.

23          MR. MASUMOTO:  Stop.

24          MR. SIMPSON:  (Indiscernible) here.

25          MR. MASUMOTO:  This is Brian Masumoto.

1          MR. SIMPSON:  (Indiscernible.)

2          MR. MASUMOTO:  Please stop.

3          MR. SIMPSON:  (Indiscernible.)

4          MR. MASUMOTO:  Stop.

5          MR. SIMPSON:  (Indiscernible.)

6          MR. MASUMOTO:  Will the parties please stop?  All

7    right.

8          MR. PASTERNAK:  Yeah, everybody stop.  We need some

9    decorum.  And we need to wrap this 341.  It's been 93 minutes.

10         MR. SIMPSON:  Yeah.  I'm --

11         MR. PASTERNAK:  (Indiscernible.)

12         MR. SIMPSON:  I'm walking away from this in a minute,

13   Jon.  This is nothing but an --

14         MR. PASTERNAK:  All right.

15         MR. SIMPSON:  -- act of discovery.  You've had two

16   weeks to get to this case.  Why am I not -- my lawyer's not

17   here because of the way these people act, the way they sue

18   everyone, threaten insurance companies, they threaten to sue.

19   Let's make this a two-way discovery, guys.  Let's make this

20   two-way.

21         MR. MASUMOTO:  Mr. Simpson?

22         MR. SIMPSON:  (Indiscernible.)

23         MR. PASTERNAK:  Jeff, Jeff, Jeff, I will speak for

24   you offline, please.  Let's get the 341 completed, everyone.

25         MR. MASUMOTO:  All right.  Mr. Koevary --

```
 1              MR. KOEVARY:  I don't have much more.

 2              MR. MASUMOTO:  Okay.

 3              MR. PASTERNAK:  Okay.

 4              MR. KOEVARY:  But --

 5              MR. MASUMOTO:  Mr. Koevary, why don't you proceed?

 6              MR. KOEVARY:  (Indiscernible) Jon -- Jon -- Jon --

 7    Jon, look, sorry, Mr. Masumoto.  I --

 8              MR. PASTERNAK:  Go ahead, Jonathan.

 9              MR. KOEVARY:  Okay.  I don't have much more, but I

10    don't want to hear that this is taking too long.  Because of

11    what the record is.

12              MR. MASUMOTO:  All right, Mr. Koevary, let's --

13              MR. KOEVARY:  (Indiscernible.)

14              MR. MASUMOTO:  -- let's proceed.

15              MR. PASTERNAK:  (Indiscernible) 341 should be

16    wrapping up.

17              MR. KOEVARY:  Okay.

18              MR. PASTERNAK:  But go ahead.

19              MR. KOEVARY:  Okay.

20              MR. PASTERNAK:  (Indiscernible.)

21              MR. KOEVARY:  All right.  Other than the Cambridge

22    Acquisitions account, did the debtor move AREH funds to any

23    other accounts outside First Republic?

24              MR. SIMPSON:  As I said to you prior, and I already

25    answered your question, I said, yes.  I said we established
```

 1 | bank accounts with the same team of First Republic people over

 2 | at their new organization, which was Citizens because First

 3 | Republic gave access to junior staff members who would give

 4 | access to me, but by my documents to pay payroll.  So yes, we

 5 | established new bank account.  Oh, this is undisclosed.  So if

 6 | they deserved it or not, for certain court orders, they have

 7 | every piece of information, open to your clients, not AREH

 8 | clients.  But go ahead.  Next.

 9 | MR. KOEVARY:  You were talking with Mr. Southard about

10 | booking funds as loans, transfers as loans in and out of JJ

11 | Arch, correct.

12 | MR. SIMPSON:  I said there were small payments that

13 | were required for certain assets as it relates to JJ Arch, not

14 | AREH assets that I have made small loans to cover payroll and

15 | other costs, insurance costs, et cetera.

16 | MR. KOEVARY:  Okay.  Were any of those post-petition?

17 | MR. SIMPSON:  Yes.

18 | MR. KOEVARY:  And did you receive court approval for

19 | any of those?

20 | MR. SIMPSON:  I didn't know I needed court approval,

21 | but to pay an insurance payment that was $1,000 last week.  I

22 | don't know.  Again, the answer is I don't know, but counsel is

23 | here, right, but new, right?  Like, he doesn't know either.

24 | But it's a choice of paying insurance or not, right?  If that's

25 | the option, that's the option.  If I have to get court approval

1   for $2,000, shame on me.  I guess I should have done that.

2           MR. KOEVARY:  Okay.  I have no further questions.

3           MR. MASUMOTO:  All right.  This is Brian Matsumoto.

4   Are there any other questions?

5           MS. THORNE:  Yes, this is Leslie Thorne for Oak.  I

6   have a few questions.

7           MR. MASUMOTO:  All right.  Please proceed.

8           MR. SIMPSON:  Can't wait.  Go ahead.

9           MS. THORNE:  All right.  I'm going to jump around a

10  little bit to try to keep things focused.  But good afternoon,

11  Mr. Simpson.  First, I just wanted to confirm a few things

12  about the portfolio projects, as that term is defined in your

13  first day affidavit.  I read that to mean essentially the

14  properties that are more or less affiliated with with AREH.

15  Are you following me so far on that?

16          MR. SIMPSON:  Yeah.

17          MS. THORNE:  Okay, great.  So I understand from your

18  answers to Mr. Koevary, that there are bank accounts for those

19  portfolio projects that are held somewhere other than First

20  Republic Bank.  That's correct?

21          MR. SIMPSON:  You are well aware of what other bank

22  accounts there are.  You have been on emails with me for

23  months.  So get to your point, please.  You have been on the

24  emails about every other bank account that exists.  There are

25  no others.

1          MS. THORNE:  Okay.  Mr. Simpson, if you could confirm

2  for me today, what banks are currently holding bank accounts

3  for the portfolio projects, that would be great.

4          MR. SIMPSON:  I have no idea.  I have zero connection

5  to activity.  I have no idea.  I have no money access to any of

6  those accounts.  Your client and you have stolen it through

7  lies you told to the Court.  So I have no idea whatsoever.  I

8  do not know.  I have no visibility.  I have no access.  I have

9  no idea.

10          MS. THORNE:  Okay.  Without getting into that, I just

11  want to confirm there --

12          MR. SIMPSON:  No, that's the truth.  That's the

13  truth.  Because you love to lie to the Court.  But go ahead.

14  What else?

15          MS. THORNE:  So your testimony today is that there

16  are bank accounts for the portfolio projects outside of First

17  Republic Bank, but you do not know what banks those accounts

18  are held in?

19          MR. SIMPSON:  No.

20          MS. THORNE:  Is that correct?

21          MR. SIMPSON:  No.  This is your typical lying

22  nonsense.  No, that's not what I said.  What I said to you was,

23  I already disclosed to the other guy who works for you, right?

24  I already disclosed to him the banks that I was aware of.  I do

25  not know what you and your client have done since November.  I

1  have no idea what's happened since November.  No clue.  I'm not

2  disclosing --

3            MS. THORNE:  (Indiscernible) --

4            MR. SIMPSON:  -- you disclosed to Chassen, but you

5  don't disclose to me even though he has no rights.  But okay,

6  go ahead.  I do not know.  I know the bank accounts that were

7  established by me as (indiscernible).  That is what I've

8  disclosed to you, and that's what I know.  Their answers since

9  November, what you guys have done, I have no idea.

10           MS. THORNE:  With all due respect, I don't know what

11 other banks, which is why I'm asking the question.

12           MR. SIMPSON:  No, you do know.

13           MS. THORNE:  So --

14           MR. SIMPSON:  You do know.  You've been copied

15 everything.  You've been copied on everything for six months.

16 You're as bad of a goon as the rest of them.  You know

17 everything, Leslie Thorne.  Go ahead.  What else you got?

18           MS. THORNE:  Well, I'd like you to tell me the name

19 of --

20           MR. SIMPSON:  You've lied to the judge about me

21 countless times.  You've lied to the judge countless times

22 about me.  What else do you want to lie about today?  Go ahead.

23           MR. PASTERNAK:  Mr. Simpson, please.

24           MR. SIMPSON:  Yes, I'm hanging up in a moment.

25           MR. PASTERNAK:  Mr. Simpson.

```
 1              MR. SIMPSON:  I'm not taking this attack.  This is

 2   ridiculous.  These are a bunch of goons that are attacking me.

 3   This is not supposed to be a discovery.

 4              MR. PASTERNAK:  You answer the questions you don't

 5   know.

 6              MR. SIMPSON:  And she's asking me questions.

 7              MR. PASTERNAK:  Leslie, ask him the question.

 8              MR. SIMPSON:  The answer is I don't know.  She keeps

 9   asking.

10              MR. PASTERNAK:  So that's --

11              MR. SIMPSON:  The answer is she knows more than I do.

12   I don't know.  (Indiscernible.)

13              MR. PASTERNAK:  Whatever.

14              MR. SIMPSON:  They have invaded my company.

15              MR. PASTERNAK:  Then stop.

16              MR. SIMPSON:  I don't know.

17              MR. PASTERNAK:  You already said that.  Let's move

18   on.

19              MS. THORNE:  And just to clarify, though, I

20   understand you were taking the position that you don't know all

21   the bank accounts, but you did note that you're aware of bank

22   accounts that have your signature card and you referred to some

23   of them with Mr. Koevary.  And I'm just trying to understand

24   where these accounts are.  And (indiscernible) --

25              MR. SIMPSON:  (Indiscernible.)  I'm not repeating
```

1    myself.  The three bank accounts we had banks with that I'm

2    aware of, ConnectOne Bank, First Republic Bank, and Citizens.

3    Citizens closed almost all of them because they were inactive.

4    That's what they told all of us.  You guys ask for screenshots

5    through Mr. Griffin in November.  They gave it all to you.  I

6    have not lied about a darn thing.  So I don't know what you're

7    referring to.  If you have something else you want to point me

8    to, please point it to me.  If not, move on.

9           MS. THORNE:  I am not here to argue with you,

10   Mr. Simpson.  (Indiscernible.)

11          MR. SIMPSON:  You are here to argue.  You're here to

12   play your trickery games.  That's what you love to do.  Come

13   on, what you got?

14          MR. MASUMOTO:  Mr. Simpson?

15          MR. SIMPSON:  Because you love to lie.

16          MR. MASUMOTO:  This is Brian Masumoto.  Please

17   control yourself.

18          MR. SIMPSON:  This woman has attacked me, has lied

19   about me in court, and has -- should be disbarred for what she

20   has done.  So please don't think for one moment when she asks

21   me leading questions that she's been on email for a year now,

22   attacks me --

23          MR. MASUMOTO:  Mr. Simpson, that's enough.

24          MR. SIMPSON:  -- and has tampered -- she has tampered

25   with evidence.

1            MR. MASUMOTO:  Mr. Pasternak, please control your

2   client, please.

3            MR. SIMPSON:  She has tampered with evidence.

4            MR. MASUMOTO:  All right.

5            MR. SIMPSON:  I'm -- Jonathan Pasternak, this is not

6   appropriate.  If we have to go to the courts, go to the courts.

7   This has got to stop.  This is ridiculous.

8            MR. PASTERNAK:  Jeff, this is a 341.  You're required

9   to answer some questions.  (Indiscernible.)

10           MR. SIMPSON:  I answered the questions.

11           MR. PASTERNAK:  Just skip the commentary.  Please

12   skip the commentary.  We'll save it for later.  All rights are

13   reserved.

14           Go ahead, Leslie.

15           MS. THORNE:  Thank you.  So I understand that you're

16   saying there were accounts at ConnectOne, Citizens, and First

17   Republic Bank.  To the best of your knowledge, are there any

18   other banks that hold accounts for the project?

19           MR. SIMPSON:  To the best of my knowledge, the answer

20   would be no, with the exception that it's possible that certain

21   banking or lending institutions required an intermediary step

22   to be funded.  So it could be that when a certain stock

23   account, a capital control agreement accounts was a required

24   stop on the train at a Wells Fargo or some other banking

25   institution along the way.  But we had some other bank account

 1   that was dictated or mandated by some other lender, that would

 2   be something that could have happened that I don't remember

 3   because it's been so many months that I've been exposed to it.

 4          Other than that, as far as being, like, relationship

 5   banking, the three banks I mentioned to you are the ones that

 6   I'm aware of.

 7          MS. THORNE:  Okay.  And Mr. Pasternak, we would just

 8   ask that at some point you will assemble a list of what the

 9   bank accounts are so that we can have those.

10          MR. SIMPSON:  No, you have the list.  You have the

11   list.  That's not a fair question.

12          MR. PASTERNAK:  Please --

13          MR. SIMPSON:  You have the list.  You should --

14          MR. PASTERNAK:  Jeff.

15          MR. SIMPSON:  -- have everything.

16          MR. PASTERNAK:  Jeff, please stop.  Put your question

17   in writing, Leslie.  Thank you.

18          MS. THORNE:  Okay.  Thank you.  Moving on to a

19   somewhat different issue.  I just wanted to confirm my

20   understanding of a few of your responses to the trustee's

21   questions.  So I understood that you were saying the debtor has

22   not contributed funds to or invested equity in any of the

23   portfolio projects.  Is that correct?

24          MR. SIMPSON:  I didn't say that.  Not what I said.  I

25   said something --

1              MS. THORNE:  Okay.

2              MR. SIMPSON:  -- very different than that.  This is

3    exactly why this isn't going to work.  But okay, I'm going to

4    give you the clarity since you like to twist words.  You're

5    very good at it.  Okay.  So what I said to you is if you look

6    at Exhibit C, and you look at what it says, JJ Arch LLC, or one

7    controlled by JJ Arch LLC.  That is the words I said.  Did you

8    not hear my words?

9              MS. THORNE:  I heard your words, but I just want to

10   clarify my question, which is the debtor JJ Arch LLC has not

11   contributed funds to any of the portfolio projects.  Is that

12   correct?

13             MR. SIMPSON:  No, that's not a fair statement.

14             MS. THORNE:  Okay.

15             MR. SIMPSON:  That's not a fair statement.

16             MS. THORNE:  Can you tell me what funds have been

17   invested by the debtor itself into portfolio projects?

18             MR. SIMPSON:  When?  Which time period?

19             MS. THORNE:  Any time period.

20             MR. SIMPSON:  Okay.  There we go with the cuteness.

21   Do you think I know right now six years of records in front of

22   me on this call what monies were given when?  You want to talk

23   about the loans that JJ Arch made to Arch Real Estate Holdings

24   when we didn't ask your client and we got zero interest for it?

25   We've already sent you those spreadsheets.  You just avoided

1  them.  So I don't have it in front of me.  We've done this

2  exercise for you.  You just use it when you want to use it.  So

3  I don't have six years in front of me of how monies were funded

4  and from where.  I'm not playing that game with you.  If you

5  want to talk about what's happened since the filing of the

6  bankruptcy, that's what we can talk about right now.  But I'm

7  not going back six years right now in front of me, I don't have

8  that information.  How could I possibly?

9          MS. THORNE:  Okay.  So you can't identify for me

10  today any funds that JJ Arch LLC has invested in any of the

11  portfolio projects, correct?

12          MR. SIMPSON:  No, not what I said at all.  Affiliates

13  of JJ Arch have invested millions, millions of dollars,

14  including me personally.  Okay, affiliates of JJ Arch.  Money

15  would flow from me to JJ Arch and JJ Arch into the assets.  It

16  happened and then it --at asset level JJ entity.  So those

17  things definitely happened.  I don't have an accounting of it

18  in front of me, but it's millions of dollars.  It's not only by

19  me, it's by Chassen, it was by Tristan Lance (phonetic), it was

20  by Michelle Miller, it was by family members.  It's countless

21  dollars.  Millions and millions and millions of dollars.  So

22  affiliated JJ entities, absolutely.

23          MS. THORNE:  Perhaps I'm not being clear.  My

24  question is not about JJ Arch affiliated entities.  My question

25  is with respect to the debtor.  Has the debtor invested --

```
 1              MR. SIMPSON:  The debtor is JJ Arch, as I have it on

 2    the schedule as direct and indirect, right?  The JJ entities,

 3    as we refer to them as indirect on purpose for tax purposes,

 4    right, was set up this way.  If you look at Exhibit C, Exhibit

 5    D, in the corporate documents, which you tend to ignore, right?

 6    Those documents refer to exactly how it's set up.  So you can

 7    refer to those documents to answer your question.  You have all

 8    the entities.  You have all the JJ entities.  You've seen them

 9    all.  You know how much money's in them.  Your client loves to

10    tell everybody how much is in each account with grants that

11    they polled everybody.  So I don't know what you're asking me

12    above and beyond that.

13              MS. THORNE:  Let me shift gears a little bit.

14    Earlier, we talked about YJ SIMCO, and you confirmed that it's

15    an entity owned by you and your wife, correct?

16              MR. SIMPSON:  It's owned by my family members.

17    What --

18              MS. THORNE:  Okay.

19              MR. SIMPSON:  -- was your questions about YJ SIMCO?

20              MS. THORNE:  And you noted that YJ SIMCO LLC has

21    nothing to do with this bankruptcy, right?

22              MR. SIMPSON:  It's not part of this bankruptcy

23    whatsoever.

24              MS. THORNE:  Okay.  A moment ago, we were talking

25    about these, I think you called them JJ-affiliated entities.
```

1  Those would include things like JJ Haverhill LLC, JJ Columbia

2  LLC, you know, 10 to 20 others, correct?

3           MR. SIMPSON:  Right.

4           MS. THORNE:  Okay.  And the debtor previously

5  assigned all of its membership interests in those entities to

6  YJ SIMCO, correct?

7           MR. SIMPSON:  It assigned any distributions, if there

8  was money to go to it, it could go upstream to an entity that

9  would be controlled by YJ SIMCO, or I could have changed it.  I

10 don't know off the top of my head if I changed it or not, but

11 I'm allowed to do that.  I have full authority to do that in my

12 documents.  So I don't know where it currently stands.  I'd

13 have to look.  I'd have to ask my accountant.

14          MS. THORNE:  (Indiscernible) --

15          MR. SIMPSON:  I don't need anyone's authority to

16 change where it -- I have no -- I don't need anyone's authority

17 to decide where I divert money that belonged to me as a net

18 result of distribution.

19          MS. THORNE:  And so is it your testimony that you

20 have every right to transfer JJ Arch interests and money to

21 other entities without input from others?  Is that right?

22          MR. SIMPSON:  For funds that would be going to a

23 partner of JJ Arch, AKA me, I could do what I want to do with

24 it.  If it involves others, there may be requirements.  But I

25 could tell you, as it relates to Chassen, he hasn't had any

1    rights since 2021.  So he hasn't had any authority to make any

2    decisions.  Who else is there?  Who else is there?  You?  You,

3    Oak?  Who else is there?  Again, who else is there?  There were

4    only two members of JJ Arch, right?  Jeff and Jared.  Unless

5    you, Oak, took over their assets, took over Jared's assets,

6    which I believe you did last year, who else is there?  So yes,

7    wherever Chassen directed his money, he had every right to do.

8    Wherever Oak directed their money, they had the right to do.

9    We all have the right to direct our money to whoever we wanted

10   to send it to, don't we?

11          MS. THORNE:  So to date, how much money has the

12   debtor transferred or paid to YJ SIMCO post-petition?  And just

13   approximately.

14          MR. SIMPSON:  JJ Arch, post-petition, zero.

15          MS. THORNE:  Okay.  How much money has the debtor

16   transferred or paid to you personally post-petition?

17          MR. SIMPSON:  As I mentioned, the only monies that

18   would have been transferred to an entity controlled by me would

19   be small amounts of reimbursement of funds that were made on

20   behalf of not the entities that you have any interest in, the

21   other entities that you have nothing to do with.

22          MS. THORNE:  Okay.

23          MR. SIMPSON:  And it's small amounts of money.

24          MS. THORNE:  I'm just trying to quantify this a

25   little bit.  Just approximately how much money would that be?

1  I understand you're saying a small amount.

2          MR. SIMPSON:  It's less than a hundred grand, maybe

3  50 grand, 60 grand, 30 grand, tiny.

4          MS. THORNE:  Okay.  Thank you.  Turning to the

5  debtor's schedules of financial affairs, I see in there that

6  the debtor claims an accounts receivable amount of

7  approximately 344,000 that's purportedly owed by AREH.  Does

8  that ring a bell?

9          MR. SIMPSON:  It does.

10         MS. THORNE:  Okay.  And just for reference,

11  Mr. Pasternak, if you're looking at it, that's in Docket 31,

12  Part 3, it's Question 11.

13         MS. PASTERNAK:  Yes, we're aware of the --

14         MS. THORNE:  Does that -- okay.  Does that amount

15  represent the guaranteed payment referred to in the AREH

16  operating agreement?

17         MR. SIMPSON:  I love when you ask questions you know

18  the answers to because I sent the claim to you, Leslie Thorne,

19  that had this exact request.  So the answer is yes.

20         MS. THORNE:  Okay.

21         MR. SIMPSON:  What is your question?  You know the

22  answer to the question.

23         MS. THORNE:  Okay.

24         MR. SIMPSON:  You have the copy of the email when I

25  asked for it.  But go ahead.

1            MS. THORNE:  And what time period does this cover?

2            MR. SIMPSON:  I don't know off the top of my head,

3    but I sent you a spreadsheet when I sent it.  Go back to your

4    email and check.  You shouldn't ask me a question you know the

5    answer to.

6            MS. THORNE:  As far as I can determine, it appears to

7    cover 2023 through the first week of November.  Does that sound

8    right to you?

9            MR. SIMPSON:  I followed the documents to say the

10   amounts that were not taken during the period of time that I

11   didn't take the guaranteed payments as JJ Arch was summed up

12   until a point of time in the contract that you took over

13   temporary control, where it says in the document of what

14   guaranteed payment is supposed to be.  So that number added up

15   to whatever I put on the spreadsheet.

16           MS. THORNE:  Okay.

17           MR. SIMPSON:  324-, 320-, whatever the number was,

18   but I did not put money in my pocket during those periods of

19   time.  Right?  There -- as a net result, this is a net effect

20   of money that were owed to the JJ entity.  Chassen didn't serve

21   any distributions because he had a member loan outstanding over

22   a million-two.  So any money that go to JJ Arch would have gone

23   to JJ Arch and then to me because Chassen has to pay off the

24   member loan first.  That's how it works.

25           MS. THORNE:  Okay.  And just for clarity, I know that

 1  JJ Arch has taken a position in some filings that you,

 2  Mr. Simpson, quote, "selflessly" did not take, quote,

 3  "distributions" for some period of time.  Is that the same

 4  amount that is referenced in this 344,000?

 5          MR. SIMPSON:  That 344- would be part of

 6  distributions that I would have been entitled to.  Did I get

 7  net zero during that time?  I don't know.  But I know I loaned

 8  a lot of money to the company, too.  So I don't have a

 9  reconciliation of that.  I don't have an accounting of it in

10  front of me.  But as a net result, as of that date, the amount

11  that was owed to me from the guaranteed payments, that was the

12  amount owed to JJ Arch.

13          MS. THORNE:  Okay.  And do you claim some other

14  distributions were owed by AREH over and above this guaranteed

15  payment?

16          MR. SIMPSON:  What -- how is that a relevant question

17  here?

18          MS. THORNE:  Well, in the schedule of financial

19  affairs, you note money is owed allegedly by AREH.  And I'm

20  just trying to understand --

21          MR. SIMPSON:  Honestly, no, I haven't seen

22  financials.  I haven't seen any financials since November.  And

23  even then, it was murky.  And you guys have been antagonizing

24  people since March and April of my accounting team.  So it's

25  been a year since I really know what's going on financially or

1  longer.  So I have no idea.  Ask Frank Sandeepan (phonetic).

2  Ask your guys on the phone.

3        MS. THORNE:  Just so I understand, the 344,000, the

4  guaranteed payment under the AREH operating agreement is

5  contingent on the approval of an annual budget, correct?  Uh-

6  huh.  Okay.  And can you tell me the last year in which there

7  was an approved annual budget?

8        MR. SIMPSON:  Oh, I'm so excited, Leslie Thorne.  I

9  love your question.  I'm so happy you asked this question.  You

10 know why?  Because I've asked this to you three times.  And I'm

11 going to do it again right now.  Here's what it says.  Read the

12 words.

13       If a budget wasn't approved, and by the way, we had a

14 meeting, and there's proof of the meeting in September of 2022.

15 We met with the boys to talk about the budget, and there was a

16 missed error on the date.  And guess what?  Doesn't matter.

17 You know what it says?  If the budget's not approved, you take

18 the lesser of the last year.  And that budget the year before

19 was much greater.  So don't tell me for one second the budget

20 wasn't approved.  Don't even go there with your nonsense.

21 Okay?  We've had this dialogue already.  You've got emails with

22 me about it.  This is not discovery.  Move on.  Ask a question

23 you haven't already asked.

24       MS. THORNE:  Okay.  So I'm trying to understand where

25 the 344 comes from.  And it seems to me, you can tell me

1  otherwise --

2          MR. SIMPSON:  The $800,000 allocation of the JJ Arch

3  under the budget.  Ask Kevin Weiner.  He's here.  Okay.

4          MS. THORNE:  Okay.  It appears that under the 2021

5  budget, there is a line item for $1,188,000.97 for payroll --

6          MR. SIMPSON:  Yeah.

7          MS. THORNE:  -- and guaranteed payment, correct?  Is

8  that right?

9          MR. SIMPSON:  I don't know the exact numbers.

10  Possibly.  Or the magnitude?  Possibly, yeah.

11          MS. THORNE:  So --

12          MR. SIMPSON:  We can send Chassen -- did Chassen put

13  in his papers to the Court he's going to lose $600,000 of being

14  fired?  Did you not see that?  The paper's (indiscernible),

15  right?  So where do you think the money came from?  That

16  million-dollar line item, right?

17          MS. THORNE:  So in the budget, the payroll expenses

18  were combined with the guaranteed payment amounts, correct?

19          MR. SIMPSON:  No, absolutely not.  Definitely not.

20  They were separated.  They were separate line items.  I do not

21  have it in front of me.  It was never commingled.  It was

22  always done separately.  And it was reviewed with Oak

23  constantly, every month, every week, through accounting people,

24  it was done.  Again, this guys, this is discovery.  That's not

25  a bankruptcy question.

```
 1              Jonathan, please step in.  This is a discovery thing.

 2   If she wants to do discovery, when her guy's ready to give up

 3   the truth about what her and Chassen did, then we can talk

 4   about it.

 5              MR. PASTERNAK:  Jeff --

 6              MR. SIMPSON:  One of these days --

 7              MR. MASUMOTO:  Mr. Simpson, this -- wait.

 8              MR. PASTERNAK:  -- please?

 9              MR. MASUMOTO:  Jonathan?

10              MS. PASTERNAK:  Yes, sir?

11              MR. MASUMOTO:  This is Brian Masumoto from the U.S.

12   Trustee's office.

13              Ms. Thorne, do you have any further questions related

14   to the $344,000 receivable amount?

15              MS. THORNE:  I just would like to hear Mr. Simpson's

16   explanation of --

17              MR. MASUMOTO:  No --

18              MS. THORNE:  -- how that 344,000 was calculated.

19              MR. MASUMOTO:  Ms. Thorne, I think --

20              MR. SIMPSON:  You have the spreadsheets.  Read it.

21              MR. MASUMOTO:  Hang on.  Ms. Thorne, I think that's a

22   question that should be left for the future for the discovery,

23   you know, if it takes place.  You can raise that, at least in

24   my mind, with respect to any challenges to the monthly

25   operating report.  That amount was listed on the monthly
```

 1  operating report for March.  If you believe the reports are

 2  inaccurate, or should be amplified, you can address it in that

 3  context.  I don't think we need to go into that much detail in

 4  this 341 meeting.  So if you have any further questions, please

 5  go ahead.  But as to the 344-, I'd ask that you deal with that

 6  outside of this 341 meeting.  Do you have any other questions?

 7          MS. THORNE:  Sure, I'm happy to move on.

 8          MR. MASUMOTO:  Okay, go ahead.

 9          MS. THORNE:  I do just have a few other questions.

10  Do the debtor's schedules anywhere address the amount that's

11  required to pay AREH for the use of its personnel to perform

12  work on behalf of the debtors?

13          MR. SIMPSON:  Excuse me, Ms. Thorne.  Again, who owns

14  AREH?  And who loans money to AREH?  Does it address the money

15  that I lent the company?  Does it address the work logs I did

16  for the Wieners in Florida for years?  Does it address all the

17  damages they caused?  (Indiscernible) --

18          MR. MASUMOTO:  Mr. Simpson, please be concise with

19  your answer.  If you can, yes or no.  If not, (indiscernible).

20          MR. SIMPSON:  The answer is I can't answer her

21  question.  She is here and she is a conniving human being.

22  She's here to try to do discovery on me.  This is not

23  appropriate.  She has done horrible things and I'm done with

24  this.  I'm sorry, Mr. Masumoto, with her, I'm done.  If there's

25  other relevant questions for bankruptcy, I'm willing to do it.

 1   But with an illegitimate human like she is, if she lies to the

 2   Court about me, I'm not going to continue this barragement in

 3   front of 10 people.  I'm not.  She'll have her day when I

 4   interview her guys for all the bad stuff they've done.  I have

 5   proof of it.  Proof.  (Indiscernible).

 6            MR. MASUMOTO:  All right.  That -- Mr. Simpson,

 7   that's enough.

 8            Ms. Thorne, I believe you're not going to get an

 9   answer to that question.  So can you move on?

10            MS. THORNE:  It appears that.  Sure, just a couple of

11   other things.  I've seen the representations that the debtor

12   does not have any employees, correct.  Is that right?

13            MR. SIMPSON:  JJ Arch has no employees.

14            MS. THORNE:  Okay.  Has the debtor ever employed its

15   own accounting staff?

16            MR. SIMPSON:  Here we go again.  No.  Outside people?

17   Yes.  Internally?  No.  Outside?  Yes.

18            MS. THORNE:  Okay.  Can you tell us who has done the

19   accounting for the debtor?

20            MR. SIMPSON:  There are people at Arch, which

21   participated to help us, my company, yes.  And outside firms.

22   Yes.  I know where you're going with this nonsense.  Oh, my

23   gosh.

24            MS. THORNE:  And I'm sorry.  When you say --

25            MR. SIMPSON:  You've been on this for a year now.

```
 1            MS. THORNE:  When you say my company --

 2            MR. SIMPSON:  -- yes, yes.  Yes, ma'am.  Five-year

 3  exclusivity.  Five-year exclusivity gone.  Oak said no, they

 4  don't want to continue after five years.  You want to talk

 5  about those meetings?  Well, we asked them read what the

 6  definition of expiration date in Arch.  It says after five

 7  years, there is no more Oak.  They hit their 50 million.  They

 8  said no, thanks.  They're done.  They're gone.  100 percent JJ

 9  Arch after five years.  Read the document.  Read the document.

10            MS. THORNE:  Sir, I'm just trying to clarify who

11  you're referring to when you say my company.

12            MR. SIMPSON:  No, you're not.  You're not.  You're

13  not trying to clarify anything.  You're not trying to clarify

14  anything.  You're playing games.  I know exactly what you're

15  trying to do.  You're trying to say that I use people in the

16  company for things that I shouldn't have and you're wrong.  My

17  bank accounts were available to the company at all time.  Use

18  all my cash.  (Indiscernible.)

19            MR. MASUMOTO:  Mr. Simpson, this is Brian --

20            MR. SIMPSON:  (Indiscernible) --

21            MR. MASUMOTO:  Mr. Simpson, stop.  Mr. Simpson, this

22  is Brian Masumoto.  Can you answer simply what outside

23  accounting firms were used on behalf of JJ Arch?  Can you

24  identify those firms?

25            MR. SIMPSON:  Yeah.  Lear & Pannepacker.  Lear &
```

1    Pannepacker of New Jersey.

2              MR. MASUMOTO:  Okay.  Any other firms?

3              MR. SIMPSON:  Yes.  I don't remember the name of the

4    firm.  The gentleman's name is Scott.  I have to find his name.

5    He's a sole practitioner.  And then I -- and then -- and I've

6    -- we've had other, you know, people out here and there.  We've

7    had consulted people.  We've had services.  There's a variety.

8    I mean, it's not -- again, I don't know where were going with

9    this.

10             MR. MASUMOTO:  All right.  Thank you.

11             Mr. Pasternak, perhaps you can consult with your

12   client and provide a list of those accounting firms to

13   Ms. Thorne.  Can you -- let's move on to the next question.

14             MS. THORNE:  Sure.  And this just relates to there

15   was a statement in the objection to the remand motion that

16   talked about the debtor's accounting staff and CFO quitting.

17   And so I was trying to figure out who that is referring to if

18   the debtor didn't have any employees.

19             MR. SIMPSON:  Again, you don't seem to understand, do

20   you?  What your client told you is wrong.  You don't read the

21   document.  Right?  Who -- who is Arch?  Right?  Where did Arch

22   come -- come from?  Would Arch exist without Jeff Simpson?  No,

23   it would not.  Right?  JJ Arch was there for the purpose that

24   you know.

25             So you (indiscernible) he was there to support the

```
 1   overall business.  If I had other businesses I was allowed to

 2   do, and he -- my money was used constantly to support the

 3   company, which you've got accounting of, if he helped to look

 4   at things for me as the guarantor, who was a guarantor for

 5   things and was prepared to be the sole guarantor to relieve

 6   your client of guarantees which they didn't accept, why would

 7   he not have knowledge or understanding of my accounting?  Why

 8   would he not?  Stupid question.

 9            Get some common sense, lady.  I'm done with her.

10   Really?  Move on.  Or I'm going to end this.  This is really

11   crazy.  This is -- we did a lot of discovery doing on the bad

12   actors.  Not me.  I'm the honest guy here.

13            MS. PASTERNAK:  Jeff, Jeff --

14            MR. SIMPSON:  (Indiscernible.)

15            MR. PASTERNAK:  Jeff, let's get the meeting finished.

16   Okay?

17            Leslie, please ask some final questions.

18            MR. SIMPSON:  And she's done.

19            MR. PASTERNAK:  Thank you.

20            MR. SIMPSON:  I'm done talking to her.  Move on.

21            MR. PASTERNAK:  Jeff, you can't dictate, Jeff.

22   Follow my instructions, please.

23            Leslie, do you have any final questions?

24            MS. THORNE:  Just a few more.  With respect to the

25   debtor's March monthly operating report, I saw a statement that
```

1  the debtor cannot file its tax returns for 2022 and 2023 until

2  AREH completes its return for those years.  Why is that?

3          MR. SIMPSON:  Did I not just answer for you the

4  ownership structure?  How could JJ Arch file its bank -- how

5  could it file its tax returns when it owns the majority of

6  AREH?  And AREH is hid from me thanks to you and your -- and

7  your goon behavior.  I don't have any information to file tax

8  returns.  Provide for me the K-1.  Provide for me everything

9  for AREH that belongs to me and I'll file the returns.

10         MS. THORNE:  Well, you agree that the debtor was

11  responsible for generating the K-1 tax forms for AREH and its

12  investors every year prior to November 3rd, 2023, right?

13         MR. SIMPSON:  No.  Until you started meddling in

14  March and February, stopped paying bills, until that point,

15  yes.  But not November.  Absolutely not.  And there's no

16  start/stop period in the agreement.  We're not going there.  As

17  every lender told you, when you decide to step in, you took

18  over every piece of shit since 2017.  So again, you want to

19  have this assistance here, we can have that one-on-one, no

20  problem.

21         But I was responsible.  We did great with tax and

22  everything until bills stopped getting paid by your people of

23  obligation.  So everything got messy in February, March of '23.

24  Not in November.

25         MS. THORNE:  But you're aware that as of November

1    2023, when you --

2              MR. SIMPSON:  Yeah.

3              MS. THORNE:  -- were no longer acting as managing

4    member, the K-1 forms for the 2022 tax year had still not been

5    provided to investors, correct?

6              MR. SIMPSON:  And why is that?

7              MR. MASUMOTO:  Excuse me.  This is Brian Masumoto.  I

8    think this is going far afield with respect to tax return

9    issues.  You can deal with that in discovery.

10             Ms. Thorne, can you move on to your next question?

11             MS. THORNE:  Understood.  That's all I have.  Thank

12   you very much.

13             MR. MASUMOTO:  All right.  Thank you.

14             MS. THORNE:  Have a great day, Jeff.

15             MR. SIMPSON:  Thank you.

16             MR. MASUMOTO:  Are there any final -- I mean, how

17   many other people need to ask questions?  Are there any other

18   questions?

19             MR. HEUER:  Hey Brian, Bill Heuer for 40 Neutral and

20   K Properties.  I have one question.

21             MR. MASUMOTO:  All right.  One question.  Go ahead.

22             MR. HEUER:  I represent 40 Neutral and Kay.  You may

23   recall that's the property at 146 East 89th Street.  Since the

24   bankruptcy case has been filed, has the debtor made any effort

25   to sell or market that property?

1          MR. SIMPSON:  The debtor has talked with you about

2   process and procedure.  She tried to sell in an amicable way.

3   And there's been a lot of dialogue, and it hasn't been

4   functional.  But to answer your question more explicitly, what

5   you don't want to know, and that your colleague, your partner

6   knows, is I got a new construction loan that your client was

7   somewhat happy with, but got greedy and demanded that when I

8   brought a new investor with new money to this deal less than

9   four months ago, he got greedy and followed Chassen about who

10  the money was going to.

11         So that was one of my efforts.  I worked out this

12  deal.  And your partner at Westerman Ball was well aware of it.

13  And your client was well aware of it.  Mr. Peltzman (phonetic),

14  who I've known for a decade that I had money lined up.  And

15  then when this all got worse, she had every opportunity to step

16  to the plate to jump in.

17         So I've done my part, bringing a construction loan

18  and bringing a new investor, all paper, all sent to your client

19  for review, even though they didn't have authority to review,

20  because they have no rights.  It was disclosed to all of them.

21  It was disclosed.  There was agreement you mentioned earlier

22  today.  We're not going to go back into that this afternoon.

23  Right.  And it sounds to me like Mr. Pasternak is going to

24  speak with you about a plan forward.

25         So I don't know what you're getting at here.  I can't

1   do something fully without the Court's approval.  And that's

2   not what my intentions are.

3          MR. HEUER:  So I appreciate the things you said, but

4   it's a very straightforward, simple, it can almost be a yes or

5   no answer.  Has the debtor tried to sell?

6          MR. SIMPSON:  It's a no.  How?  How?  No, how?

7   You've disputed -- you -- your client has disputed any version

8   we've offered of how to sell it.  Right.  And given we're under

9   a bankruptcy, I'm not going to go against the grain of the

10  dialogue that exists in a bankruptcy.  So no, I have not done

11  anything --

12         MR. PASTERNAK:  You answered the question.  The

13  answer is no.  Thank you.

14         MR. HEUER:  I have nothing further.  Thank you.

15         MR. MASUMOTO:  All right.  Thank you.

16         MR. HEUER:  Thank you, Mr. Masumoto.

17         MR. MASUMOTO:  Are there any other questions?  All

18  right.  Thank you.

19         MR. WIENER:  Yes, Kevin Wiener.  I don't -- my

20  counsel to asked questions.  There's just some stuff that was

21  raised that I don't think they would have been aware of the

22  context of --

23         MR. PASTERNAK:  Mr. Wiener's not allowed to ask

24  questions, Mr. Masumoto.

25         MR. SIMPSON:  That's not right.

1               MR. WIENER:  I believe this is our creditor's

2    meeting, there's some flexibility around --

3               MR. SIMPSON:  Are you a creditor?  He's not a

4    creditor.

5               MR. WIENER:  608941 has a very large disputed claim.

6    So we certainly (indiscernible) creditor.

7               MR. PASTERNAK:  Are you represented by counsel?

8               MR. WIENER:  (Indiscernible.)

9               MR. MASUMOTO:  Mr. Wiener, how many questions do you

10   have?

11              MR. WIENER:  Not a lot, like five or six.

12              MR. MASUMOTO:  All right.  I'll limit you to -- I'll

13   limit you to two questions.  Pick your two best and answer them

14   -- ask them.

15              MR. WIENER:  Okay.  I guess first question, you have

16   four or five fully controlled subsidiaries of JJ Arch that have

17   operating businesses or properties.  Rever, which is the car

18   dealership, (indiscernible) which is the rental, 550

19   Metropolitan, (indiscernible) condos, and East 89th Street,

20   which is a development project.  My understanding is all four

21   of those properties/businesses have secured loans that are

22   either in default or in foreclosure.  And obviously, there's

23   some dispute over what to do around Head of Pond.

24              And I guess my question is, when you filed this

25   bankruptcy, given all of the debtors controlled assets or any

1   other entities that are all facing creditor claims, why did you

2   not put any of your subsidiaries in the bankruptcies so you

3   could actually restructure your debt and get some cash flow up

4   to JJ Arch to pay its creditors?

5          MR. SIMPSON:  First of all, none of those things are

6   your business.  Second of all, they're not facing foreclosure

7   whatsoever.  Right?  There's one, 89th Street, which the loan

8   was sold.  Thanks to everything you did, ConnectOne Bank got

9   spooked and sold the loan.  And that's -- the others -- I don't

10  have any foreclosure notice to any of the other properties.  I

11  don't know what you're talking about.

12         MR. WIENER:  (Indiscernible) foreclosure.  That one

13  has others in defaults though.

14         MR. SIMPSON:  What is your point Kevin?  What are you

15  asking?  It's none of your business anyway?  Why is that

16  relevant to you?

17         MR. WIENER:  Well, I'm going --

18         MR. SIMPSON:  Unless you -- you're looking up JJ Arch

19  -- you're looking up JJ Arch assets.  How is it relevant to

20  you, Kevin Wiener?  It's none of your business.

21         MR. WIENER:  Well, because I have to decide whether

22  to file --

23         MR. SIMPSON:  (Indiscernible.)

24         MR. WIENER:  -- a proof of claim.  And in order to

25  file a proof of claim --

 1              MR. SIMPSON:  Yeah.  A proof of claim for what?

 2              MR. WIENER:  -- I need to know --

 3              MR. SIMPSON:  You're not a creditor.

 4              MR. WIENER:  -- what --

 5              MR. SIMPSON:  You're not a creditor.  You're a

 6    (indiscernible).  You're not a creditor.  Move on to the next

 7    question.  I'm not answering his question.

 8              MR. WIENER:  Well, I guess that's something that

 9    would be determined by the --

10              MR. SIMPSON:  He doesn't deserve the answer to the

11    question.

12              MR. WIENER:  -- bankruptcy court.  I'm just trying to

13    understand what assets are available to --

14              MR. SIMPSON:  (Indiscernible.)

15              MR. MASUMOTO:  Stop.  This is --

16              MR. SIMPSON:  He is not a creditor.  You are not a

17    creditor.

18              MR. MASUMOTO:  This is Brian.

19              MR. SIMPSON:  You are a goon.  You are not creditor.

20              MR. MASUMOTO:  This is Brian Masumoto.  Mr. Wiener, I

21    think you got your answer, may not be the one you want.  You

22    can take any action you deem appropriate.  Accordingly, why

23    don't you ask your next next question?

24              MR. WIENER:  Okay.  My next question would be, do you

25    have an estimate for the liquidation value if they were to be

 1  liquidated today?  Even a broad estimate of those directly

 2  controlled non-debtor entities?

 3           MR. SIMPSON:  Absolutely inappropriate for me to

 4  answer that question for -- for the goon that's trying to take

 5  advantage of me.  Unless Jonathan, if you tell me I have to

 6  answer, I'm not answering for him.  No chance.  This man

 7  inappropriately --

 8           MR. PASTERNAK:  (Indiscernible.)

 9           MR. SIMPSON:  -- (indiscernible).  Jonathan,

10  (indiscernible) of it.

11           MR. PASTERNAK:  Jeff --

12           MR. SIMPSON:  He doesn't deserve it.

13           MR. PASTERNAK:  Mr. Wiener, if this company proposed

14  the plan of reorganization, it will have to, by rule, provide a

15  liquidation analysis.  We are not prepared to present one at

16  this point.  But thank you for your question.

17           MR. MASUMOTO:  All right.  This is Brian Masumoto.

18           MR. WIENER:  (Indiscernible).  I did have one other

19  but I guess I'm stuck.

20           MR. SIMPSON:  No, you already asked your

21  (indiscernible).

22           MR. WIENER:  I appreciate it.  Thank you.

23           MR. SIMPSON:  You're done here.  You're done.

24           MR. PASTERNAK:  Thank you, Jeff.  That's enough.

25           MR. MASUMOTO:  All right.  Thank you.  All right.  I

1  believe at this point, I will conclude this 341 meeting.  I

2  will, in fact, probably schedule a continued 341 meeting, given

3  that I don't have any finality on the schedules and statement

4  of financial affairs.

5           At this time, however, I do believe I am not in a

6  position to schedule one.  A future continued date will be set

7  forth on the docket when I have some additional information.

8  Thank you very much for your participation.

9           And this 341 is concluded for today.

10          MR. PASTERNAK:  Thanks to everyone.  Have a nice day.

11          MR. MASUMOTO:  All right.

12          MS. THORNE:  Thank you.

13          MR. MASUMOTO:  Bye.

14     (Proceedings concluded)

15                          * * * * *

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3          I, Heidi Jolliff, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   HEIDI JOLLIFF, AAERT NO. 2850      DATE: JULY 1, 2024

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25