**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT OF**

**ARCH TUSCALOOSA MM LLC**

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of July 22, 2021 by and among ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Wiener"), JJ TUSCALOOSA LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ"), and ARCH PROPERTY HOLDINGS 1 LLC, a Delaware limited liability company ("Property Holdings").

WHEREAS, Managing Member, Wiener, JJ and Property Holdings (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of "Arch Tuscaloosa MM LLC" (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

ARTICLE I

**CERTAIN DEFINITIONS**

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"<u>Affiliate</u>" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Bankruptcy Action</u>" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"<u>BBA</u>" shall have the meaning set forth in <u>Section 5.5.1</u>.

"<u>Book Value</u>" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The Book Values of all of the Company Property shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company Property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Managing Member; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only

Error! Unknown document property name.

if the Managing Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)    The Book Value of any item of Company Property distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such Company Property as of the date of distribution; and

(D)    The Book Values of Company Property shall take into account any adjustments to the adjusted basis of any Company Property pursuant to Section 734 or Section 743 of the Code in determining such Company Property's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"Capital Event Proceeds" shall mean the gross proceeds derived from Capital Event with respect to the Company, or distributions from a Subsidiary with respect to, a Capital Event (other than Promote Distributions) less, in the case of a Capital Event with respect to the Company the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all

Error! Unknown document property name.

payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 22, 2020.

"Class C Percentage" shall have the meaning assigned thereto in the shall have the meaning assigned thereto in the Property Holdings Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Property" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Contributing Member" shall have the meaning set forth in Section 3.2.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Managing Member.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

Error! Unknown document property name.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.3.

"Fiscal Year" shall be as set forth in Section 11.1.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Investment Entity" shall mean Drake Arch Tuscaloosa 1, LLC, a Delaware limited liability company.

"JJ" shall have the meaning set forth in the Preamble.

"JJ Promote Percentage Interest" means the Percentage Interest of JJ multiplied by a fraction, the numerator is the aggregate capital contributions of Jeffrey Simpson and Jared Chassen in JJ and the denominator of which is the aggregate capital contributions of the Company."

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Managing Member Amount" means the amount required to be distributed pursuant to that certain Amended and Restated Limited Liability Company Agreement of the Managing Member, dated as of January 1, 2018, as the same may be amended, modified, supplemented or restated from time to time, to reduce the Unreturned Capital Contributions (as defined in such Amended and Restated Limited Liability Company Agreement) to zero.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Member Loan" shall have the meaning set forth in Section 3.2.4(i).

"Member Loan" shall have the meaning set forth in Section 3.2.4(ii).

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

5

(i)    items of income, gain, loss and deduction (including gain or loss on the disposition of any Company Property and Depreciation) shall be computed based upon the Book Value of the Company Property rather than upon such Company Property's adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)    if the Book Value of any Company Property is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such Company Property for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.3.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

Error! Unknown document property name.

"<u>Property Holdings</u>" shall have the meaning set forth in the Preamble.

"<u>Property Holdings Agreement</u>" means that certain Limited Liability Company Agreement of Property Holdings in effect from time to time.

"<u>Property Holdings Amount</u>" means the amount required to be distributed pursuant to Section 5.2(i) of the Property Holdings Agreement in order to permit distributions to thereafter be paid pursuant to Section 5.2(ii) of the Property Holdings.

"<u>Regulations</u>" means the income tax regulations promulgated under the Code.

"<u>Regulatory Allocations</u>" shall have the meaning set forth in <u>Section 5.2.5</u>.

"<u>Reserves</u>" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"<u>Subsidiary</u>" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company including, without limitation, the Investment Entity.

"<u>Taxing Authority</u>" shall have the meaning set forth in <u>Section 5.4</u>.

"<u>Transfer</u>" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"<u>Transferring Member</u>" shall have the meaning set forth in <u>Section 8.2</u>.

"<u>Wiener</u>" shall have the meaning set forth in the Preamble.

## ARTICLE II

## <u>ESTABLISHMENT OF THE COMPANY</u>

2.1.    <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "<u>Act</u>") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

Error! Unknown document property name.

2.2.    <u>Company Name</u>.    The business of the Company shall continue to be conducted under the name of "Arch Tuscaloosa MM LLC"; <u>provided</u>, <u>however</u>, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    <u>Purposes</u>.    The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of a membership interest in the Investment Entity; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.    The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.    The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service and Registered Office</u>.    The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Managing Member.   The registered office of the Company in the State of New York shall be in care of such agent for service of process or such other address as may be designated from time to time by the Managing Member; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of New York.

2.7.    <u>Admission of Members</u>.    Managing Member, JJ, Wiener and Property Holdings are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.    Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

**Error! Unknown document property name.**

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1.    Initial Capital Contributions.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Exhibit A hereto opposite its name under the heading "Initial Capital Contribution." Property Holdings shall have no obligation or right to make a Capital Contribution to the Company.

3.2.    Additional Capital Contributions.

3.2.1.    If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call Amount.

3.2.2.    Within five (5) Business Days of the Capital Call Notice, each of Wiener and JJ shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by a fraction, (x) the numerator of which is such Member's Percentage Interest and (y) the denominator of which is the aggregate Percentage Interest of Wiener and JJ.

3.2.3.    Subject to Section 3.2.4, if Wiener or JJ fails to make its Capital Contribution required by Section 3.2.2 (the "Non-Contributing Member"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then JJ, if Wiener is the Non-Contributing Member, or Wiener, if JJ is the Non-Contributing Member, so long as it has made its Capital Contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the required Capital Contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount").  If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company, minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

3.2.4.    Notwithstanding anything herein to the contrary, to the extent that the application of the provisions of this Section 3.2 with respect to a Failed Contribution Amount

9

would cause a default under any agreement to which the Company or any Subsidiary is a party, then:

(i)    to the extent the Failed Contribution Amount is contributed by a Contributing Member, in lieu of such amount being treated as a Capital Contribution by the Contributing Member, such amount shall be treated as a loan from the Contributing Member to the Non-Contributing Member (a "Member Loan") followed immediately by a contribution of the Non-Contributing Member to the Company.

(ii)    Each Member Loan shall:  (i) have an initial principal amount equal to the Failed Contribution Amount made by the applicable Contributing Member to the applicable Non-Contributing Member; (ii) bear interest at a rate of 8% per annum compounded annually (the "Member Loan Rate"); (iii) be non-recourse to the applicable Non-Contributing Member; (iii) unless otherwise agreed to by the applicable Non-Contributing Member, be payable solely out of any distributions that would otherwise thereafter be distributable to the applicable Non-Contributing Member in accordance with Section 5.7; (iv) be secured by the Non-Contributing Member's Member Interest (and the Non-Contributing Member to which a Member Loan is made does hereby grant to each Contributing Member or other Person making such Member Loan a first priority security interest in and to all of such Non-Contributing Member's Member Interest); and (v) be repayable at any time in whole or in part without premium or penalty.  Each Non-Contributing Member shall, upon request, execute such security agreements and financing statements as may from time to time be requested by the Contributing Member(s) or other Person making a Member Loan to such Non-Contributing Member to better assure the security interest in such Non-Contributing Member(s)' Member Interest granted hereby and, effective upon the making of any Member Loan, hereby irrevocably constitutes and appoints the Contributing Member(s) or other Person making such Member Loan as its true and lawful attorney-in-fact, coupled with an interest, to make, execute on behalf of the Non-Contributing Member, consent to, swear to, acknowledge, deliver, record and file such documents and instruments as may be necessary in the sole discretion of the Contributing Member(s) or other Person to confirm and render fully effective all remedies thereof in connection with such Member Loan.  Notwithstanding anything in this Section 3.2.4 to the contrary, the terms of each Member Loan shall be subject to the provisions of any loan agreement in which the Company or any Subsidiary holds a direct or indirect interest is a party.

3.3.    No Interest.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    Return of Capital.  No Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

Error! Unknown document property name.

3.5.   No Personal Liability.   Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company Property. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except to the extent such Member expressly agrees otherwise.

## ARTICLE IV

## **CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.   Capital Accounts.   A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.   Adjustments.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.  If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.   Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.   Transfers.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.   Capital Account Balance.   Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

**Error! Unknown document property name.**

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.    <u>Allocations of Net Profit and Net Loss</u>.  After the application of <u>Section 5.2</u>, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to <u>Section 10.3.3</u> if the Company were dissolved, its affairs wound up and the Company Property sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the Company Property securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 10.3</u> to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of the Company Property.  Subject to the other provisions of this <u>Article V</u>, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    <u>Regulatory Allocations</u>.

5.2.1.    Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.    This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.    To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with <u>Section 5.1</u> as if such Member were not a Member.

5.2.4.   If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.   Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.   It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.   Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company Property is sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

5.3.   Tax Allocations.

5.3.1.   For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.   In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Property contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Property for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).   If the Book Value of any Company Property is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Property shall take account of any variation between the adjusted basis of such Company Property for federal income tax purposes and the Book Value of such Company Property in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

Error! Unknown document property name.

5.3.3.  If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Managing Member.

5.4.  <u>Withholding</u>.  The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.  <u>Tax Matters</u>.

5.5.1.  <u>Partnership Representative</u>.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Bipartisan Budget Act of 2015 (the "<u>BBA</u>"), as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the partnership audit procedures enacted under the BBA.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.

Error! Unknown document property name.

The provisions contained in this Section 5.5 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2. <u>Tax Elections</u>.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Managing Member, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Managing Member, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Managing Member shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members.    The Company and the Managing Member shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3. <u>Tax Returns</u>.  The Managing Member shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications, elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.  The Managing Member shall provide to each Member a Form K-1 with respect to the Company by March 31st of each year.

5.5.4. <u>BBA Liabilities</u>. Notwithstanding anything in this Agreement to the contrary, in the event the Company incurs any liability for taxes, interest or penalties pursuant to the BBA:

(i)    The Managing Member may cause the Members (including any former Member) to whom such liability relates, as determined by the Managing Member in its sole good faith discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company;

(ii)    any amount not paid by a Member (or former Member) at the time requested by the Managing Member shall accrue interest at the underpayment rate under Section 6621(a)(2) of the Code, plus 10% percentage points per annum, compounded quarterly, until paid, and such Member (or former Member) shall also be liable to the Company for any damages resulting from a delay in making such payment beyond the date such payment is requested by the Managing Member, and for this purpose the fact that the Company could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii)    without limiting a Member's (or former Member's) obligation under clauses (i) and (ii), any amount paid by the Company that is attributable to a Member (or former Member), as determined by the Managing Member in its sole good faith discretion, and that is not paid by such Member pursuant to clauses (i) and (ii) may be withheld from any distribution that would otherwise be made to such Member (or former Member) under <u>Article VI</u>; and

Error! Unknown document property name.

(iv)    the obligations of each Member (or former Member) under this Section 5.5.4 shall survive the transfer by such Member of its Membership Interest and the dissolution of the Company.

5.6.    Section 754 Election.  In the event a distribution of any Company Property occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

ARTICLE VI

**DISTRIBUTIONS**

6.1.    Distributions of Cash Flow.  Cash Flow, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Managing Member as follows:  20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

6.2.    Distribution of Capital Event Proceeds.  Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

6.3.    Distributions of Promote Distributions.  Promote Distributions, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Managing Member as follows:

(i)    First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1 in proportion to their respective Percentage Interests;

(ii)    Second, to JJ in an amount equal to (x) the balance plus the amount distributed pursuant to clause (i) multiplied by (y) the JJ Promote Percentage Interest;

(iii)    Third, to JJ in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) multiplied by (y) 50% multiplied by (z) the JJ's Percentage Interest less the JJ Promote Percentage Interest;

(iv)    Fourth, to Wiener in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) and clause (iii) multiplied by (y) 50% multiplied by (z) the Wiener's Percentage Interest less;

(v)    Fifth, to Property Holdings in an amount equal to the Property Holdings Amount;

(vi)     Sixth, to Property Holdings in an amount equal to (x) one-half of the balance plus the amount distributed pursuant to clause (iii) and clause (iv) multiplied by (y) 80% multiplied by (z) the Class C Percentage;

(vii)     Seventh, to the Managing Member in the amount equal to the Managing Member Amount, if any; and

(viii)     Thereafter, the balance to Property Holdings.

6.4.     <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

6.5.     <u>Member Loans</u>.  Notwithstanding the foregoing, there shall be paid to any Contributing Member the amount of any distribution otherwise distributable to any Non-Contributing Member, to the extent and in repayment of any Member Loans made by such Contributing Member to such Non-Contributing Member, together with interest thereon at the Member Loan Rate, to be applied first to accrued and unpaid interest thereon and then to the principal balance thereof, in the order in which such Member Loans were made to such Non-Contributing Member, so that with respect to each Non-Contributing Member, the Member Loan longest outstanding is fully repaid prior to the payment of interest or principal on any Member Loan made after the date on which the longest outstanding Member Loan was made (it being understood and agreed that if more than one Contributing Member makes a Member Loan contemporaneously in connection with a Failed Contribution Amount, such payments under this <u>Section 6.5</u> in respect of Member Loans shall be made to all Contributing Members or other Persons so making such Member Loans, pro rata, in proportion to the outstanding principal balance of such contemporaneous Member Loans).  Any such amount that would otherwise be distributed hereunder to a Member that is a Non-Contributing Member shall instead be paid directly to the Contributing Member, and any amount so paid to the Contributing Member as principal and interest on the Member Loan shall be treated for all purposes of this Agreement as distributed to the Non-Contributing Member and paid by the Non-Contributing Member to the Contributing Member.

<u>ARTICLE VII</u>

**<u>MANAGEMENT AND OPERATIONS</u>**

7.1.     <u>Management</u>.

7.1.1.  The business, affairs and assets of the Company (including the Company Property) shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with

Error! Unknown document property name.

respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)    cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)    take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.    Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company (including the Company Property).  Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

Error! Unknown document property name.

7.1.3.    Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to JJ and Wiener with such additional information as JJ and Wiener may reasonably request.  Any Major Decision shall be undertaken only with the prior written consent of JJ and Wiener (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

       (i)    engage in any business or activity not authorized by this Agreement;

       (ii)    enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

       (iii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

       (iv)    admit new or substitute Members to the Company or any Subsidiary;

       (v)    modify any material terms of any organizational document of any Subsidiary; and

       (vi)    cause any Subsidiary to take any of the foregoing actions.

7.2.    Services of the Members.  Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.    Fees and Expenses.

7.3.1.    Acquisition Fee.  In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

Error! Unknown document property name.

7.3.2.    Development Fee/Asset Management Fee/Other Fees.    To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.    Due Diligence Expenses.  The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.    Legal Title to Company Property.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.    Other Activities of Members.   Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.   The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

## ARTICLE VIII

## **TRANSFER OF MEMBERSHIP INTERESTS;**

8.1.    Restrictions on Transfers of Membership Interests.   No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.    Permitted Transfers.  Notwithstanding Section 8.1, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer (such Member, a "Transferring Member"), directly or indirectly, all or a portion of such

Error! Unknown document property name.

Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

(i)    Transfers of a Member's Interest to another Member;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a direct lineal descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a direct lineal descendant of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a direct lineal descendant of the Transferring Member.  If such a direct lineal descendant is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Managing Member (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a direct lineal descendant of the Transferring Member or a Transferring Member, and such Transferring Member or descendant, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or direct lineal descendant of the Transferring Member;

(v)    If a Member is an entity, Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Wiener, any of Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either of the current members of Managing Member continues to be in Control of Managing Member.

Error! Unknown document property name.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and vo*id ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that any of the Company Property would be deemed to be "plan assets" for purposes of ERISA;

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder; or

(vii)    such transfer requires a filing with of the New York Attorney General and such filing is not submitted.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this <u>Article VIII</u>;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

**Error! Unknown document property name.**

8.5.    Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    Withdrawal, Retirement or Resignation of a Member. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this Section 8.6 shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

ARTICLE IX

**REPRESENTATIONS**

9.1.    Representations. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.    it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the

Error! Unknown document property name.

acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.   there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.   this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.   (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.   <u>Indemnity</u>.   Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this <u>Section 9.2</u> shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this <u>Section 9.2</u>, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

ARTICLE X

**DISSOLUTION AND LIQUIDATION**

10.1.   <u>Dissolution</u>.   This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "<u>Dissolution Event</u>"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

24

10.1.2. Upon the disposition of all or substantially all of the Company Property, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this <u>Article X</u> unless the Members otherwise unanimously agree.

10.2.  <u>Statement of Intent to Dissolve</u>.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the Department of State of New York.

10.3.  <u>Procedures</u>.

10.3.1. <u>Liquidation of Assets</u>.  In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "<u>Liquidating Agent</u>") will commence to wind up the affairs of the Company and liquidate the Company Property as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. <u>Authority of Liquidating Agent</u>.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company (including the Company Property) that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. <u>Distribution of Assets</u>.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company Property) of the Company will be distributed in cash to the Members in accordance with the provisions of <u>Section 6.2</u>.

10.4.  <u>Termination of the Company</u>.  Upon the completion of the liquidation of the Company and the distribution of the Company Property and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

Error! Unknown document property name.

ARTICLE XI

**FISCAL AND ADMINISTRATIVE MATTERS**

11.1.    <u>Fiscal Year</u>.  The fiscal year of the Company will be the calendar year.

11.2.    <u>Checks, Drafts, Etc.</u>  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.    <u>Books and Records</u>.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.    <u>Right of Inspection</u>.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.    <u>Reports</u>.

11.5.1. Within time periods set forth on <u>Exhibit B</u> attached hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on <u>Exhibit B</u> which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Member shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

ARTICLE XII

**CONFIDENTIALITY AND PRESS RELEASES**

12.1.    <u>Confidentiality</u>.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures

26

made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.    <u>Press Releases</u>.    No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

## ARTICLE XIII

## **INDEMNIFICATION**

13.1.    <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not

Error! Unknown document property name.

entitled to indemnification under this <u>Section 13.1.2</u> with respect thereto.  Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2.  <u>Exculpation/Member Indemnification</u>.  Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3.  <u>Insurance</u>.  Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this <u>Article XIII</u>.

<u>ARTICLE XIV</u>

**MISCELLANEOUS**

14.1.  <u>Notices</u>.   All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on <u>Exhibit A</u> hereto.  All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.  Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this <u>Section 14.1</u> to the other Member.  Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.  <u>Extension Not a Waiver</u>.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

28

14.3.    Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.    Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.    Venue.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.    Headings.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.    Failure to Enforce Provision.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.    Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.    Assignment.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

Error! Unknown document property name.

14.11. <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement. The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes. Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

[Signature page follows]

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:     JJ Arch LLC
        Managing Member

        By:     _____
                Jeffrey Simpson
                Managing Member


ARCH PROPERTY HOLDINGS 1 LLC

By:     JJ Arch LLC
        Managing Member

        By:     _____
                Jeffrey Simpson
                Managing Member


JJ TUSCALOOSA LLC

By:     JJ Arch LLC
        Managing Member

        By:     _____
                Jeffrey Simpson
                Managing Member


608941 NJ INC.


By: _____
        Name:
        Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
         Managing Member


         By:      _____
                  Jeffrey Simpson
                  Managing Member


ARCH PROPERTY HOLDINGS 1 LLC

By:    JJ Arch LLC
         Managing Member


         By:      _____
                  Jeffrey Simpson
                  Managing Member


JJ TUSCALOOSA LLC

By:    JJ Arch LLC
         Managing Member


         By:      _____
                  Jeffrey Simpson
                  Managing Member


608941 NJ INC.


By:    _____
         Name:    Frank van Biesen
         Title:     CFO

<u>Exhibit A</u>

Members, Addresses and Capital Contributions

<u>Member and Address</u>                          <u>Percentage Interest</u>

ARCH REAL ESTATE HOLDINGS LLC            0%
15 West 27th Street
6th Floor
New York, NY 10001


ARCH PROPERTY HOLDINGS 1 LLC             0%
15 West 27th Street
6th Floor
New York, NY 10001


JJ TUSCALOOSA LLC                        50%
15 West 27th Street
6th Floor
New York, NY 10001


608941 NJ INC.                           50%
222 New Road
Parsippany, NJ 07054

<u>Exhibit B</u>

<u>Reports</u>

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

    a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

    b.      a statement of the Capital Account of each Member.

2.      Within forty-five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

    a.      a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

    b.      a statement of the Capital Account of each Member.