UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

In re:

       JJ ARCH LLC,

                      Debtor.[1]

---------------------------------------------------------------- x

JJ ARCH LLC,

                 *Plaintiff,*

   -against-

608941 NJ INC.; Jared Chassen; Arch Real Estate
Holdings LLC; Infinity Real Estate LLC; and Michelle
Miller,

               *Defendants.*

---------------------------------------------------------------- x

Chapter 11

Case No. 24-10381 (JPM)

Adv. Pro. No. _____

## VERIFIED COMPLAINT

Plaintiff JJ ARCH LLC (the "Debtor") hereby files the following Complaint against

608941 NJ INC. ("Oak");[2] Jared Chassen ("Mr. Chassen"); Arch Real Estate Holdings LLC

("AREH"); Infinity Real Estate LLC ("Infinity"); and Michelle Miller ("Ms. Miller"), and in

support thereof state and allege as follows:

## NATURE OF THE ACTION

1.     Since taking temporary control of AREH pursuant to an order of the State

Court (as defined below), Oak, working together with Mr. Chassen,[3] have allowed chaos to reign

---

[1]    The last four digits of the Debtor's federal tax identification number are 4251.
[2]    608941 NJ Inc. is a subsidiary of 35 Oak Holdings Ltd. ("35 Oak").
[3]    And together with Infinity, with respect to the Alton transaction, as discussed below.

at the Arch Companies by either completely ignoring, or trampling over, the contractual consent rights of the Debtor and the Debtor's non-debtor affiliates, all in a concerted effort to relieve Oak of hundreds of millions of dollars in property loan guarantee obligations related to numerous Arch property investments (the "Investment Properties").[4]

2.    Pursuant to this Complaint, the Debtor asks the Court to compel Oak, Mr. Chassen, and Infinity to: (i) cease taking actions not in compliance with the Consent Provisions (as defined below) of the Operating Agreements (as defined below), and (ii) undo any transactions taken without proper consent. To the extent any transactions have been taken in violation of the Consent Provisions that cannot be undone, the Debtor seeks an award of compensatory damages from the Defendants.

3.    The Debtor's interests and consent rights in the Investment Properties are valuable assets of this Debtor's estate which the Defendants have sought to violate, usurp, or to blatantly ignore for their own financial gain.

**THE PARTIES**

4.    Plaintiff Debtor is a real estate holding and operating company formed under the laws of New York in December of 2017.[5] Mr. Jeffrey Simpson ("Mr. Simpson") is the Debtor's managing member and owns 100% of the interests in the Debtor. The Debtor serves as the managing member and Class B member of Arch Real Property Holdings I ("ARPH I").

5.    Defendant Jared Chassen is the Debtor's former non-controlling member and a participating investor in ARPH I.

6.    Defendant Oak is a corporation organized and existing under the laws of the

---

[4]    The Investment Entities and the related Investment Property are listed on Schedule A hereto.
[5]    As noted in its recently filed Chapter 11 Plan [Dkt. No. 184], the filing of the Debtor's liquidating plan triggered the dissolution of the Debtor pursuant to Section 9.1 of the Debtor's operating agreement.

State of New Jersey with a principal place of business in Toronto, Canada. Its principals are Kevin

Wiener, William Weiner, and Michael Wiener. It is the Class A member of ARPH I.

7.       Defendant AREH was formed under the New York limited liability

company law in 2017.[6]

8.       Defendant Infinity is a Delaware limited liability company.

9.       Defendant Ms. Miller is a former key employee of the Arch Companies and

a Class C Member of ARPH I.

## JURISDICTION AND VENUE

10.      The Debtor filed its chapter case on March 7, 2024 (the "Petition Date").

11.      The Bankruptcy Court has jurisdiction over this adversary proceeding

pursuant to 28 U.S.C. §§ 157 and 1334.

12.      Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409.

13.      This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

## BACKGROUND

### A.  The Arch Companies' Complex Structure

14.      At its peak, the Arch Companies managed and/or controlled in excess of

$1 billion of real estate across the United States, which, at one time, included 5.7 million of square

footage and fifteen (15) active investments in seven (7) states, and employed more than one

hundred (100) people through six (6) affiliate companies.

15.      The Arch Companies are composed of numerous affiliated operating and

investment entities in complex structures, with approximately one hundred twenty-five (125)

---

[6]     AREH, the non-member manager, generally does not own physical assets and is instead responsible for the Arch
Companies' overall operating businesses direction, including serving as the asset and investment manager for the
Investment Entities, with few exceptions. Pursuant to the State Court Proceeding (as defined below), Oak
temporarily serves as AREH's sole managing member.

investors who have invested over $100 million (the "Non-Oak Investors").[7]

16.    The Debtor[8] was established as the ultimate parent company of the Arch Companies and controlled, through AREH[9] and a series of other non-debtor subsidiaries, the Investment Properties.

17.    AREH is not the owner of the Investment Properties. Rather, ownership and control of the various Investment Properties were each structured in a similar fashion, with each Investment Property owned by a distinct corporate entity with several investment tranches (the "Property Owner")[10] that was, in turn, controlled by an intermediary managing member "MM" entity (the "Investment Entities"). AREH serves as the non-member, managing member of each of the Investment Entities.

18.    Other entities (collectively, the "JJ Entities"), controlled by the Debtor and

---

[7]    As will be discussed in detail below, the various governing documents for the Arch-affiliated companies were specifically designed to provide checks and balances on controlling parties to protect the rights of Oak, Mr. Simpson, the Debtor, and the Non-Oak Investors.

[8]    The Debtor had two members: Simpson (the managing principal of the Arch Companies) with a 50.1% interest, and Mr. Chassen with a 49.9% interest. See JJ Arch Operating Agreement, dated December 11, 2017, § 1.1, attached as Exhibit A to the Debtor's Plan [Dkt. No. 184]. These percentages were subsequently diluted. The JJ Arch Operating Agreement provides that Mr. Simpson has the power to "conduct, manage and control the affairs and business of the Company," including with respect to its position as "a direct or indirect controlling entity of an Investment Entity".

[9]    AREH has two members: the Debtor, as "Managing Member" with an 80% interest, and Oak, the "Investor Member" with a 20% interest. See AREH Operating Agreement, dated December 11, 2017, §§ 6.1-6.2, attached as Exhibit Q. Pursuant to section 7.1.1 of the AREH Operating Agreement, Mr. Simpson through the Debtor, as managing member, has "full, exclusive and complete discretion" with respect to the management of AREH's "business, affairs and assets," "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters," and the ability to "conduct, manage and control the affairs and business". By contrast, Oak's contemplated passive role as "Investor Member" was to provide capital contributions to fund AREH's general and administrative expenses, and to satisfy costs associated with due diligence into real estate investments, up to $3 million. Id. § 3.1. The AREH Operating Agreement also provided exclusivity to Oak with respect to investment opportunities up to five (5) years after the date of the operating agreement, which expired on December 11, 2022. Id. § 7.2.2. Pursuant to Section 7.1.3 of the AREH Operating Agreement, the Debtor and Oak agreed that both parties would be required to consent to any "Major Decision" undertaken by AREH, including, for example, any decision to "acquire any direct or indirect interests in any real property" or to file for bankruptcy. The AREH Operating Agreement does not disclaim any fiduciary duties of its members.

[10]    Investors serve as limited partners to both the JJ Entities and the Property Owner entities and are afforded similar protective consent rights and governance controls when the managing member self-deals.

Mr. Simpson, serve as members of the Investment Entities.[11] A corporate control chart is attached hereto as Exhibit A.

19.    Oak was offered the exclusive opportunity to serve for a five (5) year period as a seed equity investor and to provide conditional recourse, carry, and construction completion guarantees for the AREH-managed investments.[12]

20.    A general partner "MM" operating agreement was entered into by the various parties, which typically consisted of Oak, AREH, ARPH I, and the related JJ Entity, for each Investment Entity (collectively, the "Operating Agreements") to establish the rights and obligations of the parties thereto.

21.    Importantly, the economics of the Arch Companies were controlled through ARPH I, with Oak serving as Class A member, the Debtor as Class B member, and Ms. Miller and Ms. Last as Class C members. ARPH I is a party to each of the various Operating Agreements to obtain and distribute profits from the Investment Properties to the Class A, B, and C members. Profits or tier stepped "promotes" were distributed pursuant to a waterfall structure so that when all "limited partner" investor party's returns reached certain agreed upon percentages or "preferred returns", profits could be distributed to the members of ARPH I, including the Debtor. The Debtor's rights to profits from ARPH I was a valuable source of income. The ARPH I Operating Agreement provides that the Debtor has control over the management over ARPH I:

> **The business,** affairs and assets of the Company (including the Company Property) **shall be managed, arranged and caused to be coordinated by Class B Member [JJ ARCH LLC],** who shall have, except as otherwise provided in this Agreement

---

[11]    The JJ Entities include: JJ Haverhill LLC; JJ Tuscaloosa LLC; JJ Center Pointe LLC; JJ Pebble Creek LLC; JJ Columbia LLC; 1700 Alton JJ LLC; JJ Vandam LLC; JJ Midtown Oaks LLC; JJ Myrtle Point LLC; JJ 88 Arch LLC; JJ Cambridge LLC; and JJ Arch Nostrand LLC.

[12]    Oak's exclusive investment period ended, at the latest, in November 2022.

(including, but not limited to, in Section 6.1.3), full, exclusive and complete discretion with respect thereto.

See Section 6.1.1 of the ARPH I Operating Agreement, attached as Exhibit Q (emphasis added).

22.     The Operating Agreements for each Investment Entity are largely identical,[13] and a model was attached to the AREH Operating Agreement. Specifically, Exhibit "D" to the AREH Operating Agreement is a template limited liability company operating agreement, created as a model to be used at each Investment Property, that includes as a member a "JJ Entity," which was to be created and designated at the appropriate time.

23.     Exhibit "D" to the AREH Agreement contains the following provisions (hereafter referred to as the "Consent Provisions"):

7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member [AREH] desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i) engage in any business or activity not authorized by this Agreement;

(ii) enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions[.]

(emphasis added).

24.     The above terms were incorporated as a safe-guard for investors (including Oak,

---

[13]     The Alton transaction is a notable exception.

Mr. Simpson, and Mr. Chassen as well as the Non-Oak investors), providing that any activity not expressly authorized by the respective operating agreement, or any agreement between the managing member of the Investment Entity (or any of the managing member's affiliates) and the Investment Entity (a "self-dealing transaction"), must be unanimously approved by all members of the Investment Entity, including the JJ Entity. Such provisions put an important control over the managing member of the various entities.

25.    These terms were specifically incorporated into the various Operating Agreements. See, e.g., Operating Agreement for Arch Tuscaloosa MM LLC, attached hereto as Exhibit B; Operating Agreement for Arch Nostrand MM LLC, attached hereto as Exhibit C.[14]

**B.  The Arch Companies' Financial Difficulties Emerge**

26.    Owing to financial turmoil in the global real estate investment and lending markets due to high inflation and interest rate growth, substantial disagreements regarding the Arch Companies' future emerged in 2022.

27.    Anticipating issues related to interest rate increases at the Investment Properties, in November 2022, Mr. Simpson and Ms. Last provided Oak with a presentation demonstrating significant future capital needs which Oak would be required to fund. Despite its clear obligations to provide such funding, Oak began to refuse to honor its commitments to provide funding to AREH.[15] At the same time, disagreements arose between Mr. Simpson, on the

---

[14]    The following reveals this structure for one particular Investment Property at inception: (i) the Debtor served as the managing member of AREH; (ii) AREH served as the manager of Arch Nostrand MM LLC, a New York limited liability company (the "MM" entity); while Oak, a JJ entity (JJ Arch Nostrand LLC), and ARHP I served as member entities; (iii) the MM Entity served as the managing member of Arch Nostrand LLC, a New York limited liability company ("Arch Nostrand"), which is the managing member of 1580 Nostrand LLC, a New York limited liability company ("1580 Nostrand"). Importantly, each entity is composed not just of a managing member, but of other members as well, each with a full basket of rights.

[15]    In or around December 2022, Mr. Simpson requested that Oak provide additional capital contributions, consistent with its obligations under Section 3.2 of the AREH Operating Agreement. This obligation to fund AREH was separate and apart from Oaks' obligation to fund capital calls in connection with the individual AREH-managed Investment Properties. While Oak initially fulfilled such obligations, Oak began later to unreasonably demand

one hand, and Oak and Mr. Chassen, on the other hand, regarding their future roles at Arch.

28.     On account of the Arch Companies' financial issues, Mr. Simpson began to explore a possible bankruptcy filing for AREH and the Investment Entities. Despite the companies' precarious financial positions, however, owing to the consent provisions in the Operating Agreements regarding "Major Decisions", Oak's authorization was needed for any such filing. At that time, Oak's principals told Mr. Simpson they would not consent to filing for bankruptcy because they believed that any such filing might trigger numerous personal guarantees they had signed in connection with most, if not all, of the Investment Properties.

29.     Upon information and belief, the Debtor alleges that, to avoid Oak's significant financial obligations related to the guarantees, in the summer of 2023, Oak, Mr. Chassen, and other parties began a process to attempt to sideline the Debtor and Mr. Simpson from the Arch business.[16]  Upon information and belief, such actions were taken to facilitate out of court restructurings that would relieve Oak of its guaranty liabilities, all in contravention of the various governing documents and corporate controls.[17]

30.     By early August 2023, the relationship between Mr. Simpson and Mr. Chassen had completely soured and they had exchanged termination letters. Oak was also

---

that it be released from its guaranty obligations before it would provide additional required funding. See December 20, 2022 email from Frank van Beisen, Oak's CFO, attached hereto as Exhibit R.

[16]   In July 2023, meetings were held between Mr. Chassen and the Wieners and Mr. Chassen instructed Ms. Miller not to tell Mr. Simpson about them. By email dated July 19, 2023, counsel for Oak sent counsel for Mr. Chassen a proposal that required Mr. Simpson to "immediately step[] away from active day-to-day management of Arch and its subsidiaries and relinquish[] authority to act on behalf of Arch and its subsidiaries" and require an amendment of the JJ Arch Operating Agreement "such that Jared [Chassen] has sole control over JJ [Arch]." See 7/19/23 email from Andrew Silberstein, Esq. at Haynes and Boone, LLP to Len Breslow, Esq. at Breslow & Walker, LLP, attached as Exhibit S. Mr. Chassen shared that proposal with his cousin David Berg, who is a principal at the Infinity Collective which is an investor in some of the Arch projects, and Mr. Berg commented on it. See 7/20/23 email from David Berg to Mr. Chassen, attached as Exhibit T.

[17]   For example, Oak refused to provide additional funding for the One Brown property. On June 19, 2023, Oak emailed Simpson that Oak had "decided that our [Oak's] sole interest in this project is now just being released from any liability." Exhibit U, June 19, 2023 email from van Biesen. Oak felt it was not in their "best interest" to "pursue any [] aggressive strategies", but rather "let the lender know we are going to give them the keys and in return we [Oak] would like a release from the guaranties. . . .". The property was eventually foreclosed.

improperly instructing Mr. Chassen that Mr. Simpson had no authority over the Debtor or other

Arch affiliates.[18] As such, Mr. Chassen moved to shut off Mr. Simpson's access to the Arch

Companies' computer network, his Arch email account, and deactivated Mr. Simpson's physical

office access pass. Mr. Chassen had also previously removed Mr. Simpson as a signatory from

the Arch Companies' bank accounts at First Republic.[19]

31.    Oak initiated litigation in the District Court for the Southern District of

New York on August 10, 2023 (Index No. 23-07089), against Mr. Simpson individually, alleging,

among other things, breach of fiduciary duties, tortious interference with prospective business

advantage, and defamation. This case was later dismissed by Oak.

32.    Subsequently, on August 14, 2023, Mr. Simpson commenced an action in

New York State Civil Court (the "State Court Proceeding"), captioned *Simpson v. Chassen et al.,*

Index No. 158055/2023 (N.Y. Co) before the Honorable Joel M. Cohen (the "State Court"),

which sought to restore Mr. Simpson's access to his Arch Companies' accounts and re-establish

his control over AREH.

33.    Soon thereafter, the State Court imposed an Interim Order holding:

> [the Debtor] shall be managed in accordance with Section 3.1 of the Limited
> Liability Company Operating Agreement of JJ Arch LLC, dated December 11,
> 2017, as amended by Amendment No. 1 dated May 22, 2021 (the "JJ Arch
> Operating Agreement"). Specifically**, the business, affairs, and assets of JJ Arch
> shall be managed by Simpson,** subject to the limitations set forth in Section 3.2
> of the JJ Arch Operating Agreement, which provides among other things that any
> Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be
> undertaken only with the prior written consent of Chassen.  Simpson and Chassen
> shall cooperate with each other in good faith to facilitate the effective exercise of
> their respective roles and responsibilities under the JJ Arch Operating Agreement
> and related agreements[.]

---

[18]    In an email to Mr. Chassen on August 9, 2023, Michael Wiener instructed Mr. Chassen that "**directions from
Jeff [Simpson] should be ignored, as he lacks any and all authority to act on behalf of JJ Arch and the Arch
companies.**" August 9, 2023 email (emphasis added).

[19]    See August 11, 2023 letter from First Republic Bank, attached hereto as Exhibit V.

See Aug. 21, 2023 Interim Order, attached hereto as Exhibit D (emphasis added). This Interim

Order is still in effect.

34.    At a September 29, 2023 hearing, the State Court emphasized its desire to

maintain the status quo and enforce the consent rights as written in the JJ Arch Operating

Agreement:

> THE COURT: "Your client [Chassen] has a circumscribed set of consent rights
> and other than that, Mr. Simpson is in charge . . . But just basic principles, your
> client does not have a contractual right to be anything other than having his
> consent rights as a member in my opinion" (Tr. 23:7-17.)

> THE COURT: "You know what series of orders [I] can [] issue. Courts are not, as
> Mr. Bailey I think rightly put it, we are not comfortable with this role of trying to
> micromanage companies, which is why the purpose of my order was to just say
> look, you have an agreement. Follow it." (Tr. 35:14-19.)

> THE COURT: "But I think the way the contract works, you know, substantive
> decisions are up to Mr. Simpson. Unless something happens where something that
> trips a corporate right to remove Mr. Simpson, that's the way it is." (Tr. 54:15-19.)

> THE COURT: ". . . I think the short answer to your question is under this
> agreement, subject to the consent rights and to the investor members' rights,
> whatever they may be, Mr. Simpson calls the shots." (Tr. 55:7-10.)

Sept. 29, 2023 Hearing Transcript, attached hereto as Exhibit E.

35.    On October 10, 2023, Oak brought a complaint against Mr. Simpson, the

Debtor, and AREH in a separate proceeding in New York State Court, in which it sought a

temporary restraining order and preliminary injunction "restraining Defendants from initiating a

bankruptcy action in respect of AREH or any entity subject to the AREH LLC Agreement" and

"a declaration that no bankruptcy action may be initiated for any entity subject to the AREH LLC

Agreement without [Plaintiff's] consent." See Complaint in NYSCEF Index No. 654963/2023,

attached hereto as Exhibit F. Defendant Mr. Simpson removed the action to the United States

District Court for the Southern District of New York (the "District Court"). S.D.N.Y. Case No.

23-cv-8966. Three days later, Oak filed an emergency motion asking the District Court to remand

the case or to enjoin Mr. Simpson, the Debtor, and AREH from taking any bankruptcy action. On October 13, 2023, District Court Judge Carter granted the temporary restraining order pending a hearing on the preliminary injunction. At the subsequent hearing, Judge Carter asked the parties to confer and commence settlement discussions. Judge Carter requested that, if possible, that Mr. Simpson delay a larger Arch-related bankruptcy filing to see if the parties could reach an understanding. Oak eventually dismissed this case following the actions of the State Court described below.

36.    During the same period that the District Court action was occurring (on October 17, 2023), Oak intervened in the State Court Proceeding, and as a part of that intervention, Oak sought the temporary appointment of a receiver and further requested "a preliminary injunction making Oak the managing member [of AREH] during the pendency of th[e] litigation." In support of its request, Oak represented to the Court that its primary motivation in seeking to be installed as managing member of AREH was to determine to what extent additional funding was necessary to ensure continued operation of AREH and its affiliates.[20] Throughout this period, Mr. Simpson worked diligently, attempting to restructure the various obligations of the Investment Properties.

37.    While the parties engaged in litigation in various courts, the Arch Companies were experiencing severe financial distress, with Oak refusing to provide additional capital, notwithstanding its obligations to do so and its representations to the State Court.[21]

---

[20]    Contrary to these assertions, Oak continued to avoid its financial obligations. For example, the State Court noted that AREH's finances were at an "immediate crisis point" with respect to unpaid payroll and asked Oak's counsel if Oak would provide funding if made Managing Member, to which Oak's counsel replied, "Yes, we would." (Nov. 3, 2023 Hearing Transcript (NYSCEF 374), 21:3-11.). Notwithstanding this statement, Oak allowed invoices to go unpaid, shuttered AREH's offices, left AREH with only a handful of employees, and otherwise failed to adequately fund AREH to meet its obligations.

[21]    On Wednesday, October 25, 2023, the Debtor, as managing member of AREH, issued a capital call to Oak due to a severe liquidity crisis that included AREH not having sufficient funding to meet its payroll obligations. Simpson sought $300,000 in emergency funding for payroll and employee benefits by Monday, October 30, 2023.

38.     On October 27, 2023, the State Court issued an Interim Order directing the parties to "comply with their existing obligations" under the AREH Operating Agreement and prescribed a number of supervisory procedures setting the method and schedule by which the Debtor was required to provide books, records, analysis and status updates to Arch. See October 27, 2023 Interim Order attached hereto as Exhibit G. Importantly, despite temporarily appointing Oak as AREH's managing member, the State Court also opined, in a footnote, that "**the Major Decision consent rights contained in the AREH LLC Agreement with respect to Bankruptcy Actions are enforceable.**" Id. at 3 n.3.

39.     On October 31, 2023, Oak sent a notice to Mr. Simpson that it intended to remove the Debtor as AREH's managing member pursuant to the "flip-flop" provisions of section 7.1.4 of the AREH Operating Agreement. On November 3, 2023, Oak moved for a temporary restraining order and preliminary injunction removing the Debtor as AREH's managing member.

40.     On November 22, 2023, the State Court granted Oak's motion and ordered that during the pendency of the present action, "Oak shall continue to act in their [JJ Arch's] stead as AREH's sole managing member in accordance with Section 7.1 of the Limited Liability Operating Agreement of AREH (the "Operating Agreement"), owing all applicable duties to AREH and its member." See November 22, 2023 Order attached hereto as Exhibit H (the "State Court Order"). The State Court also enjoined Mr. Simpson and the Debtor from:

> [a]cting as (or holding themselves out to third parties to be) managing members of Arch Real Estate Holdings LLC ("AREH"), and . . . [d]enying prompt consent to any Major Decision proposed by Oak as Managing Member . . . unless both JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such

---

See Oct. 25, 2023 email from Simpson to Mr. van Biesen and the Wieners regarding October 24, 2023 Capital Call, attached hereto as Exhibit W. With no response from Oak, on Friday, October 27, 2023, counsel for Mr. Simpson and the Debtor followed up with counsel for Oak, stressing the "severe liquidity issue" and the upcoming Monday payroll deadline. See Oct. 27, 2023 email chain between counsel for Simpson and counsel for Oak, attached hereto as Exhibit X. Despite its contractual obligation to provide the funding, Oak tried to capitalize on the cash crisis it had created by conditioning the funding of payroll on, among other things, an "[e]xtension of TRO/commitment not to file any bankruptcy petition without consent." Id

consent . . . . [and] [o]therwise interfering with Oak's ability to exercise its responsibility as Managing Member of AREH.

See State Court Order at 2.

41.    While the State Court Proceeding centers on the dispute regarding control of AREH, none of the Debtor's rights regarding the JJ Entities or the JJ Entities' rights regarding the Investment Entities have been previously addressed in the State Court Proceedings. Mr. Simpson, who serves as the Debtor's sole managing member also serves as the sole managing member of each of the JJ Entities.

## C. Oak as Managing Member

42.    The Debtor alleges that since obtaining temporary control of AREH, Oak, with Mr. Chassen's assistance and/or blessing, has allowed chaos to ensue. Bills have gone unpaid and properties have gone into foreclosure. Upon information and belief, such actions have also violated Oak's fiduciary duties to the Non-Oak Investors and caused other related defaults under the governing documents.[22]

43.    A major reason for the chaos is that control over AREH alone cannot impute

---

[22]    Appointing Oak as temporary managing member has also resulted in numerous defaults on account of lenders taking the position that the change results in an unauthorized "change of control." For example, on January 11, 2024, AREH received a Notice of Default (the "Cambridge Default Notice") from a lender on a $6.9 million loan given to AREH-affiliated investment vehicles. See Exhibit Y attached hereto (Jan. 11, 2024 Letter from Shipman). The Cambridge Default Notice explains that the loan agreement "prohibits transfers (including involuntary transfers) of direct or indirect legal or beneficial interests in any Restricted Party". Likewise, on November 10, 2023, a different lender on a $15.8 million loan sent a Default Notice and Demand for Payment (the "Melrose Default Notice") giving notice that the appointment of Oak as "acting manager" of AREH was an Event of Default under the applicable Loan Agreement. See Nov. 10, 2023 Letter from White and Williams LLP, attached as Exhibit Z. In that instance, the lender gave notice to the borrower entities and the guarantor, Oak, that "all amounts outstanding under the Loan Agreement and the Loan Document are due and owing, and the Lender hereby demands immediate repayment in full." (Id.) The Melrose Default Notice explicitly cites this litigation and Oak's request to be appointed as Managing Member of AREH as triggering the default.

Moreover, since taking control, upon information and belief, Oak has: (i) failed to pay outstanding legal bills; (ii) failed to pay security and other maintenance bills at the Investment Properties; (iii) terminated AREH's lease for its main working location; (iv) failed to hold required investor meetings; and (v) fired and failed to fill key positions. Oak has also failed to supply Mr. Simpson with information required to be provided under the Operating Agreements and cancelled his health insurance.

control over the various Investment Properties. As noted above, the complex corporate structure put in place requires the consent of multiple parties. Rather than working together with the Debtor to obtain such consent, however, Oak and Mr. Chassen have ignored corporate formalities and sought to act alone. For example, Oak has conflated investors at the JJ Entities and Property Owner levels and sent them all capital calls, when in fact, Oak as the temporary managing member of AREH has no ability to make such requests of JJ Entity investors. Similarly, upon information and belief, Oak has homogenized investors when calling for investor meetings. While such meetings could be done when the Arch Companies' management was under one umbrella by one person acting in different roles, Oak as temporary managing member of AREH, simply does not have such authority.

44.     Rather than follow corporate formalities, Oak and Mr. Chassen's have instead chosen to singularly focus their temporary control of AREH on entering into a series of transactions on behalf of the Investment Entities chiefly designed to rid Oak of its financial obligations, including its considerable guarantee obligations, in violation of the terms of the Operating Agreements.[23] Upon information and belief, Oak has moved forward on such transactions without consent because it understands that it would never obtain the necessary consent from counterparties to approve the actions it has taken if asked. The Debtor asserts that such transactions have materially damaged its interests (and those of the Non-Oak Investors) in

---

[23]    Oak itself acknowledges that the change in control of AREH was only meant to be temporary and only last during litigation:

The Preliminary Injunction Order is merely provisional in nature and was secured to preserve the AREH-controlled properties for the benefit of all parties, including Lender. (See Affidavit of Dana King (NYSCEF No. 298), Affirmation of Michael Wiener, ¶ 42 (NYSCEF No. 305)). And because JJ Arch was removed as managing member (on a provisional basis) pursuant to a court order, the prior removal notice, dated October 31, 2023, is completely irrelevant. JJ Arch was only removed as managing member pursuant to a court order.

See Letter from Meister, Seeling & Fein, dated April 22, 2024, attached hereto as Exhibit AA.

the Investment Properties.

45.     Upon information and belief, many of these transactions have resulted in self-dealing between Oak, Mr. Chassen, and the respective Property Owner. All transactions involving members constitute "Major Decisions", requiring unanimous consent. Despite this fact, Oak has not sought the necessary consent of the respective JJ Entity in accordance with the respective Operating Agreement. Upon information and belief, Oak has also failed to comply with the informational requirements of the Operating Agreements.

46.     While in some instances, Oak and Mr. Chassen have asserted that Mr. Chassen has given the required approval at AREH, Mr. Chassen has no authority to grant any consent with respect to the JJ Entities.

47.     Through these *ultra vires* actions and others, the Debtor, through its interests in the Investment Entities and ARPH I, has been harmed, in that the value of the Debtors interests in the Investment Entities have been reduced, and its important property rights in the consent requirements of the Operating Agreements have been violated. Moreover, any possibility of further profits through its Class B interests in ARPH I have been extinguished.

48.     Owing to the failure to deliver information as required pursuant to the respective Operating Agreements, the Debtor is not aware of all of the various *ultra vires* actions taken by Oak and Mr. Chassen (and Infinity) that may violate the consent requirements.

49.     Below, however, are examples of actions taken in violation of the Operating Agreements at certain of the Investment Properties. The Debtor will seek to amend this Complaint as additional information surfaces:

1. **The Tuscaloosa Properties**

50.     In accordance with the AREH Operating Agreement, in July 2021, AREH, Oak, JJ

15

Tuscaloosa LLC (as the "JJ Entity"), and ARPH I entered into the limited liability company operating agreement for Tuscaloosa MM LLC, relating to three (3) properties located at in Tuscaloosa, Alabama ("Tuscaloosa Properties").[24]

51.    Further consistent with the AREH Agreement, the Tuscaloosa Operating Agreement contains the Consent Provisions.

52.    The underlying investment involved a portfolio of garden apartments in Alabama. As with other investments, Oak provided carry and completion guaranties.

53.    Upon information and belief, the operative loan requires an extension in th near term and additional capital is required to fund the operations and maintenance of the Tuscaloosa Properties. Despite the Consent Provisions, Mr. Simpson has not been provided any information.

**2.    Alton Property**

54.    Regarding the Alton Property, which involves a hotel located at 1700 Alton Road, in Miami Beach, Florida, 1700 Arch JJ LLC, as managing member, entered into a Limited Liability Agreement with Oak, as non-managing member. The operating agreement contains the Consent Provisions. See Section 6.1 and 6.1.3 of the 1700 Arch LLC Operating Agreement. Infinity serves alongside 1700 Alton Manager LLC as co-manager of the property owner.

55.    As with other Operating Agreements, for certain "Major Decisions", unanimous consent among co-managers is required. Major Decisions include termination of significant leases.

56.    Two weeks ago, the Debtor was informed by management (who is a relative of Mr. Chassen) that a material lease was terminated notwithstanding that the Debtor affiliated parties'

---

[24]    These include the following properties: (i) Cooper Creek, 3504 12th Ave E., Tuscaloosa, AL 35405; (ii) Broadmoore Gardens, 235 James I Harrison Jr. Pkwy., Tuscaloosa, AL 35405; and (iii) Woodlawn Manor, 3820 1st Ave, Tuscaloosa, AL 35405.

consent had not been sought.[25]

### 3. **Myrtle Point Transaction**

57.    In accordance with the AREH Agreement, AREH, Oak, JJ Myrtle LLC (as the "JJ Entity"), and ARPH I entered into the limited liability company operating agreement for Myrtle MM LLC, relating to a mixed-use development in Ridgewood, New York (the "Myrtle Point Transaction").

58.    As part of the Mrytle Point Transaction, the respective property owner entity entered into a construction loan in the amount of $106.2 million from Madison Realty Capital ("Madison"). Oak is a guarantor on the loan for construction, completion, carry costs, and traditional non-recourse carve-out guarantees.

59.    Upon information and belief, interest payments of approximately $1 million (at the nominal rate) a month have not been paid on the loan since May 1, 2023, and in July 2023, there was approximately $9.5 million owed to subcontractors on the project. See July 13, 2023 email from G. Sammarco to Mr. Chassen and Mr. Simpson, attached hereto as Exhibit I. Upon information and belief, AREH had been in negotiations with Madison since June 2023 on a forbearance agreement whereby Oak would provide funding to true-up the unpaid interest. Upon information and belief, Oak's proposal was that they would provide the funding in exchange for being released from the guaranty to the extent construction was completed and the property was at 75% occupancy by the end of the forbearance period. See June 28, 2023 email from Jerry Feuerstein, attached as Exhibit J. Upon information and belief, that agreement was never finalized

---

[25]    See email from David Berg on August 22, 2024, acknowledging that the hotel's lessor was evicted, attached as Exhibit BB. This action, which constitutes a "Major Decision", was taken without first seeking the consent of the Investment Entity or any other parties' consent, all in contravention of the management provisions in section 7.1.3 of the governing agreements. Mr. Berg also acknowledged that he was not going to seek consent from the co-manager.

and AREH was left helpless to satisfy its obligations under the loan without further funding from Oak.

60.    On December 11, 2023, Kevin Wiener emailed Mr. Simpson seeking preliminary consent regarding a planned forbearance agreement with Madison whereby Oak would be released from its guaranty in exchange for funding only $3 million in capital.[26] Upon information and belief, in the event of further default on the loan, Madison would simply record a deed in the box, and the only party that would benefit from such an arrangement would be Oak, because it would allow Oak to dodge tens of millions of dollars in guaranty exposure for the nominal amount of $3 million. Upon information and belief, if Oak were acting in accordance with its fiduciary duties to AREH and other investors, not to mention the subcontractors which remain unpaid for their work, filing for bankruptcy with respect to the property would be a possible solution to re-work the loan. Instead, upon information and belief, Oak is acting in its own self-interest to avoid its guaranty obligations by handing the keys to Madison.

61.    Oak's focus on its own guaranty exposure is plainly detrimental to the Debtor and other investors on the Myrtle Point Transaction. Indeed, the largest equity holder in the Myrtle Point Transaction, Douglas Propp, believes Oak is conflicted and that Oak's intended agreement with Madison "would be inconsistent with the fiduciary duties [Oak] owes to [him] as a member/investor." See Declaration of Douglas Propp, dated January 23, 2024 ("Propp Decl.") ¶ 9, attached hereto as Exhibit K. Oak has similarly ignored Mr. Propp's requests for current financial information and documentation for the purported agreement. Id. ¶ 8.

### 4.  The Columbia Property

62.    An AREH affiliate entity invested in four multifamily properties in Columbia,

---

[26]    See Dec. 14, 2023 email from J. Simpson, attached as Exhibit CC.

South Carolina. This project involved a $35 million loan, for which Oak served as a guarantor (and, upon information and belief, continues to serve as guarantor). In October 2023, Mr. Simpson was informed that the loan was likely to go into default. On December 12, 2023, Kevin Wiener emailed Mr. Simpson and Mr. Chassen requesting that one of them provide consent, on behalf of the Debtor, for AREH to enter into an agreement with the lender to "get approximately $600k of funding to pay outstanding payables on the property, cover payroll, and allow sufficient time for the new property manager to get put in place." See Dec. 12, 2023 email from Kevin Wiener, attached as Exhibit L.

63.    Certain of these funds – two months' worth of accounts payable – would be directed not to the properties, but to Oak. See Draft December 2023 Letter Agreement at 2, attached hereto as Exhibit M. Mr. Simpson replied, voicing a number of objections to this plan based on Mr. Simpson's expertise, including Oak's plan to hire a third-party property manager. Mr. Simpson presented other solutions to the cash flow issue but received no response from Kevin Wiener. See Dec. 14, 2023 email from J. Simpson, attached as Exhibit N.

64.    On January 2, 2024, Kevin Wiener emailed again seeking the Debtor's consent to cause the borrower entities to enter into the protective advance agreement. See Jan. 2, 2024 email from Kevin Wiener, attached as Exhibit O. Again, Mr. Simpson objected to the solution as it would be "essentially giving the keys to the lender since there is no remedy for anything that could have gone wrong . . . or potentially what will go wrong in the future." See Jan. 2, 2024 email from Mr. Simpson, also attached as Exhibit O. In essence, Oak was asking for a protective advance where monies were to be reimbursed to Oak, to the detriment of the property and its equity investors.

65.    Mr. Simpson has heard that the property has been marketed and received offers but has not seen any information regarding a possible sale.

**5. Mr. Chassen's Defaults**

66.    On August 31, 2023, Mr. Simpson made a Capital Call to Mr. Chassen pursuant to Section 4.2(b) of the JJ Arch Operating Agreement. Mr. Chassen failed to meet that Capital Call. By operation of Section 4.2(c) of the JJ Arch Operating Agreement, the unpaid Capital Call was deemed to be a "Member Default Loan."

67.    Under Section 4.2(d), a "Member Default Loan" is secured by a "security interest," meaning, the "Non-Contributing Member's Company Interest including, without limitation, the Non-Contributing Member's right to distributions hereunder." And "such security interest may be foreclosed upon . . . in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Non-Contributing Member prior to payment in full of all amounts (including interest) owed under the Default Loan."

68.    Despite this language, and his failure to make the requested Capital Call, upon information and belief, Mr. Chassen has continued to make distributions to himself while the Member Default Loan has been outstanding, in violation of Section 4.2(d). Upon information and belief, these have included distributions that would have otherwise been impermissible, notwithstanding the outstanding Member Default Loan—such as using the Debtor's funds to pay his personal cell phone bills and car insurance. See, e.g., NYSCEF Nos. 462, 463, excerpts of JJ Arch bank records for the periods August 1, 2023 to September, 24, 2023, and September 29, 2023 to December 23, 2023, attached hereto as Exhibit P.

## I.    Declaratory Judgment

69.    The Debtor incorporates by reference paragraphs 1 to 68 of this Compliant as if fully set forth herein.

70.    The Defendants have engaged in actions which have circumvented the Consent

Provisions under the Operating Agreements, thus denying the Debtor's property rights.

71.      An actual controversy exists between the parties, and the Debtor is entitled to a
Declaratory Judgment declaring that the actions taken by the Defendants in violation of the
Consent Provisions are void.

## II.      Injunctive Relief

72.      The Debtor incorporates by reference paragraphs 1 to 68 of this Compliant as if
fully set forth herein.

73.      There is no adequate remedy at law.

74.      The Debtor requests that the Court enter injunctive relief restoring the status quo
prior to Defendants' circumvention of the Consent Provisions under the Operating Agreements.

## III.      Compensatory Damages
## for Violations of the Operating Agreements

75.      The Debtor incorporates by reference paragraphs 1 to 68 of this Compliant as if
fully set forth herein.

76.      The Defendants have engaged in actions which have served to circumvent the
Consent Provisions under the Operating Agreements, thus denying the Debtor's property rights.

77.      To the extent that transactions taken in violation of the Consent Provisions of the
Operating Agreements cannot be unwound, the Debtor, on account of its interests in the various JJ
Entities, and as managing member and Class B member of ARPH I, should be awarded damages
owing to such violations.

## PRAYER FOR RELIEF

**WHEREFORE**, the Debtor seeks an order from the Court:

1. Finding that the Defendants have violated the Consent Provisions as set forth in the Complaint;
2. Voiding those actions taken by Defendants in violation of the Consent Provisions; and
3. To the extent that actions taken in violation of the Consent Provisions have been taken, but cannot be unwound, awarding damages to the Debtor; and
4. Granting such other relief as the Court deems just and proper.

Dated: New York, New York
        September 18, 2024

DAVIDOFF HUTCHER & CITRON LLP

By: */s/ Jonathan S. Pasternak*
       Jonathan S. Pasternak
605 Third Avenue
New York, New York 10158
(212) 557-7200
jsp@dhclegal.com
*Attorneys for the Debtor*

JJ ARCH, INC. BY:

/s/ Jeffrey Simpson
_____
JEFFREY SIMPSON, as managing member

## **Verification**

JEFFREY SIMPSON declares, under 28 U.S.C. § 1746 under penalty of perjury, that I have read the foregoing Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

/s/ Jeffrey Simpson

_____
JEFFREY SIMPSON

**SCHEDULE A**

| LLC Entity | Location of Property |
|---|---|
| JJ Arch Nostrand LLC | 1580 Nostrand Ave.<br>Brooklyn, NY |
| JJ Haverhill LLC | 3200 N Haverhill Rd.<br>West Palm Beach, FL |
| JJ Tuscaloosa LLC | Cooper Creek<br>3504 12th Ave E.<br>Tuscaloosa, AL 35405 |
| JJ Tuscaloosa LLC | Broadmoore Gardens<br>235 James I Harrison Jr. Pkwy.<br>Tuscaloosa, AL 35405 |
| JJ Tuscaloosa LLC | Woodlawn Manor<br>3820 1st Ave<br>Tuscaloosa, AL  35405 |
| JJ Pebble Creek LLC | Forestdale<br>Birmingham, AL |
| JJ Center Pointe LLC | Center Pointe Landings<br>107 Sterling Court NW<br>Center Point, AL 35215 |
| JJ Center Pointe LLC | City Landing Apartments<br>856 Park Brook Trail<br>Birmingham, AL 35215 |
| JJ Center Pointe LLC | Village Square Landings<br>4141 Pinson Valley Parkway<br>Birmingham, AL 35215 |
| JJ Columbia LLC | Mallard Pointe Apartments<br>1101 Halbrook Dr.<br>Columbia, SC 29209 |
| JJ Columbia LLC | Austin Woods Apartments<br>7648 Garners Ferry Rd.<br>Columbia, SC 29209 |
| JJ Columbia LLC | Harbour Landing Apartments<br>7625 Garners Ferry Rd. |

|  | Columbia SC 29209 |
|---|---|
| JJ Columbia LLC | Ravenwood Hills Apartments<br>4215 Bethel Church Rd.<br>Columbia, SC 29206 |
| JJ Vandam LLC | 9 Vandam St.<br>New York, NY 10013 |
| JJ Midtown Oaks LLC | 1351 Dekalb Ave.<br>Brooklyn, NY 11221 |
| JJ Midtown Oaks LLC | 1010 Bushwick Ave.<br>Brooklyn, NY 11221 |
| JJ Midtown Oaks LLC | 435 Central Ave.<br>Brooklyn, NY 11221 |
| JJ Myrtle Point LLC | 3-50 St. Nicholas Ave.<br>Queens, NY 11385 |
| JJ 88 Arch LLC | 88 University Pl.<br>New York, NY 10003 |
| JJ Cambridge LLC | 10101-10133 Claude Freeman Dr.<br>Charlotte, NC |
| 1700 Alton JJ LLC | 1700 Alton Road<br>Miami, Florida |

.

.

**Exhibit A**

Exhibit A

Eligible Asset Structure



**Exhibit B**

# LIMITED LIABILITY COMPANY

# OPERATING AGREEMENT OF

# ARCH TUSCALOOSA MM LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of July 22, 2021 by and among ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Wiener"), JJ TUSCALOOSA LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ"), and ARCH PROPERTY HOLDINGS 1 LLC, a Delaware limited liability company ("Property Holdings").

WHEREAS, Managing Member, Wiener, JJ and Property Holdings (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of "Arch Tuscaloosa MM LLC" (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1. <u>Certain Defined Terms</u>.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"BBA" shall have the meaning set forth in Section 5.5.1.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The Book Values of all of the Company Property shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company Property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Managing Member; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only

2

Error! Unknown document property name.

if the Managing Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

   (C) The Book Value of any item of Company Property distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such Company Property as of the date of distribution; and

   (D) The Book Values of Company Property shall take into account any adjustments to the adjusted basis of any Company Property pursuant to Section 734 or Section 743 of the Code in determining such Company Property's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

   If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

   "Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

   "Capital Account" shall have the meaning set forth in Section 4.1.

   "Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

   "Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

   "Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

   "Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

   "Capital Event Proceeds" shall mean the gross proceeds derived from Capital Event with respect to the Company, or distributions from a Subsidiary with respect to, a Capital Event (other than Promote Distributions) less, in the case of a Capital Event with respect to the Company the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

   "Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all

3

payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 22, 2020.

"Class C Percentage" shall have the meaning assigned thereto in the shall have the meaning assigned thereto in the Property Holdings Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Property" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Contributing Member" shall have the meaning set forth in Section 3.2.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Managing Member.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.3.

"Fiscal Year" shall be as set forth in Section 11.1.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Investment Entity" shall mean Drake Arch Tuscaloosa 1, LLC, a Delaware limited liability company.

"JJ" shall have the meaning set forth in the Preamble.

"JJ Promote Percentage Interest" means the Percentage Interest of JJ multiplied by a fraction, the numerator is the aggregate capital contributions of Jeffrey Simpson and Jared Chassen in JJ and the denominator of which is the aggregate capital contributions of the Company."

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Managing Member Amount" means the amount required to be distributed pursuant to that certain Amended and Restated Limited Liability Company Agreement of the Managing Member, dated as of January 1, 2018, as the same may be amended, modified, supplemented or restated from time to time, to reduce the Unreturned Capital Contributions (as defined in such Amended and Restated Limited Liability Company Agreement) to zero.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Member Loan" shall have the meaning set forth in Section 3.2.4(i).

"Member Loan" shall have the meaning set forth in Section 3.2.4(ii).

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

Error! Unknown document property name.

(i)    items of income, gain, loss and deduction (including gain or loss on the disposition of any Company Property and Depreciation) shall be computed based upon the Book Value of the Company Property rather than upon such Company Property's adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)    if the Book Value of any Company Property is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such Company Property for purposes of computing Net Profits and Net Losses; and

(vi)    items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.3.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

"<u>Property Holdings</u>" shall have the meaning set forth in the Preamble.

"<u>Property Holdings Agreement</u>" means that certain Limited Liability Company Agreement of Property Holdings in effect from time to time.

"<u>Property Holdings Amount</u>" means the amount required to be distributed pursuant to Section 5.2(i) of the Property Holdings Agreement in order to permit distributions to thereafter be paid pursuant to Section 5.2(ii) of the Property Holdings.

"<u>Regulations</u>" means the income tax regulations promulgated under the Code.

"<u>Regulatory Allocations</u>" shall have the meaning set forth in <u>Section 5.2.5</u>.

"<u>Reserves</u>" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"<u>Subsidiary</u>" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company including, without limitation, the Investment Entity.

"<u>Taxing Authority</u>" shall have the meaning set forth in <u>Section 5.4</u>.

"<u>Transfer</u>" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"<u>Transferring Member</u>" shall have the meaning set forth in <u>Section 8.2</u>.

"<u>Wiener</u>" shall have the meaning set forth in the Preamble.

<u>ARTICLE II</u>

**<u>ESTABLISHMENT OF THE COMPANY</u>**

2.1.    <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "<u>Act</u>") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

7

2.2.    Company Name.    The business of the Company shall continue to be conducted under the name of "Arch Tuscaloosa MM LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.    The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of a membership interest in the Investment Entity; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    Principal Place of Business and Address.    The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    Term.    The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    Agent for Service and Registered Office.    The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Managing Member.  The registered office of the Company in the State of New York shall be in care of such agent for service of process or such other address as may be designated from time to time by the Managing Member; provided, that the Company shall at all times maintain a registered agent and a registered office in the state of New York.

2.7.    Admission of Members.    Managing Member, JJ, Wiener and Property Holdings are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    Limitation on Liability.    Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

## ARTICLE III

## **CAPITAL CONTRIBUTIONS**

3.1.    Initial Capital Contributions.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Exhibit A hereto opposite its name under the heading "Initial Capital Contribution." Property Holdings shall have no obligation or right to make a Capital Contribution to the Company.

3.2.    Additional Capital Contributions.

3.2.1.    If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call Amount.

3.2.2.    Within five (5) Business Days of the Capital Call Notice, each of Wiener and JJ shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by a fraction, (x) the numerator of which is such Member's Percentage Interest and (y) the denominator of which is the aggregate Percentage Interest of Wiener and JJ.

3.2.3.    Subject to Section 3.2.4, if Wiener or JJ fails to make its Capital Contribution required by Section 3.2.2 (the "Non-Contributing Member"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then JJ, if Wiener is the Non-Contributing Member, or Wiener, if JJ is the Non-Contributing Member, so long as it has made its Capital Contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the required Capital Contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount").  If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company, minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

3.2.4.    Notwithstanding anything herein to the contrary, to the extent that the application of the provisions of this Section 3.2 with respect to a Failed Contribution Amount

Error! Unknown document property name.

would cause a default under any agreement to which the Company or any Subsidiary is a party, then:

(i)        to the extent the Failed Contribution Amount is contributed by a Contributing Member, in lieu of such amount being treated as a Capital Contribution by the Contributing Member, such amount shall be treated as a loan from the Contributing Member to the Non-Contributing Member (a "Member Loan") followed immediately by a contribution of the Non-Contributing Member to the Company.

(ii)        Each Member Loan shall:  (i) have an initial principal amount equal to the Failed Contribution Amount made by the applicable Contributing Member to the applicable Non-Contributing Member; (ii) bear interest at a rate of 8% per annum compounded annually (the "Member Loan Rate"); (iii) be non-recourse to the applicable Non-Contributing Member; (iii) unless otherwise agreed to by the applicable Non-Contributing Member, be payable solely out of any distributions that would otherwise thereafter be distributable to the applicable Non-Contributing Member in accordance with Section 5.7; (iv) be secured by the Non-Contributing Member's Member Interest (and the Non-Contributing Member to which a Member Loan is made does hereby grant to each Contributing Member or other Person making such Member Loan a first priority security interest in and to all of such Non-Contributing Member's Member Interest); and (v) be repayable at any time in whole or in part without premium or penalty.  Each Non-Contributing Member shall, upon request, execute such security agreements and financing statements as may from time to time be requested by the Contributing Member(s) or other Person making a Member Loan to such Non-Contributing Member to better assure the security interest in such Non-Contributing Member(s)' Member Interest granted hereby and, effective upon the making of any Member Loan, hereby irrevocably constitutes and appoints the Contributing Member(s) or other Person making such Member Loan as its true and lawful attorney-in-fact, coupled with an interest, to make, execute on behalf of the Non-Contributing Member, consent to, swear to, acknowledge, deliver, record and file such documents and instruments as may be necessary in the sole discretion of the Contributing Member(s) or other Person to confirm and render fully effective all remedies thereof in connection with such Member Loan.  Notwithstanding anything in this Section 3.2.4 to the contrary, the terms of each Member Loan shall be subject to the provisions of any loan agreement in which the Company or any Subsidiary holds a direct or indirect interest is a party.

3.3.    No Interest.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    Return of Capital.  No Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

Error! Unknown document property name.

3.5.    No Personal Liability.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company Property. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except to the extent such Member expressly agrees otherwise.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.    Capital Accounts.    A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    Adjustments.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.  If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.    Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.    Transfers.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.    Capital Account Balance.    Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

11

# ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1.    Allocations of Net Profit and Net Loss.  After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and the Company Property sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the Company Property securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of the Company Property.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    Regulatory Allocations.

5.2.1.    Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.    This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.    To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

Error! Unknown document property name.

5.2.4.   If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this <u>Section 5.2.4</u> shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article V</u> have been made as if <u>Section 5.2.3</u> and this <u>Section 5.2.4</u> were not in this Agreement.

5.2.5.   Any allocations required to be made pursuant to <u>Sections 5.2.1-5.2.4</u> (the "<u>Regulatory Allocations</u>") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to <u>Section 5.1</u> so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to <u>Section 5.1</u> had such Regulatory Allocations under this <u>Section 5.2</u> not occurred.

5.2.6.   It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to <u>Section 10.3</u>, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to <u>Section 10.3</u>.   Accordingly, notwithstanding anything to the contrary in this <u>Article V</u>, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company Property is sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with <u>Section 10.3</u>.

5.3.   <u>Tax Allocations</u>.

5.3.1.   For federal income tax purposes, except as otherwise provided in this <u>Section 5.3</u>, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to <u>Sections 5.1</u> and <u>5.2</u>.

5.3.2.   In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Property contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Property for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).   If the Book Value of any Company Property is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Property shall take account of any variation between the adjusted basis of such Company Property for federal income tax purposes and the Book Value of such Company Property in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

13

Error! Unknown document property name.

5.3.3.  If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Managing Member.

5.4.  <u>Withholding</u>.  The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.  <u>Tax Matters</u>.

5.5.1.  <u>Partnership Representative</u>.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Bipartisan Budget Act of 2015 (the "<u>BBA</u>"), as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the partnership audit procedures enacted under the BBA.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.

Error! Unknown document property name.

The provisions contained in this Section 5.5 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2. <u>Tax Elections</u>.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Managing Member, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Managing Member, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Managing Member shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members.    The Company and the Managing Member shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3. <u>Tax Returns</u>.  The Managing Member shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications, elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.  The Managing Member shall provide to each Member a Form K-1 with respect to the Company by March 31st of each year.

5.5.4. <u>BBA Liabilities</u>. Notwithstanding anything in this Agreement to the contrary, in the event the Company incurs any liability for taxes, interest or penalties pursuant to the BBA:

(i)      The Managing Member may cause the Members (including any former Member) to whom such liability relates, as determined by the Managing Member in its sole good faith discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company;

(ii)      any amount not paid by a Member (or former Member) at the time requested by the Managing Member shall accrue interest at the underpayment rate under Section 6621(a)(2) of the Code, plus 10% percentage points per annum, compounded quarterly, until paid, and such Member (or former Member) shall also be liable to the Company for any damages resulting from a delay in making such payment beyond the date such payment is requested by the Managing Member, and for this purpose the fact that the Company could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii)      without limiting a Member's (or former Member's) obligation under clauses (i) and (ii), any amount paid by the Company that is attributable to a Member (or former Member), as determined by the Managing Member in its sole good faith discretion, and that is not paid by such Member pursuant to clauses (i) and (ii) may be withheld from any distribution that would otherwise be made to such Member (or former Member) under <u>Article VI</u>; and

15

(iv)    the obligations of each Member (or former Member) under this Section 5.5.4 shall survive the transfer by such Member of its Membership Interest and the dissolution of the Company.

5.6.    Section 754 Election.  In the event a distribution of any Company Property occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

## ARTICLE VI

## **DISTRIBUTIONS**

6.1.    Distributions of Cash Flow.  Cash Flow, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Managing Member as follows:  20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

6.2.    Distribution of Capital Event Proceeds.  Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

6.3.    Distributions of Promote Distributions.  Promote Distributions, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Managing Member as follows:

(i)    First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1 in proportion to their respective Percentage Interests;

(ii)    Second, to JJ in an amount equal to (x) the balance plus the amount distributed pursuant to clause (i) multiplied by (y) the JJ Promote Percentage Interest;

(iii)    Third, to JJ in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) multiplied by (y) 50% multiplied by (z) the JJ's Percentage Interest less the JJ Promote Percentage Interest;

(iv)    Fourth, to Wiener in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) and clause (iii) multiplied by (y) 50% multiplied by (z) the Wiener's Percentage Interest less;

(v)    Fifth, to Property Holdings in an amount equal to the Property Holdings Amount;

16

(vi)      Sixth, to Property Holdings in an amount equal to (x) one-half of the balance plus the amount distributed pursuant to clause (iii) and clause (iv) multiplied by (y) 80% multiplied by (z) the Class C Percentage;

(vii)     Seventh, to the Managing Member in the amount equal to the Managing Member Amount, if any; and

(viii)    Thereafter, the balance to Property Holdings.

6.4.    <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

6.5.    <u>Member Loans</u>.  Notwithstanding the foregoing, there shall be paid to any Contributing Member the amount of any distribution otherwise distributable to any Non-Contributing Member, to the extent and in repayment of any Member Loans made by such Contributing Member to such Non-Contributing Member, together with interest thereon at the Member Loan Rate, to be applied first to accrued and unpaid interest thereon and then to the principal balance thereof, in the order in which such Member Loans were made to such Non-Contributing Member, so that with respect to each Non-Contributing Member, the Member Loan longest outstanding is fully repaid prior to the payment of interest or principal on any Member Loan made after the date on which the longest outstanding Member Loan was made (it being understood and agreed that if more than one Contributing Member makes a Member Loan contemporaneously in connection with a Failed Contribution Amount, such payments under this <u>Section 6.5</u> in respect of Member Loans shall be made to all Contributing Members or other Persons so making such Member Loans, pro rata, in proportion to the outstanding principal balance of such contemporaneous Member Loans).  Any such amount that would otherwise be distributed hereunder to a Member that is a Non-Contributing Member shall instead be paid directly to the Contributing Member, and any amount so paid to the Contributing Member as principal and interest on the Member Loan shall be treated for all purposes of this Agreement as distributed to the Non-Contributing Member and paid by the Non-Contributing Member to the Contributing Member.

## ARTICLE VII

## **MANAGEMENT AND OPERATIONS**

7.1.    <u>Management</u>.

7.1.1.  The business, affairs and assets of the Company (including the Company Property) shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with

17

respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)      conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)     open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)     employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)      bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)     deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)   cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)     take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.   Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company (including the Company Property).  Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

18

Error! Unknown document property name.

7.1.3.    Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to JJ and Wiener with such additional information as JJ and Wiener may reasonably request.  Any Major Decision shall be undertaken only with the prior written consent of JJ and Wiener (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)    engage in any business or activity not authorized by this Agreement;

(ii)    enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(iii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(iv)    admit new or substitute Members to the Company or any Subsidiary;

(v)    modify any material terms of any organizational document of any Subsidiary; and

(vi)    cause any Subsidiary to take any of the foregoing actions.

7.2.    Services of the Members.  Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.    Fees and Expenses.

7.3.1.    Acquisition Fee.  In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

Error! Unknown document property name.

7.3.2.    Development Fee/Asset Management Fee/Other Fees.    To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.    Due Diligence Expenses.    The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.    Legal Title to Company Property.    Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.    Other Activities of Members.    Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.    Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.    The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

## ARTICLE VIII

## **TRANSFER OF MEMBERSHIP INTERESTS;**

8.1.    Restrictions on Transfers of Membership Interests.    No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.    To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.    No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.    Permitted Transfers.    Notwithstanding Section 8.1, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer (such Member, a "Transferring Member"), directly or indirectly, all or a portion of such

Error! Unknown document property name.

Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

    (i)  Transfers of a Member's Interest to another Member;

    (ii)  Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

    (iii)  Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a direct lineal descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a direct lineal descendant of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a direct lineal descendant of the Transferring Member.  If such a direct lineal descendant is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Managing Member (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

    (iv)  Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a direct lineal descendant of the Transferring Member or a Transferring Member, and such Transferring Member or descendant, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or direct lineal descendant of the Transferring Member;

    (v)  If a Member is an entity, Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Wiener, any of Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either of the current members of Managing Member continues to be in Control of Managing Member.

Error! Unknown document property name.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and voi*d ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that any of the Company Property would be deemed to be "plan assets" for purposes of ERISA;

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder; or

(vii)    such transfer requires a filing with of the New York Attorney General and such filing is not submitted.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this <u>Article VIII</u>;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

Error! Unknown document property name.

8.5.    Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    Withdrawal, Retirement or Resignation of a Member. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this Section 8.6 shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

## ARTICLE IX

## **REPRESENTATIONS**

9.1.    Representations. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.    it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the

23

acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.  this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.  (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.    Indemnity.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

ARTICLE X

**DISSOLUTION AND LIQUIDATION**

10.1.    Dissolution.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

Error! Unknown document property name.

10.1.2. Upon the disposition of all or substantially all of the Company Property, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2.    Statement of Intent to Dissolve.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the Department of State of New York.

10.3.    Procedures.

10.3.1. Liquidation of Assets.  In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate the Company Property as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company (including the Company Property) that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company Property) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4.    Termination of the Company.  Upon the completion of the liquidation of the Company and the distribution of the Company Property and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

Error! Unknown document property name.

ARTICLE XI

**FISCAL AND ADMINISTRATIVE MATTERS**

11.1.   <u>Fiscal Year</u>.  The fiscal year of the Company will be the calendar year.

11.2.   <u>Checks, Drafts, Etc.</u>  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.   <u>Books and Records</u>.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.   <u>Right of Inspection</u>.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.   <u>Reports</u>.

11.5.1. Within time periods set forth on <u>Exhibit B</u> attached hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on <u>Exhibit B</u> which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Member shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

ARTICLE XII

**CONFIDENTIALITY AND PRESS RELEASES**

12.1.   <u>Confidentiality</u>.   The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures

Error! Unknown document property name.

made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.  <u>Press Releases</u>.  No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

ARTICLE XIII

**INDEMNIFICATION**

13.1.  <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not

27

entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2.    Exculpation/Member Indemnification.  Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3.    Insurance.  Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

ARTICLE XIV

**MISCELLANEOUS**

14.1.    Notices.   All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A hereto.  All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.  Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.  Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.    Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

Error! Unknown document property name.

14.3.    Entire Agreement; Amendments.    This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.    Governing Law.    THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.    Venue.    Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.    Headings.    Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.    Failure to Enforce Provision.    The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.    Interpretation.    All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.    Assignment.    This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

Error! Unknown document property name.

14.11. <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

[Signature page follows]

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
       Managing Member

    By:    _____
           Jeffrey Simpson
           Managing Member


ARCH PROPERTY HOLDINGS 1 LLC

By:    JJ Arch LLC
       Managing Member

    By:    _____
           Jeffrey Simpson
           Managing Member


JJ TUSCALOOSA LLC

By:    JJ Arch LLC
       Managing Member

    By:    _____
           Jeffrey Simpson
           Managing Member


608941 NJ INC.



By: _____
       Name:
       Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:    JJ Arch LLC
       Managing Member


       By:    _____
              Jeffrey Simpson
              Managing Member


ARCH PROPERTY HOLDINGS 1 LLC

By:    JJ Arch LLC
       Managing Member


       By:    _____
              Jeffrey Simpson
              Managing Member


JJ TUSCALOOSA LLC

By:    JJ Arch LLC
       Managing Member


       By:    _____
              Jeffrey Simpson
              Managing Member


608941 NJ INC.


By:    _____
       Name:    Frank van Biesen
       Title:    CFO

Exhibit A

Members, Addresses and Capital Contributions

| Member and Address | Percentage Interest |
|---|---|
| ARCH REAL ESTATE HOLDINGS LLC<br>15 West 27th Street<br>6th Floor<br>New York, NY 10001 | 0% |
| ARCH PROPERTY HOLDINGS 1 LLC<br>15 West 27th Street<br>6th Floor<br>New York, NY 10001 | 0% |
| JJ TUSCALOOSA LLC<br>15 West 27th Street<br>6th Floor<br>New York, NY 10001 | 50% |
| 608941 NJ INC.<br>222 New Road<br>Parsippany, NJ 07054 | 50% |

<u>Exhibit B</u>

<u>Reports</u>

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

   a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

   b.      a statement of the Capital Account of each Member.

2.      Within forty-five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

   a.      a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

   b.      a statement of the Capital Account of each Member.

**Exhibit C**

## LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT OF

## ARCH NOSTRAND MM LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of _____, 2022 by and among ARCH REAL ESTATE HOLDINGS LLC, a New York limited liability company ("Managing Member"), 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Wiener"), JJ ARCH NOSTRAND LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ"), and ARCH PROPERTY HOLDINGS 1 LLC, a Delaware limited liability company ("Property Holdings").

WHEREAS, Managing Member, Wiener, JJ and Property Holdings (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of "ARCH NOSTRAND MM LLC" (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1. Certain Defined Terms. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"<u>Affiliate</u>" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Bankruptcy Action</u>" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"<u>BBA</u>" shall have the meaning set forth in <u>Section 5.5.1</u>.

"<u>Book Value</u>" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)    The Book Values of all of the Company Property shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company Property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Managing Member; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only

2

Error! Unknown document property name.

if the Managing Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

       (C)    The Book Value of any item of Company Property distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such Company Property as of the date of distribution; and

       (D)    The Book Values of Company Property shall take into account any adjustments to the adjusted basis of any Company Property pursuant to Section 734 or Section 743 of the Code in determining such Company Property's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

       If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

       "Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

       "Capital Account" shall have the meaning set forth in Section 4.1.

       "Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

       "Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

       "Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

       "Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

       "Capital Event Proceeds" shall mean the gross proceeds derived from Capital Event with respect to the Company, or distributions from a Subsidiary with respect to, a Capital Event (other than Promote Distributions) less, in the case of a Capital Event with respect to the Company the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted Reserves.

       "Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions, Capital Event Proceeds and Promote Distributions), less the following payments and expenditures (i) all

3

payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on January 11, 2022.

"Class C Percentage" shall have the meaning assigned thereto in the shall have the meaning assigned thereto in the Property Holdings Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Property" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Contributing Member" shall have the meaning set forth in Section 3.2.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Managing Member.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

Error! Unknown document property name.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.3.

"Fiscal Year" shall be as set forth in Section 11.1.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Investment Entity" shall mean 9 Vandam LP JV LLC, a New York limited liability company.

"JJ" shall have the meaning set forth in the Preamble.

"JJ Promote Percentage Interest" means the Percentage Interest of JJ multiplied by a fraction, the numerator is the aggregate capital contributions of Jeffrey Simpson and Jared Chassen in JJ and the denominator of which is the aggregate capital contributions of the Company."

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Managing Member Amount" means the amount required to be distributed pursuant to that certain Amended and Restated Limited Liability Company Agreement of the Managing Member, dated as of January 1, 2018, as the same may be amended, modified, supplemented or restated from time to time, to reduce the Unreturned Capital Contributions (as defined in such Amended and Restated Limited Liability Company Agreement) to zero.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Member Loan" shall have the meaning set forth in Section 3.2.4(i).

"Member Loan" shall have the meaning set forth in Section 3.2.4(ii).

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

Error! Unknown document property name.

(i)      items of income, gain, loss and deduction (including gain or loss on the disposition of any Company Property and Depreciation) shall be computed based upon the Book Value of the Company Property rather than upon such Company Property's adjusted bases for federal income tax purposes;

(ii)      any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)      any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)      there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)      if the Book Value of any Company Property is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such Company Property for purposes of computing Net Profits and Net Losses; and

(vi)      items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.3.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage set forth opposite its name on Exhibit A under the column "Percentage Interest," as such percentage may be adjusted from time to time pursuant to this Agreement.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" means any distributions received by the Company from a Subsidiary that are not in proportion to the capital contributed by the Company to such Subsidiary.

"Property Holdings" shall have the meaning set forth in the Preamble.

"Property Holdings Agreement" means that certain Limited Liability Company Agreement of Property Holdings in effect from time to time.

"Property Holdings Amount" means the amount required to be distributed pursuant to Section 5.2(i) of the Property Holdings Agreement in order to permit distributions to thereafter be paid pursuant to Section 5.2(ii) of the Property Holdings.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member.

"Subsidiary" shall mean any Person of which ten percent (10%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company including, without limitation, the Investment Entity.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Transferring Member" shall have the meaning set forth in Section 8.2.

"Wiener" shall have the meaning set forth in the Preamble.

ARTICLE II

**ESTABLISHMENT OF THE COMPANY**

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2.    <u>Company Name</u>.    The business of the Company shall continue to be conducted under the name of "ARCH NOSTRAND MM LLC"; <u>provided</u>, <u>however</u>, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    <u>Purposes</u>.    The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of a membership interest in the Investment Entity; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.    The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.    The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service and Registered Office</u>.    The agent for service of process upon the Company shall be as set forth in the Certificate of Formation or such other agent as may be designated from time to time by the Managing Member.  The registered office of the Company in the State of New York shall be in care of such agent for service of process or such other address as may be designated from time to time by the Managing Member; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of New York.

2.7.    <u>Admission of Members</u>.    Managing Member, JJ, Wiener and Property Holdings are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.    Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

8

## ARTICLE III

## **CAPITAL CONTRIBUTIONS**

3.1.    Initial Capital Contributions.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Exhibit A hereto opposite its name under the heading "Initial Capital Contribution." Property Holdings shall have no obligation or right to make a Capital Contribution to the Company.

3.2.    Additional Capital Contributions.

3.2.1.    If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (i) to meet its general and administrative expenses or (ii) to make a capital contribution to a Subsidiary, Managing Member shall deliver a written notice to the Members (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call Amount.

3.2.2.    Within five (5) Business Days of the Capital Call Notice, each of Wiener and JJ shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by a fraction, (x) the numerator of which is such Member's Percentage Interest and (y) the denominator of which is the aggregate Percentage Interest of Wiener and JJ.

3.2.3.    Subject to Section 3.2.4, if Wiener or JJ fails to make its Capital Contribution required by Section 3.2.2 (the "Non-Contributing Member"), as and when due, for any reason, and such failure continues for five (5) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then JJ, if Wiener is the Non-Contributing Member, or Wiener, if JJ is the Non-Contributing Member, so long as it has made its Capital Contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional Capital Contribution equal to the required Capital Contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount").  If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, then, the Percentage Interest (as the same may have been previously adjusted) of each of the Members shall be adjusted to equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the aggregate Capital Contributions then or theretofore made by such Member to the Company including the Failed Contribution Amount, plus (ii) in the case of the Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by such Member to the Company, minus (b) in the case of the Non-Contributing Member, 25% of the Failed Contribution Amount then or theretofore made by the Contributing Member to the Company, by (2) 100% of the aggregate Capital Contributions (including without limitation the contribution of the Failed Contribution Amount) then or theretofore made by all of the Members to the Company.

3.2.4.    Notwithstanding anything herein to the contrary, to the extent that the application of the provisions of this Section 3.2 with respect to a Failed Contribution Amount

9

would cause a default under any agreement to which the Company or any Subsidiary is a party, then:

(i)     to the extent the Failed Contribution Amount is contributed by a Contributing Member, in lieu of such amount being treated as a Capital Contribution by the Contributing Member, such amount shall be treated as a loan from the Contributing Member to the Non-Contributing Member (a "Member Loan") followed immediately by a contribution of the Non-Contributing Member to the Company.

(ii)     Each Member Loan shall:  (i) have an initial principal amount equal to the Failed Contribution Amount made by the applicable Contributing Member to the applicable Non-Contributing Member; (ii) bear interest at a rate of 8% per annum compounded annually (the "Member Loan Rate"); (iii) be non-recourse to the applicable Non-Contributing Member; (iii) unless otherwise agreed to by the applicable Non-Contributing Member, be payable solely out of any distributions that would otherwise thereafter be distributable to the applicable Non-Contributing Member in accordance with Section 5.7; (iv) be secured by the Non-Contributing Member's Member Interest (and the Non-Contributing Member to which a Member Loan is made does hereby grant to each Contributing Member or other Person making such Member Loan a first priority security interest in and to all of such Non-Contributing Member's Member Interest); and (v) be repayable at any time in whole or in part without premium or penalty.  Each Non-Contributing Member shall, upon request, execute such security agreements and financing statements as may from time to time be requested by the Contributing Member(s) or other Person making a Member Loan to such Non-Contributing Member to better assure the security interest in such Non-Contributing Member(s)' Member Interest granted hereby and, effective upon the making of any Member Loan, hereby irrevocably constitutes and appoints the Contributing Member(s) or other Person making such Member Loan as its true and lawful attorney-in-fact, coupled with an interest, to make, execute on behalf of the Non-Contributing Member, consent to, swear to, acknowledge, deliver, record and file such documents and instruments as may be necessary in the sole discretion of the Contributing Member(s) or other Person to confirm and render fully effective all remedies thereof in connection with such Member Loan.  Notwithstanding anything in this Section 3.2.4 to the contrary, the terms of each Member Loan shall be subject to the provisions of any loan agreement in which the Company or any Subsidiary holds a direct or indirect interest is a party.

3.3.    No Interest.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    Return of Capital.  No Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

Error! Unknown document property name.

3.5.  No Personal Liability.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company Property. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except to the extent such Member expressly agrees otherwise.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.  Capital Accounts.  A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.  Adjustments.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.  If the Contributing Member elects to make a further additional Capital Contribution equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an additional amount equal to 25% of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 6.2 in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.  Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.  Transfers.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.  Capital Account Balance.  Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

Error! Unknown document property name.

<u>ARTICLE V</u>

## ALLOCATIONS AND DISTRIBUTIONS

5.1.    <u>Allocations of Net Profit and Net Loss</u>.  After the application of <u>Section 5.2</u>, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to <u>Section 10.3.3</u> if the Company were dissolved, its affairs wound up and the Company Property sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the Company Property securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 10.3</u> to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of the Company Property.  Subject to the other provisions of this <u>Article V</u>, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    <u>Regulatory Allocations</u>.

5.2.1.   Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.   This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.   To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with <u>Section 5.1</u> as if such Member were not a Member.

12

5.2.4.   If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.   Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.   It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3.   Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company Property is sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

5.3.   Tax Allocations.

5.3.1.   For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.   In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Property contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Property for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).   If the Book Value of any Company Property is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Property shall take account of any variation between the adjusted basis of such Company Property for federal income tax purposes and the Book Value of such Company Property in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

13

5.3.3.  If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Managing Member.

5.4.  <u>Withholding</u>.    The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.  <u>Tax Matters</u>.

5.5.1.  <u>Partnership Representative</u>.    Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Bipartisan Budget Act of 2015 (the "<u>BBA</u>"), as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the partnership audit procedures enacted under the BBA.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.

14

The provisions contained in this Section 5.5 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2.  <u>Tax Elections</u>.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Managing Member, in its good faith discretion after consultation with the Members; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Managing Member, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Managing Member shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members.  The Company and the Managing Member shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3.  <u>Tax Returns</u>.  The Managing Member shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications, elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.  The Managing Member shall provide to each Member a Form K-1 with respect to the Company by March 31st of each year.

5.5.4.  <u>BBA Liabilities</u>. Notwithstanding anything in this Agreement to the contrary, in the event the Company incurs any liability for taxes, interest or penalties pursuant to the BBA:

(i)     The Managing Member may cause the Members (including any former Member) to whom such liability relates, as determined by the Managing Member in its sole good faith discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company;

(ii)     any amount not paid by a Member (or former Member) at the time requested by the Managing Member shall accrue interest at the underpayment rate under Section 6621(a)(2) of the Code, plus 10% percentage points per annum, compounded quarterly, until paid, and such Member (or former Member) shall also be liable to the Company for any damages resulting from a delay in making such payment beyond the date such payment is requested by the Managing Member, and for this purpose the fact that the Company could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii)     without limiting a Member's (or former Member's) obligation under clauses (i) and (ii), any amount paid by the Company that is attributable to a Member (or former Member), as determined by the Managing Member in its sole good faith discretion, and that is not paid by such Member pursuant to clauses (i) and (ii) may be withheld from any distribution that would otherwise be made to such Member (or former Member) under <u>Article VI</u>; and

15

(iv)    the obligations of each Member (or former Member) under this <u>Section 5.5.4</u> shall survive the transfer by such Member of its Membership Interest and the dissolution of the Company.

5.6.    <u>Section 754 Election</u>.  In the event a distribution of any Company Property occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

## ARTICLE VI

## **DISTRIBUTIONS**

6.1.    <u>Distributions of Cash Flow</u>.  Cash Flow, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Managing Member as follows:  20% to the Managing Member; and 80% to the Members (including the Managing Member to the extent it has made a Capital Contribution) in proportion to their respective Percentage Interests.

6.2.    <u>Distribution of Capital Event Proceeds</u>.  Capital Event Proceeds shall be distributed to the Members within five (5) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests.

6.3.    <u>Distributions of Promote Distributions</u>.  Promote Distributions, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Managing Member as follows:

(i)    First, to the Members other than the Managing Member in the aggregate amount of distributions paid to Managing Member pursuant to Section 6.1 in proportion to their respective Percentage Interests;

(ii)    Second, to JJ in an amount equal to (x) the balance plus the amount distributed pursuant to clause (i) multiplied by (y) the JJ Promote Percentage Interest;

(iii)    Third, to JJ in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) multiplied by (y) 50% multiplied by (z) the JJ's Percentage Interest less the JJ Promote Percentage Interest;

(iv)    Fourth, to Wiener in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) and clause (iii) multiplied by (y) 50% multiplied by (z) the Wiener's Percentage Interest less;

(v)    Fifth, to Property Holdings in an amount equal to the Property Holdings Amount;

16

(vi)        Sixth, to Property Holdings in an amount equal to (x) one-half of the balance plus the amount distributed pursuant to clause (iii) and clause (iv) multiplied by (y) 80% multiplied by (z) the Class C Percentage;

(vii)       Seventh, to the Managing Member in the amount equal to the Managing Member Amount, if any; and

(viii)      Thereafter, the balance to Property Holdings.

6.4.    <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

6.5.    <u>Member Loans</u>.  Notwithstanding the foregoing, there shall be paid to any Contributing Member the amount of any distribution otherwise distributable to any Non-Contributing Member, to the extent and in repayment of any Member Loans made by such Contributing Member to such Non-Contributing Member, together with interest thereon at the Member Loan Rate, to be applied first to accrued and unpaid interest thereon and then to the principal balance thereof, in the order in which such Member Loans were made to such Non-Contributing Member, so that with respect to each Non-Contributing Member, the Member Loan longest outstanding is fully repaid prior to the payment of interest or principal on any Member Loan made after the date on which the longest outstanding Member Loan was made (it being understood and agreed that if more than one Contributing Member makes a Member Loan contemporaneously in connection with a Failed Contribution Amount, such payments under this <u>Section 6.5</u> in respect of Member Loans shall be made to all Contributing Members or other Persons so making such Member Loans, pro rata, in proportion to the outstanding principal balance of such contemporaneous Member Loans).  Any such amount that would otherwise be distributed hereunder to a Member that is a Non-Contributing Member shall instead be paid directly to the Contributing Member, and any amount so paid to the Contributing Member as principal and interest on the Member Loan shall be treated for all purposes of this Agreement as distributed to the Non-Contributing Member and paid by the Non-Contributing Member to the Contributing Member.

<u>ARTICLE VII</u>

**<u>MANAGEMENT AND OPERATIONS</u>**

7.1.    <u>Management</u>.

7.1.1.    The business, affairs and assets of the Company (including the Company Property) shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with

Error! Unknown document property name.

respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)     conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)   enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)   admit one or more additional members solely to provide necessary capital in the event that the Members fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)  cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)    take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.  Except as otherwise provided in this Agreement, the Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company (including the Company Property).  Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

Error! Unknown document property name.

7.1.3.   Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "<u>Major Decision</u>"), Managing Member shall provide written notice thereof to JJ and Wiener with such additional information as JJ and Wiener may reasonably request.  Any Major Decision shall be undertaken only with the prior written consent of JJ and Wiener (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)   engage in any business or activity not authorized by this Agreement;

(ii)   enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in <u>Section 7.3</u> and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(iii)   enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(iv)   admit new or substitute Members to the Company or any Subsidiary;

(v)   modify any material terms of any organizational document of any Subsidiary; and

(vi)   cause any Subsidiary to take any of the foregoing actions.

7.2.   <u>Services of the Members</u>.   Managing Member and the Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this <u>Section 7.2</u> or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.3.   <u>Fees and Expenses</u>.

7.3.1.   <u>Acquisition Fee</u>.  In connection with the acquisition of any asset by the Company or a Subsidiary, the Managing Member shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

Error! Unknown document property name.

7.3.2.  Development Fee/Asset Management Fee/Other Fees.  To the extent that the Company acquires an asset in a Subsidiary with non-Affiliated investors, Managing Member shall be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such asset to the extent the Managing Member or its Affiliate provides such services.

7.3.3.  Due Diligence Expenses.  The Company shall reimburse Managing Member for any actual out-of-pocket third party expenses incurred by such Member in connection with the direct or indirect acquisition by the Company of an asset.

7.4.  Legal Title to Company Property.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.5.  Other Activities of Members.  Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

## ARTICLE VIII

## **TRANSFER OF MEMBERSHIP INTERESTS;**

8.1.  Restrictions on Transfers of Membership Interests.  No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2.  Permitted Transfers.  Notwithstanding Section 8.1, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer (such Member, a "Transferring Member"), directly or indirectly, all or a portion of such

Error! Unknown document property name.

Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

(i)      Transfers of a Member's Interest to another Member;

(ii)     Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)    Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a direct lineal descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a direct lineal descendant of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a direct lineal descendant of the Transferring Member.  If such a direct lineal descendant is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Managing Member (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv)     Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a direct lineal descendant of the Transferring Member or a Transferring Member, and such Transferring Member or descendant, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or direct lineal descendant of the Transferring Member;

(v)      If a Member is an entity, Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Wiener, any of Michael Wiener, William Wiener or Kevin Wiener continues to Control the Members or (y) in the case of Managing Member, either of the current members of Managing Member continues to be in Control of Managing Member.

Error! Unknown document property name.

8.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and voi*d ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that any of the Company Property would be deemed to be "plan assets" for purposes of ERISA;

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder; or

(vii)    such transfer requires a filing with of the New York Attorney General and such filing is not submitted.

8.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this <u>Article VIII</u>;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

Error! Unknown document property name.

8.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 8.4</u>, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 8.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

ARTICLE IX

**REPRESENTATIONS**

9.1.    <u>Representations</u>. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1.    it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2.    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the

23

acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3.   there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4.   this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5.   (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2.   <u>Indemnity</u>.  Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this <u>Section 9.2</u> shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this <u>Section 9.2</u>, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

<u>ARTICLE X</u>

## **DISSOLUTION AND LIQUIDATION**

10.1.   <u>Dissolution</u>.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "<u>Dissolution Event</u>"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

**Error! Unknown document property name.**

10.1.2. Upon the disposition of all or substantially all of the Company Property, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this <u>Article X</u> unless the Members otherwise unanimously agree.

10.2.    <u>Statement of Intent to Dissolve</u>.   In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the Department of State of New York.

10.3.    <u>Procedures</u>.

10.3.1. <u>Liquidation of Assets</u>.   In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "<u>Liquidating Agent</u>") will commence to wind up the affairs of the Company and liquidate the Company Property as promptly as is consistent with obtaining the fair value thereof.   In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. <u>Authority of Liquidating Agent</u>.   In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company (including the Company Property) that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. <u>Distribution of Assets</u>.   Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company Property) of the Company will be distributed in cash to the Members in accordance with the provisions of <u>Section 6.2</u>.

10.4.    <u>Termination of the Company</u>.   Upon the completion of the liquidation of the Company and the distribution of the Company Property and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

ARTICLE XI

**FISCAL AND ADMINISTRATIVE MATTERS**

11.1.  Fiscal Year.  The fiscal year of the Company will be the calendar year.

11.2.  Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3.  Books and Records.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

11.4.  Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5.  Reports.

11.5.1. Within time periods set forth on Exhibit B attached hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit B which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Member shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary.  In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

ARTICLE XII

**CONFIDENTIALITY AND PRESS RELEASES**

12.1.  Confidentiality.  The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures

Error! Unknown document property name.

made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2.  <u>Press Releases</u>.  No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of the Members or its Affiliates without the prior written consent of the Members.

ARTICLE XIII

**INDEMNIFICATION**

13.1.  <u>Indemnification</u>.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("<u>Indemnifying Member</u>") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 13.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not

27

entitled to indemnification under this Section 13.1.2 with respect thereto.  Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2.    Exculpation/Member Indemnification.  Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3.    Insurance.  Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

ARTICLE XIV

**MISCELLANEOUS**

14.1.    Notices.    All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A hereto.  All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.  Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.  Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2.    Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

28

14.3.    Entire Agreement; Amendments.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4.    Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5.    Venue.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6.    Headings.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7.    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8.    Failure to Enforce Provision.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9.    Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10.  Assignment.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

Error! Unknown document property name.

14.11. <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.    The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.    Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

[Signature page follows]

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH REAL ESTATE HOLDINGS LLC

By:   JJ Arch LLC
Managing Member

    By: _____
Jeffrey Simpson
Managing Member

ARCH PROPERTY HOLDINGS 1 LLC

By:   JJ Arch LLC
Managing Member

    By: _____
Jeffrey Simpson
Managing Member

JJ ARCH NOSTRAND LLC

By:   JJ Arch LLC
Managing Member

    By: _____
Jeffrey Simpson
Managing Member

608941 NJ INC.

By: _____
Name:  Frank van Biesen
Title:  CFO

<u>Exhibit A</u>

Members, Addresses and Capital Contributions

<u>Member and Address</u>                    <u>Percentage Interest</u>

ARCH REAL ESTATE HOLDINGS LLC          0%
15 West 27th Street
6th Floor
New York, NY 10001


ARCH PROPERTY HOLDINGS 1 LLC           0%
15 West 27th Street
6th Floor
New York, NY 10001


JJ ARCH NOSTRAND LLC                   50%
15 West 27th Street
6th Floor
New York, NY 10001


608941 NJ INC.                         50%
222 New Road
Parsippany, NJ 07054

Exhibit B

Reports

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

   a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

   b.      a statement of the Capital Account of each Member.

2.      Within forty-five (45) days after the end of each calendar quarter, a financial report of the Company which shall include:

   a.      a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request;

   b.      a statement of the Capital Account of each Member.

**Exhibit D**

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    **HON. JOEL M. COHEN**                          PART _____ 03M _____

                                                *Justice*

-------------------------------------------------------------------------------X

JEFFREY SIMPSON, JJ ARCH LLC                    INDEX NO. _____ 158055/2023 _____

                     Plaintiffs,

              - v -                             **ORDER REGARDING**
                                                **INTERIM OPERATING**
JARED CHASSEN, FIRST REPUBLIC BANK,             **PROCEDURES (Mot. Seq. 001)**

                     Defendants.

-------------------------------------------------------------------------------X

WHEREAS, on August 14, 2023, Jeffrey Simpson ("Simpson"), individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC, and JJ Arch LLC (collectively, "Plaintiffs") filed the above-captioned action against Jared Chassen ("Chassen") and First Republic Bank ("First Republic");

WHEREAS, on August 15, 2023, Plaintiffs filed an Order to Show Cause seeking preliminary injunctive relief;

WHEREAS, on August 16, 2023, counsel for the Plaintiffs and counsel for Chassen appeared before the Honorable Joel Cohen of the Supreme Court of the State of New York, County of New York;

WHEREAS, on August 16, 2023, the Court ordered the parties to confer regarding interim operating measures for JJ Arch LLC ("JJ Arch") and its related companies (the "Arch Companies");

WHEREAS, the parties submitted competing orders for the Court's consideration;

WHEREAS, on August 18, 2023, counsel for the Plaintiffs and counsel for Chassen appeared before the Court; and

# INTERIM ORDER

WHEREAS, on August 18, 2023, the Court ordered the parties to jointly file a proposed interim order regarding operating procedures for the Arch Companies, but the parties instead again submitted competing proposals;

NOW THEREFORE, IT IS SO ORDERED by the Court that **pending the to-be-scheduled hearing on Plaintiff's motion for a preliminary injunction** (Motion Sequence No. 001):

1. The First Republic accounts that are subject to the Adverse Claim letter dated August 11, 2023 (the "Arch Accounts") shall be unfrozen. Both Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court;

2. The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect;

3. JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021 (the "JJ Arch Operating Agreement"). Specifically, the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen. Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements; and

      4.      Simpson and Chassen shall issue a joint communication to all employees of the

Arch Companies in the form attached hereto as Exhibit A.

      This constitutes an interim decision and order of the Court on Motion Sequence No. 001.

DATE: 8/21/2023

JOEL M. COHEN, JSC

**Check One:**      ☐ **Case Disposed**      ☒ **Non-Final Disposition**

**Check if Appropriate:**      ☐ **Other (Specify** _____ **)**

FILED: NEW YORK COUNTY CLERK 08/21/2023 10:26 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 36                                    RECEIVED NYSCEF: 08/21/2023

## EXHIBIT A - JOINT COMMUNICATION

Dear Arch team members,

We understand that the last few weeks have been very challenging for all of us, but we sincerely hope that we have turned a corner.  Jeff and Jared are both still members of JJ Arch and will be jointly running the business at the present time.

We very much appreciate your dedication to Arch, and we look forward to continuing to work with you.

Thank you for your patience,

Jeff and Jared

**Exhibit E**

1

```
NEW YORK STATE SUPREME COURT.
NEW YORK COUNTY : CIVIL TERM : PART 3
---------------------------------------------------------X
JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ
ARCH LLC,

                     Plaintiffs,

        -against-                Index No. 158055/2023

JARED CHASSEN and FIRST REPUBLIC BANK,

                     Defendants.
---------------------------------------------------------X

September 29, 2023


B E F O R E:  HON. JOEL M. COHEN
                  Supreme Court Justice


A P P E A R A N C E S:


ADAM LEITMAN BAILEY P.C.
Attorneys for the Plaintiffs
One Battery Park Plaza - Floor 18
New York, New York  10004-1646
BY:  ADAM LEITMAN BAILEY, ESQ.


AIDALA, BERTUNA & KAMINS, P.C.
Attorneys for the Defendant - Jared Chassen
546 Fifth Avenue - 6th Floor
New York, New York  10036
BY:  JONATHAN LEVENTHAL, ESQ.


SCHWARTZ LAW PLLC
Of Counsel Attorneys for the Defendant - Jared Chassen
150 Broadway - Suite 701
New York, New York  10038
BY:  ALLEN SCHWARTZ, ESQ.
```

A P P E A R A N C E S:   (Continued)


SHERMAN ATLAS SYLVESTER & STAMELMAN LLP
Attorneys for the Defendant - First Republic Bank
1185 Avenue of the Americas - Third Floor
New York, New York  10036
BY:   JAY KANDEL, ESQ. (Virtually)


                         Lori Ann Sacco
                         Official Court Reporter

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 105 of 409

3

```
 1                        MOTION

 2          THE COURT:  All right.  Good morning

 3     everyone.  Let's get started.  I would like to begin

 4     with appearances, starting with the plaintiff.

 5          MR. BAILEY:  Adam Leitman Bailey appearing

 6     for the plaintiff.

 7          THE COURT:  Good morning.  And for the

 8     defendants in the courtroom.

 9          MR. LEVENTHAL:  John M. Leventhal, Aidala,

10     Bertuna and Kimins, 546 Fifth Avenue, New York, New

11     York 10036.

12          MR. SCHWARTZ:  Allen Schwartz, your Honor, of

13     counsel to Aidala, Bertuna and Kimins.

14          THE COURT:  And on Teams.

15          MR. KANDEL:  Good morning, your Honor.  This

16     is Tyler Kandel with Sherman, Atlas, Sylvester and

17     Stamelman on behalf of JPMorgan Chase Bank as

18     purchaser of certain assets and assumed liabilities

19     of First Republic Bank on the FCIC as receiver.

20          THE COURT:  All right.  Still waiting for

21     your exit ramp in this case, Mr. Kandel, yes.

22          MR. KANDEL:  As am I, yes.

23          THE COURT:  So, we're here today on the

24     preliminary injunction motion filed way back when by

25     the plaintiff.  So, why don't we just get right to

26     it.  I would shoot for roughly a half hour a side
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 106 of 409

4

1                          MOTION

2       total, because I would like to try to be done this

3       morning.  So, Mr. Bailey, the floor is yours.  If you

4       can use the lectern, I would appreciate it.

5               MR. BAILEY:  Thank you, your Honor.  And I

6       appreciate your time.

7               THE COURT:  Is it okay to do it over there?

8               MR. BAILEY:  No.  No.  I'm great.  Good

9       morning again.  Okay.  I'm going to do this a little

10      bit differently than I normally do it.  Normally I

11      would state the issues and then the rollout

12      application and conclusions.  And I'll do it a

13      different way, and I think it's going to work

14      hopefully.

15              The real estate world is in chaos.  Every

16      real estate business that actually takes out loans is

17      having a tough time surviving that I'm aware of.  And

18      we have about 10,000 active clients.  It is really,

19      really difficult to survive.

20              Jeff Simpson, the managing partner of Arch

21      and JJ Arch is fighting for his life.  And since you

22      put him back into business, via the interim order,

23      things have been good at the company.

24              THE COURT:  Have been or have not been?

25              MR. BAILEY:  Have been.  Have been.  The

26      morale has been good.  As far as the company, that's

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM          INDEX NO. 158055/2023
NYSCEF DOC. NO. 224          24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document   RECEIVED NYSCEF: 10/17/2023
Pg 107 of 409

5

MOTION

1

2          the internal with employees and the morale of the

3          company.  On the outset of the company Jeff's on --

4          Jeff is -- Jeff is on tons of guarantees, on tons of

5          loans.  He is having a rough time.  Attached to our

6          papers you can see a spreadsheet of deals that he is

7          on.  It's extremely difficult working with the

8          lenders.  Working with the deals he's on.  Making

9          sure the deals happen.  Having to give up some

10         buildings.  Having to make tough decisions with

11         employees.  Having to cut costs.  And that is where

12         right now there is one employee Jared Chassen, who is

13         doing everything he can, even currently today, to try

14         to cause harm to the company.  To work for another

15         company.  I'm going to get into detail coming up on

16         how he's doing it.  How he's still violating your

17         first order, your second order and what he's doing to

18         hurt the company now.

19              Let's start with -- let's start with from

20         where we started to where we are today we know a lot

21         more of how it happened and why it happened through

22         reading documents.  The draw, when things were really

23         good for the company, for Jared Chassen was around

24         $48,000 a month he would get, and he was very happy

25         about that.  Then Jeffrey Simpson met with

26         Mr. Chassen and also wrote him, which is an exhibit,

MOTION

an e-mail saying we're not going to be able to

survive if we keep taking distributions.  It wasn't a

draw.  It was distributions they would call it.

We're not going to survive if we take distributions

of 48,000 a month anymore.  We're going to go out of

business.  That is exact time, the exact week that

Jared Chassen contacted 35 Oak and said we need to

get rid of Jeff Simpson.  He contacted them.  I've

seen the first page of the agreement, so I couldn't

attach it as the exhibit, because I don't have the

full one, 'cause I don't believe that's proper.  But

we know that 35 Oak, who wants to run the Arch

business, jumped at the chance to have an employee on

their side.  And we know that Jared Chassen was paid.

We don't know how much.  We know that they paid, and

this is in writing, 20,000 to Fried, Frank to hire

attorneys and around 50,000 to another law firm to

retain them.  And they had an agreement whereby they

protect any employee at the firm that would sign it

and indemnify them.  We don't know -- we don't have

the full agreement, so we don't know exactly what's

in it.  I know through discovery, we'll receive this,

but we still don't have an answer in this case, but

through discovery we'll receive, as far as I know, we

don't have an answer, through discovery we'll receive

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 109 of 409

7

```
 1                         MOTION

 2         this agreement.  But Jared under I believe it's three

 3         point -- there is a provision in the agreements that

 4         requires, without getting into every detail, you

 5         know, there is a provision in the agreements that

 6         require Jared Chassen to give his full -- his full

 7         time and his full loyalty and his full -- work full

 8         time for JJ Arch.  That is his requirement.  He's not

 9         allowed to work for any other company and he can't --

10         and specifically he cannot work for 35 Oak and he

11         violated that.

12              So, right now it's really hard to have an

13         employee who, when he comes to meetings -- Because

14         Jeff Simpson worked really hard.  He was ordered by

15         me to not only welcome him back, but send out e-mails

16         announcing that he's back, and we're going to

17         cooperate and we're going to get along.  And Jeff

18         started giving him assignments.  Jared refused to do

19         them.  I said Jeff, you have to keep going and keep

20         giving him work to do.  Jared refused to do them.  I

21         said you got to keep trying.  You got to keep doing

22         it.  It's not going to work out unless you invite him

23         back and get him back in.  And what kept happening

24         was that he kept on doing, Jared Chassen kept on

25         doing everything he can to try to hurt the company

26         and he refused to work for the company.
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
RECEIVED NYSCEF: 10/17/2023

Pg 110 of 409

8

MOTION

Now, this is why, I guess, from the Cardozo,
Justice Cardozo on, you know, our judges have always
said that we have to let businesses, from the Menorah
case on, we have to let businesses act on their own.
We can't interfere with their -- we can't interfere
with their affairs.  And when I was a young law
student as Syracuse Law School, where our president
went -- We have very few things to brag about, so I
have to mention that -- I didn't understand that.
Why can't judges, you know, they are so smart.  Why
can't they interfere with the affairs and give
advice.  It doesn't work because it's hard for a
judge to know, 28 years later, it's hard for a judge
to jump in and be able to be in the guts of the
business, in the courage of the business, these hard
decisions to be made, to jump in and tell us what to
do.  Yes, it's a great idea that everybody Kumbala,
get along again, but not when someone -- not when
money is involved, money causes, money is following
it.  And I don't blame Jared Chassen.  You're getting
$48,000 a month.  Based on the money he stole, I'm
sorry, money he paid himself during the coup that he
refuses to reimburse for private schools, for the
expenses that he has.  I don't blame him for wanting
to have 48,000 a month to pay himself.  That doesn't

```
1                        MOTION

2       exist anymore.  Jeff Simpson doesn't get that.  He

3       doesn't take any money out.  He can't.  There is

4       hardly any money in the business right now.  He can't

5       take that himself.  By the way, any money that Jeff

6       takes he was giving to Jared.  There is no money

7       anymore.

8              So, I understand where Jared is coming from.

9       He wants money.  He needs money.  Greed is not a bad

10      thing, I guess.  I'm in a business where I've never

11      been interested -- I have to run a business.  I have

12      to make money.  But I never entered a business where

13      money was my goal.  So, I have trouble understanding

14      it, but I remember, you know, Ivan Boesky saying

15      greed, for lack of a better word, is good.  Fine.  I

16      don't get it, but I understand people's goals are

17      being interested in money.  Fine.

18              THE COURT:  I think that was a movie, but go

19      ahead.

20              MR. BAILEY:  Well, it was the Wall Street's

21      movie was taken by an Ivan Boesky's speech that he

22      gave at Burke.

23              THE COURT:  Got it.

24              MR. BAILEY:  Okay.  So, what does Chassen do?

25      He freezes all credit cards for everybody in the

26      business except guess who?  His own.
```

```
 1                        MOTION

 2            Let me explain a couple of things that my

 3       adversaries pointed out, and then we'll continue.

 4       Citizens Bank was opened up, because up until

 5       yesterday, as Mr. Kandel will, I'm sure, affirm, I

 6       hope, you never know, they finally, after disobeying

 7       the court order for about 40 days, the first interim

 8       court order for 40 days, finally Mr. Chassen signed

 9       the cards needed to put -- give Mr. Simpson the

10       authority once again to be on the bank accounts.  He

11       orally took away that authority during the coup,

12       where he wrote to First Republic and said take

13       Mr. Simpson off all accounts.  That was done.  Then

14       finally yesterday was the day where we received the

15       notification from Mr. Kandel that both of you have

16       signed.  The debate last week, which we had with

17       Mr. Blaustein, who did the best he can to make sure

18       we would get payroll and your law clerk worked really

19       hard at it, and I give them full kudos for this, he

20       worked really hard, because both orders read that

21       Mr. Chassen gets -- only receives viewing access

22       only, which thank God for that, because Mr. Chassen

23       was -- any chance he could get, he was just taking

24       whatever money he could.  So, if he had more than

25       viewing access, we really would be out of business.

26       Thank God you put that in the order.  Thank you.
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document

RECEIVED NYSCEF: 10/17/2023

Pg 113 of 409

11

MOTION

When we opened the Citizen's Bank account, because we
didn't have access to the First Republic Bank
accounts, we gave Mr. Chassen viewing access.

Finally, we got the cards where they are
signed, where I believe Mr. Chassen gets viewing
access and we can do business again.  However, ten
minutes ago in court Mr. Simpson showed me his
computer that he does not have administrative access.
And I wrote to Mr. Kandel asking him, can he help
with this -- this problem or situation.  And I
haven't had time to check my e-mail obviously since
then.

Okay.  Next.  My adversaries complain about
Tristan Last, who is actually here (indicating).
She's waiving.  She is one -- This is a personal
observation and doesn't really mean anything
obviously because it's personal, but knowing,
spending so much time with this company now, she is
the most important person at the company besides Jeff
Simpson and then -- and before his money hungry bing
Jared Chassen.  So, she would be number three.  She
quit the company or resigned temporarily when the
coup happened.  She said I can't participate in these
actions.  So she said in protest I'm resigning.  She
put that in writing, and she explained that in

                            MOTION

 1

 2    writing.  And she has an affidavit that -- You're

 3    always the most prepared judge out of anyone I've

 4    ever seen, so I'm sure you read it already.  And

 5    that's a compliment to you.  So, she never quit

 6    permanently.  It's not a new hire, where the

 7    adversary is claiming that only Jared Chassen can --

 8    can hire employees.  But so it's someone who came

 9    back after a coup was over.  You know, extrinsic

10    circumstances.  Also if you look at the corporate

11    documents, which I've done thoroughly, because the

12    last two times I wasn't so great with the corporate

13    documents, so I made myself do a better job this

14    time, Mr. Simpson also has a right to hire under 7.1,

15    under management.  And he, under also 3.1, number

16    four, he can employ persons.  So, yes, under

17    meaningful decisions Mr. Chassen has a right to hire,

18    but it's not an exclusive right.  Mr. Simpson also

19    has a right to hire on the book.  And then we have an

20    employee --

21         THE COURT:  Mr. Chassen's rights are just

22    rights to consent to certain major decisions.

23         MR. BAILEY:  I was about to go there.  So

24    it's really Mr. Chassen's job, it's not Mr. Simpson.

25    I think that Mr. Chassen's right overrides

26    Mr. Simpson.  You know, I'm the type of attorney

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 115 of 409

13

```
 1                          MOTION

 2     that's not going to try to BS anyone.  So, it's

 3     really Mr. Chassen's job.  However, you know,

 4     Mr. Chassen is not coming to work.  When he does come

 5     to work -- You know, he had COVID, so he couldn't

 6     come to work those days.  Remember the story of The

 7     Boy That Cried Wolf?  I have a seven and eight year

 8     old, so these stories are fresher in my mind than

 9     yours.  But he was calling in sick all the time and

10     he doesn't show up to work hardly ever.  So, if no

11     one is doing the job that he's suppose to be doing,

12     then what is the company suppose to do.  We have to

13     revert back to the other rights in the agreement, the

14     other person that has the right to hire.  He's not

15     there to do his job.  He's refusing to do his job.

16          What is he doing?  Let me give you a couple

17     of things that he's doing.  Besides refusing to work,

18     he refuses to take assignments.  His purpose, this is

19     in our papers, his purpose is to interfere with --

20     with company affairs.  Bank accounts, we went over

21     that.  The bank forms are now filled out finally.  We

22     went over him removing -- Okay.  He refused -- he has

23     refused to reimburse the company for monies taken for

24     personal expenses without authorization.  Every,

25     going back in time, every time money has been taken

26     out of the company, Jeff Simpson has authorized it.
```

14

|  |  |
|---|---|
| 1 | MOTION |
| 2 | That's the company policy.  So, during the coup I get |
| 3 | Jeff Simpson couldn't do that because he was kicked |
| 4 | out of the company.  But when Jeff came back and said |
| 5 | can you show -- can you -- you know, can you |
| 6 | reimburse the monies you took out because I would |
| 7 | never have authorized these personal expenses, he |
| 8 | refused to pay it back. |
| 9 | Next one.  Chassen contacted 35 Oak.  We went |
| 10 | over the agreement with them.  We still -- He is |
| 11 | still violating your first order.  E-mail access, |
| 12 | Jeff Simpson still does not have access to the |
| 13 | Dropbox where the company documents are kept.  This |
| 14 | is still going on today.  He still doesn't have |
| 15 | access to all the documents he needs.  So he's trying |
| 16 | to run a business.  He needs documents for a certain |
| 17 | building and he can't get them.  Do you know where |
| 18 | the documents are?  They were downloaded, this is |
| 19 | from our computer person, they were downloaded to |
| 20 | Jared Simpson's personal computer.  Where is it?  In |
| 21 | the Hamptons.  They haven't been delivered to Jeff |
| 22 | Simpson. |
| 23 | THE COURT:  Where is that in the record?  Is |
| 24 | there an affidavit from the IT person? |
| 25 | MR. BAILEY:  No.  It's in -- it's in your |
| 26 | affidavit. |

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 10/17/2023

Pg 117 of 409

15

```
 1                           MOTION

 2              MR. SIMPSON:  There is an exhibit that shows

 3         the entries.

 4              MR. BAILEY:  There is an exhibit that shows

 5         the entries and it shows -- it shows his Dropbox in

 6         the Hamptons and the account.

 7              THE COURT:  No.  I meant, you know, by this

 8         point in time, your statement that he doesn't have

 9         access to corporate documents --

10              MR. BAILEY:  That's in his affidavit as well.

11         Also the website, which is also in his affidavit.  We

12         don't have access to the domain name of the website.

13         The website is in disarray.  It hurts the reputation

14         of the company by not having a website that actually

15         works well, that's missing pages.  Simpson cannot

16         update or fix the website as Chassen will not release

17         access to the main name of the company.  This is part

18         of your first order.  We still don't have it.  It's

19         still ongoing.  It's just disbelief.

20              THE COURT:  Again the evidence supporting

21         this is all in Mr. Simpson's affidavit?

22              MR. BAILEY:  Yes.  But do we have an exhibit

23         supporting it, I hope so.

24              THE COURT:  All right.  Keep going.

25              MR. BAILEY:  Okay.  3.3 of JJ Arch's

26         operating agreement requires that Chassen,
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224
24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
RECEIVED NYSCEF: 10/17/2023

Pg 118 of 409

16

```
 1                           MOTION

 2      Mr. Chassen devote substantially all his business

 3      time to the company.  Instead, as I said, he's not

 4      showing up to work.  He disconnected QuickBooks link

 5      to the current staff.  He's caused a tax lien.

 6              THE COURT:  Say that one again.

 7              MR. BAILEY:  QuickBooks is no longer linked

 8      to the current staff.  That's how they pay the

 9      employees.  That's his job.  His job duties includes

10      QuickBooks.  A tax lien has been put on Arch.  That's

11      Jared's former job or the job he's suppose to be

12      doing, not happening.  He told the accounting

13      employee to refuse following Simpson orders in the

14      affidavit.

15              THE COURT:  Is the tax lien in the record?

16              MR. BAILEY:  In the affidavit.

17              THE COURT:  The actual lien itself.  It's a

18      document.

19              MR. BAILEY:  No, we don't have it.

20              You have it, but is it in the affidavit?

21              MR. SIMPSON:  I'm not sure.

22              MR. BAILEY:  No, it's not in the affidavit.

23              THE COURT:  All right.  Keep going.

24              MR. BAILEY:  I'm happy to get anything that's

25      missing.

26              Without Simpson's authority he sent checks
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 119 of 409

17

```
 1                           MOTION

 2       and money transfers to pay for financial obligations

 3       that this company didn't have the money or were not

 4       priority payments to make without Jeff Simpson's

 5       authority.  The way the business runs, no money goes

 6       out without Jeff Simpson's authority.  We have in the

 7       record an e-mail from long ago where that policy was

 8       set up.  Then we have an e-mail to Jared saying why

 9       did you do this.  On 9/13/2023 he moved items from

10       Arch companies into his personal bank accounts as

11       Exhibit 19 in the Hamptons.  The Hamptons -- the

12       Hamptons move is Exhibit 19.  I should have been

13       clearer about that earlier.  I apologize.

14                Chassen disrupts company affairs by not

15       coming to meetings or coming to meetings late.  He

16       rarely comes to work.  And he focuses -- and his

17       focus is on 35 Oak and to take over and to have them

18       take over the company.  I have no further remarks.

19                THE COURT:  Okay.  Thank you.  Counsel.

20                MR. SCHWARTZ:  Good morning, your Honor.

21                THE COURT:  Good morning.

22                MR. SCHWARTZ:  Before I address some of the

23       points that were made by Mr. Bailey, I do want to

24       address first the reply that was served, I think it

25       was two nights ago, and our desire to be able to

26       respond to that reply, which contains several
```

|   |   |
|---|---|
| 1 | MOTION |
| 2 | affidavits.  I think it's about five affidavits, many |
| 3 | of which, while there is no word count certification |
| 4 | attached to those affidavits, they appear to be, some |
| 5 | of them appear to be 20 plus pages on reply.  They |
| 6 | contain numerous screenshots, which appear to be some |
| 7 | of those screenshots that were stolen or -- or |
| 8 | accessed when Mr. Chassen was improperly removed from |
| 9 | the company.  And we would like the opportunity to -- |
| 10 | to be able to address that in some detail. |
| 11 | We did send the Court a letter yesterday.  It |
| 12 | was a brief letter.  But in that letter we did note |
| 13 | that as an example of some of the outright falsehoods |
| 14 | in these affidavits, one example being that |
| 15 | Mr. Simpson testified that he does not have access to |
| 16 | GoDaddy, to the website, and we attached e-mails from |
| 17 | the IT person, who Mr. Simpson says is JJ Arch's IT |
| 18 | person in his affidavit, which was directed both to |
| 19 | Mr. Simpson and to Mr. Chassen, where he acknowledges |
| 20 | that Mr. Chassen had made a request to transfer the |
| 21 | access to Mr. Simpson for that GoDaddy website that |
| 22 | had been sitting in his junk e-mail.  Now this might |
| 23 | have been just a simple oversight, but this, as we |
| 24 | showed in the e-mail, it does not appear to be.  So |
| 25 | this e-mail was sent weeks before.  This is just one |
| 26 | example, your Honor. |

```
 1                        MOTION

 2              THE COURT:  Here's my comment on the reply.

 3      There are some parts of the evidentiary submission in

 4      the reply that are responding to arguments or

 5      statements made in the opposition, and that's okay

 6      for a reply.  But there are large parts of the reply

 7      affidavits that are just additional arguments in

 8      support of the motion, which you can't just bring in

 9      on reply for the first time.

10              I recognize that the process is always a

11      little chaotic in a preliminary injunction fight and

12      sometimes the initial papers by the movant doesn't

13      reflect a full investigation yet.  And a way to deal

14      with that is for the plaintiff to seek to supplement

15      their papers before the opposition.  But the way it

16      worked here, and I'm not really casting aspersions,

17      it does put the defendant in an impossible position

18      that a day and a half before the hearing there is

19      waves of affidavits that, you know, are generally

20      relevant, but given the lack of an ability to test

21      them, I mean I'm not going to take the step of

22      striking it.  I'm also not going to give it a whole

23      lot of weight at this point because, you know,

24      frankly 90 percent of what I received are just the

25      two principals swearing at each other across various

26      affidavits.  And the few third party affidavits I've
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM          INDEX NO. 158055/2023

NYSCEF DOC. NO. 224          24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document          RECEIVED NYSCEF: 10/17/2023

Pg 122 of 409

20

MOTION

1

2      gotten just came in in relatively recently, and I

3      have to figure out what to do with those.  Look, I

4      agree with you that I'm not just going to assume the

5      truth of various affidavits that came pouring in

6      without the ability to test them, depose them.  You

7      know, the movant has the burden and, you know, just

8      putting in affidavits a day and a half before the

9      hearing.  I recognize that you haven't had a chance

10     to test it.  I have some issues with the affidavits

11     on their face anyway, but I didn't want to postpone

12     this hearing to give you time to do it.  We'll just

13     see what the evidence that they have submitted that I

14     consider, but I'm -- I take your point.  I'm not

15     going to strike it at this point, but large portions

16     of it should have either been in the original papers

17     or there should have been another procedure in place

18     for you to have an opportunity to respond.  So, I

19     agree.

20          MR. SCHWARTZ:  Thank you, your Honor.  And

21     just to -- just to add to that, with respect to the

22     three affidavits that were submitted by employees, we

23     -- we also, in a letter that we sent yesterday, we

24     sent an e-mail by that same employee where that

25     employee said precisely the opposite.  He described

26     Mr. Simpson as extraordinarily abusive.  And then he

MOTION

1

2    submitted an affidavit here scolding Mr. Simpson.

3    So, we certainly want to have a chance to address

4    that.  And with the other, we would submit this with

5    Ms. Miller.  Again, she submitted an affidavit

6    extolling Mr. Simpson, but we have communication on

7    Linkedin directed from Mr. Bailey to Mr. -- to

8    Ms. Miller basically implicitly or implicitly,

9    however you want to read it, threatening her

10   potential inclusion in this lawsuit if she weren't to

11   reverse or pick a side.  So, with that being said, we

12   have what to tell the Court about all of this.  So I

13   just wanted to alert the Court that there is a lot to

14   be -- to be said about what was submitted in the --

15   in the reply.

16           All right.  So with that being said, your

17   Honor, you know, we're here today about this motion

18   for a preliminary injunction.  You know, we don't

19   generally object, your Honor, to the maintenance of

20   the status quo anti as your Honor provided in the

21   interim order.  But what is being asked on top of

22   what your Honor provided in that interim order, to

23   restore the status quo and pending the resolution of

24   this litigation and these issues about -- about what

25   happened and who -- and what should happen, they're

26   asking, your Honor, to basically give Mr. Simpson

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 10/17/2023
Pg 124 of 409

22

MOTION

1

2    sole control over -- over the bank accounts.  I mean,

3    that is facially what -- what their motion is

4    seeking.

5         THE COURT:  Look, what I did in the interim

6    order is attempt to reinstitute the agreement.  Now

7    the agreement does give Mr. Simpson managerial

8    authority subject really only to certain consent

9    rights for certain major decisions.  And I'll say

10   this as a basic principle, although I think it has to

11   be -- I've had to think through it in light of what

12   I've seen recently.  If nothing else had happened,

13   right, if none of these disputes had happened, none

14   of the back and forth had happened, none of the

15   violations of court orders had happened, and if

16   Mr. Simpson just woke up one day and said you know

17   what, I've allowed you to have signing authority on

18   these bank accounts for a long time.  I've now

19   decided that I really should be the only one who has

20   signing authority on these banks.  You still have

21   your consent rights, but we're going to wipe the

22   slate clean and start over again.  This is the way as

23   manager I'm going to organize this.  I don't think a

24   Court would look at that and strike that down and say

25   that's outside the scope of his responsibility.  He

26   is in charge.

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 125 of 409

23

```
 1                        MOTION

 2            Now, the business has run for years with

 3       Mr. Chassen having frankly more access and authority

 4       over the day-to-day banking relationship.  That's

 5       also true.  But nothing would have stopped

 6       Mr. Simpson from revising that, at least that's the

 7       way I read the agreements.  Your client has a

 8       circumscribed set of consent rights and other than

 9       that, Mr. Simpson is in charge.  The problem I have

10       is that as I've watched this case unfurl itself, I

11       have grave concerns frankly about either of the two

12       principals being totally in charge of anything at

13       this point, because I think credibility on both sides

14       has been somewhat lacking.  But just basic

15       principles, your client does not have a contractual

16       right to be anything other than having his consent

17       rights as a member in my opinion.

18            MR. SCHWARTZ:  Your Honor, I think that the

19       operating agreement does, it does as your Honor say,

20       provides, as your Honor has characterized them,

21       fairly robust consent rights, but Mr. Chassen is a

22       check and a balance on Mr. Simpson.  That is what the

23       operating agreement -- agreement does, does envision

24       that is his role.

25            THE COURT:  In terms of operationally running

26       the bank accounts, the contract does not say that.
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 126 of 409

24

```
 1                        MOTION

 2            MR. SCHWARTZ:  That's correct, your Honor.

 3      But as your Honor, you know, pointed out, I think in

 4      a prior hearing, you know, hearing, I think it might

 5      have been on the TRO hearing or one of the other

 6      hearings, your Honor pointed out that, you know, this

 7      is about the status quo.  And so the issue here is --

 8      is, you know, Mr. Simpson is seeking to alter a

 9      status quo here.  So the question then becomes

10      several fold.  Number one, does he have a probability

11      of success on the merits.  Number two, does he suffer

12      irretrievable injury if Mr. Chassen also has

13      signatory control over these agreements -- over the

14      bank accounts.  Excuse me.  And number three, is

15      Mr. Simpson coming here with clean hands.  Do the

16      equities favor Mr. Simpson.  He's seeking equitable

17      relief from the Court, to have the Court change the

18      status quo and give him powers, that while they may

19      be powers that he may or may not have had in the

20      operating agreement, he's asking the Court now to

21      enforce them and modify and alter the status quo as

22      the business has been operating in the context that

23      we have just seen, the Court has just seen unfold,

24      which includes, your Honor, continuing noncompliance

25      with the Court's TRO of September 15, 2023, which we

26      address also in our letter yesterday.  Some of that,
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 127 of 409

25

1                              MOTION

2        firing employees without obtaining Mr. -- hiring new

3        employees without obtaining Mr. Chassen's consent in

4        addition to Ms. Last, new employees, firing employees

5        that he perceives is aligned with Chassen as far as

6        we can tell.  Not allowing him access.

7               THE COURT:  The place does seem to be a bit

8        of a mess at the moment.

9               MR. SCHWARTZ:  And, your Honor, we actually,

10       just as an aside, you know, we just learned today

11       that apparently there were -- there was -- investors

12       had submitted documents for -- for I think it's --

13       What's the --

14               MR. LEVENTHAL:  1031.

15               MR. SCHWARTZ:  -- 1031, it just slipped my

16       head, but 1031 tax transfers for tax benefits.  We

17       learned that those 1031 exchanges did not go through

18       for numerous investors of the company, and the

19       investors were never told by Mr. Simpson.  So, there

20       is apparently a lot of angry investors in these

21       companies as we sit here now.

22               THE COURT:  You mean tax-free exchanges?

23               MR. SCHWARTZ:  Yes, 1031 tax exchanges.  So a

24       lot of investors, including Mr. Chassen, are being

25       issued with K-1s that are going to be posing a lot of

26       tax liability on them.  This is definitely a

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 128 of 409

26

| 1 | MOTION |
|---|---|

2       situation where Mr. Simpson wasn't -- This is just

3       another example where he wasn't forthright with

4       investors.  This was over six months.

5               THE COURT:  Can I ask you another question

6       that's been at least in my mind I saw in the papers.

7       So, I take it there is another lawsuit by the

8       investor member.  Is it across the street in the

9       Southern District?

10              MR. SCHWARTZ:  Yes.  Yes.

11              THE COURT:  Am I right that there is another

12      judge somewhere, well not too far away, also being

13      asked to reach decisions on managerial rights at the

14      same time I am?

15              MR. SCHWARTZ:  So, the way I would say it is,

16      is that the 35, that's what we call them, though they

17      have a different technical name, 35 Oak is the

18      minority member of Arch Real Estate Holdings LLC.

19      So, Arch Real Estate Holdings -- So, there is -- JJ

20      Arch is the 80 percent member, the managing member of

21      Arch Real Estate Holdings LLC.  The case here is

22      about --

23              THE COURT:  I have just a very simple

24      question.  Is that Court also reaching the question

25      of whether, for example, JJ Arch continues as the

26      managing member of the real estate company?

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM          INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document   RECEIVED NYSCEF: 10/17/2023
Pg 129 of 409

27

```
 1                          MOTION

 2              MR. SCHWARTZ:  So, it's unclear at this time

 3         whether the relief 35 Oak is seeking is simply

 4         monetary damages or if they are seeking the outright

 5         removal of JJ Arch from the face of the complaint and

 6         the pleadings, which is the only thing that's --

 7         that's really relevant in terms of determining what

 8         they are seeking at this time.  It doesn't appear

 9         they are actually seeking the removal at this time,

10         but they are seeking declaratory, other forms of

11         relief.

12              THE COURT:  I'll let Mr. Bailey respond

13         later.  I did see that they have, you know, these

14         termination rights are similar

15              MR. SCHWARTZ:  Okay.

16              THE COURT:  Anyway, go ahead.  I just wanted

17         to see whether my orders are already in conflict with

18         anything.

19              MR. SCHWARTZ:  No, they are not in conflict

20         with anything.  The case -- the case has not gotten

21         to a place where that has been, as far as we know,

22         any motion practice.  I'm not sure if the complaint

23         has been served yet though.  We believe it is in the

24         process or it will be served.  I don't know the exact

25         status of the case other than to say there hasn't

26         been any motion practice.
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 130 of 409

28

MOTION

THE COURT: All right. Continue. I hope at

some point you're going to address these two points

that they have made of specific things that were in

my interim order that they say have not been complied

with, the Dropbox and his e-mail. At least I heard

that -- that he has no access to the Dropbox files.

No access to the website. I guess you've described

what that is. I thought at some point in their

papers they say he still doesn't have access to his

e-mail, is that right?

MR. BAILEY: We have access to e-mail.

THE COURT: He does have access to e-mails.

MR. SCHWARTZ: I think the website they are

referring to, the GoDaddy, which as I said is an

outright false testimony because --

THE COURT: That was the one where the IT guy

said he did see it was in his junk mail, something

like that.

MR. SCHWARTZ: Yes. We'll respond to the

Dropbox if we have the opportunity to submit

opposition or sur-reply to these accusations. We

will -- we will address it similarly. Mr. Chassen

was shut out of all company systems. He was fired,

terminated. He was shut out of bank accounts. He

was shut out of his own e-mails. He was shut out of

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 131 of 409

29

MOTION

1

2      Dropbox.  Until September 15th he had no access to

3      anything.  So, the idea that he is somehow still

4      shutting out Mr. Simpson who has control of this

5      company is -- is facially hard to believe, but we

6      will also establish that in affidavit testimony, if

7      your Honor gives us that opportunity to do so, that

8      that's the case.  Similarly to the GoDaddy issue in

9      the website, where we established, showed or the

10     e-mails show that Mr. Chassen did what he had to do

11     to give him that access.  He has that access.  And

12     this testimony is simply false.  It's frankly

13     incredible that it's even being submitted to the

14     Court.

15           THE COURT:  Okay.  Let me let you continue.

16     I'm sorry for the questions.

17           MR. SCHWARTZ:  Okay.  So, your Honor, in

18     terms of the probability of success on the merits,

19     your Honor, you know, there is a lot of -- there is a

20     lot of dispute.  As your Honor pointed out, you have

21     testimony from both principals.  The facts are

22     certainly sharply disputed here at best.  And we --

23     we, as Mr. Chassen points out in his affidavit,

24     Mr. Simpson was -- he had ample reason, basis to have

25     done what he did in August of 2023 in terms of

26     terminating Mr. Mr. Simpson at that time.

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 132 of 409

30

MOTION

1

2    Mr. Simpson was threatening to blow up the company.

3    Mr. Simpson was extremely volatile.  Mr. Simpson's

4    actions were, in terms of his -- his relationship and

5    actions towards other minority members, investor

6    members, was -- was very abusive.  And so, your

7    Honor, in terms of the probability of success on the

8    merits prong of it, there is certainly -- we would

9    say they haven't established any probability of

10    success or an adequate probability of success based

11    on the facts that have been presented to the Court.

12    I will also note, your Honor, that the complaint will

13    likely be dismiss, albeit probably without prejudice

14    at some point because of the intermingling of the

15    direct derivative claims, which subjects the entire

16    complaint to dismissal under -- under Court of

17    Appeals precedent.  We also point out in the

18    memorandum of law, your Honor, which I know your

19    Honor has read, that some of the claims are

20    duplicative of the brief of fiduciary duty claims.

21    So, those claims will be dismissed.

22         So in terms of the probability of success on

23    the merits, we don't believe they establish that, but

24    at best here the facts are sharply disputed.  And in

25    a situation where the facts are so sharply disputed,

26    there is case law that says that injunctive relief

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
NYSCEF DOC. NO. 224
INDEX NO. 158055/2023
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 133 of 409

31

```
 1                           MOTION

 2        may be inappropriate in such circumstances or

 3        certainly injunctive relief altering a status quo

 4        to --

 5              THE COURT:  Just so I'm clear.  Is your

 6        position that we should go back and wipe out the

 7        interim order and all the other orders and just go

 8        back to the state of affairs before the lawsuit

 9        began, which was Mr. Simpson's out?

10              MR. SCHWARTZ:  Your Honor, we're not -- As I

11        said, I think we would -- we are not -- As I said

12        earlier, we're not opposed to the interim order

13        maintained in the status quo anti.  We recognize that

14        resolution that the Court put in place to restore the

15        operating agreement, restore the parties to their

16        rights under the operating agreement, both parties

17        was -- was -- was reasonable in this context.  We

18        don't have a pending -- You know, we're not --

19              THE COURT:  So, a lot of what the plaintiffs

20        sought in the initial preliminary injunction is

21        incorporated in those orders.  So, to that extent you

22        don't oppose the grant of the motion to keep those

23        orders in place?

24              MR. SCHWARTZ:  Yes.  That's correct, your

25        Honor.  We're not -- we're not asking the Court to

26        basically deny the motion and thereby remove Simpson
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 134 of 409

32

1                              MOTION

2        now.  Rather we're asking that -- We're conceding

3        that the Court should -- We're conceding the interim

4        orders, correct.

5              THE COURT:  By their terms the interim orders

6        expire at the end of this hearing unless I --

7              MR. SCHWARTZ:  Yes.  We, you know, we -- we

8        understand that.

9              THE COURT:  Okay.

10             MR. SCHWARTZ:  And frankly it's not -- it

11       wouldn't be clear what would happen if the interim

12       orders expire.  I mean we would just have a new free

13       for all potentially without the interim orders, and

14       we would have further motion practice immediately

15       thereafter, Simpson motion practice most likely for

16       the exact same purposes if the interim orders were --

17       were to expire.  So, with that in mind, that is the

18       reason why we are taking the position that we are

19       taking is because without the Court's interim orders,

20       the status would be highly unclear in terms of --

21       because things have changed on the ground since the

22       Court entered the interim orders.  At the time the

23       interim orders were entered, Mr. Simpson was not a

24       member -- was not -- had been removed from the

25       company.  And so now Mr. Simpson is in full control

26       of the company.  So, if the interim orders were to be

MOTION

```
 1
 2    removed now, in effect we would be in a situation
 3    where we would be back in front of the Court seeking
 4    relief.  And they would be back in court seeking
 5    relief.
 6            THE COURT:  Now, I'm going to ask you about
 7    something that's in these new affidavits which sort
 8    of surprised me a little, and recognizing that you
 9    are really not required to answer this if you feel
10    like you need more information.  But for the first
11    time I think I saw in this last affidavit, and it was
12    somewhat echoed in Mr. Simpson's, that there was,
13    right before all the conflagrations began in August,
14    that in July, at least as Ms. Last put it, there were
15    discussions going on about actually turning over the
16    company to Mr. Chassen.  Ms. Last refers to it that
17    way.  I guess Mr. Simpson refers to it as a proposed
18    buyout, which seemed inconsistent with all the stuff
19    I was hearing about Mr. Chassen being incompetent.
20    But maybe as a buyout I understand it.  Do you have
21    enough information now to help me understand where
22    that all fits in?  'Cause it really happened right
23    before everything blew up.
24            MR. SCHWARTZ:  So, I don't have -- You know,
25    I don't want to give your Honor the impression that I
26    could give your Honor any kind of fulsome answer to
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM          INDEX NO. 158055/2023
NYSCEF DOC. NO. 224          24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document          RECEIVED NYSCEF: 10/17/2023
Pg 136 of 409

34

```
 1                            MOTION

 2       that question just other than to say those

 3       conversations were going on.  I believe those

 4       discussions were with the participation of 35 Oak.

 5       And I believe that those discussions did blow up.  I

 6       am also aware that, you know, there are other

 7       business dealings between Mr. Simpson and Mr. Chassen

 8       regarding their other assets separate and apart from

 9       Arch Real Estate Holdings.  And there was actually a

10       settlement that was reached, a contract that was

11       reached to basically split their -- to go their

12       separate ways and to divide up those -- those assets,

13       those liabilities.  This will all be presented in

14       affidavit testimony in a submission.

15            THE COURT:  Look, the affidavits candidly are

16       not awfully helpful at this point.  I heard enough

17       from the two principals.  What I really need is

18       actual evidence that can be tied to contemporaneous

19       documents or maybe disinterested witnesses, if there

20       are any.  But what this -- look, what this whole

21       thing is screaming out for is for some sort of

22       commercial resolution, because I don't think there is

23       a court in this world that can waive some magic wand

24       and make this company run smoothly at this point

25       because you have two principals who are oppositional.

26       You have an investor member who is either protecting
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 10/17/2023
Pg 137 of 409

35

MOTION

1

2       their interests, if you look at it from one

3       perspective or acting opportunistically if you look

4       at it from another perspective.  But you have three

5       power centers sort of swirling around each other.

6       And you have a business that strikes me as

7       potentially in danger of drifting.  And, you know,

8       somebody needs to be able to take control without a

9       court overseeing it all.  Now whether that's one of

10      the individuals sitting in front of me here, whether

11      it's a receiver, which is the more extreme version of

12      court intervention, but I do have some real concerns

13      as to how this business is going to run in a

14      rationale way under the current circumstances.  You

15      know what series of orders can I issue.  Courts are

16      not, as Mr. Bailey I think rightly put it, we are not

17      comfortable with this role of trying to micromanage

18      companies, which is why the purpose of my order was

19      to just say look, you have an agreement.  Follow it.

20      That didn't go very well, because immediately there

21      was chaos.  So, I'll continue to do the best I can,

22      but if you all can't see that there is a need for

23      commercial resolution to this, I don't mean you all

24      the lawyers, but the principals can't see there has

25      to be some resolution to this, otherwise you're going

26      to lead to these people dragging themselves under the

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document

RECEIVED NYSCEF: 10/17/2023

Pg 138 of 409

36

```
 1                          MOTION

 2       water.

 3               MR. SCHWARTZ:  My colleague, Judge Leventhal,

 4       he asked if he could address you quickly.

 5               THE COURT:  That's fine.  You guys have a few

 6       more minutes, and then I'll have Mr. Bailey speak.

 7               MR. BAILEY:  Could I -- could I help with

 8       information?

 9               THE COURT:  Let me let Mr. Leventhal say

10       something first.

11               MR. LEVENTHAL:  I want to make two

12       observations.  What happened, there was a profit

13       event in 2022, the summer, 200 million.  There was a

14       $60 million profit, and they did 1031 transfers

15       within a short time.

16               THE COURT:  They bought other properties with

17       the property?

18               MR. LEVENTHAL:  Well, they tried to.  Today

19       everyone was served with a K-1, not everyone, but a

20       lot of the people were served with K-1s.  And they

21       were just told today that the -- the 1031s were not

22       approved.  And they knew this five months ago.

23               So, you mentioned receiver.  That's why I'm

24       getting up.  We can't ask for a receiver, because it

25       would cause foreclosures.  I don't think they can ask

26       for a receiver.  I think it would cause some harm.
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 139 of 409

37

MOTION

You have a lot more experience than I do -- I think
some of these -- in this area -- you may have some of
these investors who are very disgruntled who thought
they never got the profit.  They don't have the
money, and they have a big tax bill.  I think they
may come forward regarding that.

One other observation I want to make.  Even
though you said how we would return.  There is an
outstanding order from the contempt which basically
is that our client is a signatory.  So, I just want
to point out to you that if Mr. Simpson is solely in
charge, he's going to do what he did before.  He's
going to ignore the order with Mr. Bailey's approval,
saying no, no, no, only viewing rights.  And -- and
characterizing the transcript as dicta.  Your
pronouncements on the record calling it dicta and
somehow construing that order as saying oh, no, you
only have viewing rights.  If you permit him to be
only in charge, he's going to squash everyone.  He's
going to remove people who talk to Jared, as he did
dismissing three people upon his coming.  There might
have to be a receiver.  We can't ask for one and
we're not going to because of the catastrophic
effect.  I think that may have to be the remedy in
the future.  I'm pointing out to you that Mr. Simpson

```
 1                              MOTION

 2      and his lawyer is allowing this to thumb their nose

 3      at the Court.  And I think you should take that into

 4      consideration.

 5              THE COURT:  Thank you.  All right,

 6      Mr. Bailey.

 7              MR. BAILEY:  Thank you, your Honor.

 8              MR. KANDEL:  Your Honor, may I just speak?

 9              THE COURT:  Yeah.  Just briefly, Mr. Kandel.

10      Sure.

11              MR. KANDEL:  Yeah, because I know Mr. Bailey

12      is going to speak, and he may want to respond to what

13      I'm going to say.

14              Yesterday I received from both counsel

15      executed signature documents called multi vesting

16      account forms that I then forwarded to my client.

17      Those forms as completed, and I'll wait for my client

18      to confirm this, but would provide both individuals

19      with the authority to make transactions in each of

20      the accounts.  And I just want to make sure that the

21      counsels sitting in the courtroom are aware that's

22      what these documents provide as completed.

23              THE COURT:  Which is consistent with what the

24      order required.

25              MR. KANDEL:  Correct.  But I thought I heard

26      from Mr. Bailey that he said yesterday that there was
```

MOTION

1

2    documentation that provides for Mr. Simpson only to

3    have the authority to make transactions and that

4    Mr. Chassen would only have viewing access.  I just

5    want to make sure everybody is aware the documents I

6    forwarded, at least my understanding is, that as

7    completed would provide both individuals with the

8    authority to make transactions.  I am waiting to hear

9    from my client as to the processing of those forms.

10   You know, I know Mr. Simpson, who has peppered me

11   with e-mails, wants things to occur more quickly than

12   is commercially practicable, and they are going --

13   you know, the bank will process the documents in a

14   commercially reasonable amount of time.  Thank you,

15   your Honor.  That's all I have.

16        THE COURT:  All I will say before Mr. Bailey

17   goes, under the current orders what people have done,

18   at least what you just described, is exactly what I

19   ordered.  All of those orders were pending this

20   hearing today.  So, today I think plaintiff can

21   certainly make the argument that going forward he

22   should have sole authority and that that would then

23   supersede the interim orders that I've entered.  But,

24   you know, what you've just described is what --

25   frankly I'm surprised it took this long for the

26   parties to get the signature cards to you, since that

<pre>
 1                            MOTION

 2      order was, I don't know how long ago it was, but it

 3      wasn't yesterday.

 4               Anyway Mr. Bailey, go ahead.

 5               MR. BAILEY:  Thank you, your Honor.

 6               THE COURT:  You only have about, because I

 7      want to give you an answer --

 8               MR. BAILEY:  I'm going to be really quick.

 9               THE COURT:  Well, talk slow and still be

10      quick.

11               MR. BAILEY:  I will speak slowly.  Number one

12      and most importantly, if you appoint a receiver, that

13      will cause a default in all loan agreements.  The

14      mention of a receiver in your last transcript caused

15      much harm and a lot of phone calls in distress to

16      Jeffrey Simpson to not be defaulted upon.  And my

17      letting -- letting Jeffrey know to keep telling him

18      it's not the order, it's dicta and dicta doesn't

19      matter, only the order does, was a great help.  But a

20      receiver would be very, very bad.

21               THE COURT:  I understand your point.

22               MR. BAILEY:  Thank you.

23               THE COURT:  The reference to receiver was not

24      an order.  The reference to bank account access was.

25      Go ahead.

26               MR. BAILEY:  Okay.  Obviously giving bank
</pre>

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224
24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
RECEIVED NYSCEF: 10/17/2023
Pg 143 of 409

41

1                                    MOTION

2          account access to someone who is trying to ruin the

3          company and help out a third company is a -- would be

4          very, very bad.  Viewing access only -- viewing

5          access only is -- is not only preferable but I think

6          essential.

7                    THE COURT:  Well, I do want to make one thing

8          clear.  I worded it very specifically.  I said that

9          the parties should, for reasons that I thought were

10         extraordinary, because I frankly lost trust in the

11         parties to -- to follow normal business practice as

12         opposed to a reign of retribution, that they should

13         both have authority, but that it was subject to, you

14         know, the actual transactions are still subject to

15         the overarching provisions of the operating

16         agreement.  And among those, you know, this whole

17         idea of the parties taking informal distributions and

18         sending checks to private schools, look, some

19         companies do that, but it's not in the operating

20         agreement.  There should be -- You know, again,

21         Mr. Simpson is the managing member.  And I don't have

22         any problem at all with the idea that yeah, they both

23         have signing authority, but Mr. Chassen does not have

24         authority to give himself informal distributions by

25         sending monies to private schools.  I'm not

26         suggesting that what happened in the past is

|     | MOTION |
|-----|--------|
| 1   |        |

2      improper, because I don't know enough about whether

3      things were authorized and consented to in various

4      ways.  Maybe.  Maybe not.  But I do want to make it

5      clear that the fact that Mr. Chassen was given

6      signing authority does not mean that I'm waiving away

7      all the provisions of the agreement governing

8      distributions and the like, which are subject to

9      Mr. Simpson's managerial control.

10          MR. BAILEY:  Right.  But that being said, the

11     first thing Mr. Simpson will do will be telling

12     Mr. Chassen he only has viewing authority.  That will

13     be one --

14          THE COURT:  Now we're starting to -- to -- I

15     recognize you may think that the Court has gone out

16     over its skis a little bit here.  You're the party

17     that brought the Court into this by filing this case.

18     Once you bring the Court into a situation where there

19     are fiduciary duties in all sorts of different

20     directions, you know, I think the Court properly can

21     exercise discretion in deciding, especially in a

22     preliminary injunction, how to maintain the status

23     quo in a way that avoids harming the parties and the

24     company.  And so there may be situations where to --

25     to effect that role, which again you guys brought me

26     in to deal with it initially, I will do some of that.

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 145 of 409

43

MOTION

1

2  But my -- my guiding principles are largely the

3  contract.  But I will tell you that your client has

4  acted in ways that trouble me in terms of complying

5  with court orders and doing what I thought was

6  necessary to balance things out a bit.  But I'm not

7  taking away the managerial control, but I think some

8  guardrails are necessary, 'cause frankly I am

9  concerned about what I've seen here.

10      MR. BAILEY:  Understood.  At the same time I

11  think we have shown at least eight examples that by

12  giving Mr. Chassen access to bank accounts, he's

13  going to take money that he's not allowed to take.

14      THE COURT:  Well, I'm, without necessarily

15  dealing with each individual situation, I am amenable

16  to making it even more clearer that having signing

17  authority does not mean that it's a license to do

18  whatever you want.  It means that in fulfilling the

19  corporate, you know, operating the corporate

20  business, each of them should have some role in it.

21  But I am not signing off on some change in the

22  corporate documents that would permit Mr. Chassen to

23  grant himself a distribution.  I just want to make

24  that clear.  That hasn't really been stated.  And I'm

25  not characterizing what he did before in the same

26  colorful way you have periodically, because as I

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023

NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023

Pg 146 of 409

44

MOTION

1    said, I've had a lot of experience with companies of

2    this type, where it is perfectly agreed and accepted

3    that the partners will sometimes do things

4    informally.  I don't know enough yet about this one,

5    although it does have elements of that that I have

6    seen so far.  But I'm saying going forward, informal

7    is not going to work anymore because the parties

8    don't trust each other.  So distributions are going

9    to have to be by the book.

10   MR. BAILEY:  Understood.  You asked about the

11   lawsuit that's attached as an exhibit involving 35

12   Oak against Mr. Simpson.

13   THE COURT:  Just to be clear for Mr. Kandel's

14   purposes.  That is not for the bank to regulate.  The

15   bank is an order taker here.  If these two guys have

16   signing authority and one of them does something that

17   might ultimately be viewed as conversion or

18   inappropriate, it's not the bank's liability, all

19   right.  That's on the two principals.

20   MR. BAILEY:  Your Honor --

21   MR. KANDEL:  Thank you, your Honor.  I

22   appreciate that.  I was going to ask for

23   clarification on that myself, because I could foresee

24   a world where the bank or me specifically will be

25   receiving daily e-mails with threats and

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 147 of 409

45

MOTION

1

2    admonishments not to execute transactions based upon

3    the other individual's authority.

4            THE COURT:  That's between the parties and

5    the Court.

6            MR. BAILEY:  I would go a step further.  Your

7    Honor, I would like to discontinue our case against

8    the bank as soon as, if you're ruling that both

9    parties -- as soon as my client has administrative

10   authority, I would like to discontinue our case

11   against the bank.  They are only a stakeholder in

12   this case.  We didn't bring -- we didn't bring a case

13   against the bank to go against them.  We brought a

14   case as a stakeholder, because they are holding the

15   money.

16           THE COURT:  I understand.

17           MR. BAILEY:  They were never an adversary to

18   our client.

19           THE COURT:  Your proviso about your client

20   having -- I don't know what you mean by that.  If at

21   the end of this hearing I reconfirm that your client

22   is the managing member, but that I -- I don't think

23   that means, given the current circumstances, he's

24   solely in charge of the mechanics of paying bills and

25   the like.  Go ahead.

26           MR. BAILEY:  My client's intention is -- is

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
NYSCEF DOC. NO. 224

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 148 of 409

INDEX NO. 158055/2023

RECEIVED NYSCEF: 10/17/2023

46

```
1                              MOTION

2        to move all monies from First Republic to another

3        bank for a fresh, clean start.  Just so you know.

4        'Cause it hasn't been easy working with that bank.

5        And I'm sure Mr. Kandel will celebrate us moving the

6        monies out of that bank.  So we would ask for the

7        authority to do that.

8             THE COURT:  I don't know if that comes within

9        the consent rights or not.  Maybe not.

10            MR. BAILEY:  It doesn't mention it in any

11       part of the agreements.  And the managing manager,

12       under 3.1 the managing member has the right to open

13       and maintain bank accounts of all Arch, JJ Arch --

14            THE COURT:  That wouldn't surprise me.

15            MR. BAILEY:  Next.  The 35 Oak versus Simpson

16       has not been served yet.  It may be served.  There is

17       another attorney that Jeff Simpson uses named Avi

18       Weitzman.  And I thought he was going to come in this

19       case, in case I had an adversarial relationship with

20       Mr. Kandel, which hasn't happened thankfully.  But

21       he -- we know as of today the lawsuit has not been

22       served, and one of the reasons would he -- it

23       probably hasn't been served is because the coup, when

24       Jeff was out, 35 Oak's attorney, Brett Lavender,

25       contacted me because they needed Jeff's signatures to

26       do business and sell properties.  And they couldn't
```

| | MOTION |
|---|---|
| 1 | |
| 2 | do it because Jeff was on loans and guarantees.  So, |
| 3 | they called me to get Jeff's signature, and I said do |
| 4 | you really think Jeff is going to sign anything when |
| 5 | you kicked him out of the company.  That's how that |
| 6 | went.  That explains that. |
| 7 |     The only people laid off because of the |
| 8 | trying times at -- at -- By the way, I could get the |
| 9 | section if you want, but Jeff has the power to fire, |
| 10 | very junior staff members, and that's Jeff's |
| 11 | prerogative to fire not Mr. Chassen's.  And I believe |
| 12 | that covers all of the questions that were |
| 13 | outstanding by you.  Thank you very much. |
| 14 |     THE COURT:  Okay.  All right.  Here's where I |
| 15 | am on this.  First, the standard, a party seeking the |
| 16 | drastic remedy of a preliminary injunction has the |
| 17 | burden of demonstrating by clear and convincing |
| 18 | evidence a likelihood of ultimate success on the |
| 19 | merits, the prospect of irreparable injury if the |
| 20 | provisional relief is withheld, and the balancing of |
| 21 | the equities in the movant's favor.  The purpose of a |
| 22 | preliminary injunction generally is to maintain the |
| 23 | status quo and prevent the dissipation of property |
| 24 | that could render a judgment ineffectual.  Here, I |
| 25 | mean, frankly most of the substantive elements of the |
| 26 | motion for preliminary injunction were granted |

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 150 of 409

48

MOTION

1

2    effectively or many of the elements were granted in

3    the interim operating order as modified by some

4    subsequent orders, 'cause at the time, when this

5    motion was brought, Mr. Simpson was really out of the

6    company and without access to documents and e-mails

7    and all sorts of things.  And the defendant doesn't

8    really seek to modify any of that.  So there is

9    actually relatively narrow disputes at the moment,

10   although the parties are continuing to expand the

11   orbit of disputes each day.

12        Where we are now is, I may be over-

13   simplifying it a little bit, is Mr. Simpson wants a

14   much clearer statement that he is entirely in charge.

15   Effectively has tried in several different ways

16   either minimize or jettison Mr. Chassen from the

17   company in several different ways, some formal, some

18   informal.

19        You know, in my view the evidentiary record

20   now does not justify any changes to the existing

21   orders that I have entered.  No expansions of it.

22   The guardrails that I put up I think are relatively

23   narrow, but the principle around my interim order is

24   really as far as I'm willing to go at this point.

25   There are stark factual disputes about almost

26   everything plaintiff has said in his reply papers and

                        MOTION

1

2        in his opening papers.  The lion's share of the, you

3        know, "evidence" that was submitted is -- is just

4        affidavit testimony, which is not subject to cross

5        examination.  A lot of it, you know, is -- Some of

6        the affidavits seem to, I mean candidly, be written

7        by multiple people.  They seem to go in one

8        direction, and then a different voice takes over and

9        something else is said.  I don't know exactly what's

10       going on here, but I find it difficult to just accept

11       at face value the various statements that were made.

12       I don't suggest that purgery is going on here, but a

13       lot of what's in the affidavits are conclusions and

14       opinions.  There are some facts in there.  A lot of

15       it is unsupported by any concrete evidence.  And this

16       is a dispute that, you know, I don't suspect will be

17       resolved quickly, but I am not persuaded that

18       plaintiff has established such a likelihood of

19       success on the merits on everything that would

20       justify the full scope of the injunctive relief they

21       seek.  Again my view is that the interim orders that

22       were entered give plaintiff most of what they were

23       seeking anyway.  I don't think that, to the extent

24       that they are asking for more than that, it is

25       appropriate.

26                Now, to the extent that things that were

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 152 of 409

50

MOTION

ordered, such as providing access to company

documents and the like and the website, which seems

like an issue that should be resolvable based on what

I've seen, the evidentiary recovered is still a mess

candidly on all of that.  I don't need to change the

order, because the order already gives Mr. Simpson

that relief.  So, if there are disputes about whether

the orders are being complied with, you know our

address.  So, that's the way we'll deal with that.

        I will say this.  Even if the plaintiff was

able to demonstrate more of a likelihood of success

on all of their claims as well as irreparable injury,

the balance of equities does not favor the plaintiffs

here.  The actions I've observed over the past

several weeks don't give me confidence to alter the

status quo from the interim orders.  Instead, from my

perspective, the plaintiff has demonstrated the

inclination to take every opportunity possible to

either get around court orders or further inflame the

situation at every turn.  You know, even the

supported affidavits sort of in polite ways make note

of Mr. Simpson's, you know, sort of aggressive and

blunt attitude.  I don't have a particular problem

with that.  I have a pretty thick skin myself.  But

when it gets to the point of, in my view, acting

MOTION

1

2          inconsistently with both the letter and spirit of

3          court orders that are trying to lower the temperature

4          around a potentially very disruptive corporate

5          dispute, then it does become my business.  And I will

6          just give you the observation that a calmer, more

7          analytical approach to explaining to the Court your

8          managerial responsibilities and conduct which

9          demonstrates an intention to exercise those

10         managerial responsibilities for the benefit of the

11         entity and its customers as opposed to what can only

12         really be described as vendettas, maybe some of the

13         vendettas have some justification, but like all

14         vendettas they tend to lead to overreaction.  And so,

15         in my view plaintiff does not come today with clean

16         hands to seek additional injunctive relief.  That may

17         change.  You know, I imagine I'm going to learn more

18         about this company than I ever wanted to, but I am

19         here, believe it or not, to try to help.

20              I think the orders that I've done to date are

21         sufficient.  They don't give everybody what they

22         want.  The only clarification that I will make, and

23         again I don't think it needs to change the words of

24         the order, but I do want to make it clear, this is

25         not dicta, when I said that each of these folks

26         should have at least the ability to make banking

MOTION

2      transactions, that is subject to the provisions of

3      the operating agreement.  And the operating agreement

4      does put Mr. Simpson in charge of the business.  So,

5      Mr. Chassen does not have independent authority to

6      spend corporate funds on anything without

7      Mr. Simpson's approval.  That certainly goes to

8      paying distributions and the like.

9            Now, if an investor member has separate

10     rights that can, you know, basically push Mr. Simpson

11     or JJ Arch out as managing member of the real estate

12     company, that's a separate lawsuit.  But Mr. Chassen

13     has no claims in this lawsuit at this point to remove

14     Mr. Simpson.  So unless and until there is some claim

15     to remove Mr. Simpson in a legally justifiable way,

16     Mr. Chassen's ability to help manage this company is

17     governed by the operating agreement, meaning he can

18     help to affect corporate transactions.  And I think

19     having him be removed from the banking

20     authorizations, which he has had for years, really

21     doesn't make any sense.  But I'm not, by making that

22     ruling changing the nature of Mr. Simpson's initial

23     control over transactions and decisions subject only

24     to Mr. Chassen's consent rights, and although not

25     part of this case, subject to the investor members'

26     rights that it may have under the agreement as well.

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 155 of 409

53

```
 1                              MOTION

 2       I'm not, by anything I'm saying here, denigrating

 3       what their rights may be.

 4              So, all I'll add is that, you know, I will

 5       continue to judge people by how they act under these

 6       orders.  The orders are intended to permit the

 7       company to go back to normal operating procedure.

 8       You know, if the past is prologue, the next I hear

 9       from people will be another series of firings.  I

10       really urge you to try to figure out a way to run

11       this business and put some of this vendetta mindset

12       to the side.  You know, I'm in this now.  I don't

13       particularly want to be.  This is not a court's role

14       to be overseeing a company.  I'm trying as best I can

15       to let the contracts do their job.  But if I continue

16       to hear of, you know, maybe they are viewed as tough

17       management styles, they come across to the Court as

18       completely irrational in most situations.  And we'll

19       see what happens next.  But at this point we need to

20       get on with this litigation, all right.

21              MR. LEVENTHAL:  Clarification, your Honor, if

22       I may.

23              THE COURT:  Yes.

24              MR. LEVENTHAL:  A corporate bill, if

25       Mr. Chassen writes the check, he needs the permission

26       of Mr. Simpson to write that check?  'Cause if that
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 156 of 409

54

MOTION

1  is so, I envision Mr. Simpson saying no, and he'll

2  write the check to further eviscerate his authority

3  in the eyes of the employees.  That's what I

4  envision.

5        THE COURT:  Well, look, unless and until this

6  partnership is broken up, Mr. Chassen is a 49 percent

7  member without managerial control.  I get that point,

8  and I know the initial order also included a scripted

9  statement drafted by the parties to the employees

10  saying that the parties are partners and they are

11  going to continue to work together.  And my order

12  mandated that the parties cooperate with one another

13  in effecting this.  You know, I'm not going to

14  legislate manners.  But I think the way the contract

15  works, you know, substantive decisions are up to

16  Mr. Simpson.  Unless something happens where

17  something that trips a corporate right to remove

18  Mr. Simpson, that's the way it is.

19        Now, what Mr. Simpson chooses to do with that

20  discretion and whether the exercise of that

21  discretion can rise to the level where the Court

22  would take action, I don't know.  But Mr. Chassen,

23  his contractual rights are to be a 49 percent member

24  with substantial consent rights to important

25  decisions.  I should have mentioned.  I have seen, at

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
RECEIVED NYSCEF: 10/17/2023
Pg 157 of 409
55

<pre>
1                        MOTION

2        least based on what I'm looking at, decisions have

3        been made that seem to me to be inconsistent

4        potentially with the consent rights.  That does go

5        into my reasoning as to why not to give some broader

6        statement of authority for Mr. Simpson.  But, yeah, I

7        think the short answer to your question is under this

8        agreement, subject to the consent rights and to the

9        investor members' rights, whatever they may be,

10       Mr. Simpson calls the shots.

11            MR. SCHWARTZ:  Your Honor, if I just can make

12       two quick --

13            THE COURT:  We are very, very short on time.

14            MR. SCHWARTZ:  First of all, this is

15       obviously without, you know, prejudice to us making

16       our own motion based on our own counterclaims for

17       differing relief, that's correct?

18            THE COURT:  Agreed.

19            MR. SCHWARTZ:  And then second, your Honor,

20       in terms of a bond.  I mean, it is a requirement that

21       the party obtaining an injunction post a bond.  Now

22       that bond has to be rationally or reasonably related

23       to the potential damages that the nonmovant may

24       suffer.  We -- we submitted --

25            THE COURT:  I'm going to cut you off by

26       saying I'll take submissions from each side as to the
</pre>

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
NYSCEF DOC. NO: 224
INDEX NO. 158055/2023
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 158 of 409

56

1                              MOTION

2        amount of the bond.  You know, again since I haven't

3        really done anything more than what I've done before,

4        I'm not sure that anyone saw the need for a bond

5        before a substantial one.  If you want to put in a

6        submission, a letter explaining what you think is the

7        appropriate bond is, and than the plaintiff can

8        respond, I will review those carefully obviously.

9              MR. BAILEY:  May I advised my adversary

10       before he does so to read about no bonds in the

11       operating agreement before he puts ink on paper.

12             THE COURT:  I, of course, care about what the

13       contract says, but I also care about what the CPLR

14       says.  And generally speaking I'm required to

15       consider a bond --

16             MR. BAILEY:  Understood.

17             THE COURT:  -- for a preliminary injunction.

18             MR. SCHWARTZ:  And just to say one more

19       thing, your Honor.  The way we understand what your

20       Honor is saying is that Mr. Chassen will have

21       signatory rights over the bank accounts, including

22       new bank accounts.  But that your Honor is saying

23       that he will need to obtain Mr. Simpson's approval to

24       make -- to use those bank accounts.  So, we look at

25       that as -- that is an expansion from the language of

26       the interim order.

```
 1                              MOTION

 2              THE COURT:  No, it's not.  Well, the interim

 3      order as followed up by the subsequent order in

 4      response to the contempt motion, which that is the

 5      first time that I gave reference to signatory

 6      authority, said it's subject to the terms of the

 7      agreement.  The agreement does not give Mr. Chassen

 8      managerial authority.  So, I didn't change anything.

 9      And what has changed is that in the past Mr. Simpson

10      had seemingly delegated authority to Mr. Chassen in a

11      wide variety of things.  My point to you today has

12      been the contract does not give Mr. -- does not give

13      Mr. Chassen permanent managerial rights because in

14      the past he was granted some.  You know, and at the

15      moment I think trying to set up a situation where

16      both parties have managerial rights I think leads to

17      a deadlock.  So, but again make whatever arguments

18      you want as to a bond, and I don't feel bound by

19      whatever the agreement says about -- about a bond.

20      That's -- that's a responsibility on me as a court.

21      You know, I may take into account, if the parties had

22      agreed that there would be no bond, I could at least

23      consider that.  All right.  Thank you all.  Good luck

24      getting back to your respective homes.

25              MR. BAILEY:  Thank you, your Honor.

26              MR. SCHWARTZ:  Thank you, your Honor.
```

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 160 of 409

58

1               MOTION

2               THE COURT:  And please order the transcript.

3       If past is prologue again, people will disagree about

4       almost everything I do or say.

5               MR. SCHWARTZ:  We're here back I think on the

6       19th for the contempt hearing.

7               MR. BAILEY:  Can we agree to let the bank out

8       of the case?

9               THE COURT:  You're the plaintiff.

10              MR. KANDEL:  Accepted.

11              MR. BAILEY:  I can do that.

12              MR. SCHWARTZ:  You can do a notice of

13      voluntary discontinuance of them.

14              THE COURT:  Yes.  While you're at it, I would

15      do a voluntary discontinuance of the duplicative

16      matter on my docket.

17              MR. BAILEY:  I have two dockets.  We have to

18      do a voluntary discontinuance on both of them?

19              THE COURT:  No, only on one.

20              MR. BAILEY:  Only on one.

21              THE COURT:  I'm sorry.  Two things.  You can

22      dismiss the bank on -- The 158055 matter is the

23      active one that you've been doing all of your court

24      papers in.  Keep that one.  For some reason you filed

25      another matter with the same complaint on the same

26      day.  You just need to get rid of that.  You can do

1                              MOTION

2          it by a discontinuance, a stipulation of

3          discontinues.  Why don't you do it by a stipulation

4          of discontinuance, okay.  Thanks everyone.

5                   MR. KANDEL:  Thank you, your Honor.

6                   MR. BAILEY:  Thank you, your Honor.

7                   MR. LEVENTHAL:  Thank you, your Honor.

8

9                              ooOoo

10

11

12

13

14

15

16

17

18

19

20

21     Certified to be a true and accurate transcript of the

22     above-captioned stenographic minutes.

23

24     _Lori Ann Sacco_____

25     Lori Ann Sacco

26     Official Court Reporter

## $

**$48,000** [2] - 5:24, 8:22
**$60** [1] - 36:14

## 1

**10,000** [1] - 4:18
**10004-1646** [1] - 1:17
**10036** [3] - 1:20, 2:5, 3:11
**10038** [1] - 1:24
**1031** [6] - 25:14, 25:15, 25:16, 25:17, 25:23, 36:14
**1031s** [1] - 36:21
**1185** [1] - 2:4
**15** [1] - 24:25
**150** [1] - 1:23
**158055** [1] - 58:22
**158055/2023** [1] - 1:7
**15th** [1] - 29:2
**18** [1] - 1:16
**19** [2] - 17:11, 17:12
**19th** [1] - 58:6

## 2

**20** [1] - 18:5
**20,000** [1] - 6:17
**200** [1] - 36:13
**2022** [1] - 36:13
**2023** [3] - 1:10, 24:25, 29:25
**28** [1] - 8:14
**29** [1] - 1:10

## 3

**3** [1] - 1:2
**3.1** [2] - 12:15, 46:12
**3.3** [1] - 15:25
**35** [12] - 6:8, 6:13, 7:10, 14:9, 17:17, 26:16, 26:17, 27:3, 34:4, 44:12, 46:15, 46:24

## 4

**40** [2] - 10:7, 10:8
**48,000** [2] - 6:6, 8:26
**49** [2] - 54:7, 54:24

## 5

**50,000** [1] - 6:18
**546** [2] - 1:20, 3:10

## 6

**6th** [1] - 1:20

## 7

**7.1** [1] - 12:14
**701** [1] - 1:23

## 8

**80** [1] - 26:20

## 9

**9/13/2023** [1] - 17:9
**90** [1] - 19:24

## A

**ability** [1] - 19:20, 20:6, 51:26, 52:16
**able** [6] - 6:2, 8:15, 17:25, 18:10, 35:8, 50:12
**above-captioned** [1] - 59:22
**abusive** [2] - 20:26, 30:6
**accept** [1] - 49:10
**accepted** [2] - 44:3, 58:10
**access** [32] - 10:21, 10:25, 11:3, 11:4, 11:7, 11:9, 14:11, 14:12, 14:15, 15:9, 15:12, 15:17, 18:15, 18:21, 23:3, 25:6, 28:7, 28:8, 28:10, 28:12, 28:13, 29:2, 29:11, 39:4, 40:24, 41:2, 41:4, 41:5, 43:12, 48:6, 50:2
**accessed** [1] - 18:8
**account** [6] - 11:2, 15:6, 38:16, 40:24, 41:2, 57:21
**accounting** [1] - 16:12
**accounts** [16] - 10:10, 10:13, 11:4, 13:20, 17:10, 22:2, 22:18, 23:26, 24:14, 28:25, 38:20, 43:12, 46:13, 56:21, 56:22, 56:24
**accurate** [1] - 59:21
**accusations** [1] - 28:22
**acknowledges** [1] - 18:19
**act** [2] - 8:5, 53:5
**acted** [1] - 43:4
**acting** [2] - 35:3, 50:26
**action** [1] - 54:23
**actions** [4] - 11:25, 30:4, 30:5, 50:15
**active** [2] - 4:18, 58:23
**actual** [3] - 16:17, 34:18, 41:14
**ADAM** [2] - 1:15, 1:17
**Adam** [1] - 3:5
**add** [2] - 20:21, 53:4
**addition** [1] - 25:4
**additional** [2] - 19:7, 51:16
**address** [9] - 17:22, 17:24, 18:10, 21:3, 24:26, 28:3, 28:23, 36:4, 50:10
**adequate** [1] - 30:10
**administrative** [2] - 11:9, 45:9
**admonishments** [1] - 45:2
**adversarial** [1] - 46:19
**adversaries** [2] - 10:3, 11:14
**adversary** [3] - 12:7, 45:17, 56:9
**advice** [1] - 8:13
**advised** [1] - 56:9
**affairs** [5] - 8:7, 8:12, 13:20, 17:14, 31:8
**affect** [1] - 52:18
**affidavit** [18] - 12:2, 14:24, 14:26, 15:10, 15:11, 15:21, 16:14, 16:16, 16:20, 16:22, 18:18, 21:2, 21:5, 29:6, 29:23, 33:11, 34:14, 49:4
**affidavits** [17] - 18:2, 18:4, 18:14, 19:7, 19:19, 19:26, 20:5, 20:8, 20:10, 20:22, 33:7, 34:15, 49:6, 49:13, 50:22
**affirm** [1] - 10:5
**aggressive** [1] - 50:23
**ago** [5] - 11:8, 17:7, 17:25, 36:22, 40:2
**agree** [3] - 20:4, 20:19, 58:7
**agreed** [3] - 44:3, 55:18, 57:22
**agreement** [28] - 6:10, 6:19, 6:22, 7:2, 13:13, 14:10, 15:26, 22:6, 22:7, 23:19, 23:23, 24:20, 31:15, 31:16, 35:19, 41:16,
**acting** 41:20, 42:7, 52:3, 52:17, 52:26, 55:8, 56:11, 57:7, 57:19
**agreements** [6] - 7:3, 7:5, 23:7, 24:13, 40:13, 46:11
**ahead** [5] - 9:19, 27:16, 40:4, 40:25, 45:25
**Aidala** [2] - 3:9, 3:13
**AIDALA** [1] - 1:19
**albeit** [1] - 30:13
**alert** [1] - 21:13
**aligned** [1] - 25:5
**ALLEN** [1] - 1:24
**Allen** [1] - 3:12
**allowed** [3] - 7:9, 22:17, 43:13
**allowing** [2] - 25:6, 38:2
**almost** [2] - 48:25, 58:4
**alter** [2] - 24:8, 24:21, 50:16
**altering** [1] - 31:3
**amenable** [1] - 43:15
**Americas** [1] - 2:4
**amount** [2] - 39:14, 56:2
**ample** [1] - 29:24
**analytical** [1] - 51:7
**angry** [1] - 25:20
**Ann** [2] - 2:13, 59:25
**announcing** [1] - 7:16
**answer** [6] - 6:24, 6:26, 33:9, 33:26, 40:7, 55:7
**anti** [2] - 21:20, 31:13
**anyway** [4] - 20:11, 27:16, 40:4, 49:23
**apart** [1] - 34:8
**apologize** [1] - 17:13
**Appeals** [1] - 30:17
**appear** [5] - 18:4, 18:5, 18:6, 18:24, 27:8
**appearances** [1] - 3:4
**appearing** [1] - 3:5
**application** [1] - 4:12
**appoint** [1] - 40:12
**appreciate** [3] - 4:4, 4:6, 44:23
**approach** [1] - 51:7
**appropriate** [2] - 49:25, 56:7
**approval** [3] - 37:14, 52:7, 56:23
**approved** [1] - 36:22
**Arch** [16] - 4:20, 4:21, 6:13, 7:8, 16:10,
**acting** 17:10, 26:18, 26:19, 26:20, 26:21, 26:25, 27:5, 34:9, 46:13, 52:11
**ARCH** [3] - 1:4, 1:4, 1:5
**Arch's** [2] - 15:25, 18:17
**area** [1] - 37:3
**argument** [1] - 39:21
**arguments** [3] - 19:4, 19:7, 57:17
**aside** [1] - 25:10
**aspersions** [1] - 19:16
**assets** [3] - 3:18, 34:8, 34:12
**assignments** [2] - 7:18, 13:18
**assume** [1] - 20:4
**assumed** [1] - 3:18
**ATLAS** [1] - 2:3
**Atlas** [1] - 3:16
**attach** [1] - 6:11
**attached** [4] - 5:5, 18:4, 18:16, 44:12
**attempt** [1] - 22:6
**attitude** [1] - 50:24
**attorney** [3] - 12:26, 46:17, 46:24
**Attorneys** [4] - 1:16, 1:19, 1:23, 2:4
**attorneys** [1] - 6:18
**August** [2] - 29:25, 33:13
**authority** [29] - 10:10, 10:11, 16:26, 17:5, 17:6, 22:8, 22:17, 22:20, 23:3, 38:19, 39:3, 39:8, 39:22, 41:13, 41:23, 41:24, 42:6, 42:12, 43:17, 44:17, 45:3, 45:10, 46:7, 52:5, 54:3, 55:6, 57:6, 57:8, 57:10
**authorization** [1] - 13:24
**authorizations** [1] - 52:20
**authorized** [3] - 13:26, 14:7, 42:3
**Avenue** [3] - 1:20, 2:4, 3:10
**Avi** [1] - 46:17
**avoids** [1] - 42:23
**aware** [4] - 4:17, 34:6, 38:21, 39:5
**awfully** [1] - 34:16

**B**

**bad** [3] - 9:9, 40:20, 41:4
**Bailey** [12] - 3:5, 4:3, 17:23, 21:7, 27:12, 35:16, 36:6, 38:6, 38:11, 38:26, 39:16, 40:4
**BAILEY** [44] - 1:15, 1:17, 3:5, 4:5, 4:8, 4:25, 9:20, 9:24, 12:23, 14:25, 15:4, 15:10, 15:22, 15:25, 16:7, 16:16, 16:19, 16:22, 16:24, 28:12, 36:7, 38:7, 40:5, 40:8, 40:11, 40:22, 40:26, 42:10, 43:10, 44:11, 44:21, 45:6, 45:17, 45:26, 46:10, 46:15, 56:9, 56:16, 57:25, 58:7, 58:11, 58:17, 58:20, 59:6
**Bailey's** [1] - 37:14
**balance** [3] - 23:22, 43:6, 50:14
**balancing** [1] - 47:20
**BANK** [1] - 1:8
**bank** [28] - 10:10, 13:20, 13:21, 17:10, 22:2, 22:18, 23:26, 24:14, 28:25, 39:13, 40:24, 40:26, 43:12, 44:15, 44:16, 44:25, 45:8, 45:11, 45:13, 46:3, 46:4, 46:6, 46:13, 56:21, 56:22, 56:24, 58:7, 58:22
**Bank** [6] - 2:4, 3:17, 3:19, 10:4, 11:2, 11:3
**bank's** [1] - 44:19
**banking** [3] - 23:4, 51:26, 52:19
**banks** [1] - 22:20
**based** [6] - 8:22, 30:10, 45:2, 50:4, 55:2, 55:16
**basic** [2] - 22:10, 23:14
**basis** [1] - 29:24
**Battery** [1] - 1:16
**become** [1] - 51:5
**becomes** [1] - 24:9
**began** [2] - 31:9, 33:13
**begin** [1] - 3:3
**behalf** [1] - 3:17
**benefit** [1] - 51:10

**benefits** [1] - 25:16
**BERTUNA** [1] - 1:19
**Bertuna** [2] - 3:10, 3:13
**best** [5] - 10:17, 29:22, 30:24, 35:21, 53:14
**better** [2] - 9:15, 12:13
**between** [2] - 34:7, 45:4
**big** [1] - 37:6
**bill** [2] - 37:6, 53:24
**bills** [1] - 45:24
**bing** [1] - 11:21
**bit** [5] - 4:10, 25:7, 42:16, 43:6, 48:13
**blame** [2] - 8:21, 8:25
**Blaustein** [1] - 10:17
**blew** [1] - 33:23
**blow** [2] - 30:2, 34:5
**blunt** [1] - 50:24
**Boesky** [1] - 9:14
**Boesky's** [1] - 9:21
**bond** [10] - 55:20, 55:21, 55:22, 56:2, 56:4, 56:7, 56:15, 57:18, 57:19, 57:22
**bonds** [1] - 56:10
**book** [2] - 12:19, 44:10
**bought** [1] - 36:16
**bound** [1] - 57:18
**Boy** [1] - 13:7
**brag** [1] - 8:9
**Brett** [1] - 46:24
**brief** [2] - 18:12, 30:20
**briefly** [1] - 38:9
**bring** [4] - 19:8, 42:18, 45:12
**broader** [1] - 55:5
**Broadway** [1] - 1:23
**broken** [1] - 54:7
**brought** [4] - 42:17, 42:25, 45:13, 48:5
**BS** [1] - 13:2
**building** [1] - 14:17
**buildings** [1] - 5:10
**burden** [2] - 20:7, 47:17
**Burke** [1] - 9:22
**business** [27] - 4:16, 4:22, 6:7, 6:14, 8:16, 9:4, 9:10, 9:11, 9:12, 9:26, 10:25, 11:7, 14:16, 16:2, 17:5, 23:2, 24:22, 34:7, 35:6, 35:13, 41:11, 43:20, 46:26, 51:5, 52:4, 53:11
**businesses** [2] - 8:4, 8:5

**buyout** [2] - 33:18, 33:20
**BY** [4] - 1:17, 1:21, 1:24, 2:5

**C**

**calmer** [1] - 51:6
**candidly** [3] - 34:15, 49:6, 50:6
**cannot** [2] - 7:10, 15:15
**captioned** [1] - 59:22
**Cardozo** [2] - 8:2, 8:3
**cards** [4] - 9:25, 10:9, 11:5, 39:26
**care** [2] - 56:12, 56:13
**carefully** [1] - 56:8
**case** [20] - 3:21, 6:24, 8:5, 23:10, 26:21, 27:20, 27:25, 29:8, 30:26, 42:17, 45:7, 45:10, 45:12, 45:14, 46:19, 52:25, 58:8
**casting** [1] - 19:16
**catastrophic** [1] - 37:24
**caused** [2] - 16:5, 40:14
**causes** [1] - 8:20
**celebrate** [1] - 46:5
**centers** [1] - 35:5
**certain** [5] - 3:18, 12:22, 14:16, 22:8, 22:9
**certainly** [6] - 21:3, 29:22, 30:8, 31:3, 39:21, 52:7
**certification** [1] - 18:3
**Certified** [1] - 59:21
**chance** [4] - 6:14, 10:23, 20:9, 21:3
**change** [6] - 24:17, 43:21, 50:6, 51:17, 51:23, 57:8
**changed** [2] - 32:21, 57:9
**changes** [1] - 48:20
**changing** [1] - 52:22
**chaos** [2] - 4:15, 35:21
**chaotic** [1] - 19:11
**characterized** [1] - 23:20
**characterizing** [2] - 37:16, 43:25
**charge** [8] - 22:26, 23:9, 23:12, 37:13, 37:20, 45:24, 48:14, 52:4
**Chase** [1] - 3:17

**CHASSEN** [1] - 1:8
**Chassen** [55] - 1:19, 1:23, 5:12, 5:23, 5:26, 6:8, 6:15, 7:6, 7:24, 8:21, 9:24, 10:8, 10:21, 10:22, 11:4, 11:6, 11:22, 12:7, 12:17, 13:4, 14:9, 15:16, 15:26, 16:2, 17:14, 18:8, 18:19, 18:20, 23:3, 23:21, 24:12, 25:5, 25:24, 28:23, 29:10, 29:23, 33:16, 33:19, 34:7, 39:4, 41:23, 42:5, 42:12, 43:12, 43:22, 48:16, 52:5, 52:12, 53:25, 54:7, 54:23, 56:20, 57:7, 57:10, 57:13
**Chassen's** [8] - 12:21, 12:24, 12:25, 13:3, 25:3, 47:11, 52:16, 52:24
**check** [5] - 11:12, 23:22, 53:25, 53:26, 54:3
**checks** [2] - 16:26, 41:18
**chooses** [1] - 54:20
**circumscribed** [1] - 23:8
**circumstances** [4] - 12:10, 31:2, 35:14, 45:23
**Citizen's** [1] - 11:2
**citizens** [1] - 10:4
**CIVIL** [1] - 1:2
**claim** [1] - 52:14
**claiming** [1] - 12:7
**claims** [6] - 30:15, 30:19, 30:20, 30:21, 50:13, 52:13
**clarification** [3] - 44:24, 51:22, 53:21
**clean** [4] - 22:22, 24:15, 46:3, 51:15
**clear** [8] - 31:5, 32:11, 41:8, 42:5, 43:24, 44:14, 47:17, 51:24
**clearer** [3] - 17:13, 43:16, 48:14
**clerk** [1] - 10:18
**client** [11] - 23:7, 23:15, 37:11, 38:16, 38:17, 39:9, 43:3, 45:9, 45:18, 45:19, 45:21
**client's** [1] - 45:26
**clients** [1] - 4:18

**COHEN** [1] - 1:12
**colleague** [1] - 36:3
**colorful** [1] - 43:26
**comfortable** [1] - 35:17
**coming** [7] - 5:15, 9:8, 13:4, 17:15, 24:15, 37:22
**comment** [1] - 19:2
**commercial** [2] - 34:22, 35:23
**commercially** [2] - 39:12, 39:14
**communication** [1] - 21:6
**companies** [5] - 17:10, 25:21, 35:18, 41:19, 44:2
**company** [49] - 4:23, 4:26, 5:3, 5:14, 5:15, 5:18, 5:23, 7:9, 7:25, 7:26, 11:19, 11:20, 11:23, 13:12, 13:20, 13:23, 13:26, 14:2, 14:4, 14:13, 15:14, 15:17, 16:3, 17:3, 17:14, 17:18, 18:9, 25:18, 26:26, 28:24, 29:5, 30:2, 32:25, 32:26, 33:16, 34:24, 41:3, 42:24, 47:5, 48:6, 48:17, 50:2, 51:18, 52:12, 52:16, 53:7, 53:14
**complain** [1] - 11:14
**complaint** [5] - 27:5, 27:22, 30:12, 30:16, 58:25
**completed** [3] - 38:17, 38:22, 39:7
**completely** [1] - 53:18
**complied** [2] - 28:5, 50:9
**compliment** [1] - 12:5
**complying** [1] - 43:4
**computer** [3] - 11:9, 14:19, 14:20
**conceding** [2] - 32:2, 32:3
**concerned** [1] - 43:9
**concerns** [2] - 23:11, 35:12
**conclusions** [2] - 4:12, 49:13
**concrete** [1] - 49:15
**conduct** [1] - 51:8
**confidence** [1] - 50:16
**confirm** [1] - 38:18
**conflagrations** [1] - 33:13

**conflict** [2] - 27:17, 27:19
**consent** [12] - 12:22, 22:8, 22:21, 23:8, 23:16, 23:21, 25:3, 46:9, 52:24, 54:25, 55:4, 55:8
**consented** [1] - 42:3
**consider** [3] - 20:14, 56:15, 57:23
**consideration** [1] - 38:4
**consistent** [1] - 38:23
**construing** [1] - 37:18
**contacted** [4] - 6:8, 6:9, 14:9, 46:25
**contain** [1] - 18:6
**contains** [1] - 17:26
**contemporaneous** [1] - 34:18
**contempt** [3] - 37:10, 57:4, 58:6
**context** [2] - 24:22, 31:17
**continue** [7] - 10:3, 28:2, 29:15, 35:21, 53:5, 53:15, 54:12
**Continued** [1] - 2:2
**continues** [1] - 26:25
**continuing** [2] - 24:24, 48:10
**contract** [6] - 23:26, 34:10, 43:3, 54:15, 56:13, 57:12
**contracts** [1] - 53:15
**contractual** [2] - 23:15, 54:24
**control** [9] - 22:2, 24:13, 29:4, 32:25, 35:8, 42:9, 43:7, 52:23, 54:8
**conversations** [1] - 34:3
**conversion** [1] - 44:18
**convincing** [1] - 47:17
**cooperate** [2] - 7:17, 54:13
**corporate** [11] - 12:10, 12:12, 15:9, 43:19, 43:22, 51:4, 52:6, 52:18, 53:24, 54:18
**correct** [5] - 24:2, 31:24, 32:4, 38:25, 55:17
**costs** [1] - 5:11
**Counsel** [1] - 1:23
**counsel** [3] - 3:13, 17:19, 38:14
**counsels** [1] - 38:21
**count** [1] - 18:3

**counterclaims** [1] - 55:16
**COUNTY** [1] - 1:2
**coup** [6] - 8:23, 10:11, 11:24, 12:9, 14:2, 46:23
**couple** [2] - 10:2, 13:16
**courage** [1] - 8:16
**course** [1] - 56:12
**court** [13] - 10:7, 10:8, 11:8, 22:15, 33:4, 34:23, 35:9, 35:12, 43:5, 50:20, 51:3, 57:20, 58:23
**COURT** [75] - 1:2, 3:2, 3:7, 3:14, 3:20, 3:23, 4:7, 4:24, 9:18, 9:23, 12:21, 14:23, 15:7, 15:20, 15:24, 16:6, 16:15, 16:17, 16:23, 17:19, 17:21, 19:2, 22:5, 23:25, 25:7, 25:22, 26:5, 26:11, 26:23, 27:12, 27:16, 28:2, 28:13, 28:17, 29:15, 31:5, 31:19, 32:5, 32:9, 33:6, 34:15, 36:5, 36:9, 36:16, 38:5, 38:9, 38:23, 39:16, 40:6, 40:9, 40:21, 40:23, 41:7, 42:14, 43:14, 44:14, 45:4, 45:16, 45:19, 46:8, 46:14, 47:14, 53:23, 54:6, 55:13, 55:18, 55:25, 56:12, 56:17, 57:2, 58:2, 58:9, 58:14, 58:19, 58:21
**Court** [29] - 1:12, 2:13, 18:11, 21:12, 21:13, 22:24, 24:17, 24:20, 24:23, 26:24, 29:14, 30:11, 30:16, 31:14, 31:25, 32:3, 32:22, 33:3, 38:3, 42:15, 42:17, 42:18, 42:20, 45:5, 51:7, 53:17, 54:22, 59:26
**court's** [1] - 53:13
**Court's** [2] - 24:25, 32:19
**courtroom** [2] - 3:8, 38:21
**courts** [1] - 35:15
**covers** [1] - 47:12
**COVID** [1] - 13:5
**CPLR** [1] - 56:13
**credibility** [1] - 23:13

**credit** [1] - 9:25
**Cried** [1] - 13:7
**cross** [1] - 49:4
**current** [7] - 16:5, 16:8, 35:14, 39:17, 45:23
**customers** [1] - 51:11
**cut** [2] - 5:11, 55:25

**D**

**daily** [1] - 44:26
**damages** [2] - 27:4, 55:23
**danger** [1] - 35:7
**date** [1] - 51:20
**day-to-day** [1] - 23:4
**days** [3] - 10:7, 10:8, 13:6
**deadlock** [1] - 57:17
**deal** [3] - 19:13, 42:26, 50:10
**dealing** [1] - 43:15
**dealings** [1] - 34:7
**deals** [3] - 5:6, 5:8, 5:9
**debate** [1] - 10:16
**decided** [1] - 22:19
**deciding** [1] - 42:21
**decisions** [10] - 5:10, 8:17, 12:17, 12:22, 22:9, 26:13, 52:23, 54:16, 54:26, 55:2
**declaratory** [1] - 27:10
**default** [1] - 40:13
**defaulted** [1] - 40:16
**defendant** [2] - 19:17, 48:7
**Defendant** [3] - 1:19, 1:23, 2:4
**defendants** [1] - 3:8
**Defendants** [1] - 1:9
**definitely** [1] - 25:26
**delegated** [1] - 57:10
**delivered** [1] - 14:21
**demonstrate** [1] - 50:12
**demonstrated** [1] - 50:18
**demonstrates** [1] - 51:9
**demonstrating** [1] - 47:17
**denigrating** [1] - 53:2
**deny** [1] - 31:26
**depose** [1] - 20:6
**derivative** [1] - 30:15
**derivatively** [2] - 1:3, 1:4
**described** [5] - 20:25, 28:8, 39:18, 39:24,

51:12
**desire** [1] - 17:25
**detail** [3] - 5:15, 7:4, 18:10
**determining** [1] - 27:7
**devote** [1] - 16:2
**dicta** [5] - 37:16, 37:17, 40:18, 51:25
**different** [6] - 4:13, 26:17, 42:19, 48:15, 48:17, 49:8
**differently** [1] - 4:10
**differing** [1] - 55:17
**difficult** [3] - 4:19, 5:7, 49:10
**direct** [1] - 30:15
**directed** [2] - 18:18, 21:7
**direction** [1] - 49:8
**directions** [1] - 42:20
**disagree** [1] - 58:3
**disarray** [1] - 15:13
**disbelief** [1] - 15:19
**disconnected** [1] - 16:4
**discontinuance** [5] - 58:13, 58:15, 58:18, 59:2, 59:4
**discontinue** [2] - 45:7, 45:10
**discontinues** [1] - 59:3
**discovery** [3] - 6:23, 6:25, 6:26
**discretion** [3] - 42:21, 54:21, 54:22
**discussions** [3] - 33:15, 34:4, 34:5
**disgruntled** [1] - 37:4
**disinterested** [1] - 34:19
**dismiss** [2] - 30:13, 58:22
**dismissal** [1] - 30:16
**dismissed** [1] - 30:21
**dismissing** [1] - 37:22
**disobeying** [1] - 10:6
**dispute** [3] - 29:20, 49:16, 51:5
**disputed** [3] - 29:22, 30:24, 30:25
**disputes** [5] - 22:13, 48:9, 48:11, 48:25, 50:8
**disruptive** [1] - 51:4
**disrupts** [1] - 17:14
**dissipation** [1] - 47:23
**distress** [1] - 40:15
**distribution** [1] - 43:23

51:12
**distributions** [8] - 6:3, 6:4, 6:5, 41:17, 41:24, 42:8, 44:9, 52:8
**District** [1] - 26:9
**divide** [1] - 34:12
**docket** [1] - 58:16
**dockets** [1] - 58:17
**document** [1] - 16:18
**documentation** [1] - 39:2
**documents** [17] - 5:22, 12:11, 12:13, 14:14, 14:15, 14:16, 14:18, 15:9, 25:12, 34:19, 38:15, 38:22, 39:5, 39:13, 43:22, 48:6, 50:3
**domain** [1] - 15:12
**done** [8] - 4:2, 10:13, 12:11, 29:25, 39:17, 51:20, 56:3
**down** [1] - 22:24
**downloaded** [2] - 14:18, 14:19
**drafted** [1] - 54:10
**dragging** [1] - 35:26
**drastic** [1] - 47:16
**draw** [2] - 5:22, 6:4
**drifting** [1] - 35:7
**Dropbox** [6] - 14:13, 15:5, 28:6, 28:7, 28:21, 29:2
**duplicative** [2] - 30:20, 58:15
**during** [3] - 8:23, 10:11, 14:2
**duties** [2] - 16:9, 42:19
**duty** [1] - 30:20

**E**

**e-mail** [2] - 6:2, 11:12, 14:11, 17:7, 17:8, 18:22, 18:24, 18:25, 20:24, 28:6, 28:11, 28:12
**e-mails** [8] - 7:15, 18:16, 28:13, 28:26, 29:10, 39:11, 44:26, 48:6
**easy** [1] - 46:4
**echoed** [1] - 33:12
**effect** [3] - 33:2, 37:25, 42:25
**effecting** [1] - 54:14
**effectively** [2] - 48:2, 48:15
**eight** [2] - 13:7, 43:11

**either** [5] - 20:16, 23:11, 34:26, 48:16, 50:20
**elements** [3] - 44:6, 47:25, 48:2
**employ** [1] - 12:16
**employee** [8] - 5:12, 6:14, 6:20, 7:13, 12:20, 16:13, 20:24, 20:25
**employees** [11] - 5:2, 5:11, 12:8, 16:9, 20:22, 25:2, 25:3, 25:4, 54:4, 54:10
**end** [2] - 32:6, 45:21
**enforce** [1] - 24:21
**entered** [6] - 9:12, 32:22, 32:23, 39:23, 48:21, 49:22
**entire** [1] - 30:15
**entirely** [1] - 48:14
**entity** [1] - 51:11
**entries** [2] - 15:3, 15:5
**envision** [3] - 23:23, 54:2, 54:5
**equitable** [1] - 24:16
**equities** [3] - 24:16, 47:21, 50:14
**especially** [1] - 42:21
**ESQ** [4] - 1:17, 1:21, 1:24, 2:5
**essential** [1] - 41:6
**establish** [2] - 29:6, 30:23
**established** [3] - 29:9, 30:9, 49:18
**ESTATE** [1] - 1:4
**estate** [4] - 4:15, 4:16, 26:26, 52:11
**Estate** [4] - 26:18, 26:19, 26:21, 34:9
**event** [1] - 36:13
**evidence** [6] - 15:20, 20:13, 34:18, 47:18, 49:3, 49:15
**evidentiary** [3] - 19:3, 48:19, 50:5
**eviscerate** [1] - 54:3
**exact** [4] - 6:7, 27:24, 32:16
**exactly** [3] - 6:22, 39:18, 49:9
**examination** [1] - 49:5
**example** [5] - 18:13, 18:14, 18:26, 26:3, 26:25
**examples** [1] - 43:11
**except** [1] - 9:26
**exchanges** [3] - 25:17, 25:22, 25:23

**exclusive** [1] - 12:18
**excuse** [1] - 24:14
**execute** [1] - 45:2
**executed** [1] - 38:15
**exercise** [3] - 42:21, 51:9, 54:21
**Exhibit** [2] - 17:11, 17:12
**exhibit** [6] - 5:26, 6:11, 15:2, 15:4, 15:22, 44:12
**exist** [1] - 9:2
**existing** [1] - 48:20
**exit** [1] - 3:21
**expand** [1] - 48:10
**expansion** [1] - 56:25
**expansions** [1] - 48:21
**expenses** [3] - 8:25, 13:24, 14:7
**experience** [2] - 37:2, 44:2
**expire** [3] - 32:6, 32:12, 32:17
**explain** [1] - 10:2
**explained** [1] - 11:26
**explaining** [2] - 51:7, 56:6
**explains** [1] - 47:6
**extent** [3] - 31:21, 49:23, 49:26
**extolling** [1] - 21:6
**extraordinarily** [1] - 20:26
**extraordinary** [1] - 41:10
**extreme** [1] - 35:11
**extremely** [2] - 5:7, 30:3
**extrinsic** [1] - 12:9
**eyes** [1] - 54:4

**F**

**face** [3] - 20:11, 27:5, 49:11
**facially** [2] - 22:3, 29:5
**fact** [1] - 42:5
**facts** [5] - 29:21, 30:11, 30:24, 30:25, 49:14
**factual** [1] - 48:25
**fairly** [1] - 23:21
**false** [2] - 28:16, 29:12
**falsehoods** [1] - 18:13
**far** [7] - 4:26, 6:25, 25:5, 26:12, 27:21, 44:7, 48:24
**favor** [3] - 24:16, 47:21, 50:14

**FCIC** [1] - 3:19
**few** [3] - 8:9, 19:26, 36:5
**fiduciary** [2] - 30:20, 42:19
**Fifth** [2] - 1:20, 3:10
**fight** [1] - 19:11
**fighting** [1] - 4:21
**figure** [2] - 20:3, 53:10
**filed** [2] - 3:24, 58:24
**files** [1] - 28:7
**filing** [1] - 42:17
**filled** [1] - 13:21
**finally** [5] - 10:6, 10:8, 10:14, 11:5, 13:21
**financial** [1] - 17:2
**fine** [3] - 9:15, 9:17, 36:5
**fire** [2] - 47:9, 47:11
**fired** [1] - 28:24
**firing** [2] - 25:2, 25:4
**firings** [1] - 53:9
**firm** [2] - 6:18, 6:20
**first** [13] - 5:17, 6:10, 10:7, 14:11, 15:18, 17:24, 19:9, 33:10, 36:10, 42:11, 47:15, 55:14, 57:5
**First** [5] - 2:4, 3:19, 10:12, 11:3, 46:2
**FIRST** [1] - 1:8
**fits** [1] - 33:22
**five** [2] - 18:2, 36:22
**fix** [1] - 15:16
**Floor** [3] - 1:16, 1:20, 2:4
**floor** [1] - 4:3
**focus** [1] - 17:17
**focuses** [1] - 17:16
**fold** [1] - 24:10
**folks** [1] - 51:25
**follow** [2] - 35:19, 41:11
**followed** [1] - 57:3
**following** [2] - 8:20, 16:13
**foreclosures** [1] - 36:25
**foresee** [1] - 44:24
**formal** [1] - 48:17
**former** [1] - 16:11
**forms** [5] - 13:21, 27:10, 38:16, 38:17, 39:9
**forth** [1] - 22:14
**forthright** [1] - 26:3
**forward** [3] - 37:7, 39:21, 44:7
**forwarded** [2] - 38:16,

39:6
**four** [1] - 12:16
**Frank** [1] - 6:17
**frankly** [9] - 19:24, 23:3, 23:11, 29:12, 32:10, 39:25, 41:10, 43:8, 47:25
**free** [2] - 25:22, 32:12
**freezes** [1] - 9:25
**fresh** [1] - 46:3
**fresher** [1] - 13:8
**Fried** [1] - 6:17
**front** [2] - 33:3, 35:10
**fulfilling** [1] - 43:18
**full** [11] - 6:12, 6:22, 7:6, 7:7, 10:19, 19:13, 32:25, 49:20
**fulsome** [1] - 33:26
**funds** [1] - 52:6
**future** [1] - 37:26

**G**

**generally** [4] - 19:19, 21:19, 47:22, 56:14
**given** [3] - 19:20, 42:5, 45:23
**goal** [1] - 9:13
**goals** [1] - 9:16
**God** [2] - 10:22, 10:26
**GoDaddy** [4] - 18:16, 18:21, 28:15, 29:8
**governed** [1] - 52:17
**governing** [1] - 42:7
**grant** [2] - 31:22, 43:23
**granted** [3] - 47:26, 48:2, 57:14
**grave** [1] - 23:11
**great** [4] - 4:8, 8:18, 12:12, 40:19
**Greed** [1] - 9:9
**greed** [1] - 9:15
**ground** [1] - 32:21
**guarantees** [2] - 5:4, 47:2
**guardrails** [2] - 43:8, 48:22
**guess** [5] - 8:2, 9:10, 9:26, 28:8, 33:17
**guiding** [1] - 43:2
**guts** [1] - 8:15
**guy** [1] - 28:17
**guys** [3] - 36:5, 42:25, 44:16

**H**

**half** [3] - 3:26, 19:18, 20:8

**Hamptons** [5] - 14:21, 15:6, 17:11, 17:12
**hands** [2] - 24:15, 51:16
**happy** [5] - 5:24, 16:24
**hard** [8] - 7:12, 7:14, 8:13, 8:14, 8:16, 10:19, 10:20, 29:5
**hardly** [2] - 9:4, 13:10
**harm** [3] - 5:14, 36:26, 40:15
**harming** [1] - 42:23
**head** [1] - 25:16
**hear** [3] - 39:8, 53:8, 53:16
**heard** [3] - 28:6, 34:16, 38:25
**hearing** [1] - 19:18, 20:9, 20:12, 24:4, 24:5, 32:6, 33:19, 39:20, 45:21, 58:6
**hearings** [1] - 24:6
**help** [8] - 11:10, 33:21, 36:7, 40:19, 41:3, 51:19, 52:16, 52:18
**helpful** [1] - 34:16
**highly** [1] - 32:20
**himself** [5] - 8:23, 8:26, 9:5, 41:24, 43:23
**hire** [7] - 6:17, 12:6, 12:8, 12:14, 12:17, 12:19, 13:14
**hiring** [1] - 25:2
**holding** [1] - 45:14
**Holdings** [4] - 26:18, 26:19, 26:21, 34:9
**HOLDINGS** [1] - 1:4
**homes** [1] - 57:24
**HON** [1] - 1:12
**Honor** [49] - 3:12, 3:15, 4:5, 17:20, 18:26, 20:20, 21:17, 21:19, 21:20, 21:22, 21:26, 23:18, 23:19, 23:20, 24:2, 24:3, 24:6, 24:24, 25:9, 29:7, 29:17, 29:19, 29:20, 30:7, 30:12, 31:25, 33:25, 33:26, 38:7, 38:8, 39:15, 40:5, 44:21, 44:22, 45:7, 53:21, 55:11, 55:19, 56:19, 56:20, 56:22, 57:25, 57:26, 59:5, 59:6, 59:7
**hope** [3] - 10:6, 15:23, 28:2
**hopefully** [1] - 4:14

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 166 of 409

5

hour [1] - 3:26
hungry [1] - 11:21
hurt [2] - 5:18, 7:25
hurts [1] - 15:13

**I**

idea [4] - 8:18, 29:3, 41:17, 41:22
ignore [1] - 37:14
imagine [1] - 51:17
immediately [2] - 32:14, 35:20
implicitly [2] - 21:8
important [2] - 11:20, 54:25
importantly [1] - 40:12
impossible [1] - 19:17
impression [1] - 33:25
improper [1] - 42:2
improperly [1] - 18:8
inappropriate [2] - 31:2, 44:19
inclination [1] - 50:19
included [1] - 54:9
includes [1] - 16:9, 24:24
including [2] - 25:24, 56:21
inclusion [1] - 21:10
incompetent [1] - 33:19
inconsistent [2] - 33:18, 55:3
inconsistently [1] - 51:2
incorporated [1] - 31:21
incredible [1] - 29:13
indemnify [1] - 6:21
independent [1] - 52:5
Index [1] - 1:7
indicating) [1] - 11:15
individual [1] - 43:15
individual's [1] - 45:3
individually [1] - 1:3
individuals [3] - 35:10, 38:18, 39:7
ineffectual [1] - 47:24
inflame [1] - 50:20
informal [4] - 41:17, 41:24, 44:7, 48:18
informally [1] - 44:5
information [3] - 33:10, 33:21, 36:8
initial [4] - 19:12, 31:20, 52:22, 54:9
injunction [10] - 3:24, 19:11, 21:18, 31:20, 42:22, 47:16, 47:22,

47:26, 55:21, 56:17
injunctive [4] - 30:26, 31:3, 49:20, 51:16
injury [3] - 24:12, 47:19, 50:13
ink [1] - 56:11
instead [2] - 16:3, 50:17
intended [1] - 53:6
intention [2] - 45:26, 51:9
interested [2] - 9:11, 9:17
interests [1] - 35:2
interfere [4] - 8:6, 8:12, 13:19
interim [24] - 4:22, 10:7, 21:21, 21:22, 22:5, 28:5, 31:7, 31:12, 32:3, 32:5, 32:11, 32:13, 32:16, 32:19, 32:22, 32:23, 32:26, 39:23, 48:3, 48:23, 49:21, 50:17, 56:26, 57:2
intermingling [1] - 30:14
internal [1] - 5:2
intervention [1] - 35:12
investigation [1] - 19:13
investor [6] - 26:8, 30:5, 34:26, 52:9, 52:25, 55:9
investors [7] - 25:11, 25:18, 25:19, 25:20, 25:24, 26:4, 37:4
invite [1] - 7:22
involved [1] - 8:20
involving [1] - 44:12
irrational [1] - 53:18
irreparable [2] - 47:19, 50:13
irretrievable [1] - 24:12
issue [4] - 24:7, 29:8, 35:15, 50:4
issued [1] - 25:25
issues [3] - 4:11, 20:10, 21:24
IT [4] - 14:24, 18:17, 28:17
items [1] - 17:9
itself [2] - 16:17, 23:10
Ivan [2] - 9:14, 9:21

**J**

JARED [1] - 1:8

Jared [19] - 1:19, 1:23, 5:12, 5:23, 6:8, 6:15, 7:2, 7:6, 7:18, 7:20, 7:24, 8:21, 9:6, 9:8, 11:22, 12:7, 14:20, 17:8, 37:21
Jared's [1] - 16:11
JAY [1] - 2:5
Jeff [22] - 4:20, 5:4, 6:9, 7:14, 7:17, 7:19, 9:2, 9:5, 11:20, 13:26, 14:3, 14:4, 14:12, 14:21, 17:4, 17:6, 46:17, 46:24, 47:2, 47:4, 47:9
Jeff's [4] - 5:3, 46:25, 47:3, 47:10
JEFFREY [1] - 1:3
Jeffrey [3] - 5:25, 40:16, 40:17
jettison [1] - 48:16
JJ [11] - 1:4, 1:4, 4:21, 7:8, 15:25, 18:17, 26:19, 26:25, 27:5, 46:13, 52:11
job [11] - 12:13, 12:24, 13:3, 13:11, 13:15, 16:9, 16:11, 53:15
JOEL [1] - 1:12
John [1] - 3:9
JONATHAN [1] - 1:21
JPMorgan [1] - 3:17
Judge [1] - 36:3
judge [5] - 8:14, 12:3, 26:12, 53:5
judges [2] - 8:3, 8:11
judgment [1] - 47:24
July [1] - 33:14
jump [2] - 8:15, 8:17
jumped [1] - 6:14
junior [1] - 47:10
junk [2] - 18:22, 28:18
Justice [1] - 1:12, 8:3
justifiable [1] - 52:15
justification [1] - 51:13
justify [2] - 48:20, 49:20

**K**

K-1 [1] - 36:19
K-1s [2] - 25:25, 36:20
KAMINS [1] - 1:19
KANDEL [9] - 2:5, 3:15, 3:22, 38:8, 38:11, 38:25, 44:22, 58:10, 59:5
Kandel [3] - 3:16, 3:21, 10:5, 10:15,

11:10, 38:9, 46:5, 46:20
Kandel's [1] - 44:14
keep [10] - 6:3, 7:19, 7:21, 15:24, 16:23, 31:22, 40:17, 58:24
kept [4] - 7:23, 7:24, 14:13
kicked [2] - 14:3, 47:5
Kimins [2] - 3:10, 3:13
kind [1] - 33:26
knowing [1] - 11:18
kudos [1] - 10:19
Kumbala [1] - 8:18

**L**

lack [2] - 9:15, 19:20
lacking [1] - 23:14
laid [1] - 47:7
language [1] - 56:25
large [2] - 19:6, 20:15
largely [1] - 43:2
last [7] - 10:16, 12:12, 25:4, 33:11, 33:14, 33:16, 40:14
Last [1] - 11:15
late [1] - 17:15
Lavender [1] - 46:24
LAW [1] - 1:22
law [5] - 6:18, 8:7, 10:18, 30:18, 30:26
Law [1] - 8:8
lawsuit [7] - 21:10, 26:7, 31:8, 44:12, 46:21, 52:12, 52:13
lawyer [1] - 38:2
lawyers [1] - 35:24
lead [2] - 35:26, 51:14
leads [1] - 57:16
learn [1] - 51:17
learned [2] - 25:10, 25:17
least [10] - 23:6, 26:6, 28:6, 33:14, 39:6, 39:18, 43:11, 51:26, 55:2, 57:22
lectern [1] - 4:4
legally [1] - 52:15
legislate [1] - 54:15
LEITMAN [2] - 1:15, 1:17
Leitman [1] - 3:5
lenders [1] - 5:8
letter [7] - 18:11, 18:12, 20:23, 24:26, 51:2, 56:6
letting [2] - 40:17
level [1] - 54:22
LEVENTHAL [8] -

1:21, 3:9, 25:14, 36:11, 36:18, 53:21, 53:24, 59:7
Leventhal [3] - 3:9, 36:3, 36:9
liabilities [2] - 3:18, 34:13
liability [2] - 25:26, 44:19
license [1] - 43:17
lien [4] - 16:5, 16:10, 16:15, 16:17
life [1] - 4:21
light [1] - 22:11
likelihood [3] - 47:18, 49:18, 50:12
likely [2] - 30:13, 32:15
link [1] - 16:4
linked [1] - 16:7
Linkedin [1] - 21:7
lion's [1] - 49:2
litigation [2] - 21:24, 53:20
LLC [5] - 1:4, 1:4, 1:5, 26:18, 26:21
LLP [1] - 2:3
loan [1] - 40:13
loans [3] - 4:16, 5:5, 47:2
look [12] - 12:10, 20:3, 22:5, 22:24, 34:15, 34:20, 35:2, 35:3, 35:19, 41:18, 54:6, 56:24
looking [1] - 55:2
Lori [2] - 2:13, 59:25
lost [1] - 41:10
lower [1] - 51:3
loyalty [1] - 7:7
luck [1] - 57:23

**M**

magic [1] - 34:23
mail [13] - 6:2, 11:12, 14:11, 17:7, 17:8, 18:22, 18:24, 18:25, 20:24, 28:6, 28:11, 28:12, 28:18
mails [8] - 7:15, 18:16, 28:13, 28:26, 29:10, 39:11, 44:26, 48:6
main [1] - 15:17
maintain [3] - 42:22, 46:13, 47:22
maintained [1] - 31:13
maintenance [1] - 21:19
major [2] - 12:22, 22:9

manage [1] - 52:16
management [2] - 12:15, 53:17
manager [2] - 22:23, 46:11
managerial [10] - 22:7, 26:13, 42:9, 43:7, 51:8, 51:10, 54:8, 57:8, 57:13, 57:16
managing [10] - 1:4, 1:4, 4:20, 26:20, 26:26, 41:21, 45:22, 46:11, 46:12, 52:11
mandated [1] - 54:13
manners [1] - 54:15
matter [4] - 40:19, 58:16, 58:22, 58:25
mean [12] - 11:17, 19:21, 22:2, 25:22, 32:12, 35:23, 42:6, 43:17, 45:20, 47:25, 49:6, 55:20
meaning [1] - 52:17
meaningful [1] - 12:17
means [2] - 43:18, 45:23
meant [1] - 15:7
mechanics [1] - 45:24
meetings [3] - 7:13, 17:15
member [17] - 1:4, 1:4, 23:17, 26:8, 26:18, 26:20, 26:26, 32:24, 34:26, 41:21, 45:22, 46:12, 52:9, 52:11, 54:8, 54:24
members [3] - 30:5, 30:6, 47:10
members' [2] - 52:25, 55:9
memorandum [1] - 30:18
Menorah [1] - 8:4
mention [3] - 8:10, 40:14, 46:10
mentioned [2] - 36:23, 54:26
merits [6] - 24:11, 29:18, 30:8, 30:23, 47:19, 49:19
mess [2] - 25:8, 50:5
met [1] - 5:25
micromanage [1] - 35:17
might [4] - 18:22, 24:4, 37:22, 44:18
Miller [2] - 21:5, 21:8
million [2] - 36:13, 36:14
mind [3] - 13:8, 26:6,

32:17
mindset [1] - 53:11
minimize [1] - 48:16
minority [2] - 26:18, 30:5
minutes [3] - 11:8, 36:6, 59:22
missing [2] - 15:15, 16:25
modified [1] - 48:3
modify [2] - 24:21, 48:8
moment [2] - 25:8, 48:9, 57:15
monetary [1] - 27:4
money [23] - 8:20, 8:22, 8:23, 9:3, 9:4, 9:5, 9:6, 9:9, 9:12, 9:13, 9:17, 10:24, 11:21, 13:25, 17:2, 17:3, 17:5, 37:6, 43:13, 45:15
monies [5] - 13:23, 14:6, 41:25, 46:2, 46:6
month [4] - 5:24, 6:6, 8:22, 8:26
months [2] - 26:4, 36:22
morale [2] - 4:26, 5:2
morning [7] - 3:2, 3:7, 3:15, 4:3, 4:9, 17:20, 47:17
most [7] - 11:20, 12:3, 32:15, 40:12, 47:25, 49:22, 53:18
motion [14] - 3:24, 19:8, 21:17, 22:3, 27:22, 27:26, 31:22, 31:26, 32:14, 32:15, 47:26, 48:5, 55:16, 57:4
movant [2] - 19:12, 20:7
movant's [1] - 47:21
move [2] - 17:12, 46:2
moved [1] - 17:9
movie [2] - 9:18, 9:21
moving [1] - 46:5
MR [89] - 3:5, 3:9, 3:12, 3:15, 3:22, 4:5, 4:8, 4:25, 9:20, 9:24, 12:23, 14:25, 15:2, 15:4, 15:10, 15:22, 15:25, 16:7, 16:16, 16:19, 16:21, 16:22, 16:24, 17:20, 17:22, 20:20, 23:18, 24:2, 25:9, 25:14, 25:15, 25:23, 26:10, 26:15,

27:2, 27:15, 27:19, 28:12, 28:14, 28:20, 29:17, 31:10, 31:24, 32:7, 32:10, 33:24, 36:3, 36:7, 36:11, 36:18, 38:7, 38:8, 38:11, 38:25, 40:5, 40:8, 40:11, 40:22, 40:26, 42:10, 43:10, 44:11, 44:21, 44:22, 45:6, 45:17, 45:26, 46:10, 46:15, 53:21, 53:24, 55:11, 55:14, 55:19, 56:9, 56:16, 56:18, 57:25, 57:26, 58:5, 58:7, 58:10, 58:11, 58:12, 58:17, 58:20, 59:5, 59:6, 59:7
multi [1] - 38:15
multiple [1] - 49:7

**N**

name [3] - 15:12, 15:17, 26:17
named [2] - 46:17
narrow [2] - 48:9, 48:23
nature [1] - 52:22
necessarily [1] - 43:14
necessary [2] - 43:6, 43:8
need [9] - 6:8, 33:10, 34:17, 35:22, 50:6, 53:19, 56:4, 56:23, 58:26
needed [2] - 10:9, 46:25
needs [6] - 9:9, 14:15, 14:16, 35:8, 51:23, 53:25
never [8] - 9:10, 9:12, 10:6, 12:5, 14:7, 25:19, 37:5, 45:17
new [6] - 12:6, 25:2, 25:4, 32:12, 33:7, 56:22
NEW [2] - 1:2, 1:2
New [10] - 1:17, 1:20, 1:24, 2:5, 3:10
next [5] - 11:14, 14:9, 46:15, 53:8, 53:19
nights [1] - 17:25
noncompliance [1] - 24:24
none [3] - 22:13, 22:14
nonmovant [1] - 55:23
normal [2] - 41:11,

53:7
normally [1] - 4:10
nose [1] - 38:2
note [3] - 18:12, 30:12, 50:22
nothing [2] - 22:12, 23:5
notice [1] - 58:12
notification [1] - 10:15
number [6] - 11:22, 12:15, 24:10, 24:11, 24:14, 40:11
numerous [2] - 18:6, 25:18

**O**

Oak [10] - 6:8, 6:13, 7:10, 14:9, 17:17, 26:17, 27:3, 34:4, 44:13, 46:15
Oak's [1] - 46:24
object [1] - 21:19
obligations [1] - 17:2
observation [3] - 11:17, 37:8, 51:6
observations [1] - 36:12
observed [1] - 50:15
obtain [1] - 56:23
obtaining [3] - 25:2, 25:3, 55:21
obviously [5] - 11:12, 11:18, 40:26, 55:15, 56:8
occur [1] - 39:11
Official [2] - 2:13, 59:26
old [1] - 13:8
once [2] - 10:10, 42:18
One [1] - 1:16
one [31] - 5:12, 6:12, 11:16, 13:11, 14:9, 16:6, 18:14, 18:25, 22:16, 22:19, 24:5, 24:10, 28:17, 35:2, 35:9, 37:8, 37:23, 40:11, 41:7, 42:13, 44:5, 44:17, 46:22, 49:7, 54:13, 56:5, 56:18, 58:19, 58:20, 58:23, 58:24
ongoing [1] - 15:19
ooOoo [1] - 59:9
open [1] - 46:12
opened [2] - 10:4, 11:2
opening [1] - 49:2
operating [16] - 15:26, 23:19, 23:23, 24:20,

24:22, 31:15, 31:16, 41:15, 41:19, 43:19, 48:3, 52:3, 52:17, 53:7, 56:11
operationally [1] - 23:25
opinion [1] - 23:17
opinions [1] - 49:14
opportunistically [1] - 35:3
opportunity [5] - 18:9, 20:18, 28:21, 29:7, 50:19
oppose [1] - 31:22
opposed [3] - 31:12, 41:12, 51:11
opposite [1] - 20:25
opposition [3] - 19:5, 19:15, 28:22
oppositional [1] - 34:25
orally [1] - 10:11
orbit [1] - 48:11
order [35] - 4:22, 5:17, 10:7, 10:8, 10:26, 14:11, 15:18, 21:21, 21:22, 22:6, 28:5, 31:7, 31:12, 35:18, 37:10, 37:14, 37:18, 38:24, 40:2, 40:18, 40:19, 40:24, 44:16, 48:3, 48:23, 50:7, 51:24, 54:9, 54:12, 56:26, 57:3, 58:2
ordered [3] - 7:14, 39:19, 50:2
orders [31] - 10:20, 16:13, 22:15, 27:17, 31:7, 31:21, 31:23, 32:4, 32:5, 32:12, 32:13, 32:16, 32:19, 32:22, 32:23, 32:26, 35:15, 39:17, 39:19, 39:23, 43:5, 48:4, 48:21, 49:21, 50:9, 50:17, 50:20, 51:3, 51:20, 53:6
organize [1] - 22:23
original [1] - 20:16
otherwise [1] - 35:25
outright [3] - 18:13, 27:4, 28:16
outset [1] - 5:3
outside [2] - 22:25
outstanding [2] - 37:10, 47:13
overarching [1] - 41:15
overreaction [1] - 51:14

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM    INDEX NO. 158055/2023
NYSCEF DOC. NO. 224    24-10381pm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 10/17/2023
Pg 168 of 409

7

overrides [1] - 12:25
overseeing [2] - 35:9, 53:14
oversight [1] - 18:23
own [5] - 8:5, 9:26, 28:26, 55:16

**P**

P.C [2] - 1:15, 1:19
page [1] - 6:10
pages [2] - 15:15, 18:5
paid [3] - 6:15, 6:16, 8:23
paper [1] - 56:11
papers [10] - 5:6, 13:19, 19:12, 19:15, 20:16, 26:6, 28:10, 48:26, 49:2, 58:24
Park [1] - 1:16
part [3] - 15:17, 46:11, 52:25
PART [1] - 1:2
participate [1] - 11:24
participation [1] - 34:4
particular [1] - 50:24
particularly [1] - 53:13
parties [16] - 31:15, 31:16, 39:26, 41:9, 41:11, 41:17, 42:23, 44:8, 45:4, 45:9, 48:10, 54:10, 54:11, 54:13, 57:16, 57:21
partner [1] - 4:20
partners [2] - 44:4, 54:11
partnership [1] - 54:7
parts [2] - 19:3, 19:6
party [4] - 19:26, 42:16, 47:15, 55:21
past [6] - 41:26, 50:15, 53:8, 57:9, 57:14, 58:3
pay [4] - 8:26, 14:8, 16:8, 17:2
paying [1] - 45:24, 52:8
payments [1] - 17:4
payroll [1] - 10:18
pending [3] - 21:23, 31:18, 39:19
people [10] - 35:26, 36:20, 37:21, 37:22, 39:17, 47:7, 49:7, 53:5, 53:9, 58:3
people's [1] - 9:16
peppered [1] - 39:10
perceives [1] - 25:5
percent [1] - 19:24,

26:20, 54:7, 54:24
perfectly [1] - 44:3
periodically [1] - 43:26
permanent [1] - 57:13
permanently [1] - 12:6
permission [1] - 53:25
permit [3] - 37:19, 43:22, 53:6
person [6] - 11:20, 13:14, 14:19, 14:24, 18:17, 18:18
personal [6] - 11:16, 11:18, 13:24, 14:7, 14:20, 17:10
persons [1] - 12:16
perspective [3] - 35:3, 35:4, 50:18
persuaded [1] - 49:17
phone [1] - 40:15
pick [1] - 21:11
place [5] - 20:17, 25:7, 27:21, 31:14, 31:23
plaintiff [13] - 3:4, 3:6, 3:25, 19:14, 39:20, 48:26, 49:18, 49:22, 50:11, 50:18, 51:15, 56:7, 58:9
plaintiffs [2] - 31:19, 50:14
Plaintiffs [2] - 1:6, 1:16
Plaza [1] - 1:16
pleadings [1] - 27:6
PLLC [1] - 1:22
plus [1] - 18:5
point [20] - 7:3, 15:8, 19:23, 20:14, 20:15, 23:13, 28:3, 28:9, 30:14, 30:17, 34:16, 34:24, 37:12, 40:21, 48:24, 50:26, 52:13, 53:19, 54:8, 57:11
pointed [1] - 10:3, 24:3, 24:6, 29:20
pointing [1] - 37:26
points [3] - 17:23, 28:3, 29:23
policy [1] - 14:2, 17:7
polite [1] - 50:22
portions [1] - 20:15
posing [1] - 25:25
position [3] - 19:17, 31:6, 32:18
possible [1] - 50:19
post [1] - 55:21
postpone [1] - 20:11
potential [2] - 21:10, 55:23
potentially [4] - 32:13,

35:7, 51:4, 55:4
pouring [1] - 20:5
power [2] - 35:5, 47:9
powers [2] - 24:18, 24:19
practicable [1] - 39:12
practice [5] - 27:22, 27:26, 32:14, 32:15, 41:11
precedent [1] - 30:17
precisely [1] - 20:25
preferable [1] - 41:5
prejudice [2] - 30:13, 55:15
preliminary [9] - 3:24, 19:11, 21:18, 31:20, 42:22, 47:16, 47:22, 47:26, 56:17
prepared [1] - 12:3
prerogative [1] - 47:11
presented [2] - 30:11, 34:13
president [1] - 8:8
pretty [1] - 50:25
prevent [1] - 47:23
principals [7] - 19:25, 23:12, 29:21, 34:17, 34:25, 35:24, 44:20
principle [2] - 22:10, 48:23
principles [2] - 23:15, 43:2
priority [1] - 17:4
private [3] - 8:24, 41:18, 41:25
probability [6] - 24:10, 29:18, 30:7, 30:9, 30:10, 30:22
problem [4] - 11:11, 23:9, 41:22, 50:24
procedure [2] - 20:17, 53:7
process [3] - 19:10, 27:24, 39:13
processing [1] - 39:9
profit [3] - 36:12, 36:14, 37:5
prologue [2] - 53:8, 58:3
prong [1] - 30:8
pronouncements [1] - 37:17
proper [1] - 6:12
properly [1] - 42:20
properties [2] - 36:16, 46:26
property [2] - 36:17, 47:23
proposed [1] - 33:17
prospect [1] - 47:19

protect [1] - 6:20
protecting [1] - 34:26
protest [1] - 11:25
provide [3] - 38:18, 38:22, 39:7
provided [2] - 21:20, 21:22
provides [2] - 23:20, 39:2
providing [1] - 50:2
provision [2] - 7:3, 7:5
provisional [1] - 47:20
provisions [3] - 41:15, 42:7, 52:2
proviso [1] - 45:19
purchaser [1] - 11:20
purgery [1] - 49:12
purpose [4] - 13:18, 13:19, 35:18, 47:21
purposes [2] - 32:16, 44:15
push [1] - 52:10
put [13] - 4:22, 10:9, 10:26, 11:26, 16:10, 19:17, 31:14, 33:14, 35:16, 48:22, 52:4, 53:11, 56:5
puts [1] - 56:11
putting [1] - 20:8

**Q**

questions [2] - 29:16, 47:12
quick [3] - 40:8, 40:10, 55:12
QuickBooks [3] - 16:4, 16:7, 16:10
quickly [3] - 36:4, 39:11, 49:17
quit [2] - 11:23, 12:5
quo [11] - 21:20, 21:23, 24:7, 24:9, 24:18, 24:21, 31:3, 31:13, 42:23, 47:23, 50:17

**R**

ramp [1] - 3:21
rarely [1] - 17:16
rather [1] - 32:2
rationale [1] - 35:14
rationally [1] - 55:22
reach [1] - 26:13
reached [2] - 34:10, 34:11
reaching [1] - 26:24
read [6] - 10:20, 12:4, 21:9, 23:7, 30:19,

56:10
reading [1] - 5:22
REAL [1] - 1:4
real [5] - 4:15, 4:16, 26:26, 35:12, 52:11
Real [4] - 26:18, 26:19, 26:21, 34:9
really [28] - 4:18, 4:19, 5:22, 7:12, 7:14, 10:18, 10:20, 10:25, 11:17, 12:24, 13:3, 19:16, 22:8, 22:19, 27:7, 33:9, 33:22, 34:17, 40:8, 43:24, 47:4, 48:5, 48:8, 48:24, 51:12, 52:20, 53:10, 56:3
reason [3] - 29:24, 32:18, 58:24
reasonable [2] - 31:17, 39:14
reasonably [1] - 55:22
reasoning [1] - 55:5
reasons [2] - 41:9, 46:22
receive [3] - 6:23, 6:25, 6:26
received [2] - 10:14, 19:24, 38:14
receiver [10] - 3:19, 35:11, 36:23, 36:24, 36:26, 37:23, 40:12, 40:14, 40:20, 40:23
receives [1] - 10:21
receiving [1] - 44:26
recently [2] - 20:2, 22:12
recognize [2] - 19:10, 20:9, 31:13, 42:15
recognizing [1] - 33:8
reconfirm [1] - 45:21
record [5] - 14:23, 16:15, 17:7, 37:17, 48:19
recovered [1] - 50:5
reference [3] - 40:23, 40:24, 57:5
referring [1] - 28:15
refers [2] - 33:16, 33:17
reflect [1] - 19:13
refuse [1] - 16:13
refused [6] - 7:18, 7:20, 7:26, 13:22, 13:23, 14:8
refuses [2] - 8:24, 13:18
refusing [2] - 13:15, 13:17
regarding [2] - 34:8,

37:7
**regulate** [1] - 44:15
**reign** [1] - 41:12
**reimburse** [3] - 8:24, 13:23, 14:6
**reinstitute** [1] - 22:6
**related** [1] - 55:22
**relationship** [3] - 23:4, 30:4, 46:19
**relatively** [3] - 20:2, 48:9, 48:22
**release** [1] - 15:16
**relevant** [2] - 19:20, 27:7
**relief** [12] - 24:17, 27:3, 27:11, 30:26, 31:3, 33:4, 33:5, 47:20, 49:20, 50:8, 51:16, 55:17
**remarks** [1] - 17:18
**remedy** [2] - 37:25, 47:16
**remember** [2] - 9:14, 13:6
**removal** [2] - 27:5, 27:9
**remove** [5] - 31:26, 37:21, 52:13, 52:15, 54:18
**removed** [4] - 18:8, 32:24, 33:2, 52:19
**removing** [1] - 13:22
**render** [1] - 47:24
**reply** [11] - 17:24, 17:26, 18:5, 19:2, 19:4, 19:6, 19:9, 21:15, 28:22, 48:26
**Reporter** [2] - 2:13, 59:26
**REPUBLIC** [1] - 1:8
**Republic** [5] - 2:4, 3:19, 10:12, 11:3, 46:2
**reputation** [1] - 15:13
**request** [1] - 18:20
**require** [1] - 7:6
**required** [3] - 33:9, 38:24, 56:14
**requirement** [2] - 7:8, 55:20
**requires** [2] - 7:4, 15:26
**resigned** [1] - 11:23
**resigning** [1] - 11:25
**resolution** [5] - 21:23, 31:14, 34:22, 35:23, 35:25
**resolvable** [1] - 50:4
**resolved** [1] - 49:17
**respect** [1] - 20:21

**respective** [1] - 57:24
**respond** [6] - 17:26, 20:18, 27:12, 28:20, 38:12, 56:8
**responding** [1] - 19:4
**response** [1] - 57:4
**responsibilities** [2] - 51:8, 51:10
**responsibility** [2] - 22:25, 57:20
**restore** [3] - 21:23, 31:14, 31:15
**retain** [1] - 6:19
**retribution** [1] - 41:12
**return** [1] - 37:9
**reverse** [1] - 21:11
**revert** [1] - 13:13
**review** [1] - 56:8
**revising** [1] - 23:6
**rid** [2] - 6:9, 58:26
**rightly** [1] - 35:16
**rights** [26] - 12:21, 12:22, 13:13, 22:9, 22:21, 23:8, 23:17, 23:21, 26:13, 27:14, 31:16, 37:15, 37:19, 46:9, 52:10, 52:24, 52:26, 53:3, 54:24, 54:25, 55:4, 55:8, 55:9, 56:21, 57:13, 57:16
**rise** [1] - 54:22
**robust** [1] - 23:21
**role** [5] - 23:24, 35:17, 42:25, 43:20, 53:13
**rollout** [1] - 4:11
**rough** [1] - 5:5
**roughly** [1] - 3:26
**ruin** [1] - 41:2
**ruling** [2] - 45:8, 52:22
**run** [7] - 6:13, 9:11, 14:16, 23:2, 34:24, 35:13, 53:10
**running** [1] - 23:25
**runs** [1] - 17:5

**S**

**Sacco** [2] - 2:13, 59:25
**saw** [3] - 26:6, 33:11, 56:4
**School** [1] - 8:8
**schools** [3] - 8:24, 41:18, 41:25
**SCHWARTZ** [32] - 1:22, 1:24, 3:12, 17:20, 17:22, 20:20, 23:18, 24:2, 25:9, 25:15, 25:23, 26:10,

26:15, 27:2, 27:15, 27:19, 28:14, 28:20, 29:17, 31:10, 31:24, 32:7, 32:10, 33:24, 36:3, 55:11, 55:14, 55:19, 56:18, 57:26, 58:5, 58:12
**Schwartz** [1] - 3:12
**scolding** [1] - 21:2
**scope** [2] - 22:25, 49:20
**screaming** [1] - 34:21
**screenshots** [2] - 18:6, 18:7
**scripted** [1] - 54:9
**second** [5] - 5:17, 55:19
**section** [1] - 47:9
**see** [8] - 5:6, 20:13, 27:13, 27:17, 28:18, 35:22, 35:24, 53:9
**seek** [4] - 19:14, 48:8, 49:21, 51:16
**seeking** [12] - 22:4, 24:8, 24:16, 27:3, 27:4, 27:8, 27:9, 27:10, 33:3, 33:4, 47:15, 49:23
**seem** [4] - 25:7, 49:6, 49:7, 55:3
**seemingly** [1] - 57:10
**sell** [1] - 46:26
**send** [2] - 7:15, 18:11
**sending** [2] - 41:18, 41:25
**sense** [1] - 52:21
**sent** [4] - 16:26, 18:25, 20:23, 20:24
**separate** [4] - 34:8, 34:12, 52:9, 52:12
**September** [3] - 1:10, 24:25, 29:2
**series** [2] - 35:15, 53:9
**served** [9] - 17:24, 27:23, 27:24, 36:19, 36:20, 46:16, 46:22, 46:23
**set** [3] - 17:8, 23:8, 57:15
**settlement** [1] - 34:10
**seven** [1] - 13:7
**several** [5] - 17:26, 24:10, 48:15, 48:17, 50:16
**share** [1] - 49:2
**sharply** [3] - 29:22, 30:24, 30:25
**SHERMAN** [1] - 2:3
**Sherman** [1] - 3:16
**shoot** [1] - 3:26

**short** [3] - 36:15, 55:7, 55:13
**shots** [1] - 55:10
**show** [3] - 13:10, 14:5, 29:10
**showed** [3] - 11:8, 18:24, 29:9
**showing** [1] - 16:4
**shown** [1] - 43:11
**shows** [4] - 15:2, 15:4, 15:5
**shut** [4] - 28:24, 28:25, 28:26
**shutting** [1] - 29:4
**sick** [1] - 13:9
**side** [5] - 3:26, 6:15, 21:11, 53:12, 55:26
**sides** [1] - 23:13
**sign** [2] - 6:20, 47:4
**signatory** [4] - 24:13, 37:11, 56:21, 57:5
**signature** [3] - 38:15, 39:26, 47:3
**signatures** [1] - 46:25
**signed** [3] - 10:8, 10:16, 11:6
**signing** [7] - 22:17, 22:20, 41:23, 42:6, 43:16, 43:21, 44:17
**similar** [1] - 27:14
**similarly** [2] - 28:23, 29:8
**simple** [2] - 18:23, 26:23
**simplifying** [1] - 48:13
**simply** [2] - 27:3, 29:12
**SIMPSON** [3] - 1:3, 15:2, 16:21
**Simpson** [73] - 4:20, 5:25, 6:9, 7:14, 9:2, 10:9, 10:13, 11:8, 11:21, 12:14, 12:18, 12:24, 12:26, 13:26, 14:3, 14:12, 14:22, 15:15, 16:13, 18:15, 18:17, 18:19, 18:21, 20:26, 21:2, 21:6, 21:26, 22:7, 22:16, 23:6, 23:9, 23:22, 24:8, 24:15, 24:16, 25:19, 26:2, 29:4, 29:24, 29:26, 30:2, 30:3, 31:26, 32:15, 32:23, 32:25, 33:17, 34:7, 37:12, 37:26, 39:2, 39:10, 40:16, 41:21, 42:11, 44:13, 46:15, 46:17, 48:5, 48:13, 50:7, 52:4,

52:10, 52:14, 52:15, 53:26, 54:2, 54:17, 54:19, 54:20, 55:6, 55:10, 57:9
**Simpson's** [13] - 14:20, 15:21, 16:26, 17:4, 17:6, 30:3, 31:9, 33:12, 42:9, 50:23, 52:7, 52:22, 56:23
**sit** [1] - 25:21
**sitting** [3] - 18:22, 35:10, 38:21
**situation** [8] - 11:11, 26:2, 30:25, 33:2, 42:18, 43:15, 50:21, 57:15
**situations** [2] - 42:24, 53:18
**six** [1] - 26:4
**skin** [1] - 50:25
**skis** [1] - 42:16
**slate** [1] - 22:22
**slipped** [1] - 25:15
**slow** [1] - 40:9
**slowly** [1] - 40:11
**smart** [1] - 8:11
**smoothly** [1] - 34:24
**sole** [1] - 22:2, 39:22
**solely** [2] - 37:12, 45:24
**someone** [3] - 8:19, 12:8, 41:2
**sometimes** [2] - 19:12, 44:4
**somewhat** [2] - 23:14, 33:12
**somewhere** [1] - 26:12
**soon** [2] - 45:8, 45:9
**sorry** [3] - 8:23, 29:16, 58:21
**sort** [5] - 33:7, 34:21, 35:5, 50:22, 50:23
**sorts** [2] - 42:19, 48:7
**sought** [1] - 31:20
**Southern** [1] - 26:9
**speaking** [1] - 56:14
**specific** [1] - 28:4
**specifically** [3] - 7:10, 41:8, 44:25
**speech** [1] - 9:21
**spend** [1] - 52:6
**spending** [1] - 11:19
**spirit** [1] - 51:2
**split** [1] - 34:11
**spreadsheet** [1] - 5:6
**squash** [1] - 37:20
**staff** [3] - 16:5, 16:8, 47:10

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 224

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 170 of 409

RECEIVED NYSCEF: 10/17/2023

9

stakeholder [2] - 45:11, 45:14
STAMELMAN [1] - 2:3
Stamelman [1] - 3:17
standard [1] - 47:15
stark [1] - 48:25
start [4] - 5:19, 22:22, 46:3
started [3] - 3:3, 5:20, 7:18
starting [2] - 3:4, 42:14
state [2] - 4:11, 31:8
STATE [1] - 1:2
statement [4] - 15:8, 48:14, 54:10, 55:6
statements [2] - 19:5, 49:11
status [13] - 21:20, 21:23, 24:7, 24:9, 24:18, 24:21, 27:25, 31:3, 31:13, 32:20, 42:22, 47:23, 50:17
stenographic [1] - 59:22
step [2] - 19:21, 45:6
still [16] - 3:20, 5:16, 6:24, 14:10, 14:11, 14:12, 14:14, 15:18, 15:19, 22:20, 28:10, 29:3, 40:9, 41:14, 50:5
stipulation [2] - 59:2, 59:3
stole [1] - 8:22
stolen [1] - 18:7
stopped [1] - 23:5
stories [1] - 13:4
story [1] - 13:6
street [1] - 26:8
Street's [1] - 9:20
strike [2] - 20:15, 22:24
strikes [1] - 35:6
striking [1] - 19:22
student [1] - 8:8
stuff [1] - 33:18
styles [1] - 53:17
subject [10] - 22:8, 41:13, 41:14, 42:8, 49:4, 52:2, 52:23, 52:25, 55:8, 57:6
subjects [1] - 30:15
submission [3] - 19:3, 34:14, 56:6
submissions [1] - 55:26
submit [2] - 21:4, 28:21
submitted [9] - 20:13,

20:22, 21:2, 21:5, 21:14, 25:12, 29:13, 49:3, 55:24
subsequent [2] - 48:4, 57:3
substantial [2] - 54:25, 56:5
substantially [1] - 16:2
substantive [2] - 47:25, 54:16
success [9] - 24:11, 29:18, 30:7, 30:10, 30:22, 47:18, 49:19, 50:12
suffer [2] - 24:11, 55:24
sufficient [1] - 51:21
suggest [1] - 49:12
suggesting [1] - 41:26
suing [1] - 1:4
Suite [1] - 1:23
summer [1] - 36:13
supersede [1] - 39:23
supplement [1] - 19:14
support [1] - 19:8
supported [1] - 50:22
supporting [2] - 15:20, 15:23
suppose [3] - 13:11, 13:12, 16:11
SUPREME [1] - 1:2
Supreme [1] - 1:12
sur [1] - 28:22
sur-reply [1] - 28:22
surprise [1] - 46:14
surprised [2] - 33:8, 39:25
survive [3] - 4:19, 6:3, 6:5
surviving [1] - 4:17
suspect [1] - 49:16
swearing [1] - 19:25
swirling [1] - 35:5
Sylvester [1] - 3:16
SYLVESTER [1] - 2:3
Syracuse [1] - 8:8
systems [1] - 28:24

T

taker [1] - 44:16
tax [9] - 16:5, 16:10, 16:15, 25:16, 25:22, 25:23, 25:26, 37:6
tax-free [1] - 25:22
Teams [1] - 3:14
technical [1] - 26:17
temperature [1] - 51:3

temporarily [1] - 11:23
ten [1] - 11:7
tend [1] - 51:14
TERM [1] - 1:2
terminated [1] - 28:25
terminating [1] - 29:26
termination [1] - 27:14
terms [12] - 23:25, 27:7, 29:18, 29:25, 30:4, 30:7, 30:22, 32:5, 32:20, 43:4, 55:20, 57:6
test [3] - 19:20, 20:6, 20:10
testified [1] - 18:15
testimony [6] - 28:16, 29:6, 29:12, 29:21, 34:14, 49:4
thankfully [1] - 46:20
THE [74] - 3:2, 3:7, 3:14, 3:20, 3:23, 4:7, 4:24, 9:18, 9:23, 12:21, 14:23, 15:7, 15:20, 15:24, 16:6, 16:15, 16:17, 16:23, 17:19, 17:21, 19:2, 22:5, 23:25, 25:7, 25:22, 26:5, 26:11, 26:23, 27:12, 27:16, 28:2, 28:13, 28:17, 29:15, 31:5, 31:19, 32:5, 32:9, 33:6, 34:15, 36:5, 36:9, 36:16, 38:5, 38:9, 38:23, 39:16, 40:6, 40:9, 40:21, 40:23, 41:7, 42:14, 43:14, 44:14, 45:4, 45:16, 45:19, 46:8, 46:14, 47:14, 53:23, 54:6, 55:13, 55:18, 55:25, 56:12, 56:17, 57:2, 58:2, 58:9, 58:14, 58:19, 58:21
themselves [1] - 35:26
thereafter [1] - 32:15
thereby [1] - 31:26
thick [1] - 50:25
Third [1] - 2:4
third [2] - 19:26, 41:3
thoroughly [1] - 12:11
threatening [2] - 21:9, 30:2
threats [1] - 44:26
three [6] - 7:2, 11:22, 20:22, 24:14, 35:4, 37:22
thumb [1] - 38:2

tied [1] - 34:18
today [13] - 3:23, 5:13, 5:20, 14:14, 21:17, 25:10, 36:18, 36:21, 39:20, 46:21, 51:15, 57:11
together [1] - 54:12
tons [2] - 5:4
took [3] - 10:11, 14:6, 39:25
top [1] - 21:21
total [1] - 4:2
totally [1] - 23:12
tough [3] - 4:17, 5:10, 53:16
towards [1] - 30:5
transactions [8] - 38:19, 39:3, 39:8, 41:14, 45:2, 52:2, 52:18, 52:23
transcript [4] - 37:16, 40:14, 58:2, 59:21
transfer [1] - 18:20
transfers [3] - 17:2, 25:16, 36:14
tried [2] - 36:18, 48:15
trips [1] - 54:18
Tristan [1] - 11:15
TRO [2] - 24:5, 24:25
trouble [2] - 9:13, 43:4
true [2] - 23:5, 59:21
trust [2] - 41:10, 44:9
truth [1] - 20:5
try [6] - 4:2, 5:13, 7:25, 13:2, 51:19, 53:10
trying [8] - 7:21, 14:15, 35:17, 41:2, 47:8, 51:3, 53:14, 57:15
turn [1] - 50:21
turning [1] - 33:15
two [14] - 12:12, 17:25, 19:25, 23:11, 24:11, 28:3, 34:17, 34:25, 36:11, 44:16, 44:20, 55:12, 58:17, 58:21
Tyler [1] - 3:16
type [2] - 12:26, 44:3

U

ultimate [1] - 47:18
ultimately [1] - 44:18
unclear [2] - 27:2, 32:20
under [15] - 7:2, 12:14, 12:15, 12:16, 30:16, 31:16, 35:14, 35:26, 39:17, 46:12, 52:26,

53:5, 55:7
understood [3] - 43:10, 44:11, 56:16
unfold [1] - 24:23
unfurl [1] - 23:10
unless [4] - 7:22, 32:6, 52:14, 54:6
Unless [1] - 54:17
unsupported [1] - 49:15
up [18] - 5:9, 5:15, 10:4, 13:10, 16:4, 17:8, 22:16, 30:2, 33:23, 34:5, 34:12, 36:24, 48:22, 54:7, 54:16, 57:3, 57:15
update [1] - 15:16
urge [1] - 53:10
uses [1] - 46:17

V

value [1] - 49:11
variety [1] - 57:11
various [4] - 19:25, 20:5, 42:3, 49:11
vendetta [1] - 53:11
vendettas [2] - 51:12, 51:13, 51:14
version [1] - 35:11
versus [1] - 46:15
vesting [1] - 38:15
via [1] - 4:22
view [4] - 48:19, 49:21, 50:26, 51:15
viewed [2] - 44:18, 53:16
viewing [10] - 10:21, 10:25, 11:4, 11:6, 37:15, 37:19, 39:4, 41:4, 42:12
violated [1] - 7:11
violating [2] - 5:16, 14:11
violations [1] - 22:15
Virtually [1] - 2:5
voice [1] - 49:8
volatile [1] - 30:3
voluntary [3] - 58:13, 58:15, 58:18

W

wait [1] - 38:17
waiting [2] - 3:20, 39:8
waive [1] - 34:23
waiving [2] - 11:16, 42:6
Wall [1] - 9:20
wand [1] - 34:23

FILED: NEW YORK COUNTY CLERK 10/17/2023 09:39 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 224
RECEIVED NYSCEF: 10/17/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 171 of 409

10

**wants** [4] - 6:13, 9:9, 39:11, 48:13
**watched** [1] - 23:10
**water** [1] - 36:2
**waves** [1] - 19:19
**ways** [6] - 34:12, 42:4, 43:4, 48:15, 48:17, 50:22
**website** [11] - 15:11, 15:12, 15:13, 15:14, 15:16, 18:16, 18:21, 28:8, 28:14, 29:9, 50:3
**week** [2] - 6:7, 10:16
**weeks** [2] - 18:25, 50:16
**weight** [1] - 19:23
**Weitzman** [1] - 46:18
**welcome** [1] - 7:15
**whereby** [1] - 6:19
**whole** [3] - 19:22, 34:20, 41:16
**wide** [1] - 57:11
**willing** [1] - 48:24
**wipe** [2] - 22:21, 31:6
**withheld** [1] - 47:20
**witnesses** [1] - 34:19
**woke** [1] - 22:16
**Wolf** [1] - 13:7
**word** [2] - 9:15, 18:3
**worded** [1] - 41:8
**words** [1] - 51:23
**works** [2] - 15:15, 54:16
**world** [3] - 4:15, 34:23, 44:25
**write** [2] - 53:26, 54:3
**writes** [1] - 53:25
**writing** [3] - 6:17, 11:26, 12:2
**written** [1] - 49:6
**wrote** [3] - 5:26, 10:12, 11:10

### Y

**year** [1] - 13:7
**years** [3] - 8:14, 23:2, 52:20
**yesterday** [8] - 10:5, 10:14, 18:11, 20:23, 24:26, 38:14, 38:26, 40:3
**YORK** [2] - 1:2, 1:2
**York** [10] - 1:17, 1:20, 1:24, 2:5, 3:10, 3:11
**young** [1] - 8:7

**Exhibit F**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| 608941 NJ INC., | Index No.: _____ |
| *Plaintiff,* | |
| - against - | **SUMMONS** |
| JEFFREY SIMPSON, JJ ARCH LLC, and ARCH REAL ESTATE HOLDINGS LLC, | |
| *Defendants.* | |

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the Complaint of Plaintiff, 608941 NJ INC.,

in this action and to serve a copy of your appearance or answer on Plaintiff's attorneys within

twenty (20) days after the service of this Summons, exclusive of the day of service (or within thirty

(30) days after the service is complete if this Summons is not personally delivered to you within

the State of New York); and in case of your failure to appear or answer, judgment will be taken

against you by default for the relief demanded in the Complaint.

The basis of venue designated is pursuant to C.P.L.R. §503(a) as Defendants reside and

conduct business in New York County. Venue is further proper in the Supreme Court of the State

of New York, County of New York, pursuant to C.P.L.R. §507.

Dated: October 10, 2023
     New York, New York

Respectfully submitted,

HAYNES AND BOONE, LLP

By: /s/ Leslie C. Thorne
Leslie C. Thorne
leslie.thorne@haynesboone.com
Aishlinn Bottini
aishlinn.bottini@haynesboone.com
30 Rockefeller Plaza, 26th Floor
New York, NY 10112

(212)835-4848

*Attorneys for Plaintiff 608941 NJ INC.*

TO:    JEFFREY SIMPSON
       1055 Park Avenue Unit 4,
       New York, New York 10028

       JJ ARCH LLC
       88 University Place, 11th floor
       New York, NY 10003

       ARCH REAL ESTATE HOLDINGS LLC
       88 University Place, 11th floor
       New York, NY 10003

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

608941 NJ INC.,

                                    *Plaintiff*,

          - against -

JEFFREY SIMPSON, JJ ARCH LLC, and
ARCH REAL ESTATE HOLDINGS LLC,

                                    *Defendants*.

---

Index No.: _____

**COMPLAINT**

608941 NJ INC. ("Plaintiff") brings the following Complaint against JEFFREY

SIMPSON, JJ ARCH LLC, and ARCH REAL ESTATE HOLDINGS LLC, ("Defendants," and

with Plaintiff, the "Parties"), by and through its undersigned counsel Haynes and Boone, LLP,

alleges, upon knowledge as to itself and upon information and belief as to all other matters, as

follows:

## NATURE OF THE PROCEEDINGS

1.       Plaintiff 608941 NJ INC. ("Oak" or "Investor Member") and Defendant JJ Arch

LLC ("JJ Arch") are parties to a December 11, 2017 Limited Liability Company Operating

Agreement (the "AREH LLC Agreement") that governs the operations of Defendant Arch Real

Estate Holdings LLC ("AREH"). Together, Oak and JJ Arch are the two members of AREH.

2.       Defendant Jeffrey Simpson ("Simpson") is currently acting as the managing

member of JJ Arch (pursuant to an interim court order), and his status at JJ Arch is the subject of

the proceedings styled as *Simpson v. Chassen*, Case No. 158055-2023, proceeding in New York

Supreme Court – Commercial Division (the "JJ Arch Proceeding").  In all events and regardless

of Simpson's status at JJ Arch, JJ Arch was and still is the Managing Member of AREH.

3.      By this action and for the reasons detailed herein, Plaintiff Oak seeks to obtain (1) access to inspect and copy AREH's books and records (2) an equitable accounting of AREH's assets (3) injunctive relief restraining Defendants from initiating a bankruptcy action in respect of AREH or any entity subject to the AREH LLC Agreement, and (4) a declaration that no bankruptcy action may be initiated for any entity subject to the AREH LLC Agreement without Oak's consent, per the AREH LLC Agreement.

## THE PARTIES

4.      Oak is a corporation duly organized and existing under, and by virtue of, the laws of the State of New Jersey, with its principal place of business in Toronto, Canada.

5.      Upon information and belief, Defendant Jeffrey Simpson is a resident of the State of New York, domiciled at 1055 Park Avenue Unit 4, New York, New York 10028.

6.      Upon information and belief, Defendant JJ Arch is a limited liability company organized under the laws of New York. Its members are natural persons, Jeffrey Simpson and non-party Jared Chassen, both residents of the State of New York.

7.      Upon information and belief, Defendant Arch is a limited liability company organized under the laws of New York. Its members are Oak and JJ Arch.

## JURISDICTION, VENUE, AND GOVERNING LAW

8.      This Court has personal jurisdiction upon appropriate service of process over Defendants Jeffrey Simpson, JJ ARCH, and ARCH as they reside and conduct business in the State of New York, County of New York.

9.      Venue is proper in the Supreme Court of the State of New York, County of New York, pursuant to C.P.L.R. §503(a) as Defendants reside and conduct business in New York

2

County. Venue is further proper in the Supreme Court of the State of New York, County of New York, pursuant to C.P.L.R. §507.

## FACTUAL BACKGROUND

### A. Oak's History

10.    Plaintiff Oak is a subsidiary of 35 Oak Holdings Ltd. ("Oak Guarantor"), a Canadian entity owned and controlled by members of the Wiener family.

11.    Oak Guarantor is a holding company and family office. While it is today focused on investments and real estate, the family business was first created by the family patriarch, David Wiener, a refugee who came to Canada in the 1950s after surviving the Holocaust.

12.    David Wiener started Wiener Electric, a company that would later become Visioneering Corp. Visioneering pioneered the use of a lightweight frame housing for fluorescent lighting. Under the leadership of David, and later David's son, Bill Wiener, Visioneering would become the largest independent manufacturer of lighting in Canada.

13.    David was always a believer that land was the safest possible store of value, because it is finite and satisfies a basic need. Accordingly, the Wiener family began using the proceeds from Visioneering's success to invest in real estate, always adopting a conservative approach to its investment.  The strategy was to choose a parcel in an area that believed to have long-term development potential and revenue streams that could cover its operating expenses, purchase the land in cash without any leverage, and hold onto the land as long as it took for its value to be realized before selling it.

14.    As described more fully below, the unjustified and contractually prohibited acts and omissions of Simpson, acting on behalf of JJ Arch and AREH, have already harmed and stand to further threaten the stability of the Oak, Oak Guarantor and the Wiener family legacy.

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
NYSCEF DOC. NO. 2
INDEX NO. 654963/2023
RECEIVED NYSCEF: 10/10/2023

24-10381-smb Doc 192-66 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document
Pg 178 of 409

### B. Oak's Entitlement to Books and Records

15.     Defendant AREH is governed by the AREH LLC Agreement. Pursuant to the Preamble and Section 13.1.1 of the AREH LLC Agreement, Plaintiff Oak is denominated the "Investor Member" of AREH LLC and Defendant JJ Arch the "Managing Member." A true and correct copy of the AREH LLC Agreement is annexed hereto as **Exhibit 1**.

16.     The AREH LLC Agreement requires JJ Arch, the Managing Member, to maintain certain books and records and provide financial reporting to AREH's members, and likewise grants Oak, as the Investor Member, various rights to such information.

17.     The AREH LLC Agreement provides that "Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law."

18.     The AREH LLC Agreement provides that Oak, as Investor Member, has a right to inspect the books and records of AREH LLC and to receive regular financial reporting as follows: per Section 11.4 of the AREH LLC Agreement, "Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense. Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request."

19.     Additionally, the Managing Member, JJ Arch must also provide "all information reasonably requested in writing by any Member related to the business, operation, and financial

4

performance and condition of the Company or the Property[,]" pursuant to Section 11.5.2 of the AREH LLC Agreement.

20.    Oak is also entitled to receive certain regular financial reporting.  Specifically, Section 11.5 provides that "[w]ithin forty-five (45) days after the end of each calendar quarter, a financial report of the Company [must be provided to all Members] which shall include: a. a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request; b. a statement of the Capital Account of each Member."

21.    Oak has inconsistently received the required financial reports and AREH has failed to substantially fulfill its obligations under Section 11.5.

22.    Oak has repeatedly made prior requests for the financial reporting required to be provided to Oak under the AREH LLC Agreement, which requests have been rebuffed, refused, or granted only subject to unreasonable and unjustified conditions.

23.    By letter dated September 18, 2023 (the "Demand Letter"), Oak demanded[1] that AREH and all subsidiary entities to whom Oak, the Investor Member, has contributed capital or that is directly or indirectly managed by AREH (collectively, the "Applicable Entities") make available certain books and records for inspection and copying.  A true and correct copy of the Demand Letter is annexed hereto as **Exhibit 2**.

_____

[1] Oak directed its correspondence to Adam Leitman Bailey, Mr. Simpson's counsel.  Oak has not consented to AREH's retention of counsel and no allegations herein constitute a waiver of Oak's rights to raise any future challenges on this issue, including challenges based on a conflict of interest.

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
NYSCEF DOC. NO. 2

INDEX NO. 654963/2023

RECEIVED NYSCEF: 10/10/2023

24-10381-smb Doc 192-6 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document
Pg 180 of 409

24. Specifically, Oak sought by its Demand Letter to inspect and make copies of the following documents for AREH and the Applicable Entities:

a. An alphabetical list of the name and mailing address of each current member and manager of each Applicable Entity, including each member's contribution (capital contributions or otherwise) to such Applicable Entity and share of the profits and losses.

b. Each Applicable Entity's articles of organization or similar organizational document, all its amendments and restatements, and any powers of attorney used to execute those documents.

c. Each Applicable Entity's operating agreement and its amendments and restatements.

d. Each Applicable Entity's federal, state, and local income tax or information returns and reports for the three most recent fiscal years.

e. Any financial statements maintained by any Applicable Entity for the three most recent fiscal years.

f. Complete and accurate books and records supporting the documentation of any expenditures from each Applicable Entity's bank accounts.

g. Complete and accurate information regarding the state of the business and financial condition of each Applicable Entity's – including, but not limited to:

    i. Bank records;

    ii. QuickBooks, or other accounting system files;

    iii. Check registers; and

    iv. Evidence of payment and support of expenses.

6

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
INDEX NO. 654963/2023
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 10/10/2023

24-10381-jpm Doc 192-7 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document
Pg 181 of 409

25.     The Demand Letter specified that the above-referenced categories "must include all relevant books and records in the possession, custody, or control of the Company, including books and records which are in the possession of any of the Company's agents, including but not limited to its attorneys, accountants, managing member or other agents and advisors."

26.     The Demand Letter also demanded compliance with the provision of the AREH LLC Agreement that requires AREH to provide within forty five (45) days after the end of each calendar quarter, "a financial report of [AREH] which shall include a balance sheet and profit and loss statement of the Company for the quarter, including a quarterly balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Members, all as prepared in accordance with Generally Accepted Accounting Principles consistently applied and such tax estimates as any Member shall reasonably request [and] a statement of the Capital Account of each Member."

27.     Lastly, the Demand Letter sought "a full accounting of each Applicable Entity with detailed schedules of income and expenses from January 1, 2020 to the present, which it is entitled to under *Gottlieb v. Northriver Trading Co., LLC*, 58 A.D.3d 550 (1st Dept 2009).

28.     On or around September 26, 2023, counsel for Mr. Simpson responded to the Demand Letter and would not agree to the books and record inspection.[2]

29.     While certain AREH employees have at times indicated that some undefined subset of "books and records" would be made available at some point, it is apparent that AREH has no intention of honoring Oak's rights under the AREH LLC Agreement, as it has conditioned Oak's access to a subset of the books and records on agreement to unreasonable and unjustified terms,

---

[2] The email from Mr. Simpson's counsel was designated as privileged subject to Rule of Evidence 408. Without conceding the correspondence is subject to any privilege, Oak has not attached it as an exhibit due to counsel's claim of privilege.

which are contrary to Oak's rights under the AREH LLC Agreement. In particular, under AREH's and JJ Arch's proposed Confidentiality Agreement annexed hereto as **Exhibit 17**, Oak would be prohibited from making copies of the documents or disclosing any information contained within the documents to any third parties.

30. Specifically, JJ Arch's proposed Confidentiality Agreement provides:

   a. "35 Oak agrees that it will not copy in any form (including screen shots or photographs of any kind) any of the Documents, nor will 35 Oak remove any of the Documents from the room in which the Meeting takes place[.]" *Id.* at ¶ 3.

   b. "All Documents, Information and communications between (or on behalf of) the Parties pursuant to this Confidentiality Agreement are confidential and shall not be disclosed by 35 Oak to third parties in any form or under any circumstances other than as required pursuant to a facially valid court order or subpoena and shall not be disclosed or otherwise used in connection with any subsequent proceeding, unless such Document, Information, or communication was or is (1) publicly known; (2) already known to 35 Oak prior to the Meeting through lawful means; (3) lawfully obtained by 35 Oak from a third party; or (4) obtained by 35 Oak pursuant to lawful process." *Id.* at ¶ 4.a.

   c. "All the Documents, Information and any statements made during the course of or in connection with the Meeting are privileged settlement discussions, and (i) are made without prejudice to the Parties' legal position, and are inadmissible for any purpose in any legal proceeding and (ii) are privileged and inadmissible for any purposes, including impeachment, under Rule 408 of the Federal Rules

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
NYSCEF DOC. NO. 2
INDEX NO. 654963/2023
RECEIVED NYSCEF: 10/10/2023
24-10381-jpm Doc 1926-7 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document
Pg 183 of 409

of Evidence and any applicable federal or state statute, rule or common law provisions." *Id.* at ¶ 4.d.

31.     In other words, Defendants will only agree to provide Oak with the books and records if Oak cannot do anything with them.

32.     Accordingly, Oak has never received access to any books and records as of the date of this filing.

33.     As Oak explained in its Demand Letter, the inspection of each Applicable Entity's books and records as demanded in the Demand Letter is sought for proper purposes reasonably related to Investor Member's interests as a Member of the Company, including Investor Member's:

a.   valuation of its ownership interest in the Applicable Entities;

b.   investigation of the status of the Applicable Entities' business and financial condition;

c.   investigation of the conduct of the Applicable Entities' management; and

d.   investigation of any potential wrongdoing and mismanagement of the Applicable Entities committed by its management.

34.     These purposes are related to Investor Member's membership interest in AREH because, *inter alia*, to the extent these books and records substantiate wrongdoing and mismanagement, Investor Member is entitled to seek a remedy in law and/or equity.  Accordingly, access to the books and records is essential to Investor Member's ability to adjudicate its rights it enjoys as a result of its membership in AREH and pursuant to the AREH LLC Agreement.

35.     It is just and reasonable for Investor Member to demand these categories of documents given that Mr. Simpson has repeatedly demanded contributions from Investor Member

9

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
NYSCEF DOC. NO. 2
INDEX NO. 654963/2023
RECEIVED NYSCEF: 10/10/2023
24-10381-jpm   Doc 1926-7   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 184 of 409

without providing any basis, explanation, or supporting documentation, and the AREH LLC Agreement entitles Investor Member to receive this information in any case.

### C. The Mismanagement of AREH

36.     Defendant's total disregard of Oak's entitlement and need to access the books and records is particularly egregious in light of recent events, a number of which Investor Member learned for the first time from the parties' court filings in the JJ Arch Proceeding, which indicate that serious mismanagement of AREH has occurred and is ongoing.  Such events include the following:

37.     With respect to certain properties under development, AREH purposely failed to comply with the requirements under Section 1031 of the Internal Revenue Code (the "1031 Exchange") to obtain tax benefits, the receipt of which was essential to the commercial success of the project and was the basis on which investment was sought and obtained.  While members of AREH's staff, and Mr. Simpson himself, were aware of the failure to obtain these benefits, they delayed revealing this information to investors with certain investors (including Investor Member) never receiving any formal notice of the issue.  As a result, investors in the project now face unexpected and significant tax liabilities that eclipse any possible return that could have been obtained on the property.  *See* **Exhibit 3**.

38.     Oak is particularly prejudiced by AREH's inexplicable and apparently intentional abandonment of the 1031 Exchange because Oak's tax liabilities are entirely unknown, as AREH has yet to issue a K-1, while Oak's tax filing deadline is October 16.

39.     The circumstances surrounding AREH's abandonment of the 1031 Exchange have yet to be fully disclosed, while startling new information in Chassen's October 6, 2023 affidavit in the JJ Arch Proceeding indicates that Simpson himself had minimal funds on the line, and

therefore was uniquely insulated from the failure. *See* **Exhibit 18** at ¶ 24. Nevertheless, Oak has yet to receive an explanation as to why it now, as the largest investor in the failed 1031 Exchange, faces millions in tax liabilities. On numerous occasions, Simpson, acting on behalf of JJ Arch and AREH, has falsely advised Investor Member that certain capital calls have been made to other investors. As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute.

40. Related to the above, Simpson has repeatedly demanded capital contributions from Investor Member without following the contractual procedures elaborated in the AREH LLC Agreement requiring the formal issuance of capital calls and regular financial reporting. Investor Member has acceded to these demands from time to time under the understanding that such capital needs were urgent and that ruinous events would ensue absent an immediate contribution of capital. **Exhibit 4**,[3] a September 24, 2023 email with the subject line, "Emergency funds - URGENT reply required" is typical of the extortive demands for capital Investor Member has received, which flout all proper procedure for capital calls and lack virtually any explanation for the necessity of the funds.

41. In a similar instance where Simpson made demands for capital that was purportedly urgently needed, he refused to provide a breakdown of how much money he was asking for or whether such funds were being contributed to AREH or to one of the properties subject to AREH's management. When Oak refused, Simpson proposed "borrowing" money from the properties, regardless of whether he had consent from the investors in those properties to do so, demonstrating

---

[3] Certain redactions are applied regarding settlement, pursuant to Federal Rule of Evidence 408.

an exceptionally troubling attitude towards his obligations to investors, the properties, and to sound accounting practices. *See* **Exhibit 14**.

42.     Consistent with the apparent free-for-all that characterizes Simpson's bookkeeping practices, Simpson failed to present a budget for Oak's approval for 2023, and when this significant lapse in protocol was brought to his attention, insisted that regardless of Oak's approval, Simpson could proceed with the prior year's budget as if approved for 2023 if he desired, misconstruing the terms of the AREH LLC Agreement. *See* **Exhibit 16**.

43.     Indeed, Simpson's failure to formally raise capital calls and prepare appropriate paperwork evidencing the basis and terms on which capital has been contributed by Oak appears to serve Simpson's modus operandi of recanting or denying the statements on which Oak's investment of further capital was predicated.

44.     AREH, through the acts and omissions of Simpson, has failed to make debt servicing payments as required, causing the affected properties to go into default. As of the date of this filing, Oak has received default notices regarding at least four properties, which number is expected to expand based on Oak's understanding that formal notices have not been sent in all applicable cases. Similarly, certain properties are scheduled for foreclosure auctions as of the date of this filing.

45.     In one instance that led to a formal notice of default being issued, email correspondence reflects that despite repeated notices of the shortfall and the need to immediately remedy it, Mr. Simpson did not even respond to the debt servicer until after the initial date for payment had passed. Mr. Simpson then failed to notify Investor Member until the eve of the default, which is non-remedial, in addition to having never made a capital call for the property. *See* **Exhibit 5.**

46.     Simpson has also demanded that the investors refrain from engaging in any communications regarding the Applicable Entities that do not include Simpson, which he has no basis or right to demand.  Rather, such demands appear to be solely motivated to inhibit the free flow of information among the investors and to enable Simpson to use such information disparities to his advantage.  *See* **Exhibit 6**.[4]

47.     Both members of JJ Arch have accused the other of misappropriating company funds in the JJ Arch Proceeding.  For instance, in his September 14, 2023 affidavit (the "Chassen Affidavit"), Mr. Chassen attests as follows: "The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds."  *See* **Exhibit 7** at ¶ 30.

48.     Indeed, Simpson readily admitted to improper use of company funds, explaining that an employee of his automobile business, Rêver Motors, which is completely separate from AREH, is on the AREH payroll.  *See* Exhibit 12 at ¶ 21.

49.     The Chassen Affidavit also contains numerous statements that Simpson mismanaged AREH and the Applicable Entities, made misrepresentations to investors, and provided them with inadequate reporting, including:

> a.  "The operation of the Arch Entities did well initially, but it went downhill over the past two years." *Id.* ¶ 16.
>
> b.  "Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself

---

[4] Certain redactions are applied for attorney-client privilege.

were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks." *Id.* ¶ 19.

c. "Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else." *Id.* ¶ 19

d. "Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss." *Id.* ¶ 20

e. "Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses." *Id.* ¶ 21.

a. "[A]s cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures." *Id.* ¶ 22.

50.     Finally, Simpson's secrecy regarding AREH's and the Applicable Entities' finances have seriously impeded reaching workable solutions for the properties, many of which are suffering major losses that would have been entirely preventable with reasonable recordkeeping and sharing practices. For instance, recent discussions to salvage a project were completely undermined because Simpson, acting on behalf of JJ Arch and AREH, refused to provide any meaningful information as to the financial needs to complete the project and secure a much-needed anchor tenant. *See* **Exhibit 15**.

51.     In light of all the foregoing, access to AREH's and the Applicable Entities' books and records are essential to Oak's vindication of its rights and to protect itself in the rapidly evolving events surrounding the operations of AREH.

### D. Simpson's Exploitative Threats to File for Bankruptcy

52.     Oak recently learned of Simpson's threats to put AREH and/or the Applicable Entities into bankruptcy, which action would have serious deleterious effects on Oak and would violate the AREH LLC Agreement.

53.     Specifically, the Chassen Affidavit states, "Simpson in text messages and in verbal communications to me and Michelle Miller, a junior partner/employee, threatened to put all the

15

Arch entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business. Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, '[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization.'" *See* Exhibit 7 at ¶ 23.

54.    As referenced in the Chassen Affidavit, the AREH LLC Agreement provides in Section 7.1.3 that any decision to "file, acquiesce to, consent to or take of any Bankruptcy Action" constitutes a "Major Decision" under the AREH LLC Agreement and therefore requires Oak's consent. Thus, besides violating Simpson's and JJ Arch's fiduciary duties to Oak, the threatened action would also violate its Major Decision rights.

55.    A denial of Oak's Major Decision rights—that is, to consent or not to an action and thereby participate in the management and control of AREH—cannot be remedied by money damages, because, *inter alia*, the harm suffered consists of a deprivation of a bargained for right essential to maintaining the balance of power between the members of AREH. Oak's power to veto action constituting a Major Decision is the primary means by which Oak is entitled to protect its interests.

56.    The threatened action of filing for bankruptcy would also trigger Oak's and its affiliates' guaranty obligations under certain loan agreements, exceeding $350 million dollars, which is precisely the circumstance that Simpson is exploiting by making these threats. *See*, *e.g.*, **Exhibit 8** at §13.1(b)(1)(iii); **Exhibit 9**.

57.    Due to the nature of the threatened action and the irreparable harm that would result to Oak, in a September 22, 2023 letter (the "Bankruptcy Demand Letter"), Oak's counsel sought

confirmation from Simpson through his counsel that Simpson would not institute a Bankruptcy Action in respect of AREH or the Affiliated Entities absent Oak's consent and in accordance with the AREH LLC Agreement. A true and correct copy of the Bankruptcy Demand Letter is annexed hereto as **Exhibit 10.**

58.     In reply to the Bankruptcy Demand Letter, Simpson's counsel offered the equivocal statement that "Arch has every intention to comply with its obligations under the Operating Agreement," including the Major Decision obligations. *See* **Exhibit 11.**

59.     Adding to the concerns of an impending bankruptcy action by AREH or the Applicable Entities, Simpson's subsequent October 2, 2023 affidavit filed in the JJ Arch Proceeding (the "Simpson Affidavit"), admitted that bankruptcy was discussed, that he considered Oak and the Oak Guarantor at fault for the situation, and that serious solvency concerns exist. Specifically, Simpson averred, "Bankruptcy was mentioned (and suggested by several attorneys as possibly the only remedy left) only due to 35 Oak's [Oak Guarantor] precipitating a crisis by advising me that it would provide additional funding to the operating business or properties only if I surrendered control to them. . . . Bankruptcy may have been the only the option since the debts were piling up and the potential defaults were increasing significantly. Arch corporate had already accumulated over $2 million of debt for providing services to the properties with which it is affiliated, but no capital to reimburse for its staff." **Exhibit 12** at ¶ 19.

60.     Simpson's further statement in the Simpson Affidavit that "I could not, and would not, enter into a bankruptcy proceeding without further discussion amongst the partners" strongly suggests that Simpson fails to appreciate that his obligation to Oak goes far beyond a "discussion" as to any potential bankruptcy, because such action is absolutely prohibited by the AREH LLC Agreement without Oak 's consent. *See* Exhibit 12 at ¶ 19; Exhibit 1 at § 7.1.3.

61.     In light of the foregoing and in an effort to avoid needless motion practice over verbiage that was potentially inadvertently unclear, Oak's counsel sought confirmation twice that AREH would obtain Oak's consent prior to filing, acquiescing to, consenting to or taking any Bankruptcy Action, consistent with its obligations under the AREH LLC Agreement.  *See* **Exhibit 13**.

62.     Rather than clarify that neither AREH nor Simpson would take a Bankruptcy Action without Oak's consent, as Oak requested, Simpson's counsel insisted that the initial message was "clear" and repeated that "Arch and Jeff Simpson *have every intent* to abide by their contractual obligations with respect to major decisions."  *See* Exhibit 13 (emphasis added).

63.     In so responding, and continuing to dodge the Oak's simple questions, it can only conclude that Simpson will soon initiate a Bankruptcy Action without Oak's consent, in violation of the AREH LLC Agreement and requiring immediate relief.

## COUNT I
### Demand for Books and Records

64.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

65.     As alleged herein, Plaintiff Oak, the Investor Member in AREH LLC, has rights to receive books and records and certain financial reporting under the AREH LLC Agreement.

66.     Oak also enjoys statutory rights to AREH's books and records under New York Limited Liability Company Law § 1102.

67.     The Demand Letter constituted a written demand on AREH to inspect and make copies of the books and records of AREH.

68.     Oak's purpose for inspecting and copying the books and records is proper and related to its membership interest in AREH LLC.  More specifically, the demanded books and

records relate to Oak's interests as a Member of AREH, including its: (i) valuation of its ownership interest in the Applicable Entities, (ii) investigation of the status of the Applicable Entities' business and financial condition, (iii) investigation of the conduct of the Applicable Entities' management, and (iv) investigation of any potential wrongdoing and mismanagement of the Applicable Entities committed by its management.

69.     Oak's inspection of AREH's books and records is just and reasonable because the AREH LLC Agreement entitles Oak to access such documents, and Oak has substantial financial interests at stake in investment in AREH.

70.     The Operating Agreement contains no procedural requirements for Oak to satisfy before conducting a books and records inspection except to provide "reasonable prior notice to Managing Member," which Oak has done by way of the Demand Letter.

71.     Defendant AREH, its Managing Member (JJ Arch) and JJ Arch's Managing Member (Mr. Simpson) responded to the Demand Letter by imposing unreasonable restrictions on the inspection, amounting to a denial of Oak's demand.

72.     In light of the Defendants' unreasonable restriction on Oak's access to the requested books and records, Oak is entitled to a court order (1) directing the Defendants to allow Oak to inspect and make copies of AREH's books and records and (2) declaring Oak's rights to inspect and make copies of AREH's books and records.

## COUNT II
### Equitable Accounting

73.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

74.     Defendant Mr. Simpson, (by virtue of his status as Managing Member of Defendant JJ Arch, which is the Managing Member of Defendant AREH), owes Oak (as Investor Member of

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM     INDEX NO. 654963/2023
NYSCEF DOC. NO. 2    24-10381-jpm Doc 192-7 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document    RECEIVED NYSCEF: 10/10/2023

Pg 194 of 409

AREH) a fiduciary duty or other trust-based duty with respect to the business and affairs of Defendant AREH.

75.     As a result of this trust-based relationship between Defendant Mr. Simpson, and Oak, Oak is entitled to an accounting with respect to AREH.

76.     Plaintiff has previously demanded such an accounting from Defendants.

77.     Defendants have failed and/or refused to provide such accounting.

78.     On information and belief, Defendants have failed and/or refused to provide such accounting so as to conceal defendants' wrongful acts in derogation of the plaintiff's rights.

79.     An accounting is necessary to determine Oak's monetary damages and/or in order to determine the true and full information about the financial affairs of the AREH.

80.     The accounting is applicable to AREH for each annual year (or partial period) of its operation and its management by Defendants Simpson and JJ Arch.

### COUNT III
**Injunctive Relief**

81.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

82.     Pursuant to the Section 7.1.3 of the AREH LLC Agreement, any decision to "file, acquiesce to, consent to or take of any Bankruptcy Action" constitutes a "Major Decision" under the AREH LLC Agreement and requires Oak's consent.

83.     Simpson has threatened to violate Oak's Major Decision right by instituting a Bankruptcy Action without its consent.

84.     There is no adequate remedy at law for a deprivation of Oak's decision not to consent to a Major Decision.

85.     A temporary restraining order and a preliminary injunction restraining Defendants from filing, acquiescing to, consenting to or taking of any Bankruptcy Action in respect of AREH or any of the Applicable Entities is required in order to prevent the otherwise irremediable violation of Oak's Major Decision rights.

**COUNT IV**
**Declaratory Judgment**

86.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

87.     There is a justiciable controversy because Simpson, on behalf of JJ Arch and/or AREH, is aware of and has refused to acknowledge Oak's Major Decision rights with respect to any Bankruptcy Action.

88.     Simpson's counsel's response to the Bankruptcy Demand Letter and the statements in the Simpson Affidavit give Oak a reasonable basis to apprehend that Simpson, acting on behalf of JJ Arch and/or AREH will violate Oak's Major Decision rights, potentially based on his differing understanding of his obligations under the AREH LLC Agreement.

89.     Accordingly, and consistent with the injunctive relief it seeks, Oak desires a declaration that the AREH LLC Agreement prohibits Simpson, JJ Arch and AREH, from filing, acquiescing to, consenting to or taking of any Bankruptcy Action in respect of AREH or any of the Applicable Entities, without Oak's consent.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court issue judgment for Plaintiff and against Defendants as follows:

(a)     Ordering the Defendants to allow Oak to inspect and make copies of AREH's books and records;

21

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
NYSCEF DOC. NO. 2
INDEX NO. 654963/2023
RECEIVED NYSCEF: 10/10/2023

24-10381-lpm23 Doc 192-6 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document
Pg 196 of 409

(b)     Declaring Oak's rights to inspect and make copies of AREH's books and records;

(c)     Ordering Defendants to make an equitable accounting of AREH's assets;

(d)     Declaring Oak's Major Decision rights under the AREH LLC Agreement generally and as to any Bankruptcy Action; and

(e)     For such other and further relief as this Court may deem just and proper.


Dated: October 10, 2023              Respectfully submitted,
     New York, New York
                                    HAYNES AND BOONE, LLP


                                    By: /s/ Leslie C. Thorne
                                    Leslie C. Thorne
                                    leslie.thorne@haynesboone.com
                                    Aishlinn Bottini
                                    aishlinn.bottini@haynesboone.com
                                    30 Rockefeller Plaza, 26th Floor
                                    New York, NY 10112
                                    (212)835-4848

                                    *Attorneys for Plaintiff 608941 NJ INC.*

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
INDEX NO. 654963/2023

NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 10/10/2023

24-10381-lgb Doc 126-7 Filed 09/18/24 Entered 09/18/24 14:54:15 Main Document
Pg 197 of 409

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 654963/2023
RECEIVED NYSCEF: 10/10/2023

24-10381-jpm    Doc 126-7    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 198 of 409

# LIMITED LIABILITY COMPANY

# OPERATING AGREEMENT OF

# ARCH REAL ESTATE HOLDINGS LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of December 11, 2017, by and between 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Investor Member"), and JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ Member", and Investor Member and JJ Member, each a "Member", and collectively, the "Members").

WHEREAS, the Members desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch Real Estate Holdings LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Acquisition Fees" shall mean all fees paid to the Company in connection with the acquisition of an asset by a Subsidiary or another Person.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Annual Budget" means the annual budget of the Company approved in accordance with Section 7.4 as the same may be modified in accordance herewith.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided,

however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C)     The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions (other than Capital Contributions made by JJ Member pursuant to Section 3.4) and Acquisition Fees), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as

812194-9

such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on November 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Damages" shall have the meaning set forth in Section 7.6.4.

"Default Loan" shall have the meaning set forth in Section 3.2.3.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"Due Diligence Materials" shall have the meaning set forth in Section 7.2.2.

"Eligible Asset" means any interest in real property either directly or indirectly through an ownership or leasehold interest including a preferred equity interest but excluding the origination or purchase of any debt financing unless such debt financing is being acquired or originated with the likely expectation that such debt financing will ultimately result in ownership of the collateral for such debt financing, and which is reasonably expected to satisfy the criteria set forth on Exhibit A hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exercise Period" shall have the meaning set forth in Section 7.9.2.

"Fiscal Year" shall be as set forth in Section 11.1.

"Guarantor Indemnitor" shall have the meaning set forth in Section 7.6.4

"Guaranty" or "Guaranties" shall have the meaning set forth in Section 7.7.1.

"Guaranty Indemnified Parties" shall have the meaning set forth in Section 7.6.4.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Initiating Member" shall have the meaning set forth in Section 7.9.1.

"Investment Expiration Date" means the earlier of (i) the fifth anniversary of the date hereof; (ii) at such time as there are five Rejected Eligible Assets; (iii) the date on which none of Michael Wiener, William Wiener or Kevin Wiener controls Investor Member unless waived in writing by Managing Member; (iv) the date on which Jeffery Simpson no longer controls Managing Member unless waived in writing by Investor Member; or (v) the date on which the Investor Member and its Affiliates have made aggregate capital contributions, without giving effect to a return of any capital contributions, to the Company and its Subsidiaries equal to $50,000,000.00.

"Investor Member" shall have the meaning set forth in Preamble.

"Investor Member Maximum Capital Contribution" means $3,000,000.00.

"JJ Member" shall have the meaning set forth in the Preamble.

"JJ Member Promote Distribution" means an amount equal that portion of a Promote Distribution received by JJ Member and its Affiliate from a Subsidiary which is ultimately distributable to JJ Member or the equity holders of JJ Member.  For example purposes, if an Affiliate of JJ Member receives a Promote Distribution of $100,000 and $40,000 of it is distributable to JJ Member and $60,000 distributable to an Affiliate of JJ Member and the

equity holders of JJ Member hold a 10% interest in such Affiliate, the JJ Member Promote Distribution will be $46,000 [$40,000 + (10% x $60,000)].

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Major Decision" shall have the meaning set forth in Section 7.1.3.

"Managing Member" means JJ Member, or a replacement "managing member" appointed pursuant to Section 7.1.4.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)     items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)     any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)     any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)     there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v)     if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)     items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Company Promote Interest" shall have the meaning set forth in Section 7.8.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Offer Notice" shall have the meaning set forth in Section 7.9.1.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" has the meaning set forth in the operating agreement or other governing document of the applicable Subsidiary.

"Proposed Annual Budget" has the meaning set forth in Section 6.7.

"Recourse Party" shall have the meaning set forth in Section 7.7.1.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Rejected Eligible Asset" shall have the meaning set forth in Section 7.2.2.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member; provided that, unless required under a loan, the Company shall not hold reserves less than $375,000 without Investor Member's consent, not to be unreasonably withheld, conditioned or delayed.

"Responding Member" shall have the meaning set forth in Section 7.9.1.

"ROFO Closing Date" shall have the meaning set forth in Section 7.9.4.

"ROFO Default" shall have the meaning set forth in Section 7.9.4.

"ROFO Deposit" shall have the meaning set forth in Section 7.9.2.

"ROFO Election" shall have the meaning set forth in Section 7.9.2.

812194-9

"ROFO Price" shall have the meaning set forth in Section 7.9.1.

"ROFO Sale" shall have the meaning set forth in Section 7.9.2.

"Sale Asset" shall have the meaning set forth in Section 7.9.1.

"Subsidiary" shall mean any Person of which fifty percent (50%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contributions" means with respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 6.2(ii).

ARTICLE II

**ESTABLISHMENT OF THE COMPANY**

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall continue to be conducted under the name of "Arch Real Estate Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:  (i) create a real estate

9

812194-9

investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate.  Managing Member shall provide written notice of the Company's principal place of business to Investor Member promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Agent for Service</u>.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation. or such other agent as may be designated from time to time by Managing Member.

2.7.    <u>Admission of Members</u>.  Investor Member and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

ARTICLE III

**CAPITAL CONTRIBUTIONS**

3.1.    <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on <u>Schedule 1</u> hereto opposite its name under the heading "Initial Capital Contribution."

3.2.    <u>Additional Capital Contributions</u>.

3.2.1.  If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with the Company's due diligence in connection

with approved Eligible Assets, Managing Member shall deliver a written notice to Investor Member (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Notwithstanding anything herein to the contrary, without the consent of Investor Member, which may be granted or withheld in its sole and absolute discretion, in no event shall the Company be permitted to make a Capital Call if the Capital Call Amount to be made by Investor Member, when added to the then Unreturned Capital Contributions of Investor Member, would cause the aggregate Unreturned Capital Contributions to exceed Investor Member Maximum Capital Contribution.

3.2.2. Investor Member shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to the Capital Call Amount.

3.2.3. If the Investor Member shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then JJ Member shall have the right to contribute the amount of the Investor Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a "Default Loan") to the Investor Member in an amount equal to the unfunded capital contribution.

3.2.4. Each Default Loan shall be deemed to constitute a loan made by the JJ Member to the Investor Member in accordance with the terms hereof, immediately followed by a capital contribution by the Investor Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the JJ Member and shall constitute a debt owed by the Investor Member. Any Default Loan shall bear interest at the rate of eight percent (8%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Investor Member from any distributions due to Investor Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Investor Member and shall be secured by the Investor Member's Membership Interest including, without limitation, the Investor Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Investor Member hereby pledges, assigns and grants a security interest in its Membership Interest to the JJ Member and agrees to execute such documents and statements as are reasonably requested by the JJ Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Investor Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Investor Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the JJ Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Investor Member, and (y) any proceeds of the sale of the Investor Member's Membership Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Investor Member.

3.3.    No Interest.    Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    JJ Member Promote Distribution Capital Contributions.    No later than ten (10) Business Days after the receipt of Promote Distribution, if the Unreturned Capital Contribution of Investor Member is in excess of zero, JJ Member shall make a capital contribution to the Company equal to the lesser of (i) the amount of such JJ Member Promote Distribution or (ii) the product of the Investor Member's Unreturned Capital Contribution and a fraction, the numerator of which is the aggregate unreturned capital contributions made by JJ Member and its Affiliates to all Subsidiaries and the denominator of which is the aggregate unreturned capital contributions made by JJ Member, Investor Member and their respective Affiliates to all Subsidiaries.

3.5.    Return of Capital.    Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6.    No Personal Liability.    Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in Section 7.6.1.

ARTICLE IV

**CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS**

4.1.    Capital Accounts.    A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    Adjustments.    The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject

to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with <u>Section 5.1</u>), and (z) any deductions and losses allocated to such Member pursuant to <u>Section 5.2</u>.

4.3.     <u>Negative Capital Accounts</u>.   No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.     <u>Transfers</u>.   If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.     <u>Capital Account Balance</u>.     Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to <u>Sections 5.1</u> and <u>5.2</u> and all contributions and distributions made prior to the time as of which such determination is to be made.

ARTICLE V

<b>ALLOCATIONS AND DISTRIBUTIONS</b>

5.1.     <u>Allocations of Net Profit and Net Loss</u>.   After the application of <u>Section 5.2</u>, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to <u>Section 10.3.3</u> if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 10.3</u> to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.   Subject to the other provisions of this <u>Article V</u>, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.     <u>Regulatory Allocations</u>.

5.2.1. Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in

13

Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

       5.2.2.  This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

       5.2.3.  To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with <u>Section 5.1</u> as if such Member were not a Member.

       5.2.4.  If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this <u>Section 5.2.4</u> shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article V</u> have been made as if <u>Section 5.2.3</u> and this <u>Section 5.2.4</u> were not in this Agreement.

       5.2.5.  Any allocations required to be made pursuant to <u>Sections 5.2.1-5.2.4</u> (the "<u>Regulatory Allocations</u>") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to <u>Section 5.1</u> so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to <u>Section 5.1</u> had such Regulatory Allocations under this <u>Section 5.2</u> not occurred.

       5.2.6.  It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to <u>Section 10.3</u>, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to <u>Section 10.3</u>. Accordingly, notwithstanding anything to the contrary in this <u>Article V</u>, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with <u>Section 10.3</u>.

5.3.   Tax Allocations.

5.3.1.   For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2.   In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.   If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4.   Withholding.   The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a

812194-9

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

### 5.5.    Tax Matters.

5.5.1.   Tax Matters Partner; Partnership Representative.    Managing Member shall be the "Tax Matters Partner" of the Company.  The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner.  The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner.  Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018.  Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.  The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2.   Tax Elections.    All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with Investor Member; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members.  The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members.  The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3.   Tax Returns.  The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

FILED: NEW YORK COUNTY CLERK 10/10/2023 11:40 AM
INDEX NO. 654963/2023
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 10/10/2023

24-10381-jpm   Doc 326-7   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 213 of 409

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6. <u>Section 754 Election</u>. In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

ARTICLE VI

**DISTRIBUTIONS**

6.1. <u>Distributions of Cash Flow</u>. Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member in the following order of priority:

(i)    First, to Investor Member an amount equal to 4% per annum simple interest on its Unreturned Capital Contribution;

(ii)    Second, to Investor Member and JJ Member pro rata based on their respective Unreturned Capital Contributions until their respective Unreturned Capital Contributions are reduced to zero;

(iii)    Thereafter, 80% to JJ Member and 20% to Investor Member.

6.2. <u>Distributions of Acquisition Fees</u>. All Acquisition Fees, if any, shall be distributed within five (5) Business Days of the receipt thereof to the Members as follows:  20% to Investor Member; and 80% to JJ Member.

6.3. <u>Distributions Restricted by the Act</u>. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

ARTICLE VII

**MANAGEMENT AND OPERATIONS**

7.1. <u>Management</u>.

7.1.1. The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 7.1.3</u>), full,

17

exclusive and complete discretion with respect thereto. Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3. Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)    bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)    deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)    admit one or more additional members solely to provide necessary capital in the event that Investor Member fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii)    cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix)    take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2.    Except as otherwise provided in this Agreement, Investor Member shall not participate in the management or control of the Company or have any right to approve,

vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)      acquire any direct or indirect interests in any real property;

(ii)     file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)    sell any Company Asset or any portion thereof other than any Company Asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property or in accordance with Section 7.9;

(iv)    merge, consolidate or other reorganize the Company with another Person;

(v)     borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Managing Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Asset, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)   enter into any lease for space at a Company Asset of more than 10% of the rentable area of such Company Asset;

(viii)  engage in any business or activity not authorized by this Agreement;

(ix)    enter into any agreement requiring the expenditure of more than $50,000 per annum;

(x)    enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi)    incur any expense in excess of the amount set forth in the Annual Budget; provided that emergency expenditures and other expenditures not in excess of 10% over any line item in, or 5% over the aggregate, Annual Budget amount may be incurred without the consent of Investor Member;

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)    admit new or substitute Members to the Company or any Subsidiary;

(xiv)    modify any material terms of any organizational document of any Subsidiary; and

(xv)    cause any Subsidiary to take any of the foregoing.

7.1.4.    Removal of JJ Member as Managing Member. JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice.  Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member.  If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to Section 6.1(iii) or 6.2.

7.1.5.    Meetings.  Managing Member shall meet with Investor Member, which meeting may be by telephone, no less frequently than monthly to provide Investor Member with a general update on the Company Asset and the Company.  Any action required or permitted to be taken at any meeting or otherwise requiring the affirmation, vote, consent or approval of the Members may be taken without a meeting if the Members affirm, vote for, consent to or approve, the same at a meeting do so in writing, and the writing or writings are filed with the minutes of proceeding of the Members, as the case may be.

812194-9

7.2.    Services of the Members; Company Opportunities.

7.2.1.  Managing Member and Investor Member shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) subject to Section 7.2.2 or Section 7.9, acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.2.2.  Prior to the Investment Expiration Date or, if an Expense Contribution is required at such time as the Investor Member Maximum Expense Capital Contribution has been funded and Investor Member elects not to make such Expense Contribution, Managing Member and its Affiliates shall first offer all Eligible Assets to the Company.  Managing Member shall provide Investor Member with such information with respect to such Eligible Asset as is reasonably required for Investor Member to make an informed decision as to whether to consent to the Company acquiring such Eligible Asset including, without limitation, a description of the Eligible Asset, historic financial statements, if any, with respect to such Eligible Asset, projected cash flows from such Eligible Asset, the estimated costs associated with acquiring such Eligible Asset, including due diligence costs, and the amount, if any of the capital that will be contributed by Managing Member, together with such other information as Investor Member shall reasonably request (the "Due Diligence Information").  If Investor Member fails to consent to the Company acquiring any proposed Eligible Asset within fifteen (15) days of Managing Member providing the Due Diligence Information and Managing Member has elected to provide not less than 5% of the equity capital (after taking into account reasonably anticipated debt or third party equity financing) required to acquire such Eligible Asset (a "Rejected Eligible Asset"), Managing Member shall have the right to pursue such Eligible Asset independent of the Company provided however if the ultimate terms of the investment in such Eligible Asset are, in the aggregate, no more favorable to Managing Member than those presented to the Company.  Notwithstanding the foregoing, prior to the Investment Expiration Date, Managing Member shall not acquire any Rejected Eligible Asset which is in the same asset class and within a radius of 0.25 miles for urban properties and 2.0 miles for non-urban properties as an existing Company Asset.

7.3.    Guaranteed Payment; Fees and Expenses.

7.3.1.  Guaranteed Payment.  As compensation for its various undertaking and capital commitments hereunder, Managing Member shall be entitled to a monthly guaranteed payment from the Company equal to the amount set forth in the Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance. The right of Managing Member to receive Managing Member Guaranteed Payment shall automatically terminate upon Managing Member no longer serving as the "Managing Member" of the Company.

812194-9

7.3.2.  <u>Acquisition Fee</u>.  In connection with the acquisition of each Eligible Asset, the Company shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.3.  <u>Development Fee/Asset Management Fee/Other Fees</u>.  To the extent that an Eligible Asset is acquired in a Subsidiary with non-Affiliated investors, Managing Member shall use its good faith efforts to provide for the Company to be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such Company Asset to the extent the Company or an Affiliate of the Company or a Member provides such services.

7.3.4.  <u>Due Diligence Expenses</u>.  The Company shall reimburse each Member for any actual out-of-pocket third party expenses incurred by such Member in connection with its determination as to whether to cause the Company to acquire an Eligible Asset.

7.4.  <u>Budget</u>.  The initial Annual Budget of the Company is as set forth in Exhibit B hereto.  No later than November 1 of each calendar year, Managing Member shall prepare (or cause to be prepared) an annual budget (the "<u>Proposed Annual Budget</u>"), and deliver such Proposed Annual Budget to Investor Member.  In the event that Investor Member objects in writing to all or a portion of the Proposed Annual Budget within thirty (30) days of receipt thereof, the Members shall, diligently and in good faith, attempt to achieve a unanimous decision with respect to the Proposed Annual Budget.  In the event that Members are unable to achieve a unanimous decision with respect to the Proposed Annual Budget, the Annual Budget then in effect shall remain the Annual Budget modified as follows:  (i) any line item agreed upon by the Members in the Proposed Annual Budget shall be substituted for the same line item in the current Annual Budget; (ii) all line items that are not agreed upon shall be the lesser of the amount provided for in the current Annual Budget or the amount set forth in the Proposed Annual Budget; and (iii) any new line item in the Proposed Annual Budget shall not be deemed included in the Annual Budget.

7.5.  <u>Legal Title to Company Asset</u>.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.6.  <u>Guaranties</u>.

7.6.1.  The Members acknowledge that in connection with any (i) financing or refinancing by the Company or any Subsidiary entered into on or after the date of this Agreement with respect to a Company Asset the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty, environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "<u>Guaranty</u>," and collectively, "<u>Guaranties</u>").  Each Member, in its sole discretion, shall or shall cause one or more of its Affiliates satisfactory to the applicable lender or landlord (each a "<u>Recourse Party</u>") to provide any such Guaranty.

7.6.2.  In consideration of providing an unconditional payment Guaranty, the party providing such Guaranty shall be entitled to a one-time fee equal to 2.0% of the amount

**Exhibit G**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

Plaintiffs,

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

Defendants.

Index No. 158055/2023

Motion Sequence No. 004

**INTERIM ORDER REGARDING
MEASURES DURING THE
PENDENCY OF THE ORDER TO
SHOW CAUSE REGARDING THE
APPOINTMENT OF RECEIVER FOR
JJ ARCH**

WHEREAS, on August 14, 2023, Jeffrey Simpson ("Simpson"), individually and

purportedly derivatively on behalf of JJ Arch LLC ("JJ Arch") and Arch Real Estate Holdings

LLC ("AREH") filed the above-captioned action against Jared Chassen ("Chassen") and First

Republic Bank ("First Republic") (NYSCEF No. 1); and

WHEREAS, on August 15, 2023, Simpson filed an Order to Show Cause seeking

preliminary injunctive relief (NYSCEF Nos. 9-22) (Motion Sequence No. 1); and

WHEREAS, on August 21, 2023, the Court entered an Order Regarding Interim

Operating Procedures ("Interim Order") (NYSCEF No. 36); and

WHEREAS, on September 14, 2023, Chassen moved, inter alia, to hold Simpson in

contempt of the Interim Order and sought injunctive and remedial relief (NYSCEF Nos. 61-85)

(Motion Sequence No. 3); and

1

FILED: NEW YORK COUNTY CLERK 10/30/2023 09:41 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 292
RECEIVED NYSCEF: 10/27/2023
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 221 of 409

WHEREAS, on September 15, 2023, the Court entered a temporary restraining order (NYSCEF No. 86); and

WHEREAS, on September 29, 2023, the Court granted Simpson's motion for a preliminary injunction "in part to the extent set forth in the Court's Interim Order (NYSCEF No. 36) and the Order to Show Cause entered in Mot. Seq. 003 (NYSCEF No. 86), which shall remain in effect until further Order of the Court . . ."; (NYSCEF No. 159); and

WHEREAS, on October 17, 2023, 608941 NJ Inc. ("Oak" or "Investor Member") filed an Order to Show Cause Regarding Appointment of Receiver for JJ Arch LLC (the "OSC," NYSCEF Nos. 225-269)[1]; and

WHEREAS, on October 19, 2023, counsel for Oak, counsel for Simpson, counsel for JJ Arch, counsel for AREH, and counsel for Chassen appeared before the Honorable Joel M. Cohen of the Supreme Court of the State of New York, County of New York to argue the OSC; and

WHEREAS, on October 19, 2023, the Court ordered further briefing on whether the Court should grant the relief requested in the OSC; and

WHEREAS, on October 19, 2023, the Court authorized Oak to submit a proposed order setting forth proposed interim measures pending resolution Oak's motion to appoint a receiver, and the Court has considered that proposed order as well as comments from counsel for AREH and Simpson;

**NOW THEREFORE IT IS SO ORDERED** that pending the hearing on this motion (Motion Seq. No. 4):

---

[1] For purposes of this Interim Order, Oak is considered to be joined as a party (CPLR 6401[a]). Any reference to "parties" subject to this Order shall be construed to include Oak.

2

1.    JJ Arch, AREH, Simpson, Chassen, and Oak shall comply with their existing

obligations under the Limited Liability Company Operating Agreement of Arch Real Estate

Holdings LLC (the "AREH LLC Agreement"). This includes, without limitation, complying

with the requirements of Section 7.13 of the AREH LLC Agreement, which provides in part that

any "Major Decision"[2] (including but not limited to filing, acquiescing to, consenting to, or

taking any Bankruptcy Action) shall be undertaken only with the prior written consent of all

AREH Members (and, for avoidance of doubt, any action or decision that would constitute a

Major Decision if made or taken by the Company shall be a Major Decision if made or taken by

any Subsidiary), which consent shall be deemed granted by an AREH Member if such Member

fails to object to such action within fifteen (15) days of AREH Managing Member's written

request therefor.[3] Moreover, nothing herein shall abridge or diminish Oak's rights under Section

7.1.4 of the AREH LLC Agreement to remove JJ Arch as Managing Member

---

[2] Unless otherwise indicated, capitalized terms have the meanings set forth in the AREH LLC Agreement.

[3] Contrary to the position taken by Simpson and AREH in connection with this motion, the Court finds that the Major Decision consent rights contained in the AREH LLC Agreement with respect to Bankruptcy Actions are enforceable (*In re Pasta Bar By Scotto II, LLC*, No. 15-12766 (MG), 2015 WL 7307246, at *1 (Bankr SDNY Nov. 19, 2015) (enforcing "Major Decision" right of LLC member regarding authority to commence a bankruptcy action and dismissing the unauthorized Chapter 11 petition). The cases on which AREH's counsel relies for the proposition that Oak's consent right is unenforceable as a matter of federal law are inapposite. Each involves a situation in which a *creditor*, directly or indirectly, sought to restrict a debtor from seeking bankruptcy protection (*see In re Lexington Hosp. Grp., LLC*, 577 BR 676, 684 [Bankr ED Ky 2017]). Here, by contrast, Oak is acting solely as a Member of AREH (contributing to AREH's decision as a *debtor* as to whether to take a Bankruptcy Action) and not as a *creditor* (or on behalf of AREH's creditors) to limit AREH's rights as a debtor. The Court will, of course, give due consideration to any decision rendered on this issue in the related pending lawsuit by Oak that was removed to the United States District Court for the Southern District of New York (*608941 NJ Inc. v Simpson*, US Dist Ct, SD NY, 23 CV 8966, Carter, J, 2023).

3

2.      Within seven (7) days of the entry of this Order, or sooner if reasonably practical, the books and records of AREH and the books and records of all subsidiary entities to whom Investor Member or its affiliate has contributed capital or that are directly or indirectly managed or controlled by AREH (the "Applicable Entities"), from January 1, 2020 to the present, will be made available to Oak, and any accounting professional Oak may retain. No limitations on use or copying of the documents shall apply, except those found in the AREH LLC Agreement (as applicable to the respective rights of Oak), or those limitations, expressed or implied, by applicable law or by relevant and enforceable confidentiality agreements, if any; *provided* that AREH or JJ Arch shall be provided with a copy of any documents or information that Oak or AREH copy or remove from AREH's offices. This obligation is continuing and requires the good faith efforts of AREH, the Managing Member of AREH as that term is defined in Section 1.1 and the Preamble to the AREH LLC Agreement ("AREH Managing Member"), and Simpson. The books and records Oak is entitled to receive include, but are not limited to:

a.      An alphabetical list of the name and mailing address of each current member and manager of each Applicable Entity, including each member's contribution (capital contributions or otherwise) to such Applicable Entity and share of the profits and losses.

b.      Each Applicable Entity's articles of organization or similar organizational document, all its amendments and restatements, and any powers of attorney used to execute those documents.

c.      Each Applicable Entity's operating agreement and its amendments and restatements.

4

    d. Each Applicable Entity's federal, state, and local income tax or information returns and reports for the three most recent fiscal years.

    e. Any financial statements maintained by any Applicable Entity for the three most recent fiscal years.

    f. Complete and accurate books and records supporting the documentation of any expenditures from each Applicable Entity's bank accounts.

    g. Reasonably detailed capital stack statements on every Applicable Entity (including, without limitation, the order of priority in which the proceeds of a hypothetical liquidation of each Applicable Entity would be distributed);

    h. Complete and accurate information regarding the state of the business and financial condition of each Applicable Entity's – including, but not limited to:

        i. Bank records;

        ii. QuickBooks, or other accounting system files;

        iii. Check registers; and

        iv. Evidence of payment and support of expenses.

3. On November 1, 2023, and by the first of each month thereafter while this Order remains in effect, Oak will be provided a statement specifying the amount spent under each line item of the most recently approved AREH budget.

4. In operating AREH and each Applicable Entity, JJ Arch will make its best effort, in reasonable good faith, to provide full transparency with respect to any request for information from Oak regarding:

5

a. The status of negotiations with lenders in respect of loans pursuant to which Oak or 35 Oak Holdings Ltd. ("Oak Guarantor") has executed a guaranty, or any affiliate of Oak or Oak Guarantor, has executed a guaranty.

b. Any discussions or negotiations (past, present or future) to bring in any new lenders or investors with respect to any Applicable Entity for which Oak, Oak Guarantor, or any affiliate of Oak or Oak Guarantor has executed a guaranty.

5.    Oak, or any agent or representative it may appoint, is entitled to access, at any reasonable time, and subject to applicable laws about personnel presence on construction sites and any contractual limits on access to space from lease agreements, any AREH or any Applicable Entities' building or build sites, provided that Oak will provide AREH and JJ Arch with reasonable advance notice, and consider AREH's advice in good faith concerning access, to avoid unreasonable disruption of AREH's business activities.

6.    Simpson and/or the AREH Managing Member will ensure that Oak receives a reasonable and prompt summary of all communications with lenders, banks, or other investors regarding AREH or the Applicable Entities.

a. In the event that Simpson receives an incoming communication from lenders, banks, or other investors regarding AREH or the Applicable Entities, Simpson will send a summary of the discussion by email to Oak.

b. JJ Arch and Simpson shall not impede Oak from communicating with any lenders or negotiating settlements with such lenders where Oak or an affiliate of Oak has a guaranty agreement, provided that Oak's

6

communications are consistent with the AREH LLC Agreement and applicable law.

c.   To the extent any aforementioned discussions pertain solely to Simpson's personal guaranty obligations, Simpson is entitled to communicate with lenders, banks and counsel directly without a requirement to include Oak.

7.   Simpson (and Chassen, as necessary) will cooperate with any banking entities that have accounts that hold AREH's funds, any Applicable Entities' funds, or in any way facilitate AREH's business (the "Accounts") to ensure that Oak has viewing access with respect to the Accounts.

8.   The Interim Order (NYSCEF Doc. No. 36), the TRO (NYSCEF Doc. No. 86), and the Preliminary Injunction (NYSCEF Doc. No. 159), which incorporates by reference the Interim Order and TRO until further order of the Court, remain in full force and effect. Except where he is explicitly mentioned, this Order does not address the rights of Chassen in JJ Arch, which is addressed in the orders incorporated by this paragraph, but this Order's scope and substance shall not be construed to diminish any rights of Chassen in JJ Arch. To the extent anything in this Order conflicts with those earlier orders, the terms of this Order shall prevail.

9.   Opposition or cross-motions, if any, with respect to Motion Sequence No. 004 shall be filed **on or before 5:00 p.m. on November 15, 2023**, with reply papers, if any, filed **on or before 5:00 p.m. on November 22, 2023**.

10.   The hearing on Motion Sequence No. 4 shall be **on December 1, 2023, at 10:00 a.m.**

7

FILED: NEW YORK COUNTY CLERK 10/30/2023 09:41 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 252
RECEIVED NYSCEF: 10/27/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 227 of 409

This constitutes an interim decision and order of the Court on Motion Sequence No. 4.


Hon. Joel M. Cohen, JSC


DATED: _10/27/23_____

**Exhibit H**

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 229 of 409

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 03M

------------------------------------------------------------------------------X

JEFFREY SIMPSON, JJ ARCH LLC,

                        Plaintiffs,

- v -

JARED CHASSEN, FIRST REPUBLIC BANK,

                        Defendants.

| | |
|---|---|
| **INDEX NO.** | 158055/2023 |
| **MOTION DATE** | 11/03/2023 |
| **MOTION SEQ. NO.** | 005 |

**AMENDED DECISION +
ORDER ON MOTION**

------------------------------------------------------------------------------X

608941 NJ INC

                        Plaintiff,

- v -

JEFFREY SIMPSON, JJ ARCH LLC, AND ARCH REAL
ESTATE HOLDINGS LLC,

                        Defendants.

------------------------------------------------------------------------------X

HON. JOEL M. COHEN:

The following e-filed documents, listed by NYSCEF document number (Motion 005) 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 321, 322, 323, 324, 325, 329, 330, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 356, 357, 358, 359, 360, 361, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 412, 413, 414, 415, 416

were read on this motion for         PRELIMINARY INJUNCTION/RESTRAINING ORDER    .

       The Court's November 20, 2023 Interim Decision and Order (NYSCEF 412) granting

Plaintiff 608941 NJ Inc.'s ("Oak") motion for a preliminary injunction is hereby amended to

provide the following details with respect to the terms and scope of the injunction.  It is now

further:

       **ORDERED** that, during the pendency of this action and subject to further order of the

Court, Jeffrey Simpson and JJ Arch LLC are enjoined from:

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL
Motion No.  005
    Page 1 of 8

1 of 8

1. Acting as (or holding themselves out to third parties to be) managing members of Arch Real Estate Holdings LLC ("AREH"), and Oak shall continue to act in their stead as AREH's sole managing member in accordance with Section 7.1 of the Limited Liability Operating Agreement of AREH (the "Operating Agreement"), owing all applicable duties to AREH and its members;

2. Denying prompt consent to any Major Decision proposed by Oak as Managing Member under Section 7.1.3 of the Operating Agreement unless *both* JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such consent (or alternatively, either JJ Arch member may convey consent);

3. Making any filings with the New York City Department of Buildings or any other similar regulatory authorities in any jurisdictions on behalf of AREH or any of its subsidiary entities; and

4. Otherwise interfering with Oak's ability to exercise its responsibilities as Managing Member of AREH.

**ORDERED** that, during the pendency of this action and subject to further order of the Court, Jeffery Simpson is enjoined from entering the offices of AREH except with and upon the terms stated in an advance written consent provided by Oak[1]; it is further

---

[1] Oak proposed adding a provision enjoining Mr. Simpson from contacting employees of AREH or its subsidiaries except through counsel or with the advance written permission of Oak. The Court has not included that proposed language, which seems an excessively broad restriction on what could be legitimate and inoffensive conduct and speech. That said, the Court notes that contacting individuals who are represented by counsel (as current and former employees of AREH may be) during the course of a litigation can raise significant issues. In addition, it should go without saying any actions that could constitute threats to actual or potential witnesses could raise even graver concerns, as Mr. Simpson's counsel acknowledged during the argument of this motion. For now, the Court will rely on counsel to advise Mr. Simpson on these issues

**158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL**                                      Page 2 of 8
**Motion No. 005**

2 of 8

**ORDERED** that, during the pendency of this action and subject to further order of the Court, Oak representatives Michael Wiener, Kevin Wiener, and Frank van Biesen shall each be permitted to have online viewing access to the Arch Accounts listed on Exhibit A, attached hereto, and shall each be given authorized signer access to make transactions in the Arch Accounts; and Jeffrey Simpson and Jared Chassen, shall cease to have authorized signer access but shall retain viewing access to the Arch Accounts; and all parties must promptly provide any information or documentation requested by First Republic Bank (or its successor in interest) to implement this Order; and it is further

**ORDERED** that, pursuant to CPLR 6312(b), Oak shall be required, within 15 days of the filing of notice of entry of this Order, to cause a duly licensed surety to file an undertaking for costs and damages that may be suffered by Jeffrey Simpson and/or JJ Arch should the preliminary injunction herein ordered be found to have been improvidently granted, in the fixed sum of $250,000.00, failing which the preliminary injunction herein ordered shall dissolve.[2]

---

rather than attempting to incorporate these restrictions – which are imposed by law and carry their own independent consequences – in this Order.  However, the Court reserves judgment on a future motion for injunctive relief if subsequent events give rise to such a motion.

[2] The Court considered the competing proposals for an undertaking and believes $250,000.00 is a reasonable amount in the circumstances.  To be clear, however, the undertaking is solely to protect against injury flowing from the preliminary injunction itself (if later found to have been improvidently granted).  To the extent harm is claimed to result instead from Managing Member conduct that constitutes an independent breach of contract, fiduciary duty, or other viable claim, the harmed parties are not limited to making claims against the undertaking ordered herein.

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL                    Page 3 of 8
Motion No. 005

3 of 8

This constitutes the Decision and Order of the Court.

| 11/22/2023 | | JOEL M. COHEN, J.S.C. |
| --- | --- | --- |
| **DATE** | | |

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | X | GRANTED | | DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | REFERENCE |

**158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL**                    Page 4 of 8
**Motion No.  005**

4 of 8

## EXHIBIT A

CHECKING XXXXXXX5334 5952 BENNER MANAGER LLC
CHECKING XXXXXXX5342 ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX5367 5952 BENNER INVESTOR LLC
CHECKING XXXXXXX1395 ARCH 11 GREENE ST MM LLC
CHECKING XXXXXXX1577 ARCH BUILDERS LLC A DISREGARDED ENTITY OF
ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX1809 ARCH 11 GREENE ST BUILDERS LLC A DISREGARDED
ENTITY OF ARCH REAL ESTATE
HOLDINGS LLC
CHECKING XXXXXXX8449 5401 CALIFORNIA ASSOCIATES LLC
CHECKING XXXXXXX1160 TDRT 11 GREENE STREET LLC
CHECKING XXXXXXX2013 ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX1825 ARCH 45 SAVINGS INVESTORS LLC
CHECKING XXXXXXX1874 ARCH 45 SAVINGS LLC
CHECKING XXXXXXX1924 ARCH 45 SAVINGS MM LLC
CHECKING XXXXXXX1932 45 SAVINGS STREET JV LLC
CHECKING XXXXXXX1973 45 SAVINGS STREET MM LLC
CHECKING XXXXXXX5952 CAMBRIDGE ACQUISITIONS LLC
CHECKING XXXXXXX6075 CAMBRIDGE MEZZ LLC
CHECKING XXXXXXX4165 CAMBRIDGE ACQUISITIONS LLC
CHECKING XXXXXXX4181 CAMBRIDGE ACQUISITIONS LLC
MONEY MARKET CHECKING XXXXXXX3763 CAMBRIDGE ACQUISITIONS LLC
CHECKING XXXXXXX4013 ARCH CAMBRIDGE INVESTORS LLC
CHECKING XXXXXXX4154 ARCH ADVISORS LLC
CHECKING XXXXXXX5160 ARCH ASSET MANAGEMENT LLC
CHECKING XXXXXXX7952 ARCH ADVISORS LLC
CHECKING XXXXXXX6568 MIDTOWN OAKS JV LLC
CHECKING XXXXXXX6626 MIDTOWN OAKS MM JV LLC
CHECKING XXXXXXX9491 CAMELOT CLASS B JV LLC
CHECKING XXXXXXX9509 CAMELOT JV LLC
CHECKING XXXXXXX9525 CAMELOT MM JV LLC
CHECKING XXXXXXX0673 ARCH PROPERTY MANAGEMENT LLC
CHECKING XXXXXXX0764 MMSS LLC
CHECKING XXXXXXX7456 NCSC JV LLC
CHECKING XXXXXXX7464 NCSC MM JV LLC
MONEY MARKET CHECKING XXXXXXX9197 FRANCISCAN PROPERTY OWNER LLC
MONEY MARKET CHECKING XXXXXXX9346 ABNER PROPERTY OWNER LLC
MONEY MARKET CHECKING XXXXXXX8508 OAK GROVE PROPERTY OWNER LLC
CHECKING XXXXXXX5724 LAKESTAR CAMBRIDGE LLC
CHECKING XXXXXXX5799 ARCH SLOPE CAMBRIDGE LLC
CHECKING XXXXXXX5823 ARCH SLOPE CAMBRIDGE MM LLC
CHECKING XXXXXXX5872 ARCH CAMBRIDGE MM LLC
CHECKING XXXXXXX5948 102-02 PARTNERS CAMBRIDGE LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL    Page 5 of 8
Motion No. 005

5 of 8

CHECKING XXXXXXX6003 4690 ORACLE INVESTORS LLC
CHECKING XXXXXXX0122 ARCH BUILDERS LLC A DISREGARDED ENTITY OF
ARCH REAL ESTATE HOLDINGS LLC
CHECKING XXXXXXX6194 ARCH PROPERTY MANAGEMENT LLC
CHECKING XXXXXXX2411 ONE BROWN JV LLC
CHECKING XXXXXXX2429 ONE BROWN MM JV LLC
CHECKING XXXXXXX6016 1 BROWN STREET ASSOCIATES LP AND 1 BROWN
STREET OWNER LLC (DACA)
CHECKING XXXXXXX6024 1 BROWN STREET ASSOCIATES LP
CHECKING XXXXXXX6032 1 BROWN STREET ASSOCIATES LP
CHECKING XXXXXXX4607 RIDGEWOOD TOWER LLC
CHECKING XXXXXXX4110 MYRTLE POINT CM LLC
CHECKING XXXXXXX4243 MYRTLE POINT JV LLC
CHECKING XXXXXXX4458 MYRTLE POINT MM JV LLC
CHECKING XXXXXXX5413 DRAKE ARCH BIRMINGHAM 1 LLC
CHECKING XXXXXXX5470 PEBBLE CREEK BORROWER LLC
CHECKING XXXXXXX5553 PEBBLE CREEK MM JV LLC
CHECKING XXXXXXX0862 PEBBLE CREEK BORROWER LLC
CHECKING XXXXXXX0896 PEBBLE CREEK BORROWER LLC
CHECKING XXXXXXX4826 2501 VENTURES OP CO I LLC
CHECKING XXXXXXX1846 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0744 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0785 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0793 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0801 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0843 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0884 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0918 HAMR BORROWER 3 LLC
CHECKING XXXXXXX0942 HAMR BORROWER 3 LLC (DEPOSIT ACCOUNT
CONTROL AGREEMENT)
CHECKING XXXXXXX2326 ARCH DEVELOPERS LLC
CHECKING XXXXXXX3294 2501 ARCH LLC
CHECKING XXXXXXX3351 2501 JV LLC
CHECKING XXXXXXX1005 3820 1ST OWNER LLC
CHECKING XXXXXXX1044 3820 1ST OWNER LLC
CHECKING XXXXXXX1336 3504 12TH OWNER LLC
CHECKING XXXXXXX5987 3504 12TH OWNER LLC (DEPOSIT ACCOUNT CONTROL
AGREEMENT)
CHECKING XXXXXXX5995 3504 12TH OWNER LLC
CHECKING XXXXXXX1203 235 JAMES OWNER LLC
CHECKING XXXXXXX1810 235 JAMES OWNER LLC
CHECKING XXXXXXX1054 DRAKE ARCH TUSCALOOSA 1 LLC
CHECKING XXXXXXX0019 ARCH TUSCALOOSA MM LLC
CHECKING XXXXXXX7278 2501 BISCAYNE PROPERTY OWNER LLC
CHECKING XXXXXXX2373 ARCH PROPERTY HOLDINGS 2 LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL          Page 6 of 8
Motion No. 005

6 of 8

CHECKING XXXXXXX2418 DRAKE ARCH COLUMBIA 1 LLC

CHECKING XXXXXXX2475 COLUMBIA MM JV LLC

CHECKING XXXXXXX8438 9 VANDAM JV LLC

CHECKING XXXXXXX8776 9 VANDAM OWNER LLC

CHECKING XXXXXXX6402 HAMR BORROWER 3 LLC

CHECKING XXXXXXX0347 3504 12TH OWNER LLC

CHECKING XXXXXXX8537 9 VANDAM MM JV LLC

CHECKING XXXXXXX2060 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2102 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2128 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2151 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2169 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2177 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2185 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2201 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2219 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2235 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2045 1700 ARCH LLC

CHECKING XXXXXXX9537 CENTER POINT BORROWER 1 LLC

CHECKING XXXXXXX1409 CENTER POINT BORROWER 1 LLC (OPERATING - CAPEX)

CHECKING XXXXXXX1417 CENTER POINT BORROWER 1 LLC (OPERATING - RENT)

CHECKING XXXXXXX1540 CENTER POINT BORROWER 1 LLC (SECURITY DEPOSIT)

CHECKING XXXXXXX9636 CENTER POINT BORROWER 2 LLC

CHECKING XXXXXXX0154 CENTER POINT BORROWER 2 LLC (SECURITY DEPOSIT ACCOUNT)

CHECKING XXXXXXX0188 CENTER POINT BORROWER 2 LLC (OPERATING - RENT)

CHECKING XXXXXXX0220 CENTER POINT BORROWER 3 LLC

CHECKING XXXXXXX6215 CENTER POINT BORROWER 3 LLC (OPERATING ACCOUNT - RENT)

CHECKING XXXXXXX6223 CENTER POINT BORROWER 3 LLC (SECURITY DEPOSIT ACCOUNT)

CHECKING XXXXXXX5922 CAMELOT 3 LLC

CHECKING XXXXXXX5930 CAMELOT HOLDINGS JV 2 LLC

CHECKING XXXXXXX5948 CAMELOT JV 2 LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL          Page 7 of 8
Motion No. 005

7 of 8

CHECKING XXXXXXX5963 CAMELOT MM JV 2 LLC
CHECKING XXXXXXX5971 CAMELOT MM JV 3 LLC
CHECKING XXXXXXX5989 NCSC JV 2 LLC
CHECKING XXXXXXX5997 NCSC MM JV 2 LLC
CHECKING XXXXXXX6003 MIDTOWN OAKS MM JV 2 LLC
CHECKING XXXXXXX6011 MIDTOWN OAKS JV 2 LLC
CHECKING XXXXXXX4703 9 VANDAM BORROWER 2 LLC
CHECKING XXXXXXX6583 88 ARCH LLC
CHECKING XXXXXXX2053 9 VANDAM LP JV LLC
CHECKING XXXXXXX2460 1580 NOSTRAND LLC
CHECKING XXXXXXX1303 ARCH NOSTRAND MM LLC
CHECKING XXXXXXX8400 88 TOWER LLC
CHECKING XXXXXXX0767 88 TOWER LLC
CHECKING XXXXXXX0495 CONSTRUCTION SERVICES AND SOLUTIONS LLC
CHECKING XXXXXXX5316 88 TOWER LLC (DACA ACCOUNT)
CHECKING XXXXXXX0751 TOWER OWNER TWO LLC
CHECKING XXXXXXX7223 ORE LIVING II LLC
CHECKING XXXXXXX6075 ARCH NOSTRAND LLC
CHECKING XXXXXXX6688 3200 N HAVERHILL BORROWER LLC
CHECKING XXXXXXX3516 3200 N HAVERHILL BORROWER LLC

158055/2023   SIMPSON, JEFFREY ET AL vs. CHASSEN, JARED ET AL                    Page 8 of 8
Motion No.  005

8 of 8

**Exhibit I**

| | |
|---|---|
| **From:** | Gerald Sammarco[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=978D9D4FA6D141D190A83BF66 A5EC24D-9B2F7B37-F6] |
| **Sent:** | Thur 7/13/2023 10:48:04 PM (UTC) |
| **To:** | Jared Chassen[jchassen@archcre.com]; Jeffrey Simpson[jsimpson@archcre.com] |
| **Subject:** | Re: Draft Myrtle State of Affairs - R1 |

**Base Building Financial & Legal**

- Approximately 50 vendors are active/open with current balances due totaling approximately $9.5M
- Hard costs to complete, including open balances, for the base building and commitments to complete current tenant improvements total approximately $13M looking forward per the latest May 2023 budget.
- Of the $9.5M current due for open vendors' work and material in place, approximately $7.5M is over 30 days with some open balances aging up to 6 Months.
- Of the 50 vendors, approximately 24 vendors are on a weekly follow up basis looking for updates on payments that are aging beyond 2 months. 12-15 of these vendors follow up on a daily basis, by phone/text/email seeking at least partial payment towards the oldest balances. Numerous in-person debates have escalated to verbal altercations with multiple staff members.
- Of the 50 vendors, 10 have initiated legal action or have indicated intention to initiate legal action towards their open balances.
- One recent vendor, Reliable Plumbing, had released a lien placed on the property in exchange for a closeout/termination agreement that included future milestone payments towards their reduced settlement balance. The next installment payment of $200k is due July 15 with two subsequent smaller payments due behind it on August 15 and September 15. Failure to pay the milestone payments may result in our legal default of the agreement, thus nullifying our negotiated final closeout amount. Reliable has indicated that they intend to replace their lien on the property swiftly pending any late payments for the full amount due.
- One new lien in the amount of $286k has been recently placed on the property by a lower-tier vendor of a subcontractor, Core Glazing, that was closed out and is currently being handled by our attorney that helped to finalize the closeout of the subcontractor responsible. In the closeout agreement with Core Glazing, Arch had agreed to pay their open vendors' accounts directly that were outside of the aforementioned vendor's lien in the amount of $237k. This agreement was finalized on June 2 and Arch has not been able to complete the vendors' payments to date putting additional liens at risk from the 3 vendors included in the closeout agreement.
- Manpower has fell from its peak of 137 workers in Q2 2023 to the recent daily average of 38 workers between Arch and its respective subcontractors.

**Burlington**
- Burlington delivery of the improved spaces in the cellar and 3rd floor areas in their lease are due for delivery/punchlist commencement on 7/21/23 per recent renegotiations.
- Burlington-related subcontractors and suppliers, represented in the values above, account for approximately $500k of the open balances in question.
- Total commitments through completion of the direct costs for the Burlington spaces, including the open balances, are approximately $1M
- Indirect subcontractors that provide necessary services to the Burlington space that are indirectly impacting the ability to deliver all common areas and services to the tenant, such as elevators, mechanical, electrical, fire alarm and plumbing, have open balances, included above, totaling approximately $3M
- Completion of the work is not only impacting physical delivery of a finished space, but also legal occupancy of the space, required by the Lease.

**Target**
- Delivery of the white-box spaces on the second floor and related common areas are past due for delivery. Recent attempts to work through the issues has found Arch debating solely against what the Lease requirements are for delivery to no resolution.

• The entitlements that Arch is required to provide to Target as part of the Lease, specifically building department temporary certificate of occupancy (TCO) for the parking areas and the FDNY letter of acceptance have not been delivered per Lease or per tenant's requirements.

• Indirect subcontractors that provide necessary services to the Target space that are indirectly impacting the ability to deliver the aforementioned entitlements, specifically in common areas and services to the tenant are similar to the vendors mentioned above in the Burlington section: elevators, electrical, fire alarm, mechanical and plumbing.

**Other Key Constraints Affecting Overall Project Delivery**

• Prior developer's business activities prior to Arch's involvement in the project, unbeknownst to Arch, have resulted in staggering debts, multiple mechanic's liens and one legal judgement against the property. Two of the vendors impacted in this situation continue to remain working on the project, specifically our Mechanical Engineer and Structural Engineer of record. This has produced numerous challenges, directly and indirectly with our lender. More importantly, the involvement of these two engineering firms creates for a slow, tense working arrangement for normal activities and a regular conversation about our ability to work beyond these open debts. Resolution of these matters, legally or financially, need to take place in order to finalize delivery of the project as we will need the engineering teams to provide a final sign-off in some capacity before we are finished.

• Sewer connections, permitted by the NYC Department of Environmental Protection, are currently constrained by the ability to produce a 99 year ground lease of the "Stahl" related areas along Myrtle Avenue. This is being attempted to be resolved in parallel through our engineering efforts to pursue permits otherwise through different channels. All being met with conflict and unique challenges. Inability to deliver a sewer connection prior to any tenant's schedule occupancy of their space would cease our ability to deliver the space appropriately. Navigation through the hurdles that this entails is mostly assisted by our aforementioned Mechanical Engineer.

• Permanent power for the project was severely under-engineered prior to Arch's involvement in the project. Once commercial leasing and commercial tenant's requirements were accurately calculated in Q1 2023, the process to pursue the appropriate amount of energy delivery for the property began with the historically slow-moving, bureaucratic agency, being Con Edison. This critical path item has been subsidized with temporary electrical connections. However, full occupancy of all residential and commercial spaces cannot begin until power is fully energized to the required capacities. Although this is on schedule for Q3 2023, we are at the mercy of Con Edison. Navigation through the hurdles that this entails is mostly assisted by our aforementioned Mechanical Engineer.

• Natural Gas delivery and final developer's agreements with the provider, National Grid, were not finalized until Q2 2023. National Grid has recently initiated their infrastructure work in the surrounding streets to deliver high-pressure gas to the site. However, despite the upfront delays, some of the aforementioned constraints, specifically plumbing and fire alarm, may impact our ability to receive the utility connections upon National Grid's timeline. This would impact the delivery of the residential component of the building and any future commercial tenants requiring gas for kitchen operations. Navigation through the hurdles that this entails is mostly assisted by our aforementioned Mechanical Engineer.

• NYC Department of Buildings placed an audit on the project's design in late 2022 for compliance with the governing energy code to which the building must comply. This unfortunate random audit has disrupted our design and inspection processes and may ultimately affect subsequent TCO's of the building should the audit not conclude promptly. Our architect and aforementioned engineering teams are working on and responding to all comments and objections actively; however, this is traditionally a tedious process that does not go away without tremendous focus and effort.

**GERALD SAMMARCO**

Director of Special Projects

—

**P** 646.418.0820

gsammarco@archcobuilders.com | archcobuilders.com

88 University Place, 2nd Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**Exhibit J**

| | |
|---|---|
| **From:** | jsimpson001@icloud.com[jsimpson001@icloud.com] |
| **Sent:** | Thur 12/14/2023 3:19:12 AM (UTC) |
| **To:** | 'Nagi, Jason'[Jason.Nagi@offitkurman.com]; 'Steve Altman'[steve@commercialtriallawyer.com] |
| **Subject:** | myrtle point with madison by july |

And this was July

---

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Monday, July 10, 2023 3:41 PM
**To:** Y. David Scharf <dscharf@morrisoncohen.com>; Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Tristan Last <tlast@archcre.com>; Josh Zegen <josh@madisonrealtycapital.com>; Jared Chassen <jchassen@archcre.com>; mwiener@35oak.com; fvanbiesen <fvanbiesen@35oak.com>; David Baharestani <DBaharestani@madisonrealtycapital.com>; Matthew Budofsky <matthew.budofsky@kandfllp.com>
**Subject:** RE: Proposal - FOR SETTLEMENT PURPOSES PURSUANT TO PNA

We are working through a few issues and hope to have a draft to you by tomorrow.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 243 of 409

**From:** Y. David Scharf <dscharf@morrisoncohen.com>
**Sent:** Monday, July 10, 2023 1:44 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Tristan Last <tlast@archcre.com>; Josh Zegen <josh@madisonrealtycapital.com>; Jared Chassen <jchassen@archcre.com>; mwiener@35oak.com; fvanbiesen <fvanbiesen@35oak.com>; David Baharestani <DBaharestani@madisonrealtycapital.com>
**Subject:** RE: Proposal - FOR SETTLEMENT PURPOSES PURSUANT TO PNA

**\*\* EXTERNAL EMAIL \*\***

Jerry, I am reaching out not in accusatory or provocative way to ask where things stand as this project is going to die on the vine. Please update us. We said yes. We said yes in June when getting current was only 2 months and now in July when coming current means three months. It's almost August. Is there anything I can do on my side of legal to move this along.

**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 |C: 917.754.0484 |F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Thursday, July 6, 2023 7:53 PM
**To:** Y. David Scharf <dscharf@morrisoncohen.com>
**Cc:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Tristan Last <tlast@archcre.com>; Josh Zegen <josh@madisonrealtycapital.com>; Jared Chassen <jchassen@archcre.com>; mwiener@35oak.com; fvanbiesen <fvanbiesen@35oak.com>; David Baharestani <DBaharestani@madisonrealtycapital.com>
**Subject:** Re: Proposal - FOR SETTLEMENT PURPOSES PURSUANT TO PNA

Thanks Jerry and David.  Arch (and Oak) are in agreement on funding the 3 months interest below

instead of the 2 we proposed, so long the rest falls inline.


JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone


On Jul 6, 2023, at 7:47 PM, Y. David Scharf <dscharf@morrisoncohen.com> wrote:

 Jerry. How soon can you get the documents to us. There is a lot that is ambiguous esp the timing of getting funds flowing. When can get that information and doc to review.


**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 |C: 917.754.0484 |F: 917.522.3104
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn
**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com


On Jul 6, 2023, at 5:57 PM, Jerry Feuerstein <jfeuerstein@kandfllp.com> wrote:

**CAUTION:** External sender. Verify before continuing.


Below are our responses.


All –

Thank you for your time this week.  Please see below for our updated

proposal:

1. Madison will forbear until December 31, 2023 subject to the conditions set forth in this email.

AGREED

2. Upon execution of the forbearance agreement the Borrower will make the loan current with payments that were due on May 1, 2023 and June 1, 2023 (~$2mm).

UPON EXECUTION OF THE FORBEARANCE, BORROWER WILL MAKE THE LOAN CURRENT WITH THE PAYMENTS THAT WERE DUE ON MAY 1, 2023, JUNE 1, 2023 AND JULY 1, 2023- PLEASE NOTE THAT IF NO PAYMENTS ARE BEING MADE IN THE FUTURE DURING THE FORBEARANCE PERIOD, THE LOAN NEEDS TO BE MADE CURRENT NOW

3. Upon the execution of the forbearance agreement, Lender will fund $2.6mm, holding back $____ for the new judgement.

WILL BE FUNDED UPON EXEUCTION OF THE FORBEARANCE AGREEMENT AND SATISFACTION OF ALL CONDITIONS TO EXECUTION.

4. Lender will fund half of the loan balance remaining within 14 days of the execution of the forbearance agreement subject to Borrower providing accounting back up of at least $3mm contributed since April 1, 2023 and the other half of the remaining loan balance within 30 days of execution of the forbearance agreement

FUNDING STRUCTURING AND MECHANICS BEING DISUSSED INTERNALLY

5. All outstanding real estate taxes will be paid upon the execution of the forbearance agreement.

AGREED

6.  Escrow reserves for liens shall be reduced to 150%.

DISCUSSING WITH TITLE COMPANY

7.  Provided a termination event has not occurred, if the property
has a temporary certificate of occupancy for 75% of the residential
units, Target is in possession of the property and leasing of the
market and affordable units has commenced, and interest is trued
up (unless there is an agreement signed with a true third party that
would take out Madison) by December 31, 2023, the forbearance
period may be extended until March 31, 2024.  Upon meeting the
hurdles above, the completion guaranty will be released.  Borrower
will sign a deed in a box in exchange for a waiver and release in
favor of Borrower should Lender not be taken out by March 31,
2024.

EXTENSION IS CONDITIONED UPON ALL PAYMENTS BEING PAID
CURRENT.  TERMS OF THE DEED IN THE BOX AND RELEASE TO BE
RESOLVED WITH COUNSEL BUT ALL GUARANTEES WILL NOT BE
RELEASED UNLESS THE DEED IS RELEASED.   IF AN EARLIER
TERMINATION EVENT DEED CAN BE RELEASED.

8.  Notwithstanding the above, Borrower can make one additional
interest payment by November 15, 2023 to extend all of the dates
described herein by 1 month.

AGREED

9.  The forbearance agreement shall contain customary provisions
including a general release in favor of the lenders and reaffirmation
of the loan documents and acknowledgement of no outstanding
defaults on any potential legacy foot-faults by both Borrower and
the 35 Oak.

AGREED

After the last req funding (req 44) there was ~$12.6mm of undrawn funds. We are requesting that $2.6mm be funded towards hard costs upon execution of the forbearance, $5mm be advanced 14 days from the date of execution (with proof of the prior $3mm going in), and the remaining $5mm to be advanced 30 days from the date of execution. A copy of the latest budget is attached.

SEE ABOVE

A response to the proposed forbearance terms on Nostrand will follow in the coming days.


PLEASE SEND



Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you. IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.


THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Tristan Last <tlast@archcre.com>

**Sent:** Friday, June 30, 2023 7:14 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Y. David Scharf <dscharf@morrisoncohen.com>; Josh Zegen <josh@madisonrealtycapital.com>; Jared Chassen <jchassen@archcre.com>; mwiener@35oak.com; fvanbiesen <fvanbiesen@35oak.com>
**Subject:** RE: Proposal


**\*\* EXTERNAL EMAIL \*\***

All –

Thank you for your time this week.  Please see below for our updated proposal:

    1.  Madison will forbear until December 31, 2023 subject to the conditions set forth in this email.
    2.  Upon execution of the forbearance agreement the Borrower will make the loan current with payments that were due on May 1, 2023 and June 1, 2023 (~$2mm).
    3.  Upon the execution of the forbearance agreement, Lender will fund $2.6mm, holding back $____ for the new judgement.
    4.  Lender will fund half of the loan balance remaining within 14 days of the execution of the forbearance agreement subject to Borrower providing accounting back up of at least $3mm contributed since April 1, 2023 and the other half of the remaining loan balance within 30 days of execution of the forbearance agreement
    5.  All outstanding real estate taxes will be paid upon the execution of the forbearance agreement.
    6.  Escrow reserves for liens shall be reduced to 150%.
    7.  Provided a termination event has not occurred, if the property has a temporary certificate of occupancy for 75% of the residential units, Target is in possession of the property and leasing of the market and affordable units has commenced, and interest is trued up (unless there is an agreement signed with a true third party that would take out Madison) by December 31, 2023, the forbearance period may be extended until March 31, 2024.  Upon meeting the hurdles above, the completion guaranty will be released.  Borrower will sign a deed in a box in exchange for a waiver and release in favor of Borrower should Lender not be taken out by March 31, 2024.
    8.  Notwithstanding the above, Borrower can make one additional interest payment by November 15, 2023 to extend all of the dates described herein by 1 month.
    9.  The forbearance agreement shall contain customary provisions including a general release in favor of the lenders and reaffirmation of the loan documents and acknowledgement of no outstanding defaults on any potential legacy foot-faults by both Borrower and

the 35 Oak.

After the last req funding (req 44) there was ~$12.6mm of undrawn funds.  We are requesting that $2.6mm be funded towards hard costs upon execution of the forbearance,  $5mm be advanced 14 days from the date of execution (with proof of the prior $3mm going in), and the remaining $5mm to be advanced 30 days from the date of execution.  A copy of the latest budget is attached.

A response to the proposed forbearance terms on Nostrand will follow in the coming days.

Best,

**TRISTAN LAST**
Managing Director
—
**D** 646.854.7102 | **C** 347.931.2594
tlast@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*

<image001.png>

---

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Thursday, June 29, 2023 5:30 AM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Y. David Scharf <dscharf@morrisoncohen.com>; Josh Zegen <josh@madisonrealtycapital.com>; Jared Chassen <jchassen@archcre.com>; Tristan Last <tlast@archcre.com>; mwiener@35oak.com; fvanbiesen <fvanbiesen@35oak.com>
**Subject:** Re: Proposal


Yes
It's a zoom call


JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Jun 29, 2023, at 12:59 AM, Jerry Feuerstein <jfeuerstein@kandfllp.com> wrote:

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 250 of 409

Are we on for 10:00?

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

On Jun 28, 2023, at 8:28 PM, Y. David Scharf
<dscharf@morrisoncohen.com> wrote:

** EXTERNAL EMAIL **

Will put all aside for this and be available.

**Y. David Scharf**
*Chair and Co-Managing Partner*
T: 212.735.8604 |C: 917.754.0484 |F: 917.522.31
04
dscharf@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

On Jun 28, 2023, at 7:55 PM,
Jeffrey Simpson
<jsimpson@archcre.com>
wrote:

**CAUTION:** External sender. Verify before continuing.

Good here.  Let me see if the
others can but 35 Oak said they
will be available.

YDS?

JEFFREY SIMPSON

Managing Partner | Arch Companies

D  646.854.6810 | C  646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

> On Jun 28, 2023, at 7:38 PM, Josh Zegen <josh@madisonrealtycapital.com> wrote:
>
> How's 10am?
>
> Sent from my iPhone
>
>> On Jun 28, 2023, at 7:31 PM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

**WA**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 252 of 409

**RNING: This email originated outside of Madison Realty Capital.**

Hey Josh and Jerry, I don't mean to nag but can we please schedule the call for tomorrow as noted below? I am worri

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 533

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 253 of 409

ed we are going to lose people for the holiday and everyone on this side is motivated to bring closure to both deals with Madison.

---

**From:** Jeffrey Simpson
**Sent:** Wednesday, June 28, 2023 2:47 PM
**To:** Josh Zege

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM

INDEX NO. 158055/2023

NYSCEF DOC. NO. 533

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 254 of 409

n <[josh@madisonrealtycapital.com](mailto:josh@madisonrealtycapital.com)>; Jared Chassen <[jchassen@archcre.com](mailto:jchassen@archcre.com)>

**Cc:** Jerold Feuerstein <[jfeuerstein@kandflp.com](mailto:jfeuerstein@kandflp.com)>; Tristan Last <[tlast@archcre.com](mailto:tlast@archcre.com)>; [dscharf@morrisoncohen.com](mailto:dscharf@morrisoncohen.com); [mwiener@35](mailto:mwiener@35)

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM

INDEX NO. 158055/2023

NYSCEF DOC. NO. 533

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document

RECEIVED NYSCEF: 01/29/2024

Pg 255 of 409

[oak.com](http://oak.com); [fvanbiesen@35oak.com](mailto:fvanbiesen@35oak.com)

**Subject:** RE: Proposal

I apologize, I did CC Michael Wiener and Frank Van Biesen from 35 Oak on the last email. We will introduce everyone on the call.

Than

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM

INDEX NO. 158055/2023

NYSCEF DOC. NO. 533

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document

Pg 256 of 409

RECEIVED NYSCEF: 01/29/2024

k
you.

**From
:**
Jeffr
ey
Simp
son
**Sent:**
Wed
nesd
ay,
June
28,
2023
2:45
PM
**To:**
Josh
Zege
n
<jos
h@
madi
sonr
ealty
capit
al.co
m>;
Jared
Chas
sen
<jcha
ssen
@arc
hcre.
com
>
**Cc:**
Jerol
d
Feue
rstei
n
<jfeu
erste
in@k

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 333
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 01/29/2024
Pg 257 of 409

andfllp.com>; Tristan Last <tlast@archcre.com>; dscharf@morrisoncohen.com; mwiener@35oak.com; fvanbiesen@35oak.com

**Subject:** RE: Proposal

Hi Josh,

Thank you for sharing the below, we

appreciate it and it seems like we are all heading in the right direction. And thanks for meeting last Friday and turning this around so quickly.

We did have several conversations with our partner,

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 259 of 409

35 Oak, regarding these next steps. They would like to have a conversation with you and us (with Jerry and David, I presume) to discuss next steps. They haven't reviewed this yet but I know that they will

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 01/29/2024
Pg 260 of 409

take a look today and I would like to see if tomorrow will be possible for this meeting? The hope is to resolve on both matters very quickly, fund the dollars needed and get both of these on track imminentl

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 01/29/2024
Pg 261 of 409

y. The BK conversations regarding Nostrand are very active and we believe that process can be initiated quickly too. David will share any details with Jerry on that call as well.

Thanks,

Jeff

---

**From**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM

NYSCEF DOC. NO. 533

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 262 of 409

---

: Josh Zegen <josh@madisonrealtycapital.com>

**Sent:** Wednesday, June 28, 2023 2:13 PM

**To:** Jared Chassen <jchassen@archcre.com>; Jeffrey Simpson <jsimpson@archcre.com>

**Cc:** Jerold Feuerstein <jfeu

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM

NYSCEF DOC. NO. 533

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 263 of 409

[erstein@kandfllp.com](mailto:erstein@kandfllp.com)>

**Subject:** Fwd: Proposal

Jeff and Jared, see below in response to your request.

Talk soon,

Josh

Sent from my iPhone

Begin forwarded message:

**From:** Jerry Feuerstein <[jfeuerstein@kandfllp.com](mailto:jfeuerstein@kandfllp.com)>
**Date:** June 28, 2023 at 1:24:59 PM EDT

**To:** Josh Zegen
<josh@madisonrealtycapital.com>
**Subject: FW: Proposal**

**WARNING: This email originated outside of Madison Realty Capital.**

FOR SETTLEMENT PURPOSES- SUBJECT TO THE APPLICABLE PRE-NEGOTIATION LETTERS.  NOT BINDING UNTIL THERE IS A FULLY EXECUTED AGREEMENT

The proposed forbearance terms on Ridgewood are as follows:

1.  Madison will forbear until December 31, 2023 subject to the conditions set forth in this email.
2.  Upon execution of the forbearance agreement the Borrower will make the payments that were due on May 1, 2023 and June 1, 2023.
3.  Commencing on August 1, 2023, Borrower will make monthly payment that was due on July 1, 2023 and on September 1, 2023 the borrower shall make the monthly payment that was due on August 1, 2023.
4.  On October 1, 2023, the borrower shall make the loan current by making the payment that was due on September 1, 2023 and the October 1, 2023 payment.  Commencing November 1, 2023, the Borrower will make regular interest payments.
5.  Upon the execution of the forbearance agreement, Lender will fund Req. 46, holding back $____ for the new judgement.
6.  Lender will fund Req. 48 (Pencil Req attached) within 14 days of the execution of the forbearance agreement subject to Borrower providing accounting back up of at least $3mm contributed since April 1, 2023
7.  All outstanding real estate taxes will be paid upon the execution of the forbearance agreement.
8.  Escrow reserves for liens shall be reduced to 150%
9.  Provided a termination event has not

occurred, if the property has a certificate of occupancy for 75% of the residential units, Target is in possession of the property and leasing of the market and affordable units has commenced by December 31, 2023, the forbearance period may be extended until March 31, 2024.

10. The forbearance agreement shall contain customary provisions including a general release in favor of the lenders and reaffirmation of the loan documents by both Borrower and the Guarantors.

The proposed forbearance terms on Nostrand are as follows:

1. Madison will forbear until March 1, 2024

2. Borrower will make one interest payment each quarter. Upon the execution of the forbearance agreement, Borrower will pay 3 interest payments with the next quarterly payment due on September 1, 2023. All other interest payments will be deferred until the earlier of (i) a termination event under the forbearance agreement, (iii) the repayment of the loan (ii) March 1, 2024.

3. Upon the property converting to REO, Borrower will commence making monthly interest payments.

4. The forbearance agreement shall contain customary provisions including a general release in favor of the lenders and reaffirmation of the loan documents by both Borrower and the Guarantors.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you. IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Josh Zegen <josh@madisonrealtycapital.com>
**Sent:** Tuesday, June 27, 2023 6:16 PM
**To:** Jared Chassen <jchassen@archcre.com>
**Cc:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Subject:** Re: Proposal

**\*\* EXTERNAL EMAIL \*\***

Jerry is turning this,  will have back in the am

Sent from my iPhone

On Jun 27, 2023, at 6:10 PM, Jared Chassen <jchassen@archcre.com> wrote:

**WARNING: This email originated outside of Madison Realty Capital.**

Will you be able to send your mark up today? I really need to get cash in asap.

JARED CHASSEN
Partner | Arch Companies
D  646.854.1947 | C  646.634.9955
jchassen@archcre.com | archcorealestate.com [archcorealestate.com]
15 West 27th Street, 6th Floor, New York, NY 10001

On Jun 26, 2023, at 9:27 AM, Jared Chassen <jchassen@archcre.com> wrote:

I hope you had a nice weekend, please let me know what I can do to help move this forward, I really need to get the job moving ASAP early this week. Thank you for your time and consideration again.

**JARED CHASSEN**
Partner
—

**D** 646.854.1947 | **C** 646.634.9955
jchassen@archcre.com |
archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*
<image001.png>

**From:** Jared Chassen
**Sent:** Friday, June 23, 2023 5:47 PM
**To:** Josh Zegen <josh@madisonrealtycapital.com>
**Subject:** Proposal

Thank you for today.

Please see below for a proposal for a 90-day forbearance at Myrtle:

1. Simple forbearance docs
2. Lender will fund Req. 46 as of the day of agreement holding back $___ for the new judgement subject to the equity funding 1 month of interest
3. Lender will fund Req. 48 (Pencil Req attached) within 14 days of the agreement subject to Borrower providing accounting back up of at least $3mm contributed since April 1, 2023
4. All subsequent Reqs will be funded within 14 days of submission
5. Borrower shall deliver Lender with the executed equity recap and debt recap
6. Soft costs will continue to be funded by equity
7. No default interest shall accrue during this 90 day period
8. 60 days from the agreement the borrower shall pay 1 month interest
9. RET will be allowed to age as payable through the forbearance period
10. Escrow reserves for liens shall be reduced to 150%

There will be a prebaked extension option subject to the following hurdles:
1. The building has residential TCO on at least 75% of the residential units
2. Leasing of the market and affordable units has commenced
3. Target in possession of its space
4. Binding LOI on any potential restructuring between 35 Oak and

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 535
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 269 of 409

Doug Propp are executed

5.  Borrower funds $5mm less any funds deployed during the forbearance period (anticipated to be $1mm-$2mm based on the above) and amounts required to be funded to true up any outstanding debt service [This will be funded by Oak]

Key Terms of Extension Option

1.  12 month term with one 6-month extension option subject only to TCO for the entire building

2.  Rate: S+325 subject to a floor of 7.75%

3.  No Fees

4.  Borrower pays for legal costs

5.  Carry Guaranty increased to cover any remaining TI / LC; completion guaranty to go away

6.  No minimum interest or carry reserves hold backs

7.  RET will be made current upon the exercise of the Extension Option

8.  Equity funded as part of exercising the extension option shall be allowed to be used for any cost at the property (TI/LC, OpEx, Debt Service, LL Work, Punchlist)

9.  If not achieved in #4 above, the TICs will be collapsed and upon such collapse, Lender shall increase proceeds by $X mm which shall be allowed to be distributed to Doug Propp

JARED CHASSEN

Partner | Arch Companies

D 646.854.1947 | C 646.634.9955

jchassen@archcre.com | archcorealestate.com [archcorealestate.com]

15 West 27th Street, 6th Floor, New York, NY 10001

This message, including any attachments, may contain privileged and confidential information and is intended only for the addressee(s). If you are not the intended addressee, you are prohibited from reviewing, copying, disclosing, distributing, altering or using this information. The sender does not waive any of its rights, privileges or other protections with respect to this information. Please notify the sender immediately by e-mail if you received this message in error, delete the e-mail as well as any attachments, and destroy all hard copies. E-mail transmissions cannot be guaranteed to be secure or without error as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender, therefore, does not accept liability for any errors or omissions in the contents of this message which arise during or as a result of e-mail transmission. This message is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any securities or related financial instruments in any jurisdiction, as an official confirmation of any transaction or as giving investment advice. All e-mail sent to or from this address are subject to retention and review by someone other than the addressee(s). Past performance is not indicative of future results.

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit
http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 533
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 271 of 409

transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

**Exhibit K**

## DECLARATION OF DOUGLAS PROPP

1.      I am over eighteen (18) years old and have personal knowledge of the matters discussed in this declaration.

2.      I was the co-founder and CEO of Atlantic Television, a company that provided award-winning camera, lighting and sound crew members to support television production in the United States and Canada.

3.      I have known Jeff Simpson for approximately 15 years and our families live in the same community.  In addition, Arch Real Estate Holdings Inc. ("Arch") was a tenant for three years in a building that my family owned.

4.      In or around August 2021, following the sale of interests in real estate involved with two limited liability companies that I controlled, I sought to reinvest approximately $19 million through a Section 1031 deferred-taxation transaction.

5.      At that time, I spoke with Jeff Simpson who I knew ran a real estate investment company.  Based on our conversations Mr. Simpson understood that I was considering real estate investments and he proposed several that he managed through his association with Arch. I ultimately chose to invest the $19 million in one of the Arch projects that Mr. Simpson was operating and managing -- an Arch-managed investment property through an entity called Myrtle Point MM JV LLC ("Myrtle Point").

6.      I understand that Arch arranged for a construction loan for Myrtle Point in the amount of approximately $100 million ("Construction Loan").  A party that I know as "Oak" is the sole guarantor of the Construction Loan (guarantying both interest and completion), and I am advised that the loan is currently in default.   To the best of my knowledge, I was, and remain, the majority equity interest in Myrtle Point.  The agreement governing my investment in Myrtle

Point specifically provides that I must "consent" to any "Major Decision" and that includes, among other things, any decision to revise, cancel or amend the Construction Loan.

7.      It has come to my attention that, as a result of a court order, Mr. Simpson no longer manages Arch, and that as of October 2023 Arch is managed by Oak, the minority equity holder in Myrtle Point and guarantor for the Construction Loan.

8.      Since the time that Oak gained control of Arch pursuant to the court order, I have had some communications with Arch, both directly with Oak personnel and through respective counsel, concerning the status and future of Myrtle Point and my investment. In the weeks following Oak's appointment as manager of Arch, our communications centered on Oak pursuing plans to reach some agreement with the lender to continue its funding on the Construction Loan, the possibility of additional funding through Oak and whether it could revise its guaranty. My counsel requested current financial information and documentation for an agreement, but it was not provided (we did receive some old financial data); the last inquiry made to Oak's counsel was in mid-November, 2023.

9.      I have been informed by Mr. Simpson that he believes Oak may be currently negotiating with the lender on the Construction Loan to simply "give back the keys" to the Myrtle Point assets in exchange for a release of its guaranty on the $100 million construction, an arrangement that would likely lead to the loss of my entire interest (and investment) in Myrtle Point. If this is true, Oak, in its role as the Managing Member of Arch, may well be putting its own interests ahead of mine. As a layman, it appears to me that Oak is conflicted in the transaction Mr. Simpson has described to me, as the benefits it seeks as guarantor on the Construction Loan would be inconsistent with the fiduciary duties it owes to me as a member/investor.

FILED: NEW YORK COUNTY CLERK 01/29/2024 09:49 AM
NYSCEF DOC. NO. 528
24-10381-lpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 275 of 409
INDEX NO. 158055/2023
RECEIVED NYSCEF: 01/29/2024

10.    It is my understanding that Arch requires my consent for any amendment to the

Construction Loan. Oak, as manager of Arch, has not sought my consent or informed me of

recent negotiations described to me by Mr. Simpson.  My interest in this matter relates

exclusively in protecting my investment, and I fully expect any person or entity charged with

managing Arch to act in accordance with their obligations to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Dated:  New York, New York
January _, 2024

_____  1/23/24
Douglas Propp

**Exhibit L**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 552
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 277 of 409

| | |
|---|---|
| **From:** | Kevin Wiener[kwiener@35oak.com] |
| **Sent:** | Tue 1/2/2024 3:19:50 PM (UTC) |
| **To:** | Jeffrey Simpson[jsimpson001@icloud.com] |
| **Cc:** | jaredchassen@gmail.com[jaredchassen@gmail.com]; Michael Wiener[MWiener@35OAK.com]; Steve Altman[steve@commercialtriallawyer.com] |
| **Subject:** | RE: Columbia Protective Advance Agreement |

Responses below in bold

Sent from my Galaxy

-------- Original message --------
From: Jeffrey Simpson <jsimpson001@icloud.com>
Date: 2024-01-02 4:11 a.m. (GMT-05:00)
To: Kevin Wiener <kwiener@35oak.com>
Cc: jaredchassen@gmail.com, Michael Wiener <MWiener@35OAK.com>, Steve Altman <steve@commercialtriallawyer.com>
Subject: Re: Columbia Protective Advance Agreement

EXTERNAL

[EXTERNAL EMAIL]

I shared a long list of concerns as to why this doesn't work, most importantly it's essentially giving the keys to the lender since there is no remedy for anything that could have gone wrong (inclusive of your improper attempts to take control over Arch, a material adverse change to the guarantor as in the significant amount of contingent liabilities you currently have, and has not found a remedy to resolve) or potentially what will go wrong in the future.  **This isnt giving the keys it's receiving a protective advance to ensure the property can operate since there isn't enough cash flow to cover interest and operating expenses. The lender remains very interested in a workout but they don't trust what the real carry of the property is until there's an independent third party managing it. Drake also wants a third party manager in before they're willing to discuss their participation in a workout.**
Are you now suggesting that Ore Living is going to be managing the assets going forward? Are the funds going to be reimbursing by the affiliated property manager for the rearview mirror or going forward or both?  **Ore Living is remaining property manager until Asset Living comes in (currently targeted for Jan 15). The funds are to reimburse payroll for Nov and Dec and lender has indicated they will also reimburse for Jan payroll until new property manager comes in.**

What happened to the consent regarding the change in property managers that affected two other assets in order to help this one?  **Asset Living appears to be willing to manage Columbia without the other two. We're still proceeding with them for Tuscaloosa but**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 352
INDEX NO. 158055/2023
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 278 of 409

**there's no rush to change managers for Forestdale.**

What is the status of providing Drake with managing member authority on this asset and the other two that was contemplated several months ago? **Drake doesn't seem to be in any particular rush to take over the assets right now.**

After I see the answer to these questions, then we will review the words of the document more carefully.

And no, a simple "approved" from Jared is not acceptable.   I am sure you saw the correspondence that we sent to the Court last week.   If he provides that approval to you and you continue forward without my consent, we will take immediate action to stop you and to notify the other parties in this contemplated transaction why that will not work, of course unless the Court decides otherwise.

All rights reserved.

Jeffrey Simpson

Sent from my iPhone

> On Jan 2, 2024, at 1:29 AM, Kevin Wiener <kwiener@35oak.com> wrote:

> Hi Jeff and Jared,

> Further to the previous email sent in mid-December, I'm attaching the final turn of the letter agreement from the lender as well as the schedule covering the cash needs that lender is advancing funds to pay. There aren't really any major differences from the version circulated a few weeks ago except that it specifically references that part of the advance is to cover payroll incurred by the affiliated property manager.

> Drake has already provided consent to execute.

> Can one of you please confirm by reply email that AREH has JJ's consent to cause the HAMR Borrower entities to enter into the attached protective advance agreement? I'd like to get it executed tomorrow.

> Thanks,

> Kevin

> **From:** Kevin Wiener
> **Sent:** Tuesday, December 12, 2023 12:40 PM

**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>
**Cc:** Steve Altman <steve@commercialtriallawyer.com>; Allen Schwartz <allen@allenschwartzlaw.com>; Leslie Thorne <Leslie.Thorne@haynesboone.com>; Stephen B. Meister <sbm@msf-law.com>
**Subject:** Columbia Protective Advance Agreement


Hi Jeff and Jared,

I'm attaching a copy of a protective advance agreement from the lender on Columbia to get approximately $600k of funding to pay outstanding payables on the property, cover payroll, and allow sufficient time for the new property manager to get put in place. Drake has advised they're not putting in any more funding at this time until the property manager is in and they can figure out if it makes economic sense to continue to invest into this property, and the other investors are not in a position to cover Drake's share of the expenses.

The lender is requiring the borrower to agree to allocate the advance to agreed upon expenses, reaffirm the loan and amounts payable, and waive defences. We do not really see it as feasible to get them to put in these funds without that language in the agreement.

We're getting the schedule and numbers in the attached finalized and a consent put together but in the meantime I wanted you to have the agreement to look over and confirm that you're fine with it.

We do need to move quickly on this as many of the vendors have refused additional work on the property until their payables are paid, which will lead to degradation of the asset.

Let me know if you have any questions or need any additional information.

Thanks,

Kevin

**Exhibit M**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM    INDEX NO. 158055/2023

NYSCEF DOC. NO. 344    24-10381-lpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document    RECEIVED NYSCEF: 01/29/2024

Pg 281 of 409

**BPCRE 2022-FL2, LTD.**
452 Fifth Avenue, 30th Floor
New York, New York 10018

December [\_\_], 2023

**Via Email**

35 OAK HOLDINGS LIMITED
35 Oak Street
Toronto, Ontario M9N 1A1
Attn: Frank van Biesen

Jeffrey Zwick & Associates, P.C.
2329 Nostrand Avenue, Suite 400
Brooklyn, New York 11210
Attn: Ilan Lerman, Esq.

HAMR BORROWER 1 LLC
HAMR BORROWER 2 LLC
HAMR BORROWER 3 LLC
c/o Arch Real Estate Holdings LLC
15 West 27th Street, 6th Floor
New York, New York 10001
Attn: Kevin Wiener and Michael Wiener

Re:   Loan arrangement (the "***Loan***") by and among **HAMR BORROWER 1 LLC**, a Delaware limited liability company ("***Borrower 1***"), **HAMR BORROWER 2 LLC**, a Delaware limited liability company ("***Borrower 2***"), and **HAMR BORROWER 3 LLC**, a Delaware limited liability company ("***Borrower 3***"; and together with Borrower 1 and Borrower 2, individually and collectively, jointly and severally, "***Borrower***"), and **BPCRE 2022-FL2, LTD.**, an exempted company incorporated with limited liability under the laws of Bermuda (as successor-in-interest to WALKER & DUNLOP COMMERCIAL PROPERTY FUNDING, LLC, a Delaware limited liability company, together with its successors and assigns, "***Lender***").

Dear Sir or Madam:

Reference is hereby made in this letter agreement (this "***Agreement***") to that certain Loan Agreement, dated as of April 22, 2021 by and between Borrower and Lender (as amended, modified, supplemented or restated and in effect from time to time, the "***Loan Agreement***" and together any other document executed or delivered in connection with the Loan, as may be amended, modified, supplemented or restated and in effect from time to time, the "***Loan Documents***"). *Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.*

This Agreement is made in connection with the Loan Agreement referenced above and shall constitute a Loan Document.

As described more fully in that certain letter from Lender to the Borrower, dated November 6, 2023 (the "Default Notice"), certain Events of Default have occurred and are continuing under the Loan Agreement (all such existing Events of Default, the "Existing Events of Default").

As a result of the Existing Events of Default, as well as any other Defaults or Events of Default that may exist or hereafter arise, Lender is entitled to exercise any and all rights and remedies under the

Loan Agreement and/or other Loan Documents and Lender is under no obligation to make any further loans, advances or financial accommodations to Borrower pursuant to the Loan Documents.

However, Borrower has advised Lender that funds are required to pay certain costs and expenses of operating, maintaining and managing the Property, including, without limitation, payroll and payroll-related expenses which are being reimbursed to the affiliated management company of the Borrower for costs incurred for the months of November and December 2023, all as more particularly described in detail on Schedule I attached hereto, and Borrower and Guarantor have failed to deposit funds in the Debt Service and Operating Expenses Reserve Account in accordance with the terms and conditions of the Loan Documents sufficient to pay such costs and expenses despite Lender's repeated demands therefor. As such, Lender has deemed it advisable to advance funds in the aggregate amount of $497,851 to pay the existing costs and expenses described on Tab "OUTPUT" of Schedule I in order to protect Lender's rights in and to the Property (such advance being the "Protective Advance"), and has consented to make the Protective Advance directly to the parties identified on said Schedule I,[1] subject to, in all respects, the terms and conditions of this Agreement, the Default Notice and that certain Pre-Negotiation Letter Agreement dated October 30, 2023.

Borrower hereby agrees and acknowledge that the proceeds of the Protective Advance shall be used strictly to pay the costs and expenses described on Schedule I.  Borrower hereby further agrees and acknowledges that Lender shall be under no obligation to make any additional advances and that the decision to fund any additional advances shall be subject to the sole and absolute discretion of Lender. Nothing contained in this Agreement or any delay by Lender in exercising any rights or remedies under the Loan Documents or applicable law with respect to any Defaults or Events of Default: (a) shall constitute:  (i) a modification or an alteration of the terms, conditions or covenants of any of the Loan Documents, all of which remain in full force and effect; (ii) a course of dealing or other basis for altering any rights or obligations of Lender under the Loan Documents or any obligations of Borrower under the Loan Documents or any other contract or instrument; or (iii) a waiver of any Default or Event of Default (including, without limitation, the Existing Events of Default) or a waiver, release or limitation upon Lender's exercise of any of its rights and remedies under the Loan Documents, all of which are hereby expressly reserved; (b) shall confer on Borrower any right to notice or cure periods with respect to any Default or Event of Default under the Loan Documents not expressly set forth in the Loan Documents; or (c) shall relieve or release Borrower in any way from any of their respective duties, obligations, covenants or agreements under the Loan Documents or from the consequences of the Existing Events of Default or any other Defaults or Events of Default that may be declared pursuant to the Loan Documents.  Lender is not obligated to waive the Existing Events of Default or any Default or Event of Default, whether now existing but not yet declared or which may occur after the date of this letter.

Borrower further acknowledges and agrees that the Protective Advance shall be added to the Outstanding Principal Balance and shall constitute part of the Debt, and Borrower shall not take (or encourage any other party to take) any action seeking to invalidate, recharacterize, or otherwise challenge the status of the Protective Advance.

Borrower hereby (i) represents and warrants to Lender that its execution and delivery of this Agreement has been duly authorized, and that the person executing this Agreement on behalf of Borrower is duly authorized to do so, and (ii) acknowledges and agrees that as of the date hereof the total amount due and payable to Lender pursuant to the Loan Documents is $34,270,402.41, which consists of (x) unpaid principal in the amount of $33,721,587.24, (y) accrued interest in the amount of $278,772.81 and (z) default interest through [December 31th, 2023] in the amount of $270,042.36  .

---

[1] TBD if funds will be advanced directly or advanced to Borrower or combination.

48
83-
24
49-
85
82

Borrower hereby represents and warrants that this Agreement, the Loan, and the Loan Documents to which it is a party constitute the legal, valid and binding obligations of Borrower, respectively, enforceable against Borrower in accordance with their respective terms without defense or offset, and Borrower hereby ratifies and confirms all and singular the terms and conditions of the Loan and the Loan Documents to which it is a party evidencing the same, and acknowledges, confirms, and agrees that, except as specifically modified herein, the Loan Agreement and all of the other Loan Documents, and all of the terms and conditions of the Loan, shall remain in full force and effect.

Borrower hereby represents and warrants to Lender that, as of the date hereof, Borrower does not have any offsets, defenses, claims, or counterclaims (i) with respect to the Loan or the Loan Documents or (ii) against Lender or any of its respective officers, directors, employees, attorneys, representatives, predecessors, successors, and assigns with respect to Borrower's liabilities and obligations due and owing to Lender under the Loan Documents and that, to the extent Borrower has or ever had any such offsets, defenses, claims, or counterclaims, Borrower hereby specifically WAIVES AND RELEASES any and all rights to such offsets, defenses, claims, or counterclaims.

Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect and in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provisions of this Agreement.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of choice of laws or conflict of laws.

This Agreement shall be binding upon Borrower and its respective successors and assigns and shall inure to the benefit of Borrower and Lender and their respective successors and assigns.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.  Said counterparts shall constitute but one and the same instrument and shall be binding upon each of the undersigned individually as fully and completely as if all had signed but one instrument and shall be unaffected by the failure of any of the undersigned to execute any or all of said counterparts. Any facsimile or e-mail (in .pdf format) transmittal of original signature versions of this Agreement shall be considered to have the same legal effect as execution and delivery of the original document and shall be treated in all manner and respects as the original document.

Borrower hereby acknowledges and agrees that Lender, in determining whether to enter into this Agreement, is relying upon the representations, warranties acknowledgments and agreements contained herein.

By countersignature of this Agreement, Borrower hereby acknowledges, accepts and agrees to all provisions hereof.


[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]


48
83-
24
49-
85
82

Very truly yours,

**BPCRE 2022-FL2, LTD.**,
a newly formed exempted company incorporated with
limited liability under the laws of Bermuda

By: _____
     Name:
     Title:

cc:    King & Spalding LLP
      1185 Avenue of the Americas
      New York, New York 10036
      Attention: Erik F. Andersen, Esq.

4883-2449-
8582 v.2

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 344
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 285 of 409

**ACKNOWLEDGED, AGREED TO AND ACCEPTED AS OF THE DATE FIRST ABOVE WRITTEN:**

**BORROWER**:

**HAMR BORROWER 1 LLC,**
a Delaware limited liability company

By:_____
Name: Michael Wiener
Title: Authorized Signatory

**HAMR BORROWER 2 LLC,**
a Delaware limited liability company

By:_____
Name Michael Wiener
Title: Authorized Signatory

**HAMR BORROWER 3 LLC,**
a Delaware limited liability company

By:_____
Name:  Michael Wiener
Title: Authorized Signatory

**Exhibit N**

| From: | Jeffrey Simpson[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F81AE2C656FA45BD8A4297820 019DC86-JSIMPSON] |
|---|---|
| Sent: | Thu 12/14/2023 3:14:11 AM (UTC) |
| To: | Kevin Wiener[kwiener@35oak.com]; Jared Chassen[jchassen@archcre.com] |
| Cc: | Leslie Thorne[Leslie.Thorne@haynesboone.com]; Stephen B. Meister[sbm@msf-law.com]; Steve Altman[steve@commercialtriallawyer.com]; Allen Schwartz[allen@allenschwartzlaw.com] |
| Subject: | RE: Myrtle/Madison Negotiations |

**Kevin,**

**I have spent some time considering the Myrtle forbearance agreement terms that you have sent to me.  At this time, I cannot consent to it for the following reasons:**

**These deal terms are principally the same as those I negotiated on behalf of Arch this past summer.  They made sense then but do not now because the circumstances have materially changed.  Among those material changes, which make what you are proposing a bad deal now are the following:**

> a.  **There is between $6 and $7 million owed to subcontractors, and the remaining balance of the loan is insufficient to meet those obligations and complete the construction materially at the speed required in the arrangement.**
> b.  **Arch Builders, which I have at all times managed and run, holds the construction license.  It is uniquely qualified and equipped to complete the project (quickly and the least expensive), but you have not requested my services and it is a virtual certainty that no third-party construction manager could complete the project under the time frame and budget required by the terms of the forbearance agreement.  We would all be simply working to hand the keys back to the lender, without question.**
> c.  **There is no room for error (of time, mostly concerning) without serious ramifications.**

**These three items of spooling up a construction management company, coupled with the $1 million monthly, non-default interest carry, makes the forbearance a solution that does not benefit ARCH or the borrower.  The ONLY party that is benefitted by entering into this proposed agreement is Oak because it will be released from its guaranty for a nominal amount, given its exposure.**

**I believe that a bankruptcy filing with respect to this project is in the best interest of all parties at this time.  The automatic stay would permit renegotiation with the subs, obtain relief from the lender, or at least reduce the interest or default interest, and would likely provide a more reasonable outcome with the lender.  You have indicated your concern that such a filing might or does trigger potential personal liability for you.  We differ, and in any event that liability has likely already been triggered as the result of some of your family's prior actions and positions**

taken in the pending litigations, like requesting a receiver and refusing to fund loan obligations without reason.

I understand that you may likely do as you please (as you have done recently, I believe wrongfully). So there is no uncertainty, I do not consent to Arch's entering into the proposed forbearance agreement on the terms now presented.

All rights reserved.

**Jeff**


**JEFFREY SIMPSON**

**D** 646.854.6810 | **C** 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 2nd Floor, New York, NY 10003



---

**From:** Kevin Wiener <kwiener@35oak.com>
**Sent:** Monday, December 11, 2023 1:22 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>
**Cc:** Leslie Thorne <Leslie.Thorne@haynesboone.com>; Stephen B. Meister <sbm@msf-law.com>; Steve Altman <steve@commercialtriallawyer.com>; Allen Schwartz <allen@allenschwartzlaw.com>
**Subject:** Myrtle/Madison Negotiations


Hi Jeff and Jared,

I wanted to update you on the progress of negotiations with lenders on some files so that we can incorporate your feedback into the paperwork prior to final execution versions for major decision consent.

The first one I wanted to discuss is the negotiations with Madison on the Myrtle Point project.

As you know, Jeff had previously provided an "Option 2" proposal that contemplated Oak running the project before there was the full court-ordered change in control. We have been using that as the starting point for the negotiation with Madison (the major point being a 6-month forbearance with a deed in a box and Madison unlocks the rest of the loan). We had previously discussed the proposal with Doug Propp, and he confirmed he was willing to consent to a deed in a box forbearance as long as Oak put $3 million in capital into the project behind his $6 million, which Oak agreed to do.

We've since been trading paper back and forth with Madison but the major points of the deal are:

- Madison will give us a six-month forbearance to continue work on the project and find a new lender and equity partner
- Oak will capitalize $3 million into the project and those proceeds will be paid immediately to Madison; at least $1 million must be used for construction funding; the remaining $2 million can be used for project costs or interest at Madison's option.
- In exchange for this $3 million payment, Madison will release the rest of the loan without regard for balancing requirements. Madison will also release Oak from the carry and construction guarantees.
- Madison's loan principal and non-default interest must be paid by the end of the six months. The six months can be extended for up to an additional three months on the payment of $1 million for each additional month. The first month, that million would be applied to interest. The second month it is 50% interest and 50% and extension fee. The third month it would be 100% an extension fee. While Madison may be open to remaining as lender depending on the equity partner we bring in, they are unwilling to commit to that now
- In the event the loan principal and non-default interest isn't paid at the end of the six month period (plus any extensions paid for monthly), then Madison will record the deed in the box.

The plan would be to run an expedited process for new equity and debt while using the funds from Oak and Madison to get Target in and complete as much construction as we can with the money.

I'm attaching a copy of our most recent sign-back to Madison; as you can see we're quite close. They're aware that any final agreement is subject to JJ approval. Please advise if there's anything in the agreement you think needs to be changed, removed or added. We're hoping to be in an execution position by the end of the week so that construction can resume before 2024.

Jeff, I believe Ian provided you with a link to your other email address with Dropbox access to all the loan documents. Please advise if anything is missing that you need for your review and we'll either get you Dropbox access or just email it.

Regards,

Kevin

**Exhibit O**

| | |
|---|---|
| **From:** | Kevin Wiener[kwiener@35oak.com] |
| **Sent:** | Tue 1/2/2024 3:19:50 PM (UTC) |
| **To:** | Jeffrey Simpson[jsimpson001@icloud.com] |
| **Cc:** | jaredchassen@gmail.com[jaredchassen@gmail.com]; Michael Wiener[MWiener@35OAK.com]; Steve Altman[steve@commercialtriallawyer.com] |
| **Subject:** | RE: Columbia Protective Advance Agreement |

Responses below in bold

Sent from my Galaxy

-------- Original message --------
From: Jeffrey Simpson <jsimpson001@icloud.com>
Date: 2024-01-02 4:11 a.m. (GMT-05:00)
To: Kevin Wiener <kwiener@35oak.com>
Cc: jaredchassen@gmail.com, Michael Wiener <MWiener@35OAK.com>, Steve Altman <steve@commercialtriallawyer.com>
Subject: Re: Columbia Protective Advance Agreement

EXTERNAL

[EXTERNAL EMAIL]

I shared a long list of concerns as to why this doesn't work, most importantly it's essentially giving the keys to the lender since there is no remedy for anything that could have gone wrong (inclusive of your improper attempts to take control over Arch, a material adverse change to the guarantor as in the significant amount of contingent liabilities you currently have, and has not found a remedy to resolve) or potentially what will go wrong in the future. **This isnt giving the keys it's receiving a protective advance to ensure the property can operate since there isn't enough cash flow to cover interest and operating expenses. The lender remains very interested in a workout but they don't trust what the real carry of the property is until there's an independent third party managing it. Drake also wants a third party manager in before they're willing to discuss their participation in a workout.**
Are you now suggesting that Ore Living is going to be managing the assets going forward? Are the funds going to be reimbursing by the affiliated property manager for the rearview mirror or going forward or both? **Ore Living is remaining property manager until Asset Living comes in (currently targeted for Jan 15). The funds are to reimburse payroll for Nov and Dec and lender has indicated they will also reimburse for Jan payroll until new property manager comes in.**

What happened to the consent regarding the change in property managers that affected two other assets in order to help this one? **Asset Living appears to be willing to manage Columbia without the other two. We're still proceeding with them for Tuscaloosa but**

**there's no rush to change managers for Forestdale.**

What is the status of providing Drake with managing member authority on this asset and the other two that was contemplated several months ago? **Drake doesn't seem to be in any particular rush to take over the assets right now.**

After I see the answer to these questions, then we will review the words of the document more carefully.

And no, a simple "approved" from Jared is not acceptable.   I am sure you saw the correspondence that we sent to the Court last week.   If he provides that approval to you and you continue forward without my consent, we will take immediate action to stop you and to notify the other parties in this contemplated transaction why that will not work, of course unless the Court decides otherwise.

All rights reserved.

Jeffrey Simpson

Sent from my iPhone

> On Jan 2, 2024, at 1:29 AM, Kevin Wiener <kwiener@35oak.com> wrote:

> Hi Jeff and Jared,

> Further to the previous email sent in mid-December, I'm attaching the final turn of the letter agreement from the lender as well as the schedule covering the cash needs that lender is advancing funds to pay. There aren't really any major differences from the version circulated a few weeks ago except that it specifically references that part of the advance is to cover payroll incurred by the affiliated property manager.

> Drake has already provided consent to execute.

> Can one of you please confirm by reply email that AREH has JJ's consent to cause the HAMR Borrower entities to enter into the attached protective advance agreement? I'd like to get it executed tomorrow.

> Thanks,

> Kevin

> **From:** Kevin Wiener
> **Sent:** Tuesday, December 12, 2023 12:40 PM

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 552

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 293 of 409

**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen
<jchassen@archcre.com>
**Cc:** Steve Altman <steve@commercialtriallawyer.com>; Allen Schwartz
<allen@allenschwartzlaw.com>; Leslie Thorne <Leslie.Thorne@haynesboone.com>;
Stephen B. Meister <sbm@msf-law.com>
**Subject:** Columbia Protective Advance Agreement

Hi Jeff and Jared,

I'm attaching a copy of a protective advance agreement from the lender on Columbia
to get approximately $600k of funding to pay outstanding payables on the property,
cover payroll, and allow sufficient time for the new property manager to get put in
place. Drake has advised they're not putting in any more funding at this time until the
property manager is in and they can figure out if it makes economic sense to continue
to invest into this property, and the other investors are not in a position to cover
Drake's share of the expenses.

The lender is requiring the borrower to agree to allocate the advance to agreed upon
expenses, reaffirm the loan and amounts payable, and waive defences. We do not
really see it as feasible to get them to put in these funds without that language in the
agreement.

We're getting the schedule and numbers in the attached finalized and a consent put
together but in the meantime I wanted you to have the agreement to look over and
confirm that you're fine with it.

We do need to move quickly on this as many of the vendors have refused additional
work on the property until their payables are paid, which will lead to degradation of
the asset.

Let me know if you have any questions or need any additional information.

Thanks,

Kevin

**Exhibit P**

View All Activity

| Successfully retrieved account information. |
| --- |

Enter your inquiry criteria in the form fields below, then choose 'View Results'.

**Criteria**

Account Number * 80006445359-JJ ARCH LLC    Lookup

Inquiry Type *   All Activity

From Posting Date *  08/01/2023    To Posting Date    09/24/2023

**Account Details**

| Account Number: | 80006445359-JJ ARCH LLC | | |
| --- | --- | --- | --- |
| Balances as of 12:10:44 PM PDT on 10/23/2023 | | | |
| Current Balance: | $6,229.81 | Available Balance: | $6,229.81 |
| Total Float: | $0.00 | One Day Float: | $0.00 |
| Two Day Float: | $0.00 | Three Day Float: | $0.00 |
| Average Available Balance: | $146,732.33 | Average Available 12 Month: | $91,433.00 |
| Amount of Last Deposit: | $2,000.00 | Date of Last Deposit: | 10/19/2023 |
| Date Last Active: | 10/19/2023 | Statement Date: | 09/30/2023 |
| Interest Deposit: | $0.00 | Interest Rate: | 0.000% |
| Last Year Interest Paid: | $0.00 | YTD Interest Paid: | $0.00 |
| Accrued Interest: | $0.00 | Beginning Statement Bal: | $10,054.42 |

Results 1-16    |<  <  >  >|

Pending transactions are in the process of being processed or posted to your account. The amount may not be reflected in your available balance and the final dollar amount posted may differ from the pending transaction amount.

| Date | Status | Description | Serial Number | Withdrawal Amount | Deposit Amount | Balance | Image |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 09/21/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JARED CHASSEN 17 S 1312148117 9000313004 | | $481.60 | | $10,410.49 | |
| 09/15/2023 | | ACH DEBIT JPMORGAN CHASE EXT TRNSFR JJ ARCH LLC 18145682353 9200502231 | | $1,176.40 | | $10,892.09 | |
| 09/11/2023 | | ACH DEBIT GEICO PREM COLL JEFFREY S SIMPSON 3530075853 | | $166.61 | | $12,068.49 | |
| 09/01/2023 | | INTERNET TRANSFER TO DDA# 80018321124 ON 09/01 AT 01:38 PM TRANSFER TO COVER DEBT SERVICE | | $2,000.00 | | $12,235.10 | |
| 08/29/2023 | | ACH DEBIT INTUIT * QBOOKS ONL JJ ARCH LLC 9185622 0000756346 | | $217.75 | | $14,235.10 | |
| 08/29/2023 | | ACH DEBIT VERIZON PAYMENTREC JARED CHASSEN 9558454250001 9783397101 | | $138.32 | | $14,452.85 | |
| 08/24/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JJ ARCH LLC 17 S 1314542717 9000313004 | | $1,465.09 | | $14,591.17 | |
| 08/23/2023 | | ACH DEBIT STATE FARM RO 27 CPC-CLIENT JARED CHASSEN 17 S 1312148117 9000313004 | | $481.60 | | $16,056.26 | |
| 08/10/2023 | | ACH DEBIT GEICO PREM COLL JEFFREY S SIMPSON 3530075853 | | $171.53 | | $16,537.86 | |
| 08/09/2023 | | DOMESTIC ONLINE WIRE CHAMCHA REAL ESTAT E INC N089G5151LZW7YKB | | $25,000.00 | | $16,709.39 | |
| 08/04/2023 | | DOMESTIC ONLINE WIRE ELMWOOD DAY SCHOOL INC. N084G5807DCWN97R | | $9,400.00 | | $41,709.39 | |
| 08/01/2023 | | INTERNET TRANSFER TO DDA# 80019331132 ON 08/01 AT 01:58 PM FUNDING FOR 1640 M OTORS | | $25,000.00 | | $51,109.39 | |
| 08/01/2023 | | INTERNET TRANSFER TO SAV# 50017311486 ON 08/01 AT 01:49 PM 88 SCHWENKS SALE P ROCEEDS | | $127,854.64 | | $76,109.39 | |
| 08/01/2023 | | INTERNET TRANSFER TO DDA# 80003451846 ON 08/01 AT 01:49 PM 88 SCHWENKS SALE P ROCEEDS | | $127,854.64 | | $203,964.03 | |
| 08/01/2023 | | INTERNET TRANSFER FROM SAV 50017311486 ON 08/01 AT 01:58 PM FUNDING FOR 1640 M OTORS | | | $25,000.00 | $331,818.67 | |
| 08/01/2023 | | INTERNET TRANSFER FROM DDA# 80013320904 ON 08/01 AT 11:45 AM 88 SCHWENKS SALE P ROCEEDS | | | $255,709.27 | $306,818.67 | |

12/23/21 4:24AM 03811pm    Doc 192    Filed 09/18/23 Entered Transaction Inquiry/Activity detail 15    Main Document

Pg 296 of 409

View All Activity

| Successfully retrieved account information. |

Enter your inquiry criteria in the form fields below, then choose 'View Results'.

⊟ Criteria

| Account Number * | 80012631442-225 HPR LLC 1442 | Lookup |
| Inquiry Type * | All Activity ▾ | |
| From Posting Date * | 09/29/2023 | To Posting Date | 12/23/2023 |

⊟ Account Details

| Account Number: | 80012631442-225 HPR LLC 1442 |
| Balances as of 01:36:42 AM PST on 12/23/2023 | |

| Current Balance: | $4,342.29 | Available Balance: | $4,342,29 |
|---|---|---|---|
| Total Float: | $0.00 | One Day Float: | $0.00 |
| Two Day Float: | $0.00 | Three Day Float: | $0.00 |
| Average Available Balance: | $16,863.50 | Average Available 12 Month: | $12,259.00 |
| Amount of Last Deposit: | $0.01 | Date of Last Deposit: | 12/22/2023 |
| Date Last Active: | 12/22/2023 | Statement Date: | 11/30/2023 |
| Interest Deposit: | $0.00 | Interest Rate: | 0.000% |
| Last Year Interest Paid: | $0.00 | YTD Interest Paid: | $0.00 |
| Accrued Interest: | $0.00 | Beginning Statement Bal: | $2,618.61 |

Results 1-20    |< | < | > | >|

Pending transactions are in the process of being processed or posted to your account. The amount may not be reflected in your available balance and the final dollar amount posted may differ from the pending transaction amount.

| Date | Status | Description | Serial Number | Withdrawal Amount | Deposit Amount | Balance | Image |
|---|---|---|---|---|---|---|---|
| Pending | | DOMESTIC ONLINE WIRE 70 WINDING WAY LLC N0CMF0722IMKL1UE | | | $4,000.00 | $4,342.29 | |
| Pending | | RETURN ITEM #0526 PREMIN7183758300 INSFINANCE 225 HEAD OF POND * 2940256 0000000526 | | $701.98 | | $342.29 | |
| 12/21/2023 | | ACH DEBIT PREMIN7183758300 INSFINANCE 225 HEAD OF POND * 2940256 0000000526 | | $701.98 | | -$359.69 | |
| 12/15/2023 | | ACH DEBIT INTUIT * QBOOKS ONL 225 HPR LLC 0913024 0000756346 | | $65.33 | | $342.29 | |
| 12/12/2023 | | ACH CREDIT AIRBNB PAYMENTS SQZPHZOLK4 225 HPR LLC 3263051428 | | | $0.01 | $407.62 | |
| 12/01/2023 | | ACH DEBIT JPMORGAN CHASE CHASE ACH 225 HPR LLC 1000008113 | | $2,211.00 | | $407.61 | |
| 11/29/2023 | | ACH DEBIT LIPA DIRECTPAY 225 HPR LLC 1563585000 | | $159.80 | | $2,618.61 | |
| 11/27/2023 | | ACH DEBIT PREMIN7183758300 INSFINANCE 225 HEAD OF POND * 4521877 0000000526 | | $701.98 | | $2,778.41 | |
| 11/24/2023 | | ACH DEBIT OPTIMUM 7839 CABLE PMNT J CHASSEN 9078390001 | | $109.02 | | $3,480.39 | |
| 11/15/2023 | | ACH DEBIT INTUIT * QBOOKS ONL 225 HPR LLC 1371312 0000756346 | | $65.33 | | $3,589.41 | |
| 11/09/2023 | | ACH DEBIT JPMORGAN CHASE CHASE ACH 225 HPR LLC 1000008113 | | $2,211.00 | | $3,654.74 | |
| 11/01/2023 | | ACH DEBIT LIPA DIRECTPAY 225 HPR LLC 1563585000 | | $165.06 | | $5,865.74 | |
| 10/31/2023 | | WITHDRAWAL TRANSFER TLR 06 BR 79 TO: JJ ARCH LLC | | $3,000.00 | | $6,030.80 | |
| 10/24/2023 | | ACH DEBIT OPTIMUM 7839 CABLE PMNT J CHASSEN 9078390001 | | $109.02 | | $9,030.80 | |
| 10/20/2023 | | ACH DEBIT PREMIN7183758300 INSFINANCE 225 HEAD OF POND * 4110454 0000000526 | | $701.98 | | $9,139.82 | |
| 10/19/2023 | | INTERNET TRANSFER TO DDA# 80006445359 ON 10/19 AT 07:48 AM CONTRIBUTION | | $2,000.00 | | $9,841.80 | |
| 10/16/2023 | | ACH DEBIT INTUIT * QBOOKS ONL 225 HPR LLC 2533485 0000756346 | | $65.33 | | $11,841.80 | |
| 10/11/2023 | | INTERNET TRANSFER TO DDA# 80006445359 ON 10/11 AT 02:38 PM DISTRIBUTION | | $10,000.00 | | $11,907.13 | |
| 10/04/2023 | | ACH DEBIT LIPA DIRECTPAY 225 HPR LLC 1563585000 | | $233.80 | | $21,907.13 | |
| 10/02/2023 | | WITHDRAWAL - ELECTRONIC TO ACCT ML22-818611-6 | | $2,211.00 | | $22,140.93 | |

**Exhibit Q**

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF

## ARCH PROPERTY HOLDINGS I LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of July 9, 2020, by and among 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, the "Class A Member"), JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, the "Class B Member"), and each of the other individuals signatory hereto, if any (the "Class C Members").

WHEREAS, the Class A Member, Class B Member, and Class C Members (the "Members") previously entered into that certain Limited Liability Company Agreement of Arch Property Holdings I LLC (the "Original Agreement");

WHEREAS, the Members desire to amend and restate the Original Agreement in its entirety as provided herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto amend and restate the Original Agreement as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

1.1.    Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the

appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"BB Act" shall have the meaning set forth in Section 9.5.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves) or other commitments or obligations of the Company (including loans by Members to the Company), and (iii) Reserves. The Company shall separately account for, and maintain separate accounts for, Cash Flow attributable to cash receipts of each Investment Entity.

"Certificate of Formation" means that certain Certificate of Formation of the Company, dated and filed with the Secretary of State of the State of Delaware on February 26, 2018.

"Class A Member" shall have the meaning set forth in the Preamble.

"Class A Percentage" means the percentage equal to (i) the number of Class A Units outstanding divided by (ii) the sum of the number of Class A Units, the Class B Units outstanding and the Class C Units outstanding

"Class A Units" means an interest in the Company classified as a Class A Unit hereunder.

"Class B Member" shall have the meaning set forth in the Preamble.

"Class B Percentage" means the percentage equal to (i) the number of Class B Units outstanding divided by (ii) the sum of the number of Class B Units outstanding and the Class C Units outstanding

"Class B Units" means an interest in the Company classified as a Class B Unit hereunder.

2

"Class C Members" shall have the meaning set forth in the Preamble.

"Class C Series" shall have the meaning set forth in Section 2.8(b).

"Class C Percentage" means the percentage equal to (i) the number of Class C Units outstanding divided by (ii) the sum of the number of Class B Units outstanding and the Class C Units outstanding

"Class C Units" means an interest in the Company classified as a Class C Unit hereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means the limited liability company formed pursuant to the Certificate of Formation and governed by the terms of this Agreement.

"Company Property" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Dissolution Event" shall have the meaning set forth in Section 8.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fiscal Year" shall be as set forth in Section 9.1.

"Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)    Subject to the final sentence of this definition, the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset.

(ii)    The Gross Asset Value of all Company Property shall be adjusted to equal their respective gross fair market values as of the following times: (a) the acquisition of additional Units by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for a Unit; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);  provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Class B Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

3

(iii)     The Gross Asset Value of any Company Property distributed to any Member shall be adjusted to equal the gross fair market value of such Company Property on the date of distribution; and

(iv)     The Gross Asset Value of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Company Property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and clause (vi) of the definition of Net Profits and Net Losses herein; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Class B Member determines that an adjustment pursuant to clause (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Net Profits or Net Losses.

"Hurdle Amount" shall mean, with respect to each Class C Unit, an amount equal to the fair market value of the Company's interest in the applicable Investment Entity on the date such Class C Unit is issued by the Company.  The determination of the fair market value of the Company's interest in the applicable Investment Entity for purposes of a Class C Unit's Hurdle Amount will be made by the Plan Administrator and shall be specifically set forth in the Restricted Unit Agreement evidencing each Profit Interest Award.

"Indemnifying Member" shall have the meaning set forth in Section 10.1.1.

"Indemnitee" shall have the meaning set forth in Section 10.1.2.

"Investment Entity" means each of the Persons set forth on Schedule A hereto, as such Schedule may be amended from time to time.

"Investment Entity Agreement" means, with respect to each Investment Entity, the Limited Liability Company Agreement of such Investment Entity, as the same may be amended, modified, supplemented or restated from time to time.

"Joinder Agreement" shall have the meaning set forth in Section 7.4(b).

"Liquidating Agent" shall have the meaning set forth in Section 8.3.1.

"Members" shall have the meaning set forth in the Recitals.

"Net Profits and Net Losses" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments (without duplication):

4

(i)      Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)      Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(iii)      In the event the Gross Asset Value of any Company Property is adjusted in the manner set forth in the definition of "Gross Asset Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(iv)      Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation based on the Gross Asset Value of the assets for such fiscal year or other period, computed in accordance with the definition thereof;

(vi)      To the extent an adjustment to the adjusted tax basis of any Company Property pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the Company Property) or loss (if the adjustment decreases the basis of the Company Property) from the disposition of the Company Property and shall be taken into account for the purposes of computing Profits or Losses; and

(vii)      Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 5.1(b) shall not be taken into account in computing Net Profits or Net Losses.

The Company shall separately account for, and maintain separate accounts for Net Profits or Net Losses attributable to each Investment Entity.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Partnership Representative" shall have the meaning set forth in Section 9.5.

5

"Permitted Transfers" shall have the meaning set forth in Section 7.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Plan Administrator" shall mean the administrator of the Profit Interest Plan (initially, the Class B Member).

"Profit Interest Award" shall mean the grant by the Company of Class C Units under the Profit Interest Plan to an eligible employee, officer and consultant of the Company, the Investment Entities or their respective Affiliates.

"Profit Interest Plan" shall mean the Company's 2018 Profit Interest Equity Plan pursuant to which the Company has reserved Class C Units for future issuance to key employees, executives, officers and consultants of the Company, the Investment Entities or their respective Affiliates.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Regulations" means the income tax regulations promulgated under the Code.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or an Investment Entity is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Class B Member; provided that, unless required under a loan, the Company shall not hold reserves less than $5,000 without Class A Member's consent, not to be unreasonably withheld, conditioned or delayed. The Company shall separately account for, and maintain separate accounts for Reserves attributable to each Investment Entity.

"Restricted Unit Agreement" shall mean an agreement, the form of which shall be approved by the Plan Administrator, that is entered into by the Company and the recipient of a Profit Interest Award pursuant to the terms of the Profit Interest Plan.

"Transfer" means, with respect to any Units, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Units, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Units or (B) any direct or indirect beneficial owner of such Member.

"Transferring Member" shall have the meaning set forth in Section 7.2.

"Units" means collectively or individually, as the context requires, Class A Units, Class B Units and/or Class C Units.

Error! Unknown document property name.

## ARTICLE II

## ESTABLISHMENT OF THE COMPANY

2.1.    Formation of the Company.  The Members desire to continue the existence of the Company under the Delaware Limited Liability Company Act, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.

2.2.    Company Name.  The business of the Company shall be conducted under the name of "Arch Property Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Class B Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates.  In this regard, Class B Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes: (i) to hold an interest in each Investment Entity; (ii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iii) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4.    Principal Place of Business and Address.  The principal place of business of the Company shall be located at such place as Class B Member may from time to time designate.  Class B Member shall provide written notice of the Company's principal place of business to the Members promptly after a change in the Company's principal place of business.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Class B Member.

2.5.    Term.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    Agent for Service and Registered Office.  The agent for service of process upon the Company shall be as set forth in the Certificate of Formation, or such other agent as may be designated from time to time by Class B Member.  The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by Class B Member; provided, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

2.7.    Admission of Members. Each of Class A Member, Class B Member and the Class C Members are hereby admitted to the Company as Members holding the respective number and class of Units as set forth on (i) Schedule A with respect to Class A Units and Class B Units and (ii) Schedule B with respect to Class C Units.  Except as expressly permitted by Section 2.8 or other provisions of this Agreement, no other Person shall be admitted as a member or manager

Error! Unknown document property name.

of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.   <u>Class C Units</u>.

(a)     The Members hereby acknowledge and agree that the Company has reserved 20,000 Class C Units under the terms of the Profit Interest Plan, which number of Class C Units may be adjusted in accordance with the terms of the Profit Interest Plan, for future issuances to certain key employees, executives, officers and consultants of the Company, the Investment Entities or their respective Affiliates.  The issuances of the Class C Units under the Profit Interest Plan shall be made at the discretion of the Plan Administrator and may be made with or without cash consideration and on such other terms and conditions, as the Plan Administrator shall determine, provided that each Profit Interest Award shall be evidenced by a Restricted Unit Agreement that will be entered into by the Company and the recipient of the Profit Interest Award. In addition to a Restricted Unit Agreement, each individual receiving Class C Units under the Profit Interest Plan shall be obligated, as a precondition to the receipt of such Class C Units, to execute a Joinder Agreement (as defined in <u>Section 7.4(b)</u>) whereby such recipient shall agree to become a party to this Agreement.  In the event that any Class C Units that are issued under the Profit Interest Plan expire, are canceled, terminated, repurchased or forfeited in any manner, such Class C Units shall again be available for issuance by the Plan Administrator under the Profit Interest Plan, as provided in Section 4 of the Profit Interest Plan.

(b)     The Company shall maintain a separate series of Class C Units with respect to its interest in each of the Investment Entities (each such series, a "<u>Class C Series</u>"). Each of the Class C Series, together with the Investment Entity applicable to such Class C Series and the Class C Members applicable to such Class C Series are set forth on <u>Schedule C</u> attached hereto, as such Schedule may be amended from time to time. The Company shall separately account for, and maintain separate accounts for Reserves, Cash Flow, Net Profits or Net Losses and Capital Accounts, in each case, attributable to each Investment Entity.

2.9.   <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

ARTICLE III

**CAPITAL CONTRIBUTIONS**

3.1.   <u>Initial Capital Contributions</u>.  On the date hereof, the Class A Member and Class B Member shall each make an initial Capital Contribution to the Company in the amount of $[5,000].

3.2.   <u>Additional Capital Contributions</u>.  If, at any time or from time to time, Class A Member and Class B Member determine that additional funds are required by the Company to meet its general and administrative expenses, Class A Member and Class B Member shall be obligated to make an additional Capital Contribution to the Company in immediately available

8

funds within five (5) Business Days of such determination equal to one half of the required additional funds.

3.3.    No Interest.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4.    Return of Capital.  No Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.5.    No Personal Liability.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company Property. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except to the extent such Member expressly agrees otherwise.

<u>ARTICLE IV</u>

**<u>CAPITAL ACCOUNTS</u>**

4.1.    Capital Accounts.    A capital account ("Capital Account") shall be maintained for each Member which shall be computed from the date of the initial formation of the Company and which shall be equal to the Capital Contributions of each Member increased by each Member's allocable share of Net Profit and decreased by the aggregate for such Member of (x) distributions made to such Member and (y) such Member's allocable share of Net Loss.  The Capital Account of a Member shall be maintained and adjusted in accordance with the accounting principles on which the Company's books of account are kept and tax returns prepared.  The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Regulations promulgated under Article 704 of the Code and shall be interpreted and applied in a manner consistent with such Regulations. The Company shall separately account for, and maintain separate sub-accounts for Capital Accounts attributable to each Investment Entity.

4.2.    Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.3.    Transfers.  If any Units are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Units.

9

4.4.    _Capital Account Balance_.  Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Section 5.1 and all contributions and distributions made prior to the time as of which such determination is to be made.

ARTICLE V

**ALLOCATIONS AND DISTRIBUTIONS**

5.1.    _Allocations of Net Profit and Net Loss_.  (a) Except as otherwise provided in this Code and Treasury Regulations promulgated thereunder, Net Profit and Net Loss and, to the extent necessary, individual items of income, gain, loss, or deduction of the Company shall be allocated among the Members in a manner such that the Capital Account of each Member, as increased by the amount of such Member's share of "partnership minimum gain" (as defined in Treasury Regulations Section 1.704-2(d)) and the amount of such Member's share of "partner non-course debt minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(i)), immediately after making such allocation, is as nearly as possible equal (proportionately) to the distributions that would be made to such Member pursuant to Section 8.3.3 if the Company were dissolved, its affairs wound up and the Company Property sold for an amount equal to their respective book values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the Company Property securing such liability), and the remaining cash was distributed in accordance with the priority contemplated by Section 8.3.3.

(b) Although the Members do not anticipate that events will arise that will require application of this Section 5.1(b), provisions governing the allocation of income, gain, loss, deduction and credit (and items thereof) are included in this Agreement as may be necessary to provide that the Company's allocation provisions contain a so-called "Qualified Income Offset" and comply with all provisions relating to the allocation of so-called "Non-recourse Deductions" and "Partner Non-recourse Deductions" and the chargeback thereof as set forth in the Regulations under Section 704(b) of the Code.

(c) Any item of taxable income, gain, loss or deduction of the Company (as well as any credits or the basis of property to which such credits apply) as determined for federal income tax purposes shall be allocated in the same manner as the corresponding income, gain, loss, or deduction is allocated under Section 5.1(a).  Allocations pursuant to this Section 5.1(c) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items, or distributions pursuant to any provision of this Agreement

5.2.    _Distributions of Cash Flow_.  Cash Flow, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by Class B Member in the following order of priority:

(i)    First, to Class A Member and Class B Member pro rata based on their respective Capital Contributions until they have received an aggregate amount equal to their respective Capital Contributions together with a 4% per annum return thereon; and

10

Error! Unknown document property name.

    (ii)  Second, to the Class C Members holding Class C Units in the Class C Series attributable to the applicable Investment Entity pro rata to the extent such amount was distributed to the Company pursuant to Section 6.3(vi) of the applicable Investment Entity Agreement;

    (iii)  Third, to the Class A Member in an amount equal to (x) the balance plus the amount distributed pursuant to clause (ii) multiplied by (y) the Class A Percentage;

    (iv)  Thereafter, to the Class B Member.

; <u>provided</u> that, notwithstanding the distributions set forth in this <u>Section 5.2)</u>, a Class C Member shall not be entitled to receive any distributions from the Company with respect to the applicable Class C Series until such time as the aggregate amount of distributions from the applicable Investment Entity that are made to the Members under this <u>Section 5.2</u> (calculated from and after the date of issuance of such applicable Class C Units) exceeds the Hurdle Amount with respect to such Class C Series.  Any distributions that are not payable to a Class C Member by virtue of the requirement set forth in this proviso above shall be payable to the Class B Member and other Class C Members who are entitled to receive such distributions in accordance with the principles of this <u>Section 5.2</u> (it being understood that, in such event, the distributions set forth in this <u>Section 5.2(ii) and (iii)</u> shall be recalculated by disregarding the Class C Units of the applicable Class C Series whose Hurdle Amount is not met).

    5.3.  <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Units if such payment, distribution or redemption would violate the Act or any other applicable law.

<u>ARTICLE VI</u>

**<u>MANAGEMENT AND OPERATIONS</u>**

    6.1.  <u>Management</u>.

    6.1.1.  The business, affairs and assets of the Company (including the Company Property) shall be managed, arranged and caused to be coordinated by Class B Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 6.1.3</u>), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Class B Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Class B Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform.

    6.1.2.  Except as otherwise provided in this Agreement, no Class C Member shall participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company (including the Company Property).  Unless authorized in writing to do so by this Agreement or by Class B Member, no Member, attorney-in-fact, employee or other agent of the

11

Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

6.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Class B Member desires to cause the Company or an Investment Entity to take any of the following decisions or actions, Class B Member shall provide written notice thereof to Class A Member with such additional information as the Class A Member may reasonably request. Any such decision shall be undertaken only with the prior written consent of Class A Member, which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Class B Member's written request therefor:

(i)    acquire any direct or indirect interests in any real property;

(ii)    file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)    sell any Company Property or any portion thereof other than any Company Property that is no longer required for the operation of the Company or any other Company Property or any obsolete personal property;

(iv)    merge, consolidate or other reorganize the Company with another Person;

(v)    borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)    possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Class B Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Property, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)    enter into any lease for space at a Company Property of more than 10% of the rentable area of such Company Property;

(viii)    engage in any business or activity not authorized by this Agreement;

(ix)    enter into any agreement requiring the expenditure of more than $5,000 per annum;

(x)    enter into any agreement with Class B Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 6.3 and for transactions where the compensation paid to Class B Member or any

12

such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi)    incur any expense other than in the ordinary course of business; and

(xii)    enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement.

6.2.    <u>Services of the Members</u>.  The Members shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company.

6.3.    <u>Legal Title to Company Property</u>.  Legal title to the Company Property, shall be held in the name of the Company or the applicable Investment Entity.

6.4.    <u>Other Activities of Members</u>.  Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

<u>ARTICLE VII</u>

**<u>TRANSFER OF UNITS</u>**

7.1.    <u>Restrictions on Transfers of Units</u>.  No Member shall Transfer all or any portion of its Units, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this <u>Article VII</u> and until all requirements and conditions stated in this <u>Article VII</u>, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this <u>Article VII</u> shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of Units that would cause such violation, and the intended transferee shall acquire no rights in such Units.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

Error! Unknown document property name.

7.2.    <u>Permitted Transfers</u>.    Notwithstanding <u>Section 7.1</u>, but subject to the applicable provisions of terms of any loan to an Investment Entity, the Company or any Person in which an Investment Entity or the Company holds a direct or indirect interest, a Member may Transfer (such Member, a "<u>Transferring Member</u>"), directly or indirectly, all or a portion of such Member's Units, without the consent of the Company or any other Member, as follows ("<u>Permitted Transfers</u>"); <u>provided</u> that no Transfer of Class C Units can be made unless such Transfer is in compliance with the Profit Interest Plan and a Class C Member's Restricted Unit Agreement:

(i)    Transfers of Units to another Member;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii)    Transfers by a Member of up to 49% such Member's Units as of the date hereof to, or for the benefit of, a direct lineal descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a direct lineal descendant of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Units that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Units which are held in trust may be distributed to a Person other than a direct lineal descendant of the Transferring Member.  If such a direct lineal descendant is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Units are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Class B Member (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Units that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Units which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv)    Transfers by a Member of up to 49% of such Member's Units as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Units of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Units which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member; and

(v)    Transfers by the Class A Member or Class B Member of up to 49% of such Member's Units as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Class A Member, Michael Wiener, William Wiener or Kevin Wiener continues to Control Class A Member or (y) in the case of Class B Member, Jeffrey Simpson or Jared Chassen continues to be in Control of Class B Member.

14

Error! Unknown document property name.

(vi)    Transfers of Units that are approved by the Class A Member and the Class B Member.

7.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and voi*d ab initio* if:

(i)    it would violate any financing documents to which the Company or an Investment Entity, or any subsidiary thereof is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of the interest in the Company held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the Company Property would be deemed to be "plan assets" for purposes of ERISA;

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder; or

(vii)    such transfer requires a filing with of the Delaware Attorney General and such filing is not submitted.

7.4.    <u>Substitute Members</u>. No assignee of all or part of a Member's Unit shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this <u>Article VII</u>;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member (a "<u>Joinder Agreement</u>"), and agrees in such Joinder Agreement that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Error! Unknown document property name.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

7.5.    <u>Effect of Admission as a Substitute Member</u>. Unless and until admitted as a substitute Member pursuant to <u>Section 7.4</u>, a permitted assignee of all or a part of a Member's Unit shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Unit, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Unit transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Unit transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act.  Upon admission of a permitted assignee as a substitute Member, the assignor of the applicable Units so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Units so transferred.  A Person shall not cease to be a Member upon assignment of all of such Member's Units unless and until the assignee(s) becomes a substitute Member.

7.6.    <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 7.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

ARTICLE VIII

<strong><u>DISSOLUTION AND LIQUIDATION</u></strong>

8.1.    <u>Dissolution</u>.  This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "<u>Dissolution Event</u>"):

8.1.1.    Upon the election to dissolve by Class A Member and Class B Member; or

8.1.2.    Upon the disposition of all or substantially all of the Company Property, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this <u>Article VIII</u> unless Class A Member and Class B Member otherwise unanimously agree.

16

8.2.    <u>Statement of Intent to Dissolve</u>.  In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of Delaware.

8.3.    <u>Procedures</u>.

8.3.1.    <u>Liquidation of Assets</u>.  In the event of the dissolution of the Company, Class B Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "<u>Liquidating Agent</u>") will commence to wind up the affairs of the Company and liquidate the Company Property as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

8.3.2.    <u>Authority of Liquidating Agent</u>.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

8.3.3.    <u>Distribution of Assets</u>.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company Property) of the Company will be distributed in cash to the Members in accordance with the provisions of <u>Section 5.2</u>.

8.4.    <u>Termination of the Company</u>.  Upon the completion of the liquidation of the Company and the distribution of all Company Property and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

<u>ARTICLE IX</u>

**<u>FISCAL AND ADMINISTRATIVE MATTERS</u>**

9.1.    <u>Fiscal Year</u>.  The fiscal year of the Company will be the calendar year.

9.2.    <u>Checks, Drafts, Etc.</u>  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Class B Member from time to time shall authorize and designate in writing.

9.3.    <u>Books and Records</u>.  Class B Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for

17

such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Class B Member.

9.4.    Right of Inspection.  Any Member of the Company will have the right to examine, during normal business hours of Class B Member, for any purpose and upon reasonable prior notice to Class B Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.  Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

9.5.    Partnership Representative.  (a) The Members hereby appoint the Class B Member as the person with authority to act on behalf of the Company (the "Partnership Representative") pursuant to Section 6223(a) of the Code (as amended by Title XI of the Bipartisan Budget Act of 2015 (such Title XI, including the corresponding provisions of the Code impacted thereby, and any corresponding provisions of state or local income tax law, as the same may be amended from time to time, the "BB Act")).

(b)    The Partnership Representative shall have the right to make on behalf of the Company any and all elections and take any and all actions that are available to be made or taken by the Partnership Representative or the Company under the BB Act, and the Members shall take such actions requested by Partnership Representative consistent with any such elections made and actions taken by Partnership Representative, including filing amended tax returns and paying any tax due in accordance with Section 6225(c)(2) of the Code as amended by the BB Act, it being understood that no such amended tax return shall be filed in accordance with such section with respect to the Company without the advance written consent of the Partnership Representative in its sole discretion.

(c)    Notwithstanding anything in this Agreement to the contrary, in the event the Company incurs any liability for taxes, interest or penalties pursuant to the BB Act:

(i)    The Class B Member may cause the Members (including any former Member) to whom such liability relates, as determined by the Class B Member in its sole good faith discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company;

(ii)    any amount not paid by a Member (or former Member) at the time requested by the Class B Member shall accrue interest at the underpayment rate under Section 6621(a)(2) of the Code, plus 10% percentage points per annum, compounded quarterly, until paid, and such Member (or former Member) shall also be liable to the Company for any damages resulting from a delay in making such payment beyond the date such payment is requested by the Class B Member, and for this purpose the fact that the Company could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii)    without limiting a Member's (or former Member's) obligation under clauses (i) and (ii), any amount paid by the Company that is attributable to a Member (or former Member), as determined by the Class B Member in its sole good faith discretion, and that is not paid by such Member pursuant to clauses (i) and (ii) may be withheld

18

from any distribution that would otherwise be made to such Member (or former Member) under Section 5.2; and

(iv)    the obligations of each Member (or former Member) under this Section 9.5 shall survive the transfer by such Member of its Units and the dissolution of the Company.

ARTICLE X

**INDEMNIFICATION**

10.1.    Indemnification.

10.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("Indemnifying Member") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this Section 10.1.1 shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

10.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "Indemnitee") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Units or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party.  Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 10.1.2 with respect thereto.  Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

10.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent

19

of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

10.2.    Exculpation/Member Indemnification.  Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

10.3.    Insurance.  Class B Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article X.

ARTICLE XI

**MISCELLANEOUS**

11.1.    Notices.

11.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the applicable Member at the addresses set forth on the books and records at the Company.

11.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

11.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 11.1 to the other Member.

11.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

11.2.    Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

Error! Unknown document property name.

11.3.    <u>Entire Agreement; Amendments</u>.  This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Class A Member and the Class B Member, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto; provided, however, no amendment, variation, modification or change hereto that has a material and disproportional adverse effect on the rights of a Class C Member hereunder shall be made without the consent of the Class C Member(s) so disproportionally effected.

11.4.    <u>Governing Law</u>.  THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

11.5.    <u>Venue</u>.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

11.6.    <u>Headings</u>.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

11.7.    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

11.8.    <u>Failure to Enforce Provision</u>.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

11.9.    <u>Interpretation</u>.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

11.10.    <u>Assignment</u>.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Units as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

21

      11.11. <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

[Signature page follows]

**Error! Unknown document property name.**

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH PROPERTY HOLDINGS I, LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set above.

608941 NJ INC.

By: _____

Name: FRANK VAN BIEJEN

Title: CFO & SECRETARY

Address:

Tax ID:

Class of Units:        Class A

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH PROPERTY HOLDINGS I, LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set above.

JJ ARCH LLC

By:_____
Jeffrey Simpson
Managing Member

Address:        524 Broadway
                Suite 405
                New York, New York 10012

Tax ID:

Class of Units:        Class B

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH PROPERTY HOLDINGS I, LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set above.

By: _____

Name: Michelle Miller

Address: 338 Berry St. 7A
Brooklyn NY, 11249

Tax ID: _____

AND

By: _____

Name: TRISTAN LAST

Address: 60 W. 23RD St #1048
NEW YORK, NY 10010

Tax ID: _____

Class of Units:    Class C, Series

Schedule A

Investment Entities; Class A Units and Class B Units

| Investment Entity | Class A Units | Class B Units |
|---|---|---|
| Arch 11 Greene St MM LLC | 20,000 | 60,000 |
| Arch 701 S. Juniper MM LLC | 20,000 | 60,000 |
| Arch 45 Savings MM LLC | 20,000 | 60,000 |
| Arch Cambridge MM LLC | 20,000 | 60,000 |
| Arch 5401 California MM LLC | 20,000 | 60,000 |
| Midtown Oaks MM JV LLC | 20,000 | 60,000 |
| Camelot MM JV LLC | 20,000 | 60,000 |
| Arch MM 550 Metropolitan Ave LLC | 20,000 | 60,000 |
| NCSC MM JV LLC | 20,000 | 60,000 |

Schedule B

Class C Series; Class C Members; Class C Units

| Class C Series | Investment Entity | Class C Members | Number of Class C Units |
|---|---|---|---|
| 1 | Arch 11 Greene St MM LLC | Tristan Last | 10,000 |
| 1 | Arch 11 Greene St MM LLC | Michelle Miller | 10,000 |
| 2 | Arch 701 S. Juniper MM LLC | Tristan Last | 10,000 |
| 2 | Arch 701 S. Juniper MM LLC | Michelle Miller | 10,000 |
| 3 | Arch 45 Savings MM LLC | Tristan Last | 10,000 |
| 3 | Arch 45 Savings MM LLC | Michelle Miller | 10,000 |
| 4 | Arch Cambridge MM LLC | Tristan Last | 10,000 |
| 4 | Arch Cambridge MM LLC | Michelle Miller | 10,000 |
| 5 | Midtown Oaks MM JV LLC | Tristan Last | 10,000 |
| 5 | Midtown Oaks MM JV LLC | Michelle Miller | 10,000 |
| 6 | Arch 5401 California MM LLC | Tristan Last | 10,000 |
| 6 | Arch 5401 California MM LLC | Michelle Miller | 10,000 |
| 7 | Camelot MM JV LLC | Tristan Last | 10,000 |
| 7 | Camelot MM JV LLC | Michelle Miller | 10,000 |
| 8 | Arch MM 550 Metropolitan Ave LLC | Tristan Last | 10,000 |
| 8 | Arch MM 550 Metropolitan Ave LLC | Michelle Miller | 10,000 |
| 9 | NCSC MM JV LLC | Tristan Last | 10,000 |
| 9 | NCSC MM JV LLC | Michelle Miller | 10,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Exhibit R**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM

INDEX NO. 158055/2023

NYSCEF DOC. NO. 329

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 327 of 409

**From:** Jared Chassen <jchassen@archcre.com>
**Sent:** Tuesday, June 20, 2023 11:18 AM
**To:** Michelle Miller <mmiller@archcre.com>; Jeffrey Simpson
<jsimpson@archcre.com>
**Subject:** FW: Discussions

**JARED CHASSEN**
Partner
—

**D** 646.854.1947 | **C** 646.634.9955
jchassen@archcre.com | archcorealestate.com
88 University Place, 2ⁿᵈ Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Frank van Biesen <fvanbiesen@35OAK.com>
**Sent:** Wednesday, December 28, 2022 1:27 PM
**To:** Jared Chassen <jchassen@archcre.com>
**Subject:** RE: Discussions

Jared,

See my comments below also

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 529
RECEIVED NYSCEF: 01/29/2024

24-10381jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 328 of 409

**Frank van Biesen, CFA** | **Chief Financial Officer**

Phone: 416-245-6046 ext: 336 | Fax: 416-245-0538

Mobile: 416-648-5139

35 Oak Holdings Ltd. | 35 Oak Street | Toronto ON M9N 1A1

fvanbiesen@35oak.com



**From:** Jared Chassen <jchassen@archcre.com>

**Sent:** December 27, 2022 9:55 AM

**To:** Frank van Biesen <fvanbiesen@35OAK.com>

**Subject:** RE: Discussions

**EXTERNAL**

[EXTERNAL EMAIL]

Re-reading, I put action steps in Green. Let me know if you want to further discuss.

**JARED CHASSEN**

Partner

—

**D** 646.854.1947 | **C** 646.634.9955

jchassen@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Jared Chassen

**Sent:** Tuesday, December 20, 2022 6:50 PM

**To:** fvanbiesen@35oak.com

**Cc:** Bill Wiener <BWiener@35oak.com>; Michael Wiener <MWiener@35oak.com>; Jeffrey Simpson <jsimpson@archcre.com>

**Subject:** RE: Discussions

Frank, thank you for your thoughtful email, Jeff and I reviewed this together and are appreciative of the email. Please see some comments/questions below for clarifications.

**JARED CHASSEN**

Partner

—

**D** 646.854.1947 | **C** 646.634.9955

jchassen@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



---

**From:** Frank van Biesen <fvanbiesen@35OAK.com>
**Sent:** Tuesday, December 20, 2022 11:10 AM
**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen
<jchassen@archcre.com>
**Cc:** Michael Wiener <MWiener@35OAK.com>; Bill Wiener <BWiener@35oak.com>
**Subject:** Discussions


Jeff/Jared,

We owe you guys some feedback and further info on the discussion from last week.
Herewith are some thoughts and further responses, all for review and discussion.

    1.  In an effort to provide some kind of overarching guidance, I expect we could
have as much as $15-$20M available over the coming year. I am somewhat
more comfortable in that position given that the 6-pack sale is now merely days
away from closing. That said, we can't (and you don't expect us to) be carte
blanche with this, since using all this up would completely eliminate any other
opportunities for us. We are committed to supporting the deals we are in,
especially as long as we continue to see them as accretive.


<span style="color:red">Understood and as you know we are being a steward to each dollar spent, stretching
them as much as possible. As previously discussed we have already commenced a full
corporate budget cutting program and started analyzing each deal for cost cutting
measures.</span>

<span style="color:green">We have spent the last week cutting unnecessary expenses, already 7 figures, we
have cut salaries, etc. We are almost done with Phase 1 and I will get you a report
mid Jan of what we did.</span>

<span style="color:blue">Let's include as part of first update meeting in Jan.</span>


    2.  I would like to be somewhat more 'in the weeds' as we move through next
year – ie each deal action plan laid out and reviewed such that we can get

comfort around the additional investment making sense. I am very nervous that we have positions where the lack of participating equity creates much larger carry risk than we would otherwise have expected.

Absolutely, lets figure out how you want to be involved, this is already in motion on each property and corporately from our side.

We are going to implement the 1-2 times a month meeting we used to have during COVID, organically, you can let us know what you want added or removed.

Can we schedule first call? Is Jan 7 too early?

3. In order to stretch dollars I propose that for 2501 JV we only seek to land the TTDs, and do no other work. Notwithstanding the whole 'what do we build' issue, at least there is little carrying cost and no pressure to move from Infinity (that I am aware of).

We have been proposing this for months, but since we're just a project manager at this point, no decisions have been made. This decision will need to be made in concert with the 50% partner (IRE). I propose we have a meeting the first week of January with all parties as IRE has reached out to Michael and I (or even next week as Jeff will be in Florida).

We need to have this meeting ASAP, do you want me to push on the partners to make it happen? Dave has reached out to Michael and I, we didn't respond. It is really Oak at this point that needs to jump in to make this happen.

Not sure a meeting is needed, as Infinity seems happy to sit tight. I can try to organize, but in the interim we need to just charge the JV for JP's time to cement the TDD's.

4. In my ideal world, Pittsburgh would be bought out from under us such that the deposit is not lost. That might be wishful thinking – you guys will have further updates I'm sure. If I need to take capital from the $20M, I need to stack it up against moving Bushwick forward etc. Capital allocation is key across the various deals, which I expect you also appreciate. I know Bill was proposing a certain funding solution that included an extension mechanism to a VTB note, and I'm not dismissing it offhand.

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 529

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-pm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 331 of 409

We are working on options, and I am keeping Frank up to date. I am sending you email for confirmation. OK as discussed separately.

5.  I know you have contemplated the possibility of selling certain positions. We are open to anything you deem worthwhile looking at, including trading out at our basis or even below.

We are working on this on a case-by-case basis, this will continue to be a fluid discussion. We are brainstorming this internally and will start to have these discussions with you as needed in 2023' OK agreed

6.  We will continue to support the platform as we have done. As far as the interest on the loan goes, I think prime (NY Composite?) seems reasonable and can be set fixed at 6-month intervals for simplicity. I am ok with this starting in January alongside a minor modification to our agreement for both parties to understand how we are moving forward together. I am working on an amendment to Oak x Arch that will address all this, expected in Jan 2023 OK

That said, it seems to me (and likely to you also) that 35 Oak has reached its limit of being able to support the future growth objectives of the platform. As I have had to learn – and relearn – the platform requires fee income from deal flow and we are running out of capacity to fund them, partly due to our own diversification, and partly due to Arch's growth need to take on larger deals. As a result, a new principal partner starts to make sense for the platform. I know this isn't happening overnight, but if you agree, we should start a process and a timeline to find one. We would only expect that any outstanding loan would be retired upon finding someone.

We understand and agree, Frank I will continue to work on this with you.  As I mentioned prior, when we do our modification, we will have provisions for this. Understood, this is what amendment is for.  OK

If I have missed anything, let me know. The above is not meant to be declarative, but instead key points for discussion. I'm available all this week and next week.

Frank

**Frank van Biesen, CFA** | **Chief Financial Officer**
Phone: 416-245-6046 ext: 336 | Fax: 416-245-0538
Mobile: 416-648-5139

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 329
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 332 of 409

35 Oak Holdings Ltd. | 35 Oak Street | Toronto ON M9N 1A1
fvanbiesen@35oak.com



**Exhibit S**

From: <jaredchassen@gmail.com>
Date: Thu, Jul 20, 2023 at 9:37 AM
Subject: Fwd: Oak/JJ Proposal
To: Michelle Miller <michelle.c.hirsch@gmail.com>

Jared Chassen

Begin forwarded message:

> **From:** David Berg <db@infinitycollective.com>
> **Date:** July 20, 2023 at 9:07:16 AM EDT
> **To:** jaredchassen@gmail.com
> **Cc:** Jeffery Dayon <JDayon@mdlawllp.com>
> **Subject: RE: Oak/JJ Proposal**

See below thoughts/concerns in <span style="color:red">red</span>:

1. Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries. He would make himself available as a consultant on an agreed hourly rate to help out with specific properties as and when Arch requires. The settlement documents will include customary mutual non-disparagement, confidentiality, and similar provisions. Jeff would also agree to a period of non-solicitation of Arch employees. <span style="color:red">This is obviously critical</span>

2. The JJ Operating Agreement is amended such that Jared has sole control over JJ. <span style="color:red">Jared cannot inherit any liabilities prior to this transition. Ideally there would be a new entity that is fresh that Jared could take over control with. Jeff this should be structured in a similar manner as a receiver or third party if possible. Jared isn't privy or responsible for all the liability that Jeff has put on the company. That risk ultimately needs to stay with EITHER Jeff or 35 Oak. As Simpson has clearly stated, 'Jared is an employee that can be fired'…So why would he have to take on the liability of managing member for anything prior to this exection?</span> Any further amendment involving control or otherwise granting any person approval rights would require Oak consent. JJ would remain the managing member of Arch (subject to the below).

3. The applicable provisions of the Arch Operating Agreement will be amended such that no direct or indirect transfer or change to JJ's structure can be made that would result in Jared ceasing to have sole control of JJ without Oak consent in its sole discretion.

4. Arch and Oak will agree to a reasonable budget for the Properties and for Arch's operations for a reasonable period of time, and Oak will commit to funding that budget in accordance with the JV agreement.  Amendments to the budget, adopting any further budget, or incurring or calling for capital for expenses outside the approved budget will require the consent of Oak.  The budget will take into account the timing of expenses, fee payouts, etc so that as much as possible Oak contributions towards the capital of Arch and the Properties is funded by money coming out of the properties. <span style="color:red">This budget needs to be in collaboration and also approved by Jared. He will need to inform Oak of the salaries/payroll and admin expenses he needs to operate. If they underfund or do not provide the sufficient cash, he can't be forced to stay in the seat and operate.</span>

5. Oak will have the right to appoint the Arch controller/CFO

6. Oak/JJ will discuss a broker (including ACRE) but Oak should have the right to bring in Infinity without a fee and to otherwise bring third party capital on board to help fund/replace capital in on some of these properties

7. JJ and Oak work together in good faith to see if they can get alternative managers to come in and run the portfolio or specific properties at the end of the initial budgeted period (the "Interim Period")

8. After the end of the Interim Period, if (a) alternative managers are not engaged  (b) a new budget/business plan for the next one year period is not agreed-to, or (c) there is any other material deadlock between Oak and JJ, then, at Oak's option, at any time thereafter Oak or its designee will become the managing member of Arch.

9. JJ will cooperate in good faith to enable Oak/Arch to obtain all required third party consents in connection with any change in the manager/managing member. JJ will also confirm that Jared taking control of JJ does not violate any applicable agreement. This will definitely require lender consent on numerous fronts I imagine. I don't see why Oak, if they already own the risk, wouldn't step in as managing member of JJ? This is seemingly the right move and they can retain Jared for services/employment/promote etc… Or they can be co-managing members but Oak owns liability that they already own

10. If Oak or its designee becomes the managing member of Arch, JJ would then remain as a non-managing member with a right to its proportionate share of distributions. Oak/JJ to discuss compensation for work done by JJ up to date of the change of control, including any promote that would then be earned based on current valuations and recognizing their will need to be an incentive for any replacement manager.

11. Customary mutual releases between Oak and Jeff, other than for fraud or willful misconduct

Most of this is 'look forward' terms with Jared in control so this negotiation should be happening with Jared. Not sure why Jeff is even involved other than being removed and released ? The scary thing is that A LOT of the shoes have yet to drop. So yes on Nostrand and Myrtle, they are in default and lender discussions are ongoing. But on other properties, the defaults are yet to occur but are imminent. So if they come post this transaction/change, Jared would be seemingly liable for JJ at that time…We know the risk/liability is coming

**David Berg**
Partner

# infinity collective

db@infinitycollective.com
(212)-795-9595 | Ext 113
M: (610)-324-6474

**Miami**
1111 Lincoln Road, Suite 712
Miami Beach, FL 33139

**New York**
43 West 24th Street, 10th Floor
New York, NY 10010

© Copyright 2023 INFINITY COLLECTIVE LLC. All rights reserved. This email may contain information that is confidential and may c
inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended reci
are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please no
sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** jaredchassen@gmail.com <jaredchassen@gmail.com>
**Sent:** Thursday, July 20, 2023 8:54 AM
**To:** jaredchassen@gmail.com
**Cc:** Jeffery Dayon <JDayon@mdlawllp.com>; David Berg <db@infinitycollective.com>
**Subject:** Re: Oak/JJ Proposal

[CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe]

Looping in Berg proper email.

Jared Chassen

> On Jul 20, 2023, at 8:50 AM, jaredchassen@gmail.com wrote:
>
> Please see an agreement that was sent out from Oak last night. I'd like to review today as it changes my risk in many ways. Jeff , can we please review after you review Arch and JJ.
>
> Also, Jeff, can you give me comments on the chassen/simpson separation, i want to sign that before the relationship sours.
>
> Jared Chassen
>
> Begin forwarded message:
>
>> **From:** Jeffrey Simpson <jsimpson@archcre.com>
>> **Date:** July 20, 2023 at 7:56:27 AM EDT
>> **To:** Len Breslow <LBreslow@breslowwalker.com>

FILED: NEW YORK COUNTY CLERK 09/29/2023 09:18 PM
NYSCEF DOC. NO. 170
INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/29/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 338 of 409

**Cc:** Jared Chassen <jchassen@archcre.com>
**Subject: Re: Oak/JJ Proposal**

Sorry, I didn't mean to send request twice.

JEFFREY SIMPSON

Managing Partner | Arch Companies

D  646.854.6810 | C  646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone

On Jul 20, 2023, at 3:20 AM, Jeffrey Simpson <jsimpson@archcre.com> wrote:

Is 11 or 11:30 okay?

I have a 10

**From:** Len Breslow <LBreslow@breslowwalker.com>
**Sent:** Wednesday, July 19, 2023 11:01 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Subject:** FW: Oak/JJ Proposal

See below.  Can discuss tomorrow.  I should be at my office by 10am or so.

Len Breslow

Breslow & Walker, LLP

[www.breslowwalker.com](www.breslowwalker.com)

-------- Original message --------

From: "Silberstein, Andrew"
<[Andrew.Silberstein@haynesboone.com](Andrew.Silberstein@haynesboone.com)>

Date: 7/19/23 9:33 PM (GMT-05:00)

To: Len Breslow
<[LBreslow@breslowwalker.com](LBreslow@breslowwalker.com)>

Cc: "Lavender, Brad"
<[Brad.Lavender@haynesboone.com](Brad.Lavender@haynesboone.com)>,
"Thorne, Leslie"
<[Leslie.Thorne@haynesboone.com](Leslie.Thorne@haynesboone.com)>

Subject: Oak/JJ Proposal

Len,

On behalf of our client, the below
outlines the terms on which Oak
proposes to resolve the major issues
with JJ/Arch.  Please let us know if you
can jump on a call tomorrow after
you've spoken with your
client.  Thanks.

Subject to FRE 408 and
Equivalent State Statutes

1. Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries. He would make himself available as a consultant on an agreed hourly rate to help out with specific properties as and when Arch requires. The settlement documents will include customary mutual non-disparagement, confidentiality, and similar provisions. Jeff would also agree to a period of non-solicitation of Arch employees.

2. The JJ Operating Agreement is amended such that Jared has sole control over JJ.  Any further amendment involving control or otherwise granting any person approval rights would require Oak consent. JJ would remain the managing member of Arch (subject to the below).

3. The applicable provisions of the Arch Operating Agreement will be amended such that no direct or indirect transfer or change to JJ's structure can be made that would result in Jared ceasing to have sole control of JJ without Oak consent in its sole discretion.

4. Arch and Oak will agree to a reasonable budget for the Properties and for Arch's operations for a reasonable period of time, and Oak will commit to funding that budget in accordance with the JV agreement.  Amendments to the budget, adopting any further budget, or incurring or calling for capital for expenses outside the approved budget will require the consent of Oak.  The budget will take into

FILED: NEW YORK COUNTY CLERK 09/29/2023 09:18 PM INDEX NO. 158055/2023

NYSCEF DOC. NO. 170    24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document    RECEIVED NYSCEF: 09/29/2023

Pg 341 of 409

account the timing of expenses, fee payouts, etc so that as much as possible Oak contributions towards the capital of Arch and the Properties is funded by money coming out of the properties.

5. Oak will have the right to appoint the Arch controller/CFO

6. Oak/JJ will discuss a broker (including ACRE) but Oak should have the right to bring in Infinity without a fee and to otherwise bring third party capital on board to help fund/replace capital in on some of these properties

7. JJ and Oak work together in good faith to see if they can get alternative managers to come in and run the portfolio or specific properties at the end of the initial budgeted period (the "Interim Period")

8. After the end of the Interim Period, if (a) alternative managers are not engaged  (b)  a new budget/business plan for the next one year period is not agreed-to, or (c) there is any other material deadlock between Oak and JJ, then, at Oak's option, at any time thereafter Oak or its designee will become the managing member of Arch.

9. JJ will cooperate in good faith to enable Oak/Arch to obtain all required third party consents in connection with any change in the manager/managing member. JJ will also confirm that Jared taking control of JJ does not violate any applicable agreement.

10. If Oak or its designee becomes the managing member of Arch, JJ would then remain as a non-managing member with a right to its proportionate share of

FILED: NEW YORK COUNTY CLERK 09/29/2023 09:18 PM
NYSCEF DOC. NO. 170

INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/29/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 342 of 409

distributions. Oak/JJ to discuss compensation for work done by JJ up to date of the change of control, including any promote that would then be earned based on current valuations and recognizing their will need to be an incentive for any replacement manager.

11. Customary mutual releases between Oak and Jeff, other than for fraud or willful misconduct



**Andrew Silberstein**
Counsel
andrew.silberstein@haynesboone.com

**Haynes and Boone, LLP**
30 Rockefeller Plaza
26th Floor
New York, NY 10112

(t) +1 212.835.4835
(f) +1 212.884.8243

vCard | Bio | Website

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

FILED: NEW YORK COUNTY CLERK 09/29/2023 09:18 PM
NYSCEF DOC. NO. 170
INDEX NO. 158055/2023
RECEIVED NYSCEF: 09/29/2023

**HAYNES BOONE**

# infinity
# collective

This email has been scanned for spam and viruses. Click here to report this email as spam.

**Exhibit T**

| | |
|---|---|
| **From:** | Michelle Hirsch[michelle.c.hirsch@gmail.com] |
| **Sent:** | Thur 9/7/2023 6:35:49 PM (UTC) |
| **To:** | Jeffrey Simpson[jsimpson@archcre.com] |
| **Subject:** | Fwd: Oak/JJ Proposal |
| **Attachment:** | image001.jpg |

---------- Forwarded message ---------
From: <jaredchassen@gmail.com>
Date: Thu, Jul 20, 2023 at 9:37 AM
Subject: Fwd: Oak/JJ Proposal
To: Michelle Miller <michelle.c.hirsch@gmail.com>


Jared Chassen

Begin forwarded message:

> **From:** David Berg <db@infinitycollective.com>
> **Date:** July 20, 2023 at 9:07:16 AM EDT
> **To:** jaredchassen@gmail.com
> **Cc:** Jeffery Dayon <JDayon@mdlawllp.com>
> **Subject: RE: Oak/JJ Proposal**


See below thoughts/concerns in red:

1. Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries. He would make himself available as a consultant on an agreed hourly rate to help out with specific properties as and when Arch requires. The settlement documents will include customary mutual non-disparagement, confidentiality, and similar provisions. Jeff would also agree to a period of non-solicitation of Arch employees. This is obviously critical

2. The JJ Operating Agreement is amended such that Jared has sole control over JJ. Jared cannot inherit any liabilities prior to this transition. Ideally there would be a new entity that is fresh that Jared could take over control with. Jeff this should be structured in a similar manner as a receiver or third party if possible. Jared isn't privy or responsible for all the liability that Jeff has put on the company. That risk ultimately needs

to stay with EITHER Jeff or 35 Oak. As Simpson has clearly stated, 'Jared is an employee that can be fired'…So why would he have to take on the liability of managing member for anything prior to this exection? Any further amendment involving control or otherwise granting any person approval rights would require Oak consent. JJ would remain the managing member of Arch (subject to the below).

3.  The applicable provisions of the Arch Operating Agreement will be amended such that no direct or indirect transfer or change to JJ's structure can be made that would result in Jared ceasing to have sole control of JJ without Oak consent in its sole discretion.

4.  Arch and Oak will agree to a reasonable budget for the Properties and for Arch's operations for a reasonable period of time, and Oak will commit to funding that budget in accordance with the JV agreement. Amendments to the budget, adopting any further budget, or incurring or calling for capital for expenses outside the approved budget will require the consent of Oak.  The budget will take into account the timing of expenses, fee payouts, etc so that as much as possible Oak contributions towards the capital of Arch and the Properties is funded by money coming out of the properties. This budget needs to be in collaboration and also approved by Jared. He will need to inform Oak of the salaries/payroll and admin expenses he needs to operate. If they underfund or do not provide the sufficient cash, he can't be forced to stay in the seat and operate.

5.  Oak will have the right to appoint the Arch controller/CFO

6.  Oak/JJ will discuss a broker (including ACRE) but Oak should have the right to bring in Infinity without a fee and to otherwise bring third party capital on board to help fund/replace capital in on some of these properties

7.  JJ and Oak work together in good faith to see if they can get alternative managers to come in and run the portfolio or specific properties at the end of the initial budgeted period (the "Interim Period")

8.  After the end of the Interim Period, if (a) alternative managers are not engaged  (b)  a new budget/business plan for the next one year period is not agreed-to, or (c) there is any other material deadlock between Oak and JJ, then, at Oak's option, at any time thereafter Oak or its designee will become the managing member of Arch.

9.  JJ will cooperate in good faith to enable Oak/Arch to obtain all required third party consents in connection with any change in the manager/managing member. JJ will also confirm that Jared taking control of JJ does not violate any applicable agreement. This will definitely require lender consent on numerous fronts I imagine. I don't see why Oak, if they already own the risk, wouldn't step in as managing member of JJ? This is seemingly the right move and they can retain Jared for services/employment/promote etc… Or they can be co-managing members but Oak owns liability that they already own

10.  If Oak or its designee becomes the managing member of Arch, JJ

would then remain as a non-managing member with a right to its proportionate share of distributions.  Oak/JJ to discuss compensation for work done by JJ up to date of the change of control, including any promote that would then be earned based on current valuations and recognizing their will need to be an incentive for any replacement manager.

11.  Customary mutual releases between Oak and Jeff, other than for fraud or willful misconduct

Most of this is 'look forward' terms with Jared in control so this negotiation should be happening with Jared. Not sure why Jeff is even involved other than being removed and released ? The scary thing is that A LOT of the shoes have yet to drop. So yes on Nostrand and Myrtle, they are in default and lender discussions are ongoing. But on other properties, the defaults are yet to occur but are imminent. So if they come post this transaction/change, Jared would be seemingly liable for JJ at that time…We know the risk/liability is coming

**David Berg**

Partner



db@infinitycollective.com

(212)-795-9595 | Ext 113
M: (610)-324-6474

**Miami**
1111 Lincoln Road, Suite 712
Miami Beach, FL 33139

**New York**
43 West 24th Street, 10th Floor


NewYork, NY 10010

© **Copyright 2023 INFINITY COLLECTIVE LLC.** All rights reserved. This email may contain information that is confidential and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** jaredchassen@gmail.com <jaredchassen@gmail.com>
**Sent:** Thursday, July 20, 2023 8:54 AM
**To:** jaredchassen@gmail.com
**Cc:** Jeffery Dayon <JDayon@mdlawllp.com>; David Berg <db@infinitycollective.com>
**Subject:** Re: Oak/JJ Proposal


[CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe]

Looping in Berg proper email.

Jared Chassen

> On Jul 20, 2023, at 8:50 AM, jaredchassen@gmail.com wrote:
>
> Please see an agreement that was sent out from Oak last night. I'd like to review today as it changes my risk in many ways. Jeff , can we please review after you review Arch and JJ.

Also, Jeff, can you give me comments on the chassen/simpson separation, i want to sign that before the relationship sours.

Jared Chassen

Begin forwarded message:

> **From:** Jeffrey Simpson <jsimpson@archcre.com>
> **Date:** July 20, 2023 at 7:56:27 AM EDT
> **To:** Len Breslow <LBreslow@breslowwalker.com>
> **Cc:** Jared Chassen <jchassen@archcre.com>
> **Subject: Re: Oak/JJ Proposal**
>
> Sorry, I didn't mean to send request twice.
>
> JEFFREY SIMPSON
>
> Managing Partner | Arch Companies
>
> D  646.854.6810 | C  646.753.2872
>
> jsimpson@archcre.com | archcorealestate.com
>
> 88 University Place, 11th Floor, New York, NY 10003
>
> Sent from my iPhone
>
>> On Jul 20, 2023, at 3:20 AM, Jeffrey Simpson <jsimpson@archcre.com> wrote:
>>
>> Is 11 or 11:30 okay?
>>
>> I have a 10
>>
>> **From:** Len Breslow <LBreslow@breslowwalker.com>
>> **Sent:** Wednesday, July 19, 2023 11:01 PM

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 535

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 350 of 409

**To:** Jeffrey Simpson
<jsimpson@archcre.com>
**Subject:** FW: Oak/JJ Proposal

See below.  Can discuss tomorrow.  I
should be at my office by 10am or so.

Len Breslow

Breslow & Walker, LLP

www.breslowwalker.com

-------- Original message --------

From: "Silberstein, Andrew"
<Andrew.Silberstein@haynesboone.com>

Date: 7/19/23 9:33 PM (GMT-05:00)

To: Len Breslow
<LBreslow@breslowwalker.com>

Cc: "Lavender, Brad"
<Brad.Lavender@haynesboone.com>,
"Thorne, Leslie"
<Leslie.Thorne@haynesboone.com>

Subject: Oak/JJ Proposal

Len,

On behalf of our client, the below outlines
the terms on which Oak proposes to
resolve the major issues with JJ/Arch.
Please let us know if you can jump on a

call tomorrow after you've spoken with your client. Thanks.

Subject to FRE 408 and
Equivalent State Statutes

1. Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries. He would make himself available as a consultant on an agreed hourly rate to help out with specific properties as and when Arch requires. The settlement documents will include customary mutual non-disparagement, confidentiality, and similar provisions. Jeff would also agree to a period of non-solicitation of Arch employees.

2. The JJ Operating Agreement is amended such that Jared has sole control over JJ. Any further amendment involving control or otherwise granting any person approval rights would require Oak consent. JJ would remain the managing member of Arch (subject to the below).

3. The applicable provisions of the Arch Operating Agreement will be amended such that no direct or indirect transfer or change to JJ's structure can be made that would result in Jared ceasing to have sole control of JJ without Oak consent in its sole discretion.

4. Arch and Oak will agree to a reasonable budget for the Properties and for Arch's operations for a reasonable period of time, and Oak will commit to funding that budget in accordance with the JV agreement. Amendments to the

budget, adopting any further budget, or incurring or calling for capital for expenses outside the approved budget will require the consent of Oak. The budget will take into account the timing of expenses, fee payouts, etc so that as much as possible Oak contributions towards the capital of Arch and the Properties is funded by money coming out of the properties.

5. Oak will have the right to appoint the Arch controller/CFO

6. Oak/JJ will discuss a broker (including ACRE) but Oak should have the right to bring in Infinity without a fee and to otherwise bring third party capital on board to help fund/replace capital in on some of these properties

7. JJ and Oak work together in good faith to see if they can get alternative managers to come in and run the portfolio or specific properties at the end of the initial budgeted period (the "Interim Period")

8. After the end of the Interim Period, if (a) alternative managers are not engaged (b) a new budget/business plan for the next one year period is not agreed-to, or (c) there is any other material deadlock between Oak and JJ, then, at Oak's option, at any time thereafter Oak or its designee will become the managing member of Arch.

9. JJ will cooperate in good faith to enable Oak/Arch to obtain all required third party consents in connection with any change in the manager/managing member. JJ will also confirm that Jared taking control of JJ does not violate any applicable agreement.

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 539
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 353 of 409

10.  If Oak or its designee becomes the managing member of Arch, JJ would then remain as a non-managing member with a right to its proportionate share of distributions. Oak/JJ to discuss compensation for work done by JJ up to date of the change of control, including any promote that would then be earned based on current valuations and recognizing their will need to be an incentive for any replacement manager.

11.  Customary mutual releases between Oak and Jeff, other than for fraud or willful misconduct

**Andrew Silberstein**
Counsel
andrew.silberstein@haynesboone.com

**Haynes and Boone, LLP**
30 Rockefeller Plaza
26th Floor
New York, NY 10112

(t) +1 212.835.4835
(f) +1 212.884.8243

vCard | Bio | Website

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

**Exhibit U**

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 332

INDEX NO. 158055/2023

RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 355 of 409

| | |
|---|---|
| **From:** | Len Breslow[LBreslow@breslowwalker.com] |
| **Sent:** | Thur 7/27/2023 3:17:08 PM (UTC) |
| **To:** | Jeffrey Simpson[jsimpson@archcre.com]; Michelle Miller[mmiller@archcre.com] |
| **Subject:** | RE: One Brown |

Ok.  Message delivered to Brad.  You should have David draft the consents.  Keep me in the loop re: responses from the investors.

**From:** Jeffrey Simpson <jsimpson@archcre.com>
**Sent:** Thursday, July 27, 2023 10:26 AM
**To:** Len Breslow <LBreslow@breslowwalker.com>; Michelle Miller <mmiller@archcre.com>
**Subject:** RE: One Brown

Auction postponed until next Friday, FYI.  Not official yet but lender told us

**From:** Jeffrey Simpson
**Sent:** Wednesday, July 26, 2023 11:41 PM
**To:** Len Breslow <LBreslow@breslowwalker.com>; Michelle Miller <mmiller@archcre.com>
**Subject:** Fwd: One Brown

JEFFREY SIMPSON
Managing Partner | Arch Companies
D  646.854.6810 | C  646.753.2872
jsimpson@archcre.com | archcorealestate.com
88 University Place, 11th Floor, New York, NY 10003

Sent from my iPhone
Begin forwarded message:

> **From:** Michelle Miller <mmiller@archcre.com>
> **Date:** July 26, 2023 at 11:21:36 PM EDT
> **To:** Kevin Wiener <kwiener@35oak.com>, Michael Wiener <MWiener@35oak.com>, fvanbiesen <fvanbiesen@35oak.com>, Charles Dreezer <cdreezer@35oak.com>
> **Cc:** Jeffrey Simpson <jsimpson@archcre.com>, Tristan Last <tlast@archcre.com>, Jared Chassen <jchassen@archcre.com>
> **Subject: Fwd: One Brown**
>
> Hi All - Jeff's reference is to the indemnity point brought up in the email below
>
> MICHELLE MILLER
> Partner | Arch Companies

D  646.854.8551 | C  908.342.2355
mmiller@archcre.com | archcorealestate.com
15 West 27th Street, 6th Floor, New York, NY 10001

---

**From:** Michelle Miller <mmiller@archcre.com>
**Sent:** Wednesday, June 21, 2023 3:54 PM
**To:** Frank van Biesen <fvanbiesen@35OAK.com>; Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Jared Chassen <jchassen@archcre.com>; Michael Wiener <MWiener@35OAK.com>; Charles Dreezer <cdreezer@35oak.com>; Bill Wiener <BWiener@35oak.com>
**Subject:** RE: One Brown

Thank you for the feedback on the direction for Brown. We have provided the most recent documents related to the assignment to your attorney for review and will continue to provide any further drafts for sign off. Furthermore, I wanted to give you a historical review of information so the Oak team has it on file.

The property originally had an investment of the GP and LP of $1.56m and $6.24m of which 35 Oak was $780k of the GP and $1.14m of the LP, and $350k was syndicated post-closing.  The senior loan was $66.4m and the mezz was $9.4m. The deal was consummated on 10/15/2020 and the documents had a completion guaranty and non-recourse carveout guaranty with 35 Oak as the sole guarantor.

The syndicate had a capital call in May 2021 and only provided 12% of the required funds.
The syndicate had a capital call in September 2021 and only provided 28% of the required funds.
The syndicate had a capital call in April 2022 and only provided 11% of the required funds.
The syndicate had a capital call in December 2022 and only provided 10% of the required funds.

At the initial maturity to the senior, the Arch team heavily negotiated with the senior lender to push down the exposure to the partners and guarantor of cash required at the time, knowing that there will be more turbulence ahead.  The mezz lender acknowledged and agreed to the terms of the extension.  The extension was reviewed and approved by signature in November and December for the mezz.

At this point, there was no event of default on the senior or the mezz loan.  In conjunction with the extension, 35 Oak was released from the completion guaranty, but the future obligations were that a debt yield would need to be met and that additional funds would be needed for lender reserves and rate cap for an additional 6-month extension.

Once these obligations were becoming challenging (8 weeks prior), Arch was proactive with the mezz lender to try and cut a deal where 35 Oak would not have to invest any more cash or very minimal cash. This was not successful, and the results were a foreclosure notice. The initial EOD was reflective of 2 months of interest not paid on the mezz loan and the extension payment requirements not being met on the

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 512
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 357 of 409

senior loan.  35 Oak was notified and had no intention of funding.  As the foreclosure date is around the corner, Arch provided 35 Oak with certain options that could buy time, but none of those options would satisfy the defaults or foreclosure except for writing a large equity check which 35 Oak was not willing to do.

We reviewed with your attorney the potential risks associated with a process like this. Your attorney has reviewed with you separately as well, hence the feedback received in your email below.

The reason we have been fighting so hard to negotiate an assignment of membership interests vs the lender proceeding under a UCC auction is to limit the liabilities to 35 Oak. The aim is to obtain a guaranty release from the transfer date onward (with certain carveouts) and for the lender to waive any transfer tax liabilities. To the extent the lender triggers a guaranty as a result of a bad boy act, we will handle together as per the AREH agreement, which provides for indemnities from the directly attributable party.

However, in order to achieve this outcome and to not trigger any other guaranty liabilities, more aggressive paths to fight the foreclosure were not viable options for 35 Oak. This means the only other way to resolve the current defaults would have been to pay the amounts required by the lenders. While we may not disagree with your choice, the decision on how to proceed is ultimately that of 35 Oak's alone. JJ Arch party does not have the obligation to cure the economic defaults under the underlying RE documents and cannot take on the liability of any risks carried forward by 35 Oak's conclusion. As a result, though the chances are remote, for losses that could occur strictly due to the decision to *surrender of the property* (as opposed to performance for example) and any related litigation that could arise from investors (inclusive of legal fees), JJ is asking for a personal and corporate hold harmless and indemnity in order for JJ Arch to sign on behalf of Arch on the assignment documents.

Please acknowledge so that we can continue on the path that has been discussed.

**MICHELLE MILLER**
Partner
—
**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 2ⁿᵈ Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



**From:** Frank van Biesen <fvanbiesen@35OAK.com>
**Sent:** Monday, June 19, 2023 6:22 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>
**Cc:** Jared Chassen <jchassen@archcre.com>; Michelle Miller

<[mmiller@archcre.com](mailto:mmiller@archcre.com)>; Michael Wiener <[MWiener@35OAK.com](mailto:MWiener@35OAK.com)>; Charles Dreezer <[cdreezer@35oak.com](mailto:cdreezer@35oak.com)>; Bill Wiener <[BWiener@35oak.com](mailto:BWiener@35oak.com)>

**Subject:** One Brown

Jeff,

Pursuant to the telephone conversation we had with Michael, we've decided that our sole interest in this project is now just being released from any liability. As discussed we feel it is not in our best interest to pursue any of the aggressive strategies reviewed.

We want to also make sure that we structure it in a way that we are not on the hook for transfer tax. Ideally, let the lender know we are going to give them the keys and in return we would like a release from the guaranties and we want to arrange a 76/24 so we can avoid transfer tax.

We recognize the potential 'tail risks' that you mentioned on the phone, and we hope these will not be come issues as we finalize this unfortunate exit.

Please copy the team on any progress and communications.

Thanks

Frank


**Frank van Biesen, CFA** | **President & COO**
Phone: 416-245-6046 ext: 336 | Fax: 416-245-0538
Mobile: 416-648-5139
35 Oak Holdings Ltd. | 35 Oak Street | North York ON M9N 1A1
[fvanbiesen@35oak.com](mailto:fvanbiesen@35oak.com)



**Exhibit V**



**FIRST REPUBLIC**
*now part of* JPMORGAN CHASE

August 11, 2023

Jeffrey Simpson
1230 Park Ave Apt 16E
New York, NY 10128

RE: Adverse Claim on Your Accounts

Dear Jeffrey Simpson,

Please be advised that effective May 1, 2023, deposit products and services are offered by JPMorgan Chase Bank, N.A., Member FDIC. All references to First Republic Bank, First Republic, or the Bank in any account disclosures, agreements, communications or other applicable materials, now refer to JPMorgan Chase Bank, N.A. All terms and conditions, fees and rates for accounts, products, and services referenced in these disclosures govern your account relationship with JPMorgan Chase Bank, N.A. and are in full force and effect as disclosed until otherwise communicated.

We have received conflicting instructions regarding the ownership and control of the above-referenced account(s). Because we have been made aware that there is a dispute, based on the "Conflicting Demands/Disputes" section of the enclosed Business Account Disclosure and Agreement, we have placed a hold on the attached accounts. While the hold is in effect, no deposits or withdrawals will be permitted. The hold will be released when we receive evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts.

We encourage you to keep us informed on your progress and any arrangements you reach involving the accounts.

Thank you for your understanding, and we wish you a speedy resolution.

Yours sincerely,

Christy Santoro
Preferred Banker
csantoro@firstrepublic.com
(212) 621-1254

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
NYSCEF DOC. NO. 6
INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 361 of 409

| |
|---|
| CHECKING XXXXXXX5334 5952 BENNER MANAGER LLC |
| CHECKING XXXXXXX5342 ARCH REAL ESTATE HOLDINGS LLC |
| CHECKING XXXXXXX5359 JJ ARCH LLC |
| CHECKING XXXXXXX5367 5952 BENNER INVESTOR LLC |
| CHECKING XXXXXXX1395 ARCH 11 GREENE ST MM LLC |
| CHECKING XXXXXXX1577 ARCH BUILDERS LLC A DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC |
| CHECKING XXXXXXX1809 ARCH 11 GREENE ST BUILDERS LLC A DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC |
| CHECKING XXXXXXX8449 5401 CALIFORNIA ASSOCIATES LLC |
| CHECKING XXXXXXX1160 TDRT 11 GREENE STREET LLC |
| CHECKING XXXXXXX2013 ARCH REAL ESTATE HOLDINGS LLC |
| CHECKING XXXXXXX1825 ARCH 45 SAVINGS INVESTORS LLC |
| CHECKING XXXXXXX1874 ARCH 45 SAVINGS LLC |
| CHECKING XXXXXXX1924 ARCH 45 SAVINGS MM LLC |
| CHECKING XXXXXXX1932 45 SAVINGS STREET JV LLC |
| CHECKING XXXXXXX1973 45 SAVINGS STREET MM LLC |
| CHECKING XXXXXXX5952 CAMBRIDGE ACQUISITIONS LLC |
| CHECKING XXXXXXX6075 CAMBRIDGE MEZZ LLC |
| CHECKING XXXXXXX4165 CAMBRIDGE ACQUISITIONS LLC |
| CHECKING XXXXXXX4181 CAMBRIDGE ACQUISITIONS LLC |
| MONEY MARKET CHECKING XXXXXXX3763 CAMBRIDGE ACQUISITIONS LLC |
| CHECKING XXXXXXX4013 ARCH CAMBRIDGE INVESTORS LLC |
| CHECKING XXXXXXX4154 ARCH ADVISORS LLC |
| CHECKING XXXXXXX5160 ARCH ASSET MANAGEMENT LLC |
| CHECKING XXXXXXX7952 ARCH ADVISORS LLC |
| CHECKING XXXXXXX6439 JJ CAMBRIDGE LLC |
| CHECKING XXXXXXX6568 MIDTOWN OAKS JV LLC |
| CHECKING XXXXXXX6451 JJ MIDTOWN OAKS LLC |
| CHECKING XXXXXXX6626 MIDTOWN OAKS MM JV LLC |
| CHECKING XXXXXXX9491 CAMELOT CLASS B JV LLC |
| CHECKING XXXXXXX9509 CAMELOT JV LLC |
| CHECKING XXXXXXX9525 CAMELOT MM JV LLC |
| CHECKING XXXXXXX9541 JJ CAMELOT LLC |
| CHECKING XXXXXXX0673 ARCH PROPERTY MANAGEMENT LLC |
| CHECKING XXXXXXX0764 MMSS LLC |
| CHECKING XXXXXXX7456 NCSC JV LLC |
| CHECKING XXXXXXX7464 NCSC MM JV LLC |
| CHECKING XXXXXXX7480 JJ NCSC LLC |
| MONEY MARKET CHECKING XXXXXXX9197 FRANCISCAN PROPERTY OWNER LLC |
| MONEY MARKET CHECKING XXXXXXX9346 ABNER PROPERTY OWNER LLC |
| MONEY MARKET CHECKING XXXXXXX8508 OAK GROVE PROPERTY OWNER LLC |
| CHECKING XXXXXXX5724 LAKESTAR CAMBRIDGE LLC |
| CHECKING XXXXXXX5799 ARCH SLOPE CAMBRIDGE LLC |
| CHECKING XXXXXXX5823 ARCH SLOPE CAMBRIDGE MM LLC |
| CHECKING XXXXXXX5872 ARCH CAMBRIDGE MM LLC |
| CHECKING XXXXXXX5948 102-02 PARTNERS CAMBRIDGE LLC |

| |
|---|
| CHECKING XXXXXXX6003 4690 ORACLE INVESTORS LLC |
| CHECKING XXXXXXX0122 ARCH BUILDERS LLC A DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC |
| CHECKING XXXXXXX6194 ARCH PROPERTY MANAGEMENT LLC |
| CHECKING XXXXXXX2411 ONE BROWN JV LLC |
| CHECKING XXXXXXX2429 ONE BROWN MM JV LLC |
| CHECKING XXXXXXX6016 1 BROWN STREET ASSOCIATES LP AND 1 BROWN STREET OWNER LLC (DACA) |
| CHECKING XXXXXXX6024 1 BROWN STREET ASSOCIATES LP |
| CHECKING XXXXXXX6032 1 BROWN STREET ASSOCIATES LP |
| CHECKING XXXXXXX4607 RIDGEWOOD TOWER LLC |
| CHECKING XXXXXXX4110 MYRTLE POINT CM LLC |
| CHECKING XXXXXXX4243 MYRTLE POINT JV LLC |
| CHECKING XXXXXXX4458 MYRTLE POINT MM JV LLC |
| CHECKING XXXXXXX9070 JJ ARCH HOLDINGS CORP |
| CHECKING XXXXXXX5413 DRAKE ARCH BIRMINGHAM 1 LLC |
| CHECKING XXXXXXX5470 PEBBLE CREEK BORROWER LLC |
| CHECKING XXXXXXX5512 JJ PEBBLE CREEK LLC |
| CHECKING XXXXXXX5553 PEBBLE CREEK MM JV LLC |
| CHECKING XXXXXXX0862 PEBBLE CREEK BORROWER LLC |
| CHECKING XXXXXXX0896 PEBBLE CREEK BORROWER LLC |
| CHECKING XXXXXXX4826 2501 VENTURES OP CO I LLC |
| CHECKING XXXXXXX1846 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0744 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0785 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0793 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0801 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0843 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0884 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0918 HAMR BORROWER 3 LLC |
| CHECKING XXXXXXX0942 HAMR BORROWER 3 LLC (DEPOSIT ACCOUNT CONTROL AGREEMENT) |
| CHECKING XXXXXXX2326 ARCH DEVELOPERS LLC |
| CHECKING XXXXXXX3294 2501 ARCH LLC |
| CHECKING XXXXXXX3351 2501 JV LLC |
| CHECKING XXXXXXX1005 3820 1ST OWNER LLC |
| CHECKING XXXXXXX1044 3820 1ST OWNER LLC |
| CHECKING XXXXXXX1336 3504 12TH OWNER LLC |
| CHECKING XXXXXXX5987 3504 12TH OWNER LLC (DEPOSIT ACCOUNT CONTROL AGREEMENT) |
| CHECKING XXXXXXX5995 3504 12TH OWNER LLC |
| CHECKING XXXXXXX1203 235 JAMES OWNER LLC |
| CHECKING XXXXXXX1810 235 JAMES OWNER LLC |
| CHECKING XXXXXXX1054 DRAKE ARCH TUSCALOOSA 1 LLC |
| CHECKING XXXXXXX0019 ARCH TUSCALOOSA MM LLC |
| CHECKING XXXXXXX0084 JJ TUSCALOOSA LLC |
| CHECKING XXXXXXX7278 2501 BISCAYNE PROPERTY OWNER LLC |
| CHECKING XXXXXXX2373 ARCH PROPERTY HOLDINGS 2 LLC |
| CHECKING XXXXXXX2541 JJ COLUMBIA LLC |
| CHECKING XXXXXXX2418 DRAKE ARCH COLUMBIA 1 LLC |

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 6
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 08/15/2023
Pg 363 of 409

CHECKING XXXXXXX2475 COLUMBIA MM JV LLC

CHECKING XXXXXXX8438 9 VANDAM JV LLC

CHECKING XXXXXXX8776 9 VANDAM OWNER LLC

CHECKING XXXXXXX8867 JJ VANDAM LLC

CHECKING XXXXXXX6402 HAMR BORROWER 3 LLC

CHECKING XXXXXXX0347 3504 12TH OWNER LLC

CHECKING XXXXXXX8537 9 VANDAM MM JV LLC

CHECKING XXXXXXX2060 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2102 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2128 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2151 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2169 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2177 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2185 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2201 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2219 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2235 ARCH BUILDERS LLC DISREGARDED ENTITY OF ARCH REAL ESTATE HOLDINGS LLC

CHECKING XXXXXXX2037 1700 ARCH JJ LLC

CHECKING XXXXXXX2045 1700 ARCH LLC

CHECKING XXXXXXX9537 CENTER POINT BORROWER 1 LLC

CHECKING XXXXXXX1409 CENTER POINT BORROWER 1 LLC (OPERATING - CAPEX)

CHECKING XXXXXXX1417 CENTER POINT BORROWER 1 LLC (OPERATING - RENT)

CHECKING XXXXXXX1540 CENTER POINT BORROWER 1 LLC (SECURITY DEPOSIT)

CHECKING XXXXXXX9636 CENTER POINT BORROWER 2 LLC

CHECKING XXXXXXX0154 CENTER POINT BORROWER 2 LLC (SECURITY DEPOSIT ACCOUNT)

CHECKING XXXXXXX0188 CENTER POINT BORROWER 2 LLC (OPERATING - RENT)

CHECKING XXXXXXX0220 CENTER POINT BORROWER 3 LLC

CHECKING XXXXXXX6215 CENTER POINT BORROWER 3 LLC (OPERATING ACCOUNT - RENT)

CHECKING XXXXXXX6223 CENTER POINT BORROWER 3 LLC (SECURITY DEPOSIT ACCOUNT)

CHECKING XXXXXXX5922 CAMELOT 3 LLC

CHECKING XXXXXXX5930 CAMELOT HOLDINGS JV 2 LLC

CHECKING XXXXXXX5948 CAMELOT JV 2 LLC

CHECKING XXXXXXX5963 CAMELOT MM JV 2 LLC

CHECKING XXXXXXX5971 CAMELOT MM JV 3 LLC

CHECKING XXXXXXX5989 NCSC JV 2 LLC

CHECKING XXXXXXX5997 NCSC MM JV 2 LLC

CHECKING XXXXXXX6003 MIDTOWN OAKS MM JV 2 LLC

CHECKING XXXXXXX6011 MIDTOWN OAKS JV 2 LLC

CHECKING XXXXXXX4703 9 VANDAM BORROWER 2 LLC

CHECKING XXXXXXX6583 88 ARCH LLC

CHECKING XXXXXXX2053 9 VANDAM LP JV LLC

CHECKING XXXXXXX2460 1580 NOSTRAND LLC

CHECKING XXXXXXX1303 ARCH NOSTRAND MM LLC

CHECKING XXXXXXX1442 225 HPR LLC

CHECKING XXXXXXX5207 JJ ARCH NOSTRAND LLC

CHECKING XXXXXXX0904 88 SCHWENKS LLC

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
NYSCEF DOC. NO. 6
INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023
24-10381-jpm   Doc 192   Filed 09/18/24   Entered 09/18/24 14:54:15   Main Document
Pg 364 of 409

| | |
|---|---|
| CHECKING XXXXXXX8400 88 TOWER LLC | |
| CHECKING XXXXXXX0767 88 TOWER LLC | |
| CHECKING XXXXXXX0495 CONSTRUCTION SERVICES AND SOLUTIONS LLC | |
| CHECKING XXXXXXX8039 JJ 88 ARCH LLC | |
| CHECKING XXXXXXX5316 88 TOWER LLC (DACA ACCOUNT) | |
| CHECKING XXXXXXX0751 TOWER OWNER TWO LLC | |
| CHECKING XXXXXXX1124 JJ NY 550 LLC | |
| CHECKING XXXXXXX7223 ORE LIVING II LLC | |
| CHECKING XXXXXXX0709 146 E 89 BORROWER 1 LLC | |
| CHECKING XXXXXXX9858 JJ NY 550 LLC | |
| CHECKING XXXXXXX6075 ARCH NOSTRAND LLC | |
| CHECKING XXXXXXX6688 3200 N HAVERHILL BORROWER LLC | |
| CHECKING XXXXXXX3516 3200 N HAVERHILL BORROWER LLC | |

**Exhibit W**

| | |
|---|---|
| **From:** | Lavender_Brad |
| **To:** | Silberstein_Andrew |
| **Subject:** | FW: Capital Call for AREH and Myrtle Point Reallocation / Immediate Cash Needs |
| **Date:** | Thursday, October 26, 2023 9:18:56 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | AREH Spending_102523.pdf |
| | Myrtle - 520 - Capital Call - 10.24.2023.pdf |
| | Myrtle - 524 - Capital Call - 10.24.2023.pdf |
| | Myrtle - NJ - Capital Call 10.24 2023.pdf |
| | capital call notice 10.25.23.pdf |



-------- Original message --------

From: Jeffrey Simpson <jsimpson@archcre.com>

Date: 2023-10-25 10:40 p.m. (GMT-05:00)

To: Frank van Biesen <fvanbiesen@35OAK.com>, Michael Wiener <MWiener@35OAK.com>, Kevin Wiener <kwiener@35oak.com>

Cc: Tristan Last <tlast@archcre.com>, Michelle Miller <mmiller@archcre.com>, Scott Griffin <sgriffin@grifflegal.com>

Subject: Capital Call for AREH and Myrtle Point Reallocation / Immediate Cash Needs

<span style="background-color:#f5d76e">**EXTERNAL**</span>
[EXTERNAL EMAIL]

Good evening,

Attached is the Arch spending and receivables reconciliation and budget. In addition, we've attached a proposed capital call package which includes the reallocation of certain funds from the AREH loan to the Myrtle Point project.

Please note that the following funds are required for payroll and employee benefits by Monday. There is a payroll for CS&S due tomorrow, we will either fund that from cash from operations or I will inject the cash required to cover it. The others are urgent. You will see that many of these should ultimately be reimbursed from the properties when funding resumes, as we have done in the past and standard course of operations.

Tristan and Michelle are CC here for any questions that you may have. Also, please note that Michelle will likely only be in the office until Friday and she will be on maternity leave possibly starting on Monday, depending on her Dr's visit. She will be available as much as possible next week but it's unknown and of course we all wish for her health first and foremost.

Thanks,

Jeff

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 301
RECEIVED NYSCEF: 11/03/2023



Thanks

**MICHELLE MILLER**
Partner
—
**D** 646.854.8551 | **C** 908.342.2355
mmiller@archcre.com | archcorealestate.com
88 University Place, 2nd Floor, New York, NY 10003

*PLEASE NOTE THAT OUR ADDRESS HAS CHANGED*



FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 301
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
RECEIVED NYSCEF: 11/03/2023
Pg 368 of 409

October 24, 2023

608941 NJ Inc.

Re:    Arch Real Estate Holdings LLC

To Michael Wiener:

Reference is hereby made to the Limited Liability Company Agreement of Arch Real Estate Holdings LLC (the "Company") dated as of December 11, 2017 (the "LLC Agreement"). All capitalized terms used herein shall have the same meanings herein as in the LLC Agreement unless otherwise defined herein.

Whereas on June 26, 2023, 608941 NJ Inc. made a payment in the amount of $650,000.00 to the Company's account. As noted in the email attached in Exhibit A, this amount was offset by open receivables of a Company Asset, Myrtle Point, shown in Exhibit B;

Whereas this payment should have been credited to the capital account of 608941 NJ Inc. at the Company Asset Myrtle Point and funds used toward affiliate accounts payable;

Whereas this payment was instead shown as a payment toward the Investor Member Maximum Capital Contribution;

Whereas, as shown in Exhibit C, we will be making reallocations to properly reflect the Investor Member's $650,000.00 payment as an increase to its capital account at the Myrtle Point Company Asset and a reduction of the Investor Member's balance applied toward the Investor Member Maximum Capital Contribution:

Therefore, this notice constitutes a Capital Call Notice in accordance with Section 3.2 of the LLC Agreement. Pursuant to Section 3.2.1 of the LLC Agreement, the Manager has determined that additional funds, in an aggregate amount of $413,038.00, are required by the Company or a Subsidiary. The Required Contribution by 608941 NJ Inc is $413,038.00. Please wire the Required Contribution in immediately available funds to the Company account no later than October 31, 2023.

Please contact jsimpson@archcre.com with any questions.

Yours truly,

JJ Arch LLC

By:_____
Name: Jeffrey Simpson
Title:  Authorized Signatory

**Exhibit A**

## Corporate Cash Needs

MM    Michelle Miller
To ○ fvanbiesen
Cc ○ Jared Chassen

↩ Reply    ↩ Reply All    → Forward    [image]    ...

Fri 6/23/2023 11:21 AM

(i) You replied to this message on 6/23/2023 3:20 PM.

[PDF]  Corporate Expense Projection.pdf  ✓
       13 KB

We are calling for a total of $650k to support corporate expenses for the next 4 weeks (breakout attached). In addition to direct expenses, this includes $87k which is due to 435 Central which was previously used for CS&S. However, we have $451k of open receivables from Myrtle through May and an estimated additional $160k in June which would have otherwise significantly reduced this amount. We will also be sending out property cash needs later today.

|  |  |
|---|---|
| $435,000 | Corporate Cash Needs |
| $87,000 | Due to 435 Central |
| $128,000 | Due to JJ |
| $650,000 | Total Corporate Needs |

|  |  |
|---|---|
| $451,000 | Receivables from Myrtle through May |
| $160,000 | Estimated Myrtle Receivables in June |
| $39,000 | Net |

Thanks

**MICHELLE MILLER**

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 301

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document

RECEIVED NYSCEF: 11/03/2023

Pg 370 of 409

**Exhibit B**



**Myrtle Point CM LLC**

**Unpaid Bills**

Due: January - December 2023

| DATE | TRANSACTION TYPE | NUM | DUE DATE | PAST DUE | AMOUNT | OPEN BALANCE |
|---|---|---|---|---|---|---|
| ▼ Arch Builders LLC (646) 854-5811 | | | | | | |
| 01/09/2023 | Bill | 1569 | 02/08/2023 | 258 | 752.11 | 752.11 |
| 03/29/2023 | Bill Payment (Check) | wired 3/29 | 03/29/2023 | 209 | -29,538.13 | -29,538.13 |
| 03/09/2023 | Bill | 1818 | 04/08/2023 | 199 | 20,000.00 | 20,000.00 |
| 03/14/2023 | Bill | 1834 | 04/13/2023 | 194 | 38,098.52 | 38,098.52 |
| 03/22/2023 | Bill | 1839 | 04/21/2023 | 186 | 29,538.13 | 29,538.13 |
| 03/22/2023 | Bill | 1802 | 04/21/2023 | 186 | 5,430.15 | 5,430.15 |
| 03/31/2023 | Bill | 1872 | 04/30/2023 | 177 | 40,000.00 | 40,000.00 |
| 03/31/2023 | Bill | 1868 | 04/30/2023 | 177 | 3,059.17 | 3,059.17 |
| 05/24/2023 | Bill | 1910 | 05/23/2023 | 154 | 28,238.25 | 28,238.25 |
| 06/20/2023 | Bill | 1875 | 07/20/2023 | 96 | 150,198.00 | 150,198.00 |
| **Total for Arch Builders LLC** | | | | | **$285,776.20** | **$285,776.20** |
| ▼ Construction Services and Solution LLC | | | | | | |
| 03/01/2023 | Bill | 1139 | 03/31/2023 | 207 | 36,489.09 | 36,489.09 |
| 05/11/2023 | Bill | 1193 | 06/10/2023 | 136 | 100,209.17 | 25,209.17 |
| 05/19/2023 | Bill | 1903 | 06/18/2023 | 128 | 80,000.00 | 80,000.00 |
| 06/01/2023 | Bill | 1206 (Myrtle) | 07/01/2023 | 115 | 188,859.05 | 188,859.05 |
| 06/07/2023 | Bill | 1214 | 07/07/2023 | 109 | 101,658.03 | 101,658.03 |
| 06/14/2023 | Bill | 1221 | 07/14/2023 | 102 | 89,462.49 | 89,462.49 |
| 06/21/2023 | Bill | 1233 | 07/21/2023 | 95 | 74,621.48 | 74,621.48 |
| 06/30/2023 | Bill | 1241 | 07/30/2023 | 86 | 66,528.88 | 66,528.88 |
| **Total for Construction Services and Solution LLC** | | | | | **$737,828.19** | **$662,828.19** |
| **TOTAL** | | | | | **$1,023,604.39** | **$948,604.39** |



**Ridgewood Towe LLC**

**A/P Aging Detail**

As of June 30, 2023

| DATE | TRANSACTION TYPE | NUM | VENDOR | DUE DATE | PAST DUE | AMOUNT | OPEN BALANCE |
|---|---|---|---|---|---|---|---|
| ▼ Current | | | | | | | |
| 06/06/2023 | Bill | 518 | Arch Advisors LLC | 07/06/2023 | 110 | 62,500.00 | 62,500.00 |
| 06/06/2023 | Bill | 517 | Arch Advisors LLC | 07/06/2023 | 110 | 62,500.00 | 62,500.00 |
| **Total for Current** | | | | | | **$125,000.00** | **$125,000.00** |
| **TOTAL** | | | | | | **$125,000.00** | **$125,000.00** |

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM

NYSCEF DOC. NO. 301

INDEX NO. 158055/2023

RECEIVED NYSCEF: 11/03/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 371 of 409

## Exhibit C

| | | DR | CR |
|---|---|---|---|
| **ARCH REAL ESTATE HOLDINGS** | | | |
| 6/26/2023 PARTNERS EQUITY:608941 NJ INC.:LOAN @ 4% | | 650,000.00 | |
| Investment in Subsidiaries:Arch Builders LLC | | | 650,000.00 |
| | | | |
| **ARCH BUILDERS** | | | |
| 6/26/2023 Equity:Members Draw/Distribution | | 650,000.00 | |
| Investment in Subsidiaries:Construction Services & Solutions LLC | | | 650,000.00 |
| | | | |
| **CS&S** | | | |
| 6/26/2023 Equity: ARCH BUILDERS LLC:DISTRIBUTION/DRAW | | 650,000.00 | |
| Accounts Receivable (Myrtle) | | | 650,000.00 |
| | | | |
| **MYRTLE POINT CM** | | | |
| 6/26/2023 Accounts Payable (CS&S) | | 650,000.00 | |
| Accounts Receivable (Ridgewood Tower) | | | 650,000.00 |
| | | | |
| **RIDGEWOOD TOWER** | | | |
| 6/26/2023 Accounts Payable (Myrtle Point CM) | | 650,000.00 | |
| Members Equity | | | 650,000.00 |

**Exhibit X**

| | |
|---|---|
| **From:** | Thorne, Leslie |
| **To:** | Michael Wiener; Kevin Wiener; Lavender, Brad; Silberstein, Andrew; Bottini, Aishlinn |
| **Subject:** | FW: Arch - Payroll Funding Request |
| **Date:** | Friday, October 27, 2023 6:47:02 PM |
| **Attachments:** | PtXYdITY-1 copy.png |
| | 3209_001.pdf |



## HAYNES BOONE

**Leslie C. Thorne** | Partner | She/Her/Hers
leslie.thorne@haynesboone.com | (t) +1 212.835.4848

**From:** Scott Griffin <sgriffin@grifflegal.com>
**Sent:** Friday, October 27, 2023 6:35 PM
**To:** Thorne, Leslie <Leslie.Thorne@haynesboone.com>
**Cc:** Lavender, Brad <Brad.Lavender@haynesboone.com>; Richard Milin <rmilin@grifflegal.com>
**Subject:** Re: Arch - Payroll Funding Request

---

**EXTERNAL:** Sent from outside Haynes and Boone, LLP

---

Leslie:

Given Oak's refusal to honor any portion of the recent Capital Call, including our expressed request for Oak to fund the upcoming payroll, AREH was required to furlough employees.

Please see the attached letter sent to employees. AREH reserves all rights.


# GRIFFIN

Scott A. Griffin I Partner
**Griffin LLP**
420 Lexington Avenue, Suite 400
New York, NY 10170
Office: +1.646.998.5575
Mobile: +1.917.975.4863
Fax:  +1.646.998.5574

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
NYSCEF DOC. NO. 302

INDEX NO. 158055/2023
RECEIVED NYSCEF: 11/03/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 374 of 409

sgriffin@grifflegal.com | www.grifflegal.com

On Oct 27, 2023, at 6:05 PM, Thorne, Leslie <Leslie.Thorne@haynesboone.com> wrote:

If there's a condition Mr. Simpson finds objectionable and there is a good reason why, we're happy to consider.

<image001.jpg>

**Leslie C. Thorne** | Partner | She/Her/Hers
leslie.thorne@haynesboone.com | (t) +1 212.835.4848

**From:** Scott Griffin <sgriffin@grifflegal.com>
**Sent:** Friday, October 27, 2023 4:21 PM
**To:** Thorne, Leslie <Leslie.Thorne@haynesboone.com>
**Cc:** Lavender, Brad <Brad.Lavender@haynesboone.com>; Richard Milin <rmilin@grifflegal.com>
**Subject:** Re: Arch - Payroll Funding Request

| **EXTERNAL:** Sent from outside Haynes and Boone, LLP |
| --- |

Leslie:

I'll forward this to my client, but confirming that your client is not willing to fund the very specific payroll of $299k needed for Monday unless the below conditions are satisfied, correct?

Best,

Scott

Scott A. Griffin I Partner
**Griffin LLP**
420 Lexington Avenue, Suite 400
New York, NY 10170
Office: +1.646.998.5575
Mobile: +1.917.975.4863
Fax:  +1.646.998.5574
sgriffin@grifflegal.com | www.grifflegal.com

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 302

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 375 of 409

RECEIVED NYSCEF: 11/03/2023

On Oct 27, 2023, at 4:12 PM, Thorne, Leslie <Leslie.Thorne@haynesboone.com> wrote:

Scott,

As your client knows, Investor Member has never refused to provide funding for payroll or other overhead.  Instead, despite having no further funding obligation, it has simply—and repeatedly—sought basic information and commitments before contributing more money into a completely opaque organization.  But that information has not been forthcoming.  Thus, in order to consider further commitments, Investor Member needs the following from Mr. Simpson:

1. **Books and records.**  Investor Member has been provided with only minimal information that does not even come close to what has been ordered produced and what Investor Member needs to assess Arch's financial situation.  While it can see sales and invoices, it can't see whether any of those invoices have been paid. We also don't have any visibility into balance sheets, audit logs, or where Investor Member's capital contributions have gone.  We have been told that the only way we can see this information is by Arch granting admin access, to which our client promptly responded that it would be willing to sign something committing not to change anything in the system (only to view what is there). Attached please find a letter agreement to that end.

2. **Payroll information.**  Investor Member needs specific information concerning payroll:  who is on payroll, their position, how much they get paid and when payment is due.  Once paid, when is the next payroll date?

3. **Commitment as to use of funds.**  Investor Member also needs an agreement as to how any contribution would be used.  Specifically, we need confirmation that no Arch employees will be working for or providing any services whatsoever to JJ Arch or Mr. Simpson personally (including but not limited to work for Rever).  We further need confirmation that none of the contributed funds will be used to pay the Griffin firm, Mr. Israel's firm or JJ Arch.

4. **Simpson return of monies owed to Arch**. In order to secure additional funds, Mr. Simpson must repay Arch the money he owes it.  Mr. Simpson has already admitted that he owes Arch money for, among other things, payments to Rever workers and to others doing work for him personally.  We would need to see proof of repayment of those amounts.

5. **Extension of TRO/commitment not to file any bankruptcy**

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 302
RECEIVED NYSCEF: 11/03/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 376 of 409

**petition without consent**. As you might expect, Investor Member is reluctant to provide additional funds when it is doing so under extreme duress and the threat of an unauthorized and unnecessary bankruptcy filing that would only serve to hurt Arch and Investor Member. Thus, Arch needs to agree that it will honor the terms of the TRO and its prohibition on any bankruptcy filing without consent until November 30.

6. **Classification of capital contributions.** Investor Member requires that Mr. Simpson rescind his efforts to reclassify Investor Member's prior capital contributions. As I'm sure you can appreciate, Investor Member will not continue to fund—despite having no obligation to do so—while Mr. Simpson is wrongfully trying to reclassify its equity.


Best,
Leslie


<image001.jpg>


**Leslie C. Thorne** | Partner | She/Her/Hers
leslie.thorne@haynesboone.com | (t) +1 212.835.4848
**From:** Scott Griffin <sgriffin@grifflegal.com>
**Sent:** Friday, October 27, 2023 9:55 AM
**To:** Thorne, Leslie <Leslie.Thorne@haynesboone.com>
**Cc:** Lavender, Brad <Brad.Lavender@haynesboone.com>; Richard Milin <rmilin@grifflegal.com>
**Subject:** Arch - Payroll Funding Request


**EXTERNAL:** Sent from outside Haynes and Boone, LLP


 Leslie:


As I mentioned to you on Wednesday evening the company is dealing with a severe liquidity issue - specifically included in that liquidity issue is that the company does not have the requisite cash to fund payroll in the amount of approx.$300k (the payroll funding payment is due on Monday). The payroll amount was included in the budget with the recent Capital Call. I am attaching a breakout with payroll related amounts.  As you can appreciate, we can't have employees come to work if we can't pay them, and will correspondingly likely lose those employees.


We have not heard back on your client's willingness to honor the Capital Call or whether they had any issues with the budget. Can you advise as to whether your client intends to provide funding (all or part) in connection

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
NYSCEF DOC. NO. 302

INDEX NO. 158055/2023
RECEIVED NYSCEF: 11/03/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 377 of 409

with the Capital Call and related budget?

Best,

Scott

<image002.png>

Scott A. Griffin I Partner
**Griffin LLP**
420 Lexington Avenue, Suite 400
New York, NY 10170
Office: +1.646.998.5575
Mobile: +1.917.975.4863
Fax:  +1.646.998.5574
sgriffin@grifflegal.com I www.grifflegal.com

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended
recipient. If you have received this transmission in error, please
immediately notify the sender and delete it from your system.
<Oct. 27 2023 Letter Agreement.docx>

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended
recipient. If you have received this transmission in error, please
immediately notify the sender and delete it from your system.

FILED: NEW YORK COUNTY CLERK 11/03/2023 01:51 PM
NYSCEF DOC. NO. 302

INDEX NO. 158055/2023
RECEIVED NYSCEF: 11/03/2023

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 378 of 409

Arch Real Estate Holdings LLC
88 University, 2nd Floor
New York, NY 10003

October 27, 2023

To: All Employees
Subject: Important Update

Dear Team,

It is with a heavy heart that I am writing to inform you about a difficult and unfortunate situation that we are facing. We understand and appreciate all of your hard work and dedication in contributing to the success of Arch.

Arch has recently been confronted with unexpected and severe financial challenges despite our best efforts to mitigate them. Due to these challenges, we do not want to be in a position where employees are performing work for which they are not compensated for.

Accordingly, you are as of this date being placed on furlough and must stop all work beginning immediately. We will be in touch with further instruction as soon as we have more information.

Please know that you will be compensated for all work you have already performed to date in accordance with Arch's regular payroll procedures. Please know that we are actively exploring all available options to address this issue and get back on track as soon as possible.

During this challenging period, we want to assure you that we are committed to keeping you informed of any developments and progress in resolving this issue. We encourage you to reach out to Tristan Last for any questions you may have, and we will do our best to provide support and assistance.

We appreciate your understanding, patience, and dedication during these trying times. Your resilience and commitment are what have made our company great, and we are fully committed to resolving this situation in a way that is fair and just to all of our valued employees. We are confident that, together, we will overcome this challenge and emerge even stronger.

Thank you for your understanding and continued dedication to Arch. Your hard work and commitment are deeply appreciated.

Sincerely,

Jeffrey Simpson
Authorized Signatory
Arch Companies

FIRM:62908710v1

**Exhibit Y**

SHIPMAN

January 11, 2024

## VIA FEDERAL EXPRESS AND EMAIL

To Distribution List on Schedule 1 attached hereto.

Re:     Mezzanine loan (the "Loan") made to Cambridge Mezz LLC, a Delaware limited liability company and Cambridge Mezz 2 LLC, a Delaware limited liability company, jointly and severally, as borrower (collectively, "Borrower"), which Loan is (a) evidenced by, inter alia, (i) that certain Mezzanine Promissory Note, dated as of October 9, 2018, in the original principal amount of $6,900,000.00 (the "Note") in favor of MSC-Cambridge Charlotte Holdco, LLC (together with its successors and assigns, the "Lender"), and (ii) that certain Mezzanine Loan Agreement, dated as of October 9, 2018, by and between Borrower and Lender (the "Loan Agreement"), and (b) secured by, inter alia, that certain Pledge and Security Agreement, dated as of October 9, 2018, by Borrower in favor of Lender (the "Security Instrument"; together with the Note, the Loan Agreement and each other document entered into in connection with the Loan, as the same may be amended, modified and supplemented from time to time, each a "Loan Document" and collectively, the "Loan Documents"). In connection with the Loan, each of Yeheskel Frankel, an individual, and 35 Oak Holdings Limited, a corporation organized under the laws of Ontario, jointly and severally, as guarantor (collectively, "Guarantor") delivered to Lender that certain Mezzanine Limited Recourse Guaranty, dated as of October 9, 2018.

Dear Sirs and Mesdames:

Shipman & Goodwin LLP represents the Lender in connection with the Loan.

Reference is made to the Loan Agreement. Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

We understand that (a) Arch Real Estate Holdings LLC ("AREH") is the non-member manager of Arch Cambridge MM LLC, a Sponsor under the Loan Agreement ("Arch Cambridge"), (b) AREH is owned by JJ Arch LLC ("JJ Arch") and 608941 NJ Inc. ("608941"), (c) prior to the effective date of the removal notice referenced in the following clause (d), JJ Arch served as the managing member of AREH and (d) by notice dated October 31, 2023, 608941 removed JJ Arch as managing member of AREH effective as of 12:01 a.m. on November 2017 and that from and after such date, 608941 has served as the managing member of AREH.

Article 6 of the Loan Agreement prohibits transfers (including involuntary transfers) of direct or indirect legal or beneficial interests in any Restricted Party. As AREH is the non-member manager of Arch Cambridge, a Sponsor, AREH is a Restricted Party under the Loan Agreement. Accordingly, the involuntary transfer of the managing member rights in

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
NYSCEF DOC. NO. 554
INDEX NO. 158055/2023
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 381 of 409

AREH, constitutes a prohibited transfer under Article 6 of the Loan Agreement and an Event of Default under the Loan Documents.

Additionally, we hereby notify Borrower and Guarantors that a violation of Article 6 of the Loan Agreement also results in the Debt becoming full recourse to Borrower under Section 13(b) of the Loan Agreement and full recourse to the Guarantors on joint and several basis under the terms of the Guaranty.

PLEASE TAKE NOTICE that Lender hereby reserves all of its rights, remedies and powers under the Loan Documents, at law and in equity, arising from or in connection with the transfer described above.

PLEASE ALSO TAKE NOTICE that failure of or delay by Lender to exercise all or any of its rights, remedies or powers shall not be deemed to constitute a modification or waiver thereof, an extension of any date for performance by Borrower or any Guarantor, nor shall it be a bar to the exercise of Lender's rights, remedies and powers at a later date. Lender has not agreed to forbear from exercising its rights, remedies and powers, but rather reserves the right to take such action at such time as Lender deems necessary or appropriate in order to protect its interests, and Lender hereby expressly reserves all of its rights, remedies and powers.

This letter is made without prejudice to or waiver of the rights and remedies of the Lender under the Loan Documents, or any other right or remedy available to Lender at law or in equity. The acceptance of any payments by Lender from Borrower shall not constitute a waiver of the rights and remedies of Lender under the Loan Documents, or any other right or remedy available to Lender at law or in equity. Should there be any discussions or communications among Borrower, Guarantors and/or Lender (or any other Person holding an interest in the Loan), or their respective representatives or counsel (including, without limitation, any servicer or special servicer of the Loan), about the above matters, or should there be any delay in Lender exercising its respective rights and remedies under the Loan Documents, the same shall not cause a modification thereof, establish a custom or practice, or waive, limit or condition Lender's rights and remedies under the Loan Documents. Any agreement by Lender, including any agreement to forbear, modify the Loan Documents, or waive any rights or remedies, must be in writing and signed by an authorized representative of Lender; no oral or implied agreement of any kind will be recognized or enforceable.

This letter does not purport to describe all events or conditions relating to the Loan that may constitute Defaults, Events of Default, or recourse events pursuant to Article 13 of the Loan Agreement, and this letter has no bearing on, and in no way supersedes or affects, any prior or future default notices issued by Lender in connection with the Loan. Lender expressly reserves all of its rights and remedies under the Loan Documents and any other right or remedy available to lender at law or equity.

*[remainder of page left blank; signature page follows]*

2

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 354
RECEIVED NYSCEF: 01/29/2024

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 382 of 409

Very truly yours,

Robert E. Grady

3

Exhibit A

Addressees

Cambridge Mezz LLC
Cambridge Mezz 2 LLC
c/o Arch Companies
425 Broadway, Suite 405
New York, New York 10012
Attention: Jeffrey Simpson

Cambridge Mezz LLC
Cambridge Mezz 2 LLC
c/o Lakestar International LLC
1318 Avenue J
Brooklyn, New York 11230
Attention: Yeheskel Frankel

Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019
Attention: Eddie E. Frastai, Esq.
Facsimile: (212) 878-8375

Akerman LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103
Attention: Yariv C. Ben-Ari, Esq.
Facsimile: 212-905-6498

Yeheskel Frankel
c/o Lakestar Properties LLC
40 Airport Road
Lakewood, New Jersey 08701

35 Oak Holdings Limited
35 Oak Street
Toronto ON M9N 1A1
Attn: Frank van Biesen, Chief Financial Officer

Arch Companies
524 Broad Street, Suite 405
New York, New York 10012
Attn: Jeffrey Simpson

4

**Exhibit Z**



**Thomas M. Pinney**

1650 Market Street | One Liberty Place, Suite 1800 | Philadelphia, PA 19103-7395
Direct 215.864.6371 | Fax 215.789.6671
pinneyt@whiteandwilliams.com | whiteandwilliams.com

November 10, 2023

<u>**VIA EMAIL AND OVERNIGHT DELIVERY**</u>

3200 N Haverhill Borrower, LLC
3200 N Haverhill Borrower 2 LLC
3200 N Haverhill Borrower 3 LLC
c/o Arch Companies
88 University Place, 11th Floor
New York, New York 10003
Attn: Michelle Miller and Jeffrey Simpson
    mmiller@archre.com
    jsimpson@archre.com

    RE:    <u>**Default Notice and Demand for Payment**</u>

Dear Borrower:

    This office and the undersigned represent Tilden Park DL Holdings LLC (the "**Lender**"), as successor in interest to Tilden Park Domestic Lending SBC I LLC.  The Lender is the holder and owner of that certain mortgage loan in the maximum original amount of $15,885,563.00 (the "**Loan**") to 3200 N Haverhill Borrower, LLC, 3200 N Haverhill Borrower 2 LLC, and 3200 N Haverhill Borrower 3 LLC, each a Delaware limited liability company (as tenants in common, jointly and severally, "**Borrower**").   The Loan is evidenced by, among other things, a Loan Agreement, dated as of July 19, 2022 (the "**Loan Agreement**"), by and between the Lender and the Borrower.  The Loan is guaranteed by 608941 NJ, Inc. (the "**Guarantor**") pursuant to, among other things, a Completion Guaranty and a Guaranty of Recourse Obligations each dated June 19, 2022 (the "**Guaranties**").  Each capitalized term used but not defined herein is used as defined in the Loan Agreement or Guaranties, as applicable.

    October 17, 2023, the Guarantor intervened in the case of *Jefferey Simpson, et al. v. Jared Chassen, et al.*, (the "**NY Action**") and filed a complaint and a motion seeking the appointment of a receiver for Sponsor.  On November 3, 2023, the court hearing the NY Action entered an Order pursuant to the Guarantor's motion, that, among other things, ordered that the Guarantor would be the "acting manager" of the Sponsor. Pursuant to Section 6.1(a) of the Loan Agreement, the change in management control of the Sponsor constitutes a change in Control of the Sponsor. This change in Control is an Event of Default under the Loan Agreement pursuant to Section 10.1(e). In addition, the commencement of the NY Action and the seeking the

---

Connecticut | Delaware | Maryland | Massachusetts | New Jersey | New York | Pennsylvania | Rhode Island

3200 N Haverhill Borrower, LLC
3200 N Haverhill Borrower 2 LLC
3200 N Haverhill Borrower 3 LLC
November 10, 2023
Page 2

appointment of a receiver for the Sponsor is an Event of Default under Section 10.1(g)(i)(B) of the Loan Agreement.  Neither of these Events of Default are subject to a right of cure.

**The Lender hereby notifies the Borrower and the Guarantor that due to these Events of Default that have occurred and are continuing, the Lender is electing to accelerate the repayment of the Loan pursuant to Section 10.2 of the Loan Agreement. Accordingly, all amounts outstanding under the Loan Agreement and the Loan Documents are due and owing, and the Lender hereby demands immediate repayment in full.**

The Lender hereby:  (A) confirms that the Lender has not waived any Default or Event of Default; (B) expressly reserves all the rights of the Lender against the Borrower and the Guarantor under the Loan Documents (relating to the Events of Default and otherwise); and (C) confirms that the Lender shall be entitled to pursue at any time and from time to time, without further notice, demand, or any other action, any and all rights and remedies provided under the Loan Agreement and the other Loan Documents, at law, in equity, and/or otherwise with respect to any Event of Default and/or any Default, all in the sole and absolute discretion of the Lender.

Neither this letter nor any other communications between the Lender, on the one hand, and the Borrower or the Guarantor, on the other hand, shall be construed as a consent, waiver, forbearance, or other modification with respect to any term, condition, or other provision of the Loan Agreement, the Guaranties or any other Loan Document.  Neither this letter, nor any other communications between the Lender, on the one hand, and the Borrower or the Guarantor, on the other hand, nor any act or omission on the part of the Lender (including, without limitation, the acceptance of any payment in respect of the Borrower's or the Guarantor's obligations) constitutes, nor shall be deemed to constitute, a course of conduct or a course of dealing so as to justify an expectation by the Borrower or the Guarantor that the Lender will forbear in the further exercise any rights or remedies available to it with respect to the Events of Default and/or any further Event of Default, or an expectation by the Borrower or the Guarantor that Lender will waive any Event of Default and/or the Default.

[Remainder of page left intentionally blank.]

3200 N Haverhill Borrower, LLC
3200 N Haverhill Borrower 2 LLC
3200 N Haverhill Borrower 3 LLC
November 10, 2023
Page 3

Very truly yours,

WHITE AND WILLIAMS LLP

By:_____
Thomas M. Pinney

TMP:rlw

cc:    VIA EMAIL AND OVERNIGHT DELIVERY

King & Spalding LLC
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
Attn: Brian Ashin, Esq.

608941 NJ Inc.
88 University Place
11th Floor
New York, New York 10003

**Exhibit AA**



Stephen B. Meister
Direct (212) 655-3551
Fax (646) 539-3651
*sbm@msf-law.com*

April 22, 2024

**_VIA FEDERAL EXPRESS_**

To Distribution List on the Schedule attached hereto.

Re:    Mezzanine loan (the "<u>Loan</u>") made to Cambridge Mezz LLC, and Cambridge Mezz 2 LLC, each a Delaware limited liability company, jointly and severally, as borrower (collectively, "<u>Borrower</u>"), (a) evidenced by (i) Mezzanine Promissory Note, dated October 9, 2018, in original principal amount of $6,900,000.00 (the "<u>Note</u>") in favor of MSC-Cambridge Charlotte Holdco, LLC (together with its successors and assigns, "<u>Lender</u>"), and (ii) Mezzanine Loan Agreement, dated October 9, 2018, between Borrower and Lender (the "<u>Loan Agreement</u>"), and (b) secured by (i) Pledge and Security Agreement, dated October 9, 2018, by Borrower in favor of Lender (the "<u>Security Instrument</u>") and (ii) Mezzanine Limited Recourse Guaranty, dated October 9, 2018, by Yeheskel Frankel, and 35 Oak Holdings Limited, a corporation organized under the laws of Ontario, jointly and severally, as guarantor (collectively, "<u>Guarantor</u>") in favor of Lender (the "<u>Guaranty</u>," and together with the Note, the Loan Agreement and other documents entered into in connection with the Loan, as the same may be amended from time to time, each a "<u>Loan Document</u>" and collectively, the "<u>Loan Documents</u>").

Dear Sir or Madam:

This firm represents 35 Oak Holdings Limited ("<u>35 Oak</u>") and 608941 NJ Inc. ("<u>608941</u>") (and together, "<u>Oak</u>"). We refer to your letter, dated January 11, 2024, on behalf of Lender (the "<u>Letter</u>"). Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

The Letter asserts that: (i) Arch Real Estate Holdings LLC ("<u>AREH</u>") is the non-member manager of Arch Cambridge MM LLC, a Sponsor under the Loan Agreement; (ii) AREH is owned by JJ Arch LLC ("<u>JJ Arch</u>") and 608941; (iii) 608941 removed JJ Arch as managing member of AREH in November 2023; and (iv) since that time, 608941 has served as the managing member of AREH. The Letter further asserts that: (i) Article 6 of the Loan Agreement prohibits transfers (including involuntary transfers) of direct or indirect legal or beneficial interests in any Restricted Party; (ii) AREH is a Restricted Party under the Loan Agreement; (iii) the involuntary transfer of the managing member rights of AREH constitutes a prohibited transfer under Article 6 of the Loan Agreement and an Event of Default under the Loan Documents; and (iv) a violation of Article 6 of the Loan Agreement also results in the Debt becoming fully recourse to Borrower under Section 13.1(b) of the Loan Agreement, and fully recourse to the Guarantors on a joint and several basis under the Guaranty.

Lender's position is erroneous, commercially unreasonable, and legally untenable for several reasons.

*First*, the Letter completely fails to address the fact that JJ Arch was relieved of its status as managing member of AREH, on a provisional basis only, by judicial order, during the pendency of a litigation. In an action styled *Jeffrey Simpson, individually and derivatively v. Jared Chassen, et al.*, Index No. 158055/2023 (Supreme Court, New York County), counsel for 608941 (as third-party plaintiff) filed a motion for

preliminary injunctive relief seeking to temporarily enjoin Jeffrey Simpson ("Simpson") and JJ Arch from acting as managing member of AREH during the pendency of the litigation, and to declare 608941 as the temporary managing member of AREH in place of JJ Arch *pendente lite*.  AREH's Limited Liability Company Operating Agreement dated December 11, 2017 (the "Operating Agreement") — which was submitted to and approved by Lender — expressly provides in Section 7.1.4 ("Removal of JJ Member as Managing Member") that JJ Arch (or "JJ Member") may be removed by 608941 (or "Investor Member") upon a "Cause Event."

By order dated November 3, 2023, the Court (the Honorable Joel M. Cohen, J.S.C.) granted interim relief pending resolution of the preliminary injunction application (the "TRO"), pursuant to which Simpson and JJ Arch were temporarily "restrained and enjoined from acting as the managing member of AREH[.]" (NYSCEF No. 321)  After receiving full briefing and hearing oral argument, the Court ultimately granted the motion for preliminary injunctive relief on November 20, 2023, as stated on the record (NYSCEF No. 417), and pursuant to a Decision and Order (NYSCEF No. 412) (the "Preliminary Injunction Order").  Pursuant to the Preliminary Injunction Order, Simpson and JJ Arch were ordered to refrain from acting as managing member of AREH only during the pendency of the litigation, and 608941 was authorized to act as managing member of AREH.

The Preliminary Injunction Order is merely provisional in nature and was secured to preserve the AREH-controlled properties for the benefit of all parties, including Lender. (See Affidavit of Dana King (NYSCEF No. 298), Affirmation of Michael Wiener, ¶ 42 (NYSCEF No. 305)).  And because JJ Arch was removed as managing member (on a provisional basis) pursuant to a court order, the prior removal notice, dated October 31, 2023, is completely irrelevant.  JJ Arch was only removed as managing member pursuant to a court order.  Further, Lender cannot credibly take the position that Article 6 of the Loan Agreement prohibits Oak from exercising its right to remove JJ Arch as managing member, for cause.  It is for that precise reason that Lender did not object to Section 7.1.4 of the Operating Agreement.

*Second*, we note that, in granting this provisional relief, the Court observed that Oak produced compelling and overwhelming evidence of malfeasance by Simpson to necessitate the temporary removal of JJ Arch as managing member of AREH:

> Candidly, the movants have done a masterful job in my opinion of marshaling evidence, the kind of evidence that Courts look for when making the difficult decision to enter an injunction like this. I think they have what I view to be a substantial case in terms of likelihood of success on the merits of one or more cause events.  I am not making final determination on that, but the barrage of evidence … to me is extremely powerful stuff.  The [operating] agreement does provide Oak with a right to remove JJ Arch as managing member upon a cause event, and there [is] lots of them listed in the agreement including willful misconduct, breach of fiduciary duty, gross negligence which has resulted in material loss to the company, its subsidiaries and its members.
>
> *        *        *
>
> The management style and the kinds of communications that I have seen here really give me no confidence that regardless of how skillful Mr. Simpson may be as a real estate executive in terms of finding the right things to invest in and the like, I think that the record shows just a substantial amount of doubt about his conduct or JJ Arch's conduct through him as a managing member of an ongoing operation with lots of responsibilities to track investor funds, properly characterize them, properly match them to investors.  Evidence has been put in here about funds being moved around from account to account, you know, based on fiat as opposed to normal accounting rules.

Transcript of Proceedings before the Hon. Joel M. Cohen, J.S.C., Nov. 20, 2023, 57:1-15; 57:24-58:10[1]

*Third*, beyond the temporary nature of the Preliminary Injunction Order, it is important to note that the Court merely allowed a "flip" of the managing member and major decision rights already expressly allowed under the AREH operating agreement.  In other words, before the Court's order, JJ Arch was the managing member and Oak enjoyed major decision rights.  After the Court's order, the parties' respective roles "flipped" on a provisional basis – Oak would act as managing member, and JJ Arch enjoyed major decision rights – exactly as permitted under the Lender-approved operating agreement.

*Fourth*, the notion that an Event of Default and full recourse liability has been triggered by Oak's efforts to safeguard the AREH-controlled properties (including Lender's collateral) by obtaining, at great effort and expense, a court-sanctioned *temporary* "flip" of the AREH managing member – for cause – is commercially unreasonable and absurd.  *See CP III Rincon Towers, LLC v. Cohen*, 10-CV-4638 (JMF), 2022 WL 61318, at *13 (S.D.N.Y., Jan. 6, 2022) (effort to enforce guaranty based on assertion of full recourse liability under transfer provision of loan agreement rejected as producing "absurd" and "commercially unreasonable" outcome).  Likewise, here, we are confident no court would hold that Oak's efforts to provisionally and temporarily remove JJ Arch as AREH's managing member – for cause – would be deemed in violation of the transfer restrictions embodied in Article 6 of the Loan Agreement.

*Fifth,* Lender is estopped from objecting to Oak's enforcement of its rights under Section 7.1.4 of the Operating Agreement.  It is our understanding that Lender received a copy of, and approved, the Operating Agreement.  Thus, Lender endorsed Oak's rights under Section 7.1.4 of the Operating Agreement and is estopped from now claiming that these rights are improper.  The Court was comfortable granting the provisional relief sought — without Lender's presence in the proceeding — precisely because the Court knew the Lender had "signed onto" the prospect of such a "flipping of roles."  We also note that Lender waited until long after the Court granted the TRO and preliminary injunction to raise an objection to the relief sought in Oak's motion, thus getting the benefit of the judicial relief (at Oak's great effort and expense), while seeking to exploit the ruling in a highly strange and senseless manner.  Surely, Lender has been monitoring this litigation and would have intervened to object to Oak's motion if it truly felt that the requested relief was unwarranted and ran counter to its contractual rights.

In sum, Lender's position is completely untenable.  Article 6 of the Loan Agreement does not prohibit Oak from obtaining — or result in a triggering of full recourse in the event of — a court order directing that JJ Arch be removed as managing member of AREH, for cause, on a provisional basis.  Lender cannot credibly take a contrary position, because it consented to the Operating Agreement and Section 7.1.4 therein.  Further, although Lender's position is rejected, we are willing to structure an equity transfer that would put Yeheskel Frankel, who is also a sponsor, in sole control of the property; please confirm that you wish Oak to do so and that, thereafter, Lender will withdraw its assertion of a default and full recourse trigger.

All rights reserved.

Sincerely,

*/s Stephen B. Meister*

Stephen B. Meister

Encl.

---

[1] A true and correct copy of the pertinent portion of the transcript is enclosed herewith.

## Schedule of Addressees

### By FedEx and Email

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06013
Attention: Robert E. Grady, Esq.
Email: rgrady@goodwin.com

### By FedEx Only

MSC – Cambridge Charlotte HoldCo, LLC
c/o Morrison Street Capital
121 SW Morrison Street, Suite 200
Portland, Oregon 97204
Attention: Loan Servicing Department

Cambridge Mezz LLC
Cambridge Mezz 2 LLC
c/o Arch Companies
425 Broadway, Suite 405
New York, New York 10012
Attention: Jeffrey Simpson

Cambridge Mezz LLC
Cambridge Mezz 2 LLC
c/o Lakestar International LLC
1318 Avenue J
Brooklyn, New York 11230
Attention: Yeheskel Frankel

Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019
Attention:  Eddie E. Frastai, Esq.

Akerman LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103
Attention: Yariv C. Ben-Ari, Esq.

Yeheskel Frankel
c/o Lakestar Properties LLC
40 Airport Road
Lakewood, New Jersey 08701

Arch Companies
524 Broad Street, Suite 405
New York, New York 10012
Attention: Jeffrey Simpson

Yeheskel Frankel
c/o Lakestar International, LLC
333 Pearsall Avenue, Suite 200
Cedarhurst, New York 11516

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK : CIVIL TERM : PART 3
2   ---------------------------------------------------------X
    JEFFREY SIMPSON, individually and derivatively as
3   managing member OF JJ ARCH LLC, suing derivatively
    as managing member of ARCH REAL ESTATE HOLDINGS LLC,
4   and JJ ARCH LLC,
                          Plaintiff,
5
            - against -
6
    JARED CHASSEN and FIRST REPUBLIC BANK,
7
                          Defendants.
8   ---------------------------------------------------------X
    608941 NJ INC.
9
                          Plaintiff,
10
            - against -
11
12  JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL ESTATE
    HOLDINGS LLC,
13                        Defendants,
14          - and -
15  ARCH REAL ESTATE HOLDINGS LLC,
16                        Nominal Defendant.
    ---------------------------------------------------------X
17  Index No. 158055/2023
18
19                        November 20, 2023
                          60 Centre Street
20                        New York, New York
21
22  B E F O R E:   HONORABLE JOEL M. COHEN, JSC
23
24                    (APPEARANCES ON NEXT PAGE)
25

                    Rachel C. Simone-Ivanac, CSR, RMR, CRR

2

```
 1   A P P E A R A N C E S:

 2

 3           ALTMAN & COMPANY PC
                 Attorneys for Jeffrey Simpson
                 P.O BOX 590
 4               Southampton, New York 11969
                 BY:  STEVEN ALTMAN, ESQ.

 5

 6       SAM ISRAEL, ESQ
                 Attorneys for Jeffrey Simpson and JJ ARCH LLC
 7               1 Liberty Plaza, 23rd Floor
                 New York, New York 10006

 8

 9       AIDALA BERTUNA & KAMINS
                 Attorneys for Jared Chassen
10               546 5th Avenue, Sixth Floor
                 New York, New York 10036
11               BY:  ALAN SCHWARTZ, ESQ.
                     JOHN LEVENTHAL, ESQ.

12

13       POLSINELLI
                 Attorneys for Arch Real Estate Holdings
14               600 Third Avenue, 42nd Floor
                 New York, New York 10016
15               BY:  AARON ZERYKIER, ESQ.

16

17       HAYNES BOONE, LLP
                 Attorneys for 60289412 NJ Inc.
                 30 Rockefeller Plaza
18               New York, New York 10112
                 BY:  LESLIE C. THORNE, ESQ.
19                   ASHLINN BOTTINI, ESQ.

20

21       SHERMAN ATLAS SYLVESTER & STAMELMAN
                 Attorneys for First Republic Bank
22               210 Park Avenue, Second Floor
                 Florham Park, New Jersey 07932
23               BY:  TYLER KANDEL, ESQ.

24

25
```

Rachel C. Simone-Ivanac, CSR, RMR, CRR

Proceedings

56

1       goes directly to the point of, Well, Oak's just protecting

2       their financial interest.  That's what they are doing.  They

3       are not.  That's not what this is only about.  It is in

4       furtherance of the dispute that they started at the

5       beginning using Mr. Chassen as his beard, a very, very, very

6       seriously troubling fact, which probably is going to be

7       irrefutable when I start serving document requests and

8       third-party subpoenas which will be, probably, next week.

9               THE COURT:  Thank you.

10              MS. THORNE:  Your Honor, can I --

11              THE COURT:  No. I have what I need for now.

12              Look, this is an intensely practical and legal

13      decision.  It is a combination of a lot.  I do have a

14      company here by, really, all accounts which is in a fairly

15      critical phase at the moment both in terms of financial

16      needs and -- and this part wasn't really addressed too much

17      by the defense.  Just a morass of accounting and tax issues

18      need to be sorted out very, very quickly.  I don't, frankly,

19      think we have time for a lot of throwing things in reverse,

20      which I think is what an immediate receiver over the whole

21      entity would be.

22              I am now going to go through the analysis here.

23              The standards for a preliminary injunction are

24      clear; likelihood of success on the merits, irreparable

25      harm, balancing of the equities.

Rachel C. Simone-Ivanac, CSR, RMR, CRR

NYSCEF DOC. NO. 417

RECEIVED NYSCEF: 11/22/2023

Proceedings

57

1          Candidly, the movants have done a masterful job in

2     my opinion of marshalling evidence, the kind of evidence

3     that Courts look for when making the difficult decision to

4     enter an injunction like this.  I think they have what I

5     view to be a substantial case in terms of likelihood of

6     success on the merits of one or more cause events.  I am not

7     making final determination on that, but the barrage of

8     evidence even before we look at the reply brief -- and I

9     will get to that in re moment -- to me is extremely powerful

10    stuff.  The agreement does provide Oak with a right to

11    remove JJ Arch as managing member upon a cause event, and

12    there lots of them listed in the agreement including willful

13    misconduct, breach of fiduciary duty, gross negligence which

14    has resulted in material loss to the company, its

15    subsidiaries and its members.

16          I think the number of serious things that have

17    become apparent to me that there may be defenses to,

18    reactions to, responses to, are many and varied.  I think

19    the information with respect to the tax issues that the

20    company is facing, that the investors are facing because of

21    the inability to at least perform on what was alleged to be

22    a 1031 exchange of properties is -- there may be an answer

23    to that, but at the moment it's not apparent to me.

24          The management style and the kinds of

25    communications that I have seen here really give me no

Rachel C. Simone-Ivanac, CSR, RMR, CRR

Proceedings

58

1          confidence that regardless of how skillful Mr. Simpson may

2          be as a real estate executive in terms of finding the right

3          things to invest in and the like, I think that the record

4          shows just a substantial amount of doubt about his conduct

5          or JJ Arch's conduct through him as a managing member of an

6          ongoing operation with lots of responsibilities to track

7          investor funds, properly characterize them, properly match

8          them to investors.  Evidence has been put in here about

9          funds being moved around from account to account, you know,

10         based on fiat as opposed to normal accounting rules.

11              Again, it's a preliminary finding of a likelihood

12         of success.  It's not a trial.  In a trial, you know,

13         Mr. Simpson and JJ Arch will have the ability with counsel

14         who has had more than just a week or two to get ready -- and

15         he has had other counsel for a while but, you know, at the

16         moment, the balance of the evidence is really just

17         overwhelming on the movant's side here that the place is a

18         mess.  Is it a mess because Oak didn't fund when they wanted

19         to?  Possibly.  That's not something that I can just

20         discount.  But the degree of chaos that I see in the

21         documents, in the affidavits, in the e-mails is really

22         unusual to see in a going concern where someone is charged

23         with essentially managing investment from lots of

24         sophisticated people who are really angry.  And it seems to

25         me there's a legitimate complaint of being shut out of

                    Rachel C. Simone-Ivanac, CSR, RMR, CRR

Proceedings

59

1    important decisions that they have a contractual right to be

2    involved in, and so is my faith in just accepting what is at

3    this point sort of conclusory counterpunches as to whether

4    the cause of all of this chaos is someone other than

5    Mr. Simpson.  It may be, but right now the significant

6    balance of the evidence is in support of this motion.  So

7    likelihood of success, I think, has been met.

8           I also think that the prong of irreparable harm

9    has clearly been met.  As Oak's counsel pointed out, the

10   deprivation of major decision rights, the mismanagement of a

11   company, a company in disarray on all accounts along with a

12   significant risk that JJ Arch who is the defendant here

13   on -- in the claims in this direction, you know, doesn't

14   seem to have the wherewithal to be able to satisfy a

15   judgment anyway.  So the number of alleged breaches of

16   fiduciary duty and other conduct here easily satisfy the

17   irreparable harm standard.

18          In terms of the balancing of the equities, I am

19   motivated here in part by trying to do as little harm as

20   possible.

21          Whenever a Court gets involved -- and I have, I

22   can tell you, quite reluctantly had to get involved here --

23   we do so with a lot of humility.  This isn't really what we

24   do for a living.  We only do it when we see no other choice.

25   And here, in terms of choosing between the various options

Rachel C. Simone-Ivanac, CSR, RMR, CRR

NYSCEF DOC. NO. 417

RECEIVED NYSCEF: 11/22/2023

Proceedings

60

1    in front of me which is either having Mr. Simpson continue

2    to run things as he had before, or going through the list of

3    potential receivers and finding one to drop into the middle

4    of this difficult situation or having Oak, who is first and

5    foremost a business who has a legitimate interest, first of

6    all, in serving this role because contractually that is

7    exactly what is supposed to happen when the managing member

8    is removed for cause, that the investor member becomes the

9    managing member.  So that's one thing.

10          There is also the fact that -- at least I am

11   persuaded by the presentation thus far that they have come

12   in and done a reasonable job of steadying the ship.  I have

13   seen no evidence at this point of self-dealing.  It would be

14   an inordinately dumb thing do because you are talking about

15   operating under a microscope.  You are in the middle of a

16   court case in which every step you take, unfortunately, is

17   going to be creating discoverable evidence.  I am

18   comfortable both because I have confidence in counsel, and

19   because I have seen no reason based on looking at the

20   affidavits and reading them carefully.  These are not

21   perfunctory affidavits from business people.  These are the

22   kinds of affidavits that give Courts comfort that these

23   people are dialed in and working.

24          The supportive letter from the other investors has

25   some evidentiary issues in terms of foundation, so I can't

Rachel C. Simone-Ivanac, CSR, RMR, CRR

Proceedings

61

1      really do much with that, I can't even read all of it; but

2      it does directionally suggest that the other investors --

3      who I haven't really heard of until now -- are supportive of

4      Oak continuing in this role.

5           I have really longed for from the beginning of

6      this case -- you know, most of what I heard from was

7      Mr. Chassen and Mr. Simpson going back and forth. And, you

8      know, that's fine, and some day I will have to make

9      credibility determinations; but I am now starting to see a

10     richer field of witnesses who have less personal axes to

11     grind, or at least it seems to me.

12          I recognize that all of this is subject to

13     cross-examination, none of which has happened yet, but I am

14     left with an abiding sense that whatever Mr. Simpson's

15     talents are as a real estate business person, this business

16     is broken at the moment, and it was broken on his watch. He

17     may well ultimately persuade me that I have this exactly

18     wrong and that he was doing fine until Oak undermined him.

19     However, that's not the way I see the likelihood based on

20     the facts in front of me now.

21          Although it's tempting to go all the way to the

22     receiver immediately, I am not going to do that. I am going

23     to maintain the order I have currently, which is that Oak

24     will be the managing member of Arch, the entity.

25          It's an intriguing idea because this motion is not

Rachel C. Simone-Ivanac, CSR, RMR, CRR

Proceedings

62

1      yet ready for a hearing about whether to appoint a receiver

2      for JJ Arch to participate in management of the Arch entity

3      so that Mr. Simpson and Mr. Chassen have a seat at the table

4      because I'm not giving them that seat now.  I think this

5      place has to be run by Oak with fiduciary and other duties,

6      contractual, that it owes to the remaining members, all of

7      them.  I'm not going to have it be comanaged, though.  Oak

8      is the managing member.

9           I am interested in, though, when we get to the

10     next motion which I don't think is scheduled for hearing

11     until, maybe, a December 1 or so, that if -- you know, I

12     don't see that trying to slam Mr. Simpson and Oak together

13     again and try to have them work together is really a

14     practical solution here.  I have seen too much, frankly.

15     And I understand that this is a personal battle here, but

16     it's just not going to work that way.  Potentially, though,

17     if there is a proxy by a respected and neutral but motivated

18     receiver, perhaps that's a way back in; but at the moment I

19     am not going to do that.

20          I am granting the motion.  I want a proposed order

21     that considers all the practical things such as bank

22     accounts and the like.  We didn't really cover that terribly

23     carefully or well in the TRO because it was moving kind of

24     quickly.  I don't want a long order.  I don't want a

25     regulatory order which has me overseeing everything.

Rachel C. Simone-Ivanac, CSR, RMR, CRR

**Exhibit BB**

**From:** Jeffrey Simpson <jsimpson001@icloud.com>
**Date:** August 22, 2024 at 8:34:16 PM EDT
**To:** David Berg <db@infinitycollective.com>
**Subject: Re: 1700 Alton Reports**

Thank you for the update.   Is there a trigger in the loan with the eviction surrounding the tenant?   Is the lender aware and have they acknowledged the eviction?   Has the tenant fought back regarding eviction?   Was the property returned in an orderly fashion?

I will look at the agreement but it is quite troubling that you have such activity of this order of magnitude without telling anybody on the JJ side.  I should not have to reach out to you to find out about this type of information.   Of course if you've directly communicated with Jared or Oak that will not at all satisfy the conditions of what's required amongst the agreement.

Jeffrey Simpson

Sent from my iPhone

On Aug 22, 2024, at 8:12 PM, David Berg <db@infinitycollective.com> wrote:

Hi Jeff,

Attached is our 2nd quarter report that was just published.

We have re-tenanted the restaurant space with Paya (see Feal Hospitality deck). In addition, LuxUrban defaulted on their lease so we evicted them. We took their $500k security deposit and are pursuing their guarantor.  We are hoping to have the hotel re-leased by early September.

Our debt expires in mid October but we needed to re-stabilize the building before renewing with Amerant or looking at a different term deal with them (3 yr, 5 yr etc).

Our goal is to have the building fully leased again within the next 2-3 weeks and send all materials to Amerant for a new loan discussion. We still have the existing extension at our disposal if we run into a time crunch.

Best,
David

**David Berg**
*Partner*

<ICNEW_fd81598b-a3e6-4ee4-9f47-fa1d772f349a.JPG>

db@infinitycollective.com
(212)-795-9595 | Ext 113
M: (610)-324-6474

**Miami**
1111 Lincoln Road, Suite 712
Miami Beach, FL 33139

**New York**
43 West 24th Street, 10th Floor
NewYork, NY 10010

© Copyright 2023 INFINITY COLLECTIVE LLC. All rights reserved. This email may contain information that is confidential and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** Jeffrey Simpson <jsimpson001@icloud.com>
**Sent:** Thursday, August 22, 2024 4:22 PM
**To:** David Berg <db@infinitycollective.com>
**Subject:** Re: 1700 Alton Reports

[CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe]

Good afternoon,

I have not heard from you in several months and you alerted me to a loan refinance or some other iteration that was coming up for September, I believe.   Please send the latest report for the property and where we stand on the refinance.

Thanks

Jeffrey Simpson

Sent from my iPhone

On May 14, 2024, at 4:06 PM, David Berg <db@infinitycollective.com> wrote:

Jeff,

As discussed, please find attached the Q4 2023 and Q1 2024 reports for Alton.

I have not received the term sheet from Amerant yet but I have asked them for a 3 year quote with flexible pre-payment as discussed. I will forward upon receipt.

Best,
David

**David Berg**
*Partner*

<ICNEW_fd81598b-a3e6-4ee4-9f47-fa1d772f349a.JPG>

db@infinitycollective.com
(212)-795-9595 | Ext 113
M: (610)-324-6474

**Miami**
1111 Lincoln Road, Suite 712
Miami Beach, FL 33139

**New York**
43 West 24th Street, 10th Floor
NewYork, NY 10010

**© Copyright 2023 INFINITY COLLECTIVE LLC.** All rights reserved. This email may contain information that is confidential and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

<1700 Alton Rd - Q4 2023 Investor Report.pdf>
<1700 Alton Rd - Q1 2024 Investor Report.pdf>
<1700 Alton Rd - Q2 2024 Investor Report.pdf>
<Feal Hospitality 2024 PAYA (1700 Alton Tenant).pdf>

**Exhibit CC**

| From: | Jeffrey Simpson[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F81AE2C656FA45BD8A4297820 019DC86-JSIMPSON] |
|---|---|
| Sent: | Thur 12/14/2023 3:14:11 AM (UTC) |
| To: | Kevin Wiener[kwiener@35oak.com]; Jared Chassen[jchassen@archcre.com] |
| Cc: | Leslie Thorne[Leslie.Thorne@haynesboone.com]; Stephen B. Meister[sbm@msf-law.com]; Steve Altman[steve@commercialtriallawyer.com]; Allen Schwartz[allen@allenschwartzlaw.com] |
| Subject: | RE: Myrtle/Madison Negotiations |

**Kevin,**

**I have spent some time considering the Myrtle forbearance agreement terms that you have sent to me.  At this time, I cannot consent to it for the following reasons:**

**These deal terms are principally the same as those I negotiated on behalf of Arch this past summer.  They made sense then but do not now because the circumstances have materially changed.  Among those material changes, which make what you are proposing a bad deal now are the following:**

> a.  **There is between $6 and $7 million owed to subcontractors, and the remaining balance of the loan is insufficient to meet those obligations and complete the construction materially at the speed required in the arrangement.**
> b.  **Arch Builders, which I have at all times managed and run, holds the construction license.  It is uniquely qualified and equipped to complete the project (quickly and the least expensive), but you have not requested my services and it is a virtual certainty that no third-party construction manager could complete the project under the time frame and budget required by the terms of the forbearance agreement.  We would all be simply working to hand the keys back to the lender, without question.**
> c.  **There is no room for error (of time, mostly concerning) without serious ramifications.**

**These three items of spooling up a construction management company, coupled with the $1 million monthly, non-default interest carry, makes the forbearance a solution that does not benefit ARCH or the borrower.  The ONLY party that is benefitted by entering into this proposed agreement is Oak because it will be released from its guaranty for a nominal amount, given its exposure.**

**I believe that a bankruptcy filing with respect to this project is in the best interest of all parties at this time.  The automatic stay would permit renegotiation with the subs, obtain relief from the lender, or at least reduce the interest or default interest, and would likely provide a more reasonable outcome with the lender.  You have indicated your concern that such a filing might or does trigger potential personal liability for you.  We differ, and in any event that liability has likely already been triggered as the result of some of your family's prior actions and positions**

24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 408 of 409

taken in the pending litigations, like requesting a receiver and refusing to fund loan obligations without reason.

I understand that you may likely do as you please (as you have done recently, I believe wrongfully).  So there is no uncertainty, I do not consent to Arch's entering into the proposed forbearance agreement on the terms now presented.

All rights reserved.

**Jeff**

**JEFFREY SIMPSON**

**D** 646.854.6810 | **C** 646.753.2872

jsimpson@archcre.com | archcorealestate.com

88 University Place, 2ⁿᵈ Floor, New York, NY 10003



---

**From:** Kevin Wiener <kwiener@35oak.com>
**Sent:** Monday, December 11, 2023 1:22 PM
**To:** Jeffrey Simpson <jsimpson@archcre.com>; Jared Chassen <jchassen@archcre.com>
**Cc:** Leslie Thorne <Leslie.Thorne@haynesboone.com>; Stephen B. Meister <sbm@msf-law.com>; Steve Altman <steve@commercialtriallawyer.com>; Allen Schwartz <allen@allenschwartzlaw.com>
**Subject:** Myrtle/Madison Negotiations

Hi Jeff and Jared,

I wanted to update you on the progress of negotiations with lenders on some files so that we can incorporate your feedback into the paperwork prior to final execution versions for major decision consent.

The first one I wanted to discuss is the negotiations with Madison on the Myrtle Point project.

As you know, Jeff had previously provided an "Option 2" proposal that contemplated Oak running the project before there was the full court-ordered change in control. We have been using that as the starting point for the negotiation with Madison (the major point being a 6-month forbearance with a deed in a box and Madison unlocks the rest of the loan). We had previously discussed the proposal with Doug Propp, and he confirmed he was willing to consent to a deed in a box forbearance as long as Oak put $3 million in capital into the project behind his $6 million, which Oak agreed to do.

FILED: NEW YORK COUNTY CLERK 01/29/2024 10:46 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 547
24-10381-jpm    Doc 192    Filed 09/18/24    Entered 09/18/24 14:54:15    Main Document
Pg 409 of 409
RECEIVED NYSCEF: 01/29/2024

We've since been trading paper back and forth with Madison but the major points of the deal are:

- Madison will give us a six-month forbearance to continue work on the project and find a new lender and equity partner
- Oak will capitalize $3 million into the project and those proceeds will be paid immediately to Madison; at least $1 million must be used for construction funding; the remaining $2 million can be used for project costs or interest at Madison's option.
- In exchange for this $3 million payment, Madison will release the rest of the loan without regard for balancing requirements. Madison will also release Oak from the carry and construction guarantees.
- Madison's loan principal and non-default interest must be paid by the end of the six months. The six months can be extended for up to an additional three months on the payment of $1 million for each additional month. The first month, that million would be applied to interest. The second month it is 50% interest and 50% and extension fee. The third month it would be 100% an extension fee. While Madison may be open to remaining as lender depending on the equity partner we bring in, they are unwilling to commit to that now
- In the event the loan principal and non-default interest isn't paid at the end of the six month period (plus any extensions paid for monthly), then Madison will record the deed in the box.

The plan would be to run an expedited process for new equity and debt while using the funds from Oak and Madison to get Target in and complete as much construction as we can with the money.

I'm attaching a copy of our most recent sign-back to Madison; as you can see we're quite close. They're aware that any final agreement is subject to JJ approval. Please advise if there's anything in the agreement you think needs to be changed, removed or added. We're hoping to be in an execution position by the end of the week so that construction can resume before 2024.

Jeff, I believe Ian provided you with a link to your other email address with Dropbox access to all the loan documents. Please advise if anything is missing that you need for your review and we'll either get you Dropbox access or just email it.

Regards,

Kevin