UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: <br><br> JJ ARCH LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 24-10381 (JPM) |
| JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC and JJARCH LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> JARED CHASSEN and FIRST REPUBLIC BANK, <br><br> Defendants. | Adv. Pro. No. 24-01335 (JPM) <br><br> **DECLARATION OF KEVIN WIENER IN SUPPORT OF ARCH REAL ESTATE HOLDINGS LLC'S MOTION FOR ORDER IN AID OF EXISTING STATE COURT ORDERS DEEMING THE DEBTOR TO HAVE AUTHORIZED THE HAVERHILL SELLERS TO CONSUMMATE THE MELROSE TRANSACTION** |
| JARED CHASSEN, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC and JJARCH LLC, <br><br> Counterclaim-Plaintiffs, <br><br> -against- <br><br> JEFFREY SIMPSON and YJ SIMCO LLC, <br><br> Counterclaim-Defendants <br><br> And <br><br> JJ ARCH LLC and ARCH REAL ESTATE HOLDINGS LLC, <br><br> Nominal Defendants. | |

12662879-1

608941 NJ INC,

        Intervenor-Plaintiff,

-against-

JEFFREDY SIMPSON, JJ ARCH LLC, and ARCH REAL ESTATE HOLDINGS LLC,

        Defendants

And

ARCH REAL ESTATE HOLDINGS, LLC

        Nominal Defendant.

I, KEVIN WIENER, pursuant to 28 U.S.C. § 1746, declare:

1.     I am the Executive Vice President of 608941 NJ Inc. ("**Oak**"), the acting managing member of Arch Real Estate Holdings LLC ("**AREH**"). I make this declaration to provide this Court with background information about the proposed sale of the property located at 3200 N Haverhill Rd, West Palm Beach, Florida ("**Melrose Apartments**" or the "**Property**")).

**Property Background**

2.     Melrose Apartments, a 60-unit multifamily apartment complex, was purchased on July 20, 2022, by three AREH-controlled limited liability companies: 3200 N Haverhill Borrower LLC, 3200 N Haverhill Borrower 2 LLC and 3200 N Haverhill Borrower 3 LLC (collectively, the "**Sellers**") as tenants in common for the price of $18 million. The Property is secured by a mortgage in the amount of $15,868,125, comprised of an initial advance on purchase of $14,368,125 and a funding commitment of up to $1.5 million to fund an interior and exterior renovation and value-add program. The loan bears interest at the rate of 420 basis points over SOFR, with the current loan principal at $15,725,825 and interest rate around nine percent.

2

3. In connection with the purchase, AREH raised $5,581,000 in equity from investors, with an additional $180,000 in equity assigned to certain AREH principals and employees as acquisition fees for a total equity basis of $5,750,000. $2.5 million of the equity investment was raised from two investors as part of a 1031 rollover transaction, with each of those two investors holding all of the interest equity interests in 3200 N Haverhill Borrower 2 LLC and 3200 N Haverhill 3 LLC.

4. In addition, $700,000 of the equity raised was from an investor's charitable trust, with this trust participating in both the limited partnership and a general partnership entity.[1]

5. The initial equity interests in Melrose Apartments are set out in the following chart:[2]

| Investor Group | Cash Invested | Acquisition Fees Invested | Percentage Ownership |
|---|---|---|---|
| 1031 Investors | $2,500,000 | -- | 43.4% |
| Charitable Trust | $700,000 | -- | 12.15% |
| Oak and Family of Oak Principals | $1,047,996 | $36,000 | 18.82% |
| Jared Chassen and Family | $275,000 | $40,000 | 5.47% |

---

[1] Unlike most AREH investments, which only have one general partner entity, with the naming convention "MM LLC", Melrose Apartments has two levels of general partner entity, with the charitable trust invested in 3200 N Haverhill MM LLC, which in turn is managed by a second-tier general partner entity, 3200 N Haverhill GP LLC.

[2] The exact percentages may vary slightly since a small portion of the investment into each entity was spent on company establishment expenses before being invested into each lower-tier entity in the chain of ownership. This chart sums together all funds invested at all tiers of ownership.

3

12662879-1

| Jeffrey Simpson and Family[3] | $483,004 | $40,000 | 9.08% |
|---|---|---|---|
| Former AREH Employees | $75,000 | $64,000 | 2.41% |
| Other Investors | $500,000 | -- | 8.68% |
| Total Investment | $5,581,000 | $180,000 | 100% |

6.  In addition to the initial capital contributions, approximately $420,000 in additional capital has been provided by investors to help carry the Property over 2023 and 2024, with about $250,000 of that contributed by Oak and family members of Oak principals and the remainder contributed by other investors.[4] Where only some investors respond to a capital call, the "member loan" overcontribution by the other investors bears interest at a rate of 18%. These member loans must be repaid from any distributions before any funds are returned to the original equity.

7.  The ownership structure for Melrose Apartments is set out in the organizational chart attached hereto as **Exhibit "A"**. The operating agreements for 3200 N Haverhill Owner LLC, 3200 N Haverhill Owner 2 LLC, 3200 N Haverhill Owner 3 LLC, 3200 N Haverhill MM LLC and 3200 N Haverhill GP LLC are attached hereto as **Exhibit "B"**.

8.  At each tier of ownership (prior to AREH), the managing member or non-member manager has the sole right to make decisions for the respective LLC, subject to limited major decision rights. Those rights are limited to decisions to amend any of the operating agreements, put any of the entities into bankruptcy, acquire any real property other than Melrose Apartments,

---

[3] The vast majority of this investment is in the limited partnership by extended family members of Mr. Simpson, with Mr. Simpson himself investing only $43,000 in cash.
[4] No additional capital has been provided by Mr. Simpson at any time.

4

12662879-1

or to enter into a self-dealing transaction with the managing member or its affiliate where compensation paid is at above-market rates.[5] At the AREH level, consent is required from both members of AREH to sell real property held by a subsidiary.

9. Notably, while JJ Arch LLC (the "**Debtor**") has major decision rights over a sale, through its membership interest in AREH, it does not actually hold any equity whatsoever in the Property. Rather, at the time the Property was acquired, the Debtor assigned its $144,000 in acquisition fees in the form of equity directly to the principals of the Debtor (Jeffrey Simpson and Jared Chassen) as well as to certain AREH employees. That equity is held directly by Mr. Simpson, Mr. Chassen, and certain of their family members through JJ Haverhill LLC, an entity in which the Debtor has no equity or other economic interest.

10. The Debtor's only economic interests in the Property are through its membership interest in AREH, which holds a 0% membership interest in (but has management rights over) 3200 N Haverhill GP LLC, as well as the Debtor's membership interest in Arch Property Holdings I LLC, which also has a 0% membership interest in 3200 N Haverhill GP LLC. The operating agreement for 3200 N Haverhill GP LLC provides for 20% of its operating distributions to go to AREH, which has never occurred. On a sale of the Property, all ordinary proceeds of the sale in 3200 N Haverhill GP LLC would be divided equally between Oak and JJ Haverhill LLC. Only in the event that the sale price were high enough to trigger additional promote distributions from other investors to 3200 N Haverhill GP LLC would some of those promote distributions be

---

[5] From his prior correspondence, Mr. Simpson appears to be asserting that a sale of the Property is a self-dealing transaction because any action that causes the mortgage to be repaid will ensure that Oak does not face a claim under its guarantee obligations to the lender. There is no basis in the language of the operating agreements for this theory that the Property owners require Mr. Simpson's consent to repay their debts. And in any event, the only guarantee on the mortgage is a non-recourse carveout that would not be triggered by a repayment default. Even if that guarantee somehow were implicated, there is sufficient equity in the Property that the mortgage would be repaid in full even in the event of a foreclosure rather than a sale. Oak's only financial interest in a sale is the same as every other investor – to maximize the recovery of its investment.

5

distributed to Arch Property Holdings I LLC, and from there to the Debtor.[6] Investors are entitled to a compounded annual return of 8% on their capital (after member loans) before any promote distributions are paid, which means the Debtor would only have any economic interest in a sale if more than about $7 million in proceeds were returned to investors. This would require a sale price in excess of $23 million.[7]

**The Justification for a Sale**

11. Soon after becoming acting managing member of AREH, it became clear to Oak that a long-term plan needed to be developed to either sell or refinance the Property. While we were successful in putting in place new, third-party property management and raising rents on the units, the Property was simply too heavily levered to be a sustainable investment, particularly given its high interest variable-rate loan. Even accounting for rate cap income, the Property was operating at a negative carry and the rate cap was set to expire summer of 2024. Without the rate cap, the Property would be operating at a cash burn of about $900,000 a year.

12. At an early 2024 meeting with investors, we advised of our plan to capital call additional equity while we put together a longer-term plan for the asset. It was our hope that by increasing the property's operating income, we could obtain an agency loan at a lower-fixed rate of interest. With a lower interest rate and a cash-in refinance that would allow the property to become self-sustaining, the hope was that the Property could be held over a long period of time.

---

[6] However, under the AREH operating agreement, the Debtor in turn is required to redirect those promote distributions as a capital contribution to AREH so long as Oak has unreturned capital. This was designed to ensure that the Debtor could not receive promote distributions before AREH was economically self-sufficient and no longer dependent on capital contributions from Oak to operate. Currently, Oak has over $3 million in unreturned capital in AREH.

[7] The sale price would likely need to significantly exceed $30 million before any promote distributions would be available to the Debtor's existing creditors rather than needing to be redirected to AREH. The highest level of promote distribution after investors receive a 14% return on investment is 29.34% of additional distributions. About half of those promote distributions would go to JJ Haverhill LLC and Oak. A portion of any promotes paid to Arch Property Holdings I LLC would also be distributed to Oak and former AREH employees. AREH would then need to receive in excess of $3 million of redirected distributions from the Debtor before Oak's unreturned capital to AREH would be repaid and funds would be available to the Debtor's other creditors.

12662879-1

At the same time, we intended to explore a possible sale of the Property in the event a refinance was unobtainable or did not make economic sense as compared to a sale.

13. Over the summer of 2024, it became clear that a refinance likely was not a feasible option for the Property. First, Mr. Simpson's unauthorized bankruptcy filing on behalf of the Debtor and his clear willingness to disregard operating agreements and court orders to pursue a campaign of destruction against Oak has made this a toxic asset for any agency lender. Based on discussions with our mortgage broker, it would be impossible to obtain an agency loan so long as Mr. Simpson has any kind of potential management or consent rights anywhere in the capital stack and possibly even if he was only invested in a totally passive role. Mr. Simpson would need to consent to have him and the Debtor permanently relinquish their consent rights and for him to transfer his equity, and he appears to have no appetite to do so, at least not without satisfying some sort of unrealistic and extortionate demand.

14. Even if that obstacle could be overcome, there would be two more: capital and economics. The response to our capital call made clear that there is minimal appetite from the existing investor pool to put more money into the Property. Only three investors other than Oak and family members of Oak principals responded to the capital call. Of our largest investors, we are aware that one of the 1031 investors (with a $1 million investment) is unable to put in additional capital. The charitable trust also cannot put in any additional funds and its principal is legally barred from doing so.

15. We expect that an agency lender would give us proceeds of between $11 and 12 million, which means that a refinance would require a contribution of about $5 million in new equity. There is simply no appetite from the investor pool to provide anywhere close to that

7

amount, even if we can attract some external preferred equity. Nor is Oak willing to put in the several million dollars required to make up the gap.

16. Finally, even if we were able to obtain the capital for the refinance, an additional $5 million in new preferred equity would quickly drown the existing equity through its preferred return. Even if we were able to obtain preferred equity at a 12% return (compared to the 18% built-in return in the operating agreements), we would need cap rate compression down to 5.5% in 4-5 years just to see the same returns in nominal dollars to existing equity as a sale today. Given the time-value of money (and the fact that there is already $420,000 in member loans accruing interest), we would be setting up a very high likelihood of a complete equity wipeout for existing investors to gamble on a very slim chance of investors getting a slightly higher partial return of their initial capital.[8] Oak, as acting managing member of AREH, does not consider such a gamble consistent with its fiduciary duties to investors.

17. In the absence of a refinance, the only other alternative to a sale would be to hold the current variable-rate loan and sell prior to maturity on August 1, 2025.[9] Doing so would require the purchase of another rate cap[10] and necessitate the contribution of another $700,000 or so in equity. Again, there is little to no appetite from investors, including Oak, to put in that additional capital, particularly given the difficulties in selling the asset while the Debtor is in bankruptcy and Mr. Simpson is doing everything possible to interfere with management. And the short-term trends in the West Palm Beach rental market, where significant additional rental supply has recently come online, do not give any indication that a sale in eight months would be at a higher price than a sale

---

[8] There is no remotely plausible scenario in which the Debtor is paid promote distributions with an additional 4-5 years of both preferred and common equity accruing return entitlements.
[9] While the loan includes an extension option, it is very unlikely the Property would meet the loan-to-value requirements to be able to exercise that option.
[10] The lender has waived the rate cap requirement while we are under contract to sell the Property.

today. All that would happen is that after the repayment of member loans, existing equity would be wiped out.

18. The reality, however, is that all these scenarios depend on obtaining capital that we cannot obtain. If we cannot sell the property, there will be insufficient capital to make interest payments, the loan will go into default and begin accruing default interest, the lender will foreclose and both equity and any unsecured creditors will face a complete wipeout.

**The Sale Process**

19. Given that a sale was the best avenue forward for the property, we embarked on a robust sale process to try to obtain the best possible return to investors, while knowing that the Debtor's bankruptcy and the litigation over control of AREH would make title insurance complicated and would likely require a court order confirming authority to allow an insured sale to go forward. Our desire to get the highest possible bid was therefore balanced with the need to find a committed buyer willing to stick with us while we shepherded the sale through a court approval process and avoid a drawn-out closing period while we incur $75,000 a month in equity burn.

20. AREH interviewed and obtained BOVs from three different brokers, ultimately retaining CBRE Group based on their strong pitch and their 48% market share for all South Florida multi-family sales last year.

21. CBRE in turn sent out an initial marketing broadcast on June 6, followed by six updates to their list of 100,000 investors, with offers due on July 12. A marketing website was also set up to advertise the property and 187 interested investors signed confidentiality agreements. The broker also reached out with a targeted mailing to multifamily owners and 1031 buyers in South Florida.

22. Ultimately, 15 interested buyers conducted property tours, and 14 made offers, with a second best and final round with the top five groups. Of the top five bidders, we ultimately decided to accept an offer from F Advance as representing the offer that would provide the most return to equity.[11] We estimate that after repayment of the mortgage and closing costs, there should be approximately $1.3 million in proceeds to existing equity, of which around $450,000 would be used to repay additional capital and member loans and the remaining $850,000 would be returned to the original equity pool. This would represent an approximately 15% recovery of the original equity.

23. On September 13, 2024, the Sellers entered into a purchase and sale agreement ("**PSA**") with F Advance, with an effective date of September 16 and a scheduled closing date of December 2, 2024. Under the PSA, the Sellers are required to obtain consent from the Debtor to the sale an order from this Court confirming their authority to transact by November 18, 2024. A copy of the PSA is attached hereto as **Exhibit "C"**.

24. On September 18, 2024, I sent a written notice to the Debtor requesting its consent to enter into the proposed sale. While Mr. Simpson provided several colourful responses, he ultimately neither consented to, nor objected to the request.[12] A copy of the email exchange is attached hereto as **Exhibit "D"**. No objection was received by October 3, 2024, the 15-day

---

[11] While one other group made an offer $100,000 higher than F Advance, that offer included a significantly longer closing period, was conditional on obtaining financing, and included a deposit 75% smaller than F Advance. Our brokers also advised us that F Advance was a highly committed buyer that is ready, willing and able to close on the Property. Because of the need to explain our governance issues and draft a PSA that would be conditional on obtaining court confirmation of our authority to transact, we could not afford a buyer who would easily get cold feet. Moreover, the longer closing period would cost us tens of thousands in additional equity burn. We therefore believe that the bid chosen had the best likelihood of providing the highest return to investors. As it was, navigating around the insurability issues connected to the Debtor's bankruptcy caused it to take several weeks to negotiate and finalize the purchase and sale agreement and confirm with the title company that a court order would be required to avoid a title exception related to this bankruptcy proceeding.

[12] To the extent he had purported to object to the request, such an objection would have been barred by the New York Supreme Court preliminary injunction requiring both Mr. Simpson and Mr. Chassen to agree to deny consent to an AREH major decision.

10

deadline to object to a major decision request under the AREH operating agreement, and the Debtor was deemed to have consented to the sale as of October 4. A copy of the AREH operating agreement is attached hereto as Exhibit **"E"**.

25. Nonetheless, on October 7, 2024, AREH received written notice from Mr. Chassen that he was consenting to the transaction on behalf of the Debtor. A copy of the fully executed consent is attached hereto as **Exhibit "F"**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct.

Executed on October 10, 2024

_____
Kevin Wiener

12662879-1