UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re: JJ Arch LLC.,

                    Debtor.

-----------------------------------------------------------x

Chapter 11

Case No.: 24-10381 (JPM)

### MEMORANDUM OPINION AND ORDER ON JARED CHASSEN AND ARCH REAL ESTATE HOLDINGS LLC'S JOINT MOTION TO DISMISS THE CHAPTER 11 CASE FOR THE DEBTOR'S FAILURE TO COMPLY WITH ITS OBLIGATIONS

*A P P E A R A N C E S :*

**DAVIDOFF HUTCHER & CITRON LLP**
*Counsel for the Debtor*
605 Third Avenue
New York, New York 10158
By:    Jonathan S. Pasternak
        James B. Glucksman

**HAYNES AND BOONE, LLP**
*Counsel for 608941 NJ, Inc.*
30 Rockefeller Plaza
New York, New York 10112
By:    Leslie C. Thorne
        Richard Kanowitz
        Aishlinn Bottini
        Jordan Chavez

**SCHWARTZ LAW PLLC**
*Co-Counsel for Jared Chassen*
150 Broadway, Suite 701
New York, New York 10038
By:    Allen Schwartz

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**
*Co-Counsel for Jared Chassen*
200 West 41st Street, 17th Floor
New York, New York 10036
By:    Sean C. Southard
        Fred Stevens
        Brendan M. Scott

**OLSHAN FROME WOLOSKY LLP**
*Counsel for Arch Real Estate Holdings LLC*
1325 Avenue of the Americas
New York, New York 10019
By:     Jonathan T. Koevary
        Adam H. Friedman
        Katherine Mateo

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**[1]

Before the Court is *Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Dismiss the Chapter 11 Case for the Debtor's Failure to Comply with its Obligations* (the "Dismissal Motion") filed by Jared Chassen ("Mr. Chassen") and Arch Real Estate Holdings LLC ("AREH"). [Doc. 170]. The Dismissal Motion seeks the dismissal of this bankruptcy proceeding in accordance with, *inter alia*, 28 U.S.C. § 1112(b). [*See* Dismissal Motion, Doc. 170, p. 6].

Filed in response to the Dismissal Motion is the *Debtor's Objection to Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Dismiss Case* (the "Debtor Objection") filed by JJ Arch LLC (the "Debtor"), the debtor-in-possession in the above-captioned Chapter 11 case. [Doc. 185]. The Debtor argues that Mr. Chassen and AREH have "failed to demonstrate the necessary cause to warrant dismissal under applicable law in this jurisdiction" and ask that the Court deny the Dismissal Motion accordingly. [Debtor Objection, Doc. 185, p. 3].

After careful consideration, and for the reasons set forth below, the Court GRANTS the Dismissal Motion.

## I.    FACTUAL BACKGROUND

The Debtor is a real estate holding company formed by Mr. Chassen and Mr. Simpson under the laws of New York in December of 2017. [Doc. 16, p. 54] (the Debtor's Operating Agreement). The relevant provisions of the Debtor's original Operating Agreement are as follows:

---

[1]        Unless otherwise specified, references to "[Doc. __]" are to filings entered in the bankruptcy captioned *In re: JJ Arch LLC*, Case No. 24-10381 (March 7, 2024). References to "[Adv. Pro. Dkt., Doc. __]" are to filings entered in the adversary proceeding *Jeffrey Simpson, et al., v. First Republic Bank, et al.*, Case No. 24-1334 (April 3, 2024).

References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York.

1

(i)    Mr. Simpson was given the "unilateral power and authority . . . to make and implement all decisions with respect to" the Debtor's day-to-day operation, including the power to "conduct, manage and control the affairs and business of the [Debtor and its subsidiaries]," *see id.* at p. 55; but

(ii)   the Debtor could not engage in certain actions—what the Operating Agreement calls "Major Decisions"—without Mr. Chassen's written consent, *see id.* at p. 56 (defining "Major Decisions" as, *inter alia*, the "tak[ing] of a Bankruptcy Action"); and

(iii)  either member of the Debtor was deemed to "Resign" when that member either "fail[ed] to provide substantially all of his business time for the benefit of the [Debtor]," or that member engaged in a "Cause Event," *e.g.*, willful misconduct, breach of fiduciary duty, or "gross negligence in relation to the business or affairs of [AREH] or a Subsidiary," *id.* at pp. 53, 77.

The Debtor's assets consist primarily of two baskets of rights. The first basket consists of membership interests in entities unrelated to AREH (the "Non-AREH Entities"). [*See* Doc. 31] (the schedules filed by Mr. Simpson on behalf of the Debtor, hereinafter "Debtor Schedules"); [*see also* Doc. 170-2, pp. 18, 20–22, the transcript from Mr. Simpson's 341 meeting, hereinafter "341 Transcript"). According to Mr. Simpson, the Non-AREH Entities are holding companies that: (i) the Debtor owns outright; and (ii) directly own certain operating companies and real property. [*See* Doc. 16, pp. 8–10, the First Day Affidavit of Mr. Simpson, hereinafter "First Day Affidavit"] (noting that "[t]he real property associated with the [Non-AREH Entities] have an aggregate estimated value of approximately $10 million and generate approximately $1.1 million of revenue annually for the Debtor").

Prior to these proceedings, however, the Debtor generated most of its revenue through its second basket: its membership rights in AREH, a position Mr. Simpson describes as the Debtor's "most valuable asset." [First Day Affidavit, Doc. 16, p. 5]; [*see also* Adv. Pro. Doc. 20, p. 11] (claiming that the Debtor was formed "for the primary purpose of managing AREH, AREH's various direct and indirect subsidiaries and investments and certain non-AREH investment

vehicles").[2]  AREH, in turn, is the non-member manager of a number of operating subsidiaries (the "Portfolio Entities") that develop and manage real property projects (the "Portfolio Projects") situated throughout the United States, using both capital infusions from 608941 NJ, Inc. ("Oak") and third-party investment capital.  [First Day Affidavit, Doc. 16, pp. 83–85] (listing the provisions of the AREH Operating Agreement that provide for Oak's capital obligations); *id.* at p. 4 (describing the "utiliz[ation] [of] third-party investors" as being "key component[]" of AREH's business).

Oak is AREH's sole other member. *Id.* at pp. 75–110.  The relevant details of AREH's corporate composition are as follows:

(i)     the Debtor holds an 80% interest in AREH and acts as AREH's "Managing Member," a role that allows the Debtor to exercise "exclusive and complete discretion" over the "business, affairs and assets of [AREH]," *see id.* at pp. 90–91; and

(ii)    Oak holds a 20% interest in AREH and acts as AREH's "Investor Member," a role that gives Oak the right to "remove [the Debtor] as 'managing member' [of AREH] upon a Cause Event," *see id.* at p. 93;[3] but

(iii)   notwithstanding the Debtor's operational control over AREH, the AREH Operating Agreement—much like the Debtor's—provides that Oak's consent is required for "Major Decisions," including, *inter alia*, the "tak[ing] of any Bankruptcy Action," *see id.* at pp. 92–93.

For reference, Mr. Simpson's First Day Affidavit includes the following organizational chart for AREH:

---

[2]     According to Mr. Simpson, AREH generates revenue by managing the Portfolio Entities, which are responsible for services relating to "low-cost [] asset management, property management, advisory, direct construction trades, and construction management" with respect to each project.  [First Day Affidavit, Doc. 16, p. 5–7] (noting that AREH is "responsible for the [Portfolio Entities'] overall business direction, including investment decisions, executing corporate strategy and fostering and maintaining relationships with the [] prospective and existing capital partners and investors").

[3]     The AREH Operating Agreement defines "Cause Event" using the same definition provided in the Debtor's Operating Agreement.  [Doc. 16, pp. 51, 77–78].



[First Day Affidavit, Doc. 16, p. 6].  Mr. Simpson has also provided a graphic illustrating the

"general organizational structure" of each Portfolio Entity:



*Id.* at p. 7.[4]   The Debtor's business operated relatively smoothly in the years following its formation.  Indeed, prior to this dispute, the Debtor—indirectly, through AREH, the Portfolio Entities and the Non-AREH Entities—accumulated a real estate portfolio purportedly worth over $1 billion.  *Id.* at p. 2.

The relationship between Mr. Chassen and Mr. Simpson became strained in mid-2023.[5] Sometime during the weekend of August 5, 2023, Mr. Chassen and Mr. Simpson exchanged emails (the "August Exchange") that attempted to "resign" the other from the Debtor on the basis of several Cause Events, ostensibly in accordance with the terms of the Debtor's Operating Agreement.  [*See* Adv. Pro. Dkt., Doc. 3, ¶ 5]; [Adv. Pro. Dkt., Doc. 1-2, p. 24].  Following this exchange, on August 6, 2024, Oak apparently contacted Mr. Simpson and "advised [him] that he had committed multiple Cause Events . . . [as] identified in the JJ Arch Operating Agreement." [*See* Adv. Pro. Dkt., Doc. 1, pp. 25, 200]; [Doc. 14-1, p. 12]; [Doc. 4-3, pp. 348–49] ("[The Debtor], through the actions of Jeffrey Simpson . . . has committed multiple Cause Events . . .

---

[4]       With respect to the role played by Arch Real Property Holdings I LLC ("ARPH I") in the greater AREH enterprise, Mr. Simpson has explained:

> A general partner [] operating agreement [for each Portfolio Entitiy] was entered into by the [] parties, which typically consisted of Oak, AREH, ARPH I, and [a] related JJ Entity . . . [but] the economics of the [Portfolio Entities] were controlled through ARPH I . . . [which] is a party to each of the various Operating Agreements to *obtain* and *distribute profits from* the Investment Properties to the [members of ARPH I] . . . The Debtor's rights to profits from ARPH I was a valuable source of income [and] [t]he ARPH I Operating Agreement provides [] the Debtor [with] control over the management over ARPH I . . . .

[Doc. 192, p. 5] (emphasis added).

[5]       The parties dispute the events precipitating this litigation.  The accuracy of the allegations made in the course of the State Court Proceeding are, however, wholly irrelevant to the instant Dismissal Motion, the resolution of which requires only a review of the record developed before this Court and Justice Cohen.  This opinion should therefore not be read to decide the merits of any pending cause of action.

[and] [w]e reserve all of our rights and remedies under the [AREH Operating Agreement], at law, or in equity . . . .").

## II.   PROCEDURAL HISTORY

### a.   The State Court Proceeding

On August 15, 2023, Mr. Simpson filed a derivative action on behalf of the Debtor and AREH in New York State Supreme Court before the Honorable Joel M. Cohen (the "State Court Proceeding"). [*See generally* Adv. Pro. Dkt., Doc. 1-2, pp. 10–45] (the first-filed state court complaint). What followed was a complex, contentious series of pleadings and motions involving no less than five parties and no less than 37 causes of action.[6] Those causes of action included, *inter alia*, breach of fiduciary duty, conversion, breach of contract, defamation, fraud, and tortious interference with a prospective business advantage. [*See* Adv. Pro. Dkt., Doc. 2-1, pp. 1–5]. As relevant here, the State Court Proceeding involved claims asserted by, against and on behalf of Oak, Mr. Chassen and AREH (collectively, the "State Court Litigants"). *See generally id.*

During the pendency of the State Court Proceeding, Justice Cohen issued a series of interim orders (the "Interim Orders") intended to preserve the operational status quo of both AREH and the Debtor. [*See* Adv. Pro. Dkt., Doc. 3-8, pp. 22–23] (where, during a hearing held on September 11, 2023, Justice Cohen states that the governance of the Debtor is "clearly something that should go back to the status quo . . . [to] [g]et the business back on track"); [Doc. 14-1, p. 82] (where, at

---

[6]     Though the claims asserted in the State Court Proceeding are numerous, a fair reading of that record suggests that—at their core—those claims seek to identify the party that is properly in control of the Debtor (and, relatedly, AREH). [*See* Adv. Pro. Dkt., Doc. 1. at p. 12] (where Mr. Simpson describes this lawsuit as a means of "undo[ing] a coup d'état executed by [Mr.] Chassen . . . ."); *but see id.* at p. 81 (where Mr. Chassen asserts counterclaims seeking to "recover for [Mr.] Simpson's breach of fiduciary duty and other corporate wrongdoing, to declare that [Mr.] Chassen is the sole managing member of [the Debtor], and to declare [Mr.] Simpson resigned as a member of [the Debtor]").

A full accounting of the claims and parties involved in the State Court Proceeding can be found at [Adv. Pro. Dkt., Doc. 2-1, pp. 1–5].

a hearing held on November 20, 2023, Justice Cohen indicates his desire to "do[] [his] level best to keep the ship afloat while the litigation proceeds").

Following oral argument, Justice Cohen issued an Interim Order on August 21, 2023, providing that:

> [t]he August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are *hereby void and of no force or effect* . . . [and] the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in . . . the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen. Simpson and Chassen *shall cooperate with each other in good faith* to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement . . . .

[Doc. 41-6, p. 3] (emphasis added). Thereafter, on November 28, 2023, Justice Cohen issued two Interim Orders addressing the provisional governance of both the Debtor and AREH. The first of those Interim Orders (the "AREH Interim Order") appointed Oak as AREH's "sole managing member" and enjoined Mr. Simpson and the Debtor from:

> [a]cting as (or holding themselves out to third parties to be) managing members of Arch Real Estate Holdings LLC ("AREH"), and . . . [d]enying prompt consent to any Major Decision proposed by Oak as Managing Member . . . unless *both* JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such consent . . . . [and] [o]therwise interfering with Oak's ability to exercise its responsibility as Managing Member of AREH.

[Doc. 38-3, pp. 2–3] (emphasis added). The second Interim Order issued November 28, 2023, provided that:

> [d]uring the pendency of this litigation and subject to further order of the Court[,] Simpson and Chassen are enjoined from unilaterally seeking to terminate or force the resignation of the other member without permission of the Court . . . [and] [e]xcept as limited by the Court's preliminary injunction orders granting Oak the status of Acting Managing Member in [AREH] . . . the Court's prior Order [issued August 21, 2023] remains in full force and effect . . . .

[Doc. 38-3, pp. 3–4].   Justice Cohen indicated that the Interim Orders remained in place at a

hearing held February 2, 2024, and subsequently set an evidentiary hearing for June 7, 2024, to

decide the "ultimate issue" of Mr. Simpson and Mr. Chassen's respective rights vis-à-vis the

Debtor.  [*See* Adv. Pro. Dkt., Doc. 20-2, pp. 63–64]; [Doc. 4-5, pp. 42, 63]; [Doc. 41-19].

### b.  The Bankruptcy

Mr. Simpson unilaterally filed a petition for chapter 11 relief on behalf of the Debtor on

March 7, 2024.   [*See generally* Doc. 1] (the Debtor's first petition, designating this case as one

arising under subchapter V).[7]   The Debtor's petition—which lists Mr. Simpson as its sole equity

holder—includes the following footnote:

> Jared Chassen of [] Irvington, NY 10533, previously owned a 49.9% membership
> interest in the Debtor JJ Arch LLC [].  Mr. Chassen, however, was deemed to have
> resigned as a member of JJ Arch, as of August 5, 2023, pursuant to the definition
> of "Resignation" as set forth in the Limited Liability Operating Agreement of JJ

---

[7]      The Debtor amended its petition to withdraw its subchapter V designation on June 5, 2024.  [*See* Doc. 124,
hereinafter "Petition"].

Arch LLC . . . Accordingly, Mr. Simpson currently owns 100% of the equity interests in the Debtor.[8]

*Id.* at p. 12, n.1.  One week later, on March 14, 2024, Mr. Chassen filed a *Motion for an Order Dismissing the Debtor's Bankruptcy Case* (Mr. Chassen's "First Motion to Dismiss").   [*See* Doc. 4].  That Motion argued that the Debtor's petition should be dismissed because "[t]he [Debtor's] Operating Agreement, together with the orders in the [State Court] Proceeding, leave no doubt that Mr. Simpson not only lacked authority to bring the Petition, but that this filing is in bad faith and in contempt of court."  *Id.* at p. 4.  AREH—making a functionally identical argument—joined Mr.

---

[8]      Local Rule 1007-2 provides that "[a] debtor in a chapter 11 case must file an affidavit setting forth[] the nature of the debtor's business and a concise statement of the circumstances leading to the debtor's filing under chapter 11. . . [as well as] the names of the individuals who comprise the debtor's existing senior management, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience."

Curiously, Mr. Simpson's First Day Affidavit contains the following narrative:

> I have been involved in litigation in New York State court with Jared Chassen [], the former minority member of the Debtor regarding, *inter alia*, the management of the Debtor.  Mr. Chassen *voluntarily* decided to cease providing substantially all of his business time for the benefit of the Debtor no later than January 2024 and, as a result, was deemed to have resigned from the Debtor under the under [sic] the terms of the [Debtor's] Operating Agreement.  As a result of such resignation, Mr. Chassen's interest in the Debtor was "deemed automatically redeemed by the [Debtor]," Mr. Chassen was "no longer . . . deemed a 'Member' of the [Debtor]" and Mr. Chassen was no longer "entitled to any rights as a Member of the [Debtor] for any period from and after such Resignation[]" . . . [A]lthough certain of the New York state court orders did enjoin the Debtor's members from unilaterally seeking to terminate or force the resignation of the other without permission of the court, such orders did not prohibit Mr. Chassen from *voluntarily* resigning from the Debtor in the manner in which he chose to do so.

[First Day Affidavit, Doc. 16, p. 11, n.14] (emphasis added); *see also* [Doc. 6, p. 4] (arguing that Mr. Chassen resigned under the Debtor's operating agreement when "counsel for [Oak], the ultimate 20% owner of AREH, confirmed in writing that Mr. Chassen was not devoting substantially all of his business time for the benefit of [the Debtor] . . . [and] [s]uch resignation was voluntary and not forced by Mr. Simpson"); [Doc. 56, pp. 16–17] ("We absolutely have an argument that we don't believe has been addressed by the state court, which is the -- you know, what we referred to as the voluntary resignation in our objection to the motion to shorten notice, which is whether or not Mr. Chassen's been devoting substantially all of his business time for the benefit of [the Debtor].").

Chassen's Motion to Dismiss on March 18, 2024.[9]  [*See* Doc. 13) (collectively with Mr. Chassen's First Motion to Dismiss, the "First Motions to Dismiss").

### c.  <u>The Lift Stay Motions and the Remand Motion</u>

Mr. Chassen and AREH filed motions to lift the automatic stay on March 25, 2024.[10]  Both Motions argued that "[t]he automatic stay generally only applies to the debtor and its property and does not extend to third parties, such as third party guarantors, co-debtors, officers and members of a debtor."  [AREH Lift Stay Motion, Doc. 38, pp. 7–8, 13] (describing this bankruptcy as "an attempt to use the automatic stay as [both] a sword and a shield"); [Chassen Lift Stay Motion, Doc. 40, pp. 22–31].  The Lift Stay Motions requested an order confirming that the automatic stay did not apply to the State Court Proceeding or, alternatively, modifying the automatic stay as necessary

---

[9]    The Bankruptcy Code provides certain time limits applicable to the resolution of a motion to dismiss a bankruptcy.  *See* 11 § U.S.C. 1112(b)(3) (following the filing of a motion to dismiss, a court must "commence the hearing on [the] motion [to dismiss] not later than 30 days after filing . . . and shall decide the motion not later than 15 days after commencement of such hearing . . . .").  The Bankruptcy Code, however, makes those time periods inapplicable where "the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting th[ose] time limits . . . ." *Id.*

A hearing on the First Motions to Dismiss was initially set for April 5, 2024.  [Doc. 50, p. 2].  However, on March 27, 2024, counsel for Mr. Chassen wrote a letter to this Court indicating that Mr. Chassen, AREH and the Debtor "have agreed to adjourn the [First] Motion[s] to Dismiss pending the Court's determination of the [Lift Stay] Motions, so that the Court and all parties may collectively preserve resources that would otherwise be expended in a contention discovery process . . . ." *See id.* at p. 1.  The time periods set by Section 1112(b)(3) are thus inapplicable to the First Motions to Dismiss.

The Court initially set a hearing with respect to the instant Dismissal Motion for August 29, 2024.  [Doc. 171].  With the consent of the parties, that hearing was adjourned twice.  [*See* Doc. 190] (the *Notice of Second Adjournment of Hearing* filed by AREH). A hearing (the "Hearing") on the instant Dismissal Motion was ultimately held on Wednesday, September 25, 2024.  The Court finds that the complicated nature of the issues raised in both this proceeding and in related matters amounted to "compelling circumstances" preventing the Court from deciding the Dismissal Motion within the time period set by 1112(b)(3) (albeit by one day).

[10]    [*See generally* Doc. 38, AREH's *Motion For Entry Of An Order (I) Confirming That the Automatic Stay Does Not Apply to Certain Corporate Governance Disputes, and/or (II) Modifying The Automatic Stay As Necessary In Order to Address Such Corporate Governance Disputes*, hereinafter "AREH Lift Stay Motion"]; [Doc. 40, Mr. Chassen's *Motion for Entry of an Order (I) Confirming that the Automatic Stay does not Apply to Certain Corporate Governance Disputes, and/or (II) Modifying the Automatic Stay as Necessary in Order to Address Such Corporate Governance Disputes*, hereinafter "Chassen Lift Stay Motion," and collectively with the AREH Lift Stay Motion, the "Lift Stay Motions"].

such that the State Court Proceeding might proceed. [Chassen Lift Stay Motion, Doc. 40, p. 7]; [AREH Lift Stay Motion, Doc. 38, pp. 7–8].

The Debtor removed the State Court Proceeding to the District Court on April 1, 2024, ostensibly pursuant to 28 U.S.C. §§ 1334 and 1452 and Bankruptcy Rule 9027. *See generally* [Adv. Pro. Dkt., Doc. 1]. Mr. Simpson and the Debtor objected to the Lift Stay Motions that same day. [Doc. 60] (where, among other things, the Debtor argued the Lift Stay Motions are moot because "the State [Court Proceeding] has been removed to this Court and is no longer pending in the State Court"); [Doc. 62, p. 1–2] (where Mr. Simpson argued that "*this Court* must resolve the questions of who is in control of the Debtor and whether the Debtor is in control of AREH, as these issues are fundamental to the administration of th[e] Bankruptcy") (emphasis in original). The District Court referred that case to this Court on April 3, 2024, in accordance with the Amended Standing Order of Reference, M-431 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.). [*See* Adv. Pro. Dkt., Doc. 1-3].

Mr. Chassen and AREH filed a motion to remand the State Court Proceeding on April 10, 2024.[11] The Remand Motion made two arguments:

(i)     Mr. Chassen and AREH first argued that "[r]emoval of this action to federal court was improper because [any basis for] federal jurisdiction is lacking . . . [a]nd even if there were a basis for federal bankruptcy court jurisdiction, remand would nevertheless be required on principles of mandatory abstention," *see* [Remand Motion, Adv. Pro. Dkt., Doc. 2, pp. 8–25] (discussing 11 U.S.C § 1334(c)(2)); and

(ii)    in the alternative, Mr. Chassen and AREH argued that this adversary proceeding should be dismissed on the grounds of either permissive abstention under 28 U.S.C. § 1334(c)(1), or equitable remand, *see id.* at pp. 26–39.

---

[11]     [*See Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Remand Based on Lack of Jurisdiction or, in the Alternative, Principles of Abstention or Equity*, Adv. Pro. Dkt., Doc. 2, hereinafter the "Remand Motion"].

Mr. Simpson and the Debtor contested both positions.[12]  With respect to subject matter jurisdiction,

Mr. Simpson and the Debtor maintained that the State Court Proceeding was "core" under 28

U.S.C. § 157(b)(2)) because it "involves and directly affects the property of the estate."  [Debtor

Remand Objection, Adv. Pro. Dkt., Doc. 20, p. 16].  As to the Remand Motion's second argument,

Mr. Simpson and the Debtor claim that "the exercise of either equitable remand or permissive

abstention of a core proceeding is appropriate in only a few extraordinary and narrow contexts,"

and, given these restraints, "Chassen, AREH and Oak have failed to . . . establish[] that permissive

abstention or equitable remand is warranted . . . ."  *Id.* at pp. 10, 24.

### d.  **The Court's Prior Decisions**

The Court granted both the Remand Motion and the Lift Stay Motions on June 10, 2023.[13]

With respect to the Remand Motion, the Court found:

(i)      this Court possessed only "related to" jurisdiction over the State Court Proceeding
under 28 U.S.C. § 1334(b);

(ii)     the State Court Proceeding was a "non-core" proceeding within the meaning of 28
U.S.C. § 157(b);

(iii)     the Commercial Division of the Supreme Court of the State of New York could
"timely adjudicate" the State Court Proceeding;

(iv)     abstention was mandated under 28 U.S.C. § 1334(c)(2); and

(v)      alternatively, permissive abstention and equitable remand were warranted under 28
U.S.C. §§ 1334(c)(1) and 1452(b).

---

[12]      [*See* Adv. Pro. Dkt., Doc. 20, the Debtor's *Objection to (I) Jared Chassen and Arch Real Estate Holdings
LLC's Joint Motion to Remand Based on Lack of Jurisdiction or, in the Alternative, Principles of Abstention or
Equity and (II) Oak's Joinder to Motion to Remand,* hereinafter the "Debtor Remand Objection"]; [Adv. Pro. Dkt.,
Doc. 21, Mr. Simpson's *Joinder to Debtors* [sic] *Objection to Motion to Remand*, and collectively with the Debtor
Remand Objection, the "Remand Objections"].

[13]      [*See* Doc. 131, the Court's *Memorandum Opinion and Order, and Findings of Fact and Conclusions of
Law, on Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Remand Based on Lack of Jurisdiction
or, in the Alternative, Principles of Abstention or Equity*, hereinafter the "Remand Order"]; [*see also* Doc. 132, the
Court's *Memorandum Opinion and Order*, hereinafter the "Lift Stay Order"].

[Remand Order, Doc. 131, p. 37].   The Court thereafter submitted the findings of fact and conclusions of law contained in the Remand Order to the District Court for the Southern District of New York for review.[14]

The Debtor objected to those findings of fact and conclusions of law on June 24, 2024. [*See generally* Adv. Pro. Dkt., Doc. 31].   The District Court has yet to rule on those objections. *See JJ Arch LLC et al v. Jared Chassen et al*, Case No. 24-04847-KPF (Southern District of New York, June 26, 2024).

With respect to the Lift Stay Motions, the Court held:

[b]roadly speaking, the State Court Proceeding implicates three categories of claims.   The first of these are claims brought *against* the Debtor by Oak.   These claims are plainly implicated by the automatic stay.

The second of these are derivative actions brought on behalf of the Debtor against Mr. Chassen, Mr. Simpson and Oak.   These claims are properly considered property of the Debtor's estate.   However, because Section 362(a) does not, by its own terms, stay proceedings where a debtor appears as a party-plaintiff, these claims are not automatically subject to the automatic stay.

The final category of claims involves those between non-Debtor third parties. This category encompasses, for example, claims asserted by Oak directly against Mr. Simpson, or by Mr. Simpson against Mr. Chassen.   It is axiomatic that "[a] suit against a [non-debtor] is not automatically stayed by the debtor's bankruptcy" unless that suit involves "a claim against [a] non-debtor [that] will have an immediate adverse economic consequence for the debtor's estate[]" . . . [and] the Court [thus] agrees with AREH and Mr. Chassen in that the automatic stay does not apply to the claims pending between [those] non-Debtor third parties.

[Lift Stay Order, Doc. 132, pp. 15–19] (emphasis in original) (internal citations omitted).   With respect to the first category of claims (those asserted directly against the Debtor), the Court found

---

[14]        For the reasons enumerated in the Remand Order, the State Court Proceeding constituted a non-core proceeding within the meaning of 28 U.S.C. § 157(b).   [*See* Remand Order, Doc. 131, pp. 14–19] (finding that "the State Court Proceeding is merely 'related to' the Debtor's bankruptcy and therefore non-core").   The Remand Order was therefore a submission of "proposed findings of fact and conclusions of law" to the United States District Court for the Southern District of New York (the "District Court") in accordance with 11 U.S.C. § 157(c)(1).   *See id.* at p. 4, n.2.

further that "the first, second, sixth, tenth, and eleventh [*Sonnax*] factors support lifting the stay . . . [and] the remaining *Sonnax* factors are either irrelevant to or do not, on balance, support the preservation of the stay." *See id.* at pp. 20–22 (discussing *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir. 1990)). The Debtor appealed[15] the Lift Stay Order on June 24, 2024. [Doc. 147]. The District Court has yet to decide that appeal. *See In Re: JJ Arch LLC*, Case. No. 24-04850-PAE (Southern District of New York, June 26, 2024).

**e. The Instant Motion**

Mr. Chassen and AREH filed the instant Dismissal Motion on August 6, 2024. [*See generally* Dismissal Motion, Doc. 170]. The Dismissal Motion argues that "[t]he Debtor's continued gamesmanship, lack of an ability to reorganize, and abuse of the bankruptcy process require dismissal of the case." *Id.* at p. 21. Mr. Chassen and AREH thus argue that dismissal is appropriate for three reasons:

(i)    first, because the Debtor's prosecution of this bankruptcy and its related adversary proceedings has caused a "substantial or continuing loss to or diminution of the estate," and otherwise indicates an "absence of a reasonable likelihood of rehabilitation" within the meaning of 11 U.S.C § 1112(b)(4)(A), *see id.* at pp. 20–22;

(ii)    second, because the Debtor's post-petition conduct amounts to "gross mismanagement of the estate" within the meaning of 11 U.S.C § 1112(b)(4)(B), *id.*; and

(iii)    third, because the records developed before this Court and before Justice Cohen indicate that this case is "nothing but [a case] of forum shopping and makes clear that [this case's] purpose is to bring what is essentially a two-party state court dispute to [a new] forum," *id.* at p. 23.

---

[15]    Unlike the Remand Order, *see supra*, n.14, the Court held that the Lift Stay Motions presented a "core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G)." [Lift Stay Order, Doc. 132, p. 12]; [*see also* Remand Order, Doc. 131, pp. 15–16] (citing *Stern v. Marshall*, 564 U.S. 462, 474–75 (2011) for the proposition that "[p]arties may appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards").

Given the arguments above, the Dismissal Motion maintains that "[d]ismissal of the Chapter 11 Case is clearly appropriate and in the best interest of the Debtor's estate and creditors, as well as its other stakeholders." *See id* at p. 24 ("Based on these facts, there is no reason to burden this Court or the Debtor with the continued administration of the Chapter 11 Case.").

   **f.   The Debtor's Objection and Proposed Plan of Liquidation**

The Debtor filed its *Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Small Business Debtor JJ Arch* (the Debtor's "Plan") on September 3, 2024. [*See generally* Doc. 184]. As relevant here, the introduction to the Debtor's Plan reads:

> [T[he Plan proposes to pay or otherwise satisfy Allowed Administrative Claims, Allowed Secured Claims, and Allowed General Unsecured Claims in full and in Cash on the Effective Date or as soon as practicably thereafter. The Plan will be funded from amounts generated from the sale of certain or all of the Non-Debtor Real Property Assets.[16] Such Non-Debtor Real Property Assets will only be sold to the extent necessary to raise sufficient funds to consummate the Plan.

*Id.* at pp. 7–8. The Plan, however, provides further that:

> The Debtor [] holds certain [indirect] interests in other real properties through certain affiliated entities (the "Portfolio Property Entities")[17] . . . [and] [i]t has come to the Debtor's attention that since the [AREH Interim Order], certain of the real property of these Portfolio Property Entities may have been improperly sold, disposed of, and/or refinanced . . . without the required consent of the Debtor and/or affiliates of the related Portfolio Property Entities, and in contravention of their respective governing documents. The Debtor also believes that Oak has used its powers [under the AREH Interim Order] improperly to engage in self-dealing, fraudulent conveyances, improper capital calls . . . in violation of the control provisions of the respective governing documents. The Debtor asserts that these actions of Oak . . . have sought to improperly sideline Mr. Simpson, have eroded

---

[16]    The Plan defines "Non-Debtor Real Property Assets" as "real property in which the Debtor owns an interest in" located throughout the state of New York. [Plan, Doc. 184, p. 13]. It appears these "Non-Debtor Real Property Assets" are the assets owned by Non-AREH Entities. *Compare id.* (providing the address for each Non-Debtor Real Property Asset) [*with* Debtor Schedules, Doc. 31, pp. 10–13] (using those same addresses in connection with the Non-AREH Entities and describing the Debtor's interest in each as being an "Indirect LLC Interest").

[17]    The Plan uses the term "Portfolio Property Entities," which are apparently certain subsidiaries of the Debtor listed in "Schedule A" to the Plan. [*See* Plan, Doc. 184, pp. 45–46]. It appears these entities are managed by AREH and are thus properly considered Portfolio Entities as defined by the Court *supra*, Part. I. [Plan, Doc. 184, p. 7] ("Following *the temporary control of AREH by Oak* . . . .").

the value of the Arch Companies' operating business and resulted in a significant
negative impact upon the Debtor's affiliates . . . [but this conduct] ha[s] also served
to create Claims by the Debtor against the parties taking such actions.

*Id.* (noting that "[t]he Portfolio [] Entities are in the process of assigning their interests in the

Portfolio Projects to the Debtor directly pursuant to th[ose] [] entities' transfer provisions").

Following confirmation, the Debtor thus intends to retain various other assets (the "Non-Creditor

Assets"), specifically "(i) any remaining Non-Debtor Real Property Assets, (ii) the Portfolio

Projects,[18] (iii) the Portfolio [] Entities, (iv) any Receivable Payments,[19] and (v) the Debtor's

interests in the Causes of Action[20] . . . against AREH, Oak, and Mr. Chassen" as a means of

---

[18]    The "Portfolio Projects" are the real properties directly owned by the subsidiaries of the Debtor that are
described as "Portfolio Property Entities" in "Schedule A" to the Plan.  [*See* Plan, Doc. 184, pp. 7, 45–46].

[19]    The Plan defines "Receivable Payments" as being "any receivable payments paid or to be paid to the Estate
on account of amounts due and owing to the Debtor including, but not limited to, all amounts due and owing to the
Debtor from AREH."  [Plan, Doc. 184, p. 14].  This would presumably include any amounts due to the Debtor by
ARPH I.  *See supra*, n.4.

[20]    The Plan defines "Causes of Action" as being:

    any and all Claims, rights, actions, choses in action, suits, causes of action, Liens, judgments and
    damages belonging to the Debtor or its Estate and any and all liabilities, obligations, covenants,
    undertakings and debts owing to the Estate, whether arising prior to, or after, the Petition Date and
    in each case whether known or unknown, in law, equity or otherwise, including, without
    limitation, receivables and those Claims and actions to avoid or recover pre-petition or post-
    petition transfers of money or property pursuant to applicable bankruptcy and non-bankruptcy law
    and also including the State Court [Proceeding].

[*See* Plan, Doc. 184, p. 11].

"maximiz[ing] [the] funds available to Creditors[21] and [Mr. Simpson]." *Id.* at pp. 7–8, 13, 25; *see also id.* at p. 8 ("This liquidating Chapter 11 Plan contemplates the disposition of *all or substantially all of the Debtor's Assets.*") (emphasis added). The Plan does not classify any of the State Court Litigants as creditors of the Debtor's estate. *Id.* at p. 8; *but see id.* at p. 21 (noting that the K-1 provided to the Debtor "lists approximately $32,576,245 in potential contingent [tax] liabilities owed by the Debtor"); [*see also* Lift Stay Order, Doc. 132, pp. 15–16] (describing the claims brought against the Debtor by Oak, which include claims for money damages for the acts of the Debtor occurring at the direction of Mr. Simpson).

The Debtor objected to the Dismissal Motion on September 3, 2024—the same day it filed its Plan. [*See generally* Debtor Objection, Doc. 185]. The Debtor contests each argument proffered by the Dismissal Motion, maintaining that:

(i)     there has been no "substantial or continuing loss to or diminution of the estate" given that the "prosecuti[on] of the [] Plan [just] filed will be straightforward . . . [and] will result in payment in full of the Debtor's creditors," *id.* at p. 10;

(ii)    the Debtor has not engaged in "gross mismanagement" of the estate, as the Debtor's conduct was a response to "a severe financial meltdown owing to macroeconomic factors, a lack of funding," and the fact that the parties to this proceeding were "engaged in contentious litigation in multiple forums," *id.* at p. 11; and, finally,

---

[21]     The Plan defines "Creditors" as being:

any Person who: (a) holds a Claim against the Debtor that arose prior to the Petition Date; (b) holds a Claim against the Debtor, which arose after the Petition Date, other than an Administrative Claim of the type specified in Bankruptcy Code section 503(b); or (c) holds a Claim against the Debtor of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

[*See* Plan, Doc. 184, p. 7]; *see also id.* at p. 14 (defining the term "Person"). However, given that the Plan's sole source of funding is the "amounts generated from the sale of certain or all of the Non-Debtor Real Property Assets," *see id.* at p. 7, it is unclear precisely which Creditors (if any) would benefit from the transfers of the Debtor's Non-Creditor Assets.

(iii)    dismissal "is not in the best interest of the Debtor's estate and creditors" because "[i]f the Debtor's Chapter 11 Case is dismissed, there is no assurance of what will happen to the Debtor's assets and what actions may be taken by creditors," *id.* at p. 16 (arguing further that "to the extent [other parties] have issues with the Debtor's Plan, or proposed sales or any other issue, the proper path is for discovery and argument before this Court, not [] wholesale dismissal").[22]

AREH and Mr. Chassen filed their *Reply in Further Support of Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Dismiss the Chapter 11 Case for the Debtor's Failure to Comply with its Obligations* (the "Dismissal Reply") on September 6, 2023.  [Doc. 188].[23]  The Court thereafter held its Hearing on the Dismissal Motion on September 25, 2024.  [*See* Doc. 190] (the *Notice of Second Adjournment of Hearing* filed by AREH).

**g.  Other Notable Proceedings**

The record also reflects three events occurring in the days preceding the Hearing that bear mentioning.

---

[22]    No party to this proceeding has sought conversion.  [*See generally* Dismissal Motion, Doc. 170]; [Debtor Objection, Doc. 185]; [Dismissal Reply, Doc. 188].

[23]    The Court notes that on September 9, 2024, the Debtor responded to the Reply with a *Response to Movants' Reply In Further Support of Motion To Dismiss Chapter 11 Case*, which describes the Reply as:

> rais[ing] a number of false issues and makes a host of unsupported allegations in [Mr. Chassen and AREH's] continued scorched-earth campaign against the Debtor and its sole managing member in support of their ultimate goals of (i) shirking their significant debt and equity obligations, and (ii) bypassing the corporate governance controls contained in the operative documents, all to gain complete control over the Arch Companies.

[*See* Doc. 189, pp. 1–2, hereinafter "Debtor Response"].  AREH (on behalf of both AREH and Mr. Chassen) thereafter filed a *Response to Debtor's Unauthorized Sur-Reply* (the "Second Reply") on September 19, 2024, one day before the Hearing.  [*See* Doc. 193, pp. 1–2] (where AREH and Mr. Chassen argue that the "[Debtor Response] and its accompanying declaration should be stricken in their entirety as unauthorized . . . [but] believe it appropriate to make a few responsive points" to the issues raised by the Debtor Response).  Five days after the Hearing, on September 25, 2024, the Debtor filed a *Response to Mr. Chassen and Arch Real Estate's Unauthorized Sur-Replies* (the "Second Debtor Response"), which can be found at [Doc. 200].

The Court does not believe that the Second Reply, the Debtor Response, or the Second Debtor Response present issues or arguments pertinent to the resolution of the instant Dismissal Motion.  Accordingly, the Court does not rely upon those filings for the purposes of this opinion.

The first of these occurred on September 18, 2024, when the Debtor filed a complaint (the "Consent Complaint") before this Court. [*See generally* Doc. 192]; *see also JJ Arch LLC v. 608941 NJ, Inc. et al.*, Case No. 24-4025 (Bankr. S.D.N.Y., September 18, 2024) (hereinafter the "Consent Proceeding"). The Consent Complaint asserts claims against: (i) the State Court Litigants; (ii) Infinity Real Estate LLC ("Infinity"), a limited liability company formed under the law of Delaware; and (iii) Michelle Miller ("Ms. Miller"), a party the Debtor describes as "a former key employee" and "a Class C Member of ARPH I . . . ." *Id.* at p. 3.[24] The Consent Complaint seeks declaratory, injunctive and compensatory relief against all defendants arising from various alleged violations of the AREH Operating Agreement, as well as the operating agreements of several Portfolio Entities that have been proceeding in accordance with the AREH Interim Order.[25] [*See* Consent Complaint, Doc. 192, p. 15] ("Through these *ultra vires* actions . . . the Debtor . . . has been harmed, in that the value of the Debtors [sic] interests in the [Portfolio Entities] have been

---

[24]     The allegations made by the Debtor in the Consent Proceeding appear to be premised in large put upon the assumption that the AREH Interim Order issued by Judge Cohen on November 28, 2023, remains in effect. [*See, e.g.*, Consent Complaint, Doc. 131, p. 13] ("The Debtor alleges that since [the AREH Interim Order], Oak, with Mr. Chassen's assistance and/or blessing, has allowed chaos to ensue."); *id.* at n. 23 ("Moreover, *since taking control*, upon information and belief, Oak has: (i) failed to pay outstanding legal bills; (ii) failed to pay security and other maintenance bills at the Investment Properties; (iii) terminated AREH's lease for its main working location; (iv) failed to hold required investor meetings; and (v) fired and failed to fill key positions."); *id.* at p. 12 ("On November 22, 2023, the State Court granted Oak's motion and ordered that during the pendency of the present action, 'Oak shall continue to act in [JJ Arch's] stead as AREH's sole managing member in accordance with Section 7.1 of the Limited Liability Operating Agreement of AREH . . . .'"); *cf. id.* at pp. 9–10 (describing the Interim Order issued August 21, 2023, as being "still in effect").

This is surprising given that—as the Court previously noted—both the Debtor and Mr. Simpson have questioned the extent to which the Interim Orders apply in the context of this bankruptcy. [*See* Remand Order, Doc. 131, p. 26 n.20] (cataloguing instances where "Mr. Simpson and the Debtor [] emphasize[] [] the fact that the Interim Orders are 'interim' and therefore non-final"); *but see id.* (holding that, in accordance with Bankruptcy Rule 9027(i), "the Interim Orders bear directly upon the Debtor's reorganization— including the threshold issue of whether Mr. Simpson possessed the authority file a petition for relief on behalf of the Debtor").

[25]     For reference, Mr. Simpson has described ARPH I as being the channel through which AREH receives the profits generated by the Portfolio Properties. [*See* Consent Complaint, Doc. 195, p. 5] (where Mr. Simpson states that "[t]he ARPH I Operating Agreement provides [] the Debtor [with] control over the management over ARPH I . . . .").

reduced, and its important property rights in the consent requirements of the [various] Operating Agreements have been violated.").

Second, on September 23, 2024, the Debtor removed an interpleader proceeding (the "Insurance Proceeding") initiated by Great American Insurance Company ("Great American") and first filed in New York State Supreme Court before Justice Cohen. [*See generally* Doc. 195, pp. 1–25, hereinafter the "Great American Complaint"). The Insurance Proceeding seeks to identify the proper beneficiaries of a directors-and-officers policy (the "D&O Policy") in favor of AREH, particularly with respect to the attorneys' fees incurred by both the Debtor and Mr. Simpson during the pendency of this bankruptcy. *See, e.g.*, *id.* at p. 14 ("Interpleader-Defendants Simpson and Chassen have sought, and Simpson has been extended, coverage under the Policy as Insureds."); *id.* at p. 15 ("[Great American] faces competing demands from at least two Insureds (Simpson and Chassen), each seeking coverage for the Policy's remaining available Limit of Liability."); *id.* at pp. 13, 15 ("The Policy contains an aggregate limit of liability of $3 million . . . [but] [a]t the time of this filing, factoring in Costs of Defense advanced on behalf of Simpson, the remaining limit of liability is $2,105,999.29.").

Most recently, on September 24, 2024, counsel for Mr. Chassen filed a letter to the Court of the regarding a "recent legal development." [*See* Doc. 199, hereinafter the "TRO Letter"]. The TRO Letter reads in full:

> In relation to the upcoming [H]earing[] set for [tomorrow] and on behalf of our client Jared Chassen, we wish to alert the Court to a recent legal development. On September 24, 2024, Justice Andrew Borrok, *on behalf of Justice Joel M. Cohen*, issued the enclosed Temporary Restraining Order ("TRO") based upon the enclosed supporting memorandum of law. The TRO restrains Mr. Simpson and YJ Simco

LLC[26] from transferring to Mr. Simpson or any entity he owns or controls, *including YJ Simco, or to the Debtor*, the property, assets, and membership interests owned by the Portfolio [] Entities [], pending a hearing on the matter before Justice Cohen on October 25, 2024.

The Operating Agreements of these entities show that the Debtor is not a member or owner of Portfolio [] Entities, which instead have numerous individual investors, including Mr. Chassen and his family members. Mr. Chassen sought the TRO to prevent Mr. Simpson and YJ Simco LLC from effectuating a threatened no-consideration, insider transfer of property belonging to him and others, including his family members. Mr. Chassen argued that such a transfer (1) breaches Mr. Simpson's fiduciary duties to the various members of these entities; (2) constitutes a fraudulent conveyance under the New York's Uniform Voidable Transaction Act and (3) violates the terms of the relevant Operating Agreements.

*See id.* at p. 1 (emphasis added); *see also* [Doc. 199-1] (the TRO issued by Justice Borrack).[27]

<u>**ANALYSIS**</u>

### III.   <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). *See In re Laub*, 2024 WL 3024513, at *2 (Bankr. S.D.N.Y. June 14, 2024). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B). *Id.*

---

[26]   YJ Simco LLC ("YJ Simco") is an "affiliate" of the Debtor that is not managed by AREH (and therefore not a Portfolio Entity) and is not controlled by the Debtor (and thus not a Non-AREH Entity). [*See* 341 Transcript, Doc. 17-2, p. 55] ("MR. SOUTHARD: What is YJ SIMCO LLC, Mr. Simpson?  MR. SIMPSON: It is an entity that's controlled by me and my wife.  It has nothing to do with this."); *see also id.* at p. 56 ("MR SIMPSON: [YJ Simco] has no involvement.  It's not related.  It's not related . . . your client [is trying] to include my family's LLC into litigation, which is not appropriate.").

The Debtor's State of Financial Affairs ("Debtor SOFA") indicate that the Debtor paid YJ Simco $38,000 within 90 days prior to this bankruptcy as a "[r]eimbursement for various loans that YJ Simco LLC has made to the [D]ebtor?s [sic] investment entity."  [Doc. 32, p. 8].

[27]   As a final matter, the Court notes that yesterday, on October 10, 2024, AREH filed a *Motion in Aid of Existing State Court Order Deeming the Debtor to Have Authorized the Haverhill Sellers to Consummate the Melrose Transaction.* [*See generally* Adv. Pro. Dkt., Doc. 40]; *see also id.* at p. 7 ("Mr. Simpson has (contrary to the Debtor's previous proposed counsel's own representations to this Court) taken the position that no Major Decision can be made absent his consent notwithstanding the Existing [Interim Orders] . . . ."); *id.* at p. 16 ("By this Motion, AREH requests entry of an order in aid of Existing [Interim Orders] affirming that the Debtor has consented to [a pending transaction] by virtue of Mr. Chassen's approval, or, alternatively, by virtue of Mr. Simpson's failure to object.").

## IV.  **DISMISSAL**

A court must convert or dismiss a bankruptcy where "cause" exists "so long as [conversion or dismissal] is in the best interest of both the creditors and the estate." *In re Halal 4 U LLC*, 2010 WL 3810860, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citing 11 U.S.C § 1112(b) and COLLIER ON BANKRUPTCY ¶ 1112.04).  Although Section 1112(b)(4) of the Bankruptcy Code provides a number of examples of "cause," that list "is not exhaustive and courts are free to consider other factors." *Id.* (internal quotations omitted); *see also In re C-TC 9th Ave. P'ship,* 113 F.3d 1304, 1311 (2d Cir. 1997) ("It is important to note that [Section 1112(b)(4)] is illustrative, not exhaustive.").  As one court has observed:

> The Court [must] be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases . . . [and] [i]t is clear that Congress amended section 1112(b) to make it broader, more strict as to debtors, and more encompassing.  For example, the legislative history for section 1112(b) reflects that versions of this section leading to the enactment are entitled "Expanded Grounds for Dismissal or Conversion and Appointment of the Trustee."

*In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009) (citing *In re TCR of Denver, LLC*, 338 B.R. 494, 500 (Bankr.D.Colo.2006) and the legislative history accompanying Section 1112); *see also In re Weiss Multi-Strategy Advisers LLC,* 2024 WL 2767893, at *12 (Bankr. S.D.N.Y. May 29, 2024) ("Bankruptcy judges have wide discretion to determine whether cause exists to dismiss or convert a case under § 1112(b).").  Once the movant establishes that "cause" exists, "the burden shifts to the respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate." *Halal 4 U*, 2010 WL at *2–3.

### a. <u>Section 1112(b)(4)(A)</u>

Section 1112(b)(4) of the Bankruptcy Code provides that cause exists where there is "[s]ubstantial or continuing loss to or diminution of the estate" and an "absence of a reasonable likelihood of rehabilitation . . . ."  11 U.S.C § 1112(b)(4)(A).

Three aspects of this case indicate that "cause" exists under Section 1112(b)(4)(A).  The first is the fact that the Debtor is not actively generating revenue.  This fact is evidenced by a number of items in the record, including:

(i)    Mr. Simpson's First Day Affidavit, which provides that the Debtor "is a real estate holding company with no employees . . . [whose] business is limited solely to its indirect ownership interests in various real property assets and indirect managerial control in each of the Portfolio Projects," [*see* First Day Affidavit, Doc. 16, p. 5];

(ii)   the fact that Great American, rather than the Debtor, has apparently paid for the Debtor's administrative expenses arising from both this bankruptcy and from the State Court Proceeding,[28] and

---

[28]    [*See* Great American Complaint, Doc. 195, pp. 15, 19–20]; [*see also* Adv. Pro Dkt., Doc. 25, pp. 13–14, 38–39] (where counsel for AREH argues that Mr. Simpson and the Debtor have "no money to fund this estate apparently other than" the Great American insurance policy); [Debtor Schedules, Doc. 31, p. 16] (listing former counsel hired by Mr. Simpson as being the Debtor's largest unsecured creditor).

(iii)   Mr. Simpson's 341 testimony, which indicates that the Debtor does not possess the funds sufficient to pay for, *inter alia*, the continuation of this bankruptcy.[29]

The second consideration is the exceptional rate at which the Debtor has incurred expenses administrative following the August Exchange.  The Great American Complaint indicates that, as of June 25, 2024, Great American has "advanced $894,000.71 in Costs of Defense incurred by Simpson [in] connection with" both this proceeding and the State Court Proceeding.[30]  [*See* Great American Complaint, Doc. 195, pp. 19–20].  If past is prologue, the Court believes the Debtor will continue to incur substantial fees resulting from Mr. Simpson's prosecution of this bankruptcy.[31]

*See id.* at p. 15 ("Simpson's and Chassen's claims for Costs of Defense, along with any anticipated

---

[29]   At the 341 meeting held June 20, 2024, Mr. Simpson and the United States Trustee engaged in the following colloquy:

> MR. MASUMOTO:  With respect to the May report, do -- what is your anticipated income?
> MR. SIMPSON:  I don't know of any.
> MR. MASUMOTO:  I'm sorry. You don't know of any 1 income that's likely to be reported in the May --
> MR. SIMPSON:  As in zero.
> MR. MASUMOTO:  Okay.
> MR. SIMPSON:  As in zero.
> MR. MASUMOTO:  All right.
> MR. SIMPSON:  As in zero. I mean, there is -- there's really no -- there's no sources of revenue at this point for anywhere in JJ Arch . . . Like, there's no transactions that are occurring that are bringing positive cash flow into JJ Arch in its current time . . . it's impossible to bring any money in.

[*See* 341 Transcript, Doc. 170-2, pp. 40]; *see also id.* at p. 41 ("MR. MASUMOTO: Okay.  And with respect to AREH, you don't anticipate any funds being upstream from AREH going forward at this time. Is that correct?  MR. SIMPSON:  You can -- you could ask the folks at Oak or AREH if they're ever going to pay the bills they're supposed to, but highly unlikely, is my guess.").

[30]   Neither the Debtor nor Mr. Simpson have provided evidence disputing the amount of attorneys' fees advanced by Great American.

[31]   The Court observes that Mr. Simpson has, since the August Exchange, hired no less than six firms—some on his behalf and some on behalf of the Debtor—who have appeared both before this Court and before Justice Cohen.  [*See* Adv. Pro. Dkt., Doc. 2] (Altman & Company P.C., appearing for Mr. Simpson); [Doc. 14-1] (Altman & Company P.C., for Mr. Simpson and Sam Israel, Esq. for both Mr. Simpson and the Debtor); [Remand Order, Doc. 131, p. 19 n.14] (listing the three firms hired at the direction of Mr. Simpson, two on behalf of the Debtor and one on behalf of Mr. Simpson, all of whom who have since withdrawn from this bankruptcy); [Doc. 163] (the Order issued by this Court approving the retention of the Debtor's current counsel); [*see also* Adv. Pro. Dkt., Doc. 3-8] (Adam Leitman Bailey P.C., appearing for both Mr. Simpson and the Debtor); [*but see* Debtor Schedules, Doc. 31, p. 16] (listing the Bailey firm as a creditor owed $128,353.00 by the estate).

indemnity payments made to resolve the Lawsuit, as well as claims made by [former counsel to the Debtor and Mr. Simpson] will *exceed the remaining Policy proceeds.*") (emphasis added); [*see also* Debtor Schedules, Doc. 31, p. 16] (listing the Debtor's largest creditor as being a single attorney hired by Mr. Simpson while the State Court Proceeding was still pending before Justice Cohen); [Plan, Doc. 184, p. 27] (where the Debtor's current counsel anticipates generating $300,000 in attorneys' fees on or before the Plan's effective date). The Court finds these expenses excessive for a debtor without a stream of revenue,[32] and therefore finds that there is a "[s]ubstantial or continuing loss to or diminution of the estate" within the meaning of Section 1112(b)(4)(A). *See In re Weiss Multi-Strategy Advisers LLC,* 2024 WL 2767893, at *10 (Bankr. S.D.N.Y. May 29, 2024) ("[P]ersistent losses during the course of a bankruptcy case come[] at the expense of creditors and would weigh in favor of conversion or dismissal of the case.") (internal quotations omitted); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) ("[T]he [d]ebtors' administrative insolvency constitutes cause to convert these cases.").

Finally, the Plan as-proposed contemplates its funding via the sale of certain properties owned by Non-AREH Entities. While the Bankruptcy Code unquestionably permits plans of

---

[32]    This is especially true given that Mr. Simpson's prosecution of this bankruptcy has been labeled *ultra vires* by the State Court Litigants. [*See* First Motion to Dismiss, Doc. 4, p. 2] ("The filing should be dismissed as *unauthorized and in bad-faith* because Jeffrey Simpson [] never sought or obtained the consent of [the Debtor's] other member, Mr. Chassen, as required by the JJ Arch LLC Operating Agreement . . . and court orders entered in the New York County Supreme Court, Commercial Division [], by the Honorable Joel M. Cohen . . . .") (emphasis added); [Adv. Pro. Dkt., Doc. 4, p. 2] (where Oak claims that "[t]hrough the *unauthorized bankruptcy filing* for [the Debtor], Simpson is improperly seeking to vacate the Commercial Division orders, appoint himself as the sole managing member of [the Debtor], and avoid liability for the many breaches of fiduciary duties already found by" Justice Cohen) (emphasis added).

In light of these allegations, the continuation of this bankruptcy raises the specter of additional, post-petition claims against the Debtor—either by the State Court Litigants or by Mr. Simpson himself. [*See* Lift Stay Order, Doc. 132, pp. 15–16] (describing the claims brought against the Debtor by Oak, which include breach of fiduciary duty for the acts of the Debtor occurring at the direction of Mr. Simpson); *id.* at pp. 18 n.11 (citing Adv. Pro. Dkt., Doc. 1-2, pp. 206, 227, 231, and noting that "[t]he Debtor's operating agreement [] indicate[s] that, in certain instances, the Debtor may be obligated to indemnify either Mr. Simpson or Mr. Chassen"). The Court finds this risk untenable given the income-expense disparity discussed above.

liquidation,[33] this Plan is unconfirmable given the posture of this case, and otherwise contemplates transactions that would be violative of the TRO issued by Justice Cohen.  *See infra*, Part IV(c)(ii); [*see also* Doc. 199-1, p. 2] (the TRO issued by Justice Borrack, enjoining both Mr. Simpson and YJ Simco from "transferring to [the Debtor] or to Simpson or any entity he owns or controls . . . the property, assets, and membership interests" of the Portfolio Entities).  Without another means of raising revenue, the Court finds that the Debtor lacks the income and liquidity to justify the continued incursion of the expenses inherent in the bankruptcy process.  The Court thus finds that the Debtor lacks a "reasonable likelihood of rehabilitation" necessary to avoid dismissal.[34]  *See In re Kanterman,* 88 B.R. 26, 29 (S.D.N.Y. 1988) ("The distinction [between rehabilitation and reorganization] is significant. Rehabilitation of a debtor's estate implies the *re-establishment of a sound financial basis*, a concept which *necessarily involves establishing a cash flow* from which current obligations can be met.") (emphasis added); *accord, In re Halal 4 U LLC*, 2010 WL 3810860, *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (citing *Kanterman*, 88 B.R. at 29 for the proposition

---

[33]      *See, e.g.*, 11 U.S.C. § 1123(a)(5)(D) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . [the] sale of all or any part of the property of the estate . . . ."); 11 U.S.C. § 1123(b)(4) ("Subject to subsection (a) of this section, a plan may . . . provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests . . . ."); *but see In re Sillerman,* 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019) ("[A] [c]ourt may find that the [d]ebtor's intention to liquidate constitutes an absence of a reasonable likelihood of rehabilitation.") (citing *In re BH S & B Holdings, LLC*, 439 B.R. 342, 348 (Bankr. S.D.N.Y. 2010)).

[34]      This is especially true where, as here, there was "no reasonable possibility that the [D]ebtor [could] emerge from bankruptcy" at the outset of this proceeding.  *See infra*, Part IV(c)(ii) (citing *In re Loco Realty Corp.*, 2009 WL 2883050, at *3 (Bankr. S.D.N.Y. June 25, 2009)).

As one court has noted:

>    A continuing loss or diminution of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization. The debtor, however, should not [be] in control of the business beyond a point at which reorganization no longer remains realistic.

*See In re Weiss Multi-Strategy Advisers LLC,* 2024 WL 2767893, at *10 (Bankr. S.D.N.Y. May 29, 2024) (quoting *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003)); *see also In re Alston,* 2013 WL 6210249, at *5 (E.D. Pa. Nov. 27, 2013) ("The absence of a confirmable plan constitutes cause for dismissal under section 1112(b)(1).").

that "[i]t is not necessary that the losses to the estate be large.  All that need be found is that the estate is suffering some diminution in value."); *see also In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010) ("One indication of continuing loss to the bankruptcy estate is *negative cash flow* after the bankruptcy case is commenced. Another indicator is the debtor's inability to meet the *basic* [] *expenses* critical to the viability of its enterprise, notwithstanding the protection of the automatic stay.") (emphasis added).  Put differently, the Court finds that "cause" exists within the meaning of Section 1112(b)(4)(A).

### b.  Section 1112(b)(4)(B)

Section 1112(b)(4) of the Bankruptcy Code also provides that cause exists where there is "gross mismanagement of the estate."  11 U.S.C § 1112(b)(4)(B); *see also In re Weiss Multi-Strategy Advisers LLC,* 2024 WL 2767893, at *10 (Bankr. S.D.N.Y. May 29, 2024) ("The focus of this provision is on the estate and not the debtor. As such, the 'inquiry cannot include mismanagement by the debtor prior to the bankruptcy filing.'") (citing 7 COLLIER ON BANKR. ¶ 1112.04[b]).

In this case, the concerns discussed *supra*, Part IV(a)—namely, the Debtor's post-petition lack of income and excessive accrual of expenses—indicate that there has been "gross mismanagement of the estate" under Section 1112(b)(4)(B).  *See In re McQuillen Place Co., LLC,* 609 B.R. 823, 831 (Bankr. N.D. Iowa 2019) ("[The] Debtor's continued failure to preserve the estate constitutes gross mismanagement under § 1112(b)(4)(B)."); *In re Visicon Shareholders Tr.*, 478 B.R. 292, 310 (Bankr. S.D. Ohio 2012) (finding "cause" under Section 1112(b)(4)(B) given the "overwhelming record of gross financial mismanagement of this estate").

Additionally, implicit in Section 1112(b)(4)(B) is the understanding that a debtor-in-possession is a fiduciary as to the estate, a position that imposes upon a debtor the obligation to

"keep the Court and other parties in interest apprised of the Debtor's business operations." *In re Halal 4 U LLC*, 2010 WL 3810860, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (citing *In re G–I Holdings, Inc.*, 385 F.3d 313, 319 (3d Cir. 2004)).[35]

The Debtor in this case has not satisfied its fiducial obligation.[36]  As noted by the Dismissal Motion, the Debtor has inexplicably failed to:

(i)      timely file a single monthly operating report, [Dismissal Motion, Doc. 170, p. 10];[37]

(ii)     open a debtor-in-possession bank account, *id.* ("[T]he Debtor concede[s] that it has no 'Debtor-in-Possession Account,' and admitted . . . it has two 'non-Debtor in-Possession' bank accounts.");

---

[35]      *See also In re Carrington,* 710 F. Supp. 3d 248, 257 (S.D.N.Y. 2024) ("[T]he Bankruptcy Court did not abuse its discretion in finding cause due to [the debtor's] failure to timely file compliant monthly operating reports . . . [because] timely operating reports and the accuracy of their information are the life blood of the Chapter 11 process, serving as a 'litmus test for the debtor's ability to reorganize.") (internal quotations omitted); *In re McTiernan,* 519 B.R. 860, 866 (Bankr. D. Wyo. 2014) ("A debtor in bankruptcy must comply with the reporting requirements so that creditors and the court may determine whether the bankruptcy case is being properly administered while a debtor enjoys the benefits of the bankruptcy process.").

[36]      To the extent that Mr. Simpson believes that the State Court Litigants have "cut off Mr. Simpson from all information," [*see* Debtor Objection, Doc. 185, p. 11], the Court finds that is a matter that has been addressed—and can be re-urged—before Justice Cohen.  [*See* Remand Order, Doc. 131, p. 21 n.16] (noting that "the record indicates that the parties to this action have already had an ample opportunity to conduct discovery prior to the filing of this bankruptcy"); [Doc. 38-3, p. 4] (where, in the AREH Interim Order, Justice Cohen orders that both "Jeffrey Simpson and Jared Chassen . . . shall retain viewing access to the Arch Accounts; and all parties must promptly provide any information or documentation requested by First Republic Bank"); [*see also* Remand Order, Doc. 131, p. 26 n.20] (holding that, under Bankruptcy 9027(i), Justice Cohen's Interim Orders apply wholesale to this bankruptcy).

[37]      Though the Debtor has filed monthly operating reports for the months of March, April, May, June, and July, all five were belated, and three reports were filed collectively on September 3, 2024, simultaneously with the Debtor's Objection.  [*See* Doc. 183]; [Doc. 182]; [Doc. 181]; [Doc. 151]; [Doc. 108].

(iii)    adequately explain the contents of the April monthly operating report, which indicates that "approximately $13,000 [] passed through the Debtor in April . . . $10,750 [of which] was directed to YJ Simco LLC, an entity controlled by and for the benefit of Mr. Simpson," *id.* at p. 11;[38] and, most notably,

(iv)    file the subsidiary report required by Bankruptcy Rule 2015.3, notwithstanding the fact that the Debtor's business is "limited solely to its indirect ownership interests in various real property assets and indirect managerial control" of various subsidiaries,[39] [*see* First Day Affidavit, Doc. 16, p. 5].

These four facts—all of which are undisputed and inadequately explained, [*see generally* Debtor Objection, Doc. 185]—are sufficient to establish the existence of "cause" within the meaning of Section 1112(b)(4)(B).[40] *See, e.g., In re Halal 4 U LLC,* 2010 WL 3810860, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (finding "gross mismanagement" where "the Debtor has failed to accurately represent its interests in the properties at issue and has failed to submit monthly

---

[38]    The Court notes that Mr. Simpson's testimony suggests that, in the past (and perhaps during this bankruptcy), Mr. Simpson, YJ Simco, and/or Non-AREH Entities have paid for expenses on the behalf of either the Debtor or its subsidiaries. [*See* 341 Transcript, Doc. 170-2, pp. 55–56] (where Mr. Simpson states that "when there's no other money from any other place, it would come from another corporate entity of mine or me personally . . . [because] when monies have to be paid, and there is no other way to make money be paid . . . it's got to come from some other entity"); *see also id.* at 53 ("There have been funds [from Non-AREH Entities] that have reimbursed me for loans that I have made to several of the [subsidiaries] in small amounts."); [Debtor SOFA, Doc. 32, p. 8] (indicating that the Debtor paid YJ Simco $38,000 within 90 days prior to this bankruptcy as a "[r]eimbursement for various loans that YJ Simco LLC has made to the [D]ebtor?s [sic] investment entity." ).

[39]    Bankruptcy Rule 2015.3 provides that, in a chapter 11 case, a "debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest . . . no later than seven days before the first date set for the meeting of creditors under §341 of the [Bankruptcy] Code." As noted by AREH and Mr. Chassen, however, the Debtor "[h]as not filed its Rule 2015.3 statements concerning the operations of the [Non-AREH Entities] that Mr. Simpson continues to control" notwithstanding the fact that the Debtor's first 341 meeting was set for April 8, 2024. [Dismissal Motion, Doc. 170, p. 7; *see also* Doc. 21] (providing the date for the first-scheduled 341 meeting) [First Day Affidavit, Doc. 16, pp. 8–10] (noting that the Debtor is the majority owner of these entities and that "[t]he real property associated with the [Non-AREH Entities] . . . generate approximately $1.1 million of revenue annually for the Debtor"). Because there is no Rule 2015.3 affidavit in the record delineating the operations of the Non-AREH Entities, it is unknown which (if any) of these entities have generated revenue that would ultimately inure to the benefit of the Debtor.

[40]    These same considerations justify dismissal or conversion under Section 1112(b)(4)(F). *See In re Carrington,* 710 F. Supp. 3d 248, 257 (S.D.N.Y. 2024) ("The Bankruptcy Court thus appropriately invoked Section 1112(b)(4)(B) in citing the lapse as gross mismanagement of the estate, although it would also qualify as cause under Section 1112(b)(4)(F), which identifies the 'unexcused failure to satisfy timely any filing or reporting requirement' as cause . . . .").

operating reports that satisfactorily depict the Debtor's income and expenses by property"); *In re Republic, LLC*, 2018 WL 3203869, at \*5 (Bankr. D. Conn. June 26, 2018) (finding gross mismanagement where the debtor's principal "could not provide information on the [d]ebtor's source of income (rental monies), or whether a forty-nine percent (49%) interest in the [d]ebtor had been sold to a third party"); *accord, In re McTiernan*, 519 B.R. 860, 866 (Bankr. D. Wyo. 2014).

c. **Bad Faith**

As explained above, the examples of "cause" enumerated by Section 1112(b) are illustrative. *See In re C-TC 9th Ave. P'ship,* 113 F.3d 1304, 1311 (2d Cir. 1997); *accord, In re Casse*, 198 F.3d 327, 334 (2d Cir.1999) ("[C]ourt[s] will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.") (internal quotations omitted). Courts in this circuit and elsewhere have thus concluded that, given the nature of Sections 1112(b) and 105(a), a bankruptcy court may dismiss or convert a case upon a finding of

bad faith.[41] *In re C-TC 9th Ave. P'ship,* 113 F.3d at 1310 ("A bankruptcy court may dismiss a bad

faith filing on an interested party's motion or *sua sponte*.").

Bad faith depends upon "the totality of the circumstances, and involves finding an intent to

abuse the judicial process, and the purpose of the reorganization process." *Clear Blue Water, LLC

v. Oyster Bay Mgmt. Co.*, *LLC*, 476 B.R. 60, 68 (E.D.N.Y. 2012); *see also In re 68 West 127 Street,

LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) ("The existence of 'bad faith' depends not on any

one specific factor but on a combination of factors determined after careful examination of the

facts of the particular debtor's case.").

The "critical test" of a debtor's bad faith focuses on the debtor's petition date and asks two

questions: (i) whether there was "no reasonable likelihood that the debtor intended to reorganize"

(the "subjective bad faith" prong); and (ii) whether there was "no reasonable possibility that the

---

[41]      *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or
appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a
party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any
determination necessary or appropriate to enforce or implement court orders or rules, or to *prevent an abuse of
process*.") (emphasis added); *see also In re Stokes,* 2021 WL 4515389, at *3 (Bankr. D. Mont. Oct. 1, 2021)
("Access to bankruptcy relief in the United States is a privilege, not a right . . . [and] courts possess statutory and
inherent powers to limit the relief available to debtors who act in bad faith, abuse the bankruptcy system, or fail to
comply with basic requirements.").

Indeed, the Fifth Circuit has observed that:

> Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a
> standard of good faith for the commencement, prosecution, and confirmation of bankruptcy
> proceedings.  *See In re Victory Constr. Co.*, 9 B.R. 549, 551–60 (Bankr.C.D.Cal.1981) (containing
> an excellent historical survey).  *See, e.g., Fidelity Assur. Assoc. v. Sims*, 318 U.S. 608, 621, 63
> S.Ct. 807, 813–14, 87 L.Ed. 1032 (1943); *A–COS Leasing Corp. v. Wheless*, 422 F.2d 522, 523–25
> & n. 1 (5th Cir.1970).  Such a standard furthers the balancing process between the interests of
> debtors and creditors which characterizes so many provisions of the bankruptcy laws and is
> necessary to legitimize the delay and costs imposed upon parties to a bankruptcy.  Requirement of
> good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to
> delay creditors without benefitting them in any way or to achieve reprehensible purposes.
> Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by
> rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts,
> marshalling and turnover of assets) available only to those debtors and creditors with "clean
> hands."

*Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1071–72 (5th Cir. 1986).

debtor will emerge from bankruptcy" (the "objective futility" prong).[42]  *In re Hudson 888 Owner LLC*, 2024 WL 1145664, at *4 (Bankr. S.D.N.Y. Mar. 15, 2024) (citing *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)); *In*

---

[42]    The Court notes that the Second Circuit has cited with approval the eight-factor test announced in *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D.Ky.1992):

> The bankruptcy court in *Pleasant Pointe* considered the following factors as indicative of a bad faith filing: (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*See In re C-TC 9th Ave. P'ship,* 113 F.3d 1304, 1311 (2d Cir. 1997).  The *Pleasant Pointe* factors are often used by courts in this circuit when considering a bad faith-basis for dismissal.  *See e.g., In re Sapphire Dev., LLC*, 2015 WL 5579545, at *4 (Bankr. D. Conn. June 26, 2015), *aff'd sub nom. Sapphire Dev., LLC v. McKay*, 549 B.R. 556 (D. Conn. 2016); *In re: Worden*, 2023 WL 4480358, at *8 (Bankr. N.D.N.Y. July 11, 2023); *In re New York Classic Motors, LLC*, 2021 WL 2285440, at *3 (Bankr. S.D.N.Y. June 4, 2021).

The Second Circuit's decision, however, simply found that an application of these factors provided a sufficient basis to warrant dismissal; the Second Circuit did not mandate their use in every case.  *See In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311–12 ("The presence of the *Pleasant Pointe* factors was adequate evidence of the debtor's impermissible purpose in filing . . . [and] [b]ased on these factors, the bankruptcy court did not abuse its discretion in dismissing C–TC's petition for bad faith.").  The Court observes further that the *Pleasant Pointe* factors are designed for (and thus often used in) a specific circumstance: namely, for a situation where a debtor owning a single asset files a petition to impede a creditor secured by that asset.  *See, e.g., id.* at 1311 (applying the *Pleasant Pointe* factors to such a case); *In re Sapphire Dev., LLC*, 2015 WL 5579545, at *4 (same); *In re: Worden*, 2023 WL 4480358, at *8; *In re New York Classic Motors, LLC*, 2021 WL 2285440, at *3 (same); *In re Syndicom Corp.*, 268 B.R. 26, at *50–51 (Bankr. S.D.N.Y. 2001) (same); *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) (same); *Squires Motel, LLC v. Gance*, 426 B.R. 29, 35 (N.D.N.Y. 2010) (same).

While the *Pleasant Pointe* factors may possess some applicability beyond the facts of that case, that applicability is limited in a case such as this one, where the Debtor is a holding company with no physical assets and was not facing a pre-petition foreclosure.  [*See* First Day Affidavit, Doc. 16, p. 5].  The Court will thus consider the Debtor's (and Mr. Simpson's) bad faith outside these factors, while remaining mindful of the "underlying purpose" of chapter 11: to offer either rehabilitation or liquidation to a good-faith debtor.  *See Johnson v. Vanguard Holding Corp. (In re Johnson)*, 708 F.2d 865, 868 (2d Cir.1983) ("'Good faith,' while not defined by statute or legislative history . . . certainly does, however, require 'honesty of intention' . . . ."); *see also In re C-TC 9th Ave. P'ship,* 113 F.3d at 1308, 1310 ("The good faith standard . . . furthers the balancing process between the interests of debtors and creditors . . . and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy."); *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 71 (E.D.N.Y. 2012) (a bankruptcy court may "may consider *any factors* [that] evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions'") (emphasis added); *In re Halal 4 U LLC*, 2010 WL 3810860, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) ("Courts consider multiple factors when determining whether a filing was made in bad faith . . . .").

*re Loco Realty Corp.*, 2009 WL 2883050, at *3 (Bankr. S.D.N.Y. June 25, 2009).  The Court addresses each question in turn.

### i.  *Subjective Bad Faith*

The Court has, in the context of the Remand Motion, already examined the circumstances surrounding the filing of this bankruptcy and found them questionable.  [*See* Remand Order, Doc. 131, pp. 28–36] ("[G]iven the tenor of the record, the present posture of this case, and the history of both the State Court Proceeding and this bankruptcy . . . a re-examination of the record is necessary."); *id.* at p. 36 ("The Court believes that the record recited above establishes that the tenth factor—forum shopping—weighs in favor of abstention.").  Because the Court has already concluded that Mr. Simpson has engaged in forum shopping, it is unnecessary to repeat the findings supporting that conclusion, save for two points relevant to the instant Dismissal Motion.

First, the record overwhelmingly suggests that this bankruptcy was a means of removing the State Court Proceeding from the purview of Justice Cohen.  This is indicated by Mr. Simpson's three unsuccessful attempts to nullify the Interim Order (particularly the AREH Interim Order) in the months leading up to the filing of the petition.[43]  *See id.* at pp. 31–34.  This is also indicated by the email Mr. Simpson sent on March 6, 2024—one day before putting the Debtor into bankruptcy—to Kevin Wiener ("Mr. Wiener"), one of Oak's principals.  That email reads:

> YOU DON'T KNOW ANYTHING, GO BACK TO CANADA AS YOU ARE PLANNING TO DO ANYWAY AFTER YOU ARE FINISHED RUINING THE BUSINESS THAT I BUILT.  THE GROWN UPS WILL HANDLE IT. YOU WILL NEVER BE ALLOWED BACK IN THE US WHEN WE ARE DONE WITH THIS NONSENSE. DON'T SEND ME ANYTHING MORE, YOU WILL BE PROVEN

---

[43]    One of these attempts involved an ex parte, off-the-record email to the Honorable Deborah A. Kaplan (the Deputy Chief Administrative Judge of the New York City Courts) regarding the propriety of Justice Cohen's Interim Orders.  [*See* Remand Order, Doc. 131, pp. 32–33] (reciting that email in full); [*see also* Doc. 4-6, pp. 2–3] ("We have tried to tell [Justice] Cohen that the company has over $20M of unpaid defaulted obligations [but] he has *blocked bankruptcy*, stripped me of my rights by changing agreements without the right to do that [].") (emphasis added); *id.* ("There has not been a way to defend myself properly and it seems that [Justice] Cohen has unfairly (or improperly) rendered a decision about my character and business . . . .").

> GUILTY ON ALL RESPECTS – GOOD THAT YOU DUPED ONE JUDGE, YOU
> WON'T DUPE OTHERS . . . LIKE A COWARD THAT YOU ARE.  THIS ISNT
> A VIDEO GAME KEVIN.

[Doc. 14-3, p. 3] (emphasis in original); *see also id.* (where Mr. Wiener replies, "Jeff I'm already

in Canada.").

Second, the Debtor (at the direction of Mr. Simpson) has not proceeded in good faith during

the early stages of this bankruptcy.  Several items in the record support this conclusion, including:

(i)     the unexplained contradiction between Mr. Simpson's First Day Affidavit and the
        Debtor's Petition,[44] [*see* Remand Order, Doc. 131, pp. 34–35];

(ii)    the fact that the Debtor and Mr. Simpson removed the State Court proceeding on the
        *day oppositions to the Lift Stay Motions were due*, *see id.* at p. 11 (noting that "the
        Debtor argue[d] the Lift Stay Motions [w]ere moot because 'the State [Court
        Proceeding] has been removed to this Court and is no longer pending in the State
        Court'");

(iii)   the fact that the Debtor's proposed counsel (hired by Mr. Simpson) rehashed
        arguments before this Court that were already made before—and were set to be
        decided by—Justice Cohen in the context of the State Court Litigation prior to this
        bankruptcy,[45] *see id.* at pp. 34–35;

---

[44]    As the Court has already noted:

> The Debtor's petition states that Mr. Simpson became the Debtor's sole equity holder after "Mr.
> Chassen [] was deemed to have resigned as a member of [the Debtor]" during the August
> Exchange.  This narrative was contradicted twelve days later when Mr. Simpson filed his [First
> Day] [A]ffidavit, which provides that Mr. Chassen "voluntarily decided to cease providing
> substantially all of his business time for the benefit of the Debtor no later than January 2024 and,
> as a result, was deemed to have resigned from the Debtor under the under [sic] terms of the
> [Debtor's] Operating Agreement."

[Remand Order, Doc. 131, pp. 34–35] (internal citations omitted).

[45]    [*See* First Day Affidavit, Doc. 16, p. 11 n.14] ("Notably, although certain [Interim Orders] did enjoin the
Debtor's Members from unilaterally seeking to terminate or force the resignation of the other without permission of
the court, such orders did not prohibit Mr. Chassen from *voluntarily resigning* from the Debtor . . . .") (emphasis
added); [*see also* Doc. 4-7, pp. 7–8, 11–14, 16–17] (making a comparable argument before Justice Cohen); [*but see*
Doc. 56, pp. 16–17] (where proposed counsel for the Debtor represents to *this* Court that "[w]e absolutely have an
argument that we don't believe has been addressed by the state court, which is the -- you know, what we referred to
as the voluntary resignation in our objection to the motion to shorten notice, which is whether or not Mr. Chassen's
been devoting substantially all of his business time for the benefit of [the Debtor].").

(iv)    Mr. Simpson's willingness to continue with this bankruptcy in the face of the Remand Order,[46] which held unequivocally that "until questions relating to the Debtor's governance are answered [by Justice Cohen], this bankruptcy cannot proceed," *see id.* at p. 27; and, most recently,

(v)    the Debtor's Plan, which the Court believes warrants a separate discussion, *see infra*, Part IV(c)(ii).

In short, the circumstances of this case establish that the Debtor's Petition was not filed in order to "rehabilitat[e] or liquidat[e] to a good-faith debtor," *see supra*, n.42, and was instead an attempt by Mr. Simpson to avoid the resolution of the governance issues raised in the State Court Proceeding—a proceeding initiated by Mr. Simpson.  The record thus supports the conclusions that this bankruptcy was filed without a "good faith intent to reorganize . . . ."  *See In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001); *In re Artisanal 2015, LLC*, 2017 WL 5125545, at *11 (Bankr. S.D.N.Y. Nov. 3, 2017) ("It is plain that in filing this case, the Debtor is 'forum shopping' since in the [] Complaint it seeks to adjudicate *substantially the same matters that are pending before the State Court*.") (emphasis added); *In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, 2018 WL 4637460, at *8 (Bankr. S.D.N.Y. Sept. 25, 2018) ("[I]f the petition is not filed in good faith, it is an abuse of the judicial process or of the jurisdiction of the bankruptcy court.") (internal

---

[46]    The Court, of course, acknowledges that the District Court has not ruled on the objections to the Remand Order, *see JJ Arch LLC et al. v. Jared Chassen et al.*, Case No. 24-04847-KPF (Southern District of New York, June 26, 2024), and obviously recognizes the Debtor's clear right to assert those objections.

Nonetheless, the Court questions the motive behind the Debtor's continuation of this proceeding given that neither this Court nor Justice Cohen have decided the issues central to the State Court Proceeding—namely, the party properly in control of the Debtor.  [*See* Remand Order, Doc. 131, p. 7 n.6] ("[A] fair reading of that record suggests that—at their core—th[e] claims [asserted in the State Court Proceeding] seek to identify the party that is properly in control of the Debtor (and, relatedly, AREH)."); *id.* at p. 27 (cataloguing instances where the parties "seem to agree that questions relating to the Debtor's governance (particularly in light of the Interim Orders) logically precede any administration of the Debtor's estate"); *see also In re Wally Findlay Galleries (New York), Inc.,* 36 B.R. 849, 850 (Bankr. S.D.N.Y. 1984) ("The debtor also seeks to use this court as an appellate forum to review the state court's grant of summary judgment . . . [but] [t]he debtor is unable to propose a meaningful plan of reorganization until its [prior] litigation with [other parties] is resolved."); [Consent Complaint, Doc. 192] (asserting three claims against the State Court Litigants and other parties, all of which presume, *inter alia*, that Mr. Simpson is in control of the Debtor).

quotations omitted); *In re Wally Findlay Galleries (New York), Inc*., 36 B.R. 849, 850 (Bankr. S.D.N.Y. 1984).

### ii.    *Objective Futility*

Again, a debtor's bad faith depends upon whether, on the petition date, there was: (i) "subjective bad faith" on the part of the debtor; and (ii) an "objective futility" as to the reorganization process. *In re Hudson 888 Owner LLC*, 2024 WL 1145664, at *4 (Bankr. S.D.N.Y. Mar. 15, 2024) (citing *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)).

As a general matter, a reorganization is premised on the notion that the party acting on behalf of the debtor files a petition with the authority to initiate a bankruptcy.  If, under applicable law, the party purporting to act on behalf of the debtor lacked the authority to file, the bankruptcy must be dismissed.  *In re Richardson Foods, Inc*., 659 B.R. 154, 169 (Bankr. S.D.N.Y. 2024) (noting that "if 'those who purport to act on behalf of the corporation have not been granted authority by local law to institute the [bankruptcy], [the court] *has no alternative* but to dismiss the petition'") (emphasis added) (citing *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945)); *see also In re Inwood Heights Hous. Dev. Fund Corp.,* 2011 WL 3793324, at *9 (Bankr. S.D.N.Y. Aug. 25, 2011) (the source of a party's authority to file a petition on behalf of a debtor is "derived from state law"); *In re 3P Hightstown, LLC*, 631 B.R. 205, 210 (Bankr. D.N.J. 2021) (collecting cases and noting that "[t]he filing of a bankruptcy petition 'is a *specific* act requiring *specific* authorization'") (emphasis added).

In this case, on March 7, 2024, the applicable law governing Mr. Simpson's authority vis-à-vis the Debtor was a matter committed to Justice Cohen's Interim Orders, which "direct[ed] the [interim] operation of both AREH and the Debtor" until the claims asserted in the State Court

Proceeding were resolved.  [Remand Order, Doc. 131, p. 26].  The relevant parties that have

participated in this case—even Mr. Simpson, prior to this bankruptcy—have apparently understood

the Interim Orders to prohibit the filing of a bankruptcy petition on behalf of the Debtor pending

either: (i) a successful appeal of those Orders: or (ii) the final resolution of the State Court

Proceeding.  [*See* Doc. 14-1, pp. 32–33] (where, at the hearing immediately prior to the Interim

Orders, counsel to Mr. Simpson specifically requests an order permitting a "bankruptcy filing"

because "if ever a case screamed out for a bankruptcy trustee or a receiver, this is it"); [*see also*

Doc. 4-6, pp. 2–3] (Mr. Simpson's February 20, 2024, email to the Honorable Deborah A. Kaplan,

Deputy Chief Administrative Judge of the New York City Courts, asserting that Justice Cohen has

"*blocked bankruptcy*") (emphasis added); [Doc. 64, pp. 9–11] (where, at the first hearing held

before this Court on March 19, 2024, counsel to Mr. Chassen calls this proceeding "unauthorized"

given Justice Cohen's "very straightforward" Interim Orders); *id.* at p. 15 (where, at that same

hearing, counsel to AREH argues that "allowing Simpson to file this bankruptcy . . . was exactly

what the [Interim Orders] were designed to ensure could not happen"); *id.* at p. 20 (where, at that

same hearing, counsel to Oak argues that this proceeding "is plainly an unauthorized filing made

in direct violation of multiple court orders").

Regardless of whether this understanding of the Interim Orders is accurate,[47] the posture

of the State Court Proceeding was such Mr. Simpson either knew or should have known that, from

the first, every unilateral act he took on behalf of the Debtor would be challenged by the State

Court Litigants as unauthorized.  Because every reorganization requires an authorized petition, and

because an *un*authorized petition renders a case "subject to dismissal," *see In re Pasta B. By Scotto*

---

[47]      As the Court has emphasized, the proper interpretation of the Interim Orders is a matter best left to Justice
Cohen.  [See Remand Order, 131, p. 22] ("The Court [] believes that the State Court Proceeding presents questions
that are best decided in the Commercial Division.).

*II, LLC*, 2015 WL 7307246, at *3 (Bankr. S.D.N.Y. Nov. 19, 2015), no reasonable person would

have believed reorganization was possible under these facts (and it appears that no reasonable

person did).[48]

The Debtor's Objection makes much of the fact that there is a Plan on the record.  [*See*

Debtor Objection, Doc. 185, p. 10] (arguing that dismissal is inappropriate because the

"prosecuti[on] of the Plan filed will be straightforward . . . [and] will result in payment in full of

the Debtor's creditors"); *id.* at p. 16 ("If the Debtor's Chapter 11 Case is dismissed, there is no

assurance of what will happen to the Debtor's assets and what actions may be taken by creditors .

. . [and] to the extent [other parties] have issues with the Debtor's Plan, or proposed sales or any

other issue, the proper path is for discovery and argument before this Court, not [] wholesale

dismissal").  The Debtor thus maintains that the presence of the Plan establishes that dismissal is

improper.

The Court disagrees, and finds instead that the "objective futility" of this entire proceeding

becomes apparent when the Debtor's Plan is considered within the context of Section 1129 of the

Bankruptcy Code.  *See In re Halal 4 U LLC*, 2010 WL 3810860, at *2 (Bankr. S.D.N.Y. Sept. 24,

2010) ("Courts consider multiple factors when determining whether a filing was made in bad faith

. . . ."); *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 71 (E.D.N.Y. 2012) (a

bankruptcy court may "may consider *any factors* which evidence 'an intent to abuse the judicial

process and the purposes of the reorganization provisions'") (emphasis added).

---

[48]    As noted above, the Interim Orders were entered November 28, 2023.  *Supra*, Part II.

If Mr. Simpson did in fact believe that the Interim Orders permitted him to put the Debtor into bankruptcy, it is
unclear why he chose to appeal the AREH Interim Order in February of 2024 before the Appellate Division, First
Department, one month after Mr. Chassen purportedly "voluntarily" resigned from the Debtor "no later than January
2024 . . . ."  [First Day Affidavit, Doc. 16, p. 11, n.14]; [*see also* Remand Order, Doc. 131, pp. 31–34] (discussing
Mr. Simpson's "three attempts to nullify Justice Cohen's [Interim Orders] in the months preceding this bankruptcy").

Section 1129(a)(3) provides that a plan may only be confirmed if it "has been proposed in good faith and not by any means forbidden by law."  The Plan as-proposed assumes that the narrative provided by Mr. Simpson during the course of this bankruptcy is correct: that Mr. Simpson enjoys a position as the "sole interest holder" of the Debtor.  [*See* Plan, Doc. 184, p. 17] ("Mr. Simpson is presently the Debtor's sole managing member, who, for the reasons described below, currently owns 100% of the Interests in the Debtor."); *see also id.* ("Following Mr. Chassen's resignation, pursuant to Section 3.1 of the Operating Agreement, Mr. Simpson possesses all rights to direct all of the Debtor's 'business, affairs and assets', including but not limited to all matters pertaining to the Non-Debtor Real Property."); *id*. at p. 31 ("Prior to dissolution, the Debtor will continue to be governed by its sole managing member Jeffrey Simpson.").

The State Court Litigants have, however, repeatedly challenged Mr. Simpson's authority to act on behalf of the Debtor under both the Interim Orders and the law of the state of New York, and have contested the propriety of this bankruptcy and the Plan accordingly.[49]  [*See* Remand Order, Doc. 131, p. 30 n.22] (noting that, during the State Court Proceeding, Mr. Chassen sought "a declaration that [he] 'lawfully terminated Simpson, that Simpson may be terminated, and that Simpson is no longer a member of [the Debtor]'"); [Dismissal Reply, Doc. 188, pp. 5–6] ("[T]he Plan looks to bypass the outcome of the [Remand Order] by allowing Mr. Simpson to control the fate of the Debtor's assets and the subsidiaries it controls, even though such control is barred by the Existing [Interim] Orders."); [Adv. Pro. Dkt., Doc. 4, p. 16] (where Oak claims that "[t]his Chapter 11 Case is simply another improper attempt to avoid the [AREH Interim Order]"); [First

---

[49]      The uncertainty regarding Mr. Simpson authority over the Debtor is underscored by the existence of the Insurance Proceeding, an action brought by a disinterested third party seeking the determination of the fundamental question raised by the State Court Proceeding: the party properly in control of the Debtor.  [*See generally* Great American Complaint, Doc. 195, pp. 1–25].

Motion to Dismiss, Doc. 4, p. 4] (where Mr. Chassen argues that the Debtor's petition should be dismissed because "[t]he [Debtor's] Operating Agreement, together with the orders in the [State Court] Proceeding, leave no doubt that Mr. Simpson not only lacked authority to bring the Petition, but that this filing is in bad faith and in contempt of court").  The Plan thus could not be proposed "in good faith and not by any means forbidden by law" until a court (whether this Court, or Justice Cohen) has conclusively found that Mr. Simpson does in fact possess the authority to direct the affairs of the Debtor—authority that would include the ability to file a petition and propose a plan. [*See* Remand Order, Doc. 131, p. 27] ("[U]ntil questions relating to the Debtor's governance are answered under New York law, this bankruptcy cannot proceed."); *In re Pasta B. By Scotto II, LLC*, 2015 WL 7307246, at *3 (Bankr. S.D.N.Y. Nov. 19, 2015) ("[T]he Bankruptcy Code does not establish express rules relating to authority to file a voluntary petition for relief.  In order to determine authority to file, courts initially look to the state law governing the entity.").

Relatedly, Section 1129(a)(16) provides that a plan may only be confirmed if "[a]ll transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law."  The Plan in this case contemplates its funding "from amounts generated from the sale of certain or all" of the properties owned by Non-AREH Entities.[50]  [*See* Plan, Doc. 184, pp. 7–8, 13].  With respect to the Non-Creditor Assets, which are apparently "all or substantially all of the Debtor's [other] Assets," the Plan proposes their consolidation in the Debtor, ostensibly

---

[50]        As noted above, the Plan intends to fund its payment to creditors through the sale of "Non-Debtor Real Property Assets," which are apparently real properties directly owned by certain Non-AREH Entities.  [*Compare* Plan, Doc. 184, pp. 7–8, 13] (providing the address for each Non-Debtor Real Property Asset) [*with* Debtor Schedules, Doc. 31, p. 13] (using the same addresses and describing the Debtor's interest in each as being an "Indirect LLC Interest"); [*see also* First Day Affidavit, Doc. 16, pp. 8–10] (describing these same addresses as properties owned by Non-AREH Entities).

as a means of "maximiz[ing] [the] funds available to Creditors[51] and [Mr. Simpson]." *Id.* at pp. 7–8, 13, 25.

However, the propriety of these transfers—much like the propriety of the Plan—depends entirely upon whether Mr. Simpson possesses the legal right to direct the subsidiaries controlled by the Debtor.[52] On March 7, 2024 (the petition date) it was far from clear whether Mr. Simpson possessed this authority, as multiple parties (including Mr. Simpson) had spent *seven months* in state court litigating Mr. Simpson's continued membership in the Debtor. [*See* Remand Order, Doc. 131, p. 28] ("Mr. Simpson's state court complaint [filed in August of 2023] made several requests for relief, most (if not all) of which required a determination of the membership rights of Mr. Simpson and Mr. Chassen vis-à-vis the Debtor."); [*see also* Dismissal Reply, Doc. 188, pp. 5–6]; [Adv. Pro. Dkt., Doc. 4, p. 16]; [First Motion to Dismiss, Doc. 4, p. 4]. Seven months into this bankruptcy, it is still unclear whether Mr. Simpson possesses this authority. [*See* TRO Letter, Doc. 199] (asserting that the transfers contemplated by the Plan amount to "(1) breaches [of] Mr. Simpson's fiduciary duties to the various members of the[] [Portfolio Entities]; (2) [] fraudulent conveyance[s] under the New York's Uniform Voidable Transaction Act and (3) violat[ions] [of]

---

[51]     The Court notes again that the Plan defines "Creditors" as being:

    any Person who: (a) holds a Claim against the Debtor that arose prior to the Petition Date; (b) holds a Claim against the Debtor, which arose after the Petition Date, other than an Administrative Claim of the type specified in Bankruptcy Code section 503(b); or (c) holds a Claim against the Debtor of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

[*See* Plan, Doc. 184, p. 7]; *see also id.* at p. 14 (defining the term "Person"). Given that the Plan's sole source of funding is the "amounts generated from the sale of certain or all" of the properties owned by Non-AREH Entities, *see id.* at p. 7, it is unclear precisely which Creditors (if any) would benefit from the transfer of the Non-Creditor Assets contemplated by the Plan.

[52]     The transfer of the Portfolio Properties is, of course, presently impossible given the TRO recently issued by Justice Andrew Borrok on behalf of Justice Cohen, which enjoins both Mr. Simpson and YJ Simco from "transferring to [the Debtor] or to Simpson or any entity he owns or controls . . . the property, assets, and membership interests owned by" the Portfolio Entities. [*See* Doc. 199-1, p. 2].

the terms of the [Non-AREH Entities'] relevant Operating Agreements"); [Dismissal Reply, Doc. 188, p. 3] ("[T]he [P]lan relies upon the illegal transfer of interests of non-debtor subsidiaries to the Debtor and assets from subsidiaries for which the Debtor at this late hour has still not provided the information required by Bankruptcy Rule 2015.3.").

In summary, the Plan and the transfers it contemplates rest upon assumptions that: (i) were disputed by various parties throughout the course of the State Court Proceeding; and (ii) have thereafter been disputed before this Court from the outset of this case. Accordingly, *any* plan proposed solely at the direction of Mr. Simpson could not satisfy Sections 1129(a)(3) and 1129(a)(16) until the Debtor's governance—an issue first raised in, and central to, the State Court Proceeding—is determined. This necessarily means that, at the outset of this proceeding, there was "no reasonable possibility that the [D]ebtor [could] emerge from bankruptcy" which, in turn, compels a finding of bad faith. *In re Loco Realty Corp.*, 2009 WL 2883050, at *3 (Bankr. S.D.N.Y. June 25, 2009).

### d. <u>Section 1112(b)(2)</u>

Section 1112(b)(2) provides that a court may not convert or dismiss a case under Section 1112(b)(4) if:

> the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that . . . there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time . . . .

11 U.S.C. § 1112(b)(2)(A).[53]  Thus, upon a finding of "cause" under Section 1112(b)(4), the non-movant may nonetheless avoid dismissal or conversion by establishing that: (i) "unusual circumstances" exist such that "dismissal [or conversion] is not in the best interests of creditors and the estate;" and (ii) there is "a reasonable likelihood a plan will be confirmed acceptably soon." *Squires Motel, LLC v. Gance*, 426 B.R. 29, 35 (N.D.N.Y. 2010); *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 B.R. 418, 438 (Bankr. S.D.N.Y. 2022).

In this case, the Debtor argues that the exception provided by Section 1112(b)(2)(A) should prevent the dismissal of this bankruptcy.  [Debtor Objection, Doc. 185, pp. 8–9].  The Court disagrees.

First, Section 1112(b)(2) is, by its own terms, inapplicable where "cause" exists to dismiss or convert under Section 1112(b)(4)(A).  *See* 11 U.S.C. § 1112(b)(2)(B) (requiring the non-movant to establish that the "grounds for converting or dismissing the case include an act or omission of the debtor *other* than under paragraph (4)(A)") (emphasis added); *see also* 11 U.S.C. § 1112(b)(4)(A) (providing that "cause" exists where there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"); *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 B.R. 418, 438–39 (Bankr. S.D.N.Y. 2022) (collecting cases finding that Section 1112(b)(2) is "limited to cases where the 'grounds for

---

[53]     The "reasonable period of time" requirement is inapplicable where a debtor qualifies as a "small business debtor."  *See* 11 U.S.C. § 1112(b)(2)(A) (imposing the timeframes provided by 11 U.S.C. §§ 1121(e) and 1129(e) in "small business" case); *see also* 11 U.S.C. § 101(51D) (defining a "small business debtor" as being a debtor with "aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,024,725").

The Court notes that the Debtor's Plan is titled *Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Small Business Debtor JJ Arch*.  [Plan, Doc. 184, p. 1].  The Debtor's Petition, however, does not designate the Debtor as being a "small business debtor" within the meaning of the Bankruptcy Code.  [*See* Petition, Doc. 124, p. 2].  The Court will thus consider Section 1112(b)(2)(A) without reference to the timeframes applicable to a "small business debtor."

converting' are 'other than under paragraph (4)(A)'"); *accord*, *In re Herb Philipson's Army*, 2019 WL 11031654, at *5–6 (Bankr. N.D.N.Y. Dec. 19, 2019) ("The exception to conversion under § 1112(b)(2) . . . is inapplicable here because the [movants] seek conversion based on the ground enumerated in § 1112(b)(4)(A)."). As explained above, at least "[t]hree aspects of this case indicate that 'cause' exists under Section 1112(b)(4)(A)." *See supra*, Part IV(a) (discussing, *inter alia*, the Debtor's inability to generate revenue, the Debtor's excessive accrual of administrative expenses, and the lack of a "reasonable likelihood of rehabilitation"). Section 1112(b)(2) is thus inapposite.

Additionally, the Court finds that the second requirement of Section 1112(b)(2)—that there is a "reasonable likelihood" that a plan will be confirmed "within a reasonable period of time"— is unmet here. The Court has already concluded that "[a] plan proposed [by the Debtor] at the direction of Mr. Simpson [] could never satisfy Sections 1129(a)(3) and 1129(a)(16)" until issues relating to the governance of the Debtor are resolved. *See supra*, Part IV(c)(ii). As is clear from the record, all parties to this case (including the Debtor) believe those issues logically precede the further prosecution of this bankruptcy, notwithstanding the fact that the issues raised in the State Court Proceeding likely warrant extensive discovery. [*See* Doc. 50, p. 1] (where, in a letter to the Court dated March 27, 2024, Mr. Chassen, AREH *and the Debtor* "agree[] to adjourn the [First Motion to Dismiss] pending the Court's determination of the Stay Relief Motions, so that the Court and all parties may collectively preserve resources that would otherwise be expended in a *contentious discovery process . . . .*") (emphasis added); [*see also* Doc. 25, p. 30] (where, at the hearing held May 2, 2024, proposed Debtor's counsel agrees that reorganization "will be virtually impossible because [the Debtor] can't move forward with anything until the questions [raised by the State Court Proceeding] are dealt with"); [Doc. 85, p. 17] (where the Debtor maintains that "the history of this Chapter 11 Case makes clear that resolution of the Dismissal Issues, and related

44

[] discovery to permit such resolution, is necessary"); [Doc. 95, p. 2] (where, in a status report

dated April 25, 2024, the former Subchapter V Trustee recommends that "issues of governance

and control [] be completely resolved" before the bankruptcy proceeds); [Remand Order, Doc.

131, p. 23] (where the Court holds that "any potential delay in the bankruptcy [is] unavoidable

given the posture of this case"). The Court also observes that the Plan suffers from certain arguable

deficiencies, the disposition of which would undoubtedly require an extended (and likely

contentious) resolution process.[54] For these reasons, the Court finds that the Debtor has failed to

establish that that there is a "reasonable likelihood" that a plan will be confirmed "within a

reasonable period of time" within the meaning of Section 1112(b)(2) of the Bankruptcy Code.

---

[54]    The Court notes again that any transfer of the Non-Creditor Assets contemplated by the Plan would be
presently impossible given the TRO recently issued on behalf of Justice Cohen, which enjoins both Mr. Simpson and
YJ Simco from "transferring to [the Debtor] or to Simpson or any entity he owns or controls . . . the property,
asserts, and membership interests owned by" the Portfolio Entities. [*See* Doc. 199-1, p. 2] (setting the hearing to
consider the extension of the TRO for October 25, 2024); [*see also* Doc. 199-2] (the Memorandum of Law filed
before Justice Cohen in support of the TRO, which also seeks a preliminary injunction). The Court finds it
concerning that, at confirmation, it would be unclear whether the Debtor could effectuate a consolidation that is
apparently central to the Plan. [*See* Plan, Doc. 184, pp. 7–8, 16–18]; *see also id.* at p. 13, 20 ("Following the
Effective Date . . . the Reorganized Debtor will distribute the remainder of its assets to [Mr. Simpson] or his
nominee. Such interest will include the various interest [sic] in the Portfolio Project Entities.").

Additionally, the Court observes that the Plan does not contemplate the payment of two disputed prepetition claims
against the Debtor:

(i)      the "approximately $32,576,245 in potential contingent [tax] liabilities owed by the Debtor," which the
         Plan acknowledges but does not classify or otherwise address, *see* [Plan, Doc. 184, p. 21]; and

(ii)     the claims brought against the Debtor by Oak in the State Court Proceeding, which—though ignored
         by the Plan—nonetheless request money damages for the acts of the Debtor occurring at the direction
         of Mr. Simpson, [*see* Lift Stay Order, Doc. 132, pp. 15–16] (listing those claims); [*but see* Plan, Doc.
         184, pp. 11, 15, 35] (identifying the claims asserted in the State Court Proceeding on behalf of the
         Debtor as Non-Creditor Assets).

Assuming that these claims are ultimately filed against the estate, the Court believes that their allowance
proceedings would likely demand a time- and resource-intensive allowance process, the expense of which is
unjustifiable given the liquidity concerns outlined *supra*, Part VI(a)–(b). [*See* Doc. 203, p. 3] (where the Debtor
argues that "[w]ithout [mediation], the parties will remain at loggerheads, continue to litigate these issues *without
end* and at an *incredible cost and potential harm to the estate* as well as all interested parties") (emphasis added).

Accordingly, even if Section 1112(b)(4)(A) were inapplicable, the Court would nevertheless find that dismissal is appropriate.

**e.   The Pending Adversary Proceedings**

As described above, the Debtor has removed and initiated several adversary proceedings (collectively, the "Adversary Proceedings") in connection with this bankruptcy. *See supra*, Part II (discussing commencement of the Consent Proceeding and the removal of the State Court Proceeding and the Insurance Proceeding).

In the Second Circuit, the "general rule" is that "related proceedings ordinarily should be dismissed following the termination of the underlying bankruptcy case." *In re Zarour*, 2023 WL 315303, at *4 (S.D.N.Y. Jan. 19, 2023), *appeal dismissed* (May 30, 2023) (citing *In re Porges*, 44 F.3d 159, 162 (2d Cir. 1995)).   Dismissal of related proceedings is a matter committed to a bankruptcy court's discretion, but the post-dismissal retention of related proceedings is a power that should be used "sparingly." *See id.*; *W. Vernon Energy Corp. v. Daniels,* 2006 WL 1982772, at *3 (S.D.N.Y. June 19, 2006) ("[B]ecause federal jurisdiction is limited and cannot be manufactured, a bankruptcy court ought to exercise its discretion to retain an adversary proceeding after dismissal of a bankruptcy sparingly.").   When considering whether to retain jurisdiction, "a court is to consider four facts—namely, judicial economy, convenience to the parties, fairness and comity." *In re Millenium Seacarriers, Inc.*, 458 F.3d 92, 96 (2d Cir. 2006) (internal quotations omitted).

While the first two factors are neutral,[55] fairness and comity weigh heavily in favor of dismissal. The only connection the adversary proceedings have with this Court is the bankruptcy which, as explained above, was commenced in "subjective bad faith" without a "reasonable prospect of reorganization . . . ." *See supra*, Part IV(c). Moreover, each Proceeding raises exclusively non-bankruptcy issues,[56] all of which have a considerable overlap with the issues raised within the context of the State Court Ligation—a proceeding that this Court has already found should be decided in another forum. [*See generally* Remand Order, Doc. 131]; [Lift Stay Order, Doc. 132]. All three Proceedings were thus brought before this Court by a purported principal of the Debtor motived by a non-bankruptcy purpose. *See In re Boyce*, 2015 WL 9126085, at *4 (Bankr. E.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Boyce v. Citibank, N.A.,* 2017 WL 87066 (E.D.N.Y. Jan. 10, 2017*), aff'd sub nom. In re Boyce*, 710 F. App'x 44 (2d Cir. 2018) (finding that parties "should not be allowed to utilize th[at] [c]ourt's jurisdiction . . . to circumvent" prior state court litigation). For this reason, the Adversary Proceedings should not remain before this Court following the dismissal of this bankruptcy.

---

[55]     Judicial economy is neutral—the State Court Proceeding spent months before Justice Cohen, and the Insurance Proceeding and the Consent Proceeding have only been before this Court for a matter of weeks. *See In re AOG Ent., Inc*., 569 B.R. 563, 573 (Bankr. S.D.N.Y. 2017).(providing that, consistent with principles of federalism and comity, a federal court must "presume that a state court will operate efficiently and effectively").

Convenience to the parties is likewise neutral, as all Proceedings were initiated in the state of New York (and both the Insurance Proceeding and the State Court Proceeding were initiated before Justice Cohen). [*See generally* Adv. Pro. Dkt., Doc. 1].; [Great American Complaint, Doc. 195]; [Consent Complaint, Doc. 192].

[56]     The Court has already found that the questions asked by the State Court Proceeding "arise exclusively under New York law" and "do not raise issues unique to bankruptcy." [*See generally* Adv. Pro. Dkt., Doc. 1]; [Remand Order, Doc. 131, p. 22].

The Court observes that that the same is true with respect to both the Insurance Proceeding and the Consent Proceeding—indeed, neither complaint cites to the Bankruptcy Code. [*See generally* Great American Complaint, Doc. 195]; [Consent Complaint, Doc. 192].

### <u>Conclusion</u>

Based upon the above analysis, the Court concludes that:

(i)     cause to dismiss this case exists under 11 U.S.C. §§ 1112(b)(4)(A)–(B) and 1112(b)(4)(F);

(ii)    this case should be dismissed for bad faith;

(iii)   the exception to dismissal provided by 11 U.S.C. § 1112(b)(2) is inapplicable to this case; and

(iv)    each adversary proceeding associated with this bankruptcy should be dismissed.

For these reasons, the Dismissal Motion is GRANTED.

**IT IS SO ORDERED.**

Dated: <u>October 11, 2024</u>
New York, New York

<u>/S/ John P. Mastando III</u>
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE